## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD EXHIBITIONS, LLC,** | § | **CASE NO. 19-50900-CAG** |
| | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **RANDOLPH N. OSHEROW, Chapter 7 Trustee, and the Bankruptcy Estates of Legendary Field Exhibits, LLC; AAF Players, LLC; AAF Properties, LLC; Ebersol Sports Media Group, Inc.; LLF 2, LLC; and We Are Realtime, LLC,** | § | |
| | § | |
| Plaintiffs, | § | **Adversary No. 22-05078-CAG-7** |
| | § | |
| v. | § | |
| | § | |
| **THOMAS DUNDON; JOHN ZUTTER; and DUNDON CAPITAL PARTNERS, LLC,** | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' MOTION FOR
## SUMMARY JUDGMENT AND BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................4

SUMMARY OF ARGUMENT ............................................................................9

SUMMARY JUDGMENT EVIDENCE ...............................................................10

BACKGROUND ...............................................................................................10

ARGUMENT AND AUTHORITIES...................................................................13

A. Dundon and the league never agreed to an investment of $250 million. .......................... 13

    1. The Trustee cannot establish a meeting of the minds as to the essential terms of the alleged oral agreement. ........................................................................... 14

    2. The alleged oral contract is an unenforceable "agreement to agree."......................... 23

    3. Any prior negotiations merged into the Term Sheet................................... 24

    4. The Term Sheet is an integrated writing as to the key terms of the parties' agreement. ............................................................................................... 26

B. DCP did not breach the Term Sheet because DCP fulfilled every funding request from the league................................................................................................... 28

C. The Trustee cannot enforce a rejected agreement. ............................................. 31

D. Benefit of the bargain damages are not available for a promissory estoppel claim. .......... 31

    1. The Trustee cannot recover benefit of the bargain damages for a promissory estoppel claim........................................................................................... 32

    2. Any alleged reliance was not reasonable or justified as a matter of law. .................. 32

E. The Trustee cannot establish a claim for breach of the covenant of good faith and fair dealing against Dundon or DCP. ...................................................................... 35

    1. The Trustee cannot establish a "special relationship" between Dundon and the Debtors. ................................................................................................ 35

F. Negligent misrepresentation does not apply in this case.................................... 37

G. The Trustee cannot prove fraud because the Term Sheet negates justifiable reliance. .................................................................................................................39

H. ESMG waived its fiduciary duty claims based on the duty of care. .................................41

I. The Trustee cannot prevail on his breach of fiduciary duty claim based on contractual duties................................................................................................42

J.    The Trustee's fiduciary duty claims based on loyalty do not relate to a discrete transaction. .................................................................................................................43

K.   The Court should grant summary judgment on the unjust enrichment claim. ...................45

L.   The economic loss rule bars the Trustee's tort claims. .......................................................45

CERTIFICATE OF SERVICE .................................................................................................48

# TABLE OF AUTHORITIES

**CASES**                                                             **PAGE**

*Allied Vista, Inc. v. Holt*,
  987 S.W.2d 138 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ................................33

*Am. Healthcare Admin. Servs v. Aizen*,
  285 A.3d 461 (Del. Ch. 2022)37.......................................................................................37

*Arnold v. National Cty. Mut. Fire Ins. Co.*,
  725 S.W.2d 165 (Tex. 1987)...............................................................................................35

*Barrow-Shaver Res. Co. v. Carriso Oil & Gas, Inc.*,
  590 S.W.3d 471 (Tex. 2019)............................................................................34, 35, 40, 41

*Baxso, LLC v. Roxo Energy Co., LLC*
  668 S.W.3d 912 (Tex. App.—Eastland 2023, pet. filed)................................................33, 39

*Bechtel Corp. v. CITGO Prods. Pipeline Co.*,
  271 S.W.3d 898 (Tex. App.—Austin 2008, no pet.) ...........................................................32

*Burlington N. R. Co. v. Sw. Elec. Power Co.*,
  925 S.W.2d 92 (Tex. App. — Texarkana 1996), *aff'd sub nom. Sw. Elec.*
  *Power Co. v. Burlington N. R.R. Co*., 966 S.W.2d 467 (Tex. 1998) ...............................45, 47

*Carr v. Weiss*,
  984 S.W.2d 753 (Tex. App.—Amarillo 1999, pet. denied)...................................................27

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993) ...................................................................................................42

*City of Beaumont v. Excavators & Constructors, Inc.*,
  870 S.W.2d 123 (Tex. App.—Beaumont 1993, writ denied) ................................................32

*Coe v. Chesapeake Expl., L.L.C.*,
  695 F.3d 311 (5th Cir. 2012) ..............................................................................................14

*Davis v. Tx. Farm Bureau Ins.*,
  470 S.W.3d 97 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ...........................................31

*Dorta v. Rave*,
  No. 09-12-00376-CV, 2014 WL 69564 (Tex. App.—Beaumont Jan. 9, 2014,
  no pet.) ..............................................................................................................................25

*DSA, Inc. v. Hillsboro Indep. Sch. Dist.*,
  973 S.W.2d 662 (Tex. 1998)...............................................................................................39

**CASES** (continued)                                                    **PAGE**

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*,
   No. CV 2017-0500-JRS, 2018 WL 2727542 (Del. Ch. June 6, 2018) ....................................42

*English v. Fischer*,
   660 S.W.2d 521 (Tex. 1983)..................................................................................................36

*EZLinks Golf, LLC v. PCMS Datafit, Inc.*,
   No. CVN16C07080PRWCCLD, 2017 WL 1312209 (Del. Super. Ct. Mar. 13,
   2017) ......................................................................................................................................46

*Farah v. Mafrige & Kormanik, P.C.*,
   927 S.W.2d 663 (Tex. App. — Houston [1st Dist.] 1996, no writ).........................................19

*Farone v. Bag'n Baggage, Ltd.*,
   165 S.W.3d 795 (Tex. App. — Eastland 2005, no pet.) ....................................................19, 20

*Fastracked Executive, LLC v. Prevost Car (US), Inc.*,
   No. 01-20-00735-CV, 2022 WL 2068817 (Tex. App.—Houston [1st Dist.]
   June 9, 2022, no pet.).............................................................................................................25

*In re Fedders N. Am., Inc.*,
   405 B.R. 527 (Bankr. D. Del. 2009) ......................................................................................42

*Federal Land Bank Ass'n v. Sloane*,
   825 S.W.2d 439 (Tex. 1991)...................................................................................................38

*Fischer v. CTMI, L.L.C.*,
   479 S.W.3d 231 (Tex. 2016)........................................................................................16, 23, 24

*FrostCrushed Stone Co. v. Odell Geer Cons. Co.*,
   110 S.W.3d 41 (Tex. App.—Waco 2002, no pet.)..................................................................31

*Gillum v. Republic Health Corp.*,
   778 S.W.2d 558 (Tex. App.—Dallas 1989, no writ) .............................................................33

*Gilmartin v. KVTV-Channel 13*,
   985 S.W.2d 553 (Tex. App.—San Antonio 1998, no pet.).................................................31, 39

*Glaxo Group Ltd. v. DRIT LP*,
   248 A.3d 911 (Del. 2021) .......................................................................................................37

*Heritage Constructors, Inc. v. Chrietzberg Elec., Inc.*,
   No. 06-14-00048-CV, 2015 WL 3378377 (Tex. App.—Texarkana March 4,
   2015, no pet.) .........................................................................................................................32

**CASES** (continued)                                                                **PAGE**

*Houston Area Safety Council, Inc. v. Mendez*,
671 S.W.3d 580 (Tex. 2023)................................................................38

*Ibe v. Jones*,
836 F.3d 516 (5th Cir. 2016) ........................................................13, 45

*JP Morgan Chase Bank, N.A. v. Orca Assets G.P., LLC.*,
546 S.W.3d 648 (Tex. 2018)........................................................35, 40

*King v. Baylor Univ.*,
46 F.4th 344 (5th Cir. 2022) ..............................................................45

*Krayem v. USRP (PAC), L.P.*,
194 S.W.3d 91 (Tex. App.—Dallas 2006, pet. denied)........................31

*LAN/STV v. Martin K. Eby Constr. Co., Inc.*,
435 S.W.3d 234 (Tex. 2014)................................................................38

*Mercedes-Benz USA, LLC v. Carduco, Inc.*,
583 S.W.3d 553 (Tex. 2019)........................................35, 39, 40, 41

*Mikob Properties, Inc. v. Joachim*,
468 S.W.3d 587 (Tex. App.—Dallas 2015, pet. denied).....33, 35, 39, 41

*Miller v. Trimont Global Real Estate Advisors, LLC*,
587 F. Supp. 3d 170 (D. Del. 2022)....................................................29

*Nationsbank v. Perry Bros. Inc.*,
68 F.3d 466 (5th Cir. 1995) ................................................................36

*Pine v. Gibraltar Sav. Ass'n*,
519 S.W.2d 238 (Tex. App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.)............................19

*Playoff Corp. v. Blackwell*,
300 S.W.3d 451 (Tex. App.—Fort Worth 2009, pet. denied) ................19

*Prime Prods v. S.S.I. Plastics*,
97 S.W.3d 631 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ............36

*Prince v. Weleba*,
No. 02-23-00085-CV, 2023 WL 6476009 (Tex. App.—Fort Worth Oct. 5,
2023, no pet.), 265*Principal Life Ins. Co. v. Revalen Dev., LLC*,
358 S.W.3d 451 (Tex. App. — Dallas 2012, pet. denied)........................14

**CASES** (continued)            **PAGE**

*RDA Prof'l Beauty Supply Inc. v. Clay*,
No. 12-23-00050-CV, 2023 WL 8658711 (Tex. App.—Tyler Dec. 14, 2023,
no pet.) .........................................................................................................................23

*Reed v. Carecentric Nat'l, LLC* (*In re Soporex, Inc.*),
446 B.R. 750 (Bankr. N.D. Tex. 2011)....................................................................13

*Roark v. Stallworth Oil & Gas, Inc.*,
813 S.W.2d 492 (Tex. 1991) (Gonzalez, J., dissenting) .........................................21

*Schlumberger Tech. Corp. v. Swanson*,
959 S.W.2d 171 (Tex. 1997)..............................................................................36, 37

*Southwestern Bell Tel. Co. v. DeLanney*,
809 S.W.2d 493 (Tex. 1991)....................................................................................45

*Spangler v. Liss*,
No. 14-22-00144-CV, 2024 WL 1207300 (Tex. App.—Houston [14th Dist.]
Mar. 21, 2024, no pet.)..............................................................................................25

*In re Sun Runner Marine, Inc.*,
945 F.2d 1089 (9th Cir. 1991) ...........................................................................22, 31

*T.O. Stanley Boot Co., Inc. v. Bank of El Paso*,
847 S.W.2d 218 (Tex. 1992)........................................................................13, 14, 18

*Texas Gas Utils. Co. v. Barrett*,
460 S.W.2d 409 (Tex. 1970).....................................................................................21

*TL of Fla., Inc. v. Terex Corp.*,
54 F. Supp. 3d 320 (D. Del. 2014)............................................................................37

*Transcon. Realty Inv'rs, Inc. v. John T. Lupton Tr.*,
286 S.W.3d 635 (Tex. App.—Dallas 2009, no pet.)...........................................25, 26

*UMLIC VP LLC v. T&M Sales & Environ. Servs., Inc.*,
176 S.W.3d 595 (Tex. App. — Corpus Christi 2005, pet. denied)............................36

*Wheeler v. White*,
398 S.W.2d 93 (Tex. 1965)........................................................................................32

*Whitestone REIT Operating P'ship, L.P. v. Pillarstone Capital REIT*,
No. 2022-0607-LWW, 2024 WL 274228 (Del. Ch. Jan. 25, 2024) .........................37

*In re Xtreme Power Inc.*,
563 B.R. 614 (Bankr. W.D. Tex. 2016).............................................................43, 44

**CASES** (continued)                                                                                                    **PAGE**

*Yasuda Fire & Marine Ins. Co. of Am. v. Criaco*,
    225 S.W.3d 894 (Tex. App.—Houston [14th Dist.] 2007, no pet.)..........................................24

**STATUES AND RULES**

8 DEL. C. § 102....................................................................................................................42

11 U.S.C. § 365............................................................................................................22, 31

FED. R. BANKR. P. 7056 ......................................................................................................13

FED. R. CIV. P. 56(a) ..........................................................................................................13

**OTHER AUTHORITIES**

3 COLLIER'S ON BANKRUPTCY § 365.07[2] (16th ed. 2023) ..............................................22

OXFORD ENGLISH DICTIONARY, Vol. 5 (1978) ..................................................................22

RESTATEMENT (SECOND) OF CONTRACTS (1981)

    Section 213....................................................................................................................26
    Section 235....................................................................................................................29

RESTATEMENT (SECOND) OF TORTS § 552(1) (1977) .......................................................38

RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 5(5) (2020).....................38

RESTATEMENT (THIRD) RESTITUTION AND UNJUST ENRICHMENT § 31 cmt. i (2011)...................45

WEBSTER'S NEW COLLEGIATE DICTIONARY (1981)..........................................................22

## SUMMARY OF ARGUMENT

1.      This lawsuit stems from the bankruptcy of the now defunct Alliance of American Football League ("AAF") operated by the Debtors. Defendant Dundon tried to save the league from financial collapse by entering a written agreement by which DCP would invest up to "a maximum cumulative commitment of $70 million" into league operations in exchange for control of the league's parent entity. DCP's $70 million investment was not enough to save the league, which ultimately filed bankruptcy. In this case, the Trustee seeks to force Dundon and his partner Zutter, as well as DCP, to pay an additional $180 million to pay off creditors, most of which existed prior to DCP signing the agreement with the league.

2.      The Trustee bases his claim for $180 million in damages on an alleged oral agreement Dundon made to invest $250 million in the league.  The alleged oral agreement contradicts the written agreement the league signed with DCP pursuant to which DCP invested $70 million into the league.  Not only that, Charlie Ebersol, the person with whom the Trustee claims Dundon made the $250 million oral agreement, lacked the authority to make the agreement without board or shareholder approval, and he never sought or obtained those approvals.  The Court should not enforce the alleged oral agreement because the balance of the alleged $250 million investment ($180 million after DCP's $70 million investment) was to be invested for a to-be-determined consideration through a to-be-determined combination of equity and debt (a loan) to be funded at a to-be-determined time after the league finished its first season.  Because no one knows what the equity/debt combination would have been, what consideration Dundon would have received, or any of the other details of the proposed transaction, the alleged agreement is too uncertain to be enforced.  The Court should grant judgment for DCP and Dundon on the contract

claims because the Trustee cannot prove them as a matter of law and on the Trustee's other claims for the reasons set out below.

## SUMMARY JUDGMENT EVIDENCE

3.      This Motion is supported the allegations in the Trustee's First Amended Complaint [ECF 56] and the testimony of witnesses involved in the events at issue, including Ebersol and Dundon.  Exs. 6, 9.  Ebersol and Dundon both testified about DCP's investment in the AAF and press reports of a $250 million commitment from Dundon.  Exs. 6, 9.  Dawn Belt, an experienced corporate lawyer specializing in startups and venture financing, represented the league during the events at issue; she testified about a number of corporate documents in the exhibits.  Ex. 8 at 2 (8:5-7, 8:12-13), 3 (9:10-17), 4-5 (10:24-11:1), 5 (11:11-15).   Other witnesses include Kevin Freedman, the league's COO and head of operations (Ex. 7), Kevin Farrell, another league employee (Ex. 10), Jeff Vanderbilt, an employee of DCP, who dealt with ESMG (Ex. 11), and John Zutter, a defendant in this case who served on the board of ESMG after the DCP Term Sheet (Ex. 12).

## BACKGROUND

4.      Charles Ebersol and others co-founded Ebersol Sports Media Group, Inc. ("ESMG") in 2017.  ECF 56 at 6 ¶ 23.

5.      ESMG owned and operated the AAF and its subsidiaries, each of which are debtors in this action.  *Id.* ¶ 24.

6.      The AAF provided a professional spring football league option in the United States. *Id.* ¶ 22.  The league planned to operate its season between the weekends following the Super Bowl in February through the NFL draft in April.  *Id.* at 9 ¶ 30.

7.      On February 9, 2019, the AAF debuted with its first week of scheduled games, but when its initial funding source failed to honor commitments, the AAF lacked the funds to pay the players for the first week of play. *Id.* at 13 ¶ 46.

8.      The initial significant funding commitment had come from Reggie Fowler. *Id.* at 4 ¶ 16. He had signed a "Term Sheet for Series 1 Preferred Stock Financing." Ex. 4. The Fowler Term Sheet called for an initial equity investment of $50 million. Ex. 4 at 1. ESMG committed to creating and issuing to Fowler (or one of his entities) Series 1 Preferred Stock. Ex. 4 at 1. The Fowler Term Sheet specified features of the Series 1 Preferred Stock, including protective provisions, liquidation preferences, conversion rights, and similar characteristics of stock issued as a result of an equity investment like the one Fowler made (and like the DCP Term Sheet). Ex. 4; Ex. 8 at 9 (22:11-24), 10 (23:1–24:15). The Term Sheet separately called for a line of credit in the amount of $120 million, which allowed ESMG to borrow funds in $15 million increments conditioned on specific requirements for ESMG to draw on the line—*e.g.*, ESMG would be required to set up a finance committee, provide budgets, and perform within those budgets in order to trigger Fowler's obligation to fund the credit line. Ex. 4 at 2-3. The Fowler Term Sheet also specified repayment terms for the line of credit. Ex. 4 at 1-2.

9.      In early February, Fowler's funding of the league became erratic. ECF 56 at 12-13 ¶ 43. Ebersol realized that he needed a new funding source. *Id.* at 13 ¶¶ 46-47.¶

10.     Three days before he was introduced to Dundon, Ebersol approached a potential investor, representing "I need $10M to get through the next two weeks and an additional $60 M [for a total of $70 million] to get through the end of the season." Ex. 19 at 1. Ebersol also discussed obtaining a $100 million credit facility with another potential investor. *Id.* at 14 ¶ 50. That investor then introduced Ebersol to Dundon. *Id.* ¶ 52.

11.     Some of the details (who said what to whom) of how DCP became an investor in the league after Dundon's initial call with Ebersol are disputed.  Ebersol claims he and Dundon reached an oral agreement for a $250 million investment.  Ex. 6 at 9 (306:7-15), 6 (257:17-21).  Dundon denies a deal for $250 million but agrees that DCP made a written agreement (Ex. 1) for a $70 million investment.  Ex. 9 at 9 (167:7-19).  Dundon testified that statements to the press about a potential $250 million investment were marketing.  *Id*.  Subsequent press reports clarify that the commitment to invest $250 million was contingent on factors that included the league's viability, among other things.  Exs. 13, 14.

12.     Despite the above, the facts that compel summary judgment are not disputed.  Specifically, as set out below, the documents signed and approved show that DCP and ESMG had one agreement for a $70 million investment, and any discussion of a $250 million investment (through equity or a loan) never proceeded past a discussion.

13.     On February 14, 2019, DCP and ESMG agreed to a "Binding Term Sheet" by which DCP received two voting board seats and 75% of the fully diluted preferred stock of ESMG in exchange for DCP transferring to ESMG an initial cash injection of $5.1 million designed to cover imminent payroll and ESMG's right to make equity funding requests up to a maximum cumulative amount of $70 million through June 30, 2019.  Ex. 1.  DCP funded the $5.1 million initial cash injection the same day.  Ex. 6 at 14 (9:7-13).

14.     Following DCP's initial investment and continuing for the following eight weeks, DCP met with league leadership in Dallas to determine how to salvage the league.  Ex. 6 at 14 (9:15-19); Ex. 7 at 5 (126:11-15, 24-25), 6 (127:1-23), 7 (170:16-23); Ex. 10 at 4 (34:12-18), 5 (55:9-20), 6 (109:15-23).

15.     Despite DCP's best efforts to salvage the league, the league's debts became insurmountable, and DCP's $70 million was exhausted before the end of the season. Ex. 12 at 3-4 (305:19–306:19).  With no additional revenue sources or other capital to pay for the league to operate through the rest of the season, DCP's investment was drained by week 8.  Ex. 12 at 5 (307:12-23); Ex. 9 at 6-7 (130:16–131:3), 12-13 (255:15–256:11).

16.     At that point, the league ceased operations and filed bankruptcy because it lacked the cash to continue operations.  Ex. 12 at 3 (305:8-11).

## ARGUMENT AND AUTHORITIES

A court should grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056 (incorporating Rule 56 by reference in adversary proceedings).

**Governing law.**  As a preliminary matter, Delaware law governs Count Two — breach of the term sheet — and part of Count Three — good faith and fair dealing against DCP — because the term sheet contains a choice of law clause that selects Delaware law. Ex. 1 at 3.  Delaware law governs the statutory breach of fiduciary duty claims because ESMG is a Delaware corporation. Ex. 3.  Texas substantive law governs the remaining claims because the events complained of occurred in Texas and Texas has the most significant relationship to the transactions at issue.  *See Reed v. Carecentric Nat'l, LLC* (*In re Soporex, Inc.*), 446 B.R. 750, 760–70 (Bankr. N.D. Tex. 2011) (discussing choice of law analysis in adversary proceeding context and noting that both Federal and Texas choice of law rules apply a most significant relationship test).

## A.     Dundon and the league never agreed to an investment of $250 million.

A court cannot enforce a contract unless its terms are sufficiently definite that a court can understand what the promisor undertook.  *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847

S.W.2d 218, 221 (Tex. 1992). Formation of a contract requires proof of an offer and acceptance and a meeting of the minds on all essential elements. *See Ibe v. Jones*, 836 F.3d 516, 524 (5th Cir. 2016). The term "meeting of the minds" refers to the parties mutual understanding and assent to the expression of their agreement. *Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 454–55 (Tex. App. — Dallas 2012, pet. denied). The parties must agree on the same thing, in the same sense, at the same time. *See id.*

The parties must agree on the material terms of a contract before a court can enforce it. *Id.* Where parties leave an essential term open for future negotiation, they will not have formed a binding contract. *Id.* "Whether an agreement fails for indefiniteness is a question of law." *Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012).

The oral contract claim fails as a matter of law because there was no contract for anything other than the agreement set forth in the DCP Term Sheet. *See* ECF 56 at 40 ¶ 141–42. For an offer to be capable of forming a contract upon acceptance, the offer must be reasonably definite in its terms and must sufficiently cover the essentials of the proposed transaction such that, with an expression of assent, there will be a complete and definite agreement on all essential details. *Principal Life Ins. Co.*, 358 S.W.3d at 454–55. Courts consider each contract separately to determine its material terms. *T.O. Stanley Boot Co., Inc.*, 847 S.W.2d at 221.

1. **The Trustee cannot establish a meeting of the minds as to the essential terms of the alleged oral agreement.**

The summary judgment evidence conclusively establishes that the alleged oral agreement between Dundon and Ebersol did not contain essential terms. Ebersol, who allegedly negotiated the purported oral contract on behalf of ESMG, testified that the agreement was formed on the morning of February 14, 2019, and that the parties agreed only to the following terms:

Q. To the best of your recollection, can you please state all of the terms of that agreement?

A. Tom Dundon agreed to invest 250 million dollars for majority of Ebersol Sports Media Group and its subsidiaries total control of the board, and I believe that's it.

Ex. 6 at 9 (306:7-15).

Ebersol confirmed that he and Dundon did not agree whether the structure of the $250 million investment would take the form of equity or debt:

Q: Okay. So in your conversation with Mr. Dundon the -- let's get the deal done for $250 million the actual structure of what that would be whether debt or equity was not agreed to, correct?

A: That is correct.

Ex. 6 at 6 (257:17-21).

Even the Trustee admits in his complaint that the parties kept "as an open item" the "form the funding would take (debt, equity, or some combination)." ECF 56 at 18-19 ¶ 65. The parties never finalized any funding commitment agreement—absent that contained in the Term Sheet— concerning (a) the parties to the agreement (which Dundon-affiliated entity or entities would invest in the league); (b) the timeframe during which the alleged $250 million would be invested, (c) the mechanisms, requirements, and conditions for drawing on the funding commitment; (d) whether the investment would take the form of equity or debt or both; (e) if equity, the price per share, quantity of shares, or any mechanism for valuing the shares, the features of the shares (*e.g.*, protective provisions, conversion rights, or whether the league would be issuing a new category of shares or extending the offering of a previous shares); and (f) if debt, the interest rate, maturity date, payment schedule, conditions to fund (*e.g.*, performance in line with the budget), or any other terms of debt repayment.

Texas courts have held that material and essential terms are those that parties would reasonably regard as "vitally important ingredient[s]" of their bargain. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). The Fowler Term Sheet and the DCP Term Sheet demonstrate a deliberate intention by ESMG to structure financing deals to address the terms an investor in the league would be expected to agree on. Exs. 1, 4. Both term sheets identify the parties to the investments, the time frame within which the investments would be made, and the specific procedures and prerequisites for ESMG requesting a disbursement of investment funds (or to borrow funds in the case of the Fowler line of credit). The DCP Term Sheet dictates that the investment would take the form of equity; the Fowler Term Sheet calls for equity and debt in the form of a line of credit. Both term sheets specify the features of the shares (the equity) by providing the details of a liquidation preference, preferential distributions, conversion rights, and anti-dilution. Ex. 1, 4. In the case of the debt component of the Fowler Term Sheet, the parties agreed on repayment terms and conditions to funding (*e.g.*, creation of a finance committee, preparation of budgets, performance consistent with the budget, review sharing, and other terms). Ex. 4 at 3.

By comparison, the naked oral agreement that consists of a total amount and nothing else demonstrates that neither Dundon nor Ebersol intended the discussion of $250 million to bind anyone to a deal. The oral agreement addresses none of the topics labeled (a) through (f) above, except the total amount. The lack of agreement as to those material terms negates the formation of an enforceable oral contract.

Besides the details of the transactions themselves, the circumstances show that the deal Ebersol struck with DCP is set out in the Term Sheet and that no other agreement existed. To begin with, the Term Sheet was a material transaction that needed approval from the ESMG board. Ex. 8 at 21-22 (58:24–59:8). Ebersol sought and obtained board approval for the DCP Term Sheet

10 days after signing it. Ex. 5 at 11-12; Ex. 8 at 14 (49:3-11, 18-22), 19 (55:4-8), 20 (56:1-15). At that time, the league had already received and accepted $12 million in funding from DCP under the DCP Term Sheet. Ex. 8 at 23-24 (62:24–63:16). The minutes of the board meeting reflect that, at that time (February 24, 2019), the board believed the DCP Term Sheet providing for a maximum cumulative investment of $70 million in exchange for 75% ownership in the league and control of the board was in the "advisable and in the best interest" of ESMG. Ex. 8 at 24 (63:17–64:15). At the same time, the board approved the transfer of 75% of the shares of ESMG to DCP if the conditions of the DCP Term Sheet were met. Ex. 8 at 26 (66:1-8). The shareholders approved the Term Sheet on March 27, 2019, after ESMG had already received and accepted $50 million from DCP, and never mentioned any amount over the $70 million maximum cumulative commitment in the Term Sheet. Ex. 17. A document circulated on February 28, 2019, drafted by Dawn Belt's associate and titled, "Omnibus Amendment and Waiver," represents that DCP, "or one or more of its affiliates (including affiliates of Thomas G. Dundon) (collectively, *Dundon*") has committed to invest up to $70,000,000 in [ESMG], in exchange for Dundon receiving, among other things, 75% of [ESMG's] fully-diluted capital stock . . . and Dundon has already made certain payments to [ESMG] in connection with the Dundon Transaction." Ex. 18 at 7; Ex. 8 at 27-28 (80:24–81:16). None of the recitals in that document discusses any other additional commitment by DCP or Dundon or any other entity included within the DCP and Dundon affiliates covered by it.

The above evidence shows that the Term Sheet sets out in detail the terms of the bargain struck between Ebersol and DCP, and the ESMG board determined that, "given [ESMG's] financial position, cash reserves, accrued but unpaid liabilities, near and long-term prospects, strategic goals and objections, current product development and business development efforts,

financing alternatives and other relevant considerations," it was advisable for ESMG to enter the Term Sheet with DCP. Ex. 5 at 12. The Term Sheet was signed and approved after Ebersol claims that he had a deal for $250 million. But nothing in the Term Sheet discusses a requirement for an investment over $70 million. Ex. 1. Ebersol had no authority to make a deal for ESMG to accept an additional investment without board and shareholder approval. The board did not mention any investment of over $70 million when it approved the Term Sheet. The shareholders' approval did not contemplate any deal other than the Term Sheet even though it was signed in late March and after DCP had invested over $50 million to comply with the Term Sheet. All of these events happened after Ebersol claims to have made the deal for $250 million, and they are all consistent with the Term Sheet, but inconsistent with a deal for an additional $180 million investment.

A $250 million investment would also be a material transaction requiring board approval, as would an investment of $180 million. Ex. 8 at 22 (59:9-14). Ebersol admits the ESMG board never authorized him to enter any deal for $250 million. Ex. 6 at 19-20 (33:24-34:10); *see also id.* at 18 (20:10-14). There was no discussion of a $250 million investment when Ebersol presented the DCP Term Sheet to the board. Ex. 8 at 21 (58:6-15, 19-23). There is no discussion of it in the shareholder approval. Ex. 17. Given the detail included in the Fowler and DCP term sheets, it makes no logical sense that the parties would have left an agreement for another $180 million to the vagaries of a phone call. In cases like this one with little or no detail to substantiate an oral agreement, Texas courts have held them unenforceable.

In *T.O. Stanley Boot*, where the borrower proved the amount of the would-be loan but offered insufficient evidence of the interest rate or the repayment terms, the Texas Supreme Court held that the alleged contract failed for indefiniteness. *T.O. Stanley Boot Co.,* 847 S.W.2d at 221.

Similarly, in *Pine v. Gibraltar Sav. Ass'n*, 519 S.W.2d 238 (Tex. App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.), the court held that a would-be borrower could not recover for a bank's failure to make two sets of loans. A purported agreement for construction financing left open the amount, repayment terms, and specifications for collateral. *Id.* at 243–44. A second purported loan—for permanent financing—included no total amount and no terms. *Id.* at 243. The court held that the alleged agreements to make loans were too indefinite to be enforced. *Id.* at 243–44.

*Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663 (Tex. App. — Houston [1st Dist.] 1996, no writ), followed *Pine* and *T.O. Stanley Boot* in refusing to enforce a purported unlimited agreement to provide financing that failed to include "any of the material terms inherent in individual contracts to lend money" (*i.e.*, the total amount, the interest rate, or repayment terms). *Id.* at 678.

With respect to an equity investment, material terms include the price per share, or, at the very least, a mechanism for determining how shares of a company are to be valued. In *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 458 (Tex. App.—Fort Worth 2009, pet. denied), the court held that an alleged oral agreement pursuant to which a party was to receive a specified percentage of the "fair market value" of certain companies failed for indefiniteness because the evidence showed that the parties never agreed how "fair market value" was to be determined. *Id.* ("Because this evidence established that the parties never reached an agreement on an additional material term, the agreement fails for 'indefiniteness' as a matter of law.").

In *Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 802 (Tex. App. — Eastland 2005, no pet.), the court found no oral contract where the terms of an alleged agreement to compensate the plaintiff for his equity interest were missing, including the price, whether the method of payment would be in cash or in an equity interest, and, if in an equity interest, the method of compilation

of value, and the precise entity from which the equity interest would come. The court concluded, "The contract is not definite, certain, and clear as to essential terms; and it fails for indefiniteness." *Id*.

Here, the summary judgment evidence conclusively establishes that the parties did not orally agree on material terms that the *T.O. Stanley Boot, Pine, Farah, Playoff*, and *Farone* courts held were material. The parties did not orally agree: (a) whether there would be a debt or equity component to the alleged investment in the first instance, and, if so, (b) how much of the alleged $250 million investment would take the form of debt versus equity. And, even if the parties had reached such an agreement (which they did not outside of the Term Sheet), the purported oral agreement would still fail for indefiniteness because the parties did not agree on subsequent material terms, such as, in the case of equity, the price per share or quantity of shares or any mechanism for valuing the shares; in the case of debt, the interest rate, maturity date, payment schedule, or any other terms of debt repayment; or, in either case, the timeline under which the investor or lender was to provide the funds.

**Parties to the agreement.** Assuming Dundon and Ebersol discussed an agreement to invest $250 million, there was no meeting of the minds between Dundon and ESMG regarding the identity of the investor the parties agreed would supply the $180 million balance after DCP's $70 million maximum cumulative commitment. The board of ESMG approved a maximum cumulative commitment of $70 million in exchange for which ESMG transferred control of the league. The ESMG board minutes reflect approval of DCP's $70 million investment evidenced by the Term Sheet. Ex. 5 at 4. The ESMG board did not discuss a $250 million investment at that meeting. Ex. 7 at 17 (297:5–298:3). The ESMG board never authorized Ebersol to enter an agreement for a $250 million investment in any league entity, never approved a $250 million agreement, and

never ratified an unauthorized $250 million agreement.  Ex. 6 at 18 (20:10-14), 19-20 (33:24-34:10).

**Consideration.**  Ebersol and Dundon never reached an agreement regarding the consideration the yet-to-be identified recipient of the funds would give in exchange for the $180 million post-Term Sheet funding.  Courts do not enforce gratuitous promises.  *Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 497 (Tex. 1991) (Gonzalez, J., dissenting).  In other words, each party to a contract must contribute consideration to make an agreement enforceable.  *See Texas Gas Utils. Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970) (explaining that mutual obligations will support a finding of consideration for a contract).  In this case, there is no allegation that Dundon made a gratuitous promise to hand $250 million to the league with no strings attached.  To get the funding, the league would have had to authorize a recipient of the investment, give a corresponding promise to repay a loan for the debt component and articulate the amount (by number or percentage) of stock for an equity investment, none of which occurred.

**Structure.**  There was no agreement addressing the structure of the balance of the alleged agreement to invest.  Ebersol testified that the Fowler investment was structured as a combination of debt and equity.  Ex. 6 at 3 (119:11-16), 5 (235:13-18).  When Ebersol first talked with Dundon, he told Dundon the league needed $55 million to complete the remainder of the first season.  Ex. 9 at 8 (148:13-24).  During a series of ensuing phone calls, Ebersol and Dundon discussed multiple scenarios ranging from a $10 million bridge loan to a larger, more robust investment.  Ex. 6 at 4 (213:12-20).  Ebersol discussed a combination of debt and equity with at least one board member without an identified mix (% of each).  Ex. 6 at 6 (257:7-16).  Ebersol said he did not know the % mix of debt and equity being contemplated.  Ex. 6 at 6 (257:17-21).

Debt means that the investment would be a yet-to-be-made loan.  An unmade loan is an executory contract automatically rejected in a Chapter 7 case.  11 U.S.C. § 365(c)(2), (d)(1).  The Trustee cannot enforce a contract Section 365(c)(2) prohibits him from assuming.  *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1093 (9th Cir. 1991).  "To do so would run afoul of the carefully crafted procedures and restrictions on obtaining post-petition credit found in Section 364."  3 COLLIER'S ON BANKRUPTCY § 365.07[2] (16th ed. 2023).  Because the loan component cannot be enforced, the Trustee is left with a request that the Court ignore an important aspect of the debt/equity arrangement that forms the basis of his claim.

Attempting to avoid the loan component of the alleged agreement with Dundon, the Trustee uses the term "series infinity" throughout his complaint. Series infinity is not a term of art. It has no defined legal meaning. The term series may refer to a series of stock — the term sheet refers to "shares of Series 2," though the complaint offers no clarity on the meaning. The second part of the phrase, infinity, is not a sum certain. Infinity is incalculable, unlimited, boundless. WEBSTER'S NEW COLLEGIATE DICTIONARY at 587 (1981) (defining infinite and infinity). Infinity is endless. OXFORD ENGLISH DICTIONARY, Vol. 5 at 264 (1978) (defining infinity). Because infinity is by definition not determinable, the Trustee's allegations about "series infinity" funding lack sufficient definiteness to be enforced.

Ebersol did not identify whether he and Dundon had established any conditions to funding were part of the deal, though the Fowler and DCP Term Sheets contained explicit conditions to funding and Ebersol thought that the additional $180 million would fund the league for years to come. Ex. 6 at 9 (306:7-15).  In that respect, there was no agreement about when the investment would be made, potential acceleration of future funding commitments, or, for that matter, any agreement that Dundon would continue to fund the league if it filed bankruptcy.  The league shut

down on April 2, 2019. ECF at 39 ¶ 137. DCP's $70 million maximum commitment extended

through June 30, 2019. Ex. 1. Assuming the balance of the alleged oral agreement would have

picked up after June 30, 2019, it would have depended, at the very least, on the league's continued

operations. The failure to specify any terms and conditions renders the agreement unenforceable.

## 2. The alleged oral contract is an unenforceable "agreement to agree."

The alleged oral contract also fails because, at best, the parties formed nothing more than

an agreement to agree. "[W]hen an agreement leaves material matters open for future adjustment

and agreement that never occur, it is not binding upon the parties and merely constitutes an

agreement to agree." *Fischer v. CTMI, L.L.C.,* 479 S.W.3d 231, 237 (Tex. 2016) (internal

quotation marks omitted). As an agreement to agree, the oral contract is not enforceable. *See id*.

In *RDA Prof'l Beauty Supply Inc. v. Clay*, No. 12-23-00050-CV, 2023 WL 8658711, at *7

(Tex. App.—Tyler Dec. 14, 2023, no pet.), the court held that an oral separation agreement,

pursuant to which one party agreed to sell shares of stock in a company to another, but which left

the price term open for such sale pending two "evaluations," constituted an unenforceable

"agreement to agree." The court noted that the absence of evidence of any agreement as to material

terms, such as the date on which the stock price was to be calculated, precluded the court from

fashioning an appropriate remedy for the alleged breach. Because the court could not determine

the sale price upon which the parties would have eventually agreed, or any other terms of the sale,

the court could not approximate the amount the seller would have received and could not fashion

an appropriate remedy for any breach. *Id*. at *7 (emphasis added).

Here, the Trustee conceded that the parties kept "as an open item" the "form the funding

would take (debt, equity, or some combination)." ECF 56 at 18-19 ¶ 65. The lack of essential

terms makes impossible the task of fashioning an appropriate remedy with respect to the breach alleged by the Trustee.

Ebersol's deposition testimony concerning Dundon's alleged "breach" of the oral contract highlights this very problem:

> Q:    What is it that Mr. Dundon did not do to comply with his obligations on the February 14th agreement?
>
> A:    He did not invest 250 million dollars.

Ex. 6 at 10 (307:12-17) (objection omitted).

Ebersol did not mention that part of the Trustee's claim that Dundon failed to loan ESMG a specified amount of money at a given interest rate.  Ebersol did not testify that Dundon failed to purchase a specified number of shares at a given purchase price.  Fashioning a remedy for an alleged breach of the oral contract would require the Court to arbitrarily assign a portion of the alleged $250 million investment to equity, and a portion to debt, and to further impose additional terms, including an interest rate, maturity date, and repayment terms for the debt, a share price for the equity or a valuation date or mechanism for valuing the equity—notwithstanding the fact that the parties never agreed to those terms. The Court cannot ignore the uncertainty without imposing new terms on the parties that were never agreed to.  The absence of the agreement on essential terms renders the alleged agreement unenforceable.  *See Fischer*, 479 S.W.3d at 237.

**3.    Any prior negotiations merged into the Term Sheet.**

If DCP (or Dundon) and Ebersol had formed an oral contract under Texas law, "all prior oral and written agreements are presumed to merge into a subsequent written contract," even in the absence of an express merger clause. *Yasuda Fire & Marine Ins. Co. of Am. v. Criaco*, 225 S.W.3d 894, 899 (Tex. App.—Houston [14th Dist.] 2007, no pet.). For merger to occur, "the same parties to an earlier agreement must later enter into a written integrated agreement covering the

same subject matter." *Fastracked Executive, LLC v. Prevost Car (US), Inc.*, No. 01-20-00735-CV, 2022 WL 2068817, at *3 (Tex. App.—Houston [1st Dist.] June 9, 2022, no pet.). "An integrated contract is a writing or writings constituting a final expression of one or more terms of an agreement." *Spangler v. Liss*, No. 14-22-00144-CV, 2024 WL 1207300, at *3 (Tex. App.—Houston [14th Dist.] Mar. 21, 2024, no pet.).

"In evaluating a contract, a court may conclude that the contract is integrated in some of its terms but is not fully integrated as to others." *Dorta v. Rave*, No. 09-12-00376-CV, 2014 WL 69564, at *4 (Tex. App.—Beaumont Jan. 9, 2014, no pet.). "Whether a binding agreement is completely integrated or partially integrated, it supersedes inconsistent terms of prior agreements." RESTATEMENT (SECOND) OF CONTRACTS § 213 (1981); *see also Prince v. Weleba*, No. 02-23-00085-CV, 2023 WL 6476009, at *7 (Tex. App.—Fort Worth Oct. 5, 2023, no pet.) (parol evidence may be offered as to non-integrated portions of partially integrated contract).

*Transcon. Realty Inv'rs, Inc. v. John T. Lupton Tr.*, 286 S.W.3d 635, 641 (Tex. App.—Dallas 2009, no pet.), demonstrates how a subsequent agreement supersedes prior inconsistent terms. The parties entered an oral agreement to extend the closing date for a real estate transaction in exchange for an additional earnest money payment. *Id*. at 639. After that oral agreement, the parties agreed to an amendment of the original contract, which extended the closing date for an earnest money payment of $1.15 million. *Id*. The buyer failed to timely deposit the $1.15 million, which made the amendment per its terms null and void. *Id*. The buyer argued that, because the amendment was rendered null and void, the oral contract should control. In rejecting that argument, the court held that the oral agreement merged into the amendment, and the amendment became the controlling agreement. *Id*. at 642. The court held that the parties' execution of a written

agreement, "presumes that all prior negotiations and agreements related to the transaction have been merged into it." *Id*. at 642.

In this case (a) the Term Sheet is an integrated writing with respect to the key terms at issue (the identity of the investor, the equity DCP received, and the maximum investment amount DCP would make); (b) the two agreements were between the same parties (namely, ESMG and Dundon or one of his entities); and (c) the relevant terms of the purported oral contract directly conflict with, and merged into, the Term Sheet.

### 4. The Term Sheet is an integrated writing as to the key terms of the parties' agreement.

The Term Sheet constitutes an integrated writing at least with respect to key terms, including, the identity of the investor (DCP); the percentage of equity the DCP received (75%); and the "maximum cumulative commitment" DCP committed provide ($70 million). Ex. 1 at 1. The Term Sheet shows the parties intended the Term Sheet terms to constitute the final expression of their agreement with respect to those terms. The "binding" Term Sheet states that it is a "summary of terms" for the proposed transaction. *Id*. While the Term Sheet does contemplate the subsequent execution of a "definitive documents," it nonetheless makes clear that it is "a binding agreement of the signatories . . . enforceable by one party against the other upon ESMG's . . . receipt of the Initial Funding Amount." Ex. 1 at 1-2. ESMG was obligated to issue shares to DCP (constituting 75% of the ESMG fully diluted capital stock) upon receipt of the initial funding amount regardless of when the parties entered a definitive agreement. *Id*. at 1. ESMG agreed in the Term Sheet "to agree to any other provisions provided for in" the "definitive documentation." *Id*. at 2.

The Term Sheet contemplated that DCP would be responsible for drafting the definitive documentation. *Id*. at 2. While the Term Sheet permitted DCP to add "other provisions" to the

definitive agreement, there is nothing in the Term Sheet suggesting that DCP could unilaterally alter material provisions, such as the identity of the investor, the percentage of equity DCP would receive, or the maximum cumulative investment. The Term Sheet expressly obligates ESMG to "sign" the definitive documentation prepared by DCP without further negotiation of those terms. *Id*. Thus, the Term Sheet demonstrates that the parties intended it to the constitute the final expression of the identity of the investor (DCP), the percentage of equity the DCP would receive (75%), and the "maximum cumulative commitment" DCP would provide ($70 million).

The Term Sheet covers the same subject matter as the alleged oral contract. Ebersol testified that Dundon agreed to invest $250 million dollars for the majority of ESMG and its subsidiaries and total control of the board. Ex. 6 at 9 (306:7-15). The Term Sheet obligated ESMG to transfer control of the board and majority ownership in exchange for a maximum commitment of $70 million. Ex. 1 at 1.

The Term Sheet, as a subsequent agreement (that followed the alleged oral agreement) supersedes the prior agreement unless "it is not inconsistent with the prior agreement, is made for separate consideration, or is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written agreement." *Carr v. Weiss*, 984 S.W.2d 753, 764 (Tex. App.—Amarillo 1999, pet. denied). None of those exceptions apply in this case. The consideration that ESMG agreed to exchange with Dundon in the oral contract (control of the board and majority ownership) is identical to the consideration ESMG agreed to transfer to DCP in the Term Sheet. Ex. 1 at 1.

Ebersol testified that DCP assumed full management control of ESMG immediately upon executing the Term Sheet:

> Q.    Assuming that the [Term Sheet] was signed at 3:28 p.m. Central standard time, is it your understanding that Dundon Capital Partners assumed full management control of [the Company] at that time?
>
> A.    That [sic] my understanding.

Ex. 6 at 11 (309:15-20) (objection omitted).

Ebersol testified it was his "understanding" that, under the Term Sheet, "DCP in exchange for 5.1 million dollars got 75 percent ownership of [ESMG's] fully diluted capital stock." Ex. 6 at 8 (297:8-18). Consistent with that part of Ebersol's testimony, the Term Sheet obligates ESMG to transfer control of the board and majority ownership to DCP. Ex. 1 at 1.

The Term Sheet conflicts with the alleged oral contract because the Term Sheet sets a maximum cumulative funding amount of $70 million—not $250 million—notwithstanding the fact that DCP received the same consideration originally for the Term Sheet as what Ebersol contemplated for the oral agreement. The board and the shareholders approved the DCP Term Sheet and nothing else after the media statements made by Dundon and Ebersol about a $250 million commitment. The timing confirms that the DCP Term Sheet superseded any discussion about an alleged agreement for $250 million. The Term Sheet does not supplement the alleged oral agreement. Thus, to the extent that an alleged oral contract existed, it merged into and was superseded by the Term Sheet, and merger bars enforcement of the prior, inconsistent oral agreement.

## B.    DCP did not breach the Term Sheet because DCP fulfilled every funding request from the league.

The Court should grant summary judgment on the Trustee's claim for breach of the Term Sheet because there was no funding request from the league that DCP did not fulfill. The Term Sheet required DCP to make an initial equity investment in the league on February 14, 2019, of $5,100,000. Ex. 1 at 1. DCP sent that $5,100,000 to the league within the time period specified

28

in the Term Sheet. ECF 56 at 30 ¶ 103. The parties operated under the Term Sheet through the filing of the bankruptcy. During that time, the Term Sheet gave ESMG "the right to submit an equity funding request to [DCP] . . . up to a maximum cumulative commitment of $70,000,000." Ex. 1 at 1. ESMG made periodic funding requests consisting of a budget for expenditure of the requested funds between February 14, 2019, and April 14, 2019. ECF 56 at 30-31 ¶ 103. DCP fulfilled each funding request before April 17, 2019, the petition date. *Id.*

In his complaint, the Trustee alleges that: (a) ESMG performed all of its obligations under the "Term Sheet," ECF 56 at 41 ¶ 149, and (b) ESMG submitted funding requests for the full $70 million, *id*. ¶ 150, but (c) DCP only funded $69.7 million, leaving a shortfall of $300,000, *id*. The Trustee also claims that $1 million of the funds DCP did invest in ESMG went to pay bankruptcy fees and professionals DCP hired for the league. *Id*. at 41-41 ¶ 150.

A breach of contract claim under Delaware law requires proof of a (a) contractual obligation, (b) a failure to comply with the obligation (a breach), and (c) damages. *Miller v. Trimont Global Real Estate Advisors, LLC,* 587 F. Supp. 3d 170, 176 (D. Del. 2022). In this case, the Term Sheet did not impose upon DCP a blanket obligation to hand over $70 million to the league. The Term Sheet gave ESMG the right to make a request for funding between February 14, 2019, and June 30, 2019, subject to a maximum cumulative commitment of $70,000,000. Ex. 1 at 1. There is no agreement by DCP for a minimum commitment. The maximum cumulative commitment was a ceiling, not a floor.

Non-performance of a contractual obligation is not a breach unless performance is due. RESTATEMENT (SECOND) OF CONTRACTS § 235(2) (1981). In this case, the Term Sheet explicitly describes when performance from DCP was due — between February 14 and June 30, 2019, and only after receipt of a request for funding and a supporting budget. Ex. 1 at 1.

According to the Complaint, the league made 16 requests for funding. ECF 56 at 30-31 ¶ 103. DCP fulfilled each of those requests. *Id*. Beyond the requests for funding DCP fulfilled, there was no open, unfulfilled request at the time ESMG filed bankruptcy. Ex. 10 at 8. Because the Trustee cannot identify an unfunded funding request, he cannot prevail on his claim for breach of the Term Sheet.

The Trustee nonetheless argues that DCP fell $280,810 short of the Term Sheet's $70 million ceiling. ECF 56 at 31 ¶ 104. The $280,810 difference was spent on transaction fees borne by DCP in connection with the Term Sheet as shown on an invoice dated April 12, 2019. Ex. 11 ¶ 2. DCP sent the invoice to ESMG the same date with the explanation that the invoice settled transaction costs. *Id*. The Term Sheet expressly requires ESMG to reimburse DCP for transaction costs associated with the Term Sheet transaction. Ex. 1 at 2. The explanation for the $280,810 difference negates the allegation of breach by shortfall.

The second aspect of the Trustee's claim is that ESMG paid bankruptcy fees and professionals with part of the DCP investment. ECF 56 at 31 ¶ 104. There is no affirmative obligation in the Term Sheet that makes DCP responsible for how the league spent funds on certain expenses, but not others. Ex. 1 at 1-3. The fees for filing bankruptcy and bankruptcy professionals were paid to professionals ESMG hired. Ex. 16. The Term Sheet addresses funding requirements, which DCP complied with. Nothing in the Term Sheet authorizes the Trustee (on behalf of ESMG) to object to how ESMG spent money or to increase DCP's funding commitment after the fact if ESMG spent the funds on to an expense the Trustee has not repaid, but has enjoyed the benefit of (in the form of bankruptcy professionals).

30

**C.      The Trustee cannot enforce a rejected agreement.**

Though the details of the alleged oral agreement are scant, the Trustee has alleged, and Ebersol confirmed, that the investment from Dundon would be in the form of a combination of a loan and an equity investment. ECF 56 at 18-19 ¶ 65; Ex. 6 at 6 (257:17-21).  Though the loan part of the deal has not been quantified, 11 U.S.C. § 365(c)(2) prohibits the Trustee from assuming a contract to make a future loan to the debtor (ESMG).  Under Section 365(d)(1), the contract (assuming it existed) was rejected.  The Trustee cannot enforce a contract § 365(c)(2) prohibits him from assuming.  *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1093 (9th Cir. 1991) (holding that Section 365(c)(2) prohibits the debtor from accepting post-petition financing without complying with Section 364).

Texas law requires a plaintiff to prove his own performance as part of a claim for breach. *Krayem v. USRP (PAC), L.P.*, 194 S.W.3d 91, 94 (Tex. App.—Dallas 2006, pet. denied). Rejection is a breach.  11 U.S.C. § 365(g).  Because the Trustee cannot prove ESMG's performance and the agreement is rejected, the Trustee cannot sue for breach.

**D.      Benefit of the bargain damages are not available for a promissory estoppel claim.**

Promissory estoppel requires a plaintiff to prove he relied to his detriment on an otherwise unenforceable promise*. See FrostCrushed Stone Co. v. Odell Geer Cons. Co.,* 110 S.W.3d 41, 44 (Tex. App.—Waco 2002, no pet.).  The reliance must be reasonable and justified. *See Gilmartin v. KVTV-Channel 13*, 985 S.W.2d 553, 558 (Tex. App.—San Antonio 1998, no pet.).  Reliance is justified only when a promise is sufficiently specific and definite that it is reasonable to rely on it as a commitment to future action. *See Davis v. Tx. Farm Bureau Ins.,* 470 S.W.3d 97, 108 (Tex. App.—Houston [1st Dist.] 2015, no pet.).  Promissory estoppel will apply if injustice can be

avoided only by the enforcement of the promise. *See City of Beaumont v. Excavators & Constructors, Inc.,* 870 S.W.2d 123, 136 (Tex. App.—Beaumont 1993, writ denied).

### 1. The Trustee cannot recover benefit of the bargain damages for a promissory estoppel claim.

The Trustee alleges that "ESMG suffered substantial detrimental reliance and damage due to Dundon's promises in the amount of at least $180 million." ECF 56 at 44 ¶ 163. By that allegation, the Trustee seeks to obtain the benefit of the bargain he alleged ESMG would receive pursuant to the oral agreement he claims Dundon made with ESMG.

Benefit of the bargain damages are not available for a promissory estoppel claim. *Heritage Constructors, Inc. v. Chrietzberg Elec., Inc.,* No. 06-14-00048-CV, 2015 WL 3378377, at *7 (Tex. App.—Texarkana March 4, 2015, no pet.) (citing *Bechtel Corp. v. CITGO Prods. Pipeline Co.,* 271 S.W.3d 898, 927 (Tex. App.—Austin 2008, no pet.)). Where the promise has failed to bind the promisor to a legally sufficient contract, but the promise has acted in reliance upon a promisee to his detriment, the promisee is to be allowed to recover no more than reliance damages measured by the detriment sustained. *Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965). Relance damages include "expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty." *Bechtel Corp.*, 271 S.W.3d at 927 (internal quotation marks omitted). Because the Trustee seeks benefit of the bargain damages for his promissory estoppel claim, the Court should grant summary judgment that the Trustee take nothing on that claim.

### 2. Any alleged reliance was not reasonable or justified as a matter of law.

The Trustee's claim for promissory estoppel also fails on the merits because, as a matter of law, ESMG's reliance, if any, was not reasonable or justified.

> **a.     The alleged promise was not specific or definite enough to justifiably rely on.**

Even accepting Ebersol's testimony at face value, Dundon's alleged promise to invest $250 million in ESMG left open critical points requiring further negotiation, including:  (a) which Dundon-affiliated entity or entities would invest in ESMG; (b) the timeframe the alleged $250 million was to be invested, and whether it was to constitute a lump sum payment, a series of payments, or otherwise; (c) whether the investment would take the form of equity or debt or both; (d) if equity, the price per share, quantity of shares, or any mechanism for valuing shares; and (e) if debt, the interest rate, maturity date, payment schedule, or any other terms of the debt repayment.

Vague and indefinite promises that are not specific enough to form a contract are too indefinite to form a basis for promissory estoppel or justifiable reliance.  *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 570 (Tex. App.—Dallas 1989, no writ) (affirming the grant of summary judgment on the issue of promissory estoppel where a promises were not specific or definite enough to form the basis for justifiable reliance); *see also Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141-42 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (holding that promise to supply "whatever equipment" was needed to start a plant with no definite promise of specified items of equipment would not support promissory estoppel claim).  Thus, reliance in spite of the open items was unreasonable as a matter of law.

> **b.     The Term Sheet negates justifiable reliance.**

Reliance on an oral statement that contradicts the terms of an unambiguous written agreement is "unjustified as a matter of law."  *Mikob Properties, Inc. v. Joachim*, 468 S.W.3d 587, 599 (Tex. App.—Dallas 2015, pet. denied).  For direct contradiction to occur, the contract and the oral representation need not explicitly speak the same subject matter or precisely the same terms. *Baxso, LLC v. Roxo Energy Co., LLC* 668 S.W.3d 912, 935 (Tex. App.—Eastland 2023, pet. filed).

The Trustee claims that ESMG relied on Dundon's alleged oral promise to invest $250 million in ESMG by entering the Term Sheet—giving up a majority of the equity in ESMG and board seats to DCP in exchange for a maximum investment of $70 million. *See* ECF 56 at 44 ¶ 162. Dundon's alleged oral promise to provide a $250 million investment in exchange for control of the board and majority ownership of ESMG directly contradicts the Term Sheet, which gives DCP control of the board and majority equity ownership in ESMG in exchange for a maximum investment of $70 million. Ex. 1.

In *Barrow-Shaver Res. Co. v. Carriso Oil & Gas, Inc.*, 590 S.W.3d 471, 497, 500 (Tex. 2019), the Texas Supreme Court held that reliance on a party's oral promise that it would give consent to any assignments made by the other party was unjustified as a matter of law because the parties' contract gave the alleged promisor an "unqualified right to withhold consent" to assignments. *Id.* at 499. The court added that the oral statements "essentially eliminate[d]" the consent requirement in the agreement. *Id.* As a matter of law, the purported promisee could not reasonably rely on statements that directly contradicted the parties' written agreement. *Id.* at 500.

Similarly, here, the alleged oral promise to invest $250 million in exchange for board seats and a majority of ESMG's equity would "essentially eliminate" ESMG's obligation in the Term Sheet to transfer board seats and a majority of ESMG's equity to DCP in exchange for maximum investment of $70 million. Given the Term Sheet's express limitation of a cumulative maximum commitment of $70 million, no reasonable person could believe that ESMG's obligation to provide DCP with board seats and a majority of ESMG's equity was conditioned on *an additional investment* of $180 million.

Ebersol and ESMG's failure to exercise "ordinary care and reasonable diligence rather than blindly relying upon another party's vague assurances" precludes justifiable reliance as a matter

of law. *See JP Morgan Chase Bank, N.A. v. Orca Assets G.P., LLC.,* 546 S.W.3d 648, 660 (Tex. 2018). In an arm's length transaction, to establish justifiable reliance, a party "must have exercised ordinary care to protect its own interests and cannot blindly rely on the defendant's reputation, representations, or conduct where the plaintiff's knowledge, experience and background warrant investigation." *Mercedes-Benz USA, LLC v. Carduco, Inc.,* 583 S.W.3d 553, 563 (Tex. 2019).

Ebersol recognized that the Term Sheet did not reflect the purportedly agreed-upon investment amount of $250 million, but instead stated a maximum investment amount of $70 million. Ex. 6 at 16-17 (17:14-18:14). Despite the $180 million discrepancy, Ebersol executed the Term Sheet, giving up 75% of ESMG's equity and control of the board. Ex. 1 at 3. Ebersol (allegedly) simply took Dundon at his "word," wholly ignoring that Dundon's "word" directly conflicted with the Term Sheet's plain language. Ex. 6 at 16-17 (17:14-18:14). As a matter of law, Ebersol's reliance was not justified. *See Barrow-Shaver,* 590 S.W.3d at 499-500; *see also Joachim*, 468 S.W.3d at 599 ("A failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party."). These circumstances foreclose a promissory estoppel claim. The Court should grant a take-nothing judgment against the Trustee on Count 4.

**E.    The Trustee cannot establish a claim for breach of the covenant of good faith and fair dealing against Dundon or DCP.**

**1.    The Trustee cannot establish a "special relationship" between Dundon and the Debtors.**

The Texas Supreme Court has declined to impose a covenant of good faith and fair dealing in every contract. *See Arnold v. National Cty. Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex. 1987). To prove a claim for breach of the covenant of good faith and fair dealing under Texas law, the

plaintiff must prove that a special relationship arose between Dundon and the Debtor. *Prime Prods. v. S.S.I. Plastics*, 97 S.W.3d 631, 638 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

As an initial matter, Texas law does not recognize this cause of action against Dundon. The part of the good faith and fair dealing claim against Dundon relates to the alleged oral agreement, which is governed by Texas law. In Texas, there is no independent claim for a breach of the duty of good faith and fair dealing absent a special relationship. *UMLIC VP LLC v. T&M Sales & Environ. Servs., Inc.*, 176 S.W.3d 595, 612 (Tex. App. — Corpus Christi 2005, pet. denied); *see generally English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983) (refusing to impose a duty of good faith and fair dealing in the ordinary contract context, and concluding that the concept would abolish Texas's system of government). Special relationships arise from the "element of trust necessary to accomplish the goals of the undertaking or has been imposed by the courts because of an imbalance of bargaining power." *Nationsbank v. Perry Bros. Inc.,* 68 F.3d 466 (5th Cir. 1995). Special relationships include insurance, oil and gas, partnerships, joint venturers, and agency relationships. *See id.* (citing *English v. Fischer*, 660 S.W.2d 521, 525 (Tex. 1983)). Under Texas law, a fiduciary relationship does not arise from an ordinary contract. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997).

The Trustee cannot establish a special relationship between Dundon and Debtors at the time of the alleged promise. At that time, they had no relationship at all. There is no contract between Dundon and Debtors explicitly creating a duty of good faith and fair dealing. Therefore, the Trustee must establish a special relationship based on other facts. At most, there is a contractual relationship via the alleged oral contract between Dundon and Debtors. While fiduciary relationships may be sufficient to create a "special relationship," an oral contract between Dundon and the Debtors is insufficient to establish a fiduciary relationship. *See Schlumberger Tech.*, 959

S.W.2d at 177. To recognize Dundon's relationship with the Debtors as special, the Court would have to create an entirely new category of "special relationship" under the good faith and fair dealing doctrine that encompasses all contractual negotiations (even those between strangers) and broadly expands the application of the doctrine altogether.

### 2. The Term Sheet precludes the Trustee's claim for breach of the covenant of good faith and fair dealing against DCP.

Under Delaware law, "every contract contains an implied covenant of good faith and fair dealing." *TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 329 (D. Del. 2014). The implied covenant of good faith and fair dealing requires a party in a contractual agreement to "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Am. Healthcare Admin. Servs. v. Aizen*, 285 A.3d 461, 479 (Del. Ch. 2022). The reasonable expectations of the contracting parties are assessed at the time of contracting. *See Whitestone REIT Operating P'ship, L.P. v. Pillarstone Capital REIT*, No. 2022-0607-LWW, 2024 WL 274228, at *6 (Del. Ch. Jan. 25, 2024) (internal quotation marks omitted).

The Trustee cannot establish a claim for breach of the covenant of good faith and fair dealing against DCP because the claim mirrors the breach of contract claim against DCP and seeks the same damages. *Compare* ECF 56. at 42 ¶ 151 *with id.* at 43 ¶ 158. Under Delaware law, the covenant of good faith and fair dealing cannot be invoked when a contract addresses the conduct at issue. *See Glaxo Group Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021). Since the contract addressed the amount of the payment, and the breach claim covers that damage, there is no additional good faith and fair dealing claim. *See id.*

### F. Negligent misrepresentation does not apply in this case.

The Court should grant a take-nothing judgment on the Trustee's negligent misrepresentation claim because that cause of action does not apply in this case—meaning to the

facts alleged by the Trustee.

Texas courts apply the definition of negligent misrepresentation set forth in the *Restatement*:

Information Negligently Supplied for the Guidance of Others

(1)     One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1) (1977); *see also Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (adopting *Restatement* definition).

In 2020, the American Law Institute published the *Restatement (Third) of Torts: Liability for Economic Harm*. The Texas Supreme Court has relied on the new *Restatement* in multiple cases. *See, e.g., Houston Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 590 (Tex. 2023); *LAN/STV v. Martin K. Eby Constr. Co., Inc.*, 435 S.W.3d 234, 241 (Tex. 2014) (quoting an approved draft prior to official publication).

The *Restatement (Third)* replaces § 552 of the *Restatement (Second)* quoted above. The new provision is Section 5 titled "Negligent Misrepresentation." It restates the old Section 552 in new language, then adds:

This Section does not recognize liability for negligent misrepresentations made in the course of negotiating or performing a contract between parties.

RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 5(5) (2020). Every one of the misrepresentations alleged by the Trustee occurred during the negotiation or performance of a contract—the Term Sheet. Because the Texas Supreme Court has followed the *Restatement* on negligent misrepresentation issues, history suggests the Texas Supreme Court will adopt Section

5 of the new *Restatement*. Because it forecloses a negligent misrepresentation claim based on statements made during the negotiation and performance of an agreement, the Court should grant summary judgment on that claim.

In addition to the above, the Trustee's negligent misrepresentation claim seeks damages for the loss of the league, allegedly usurped assets, lost opportunities, and contract damages. ECF 56 at 62. Under Texas law, none of those damages are recoverable in a negligent misrepresentation action. *DSA, Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663-664 (Tex. 1998). For that reason, the Court should grant judgment for Dundon that the Trustee take nothing on his negligent misrepresentation claim.

**G.      The Trustee cannot prove fraud because the Term Sheet negates justifiable reliance.**

The same reasons that justify summary judgment on the Trustee's promissory estoppel claim compel summary judgment on the fraud claim. Like promissory estoppel, fraud depends on reliance. *Gilmartin*, 985 S.W.2d at 558; *see also Mercedes-Benz USA, LLC v. Carduco, Inc.,* 583 S.W.3d 553, 563 (Tex. 2019) (fraudulent inducement claim). Reliance on an oral statement that contradicts the terms of an unambiguous written agreement is "unjustified as a matter of law." *Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 599 (Tex. App.—Dallas 2015, pet. denied). For direct contradiction to occur, the contract and the oral representation need not explicitly speak the same subject matter or precisely the same terms. *Baxso, LLC v. Roxo Energy Co., LLC* 668 S.W.3d 912, 935 (Tex. App.—Eastland 2023, pet. filed).

The Trustee alleges that ESMG relied on Dundon's alleged oral promise to invest $250 million in ESMG by entering the Term Sheet—giving up a majority of the equity in ESMG and board seats to DCP in exchange for a maximum investment of $70 million. *See* ECF 56 at 53-54 ¶ 186, 58-59 ¶ 203. Dundon's alleged oral promise to provide a $250 million investment in

39

exchange for control of the board and majority ownership of ESMG directly contradicts the Term Sheet, which gives DCP control of the board and majority equity ownership in ESMG in exchange for a maximum investment of $70 million. Under the circumstances (discussed above), and in light of the Term Sheet, ESMG could not have "still plausibly believe[d]" Dundon's alleged oral promise. *See Carduco, Inc.*, 583 S.W.3d at 558-59.

In *Barrow-Shaver Res. Co. v. Carriso Oil & Gas, Inc.*, 590 S.W.3d 471, 497, 500 (Tex. 2019), the Supreme Court held that reliance on a party's oral promise that it would give consent to any assignments made by the other party was unjustified as a matter of law because the parties' contract gave the alleged promisor an "unqualified right to withhold consent" to assignments. *Id.* at 499. The court added that the oral statements "essentially eliminate[d]" the consent requirement in the agreement. As a matter of law, the purposed promise could not reasonably rely on statements that directly contradicted the parties' written agreement. *Id* at 500.

Similarly, here, the alleged oral promise to invest $250 million in exchange for board seats and a majority of ESMG's equity would "essentially eliminate" ESMG's obligation in the Term Sheet to transfer board seats and a majority of ESMG's equity to DCP in exchange for maximum investment of $70 million. Given the Term Sheet's express limitation of a cumulative maximum commitment of $70 million, no reasonable person could believe that ESMG's obligation to provide DCP with board seats and a majority of ESMG's equity was conditioned on *an additional investment* of $180 million.

Ebersol and ESMG's failure to exercise "ordinary care and reasonable diligence rather than blindly relying upon another party's vague assurances" precludes justifiable reliance as a matter of law. *See JP Morgan Chase Bank, N.A. v. Orca Assets G.P., LLC.,* 546 S.W.3d 648, 660 (Tex. 2018). In an arm's length transaction, to establish justifiable reliance, a party "must have exercised

ordinary care to protect its own interests and cannot blindly rely on the defendant's reputation, representations, or conduct where the plaintiff's knowledge, experience and background warrant investigation." *Carduco, Inc.,* 583 S.W.3d at 563.

Ebersol recognized and expressed concern to Dundon that the Term Sheet did not reflect the purportedly agreed-upon investment amount of $250 million, but instead, stated a maximum investment amount of $70 million. Despite the $180 million discrepancy, Ebersol executed the Term Sheet, giving up 75% of ESMG's equity and control of the board. Ex. 6 at 7 (267:4-25). Ebersol (allegedly) simply took Dundon at his "word," wholly ignoring that Dundon's "word" directly conflicted with the Term Sheet's plain language. As a matter of law, Ebersol's reliance was not justified. *See Barrow-Shaver,* 590 S.W.3d at 499-500; *see also Joachim*, 468 S.W.3d at 599 ("A failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party."). The Court should grant a judgment in favor of Dundon on the fraud claim and in favor of DCP and Dundon on the fraudulent inducement claim.

## H.    ESMG waived its fiduciary duty claims based on the duty of care.

The Court should grant summary judgment against the Trustee on his claims for breach of fiduciary duty against Dundon. The fiduciary duty claims based on the duty of care against Dundon are barred because the ESMG restated certificate of incorporation contains an exculpatory clause barring the claims.

ESMG's restated certificate contains an exculpatory clause:

> To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

Ex. 3 at 25–26 art. 8A.

Under Delaware corporate law, a certificate of incorporation may contain:

A provision eliminating or limiting the personal liability of a director of officer to the corporation . . . for monetary damages for breach of fiduciary duty as a director or officer, provided that such provision shall not eliminate or limit the liability of:

  (i)   A director or officer for any breach of the . . . duty of loyalty . . .;

  (ii)  A director or officer for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law . . . .

8 DEL. C. § 102(b)(7)(i); *see generally In re Fedders N. Am., Inc.*, 405 B.R. 527, 540, 543 (Bankr. D. Del. 2009). The barred claims are set out in paragraph 172(f) and (g) for Dundon. ECF 56 at 46-48 ¶¶ 172, 173. The exculpatory clause requires a take-nothing judgment against the Trustee on claims for money damages based on the duty of care: failure to employ a rational decision-making process and failing to act prudently. *See In re Fedders*, 405 B.R. at 543.

I.   **The Trustee cannot prevail on his breach of fiduciary duty claim based on contractual duties.**

The Trustee's fiduciary duty claims against Dundon fall into three categories — contractual duties, the duty of loyalty, and the duty of care. ECF at 46-47 ¶ 172. The first category — failing to provide funding in exchange for control—is a contractual claim, not a fiduciary duty issue. ECF at 46 ¶ 172(a). Under Delaware law, a breach of fiduciary duty claim that completely overlaps with a breach of contract claim is subject to dismissal. *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, No. CV 2017-0500-JRS, 2018 WL 2727542, at *15 (Del. Ch. June 6, 2018). In this case, the Trustee does not allege an independent basis (apart from the contract) for this particular fiduciary duty claim. The breach of oral contract claim rests on Dundon's failure to fund the league; the alleged breach of fiduciary duty in paragraph 172(a) is based on Dundon's failure to provide funding *as promised* in exchange for control of the league. ECF at 46 ¶ 172(a). The claims are the same. Under Delaware law, the fiduciary duty claim is not allowed. *Edinburgh Holdings, Inc.*, 2018 WL 2727542, *15.

**J.      The Trustee's fiduciary duty claims based on loyalty do not relate to a discrete transaction.**

The next four bases for the fiduciary claims (¶ 172(b)-(e)) against Dundon are non-specific complaints that he breached duties by:

- making unidentified decisions regarding the finances and operations of one or more unidentified debtor entities motivated by his self-interest;

- misappropriating unidentified assets and resources (that include but are not limited to television air time) of one or more unidentified debtor entities for his personal benefit;

- self-dealing and concealing or failing to disclose his self-dealing from one or more unidentified debtor entities; and

- entering unidentified contracts (that include but are not limited to the Release Agreement) that were in his (Dundon's) best interest and were detrimental to the one or more unidentified debtor entities.

ECF 56 at 46 ¶ 172(b)-(e). This category relates to the duty of loyalty. The duty of loyalty requires directors to place the best interests of a corporation above a self-interest held by the director but not shared by all stockholders generally. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Normally, a duty of loyalty analysis concerns the motives of directors in causing a corporation to enter a particular transaction in which the director is alleged to have a self-interest. *See id.* at 360–362. In this case, by contrast, the Trustee complains — not about a discrete transaction — but generally about the way Dundon ran the league.

The business judgment rule prevents courts from unreasonably injecting themselves into corporate affairs. *Id.* at 360. In other words, it bars claims based on general accusations about the way a board runs a corporation. The rule creates a presumption that directors act in a loyal manner. *Id.* To rebut the presumption, a plaintiff must allege facts indicating that a director was either interested in the transaction at issue or lacked independence to oppose its consummation. *In re Xtreme Power Inc.*, 563 B.R. 614, 632 (Bankr. W.D. Tex. 2016).

The Trustee cannot sustain his claim for breach of the duty of loyalty. Other than the Release Agreement discussed below, there is no suspect transaction, only vague references to contracts and speculative suggestions of ties to other contracting parties. A naked allegation of a past business relationship with one or more persons who may have benefited from an unidentified transaction is not enough to suggest a lack of independence. *Id.* at 633. The business judgment rule prevents courts from second-guessing ordinary board decisions after the fact. The vague, generalized allegations in the Complaint cannot survive because they ignore the rule.

The Trustee seeks damages — not for a specific suspect transaction — but for the loss of the league, opportunities not pursued, assets usurped (but not identified), and lost profits for an entity that never made a profit. ECF at 49-50 ¶ 177. There is no causal connection between what the Trustee says Dundon did and those categories of damages. Because there is no evidence of an actual loss attributable to a suspect transaction, Dundon is entitled to summary judgment.

**The Release Agreement.** The Court should grant summary judgment on the breach of fiduciary duty claims based on the F02 LLC Release (ECF 46 ¶ 172(e)) because the evidence shows that the board of ESMG approved the release before Dundon became a board member, and that Dundon did not participate in the decision for ESMG to enter the release. Ex. 5 at 11-13. The release was effective February 23, 2019. Ex. 2. Dundon was not a director at that time. Ex. 8 at 15-16 (50:15–51:3), 17-18 (53:11–54:4, 54:10-14). The ESMG board of directors authorized the release by vote taken February 24, 2019. *Id.* The shareholders elected Dundon to the board on February 24, 2019. Ex. 6 at 21 (37:4-9), Ex. 5 at 11. Because Dundon did not vote on the release, he cannot be held to account for it as a breach of fiduciary duty.

**K.      The Court should grant summary judgment on the unjust enrichment claim.**

In Count Fifteen, the Trustee seeks restitution of the benefit ESMG conferred under the theory of restitution.  ECF at 63 ¶¶ 215-16.  Under Texas law, unjust enrichment describes an action to recover restitution when a contract action fails for some reason.  *Burlington N. R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 98 (Tex. App. — Texarkana 1996), *aff'd sub nom. Sw. Elec. Power Co. v. Burlington N. R.R. Co*., 966 S.W.2d 467 (Tex. 1998).  It is not available when a valid contract governs a disputed transaction.  *King v. Baylor Univ.*, 46 F.4th 344, 368–69 (5th Cir. 2022) (affirming dismissal of unjust enrichment count where valid contract governed the disputed transaction).

In  this  case,  the  unjust  enrichment  claim  makes  little  sense.    DCP — not Dundon — received a 75% interest in the League through ESMG pursuant to the Term Sheet.  Ex. 1. Dundon got nothing.  And, besides the interests in an admittedly insolvent entity (*see* ECF at 55 ¶ 179), the Debtors gave up nothing. Recovery for unjust enrichment is limited to reimbursement for expenses, the benefit conferred, or a return of performance or its (actual) value.  RESTATEMENT (THIRD) RESTITUTION AND UNJUST ENRICHMENT § 31 cmt. i (2011); *see also Burlington Northern*, 925 S.W.2d at 97.  There is no damages model for those types of damages. The claim for unjust enrichment  cannot  survive  where  none  of  the  Defendants  received  a  tangible,  measurable enrichment.

**L.      The economic loss rule bars the Trustee's tort claims.**

"Under Texas law, the independent injury rule — also referred to as the economic loss rule — precludes recovery in tort when the loss complained of is the subject matter of a contract between the parties."  *Ibe*, 836 F.3d at 526.  "When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone." *Southwestern Bell Tel. Co. v.*

*DeLanney,* 809 S.W.2d 493, 495 (Tex. 1991) (*quoting Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex. 1986)). The Trustee's tort claims seek at least in part the same damages as his contract claims. *See* ECF 56 at 50 ¶ 178 (breach of fiduciary duty), 57-58 ¶ 197 (fraud), 60-61 ¶ 207 (fraudulent inducement), 62 ¶ 214 (negligent misrepresentation). With the possible exception of the loss of the value of the league, there are no allegations that the Debtors suffered any damages independent of the damages sought in the contract claims. In *Ibe*, the Fifth Circuit affirmed the dismissal of fraud claims based on the same facts as contract claims where the damages suffered mirrored the contract damages. 836 F.3d at 526. Delaware law also requires dismissal when the fraud claim seeks the contract claim damages. *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, No. CVN16C07080PRWCCLD, 2017 WL 1312209, at *6 (Del. Super. Ct. Mar. 13, 2017) (dismissing fraud claim where plaintiff sought identical damages for fraud and breach of contract). The same reasons justify summary judgment on the Trustee's tort claims in which he seeks contract damages.

**M.     The Trustee cannot prove a basis for disallowance.**

The Trustee's only basis for subordination is his claims in Counts 5, 11, and 12. For the same reasons the Court should grant judgment for Dundon and DCP on those claims, the Court should grant judgment against the Trustee on his request for disallowance.

**N.     The Trustee is not entitled to equitable subordination.**

In Count 16, the Trustee asks for equitable subordination, but he bases his request on the allegations of fraud made elsewhere in the Complaint. For the same reasons that the Court should grant summary judgment on those claims, the Court should also grant judgment against the Trustee on his request for subordination.

**WHEREFORE,** Defendants DCP and Dundon pray that the Court grant summary judgment that the Trustee take-nothing on his claims, and grant such other and further relief, legal or equitable, to which Defendants may be justly entitled or the Court deems proper.

Respectfully submitted,

By:  /s/*Beverly A. Whitley*

**K&L GATES LLP**

Brent D. Hockaday
Texas Bar No. 24071295
Brent.hockaday@klgates.com
1717 Main Street, Suite 2800
Dallas, Texas 75201
(214) 939-5677
(214) 939-5849 Fax

**BELL NUNNALLY & MARTIN LLP**

Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Beverly A. Whitley
Texas Bar No. 21374500
bwhitley@bellnunnally.com
Brent A. Turman
Texas Bar No. 24077506
bturman@bellnunnally.com
Sydnie A. Shimkus
Texas Bar No. 24093783
sshimkus@bellnunnally.com
2323 Ross Ave., Ste. 1900
Dallas, Texas 75201
(214) 740-1400
(214) 740-1499 Fax

**ATTORNEYS FOR DCP PARTIES**

## CERTIFICATE OF SERVICE

The undersigned certifies a true and correct copy of the foregoing pleading was served by delivering the same to the person listed below in the manner and on the date indicated.

**VIA ECF**

Nicole L. Williams
Email: nwilliams@thompsoncoburn.com
Katherine Battaia Clark
Email: dkclark@thompsoncoburn.com
THOMPSON COBURN LLP
2100 Ross Avenue, Suite 3200
Dallas, TX 75201
*Counsel for Plaintiffs Randolph N. Osherow, Chapter 7 Trustee, Debtors' Estate*

**VIA ECF**

Boris Treyzon
Email: btreyzon@actslaw.com
Jonathon Farahi
Email: jfarahi@actslaw.com
ABIR COHEN TREYZON SALO, LLP
16001 Ventura Boulevard, Suite 200
Encino, CA 91436
*Counsel for Plaintiffs Randolph N. Osherow, Chapter 7 Trustee, Debtors' Estate*

**VIA ECF**

Brian S. Engel
Email: brianen@bdfgroup.com
Steve P. Turner
Email: stevet@bdfgroup.com
BARRETT DAFIN FRAPPIER TURNER & ENGEL, LLP
580 La Ventana Blvd.
Driftwood, TX 78619
*Counsel for Plaintiffs Randolph N. Osherow, Chapter 7 Trustee, Debtors' Estate*

Dated this the 13th day of December, 2024.

/s/Beverly A. Whitley
Beverly A. Whitley

10392684.1 / 04251-00029