1              UNITED STATES BANKRUPTCY
        COURT FOR THE WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3

4   IN RE:                          )
                                    )
5   LEGENDARY FIELD EXHIBITIONS,    )
    LLC, ET AL.,                    )
6                                   ) Case No.
          DEBTORS.                  ) 19-50900-CAG-7
7   _____)
                                    )
8   RANDOLH N. OSHEROW, Chapter 7   )
    Trustee of the Bankruptcy       )
9   Estates of Legendary Field      )
    Exhibitions, LLC; ET AL.,       )
10                                  )
          PLAINTIFF,                )
11                                  )
     v.                             )
12                                  )
    DUNDON CAPITAL, PARTNER, LLC;   )
13  THOMAS DUNDON; AND JOHN         )
    ZUTTER                          )
14                                  )
          DEFENDANTS.               )
15  _____)

16

17          DEPOSITION OF CHARLIE EBERSOL

18          (Contains Confidential Portions)

19     THURSDAY, SEPTEMBER 19, 2024, 8:54 A.M.

20                ENCINO, CALIFORNIA

21

22

23

24     Reported by Michelle Somers, CSR No. 13674

25                Job No. 1174241

**EXHIBIT**

**6**

CHARLIE EBERSOL                                          JOB NO. 1174241
SEPTEMBER 19, 2024

1          MR. FARAHI:  Jonathon Farahi for the trustee.

2          VIDEOGRAPHER:  And counsel online.

3          MR. ATKINS:  John Atkins for trustee.

4          MR. SALTZ:  I am also accompanied by Tommie

09:20AM   5  Horan and Simone Poyourow as also counsel for Charlie

6  Ebersol.

7          VIDEOGRAPHER:  Thank you.  We are ready to

8  proceed.  The court reporter for today is Michelle

9  Somers with Steno.  Would the reporter, please swear in

09:21AM  10  the witness.

11         THE REPORTER:  Raise your right hand, please.

12  Do you solemnly swear to tell the truth, the whole

13  truth, and nothing but the truth?

14         MR. SALTZ:  I do.

09:21AM  15         VIDEOGRAPHER:  You may proceed.

16

17                        EXAMINATION

18  BY MR. LOWENSTEIN:

19     Q    Good morning, Mr. Ebersol, can you please

09:21AM  20  state you full name for the record.

21     A    Charles Duncan Ebersol.

22     Q    And where do you currently live?

23     A    Atlanta, Georgia.

24     Q    How long have you lived there?

09:21AM  25     A    Three plus years.

1    A    This document is the term sheet for Series 1

2  preferred stock financing, that's what it says on the

3  top of the document.

4    Q    Right, with Reggie Fowler's entity F02 LLC,

12:39PM 5  right, you can look at his signature pages?

6    A    Yeah, it starts from the front.

7    Q    Actually it's -- (unintelligible).

8    A    You're looking at 37.

9    Q    Yeah.

10    A    Yeah, it's signed by Reggie Fowler.

11    Q    And let's just walk through high level the

12  deal on what Mr. Fowler was agreeing to put in was a 50

13  million dollar equity investment and then provide 120

14  million dollar line of credit on top of that; is that

15  correct?

16    A    Those are terms in this document, correct.

17    Q    What is your memory of how you got to those

18  being the investment terms for Mr. Fowler?

19    A    We had a series of meetings with Reggie

20  beginning in I believe June of 2018 in which we

21  sketched out what the structure of a deal would look

22  like and this is what came out of that.

23    Q    And what is your recollection of why it was

24  structured where 50 million dollars of the investment

25  would be through investment in capital and 120 million

1   Mr. Anderson and so he was familiar with my approach,

2   he laughed at the audacity of trying to start a

3   football league.  He said something to the effect of I

4   wouldn't have done that, but now that you have maybe I

03:49PM 5   can get involved he -- he made jokes about -- and he

6   jokes about the challenges of being a founder, you

7   know, trying get things off the ground.

8           He said "Are you being sued yet?"  And

9   I -- and laughed, and he said, "If you're not being

03:50PM 10  sued, you're not doing anything right," and I said I

11  was not being sued yet, but that there were certainly

12  people who were threatening it.  He asked me why I was

13  asking for 10 million dollars, which was the number

14  that Erik had told him I was looking for, and I told

15  him it was a bridge loan because Reggie was not

16  performing to the degree that he said he was going to

17  but that he continued to per -- to perform as evidence

18  by which I told him I had literally just received -- I

19  said literally just received a text message from Reggie

03:50PM 20  saying that another 1.7 million dollars was coming in.

21          And he asked how much Reggie put in, and I

22  told him I didn't know, but I could get him that

23  information he asked me what if anything I could send

24  him to look at.

03:50PM 25          Sorry, I'll slow down, I apologize.

```
       1          Jonathan asked me what the parameters of the
       2    conversation that I should have -- do you want me to
       3    repeat that -- Jonathan asked me to sort of tell him
       4    the parameters of the conversation, and I told him that
04:46PM 5    Tom had said that he putting in the 10 million dollars
       6    and that he had floated the idea of a much larger
       7    investment.  Jonathan asked if it was effectively a
       8    replacement for Reggie, and I said I -- I don't know,
       9    though my investors my board minus Reggie felt that if
04:46PM 10   there was a path to getting more consistent capital in
      11    the form of Tom Dundon or otherwise that was -- would
      12    be a good situation.
      13         Q    Replacing Reggie?
      14         A    I don't -- I wouldn't say replacing Reggie
04:46PM 15   because the nature of Reggie's deal between equity and
      16    debt was complex, and I think -- it was more a question
      17    of access to consisting capital in whatever format I
      18    was or the company was capable of getting a deal.
      19         Q    Backing up to these lawsuits, when's the first
04:47PM 20   time you remember -- when Mr. Engel interviewed you at
      21    any point early on in this lawsuit, did he -- did he
      22    interview or ask you to give him the story of these
      23    phone calls that we're going through now?
      24         A    Yes.
04:47PM 25        Q    Did -- did you write those notes down from
```

1    investment from Dundon?

2        A    Jeff wanted to talk to Tom Dundon I told him

3    that I would offer that to Tom but that I did not think

4    that Tom would make himself available in the period of

05:26PM    5    time that he'd given me to have all these phone calls

6    and Jeff said, "Get the deal done."

7        Q    What deal?

8        A    250 million dollars for majority control of

9    the company, and the other terms that I previously

05:26PM    10    said.

11        Q    And was he similar to Singerman where he

12    didn't care if it was debt or equity?

13        A    I don't remember having that conversation with

14    him.

05:26PM    15        Q    Did you say whether it was debt or equity?

16        A    I didn't know.

17        Q    Okay.  So in your conversation with Mr. Dundon

18    the -- let's get the deal done for 250 million the

19    actual structure of what that would be whether debt or

05:27PM    20    equity was not agreed to, correct?

21        A    That is correct.

22        Q    And -- and other than majority control, there

23    was not a specific amount of equity or board control

24    that was discussed in that conversation, correct?

05:27PM    25        A    Not on that first phone call, no.

1        Q    Tell me what happened in that conversation and

2    then we can take a break.

3             MR. SALTZ:  Thank you.

4             THE WITNESS:  I -- I called Tom and I said

05:41PM  5    John Zutter just said that you're investing 70 million

6    dollars.  That's not what I've discussed with my

7    investors are you changing the deal and as we speak

8    right now, can you or can you not tell me that you were

9    transferring 5.1 million dollars to the company by

05:41PM 10    1:30?  And he said, "You're fixated on the 5.1 million

11    dollars."  And I said "Yes, because it has to be paid"

12    by -- I think it was -- we were saying 1:30, but I

13    think it was 2:00 o'clock 'cause I had the money had to

14    go out and -- and she said you're fixing in on a number

05:41PM 15    I will give you that number whatever John is trying to

16    put together is so we have a mechanism to pay you I

17    said, but that number is not 250.

18             And he said.  I am -- I'm a man of my word,

19    I'm committing that we are investing 250 million

20    dollars you can tell your board I'm putting in 250

21    million dollars, however John can get it together in

22    the next insert, however, many hours remaining is

23    John's business, but I'm telling you we have a deal for

24    250."

25             And I said to him, "I have to take you at word

```
 1      Q    Right, that's when it became effective, right
 2  but this committed, this committed Dundon upon the
 3  proper request of the company to invest up to 70
 4  million dollars.
06:31PM 5        MR. SALTZ:  Objection, form.
 6            MR. TREYSON:  Form.
 7  BY MR. LOWENSTEIN:
 8      Q    What's your understanding of it?  I mean this
 9  is not hard, and -- I mean, all the objections, what
06:31PM 10  was your understanding of what Dundon Capital Partners
11  was committed to do under that term sheet?
12      A    My understanding reading this document, is
13  that for 5.1 million dollars Dundon Capital Partners
14  the 5.1 million dollars is the initial funding amount,
06:31PM 15  Dundon Capital Partners in exchange for 5.1 million
16  dollars got 75 percent ownership of the company's fully
17  diluted capital stock.  I'll read the section where I'm
18  getting that if you like me.
19            "Investor ownership" -- the section "investor
06:31PM 20  ownership" it says, "Upon the execution of this
21  agreement and funding of the initial funding amount,
22  the company will issue the investor a number of shares
23  as series 2, such that immediately after the closing
24  the investor will own 75 percent of the companies fully
06:32PM 25  diluted capital stock."
```

CHARLIE EBERSOL
SEPTEMBER 19, 2024                    CONFIDENTIAL                    JOB NO. 1174241

```
         1              MR. LOWENSTEIN:  Object to form.

         2    BY MR. TREYSON:

         3         Q    When --

         4         A    Sorry, yes, that's my understanding.

06:47PM  5         Q    When was that agreement reached?

         6              MR. LOWENSTEIN:  Object to form.

         7              THE WITNESS:  We reached an agreement late

         8    morning on the 14th of February 2019.

         9    BY MR. TREYSON:

06:48PM 10         Q    To the best of your recollection, can you

        11    please state all the terms of that agreement?

        12         A    Tom Dundon agreed to invest 250 million

        13    dollars for majority of Ebersol Sports Media Group and

        14    its subsidiaries total control of the board, and I

06:48PM 15    believe that's it.

        16         Q    As far as your understanding is did Ebersol

        17    Media Group fully comply with its side of what it

        18    promised to do under the agreement?

        19              MR. LOWENSTEIN:  Object to form.

06:49PM 20              THE WITNESS:  That would -- that's my memory.

        21    BY MR. TREYSON:

        22         Q    As far as you were concerned, did Mr. Dundon

        23    fully comply with everything he promised to do under

        24    the agreement?

06:49PM 25              MR. LOWENSTEIN:  Object to form.
```

CHARLIE EBERSOL
SEPTEMBER 19, 2024                    CONFIDENTIAL                    JOB NO. 1174241

```
 1                THE WITNESS:  No.

 2      BY MR. TREYSON:

 3           Q    What it was that Mr. Dundon did not do to

 4      comply with the agreement reached on February 14th?

 5           A    He did not --

 6                MR. LOWENSTEIN:  Object to form.

 7                MR. SALTZ:  Give a beat so he can get his

 8      objection out.

 9                MR. LOWENSTEIN:  I'm a little slow.

10                THE WITNESS:  Can you ask the question again.

11      BY MR. TREYSON:

12           Q    Sure.  What is it that Mr. Dundon did not do

13      to comply with his obligations on the February 14th

14      agreement?

15                MR. LOWENSTEIN:  Object to form.

16                THE WITNESS:  He did not invest 250 million

17      dollars.

18      BY MR. TREYSON:

19           Q    Was a request made for him to invest money in

20      excess of what has investigated?

21           A    Yes.

22           Q    During the discussions leading up to the

23      agreement, did Mr. Dundon state any other

24      considerations that were involved, such as tax

25      benefits, or things like that that he wanted to
```

06:49PM (line 5)
06:49PM (line 10)
06:49PM (line 20)
06:50PM (line 25)

1      A    Okay.

2      Q    As far as your understanding as --

3      A    (Simultaneously speaking) correct.

4      Q    -- and I'm looking at -- at document page DCP

06:51PM  5  Parties02344.

6      A    Okay.

7      Q    As far as your understanding of this agreement

8  this at what point did Mr. Dundon and the entities

9  affiliated with him assume full management control of

06:51PM 10  Ebersol Media Group?

11     A    My understanding of this document is that

12  Dundon Capital Partners assumed full control when they

13  invested 5.1 million dollars as part of the initial

14  funding amount.

06:51PM 15     Q    Assuming that that document was signed at 3:28

16  p.m. Central standard time, is it your understanding

17  that Dundon Capital Partners assumed full management

18  control of Ebersol Media Group at that time?

19          MR. LOWENSTEIN:  Object to form.

06:52PM 20          THE WITNESS:  That my understanding.

21  BY MR. TREYSON:

22     Q    At that point whose decision was -- what, if

23  any amount of money was to be invested by Dundon

24  Capital Partner into Ebersol Media Group?

25          MR. LOWENSTEIN:  Object to form.

1

2                    REPORTER'S CERTIFICATION

3

4          I, Michelle Somers, Certified Shorthand

5    Reporter in and for the State of California, do hereby

6    certify:

7

8          That the foregoing witness was by me duly

9    sworn; that the deposition was then taken before me at

10   the time and place herein set forth; that the testimony

11   and proceedings were reported stenographically by me

12   and later transcribed into typewriting under my

13   direction; that the foregoing is a true record of the

14   testimony and proceedings at that time.

15

16         IN WITNESS WHEREOF, I have subscribed my name

17   on this date:

18

19

20

21

22   *Michelle Somers*
     _____
23         Michelle Somers, CSR No. 13674

24

25

```
 1                  UNITED STATES DISTRICT COURT
 2              FOR THE WESTERN DISTRICT OF TEXAS
 3                    SAN ANTONIO DIVISION
 4
 5     IN RE:                        ) Case No. 19-50900-CAG-7
                                     )
 6     LEGENDARY FIELD EXHIBITIONS,  )
       LLC, ET AL.,                  )
 7                                   )
                 DEBTORS.            ) Chapter 7
 8     _____)
                                     )
 9     RANDOLPH N. OSHEROW, Chapter 7 )
       Trustee of the Bankruptcy     )
10     Estates of Legendary Field    )
       Exhibitions, LLC; AAF Players,)
11     LLC; AAF Properties, LLC;     )
       Ebersol Sports Media Group,   )
12     Inc.; LFE 2, LLC; and We Are  )
       Realtime, LLC,                )
13                                   )
                 PLAINTIFF,          )
14                                   )
           vs.                       ) ADV. PROC. NO. 22-05078-cag
15                                   )
       DUNDON CAPITAL PARTNERS, LLC; )
16     THOMAS DUNDON; AND JOHN       )
       ZUTTER,                       )
17                                   )
                 Defendants.         )
18     _____) Volume II
19                    *** CONFIDENTIAL ***
20           VIDEO DEPOSITION OF CHARLES EBERSOL
21                     Encino, California
22               Friday, September 20, 2024
23     Reported by:
       Elaine Smith, RPR, RMR, CSR No. 5421
24
       Job No. CA 6931588
25     PAGES 1 - 126
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        term sheet.  And you don't need to look at it.        09:47:52

 2               My question is, you recall that happened

 3        on -- was executed on February 14th, 2019?

 4           A    I do.

 5               MR. ENGEL:  Objection to form.                  09:48:00

 6        BY MR. LOWENSTEIN:

 7           Q    The -- following that event, we talked

 8        about -- or at the same time -- that Dundon Capital

 9        Partners funded $5.1 million according to the terms

10        of the term sheet; correct?                           09:48:16

11               MR. SALTZ:  Objection to form.

12               THE WITNESS:  DCP funded $5.1 million that

13        day.

14        BY MR. LOWENSTEIN:

15           Q    And then after that, a group of you met at    09:48:17

16        Dundon Capital Partners' offices in Dallas, Texas;

17        correct?

18               MR. SALTZ:  Objection.  Form.

19               THE WITNESS:  I believe it was the next day,

20        that we met.                                          09:48:37

21        BY MR. LOWENSTEIN:

22           Q    On the 15th?

23           A    On the morning of the 15th, correct.

24           Q    In Dallas?

25           A    Correct.                                      09:48:42
```

Page 9

| | | |
|---|---|---|
| 1 | night of the 18th.  And then on the morning of the | 09:52:37 |
| 2 | 19th, we began having several press interviews, some | |
| 3 | of them with Mr. Dundon and I together and some of | |
| 4 | them where we were doing them individually. | |
| 5 | Q    Okay.  So February 14th you have this -- | 09:52:48 |
| 6 | these phone calls with Mr. -- Mr. Dundon where you | |
| 7 | say he committed to and reached an agreement with the | |
| 8 | league to invest $250 million.  You have meetings | |
| 9 | where the 250 million is discussed, and then you have | |
| 10 | press releases and press interviews that happen in | 09:53:05 |
| 11 | and around that 19th, 20th time frame as well; right? | |
| 12 | A    Correct. | |
| 13 | Q    And at the beginning of that process, you | |
| 14 | signed the term sheet that talked about $70 million; | |
| 15 | right? | 09:53:24 |
| 16 | MR. SALTZ:  Object to the form. | |
| 17 | THE WITNESS:  We -- the term sheet was | |
| 18 | signed on the 14th, correct. | |
| 19 | BY MR. LOWENSTEIN: | |
| 20 | Q    It references $70 million? | 09:53:33 |
| 21 | A    $70 million is referenced in the term -- | |
| 22 | Q    Right. | |
| 23 | A    -- sheet. | |
| 24 | Q    And you said that the contemplation was | |
| 25 | there was going to be a $250 million investment and | 09:53:42 |

Page 13

| | | |
|---|---|---|
| 1 | $250 million to the public and internally between | 09:56:42 |
| 2 | that.  Yet we get to the 24th and there's no | |
| 3 | reference that there's any discussion of $250 million | |
| 4 | in the -- the board meeting minutes.  And I'm asking | |
| 5 | why that happened. | 09:56:53 |
| 6 | MR. SALTZ:  Objection.  Form. | |
| 7 | Answer if you know. | |
| 8 | THE WITNESS:  Sure.  I'm sorry.  Just to | |
| 9 | understand your question, you're asking me why in the | |
| 10 | board minutes it doesn't reference $250 million? | 09:57:08 |
| 11 | MR. LOWENSTEIN:  Yes. | |
| 12 | THE WITNESS:  I don't know. | |
| 13 | BY MR. LOWENSTEIN: | |
| 14 | Q    And why were you not slamming on the table | |
| 15 | and saying, we need paper.  It's been ten days. | 09:57:18 |
| 16 | The emergency with the 5.1 is gone.  It's been ten | |
| 17 | days.  Why aren't you slamming on the table and | |
| 18 | saying, This is a $250 million deal.  Why are we | |
| 19 | getting board approval for a $70 million deal? | |
| 20 | MR. SALTZ:  Objection.  Form. | 09:57:38 |
| 21 | THE WITNESS:  Well, first of all, Mr. Dundon | |
| 22 | at that point had done half a dozen meetings, press | |
| 23 | conferences in which he said he had invested | |
| 24 | $250 million. | |
| 25 | Second of all, it was my understanding going | 09:57:49 |

Page 17

1    into that board meeting that the board meeting which        09:57:50

2    I was being directed to do by Mr. Dundon was kabuki

3    theater, because the term sheet clearly said that the

4    board was now Tom Dundon and John Zutter, and that we

5    were only being asked to do it because John Zutter        09:58:11

6    and Tom Dundon insisted that we do it.

7            And I had Tom's word.  And Tom had conveyed

8    his word not only to me but to my executive team in

9    Dallas, to -- to my understanding, to the NFL, to

10   CBS, to Turner and their leadership groups.               09:58:34

11           And so at that point in time I was doing

12   what I was told, which was my understanding of what I

13   was supposed to do based on the new structure as it

14   had been signed ten days earlier.

15           MR. LOWENSTEIN:  Objection.  Nonresponsive.        09:58:50

16   BY MR. LOWENSTEIN:

17      Q    My question is why weren't you slamming on

18   the table -- I mean, there wasn't a gun at your head

19   to do the board meeting just like Dundon said; right?

20           MR. ENGEL:  Objection.  Form.                     09:58:56

21           MR. SALTZ:  Objection.  Form.

22           You can answer.

23           THE WITNESS:  No, no one pointed a -- an

24   actual gun at my head.

25   ///                                                       09:59:05

Page 18

```
 1              THE REPORTER:  I just need to get my other      10:00:01

 2    objection besides Mr. Saltz.

 3              MR. SALTZ:  It was just Mr. Saltz.

 4              THE REPORTER:  Thank you.

 5              THE WITNESS:  I want to make sure I answer       10:00:08

 6    your question.  It seemed to me you were asking me a

 7    couple of different questions.  Which -- which

 8    question do you want me to answer?

 9    BY MR. LOWENSTEIN:

10        Q    You could have raised in the board meeting       10:00:16

11    to the board that your understanding of the deal was

12    it was for $250 million, but you didn't raise that,

13    did you?

14        A    I did not raise that.

15              MR. LOWENSTEIN:  I have -- what -- what were     10:00:27

16    we on?

17              MR. HOCKADAY:  You had 22 and 23.  If it's a

18    new exhibit, it will be 24.

19              MR. LOWENSTEIN:  Thank you.  Not red.

20              MR. HOCKADAY:  I'll do -- I'll do whatever.      10:00:48

21              MR. LOWENSTEIN:  I don't want my numbers in

22    red.

23              MR. HOCKADAY:  Deal with it.

24              (Exhibit 24 was marked for identification.)

25    ///
```

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q    And it goes on to say, "The officers of the | 10:18:02 |
| 2 | Corporation, and each of them with full authority to | |
| 3 | act without the others, are hereby authorized, in the | |
| 4 | name of and on behalf of the Corporation, to execute | |
| 5 | and deliver, and to cause the Corporation to enter | 10:18:13 |
| 6 | into and perform all its obligations under the Term | |
| 7 | Sheet, together with such changes therein," et | |
| 8 | cetera. | |
| 9 | So what you had obtained authorization for | |
| 10 | under this agreement was to execute on the term | 10:18:26 |
| 11 | sheet; correct? | |
| 12 | MR. ENGEL:  Objection to form.  That was | |
| 13 | Engel. | |
| 14 | THE WITNESS:  Sorry, I don't -- can you ask | |
| 15 | that que- -- can you rephrase that question so I can | 10:18:48 |
| 16 | understand? | |
| 17 | BY MR. LOWENSTEIN: | |
| 18 | Q    This agreement says the officers of the | |
| 19 | corporation are authorized to execute and deliver and | |
| 20 | to cause the corporation to enter into and perform | 10:18:58 |
| 21 | all of its obligations under the term sheet. | |
| 22 | That's what it says; correct? | |
| 23 | A    That's what this says, correct. | |
| 24 | Q    All right.  And it does not say that you | |
| 25 | were authorized to execute on an agreement for | 10:19:10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    $250 million, does it?                                    10:19:16

2            MR. ENGEL:  Objection.  Form.  Engel.

3                THE WITNESS:   It doesn't appear to, no.

4    BY MR. LOWENSTEIN:

5        Q    And it doesn't say that you were authorized    10:19:38

6    to enter an agreement with Mr. Dundon or a different

7    entity for another $180 million, does it?

8            MR. SALTZ:  Objection to form.

9                THE WITNESS:   There is no reference to

10   $180 million in this document.                           10:19:53

11   BY MR. LOWENSTEIN:

12       Q    In the second page of Exhibit 26, it says,

13   resolved further -- the first "Resolved Further"

14   says, "The officers of the Corporation, and each of

15   them with full authority to act without the others,     10:20:14

16   are hereby authorized, in the name of and on behalf

17   of the Corporation, to negotiate the definitive

18   agreements reasonably necessary or advisable to

19   implement the transactions contemplated by the Term

20   Sheet"; correct?                                         10:20:29

21       A    Correct.

22       Q    It does not give you, the officers of the

23   corporation, to implement transactions for -- that

24   are outside of the term sheet, does it?

25           MR. SALTZ:  Objection.  Form.                    10:20:42

Page 34

```
 1      Sheet Board Structure -- it's the first item --        10:23:02

 2      correct?

 3          A    Yeah.

 4          Q    And then it says, "Elect each of John Zutter

 5      and Tom Dundon as a Voting Director and Charles        10:23:10

 6      Ebersol as a Non-Voting Director, effective as of

 7      February 24, 2019."

 8               Do you see that?

 9          A    I do see that.

10          Q    Okay.  And then in the signature pages --      10:23:21

11      the next page, Exhibit 26, you, on behalf of Teddy

12      Bright Pictures, signed this document on March 27,

13      2019; true?

14          A    True.

15          Q    And you, on behalf of the FO2, LLC, which      10:23:43

16      was Mr. Fowley's -- Fowler's entity, signed as proxy

17      holder on March 27, 2019?

18          A    True.

19          Q    And then -- I just want to get into the last

20      question.  I'm just going to say, and the other        10:24:03

21      stockholders signed it as well; correct?

22               MR. SALTZ:  Object to the form.

23               THE WITNESS:  Correct.

24               MR. LOWENSTEIN:  All right.  You can put

25      that aside.                                             10:24:16
```

                                                        Page 37

CONFIDENTIAL

```
 1      terms of those contracts.  Sorry.                    10:32:50

 2            So that conference room's on the right.

 3      Dead ahead is the main conference room, which was the

 4      room that Tom was usually in with us and John was in.

 5      And there's a whiteboard on the -- one of the two      10:33:02

 6      walls.  And on --

 7            MR. SALTZ:  Finish your sentences.

 8            THE WITNESS:  Sorry.  In the main room,

 9      which was the room that Tom Dundon and John Zutter

10      usually held their meetings that I was in for most of  10:33:14

11      the time, there was a -- when you're looking at the

12      room, there's a whiteboard on the left.  There's a

13      television on the right.

14            And on the whiteboard we were drawing up

15      scenarios of how could you keep the league alive to    10:33:22

16      the end of the season.  And it was in response to a

17      theory that -- or not a theory.  The -- I guess, the

18      professional, educated opinion of a couple of people

19      on the team, not the least of which was a -- a lawyer

20      that worked for us whose name was David Cornwell.      10:33:40

21            David Cornwell was formerly an attorney in

22      the Players Association.  He had famously represented

23      Alex Rodriguez in Major League Baseball against -- I

24      think the Major League Baseball, when they tried to

25      not let him go to the Red Sox and he ended up going    10:33:58
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    to the Yankees, which resulted in the Yankees winning        10:34:02

2    the 2009 World Series, which was a good thing for me.

3            Anyway -- sorry -- David Cornwell had

4    pointed out to Tom and to John Zutter that the

5    largest asset of the league was the player contracts.        10:34:17

6    Specifically, we had two separate contracts.  We had

7    a player contract, which had what we referred to as

8    an NFL out.  So if a player wanted to go to the NFL,

9    they'd go.  But we had created -- largely, David

10   Cornwell and I had created this other contract which          10:34:33

11   allowed players -- it was a marketing contract which

12   allowed players to go to the NFL, but then they had

13   to come back to our league as long as our league was

14   a going concern.

15           And the asset was -- we knew Vince McMahon          10:34:44

16   and the XFL was potentially coming the following

17   year, and so what had -- what David had told Tom and

18   Bill and I and, I think, John Zutter -- and -- and

19   this is something that Bill Polian had also said,

20   David Cohen and others that were sort of experts in          10:34:58

21   the field, that if we finished the season and had an

22   argument that the second season existed, that you

23   would be able to potentially sell the asset of the

24   contracts, because the players were under three-year

25   contracts and -- and the marketing contracts would          10:35:11

Page 44

CONFIDENTIAL

1          I, the undersigned, a Certified Shorthand Reporter

2     of the State of California, do hereby certify:

3          That the foregoing proceedings were taken before

4     me at the time and place herein set forth; that any

5     witnesses in the foregoing proceedings, prior to testifying,

6     were administered an oath; that a record of the proceedings

7     was made by me using machine shorthand which was thereafter

8     transcribed under my direction; that the foregoing

9     transcript is a true record of the testimony given.

10          Further, that if the foregoing pertains to the

11    original transcript of a deposition in a federal case,

12    before completion of the proceedings, a review of the

13    transcript was requested.

14          I further certify I am neither financially

15    interested in the action nor a relative or employee of any

16    attorney or any party to this action.

17          IN WITNESS WHEREOF, I have this date subscribed my

18    name.

19

20    Dated: 9/27/2024

21

22          *Elaine Smith*

23          ELAINE SMITH, RPR, RMR

          CSR No. 5421

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127