**EXHIBIT 7**

```
           UNITED STATES BANKRUPTCY COURT
         FOR THE WESTERN DISTRICT OF TEXAS
                 SAN ANTONIO DIVISION
                      ---o0o---
IN RE:                              CASE NO.
                                    19-50900-CAG-7
LEGENDARY FIELD
EXHIBITIONS, LLC, ET AL.,
                                    CHAPTER 7
     DEBTORS.
                              /
RANDOLPH N. OSHEROW, Chapter
7 Trustee of the Bankruptcy
Estates of Legendary Field
Exhibitions, LLC; AAF Players,
LLC; AAF Properties, LLC;
Ebersol Sports Media Group,
Inc.; LFE 2, LLC; and We Are
Realtime, LLC,
     PLAINTIFF,
vs.                                 ADV.PROC.NO.
                                    22-05078-cag
DUNDON CAPITAL PARTNERS, LLC;
THOMAS DUNDON; AND JOHN
ZUTTER,
     DEFENDANTS.
     _____/
```

        VIDEOTAPED DEPOSITION OF KEVIN FREEDMAN
                Friday, October 18, 2024

Reported by: Kimberly L. Avery, CSR No. 5074
Job No. 6973961
Pages: 1 - 391

Page 1

```
 1    hand, please.
 2                    KEVIN FREEDMAN,
 3                   sworn as a witness,
 4                   testified as follows:
 5                      EXAMINATION                      09:08:07
 6    BY MR. ENGEL:
 7         Q.  Good morning, Mr. Freedman.
 8             How are you today?
 9         A.  I am well how.  How are you?
10         Q.  I'm well.                                 09:08:10
11             Just so we can get it out of the way,
12    could you state and spell your name?  That way, it
13    will help the court reporter later.
14         A.  Kevin Freedman, K-E-V-I-N F-R double
15    E-D-M-A-N.                                         09:08:22
16         Q.  Thank you, sir.
17             You are here today because you received a
18    notice of deposition from Mr. Farahi's law firm,
19    correct?
20         A.  Uh-huh.                                   09:08:33
21         Q.  All right.  Have you ever given your
22    deposition before?
23         A.  A long time ago.  Once, yeah, 20 years
24    ago.
25         Q.  Oh.  All right.  Was that in correction -- 09:08:38
```

Page 13

```
 1         Q.  Okay.  I understand that we could have to
 2    go to the documents to see what it really was.
 3             Yeah, I was going to make a joke, but I'll
 4    leave it to myself.
 5             Did you participate in planning the           09:38:53
 6    training camp for the AAF?
 7         A.  To what level of planning?
 8         Q.  Any level.
 9         A.  I'm sure I participated a little bit of
10    like -- I did not participate in any detail level     09:39:08
11    of planning the training camp.
12         Q.  That leads me to a question.  The part of
13    the business that you were in with the AAF, were
14    there other parts of the business that did other
15    things, like business operations and football         09:39:18
16    operations and --
17         A.  Yes.
18         Q.  -- other kinds of operations?
19         A.  Yes.
20         Q.  All right.  Did you have by the time         09:39:25
21    training camp started a job title with the AAF, or
22    were you still a consultant?
23         A.  I had a job title, yes.
24         Q.  And what was it?
25         A.  I was the Chief Operating Officer/Head of    09:39:36
```

Page 43

```
 1    Operations.
 2          Q.  Okay.  So I'm just going to pick Head of
 3    Operations so I don't have to say the long
 4    sentence every time.
 5          But as the Head of Operations, what was      09:39:50
 6    your function?
 7          A.  What do you -- a little more, please.
 8          Q.  Yes, sir, I can.
 9          Did your role change from the role you
10    were serving as a consultant when you got the job  09:40:06
11    title?
12          A.  Um, yes.
13          Q.  If you could, tell us how.
14          A.  Um, in the world of startups in early
15    stage, hopefully, your company is graduating on to 09:40:23
16    new things.  And so from the early days, as when I
17    joined Charlie as a consultant, it was me and
18    Charlie and a few other folks that were -- like
19    Bill and others that were doing stuff.
20          But you go from a handful of people doing    09:40:37
21    stuff to hundreds of people doing stuff, and the
22    roles just change naturally.
23          And so while I was still involved in
24    fundraising, we now had a tech piece of our
25    business, and obviously, that's where my           09:40:52
```

Page 44

| | | |
|---|---|---|
| 1 | Q. Let me ask you a better question. | |
| 2 | Did you, for example, purchase an airplane | |
| 3 | ticket and fly to Dallas at some point? | |
| 4 | A. At some point, yes. | |
| 5 | Q. Okay. And was that some point before the | 11:42:01 |
| 6 | 17th of February 2019, so you could be at meetings | |
| 7 | on the February -- on that date? | |
| 8 | MR. LOWENSTEIN: Object to leading. | |
| 9 | THE WITNESS: Most likely. | |
| 10 | BY MR. ENGEL: | 11:42:20 |
| 11 | Q. The question I'm really asking you, all | |
| 12 | fun aside, is did you attend meetings in Dallas, | |
| 13 | Texas shortly after this term sheet was signed on | |
| 14 | or about Monday, February 17th -- | |
| 15 | A. Yes. Yes. | 11:42:35 |
| 16 | Q. -- 2019? | |
| 17 | Got it. Okay. | |
| 18 | I get it fixed up? | |
| 19 | Just no fun in the world anymore, | |
| 20 | Mr. Freedman. | 11:42:43 |
| 21 | BY MR. ENGEL: | |
| 22 | Q. Okay. I want to ask you about those | |
| 23 | meetings. | |
| 24 | Was Mr. Dundon there? | |
| 25 | A. Yes. | 11:42:52 |

Page 126

```
 1       Q.   Was Mr. Zutter there?
 2       A.   Yes.
 3       Q.   Was Mr. Ebersol there?
 4       A.   Yes.
 5       Q.   Was Mr. Veit there?                           11:42:56
 6       A.   Yeah.
 7       Q.   Was Ms. Vugrincic there?
 8       A.   Yeah.
 9       Q.   Was Mr. Kantowitz there?
10       A.   Yeah.                                         11:43:07
11       Q.   Was Mr. Farrell there?
12       A.   I think so.
13       Q.   Was Mr. Zutter there?
14       A.   I think so.  Like, he was, yeah.
15       Q.   Was a young lady named Elise Lee there?       11:43:13
16       A.   She was definitely around.  I don't know
17    if she was in all the meetings, but yes.
18       Q.   Okay.  And anybody else who was there on
19    those days that you remember that I didn't list?
20       A.   Possibly Eric.                                11:43:26
21       Q.   "Eric" means Eric Schwartz?
22       A.   Yeah.
23       Q.   Okay.
24       A.   I don't remember if Bill flew in for those
25    meetings.  I don't remember.                          11:43:38
```

Page 127

```
 1    said, it was either a percentage or cents on the
 2    dollar, and I don't remember which -- whether it
 3    was 20, 40, 80, 1 or 100.
 4         Q.   Got it.
 5              And when you say a percentage or cents on    12:34:37
 6    the dollar, you mean how it was expressed
 7    because --
 8         A.   Yes.
 9         Q.   -- mathematically, those are the same.
10         A.   Yes.                                         12:34:45
11         Q.   Got it.
12              Were you kept apprised of that process as
13    it was going along?
14         A.   It is probably likely that I was cc'd on
15    emails, but I don't recall specifically.               12:34:55
16         Q.   Then I won't talk to you about that email.
17              Okay.  Do you recall going a second time
18    to the DCP offices in Dallas around March 4th or
19    5th or so?
20         A.   I believe so.  And that's part of my --      12:35:15
21    I'm pretty sure I was in Dallas at least two or
22    three times.  I don't remember exactly when they
23    were or how it happened.
24         Q.   By the way, have we now covered all the
25    conversations you ever had with Mr. Dundon?            12:35:31
```

Page 170

```
 1   sheet?  We can go to the term sheet.
 2          MR. HOCKADAY:  Should have been used
 3   earlier.
 4          MR. LOWENSTEIN:  Did you mark the Fowler
 5   term sheet, Brian?                              01:52:37
 6          MR. ENGEL:  No, I did not.
 7          MR. HOCKADAY:  Series 1.
 8          MR. ENGEL:  I did not.
 9          MR. LOWENSTEIN:  We'll keep going and see
10   if you can find it.                             01:52:44
11          You have it?
12          MR. HOCKADAY:  Yup.
13          MR. LOWENSTEIN:  Look at that.
14          Could have just used that.
15          MR. LOWENSTEIN:  I'm going to show you    01:52:51
16   what's previously been marked as Exhibit 16.
17   Maybe this will help.
18          (Deposition Exhibit No. 16 Previously
19           Marked for Identification.)
20          THE WITNESS:  I could put this over here? 01:52:59
21          MR. LOWENSTEIN:  Yeah.  I might come back
22   to it, but yes.
23          THE WITNESS:  Okay.
24   BY MR. LOWENSTEIN:
25      Q.  So let me just go through in summary.    01:53:08
```

Page 207

```
 1              So Exhibit 16, the investment says --
 2    references the $50 million for the equity,
 3    correct?
 4         A.   Correct.
 5         Q.   Then the line of credit is $120 million we    01:53:16
 6    were talking about?
 7         A.   Correct.
 8         Q.   The pre- and post-money valuation talks
 9    about the $115 million we saw in Mr. Ebersol's
10    email.                                                  01:53:30
11         A.   Correct.
12         Q.   And then under the letter of credit
13    section, in exchange for that, there's a finance
14    committee referenced that will be formed relating
15    to financial oversight regarding the letter of          01:54:07
16    credit.
17         A.   Okay.  Yup, I see it.
18         Q.   And then there's a sentence that starts
19    with, "In the event that any material category of
20    revenue or expense reported in such financial           01:54:31
21    statements..."
22              Do you see that?
23         A.   I'm looking at it now.  Okay.
24         Q.   That's essentially saying, depending on
25    the conditions, if there's a variance of more than      01:54:51
```

Page 208

| | |
|---|---|
| 1 | 3 or 5 percent from the budget that was provided |
| 2 | to Mr. Fowler, he could deny to fund further under |
| 3 | the letter of credit; is that a fair summary of |
| 4 | that? |
| 5 |     MR. ENGEL: Object to the form.    01:55:05 |
| 6 |     THE WITNESS: That seems reasonable. |
| 7 | BY MR. LOWENSTEIN: |
| 8 |   Q. And then under the local team revenue, |
| 9 | that explains how Mr. Fowler, in exchange for his |
| 10 | letter of credit, was going to share in team    01:55:16 |
| 11 | revenue? |
| 12 |   A. That -- there you go, yes. |
| 13 |     I did not recall any of that. |
| 14 |     Gosh, that's a long time ago. |
| 15 |   Q. And then under the next page, it says if   01:55:26 |
| 16 | the company sells a franchise license, that those |
| 17 | funds would be used to repay the letter of credit |
| 18 | that was outstanding. |
| 19 |     Is that a fair summary of that? |
| 20 |     MR. ENGEL: Object to the form.    01:55:43 |
| 21 |     THE WITNESS: Yes. |
| 22 | BY MR. LOWENSTEIN: |
| 23 |   Q. So in exchange for -- so there's the |
| 24 | $50 million equity part, which is set forth in one |
| 25 | part of the agreement that has its own set of    01:55:55 |

Page 209

```
 1    conditions, agreed?
 2         A.  Yes.
 3         Q.  And then the $120 million line of credit
 4    to get to that full amount has its own set of
 5    things that the league was going to give              01:56:05
 6    Mr. Fowler in return for extending that letter of
 7    credit, fair?
 8             MR. ENGEL:  Object to the form.
 9             THE WITNESS:  Yes.
10    BY MR. LOWENSTEIN:                                    01:56:12
11         Q.  And you would agree that it was important
12    to put all of those things, meaning what
13    Mr. Fowler was going to give to the league and
14    what he was going to get in exchange, in writing,
15    agreed?                                               01:56:22
16             MR. ENGEL:  Object to the form.
17             THE WITNESS:  Um, I would say it's
18    standard.
19    BY MR. LOWENSTEIN:
20         Q.  And it's important to have those things in   01:56:30
21    writing so that all of the parties know what each
22    owes the other, to test whether anybody is doing
23    what they are supposed to be doing under the
24    agreement, right?
25             MR. ENGEL:  Object to the form.              01:56:43
```

Page 210

```
 1              THE WITNESS:  Certainly reasonable --
 2              MR. HORAN:  Objection.
 3              THE WITNESS:  -- that you would have that
 4     and it would be helpful to -- so everybody knows
 5     what's happening.                                    01:56:49
 6     BY MR. LOWENSTEIN:
 7         Q.  Even if not in writing, in the theoretical
 8     instance -- let me back up.
 9              You -- you've been doing fundraising for
10     companies since you left Ernst & Young?              01:56:59
11         A.  Close enough, yeah.
12         Q.  And so that's for 23 years?
13         A.  Let's say I've been doing it -- what year
14     is it, 24?  I've been doing it for 20-plus years,
15     yup.                                                 01:57:15
16         Q.  Have you ever -- setting aside the AAF
17     because it's a complicated question if I include
18     it, but setting aside the AAF, have you ever seen
19     somebody agree to fund anywhere close to
20     $180 million without having any agreement in place   01:57:29
21     explaining what they would get in exchange for
22     that money?
23              MR. ENGEL:  Object to the form.
24              THE WITNESS:  Close to $180 million?
25              Not that I recall.                          01:57:43
```

Page 211

```
 1    BY MR. LOWENSTEIN:
 2         Q.  If you were advising an investor on making
 3    an investment, would you ever advise them to agree
 4    to invest 180 million or $250 million into a
 5    company without something in writing explaining       01:58:00
 6    what they get in exchange?
 7         A.  No.
 8             MR. ENGEL:  Object to the form.
 9             THE WITNESS:  No, I would not.
10    BY MR. LOWENSTEIN:                                    01:58:11
11         Q.  So Exhibit 16 that we've been talking
12    about, that's the deal that Mr. Ebersol is talking
13    about in exhibit -- what did I mark that, 86?
14         A.  86.
15         Q.  Is that true?                                01:58:24
16         A.  That is my understanding.
17         Q.  And when Mr. Ebersol went to Mr. Rabois,
18    he presented the entire agreement to Mr. Rabois as
19    he understood it; is that fair?
20             MR. ENGEL:  Object -- object to the form.    01:58:37
21             THE WITNESS:  Um, you are asking me what
22    Charlie represented?
23    BY MR. LOWENSTEIN:
24         Q.  Yeah.  Let me ask it differently.
25             As you read it, Mr. Ebersol in Exhibit 86    01:58:48
```

Page 212

```
 1    is outlining all of the components of the
 2    investment that Mr. Fowler promised to make in the
 3    league, fair?
 4         A.   Yes.
 5              MR. ENGEL:  Object to the form.            01:58:59
 6              THE WITNESS:  The material components,
 7    yes.
 8    BY MR. LOWENSTEIN:
 9         Q.   Right.  And that's what he -- he was going
10    to the board member and share -- investor to get    01:59:04
11    his approval by presenting the entire investment?
12              MR. ENGEL:  Object to the form.
13    BY MR. LOWENSTEIN:
14         Q.   Fair?
15         A.   Um, yes.                                  01:59:13
16         Q.   He didn't just say, Let's talk about the
17    50 million and leave out the discussion of the
18    120 million, did he?
19              MR. ENGEL:  Object to the form.
20              THE WITNESS:  He did not do that, no.     01:59:23
21    BY MR. LOWENSTEIN:
22         Q.   I'm just going to jump to it.
23              So there's been discussion here about this
24    $250 million investment.  We've seen the term
25    sheet that talks about $70 million for Mr. -- from  01:59:39
```

Page 213

```
 1    Dundon Capital Partners, correct?
 2         A.   Correct.  We have, yes.
 3         Q.   And the difference between 250 million and
 4    $70 million is 180 million?
 5         A.   That -- that sounds accurate to me.        01:59:52
 6         Q.   I am a numbers guy.
 7              Have you seen anywhere -- strike that.
 8              Do you recall ever seeing any email or
 9    document, signed or otherwise, that outlined how
10    the other $180 million of the alleged Dundon        02:00:11
11    investment would be treated?
12              MR. ENGEL:  Object to the form.
13              I withdraw that.  You just asked if he had
14    seen it.
15              THE WITNESS:  Did I see anything that     02:00:20
16    outlined -- could you just repeat the second half?
17    BY MR. LOWENSTEIN:
18         Q.   Sure.  We see Exhibit 86, that that was a
19    summary of Mr. Fowler's investment, fair?
20         A.   Uh-huh.                                   02:00:29
21         Q.   Yes?
22         A.   Yes.  Yes.  Sorry.
23         Q.   And then we see term sheet.  You saw Mr.
24    -- Dundon Capital Partners' term sheet.  You see
25    Mr. Fowler's term sheet.  And then we talked about  02:00:38
```

Page 214

| | |
|---|---|
| 1 | the documents that Mr. Ebersol was talking about |
| 2 | having formalizing the investment. |
| 3 | What I'm asking is, have you ever seen an |
| 4 | email, a term sheet or any other document drafted |
| 5 | by lawyers or otherwise that outlined how -- 02:00:53 |
| 6 | outlined anything about the additional |
| 7 | $180 million Mr. Dundon allegedly agreed to |
| 8 | provide? |
| 9 | A. Drafted by lawyers? |
| 10 | Q. Anybody. 02:01:06 |
| 11 | A. How it was going to be spent or how it was |
| 12 | going to be invested? |
| 13 | Q. And what Mr. Dundon would get in return. |
| 14 | MR. ENGEL: Object to the form. |
| 15 | THE WITNESS: No, I don't think I have. 02:01:15 |
| 16 | BY MR. LOWENSTEIN: |
| 17 | Q. You have Exhibit 67 in front of you? |
| 18 | A. Yes. |
| 19 | Q. What was -- this was the email between |
| 20 | Mr. Ebersol and Erik Anderson at WestRiver Group, 02:01:42 |
| 21 | talking about a potential investment from |
| 22 | WestRiver Group in May of 2018, correct? |
| 23 | A. Correct. |
| 24 | Q. And under the WRG Financing section, |
| 25 | Mr. Ebersol talks about preferred equity for 02:02:02 |

Page 215

| | | |
|---|---|---|
| 1 | Q. | And it says that you were present. |
| 2 | A. | Okay. |
| 3 | Q. | Do you recall that board meeting? |
| 4 | A. | I do not. |
| 5 | Q. | In that -- the top of page 2, it says: 03:50:36 |
| 6 | | "Mr. Ebersol and Ms. Bell presented a |
| 7 | | summary of the Series 2 Preferred Stock |
| 8 | | binding term sheet negotiated and signed |
| 9 | | with Dundon Capital Partners LLC, as well |
| 10 | | as an update on the funding to date from 03:51:20 |
| 11 | | DCP and ongoing negotiations regarding the |
| 12 | | detailed terms for such financing." |
| 13 | | In the second "WHEREAS," it says: |
| 14 | | "The Term Sheet provides for an investment |
| 15 | | of up to $70,000,000 from Dundon Capital 03:51:32 |
| 16 | | Partners LLC, on terms that significantly |
| 17 | | dilute the ownership and significantly |
| 18 | | impact the economic and control rights of |
| 19 | | the Corporation's existing |
| 20 | | stockholders..." 03:51:44 |
| 21 | | Do you see that? |
| 22 | A. | Yes. |
| 23 | Q. | Do you recall a discussion of that at a |
| 24 | | board meeting in or around that time? |
| 25 | A. | I don't recall it. 03:51:53 |

Page 297

1       Q.  ==Do you recall anybody bringing up during==
2  ==that board meeting any reference to $250 million?==
3       ==A.  I don't recall that.==
4       Q.  Do you recall being forced to have this
5  board meeting by Mr. Dundon or Dundon Capital         03:52:07
6  Partners?
7            MR. ENGEL:  Object to the form.
8            THE WITNESS:  Do I recall being forced?
9       I don't recall that.
10 BY MR. LOWENSTEIN:                                    03:52:16
11      Q.  Or hearing Mr. Dundon or anyone related to
12 his company telling Mr. Ebersol you need to have
13 this board meeting and say these things.
14           Do you recall any of that?
15           MR. ENGEL:  Object to the form.             03:52:27
16           THE WITNESS:  I do not recall that.
17 BY MR. LOWENSTEIN:
18      Q.  And I think an issue I know is going to be
19 raised with respect to this.  It refers to Dundon
20 Capital Partners' investment.  Do you recall          03:52:45
21 hearing anything about a separate investment
22 obligation for Tom Dundon, or other entities of
23 Tom Dundon?
24           MR. ENGEL:  Object to the form.
25           THE WITNESS:  I don't recall that.         03:52:56

Page 298

```
1                    REPORTER CERTIFICATE
2
3         I, KIMBERLY L. AVERY, do hereby certify:
4         That KEVIN FREEDMAN, in the foregoing deposition
5    named, was present and by me sworn as a witness in the
6    above-entitled action at the time and place therein
7    specified;
8         That said deposition was taken before me at said
9    time and place, and was taken down in shorthand by me,
10   a Certified Shorthand Reporter of the State of
11   California, and was thereafter transcribed into
12   typewriting, and that the foregoing transcript
13   constitutes a full, true and correct report of said
14   deposition and of the proceedings that took place;
15        IN WITNESS WHEREOF, I have hereunder subscribed my
16   hand this 25th of October 2024.
17
18
19
20              [signature]
21
                KIMBERLY L. AVERY, CSR No. 5074
22              State of California
23
24
25
```

Page 388