EXHIBIT

8

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3    _____

     IN RE:                        )
4                                   )
     LEGENDARY FIELD                )
5    EXHIBITIONS, LLC,              )
                                    )  No. 19-50900 CAG
6              Debtor,              )  Chapter 7
     _____      )  _____
7                                   )
     DUNDON CAPITAL PARTNERS,       )
8    LLC,                           )  Adversary No.
                                    )  22-05077-CAG-7
9              Plaintiff,           )
                                    )
10        vs.                       )
                                    )
11   CHARLES EBERSOL,               )
                                    )
12                                  )
               Defendant.           )
13                                  )

     _____

14

15        VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

16                       DAWN BELT

                     November 8, 2024
17   _____
                      Time: 8:43 a.m.
18        Witness location: Mountain View, California
19
20
21
22
23
     KATIE J. NELSON, RPR, CSR, CCR
24   CA CSR #14479
     OR CSR #22-0012
25   WA CCR #2971

                                              Page 1

```
 1        DAWN BELT,  sworn as a witness by the Court
 2              Reporter, testified as follows:
 3                E X A M I N A T I O N
 4   BY ATTY. LOWENSTEIN:
 5        Q.  Ms. Belt, can you please state your full name
 6   for the record?
 7        A.  Dawn Hue-Tsing Belt.
 8        Q.  And where do you live?
 9        A.  In Los Altos.
10        Q.  California?
11        A.  Yes.
12        Q.  Where do you work?
13        A.  Here at Fenwick & West.
14        Q.  What is Fenwick & West?
15        A.  A law firm.
16        Q.  How long have you worked at Fenwick & West?
17        A.  17 years.
18        Q.  Is that what you did straight out of law
19   school?
20        A.  Yes.
21        Q.  Where did you go to law school?
22        A.  UC Berkeley.
23        Q.  Undergrad?
24        A.  I -- my undergrad is at Stanford.
25        Q.  Okay.  What did you study at Stanford?
```

Page 8

1          A.   Economics.

2          Q.   Did you have any post law school degrees,

3     like an LL.M.?

4          A.   Not post law school, but my degree is a JD

5     MBA from Berkeley.

6          Q.   So you have an MBA as well?

7          A.   Mm-hm.

8          Q.   Is that a four-year program?

9          A.   Yes.

10          Q.   What is your -- for lack of a better term --

11     specialty in law?

12          A.   I'm a corporate lawyer.

13          Q.   What does that mean?

14          A.   All sorts of corporate law.  I cover

15     primarily in the start-up area working with companies

16     from formation, venture financing, exit transactions,

17     day-to-day corporate matters.

18          Q.   There is a gentleman named Jordan Roberts

19     that is also a Fenwick lawyer, are you familiar with

20     him?

21          A.   Yes.

22          Q.   Can you tell me about Jordan?

23               ATTY. FRITZ:   Object to the

24     question.

25          Q.   (By Atty. Lowenstein)  As a lawyer, what --

                                              Page  9

```
 1    what does he practice, how long has he been with the
 2    firm?
 3         A.  I don't know how long he's been at the firm
 4    exactly.
 5         Q.  Okay.  What area does he practice in?
 6         A.  Similar practice to mine.
 7         Q.  Okay.  In 2019, was he an associate or a
 8    partner?
 9         A.  Associate.
10         Q.  Okay.  Is he a partner now?
11         A.  Yes.
12         Q.  Are you a partner?
13         A.  Yes.
14         Q.  How long have you been a partner at Fenwick?
15         A.  I'm not sure exactly.
16         Q.  How many attorneys does Fenwick have?
17         A.  Between -- oh, attorneys.  I'm not sure
18    exactly actually --
19         Q.  Okay.
20         A.  -- yeah.
21         Q.  When did you first -- are you familiar with
22    the company called Ebersol Sports Media Group, Inc.?
23         A.  Yes.
24         Q.  Did Fenwick represent Ebersol Sports Media
25    Group, Inc., for a period of time?
```

Page 10

1       A.  Yes.

2       Q.  Do you know what years?

3       A.  I don't know exactly.

4       Q.  Okay.  It had other entities that were wholly

5   owned subsidiaries of -- and I'm going to call it

6   ESMG.  Does that work?

7       A.  Sure.

8       Q.  There was wholly owned subsidiaries of ESMG

9   that had various names that are also debtors in this

10  bankruptcy action.

11          Did you represent those entities as well or

12  did you just represent ESMG?

13              ATTY. FRITZ:  Object to the

14  question.

15              THE WITNESS:  Only ESMG.

16      Q.  (By Atty. Lowenstein)  And there was an

17  engagement letter between Fenwick & West and ESMG?

18      A.  Correct.

19      Q.  You don't know the date when that was signed?

20      A.  I don't know.

21      Q.  Were you involved in the formation of ESMG?

22      A.  I don't remember actually.

23      Q.  Let me show you what's been marked as Exhibit

24  240, which is a document called "Ebersol Sports Media

25  Group, Inc.'s Bylaws," adopted October 31, 2017.

                                        Page 11

1              (Exhibit 240 marked.)

2         Q.  (By Atty. Lowenstein)  Do you know if you

3   were involved in the creation of the bylaws for ESMG?

4         A.  I don't remember.

5         Q.  Are you familiar with the bylaws of ESMG?

6              ATTY. ENGEL:  Object to the form.

7              THE COURT REPORTER:  Who objected?

8              ATTY. ENGEL:  That was Brian Engel.

9   I'll object to the form.

10            Madam Reporter, it will usually be me

11  propounding objections from this side.

12             THE COURT REPORTER:  Thank you.

13             ATTY. ENGEL:  Can you hear me all

14  right, Madam Reporter?

15             THE COURT REPORTER:  I can, yes.

16  Thank you.

17             ATTY. ENGEL:  Okay.  I'm fairly

18  loud.  Thank you.

19             ATTY. FRITZ:  I take it we are

20  sharing --

21             (Crosstalk.)

22             ATTY. FRITZ:  -- so I will set it

23  between us.

24             ATTY. LOWENSTEIN:  Perfect.

25        Q.  (By Atty. Lowenstein)  Do you remember my

                                        Page 12

1    question?

2         A.  No, try again.  Sorry about that.

3         Q.  No worries.  What was my question?  The --

4              UNIDENTIFIED SPEAKER:  Are you

5    familiar --

6         Q.  (By Atty. Lowenstein)  Are you familiar with

7    the bylaws for ESMG, Exhibit 240?

8         A.  That these are the bylaws of ESMG?

9         Q.  Yes.

10        A.  That's what this says --

11        Q.  Yes.

12        A.  -- yes.

13        Q.  All right.  Let me ask you a different

14   question.

15             Did you do anything to prepare for today's

16   deposition?

17        A.  I met with these folks yesterday.

18        Q.  Mr. --

19        A.  Mr. --

20        Q.  -- Engel?

21        A.  -- Engels and Ms. Fritz and Mr. Saltz.

22        Q.  How long did you meet with them?

23        A.  Couple of hours.

24        Q.  Okay.  And did you review any documents?

25        A.  No.

Page 13

1    individual named Reggie Fowler, and it is from the

2    October 2018 timeframe.

3            Do you know if you were involved in the

4    drafting of that Term Sheet?

5        A.  Yes.

6        Q.  Another bad question.

7            Were you involved in the drafting of

8    Exhibit 16?

9        A.  Yes.

10       Q.  Okay.  Let me just ask you:  So who drafted

11   the initial draft of Exhibit 16?

12       A.  That I don't know.

13       Q.  Was it a Fenwick attorney?

14       A.  I -- I'm not sure.

15       Q.  Do you recall who represented Mr. Fowler in

16   this transaction?

17       A.  No.

18       Q.  Let me ask you about some details of it.

19           So there was first the transaction related to

20   Series 1 Preferred Stock.  I'll later show you one

21   related to Series 2 Preferred Stock.

22           Can you generally describe what Series 1 and

23   Series 2 Preferred Stock means?

24               ATTY. ENGEL:  Object to form.

25               THE WITNESS:  No, that's not a

1    valuations that supported that number or if it was an

2    issue agreed to?

3         A.  I don't remember.

4         Q.  Do you recall ever seeing a valuation of

5    ESMG?

6         A.  Like a third-party appraisal?  No.

7         Q.  Do you ever recall seeing an internal

8    appraisal done by ESMG people of the value of ESMG?

9         A.  No.

10        Q.  Okay.  In exchange for -- strike that.

11            One of the things that Mr. Fowler was getting

12   in exchange for his equity investment was a

13   liquidation preference.  Do you see that?

14        A.  Yes.

15        Q.  What is a "liquidation preference?"

16             ATTY. ENGEL:  Object to the form.

17             THE WITNESS:  Well, the liquidation

18   preference in this transaction would say that if

19   the company were to liquidate, the Series 1

20   Preferred Stock is first in line to receive any

21   proceeds.

22        Q.  (By Atty. Lowenstein)  And that's something

23   that Mr. Fowler got in exchange for the equity

24   investment piece?

25             ATTY. ENGEL:  Object to the form.

Page 22

1    Q.   (By Atty. Lowenstein)   Correct?

2    A.   It would be part of the nature of the

3  investment, a feature of the investment --

4    Q.   Hence the --

5    A.   -- for security.

6    Q.   Hence the word "preferred" in the name of the

7  stock?

8    A.   Correct.

9    Q.   Then there's a -- on the next page, there's a

10  provision called "Conversion; Anti-Dilution."

11       What does that mean?

12    A.   It means what it says here.   Each share of

13  Series 1 converts into one share of common stock.

14    Q.   So the -- somebody being issued preferred

15  shock has the ability to convert it to common stock?

16    A.   Correct.

17         ATTY. ENGEL:   Object to the form.

18    Q.   (By Atty. Lowenstein)   That's another piece

19  of consideration that Mr. Fowler received in exchange

20  for his investment or his potential investment?

21    A.   It would be a feature of the security.

22    Q.   And then there's another paragraph that says

23  "Protective Provisions."   What does that mean?

24         ATTY. ENGEL:   Object to the form.

25         THE WITNESS:   The protective

Page 23

1    provisions here?

2          Q.  (By Atty. Lowenstein)  Yes.

3          A.  This is a list of certain actions that

4    require approval.

5          Q.  So the list of things in a protective

6    provisions paragraph are things outlined that

7    Mr. Fowler would have to approve in order for them to

8    go forward on behalf of ESMG --

9              ATTY. ENGEL:  Object to the form.

10         Q.  (By Atty. Lowenstein)  -- is that a fair --

11             ATTY. ENGEL:  Sorry, Jeff.

12         Q.  (By Atty. Lowenstein)  -- summary?

13             ATTY. ENGEL:  Object to form.

14             THE WITNESS:  Not Mr. Fowler, but

15    the holders of the majority of preferred stock.

16         Q.  (By Atty. Lowenstein)  Okay.  And -- and he

17    was about to become a holder of preferred stock?

18         A.  I don't know that.

19         Q.  Okay.  Do you know if there was any other

20    Series 1 Preferred Stock issued to anyone about -- let

21    me start that over.

22             Do you know if anyone other than Mr. Fowler

23    or his company was issued Series 1 Preferred Stock?

24         A.  I don't remember.

25         Q.  And some of those protective provisions

                                              Page 24

1    questions.

2          Do you recall who drafted the original draft

3    of the binding Term Sheet for the Series 2 preferred

4    stock?

5          A.  I don't remember.

6          Q.  Does this look similar to -- well, strike

7    that.

8          Do you believe it was Fenwick that drafted

9    the Term Sheet?

10               ATTY. ENGEL:  Object to the form.

11               THE WITNESS:  Do I believe it?

12          Q.  (By Atty. Lowenstein)  Yeah.

13          A.  I guess I'm not sure what that question

14    means.

15          Q.  Well, so there's two ways to crack that nut.

16          A.  Yes.

17          Q.  One is, you have a specific recollection of

18    doing it.  Two is, it looks exactly like other forms

19    that you all created for this league, so that would

20    hint to you that it was a draft that Fenwick created.

21    That's what I mean by "believe."

22               ATTY. ENGEL:  Object to the form.

23          Q.  (By Atty. Lowenstein)  So one, do you recall

24    if Fenwick drafted the binding Term Sheet for the

25    Series 2 preferred stock?

Page 34

1          A.   I -- I don't recall.

2          Q.   So two, does it look like the form you all

3     had created for preferred -- preferred stock, term

4     sheets for stock for ESMG?

5                    ATTY. ENGEL:  Object to the form.

6                    THE WITNESS:  I don't think I can

7     say.  There -- yeah, I don't...

8          Q.   (By Atty. Lowenstein)  That's fine.

9               There is a change in the investor ownership

10    from 70 percent of the company's fully diluted stock

11    to 75 percent.

12              Do you recall conversations with

13    Mr. Skochdopole or Mr. Zutter about that?

14                    ATTY. ENGEL:  Object to the form.

15              Go ahead.

16                    THE WITNESS:  No.

17         Q.   (By Atty. Lowenstein)  What does that mean

18    when an investor owns 75 percent of the company's

19    fully diluted capital stock?

20                    ATTY. ENGEL:  Object to the form.

21                    THE WITNESS:  You want me to explain

22    that generally?

23         Q.   (By Atty. Lowenstein)  Yes.

24         A.   Can I do that?  Should I do that?  Okay.

25    That they own 75 percent of the company as in -- in

Page 35

1              ATTY. ENGEL:   -- to let me do my

2      job.

3          Q.   (By Atty. Lowenstein)   The next document in

4      this package, which is Exhibit 23, is a Minutes of a

5      Special Meeting of the Board of Directors of Ebersol

6      Sports Media Group, Inc.   Do you see that?

7          A.   Yes.

8          Q.   And you are identified in the third page --

9      although it's not signed -- as the secretary of the

10     meeting; is that correct?

11         A.   Yes.

12         Q.   Do you recall this board meeting?

13         A.   Not specifically.

14         Q.   All right.   Are -- do you recall if you were

15     the one that put together the information that's

16     included in the minutes?

17         A.   I don't remember specifically.

18         Q.   Okay.   Is it your belief that what's

19     contained in these minutes accurately reflects what

20     happened at the board meeting on February 24, 2019?

21             ATTY. ENGEL:   Object to the form.

22             THE WITNESS:   Yes.

23         Q.   (By Atty. Lowenstein)   It says that directors

24     present were Charlie Ebersol, Dick Ebersol, Jeff

25     Moorad and Keith Rabois.

Page 49

1          Do you recall that those four gentlemen

2     constituted the directors of ESMG as of February 24,

3     2019?

4               ATTY. FRITZ:  Object to the

5     question.  Can you -- for me, can you read -- just

6     read it again?

7               ATTY. LOWENSTEIN:  I can ask it

8     again.

9               ATTY. FRITZ:  Yeah, yeah.  Okay.

10              ATTY. LOWENSTEIN:  I'll see how I

11    do, but I can ask it again.

12              ATTY. FRITZ:  Yeah, yeah, yeah.

13        Q.  (By Atty. Lowenstein)  We're looking at

14    minutes of the special -- sorry.

15              We're looking at the minutes of a special

16    meeting of the board of directors of ESMG dated

17    February 24 of 2019.  The minutes identify four

18    directors, three present, one absent, which is Charlie

19    Ebersol, Dick Ebersol, Jeff Moorad and Keith Rabois.

20              My question was:  Do you recall that being

21    the board of directors at the time these minutes were

22    executed on February 24, 2019?

23        A.  I don't remember.

24        Q.  Okay.  Do you believe that since those are

25    the ones identified as the directors, that those, to

Page 50

1    your knowledge at that time, were the directors of

2    ESMG?

3        A.  Yes.

4        Q.  It also says other present -- others present

5    were Kevin Freedman, Alan Kantowitz and you.

6            Do you recall attending this board meeting by

7    telephone?

8        A.  I don't.

9        Q.  Okay.  Do you have any recollection of where

10   any of the people that participated in this board

11   meeting were when it occurred on February 24, 2019?

12       A.  No.

13       Q.  Okay.  And it said -- it says, on the first

14   paragraph:  "Ms. Belt acted as the secretary of the

15   meeting and kept the minutes."  Is that accurate?

16       A.  Correct.

17       Q.  There's -- the first section says:  "Update

18   on FO2 LLC."  Do you see that?

19       A.  Yes.

20       Q.  It says, in the subparagraph B that "FO2" --

21   which is Mr. Fowler's entity -- "signed and delivered

22   a release agreement to the company in the form

23   attached hereto as Exhibit A, pursuant to which the

24   company and FO2 agreed to a mutual release of a claims

25   in exchange for termination of the Series 1 Preferred

Page 51

1    Q.   (By Atty. Lowenstein)  Sure.  To the extent

2    there was an agreement between Mr. Fowler and the

3    company at the time of -- this release agreement was

4    agreed to, the directors controlling the company at

5    that time were the ones identified in the minutes,

6    right?

7                ATTY. ENGEL:  Object to the form.

8                THE WITNESS:  I don't remember.

9    Q.   (By Atty. Lowenstein)  At least as of the

10   date of this agreement -- or strike that.

11             At least of the date of this board meeting

12   where that agreement was reached, the directors were

13   the ones identified in the document, correct?

14                ATTY. ENGEL:  Object to the form.

15                THE WITNESS:  I don't know that, but

16   based on these minutes, that's what I would

17   expect.

18        Q.   (By Atty. Lowenstein)  And Mr. Dundon and

19   Mr. Zutter are not identified as directors on --

20   acting on behalf of the company as of February 24,

21   2019, does it?

22                ATTY. ENGEL:  Object to the form.

23                THE WITNESS:  Those names are not on

24   these minutes, yes.

25        Q.   (By Atty. Lowenstein)  Do you have any

Page 53

1    independent recollection outside of what's in the

2    minutes of Mr. Zutter or Mr. Dundon being involved in

3    this board meeting on February 24, 2019?

4         A.   I have no independent recollection of that.

5              ATTY. ENGEL:  For the record, Brent

6    whispered and I didn't hear it.

7              UNIDENTIFIED SPEAKER:  (Inaudible.)

8         Q.   (By Atty. Lowenstein)  Do you have -- do you

9    have --

10             Do you recall having any discussions with

11   Mr. Zutter, or Mr. Dundon or their counsel concerning

12   this release agreement that is referenced in the

13   minutes?

14        A.   I don't remember doing that.

15        Q.   Yes.  Okay.

16             (Quiet talking in conference room.)

17             THE COURT REPORTER:  I can't hear

18   the background noise.

19             ATTY. LOWENSTEIN:  I'm sorry.

20   Mr. Hockaday keeps whispering at me.  I'll try to

21   get him to stop.

22             UNIDENTIFIED SPEAKER:  (Inaudible.)

23        Q.   (By Atty. Lowenstein)  The next -- the first

24   paragraph on the second page of the minutes, it

25   says -- are you with me?

Page 54

1      A.  Yes.  Well, sorry.  Say that again.

2      Q.  First paragraph, second page of the minutes.

3      A.  Second page.  Okay.

4      Q.  It talks about "Mr. Ebersol and Ms. Belt

5  presented a summary of the Series 2 preferred stock

6  binding Term Sheet negotiated and signed with Dundon

7  Capital Partners."  Do you see that?

8      A.  Yes.

9      Q.  And to your recollection, was that the Term

10  Sheet we were discussing which was Exhibit 22?

11               ATTY. ENGEL:  Object to form.

12               THE WITNESS:  I don't specifically

13  remember.

14      Q.  (By Atty. Lowenstein)  Do you remember any --

15  just so you have it in front of you, Exhibit 22 is

16  that Term Sheet.

17      A.  This one?

18      Q.  Yes.  Do you recall any Term Sheet with

19  Dundon Capital Partners other than what's in

20  Exhibit 22?

21      A.  I don't.

22      Q.  Do you recall this -- providing this

23  presentation to the board on February 24, 2019?

24      A.  I don't remember.

25      Q.  That's fair.

1    In the second sentence, it says, "In

2 particular, the board discussed the need to offer

3 existing investors" -- strike that.  Skip that part.

4 Oh, no, I don't want to skip that part.  Okay.

5    It says "In particular, the board discussed

6 the need to offer existing investors an opportunity to

7 participate in the new financing.  With Mr. Charlie

8 Ebersol confirming that Tom Dundon has verbally

9 indicated that he will offer such an opportunity to

10 the company's existing stockholders, with details to

11 be negotiated and confirmed, the board directed

12 management to continue discussions with DCP

13 accordingly."

14    Did I read that correctly?

15    A.  Yes.

16    Q.  What that means is that there was going to be

17 a on note -- ongoing negotiations as to the structure

18 of any investment between Mr. Dundon or Dundon Capital

19 Partners and ESMG; is that fair?

20    A.  No.

21    ATTY. ENGEL:  Object to the form.

22    Q.  (By Atty. Lowenstein)  Okay.  So tell me how

23 I got that wrong.

24    A.  This says here, it's about how you will offer

25 the opportunity to company's existing stockholders.

Page 56

1    of the corporation's existing stockholders, and the

2    corporation has already received over $12 million from

3    Dundon Capital Partners under these terms."

4           Do you see that?

5    A.   Yes.

6    Q.   So what you were presenting to the board of

7    directors at this time was the Term Sheet that

8    provided for investment of up to $70 million, correct?

9    A.   That's what it says here.

10   Q.   And do you recall presenting anything else to

11   the board of directors at any time concerning an

12   additional investment of $180 million or a total

13   investment for $250 million?

14            ATTY. ENGEL:  Object to form.

15            THE WITNESS:  I don't remember.

16   Q.   (By Atty. Lowenstein)  Do you recall there

17   being a discussion about any -- Mr. Dundon or any

18   other entity making an investment -- strike that.

19            Do you recall presenting and seeking approval

20   for any investment from Mr. Dundon or any of his

21   affiliates for any amount above $70 million?

22            ATTY. ENGEL:  Object to the form.

23            THE WITNESS:  No.

24   Q.   (By Atty. Lowenstein)  Why was the board of

25   directors consent needed to -- for the Term Sheet for

Page 58

1    $70 million?

2                    ATTY. ENGEL:  Object to the form.

3                    THE WITNESS:   The board would need

4    to approve any material transactions to the

5    company.

6         Q.   (By Atty. Lowenstein)  And was the

7    $70 million a material transaction?

8         A.   Yes.

9         Q.   Would a $250 million investment be a material

10   transaction?

11        A.   Yes.

12        Q.   Would $180 million investment be a material

13   transaction?

14        A.   Yes.

15        Q.   Would the board have had to approve any

16   agreement with Mr. Dundon and any of his -- or any of

17   his entities for any transaction for $250 million or

18   $180 million?

19                    ATTY. ENGEL:  Object to the form.

20                    THE WITNESS:  At some point, yes.

21        Q.   (By Atty. Lowenstein)  Okay.  And the reason

22   that the board needs to approve it -- well, strike

23   that.

24             Mr. Ebersol, on his own, did not have the

25   authority to agree to a material transaction like

1          THE VIDEOGRAPHER:  I will switch

2    media.  This marks the end of Media 1 in the

3    deposition of Dawn Belt.  The time is 9:46 a.m.

4    We are off the record.

5              (Recess taken from 9:26 to 9:58 a.m.)

6          THE VIDEOGRAPHER:  This marks the

7    beginning of Media Number 2 in the deposition of

8    Dawn Belt.  The time is 9:58 a.m.; we are on

9    record.

10        E X A M I N A T I O N  -  (Continuing)

11   BY ATTY. LOWENSTEIN:

12        Q.  Ms. Belt, we're still looking at Exhibit 22

13   and I'm on the second page of the minutes of the board

14   meeting.

15        A.  22, that's this one.  The 22 is the...

16        Q.  I'm sorry.  I don't -- I can't read.

17            Ms. Belt, we're on Exhibit 23 --

18        A.  23.

19        Q.  -- I'm looking at the second page of the

20   minutes from the February 24, 2019 --

21        A.  Okay.

22        Q.  -- board meeting.  It's the second whereas

23   provision.

24            The bottom notes that at the time of this

25   board meeting, the corporation has already received

Page 62

1    over $12 million from Dundon Capital Partners under

2    these terms.  Do you see that?

3         A.  Yes.

4         Q.  So the company recognized that it was

5    receiving the money from Dundon Capital Partners,

6    correct?

7                   ATTY. ENGEL:  Objection; form.

8                   THE WITNESS:  It says the

9    corporation has received 12 million in revenues,

10   yes.

11        Q.  (By Atty. Lowenstein)  And that means that

12   the com- -- the ESMG had accepted $12 million from

13   Dundon Capital Partners before the board even approved

14   the $70 million Term Sheet, correct?

15                  ATTY. ENGEL:  Object to the form.

16                  THE WITNESS:  Yes.

17        Q.  (By Atty. Lowenstein)  The next "whereas"

18   paragraph, I'm just going to read it.

19             "Whereas, given the corporation's financial

20   position, cash reserves, accrued but unpaid

21   liabilities, near and long-term prospects, strategic

22   goals and objectives, current product development and

23   business development efforts, financing alternatives

24   and other relevant considerations, the board believes

25   that it is advisable and in the best interests of the

Page 63

1    corporation and its stockholders to raise additional

2    working capital and affect a recapitalization of the

3    corporation capital stock in accordance with the Term

4    Sheet."

5            Do you see that?

6       A.  Yes.

7       Q.  So as part of this board meeting, the board

8    made the determination that entering into the

9    $70 million Term Sheet was in the best interests of

10   the corporation, correct?

11               ATTY. ENGEL:  Object to the form.

12               THE WITNESS:  The board believes

13   that it was in the best interests of the

14   corporation and its stockholders to raise money in

15   accordance with the Term Sheet, yes.

16      Q.  (By Atty. Lowenstein)  And part of what had

17   to be done in order to make the Term Sheet effective

18   was to give Dundon Capital Partners 75 percent of the

19   stock, the fully diluted stock of ESMG, correct?

20               ATTY. ENGEL:  Object to the form.

21               THE WITNESS:  I'd have to look back

22   and analyze that, but --

23      Q.  (By Atty. Lowenstein)  I want you to do that,

24   so look at Exhibit 22.

25      A.  Okay, 22.  And -- wait.  Is that what's

Page 64

1    Q.   (By Atty. Lowenstein)   And the board of
2    directors, on February 24, 2019, determined that it
3    was in the best interest of ESMG to give Dundon
4    Capital Partners that 75 percent of the shares if all
5    the conditions were met in the Term Sheet, correct?
6                     ATTY. ENGEL:  Object to the form.
7                     THE WITNESS:   Yes.   Putting these
8    together, that's how I would read it.
9          Q.   (By Atty. Lowenstein)  And the consideration
10   Dundon Capital Partners would be given for -- giving
11   for that 75 percent interest in total was $70 million,
12   correct?
13                    ATTY. ENGEL:  Object to the form.
14                    THE WITNESS:  I'd have to read
15   through that.  And do you want me to do that now?
16         Q.   (By Atty. Lowenstein)  I actually do.
17         A.   Okay.  Okay.  Can you ask the question again?
18         Q.   Yeah.  The board determined that it was in
19   the best interest of ESMG to give Dundon Capital
20   Partners 75 percent of the fully diluted stock of ESMG
21   in exchange for up to $70 million, correct?
22                    ATTY. ENGEL:  Object to the form.
23                    THE WITNESS:  I'm sorry.  Can you
24   just say that again?  I'm trying to track that and
25   the amounts here and everything, so say -- say

                                      Page 66

1       A.  Yes.

2       Q.  And he says, The agreement extends the

3   maturity date of the December notes to May 1, 2019, et

4   cetera, and waives all events of default under all

5   notes, and it says more words.

6           What is your understanding of the importance

7   of having this omnibus amendment and waiver to notes

8   executed?

9               ATTY. ENGEL:  Object to the form.

10              THE WITNESS:  Can you repeat the

11  question?

12      Q.  (By Atty. Lowenstein)  Yeah.  What was your

13  understanding of why execution of this omnibus

14  amendment and waiver to notes would be required?

15      A.  I really couldn't say is all.

16      Q.  Now look at the draft amendment that

17  Mr. Roberts prepared.  Under the recitals in the

18  second "whereas" provision -- well, let me ask the

19  first question.

20          Did -- do you recall working with Mr. Roberts

21  on preparing the -- the omnibus amendment and waiver

22  document?

23      A.  I don't specifically remember that.

24      Q.  Would he have sent out a document like this

25  without your oversight?

Page 80

1          ATTY. ENGEL:  Object to the form.

2                    THE WITNESS:  I don't think so.

3          Q.  (By Atty. Lowenstein)  In the first page of

4     the omnibus amendment and waiver in the second

5     "whereas" paragraph, it says, "Whereas, in connection

6     with and pursuant to that certain binding Term Sheet

7     for Series 2 preferred stock, financing date,

8     February 14, 2019, by and between Dundon Capital

9     Partners LLC, and the company, Dundon Capital Partners

10    LLC, or one or more of its affiliates, including

11    affiliates of Thomas G. Dundon, has committed to

12    invest up to $70 million in the company in exchange

13    for Dundon receiving, among other things, 75 percent

14    of the company's fully diluted stock with the final

15    structure of the investment to be determined by Dundon

16    and the company."

17              Did I read that correctly?

18    A.    Yes.

19    Q.    And that was all language, to your knowledge,

20    that was put in by Fenwick & West prior to sending to

21    the people copied on these e-mails?

22                    ATTY. ENGEL:  Object to the form.

23                    THE WITNESS:  I don't know that.

24    Q.    (By Atty. Lowenstein)  Do you have any reason

25    to believe that that did not accurately reflect the

                                               Page 81

1      Q.  (By Atty. Lowenstein)  Do you recall drafting

2  any letter of intent or term sheets with any investors

3  after the one that Fenwick did with Dundon Capital

4  Partners for ESMG?

5      A.  I don't remember, no.

6              (Background noise.)

7              ATTY. LOWENSTEIN:  Sorry.  I said,

8  "Now you're at lunch," which has nothing to do

9  with this deposition.

10             (Background noise.)

11     Q.  (By Atty. Lowenstein)  Showing you what's

12  been marked as Exhibit 247, which is a very strangely

13  put together document, but this is how it was produced

14  by us apparently.

15             (Exhibit 247 marked.)

16     Q.  (By Atty. Lowenstein)  There's an e-mail from

17  you at the beginning on the first page, and it's dated

18  March 28, 2019.  And attached to that was an "Action

19  by Written Consent of the Stockholders of Ebersol

20  Sports Media Group" dated March 27, 2019.  See that?

21     A.  Yes.

22     Q.  And again, there's a description of the

23  Dundon Capital Partners Term Sheet that describes it

24  as, "The Term Sheet provides for an investment of up

25  to $70 million from Dundon Capital Partners LLC."

                                        Page 90

```
 1              REPORTER'S CERTIFICATE

 2          I, KATIE J. NELSON, RPR, CCR, CSR, the

 3   undersigned Certified Court Reporter, authorized to

 4   administer oaths and affirmations in and for the

 5   states of Washington (2971), Oregon (22-0012), and

 6   California (14479), do hereby certify:

 7              That the sworn testimony and/or proceedings,

 8   a transcript of which is attached, was given before me

 9   at the time and place stated therein; that any and/or

10   all witness(es) were duly sworn to testify to the

11   truth; that the sworn testimony and/or proceedings

12   were by me stenographically recorded and transcribed

13   under my supervision, to the best of my ability.  That

14   the foregoing transcript contains a full, true, and

15   accurate record of all the sworn testimony and/or

16   proceedings given and occurring at the time and place

17   stated in the transcript; that a review of which was

18   requested; that I am in no way related to any party to

19   the matter, nor to any counsel, nor do I have any

20   financial interest in the event of the cause.

21          WITNESS MY HAND and SIGNATURE this November 14, 2024.

22                    Katie Nelson

23          KATIE J. NELSON, RPR, CCR, CSR
            Washington CCR #2971
24          Oregon CSR #20-0012
            California CSR #14479

25
```

Page 102