```
              UNITED STATES BANKRUPTCY COURT
              FOR THE WESTERN DISTRICT OF TEXAS
                     SAN ANTONIO DIVISION
  IN RE:                         § CASE NO. 19-50900-CAG-7
                                 §
  LEGENDARY FIELD                §
  EXHIBITIONS, LLC, ET AL.,      § CHAPTER 7
                                 §
         DEBTORS.                §
                                 §
  _____

  RANDOLPH N. OSHEROW,           §
  Chapter 7 Trustee of the       §
  Bankruptcy Estates of          §
  Legendary Field                §
  Exhibitions, LLC; AAF          §
  Players, LLC; AAF              §
  Properties, LLC; Ebersol       §
  Sports Media Group, Inc.;      §
  LFE 2, LLC; and We Are         §
  Realtime, LLC,                 §
                                 §
         PLAINTIFF,              §
                                 §
  v.                             § ADV. PROC. NO. 22-05078-cag
                                 §
  DUNDON CAPITAL PARTNERS,       §
  LLC; THOMAS DUNDON; AND        §
  JOHN ZUTTER,                   §
                                 §
         DEFENDANTS.             §
```

ORAL AND VIDEOTAPED DEPOSITION OF

THOMAS DUNDON

Volume 1 of 2

December 2, 2024

Pages 1-290

Job No. 6990569

Page 1

```
 1              THE VIDEOGRAPHER:  Good afternoon everyone.
 2   Current time is 2:39 p.m.  We are on the record
 3   December 2nd, 2024.  This is media unit 1 of the
 4   recorded deposition of Thomas Dundon taken in the
 5   matter of Legendary Field Exhibitions, LLC, et al.,
 6   filed in the United States Bankruptcy Court for the
 7   Western District of Texas, San Antonio, Case Number
 8   19-50900-CAG-7.
 9              My name is Christopher Archie representing
10   Veritext, and I'm the videographer.  The court reporter
11   is Joseph Hendrick from the firm Veritext.  Counsel and
12   all present will now state their appearances and
13   affiliations for the record beginning with the noticing
14   attorney.
15              MS. WILLIAMS:  Nicole Williams and
16   Alexandra Rosetti from Thompson Coburn for the Trustee.
17              MR. FARAHI:  Jonathan Farahi for the
18   Trustee.
19              MR. TREYZON:  Boris Treyzon for the
20   Trustee.
21              MR. ENGLE:  Brian Engle for the Trustee.
22              MR. HORAN:  Tommy Horan on behalf of
23   Charlie Ebersol.
24              MR. SALTZ:  Michael Saltz on behalf of
25   Charlie Ebersol.
```

Page 9

```
 1                MR. LOWENSTEIN:  Don't guess.
 2        A.    No, I don't know the exact suite number,
 3   then.  I think it's 500 or 550.
 4   BY MS. WILLIAMS:
 5        Q.    Okay.  Does Dundon Capital Partners file
 6   tax returns?
 7        A.    I assume.
 8        Q.    Who would file those tax returns?
 9        A.    KPMG.  I believe that's right, but, you
10   know, if we're -- if we're trying to be a hundred
11   percent accurate, I believe they file my tax returns.
12              MR. LOWENSTEIN:  I am going to object to
13   form.  And because you asked him, DCP has not been
14   designated on any topic like that.
15              MS. WILLIAMS:  I'm asking for his personal
16   knowledge.
17              MR. LOWENSTEIN:  I understand. But he's
18   here in both capacities, so I wanted to make sure it
19   was clear that you said, "Does DCP do" something.  So
20   just making clear that it's his personal knowledge.
21              MS. WILLIAMS:  Okay.
22   BY MS. WILLIAMS:
23        Q.    To your knowledge, does DCP file tax
24   returns?
25        A.    Yes.
```

Page 34

```
 1         A.    I -- I don't even think I understand the
 2   question because it seems obvious what you're saying,
 3   but I would want to get someone who's an expert to make
 4   sure I don't say something that's not accurate.
 5   BY MS. WILLIAMS:
 6         Q.    So you deal in real estate, at least
 7   sometimes, right, Mr. Dundon?
 8         A.    Yes.
 9         Q.    Okay.  And you're aware that sometimes when
10   people buy a piece of real estate, they'll set up a
11   special-purpose entity to acquire that real estate; is
12   that fair?
13         A.    Yes.
14         Q.    Give it the name of a building like 2100
15   Ross LLC, right?
16         A.    Yes.
17         Q.    But it would ultimately be owned by DCP or
18   whatever the parent investment entity is; is that
19   correct?
20         A.    So, technically, I think I understand what
21   you're saying, but I think legally and from a tax
22   perspective, there are clearly some nuances to the
23   subject that you're broaching with me that I'm not an
24   expert on.
25         Q.    Sure.  And I don't expect you to be.  My
```

```
 1      trying to figure it out.
 2           Q.    And it's your testimony here today that you
 3      didn't tell Charlie that number, from your view, was
 4      $250 million?
 5           A.    I don't even -- why don't you ask me --
 6      what's the question?
 7           Q.    Is it your testimony that you never told
 8      Mr. Ebersol that you were willing to commit $250
 9      million to the AAF because that's what you thought it
10      needed?
11           A.    No.  What I -- what I told Mr. Ebersol is
12      that I would commit -- once we got to the deal, we
13      would do $70 million, and that we had the ability to
14      put in more money.  And I'm pretty confident that's
15      what every document says, that if they hit certain
16      thresholds, that we would have to come back and put in
17      more money or raise more money.  We never committed
18      more than $70 million to Charlie.
19           Q.    So your testimony today --
20           A.    Yes.
21           Q.    -- is that you never committed $250 million
22      to the AAF?
23           A.    We never committed $250 million to anybody.
24           Q.    And is it your testimony today that we're
25      not going to have any written documents that say you
```

Page 109

```
 1    asked you about investing?
 2         A.    That was what I felt about this.
 3         Q.    Do you recall who -- did you say that to
 4    Mr. Romo?
 5         A.    I don't remember specifically.
 6         Q.    Do you recall anyone who you specifically
 7    said that to?
 8         A.    I think if anybody asked me about "Should I
 9    invest in this," that was what I would have said.
10         Q.    And I'm just asking if you have any names
11    of people that you can recall?
12         A.    I know -- I mean, I don't recall specific
13    conversations, but someone like Erik Anderson or
14    whatever, you know, where they say -- it's people who
15    invest in this stuff.  But...
16         Q.    Do you recall talking to anyone else at any
17    time really that had interest in investing in AAF?
18         A.    I don't remember.  I think it -- like I
19    said, it was -- we knew what we were doing was very
20    risky and something that you wouldn't -- you would take
21    a lot of, in my opinion, reputational risk, and it
22    wouldn't be the right thing to do to take capital into
23    this -- into this structure.  It had to be something --
24    you'd have to have a very high risk tolerance.  And I
25    -- honestly, I probably would have -- I would have
```

Page 130

```
 1     thought I'd probably get in trouble if I took
 2     somebody's money to invest in this alongside of me,
 3     given the information that we had.
 4          Q.   Did you ever tell Charlie Ebersol that that
 5     was your opinion of this investment?
 6          A.   I think he knew.  I don't remember.
 7          Q.   Did you ever tell him that?
 8          A.   I don't remember.  Charlie and I had a lot
 9     of conversations.
10          Q.   Okay.  I don't want you --
11          A.   Yes.  Let me -- let me -- let me answer
12     your question.  Yes, I was specific with Charlie
13     Ebersol that we had to be very, very careful bringing
14     in third-party capital without proper structure.
15          Q.   And when were those conversations?
16          A.   Many times, 'cause he was fond of saying,
17     "We can get money."  I'm like, "We can't take people's
18     money because we can get in trouble for that kind of
19     stuff."
20          Q.   Were those conversations before or after
21     you invested in the league?
22          A.   Probably after.
23          Q.   And that was when you had control of the
24     league?
25          A.   That was when I learned I had -- I signed
```

Page 131

```
 1    years.
 2         Q.    Okay.  Do you recall any conversation you
 3    had with him about the AAF?
 4         A.    No.
 5         Q.    Earlier, when we were talking about the $70
 6    million number in the term sheet, I think you said that
 7    that number came from conversations that you and Zutter
 8    and Mr. Ebersol had; is that correct?
 9         A.    I -- I think the amount of money we needed
10    would have come from Charlie.  And then I'm assuming
11    during diligence, Zutter added to it.  But most
12    everything that we knew came from Charlie.
13         Q.    Do you have a specific recollection of
14    Mr. Ebersol giving anyone the $70 million number?
15         A.    I mean, I think it was that 5 million a
16    week.  So, it was like 55 million, and could be 70.
17    And it was a little more of there are a lot of moving
18    parts.  But, yeah, Charlie was pretty adamant that that
19    was how much it took to get through a season.
20         Q.    The 70 million?
21         A.    55 to 70, I would say, were the
22    conversations.  I don't think he had -- as you probably
23    are aware, I don't think he had an exact grasp on the
24    exact dollar amount.
25         Q.    Do you ever recall Mr. Ebersol saying a $90
```

Page 148

```
 1        A.    No.
 2        Q.    Title to the press release?
 3              Did you have any issue with the press
 4   release saying that "Tom Dundon commits $250 Million to
 5   the Alliance of American Football"?
 6        A.    No.
 7        Q.    If you didn't commit 250 million, then why
 8   didn't you have a problem with the title?
 9        A.    So the -- I was committed, if we hit the
10   numbers that we needed, to spend the 250.  I was
11   personally committed every day.  That's why I did this
12   press release.  That's why I worked so hard at it.
13   That if we needed that money and we kept performing or
14   started to perform, then I would be happy to have done
15   it.
16        Q.    Does this press release say Tom Dundon
17   would be happy to do this if certain things happened?
18        A.    This press release is marketing.  It's not
19   a contract.  You have the contract.
20        Q.    So it didn't matter to you whether or not
21   what this press release said was true?
22        A.    It was true.  I was committed to the
23   business.  There's a big difference between committed
24   in a press release and committed in a term sheet.
25        Q.    Tell me the difference.
```

Page 167

```
 1   couldn't bring in other investors given the state of
 2   the books and the diligence.
 3        Q.   Did you have any conversations with anyone
 4   at AAF where you specifically said -- you or anyone
 5   with DCP said, "We can't bring in other investors right
 6   now because we're worried about fraud, et cetera"?
 7        A.   Yes.  With Charlie.
 8        Q.   With Charlie when?
 9        A.   I can't give you a date.  I think it was a
10   well-known thing that nobody knew where all the money
11   was or what they owed.  Nobody had any idea or even if
12   the shares we were owed were unencumbered.  We were
13   working through those things, like you brought up
14   earlier, so I don't -- I believe everyone at DCP
15   believed that.
16        Q.   Okay. And I understand you're --
17             MS. WILLIAMS:  Sorry.  It feels like
18   someone's trying to choke me.
19   BY MS. WILLIAMS:
20        Q.   I understand that you're saying you think
21   everybody believed that, but I need to understand how
22   that was communicated to people at AAF, not --
23        A.   I shouldn't say everybody.  Charlie.
24        Q.   Okay. So you think Charlie understood that
25   from conversations with you?
```

Page 232

1      A.     Yes.
2      Q.     Did you tell Charlie specifically, "You
3  can't go out and get other third-party investors"?
4      A.     No.  Charlie can go talk to whoever he
5  wanted to.  What we are clear about is, if you're going
6  to actually have an investable company actually have to
7  -- everybody else is going to want real diligence.  Now
8  they can come after me, right, if we do something
9  wrong.  So we're not going to take other people's
10 capital if we're not able to provide real diligence and
11 have shares that we know are unencumbered, have -- and
12 know what our accounts receivable are and know what our
13 numbers are.  That was it.  It's that simple.
14             I didn't know how long that would take, but
15 I knew going in we didn't have all that stuff because,
16 as we've established, we didn't do proper diligence.
17 This was a deal that was uniquely something I would do,
18 but it wasn't something I would tell other people to
19 do.
20     Q.     Okay.  So was it your position after taking
21 control of the AAF in February of 2019, at that time --
22 let's just talk about February 14 through the end of
23 February.  Is it your position that you would not have
24 accepted any third-party investors at that time?
25     A.     No.  It's my position that if there was a

Page 233

```
 1    technology.  So -- I didn't buy the technology.  So
 2    that's --
 3                MS. WILLIAMS:  Objection, nonresponsive.
 4    BY MS. WILLIAMS:
 5        Q.    You previously testified that you would,
 6    quote, "never use my business judgment to do something
 7    that would prevent us from bringing in dollars that we
 8    thought would help the league succeed," unquote.
 9                Was that a true statement when you said it?
10        A.    Yes.
11        Q.    So you thought you were using your
12    reasonable business judgment to not try to get capital
13    for the league?
14                MR. LOWENSTEIN:  Object to form.
15        A.    My business judgment, once again, was we
16    couldn't provide people information that made this an
17    investable deal.
18    BY MS. WILLIAMS:
19        Q.    And in your balance of decisionmaking, you
20    decided that was sufficient reason not to try to seek
21    more capital?
22        A.    I thought the right thing to do was lose
23    $70 million rather than let somebody else put in money
24    when I couldn't provide them the information we wanted
25    to provide.  I did not want to lose $70 million.
```

Page 255

```
 1      Q.      But if you weren't going to continue to
 2   fund the league, that had to have other capital put in
 3   or it was necessarily going to fail, correct?
 4      A.      In my judgment, it was going to fail
 5   because no one would put the capital in when they had
 6   the real numbers.  And if I had had the real numbers, I
 7   wouldn't have put the capital in.  And so through the
 8   time of finding out what I learned over time, my
 9   opinion was I would be creating liability for me,
10   Charlie and everybody else if we took any additional
11   dollars.
12      Q.      So you made that judgment --
13      A.      I --
14      Q.      -- on the front end instead of the other --
15      A.      All the way through it.
16      Q.      -- choice of seeking capital, correct?
17      A.      I was unsure in the beginning.  And over
18   time, I became more sure that if you were to take
19   capital, you would open yourself up to liability.
20      Q.      So you made the decision not to take
21   capital until after the league failed, correct?
22              MR. LOWENSTEIN:  Object to form.
23      A.      Yes.
24   BY MS. WILLIAMS:
25      Q.      Okay.  You said you thought the best thing
```

Page 256

```
 1        Q.    Was there any effort to do so, though?
 2        A.    The NFL wasn't the issue.  It was the
 3   players union.  The NFL - which we don't know this to
 4   be -- we don't know what would have happened - implied
 5   if players union went along, they would be easy to deal
 6   with.
 7        Q.    Right.  But what the players were looking
 8   for, it sounds like from what you remember of the
 9   conversation, is some assurance that they weren't going
10   to be treated a certain way if they did that deal?
11        A.    No.  It was that if -- they didn't think it
12   was possible, if this existed, that they were allowed
13   to play, that there was any way that they wouldn't be
14   under pressure.  There was no rules you could come up
15   with because it's implied.  Like, even if you said,
16   "You don't have to," they would still -- feels like
17   they have to.  Just like they go through on voluntary,
18   you know, training camp and these -- whatever they --
19   their OTAs.  That was that was the message I recall.
20        Q.    That's the impression you got from the call
21   you were on?
22        A.    Yes.
23        Q.    Do you know if this could have been part of
24   a collective bargaining --
25        A.    No.
```

Page 280

```
 1                  REPORTER'S CERTIFICATION
 2                DEPOSITION OF THOMAS DUNDON
 3                      December 2, 2024
 4            I, Joseph D. Hendrick, Notary Public and
 5   Certified Shorthand Reporter in the State of Texas,
 6   hereby certify to the following:
 7            That the Witness, THOMAS DUNDON, was duly
 8   sworn by the officer and that the transcript of the
 9   oral deposition is a true record of the testimony given
10   by the witness;
11            I further certify that pursuant to FRCP
12   Rule 30(f)(1) the signature of the deponent:
13                 X     was requested by the deponent or
14   a party before the completion of the deposition and is
15   to be returned within 30 days from date of receipt of
16   the transcript;
17            _____ was not requested by the
18   deponent or a party before the completion of the
19   deposition;
20            I further certify that I am neither counsel
21   for, related to, nor employed by any of the parties or
22   attorneys in the action in which this proceeding was
23   taken;
24            Further, I am not a relative or employee of
25   any attorney of record, nor am I financially or
```

Page 285

1 otherwise interested in the outcome of the action.
2      Subscribed and sworn to on this date:
3 December 5, 2024.
4
5
6
7
8
9
10
11
            Joseph D. Hendrick, CSR #947
12          Expiration Date: 04/30/2025
            Notary Comm. Exp. 02/13/27
13
14
15
16 Attorney times:
       Nicole Williams - 04:33:13
17     All Other Counsel - 00:00:00
18
19
20
21
22
23
24
25