

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: March 03, 2025.**

CRAIG A. GARGOTTA
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-50900-CAG |
| LEGENDARY FIELD EXHIBITIONS, LLC | § | |
| Debtor. | § | CHAPTER 7 |

| | | |
|---|---|---|
| RANDOLPH N. OSHEROW, Chapter 7 | § | |
| Trustee and the Bankruptcy Estates of | § | |
| Legendary Field Exhibits, LLC; AAF | § | |
| Players, LLC; AAF Properties, LLC; Ebersol | § | |
| Sports Media Group, Inc.; LFE 2, LLC; and | § | |
| We are Realtime, LLC | § | |
| Plaintiff, | § | |
| v. | § | ADV. NO. 22-05078-CAG |
| | § | |
| THOMAS DUNDON; JOHN ZUTTER; and | § | |
| DUNDON CAPITAL PARTNERS, LLC, | § | |
| Defendant. | § | |

**ORDER DENYING DEFENDANT ZUTTER'S MOTION FOR SUMMARY JUDGMENT (ECF No. 175)**

Before the Court is Randolph Osherow in his capacity as the chapter 11 trustee's ("Plaintiff") First Amended Complaint (ECF No. 56),[1] Zutter's ("Defendant") Motion for

[1] "ECF" denotes electronic case number.

Summary Judgment (ECF No. 175), Plaintiff's Response to Defendant's Motion for Summary Judgment (ECF No. 187), and Defendant's Reply in Support of Motion for Summary Judgment (ECF No. 197). The Court set the matter for a hearing, heard oral argument, and ultimately took the matter under advisement for a memorandum order. After considering the arguments made and counsels' pleadings, for the reasons stated in this memorandum order, Defendant's Motion for Summary Judgment is **DENIED**.

## JURISDICTION

This Court has jurisdiction over this Motion to Dismiss pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (B), (C), (H), and (K). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for relief is Fed. R. Civ. P. 56, made applicable to this proceeding through Fed. R. Bankr. P. 7012 and Local Rule 7012.

## LEGAL STANDARD

Federal Rule of Bankruptcy Procedure 7056 incorporates Federal Rule of Civil Procedure 56 into adversary proceedings. Rule 56 allows parties to move for summary judgment "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment may be granted when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Id.* To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of

the non-movant's claim or defense. ***Little v. Liquid Air Corp.***, 952 F.2d 841, 847 (5th Cir. 1992) (en banc).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. ***Fields v. City of S. Hous.***, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." ***Brown v. City of Houston***, 337 F.3d 539, 541 (5*th* Cir. 2003). Neither will "only a scintilla of evidence" meet the nonmovant's burden. ***Liquid Air Corp.***, 37 F.3d at 1075. Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." ***Morris v. Covan World Wide Moving, Inc.***, 144 F.3d 377, 380 (5th Cir. 1998).

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986). In making this determination, a court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 151 (2000). The court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment and must review all facts in the light most favorable to the nonmoving party. ***Id.*** at 150; ***First Colony Life Ins. Co. v. Sanford***, 555 F.3d 177, 181 (5th Cir. 2009).

BACKGROUND

The remaining claims for the Court's consideration in this adversary proceeding are (1) breach of fiduciary duty and (2) unjust enrichment. This case arises from the creation and dissolution of an alternative professional football league called the Alliance of American Football ("AAF"), a developmental league conceptualized by individuals with close ties to the sport of American football for highly touted collegiate players and former NFL players to gain exposure and garner interest from NFL teams. In its early stage, the AAF was set to be financed by Reggie Fowler, a former part owner of the Minnesota Vikings. The AAF founders were unaware that Fowler engaged in criminal activity that resulted in the League's deprivation of liquidity as it entered its inaugural season in 2019. One week into its first season, AAF leadership recognized it lacked the sufficient funds necessary to maintain league operations, including making player payroll. To remedy this, Charles Ebersol, one of the AAF founders, engaged Thomas Dundon, an alleged millionaire investor who owned Top Golf and a hockey team, in a series of phone calls to discuss financial aid scenarios. In a separate adversary, DCP alleges that Ebersol fraudulently induced DCP to make an investment.[2]

The parties disagree as to what happened next. In Trustee's view, subsequently, Dundon allegedly sent Ebersol a term sheet providing that Dundon would send the AAF an investment of $5.1 million immediately and up to $70 million upon request. Ebersol purportedly inquired about the discrepancy between the term sheet and the $250 million investment. The Complaint further alleges that Ebersol received assurances from Dundon that the deal had not materially changed and Dundon still intended to invest $250 million. The parties later discovered that the term sheet,

[2] Adv. Case No. 22-05077.

which included series 2 preferred stock and outlined the $70 million cap on capital contributions, lacked signatures. DCP ultimately provided an approximate $70 million investment prior to the AAF's bankruptcy. The parties agree that had this funding not been provided, the AAF would not have survived more than a few days. Prior to the AAF's bankruptcy petition, Defendant and Dundon entered into a document titled a "Release Agreement" in which the AAF and its former majority shareholder Fowler agreed to release each other from any claims related to the Series One Term Sheet and requiring Fowler to support the DCP Term sheet and related change in ownership and control of the AAF to Dundon. During this time, one of the AAF's most valuable assets were the football player contracts, titled "Standard Player Agreement," which obligated players to remain in the AAF for three seasons to the exclusion of playing in any other spring football league without being released.

In this adversary, the focus is on Dundon's alleged "righthand man"—Zutter. Through its allegations, as further parsed below, Trustee argues that Defendant worked alongside Dundon to "takeover" the AAF as sole directors and decisionmakers, infiltrating the AAF from the inside out before sabotaging the league's contracts, running the AAF as leanly as possible, all with the intention of turning the company into a prepackaged bankruptcy option for Dundon to acquire. Trustee alleges Defendant, alongside Dundon, failed to maximize the value of the player contracts, gave free advertising to Dundon-affiliated entities, and engaged in other instances of self-dealing to benefit Defendant as a DCP partner and Dundon.

TRUSTEE'S FACTUAL ALLEGATIONS

In its First Amended Complaint, Trustee alleged that Defendant breached his fiduciary duties of loyalty, care, and fair dealing and unjustly enriched himself through his position at the AAF and partnership with Dundon Capital Partners, LLC ("DCP"). (ECF No. 56 at 47–48,

¶¶ 173(a)–(f)). Trustee alleges that Defendant (1) failed to "paper up" Dundon's $250 million commitment, (2) knew Dundon would not provide funding and failed to disclose this information and made self-interested decisions regarding AAF operations, (3) voted to enter into contracts in the best interest of himself, (4) failed to employ a rational decision-making process, and (5) failed to act prudently in carrying out his fiduciary duties. *Id.*

Trustee directed the Court's attention to the following pieces of summary judgment evidence to demonstrate the significant extent of Dundon's control over AAF operations:

(1) the term sheet stating that Dundon intended to invest $5,100,000 by February 14, 2019[3]
(2) Kevin Freedman's deposition testimony that he recalled Dundon stating he would invest $250,000,000[4]
(3) Defendant's email stating that "all new contracts have to run through DCP prior to execution" and carbon copying Dundon's AAF email address[5]
(4) Defendant's testimony confirming that the final determination of whether a vendor would or would not be paid ultimately fell to management[6]
(5) DCP CFO Jeff Vanderbilt's email to Dundon and Defendant stating that Vanderbilt confirmed Ebersol was scheduled to make payments up to $7,158,724 to ensure games could play that weekend without interruption[7]
(6) Defendant's email to Ebersol, in which Dundon was carbon copied, stating that in the absence of a subordination agreement and MGM Resorts International agreeing to the deal as exactly presented, Defendant and Dundon would refuse to fund the League any further. This email was in response to Ebersol's email flagging the MGM deal as "more political than practical" and requiring a "larger discussion with Tom."[8]
(7) AAF employee Kevin Farrell's email to Defendant and Vanderbilt seeking their approval for an incremental payment for the week[9];
(8) Defendant receives an email from AAF employee Eric Blanc in which Blanc stated he would "run" the "Week 6 specs" by Zutter before asking for contracts[10]
(9) Defendant emails AAF employee Jason Kulas to inform him that the DCP team was purposefully "avoiding the prefund" to leave AAF's "cash balance real

[3] ECF No. 198 at 11; App. 0011.
[4] ECF No. 209 at 291, App. 1839, lns. 16–25.
[5] Conf. App. 0088, Ex. 10.
[6] ECF No. 209 at 992–93, App. 1910–11, lns. 1–9.
[7] Conf. App. 0407, Ex. 61.
[8] Conf. App. 0364, Ex. 54.
[9] Conf. App. 0244, Ex. 30.
[10] Conf. App. 0253, Ex. 35.

low." On March 18, 2019, Defendant questions whether DCP should prefund the league, highlighting "we would lose control" despite doing so being "administratively easier."[11]

(10) Farrell's deposition statements reflect that he was authorized to make "very little" day-to day decisions "without Dundon team's involvement."[12]

Trustee further argues that Defendant had actual control at the time of the ESMG Board's resolution of the Fowler Release Agreement to demonstrate that Defendant breached his fiduciary duty as a director. Trustee argues that Dundon had control of the league by February 15, prior to when the Fowler Release Agreement became effective, and Defendant operated as Dundon's "right hand man." (ECF No. 244 at 78, lns. 8–9). While the official board resolution occurred on February 24, Trustee argues that "what matters for the purpose of establishing fiduciary duty is *control*, which can be shown by **any** of: board control, shareholder voting control, or evidence that defendant had actual control over the operations of the business." *Id.* (citing ***Tornetta v. Musk***, 310 A.3d 430, 497–99 (Del. Ch. 2024)).

In Trustee's First Amended Complaint, Trustee alleges that "on February 14, 2019, Dundon and Zutter took over effective control of the AAF. Dundon and Zutter, each in his individual capacity, became ESMG's only voting directors." (ECF No. 56 at 20). Trustee's First Amended Complaint also contends that, contemporaneous with the execution of the Term Sheet, ESMG's board of directors was reduced to three members, with Dundon and Zutter appointed as the two voting members of the board . . . Dundon and Zutter also each maintained their roles as Chief Executive Officer and Partner for DCP, respectively." *Id.* Once Defendant and Dundon gained alleged control, Defendant purportedly made "demands to Ebersol and AAF personnel to 'cut burn anywhere possible' including by 'offering ten cents on the dollar on contracts that had already been completed.'" *Id.* (citing Conf. App. 1026, lns. 15–24). Trustee alleges Defendant purposefully

---

[11] Conf. App. 0402, Ex. 60.

[12] ECF No. 209 at 1857, lns. 6–9.

slashed advertising spending, and the budget cuts made ultimately "undermined the value of the ticket price and destroyed price integrity." (ECF No. 209 at 1060, lns 20–25). Deposition testimony reveals Defendant directed League staff to "cut all nonessential" which was later interpreted by League staff to mean that "anything that would be needed to actually just produce the game was either cut or frozen." (*Id.* at 1061, lns. 15–19). One League member believed that this decision was the main reason for the League's failure. *Id.*

Trustee also notes that Defendant's "instruct[ion of] their teams within DCP to run the league as lean as possible"[13] was the precedent to Defendant's recommendation of bankruptcy for the AAF.[14] By February 21, 2019, Defendant had some AAF personnel "mak[e] funding requests directly" to Defendant and seek Defendant's approval for the weekly instrumental payment of $50,000.00 per game and receive the stadium schedule for the teams. (ECF No. 197 at 17) (citing Conf. App. 0244). Ebersol stated that Defendant instructed League personnel to not pay rent for the Arizona football stadium despite multiple games remaining in the season, leading to a disagreement that was so heated, one employee felt the need to "step in." (ECF No. 197 at 17) (citing Conf. App. 0884, lns. 3–11).

Trustee further alleges that Defendant breached his fiduciary duty and engaged in self-dealing through his approval of free advertising to other Dundon-associated enterprises. (ECF No. 244 at 87, lns. 2–3). For example, Defendant arranged advertising deals with Carvana and Topgolf, which Dundon had an "interest in" even though that airtime slot could have been used to generate revenue for the AAF. (*Id.*, lns. 3–11). Dundon admitted in his deposition testimony that every party on the no-charge advertisement list was attributable to himself. (*Id.*, lns. 11–13). In other instances,

---

[13] Conf. App. 0127.
[14] Conf. App. 0128.

Trustee alleges that Defendant sabotaged alternative funding opportunities, which startled potential investors. Trustee points to one interested former investor's email which stated, "There was a deal to be made . . . but not with threats and trying to bully the guys who held the cards . . . only a crazy person jumps in a flushes 58 million down the drain." (ECF No. 196 at 24, nn. 87) (citing ECF No. 209 at 234).

Trustee also alleges that Defendant did not act in good faith to preserve vendor contract value and keep the league operational. (ECF No. 244 at 105, lns. 18–20). Trustee argues CBS also planned to invest but was thwarted by Dundon's disinterest, and Defendant's complicity, in signing the deal and diluting CBS's investment. (*Id.* at 107, lns. 9–14). Trustee notes that Ebersol even emphasized to Dundon the importance of the CBS partnership but Defendant stepped in to respond that, in the absence of a subordination agreement and the parties' agreeing to the deal exactly as Defendant presented, Defendant would not fund the CBS deal. (*Id.*, lns. 20–25). Trustee also argued that Defendant and Dundon sought to "jettison" other shareholders and the deal with MGM and its associated rights, in the hopes that these rights would be subordinated. (*Id.*, lns. 14–17).

Finally, Trustee recently argued at the hearings held on January 31, 2025 and February 3, 2025 that Defendant directly conspired with Dundon to place the AAF into a chapter 7 bankruptcy with two goals in mind: (1) wrestle control away from Ebersol and (2) ensure Dundon did not have to fulfill the entirety of the $250M obligation. (*Id.* at 92, lns. 15–19). In Trustee's theory of the case, if the AAF were to survive, then Dundon would have been forced to fulfill the commitment he made to the league if he planned to remain in control. (*Id.*, lns. 17–19). Trustee insinuates that Dundon took issue with this because Dundon did not want to lose control and fulfill the entirety of the $250M commitment, did not want to become a minority owner or even a majority owner, and instead wanted complete control over the AAF without any of the prior Ebersol-negotiated

agreements attached. (*Id.*, lns. 20–25). In Trustee's view, Dundon and Defendant were hoping for an "asset deal," meaning they hoped to acquire the AAF with assets, no liabilities, no other shareholders to listen to, and no commitments aside from those to which Dundon agreed. (*Id.* at 93, lns. 1–7).

After inquiry from the Court at the aforementioned hearings, Trustee explained that this is essentially Defendant and Dundon's typical scheme, in which Dundon permits "all of the losses [to] roll up to Mr. Dundon individually" and then subsequently receives a substantial tax benefit while Defendant continues to follow Dundon to his various entities. (*Id.* at 94, lns. 21–24). Trustee hypothesized that Defendant and Dundon's plan was to transition the company into an asset deal that could be obtained through a prepackaged bankruptcy, which would later be sold to Dundon. (*Id.* at 96, lns. 8–9, lns. 14–19). To support this theory, Trustee points to Defendant's comment, which was made at the time of his full control over the company, as to whether he and Dundon wanted to be further involved with the AAF or whether they should evaluate purchasing the assets and leaving the liability behind. (*Id.* at 93, lns. 18–22). Trustee also notes that even after the DCP team was pushed by Dundon to renegotiate contracts and give discounts, Dundon still was reluctant to pay and once again discussed a prepackaged bankruptcy. (*Id.* at 105, lns. 8–11).

DEFENDANT'S COUNTERARGUMENTS

In its Motion for Summary Judgment, Defendant focuses primarily on waiver and proper pleading under Delaware law. Defendant counters that summary judgment should be granted on the grounds of (1) waiver through the AAF's certificate of incorporation (ECF No. 175 at 8), (2) Defendant's lack of approving the Release Agreement (ECF No. 175 at 9), (3) the alleged fiduciary duties improperly duplicating contractual duties (ECF No. 175 at 10), and (4) lack of sufficient specificity with regards to pleading unjust enrichment (ECF No. 175 at 11).

First, Defendant argues that Trustee may not bring forward duty of care-related claims because these claims are waived through an exculpatory provision.[15] (ECF No. 175 at 4–6). In Defendant's view, the "exculpatory clause requires a take-nothing judgment against the Trustee on claims for money damages based on the duty of care" as found in ¶¶ 173(a), (b), (e), and (f) of the First Amended Complaint. (*Id.* at 9). Defendant further argues that Defendant cannot be liable for the ESMG Board's approval of the Release Agreement because it was prior to when Defendant became a member of the ESMG Board. (*Id.*). Defendant notes that the ESMG Board authorized the release by vote on February 24, 2019, and Defendant was elected to the board on February 24, 2019; thus, "he cannot be held to account for it as a breach of fiduciary duty." (*Id.*).

Defendant next argues that Trustee may not bring forward its breach of fiduciary duty claims for failing to "paper up" the oral agreement (Complaint at ¶ 173(a)) and failing to address that Dundon did not intend to comply with the oral agreement (Complaint at ¶ 173(b)). (*Id.* at 10). Defendant's reasoning is because Delaware law does not permit plaintiffs to bring breach of fiduciary duty claims forward which "completely overlap" with breach of contract claims. (*Id.*) (citing ***Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.***, No. CV 2017-0500-JRS, 2018 WL 2727542, at *15 (Del. Ch. June 6, 2018)). Defendant argues that Trustee fails to allege an independent basis apart from the contract for the fiduciary duty claim. For example, the breach of oral contract claim "rests on Dundon's failure to fund the league" and the "alleged breach of fiduciary duty in paragraph 172(a) is based on Dundon's failure to provide funding *as promised* in exchange for control of the league." (*Id.*). Thus, the "claims are the same." (*Id.*).

---

[15] The relevant provision of the exculpatory provision in the ESMG restated certificate of incorporation states:

> To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

ECF No. 175 at 8 (citing Ex. 1 (Restated Cert.) at 25–26 art. 8A).

Defendant directs the Court to the board minutes to demonstrate that Defendant was not a member of the Board at the time of the Term Sheet's authorization. (*Id.*) (citing Ex. C, Ebersol Deposition at 282:13-285:18). Defendant states that the "prior members of the Board, which included Ebersol, approved the Term Sheet and that Board determined it was in the best interests of ESMG to accept a maximum cumulative commitment of $70 million in exchange for granting DCP 75% of the equity of ESMG and control of the Board." (*Id.*). Defendant states that Defendant was "powerless to paper" a $250M deal without "board or shareholder approval" and the evidence fails to demonstrate that the Board or shareholders of ESMG "ever approved a $250 million agreement with Dundon, DCP or any other Dundon affiliate." (*Id.*).

Turning to Trustee's unjust enrichment argument, Defendant argues that Trustee's claim for unjust enrichment should be dismissed because it is not properly pleaded, and Defendant obtained no benefit from his role with the AAF. (*Id.* at 11). Defendant then proceeds to cite to Texas law to support the proposition that unjust enrichment "describes an action to recover restitution when a contract action fails for some reason." (*Id.*) (citing ***Burlington N. R. Co. v. Sw. Elec. Power Co.***, 925 S.W.2d 92, 98 (Tex. App.—Texarkana 1996), *aff'd sub nom*. ***Sw. Elec. Power Co. v. Burlington N. R.R. Co.***, 966 S.W.2d 467 (Tex. 1998)). The Court previously established that the governing law for this case is Delaware law. (ECF No. 54 at 28) ("The Court will analyze the cause of action under Delaware law because the parties state that Delaware should apply to this claim. The Court will not analyze the cause of action . . . differently for each argument the Defendant make against the Complaint."). Thus, the Court will not consider Defendant's Texas law citation and will solely assess Defendant's factual counterstatements.

In its Motion for Summary Judgment, Defendant argues that it Trustee's "unjust enrichment claim makes little sense" because "DCP—not Zutter—received a 75% interest in the AAF pursuant

to the Term Sheet" and "Zutter got nothing," (ECF No. 175 at 11). At the hearing, Defendant countered that Trustee's citation of an alleged tax benefit was not sufficiently supported by the summary judgment evidence presented by Trustee. (ECF No. 244 at 117, lns. 11–14). Defendant argues that it "makes no sense" for a party to lose $70M "for the purpose of getting some sort of credit or an offset." (ECF No. 244 at 117, lns. 17–21). Defendant notes that the tax report's raw dollar amount shows a potential $14M offset, and "know[s] of no mathematical equation where 1 million, 12 million, 14 million [is] greater than 70 million to arise to such a benefit or a motivation for [an offset.]" (ECF No. 244 at 117, lns. 17–24). In Defendant's view, there is no affirmative statement from Dundon or Defendant affirmatively stating that they attempted to "drive the league into the ground" or engage in an asset deal, and implications do not conclusively establish any elements. (ECF No. 244 at 119, lns. 10–14).

## ANALYSIS

To reiterate, Defendant argues that the Court should dismiss Trustee's fiduciary duty claims against Zutter because "the AAF waived any such claims for breaches of duty of care, Zutter never approved or participated in the voting on the Release Agreement, and the Trustee improperly asserts contract claims as fiduciary claims." (ECF No. 175 at 7). The Court will first address the relevant Delaware standard of review and then turn to address each of Defendant's summary judgment arguments, in turn, below.

### I. Standard of Review: Application of the Entire Fairness Standard

The parties disagree as to which Delaware standard of review applies: the business judgment rule or the entire fairness test. Defendant argues the business judgment rule applies whereas Trustee argues that the entire fairness standard is the appropriate test.

At the hearing, Trustee explained that it has plead sufficient facts and demonstrated adequate summary judgment evidence to rebut the business judgment rule presumption and require the Court to employ the more rigorous "entire fairness" analysis. Trustee cited to the following cases to support its interpretation that entire fairness is the appropriate test: ***Frederick Hsu Living Tr. V. ODN Holding Corp.***, C.A. No. 12108, 2017 WL 1437308 (Del. Ch. 2017); ***Stone v. Ritter***, 911 A.2d 362 (Del. 2006); ***In re Bridgeport Holdings, Inc.***, 388 B.R. 548 (Bankr. D. Del. 2008). Trustee explained at the hearing that the Court should consider "a series of actions" undertaken and evaluate the facts holistically. Trustee argues that ***Bridgeport***'s fact pattern, in which a series of action by the board of directors led to a rush fire sale of all the company's assets, is comparable to the decision making undertaken by Defendant. (ECF No. 244 at 81, lns. 23–25).

Next, Trustee argues that ***In re Xtreme Power Inc.***, 563 B.R. 614 (Bankr. W.D. Tex. 2016) is comparable to the case at bar because it addressed a company which, had the petition been filed earlier, could have reorganized successfully but was unable to do so due to self-dealing directors. (*Id.* at 82, lns. 8–15). Trustee then notes that ***Frederick Hsu Living Trust*** is analogous because it involved a series of actions and inactions taken by directors in which the company's growth strategy was abandoned amid multiple directors being allegedly "beholden" to one shareholder who stood to substantially benefit. (*Id.*, lns. 16–22). Finally, Trustee argued at the hearing that ***In re Tower Air*** stands for the proposition that the "transaction" the Court may analyze is broad, requiring the Court to look beyond typical business operations and whether the pattern of decision-making was economically sensible. (*Id.* at 83, lns. 9–20).

Trustee argues that Defendant was "sufficiently loyal to, beholden to, or otherwise interested in" Dundon. (*Id.* at 78, lns. 8–13). In Trustee's view, Defendant "bounces from Dundon company to Dundon company, sometimes several at the same time" and is entirely "beholden to

Dundon." (*Id.*, lns. 23–25). Trustee argues that Defendant was never independent because he was a "DCP appointed director" who relies on Dundon for financial means and other business deals. (*Id.* at 79, lns. 21–25). Trustee argues Defendant engaged in "self-dealing" through initiating deals with Carvana and Topgolf, landing Defendant squarely on "both sides of the transaction" because these two organizations are Dundon-affiliated. (*Id.* at 88, lns. 14–18). As Trustee argued at the hearing, Defendant does receive "the business judgment benefit of the doubt when [he] actually owe[d] competing duties of loyalty to two different companies." (*Id.* at 75, lns. 19–21).

In contrast, Defendant argues that the business judgment standard presumption is correct. Defendant posits that if the Court applied entire fairness, Trustee needed to "connect the dots" between a breach and specific transaction. (*Id.* at 122, lns. 1–2). Defendant posited at the hearing that offering free advertising, for example, is not sufficiently connected to a specific transaction to amount to a breach. (*Id.*, lns. 3–7). Defendant argues that Trustee only identifies two transactions specifically towards Defendant: (1) the $250 million funding commitment and (2) the Fowler Release Agreement. (ECF No. 230 at 5). As such, the Court should dismiss the other claims because "Trustee makes no effort to tie together particular transactions and . . . interests that would implicate breach of the duty of loyalty or bad faith." (ECF No. 230 at 6) (citing ***Bridgepoint Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)***, 388 B.R. 548 (Bankr. D. Del. 2008)).

Under Delaware law, there is a distinction between "the standard of conduct and the standard of review." ***Chen v. Howard-Anderson***, 87 A.3d 648, 666 (Del. Ch. 2014). The standard of conduct "describes what directors are expected to do" and is bifurcated into the duties of "loyalty and care." ***Id.*** The standard of review is the "test that a court applies when evaluating whether directors have met the standard of conduct." ***Id.*** The standard of review is divided into three tiers:

the business judgment rule, enhanced scrutiny, and entire fairness. ***Id.*** Delaware corporate law's default standard of review for director decision making is the business judgment standard, which requires courts to "presume that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." ***Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Materials, Inc.***, 318 A.3d 1105, 1136 (Del. Ch. 2024). Essentially, directors must operate in "good faith" and "free of any conflicts of interest and exercise due care" to fulfill their fiduciary mandate. ***Id.***

If these elements are unrebutted, then the court's only role is charged with seeing "whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." ***Id.*** Delaware, however, is unflinching in there being "no 'safe harbor' for [] divided loyalties . . . where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." ***In re Tesla Motors, Inc. S'holder Litig.***, No. 12711-VCS, 2020 WL 553902, at *18 (Del. Ch. Feb. 4, 2020). This means that if Defendant demonstrates at trial that even if Trustee demonstrates Defendant was controlling the ESMG Board in its decision making, Defendant could nonetheless avoid liability so long as the transactions at issue were "fair." ***Id.*** at 19.

Here, the issue is whether the entire fairness test can be applied to a non-shareholder, non-official director's actions when that individual wielded significant authority over the business and had "actual control." Trustee extensively alleges that Defendant effectively operated in a managerial capacity prior to the Release Agreement occurrence on February 24. Trustee's allegations, which for summary judgment purposes are taken as true, indicate that advertising deals, weekly rent, and instructions to run the League as leanly as possible flowed through and

from Defendant. Trustee's evidence creates a plausible factual inquiry as to whether Defendant operated as a shadow director such that this Court could apply the entire fairness standard and hold him liable for a breach of fiduciary duty and self-dealing. As such, the Court declines to take a hyper-technical reading of the law that *only* a director or minority shareholder may be addressed under entire fairness. Because there are genuine disputes of material fact as to (1) whether Defendant operated as a controlling shadow director and (2) whether the evidence satisfies the entire fairness test, Defendant's Motion for Summary Judgment predicated upon the defense of him not physically voting on the Release Agreement's approval is denied.

II. Defendant's Remaining Summary Judgment Arguments

*a. Trustee's Duty of Care Claims Are Not Waived*

Defendant argues that the Court should dismiss Trustee's fiduciary duty claims based on the duty of care because the ESMG restated certificate of incorporation bars such claims. (ECF No. 175 at 8). Defendant argues that Delaware corporate law permits a certificate of incorporation to limit the personal liability of a director or officer for any breach of the duty of loyalty or for acts or omissions not in good faith. *Id.* at 9. Thus, the court must draw the conclusion of a "a take-nothing judgment against the Trustee on claims for money damages based on the duty of care." *Id.* Trustee counters that the exculpatory provision does not bar Trustee's breach of fiduciary duty claims because Trustee is *also* claiming that Defendant's conduct breached his duties of loyalty and fair dealing, noting that Delaware law does not permit dismissal of a duty of care claim based on an exculpatory provision if it is not the exclusive claim. (ECF No. 197 at 13) (citing ***In re Cornerstone Therapeutics Inc., S'holder Litig.***, 115 A.3d 1173, 1179–81 (Del. 2015)). Trustee explains that here, Trustee is also alleging that Defendant breached his duties of loyalty and fair dealing alongside duty of care claims, and thus the exculpatory provision does not apply.

In Delaware, "plaintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director is entitled to be dismissed from the suit." ***In re Cornerstone Therapeutics Inc, Stockholder Litig.***, 115 A.3d 1173, 1180–81 (Del. 2015). Generally, "invocation of the entire fairness standard has a powerful pro-plaintiff effect against interested parties" because once invoked at the pleading stage, plaintiffs are "able to survive a motion to dismiss by interested parties regardless of the presence of an exculpatory charter provision because their conflicts of interest support a pleading-stage inference of disloyalty." ***Id.***

The Delaware Supreme Court has also addressed the effect of coupling exculpated duty of care claims with non-exculpated duty of loyalty of duty of good faith claims. In ***In re Cornerstone Therapeutics Inc., Stockholder Litigation***, the court explained that "unless there is a violation of the duty of loyalty or the duty of good faith, a trial on the issue of entire fairness is unnecessary because a Section 102(b)(7) provision will exculpate director defendants from paying monetary damages that are exclusively attributable to a violation of the duty of care." ***Id.*** at 1180, n. 27 (citing ***Malpiede v. Townson***, 780 A.2d 1075, 1094 (Del. 2001)); *see* ***Emerald Partners v. Berlin***, 726 A.2d 1215 (Del. 1999) ("Nonetheless, where the factual basis for a claim solely implicates a violation of the duty of care, this Court has indicated that the protections of such a [Section 102(b)(7)] charter provision may properly be invoked and applied."). Here, because Trustee has coupled its duty of care claims with duty of loyalty and good faith claims, the Court may not grant Defendant's dismissal because such claims are non-exculpated. Further, Defendant cannot have it both ways—claim the exculpation clause's protection for directors while disclaiming liability for the ESMG's board's decision related to the Fowler Release Agreement because Defendant was not technically a director earlier that same day.

*b. The Fiduciary Duty Claim is not Duplicative of the Breach of Contract Claim*

Defendant next claims that Trustee's claims related to "paper[ing] up" the oral agreement and failure to disclose Dundon's lack of intent to comply with the agreement are improperly duplicative of contract claims. (ECF No. 175 at 10). Defendant argues that Delaware law prohibits court review of a breach of fiduciary duty claim that "completely overlaps" with a breach of contract claim. ***Id.*** (citing ***Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.***, No. CV 2017-0500-JRS, 2018 WL 2727542, at *15 (Del. Ch. June 6, 2018)). Defendant argues that Trustee "does not allege an independent basis (apart from the contract) for this particular breach of fiduciary duty claim" and the breach of oral contract claim "rests of Dundon's failure to fund the league; the alleged breach of fiduciary duty in paragraph 172(a) is based on Dundon's failure to provide funding *as promised* in exchange for control of the league." *Id.* In Defendant's view, the "claims are the same." ***Id.***

Trustee counters that Delaware law permits breach of contract and fiduciary duty claims to coexist if the claims "share a common nuclear of operative facts" so long "as the breach of fiduciary duty claim relies on additional facts, is broader in scope, or involves different considerations in terms of a potential remedy." (ECF No. 197 at 17) (citing ***Schuss v. Penfield Partners, L.P.***, No. 3132, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008); *see also* ***PT China LLC v. PT Korea LLC***, No. 4456, 2010 WL 761145, at *7 (Del. Ch. Feb. 26, 2010) (stating that the "appropriate inquiry is whether there's an independent basis for the two claims, even if both are related to the same or similar conduct"). Trustee points to its First Amended Complaint, which has "specific categories of damages that are separate and apart from, independent of, and unrelated to, the Trustee's breach of contract claims and damages, including 'compensatory damages . . . rescissory damages, disgorgement of benefits received . . . and attorneys' fees." (ECF No. 197 at

19). Trustee argues that its claims also are more factually elaborate, and that Defendant's actions "impaired the League's operational capabilities . . . tarnished its public reputation and diminished its chances of success in future seasons . . . erod[ing] the League's enterprise value and directly le[adding] to the League's bankruptcy, effectively reducing its value to zero." (ECF No. 197 at 19).

Under Delaware law, "breach of fiduciary duty claims is duplicative of breach of contract claims that either were substantially identical, such that the fiduciary duty claim would have been 'superfluous,' or involved remedies that were likely to be equivalent . . . ." ***Schuss v. Penfield Partners, L.P.***, No. CIV.A. 3132, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008) (footnotes and citations omitted). For example, in ***Gale v. Bershad***, the court dismissed a plaintiff's fiduciary duty claims when the plaintiff alleged that a company and its directors breached both contractual and fiduciary duties owed to the preferred stockholders. No. CIV. A. 15714, 1998 WL 118022, at *1–2 (Del. Ch. Mar. 4, 1998) (assessing an express contract claim, an implied contract claim, and a fiduciary claim). The plaintiff argued the preferred stock was redeemed at an unreasonably low and unfair price, which violated the certificate of incorporation. ***Id.*** The court held that the same facts underlying the implied contract claim were also the basis for the fiduciary duty claim, and that duty arose out of the party's contractual relationship, instead of their fiduciary relationship. ***Id.*** at 5. Thus, "because the contract claim addresses the alleged wrongdoing by the board, any fiduciary duty claim arising out of the same conduct is superfluous." ***Id.*** The court reasoned that, in Delaware, "the implied covenant of good faith and fair dealing defines the duties of parties to a contract and is analogous to the role of fiduciary law in defining the duties owed by fiduciaries." ***Blue Chip Capital Fund II Ltd. P'ship v. Tubergen***, 906 A.2d 827, 833 (Del. Ch. 2006) (citing ***Bershad***, 1998 WL 118022, at *5)).

In another instance, ***Madison Realty Partners 7, LLC v. Ag ISA, LLC***, another Delaware court applied ***Bershad*** to hold that the plaintiffs could not prosecute their claim for breach of fiduciary duty when it "overlap[ped] completely" and was "based on the same underlying conduct" with their breach of contract claim. No. CIV.A. 18094, 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001) (analyzing four claims in total, which included a breach of contract claim and aiding and abetting a breach of fiduciary duty). Here, the fiduciary duty Trustee alleges in its Complaint is not solely duplicative of a breach of contract claim. Trustee is not asserting breach of contract as a claim in this adversary—only breach of fiduciary duty and unjust enrichment. If the Court were to dismiss the breach of fiduciary duty claim based on it being duplicative of a breach of contract claim, then the entire adversary would very nearly be disposed of in its entirety despite there being genuine issues of material fact. This is not the scenario ***Madison Realty*** and ***Bershad*** contemplated avoiding. Defendant's argument to dismiss based on this Delaware principle of law is denied.

*c. There is a Genuine Issue of Material Fact as to Whether Defendant was Unjustly Enriched and Received a Benefit from his Influence over the AAF*

Defendant finally argues that he was not unjustly enriched because he received no benefit. (ECF No. 230 at 9); *see* (ECF No. 175 at 11) ("Zutter got nothing."). Defendant argues it is "hard to understand how taking a tax write off for a $70 million loss is an unjust benefit. But for Zutter, it makes no difference. There is no evidence Zutter obtained any tax write off relating to any involvement in the AAF." (ECF No. 230 at 11). Defendant also argues there is no evidence Defendant received any benefit through any of the entities that advertised with the AAF. *Id.*

Trustee counters that there is a genuine issue of material fact related to the determination of a following valuations: whether (1) Defendant and Dundon obtained benefits from tax write-offs; (2) there was a monetary equivalent of that benefit received through the advertising; and, (3)

routing funds to DCP instead of AAF operations directly prior to the bankruptcy resulted in an unjust benefit to Defendant. (ECF No. 244 at 114, lns. 18–25). Curiously, in its Response to Defendant's Motion to Dismiss, Trustee also cites to multiple Texas cases despite the Court stating that Delaware law controls. As such, the Court will not consider those cases cited in Trustee's response. However, Trustee is correct in its contention that genuine issues of material fact remain as to whether Defendant received an unjust benefit from a tax perspective, through his free advertising offers, and from pushing funds to DCP as opposed to the AAF immediately before the AAF entered bankruptcy. (*Id.* at 115, lns. 1–4). Trustee argues Defendant received the following benefits: (1) a 75 percent interest in the AAF for DCP (of which Defendant is a partner); (2) control over the AAF's operations; (3) financial benefits to other business ventures Defendant controlled or are Dundon-affiliated entities for which Defendant leads as Dundon's right hand man; (4) tax benefits for DCP, where Defendant is a partner. (ECF No. 197 at 21).

Further, at the hearing, as explained above, Trustee alleged that Defendant conspired with Dundon to put the AAF through a prepackaged bankruptcy to avoid liabilities and receive full control over the League. Trustee cited to numerous depositions and emails from Defendant indicating his disinterest in reviving the League. It is apparent that there is a genuine issue of material fact as to whether Defendant indeed obtained a benefit under this theory of the case. As such, Defendant's request for dismissal on the unjust enrichment claim is denied.

CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is **DENIED**.

# # #