

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: April 01, 2025.**

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-50900-CAG |
| | § | |
| LEGENDARY FIELD EXHIBITIONS, LLC, et al., | § | |
| | § | |
| | § | |
| Debtors. | § | CHAPTER 7 |

| | | |
|---|---|---|
| RANDOLPH N. OSHEROW, Chapter 7 Trustee for the Bankruptcy Estates Of Legendary Field Exhibits, LLC, et al., | § | |
| | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | ADV. NO. 22-05078-CAG |
| v. | § | |
| | § | |
| THOMAS DUNDON, JOHN ZUTTER, and DUNDON CAPITAL PARTNERS, LLC | § | |
| | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER DENYING IN PART AND MOOTING IN PART DEFENDANTS DCP AND DUNDON'S MOTION FOR SUMMARY JUDGMENT (ECF No. 173)

Before the Court is Randolph Osherow in his capacity as the chapter 11 trustee's

("Plaintiff") First Amended Complaint (ECF No. 56),[1] Dundon and Dundon Capital Partners' ("Defendant") Motion for Summary Judgment (ECF No. 173), Plaintiff's Response to Defendant's Motion for Summary Judgment (ECF No. 196), and Defendant's Reply in Support of Motion for Summary Judgment (ECF No. 229). The Court set the matter for a hearing, heard oral argument, and ultimately took the matter under advisement for a memorandum order. After considering the arguments made and counsels' pleadings, for the reasons stated in this memorandum order, Defendant's Motion for Summary Judgment is **DENIED IN PART** and **MOOT IN PART**.

## JURISDICTION

This Court has jurisdiction over this Motion for Summary Judgment pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (B), (C), (H), and (K). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for relief is Fed. R. Civ. P. 56, made applicable to this proceeding through Fed. R. Bankr. P. 7056 and Local Rule 7056. This case is referred to this Court by the Standing Order of Reference entered in this District. All parties consent to the Court's entry of final orders and final judgment.

## LEGAL STANDARD

Federal Rule of Bankruptcy Procedure 7056 incorporates Federal Rule of Civil Procedure 56 into adversary proceedings. Rule 56 allows parties to move for summary judgment "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). Summary judgment may be granted when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Id.* To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some element of the non-moving party's claim or defense,

---

[1] "ECF" denotes electronic case number.

or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992) (en banc).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Neither will "only a scintilla of evidence" meet the nonmovant's burden. *Liquid Air Corp.*, 37 F.3d at 1075. Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment and must review all facts in the light most favorable to the nonmoving party. *Id.* at 150; *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

3

BACKGROUND

The following claims remain for the Court's consideration:[2]

> (1) breach of oral contract against Dundon;
> (2) breach of contract against DCP;
> (3) breach of covenant of good faith and fair dealing against Dundon and DCP;
> (4) promissory estoppel against Dundon;
> (5) breach of fiduciary duty against Dundon;
> (6) fraudulent misrepresentation, fraud by nondisclosure, and constructive fraud;[3]
> (7) fraud in the inducement;[4]
> (8) negligent misrepresentation;
> (9) unjust enrichment;
> (10) disallowance under 11 U.S.C. § 502(d) against Dundon and DCP; and,
> (11) equitable subordination.

This case arises from the creation and dissolution of an alternative professional football league called the Alliance of American Football ("AAF"), a developmental league conceptualized by individuals with close ties to the sport of American football for highly touted collegiate players and former NFL players to gain exposure and garner interest from NFL teams. In its early stage, the AAF was set to be financed by Reggie Fowler, a former part owner of the Minnesota Vikings. (ECF No. 173, Ex. 6 at 3–4). The AAF founders were unaware that Fowler engaged in criminal activity that resulted in the League's deprivation of liquidity as it entered its inaugural season in 2019. (*Id.*). One week into its first season, AAF leadership recognized it lacked the sufficient funds necessary to maintain league operations, including making player payroll. To remedy this,

---

[2] Pursuant to the Court's Order Granting in Part, Denying in Part Defendants' Motion to Dismiss Complaint with Prejudice (ECF No. 54 at 37), Counts VII-X were dismissed with prejudice. The aiding and abetting claim (Count VI) was also dismissed with prejudice. (ECF No. 54 at 34). Defendant also did not address Trustee's argument related to civil conspiracy (Count XIV), so the Court will not address that claim here.

[3] Because Defendants only challenged the justifiable reliance element of the fraud claims, the Court will only analyze the factual sufficiency of that element.

[4] Defendants' arguments related to Trustee's fraud in the inducement claim are only discussed in Defendants' argument related to justifiable reliance and the economic loss rule. The Court will address fraudulent inducement in the aforementioned sections only as warranted.

4

Charles Ebersol, one of the AAF founders, engaged Thomas Dundon, an alleged millionaire investor with ownership interests in Top Golf, a professional hockey team, and Dundon Capital Partners, LLC ("DCP"), in a series of phone calls beginning on February 13, 2019 to discuss financial aid scenarios. (App. 0058, Ex. 6).

The parties disputed the amount of capital required to stabilize AAF's finances. *Compare* (*Id.*) (proposing a $10 million bridge loan), *with* (Conf. App. 0839, Ex. 79 at 247) (indicating that Dundon was the party who originally proposed $250 million). Ebersol intimated to Dundon that a bridge loan of $10 million was necessary in the short term because the league needed an immediate $5.1 million monetary infusion to pay players and other expenses for the first week of games. (App. 0058, Ex. 6). Later in the day on February 13, Ebersol forwarded marketing materials to Dundon, including an investor deck, financial projections, and other documents for the league. (App. 0058, Ex. 6). After Dundon and DCP conducted brief due diligence on the information Ebersol provided, Dundon, allegedly agreed to cover the League's entire financial need until the League became financially profitable which required approximately $250 million over several years. (Conf. App. 0843, Ex. 79 at 253). This included the AAF's immediate need for payroll and expenses. (*Id.*).

To help facilitate the parties' agreement, John Zutter, a partner of DCP, sent a draft term sheet ("Term Sheet") to Ebersol. (*Id.*, Ex. 6). The Term Sheet provided that DCP would fund an initial amount of $5.1 million and approve additional funding requests up to $70 million. (*Id.*, Ex. 1). The Term Sheet also stated that DCP would receive governance control of ESMG and 75 percent of ESMG's fully diluted capital stock. (*Id.*). The parties exchanged several variations of the Term Sheet, changing the funding amount and percent ownership DCP would take in ESMG. (*Id.*, Ex. 6). Ebersol allegedly questioned Dundon and Zutter about the Term Sheet's max

cumulative value, reiterating that Dundon agreed to provide $250 million, not $70 million. (ECF No. 173, Ex. 6 at 7, lns. 4–25). Dundon allegedly reassured Ebersol that the deal was for $250 million and that the Term Sheet was the first installment of the parties' agreement. (Conf. App. 0846, Ex. 79 at 263, lns. 1–23).

Ebersol was the only party to sign the final iteration of the Term Sheet on February 14 2019, and allegedly did so out an understanding that the Term Sheet was a small portion of a larger oral contract.[5] (ECF No. 173, Ex. 1 at 3). After Ebersol signed the Term Sheet, Dundon began sharing with the media and with members of ESMG that he was investing $250 million. (ECF No. 173, Ex. 6 at 16–17). Ebersol, nevertheless, only received board approval for the Term Sheet. (*Id.*, Ex. 17). By the time ESMG and the AAF filed for bankruptcy, ESMG received roughly $70 million from Dundon-affiliated entity DDFS Partnership, LP ("DDFSP"). (Conf. App. 0111, Ex. 17).

Prior to the AAF's bankruptcy petition, DCP and Dundon enter into a document titled a "Release Agreement" in which the AAF and its former majority shareholder Reginald Fowler agreed to release each other from any claims related to the Series One Term Sheet. Fowler was expected to support the AAF's change in ownership and control to Dundon. At this time, one of the AAF's most valuable assets was its "Standard Player Agreements" which obligated players to remain in the AAF for three seasons to the exclusion of playing in any other spring football league without being released.

At the hearings held on January 31, 2025 and February 3, 2025, Trustee further alleged that

---

[5] The parties previously used an email confirmation from DocuSign that indicated all parties executed the Term Sheet to prove that the Term Sheet was signed. (ECF No. 173, Ex. 1 at 5). Through discovery, however, DocuSign confirmed that it never received Dundon's signed version and no party claims to have seen a Term Sheet with both parties' signatures. (App. 0724, Ex. 66). The only version of the Term Sheet in evidence before the Court displays Ebersol's signature alone.

Dundon sought to "takeover" the AAF as sole director and decisionmaker, infiltrate the AAF from the inside out before sabotaging the league's contracts, run the AAF as leanly as possible, all with the intention of turning the company into a prepackaged bankruptcy option for Dundon to acquire. Trustee alleges Dundon failed to maximize the value of the player contracts, gave free advertising to Dundon-affiliated entities, and engaged in other instances of self-dealing. For example, Dundon arranged advertising deals with Carvana and Topgolf, which Dundon had an "interest in" even though that airtime slot could have been used to generate revenue for the AAF. Dundon admitted in his deposition testimony that every party on the no-charge advertisement list was attributable to himself. In other instances, Trustee alleges that Dundon sabotaged alternative funding opportunities, which startled potential investors. Trustee points to one interested former investor's email which stated, "There was a deal to be made . . . but not with threats and trying to bully the guys who held the cards . . . only a crazy person jumps in and flushes 58 million down the drain." (ECF No. 196 at 24, nn. 87) (citing ECF No. 209 at 234).

Trustee also alleges that Dundon did not act in good faith to preserve vendor contract value and keep the league operational. (ECF No. 244 at 105, lns. 18–20). Trustee argues CBS also planned to invest but was thwarted by Dundon's disinterest, and complicity, in signing the deal and diluting CBS's investment. (*Id.* at 107, lns. 9–14). Trustee notes that Ebersol even emphasized to Dundon the importance of the CBS partnership but Dundon stepped in to respond that, in the absence of a subordination agreement and the parties' agreeing to the deal exactly as presented, Dundon would not fund the CBS deal. (*Id.*, lns. 20–25). Trustee also argued that Dundon sought to "jettison" other shareholders and the deal with MGM and its associated rights, in the hopes that these rights would be subordinated. (*Id.*, lns. 14–17). Trustee explained that Dundon sought to place the AAF into a chapter 7 bankruptcy with two goals in mind: (1) wrestle control away from

7

Ebersol and (2) ensure Dundon did not have to fulfill the entirety of the $250M obligation. (*Id.* at 92, lns. 15–19). In Trustee's theory of the case, if the AAF were to survive, then Dundon would have been forced to fulfill the commitment he made to the league if he planned to remain in control. (*Id.*, lns. 17–19). Trustee insinuates that Dundon took issue with this because Dundon did not want to lose control and fulfill the entirety of the $250 million commitment, did not want to become a minority owner or even a majority owner, and instead wanted complete control over the AAF without any of the prior Ebersol-negotiated agreements attached. (*Id.*, lns. 20–25). In Trustee's view, Dundon sought an "asset deal," looking to acquire the AAF with assets, no liabilities, no other shareholders to listen to, and no commitments aside from those to which Dundon agreed. (*Id.* at 93, lns. 1–7).

After inquiry from the Court, Trustee explained that Dundon's typical scheme permits "all of the losses [to] roll up to Mr. Dundon individually" and then, he subsequently receives a tax benefit. (*Id.* at 94, lns. 21–24). Trustee hypothesized that Dundon's plan was to transition the company into an asset deal that could be obtained through a prepackaged bankruptcy, which would later be sold to Dundon. (*Id.* at 96, lns. 8–9, lns. 14–19). To support this theory, Trustee points to Dundon's righthand man John Zutter's comment, which was made at the time of Dundon having alleged full control over the AAF, as to whether he and Dundon wanted to be further involved with the AAF or whether they should evaluate purchasing the assets and leaving the liability behind. (*Id.* at 93, lns. 18–22). Trustee also notes that even after the DCP team was pushed by Dundon to renegotiate contracts and give discounts, Dundon still was reluctant to pay and once again discussed a prepackaged bankruptcy. (*Id.* at 105, lns. 8–11).

8

<u>ANALYSIS</u>

**I.**      **Standard of Review: Application of the Entire Fairness Standard.**

The parties disagree as to which Delaware standard of review applies: the business judgment rule or the entire fairness test. Dundon and DCP ("Defendants") argue that the business judgment rule applies whereas Trustee argues that the entire fairness standard is the appropriate test. The Court previously ruled in a related adversary proceeding for John Zutter that the entire fairness standard has been sufficiently alleged for the summary judgment stage.

To reiterate, at the hearings, Trustee explained that it has plead sufficient facts and demonstrated adequate summary judgment evidence to rebut the business judgment rule presumption and require the Court to employ the more rigorous "entire fairness" analysis. Trustee cited to the following cases to support its interpretation that entire fairness is the appropriate test: ***Frederick Hsu Living Tr. V. ODN Holding Corp.***, C.A. No. 12108, 2017 WL 1437308 (Del. Ch. 2017); ***Stone v. Ritter***, 911 A.2d 362 (Del. 2006); ***In re Bridgeport Holdings, Inc.***, 388 B.R. 548 (Bankr. D. Del. 2008). Trustee explained at the hearing that the Court should consider "a series of actions" undertaken and evaluate the facts holistically. Trustee argues that ***Bridgeport***'s fact pattern, in which a series of action by the board of directors led to a rush fire sale of all the company's assets, is comparable to the decision making undertaken by Defendant. (ECF No. 244 at 81, lns. 23–25).

Next, Trustee argues that ***In re Xtreme Power Inc.***, 563 B.R. 614 (Bankr. W.D. Tex. 2016) is comparable to the case at bar because it addressed a company which, had the petition been filed earlier, could have reorganized successfully but was unable to do so due to self-dealing directors. (*Id.* at 82, lns. 8–15). Trustee then notes that ***Frederick Hsu Living Trust*** is analogous because it involved a series of actions and inactions taken by directors in which the company's growth

strategy was abandoned amid multiple directors being allegedly "beholden" to one shareholder who stood to substantially benefit. (*Id.*, lns. 16–22). Finally, Trustee argued at the hearing that *In re Tower Air* stands for the proposition that the "transaction" the Court may analyze is broad, requiring the Court to look beyond typical business operations and whether the pattern of decision-making was economically sensible. (*Id.* at 83, lns. 9–20).

Trustee argues that there are "competing duties for both Dundon and Zutter between DCP and the league, creat[ing] an actual conflict of interest" such as "giving free advertising that normally is not free to his own companies, to companies he wants to have a relationship with for other reasons." (ECF No. 244 at 75, lns. 6–13). Trustee argues that "DCP was actively involved" in the AAF and took money from DCP to flow through the League, where Dundon proceeded to have "the ability to decide how to spend that money and whether to prefer, for example, to spend it on DCP's transaction costs, to spend it on things like PWC looking how to organize the league in a way that might help Dundon from a tax perspective" as opposed to surviving the first season and ensuring advertising deals were in place and "honoring contracts" with "key partners" who would have been "necessary for the AAF to grow and be successful." (ECF No. 244 at 76–77, lns. 23–25, lns. 1–8). Trustee also contends that "Dundon was blocking other investors in the league" by not "following up with other investors that had previously expressed interest." (*Id.* at 88, lns. 21–23). In Trustee's view of the case, Dundon refused to communicate with potential investors and instead wanted to place the company directly into a chapter 7 bankruptcy to maximize control and limit his obligations. (*Id.* at 89, lns. 20–22).

In contrast, Defendant argues that the business judgment standard presumption is correct. Defendant posits that if the Court applied entire fairness, Trustee needed to "connect the dots" between a breach and specific transaction. (*Id.* at 122, lns. 1–2). Defendant posited at the hearing

that offering free advertising, for example, is not sufficiently connected to a specific transaction to amount to a breach. (*Id.*, lns. 3–7). Defendant argues that Trustee only identifies two transactions specifically towards Defendant: (1) the $250 million funding commitment and (2) the Fowler Release Agreement. (ECF No. 230 at 5). As such, the Court should dismiss the other claims because "Trustee makes no effort to tie together particular transactions and . . . interests that would implicate breach of the duty of loyalty or bad faith." (ECF No. 230 at 6) (citing ***Bridgepoint Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)***, 388 B.R. 548 (Bankr. D. Del. 2008)).

Under Delaware law, there is a distinction between "the standard of conduct and the standard of review." ***Chen v. Howard-Anderson***, 87 A.3d 648, 666 (Del. Ch. 2014). The standard of conduct "describes what directors are expected to do" and is bifurcated into the duties of "loyalty and care." *Id.* The standard of review is the "test that a court applies when evaluating whether directors have met the standard of conduct." *Id.* The standard of review is divided into three tiers: the business judgment rule, enhanced scrutiny, and entire fairness. *Id.* Delaware corporate law's default standard of review for director decision making is the business judgment standard, which requires courts to "presume that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." ***Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Materials, Inc.***, 318 A.3d 1105, 1136 (Del. Ch. 2024). Directors must operate in "good faith" and "free of any conflicts of interest and exercise due care" to fulfill their fiduciary mandate. *Id.*

If these elements are unrebutted, then the court's only role is to determine "whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *Id.* Delaware, however, is unflinching in there being "no 'safe harbor'

for [] divided loyalties . . . where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *In re Tesla Motors, Inc. S'holder Litig.*, No. 12711-VCS, 2020 WL 553902, at *18 (Del. Ch. Feb. 4, 2020). This means that if Dundon demonstrates at trial that even if Trustee demonstrates he was controlling the ESMG Board in its decision making, Dundon could nonetheless avoid liability so long as the transactions at issue were "fair." *Id.* at 19.

Here, the issue is whether the entire fairness test can be applied to a non-shareholder, non-official director's actions when that individual wielded significant authority over the business and had "actual control." The Court is unpersuaded by Defendant's contention that an operating shadow director may escape liability for alleged wrongdoing solely because his wrongdoing is not embedded into a single, official transaction. Trustee's theory of the case is, at this stage, compelling that Dundon embedded his control at numerous intervals with the intention of obtaining a prepackaged bankruptcy. The Court will employ a wholistic analysis at trial to determine whether the entire fairness test applies. Because there are genuine disputes of material fact as to (1) whether Defendant operated as a controlling shadow director and (2) whether the evidence satisfies the entire fairness test, Defendant's Motion for Summary Judgment predicated upon the defense of him not physically voting on the Release Agreement's approval is denied.

## II.     An Issue of Material Fact Exists Concerning Whether Dundon and ESMG Entered into an Oral Contract.

Under Texas law, "the elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of a contract with the intent that it be mutual and binding." *Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (citing *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).

"Although, in most cases, courts have held that the elements of proof [as listed above] are the same for oral contracts as for written contracts, we assume those holdings to exclude the fifth element that deals with execution and delivery." *Garcia v. Garza*, No. 13-22-00431-CV, 2023 WL 8467664, at *3 (Tex. App.—Corpus Christi Dec. 7, 2023, no pet. h.). "In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding those communications." *Prime Products*, 97 S.W.3d at 636 (citing *Copeland v. Alsobrook*, 3 S.W.3d 598, 605 (Tex. App.—San Antonio 1999, pet. denied)). "The terms must be expressed with sufficient certainty so that there will be no doubt as to what the parties intended." *Copeland*, 3 S.W.3d at 605. "The elements of an oral contract 'may be proved by either circumstantial or direct evidence.'" *Garcia*, 2023 WL 8467664 at *3.

Dundon argues that there was no oral contract between Dundon and ESMG primarily because the alleged oral contract lacks the following material terms: (1) the parties to the contract; (2) the timeframe for the investment; (3) the mechanisms, requirements, and conditions for drawing on the funding commitment; (4) a mechanism or valuing the shares if the investment was for equity in ESMG; and (5) the conditions and terms if the investment was debt. (ECF No. 174, at 15). In support of this argument, Dundon points to ESMG's previous investment agreement with Fowler and the Term Sheet to suggest the above terms were material to the parties. (*Id.* at 16). According to Dundon, because the alleged oral contract was devoid of the above material terms, the parties lacked a meeting of the minds. (*Id.* at 14). Plaintiff counters that whether these terms are essential "depends primarily upon the intent of both parties." (ECF No. 196 at 9) (citing *Burrus v. Reyes*, 516 S.W.3d 170, 187 (Tex. App.—El Paso 2017, pet. denied)). As a result, Plaintiff argues that there is at least a question of material fact regarding the essential terms of the oral contract. (*Id.* at 7).

13

"Whether an agreement fails for indefiniteness is a question of law." ***Coe v. Chesapeake Expl., LLC***, 695 F.3d 311, 320 (5th Cir. 2012). An oral contract must be "sufficiently definite to confirm that both parties actually intended to be contractually bound," and contain "terms that are 'material and essential' to the parties' agreement." ***Fischer v. CTMI, LLC***, 479 S.W.3d 231, 237 (Tex. 2016). "Although the parties must agree to all material terms, they may choose to leave non-essential terms open for later negotiation without rendering the agreement unenforceable." ***Coe***, 695 F.3d at 320. "The material terms of a contract are determined on a case-by-case basis." ***McCalla v. Baker's Campground, Inc.***, 416 S.W.3d 416, 418 (Tex. 2013). As such, "[e]ach contract should be considered separately to determine its material terms." ***T.O. Stanley Boot Co. v. Bank of El Paso***, 847 S.W.2d 218, 221 (Tex. 1992).

Because Dundon claims each of the above terms are material, if the alleged oral contract lacks evidence of any one term, the contract will fail as a matter of law. Accordingly, the Court will review each term, in turn below, to determine if they are material and if the record contains any evidence that creates an issue of fact for trial.

> a. *The Record Contains Sufficient Evidence for the Court to Determine the Identity of the Investor Under Alleged Oral Contract at Trial.*

Dundon claims that the first term missing in the alleged oral contract is the parties to the contract. (ECF No. 173 at 20). Dundon claims that there was no meeting of the minds between Dundon and ESMG regarding the identity of the investor that would supply the $180 million balance after DCP's $70 million commitment. (*Id.*). According to Dundon, the record lacks evidence regarding whether Dundon individually or some other Dundon-related entity would perform under the oral contract. (*Id.*). Trustee maintains that the oral contract was made between Dundon and ESMG (with Ebersol on its behalf). (ECF No. 56 at 40).

The parties' positions create an issue of fact. There is evidence that Dundon and Ebersol were the individuals who conducted negotiations for the investment. In emails with news reporters, Dundon and his team repeatedly represented that Dundon was the party committed to investing $250 million. (App. 0123, Ex. 10). On the other hand, the Term Sheet provides evidence that DCP was the entity whom Dundon intended to fund the investment. (ECF No. 173, Ex. 1). In fact, Trustee maintains that the Term Sheet merely served as the installment of the initial cash injection and not as a separate contract. (Conf. App. 0846, Ex. 79 at 263 lns. 10–11) (showing Ebersol's understanding of the Term Sheet in relation to the alleged larger $250 million contract). It would follow under Trustee's theory that DCP would continue to serve as the investor under to the oral contract. Furthermore, there is evidence that DDFSP was the entity from which funds flowed to ESMG. (Conf. App. 0111, Ex. 17). Because payments came from DDFSP, it could be reasonable that DDFSP was the entity-investor under the oral contract.

Considering these facts together in the light most favorable to Trustee, there is enough evidence for a reasonable fact-finder to find that any of the above parties, or a combination thereof, could be the investor under the oral contract. The summary judgment record fails to conclusively establish that the parties did not have a meeting of the minds on who or which entity would invest $250 million. As such, the identity of the investor is sufficiently definite for trial.

      b.  *The Record Contains Sufficient Evidence for the Court to Determine the Timing of Payment and the Mechanisms for Drawing the Commitment Under the Alleged Oral Contract.*

The second term Dundon claims the alleged oral contract lacks is the time frame during which the parties were required to perform. (ECF No. 173 at 16). Trustee contends that even if the term was missing, it is not considered a material term under Texas law. (ECF No. 196 at 12) (citing ***Young v. Ershick***, 617 F. Supp. 3d 563, 583 (E.D. Tex. 2022)).

15

Trustee is correct that Texas courts routinely hold that the time of payment is not necessarily essential. *See Bryant v. Clark*, 347 S.W.2d 635, 638 (Tex. Civ. App.—Austin 1961) (declining to apply the general and finding time of payment is a material term for a purchase money contract), *aff'd*, 358 S.W.2d 614 (Tex. 1962)*; see also Young*, 617 F. Supp. 3d at 583 (citing *Yazadani-Beioky v. Sharfian*, 550 S.W.3d 808, 827 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)). "The absence of an express time for performance does not necessarily mean that the parties did not enter into an enforceable agreement; generally, the law will imply a reasonable time." *Yazadani-Beioky*, 550 S.W.3d at 827. Timely performance, however, is considered a material term if "the contract expressly makes time of the essence or if something in the nature and purpose of the contract and the surrounding circumstances make it apparent that [the] parties intended that time be of the essence." *Quantum Diversified Holdings, Inc. v. Wienheimer* (*In re Escarent Entities, L.P.*), 423 F. App'x 462, 465 (5th Cir. 2011) (analyzing time of performance in the context of a land sale contract). Thus, when a contract is silent as to time of payment, "it is usually implied that payment is to be made within a reasonable time, or on demand." *Bryant*, 347 S.W.2d at 638.

Here, none of the parties allege that the parties' oral contract was of the essence and the conduct does not indicate that any funding contribution was intended to be timely beyond the initial injection. After ESMG received the first $5.1 million, the Term Sheet indicates that the remaining amount of the parties' commitment was on a need basis. (Conf. App. 857, Ex. 79 at 303, lns. 17–25) (revealing Ebersol's understanding of the timing for the funding). Accordingly, the Court can consider both the Term Sheet and the parties' past conduct to supply a reasonable time for the investment. First, the Term Sheet reveals that ESMG would submit equity funding requests which a Dundon-related entity would fulfill. (App. 0011, Ex. 1). Additionally, the Term Sheet set

a maximum cumulative value that ESMG could request for a prescribed period. (*Id.*). Using these factors, the Court could supply an incremental schedule for the investment. As such, Defendants failed to conclusively show that the time for the investment was an essential term or that there was insufficient information for the Court to supply a reasonable timeframe at trial based on the evidence.

        c. *The Record Contains Sufficient Evidence for the Court to Determine the Terms and Conditions of the Type of Investment.*

The third, fourth, and fifth terms that Dundon claims to be material and absent from the alleged oral contract all concern the type of financial obligation the investor would undertake. Dundon alleges that the oral contract is silent as to whether the $250 million would take the form of an equity investment or if it would contain a debt component. (ECF No. 173 at 18–19). Trustee responds that the deal was not a typical investment contract; rather, the contract was for the purchase of the league. (ECF No. 196 at 11). Accordingly, Trustee claims that Dundon would pay $250 million and receive majority control of ESMG in return. (*Id.*).

For a lending contract, Texas courts generally require evidence of the interest rate, repayment terms, and collateral. *See **T.O. Stanley Boot Co.***, 847 S.W.2d at 221 (finding the only material term present was the loan amount); ***Pine v. Gibraltar Sav. Asso.***, 519 S.W.2d 238, 243–44 (Tex. Civ. App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.) (holding a contract indefinite because it lacked the loan amount, interest rate, and repayment schedule); ***Farah v. Mafrige & Kormanik, P.C.***, 927 S.W.2d 663, 678 (Tex. App.—Houston [1st Dist.] 1996, no writ) ("In a contract to loan money, the material terms are generally the amount to be loaned, the maturity date of the loan, the interest rate, and repayment terms."). For an equity investment contract, Texas courts generally require evidence of the method of payment—either cash or equity interest. ***Farone v. Bag'n Baggage, Ltd.***, 165 S.W.3d 795, 802 (Tex. App. 2005). If the form of payment is an

17

equity interest, there must be a mechanism for determining how shares of a company are to be valued and the entity where equity hails. *Id.*

Dundon asserts that the parties never negotiated or contemplated the structure of Dundon's alleged $250 million commitment which renders the contract indefinite. As Dundon points out, Ebersol admitted that the parties never discussed a structure for the alleged contract. (ECF No. 173, Ex. 6 at 6, lns. 15–21). Whether an investment would include a debt component was a term Ebersol and ESMG previously included in the Fowler Term Sheet. (*Id.* at 3, lns. 11–16). Based on this testimony, Dundon asserts that the parties intended to include a debt component which requires additional material terms under Texas law that are not present here.

On the other hand, Plaintiff's position is that the Term Sheet was a portion of the alleged larger oral contract. To support this position, Plaintiff cites to Ebersol claiming that the Term Sheet was a mechanism to "get the first payment done." (Conf. App. 0846, Ex. 79 at 263, lns. 10–11). Under Plaintiff's view of the facts, the Term Sheet provides evidence that parties did not intend to include a debt component but designed the agreement to be a purchase contract whereby Dundon would "own 75% of the company's fully diluted capital stock" after investing $250 million. (App. 0011, Ex. 1 at 1). This is further bolstered by Ebersol's testimony that Dundon's only obligation under the oral contract was to pay $250 million, not lend. (ECF No. 173, Ex. 6 at 10, lns. 12–17). The Term Sheet also provides evidence of the compensation Dundon would receive for a sale, dividend, liquidation, dissolution, or winding up of ESMG which supports Plaintiff contention that the agreement did not include a debt component. (*Id.*).

The evidence provides sufficient evidence to render the structure of the deal definite enough to survive summary judgment. Thus, the parties' competing views and supporting evidence create an issue of material fact for trial.

     d. *There is an Issue of Fact Regarding Whether the Parties Reached a Meeting of Minds on the Above Material Terms.*

Similar to Dundon's argument regarding indefinite terms, Dundon asserts that because the parties left open or failed to address the structure of the oral contract, the parties merely reached an agreement to agree. (ECF No. 173 at 23). By failing to address these terms, Dundon contends that the Court cannot enforce the alleged oral contract without imposing new terms on the parties that were never agreed to. (*Id.*).

"An essential element of any valid contract is a meeting of the minds." *In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005). "When there is no written contract in evidence, and one party attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact under Texas law." *Id.* "A meeting of the minds can be inferred from the parties' conduct and their course of dealing." *Id.* The issue is judged by "objective standards of what the parties said and did not on their alleged states of mind." *Hudgins v. Sec. Bank (In re Hudgins)*, 188 B.R. 938, 942 (Bankr. E.D. Tex. 1995).

Here, Dundon vigorously denies the existence of an oral contract while Trustee maintains that the parties formed one. Dundon claims that he made "a commitment of 250 million under certain conditions." (Conf. App. 0810, Ex. 78 at 9, lns. 5–6). According to Dundon, "the understanding was if the company performed and it took 250 [million], [Dundon] had the . . . discretion to put all the money in." (Conf App. 816, Ex. 78 at 37, lns. 6–9). Because these conditions were not met, Dundon claims the parties had an agreement to agree. Ebersol, however, asserts that Dundon stated over the phone: "[I]f you are willing to agree to a deal for 250 million dollars then we'll take care of your payments for today and I'll pay." (Conf. App. 0843, Ex. 79 at 253, lns. 7–9). This competent summary judgment evidence supports that Dundon's obligation

to invest $250 million was conditioned on Ebersol giving Dundon majority control of ESMG and the AAF. If Trustee's theory is correct, the Court would not be imposing new obligations that were not agreed on by the parties. As such, there is a dispute of material fact regarding whether the parties reached a meeting of the minds or simply created an agreement to agree. Summary judgment is not appropriate on the Plaintiff's oral contract claim, and the issue is best determined after a trial on the merits.

e. *Dundon Cannot Claim Merger at the Summary Judgment Stage.*

Dundon raises merger as a defense to Trustee's oral contract claim, arguing that any prior negotiations or agreement between Dundon and Ebersol merged into the Term Sheet which Dundon argues is a binding contract. (ECF No. 173 at 26). Trustee asserts that Dundon raised merger too late, waiving merger as an affirmative defense to Trustee's breach of oral contract claim. (ECF No. 196 at 13).

Federal Rule of Civil Procedure 8(c) ("FRCP") provides a non-exclusive list of the affirmative defenses that a party must affirmatively set forth. *Id.*; FED. R. CIV. P. 8(C)(1). The FRCP governs "the manner and time in which defenses are raised and when waiver occurs," while state substantive law "determines what constitutes an affirmative defense." ***Drexel Highlander Ltd. P'ship v. Edelman (In re Edelman)***, Nos. 13-31182, 13-03078, 2014 WL 1796217, at *36 (Bankr. N.D. Tex. 2014). While merger is not explicitly enumerated under FRCP 8(c), it is an affirmative defense under Texas law. ***Starkey v. Graves***, 446 S.W.3d 88, 101 (Tex. App.— Houston [14th Dist.] 2014, no pet.); *see also* ***Rich v. Olah***, 274 S.W.3d 878, 889 (Tex. App.— Dallas 2008, no pet.) ("[T]he failure to plead the merger doctrine waives the defense."). As such, the Court will consider whether merger was timely raised according to FRCP 8(c).

20

FRCP (8)(c) requires a defendant set forth affirmative defenses in the defendant's responsive pleading. *Lucas v. U.S.*, 807 F.2d 414, 417 (5th Cir. 1986). Generally, "[f]ailure to comply with this rule, . . . results in a waiver." *Id.* A defendant, however, does not waive a defense "if it was raised at a pragmatically sufficient time and [does] not prejudice the plaintiff in its ability to respond. A district court has discretion to determine whether the party against whom the defense was raised suffered prejudice or unfair surprise." *LSREF2 Baron, LLC v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014). Thus, the question before the Court is whether Plaintiff was provided with fair notice of Dundon's merger defense. *See Endeavour GP, LLC v. Endeavour Highrise, L.P. (In re Endeavour Highrise, L.P.)*, 432 B.R. 583, 647 (Bankr. S.D. Tex. 2010) (discussing the procedural requirements for asserting an affirmative defense). "The Fifth Circuit employs a fact-specific analysis in deciding whether the plaintiff is unfairly surprised." *Id.* (citing *Ingraham v. U.S.*, 808 F.2d 1075, 1079 (5th Cir. 1987)).

In this case, Dundon did not raise merger in his First Amended Answer; rather, merger was raised for the first time in Dundon's Motion for Summary Judgment. (ECF Nos. 65 & 173). Dundon later sought leave to file a Second Amended Answer for the purpose of adding merger as an affirmative defense which the Court held a hearing on February 14, 2025. (ECF No. 246). The Court denied leave and found that allowing Dundon to amend his answer would be an injustice and constitute unfair surprise for Trustee. (ECF No. 262). The Court relied on Trustee's contention that Trustee's claims in the First Amended Complaint were crafted in a specific manner because Dundon did not originally raise merger. In other words, Trustee represented, and the Court found, that Trustee lacked notice of Dundon's merger defense before Dundon's Motion for Summary Judgment.

Nevertheless, Dundon's affirmative defense is not waived for trial purposes. The Fifth Circuit has recognized that an affirmative defense is not waived where it is first raised in a motion for summary judgment. *Motion Med. Techs., L.L.C. v. ThermoTek, Inc.*, 875 F.3d 765, 772 (5th Cir. 2017) (collecting cases where an affirmative defense was not waived when first asserted in a motion for summary judgment). Accordingly, the Court declines to consider merger for purposes of summary judgment but finds that Dundon may pursue merger at trial if it remains applicable to the remaining claims.

     f.   *Dundon Cannot Rely on the Parol Evidence Rule.*

Dundon next argues that Trustee's breach of oral contract claim fails because the Term Sheet constituted a fully integrated writing and was the final expression of the parties' agreement. (ECF No. 173, at 26). Accordingly, Dundon asserts that the parties only agreed to an investment of $70 million. (*Id.*).

Dundon's argument concerns the parol evidence rule which "applies when parties have a valid, integrated written agreement, and precludes enforcement of prior or contemporaneous agreements." *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011). Thus, to trigger the parol evidence rule, the parties must have "entered into a valid, written, integrated contract." *West v. Quintanilla*, 573 S.W.3d 237, 243 (Tex. 2019); *see Silverthorne Seismic, LLC v. Sterling Seismic Servs., Ltd.*, No. H-20-2543, 2021 WL 11728206, at *16 (S.D. Tex. 2021) (applying the parol evidence rule where the parties do not dispute the existence of a valid contract).

Dundon cannot rely on the parol evidence to defeat Trustee's oral contract claim because the Court previously held that the Term Sheet is not a valid contract as a matter of Delaware law. (Adv. No. 22-05077, ECF No. 171). To summarize, the Court concluded DCP and ESMG reached

a positive agreement to require a signature before the Term Sheet became a binding agreement. (*Id.*). Because new evidence definitively revealed that no representative of DCP signed the Term Sheet, the Court found the Term Sheet is not a binding written contract. (*Id.*).

The Court is bound by its prior decision pursuant to the law of the case doctrine which "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pyle v. U.S. Bank N.A. (In re Pyle)*, Nos. 11-37390-hdh, 13-03252, 2015 Bankr. LEXIS 2171, at \*21 (Bankr. N.D. Tex. 2015). In the context of a bankruptcy, "the law of the case doctrine should be applied to disputes arising in the main bankruptcy case as well as all of its related adversary proceedings." *Id.* at \*22**.** As such, the parol evidence rule is not implicated because the Term Sheet is not a binding written contract.

> g. *There is a Question of Fact Regarding Whether Plaintiff's Oral Contract Claim is Property of the Estate.*

Dundon finally argues that Trustee's oral contract claim fails because a portion of the alleged oral contract constituted a contract to make a future loan to ESMG that Trustee cannot assume the oral contract pursuant to 11 U.S.C. § 365(c)(2), rendering the contract rejected. (ECF No. 173 at 31). According to Dundon, Trustee's rejection of the alleged oral contract was a breach which prohibits Trustee from suing for Dundon's alleged breach of contract. (*Id.*). In response, Trustee contends that ESMG performed under the oral contract and that Dundon materially breached pre-petition by failing to fully fund $250 million. (ECF 196 at 17). In other words, Trustee claims Dundon breached first. (*Id.*). As a result, Trustee argues the breach of oral contract claim came into the bankruptcy estate pursuant to 11 U.S.C. § 541(a). (*Id.*).

Section 365(c)(2) provides that a trustee "may not assume or assign an executory contract or unexpired lease of the debtor" if "such contract is to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor." 11 U.S.C. § 365(c)(2). If a

contract is "not assumed or rejected within 60 days after the order for relief," section 365(d)(1) deems the contract rejected. *Id.* § 365(d)(1). Thus, because a trustee may not assume a contract to loan money, that contract will be deemed rejected. A trustee may, however, pursue claims that are part of the bankruptcy estate. 11 U.S.C. § 541. Section 541 describes property of the bankruptcy estate and explains that "all legal or equitable interests of the debtor in property as of the commencement of the case" become part of the estate. *Id.*

The Fifth Circuit applies the Countryman test to determine if a contract is executory and governed by section 365. ***Argonaut Ins. Co. v. Falcon V, L.L.C. (In re Falcon V, L.L.C.)***, 44 F.4th 348, 352–53 (5th Cir. 2022) (explaining that the Countryman test was named by Professor Vern Countryman because he first proposed a definition for executory contract). The Countryman test provides that "a contract is executory if performance remains due to some extent on both sides and if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material reach of the contract, thereby excusing the performance of the other party." *Id.* (citing ***RPD Holdings, L.L.C. v. Tech Pharm. Servs. (In re Provider Meds, L.L.C.)***, 907 F.3d 845, 851 (5th Cir. 2018)) (internal quotations omitted). Accordingly, the Countryman test has two prongs: (1) performance must remain due to some extent from both parties and (2) if one side materially breaches before the bankruptcy filing, the other side's performance is excused.[6] ***In re Provider Meds, L.L.C.***, 907 F.3d at 851.

Here, there is a question of material fact regarding whether the alleged oral contract was a contract to loan money or a contract to purchase ESMG. As the Court discussed above, there is

---

[6] The analysis for a breach of contract claim in Texas is similar to the analysis for determining whether a contract is executory. A plaintiff is required to prove that that "performed or tendered performance under the contract." ***Krayem v. USRP (PAC), L.P.***, 194 S.W.3d 91, 94 (Tex. App.—Dallas 2006, pet. denied). Nevertheless, a plaintiff's breach will not excuse a defendants' prior material breach. ***Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.***, 518 S.W.3d 432, 437 (Tex. 2017) ("[A] material breach does not discharge a claim for damages that has already arisen."). "In other words, a material breach excuses *future* performance, not *past* performance." ***Id.*** (emphasis original). Thus, a claim arises for damages as soon as a material breach occurs. ***Id.***

evidence to support both parties' theories about the formation of an oral contract. Moreover, the Court cannot determine which party breached first without first determining the existence of a contract at trial. Because the Court cannot determine the extent of the alleged oral contract and the parties' obligations thereunder at this stage, the Court also cannot determine if the alleged oral contract is executory or property of the estate. Accordingly, summary judgment is not appropriate based on an improper assumption of a rejected executory contract.

### III.    Plaintiff's Claim for a Breach of the Term Sheet is Moot.

The Court need not address the merits of DCP's Motion for Summary Judgment on Trustee's breach of written contract claim because, as previously discussed, the Court determined in a related adversary that the Term Sheet failed to create a binding contract. (Adv. No. 22-05077, ECF No. 171). Pursuant to the law of the case doctrine, the Court declines to consider Trustee's beach of written contract claim. Accordingly, Trustee's breach of written contract claim is rendered moot.

### IV.    Trustee Properly Established its Claim for Breach of the Covenant of Good Faith and Fair Dealing Against Dundon and DCP.

Defendants asserts two bases for why the Court should grant summary judgment on Trustee's allegations regarding failures of good faith and fair dealing. Defendants first argue that Trustee has not sufficiently demonstrated a "special relationship" between Dundon and the Debtors to survive summary judgment. Defendants argue that the Term Sheet precludes Trustee from bringing this claim. The Court will address each of Defendants' contentions, in turn, below.

   a.   *Trustee Sufficiently Alleged Dundon's Special Relationship Through Exerting Unequal Bargaining Power.*

In its Motion for Summary Judgment, Dundon argues that Trustee fails to establish a "special relationship" between Dundon and Debtors, as required under Texas law. (ECF No. 173 at 35). Dundon argues that Texas does not recognize an independent claim for a breach of the duty

of good faith and fair dealing absent a special relationship. (ECF No. 173 at 36). Dundon explains that special relationships arise in only a few situations, such as insurance, oil and gas, joint ventures, and agency relationships. (ECF No. 173 at 36). Here, Dundon explains that the oral agreement is merely an "ordinary contract" that fails to arise to the level of a special relationship to warrant liability. (ECF No. 173 at 36). Dundon further argues that Trustee "cannot establish a special relationship between Dundon and Debtors at the time of the alleged promise . . . [because] they had no relationship at all." (ECF No. 173 at 36). In Dundon's view, if the Court were to recognize Dundon's relationship with Debtors as "special" then the Court would "have to create an entirely new category of 'special relationship' under the good faith and fair dealing doctrine that encompasses all contractual negotiations." (ECF No. 173 at 37).

Trustee counters that Dundon is not entitled to summary judgment on this count because there is a fact issue as to whether there is a special relationship. (ECF No. 196 at 36). Trustee further argues that the Court already addressed Dundon's argument in its Order Denying Dundon's Motion to Dismiss (*See* ECF No. 54) ("Texas often recognizes special relationships as either (1) fiduciary relationships arising from an element of trust necessary to accomplish the goals of the contract or (2) relationships based on extra-contractual duties arising from an imbalance of bargaining power as special relationship that imply a covenant of good faith and fair dealing.") Trustee argues that it has presented summary judgment evidence of "both types of special relationship." (ECF No. 196 at 36). For example, Trustee demonstrated that Dundon was a director of ESMG, thus owing ESMG formal fiduciary duties, and "therefore owed a duty of good faith and fair dealing in performing the Oral Contract." (ECF No. 196 at 36). Next, Trustee argues that an "imbalance of bargaining power" can also give rise to a special relationship so a Court may find liability under a theory of a breach of duty of good faith and fair dealing. (ECF No. 196 at 36–37)

26

(citing *Jhaver v. Zapata Off-Shore Co.*, 903 F.2d 381, 385 (5th Cir. 1990) ("Texas courts classify contractual relationships with imbalanced bargaining power as special.")).

Trustee further states that the "evidence supports an imbalance of power favoring Dundon," particularly, that Dundon "knew the AAF was in significant financial distress and needed to secure an investment" to meet payroll and he claimed to be a "highly liquid billionaire and interested in arbitrage" who sought to "participate in a big way" with the AAF." (Conf. App. 0832, lns. 6–7, 15–18). Trustee argues this deposition testimony from Ebersol reflects Dundon sought to use the "distressed situation as leverage, cre[ating] an imbalance of bargaining power." (ECF No. 196 at 38). In Trustee's view, "Dundon knew the AAF was in significant financial distress and needed to secure an investment . . . Dundon agreed to provide the money AAF immediately needed, but only on the condition he be able to make a larger investment and gain majority control." (ECF No. 196 at 37).

The Texas Supreme Court has "not recognized that an implied covenant of good faith and fair dealing exists in every contract but, instead, has recognized that such duty 'may arise as a result of a special relationship between the parties governed or created by a contract.'" *Tex. Champps Americana, Inc. v. Comerica Bank*, 643 S.W.3d 738, 747–48 (Tex. App.—Dallas 2022, pet. denied) (quoting *Arnold v. Nat'l Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)). Special relationships typically "arise where there is an element of trust necessary to accomplish the goals of the undertaking or when the courts have declared the existence of a special relationship because of imbalance of bargaining power." *Central Sav. & Loan Ass'n v. Stemmons Nw. Bank*, 848 S.W.2d 232, 239–40 (Tex. App.—Dallas 1992, no writ). Another Texas court has explained that special relationships are recognized "where there is unequal bargaining power between the parties and a risk exists that one of the parties may take advantage of the other based upon the

imbalance of power*." McKenzie v. Cmty. Cmty. Nat'l Bank*, No. 04-14-00540-CV, 2015 WL 3616601, at *4 (Tex. App.—San Antonio June 10, 2015, no pet.).

For example, the Texas Supreme Court held in *Arnold v. National County Mutual Fire Insurance Company* that a duty of good faith and fair dealing existed between insurance companies and insureds because the insurance companies have "exclusive control over the evaluation, processing and denial of claims" and could "arbitrarily deny coverage and delay payment of a claim" with no real penalty. 725 S.W. 2d 165, 167 (Tex. 1987); *see also In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232–33 (Tex. 2008) (explaining that a disparity in bargaining power occurs only when one party has no choice but to accept the agreement). In another instance, a Texas court evaluated "extraneous facts and conduct, such as excessive lender control over, or influence in, the borrower's business activities." *Villanova v. Fed. Deposit Ins. Corp.*, 511 S.W.3d 88, 105 (Tex. App.—El Paso 2014, no pet.). Here, Trustee has created a genuine issue of material fact as to whether there was unequal bargaining power between the parties to the extent that a special relationship could be found by the Court.

Trustee argues that while the AAF was teetering into bankruptcy, and was desperate to make payroll, Dundon sought exclusive control over a company that had no choice but to accept his funding offer. As such, Dundon's argument for summary judgment on this claim is denied.

b. *The Term Sheet Has Been Ruled as Moot.*

Dundon next argues that the Term Sheet precludes Trustee's claim for breach of the covenant of good faith and fair dealing against DCP "because the claim mirrors the breach of contract claim against DCP and seeks the same damages." (ECF No. 173 at 37). Dundon argues that, under Delaware law, "the covenant of good faith and fair dealing cannot be invoked when a contract addressed the conduct at issue." (ECF No. 173 at 37) (citing *Glaxo Group Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021)). Trustee counters that the argument surrounding the term sheet

28

was already addressed by the Court's ruling in its order regarding Defendant's Motion to Dismiss. (ECF No. 196 at 38). The Court previously determined in a related adversary that the Term Sheet failed to create a binding contract. *See* Adv. No. 22-05077, ECF No. 171 ("Because new evidence definitively revealed that no representative of DCP signed the Term Sheet, the Court found the Term Sheet is not a binding written contract.") The Court thus finds Defendant's argument on this claim and this portion of Trustee's claim moot. The Court declines to consider these arguments because there is no written agreement.

### V. Summary Judgment is Not Appropriate for the Promissory Estoppel Claim.

Dundon argues Plaintiff's promissory estoppel claim should fail for three reasons: (1) Plaintiff cannot recover benefit-of-the-bargain damages under a promissory estoppel claim; (2) Plaintiff did not justifiably rely on Dundon's promise as a matter of law; and (3) the promise is not specific enough for the Court to enforce.[7] (ECF No. 173 at 31–35).

To prevail on a promissory estoppel claim, a plaintiff must prove (1) the existence of a promise; (2) that the promisor could foresee would be relied on by the promisee; and (3) the promisee substantially relied on the promise to his detriment. *G.D. Holdings, Inc. v. H.D.H. Land & Timber, L.P.*, 407 S.W.3d 856, 861 (Tex. App.—Tyler 2013, no pet.) (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)). Promissory estoppel does not create liability for a noncontracting party where liability does not otherwise exist. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 134 (Tex. 2005). Rather, the doctrine "prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them." *Id.* (quoting *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965)). Thus, "a party that has failed to prove a legally sufficient

---

[7] Count IV in Plaintiff's complaint relates to an oral contract, which is governed by Texas law. "For this reason, the Court will examine Count IV against the Texas requirements for a valid promissory estoppel claim." (ECF No. 54 at 23).

contract, but has acted in reliance upon a promise to his detriment, may be compensated for his foreseeable, definite, and substantial reliance." ***Lucas v. Ryan***, No. 02-18-00053-CV, 2019 WL 2635561, at *51 (Tex. App.—Fort Worth June 27, 2019, no pet.).

   a. *Dundon Failed to Show that Trustee Seeks Improper Damages.*

  Dundon first argues that Trustee should take nothing on Trustee's promissory estoppel claim because the First Amended Complaint improperly seeks benefit-of-the-bargain damages rather than reliance damages. (ECF No. 173 at 32). In support of this argument, Dundon compares the amount requested by Trustee for promissory estoppel and breach of contract. (*Id.*). According to Dundon, Trustee improperly seeks the benefit of the bargain because both counts request approximately $180 million. (*Id.*). Trustee contends that the calculations for reliance damages rely on actions unrelated to Debtors' expectations under the alleged oral contract even though the damages amount to a similar figure as Trustee's request under the breach of oral contract theory. (ECF No. 196 at 23).

  "Damages recoverable in a case of promissory estoppel are not the profit that the promisee expected, but only the amount necessary to restore him to the position he would have been in had he not acted in reliance on the promise." ***Fretz Constr. Co. v. S. Nat'l Bank***, 626 S.W.2d 478, 483 (Tex. 1981). "Reliance damages are similar to out-of-pocket damages and reimburse a plaintiff for expenditures made in reliance on the promise. ***Thomas Oilfield Servs., L.L.C. v. Clark***, No. 12-18-00344-CV, 2019 WL 3024765, at *4 (Tex. App.—Tyler July 10, 2019, no pet.). Thus, a party may only recover "expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty that the injured party would have suffered had the contract been performed." ***Oto Analytics, Inc. v. Capital Plus Fin., L.L.C.***, No. 3:21-CV-2636-B, 2022 WL 1488441, at *36 (N.D. Tex. 2022) (dismissing complaint because

plaintiff failed to provide an estimate of its reliance damages). Because "the promisee in such cases is partially responsible for his failure to bind the promisor to a legally sufficient contract, it is reasonable" to award only reliance damages to achieve justice. *Wheeler*, 398 S.W.2d at 97.

Dundon only pointed to the dollar amount request for Trustee's contract claim to support his argument that Trustee improperly seeks the benefit of the bargain under promissory estoppel. Accordingly, the Court will look to Trustee's First Amended Complaint and evidence to determine if there is sufficient evidence to support an award of reliance damages.

Trustee alleges that Debtors incurred reliance damages because "Dundon refused to allow any additional sources of funding for ESMG" and plunged the league into bankruptcy while depleting AAF's enterprise value. (ECF No. 56 at 44); (ECF No. 196 at 24). This allegation is supported by emails and conversations where Dundon allegedly tanked marketing and funding opportunities at the Debtors' expense (App. 0086, Ex. 9); (App. 1152, Ex. 99) (indicating members of the NFL were optimistic about striking a deal with the AAF). Plaintiff further points to an email from Ebersol to Dundon on March 27, 2019 where Ebersol lists "go forward options" for ESMG to avoid bankruptcy. (App. 0054, Ex. 4). Less than a week later, ESMG and AAF hired bankruptcy counsel, and on April 2, 2019, the AAF ceased operations—all allegedly at Dundon's direction. (App. 1130, Ex. 95); (App. 1141, Ex. 97). Additionally, Trustee provided some quantified evidence of the Debtors' loss in enterprise value as a result Dundon's decisions. (Conf. App. 0731, Ex. 77 at 36). None of the above actions relate to Trustee's expectation under the parties' alleged oral contract and Dundon failed to meet his burden on summary judgment by putting forth evidence showing how Trustee's request constitutes anything other than reliance damages.[8]

---

[8] A movant who does not bear the burden of persuasion at trial has two options for satisfying its initial burden on summary judgment: "(1) by producing evidence that negates an essential element of the non-movant's claim or

Viewing the facts in the light most favorable to Trustee, there is enough evidence at this stage to support a claim for reliance damages. A question of fact remains regarding the proper value of reliance damages which is Trustee's burden to prove at trial. Accordingly, summary judgment is not appropriate based on Dundon's defense against Trustee's promissory estoppel claim.

b. *Justifiable Reliance is Not "Negated" as a Matter of Law.*

Next, Dundon argues that Trustee cannot prove justifiable reliance as a matter of law because the alleged promise that forms the basis for Trustee's claim is contradicted by the Term Sheet. (ECF No. 173 at 34). Trustee counters that the Court reviewed the Term Sheet and Dundon's alleged promise, finding the two representations did not contradict. (ECF No. 196 at 22).

Trustee is correct that the Court previously addressed justifiable reliance where a promise contradicts a written contract and held that the Term Sheet is not contradicted by Dundon's alleged promise to invest $250 million in exchange for majority ownership of ESMG. (ECF No. 54 at 42). While the Court reached this conclusion on Trustee's fraud claims, the same reasoning and principals apply to promissory estoppel. As such, the Court holds again that a "reasonable person could conclude that Dundon would not invest more than $70 million between the Term Sheet's effective date and June 30, 2019, and still invest a total of $250 million at some other point(s) in time." (ECF No. 54, at 42). Furthermore, the Court previously found that the Term Sheet failed to create a biding written contract. Because the Term Sheet is not a contract, the Term Sheet by itself cannot negate justifiable reliance as a matter of law. Thus, summary judgment is not appropriate based on Dundon's second argument against promissory estoppel.

---

defense or (2) by pointing to the non-movant's lack of evidence to support an essential element of its claim or defense." ***Cooper v. Blair Logistics, LLC***, No. 4:22-CV-00230, 2023 WL 2787953, at *5–6 (E.D. Tex. 2023).

    c.  *The Promise is Specific Enough to Survive Summary Judgment.*

Finally, Dundon argues Trustee's promissory estoppel claim must fail because the promise is too vague and indefinite to support justifiable reliance. (ECF No. 173 at 33). Similar to the argument Dundon asserted against Plaintiff's claim for breach of oral contract, Dundon claims the parties alleged promise left open terms that required further negotiation, including

> (a) which Dundon-affiliated entity or entities would invest in ESMG; (b) the timeframe the alleged $250 million was to be invested, and whether it was to constitute a lump sum payment, a series of payments, or otherwise; (c) whether the investment would take the form of equity or debt or both; (d) if equity, the price per share, quantity of shares, or any mechanism for valuing shares; and (e) if debt, the interest rate, maturity date, payment schedule, or any terms of the debt repayment.

(*Id.*).

"To support a finding of promissory estoppel, a successful promissory-estoppel claim must be based on an 'actual promise.'" *Eaton v. Mazanec Constr. Co.*, Nos. 10-21-00107-CV, 10-21-00111-CV, 2022 WL 7211332, at *19 (Tex. App.—Waco Oct. 12, 2022, no pet.). "The asserted 'promise' must be sufficiently specific and definite so that it would be reasonable and justified for the promise to rely on it as a commitment to future action." *Id.* "[S]tatements of an intention to reach agreement have been found too vague and indefinite to survive summary judgment on promissory estoppel." *Addicks Servs. v. GGP-Bridgeland, LP*, 596 F.3d 286, 301 (5th Cir. 2010). If a party's breach of contract claim fails for indefiniteness, Texas courts have held the party's claim for promissory estoppel will fail for the same reason. *Neeley v. Bankers Trust Co. of Tex.*, 757 F.2d 621, 630 n.7 (5th Cir. 1985).

An alternative claim for promissory estoppel will only be granted where the Court finds no contract existed. *Lucas*, 2019 WL 2635561, at *51 (explaining promissory estoppel is recoverable where a plaintiff fails to prove the existence of a contract). As discussed above, the Court finds that the alleged contract is definite enough to proceed to trial. Because the facts are definite enough

33

at this stage on Plaintiff's oral contract claim, they are also definite enough on Trustee's promissory estoppel claim. *Cf. Neeley*, 757 F.2d at 630 n.7. ("The same indefiniteness that makes the putative contract unenforceable prevents Neeley from prevailing on a promissory estoppel theory."). Accordingly, summary judgment is not appropriate on the promissory estoppel claim.

## VI.    Summary Judgment is Not Appropriate for Plaintiff's Fraud Claims.

Defendants argue that Trustee's fraud claim fails[9] because justifiable reliance is negated as a matter of law. (ECF No. 173, at 39). According to Defendants, Ebersol blindly relied on Dundon's representation that he would invest a total of $250 million despite the Term Sheet providing a maximum cumulative commitment of $70 million for a prescribed period. (*Id.* at 40). Plaintiff argues that the Court address and disposed of Defendants' argument regarding justifiable reliance in the Court's Order on Defendants' Motion to Dismiss.

Justifiable reliance usually "presents a question of fact. But the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified." *Magna Equities II, LLC v. Heartland Bank*, No. H-17-1479, 2018 WL 4080496, at *25 (S.D. Tex. 2018) (citing *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018)). Such circumstances include instances where (1) oral misrepresentations contradict a written contract's unambiguous terms and (2) "red flags" indicate reliance is unwarranted. *Id.* "Either of these circumstances can alone be sufficient to negate justifiable reliance as a matter of law." *Ly v. Maya Walnut LLC*, No. 05-21-01140, 2024 WL 260761, at *15 (Tex. App.—Dallas

---

[9] The remaining fraud claims include common law fraud, fraudulent misrepresentation, fraud by non-disclosure, constructive fraud against Dundon, and fraud in the inducement against Dundon and DCP. Because each of these claims require justifiable reliance, the Court refers to them as the "fraud claims." *See e.g. Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prod. (In re Deepwater Horizon)*, 643 F. App'x 377, 382 (5th Cir. 2016) ("For common law fraud, we look to justifiable reliance as the common law standard for reliance.").

Jan. 24, 2024, pet. filed) (finding a lack of justifiable reliance on appeal after a trial on the merits). Defendants argue that both circumstances are present here.

As discussed above, Defendants cannot rely on the Term Sheet to negate justifiable reliance as a matter of law. Thus, Defendants must show the presence of "red flags" in the creation of the parties' agreement to disprove justifiable reliance. In Texas, the following facts are considered red flags: (1) the deal was negotiated at arm's length; (2) the parties are sophisticated; (3) there are indefinite and vague statements; and (4) the negotiations are lengthy or heated. *Ly*, 2024 WL 260761, at *16–23. In the face of red flags, the law requires parties exercise care "to protect their own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *Id.* at *23. Red flags do not "preclude justifiable reliance per se; rather, if a sophisticated business entity encounters red flags, it must undertake 'additional investigation' in order to exercise reasonable diligence and avoid negation of justifiable reliance." *Stabilis Fund II, LLC v. Compass Bank*, No. 3:18-CV-0283-B, 2018 WL 3618012, at *25 (N.D. Tex. 2018).

The alleged oral contract here was not small and was negotiated at arm's length between sophisticated parties.[10] Defendants rely heavily on Ebersol's admission that Ebersol trusted Dundon's oral representation to invest a total of $250 million despite the Term Sheet listing $70 million as the maximum commitment. (ECF No. 173, Ex. 6 at 7, lns. 4–25). While the parties dispute the amount of money the league required to survive, Ebersol alleges, and summary judgment evidence reveals, that the league purportedly needed a total of $250 million in capital to become self-sustaining. (ECF No. 205, Ex. 2 at 46). If those projections are true, it may have been reasonable for Ebersol to rely on an investor's representation that he would fulfill the league's

---

[10] Arm's-length transactions are "negotiated by unrelated parties, each acting in his or her own self-interest." *Arm's-Length Transaction*, Black's Law Dictionary (6th ed. 1990).

financial needs for the long term. This is especially true if, as Ebersol claims, Dundon was the party who pitched the $250 million. (Conf. App. 0839, Ex. 79 at 247) (revealing Ebersol originally requested only $170 million to mirror Fowler's failed investment deal). Additionally, Ebersol was allegedly not the only party Dundon made the representation to; rather, Dundon admits that he shared the $250 million figure with the media multiple times. (Conf. App. 0952, Ex. 82 at 196–200). Furthermore, Ebersol maintains that he executed the Term Sheet out of an understanding that it was the first installment of the greater $250 million commitment. (Conf. App. 0846, Ex. 79 at 263, lns. 10–11). This is supported by Ebersol's email to the AAF members representing that Dundon was partnering with the league and providing $250 million. (ECF No. 205 at 115); (Conf. App. 0844, Ex 79 at 255–56). Viewing the facts in the light most favorable to the plaintiff, these repeated and consistent representations militate against finding a lack of justifiable reliance at this stage. Therefore, the Court holds that Defendants cannot negate reasonable reliance as a matter of law and the issue is a question of fact best suited for trial. As such, summary judgment is not appropriate on Trustee's fraud claims.

## VII. Summary Judgment is Not Appropriate on Plaintiff's Negligent Misrepresentation Claim.

Dundon seeks a take-nothing judgment on Trustee's negligent misrepresentation claim, arguing the claim does not apply to this case. (ECF No. 173 at 37). According to Dundon, the new Restatement (Third) of Torts does not cover misrepresentations made in connection with the negotiation or performance of a contract. (*Id.* at 38). Additionally, Dundon argues that Trustee seeks damages that are not recognized as recoverable for negligent misrepresentation. (*Id.* at 39). Trustee counters that the Court is not bound by the new Restatement because it has not been adopted by the Supreme Court of Texas. (ECF No. 196 at 31). Trustee further asserts that "there is no way for this Court to guess the extent to which" the Supreme Court of Texas will adopt the

new Restatement. (*Id.*). Finally, Trustee claims the complaint seeks damages for negligent misrepresentation that are unrelated to any breach of contract claim. (*Id.* at 33).

To prove negligent misrepresentation in Texas, Trustee must show:

> (1) the representation was made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation.

*Crain v. City of Selma*, No. SA-16-CV-408, 2017 U.S. Dist. LEXIS 30160, at *17–18 (W.D. Tex. 2017); *see also* RESTATEMENT (SECOND) OF TORTS § 552(1) (AM. L. INST. 1977). These elements reflect the definition found in the Restatement (Second) of Torts which has been adopted by the Supreme Court of Texas. *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

Defendants ask the Court to adopt the newest edition of the Restatement published by the American Institute of Law in 2020. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 5(5) (AM. L. INST. 2020). The new Restatement rejects claims for "negligent misrepresentation made in the course of negotiating or performing a contract between parties." *Id.* The Court, however, does not need to adopt a new Restatement because the existing case law in Texas already holds that "[t]he damages recoverable for a negligent misrepresentation *do not include the benefit of the plaintiff's contract with defendant*." *Airborne Freight Corp. v. C. R. Lee Enters., Inc.*, 847 S.W.2d 289, 295–96 (Tex. App.—El Paso 1992, writ denied) (emphasis original). This position reflects the economic loss rule which "generally precludes recovery in tort or economic losses resulting from a party's failure to fulfill a contractual obligation when the harm consists only of the economic loss of a contractual expectancy." *RDA Pro. Beauty Supply Inc. v. Clay*, No. 12-23-00050-CV, 2023 WL 8658711, at *7 (Tex. App.—Tyler Dec. 14, 2023, no pet.

h.).[11] Thus, the plaintiff "has the burden to establish an injury or loss attributable to the alleged negligent misrepresentation that is 'distinct, separate, and independent' from the loss of her contractual expectancy." *Id.*

Dundon's Motion for Summary Judgment does not challenge the facts of Trustee's case, but attacks Trustee's pleading itself. (ECF No. 173 at 37–38) (requesting a "take-nothing judgment on the Trustee's negligent misrepresentation claim because that cause of action does not apply in this case—meaning to the facts alleged by Trustee"). Accordingly, the Court will review Trustee's pleading to determine whether negligent misrepresentation applies to the facts alleged by Trustee. *See **St. Paul Mercury Ins. Co. v. Williamson***, 224 F.3d 425, 440 (5th Cir. 2000) ("Indeed, where a motion for summary judgment is solely based on the pleadings or only challenges the sufficiency of the plaintiff's pleadings, then such a motion should be evaluated in much the same way as a Rule 12(b)(6) motion to dismiss.").

Trustee's First Amended Complaint alleges a list of damages incurred by Debtors, including (1) "substantial depreciation and ultimate destruction of the League's enterprise value," (2) "assets and resources of Debtors that Dundon usurped and used for his own personal benefit," and (3) "lost opportunities and profits to the Debtors to pursue or close beneficial contracts with . . . other financiers and strategic partnerships." (ECF No. 56 at 62). After this list, Trustee clarifies that the complaint seeks damages that "are distinct from any contractual damages." (*Id.*). Furthermore, this Court previously determined that the facts, as plead by Trustee, allege a cause of action for negligent misrepresentation based on Dundon's statements that the AAF did not need additional outside funding. (ECF No. 54 at 52). As alleged, Dundon's representations appear to be

---

[11] Texas courts have not chosen to condition the application of the economic loss rule on whether the plaintiff prevails on claims for both tort and contract. ***RDA Pro. Beauty Supply Inc.***, 2023 WL 8658711, at *12. "The rule does not state that a plaintiff cannot recover in both contract and tort; rather, the economic loss rule precludes *any* recovery in tort for the economic losses recoverable (not necessarily actually recovered) under a claim for breach of contract." *Id.*

separate and apart from the parties' alleged oral contract which Trustee asserts was to fund money in exchange for control of ESMG. Dundon failed to prove or explain how damages are unavailable for the actions Trustee complains. Therefore, the Court declines to grant a take-nothing judgment for Dundon. At trial, Trustee must prove the above elements as well as damages that are distinct from Trustee's remaining breach of contract claim.

## VIII. Trustee's Fiduciary Duty Claims Are Not Waived Based on the Duty of Care

Dundon next argues that the fiduciary duty claims based on the duty of care are "barred because the ESMG restated certificate of incorporation contains and exculpatory clause barring the claims."[12] (ECF No. 173 at 41). In Dundon's view, an exculpatory clause requires "a take-nothing judgment against the Trustee on claims for money damages based on the duty of care: failure to employ a rational decision-making process and failing to act prudently." (ECF No. 173 at 42). Dundon next takes issue with Trustee's pleading surrounding the following two transactions: "(1) the alleged $250 million agreement and (2) the Fowler release." (ECF No. 229 at 15). In Dundon's view, "there is no evidence that Dundon received a benefit from the Fowler release," requiring the Court to grant summary judgment. (ECF No. 229 at 15).

Dundon also quarrels with Trustee's citation to the $250 million agreement because that claim "is a contractual issue, not a fiduciary duty." (ECF No. 229 at 15). In his Reply, Dundon argues that the only evidence Trustee provides "merely indicates that Dundon approved it" and contends that "[a]pproval of an action taken by a board is too little to pin liability on a director who did not vote for the transaction." (ECF No. 229 at 15). Dundon further argues that the "rest of the fiduciary duty allegations against Dundon are broad generalized allegations that Dundon

---

[12] The relevant provision of the exculpatory provision in the ESMG restated certificate of incorporation states:

> To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

ECF No. 173 at 41 (citing Ex. 3 (Restated Cert.) at 25–26 art. 8A).

was bad at being a director or made decisions that harmed the league" but these claims fail because Trustee must identify "the specific transaction and the related facts/conduct/mental state that led to the alleged breach." (ECF No. 229 at 15).

Trustee counters that the exculpatory provision in ESMG's articles of incorporation does not bar the Trustee's claims against Dundon because Delaware does not permit corporations to contract around duty of loyalty violations and bad faith claims. (ECF No. 196 at 46) (citing *In re Bridgerport Holdings, Inc.*, 388 B.R. 548, 568 (Bankr. D. Del. 2008)). Trustee argues that his claims implicate the duty of loyalty and fair dealing because it addresses "Dundon's bad faith, his competing duties to DCP, his self interest in taking these actions because both DCP and Dundon benefitted from his conduct that harmed AAF, and Dundon's potential illiquidity." (ECF No. 196 at 47). Trustee lists Dundon's alleged failures in the following order:

> (i) failure to provide funding as promised, (ii) failure to complete previously negotiated contracts in the best interests of the AAF; (iii) refusals to consider or accept additional investments or fundings from sources other than himself, including specific opportunities presented; (iv) decision to cease operations and technology development; (v) decision to breach contracts; and (vi) decision to place the AAF into bankruptcy.

(ECF No. 196 at 47). Trustee cites to deposition testimony indicating that Dundon opposed outside investments that conflicted with his desire to be in control,[13] wielded his ability to withhold

---

[13] ECF No. 205 at App. 0909–10 (On February 20, 2019, Dundon informs Kevin Adams with JP Morgan that "At this time, we do not need to seek capital"); App. 1885 at lns. 16–18 and 1890 at lns. 20–25 (Gabe Giordano affirmed in deposition testimony that (1) the general impression within the AAF was that the corporation no longer needed additional funding after Dundon's investment and (2) Dundon sought to "independently own this league and there would be no . . . discussions about sales of FANchises in the future; therefore, therefore, there would be no need for these FANchise agreements").

funding to strip AAF for parts in preparation of filing bankruptcy,[14] and giving free advertising to Dundon-affiliated entities.[15]

Similar to the analysis in a related adversary with Zutter, the Court will begin with addressing the entire fairness standard and its relevant application to this claim. Under Delaware law, there is a distinction between "the standard of conduct and the standard of review." ***Chen v. Howard-Anderson***, 87 A.3d 648, 666 (Del. Ch. 2014). The standard of conduct "describes what directors are expected to do" and is bifurcated into the duties of "loyalty and care." ***Id.*** The standard of review is the "test that a court applies when evaluating whether directors have met the standard of conduct." ***Id.*** The standard of review is divided into three tiers: the business judgment rule, enhanced scrutiny, and entire fairness. ***Id.*** Delaware corporate law's default standard of review for director decision making is the business judgment standard, which requires courts to "presume that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." ***Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Materials, Inc.***, 318 A.3d 1105, 1136 (Del. Ch. 2024). Essentially, directors must operate in "good faith" and "free of any conflicts of interest and exercise due care" to fulfill their fiduciary mandate. ***Id.***

If these elements are unrebutted, then the court's only role is charged with seeing "whether the business decision made was rational in the sense of being one logical approach to advancing

---

[14] ECF No. 196 at 15, nn. 27; Conf. App. 0088 (showing that John Zutter, a DCP partner, emailed Dundon on February 20, 2019 and stating that "Let's make sure its clear across the organization that all new contracts have to run through DCP prior to execution."); Conf. App. 0401–02 (demonstrating that Zutter emailed AAF employee Kulas to inform him that the DCP sought to leave AAF's "cash balance real low"); Conf. App. 0858–59 (showing that Ebersol stated that Dundon threatened to withhold funding "regularly" and in one instance, refused to fund players' flights to games unless the board ratified "what he felt they already ratified"); Conf. App. 1027 (demonstrating that Dundon instructed teams within DCP to "find ways to run the league as lean as possible");

[15] Conf. App. 0919 (Dundon admitted he had a nearly hundred-million-dollar interest in Carvana); Conf. App. 0994 (Carvana did not pay for advertising); Conf. App. 0999 (AAF representative Lowenstein recognizes the list of no-charge advertisers, which included Topgolf and Carvana, and his attempts to obtain other advertisers who would pay).

the corporation's objectives." *Id.* Delaware, however, is unflinching in there being "no 'safe harbor' for [] divided loyalties . . . where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *In re Tesla Motors, Inc. S'holder Litig.*, No. 12711-VCS, 2020 WL 553902, at *18 (Del. Ch. Feb. 4, 2020). This means that if Dundon demonstrates at trial that even if Trustee demonstrates Dundon was controlling the ESMG Board in its decision making, Dundon could nonetheless avoid liability so long as the transactions at issue were "fair." *Id.* at 19.

In Delaware, "plaintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director is entitled to be dismissed from the suit." *In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173, 1180–81 (Del. 2015). Generally, "invocation of the entire fairness standard has a powerful pro-plaintiff effect against interested parties." *Id.* Once invoked at the pleading stage, plaintiffs are "able to survive a motion to dismiss by interested parties regardless of the presence of an exculpatory charter provision because their conflicts of interest support a pleading-stage inference of disloyalty." *Id.* The Delaware Supreme Court has also addressed the effect of coupling exculpated duty of care claims with non-exculpated duty of loyalty of duty of good faith claims. In *In re Cornerstone Therapeutics Inc., Stockholder Litigation*, the court explained that "unless there is a violation of the duty of loyalty or the duty of good faith, a trial on the issue of entire fairness is unnecessary because a Section 102(b)(7) provision will exculpate director defendants from paying monetary damages that are exclusively attributable to a violation of the duty of care." *Id.* at 1180, n. 27 (citing *Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001)); *see Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999) ("Nonetheless, where the factual basis for a claim

solely implicates a violation of the duty of care, this Court has indicated that the protections of such a [Section 102(b)(7)] charter provision may properly be invoked and applied.").

The Court is cognizant that an exculpatory clause is a strong defense in Delaware. ***In re Orchard Enter., Inc. Stockholder Litig.***, 88 A.3d 1, 38 (Del. Ch. 2014).  Other Delaware courts, however, have been hesitant to grant summary judgment on this defense because of the possibility that, depending on the director's demeanor and credibility at trial, the defendant could fail to meet its burden of proof or the transaction could be demonstrated as fair nonetheless. ***Id.*** Here, Trustee has sufficiently demonstrated a genuine issue of material fact regarding whether Dundon breached his fiduciary duty of care to the AAF through giving free advertising, allegedly purposefully failing to preserve player contracts, stripping the AAF of its advertising and marketing spending, and failing to engage with alternative funding opportunities. Furthermore, the Court is not persuaded by Dundon's contention that the evidence provided by Trustee is insufficient and that "approval of an action taken by a board is too little to pin liability on a director who did not vote for a transaction." (ECF No. 229 at 15). Dundon is not alleged to be *just* any individual in the AAF, nor just any capital contributor, but more the artery through which all decision making flowed. As previously noted in Zutter's adversary proceeding, the Court declines to take a hyper-technical reading of the exculpation provision when the evidence demonstrates that Dundon wielded significant authority over the AAF Board and other internal decision making. Given the record evidence could support a finding of a breach of fiduciary duty, and the exculpation provision fails to bar Trustee's claims, this claim will proceed to trial.

## IX.     Trustee's Fiduciary Duty Claim is Not Barred by the Breach of Contract Claim

Dundon next argues that Delaware law prohibits court review of a breach of fiduciary duty claim that "completely overlaps" with a breach of contract claim. (ECF No. 173 at 42) (citing

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, No. CV 2017-0500, 2018 WL 2727542, at *15 (Del. Ch. June 6, 2018)). Defendant argues that Trustee "does not allege an independent basis (apart from the contract) for this particular breach of fiduciary duty claim" and the breach of oral contract claim "rests of Dundon's failure to fund the league; the alleged breach of fiduciary duty in paragraph 172(a) is based on Dundon's failure to provide funding *as promised* in exchange for control of the league." *Id.* In Defendant's view, the "claims are the same." *Id.*

To reiterate, in its First Amended Complaint, Trustee proffers the following bases to demonstrate that Dundon breached his fiduciary duty:

> (i)   Failure to provide funding as promised
> (ii)  failure to complete previously negotiated contracts in the best interest of the AAF;
> (iii) refusals to consider or accept additional investments or fundings from sources other than himself, including specific opportunities presented;
> (iv)  decision to cease operations and technology development;
> (v)   decision to breach contracts; and
> (vi)  decision to place the AAF into bankruptcy.

First Amended Complaint at ¶ 172(f)–(g). The Court, above, has explained that the remaining breach of contract claim is related to Dundon's alleged failure to provide the promised $250 million funding amount as he promised. Trustee counters that Delaware law permits breach of contract and fiduciary duty claims to coexist if the claims "share a common nucleus of operative facts" so long "as the breach of fiduciary duty claim relies on additional facts, is broader in scope, or involves different considerations in terms of a potential remedy." (ECF No. 196 at 48) (citing *Schuss v. Penfield Partners, L.P.*, No. 3132, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008)); *see also PT China LLC v. PT Korea LLC*, No. 4456, 2010 WL 761145, at *7 (Del. Ch. Feb. 26, 2010) (stating that the "appropriate inquiry is whether there's an independent basis for the two claims, even if both are related to the same or similar conduct"). Trustee argues its claim is "not

44

identical" because the "complained-of conduct is Dundon's disloyalty and bad faith when considering whether and to what extend he would fund the AAF, as promised" and "Dundon taking control of the AAF was the predecessor for the additional conduct set forth in ¶ 172's other subsections." *Id.* (citing Complaint ¶ 172). Trustee also argues that he seeks different remedies from the breach of contract claim, and that other courts have found fiduciary duty claims non-duplicative if the remedies are not "likely to be equivalent." *Id.* (citing ***Schuss***, 2008 WL 2433842, at *10).

Under Delaware law, "breach of fiduciary duty claims is duplicative of breach of contract claims that either were substantially identical, such that the fiduciary duty claim would have been 'superfluous,' or involved remedies that were likely to be equivalent . . . ." ***Schuss v. Penfield Partners, L.P.***, No. CIV.A. 3132, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008) (footnotes and citations omitted). For example, in ***Gale v. Bershad***, the court dismissed a plaintiff's fiduciary duty claims when the plaintiff alleged that a company and its directors breached both contractual and fiduciary duties owed to the preferred stockholders. No. CIV. A. 15714, 1998 WL 118022, at *1–2 (Del. Ch. Mar. 4, 1998) (assessing an express contract claim, an implied contract claim, and a fiduciary claim). The plaintiff argued the preferred stock was redeemed at an unreasonably low and unfair price, which violated the certificate of incorporation. ***Id.*** The court held that the same facts underlying the implied contract claim were also the basis for the fiduciary duty claim, and that duty arose out of the party's contractual relationship, instead of their fiduciary relationship. ***Id.*** at 5. Thus, "because the contract claim addresses the alleged wrongdoing by the board, any fiduciary duty claim arising out of the same conduct would be superfluous." ***Id.*** The court reasoned that, in Delaware, "the implied covenant of good faith and fair dealing defines the duties of parties to a contract and is analogous to the role of fiduciary law in defining the duties

45

owed by fiduciaries." ***Blue Chip Capital Fund II Ltd. P'ship v. Tubergen***, 906 A.2d 827, 833 (Del. Ch. 2006) (citing ***Bershad***, 1998 WL 118022, at *5). In another instance, ***Madison Realty Partners 7, LLC v. Ag ISA, LLC***, another Delaware court applied ***Bershad*** to hold that the plaintiffs could not prosecute their claim for breach of fiduciary duty when it "overlap[ped] completely" and was "based on the same underlying conduct" with their breach of contract claim. No. CIV.A. 18094, 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001) (analyzing four claims in total, which included a breach of contract claim and aiding and abetting a breach of fiduciary duty claim).

Here, there is one portion of the fiduciary duty that Trustee alleges in its First Amended Complaint that is duplicative. Trustee cites to the "(i) the failure to provide the funding as promised," but this is nearly identical to the basis for its same breach of contract claim, which is premised on Dundon's alleged failure to uphold his oral agreement to provide $250 million to the AAF for its first season. Thus, Defendant is partially correct and Trustee may not bring forward its fiduciary duty claim based on a failure to provide funding as promised, but may do so on the remaining allegations which are listed as sections (ii) through (vi) because those allegations are nonduplicative. Further, Trustee is correct that different requests for damages permit the Court to separately evaluate this claim. In sum, aside from the failure to provide funding as promised basis under section (i), Defendant's argument to dismiss based on this Delaware principle of law is denied.

## X.     A Genuine Issue of Material Fact Remains as to Unjust Enrichment.

Defendant argues the Trustee improperly seeks restitution of the benefit ESMG conferred under the theory of restitution because unjust enrichment counts must be dismissed when a valid contract governs the disputed transaction. (ECF No. 173 at 45) (citing ***King v. Baylor Univ.***, 46

F.4th 344, 368–69 (5th Cir. 2022)). Further, Defendant argues that it makes "little sense" for the Trustee to pursue an unjust enrichment claim because "DCP—not Dundon—received a 75% interest in the League through ESMG pursuant to the Term Sheet. Dundon got nothing." (*Id.*) Trustee counters that DCP received a 75% interest in the AAF, Dundon and DCP received control over the AAF's operations and benefits to other business ventures and friends through commercial airtime for DCP and Dundon. (ECF No. 196 at 56, n. 135). Trustee further argues that the AAF's lost tax benefit ultimately improperly benefited Dundon's portfolio through offsetting a gain. (*Id.*) At the hearing, Trustee further countered that there is a genuine issue of material fact related to the determination of a following valuations: whether (1) Dundon obtained benefits from tax write-offs; (2) there was a monetary equivalent of that benefit received through the advertising; and, (3) routing funds to DCP instead of AAF operations directly prior to the bankruptcy resulted in an unjust benefit to Dundon. (ECF No. 244 at 114, lns. 18–25).

Trustee is correct in its contention that genuine issues of material fact remain as to whether Defendant received an unjust benefit from a tax perspective, through his free advertising offers, and from pushing funds to DCP as opposed to the AAF immediately before the AAF entered bankruptcy. (*Id.* at 115, lns. 1–4). Trustee alleged that Dundon sought to engage the AAF in a prepackaged bankruptcy to avoid liabilities and receive full control over the League. Trustee cited to numerous depositions and emails from John Zutter, the "righthand man" of Dundon, indicating Dundon's disinterest in reviving the League. As such, Defendant's request for dismissal on the unjust enrichment claim is denied.

## XI.    Issues of Material Fact Remains as to Whether the Economic Loss Rule Applies

Defendant argues that the economic loss rule bars Trustee's tort claims because Trustee's tort claims "seek at least in part the same damages as his contract claims" related to the breach of

fiduciary duty claim, fraud claim, fraudulent inducement claim, and negligent misrepresentation claim. (ECF No. 173 at 46). Defendant argues that "[w]ith the possible exception of the loss of the value of the league, there are no allegations that the Debtors suffered any damages independent of the damages sought in the contract claims." (*Id.*) Defendant points to both Delaware and Texas law to argue that this Trustee is precluded from recovering in this action. (*Id.*) (citing ***Ibe v. Jones***, 836 F.3d 516, 526 (5th Cir. 2016)). Defendant further notes that Delaware law requires dismissal of fraud claims seeking contract claim damages. (*Id.*) (citing ***EZLinks Golf, LLC v. PCMS Datafit, Inc.***, No. CVN16C07080PRWCCLD, 2017 WL 1312209, at *6 (Del. Super. Ct. Mar. 13, 2017) (dismissing a fraud claim when the plaintiff sought identical damages for its fraud and breach of contract claims)).

Trustee counters that the economic loss rule does not bar any of Trustee's claims or damages. (ECF No. 196 at 57). Trustee states that "[a]t no point does the Motion challenge the Trustee's proof of tort damages independent from contract damages. To defeat summary judgment, therefore, the Trustee must demonstrate only that his pleading satisfies the economic loss rule, or an applicable exception to the same." (*Id.*) Trustee further notes that its Complaint seeks specific categories of damages that are "separate and apart from, independent of, and unrelated to, the Trustee's breach of contract claims and damages, including 'compensatory damages (including for the diminished enterprise value of the AAF), rescissory damages, disgorgement of benefits received . . . and attorney's fees." (*Id.*) (citing First Amended Complaint at ¶¶ 177, 195–96). Trustee further argues that it has presented evidence of the loss of enterprise value for the AAF separate and apart from any contractual damages: the Desai Report demonstrating that the EV of the AAF was $144.1 million as of February 13, 2019 and $63.3 million as of April 2, 2019.[16] Desai

---

[16] Conf. App. 0731.

further states that the plaintiffs "have incurred damages of $144.1 million, representing the total loss of the League's business value."[17] In its First Amended Complaint, Trustee requested the following damages to correspond with its claims:

(1) Dundon's failure to provide the required payment to ESMG pursuant to the Oral Agreement: $180.3 million;[18]

(2) DCP's failure to provide the required monies to ESMG pursuant to the Term Sheet: $1,280,000;[19]

(3) Dundon's breach of the covenant of good faith and fair dealing as to the Oral Agreement: $180.3 million.[20]

(4) Dundon's breach of the covenant of good faith and fair dealing as to the Term Sheet: $1.28 million.[21]

(5) Dundon's breach of fiduciary duty: compensatory damages including the diminished enterprise value of the League, rescissory damages, disgorgement of benefits received by Dundon and attorney's fees.[22]

Trustee also argues there are damages "unrelated to the breaches of contract that form the bases of Counts I-III incurred from the League's enterprise value depreciation."[23]

(i) the substantial depreciation and ultimate destruction of the League's enterprise value, which encompassed its market position, growth potential, technology assets and development thereof, reputation, valuable player contracts, established League and play operations, stable television viewership, and expected partnership with the NFL, the value of which was ultimately reduced to zero when Dundon solely ordered AAF's Chapter 7 bankruptcy liquidation, after Dundon and Zutter, as directors for DCP, and for DCP as the only decision-makers improperly pushed the AAF to ruin by, among other things, ceasing advertising and technology development activities, freeing players from contracts, refusing investment opportunities, and ignoring reasonable alternatives to bankruptcy that were presented;

(ii) contracts/letters of intent breached or not pursued at the direction of Dundon and Zutter, such as the January 2019 Stock and Warrant Purchase Agreement, Player Agreements, and NFLPA deal;

(iii) assets and resources of Debtors that Dundon and Zutter usurped and used for their own personal benefit (or to benefit their companies or friends) rather than

---

[17] Conf. App. 0731.
[18] ECF No. 56 at 41, ¶ 145.
[19] ECF No. 56 at 42, ¶ 151.
[20] ECF No. 56 at 43, ¶ 157.
[21] ECF No. 56 at 43, ¶ 158.
[22] ECF No. 56 at 48, ¶ 175.
[23] ECF No. 56 at 49, ¶ 177.

providing the benefit to the Debtors, for example, as to television airtime and monies; and

(iv) lost opportunities and profits to the Debtors to pursue or close beneficial contracts with, for example, the NFLPA, PAL Agreements, NFL, broadcasters, and other financiers or strategic partnerships.

(ECF No. 56 at 49–50, ¶ 177). Trustee further requested damages for the breach of fiduciary duty claim if the breach of contract claim-related claims were determined unenforceable. (ECF No. 56 at 52, ¶ 182).

Here, Defendants have not sufficiently countered and satisfied their summary judgment burden to demonstrate how, the damages as alleged, could not relate to anything outside of the oral agreement. The damages, as Trustee pled and restated above, are not exclusively related to the contract and instead are correlated also to the breach of fiduciary duty and fraud claims. Because the Court has found already that there are issues of material fact surrounding contract formation, as well as fiduciary duty and other related claims underlying the requested damages, the Court cannot make a finding on the applicability of the economic loss rule at this time. This count will proceed to trial for further review and consideration.

<u>CONCLUSION</u>

IT IS THEREFORE ORDERED that all counts, with the exception of Count II, in Defendant's Motion for Summary Judgment are **DENIED**.

IT IS FURTHER ORDERED that Count II is **MOOT**.

# # #