UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


| | | |
|---|---|---|
| RANDY OSHEROW, IN HIS CAPACITY AS CHAPTER 7 TRUSTEE, ET AL, | ) ) ) | CASE NO: 22-05078-cag ADVERSARY |
| Plaintiffs, | ) | San Antonio, Texas |
| vs. | ) ) | Monday, June 2, 2025 |
| THOMAS G. DUNDON, ET AL, | ) ) | 9:08 a.m. to 11:43 a.m. |
| Defendants. | ) | 12:52 p.m. to 3:55 p.m. |

LEAD CASE: 19-50900-cag
LEGENDARY FIELD EXHIBITIONS, LLC
AND AAF PROPERTIES, LLC


TRIAL - DAY 15

BEFORE THE HONORABLE CRAIG A. GARGOTTA,
CHIEF UNITED STATES BANKRUPTCY JUDGE


**APPEARANCES:**             SEE PAGE 2


Deputy Clerk:              Roxanne Flores


Court Reporter [ECRO]:   Recorded


Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

| | |
|---|---|
| For Chapter 7 Trustee/<br>Plaintiffs: | BRIAN S. ENGEL, ESQ.<br>NICOLE WILLIAMS, ESQ.<br>KAMRAN ANWAR, ESQ.<br>KATHARINE B. CLARK, ESQ.<br>Thompson Coburn<br>2100 Ross Avenue<br>Suite 3200<br>Dallas, TX 75201<br>972-629-7113 |
| | BORIS TREYZON, ESQ.<br>JONATHON S. FARAHI, ESQ.<br>Abir Cohen Treyzon Salo<br>16001 Ventura Boulevard<br>Suite 200<br>Encino, CA 91436<br>424-288-4367 |
| | MATEO RAMOS, LAW CLERK |
| For DCP Parties: | DAVID WEBSTER, ESQ.<br>JEFFREY S. LOWENSTEIN, ESQ.<br>GWEN I. WALRAVEN, ESQ.<br>LAURA K. LAVERNIA, ESQ.<br>BEVERLY WHITLEY, ESQ.<br>Bell Nunnally & Martin<br>2323 Ross Ave.<br>Suite 1900<br>Dallas, TX 75201<br>214-740-1410 |
| | BRENT D. HOCKADAY, ESQ.<br>K&L Gates<br>1717 Main St.<br>Suite 2800<br>Dallas, TX 75201<br>214-939-5677 |

3

**INDEX**

| PLAINTIFFS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN ZUTTER | | | | |
| BY MS. WILLIAMS | 8/78/118/184 | | | |

| TRUSTEE'S EXHIBITS | RECEIVED |
|---|---|
| 84 | 158 |
| 102 | 121 |
| 107 | 149 |
| 120 | 143 |
| 167 | 230 |
| 169 | 221 |
| 256 | 119 |
| 275 | 73 |
| 276 | 107 |
| 283 | 146 |
| 290 | 225 |
| 408 | 133 |
| 420 | 203 |
| 423 | 172 |
| 769 | 6 |
| 807 | 39 |
| 821-A | 67 |
| 911 | 151 |
| 912 | 131 |

4

**INDEX**

| **TRUSTEE'S EXHIBITS** | **RECEIVED** |
|---|---|
| **936** | **135** |
| **950** | **137** |
| **955** | **140** |
| **1032** | **239** |
| **1048** | **152** |
| **1071** | **208** |
| **1116** | **199** |
| **1117** | **193** |

| **DEFENDANTS' EXHIBIT** | **RECEIVED** |
|---|---|
| **273, as specified** | **184** |

5

**San Antonio, Texas; Monday, June 2, 2025; 9:08 a.m.**

**(Call to Order)**

THE COURT:  Good morning, ladies and gentlemen.  This is our trial -- Page 2 of the Court's docket, first of all. Adversary 22-05078, *Osherow in his Capacity as Chapter 7 Trustee versus Dundon*.  This is Day, I think, 15 of the trial. Do I have that right?

May I have appearances, first of all, from Plaintiffs?

MS. WILLIAMS:  Yes, Your Honor, Nicole Williams, Katie Clark, Kamran Anwar, Boris Treyzon, Brian Engel, Jonathon Farahi and Mateo Ramos for the Trustee.

THE COURT:  Thank you so much.

And on behalf of the Defendants?

MR. HOCKADAY:  Good morning, Your Honor.  On behalf of the Defendants, we have David Webster, Gwen Walraven, Laura Lavernia, Jeff Lowenstein, Beverly Whitley and myself, Brent Hockaday.

THE COURT:  Thank you.  And I want to -- I have to be sensitive but I assume congratulations is in order?

MR. HOCKADAY:  Yes, thank you, Your Honor.

THE COURT:  I hope everything is going splendidly.

MR. HOCKADAY:  It is.  He's sleeping about as much as a lawyer would in trial but, otherwise, everything is great.

THE COURT:  I'm glad to hear that.  Congratulations!

6

**MR. HOCKADAY:** Thank you.

**THE COURT:** Are there any housekeeping matters, Ms. Williams, that we need to address before we get started?

**MS. WILLIAMS:** Just one, Your Honor. I understand there was an agreement to admit some tax returns by stipulation on the last day of trial and so far, we have one that's agreed to and it's Trial Exhibit 7 -- I mean, Trustee's Exhibit 769. So I'd like to offer and admit that into evidence.

**THE COURT:** Any objection?

**MR. LOWENSTEIN:** No objection, Your Honor.

**THE COURT:** All right, thank you. And for the record, you are?

**MR. LOWENSTEIN:** Jeff Lowenstein.

**THE COURT:** Thank you, sir. All right.

**(Trustee's Exhibit Number 769 received in evidence)**

**MS. WILLIAMS:** No, Your Honor.

**THE COURT:** Do we have any other stipulations?

**MR. LOWENSTEIN:** One other, Your Honor, the chart for Ms. Desai's testimony. If you recall, we had marked the one during the -- during her testimony as 272 but there was one item that she didn't agree with me on. So we've corrected it and taken that one out. And so we have a corrected one that we'd like to offer as D-273 under Rule of Evidence 107.

**THE COURT:** Any objection, Ms. Williams? I know you weren't here on Friday. Any objection, Mr. Treyzon?

7

**MS. WILLIAMS:** I'm going to defer to Mr. Treyzon.

**MR. TREYZON:** Good morning, Your Honor, Boris Treyzon. Your Honor, if we can wait on this until tomorrow morning, I remember vaguely I had some concerns with it. Let me go through it. I -- it may go in just purely as a demonstrative but if I can -- actually not even tomorrow -- if I can have until lunch and after the lunch, we'll do it. I just want to review it and compare it to the transcript. I had one concern there and I wanted to look at it.

**THE COURT:** Okay. Anything else?

**MR. LOWENSTEIN:** That's all for now. Thank you, Your Honor.

**THE COURT:** All right. Thank you, sir.

So no stipulation on exhibits?

**MS. WILLIAMS:** None that I'm aware of, Your Honor.

**THE COURT:** Okay. Anything else that we need to take up before we commence with the testimony?

**MS. WILLIAMS:** I don't believe so, Your Honor.

**THE COURT:** All right, very good then. Are you ready to call Mr. Zutter?

**MS. WILLIAMS:** Yes, Your Honor.

**THE COURT:** All right. Mr. Zutter, if you'll come forward and appear in front of Ms. Flores, she's going to administer the oath.

**THE CLERK:** Please raise your right hand.

Zutter - Direct / By Ms. Williams                    8

**JOHN ZUTTER, PLAINTIFFS' WITNESS, SWORN**

**THE CLERK:**  Please take a seat.  For the record, please state your first and last name and spell your last name.

**THE WITNESS:**  John Zutter, Z-u-t-t-e-r.

**THE COURT:**  And, Ms. Flores, did I say admit Trustee's 769?  If I didn't, would you please make note of that?  All right.

And you're going to treat him as an adverse witness, correct?

**MS. WILLIAMS:**  Yes, Your Honor.

**THE COURT:**  When you're ready to go, Ms. Williams, please proceed.

**MS. WILLIAMS:**  Okay, thank you.

**DIRECT EXAMINATION**

**BY MS. WILLIAMS:**

Q    Mr. Zutter, you have a notebook in front of you that has a number of exhibits in it.  They are in number order.  So when we look at them, I'll give you the number.  If you have any issues finding what you're looking for, just let me know. Okay.

A    Sounds good, thank you.

Q    Okay.  Mr. Zutter, you worked at JPMorgan from 2006 to 2014; is that right?

A    Correct.

Q    And that's where you first met Tom Dundon, correct?

**EXCEPTIONAL REPORTING SERVICES, INC**

A    Correct.

Q    He was a client of yours, correct?

A    Amongst other (indisc.), yes, he was a client of ours.

Q    Okay.  And then in 2014 when you left JPMorgan, you went to work for Santander, right?

A    Santander Consumer USA.

Q    Okay.

        THE COURT:  Could you spell that for the record, please?  Santander -- I know how to spell it but just for the record.

        THE WITNESS:  Sure, S-a-n-t-a-n-d-e-r Consumer USA.

        THE COURT:  Thank you.

        Go ahead.

**BY MS. WILLIAMS:**

Q    And that was a company Mr. Dundon was associated with, correct?

A    Yes, ma'am.

Q    Okay.  And you stayed there for a brief time and left in 2015; is that right?

A    That's correct.

Q    And when you left, you went to Dundon Capital Partners, correct?

A    That is correct.

Q    And that was also with Mr. Dundon, correct?

A    Correct.

Zutter - Direct / By Ms. Williams                    10

Q    And you were a partner at Dundon Capital Partners?

A    That was my title, yes.

Q    Okay.  And Mr. Dundon was the only other partner, correct?

A    Yes.

Q    And you were also an officer at Dundon Capital Partners, right?

A    Yes.

Q    And that was throughout 2019, you were both a partner and an officer at Dundon Capital Partners, correct?

A    Yes, as to the officer.  As to the partner, I had transitioned formal employment to another entity but was still supporting the business as a partner.  So I was no longer being compensated and I was no longer formally employed by but I still exercised that position.

Q    You had the title of partner at Dundon Capital Partners in 2019, correct?

A    That is correct, yes.

Q    Okay.  And so as both a partner and an officer of Dundon Capital Partners in 2019, you owed a fiduciary duty to Dundon Capital Partners, correct?

A    That's my understanding.  I'm not a lawyer as to the specifics of fiduciary duties but I believe so, yes.

Q    Did you consider yourself -- did you try to act in a fiduciary capacity for Dundon Capital Partners at that time?

A    Yes, ma'am.

Zutter - Direct / By Ms. Williams                    11

Q    Okay.  And you mentioned that you had transferred employment to another entity.  Are you referring to what was called, "Employer Direct Healthcare" at that time?

A    Yes.

Q    And that was another company in the Dundon family of companies; is that fair?

A    Yes, it had ownership from a variety of other folks as well but, yes, it was still within the broader portfolio of Dundon.

Q    Okay.  So Mr. Dundon had ownership in -- I'm going to call it "EDHC."  Is that fair?

A    That's fair.

Q    Is that company now called "Lantern"?

A    That's a DBA.  So it still is legally called "Employer Direct Healthcare, LLC" but, yes, we go by "Lantern."

Q    Okay.  So in 2019, if I'm understanding you correctly, you were receiving your income technically from Employer Direct Healthcare, another Dundon company; is that correct?

A    Yes.

Q    Did you receive in 2019 -- were you employed by any company that was not at least in part owned by Mr. Dundon?

A    The only company I was employed by was Employer Direct Healthcare, LLC.

Q    Okay.  So you didn't get any employment or direct income for working in 2019 for any entity that wasn't at least owned

**EXCEPTIONAL REPORTING SERVICES, INC**

Zutter - Direct / By Ms. Williams                12

in part by Mr. Dundon?

A     (No audible response).

Q     Okay.  All right.  I want to talk about the deal. Obviously, you've been here for a lot of this proceeding.  So Mr. Dundon's agreement to invest in AAF and you understand that that conversation about that investment first started on February 13th, 2019, correct?

A     That is my understanding, correct.

Q     Okay.  And you were not present on any calls of Mr. Dundon and Mr. Ebersol on February 13th or 14th, 2019; is that correct?

A     Certainly not on February 13th and I don't believe we talked as the three of us on February 14th either.  I believe that's correct, yes.

Q     So you don't recall any conversation with Mr. Dundon and Mr. Ebersol on February 13th or 14th, 2019?

A     Where I was a party to that conversation?

Q     Correct.

A     No, ma'am.

Q     Okay.  So you don't have any personal direct knowledge on February 13th or 14th, 2019 of any conversations between Mr. Dundon and Mr. Ebersol because you weren't there, right?

A     I have knowledge of those conversations happening.  I was not a party to those conversations though.

Q     Right.  So you don't have personal knowledge.  You weren't

Zutter - Direct / By Ms. Williams                    13

there to hear any of it, correct?

A    I was not there to hear any of it.

Q    Okay.  You don't recall being part of any conversations on February 13th or 14th, 2019 regarding the AAF at all; do you?

A    That is not correct, no.

Q    That's not correct?

A    No.

Q    Do you recall testifying that you did not have any knowledge of that at your deposition in November of 2024?

A    That is not correct.

Q    That's not correct?

A    No, I said during my deposition that I did not recall but not that I -- on the benefit of sitting in this room and hearing all the testimony that has come forward, it's helped me remember a number of those conversations and today I have -- sorry.  I have a more complete memory of some of those conversations.

Q    Okay.

     MS. WILLIAMS:  Well, Your Honor, with your permission, I would like to play what Mr. Zutter had to say in his deposition about this.

     THE COURT:  Do you have an objection?

     MR. HOCKADAY:  For what purpose?  Is this to refresh his recollection or impeach him?  If it's impeachment, it's improper impeachment.

Zutter - Direct / By Ms. Williams                    14

**MS. WILLIAMS:** Well, Your Honor -- oh, sorry.

**THE COURT:** Go ahead. No, you go ahead.

**MS. WILLIAMS:** Your Honor, under Federal Rule of Civil Procedure 32(a)(3), I can use a party deposition for any purpose. Mr. Zutter now is about to testify as to something he couldn't remember or didn't say at his deposition which was not only in his individual capacity but as a designated representative of Dundon Capital Partners. So I believe that the -- I have the right to play and the Court should hear what he said at that deposition before we hear the new story that he has today.

**THE COURT:** Okay. Mr. Hockaday, you need to speak into the microphone, please.

**MR. HOCKADAY:** Sorry, Your Honor.

**THE COURT:** Go ahead.

**MR. HOCKADAY:** Yes, I have a couple problems with that. First of all, he was a corporate representative for certain select topics and there is nothing about his testimony that we just heard that is related to a corporate representative topic. She has specifically asked him in his individual capacity here in court. Now, I don't know what page and line she's going to go to but we --

**MS. WILLIAMS:** Page 51.

**MR. HOCKADAY:** Hold on -- we did this whole exercise before when I was in (indisc.). This idea that you remember

Zutter - Direct / By Ms. Williams          15

you testified at your deposition, that's not impeachment. You need to ask the question. He needs to answer it. And if it's inconsistent, then she can play it. If it's not, then she doesn't get to play his deposition just for the purpose of playing the deposition.

**THE COURT:** Well, maybe I'm not following along but I thought he acknowledged just in his last statement that his --

**MS. WILLIAMS:** It is --

**THE COURT:** -- testimony today is going to be different than what he testified to.

**MS. WILLIAMS:** It is, Your Honor.

**MR. HOCKADAY:** I think he said he didn't recall at that point in time and she asked him, you said you didn't know. Those are -- that's where my issue is. If she wants to say, then you didn't recall; now you do recall, that's fine. But that's not what I heard her question was.

**MS. WILLIAMS:** I believe I said he did not recall when asked the original question.

**THE COURT:** That's what I thought I heard, too.

So you didn't recall your testimony what happened previously but you're now recalling it today; is that correct, Mr. Zutter?

**THE WITNESS:** During the deposition, I didn't recall the specifics of the conversation. On the basis of reviewing all of the documents as part of preparation for this as well as

Zutter - Direct / By Ms. Williams                16

speaking -- or not speaking but listening in the courtroom, I have some additional memories that have come forward but that's the difference.

THE COURT: Okay. The objection is overruled. You can play the deposition.

MS. WILLIAMS: Thank you, Your Honor.

THE COURT: And you need to cite it for the record, please.

MS. WILLIAMS: Yes, Your Honor. We're going to play Page 51, Line 7 through 25 and it's Clip 3.

Mr. Anwar.

"Q  Were you a part of any of the negotiating conversations between Mr. Dundon and Mr. Ebersol on or about February 13th and 14th of 2019?

"A  I was not part of the conversations that were (indisc.) at the time, no.

"Q  Did you have any conversations?

"A  Your question was (indisc.).  Therefore, it's two people (indisc.).

"Q  I got it.

"A  I want to make sure the (indisc.).

"Q  It was.

"A  Okay.

"Q  Were we -- were you part of any conversations involving a -- around February 13th and 14th at all?

Zutter - Direct / By Ms. Williams 17

"A  I don't recall."

Q  All right.  So in November of 2024, Mr. Zutter, you did not recall being part of any conversations at all about AAF on February 13th or 14th, 2019, correct?

A  That was my testimony on that day, yes.

Q  Okay.  But now you say you do have a recollection?

A  I do.

Q  All right.  What have you now recalled since November of 2024 that you couldn't tell us before?

A  I remember that I had a conversation.  I believe it was with Alan Kantowitz and Kevin Freedman talking about some term sheet details.  I remember having conversations with some of my internal team about the ability to perform on features of the term sheet inclusive of wiring money that day and making sure that we were trying to target a specific timeline so that we were able to make payroll.  I recall going back and forth with the team on some red-lines and making sure that they reflected the details that we were willing to offer.

Q  What team are you referring to there?

A  Folks on the Dundon Capital Partners side.

Q  Okay.

A  So just to clarify --

       THE COURT:  Who are they?  I'd like to know who the team was.  Can you tell me, please?

       THE WITNESS:  Yes.  So the team that we had at the

**EXCEPTIONAL REPORTING SERVICES, INC**

Zutter - Direct / By Ms. Williams                    18

time was Jeff Vanderbilt, our Chief Financial Officer, Tom Dundon, accounting partner, the equity partner of the firm. Ryan Rostenkowski and Elisa Lee were also part of our core team.

          THE COURT: Thank you.

          Go ahead, Counsel.

BY MS. WILLIAMS:

Q    Any other broad categories?

A    So, again, some conversations between Kevin and Alan and myself. I don't recall if Charlie was part of those. I do recall that I spoke with the other two about working on the term sheet and that included the receipt of a draft from them and then us working on some red-lines prior to execution. And I recall some email traffic back and forth between my team around some of the details around constraints around when we could or couldn't get a wire completed.

          And then I remember making sure that once we had received a completed Docusign that we had then transferred the money and the attempts to kind of satisfy the urgent liquidity needs of the business so that it would make its payroll.

Q    Okay. So let me make sure I understand now what you recall. It sounds like you recall one conversation that involved people outside -- or one set of conversations. I'll ask you more about that in a minute.

          Some kind of communications that were outside of the

Zutter - Direct / By Ms. Williams                    19

Dundon Capital Partners team and those were with Mr. Kantowitz and Mr. Freedman about the term sheet; is that correct?

A    Yes.

Q    Are there any other conversations you recall that involved members of the AAF, not the Dundon Capital Partners team?

A    Not specifically, no, ma'am.

Q    Okay.  So as you sit here today, you still don't recall any communications you were involved with regarding Mr. Ebersol?

A    I don't recall if he was on that conversation with Kevin and Alan.  He might have been but I don't recall that detail.

Q    Okay.  So as you sit here today, you have no affirmative recollection of a conversation or communication that you were involved in with Mr. Ebersol on February 13th or 14th, 2019?

A    I know from reviewing the documents that we had a conversation.  I don't recall the specifics of that conversation in any detail.  So I -- I'm aware that one happened but I just -- I don't recall the details of that conversation.

Q    Okay.  So nothing else with AAF personal, correct?

A    No, ma'am.

Q    Okay.  And then the other communications that you recall now are with what we are calling the "DCP Internal Team," correct?

A    Yeah, and some of them might have had formal employment

Zutter - Direct / By Ms. Williams          20

from different places.  I don't recall whether or not Elisa was a technical employee of Employer Direct Healthcare or Dundon Capital.  I don't recall the specifics of, like, where their employment was but that was the deal team that was working on this project.

Q    Okay.  And let's talk about that for a second.  For the team that was operating on behalf of Dundon Capital Partners looking at the deal and later working with AAF, were they all treated as supporting whatever Dundon company they might be released to as opposed to working technically for one entity or another?

A    I would not agree with that characterization, no.

Q    Why not?

A    Your suggestion was they just work across all different Dundon-related entities and that's not consistent with the facts.

Q    Why not?

A    Because each of us did not work for and did not have access to all the different companies that were within the Dundon umbrella.

Q    Okay.  Did Dundon Capital Partners have any direct employees at all?

A    At that point in time, I am not --

Q    2019.

A    I don't recall who was on payroll or who was not at that

EXCEPTIONAL REPORTING SERVICES, INC

point in time.

Q Do you recall a single person that was on the payroll at Dundon Capital Partners in 2019?

A I don't recall who was on payroll for Dundon Capital during --

Q Okay. There's a difference between not remembering who and not remembering anyone being on the payroll and that's the question I'm asking, Mr. Zutter.

A I don't recall to both.

Q Okay. And Dundon Capital Partners was doing this AAF deal at least, correct?

A (No audible response).

Q And Dundon Capital Partners probably had other deals in 2019, correct?

A Correct.

Q So someone had to work on those, right?

A Correct.

Q And are the people who worked on those people who were technically employed by other Dundon-related entities?

A In some instances, yes.

Q In what instances were they not?

A Dundon Capital Partners could hire advisors from other third parties that are not affiliated with Dundon Capital itself to support transactions.

Q Okay. Like PWC, for example?

Zutter - Direct / By Ms. Williams          22

A    Like a PWC, for example.

Q    Okay.  Other than those kinds of examples, any other reason?

A    No.

Q    Okay.  And Mr. Vanderbilt, for example, he was employed by another Dundon-owned company, correct?

A    I don't recall the specifics of his employment at that time.

Q    Okay.  What about Mr. Kulas?

A    I think he was employed as a consultant by Dundon Capital but I'm not a hundred percent sure as to his employment at that time.

Q    Okay.  What about Ms. Lee?  Where was her technical employment?

A    I don't recall the specifics of her employment.

Q    Was it a Dundon-related company?

A    It would have been a Dundon-related company, yes.

Q    Okay.  And what about Mr. Rostenkowski?

A    It would have been a Dundon-related company.  I don't recall which he was employed by.

Q    Okay.  All right.  And you said you now remember communications with that internal team working on behalf of Dundon Capital Partners about certain features of the term sheet and specifically getting the money wired to AAF, that 5.1 million; is that right?

A    That's correct.  And I have one other memory from that day which is I remember -- it was either the 13th or the 14th that Mr. Dundon forwarded a previous deal structure and me providing some feedback on that as well.  And so I just wanted to make sure that I add that part in, too.

Q    Thank you.  We're going to look at that email in just a minute.  And you said you also remembered some communications with the team working on behalf of Dundon Capital Partners about red-lines to a term sheet; is that correct?

A    The red-lines were between myself and Alan and Kevin. Again, I don't recall whether Charlie was on that phone call or not.  And I know that I CC'd or brought in outside counsel as part of that.  I don't recall whether or not any of those folks were part of the red-lines.  They were certainly part of the money-transferring process but, I mean, I'm not sure they were part of the red-lining process.

Q    Okay.  When you say you brought in outside counsel, you mean outside counsel for Dundon Capital Partners?

A    Yes.

Q    To look at the red-lines, is that correct?

A    It -- I believe right -- yes, I believe during the red-lining process, we brought in outside counsel.

Q    Okay.  And so you're the one who was working on the red-lining of the term sheet; is that correct?

A    I think I also had support from outside counsel but it was

Zutter - Direct / By Ms. Williams                24

from the Dundon Capital Partners side.  Yes, it was me.

Q    Okay.  Anyone other than you and outside counsel for Dundon Capital Partners that did any red-lining or editing of the term sheet that you're aware of?

A    Not editing, no.

Q    Okay.  All right.  Anything else you remember now about February 13th or 14th, 2019?

A    No.

Q    Okay.  Mr. Dundon is the one who told you about the AAF investment opportunity, correct?

A    That's correct.

Q    Do you remember when that initial communication was?

A    I believe he initially reached out on the 13th of February.

Q    You don't remember any details about that initial communication; do you?

A    I think it was originally an email and then at some point, we had a phone call but I don't recall the exact particulars of the first communication though.

Q    Okay.  Do you recall anything about the phone call and substance?

A    I recall it was either the 13th or the 14th and Tom giving me a little bit of an overview of what the AAF was, how he had been introduced to it and what he -- and Charlie had aligned on with respect to a need for the business and a potential

Zutter - Direct / By Ms. Williams                    25

transaction framework and how much capital that the business

needed to make it through the end of the season as the baseline

for what we were trying to fund.  And he had asked me to work

on terms to find a transaction that would work for both

parties.

Q    Okay.  And you remember all that now about the initial

communication you had with Mr. Dundon?

A    Yes, ma'am.

Q    Okay.  Have you had that recollection since November 2024?

A    Yes.  Sitting in a courtroom for a number of days and kind

of reliving an event a long time ago kind of helps bring things

back a little bit.

Q    Okay.

          MS. WILLIAMS:  Your Honor, I'd like to play another

clip from Page 40 of Mr. Zutter's deposition where he did not

recall the things he's now recalling today.

          MR. HOCKADAY:  I'm going to object to sidebar.

          THE COURT:  I don't see that it's a sidebar.  There's

no jury here.  So it's overruled.

          You can play it.

          MS. WILLIAMS:  Clip number --

          MR. HOCKADAY:  Hold on.  Your Honor, I'm going to

object to improper impeachment.  Mr. Zutter talked about he

wasn't sure about the initial conversation and then he

testified that somewhere between February 13th and 14th, this

is what my understanding was.  As the Court identified very early on, I understand this is six years ago and memories may not be as crystal clear.  So the question that she's going to play is -- the answer he says is, I don't recall the initial communication.

MS. WILLIAMS:  And, Your Honor, that's exactly the question I just asked him.  I used the words "initial communication" purposely.

THE WITNESS:  And --

THE COURT:  No, you don't get to talk.  It's just the lawyers and me.

THE WITNESS:  Sorry.

MR. HOCKADAY:  Your Honor, she slipped in "initial communications."  Again, the very first question that she set up was, do you remember the initial conversation?  He said, I don't recall.

THE COURT:  Ask the question again and then we'll see.

MS. WILLIAMS:  Okay.

THE COURT:  Go ahead, please.

BY MS. WILLIAMS:

Q    I don't remember my exact question but the one I have written here is, you don't remember any of the details about that initial communication with Mr. Dundon; do you?

A    And so I don't recall the details of the initial

communication but between the 13th and the 14th, I recall that I had a conversation with Tom where he provided me sort of the substance of what is the AAF, what is the objectives, how much capital does it need, is the expectation of how much capital it needs for the rest of the year based on his conversation with Charlie and asked me to come to terms.

It was where conversations that happened between the 13th and the 14th.  I'm not sure they happened in an initial conversation but over the course of the next, call it, 36 hours prior to consummating the term sheet.

Q    Are those conversation details anything you recall being able to communicate in November of 2024 with any specificity?

A    Sorry, can you repeat the question?  I just want to make sure I understood it.

Q    Yeah.  In November of 2024, do you remember ever saying anything about these specifics you know now about the conversation with Mr. Dundon --

MR. HOCKADAY:  Your Honor, I'm going to object to an improper impeachment.  This is the same exercise where we asked him to recall everything he ever said in a deposition.  If that's the purpose of this question, it's an improper impeachment.

THE COURT:  Your response?

MS. WILLIAMS:  Your Honor, clearly by Mr. Hockaday reading where I was going with this in the deposition,

Zutter - Direct / By Ms. Williams                28

Mr. Zutter has now adapted his answer which is different from the first answer to try to stop me from using that and so I think it's fair for me to ask essentially, did you recall these details before now or why is now the first time I'm hearing them? I'm not asking specifically to the deposition. I'm saying, before we started this trial, do you remember ever telling anybody these specifics?

            **MR. HOCKADAY:** May I be heard, Your Honor?

            **THE COURT:** Yes, you may.

            **MR. HOCKADAY:** So we went through this exercise at the end of Mr. Dundon's testimony with Mr. Ebersol. And it's the whole idea that you've never said this before. You've never said this before all through the summary judgment briefing and all that.

            The purpose of a deposition is for the attorney to ask questions. It is not the witness' job to volunteer every bit of information that they know about anything. If they don't ask the question or explore it, that's it. And then if it comes out for trial for the first time, that's on the attorney for not investigating it.

            So this notion that she can ask him full fledge, do you remember having any recollection of this before is completely outside the bounds of what impeachment is for. She has asked a question based on that and I won't comment on the ridiculous coaching point of it but that is the purpose of

Zutter - Direct / By Ms. Williams    29

impeachment.

She has asked a question.  If he answers inconsistently, then she can play.  But this idea that he should have volunteered stuff six months ago when they didn't investigate it properly and he -- does he ever recall ever telling anybody now to be used as an impeachment or in a way to attack his credibility is improper.

THE COURT:  All right.  The objection is overruled. It's proper impeachment.

MS. WILLIAMS:  All right.

THE COURT:  You may play the video.

MS. WILLIAMS:  Can you play Clip 4, Mr. Anwar?

"Q   And what was the transaction as was originally described to you in that initial communication?

"A   I don't recall the initial communication."

BY MS. WILLIAMS:

Q   All right.  What specifically --

THE COURT:  What?

MR. HOCKADAY:  Never mind.  I've already laid my objection.  He testifies consistently.  He didn't recall the initial communication he just testified to in his deposition. So --

THE COURT:  Proceed.  Go ahead, Ms. Williams.

//

//

**BY MS. WILLIAMS:**

Q    Okay.  What specifically, Mr. Zutter -- and actually, let's be clear.  What days of trial have you been here?

A    I was for a number of days in the first and the second week and then last week I wasn't here.

Q    Okay.

A    Or I don't know if you met last week or -- I think there was -- last week I obviously wasn't here.

Q    Okay.  So you heard testimony from Mr. Ebersol, correct?

A    That's correct.

Q    And you heard part of the testimony from Mr. Dundon, correct?

A    I actually don't -- I wasn't here -- I don't think I was here for Tom's deposition.  I heard from a variety of other folks that were --

Q    On video?

A    Yeah.  And there was a gentleman who was in the room as well.

Q    Mr. Giordano?

A    Yes.

Q    Do you recall Mr. Giordano from when he worked at AAF?

A    No, ma'am.

Q    You have -- do you know what his job was?

A    From the -- my recollection, he had been terminated when we were involved.  So he wasn't actually employed by the

Zutter - Direct / By Ms. Williams          31

company at -- during the time that we were involved but had previously been in some sort of capital-raising function around individual teams.

Q    When do you believe he was terminated?

A    I recall from the testimony that I listened to that it had happened, I think, maybe in December or January but I don't recall the specifics of the testimony. I just recall from when I was sitting here.

Q    Okay. So other than what you may or may not recall from Mr. Giordano's testimony, setting that aside, you don't have any recollection or information about Mr. Giordano?

A    No, ma'am.

Q    Or what he was doing for AAF?

A    No, ma'am.

Q    Okay. So what is it that happened in this trial that made you remember the details of the deal that Mr. Dundon gave you on February 13th or 14th?

        MR. HOCKADAY:  Your Honor, this misstates the testimony. He said he didn't remember the details of the initial conversation.

        THE COURT:  No, I disagree. He just testified that he sat here for a number of days and based upon the events surrounding his attendance in trial, it jogged his memory. So these are proper questions. The objection is overruled.

        THE WITNESS:  Could you repeat your question, please?

Zutter - Direct / By Ms. Williams                    32

**BY MS. WILLIAMS:**

Q    Yes.  What exactly have you heard sitting in this trial that made you remember the details of the deal that Mr. Dundon gave you on February 13th or 14th, 2019?

A    I heard the testimony of Mr. Ebersol.  I heard the testimony of a variety of other folks.  I had the benefit of time to review a great number of documents.  Those things helped jog my memory.

Q    Okay.  Let's start with Mr. Ebersol.  What did Mr. Ebersol say that helped you remember what Mr. Dundon told you on February 13th or 14th, 2019 about the deal terms?

A    His testimony was a number of days long.  I think the completeness of that experience helped me remember a variety of things.

Q    Mr. Zutter, I'm going to need you to be more specific with the things you're remembering today that you didn't remember in November of 2024 when we had a chance to talk to you.

What did Mr. Ebersol say that you made you remember details of a conversation between yourself and Mr. Dundon?

A    I don't know what specific sentence or collection of sentences or days of his discussion or the other ones or the documents that I reviewed that specifically jogged my memory but the aggregation of all of that has helped me remember stuff that happened about five years ago.

Q    Can you give me any specific category or statement or

Zutter - Direct / By Ms. Williams                    33

document you've seen during this trial that has caused you to have this recollection?

A    I'm not sure I know how to categorize it.

Q    Can you remember anything specific that happened where you were, like, oh, now I remember that conversation and all these details Mr. Dundon gave me?

A    I think it was probably a little bit of every comment brings a little bit back and every document helps jog your memory and I've over the course of the last number of weeks had the opportunity to read hundreds of pages of documents and all of that refreshes my memory.

Q    Okay.  Just give me one to start.  Give me one specific comment, testimony, document that's caused this recollection.

A    One specific one would be an email where I responded saying that that initial 10-million-dollar transaction framework with dilutional.  That would be one but there's a variety of different documents that I've read and each of them has helped spark my memory.

Q    Anything else specific you can tell me while you're sitting here today?

A    It would be hard to list all the documents that I've read over the last number of weeks.

Q    Do you remember other ones that helped this recollection?

A    I read the term sheet and some of the mark-ups of it, a number of email exchanges between various parties.  I looked at

Zutter - Direct / By Ms. Williams                    34

certain phone records.

Q    What phone records did you look at?

A    Text messages of mine, for example.  We -- I think Mr. Dundon's, like, phone logs of when he called me helped spark, oh, that one on a certain day.  So just the aggregation of all that helps bring things back to life.

Q    Have those phone logs been produced, Mr. Zutter?

A    I don't know the answer to that question.

Q    Okay.  At your deposition in November 2024, do you remember looking at the term sheet and the red-lines and the drafts?

A    On the day of?

Q    Uh-huh.

A    I remember Mr. Treyzon putting a large number of documents in front of me over the course of the day.

Q    You don't specifically remember looking at the red-lines?

A    I think we looked at a variety of different red-lines, I think.

Q    Okay.  And emails between you and Mr. Dundon around this timeframe, right?

A    Yes.

Q    And emails of Mr. Ebersol around this timeframe, right?

A    Yes, ma'am.

Q    So the things you're talking about giving you a new recollection here, those aren't things you hadn't seen before

Zutter - Direct / By Ms. Williams                    35

November 2024, right?

THE COURT:  Hang on.

MR. HOCKADAY:  I'm going to object to vagueness. What is she talking about?

MS. WILLIAMS:  Working with what he's giving me, Your Honor.

THE COURT:  Right.  It's overruled.

Sir, you can answer the question.

MR. HOCKADAY:  Your Honor, may I be heard one time? And then I'll --

THE COURT:  Go ahead.

MR. HOCKADAY:  -- it's the last piece I have on this. What she -- in a deposition, Mr. Treyzon asked Mr. Zutter a number of different questions in a vacuum.  He answered them to the best of his ability.  Later on in the deposition, he showed him documents and then he answered questions based on the documents.  This happened six years ago.

This is a trick that I deal with the plaintiffs' lawyers all the time.  They ask you something if you remember every little detail and then they show you documents and then you testify to it.

So what we're doing is playing a guessing game here where the -- do you remember at the very beginning of your deposition you said you didn't recall?  Well, let's go through the testimony at his deposition then where he -- Mr. Treyzon

showed him the exhibits and Mr. Zutter walked through them

specifically. And I bet when they get up here on the screen

and walk through the exhibits, that is what will happen.

That's certainly is going to happen during my examination.

So it's -- all it is is improper impeachment. It's

fishing and the "other things" language is vague and ambiguous.

So that's my objection. I recognize it's a speaking one and

I'll sit down after this but I think that needs to be stated

here on the record based on the way this examination is being

conducted.

**THE COURT:** Ms. Williams.

**MS. WILLIAMS:** Your Honor, I am not impeaching him

right now. I'm trying to determine how he got this

recollection that he now has and he's having trouble telling me

that. We are also going to walk through the documents but I'll

tell you what I'm concerned with is not what these documents

say. They say what they say.

I'm concerned about Mr. Zutter now trying to back up

some oral communication that he had with Mr. Dundon about which

he just either really didn't remember or stonewalled at this

deposition. So I think I'm entitled to ask these questions.

It's not impeachment. I'm trying to find out where this

recollection came from.

**THE COURT:** It's perfectly fine. The objection is

overruled. It's noted on the record. You can certainly

Zutter - Direct / By Ms. Williams                    37

attempt to elicit what the change was in his recollection of the events and I'll give it the appropriate weight and credibility.  Go ahead.

**BY MS. WILLIAMS:**

Q    All right.  Any specific testimony you heard in here or document that jogged your recollection that you haven't told me yet, Mr. Zutter?

A    I'd say all of it in aggregate has helped me in bits and pieces right from the -- I have a hard time specifically answering, like, how does -- how do your memories come back but when we read a lot of different things, like, each of those sort of helps you in a way and so being in the courtroom reviewing documents has helped bring back memories.

Q    Okay.  I'm just going to ask this one more time and if the answer is "No," it's fine.  Is there anything specific you can tell me about a topic of testimony, a statement of testimony, a specific document that you haven't already told me that is part of what helped jog this recollection?

A    I think topics would be the chronology that was presented by the testimony that I heard at the --

Q    You mean the chronology your attorneys presented in court?

        **(Voice heard in courtroom)**

            **THE COURT:**  What was that?

            **MR. ANWAR:**  Your Honor, that was my fault.

            **THE COURT:**  Okay.  The Court will disregard that.

Zutter - Direct / By Ms. Williams                38

Go ahead, please.

**BY MS. WILLIAMS:**

Q    Are you referring to the chronology your attorneys presented to the Court?

A    I saw that one.  I saw one that -- I think it might have been Mr. Treyzon that did it on a chalkboard.  I heard a chronology of events during Charlie's testimony.  I reviewed a chronology of events through documents and artifacts.  And I think all of that combined helps me to remember things.

And so thematically, it would the chronology of events, the documents surround things that -- discussions people had, the direct and cross examinations that I observed. I think all of those in aggregate have helped me remember things.

Q    Okay.  You said you didn't hear Mr. Dundon's testimony, correct?

A    No.

Q    Okay.  So that is not part of what helped jog your memory?

A    I have reviewed summaries of that in preparation for today.  I've reviewed summaries of each person's testimony and so those things have also helped me remember things I wasn't here present for it.

Q    Did you read the testimony or just the summary?

A    The summary.

Q    Who prepared the summary?

Zutter - Direct / By Ms. Williams                39

A    My attorneys provided me with the summary.

Q    Okay.

          THE COURT:  All right.  Now that's all you can -- we don't want to get into attorney-client privilege.

          MS. WILLIAMS:  No, no more questions on that.

BY MS. WILLIAMS:

Q    All right.  Let's look at Exhibit -- Trustee's Exhibit 807 which is in your binder.

          MS. WILLIAMS:  And, Your Honor, there are no objections lodged to this exhibit.  So I'd like to offer it.

          THE COURT:  Mr. Hockaday, is that correct that there's no objection to it?

          MR. HOCKADAY:  Yes, Your Honor.

          THE COURT:  All right, thank you.

          So, Ms. Flores, would you note that Trustee 807 is admitted?

     (Trustee's Exhibit Number 807 received in evidence)

          Sir, do you have that exhibit?

          THE WITNESS:  Is it the first one then?

BY MS. WILLIAMS:

Q    Oh, no, it's 807.  They're in number order.

A    Okay, in number order, okay.  Thank you.

Q    Yeah, and I'm sorry.  It's a little thick but --

A    All right.

Q    If you need help, let me know.

Zutter - Direct / By Ms. Williams                40

A      No, I got it.  Okay.

Q      And it's just a two-page email with some pretty lengthy attachments.

A      Do you mind if I take a quick read through it?

Q      Let me know -- no, let me know when you're ready to talk about it.

A      That whole presentation is part of this exhibit, too?

Q      Yes, it has three attachments.  I'm not going to ask you about it but you're welcome to review it.

A      Will I be allowed to review it if the question --

Q      Yes.

A      Okay.

Q      Of course.

A      Thanks.

Q      All right.  Let me start at the top email that's on Page 1 of Trustee's Exhibit 807.  This is an email from Mr. Dundon to you; is that correct?

A      It appears that way, yes, ma'am.

Q      And it's on February 13th, 2019 at 11:05 a.m., correct?

A      It looks that way, yes.

Q      Okay.  And he's forwarding a message from Charlie Ebersol to Mr. Dundon; is that correct?

A      It looks that way, yes.

Q      And if you look kind of near the bottom on that first page, Mr. Ebersol says, "Attached to this email are an overview

Zutter - Direct / By Ms. Williams                    41

materials dec, a financial projection model and a cap table";

is that right?

A    Yes, ma'am.

Q    Do you recall receiving this email?

A    I have a loose recollection of receiving this email.

Q    Okay.  And if we look at the top, there actually are

several attachments to this email, correct?  Under the

attachments list?

A    I see that, yes.

Q    Okay.  And one is a PDF and I think that's the

presentation you were just talking about, correct?

A    I believe so, yes, ma'am.

Q    And then there's two Excel files, right?

A    Yes, ma'am.

Q    And one is called, "ESMG Financial Projections Model Via"?

A    Yes, ma'am.

Q    And the other is called, "Ebersol Sports Media Group, Inc.

2019 2/11 Summary Cap Intermediate Cap," correct?

A    Yes, ma'am.

Q    So you -- and this email actually has those three

attachments, correct?

A    It appears that way, yes.

Q    So on February 13th, 2019, you had those three attachments

and the information was in them from Mr. Ebersol, correct?

A    Yes, ma'am.

Q   You don't remember if you actually reviewed these before Mr. Ebersol signed the term sheet, correct?

A   I remember reviewing this and providing feedback to Mr. Dundon and that's the -- one of the things I mentioned a second ago in terms of jogging my memory, that the response was the one that I said a few seconds ago about dilutional.

Q   Okay.  So you now have a recollection of reviewing these materials?

A   Yes, ma'am.

Q   Okay.

    **MS. WILLIAMS:**  Your Honor, I'd like to play a clip from Page 48 of Mr. Zutter's deposition.

    **THE COURT:**  Okay, go ahead.

    **MR. HOCKADAY:**  Your Honor, in optional completeness, I'm going to get the exhibit number.

    **THE COURT:**  Sure.

    **MS. WILLIAMS:**  I'm going to -- oh, sorry.  I'm going to play 9 through 14.  Is that what you're completing?

    **MR. HOCKADAY:**  Can you give me that one more time, 9 through what?

    **MS. WILLIAMS:**  Fourteen.

    **MR. HOCKADAY:**  Do you have a page -- what's the page number?

    **MS. WILLIAMS:**  Page 48.

    **MR. HOCKADAY:**  Okay.  And then for optional

Zutter - Direct / By Ms. Williams                    43

completeness, Your Honor, I want to direct the Court's

attention to Exhibit -- Trustee's 805.  This is exactly what I

was talking about just a second ago, this tricky stuff.

        MS. WILLIAMS:  Oh, I'm going to use 805 next, Your

Honor, although he's welcome to admit it now.

        THE CLERK:  It's admitted.

        THE COURT:  Do you want me to play --

        MS. WILLIAMS:  It's already admitted.

        MR. HOCKADAY:  I mean, if she's going to play the

deposition testimony to try and impeach him like some kind of

trick, I'm going to -- I want the exhibit that says that he

testified from the best of his recollection six years ago.  He

remembers commenting on where he specifically comments on it.

This is the parlor game stuff that I was talking about, Your

Honor.

        THE COURT:  Okay.  Stop the sidebar.  These are not

parlor games.  These are appropriate questions.  So lest we not

understand what's going on here, I understand perfectly what's

going on here.  I realize it's six years ago.  I realize

memories change but the fact that the witness has changed his

testimony notwithstanding it happened six years ago is

appropriate for counsel to ask him about because it goes to his

memory and it goes to his credibility and it goes to the

weight.  Okay.

        So you can keep objecting but I'm going to tell you

Zutter - Direct / By Ms. Williams                    44

right now.  I'm going to let her ask questions because he's changed his testimony.  That is appropriate grounds for her to ask about.

Ms. Williams, excuse me.

**MR. HOCKADAY:**  Understood.

**THE COURT:**  Okay, thank you.

So you can play both and I'll listen to both of them.  Okay.  So -- but we'll play your portion first.

**MS. WILLIAMS:**  Sure.  Well, mine's a clip.  His is an exhibit and I'm going to use it next.

**THE COURT:**  Okay.  That's fine.

**MS. WILLIAMS:**  It's coming right in anyway, Your Honor.

Clip 5 which is Mr. Zutter's deposition, Page 48, 9 through 14.  Sorry.

"Q    All right.  And that email that was sent to you
as Mr. Hockaday indicated had an attachment to it.
Do you recall when you received the email if you have
reviewed what happened?

"A    (Indisc.)."

Q    All right.  Let's look at Trustee's Exhibit 805, Mr. Zutter.

**MS. WILLIAMS:**  And that is already admitted, Your Honor.

**THE COURT:**  That's fine.  Go ahead.

**EXCEPTIONAL REPORTING SERVICES, INC**

Zutter - Direct / By Ms. Williams                    45

When you have that, sir, would you let us know?

THE WITNESS: Yes, sir. I have it here, yes.

BY MS. WILLIAMS:

Q   Okay. I'm just going to start on the bottom of Page 1 --

THE COURT: Let's identify what the exhibit is just for the record. Could you ask him to do that, please?

MS. WILLIAMS: Oh, yes.

BY MS. WILLIAMS:

Q   What is this exhibit, Mr. Zutter?

A   It says, "805.0001" at the bottom.

Q   Oh, I think he meant substantively.

THE COURT: What the email --

Q   I'll ask you a leading question. This is an email chain between you and Mr. Dundon, correct?

A   Yes, that's correct.

Q   Okay.

A   Sorry, I misunderstood your question.

Q   No, no, I understand. You're not an attorney. It was clear to me.

So at the bottom of Page 1, Mr. Ebersol sends Mr. Dundon an email on February 13th, 2019, correct?

A   That's correct.

Q   You were not copied directly on that email, correct?

A   No, ma'am.

Q   And Mr. Ebersol says, "Tom, attached is a term sheet with

EXCEPTIONAL REPORTING SERVICES, INC

the following terms" and then it lists some terms, correct?

A    Yes, ma'am.

Q    Okay.  And then at the top -- no, sorry, not at the top.
Second down form the top, you respond on February 13th, 2019,
correct?

A    Yes, ma'am.

Q    Is jz@dundon.co your email address?

A    That was my DCP email address, yes.

Q    Okay.  So throughout the time period at issue here --

A    For this relevant time.

Q    -- in 2019, that's your email, right?

A    For the purposes of this, yes.  I had other email
addresses, too, but --

Q    Okay.

A    -- for everything related to this, absolutely, yes, ma'am.

Q    Okay.  You had an AAF email, too, right?

A    I think we set one up.  I don't recall if I did or didn't
use it.  I --

Q    But you had one, correct?

A    I believe we set email up under AAF.  I don't recall
actually using them.

Q    Okay.  I'll show you an email about that later.

A    Yeah.

Q    All right.  So on February 13th, 2019 at 6:31 p.m., you
send Mr. Dundon some comments on this term sheet, correct?

Zutter - Direct / By Ms. Williams                47

A      Yes, ma'am.

Q      Okay.  So you must have gotten the draft from somewhere between these two emails even though I don't see you copied, right?

A      Yes.

Q      Did Mr. Dundon probably send that to you?

A      Probably.

Q      Okay.  And the first thing you say is, "This seems dilutional for a company missing payroll and burning cash at their rate," correct?

A      Correct.

Q      So you by February 13th, 2019 at 6:31 p.m. have come to some kind of conclusion that AAF is burning a lot of cash, correct?

A      Yes, ma'am.

Q      Okay.  But you don't remember how you learned that specifically?

A      I believe it was through the attachments.

Q      Okay.  Any other recollection you have of where it might have come from?

A      It could have been -- again, I don't recall when I had my first conversation with Tom but if this was after, then it might have been informed by that conversation.  I don't recall when the time stamps of those things were.

Q      Okay.  So other than you probably looked at those three

Zutter - Direct / By Ms. Williams                    48

attachments we just saw, you don't have anything specific you remember?

A    Yes, ma'am.

Q    Okay.

A    I know that between the 13th and the 14th, I had a conversation with Tom where I got context.  I don't know if that was before or after this and --

Q    Okay.

A    -- so I don't know if that was informing this or that came after.  So --

Q    Okay.  And that's the one conversation you now recall that we had a whole conversation about already, correct?

A    A few minutes ago, yes.

Q    Okay.  I don't want to go back there if I don't need to. Okay.  So it's the same one.  And you say, "My issues are many but I'd start with" -- and I want to look at what you said on Number 2 here.  You say, "No clear plan for rest of capital and not clear what happens if they need more money next month," correct?

A    Yes, ma'am.

Q    Okay.  And then Number 5, you said, "Identifying as an issue, you have zero governance," correct?

A    (No audible response).

Q    And when you say, "You," you're referring to Mr. Dundon?

A    I would have been referring to whatever investment entity

we ultimately made this out of but kind of the figurative you, like you as the investor which would likely not be Tom as an individual but an entity.

Q    Okay.  So Mr. Dundon or whatever he chose if he so chose? Does that fit?

A    The investment company's entities, yes.  So --

Q    Okay.  Did Mr. Dundon have the ability to do it individually if he wanted to?

A    Do you mean does he have the financial wherewithal?

Q    No, like, could he do it individually just as a practical matter?

A    Sure.

Q    Okay.  And that would be up to him as the person making the investment decision, correct?

A    One hundred percent.

Q    Okay.  And then at the bottom after you list your ten issues here, you say, "If I were them and someone did this financing, the next day I could do a one-dollar senior loan with foreclosure rights and wipe you out and restructure the equity."  Is that what you said?

A    That's what I wrote, yes.

Q    Okay.  And so you're referring here to you saw a way where if Mr. Dundon were to use the term sheet that you reviewed, you had an idea about how someone might take advantage of that; is that correct?

Zutter - Direct / By Ms. Williams                50

A    I had an idea of how one could, yes.

Q    Okay.  Mr. Dundon responds to you just 20 minutes later in the top email, correct?

A    He -- I can look here.  Yes.

Q    And he says, let's put some terms together for them.  I will call you.

A    Yes, ma'am.

Q    Do you think that call after this email is the one you think you now recall?

A    Again, I don't recall if it was before or after so --

Q    Okay.  But you only recall one call, right?

A    I remember having a conversation with him where he gave me the context of the transaction.  During this period of time, I was talking to Tom probably five or ten times a day.  And so the existence of multiple calls I -- is a certainty.

But I don't -- the memory that jogged back is just the context one --

Q    Okay.

A    -- that I mentioned earlier.

Q    So you don't know.

A    No.

Q    Okay.  So you understood at this time on February 13th, 2019 that the AAF had an immediate short-term need for funds, correct?

A    Yes, ma'am.

Zutter - Direct / By Ms. Williams          51

Q    Okay.  And you believed the AAF was in a situation of particular strain at this time, correct?

A    Correct.

Q    And they needed a transaction, the AAF did, in a short period of time to live another day; is that correct?

A    Correct.

Q    Okay.  You don't know who else Mr. Ebersol or those on his AAF team were talking to about an investment at this same time period, do you?

A    Just to clarify, your question -- you're saying at this point did I know anything?

Q    Correct.

A    I was not aware of any other conversations at that point in time.

        MS. WILLIAMS:  Okay.  All right.  Let's look at Exhibit 21.  So you're going to have to go Trustee's Exhibit 21.  Sorry, Your Honor.

        THE COURT:  Do you know if this has been previously admitted?

        MS. WILLIAMS:  It has been, Your Honor.

        THE COURT:  All right.  Thank you.

        Sir, when you have it, just let us know.

        THE WITNESS:  Yes, sir.

        Have a minute just to read through it?

        MS. WILLIAMS:  Absolutely.

**THE WITNESS:**  Okay.  Thank you.

**MS. WILLIAMS:**  I'm going to start on page five whenever you're ready.

**THE WITNESS:**  Okay.  Page 5?

**MS. WILLIAMS:**  Yes.

**BY MS. WILLIAMS:**

Q    There's an email kind of near the top from Tom Dundon to Mr. Ebersol and yourself, correct?

A    Yeah.

Q    And this is on February 14th, 2019.

A    Yes, ma'am.

Q    And Mr. Dundon says, John, please work with Charlie, thanks; is that correct?

A    Correct.

Q    He's referring to working with Mr. Ebersol on getting a deal done for the AAF investment, correct?

A    Yes, ma'am.

Q    Okay.  Let's look at page two.  There's a lot of back and forth about some phone calls.  I know you read this.  But on page two, at the bottom you respond to the group on February 14th, 2019 in the morning; is that correct?

A    Yes.

Q    And you say, look forward to talking.  FYI, I'm not an attorney but will manage this deal for DCP, correct?

A    Correct.

Zutter - Direct / By Ms. Williams                53

Q    And you did manage this deal for DCP; is that right?

A    I was one of several people managing it but, yeah, I think that's a fair characterization at this point in time.

Q    You were in charge of getting this deal done, right?

A    I would say I was responsible for working on the term sheet and the documentation at this point in time.  In charge of getting it done I'd say was split between myself and Mr. Dundon on the Dundon Capital side.

Q    Okay.  Anyone else other than you and Mr. Dundon who would be part of the management of this deal?

A    No, ma'am.

Q    Okay.  And then if we go to the email at the top of this page from you on February 14th, 2019, later that morning, you saw removing Tom as we work through this, correct?

A    Correct.

Q    So you're taking Mr. Dundon off the chain while you continue these discussions, correct?

A    Yeah.  While we work through the details, that's correct.

Q    Okay.  And then you said, also like to make sure the guarantee offered yesterday is in the picture at least until we get through fulsome diligence and with respect to the immediate needs during that time period; is that correct?

A    Yes, ma'am.

Q    And was that a guarantee that was mentioned by Mr. Ebersol that Mr. Fowler might be willing to give?

Zutter - Direct / By Ms. Williams                    54

A     That's what this -- the following page seems to suggest.

Q     Okay.  So if you go to page five, is that what you're talking about?

A     Yeah.  What I just read down here at the bottom.

Q     Okay.  And that's where Charlie says, Reggie -- looks like the punctuation got a little messed up.  But it says, Reggie will write a personal guarantee against the attached assets for the ten million loan from you; is that correct?

A     That's what it says here, yes.

Q     Okay.  Is that what you're referring to in your email on page two?

A     I believe so.

Q     Okay.  And you reference on the page two email, until we get through fulsome diligence.  Did that fulsome diligence happen before any deal was reached?

A     That fulsome diligence did not happen --

Q     Okay.

A     -- prior to the execution of the term sheet, no.

Q     Okay.  And there was no guarantee from Mr. Fowler either, correct?

A     No, ma'am.

Q     Did you ever follow up and ask about any more details about a Fowler guarantee?

A     On this day?

Q     Ever.

Zutter - Direct / By Ms. Williams                    55

A    I don't recall whether we did or didn't.

Q    Okay.  All right.  And then on page one of Trustee's Exhibit 22, the second email down comes to Kevin Freedman to you and others on February 14, 2019.

A    Okay.  Just -- I don't recall whether we followed up on it with respect to the Reggie point.  But I recall some conversations over the course being like the person who's not making good on their commitments like how good is that guarantee.

     But I don't recall whether we brought it up on this day after so I don't remember whether we brought it up subsequently.

Q    Okay.  The proposed guarantee was against some assets, correct, not just a personal guarantee, right?

A    I don't remember the details.

Q    Okay.  Well let's look at what page five says at least.  It says, Reggie will write a personal guarantee against the attached assets, correct?

A    Yeah.  That's what it says, yes.

Q    Okay.  All right.  Going back to page one where Mr. Freedman sent you an email, he sent you a draft term sheet, correct?

A    Yes, ma'am.

Q    And is this the conversation or at least part of the conversation you now recall between Mr. Kantowitz,

Zutter - Direct / By Ms. Williams          56

Mr. Freedman, and yourself?

A    Yeah.  I recall that we had conversations talking through kind of a framework for a transaction, and this came subsequent to that.

Q    Okay.  The second paragraph of this email, Mr. Freedman says, we did a review on payments needed to ensure this weekend happens without any material issues, and the total amount needed is 5.1, correct?

A    That's what it says, yes.

Q    Okay.  So when Mr. Freedman represented the 5.1 amount that was needed this week, he's clearly stating that's what's needed for this weekend to happen without material issue, right?

        **THE COURT:**  I -- could you repeat the last part of your question?  I didn't -- I don't know if I heard it correctly.

        **MS. WILLIAMS:**  Oh, yes.

**BY MS. WILLIAMS:**

Q    I was saying so when Mr. Freedman gave you the 5.1 number, he's linking it to this is what we need to ensure this weekend happens without material issues, right?

A    Without any material issues, yes.

Q    He doesn't say this 5.1 million's the entirety of the accounts payable to the AAF, does he?

A    That's not on this document, no.

Zutter - Direct / By Ms. Williams                    57

Q    Okay.  And he seems to be suggesting that this is just what we need to make sure without any material issues, not even without any issues, correct?

A    Yes.  He says without any material issues.

Q    Okay.  And then he lists out how he got that number, right?

A    He lists the composition of it.

Q    Okay.  And part of that composition is .2 million credit card paid down, correct?

A    Paid down, yes.

Q    And paid down's different from payoff, correct?

A    Yes, ma'am.

Q    Okay.  So paid down implies that there is more credit card debt.  We just need to pay down this amount of it to make sure the weekend happens without material issues, correct?

A    I don't agree with that characterization, no.

Q    You don't?

A    No.

Q    Okay.  And you then forward this email and this information from Kevin Freedman to your DCP team, correct?

A    Yes, ma'am.

Q    And that's Mr. Vanderbilt, Mr. Rostenkowski, Ms. William, Mr. Kulas; is that correct?

A    Yes, ma'am.

Q    On February 14th, 2019.

A     (Inaudible) ma'am.

Q     And you say what they came to us with today, right?

A     Yeah.

Q     And they is the AAF, right?

A     Yes, ma'am.

Q     And us is DCP, correct?

A     Yes.

        **MS. WILLIAMS:**  Okay.  Let's look at Exhibit 830.
And, Your Honor, Trustee's Exhibit 830 is also already
admitted.

        **THE COURT:**  Thank you, ma'am.

        Sir, when you have it, let us know, please.

        **THE WITNESS:**  Yes, sir.

    **(Pause from 10:09 a.m. to 10:10 a.m.)**

        **MS. WILLIAMS:**  I'm sorry, Mr. Zutter.  Did you say
you were ready?  I got a little distracted.

        **THE WITNESS:**  I'm sorry.  I'm just read the --

        **MS. WILLIAMS:**  Okay.  That's fine.

        **THE WITNESS:**  -- exhibit, if that's okay.

        **MS. WILLIAMS:**  Go ahead.  I just was afraid I missed
you.

        **THE WITNESS:**  No.  I'll -- I read slowly.  Sorry.
Okay.

//

//

**BY MS. WILLIAMS:**

Q All right. I'm looking at page one of Trustee's Exhibit 830. This is an email from you to Mr. Ebersol, correct?

A Yes.

Q And it's on February 14th, 2019 at 2:58 p.m. Central time.

A It appears that way, yes.

Q Okay. And it has a draft of the term sheet attached, correct?

A Yeah. It looks that way, yes.

Q Okay. And if we look at starting at page two, it's a term sheet and it has redlines in it, correct?

A Yes, ma'am.

Q These are your redlines, right?

A I believe so, yes.

Q Okay. All right. Let's look at those redlines or at least some of them. And you're redlining what Mr. Freedman's sent you, correct, the draft?

A I believe it was from Mr. Freedman.

Q Okay. If we look under funding commitment, the redline here adds the words, subject to a maximum cumulative commitment of $70 million, correct?

A Yes, ma'am.

Q Without that redline, the 70 million's not in this term sheet, correct?

A That's correct.

Zutter - Direct / By Ms. Williams                60

Q    And without this redline, there's no reference to a maximum commitment, correct?

A    Correct.

Q    Okay.  And then if we look at page three of Trustee's Exhibit 830, I want to look under board of directors where you add the terms, and governance.  So that wasn't there previously, correct?

A    Appears that way, yes.

Q    Okay.  And originally this was drafted to have five board members that could all vote, correct?

A    Let me quickly read.  It appears that way, yeah.

Q    Okay.  And your redlines change that board to be just two members, you and Mr. Dundon, correct?

A    Two voting members.

Q    Well it just says two members right now, right?

A    (No audible response.)

Q    I know where you're going, but this one just says two members.

A    Okay.  Sorry.  Let me --

Q    It's okay.  I want you to read it.

A    Sure.  Yeah, that's correct.

Q    Okay.  And you also add more language related to governance, correct?

A    (No audible response.)

Q    And it says, the board, and in this one that's you and

EXCEPTIONAL REPORTING SERVICES, INC

Zutter - Direct / By Ms. Williams                    61

Mr. Zutter -- you and Mr. Dundon shall have full authority over all aspects of the company, correct?

A    Correct.

Q    And then you add the language, the investor shall have the right to make any and all day-to-day business decisions for or on behalf of the company, correct?

A    Correct.

Q    Including, but not limited to, determining capital required to be drawn under this agreement, correct?

A    Correct.

Q    Okay.  And then if we look at the closing paragraph, you also made some changes there, right?

A    Yeah.

Q    Okay.  So the original clause read, the initial closing shall occur as soon as practicable upon mutual completion of amending the company's existing governance and investment documents; is that right?

A    Yes.  It looks that way.

Q    Okay.  And you changed that to say the investor shall provide definitive documentation, correct?

A    Yes.

Q    Okay.  And then it says, the company's bound under this agreement to agree to any other provisions provided for in such documentation, correct?

A    Yes.

Q   Okay.  All right.  If we go back to the email that accompanies this redline, you --

A   Document.  The first page?

Q   -- say to Mr. Ebersol -- I'm sorry, page one.

A   Okay.  Thanks.

Q   You say to Mr. Ebersol, calling you now, correct?

A   Correct.

Q   Do you remember calling?

A   I don't recall the specifics of that conversation.

**MS. WILLIAMS:**  Okay.  All right.  Let's look at Exhibit D-88.  And, Your Honor, there are no objections lodged as this is Defendants' exhibit.

**THE COURT:**  Right.  Aer you offering it into evidence?

**MS. WILLIAMS:**  Yes, Your Honor.

**THE COURT:**  Any objection, Mr. Hockaday?

**MR. HOCKADAY:**  What was the number?

**THE COURT:**  D-88.

**MS. WILLIAMS:**  D-88.

**MR. HOCKADAY:**  I assume none but I'll just --

**THE COURT:**  We show that it has been admitted.

**MR. HOCKADAY:**  Oh.  Then --

**MS. WILLIAMS:**  Oh.  Well, I missed that.  I'm sorry.

**THE COURT:**  Let me (inaudible) do you show it as well?  You all are doing a great job.  Thank you.  So D-88 was

previously admitted.  You may proceed.

MR. HOCKADAY:  And I have no objection.

THE COURT:  All right.  Thank you, sir.

MS. WILLIAMS:  Thank you.  Sorry I missed one.  I hate that.

THE WITNESS:  D's are at the end.

MS. WILLIAMS:  The D's are probably at the end.  The D's are at the end.

THE WITNESS:  Got it.  I was going in order and didn't see 88 in the front.

MS. WILLIAMS:  Yeah.

THE WITNESS:  So thanks for that guidance.  Okay.

BY MS. WILLIAMS:

Q    All right.  So Trustee's Exhibit 830 that we were just looking at was you emailing Charlie at 2:58 p.m. Central.  And then you say, calling you now.  And now we have an email about 15 minutes later on February 14th, 2019 at 3:13 p.m. Central; is that right?

A    Yes, ma'am.

Q    Okay.  And this is from you to Mr. Ebersol and some others with AAF, correct?

A    Uh-huh.

Q    And then you see --

THE COURT:  Was that a yes?

THE WITNESS:  Oh, yes.

**THE COURT:** Thank you. Go ahead.

**BY MS. WILLIAMS:**

Q    And then you CC James Skochdopole -- am I saying that right?

A    I believe so.

Q    James Skochdopole at Bell and Nunnally; is that right?

A    Correct.

Q    And he's outside counsel for Dundon Capital Partners, correct?

A    Yes, ma'am.

Q    Okay. And you're sending a redline of the term sheet again, correct?

A    Yes, ma'am.

Q    And let's look at the redlines. I'll represent to you but I want to show it to you that there's only one change in this redline. But let me know if you see something else, okay, Mr. Zutter?

A    Okay.

Q    Okay. Let's look at the funding commitment again. That has the same redline as the one we just looked at in Trustee's Exhibit 830, right?

A    I mean, --

Q    Nothing's changed.

A    -- it appears the same, yeah.

Q    Okay. And let's look at the board of directors and

Zutter - Direct / By Ms. Williams                65

governance. And there's one change here, correct?

A    I believe so. Obviously I'm not doing a redline of them but --

Q    Okay. It changes it from just you and Mr. Dundon to you and Mr. Dundon being the only two voting members but Mr. Ebersol getting two non-voting members; is that correct?

A    Yes, ma'am.

Q    It still has all the other language we discussed, right, about the full authority and investor has right to make business decisions, etcetera? Do you see anything else different in there?

A    Let me do a quick read and --

Q    Absolutely.

A    -- see if I can notice anything. But -- I don't notice any other differences.

Q    Okay. And please look at the closing paragraph also. I don't believe that has any differences.

A    Yeah. I read both of them. I didn't notice any differences.

Q    Okay. All right. The $70 million number that you redlined into the term sheet, you believe that number came from a conversation between Mr. Ebersol and Mr. Dundon, correct?

A    Correct.

Q    That was not a number that came from a conversation between you and Mr. Ebersol, correct?

A     Correct.

Q     Okay.  Other than these drafts of a term sheet that was ultimately only signed by Mr. Ebersol, are you aware of any other writing that contains that $70 million number?

A     There -- up until this point in the --

Q     Correct.

A     Up until this point, aside from the term sheet, I'm not aware of.

Q     Okay.

A     And the various obvious iterations of the term sheet.

Q     Okay.  All right.  And eventually there was a final draft of a term sheet, right?

A     Yes, ma'am.

Q     Are you aware of any changes between this redline we looked at and the final?

A     I'm not aware of any.

        **MS. WILLIAMS:**  Okay.  Your Honor, I'm going to offer 821-A.  There were some objections originally to the attached documents, but we got a business records affidavit from DocuSign, which is why it's called 821-A.  So I'm not sure if they still have the objections or not.

        **MR. HOCKADAY:**  I don't think we have the declaration.

        **MS. WILLIAMS:**  You don't?

        **MR. HOCKADAY:**  I don't think so.

        **THE COURT:**  Could we provide a copy, please, to

Zutter - Direct / By Ms. Williams                    67

counsel?

       **MR. HOCKADAY:** Is that a business records --

       **MS. WILLIAMS:** It is. In fact, you're welcome to look at my copy. I've not wrote on it but it's just the rules.

       **(Attorneys confer from 10:20 a.m. to 10:21 a.m.)**

       **MR. HOCKADAY:** I have no objection, Your Honor.

       **THE COURT:** Ms. Flores, would you note that Trustee's 821-A is admitted?

       **(Trustee's Exhibit Number 821-A received in evidence)**

       Go ahead, ma'am.

       **MS. WILLIAMS:** Thank you.

**BY MS. WILLIAMS:**

Q    All right. Have you had a chance to look at it?

A    Oh, no.

Q    Eight twenty-one "A."

A    This is what's on the screen here?

Q    I would look in your book because it has attachments.

A    Oh, okay, 821-A. Okay.

Q    All right. You can see from the first page, Mr. Zutter, that those are some records we got from DocuSign; is that fair?

A    It appears that way, yes.

Q    Okay. And if I start with page two of Trustee's Exhibit 821-A, this is a DocuSign certificate of completion, correct?

A    Yeah.

Q    And at the top there it says, signatures, and it has the

Zutter - Direct / By Ms. Williams                    68

number one, correct?

A    Correct.

Q    And actually apologies, that is the signature for the affidavit itself.  So let's look at page three, which will make more sense.  All right.

So if we go to the top of page three, this is another DocuSign certification of completion, and it also says, signatures one, correct?

A    Correct.

Q    And under signer events, a little further down that page it says Charlie Ebersol, correct?

A    Correct.

Q    And you see Mr. Ebersol's electronic signature.

A    Correct.

Q    And it says that was signed on February 14th, 2019 at 1:27 p.m., correct?

A    Correct.

Q    There's no other signature listed on this page, correct?

A    Correct.

Q    And if we go down to the bottom of the page, the bottom category says carbon copy events; do you see that?

A    Yes.

Q    And it lists Mr. Freedman and Mr. Kantowitz.  And then if we look at page four, it lists John Zutter, correct?

A    Correct.

**EXCEPTIONAL REPORTING SERVICES, INC**

Zutter - Direct / By Ms. Williams                69

Q    And it says, the status is just that you were copied,

correct?

A    Correct.

Q    Okay.  And then if we look at page eight of this exhibit,

this is another way of looking at the information that DocuSign

holds.  And the fifth column says, action; do you see that?

A    Yeah.

Q    And there's various actions.

A    Yes, ma'am.

Q    There's only one that says signed, correct?

A    That's correct.

Q    And that's Mr. Ebersol.

A    Yes, ma'am.

Q    And your name is listed on there twice with the actions

printable copy attached to email and the action of viewed,

correct?

A    Correct.

Q    Okay.  Let's look at Exhibit 22, Trustee's Exhibit 22,

Which is already admitted.

     **(Pause from 10:25 a.m. to 10:26 a.m.)**

A    Okay.

Q    All right.  And I'm on page one of Trustee's Exhibit 22.

The second email down says from Alan Kantowitz via DocuSign; do

you see that?

A    Yes.

Zutter - Direct / By Ms. Williams 70

Q    To you on February 14th, 2019; is that right?

A    Yes.

Q    And it says, completed, and it has a document title that includes ESM Series Two term sheet, correct?

A    Correct.

Q    Okay.  And then if we look at the attachment, it's titled, binding term sheet for series two preferred stock financing, correct?

A    Correct.

Q    And if we look at page five, it's got two places for a signature, correct?

A    (No audible response.)

Q    And one is for Ebersol Sports Media Group, Inc., and it's signed by Mr. Ebersol, correct?

A    Correct.

Q    At this time on February 14th, 2019, your understanding was that Mr. Ebersol had authority to sign for ESMG, correct?

A    Yes, ma'am.

Q    Okay.  And then there's a blank for someone to sign for Dundon Capital Partners, LLC, correct?

A    Correct.

Q    But there's not a signature there, right?

A    Not on this document, no.

Q    You don't recall ever signing this document, do you?

A    I do not recall one way or the other.

Zutter - Direct / By Ms. Williams                71

Q    Have you ever seen any version of this document signed by you either electronically or by hand?

A    I don't recall.

Q    Have you ever seen a fully executed version of Exhibit 22?

A    I do not recall.

Q    Okay.  The calls between Mr. Dundon and Mr. Ebersol that we've discussed you were not on on February 13th and 14th, 2019, you don't know what information Mr. Ebersol may have offered to Mr. Dundon on those calls, do you?

A    I only know what Tom related to me.

Q    Okay.  You don't know what Mr. Ebersol may have offered for Mr. Dundon to review, do you?

A    Again, I only know what Tom related to me.  I -- that's the limit of my knowledge.

Q    Okay.  You don't recall asking for a balance sheet from AAF before the term sheet, do you?

A    I do not recall.

Q    You don't recall asking for that.

A    I don't recall asking for that.

Q    Do you recall asking Mr. Ebersol for any information specific -- any kind of specific company records prior to sending your final revisions to the term sheet?

A    I do not recall, no.

Q    Do you recall anyone on your DCP team that you were managing asking Mr. Ebersol or anything -- or anyone at AAF for

Zutter - Direct / By Ms. Williams    72

information prior to doing your final edits to the term sheet?

A    No, ma'am.

Q    Do you recall there being an AAF data room on or around February 14th, 2019?

A    Not at that time.

Q    When do you remember first there being one, or do you remember there being one?

A    I think that we first got access to a data room on the Sunday or the Monday following the term sheet.

Q    Okay.  So a couple of days later.

A    Yeah.  I believe so.

Q    Okay.  Do you remember asking for a data room before then?

A    I don't recall whether I asked or didn't ask.

Q    Okay.  Do you recall whether anyone on your team asked?

A    I do not recall.

Q    Okay.

A    You're saying in the context of February 14th.

Q    Before you got access.

A    Yeah.

Q    Correct.

A    I don't recall whether we asked or they offered.

        **MS. WILLIAMS:**  Okay.  All right.  Let's look at Trustee's Exhibit 275.  And, Your Honor, I believe there are no objections to this and I would like to offer it.

        **THE COURT:**  Okay.  Give Mr. Hockaday a chance to take

a look at it.

**(Pause)**

**MR. HOCKADAY:** I have no objection, Your Honor.

**THE COURT:** All right. Thank you, sir.

Ms. Flores, would you note that Trustee's 275 is admitted?

**(Trustee's Exhibit Number 275 received in evidence)**

Go ahead.

**BY MS. WILLIAMS:**

Q All right. Mr. Zutter, this is an email from you to Mr. Ebersol on February 16th, 2019, correct?

A Yes, ma'am.

Q And you say, Charlie, can you have the lawyers drop the entire data room into a box dot com site? Their site is a bit cumbersome and doesn't allow you to download more than one file at a time; is that right?

A Yes.

Q From this email it appears that you did have access to a data room some time before February 16th, 2019 at 6:32 p.m., correct?

A Yes, ma'am.

Q Okay. And you're just asking Charlie to put it in another format, correct?

A That's correct.

Q But you don't recall how long before this email you had

Zutter - Direct / By Ms. Williams                74

access to that data room.

A    I do not recall.

Q    Back in 2019, you don't recall telling anyone that Mr. Ebersol had made any misrepresentation to you in connection with the discussions on February 13th and 14th, 2019, do you?

A    Can you clarify the question?  Over the course of all of 2019 or --

THE COURT:  Two days, right, Ms. Williams?

MS. WILLIAMS:  Yes.

THE COURT:  Thirteenth and fourteenth --

THE WITNESS:  Got it.

THE COURT:  -- of February.

BY MS. WILLIAMS:

A    No.  Between the 13th and 14th I don't recall any suggestions that Charlie made misrepresentations.

MS. WILLIAMS:  Okay.  My question's a little bit different.

THE WITNESS:  I'm sorry.  I thought --

MS. WILLIAMS:  No.  It's okay.  I understand if it's confusing.  Let me ask you a different question and let's see if we can get there.

BY MS. WILLIAMS:

Q    On February 13th or 14th, 2019, did Mr. Ebersol make any misrepresentations to you?

A    I believe so, yes.

Zutter - Direct / By Ms. Williams                    75

Q    Directly to you?

A    Oh, to me as an individual or --

Q    Yes.

A    -- to me as the company --

Q    To you --

A    -- I was representing?

Q    -- personally.  Did Mr. Ebersol say anything to you on February 13th or 14th, 2019 that you're contending is a misrepresentation?

A    In a verbal conversation, no.

Q    Okay.  In an email?

A    I would -- whether signing a document is an implied misrepresentation would be kind of a -- I'm obviously not a lawyer so I don't know whether that is technically or not a misrepresentation.

But signing a document you're not authorized to sign, you know, to me sounds like a misrepresentation.  So in an email context, yes.

Q    And you're referring to the term sheet.

A    Yes, ma'am.

Q    Okay.  Other than whatever implications a signature on a term sheet might have, any other oral or written communication from Mr. Ebersol to you that you think was a misrepresentation on February 13th or 14th, 2019?

A    Indirectly I'd say, yes, again with respect to --

Zutter - Direct / By Ms. Williams                 76

Q    What do you mean indirectly?

A    I -- we looked at --

Q    I asked to you.  Did he make any misrepresentations to you, that's the question.

A    In the provision of the projections I would say yes.

Q    The ones that were attached to Exhibit 807 that we looked at?

A    I'd have to look back but I -- in that original email that we went through earlier that had the three attachments.

Q    The one Mr. Dundon forwarded to you.

A    Yes, ma'am.

Q    Okay.  So that wasn't from Mr. Ebersol to you, correct?

A    Not directly.

Q    Okay.  But let's look at it indirectly, as you say.  What in there was a misrepresentation?

A    I think the forecast was a misrepresentation of the expectations of the business.

Q    Okay.  Anything else?

A    Not that comes to mind at this moment.

Q    Okay.  Now let's extend that time period out a little bit. The things that you are saying now were indirect or implied, misrepresentations of Mr. Ebersol on February 13th through 14th, 2019, did you tell anyone back in 2019 that you thought those were misrepresentations?

A    No, ma'am.

THE COURT: Ms. Williams, is --

MS. WILLIAMS: Yes.

THE COURT: -- may I interrupt you to take a comfort break?

MS. WILLIAMS: Absolutely, Your Honor.

THE COURT: All right. So, ladies and gentlemen, it's 10:35. We'll come back at 10:45.

Mr. Zutter, you can step down and we'll resume with your testimony.

Short break, ladies and gentlemen.

THE CLERK: All rise.

**(Recess taken at 10:35 a.m.; reconvened at 10:55 a.m.)**

THE COURT: When you're ready, Ms. Williams.

MS. WILLIAMS: Thank you, Your Honor.

THE WITNESS: Ma'am, your last question before we exited, you had -- I wanted to make sure I clarify that I heard it correctly. The question prior had been February 13th and 14th. And I think Judge Gargotta confirmed that was the date.

I want to make sure I understood your last question. Was that just the 13th and 14th with respect to knowledge of misrepresentations or all of 2019? Because if it's all of, --

MS. WILLIAMS: I believe the --

THE WITNESS: -- I have to clarify --

MS. WILLIAMS: -- question was about whether during 2019 you said anything about misrepresentations from February

Zutter - Direct / By Ms. Williams    78

13th through 14th, 2019.

THE WITNESS: Sorry. I misheard you. I thought based on the prior question that you were talking about just February 13th and 14th. So I think I need to clarify my answer on that.

MS. WILLIAMS: Your Honor, I don't know if the reporter's able to read the question but I do not --

THE COURT: We don't have that capability.

MS. WILLIAMS: Okay. All right. Let me just ask what I think the question was again.

THE WITNESS: Okay.

MS. WILLIAMS: And then you give me what you think the answer is.

**DIRECT EXAMINATION (CONTINUED)**

BY MS. WILLIAMS:

Q    At any time before mid-April, 2019 did you tell anyone that you believed Mr. Ebersol had made one of these implied or indirect misrepresentations to anyone at DCP?

A    I think absolutely would be my answer. There were a number of different misrepresentations that were made over the course of that time period --

Q    Okay. Stop because we're not on the same page.

THE COURT: Right. Try again.

Q    I'm still talking about misrepresentations you're alleging were made in February 13th through 14th, 2019 time period, so

Zutter - Direct / By Ms. Williams                79

it is limited to that.

A     It's --

Q     But I'm asking during the rest of 2019, for example in March, did you ever say to Mr. Ebersol, hey, I think you made this misrepresentation to me in what you sent on February 13th?

A     I think over the course of that time period talking about the events on February 13th and 14th, absolutely there were misrepresentations.  The signing of a document when you're specifically --

          **MS. WILLIAMS:**  Okay.  I still don't think --

A     -- not allowed to is not -- is -- that is a misrepresentation.  The lack of information that is in your financial projections relative to reality is a material omission that itself is a misrepresentation.

     In the world where I live in where truth matters, when you work in regulated industries like where you're a CEO of a business, you're responsible for your numbers, you're responsible for being truthful and accurate in what you say.

     And so misrepresenting things when you have change of control provisions in your existing documents and you don't talk about how you are signing a document you're not authorized to do; when you were required to go to your board but you sign a document that requires you to get your board but you didn't go to your board; when you have to have a shareholder vote and you sign a document that requires that but you didn't do that,

those are all material misrepresentations.

The fact there's a signature on the document itself is a misrepresentation.

**MS. WILLIAMS:** All right. Your Honor, I'm going to move to strike all of those responses.

**THE COURT:** Right. I'm going to strike it. And let's just -- let's start again, bit by bit. So it's -- I'm not going to consider it.

**MS. WILLIAMS:** Okay.

**BY MS. WILLIAMS:**

Q   When we were talking before the break, Mr. Zutter, and I asked about misrepresentations on February 13th and 14th, 2019, you said there were none directly to you.

You said there might be an implied one or you think there's an implied one by the document signature. And you said there were some indirect ones including in the projections; is that correct?

A   I think that the document to me is a direct one but, yes, it's not a verbal but it is a written one that to me creates a series --

Q   You're talking about the term sheet?

A   Yes.

Q   Okay. Any other document that you're referring to there?

A   The document and the projections that you just listed. On February 13th and 14th, I think they both represent material

Zutter - Direct / By Ms. Williams                81

misrepresentations.

Q    Okay.   The projections weren't sent directly to you, correct?

A    Not directly.

Q    Okay.  At any time between February 15th and April 16th, 2019, did you go to Mr. Ebersol and say, hey, you made a misrepresentation to me on February 13th and 14th?

A    Absolutely.

Q    When did you do that?

A    So following the transaction on February 14th, as we went to start working on definitive documentation with outside counsel, we identified a series of problems that suggested that the original document was itself -- the signature of it itself was a misrepresentation because it was one that was outside of his authority.

     Specifically there was a loan between Pottruck and the business that had a change of control provision.  There was --

Q    Okay.  I'm sorry, Mr. Zutter.  I asked you when you said that to Mr. Ebersol.  I did not ask for the detail you're giving now.

A    I hadn't finished my answer.

          **MR. HOCKADAY:**  (Inaudible) his answer.  She's asking an open-ended question (inaudible).

          **MS. WILLIAMS:**  Your Honor, I'm going to move to strike.

THE COURT: All right. So let's try it again.

I think you're just looking for a time period, right? Not what the substance is --

MS. WILLIAMS: No. I said when did you tell Mr. Ebersol --

THE COURT: Right.

MS. WILLIAMS: -- that you believed he made a misrepresentation to you on February 13th or 14th, 2019.

THE WITNESS: After we had engaged outside counsel and established this gap analysis, which I believe was in the call it week following the transaction, and we identified at least four different major issues with --

MS. WILLIAMS: Your Honor, I'm sorry.

THE WITNESS: -- the transaction --

MS. WILLIAMS: I'm going to move to strike --

THE WITNESS: That is when --

MS. WILLIAMS: -- again. I don't think we're answering the question.

MR. HOCKADAY: He is answering the question (inaudible) --

THE COURT: Yeah. I think he's answering your question. You may not like the answer but --

MS. WILLIAMS: Okay.

THE COURT: -- let him -- let's let him answer it.

//

**BY MS. WILLIAMS:**

A   So following the transaction on February 14th, we had started working with Jim Skochdopole.  Jim Skochdopole started evaluating some of the corporate documents that were made available to us at least by Saturday, right, as we identified the data room.

And in review of those documentation it became very evident to us that Charlie, as the CEO, had signed a document that was materially misrepresenting his authorities.

It also put in a position where we had advanced monies that was in direct contradiction to an existing term sheet between Reggie Fowler and the business.

It created a change of control provision that was a default under the Pottruck loan.  That was, by the way, a liability that was not told to us ahead of time.

There's a default under the MGM agreement, per my understanding.

There's a shareholder vote requirement.

There is a board vote required to be able to enter into the transaction that they did with us.  Every single one of those itself is an explicit misrepresentation from my perspective.

        **MS. WILLIAMS:**  All right.  Your Honor, I understand --

A   As to when did we communicate that, --

**MS. WILLIAMS:** I --

A    -- we communicated that a week after.

THE COURT: All right. So go ahead.

**MS. WILLIAMS:** Okay. I understand you made your ruling, Your Honor, but for the record I want to object as nonresponsive to everything before we communicated that the week after because my question was when.

THE COURT: I understand. But I'm going to overrule it and let it come in. So --

**MS. WILLIAMS:** Okay.

THE COURT: -- you can follow that up.

**MS. WILLIAMS:** All right. Okay.

**BY MS. WILLIAMS:**

Q    Mr. Zutter, that was a lot. So you just referred to Mr. Skochdopole, who's outside counsel for Dundon Capital Partners, correct?

A    Correct.

Q    You referred to him doing an analysis of governing or other corporate docs of AAF.

A    Yes.

Q    And that's after Mr. Ebersol signed the term sheet, correct?

A    Correct.

Q    But the term sheet, as far as you know, was never fully executed, correct?

A    I don't recall whether we signed it one way or the other.

Q    Have you ever seen a fully executed version?

A    No, ma'am.

Q    Okay.  Are there any --

A    I don't recall whether I've seen one.

Q    Okay.  We were looking at the term sheet for quite a while, and you're welcome to go back to it at Exhibit 22 if you'd like, Trustee's Exhibit 22.

     Are there any representations and warranties in the term sheet?

     **(Pause)**

A    I'm not a lawyer to understand what the representation means from a legal term of art.  But I think the fact that you're signing it is itself a representation that you're authorized to sign it.

Q    You -- sorry, finish.

A    So I think that itself is a representation.

Q    You do a lot of deal docs, don't you, Mr. Zutter?

A    I have done some over the course of my career.

Q    Okay.  And you've seen in most deal documents there's a section or provision called representations and warranties, correct?

A    Yes, ma'am.

Q    And it usually lists out very specific what a party is representing and warrantying about its authority, about its

**EXCEPTIONAL REPORTING SERVICES, INC**

control, about things that might be required for that party to take certain actions, correct?

A     Amongst others, yes.

Q     Okay. And I don't need you to have a legal opinion. I know you're not a lawyer. But there's nothing like that in this term sheet that's Trustee's Exhibit 22, is there?

A     The specific ones you just described, no. And that's why there's the definitive documentation that's to be subsequent to this.

Q     But that --

A     That would be the more comprehensive.

Q     -- definitive documentation that DCP was to prepare, correct?

A     Correct.

Q     And you never prepared that, correct?

A     We spent all of our time remediating the misrepresentations in the first document, and also trying to get our hands around what are the actual liabilities of the company and trying to triage that.

We unfortunately never got to the position where we could get to definitive documentation because the company actually needed more money than they represented to us.

When they said 55 to 70 to get through the rest of the year, that was a wrong number. When they gave the revenue numbers, they were off by I believe --

Zutter - Direct / By Ms. Williams 87

THE COURT: So --

A -- $36 million.

THE COURT: So, --

A We never got to that.

THE COURT: -- Mr. Zutter, hold on. Take a breath. She asked a yes or no question. It calls for a yes or no answer. You have very good lawyers that are representing you. They will flesh this out when they have their chance to examine you.

But I'd like you to constrain your answers if they call for a yes or no to answer yes or no.

THE WITNESS: Yes, sir.

THE COURT: She's entitled to do that. She's treating you as an adverse witness. It's completely appropriate under the rules, okay?

THE WITNESS: Yes, sir.

Could you repeat the question, please?

BY MS. WILLIAMS:

Q Dundon Capital Partners never prepared definitive documentation, correct?

A No.

Q Let's look back at Exhibit D-88 in the back of the book. I want to look at the third page of that exhibit, which is the second page of the redlined term sheet.

A Yeah.

Zutter - Direct / By Ms. Williams                88

Q    And I want to look at the closing paragraph.  The original closing paragraph in the draft that AAF sent to you said the initial closing shall occur as soon as practicable upon mutual completion of amending the company's existing governance and investment documents, correct?

A    Correct.

Q    That would have resolved a number of the issues that you stated to me here today were problems, correct?

          MR. HOCKADAY:  Lack of foundation, Your Honor.

          THE COURT:  In what way?

          MR. HOCKADAY:  He's not a lawyer.  She's asking to make a legal interpretation of a term that was struck through that he didn't write or draft.

          THE COURT:  Your response.

          MS. WILLIAMS:  Your Honor, he did the redline.  And he has specifically talked about governing documents needing to be amended, and investment documents needing to be amended, which is the part he struck out of the term sheet draft.

          THE COURT:  Right.  We're not asking for his legal opinion.  He -- it's obvious the gentleman has a great deal of experience in drafting these kind of documents.  So -- yes?

          MR. HOCKADAY:  Oh, I was -- I sat down too soon, Your Honor.  I was waiting for you to finish before I sat down.

          THE COURT:  I was just going to say it's appropriate for you to ask him not in a legal context but factually what

EXCEPTIONAL REPORTING SERVICES, INC

Zutter - Direct / By Ms. Williams            89

happened, so it's overruled.

**BY MS. WILLIAMS:**

Q    Mr. Zutter, the part that you crossed out and the closing provision that would have provided to amend the company's governance and investment documents before the closing would have resolved some of the issues that you've raised here with me today, correct?

A    It could have.

Q    Okay.  And you made the redlines that crossed this out, correct?

A    Yes.

Q    And you changed it to the investor, which is DCP, correct?

A    Correct.

Q    The investor shall provide definitive documentation, correct?

A    Correct.

Q    And you were in charge of when and whether that got done, correct?

A    Yeah.  I do not agree with that.

Q    Okay.  Well, you're the representative of DCP, correct?

A    Correct.

Q    Mr. Ebersol's not a representative of DCP, correct?

A    No.

Q    Could Mr. Ebersol have provided this definitive documentation?

Zutter - Direct / By Ms. Williams                    90

A     Not under this structure, no.

Q     Okay.  And the investor DCP, whether you or anything else on the DCP team, didn't do that definitive documentation, correct?

A     Correct.

Q     And didn't do whatever reps and warranties may have been in there, correct?

A     Correct.

Q     Okay.  The analysis that you're saying Mr. Skochdopole did related to what you're now saying are misrepresentations, is that something that's been produced?

A     I'm not sure what has or has not been produced --

Q     To your knowledge, --

A     -- with respect to that.

Q     -- did anyone at Dundon Capital Partners provide that to Mr. Ebersol or anyone on the AAF team?

A     Absolutely.

Q     They did?

A     Yes.

Q     When?

A     In the week or two following February 14th as we started to work through remediating those issues.

Q     Okay.  They got Mr. Skochdopole's analysis.

A     I'm not sure they got Mr. Skochdopole's analysis but they got the issues that we had to work through that had been the

Zutter - Direct / By Ms. Williams                    91

problems that I was describing earlier.

Q    Okay.  Well let's --

        THE COURT:  Forgive me.

        MS. WILLIAMS:  Yes.

        THE COURT:  When you refer to "they," who do you mean by "they?"

        THE WITNESS:  We provided the what we called the gap analysis in terms of the documentation and consummation of the transaction, we provided that to Charlie and his team.  And I believe that they also brought in Dawn Belts from AAF's outside counsel as well.

        THE COURT:  All right.  Thank you.  I just need to know what "they" stood for.  Thank you.

        Go ahead.

        MS. WILLIAMS:  Okay.

BY MS. WILLIAMS:

Q    The governance and investment document issues that you're discussing, those were ultimately resolved on February 24th, 2019, correct?

A    Not all of them, no.

Q    Which ones are not resolved?

A    MGM never subordinated their position.  And the Pottruck loan remained an issue to the best of my knowledge.

Q    (Inaudible)

A    The shareholder vote did.  The board resolutions did.  And

Zutter - Direct / By Ms. Williams                92

the Reggie Fowler waiver did. And release. I'm not sure

waiver's the right term but the release.

Q    All right. You were here in the courtroom, I believe,

when Mr. Ebersol testified that the deal was for an investment

of $250 million and that that number was at Mr. Dundon's

suggestion; were you here for that?

A    I heard him come up with that story many times.

Q    Well you heard him testify to it under oath in court here,

correct?

A    Yes.

Q    Okay. You've said that --

A    I heard him perjure himself with respect --

        **THE COURT:** Whoa, stop!

A    -- to that, too.

        **THE COURT:** Okay. I don't need you to inject what

your impressions are of his testimony. Your job as the witness

is to answer her questions.

        The fact that you disagree with what Mr. Ebersol

said, that's fine. But don't inject that type of stuff in,

okay?

        **THE WITNESS:** Okay.

**BY MS. WILLIAMS:**

Q    Mr. Zutter, you said before that $250 million was never

discussed prior to the transaction in any way whatsoever; do

you remember that?

A     Yes.

Q     Did you say you weren't here on April 24th for Mr. Dundon's testimony?

A     I don't recall whether I was here on the 24th.  I don't believe I was.

Q     Okay.  Are you aware that Mr. Dundon agreed during his testimony on that day that from the very beginning when you first started talking to Mr. Zutter, you and him discussed the possibility that it will require 250 to be put in?

A     I do not recall that.

Q     Okay.  Do you disagree with that?

A     Yes.

Q     So you disagree with Mr. Dundon's testimony.

A     I have not read his testimony and so I can't speak to his specific testimony.

      I disagree with the assertion that I was ever told or I ever had a conversation with Tom that we were investing $250 million.  That flatly never happened.

      **MS. WILLIAMS:**  Okay.  Well, I don't want there to be any confusion about what the testimony was.  So, Mr. Anwar, can you pull up day eight, page 175?

      **(Pause)**

      **THE WITNESS:**  You want me to read this?  This is the right page?

      **MS. WILLIAMS:**  I'm waiting for you to zoom in.

Zutter - Direct / By Ms. Williams                94

**(Ms. Williams/Mr. Anwar confer.)**

**MS. WILLIAMS:** Sorry, Your Honor. I wrote the wrong page down.

**THE COURT:** Okay. So --

**MR. SPEAKER:** Ms. Williams, what date is the trial you're referring to?

**MS. WILLIAMS:** Day eight.

**MR. SPEAKER:** Day eight, thank you.

**MS. WILLIAMS:** Your Honor, day eight, page 177.

**THE COURT:** All right. Could we go to that, please?

**(Pause)**

**THE WITNESS:** You want me to read this page?

**(Pause)**

**MS. WILLIAMS:** Line 19 through 23.

**BY MS. WILLIAMS:**

Q    So the question is, all right, so am I correct that from the very beginning from when you first started talking to Mr. Zutter, you and him discussed the possibility that it will require 250 to be put in. And the answer from Mr. Dundon was yes; do you see that?

A    I see that.

Q    Do you disagree with that?

A    I disagree with your earlier characterization of the conversation.

Q    I literally just quoted this earlier. What did you

**EXCEPTIONAL REPORTING SERVICES, INC**

Zutter - Direct / By Ms. Williams                95

disagree with?

A    My understanding of what you had said earlier was that Tom and I talked about an investment of 250.  This is talking about a capital requirement of a company over a time period.  Those two are distinct.

Q    Okay.  So you don't disagree with what Mr. Dundon said here.

A    Are you asking if I disagree that he said it or --

Q    No.  Do you disagree --

A    -- disagree with the contents?

Q    -- with the answer yes?

A    That the company might need $250 million over a period of time, yes, I agree that it might have needed that.

Q    No.  The question is, from the very beginning, from when you first started talking to Mr. Zutter, you and him discussed the possibility that it will require 250 to be put in.  That's the question.

     Do you agree that when you and Mr. Dundon first started talking about the AAF investment, that you discussed the possibility it will require 250 to be put in?

A    First started talking, I disagree with that statement.

Q    Okay.  Do you agree that Mr. Dundon at some point talked to you about the possibility that it will require 250 to be put in?

A    I agree that over the course of the investment we talked

**EXCEPTIONAL REPORTING SERVICES, INC**

about how the business might need, should it continue to be successful, up to $250 million before it became cashflow generative and positive.

But at no point in time was there a discussion of us investing $250 million under any sort of terms.

Like could we have in the future? Sure. Could we have put a subsequent round in, could other investors? Sure. Did we ever specifically make that investment? No.

Did we talk about making it on the terms of -- conditions that we understood or the business that we understood at that time? Absolutely not.

**MS. WILLIAMS:** Mr. Zutter, I'd really like you to listen to my question because I never used the word investment. And I'm looking at this what's on the board.

Q   Do you agree that you and Mr. Dundon discussed the possibility that it will require 250 to be put in to the AAF?

A   At some point we talked about the needs of the business, yes.

Q   Is that a yes to the it will require 250 to be put in?

A   I disagree that we specifically were talking about 250 as a precise number.

Q   It's okay if the answer is no, Mr. Zutter. I just need --

**THE COURT:** It really --

Q   -- you to actually answer the question.

**THE COURT:** Mr. Zutter, it really only requires a yes

Zutter – Direct / By Ms. Williams                97

or no.  It really does.  So either yes or no.

**BY MS. WILLIAMS:**

A    No.

Q    Okay.  So, no, you don't agree with this.

A    No.

Q    And, no, you don't agree that you and Mr. Dundon ever discussed the possibility it will require 250 to be put in.

A    No.

Q    Okay.  You've also said that the $250 million investment number has no basis in reality, correct?

A    Correct.

Q    And you've also said that the 250 is made up; is that correct?

A    Correct.

Q    You stand by those after hearing the testimony of Mr. Ebersol and reviewing the summaries of the other witnesses that you weren't here for.

A    One hundred percent.

Q    Okay.  So you don't recall ever hearing Mr. Dundon say he committed to invest 250 million.

A    I do recall saying committed.

Q    You do recall him saying he was committed to invest 250 million.

A    Yes.

Q    Okay.  And you think that comports with the idea that 250

Zutter - Direct / By Ms. Williams                98

million is made up and has no basis in reality.

A    Yes.

Q    Okay.  Are you aware that Mr. Dundon approved the statement, committed to invest 250 million, to be made publicly?

A    I'm aware that he approved a public statement that said committed.

Q    Committed to invest 250 million, correct?

A    I don't recall if it said to invest but I recall the word committed.

        MS. WILLIAMS:  Okay.  All right.  Let's look at Trustee's Exhibit 46, which I believe is already admitted, Your Honor.

        THE COURT:  We'll check.  It's been previously admitted.

        When you have Trustee 46, let us know, sir.

    (Pause from 11:19 a.m. to 11:20 a.m.)

        THE WITNESS:  Okay.

BY MS. WILLIAMS:

Q    Before we look at 46, I have one follow-up to what we were discussing earlier.  And I'm sorry to keep asking, but I just want to lay the predicate that, again, you're not aware of any fully executed version of the term sheet, correct?

A    Not aware one way or the other.

Q    Okay.  If the term sheet was not fully executed, Dundon

Zutter - Direct / By Ms. Williams                99

Capital Partners could have walked away, correct?

A    I don't know the legal answer to that question.

Q    Okay.  When you were discovering what you're calling all these misrepresentations and problems, and you're talking to outside counsel, did Dundon Capital Partners ever ask to get out of it or look into whether it could?

A    We talked about that, Tom and I.  And he very specifically wanted to live up to the $70 million commitment that he had put in the term sheet.  And we funded initially and through the weeks.  And, you know, that was a investment that we wanted to support.

Q    Okay.  So even --

A    -- to the best of our abilities.

Q    -- after you became aware of what you're referring to as these various misrepresentations, Dundon Capital Partners made a decision to keep performing, correct?

A    We made the decision to keep performing and work with the team to remediate those misrepresentations.

Q    Okay.  All right.  Let's look back at Exhibit 46.  That should still be in front of you, Trustee's Exhibit 46.

A    Yes, ma'am.

Q    And starting at the top, this is February 19th, 2019, correct?

A    Yeah.

Q    And Mr. Dundon is emailing some folks, including you,

Zutter - Direct / By Ms. Williams                    100

correct?

A     Correct.

Q     And the subject line is:  forward updated release with Jim Murren, correct?

A     Yeah.

Q     Do you know who Jim Murren is?

A     I don't recall.

Q     Okay.  All right.  If we look down at the bottom, I'm still on page one.  The first email in this chain is Megan Hanson sending an email to Mr. Dundon and Mr. Ebersol, correct?

A     Yeah.

Q     And Ms. Hanson was the director of communications at AAF, correct?

A     I believe so.

Q     Okay.  And this is an attachment called TD announcement dot PDF, correct?

A     Looks that way.

Q     Is TD probably Tom Dundon?

A     Stands to reason.

Q     Okay.  And if we look at page two of Trustee's Exhibit 46, this is a draft press release, correct?

A     I don't know if this is the draft or the final but --

Q     But it's a press release.

A     Yes.

Q     Okay.  And the title is:  prominent sports owner and

Zutter - Direct / By Ms. Williams          101

entrepreneur Tom Dundon commits 250 million to the Alliance of American Football, correct?

A    Correct.

Q    And then in -- it's dated February 19th, 2019, correct?

A    Correct.

Q    And then the first paragraph says, the Alliance of American Football today announced that prominent major league sports owner, operator, and entrepreneur Tom Dundon has committed 250 million to the dynamic, newly formed professional football league; is that correct?

A    Correct.

Q    Then in the fourth paragraph, it says, Dundon will serve as chairman of the Alliance board of directors effective immediately, correct?

A    Correct.

Q    All right.  Let's go back to page one.  The email in the middle is from Randall Stephens (sic) at AT and T; do you see that?

A    Yeah.

Q    Do you know Mr. Stephens?

A    It's Stephenson but --

Q    Stephenson, thank you.  You know him then obviously.

A    I know of him.  He was the CEO of AT and T.

Q    Okay.  And he is friends with Mr. Dundon, correct?

A    That's probably a better question for Tom.

Q    Okay.  You don't know.

A    I don't know the nature of --

Q    All right.

A    -- their friendship.

Q    Well, he and Mr. Dundon are emailing at any rate on February 19th, 2019, correct?

A    Correct.

Q    And it looks like Mr. Dundon has sent him the draft release, correct?

A    Correct.

Q    And Mr. Stephenson is commenting, think this is pretty good.  Seems like the intent is twofold.  One, league has received financial endorsement and support.  And, two, the financial endorser is credible and real.  Is that correct?

A    That's what it says, yes.

Q    Okay.  And then Mr. Dundon forwards this to folks including you, correct?

A    Yeah.

Q    And Mr. Dundon doesn't dispute or comment on what's below, correct?

A    No.

Q    He just says, let's add a line on Santander and state I'm investing and will be the majority owner, correct?

A    Correct.

Q    You didn't respond in this chain and disagree with any of

the statements being made in the email or the release, did you?

A    I don't recall whether I replied to this email chain or not.

Q    Okay.  Have you ever seen a reply that you can remember?

A    Specific to this email chain, no.

Q    Okay.  Do you remember telling Megan Hanson or anyone else at AAF, hey, we shouldn't put this press release out?

A    I don't know that I ever spoke with Megan Hanson.

Q    Okay.  Did you tell anyone else at AAF I don't think we should put this press release out, or something's wrong with what's in this press release?

A    No.

Q    Okay.  Let's look at exhibit -- Trustee's Exhibit 35, which has also been previously admitted, I believe.

A    Thirty-five, you said.

Q    Yes.

        **THE COURT:**  (Inaudible) Ms. Flores.  It has previously been admitted.  Go ahead, counsel.

        **MS. WILLIAMS:**  Let me know when you're there.

    **(Pause)**

        **THE WITNESS:**  Okay.

**BY MS. WILLIAMS:**

Q    This is an email from you to Megan Hanson on February 17th, 2019, correct?

A    Looks that way.

**EXCEPTIONAL REPORTING SERVICES, INC**

Zutter - Direct / By Ms. Williams                104

Q    And you're asking Ms. Hanson to please send you the press release draft, correct?

A    Correct.

        **MS. WILLIAMS:**  Let's look at Trustee's Exhibit 276. And this is not yet in evidence, Your Honor, but I would like to offer it.

        **THE COURT:**  Okay.  Have you -- I'll wait to see -- give Mr. Hockaday a chance to look it over.

        **MR. HOCKADAY:**  Thank you, Your Honor.  I believe we previously objected to hearsay, relevance, lacks foundation, Carolina Hurricanes release.

        **THE COURT:**  Okay.

        **MR. HOCKADAY:**  I'm happy to expound on that as needed.

        **THE COURT:**  No.  I think that's enough for right now. If need be, I'll come back to you.

        **MR. HOCKADAY:**  Understood.

        **THE COURT:**  Your response.

        **MS. WILLIAMS:**  Yes, Your Honor.  This is an email from the Carolina Hurricanes which, of course, are owned and controlled by Mr. Dundon.

        It is sent to a number of people, including Mr. Zutter, and specifically asks that audience, including Mr. Zutter, for questions, concerns, or edits to what it states.

And so we have several arguments related to the hearsay argument under 801(d)(2) is that it is made by a party's agent or employee, given that it's Mr. Dundon and the Hurricanes.

It's made by a person who Mr. Dundon authorized to make a statement on the subject.

And by it having been sent to Mr. Zutter asking for comment, his lack thereof under 801(d)(2)(B) is a manifestation of the statements herein.

Alternatively, Your Honor, if not offering it for the truth of what's in here, we would like to offer for the fact that these statements were given to Mr. Zutter, he was asked to comment, and he did not do so.

So for that limited purpose we would alternatively offer it.

I believe as far as foundation and all that goes, Mr. Zutter's testified that this is his email address. And Mr. Sundheim testified regarding generally that the Hurricanes were asked to do these press releases. So I don't think there's a foundation or authentication issue.

**THE COURT:** All right. Your response, please.

**MR. HOCKADAY:** Yes, Your Honor.

So from -- I'll go in reverse order. From the foundation issue, he -- it appears he was -- he received an email.

Zutter - Direct / By Ms. Williams        106

Asking whether or not he responded to an email he hasn't confirmed whether or not he recalls receiving I think does satisfy that.

On the admission by a party opponent, respectfully, the Carolina Hurricanes are a separate entity.  There may be some common linkage between Mr. Dundon but not Mr. Zutter.

So a comment or statement made by the Carolina Hurricanes, especially one to the press, is not one that's imputed on Mr. Zutter.  So it's (inaudible) hearsay.

**THE COURT:**  Okay.  Thank --

**MS. WILLIAMS:**  Your Honor, --

**THE COURT:**  Yes, go ahead.

**MS. WILLIAMS:**  -- if I could just briefly respond.

Mr. Dundon and Mr. Zutter are both Defendants in this proceeding, so regardless of whose admission it is, as the opposing party I can use it with any witness.

**MR. HOCKADAY:**  That's not correct.  It has to be against the actual -- you can use a party opponent's statement against the witness.  He's not the party.  He's not the Carolina Hurricanes.  He's never testified he's worked for the Carolina Hurricanes --

**THE COURT:**  I understand.

**MR. HOCKADAY:**  -- in any capacity.

**THE COURT:**  All right.  So I'm going to allow them for the limited purposes showing that you sent it to -- it was

**EXCEPTIONAL REPORTING SERVICES, INC**

sent to him and he didn't comment.  So it comes in on that basis.

   **(Trustee's Exhibit Number 276 received in evidence)**

        **MS. WILLIAMS:**  Okay.

**BY MS. WILLIAMS:**

Q    All right, Mr. Zutter, let's look at Trustee's Exhibit 726.  This is --

A    Sorry, just give me a second to get there.

Q    Oh, yeah.  I'm sorry.  I didn't realize you weren't there.  276.

A    276?

Q    276.

   **(Indiscernible voice)**

        **MS. WILLIAMS:**  Oh, okay.  You know.

        **THE WITNESS:**  I thought you said 726.  Sorry.

        **MS. WILLIAMS:**  My apologies.  Two seven six.

        **THE WITNESS:**  Got it.  Okay, I'm there.

**BY MS. WILLIAMS:**

Q    Okay.  This is a copy of a Carolina Hurricanes news release sent from Mike Sundheim to a number of people, including you.  Do you see your email address there?

A    On the cc line, correct, yes, I'm there.

Q    Okay.  And this was sent on February 18th, 2019, is that correct?

A    Yes.

Zutter - Direct / By Ms. Williams                108

Q    And the release itself in the headline says Dundon invests in Alliance of American Football, correct?

A    Correct.

Q    And then the first paragraph says,

"The Alliance of American Football today announced that Carolina Hurricanes chief executive officer and owner, Tom Dundon, has invested 250 million in the Alliance of American Football."

Correct?

A    Correct.

MR. HOCKADAY:  Your Honor, I thought we were offering it for notice purposes.  He's going --

THE COURT:  Why are you --

MR. HOCKADAY:  I would object and move to strike every question and testimony now.

MS. WILLIAMS:  Well, Your Honor, I just want to establish that he read it and what it says and then that they asked for comment and then that he did not respond, so I was just setting it up.

THE COURT:  Okay, well I think you just need to ask him that.  The objection is sustained.  Try again.

MS. WILLIAMS:  Okay.  Apologies.

BY MS. WILLIAMS:

Q    This email, Mr. Zutter, says there's a release listed below and then it says please let me know if you have

Zutter - Direct / By Ms. Williams    109

questions, concerns, or edits, correct?

A    Correct.

Q    Did you respond to this email with any questions, concerns, or edits?

A    I do not recall.

Q    As you sit here today, do you know of any document where you did give questions, concerns, or edits to this release?

A    I do not recall.

Q    Okay.  I'd like to look at Trustee's Exhibit 1330.

**MS. WILLIAMS:**  And Your Honor, this is not in evidence and I'd like to offer it but I believe there are objections.

**THE COURT:**  All right.  Mr. Hockaday and the witness to get to there.

**THE WITNESS:**  That one's missing from my binder.

**MS. WILLIAMS:**  We'll put it up on the screen.  It's just two pages.

**(Pause)**

**MR. HOCKADAY:**  Your Honor, I believe we have preexisting objections to foundation and hearsay that we're going to stand on.

**MS. WILLIAMS:**  Your Honor, regarding hearsay, I'm okay with offering this for the limited purpose again of showing that Mr. Zutter was copied on this email and did not respond in any way.

**EXCEPTIONAL REPORTING SERVICES, INC**

Zutter - Direct / By Ms. Williams                110

THE COURT: Counsel?

MR. HOCKADAY: I don't see Mr. Zutter's email on there. There is a reference to all at AAF, but Mr. Zutter testified earlier he wasn't sure whether he got an email address or whether he was left out of it, so I think it's tenuous at best, respectfully.

MS. WILLIAMS: Your Honor, I have an email that will show Mr. Zutter does have an AAF email and I'm happy to go there first if that would help.

THE COURT: It might. Sure, if you want to ask it first.

MS. WILLIAMS: Okay.

BY MS. WILLIAMS:

Q    Let's look at Trustee's Exhibit 840.

MS. WILLIAMS: This is already in evidence I believe.

THE COURT: Yes, it's been previously admitted. You're correct.

MS. WILLIAMS: Okay.

BY MS. WILLIAMS:

Q    Let me know when you're there, Mr. Zutter.

A    I am.

Q    Okay. If we look at Page 2 of Trustee's Exhibit 840, on February 16th, 2019, you say "Can your folks create AAF emails for me, Jeff Vanderbilt, and Tom?" Do you see that?

A    Yep, see it.

Zutter - Direct / By Ms. Williams          111

Q    Okay.  So you're asking that AAF create an AAF email for, among other people, you, correct?

A    Correct.

Q    Okay.  And then if we go to Page 1 of this exhibit, Ms. Gerhart with AAF sends you an email on February 16th, 2019, correct?

A    Correct.

Q    And she gives you temporary login information for jz@aaf.com, among others, right?

A    Correct.

Q    Does this refresh your recollection that you did have an AAF email?

A    No.

Q    It does not?

A    That they set one up but that I ever logged into it; that's the clarification there.

Q    Okay.

A    Did I ever actually have it on my computer?  I don't know.

Q    You asked for it though, right?

A    I did.

Q    Why would you ask for it if you didn't intend to actually check it?

A    Well, I think I intended to, I just don't know that I ever did.

Q    Okay.  But you don't know that you did not, correct?

**EXCEPTIONAL REPORTING SERVICES, INC**

A    I don't know that I did not.

Q    Okay.  So if emails were sent to the whole team at AAF through the all at AAF email, you at least had an email for it to go to, correct?

A    There was an account for it to go to.

Q    Okay.  And you're just not sure when or where you looked at it, is that fair?

A    Yeah, these were temporary logins.  I don't know that I logged in and changed the password.  I don't know that I ever set it up on a computer server.

Q    Okay.

A    I don't know that I didn't, I just -- I don't recall whether I ever actually set up that account.

Q    But as you sit here today, you're not affirmatively telling me you never got an email at jz@aaf.com that you read?

A    No, ma'am

Q    Okay.

         MR. HOCKADAY:  Your Honor, we re-urge our objection, lack of foundation.

         MS. WILLIAMS:  To 1330, correct?

         MR. HOCKADAY:  Yes.

         MS. WILLIAMS:  Okay.

         MR. HOCKADAY:  And then the hearsay objection.

         THE COURT:  Your response?

         MS. WILLIAMS:  And then, Your Honor, we've

established he had an AAF email, that he asked for that AAF email. This all at AAF email would have gone to that. I know that he doesn't have a specific recollection sitting here of actually reading it, but I don't think that that should bar the evidence from coming in, especially since it's not in his interest to have gotten and read this email and not responded.

MR. HOCKADAY: Your Honor, there's no evidence that he actually did. This double negative of there's no evidence he didn't is not sufficient to establish foundation. And I'm going re-urge a relevance objection. What is the relevance of asking whether he saw what was released to the press? I don't understand. Those dots haven't been connected. But there still has not been foundation laid that establishes that he (1) even received this email, (2) much less he can speak to it. And it's object hearsay by definition.

MS. WILLIAMS: Your Honor, I'm happy to respond on relevance. As Mr. Zutter has testified, or if he hasn't I'll get him to say it because I know that he will, that he never heard 250 million used in terms of Mr. Dundon's investment and this email shows that he would have seen headlines and emails within the AAF saying that and having seen something that you believe is not true and not responding is an admission within itself.

But like I said, even if for the limited purpose of showing he had some notice and didn't say anything, I'm fine to

offer it for that limited purpose, but it's certainly relevant to the fact that he's saying 250 million was never used as an investment term ever.  That's just not correct.

MR. HOCKADAY:  Your Honor, may I respond briefly. What she's referring to --

THE COURT:  Go to the mike please, go to the mike.

MR. HOCKADAY:  Oh, I apologize.  Thank you.

What she's referring to are statements made by third party media outlets about investment.  Those are their words. So -- and Mr. Zutter's testimony about never being part of a 250 was in relation to an investment.  He acknowledged earlier when we looked at the press release that was sent to Randall Stephenson that there was a 250 million commitment.  All that was put out but Mr. Dundon testified for three days that that was all marketing.  That was out there, there's no dispute. But Mr. Zutter's testimony is, is that there was no discussion of a $250 million investment.  That is an important distinction here.

THE COURT:  Well, for purposes of this ruling the objection is sustained.  It's not going to come in on that basis.

MS. WILLIAMS:  Okay.

BY MS. WILLIAMS:

Q   Were you here when Mr. Dundon testified -- actually you said you weren't.  In your review of the summary of

Zutter - Direct / By Ms. Williams                     115

Mr. Dundon's testimony, are you aware that Mr. Dundon testified I wasn't trying to tell the truth to the media, I was trying to tell a story?

A    I'm not aware of those words being used.

Q    Okay.  Would you agree that you don't have to tell the truth to the media, that you can just tell them a story?

A    I think that in a marketing construct there is more creative license than in a legal document.

Q    Do you think that when the $250 million commitment was made publicly in press releases and to other folks at the AAF that that wasn't truthful?

A    I'm not sure of the definition of commitment.  In my definition I thought it was truthful.

Q    You think it was truthful?

A    The commitment?  Yes.

Q    Okay.  Did you ever ask Mr. Dundon if he made a $250 million commitment?

A    No.  Oh, excuse me.  Just, I'm sorry, I had a short like distraction.  Can you repeat the question?  I want to make sure I answer it accurately.

Q    Yes.  Did you ever ask Mr. Dundon directly did you make a $250 million commitment to AAF?

A    No, I did not.

Q    And you never documented any $250 million investment from Mr. Dundon or any of his entities for AAF, correct?

A    Certainly not.

Q    Did you ever tell Mr. Ebersol that Mr. Dundon or Dundon Capital Partners was not going to do a $250 million investment?

A    (No audible response)

Q    Did you tell anyone at AAF that Mr. Dundon or Dundon Capital Partners or any Dundon entity was not going to invest 250 million in AAF?

A    No.

Q    You don't have any recollection of Dundon Capital Partners' view of the value of the AAF in February of 2019, do you?

A    I think we were working on valuation analyses.  I'm not sure we came to a definitive view.  But there's a variety of ways you could get to an answer on that but we never had a formal valuation.

Q    Okay.  So my question was do you have any recollection of Dundon Capital Partners' view of the value of the AAF back in February of 2019?

A    February -- February 19th or February of 20 --

Q    February of 2019.

A    I think that our view of value of it at the time would have been that it was worth approximately $70 million, which was out commitment, because without that it would not exist.

        MS. WILLIAMS:  Your Honor, I'd like to play a deposition clip that conflicts with the recollection Mr. Zutter

EXCEPTIONAL REPORTING SERVICES, INC

has just had.

THE COURT: All right. Could you cite it for the record, please.

MS. WILLIAMS: Page 172, Lines 8 through 23.

"Q   Sir, did you have an opinion of what the value of the League was when you invested money in it?

"A   Who's you?

"Q   I'm asking you in an individual capacity and then I'm going follow up right away as a 30(b)(6).

"A   I don't recall whatever the valuation was at the time.

"Q   Okay. As a 30(b)(6) witness, do you know if you had a valuation of what the League was worth?

"A   I don't remember."

BY MS. WILLIAMS:

Q   Mr. Zutter, can you tell me and it sounds like today you have some kind of recollection of $70 million, is that right?

A   Your question a second ago was over 2019, not at the time of the investment, which was a precise point in time, and those are slightly different. But at the exact point in time when we had done the investment, whenever it was, 3:30 on February 14th, I'm not sure that I had a view of the valuation. I think over the course of the weeks that followed, as we learned more information, it was worth the commitment that we were putting in and that's about it.

Q    Okay.

THE COURT:  Are you leaving this subject?

MS. WILLIAMS:  Yes, Your Honor.

THE COURT:  Let's stop now for a lunch break.

MS. WILLIAMS:  Okay.

THE COURT:  Okay, it's 11:43.  Can we do it in an hour?  Come back a little earlier?  All right.  So we'll come back at 12:45.  The courtroom will be open after 12:30.

Ladies and gentlemen, we're in a lunch break and on recess.

(To the Witness):  Sir, you can step down.

THE CLERK:  All rise.

(Lunch recess taken at 11:43 a.m.; reconvened at 12:52 p.m.)

THE COURT:  All right.  Ms. Williams, when you're ready to proceed, you may do so.

MS. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION (CONTINUED)

BY MS. WILLIAMS:

Q    Mr. Zutter, you became a voting director of Ebersol Sports Media Group; is that right?

A    Correct.

Q    And Mr. Dundon was the only other voting director, correct?

A    Correct.

Q    And you were acting as a voting director beginning on February 14th; is that correct?

A    Correct.

Q    Do you agree that you had fiduciary duties or that you were a fiduciary to the AAF from February 14th until the bankruptcy?

A    That was our understanding, yes.

Q    Okay.  Let's look at Trustee's Exhibit 256.

       **MS. WILLIAMS:**  And, Your Honor, I don't believe there are any objections to this and I would like to offer it into evidence.

       **THE COURT:**  I'll allow Mr. Hockaday to look at it.

       **MR. HOCKADAY:**  Thank you, both.

       No objections, Your Honor.

       **THE COURT:**  All right.  And it's -- could you give me the number again, please?

       **MS. WILLIAMS:**  Trustee's Exhibit 256.

       **THE COURT:**  Ms. Flores, would you note that Trustee's 256 is admitted?  Thank you.

       **(Trustee's Exhibit Number 256 received in evidence)**

**BY MS. WILLIAMS:**

Q    Let me know when you're there, Mr. Zutter.

A    Yeah.

Q    This is an email from you to other folks on the DCP team; is that correct?

A    (Indisc.).

Q    And you sent this on February 14th, 2019 at 5:30 p.m. Central Time?

A    Yes.

Q    And it says -- you wrote in here, "Today we signed a deal to take over control of the AAF"; is that correct?

A    Correct.

Q    And you said, "We funded a small equity amount today and have control over the vehicle similar to our structure for EDHC"; is that correct?

A    Correct.

Q    "EDHC" is a reference to Employer Direct Healthcare?

A    Correct.

Q    And was Employer Direct Healthcare a stock deal that then turned into an asset deal?

A    It was not a stock deal that turned into an asset deal, no.

Q    Was it equity?

A    There's a little bit of nuance to it but ultimately it was -- it would classified as an equity deal, yes.

Q    An equity deal that became an asset deal?

A    No.

Q    Oh, it didn't become an asset deal?

A    No.

Q    Okay.  You say a few other things about meeting and then

the last sentence says, "Going to be a ton of work to figure out how to turn that ship but potentially huge payoff"; is that correct?

A    That's what it says, yes.

Q    And when you said, "Turn that ship," you're referring to the AAF, correct?

A    Correct.

Q    Let's look at Trustee's Exhibit 102 --

     **MS. WILLIAMS:**  Which I'd like to offer and, Your Honor, I also believe there are no objections.

     **(Pause)**

          **THE COURT:**  Any objections, Mr. Hockaday?

          **MR. HOCKADAY:**  None, Your Honor.

          **THE COURT:**  All right, thank you.

          Ms. Flores, note that Trustee's 102 is admitted.

     **(Trustee's Exhibit Number 102 received in evidence)**

**BY MS. WILLIAMS:**

Q    Mr. Zutter, if you'll look at the last page, Page 6 --

A    Can I just take a look real quick?

Q    Oh, yeah, absolutely, sorry.

A    Thanks.

     **(Pause)**

          Okay.

Q    All right.  If we look at the last page of Trustee's Exhibit 102, Page 6, this is an email you and I looked at in a

Zutter - Direct / By Ms. Williams                      122

different chain earlier where you were requesting on February 16th, 2019 for Mr. Ebersol to move the date around somewhere that's more accessible for you; is that right?

A    Yes.

Q    Okay.  And then if we look at Page 5 of the same exhibit, Mr. Ebersol responds to you that same night and he says he's adding Alan to manage; is that correct?

A    Yes.

Q    And do you understand that to be a reference to Alan Kantowitz?

A    Correct.

Q    Okay.  And then you respond and say, "Alan, can you add manager and geography to the payroll tab of the model?"; is that correct?

A    Yes.

Q    And then that same night, Mr. Kantowitz responds to you and says, "I just added a detailed census report to the data room"; is that correct?

A    I see that, yes.

Q    Okay.  And if we go to Page 4, you reference being in the document at the bottom and you're asking some questions; is that correct?

A    Yes.

Q    Okay.  And if we go up kind of near the top, still the same night on February 16th, Mr. Kantowitz says, "No problem,

keep them coming, here to answer any questions, working through uploading additional documents tonight and getting answers to your questions on the fly."  Do you see that?

A    Yeah.

Q    Was Mr. Kantowitz, in fact, doing that?

A    I have no reason to think he wasn't.

Q    Okay.  That same night, again, you-all are up late.  You respond and you say, "Can we connect your finance accounting folks along with your auditors on the phone with Jeff tomorrow to do some quality-of-earnings-type work?"; is that correct?

A    Correct.

Q    And Jeff is Mr. Vanderbilt?

A    Correct.

Q    Okay.  And then if we go to Page 3, still the same night, Mr. Kantowitz responds, "Yes and yes, slipping in Kevin Farrell from our side to arrange for that call."  Do you see that?

A    Yes.

Q    Okay.  So Mr. Kantowitz and now Mr. Farrell are working on responding to all of your requests, correct?

A    Yes.

Q    Okay.  If we go to the top of Page 3, the next morning on February 17th, Mr. Farrell says, "Arrived in Dallas.  I'm pulling together some remaining AP detail."  Do you see that?

A    Yes.

Zutter - Direct / By Ms. Williams                    124

Q    Does "AP" mean accounts payable?

A    I believe so.

Q    Okay.  And then there's a little back-and-forth from Mr. Vanderbilt but you start responding again on Page 2 providing some meeting times on February 17th, 2019.  Do you remember that there was a meeting in Dallas where members of AAF came to meet with members of the DCP team?

A    I think the meeting was on Monday.

Q    So the meeting is on February 18th and you're talking about it on the 17th?

A    I think we were planning for the next day.

Q    Okay, that's fair.  And if we look at Page 1, Mr. Kantowitz sends you an email on the evening of February 17th.  Do you see that?

A    Yes.

Q    And it says, "John, please see below for a proposed agenda for tomorrow."  So that would be February 18th, correct?

A    Yes.

Q    And he lists a pretty detailed agenda down here.  Do you see that?

A    Yes.

Q    It includes topics to cover, like, revenue streams, NFL/NFL PA relationship, media deals and go-forward plan.  Do you see that?

A    Yes.

Zutter - Direct / By Ms. Williams                    125

Q    It's going to cover business ops review, topics to cover org chart and head-count review.  Do you see that?

A    Yes.

Q    And then P&L (indisc.) accounting.  Do you see that?

A    Yes.

Q    On the next page, HR and benefits review, is that correct?

A    Yes.

Q    And then technology review, is that correct?

A    Yes.

Q    Was there actually a meeting on February 18th, 2019?

A    Yes.

Q    And were these topics discussed?

A    I believe so.

Q    Okay.  Let's look at Exhibit 278.

          **MS. WILLIAMS:**  And, Your Honor, this was already admitted, I believe, Trustee's Exhibit 278.

          **THE COURT:**  Okay.  I've gotten several affirmative nods.  So, yes, it's been previously admitted.

          **MS. WILLIAMS:**  Okay.

          **THE COURT:**  Go ahead, please.

**BY MS. WILLIAMS:**

Q    Let me know when you're ready, Mr. Zutter.

A    Let me just quickly reread it.

     **(Pause)**

          Okay.

Zutter - Direct / By Ms. Williams                          126

Q    All right.  At the bottom of this, there's an email to you from TD Forwarder.  Do you see that?

A    Yeah.

Q    And it's -- says that's mailed to td@aaf.com.  Do you see that?

A    Yes.

Q    Do you believe that this was set up so that emails that went to Mr. Dundon's AAF address were being automatically forwarded to the Dundon.co address?

     **MR. HOCKADAY:**  Calls for speculation.

     **THE WITNESS:**  I'm not sure.

**BY MS. WILLIAMS:**

Q    Okay.  Are you aware that you had an email --

     **THE COURT:**  No chance to rule but that was the right answer.  So go ahead.

     **MS. WILLIAMS:**  Sorry, Your Honor.

     **THE COURT:**  That's okay.

     **MS. WILLIAMS:**  He said he didn't know.  So --

     **THE COURT:**  Right.

**BY MS. WILLIAMS:**

Q    Are you aware that there are some emails -- and maybe we'll get to one here soon but are you aware that there are some emails that say "JZ Forwarder" on them?

A    I'm not aware of that, no.

Q    Do you have any recollection of whether you had an

**EXCEPTIONAL REPORTING SERVICES, INC**

Zutter - Direct / By Ms. Williams 127

automatic forwarder set up for your AAF email to your Dundon.co email?

A    I do not recall that.

Q    Okay.  All right.  At any rate, you get an email from TD Forwarder mailed to td@aaf.com on February 20th, 2019; is that correct?

A    It looks like it, yes.

Q    And that email is blank and just has a subject that says, "Need to work on incentive to move to Dallas ASAP," is that correct?

A    Yes, I see that.

Q    Is that a reference to looking at whether you can move the AAF's principal place of operations to be Dallas?

A    It could be that or a variety of other aspects of the business.

Q    But all related to the AAF business, correct?

A    All related to the AAF, yes.

Q    Okay.  And then you respond on February 20th, 2019 to TD Forwarder and that would be Tom Dundon, right?

A    Again, I'm -- I don't recall the specifics of TD Forwarder but that makes sense and I --

Q    All right.  Do you have reason to believe it's not Tom Dundon?

A    I have no reason to believe it's not Tom.

Q    Okay.  And you say, "It's top on my list.  I've reached

out to a few folks to connect on Dallas incentives." Did I read that right?

A    Yes.

Q    And then you have a list of other items at the top of mind. Do you see that?

A    (No audible response).

Q    And Point Number 5 says, "FTE" -- does that mean full-time employees?

A    I would normally define that as full-time equivalent employees but that's a slight nuance.

Q    Same -- same rough concept?

A    Yeah, it could include contractors. That's a --

Q    Okay. So you say, "FTE eval cuts, rebill views, Tom V. -- is that Mr. Veit?

A    I believe so.

Q    His main point here -- and he'll be coming back with a restructure proposal Version 2; is that correct?

A    Yes.

Q    And is this referring to you? You'd ask Mr. V. to look at the employees and/or contractors of AAF and figure out who doesn't need to be there, right?

A    Yes.

Q    And possibly also restructuring their salaries or their compensation?

A    I think we were trying to look at it in a broad, fulsome

Zutter - Direct / By Ms. Williams                    129

fashion around the employee base and if there were any changes that needed to be made.

Q   Okay.  And then Number 6 is AP.  Is that accounts payable?

A   Yes.

Q   and you say, "Kevin and Alan, our point here."  Is that Mr. Farrell and Mr. Kantowitz?

A   Yes.

Q   And you say, "We will have" -- or "We'll have a daily tracker starting tomorrow"; is that correct?

A   Correct.

Q   You mentioned earlier that there was some accounts payable that you didn't believe you were made timely aware of.  Which of the vendors were omitted from the accounts payable discussion we just saw happened on February 18th, 2019 and now this tracker we see being referenced on February 20th?

A   There were a variety of things that continued to trickle in over the course of weeks.  So, again, it's limited to one but as the following -- you know, whatever it was, nine weeks or eight weeks progressed, we had that tracker and we kept learning more and more.

     So it's kind of like the left hand and the right hand of the organization weren't talking to each other.  They didn't always have a complete view of what their liabilities or their payables were and so the amount continued to kind of grow over time.

Zutter - Direct / By Ms. Williams                    130

Q    As you sit here today, can you tell me a specific vendor or a specific payable that you weren't made aware of during the discussions during this week that you're taking issue with?

A    Yeah.  I -- as I sit here this week, I recall an email from Alan Kantowitz to the rest of the AAF team, as an example, talking about how there was 8 million due and another 8 million after that and that didn't include CVS which I think was another two and a half.  This was a week or two before we had jointly that were not, to my knowledge, told to us either then or until periods of time later.

Q    Okay.  So I heard CVS identified as a specific vendor. Any others?

A    That were between the 18th and the 20th or the 18th and over the time of the investment horizon?

Q    Between the time you got this tracker right after February 20th and --

A    And --

Q    -- forward.

A    Until time memorial, like until today?

Q    Yes.

A    Okay.  There were additional bills that were unpaid, I believe, with a security vendor.  I think there were bills around -- there were credit card payables that were larger than we thought they were.  Right.  You -- we referenced some of that earlier in terms of pay-down versus payoff but I think

**EXCEPTIONAL REPORTING SERVICES, INC**

there was just substantial quotient of them. There was a variety of other across a handful of different categories.

Q    Okay. And you're saying these weren't on the trackers or discussed at the meetings that you had before this time?

A    Before the 20th?

Q    Yes.

A    There was a host of things that were not before the 20th that were added to the ongoing kind of evolving tracker over the course of the coming weeks.

Q    Okay. Please look at Trustee's Exhibit 912.

        **MS. WILLIAMS:** And, Your Honor, this one is not in evidence but they might have an objection. I'd like to offer it.

        **THE WITNESS:** Ms. Williams, did you say 912?

        **MS. WILLIAMS:** Yes.

        **THE WITNESS:** Sorry, I was looking at 916.

        **MS. WILLIAMS:** 9-1-2.

        **THE WITNESS:** 9-1-2, okay. I'm there.

        **MS. WILLIAMS:** But we're waiting for your counsel. So --

        **MR. HOCKADAY:** Your Honor, we have no objection to this.

        **THE COURT:** Ms. Flores, please note that Trustee's 912 is admitted.

        **(Trustee's Exhibit Number 912 received in evidence)**

**BY MS. WILLIAMS:**

Q    Mr. Zutter, Exhibit 912 is Mr. Farrell sending an email to you and Mr. Vanderbilt on February 21st, 2019, correct?

A    Yes.

Q    And he is providing you and Mr. Vanderbilt with invoices related to player lodging for the months of February and March in one particular geographic area; is that correct?

A    It appears that way.

Q    Okay.  And he's asking you at the bottom of this email,

         "Specifically for in-season lodging, where should I level set with the team at large on additional discounting?  Well, we pay both invoices now in return for an X percent discount.  If a further discount is not made, will we look elsewhere?"; is that correct?

A    I see that, yes.

Q    He's asking you and Mr. Vanderbilt for advice on how to deal with this vendor; is that correct?

A    It looks that way, yes.

Q    Is that something you-all had asked Mr. Farrell and others to do, to work with you to achieve cost savings on vendors?

A    Yes.

Q    Okay.  Please look at Trustee's Exhibit 408 --

         **MS. WILLIAMS:**  Which I'd like to offer and I don't believe there are any objections, Your Honor.

**(Pause)**

THE COURT:  Do you have any objections, Mr. Hockaday?

MR. HOCKADAY:  Oh, none, Your Honor.

THE COURT:  All right.  Ms. Flores, note Trustee's 408 is admitted.

**(Trustee's Exhibit Number 408 received in evidence)**

**BY MS. WILLIAMS:**

Q    Are you there, Mr. Zutter?

A    Yeah, let me just quickly read it.

Q    Okay.

**(Pause)**

This starts in the email for Mr. Dundon's Carolina Hurricanes email on February 22nd, 2019; is that correct?

A    Yes.

Q    And in it, he addresses, "John, I need all the docs.  I need to review, print it and put in folder in conference room for me.  I think Alan has already set some things"; is that correct?

A    I see that, yes.

Q    Is that "John" addressed to you?

A    I don't see who it's addressed to but I have no reason to think it's not to me.

Q    Okay.  And then Mr. Dundon says, "Ready to start going through vendors and employees ASAP"; is that correct?

A    Yes.

Zutter - Direct / By Ms. Williams                    134

Q    And were you and Mr. Dundon getting ready to start doing a deep dive on what to do with specific vendors and specific employees?

A    We were trying to understand what the obligations of the business were so that we could get comfortable around capital allocation and disbursements of monies and before (indisc.) of a budget that everyone had confidence in.

Q    Did you or Mr. Dundon actually start going through what employees would stay on with AAF and which ones weren't?

A    I don't recall which work streams Tom was specifically involved in.  We kind of broke into a bunch of different work streams to divide and conquer.  One of the topics was going through employees.  Others was vendor, others technology, et cetera, et cetera, et cetera.  And so I don't know if Tom was in the employee review on that day.  Although over the course, we certainly talked about employees.

Q    Okay.  And that is something that happened, right, that you actually went through all the employees and all the vendors?

A    We went through a substantial portion of them.

Q    Okay.  So whether it was you or Mr. Dundon or both or someone else on the DCP team, someone on your side actually did that; is that correct?

A    We went through a bunch of the information that was provided to us on those topics, yes.

Q    Okay.  And looked at where cuts could be made, correct?

A    We had conversations with management around different scenarios where cuts would get -- in many cases, cuts were a part of that, yes.

Q    Okay.  And when you say, "management," are you referring to others at AAF?

A    Yes.

Q    Because you and Mr. Dundon are the directors of AAF, the voting ones at this point, correct?

A    Yes.  I'm talking about the management team, the employees of.

Q    Of AAF?

A    Yes.

Q    Okay.  I want you to look at Trustee's Exhibit 936 --

        **MS. WILLIAMS:**  Which I'd also like to offer and I don't think there are objections.

        **THE CLERK:**  What's the number?

        **MR. HOCKADAY:**  936.  No objection, Your Honor.

        **THE COURT:**  All right, thank you.

        Ms. Flores, note that Trustee 936 is admitted.

    **(Trustee's Exhibit Number 936 received in evidence)**

**BY MS. WILLIAMS:**

Q    Are you there, Mr. Zutter?

A    Yeah, I'm almost done reading it.  Okay.

Q    At the bottom on February 23rd of 2019, you send an email

that says, "I'd like to see entity-level financials. Who can show me that? Is that correct?

A     Yes.

Q     And Mr. Kantowitz responds with what they have, correct?

A     Yes.

Q     And then on February 23rd, again, you ask, "Can we get historical expenses by vendor by year"; is that correct?

A     Yes.

Q     And then at the bottom of that email, you say, "This is critical for the restructuring and documentation analysis"; is that correct?

A     Yes.

Q     And you were referring to a restructuring and documentation analysis related to AAF, correct?

A     Yes.

Q     Let's look at Exhibit 950

     **MS. WILLIAMS:** Which I'd like to offer into evidence -- Trustee's Exhibit 950.

     **(Pause)**

     **MR. HOCKADAY:** I don't think I have an issue with the FY big AP here but the other -- the remaining part of it is hearsay. We don't object to hearsay. So I guess no objection.

     **THE COURT:** Run that by me again.

     **MR. HOCKADAY:** I -- my team informed me that we didn't assert an objection. So --

THE COURT:  All right.

MR. SPEAKER:  Authenticity.

MR. HOCKADAY:  -- authenticity.  So I think it's related there.  We've got a *Washington Post* article.  We've got an Infinity Capital -- or Infinite Capital.

MS. WILLIAMS:  If it helps, Your Honor, I don't need the bottom emails from Mr. Brain (phonetic).  I just need the top two.

MR. HOCKADAY:  We'll just stand on the existing authenticity objection that was previously asserted.

MS. WILLIAMS:  My response to that, Your Honor, is that this was actually produced by the DCP parties and it went to Mr. Dundon which he then forwarded to Mr. Zutter and it's hard to understand Mr. Zutter's comment without the context of the emails below which is what he's commenting on.

MR. HOCKADAY:  I agree with that, Your Honor.  I'll withdraw my objection.

THE COURT:  Thank you, sir.

So Trustee's 950 is admitted.

**(Trustee's Exhibit Number 950 received in evidence)**

BY MS. WILLIAMS:

Q    Have you had a chance to read it, Mr. Zutter?

A    Yes, ma'am.

Q    Okay.  I just want to start with the email from Baird Fogel.  Do you see that?

Zutter - Direct / By Ms. Williams                     138

MR. HOCKADAY: Oh, just for a point of clarification, the -- we're just -- it's the top two emails.

THE COURT: I'm sorry. Thank you for the -- you're right. The top two emails, not the bottom.

MS. WILLIAMS: Correct.

MR. HOCKADAY: Understood, thank you. Apologies.

MS. WILLIAMS: And just for clarity for the record, the bottom email is the email from David Brain on February 19th, 2019.

THE COURT: That's correct. That's not being considered. That's not admitted.

MS. WILLIAMS: Okay.

BY MS. WILLIAMS:

Q    So if you'd look at the email above that, Mr. Zutter, from Baird Fogel at Morgan Lewis. Do you see that?

A    Yes.

Q    Are you familiar with Mr. Fogel?

A    Not personally, no.

Q    Were you aware that Morgan Lewis was acting as outside counsel for the AAF at some points?

A    Yes.

Q    Okay. And Mr. Fogel has emailed Mr. Dundon on February 24th, 2019 and he says, "Tom, as you may know, I've had the privilege of leading the Morgan Lewis team in representing the AAF from its earliest days"; is that correct?

EXCEPTIONAL REPORTING SERVICES, INC

A    I see that, yes.

Q    And then he says, "We look forward to working closely with you and continuing our partnership."  Do you see that?

A    Uh-huh.

        THE COURT:  Is that a "Yes"?

        THE WITNESS:  Sorry.  Yes.

        THE COURT:  Thank you.

        Go ahead.

**BY MS. WILLIAMS:**

Q    All right.  And then the top email -- I can't tell how you got on the chain but it looks like you did at some point get this email, correct?

A    It looks that way, yes.

Q    Okay.  And so you respond to Mr. Dundon on February 24th, 2019, correct?

A    Yes.

Q    And you say, "FYI, big AP here"?

A    Yes.

Q    Is "AP" accounts payable?

A    I believe so.

Q    Okay.  And AAF did, in fact, have a large accounts payable with Morgan Lewis; didn't it?

A    That's my recollection.

Q    Okay.

        **MS. WILLIAMS:**  And, Your Honor, I understood last

week you took judicial notice of the claims register.  So I just --

THE COURT:  Yes.

MS. WILLIAMS:  Okay.

THE COURT:  But there's a claims register with the court that I took judicial notice of it.

MS. WILLIAMS:  So I just wanted to note for the record that Number 236 on that claims register is Morgan Lewis' claim which is for 2.7 million.

THE COURT:  I'll take judicial notice of that. There's a filed claim in this case attributable to Morgan Lewis.

BY MS. WILLIAMS:

Q    All right.  I'd like you to look at Trustee's Exhibit 955, Mr. Zutter.

MS. WILLIAMS:  And I don't believe there is an objection.  I'd like to offer it.

MR. HOCKADAY:  No objection, Your Honor.

THE COURT:  All right.  Ms. Flores, please note Trustee's 955 is admitted.

   (Trustee's Exhibit Number 955 received in evidence)

BY MS. WILLIAMS:

Q    Are you ready, Mr. Zutter?

A    Yes, ma'am.

Q    Okay.  This is an email from Mr. Kantowitz to you on

February 25th, 2019, correct?

A    Yes.

Q    And, again, Mr. Kantowitz was an AAF employee, correct?

A    Yes.

Q    And he calls this email "Action Items"; is that right?

A    Yes.

Q    And he addresses it to you.  "John, below is a list of all the balls that are in my court either directly or overseeing along with some updates.  Let me know if you have any questions."  Is that correct?

A    Correct.

Q    And his list here includes a lot of trackers, right?

A    Yes.

Q    And were you, in fact, getting trackers from Mr. Kantowitz?

A    Getting as of this point in time, some of these were things that they were starting to work on and so over time, we would get trackers on a variety of different topics. Obviously, as is described on this document, some of them are things that they are going to start delivering and haven't delivered yet.  So with that clarification, yes.

Q    Okay.  But at some point during the time you were acting as director of AAF, you were getting some of these trackers. You just might not have had all of them on this particular date.

A    And not sure we got all of them that are listed here, too. I'd have to go through and think about each one of them but we did get a variety of trackers with respect to different diligence asks over time.

Q    Okay.  And Number 10 in particular is an AP tracker, correct?

A    Yes.

Q    And that's accounts payable?

A    Yes.

Q    Okay.  He's also, starting at Number 13, providing you -- or at least putting on his list that he's working on certain negotiations; is that correct?

A    Yes.

Q    Is that also something you were getting reports on?

A    Either me or others on my team.

Q    Okay.  And then Mr. Kantowitz says, "Few other one-off emails from Tom I may be working on or need clarity from him but this is most of the key stuff."  Is that right?

A    Yeah.

Q    And "Tom" refers to Mr. Dundon?

A    Yes.

Q    Okay.  So you've given Mr. Kantowitz some things to do and it sounds like Mr. Dundon is also separately giving him extra things to do.  Is that fair?

A    Yeah, he got a lot of things to do that day, it looks

like.

Q    Okay.  If you'll look at Trustee's Exhibit 120.

        MS. WILLIAMS:  I'd like to offer that and I don't believe there are any objections.

        THE COURT:  One moment, please.

    (Pause)

        MR. HOCKADAY:  No objection, Your Honor.

        THE COURT:  All right, thank you, sir.

        Trustee's 120 is admitted, Ms. Flores.

    (Trustee's Exhibit Number 120 received in evidence)

BY MS. WILLIAMS:

Q    Mr. Zutter, that last email we were looking at was February 25th, 2019.  So we're about eleven days in from when --

A    Sorry --

Q    Yeah, sure.

A    -- can I a few minutes just to read the document?

Q    Yeah.  I'm sorry.  I was actually asking about the prior one.

A    Oh, okay.  Then I can hold off on reading it.

Q    The prior one, Trustee's Exhibit 955 is dated February 25th, 2019 and I just wanted to confirm.  You're about eleven days in from making that initial investment, correct?

A    That sounds right, yes.

Q    Okay.  Now please look at Trustee's Exhibit 120.  I

Zutter - Direct / By Ms. Williams                144

apologize.

A    Okay.  No problem.  Give me just a second.

     **(Pause)**

          Okay.

Q    All right.  I'm going to start on Page 3 of this document.
On February 28th, 2019 -- so now we're about two weeks in for
DCP, right?

A    Yes.

Q    And you write, "Does anyone have an inventory of the
          projects that are on the docket right now?  We can
          try to loop in other EDHC analysts depending on the
          project.  We need to understand scope and
          requirements and who is project managing deliver
          this."  Is that right?

A    Correct.

Q    Okay.  And then Mr. Kantowitz replies to you and says that
he'll connect today and that he has a running list; is that
right?

A    Yes.

Q    And then on Page 2 at the bottom, Mr. Kantowitz actually
sends a tracker for all the projects that are being worked on,
correct?

A    Correct.

Q    And then you respond on that same day that you think some
things are missing and you give a list; is that right?

**EXCEPTIONAL REPORTING SERVICES, INC**

A    I see that, yes.

Q    And then on Page 1, Mr. Kantowitz responds to you and says, "Thanks, John.  Several of those are embedded within the descriptions of other items but I'll break them out separately to make more clear and distinct work streams"; is that correct?

A    Yep -- yes.

Q    And then you thank him; is that right?

A    Yes.

Q    And then Mr. Kantowitz replies that same day on February 28th and he says, "I've updated attached."  So he's updated his tracker; is that right?

A    Yes.

Q    And then if we look at Page 7, Pages 7 and 8 primarily are the new tracker, correct, that he sent you?

A    Yes.  I -- I'm not sure 7 and 8 versus what is --

Q    Mine all look blank after that.

A    15 and 16 look similar but they --

Q    I missed it.  You're right.

A    -- look more legible.  I don't know if they're different versions.

Q    My eyes aren't that great.  I think they are different versions of the same document.  So 7 and 8 or 15 and 16 -- does that look right?

A    Yes.

Q    Okay.  So during this February timeframe, you are

Zutter - Direct / By Ms. Williams                    146

directing AAF employees to provide you with various reports and

trackers, correct?

A     Correct.

Q     And then you're getting at least some of these reports and

trackers, correct?

A     Correct.

Q     And that continued after February, correct?

A     Correct.

Q     Okay.  Now, let's look at Trustee's Exhibit 283.

        **MS. WILLIAMS:**  Which I'd like to offer and I don't

believe there are any objections.

        **(Pause)**

        **MR. HOCKADAY:**  No objections, Your Honor.

        **THE COURT:**  All right, thank you, sir.

        Ms. Flores, please note that Trustee's 283 is

admitted.

        **(Trustee's Exhibit Number 283 received in evidence)**

        Go ahead, please.

**BY MS. WILLIAMS:**

Q     Mr. Zutter, you're sending an email on February 28th, 2019

to a Trevor Guthrie (phonetic)?

A     Yes.

Q     Okay.  Who is Trevor Guthrie?

A     I don't recall who Trevor Guthrie is.

Q     And does that omd.com email address look familiar?

Zutter - Direct / By Ms. Williams                    147

A    It doesn't today.  I don't recall who he is.

Q    Okay.  Well, you sent an email to Trevor, whoever he is, and you said, "We bought a controlling stake in the Alliance of American Football a few weeks back"; is that correct?

A    Yes.

Q    Okay.  From February -- you don't need to look at this email anymore.

From February 14th, 2019 forward, DCP was in control of whether and when capital would be injected into the AAF; is that correct?

A    I might put some nuance to it but essentially, yes.  Yes.

Q    Okay.  So you and Mr. Dundon as the board, the voting board members of AAF, had to approve the AAF's request for capital to DCP, correct?

A    Yes.

Q    Okay.  And then DCP, which also has you and Mr. Dundon as fiduciaries, then had to agree to transfer the capital into AAF, correct?

A    Correct.

Q    Okay.  So would you agree with me that you and Mr. Dundon were controlling both requests for capital and disbursements of capital to AAF depending on which hat you were wearing?

A    Not exactly.

Q    Not exactly?  Do you recall saying before that you and Mr. Dundon were controlling requests for capital and

disbursements of capital depending on which hat you were playing?

A    For simplicity, I'll -- the answer is, yes, we had control over both of them.  I know it -- so I'll just answer "Yes" and I'm not supposed to say more.

Q    Okay.  Well, because for the request for capital, you're acting for AAF, correct, making the request?

A    We had -- so requesting -- am I making the request or do I have control over it?

Q    Do you have control over the requests for capital being made for AAF to DCP?

A    Ultimately, yes.

Q    Okay.  And then as DCP, you have control over whether you're going to say "Yes" or "No," correct?

A    Yes.

Q    Okay.  And you and Mr. Dundon also directed the AAF employees work with vendors to renegotiate accounts payable, correct?

A    We worked in collaboration with them to achieve that end, yes.

Q    Okay.  But you're the voting directors, correct?  You can tell them do or don't do this, right?

A    Yes.

Q    Okay.  And so the employees were renegotiating with various vendors at your direction, correct?

A    Yes.

Q    Okay.  And then you were also trying to in some instances maybe not renegotiate but actually settle and get rid of something for a lower cost, correct?

A    Potentially, yes.

Q    Okay.  So let's look at Trustee's Exhibit 107.

        **MS. WILLIAMS:**  Which I'd like to offer and I don't believe there's an objection.

        **(Pause)**

        **MR. HOCKADAY:**  I have no objection to this, Your Honor.

        **THE COURT:**  All right, thank you.

        Trustee's 107 is admitted.

        **(Trustee's Exhibit Number 107 received in evidence)**

**BY MS. WILLIAMS:**

Q    Mr. Zutter, let's start with the February 20th, 2019 email to you from Kevin --

        **THE COURT:**  Hang on.  It's not up on the screen.

        **MS. WILLIAMS:**  Oh, I'm sorry.

        **THE COURT:**  Thank you.

        **MS. WILLIAMS:**  That's his first flaw.

        **MR. ANWAR:**  I feel like I'm having a tough day.

**BY MS. WILLIAMS:**

Q    All right.  Mr. Zutter, at the bottom, there's a February 20th, 2019 email from Mr. Farrell.  Do you see that?

Zutter - Direct / By Ms. Williams                150

A     Yes.

Q     And it attaches an Excel file called, "Cash Flow Week of 2/18/19, Version 2."  Do you see that?

A     Yes.

Q     Do you remember getting cash flow trackers from Mr. Farrell at various times?

A     Periodically.

Q     Okay.  And then it appears that you -- I don't, unfortunately, have the attachment but it appears you've looked at it because then you comment on it in the reply email to him, correct?

A     It looks that way.

Q     Okay.  And you say you want to hold on bill.com, employee reimbursement MediaVise; is that right?

A     That's what it says, yes.

Q     And "Hold on" means don't pay this right now, right?

A     Not necessarily in those words but --

Q     Something similar to that?

A     It means don't pay at this particular moment.  It doesn't mean don't pay.

Q     Right.  Don't pay it right now?

A     Yeah.

Q     Okay.  Is that fair?

A     Yeah.

Q     All right.  And then you say, "I'd like to try for a

discount with the two hotel line items, too"; is that correct?

A    Yes.

Q    Okay.  So you're telling him three things on this cash flow tracker.  You don't want to pay right now and then there's two others that you want to try to work on more of a discount. Is that fair?

A    It seems to be.

Q    Okay.  And that's your direction to Mr. Farrell, correct?

A    Yes.

Q    Okay.  Let's look at Trustee's Exhibit 911.

        **MS. WILLIAMS:**  And I don't believe there's an objection.  I'd like to offer this.

        **MR. HOCKADAY:**  991 or 911?

        **MS. WILLIAMS:**  911.

        **MR. HOCKADAY:**  Okay.

    **(Pause)**

        I have no objection, Your Honor.

        **THE COURT:**  Thank you.

        Trustee's 911 is admitted.

    **(Trustee's Exhibit Number 911 received in evidence)**

**BY MS. WILLIAMS:**

Q    This is an email, Mr. Zutter, from Mr. Farrell to you and Mr. Vanderbilt on February 21st, 2019; is that correct?

A    It seems that way, yes.

Q    Okay.  So we're just about a week out from when DCP put in

Zutter - Direct / By Ms. Williams                    152

the initial funding, correct?

A     Yes.

Q     Or from when funding was put in.  And Mr. Farrell says,
"John, Jeff, seeking your approval for this incremental payment
for this week, not on previous cash flow tracker" and talks
about a certain stadium agreement, correct?

A     Yes.

Q     Okay.  So at this point, Mr. Farrell is seeking you or
Mr. Vanderbilt's approval for a specific expense, correct?

A     It looks that way, yes.

Q     Okay.  Let's look at Trustee's Exhibit 1048.

          **MS. WILLIAMS:**  Which I'd also like to offer.

     **(Pause)**

          **THE COURT:**  Any objection, Mr. Hockaday?

          **MR. HOCKADAY:**  I'm almost done, Your Honor.

          **THE COURT:**  Oh, sure.  I'm sorry.  Take your time.

          **MR. HOCKADAY:**  My apologies.  I was just making sure
I just had my eyes on this.

          **THE COURT:**  Understood.

          **MR. HOCKADAY:**  Thank you.

          I have no objection, Your Honor.

          **THE COURT:**  Would you note -- thank you -- that
Trustee's 1048 is admitted, Ms. Flores?

     **(Trustee's Exhibit Number 1048 received in evidence)**

//

**BY MS. WILLIAMS:**

Q    Let me know when you're ready, Mr. Zutter.

A    Just give me a few seconds.

Q    Sure.

    **(Pause)**

A    Okay.

Q    All right.  If we start at the back at Page 4, there's an email from Mr. Farrell to you and Mr. Vanderbilt on March 5th, 2019.  Do you see that?

A    Yes.

Q    And he says, "Jeff, John, below is the cash bridge for the intended use of the 5 million wire sent today for your review and approval"; is that correct?

A    Yes.

Q    And there's a PDF attachment reference called "Cash bridge, week of 3/4/19," correct?

A    Yes.

Q    Here with all these cash bridge documents were the AAF employees setting forth what the capital disbursement they got from DCP was going to be used to pay?

A    Yeah, essentially it was a budget, a short-term budget for approval, for lack of a better analogy, but I don't remember the specifics of that particular week.

Q    Right.  I was just asking in general that that's what these cash flow bridges were.

Zutter - Direct / By Ms. Williams                 154

A     Yes.

Q     Okay.  And he would send them -- or someone would send them -- Mr. Farrell or someone else to you and Mr. Vanderbilt and ask approval, correct?

A     Or others on our team.

Q     On the DCP team?

A     Yes.

Q     Okay.  And then if we look at 3 -- Page 3 and then it carries over.  You respond on March 5th, 2019 and you ask, "What comprises game-day essentials and why do we need a weather forecasting service"; is that correct?

A     Incidentals, not essentials but --

Q     Oh, I'm sorry.  Incidentals.  Thank you.  Other than that, was it correct?

A     Yeah.

Q     Okay.  And then Mr. Farrell responds and provides an explanation of why they need the weather service and what those incidentals are; is that correct?

A     Yes.

Q     And he said the weather service, in particular, is standard for the NFL to protect players during the games and practices, correct?

A     Yes.

Q     Okay.  And then you respond again on March 5th, 2019 and you say, "What does this do that we can't get from

**EXCEPTIONAL REPORTING SERVICES, INC**

Weather.com"; is that correct?

A    Yes.

Q    And then you say, "On incidentals, need to granular

details and rules," correct?

A    (No audible response).

Q    So you're not approving those yet.  You're asking more

questions.  Is that fair?

A    I'm trying to understand it.

Q    But it's not approved yet, correct?

A    I'm not provided them approval.  I've been asking

clarifying questions.

Q    Okay.  And if we go to Page 2, Mr. Farrell responds to you

again and explains, "The weather system has no lag time and is

          up to the second reporting on lightening alerts.  It

          was an item that Bill Polian insisted we have in

          place for player and coach safety"; is that correct?

A    I can see that, yes.

Q    And then he also provides similar details on the

incidentals; is that correct?

A    Correct.

Q    Do you know who Mr. Bill Polian was?

A    Loosely, yes.  I don't know him personally but --

Q    Okay.  You knew he was a former NFL executive, correct?

A    Yes.

Q    And you understood that the AAF's business plan was to

produce an NFL-caliber product, correct?

A    Yes.

Q    Okay.  And you also understood that the AAF wanted to put itself in a position where it could actually reach an agreement to share players of the NFL, correct?

A    Yes.

Q    All right.  So you respond after this additional explanation on March 5th and you say, "I would think we would

            want to set specific expense rules of what is okay

            and what costs can be and how we think about process

            there and eliminate idea of a budget"; is that

correct?

A    Yes, that is correct.

Q    Okay.  And then Mr. Farrell responds to you and said, "Understood.  We'll call a meeting with Jeff, Jason and the football leagues to set parameters.  Okay to proceed with other items on the bridge?"  Is that correct?

A    Correct.

Q    So before Dundon Capital Partners became involved with the AAF, they had certain expenses that had already been determined like this weather system that Mr. Polian recommended, correct?

A    Yes.

Q    And you disagreed with some of those expenses as we've seen in this email, correct?

A    I think I'm asking clarifying questions.  I'm not sure I

Zutter - Direct / By Ms. Williams                157

affirmatively agreed or disagreed with them.

Q    Well, let's look at Page 1.  On March 5th, you say, "Need to understand sales force, massage therapist, sweatshirts, weather, incidentals.  Rest seem reasonable to JK and I."  Do you see that?

A    I do see it.

Q    Is "JK" Jason Kulas?

A    That's a fair assumption.

Q    Okay.  So in this March 5th email, you're essentially saying, here's five things I need to understand more but the rest seem reasonable which I take as an approval; is that correct?

A    I'm not sure it's an explicit approval but I think it was a qualification.

Q    Okay.  But at least these five things you've listed aren't approved, correct?

A    They were things I wanted to understand more.

Q    And at this point, they're not approved, correct?

A    I think that's fair.

        **THE COURT:**  So just for my edification, Mr. Zutter --

        **THE WITNESS:**  Yes, sir.

        **THE COURT:**  -- when you approved items, was it always done by email or was there any type of verbal approval as well?

        **THE WITNESS:**  Great question.  So we were chatting across the AAF team and the Dundon team, like, countless times

Zutter - Direct / By Ms. Williams                   158

a day and so a number of these would have been, I need to

understand sales force and then -- I'm making this up as a

hypothetical to answer your question rather than a statement of

fact.

But Kevin might have called back and said, hey,

here's how we used sales force.  Here's the use case for it.

Here's why we use it.  And then we'd say, oh, okay, that's

great.  And you wouldn't see that in an email because we had a

verbal conversation around it.

But absolutely we were meeting in person.  We were

meeting over virtual meetings.  We were meeting over the phone

and we were also doing things by email countless times a day.

**THE COURT:**  All right, thank you.

**THE WITNESS:**  Sure.

**BY MS. WILLIAMS:**

Q    All right.  If you'll look at Trustee's Exhibit 84.

A    Yes, ma'am.

**MS. WILLIAMS:**  I'd like to offer this.

**(Pause)**

**MR. HOCKADAY:**  I don't have an objection, Your Honor.

**THE COURT:**  Thank you.  Ms. Flores, would you note

that Trustee's 84 is admitted.

**(Trustee's Exhibit Number 84 received in evidence)**

**MS. WILLIAMS:**  Let me know when you're ready,

Mr. Zutter.

(Pause from 1:42 p.m. to 1:44 p.m.)

THE WITNESS:  Okay.

BY MS. WILLIAMS:

Q    All right.  I'm going to start with the email that begins at the bottom of page three and then goes on to page four.  So this is --

A    The one with Kevin --

Q    Yes.

A    -- at the very bottom.

Q    One from Mr. Farrell to yourself and -- sorry.  It's not to you.  It's from Mr. Farrell to Mr. Vanderbilt and Mr. Kulas on March 15th, 2019; do you see that?

A    Yes, I do.

Q    And it's CF tracker, so that's the cashflow tracker, correct?

A    Uh-huh.

Q    And this one's for the week of March 11th.

A    It seems that way, yes.

Q    Okay.  And you said it to Jeff and Jason, he's including the tracker there, and he gives some details of what's in it, correct?

A    Correct.

Q    All right.  Then if we go back to page three, Mr. Vanderbilt says, plus JZ, so he's adding you to the chain, correct?

A    Looks that way, yes.

Q    Okay.  And then he says, I have a couple of comments. Believe we agreed to hold off on Skycam until we get the contract executed; do you see that?

A    I do.

Q    On the credit card payment, he's asking for detail, correct?

A    Correct.

Q    And then on the 2.7 million of settlements, is that a reference to vendor settlements, do you know?

A    That would be my assumption.

Q    Okay.  And he says, correct me if I'm wrong but none of the settlements are required for football operations this weekend, is that a correct statement; do you see that?

A    Yes.

Q    Okay.  And then Mr. Farrell responds to those on an email that starts at the bottom of page two.  And Mr. Farrell is responding to Mr. Vanderbilt, Mr. Kulas, and now you; is that correct?

A    Yes.

Q    The very bottom of page two he says, payment to Skycam is per negotiated schedule to avoid a one million dollar payment last week.  Skycam is critical to our broadcast with no alternatives.  Is that --

A    I see that, yes.

Zutter - Direct / By Ms. Williams                    161

Q    -- did I read that right?  Okay.  And then on page three,
in response to the question regarding the 2.7 million of
settlements, Mr. Farrell says, SIS security requires a payment
of 322,000 today to provide services this weekend; is that
correct?

A    Yes.

Q    Okay.  He also says at the bottom of his email, for the
remainder will not require for football ops this weekend were
negotiated in good faith and based on immediate payment per our
conversation in Dallas last week walking those conversations
back do have risks; is that correct?

A    I see that.

Q    Okay.  We go back to page two, you respond to Mr. Farrell,
correct?

A    Yes.

Q    And you say, I am not okay with the Fenwick deal as I have
limited interest in an ongoing retainer there; is that what you
said?

A    I see that.

Q    And what are you saying there is that you're not okay with
the deal they negotiated with Fenwick for what was owed?

A    I believe that's what I was saying.  I don't recall the
specifics of my objection to their negotiation at the time.

Q    Okay.  And then you say, I'd target 50 percent or so for
legal settlements; is that correct?

A    Yes, that's what I wrote.

Q    Is that referring to you would target paying 50 percent or less of what was owed to legal vendors?

A    It appears that's what I wrote.

Q    Okay.  And then you said, don't see that as mission critical since we're doing the structuring work ourselves.  Is that a reference to DCP?

A    That is a reference to DCP or any outside counsel that we did as per the term sheet we talked about earlier where it had the investors responsible for definitive documentation.  So that wouldn't necessarily be us writing it.  It could be us hiring outside counsel.

Q    Okay.  So DCO or DCP's outside counsel, --

A    Yeah.

Q    -- correct?  So not counsel for AAF, correct?

A    Yes.

Q    Okay.  And I do want to clarify the outside counsel we were talking about earlier because sometimes we talked about Mr. Skochdopole specifically, but then sometimes we've just said outside counsel.  Did DCP have outside counsel other than Bell Nunnally for the AAF deal?

A    I don't think so.

Q    Okay.  So whenever we're talking about outside counsel, that's going to be Bell Nunnally, right?

A    When it's on behalf of DCP.

Q    Correct.  So, yes, when it's on behalf of DCP; is that correct?

A    Yes.

Q    Okay.

A    To the best of my knowledge.

Q    And so if you didn't want to continue with Fenwick and you wanted to use DCP's outside counsel to do the structuring, that would be dictated by what DCP said they wanted the structuring to be, correct?

A    Yes.

Q    Okay.  All right.  And then on page one of Trustee's Exhibit 84, Mr. Freedman responds and he says -- and he's directing this in particular to Mr. Kulas, per our meeting in Dallas the week before last, we agreed with Tom to negotiate the best deals possible with our vendors so we can put this all behind us.  That's what we've done here.  We'd like your approval to move forward with this payment; do you see that?

A    I see that.

Q    So they've negotiated some deals, they've let you know about them.  You're saying you still don't want to pay them, correct?

A    I'm saying I don't necessarily agree that they've found the best deals possible or that their prioritization is consistent with the framework that we had set forward in terms of how we were thinking about paying off bills and disbursement

monies.

Q   So they don't have approval to pay these settlements they negotiated, correct?

A   Based on this email chain it doesn't look like that.  I don't know if there was a separate email chain around this time that did or did not approve these.

Q   Okay.  And then at the top of this email chain, I believe Mr. Kulas forwards this to you and so you're speaking directly to him because you're the only two at the top email on March 18th, 2019; does that seem fair?

A   Yes.

Q   And you say to Mr. Kulas, spent some time with TD today.  Is that Tom Dundon?

A   Yes.

Q   And then you say, seems pretty consistent with our view.  Pay nothing that doesn't keep the lights on.  Is that what you said?

A   Correct.

Q   Was that your direction to Mr. Kulas?

A   I think it -- I wasn't giving direction to Mr. Kulas so much as I was stating our approach to how we were managing limited resources to try and extend the runway of the business as long as possible.

     And so I don't read that as a directive to Jason rather than a reiteration of an agreed-upon approach to how we were

Zutter - Direct / By Ms. Williams          165

prioritizing.

Q    Okay.  And that's agreed upon by the DCP team, correct?

A    Yes.

Q    Okay.  And then that would be passed on to the AAF team,
for example, Mr. Freedman and Mr. Farrell.

A    Yes.

Q    Okay.  And these determinations of a strategy to pay
nothing that doesn't keep the lights on, that's not related to
what documentation there was or wasn't of these expenses,
correct?

A    Can I clarify one thing from my previous answer, if that's
okay?

Q    Sure.

A    Agreed upon in terms of the prioritization I'd say was
between Tom and myself had agreed on an approach.  As board
members of the company, you know, you have to create a budget.
The budget is going to follow this prioritization.

     We discussed that with the DCP team who was helping to
support the evaluation of each of these things.  So I just want
to distinguish that Tom and I in our capacity as board members
were establishing a framework for prioritizing bills,
evaluating bills.

     The DCP team was there to support the evaluation, some of
the information that was coming in, the diligence as part of
documentation, etcetera.

But the initial establishment of that prioritization approach and why we were going to pay some categories of expenses immediately and others we'd try and negotiate, and others we would think about the next week was made really in the capacity of us board members.

Q    Okay.  But coming from you and Mr. Dundon, correct?

A    Yes.

Q    Okay.

A    That's correct.

Q    But this pay nothing that doesn't keep the lights on strategy that you're referencing in Trustee's Exhibit 84, that wasn't related to whether there was, for example, a signed agreement for that vendor, correct?

A    A signed agreement was not the determinative factor of where something's stacked on the prioritization.  It was around will it keep the games going, will this allow us to extend the runway as long as possible to try and generate as much optionality for success of the league as possible.

Q    Okay.  And also that doesn't keep the lights on standard wasn't related to what documentation you had or didn't have for any particular expense, correct?

A    No.

Q    Okay.

A    Well, let me clarify that, too.  There certainly -- as we went into individual vendor agreements, the nature of their

Zutter - Direct / By Ms. Williams                167

documentation may have informed our judgment of which it -- which kind of bucket of does it really need to be paid this week or can we maybe pay it next week or can we renegotiate it.

So when I just said that the terms didn't inform it, the terms did inform it, but it wasn't solely based on that as some sort of like binary rules framework, if that makes sense.

**MS. WILLIAMS:**  Okay.  That does make sense.

Q    So, for example, I mean Fenwick almost certainly documented what was owed to them, correct, as a law firm?

A    Say that again.  I'm sorry, I didn't hear you.

Q    Fenwick almost certainly documented what was owed to them being a law firm, correct?

A    Yeah.  No reason to think they didn't.

**MS. WILLIAMS:**  Okay.  All right.  I'd like to look at Trustee's Exhibit 1119, which I believe is already in evidence.

**THE COURT:**  I believe you're correct but we'll verify that.

**MS. WILLIAMS:**  Going to keep saying it in case I'm wrong one time.

**THE COURT:**  No, that's fine, we appreciate it.  All right.  That's correct.

**MS. WILLIAMS:**  Let me know when you're ready, Mr. Zutter.

**(Pause from 1:54 p.m. to 1:55 p.m.)**

**THE WITNESS:**  Okay.

EXCEPTIONAL REPORTING SERVICES, INC

MS. WILLIAMS:  All right.

BY MS. WILLIAMS:

Q    It looks like the back emails on page three and four are part of the same chain that we were just looking at with Trustee's Exhibit 84, correct?

A    Certainly on a similar theme.  I don't know if they're the same chain.

Q    Okay.  But on page two it looks like it diverges.  There's an email from Mr. Vanderbilt to you and Mr. Kulas on March 15th, 2019; do you see that?

A    Yes.

Q    And Mr. Vanderbilt says, I'm calculating 2.3 million for amounts that I believe should be paid today, and 2.7 million that we push; is that correct?

THE WITNESS:  I'm sorry.  I think you told me one exhibit and I pulled the wrong one so I read --

MS. WILLIAMS:  Oh.  You should be at --

THE WITNESS:  -- the wrong one.  Could you give me just --

MS. WILLIAMS:  -- 1119.

THE WITNESS:  Yeah.  I just by accident pulled to the --

MS. WILLIAMS:  That's all right.

THE WITNESS:  -- next tab so give me just --

MS. WILLIAMS:  Well why don't you look at 1119 and

Zutter - Direct / By Ms. Williams                    169

we'll start --

        **THE WITNESS:**  Yeah, sorry.  I'd --

        **MS. WILLIAMS:**-- that whole thing over.

        **THE WITNESS:**  -- gone one tab too far, which is why it looked like a different chain to me.  I'm like, I don't know what she's talking about.  Okay.

        **MS. WILLIAMS:**  All right.

**BY MS. WILLIAMS:**

Q    So now that we're looking at the right exhibit, would you agree that three and four are the same chain we were looking at earlier?

A    It appears that way.

Q    Okay.  Then on page two there's an email from Mr. Vanderbilt to you and Mr. Kulas on March 15th, 2019, correct?

A    Correct.

Q    So this was diverging from the chain that the AAF employees were on, correct?

A    Yes.

Q    And Mr. Vanderbilt says, I'm calculating 2.3 million for amounts that I believe should be paid today, and 2.7 million that we'd push; is that correct?

A    I see that, yes.

Q    So he's suggesting that the group agree that 2.3 million could be paid but 2.7 million wouldn't; is that fair?

A     Yes.

Q     And then he ends that email saying, I suspect that the decision to withhold the green lights for payment of settlements is going to result in Charlie contacting TD; is that correct?

A     Yeah.

Q     And TD is Tom Dundon.

A     Yes, ma'am.

Q     And payment of settlements would be a reference to the settlements the AAF employees are negotiating with the vendors, correct?

A     That seems fair.

Q     Okay.  And then if we look on page one, you're responding in this chain again just to Mr. Vanderbilt and Mr. Kulas on March 15th, correct?

A     Yes.

Q     And you ask a question -- I'm looking at number one.  Do we need to pay Skycam?  Seems like there may be different views on that.  Let's be sure.  I was holding this payment hostage until we entered into contract.  Was that what you wrote?

A     I'm -- the reason my hesitation is the different colors often is would be a --

Q     You're correct.

A     -- subsequent email is replying to a question.  So I think I had probably written just the blue, and the black is then a

response that came subsequent to that. So the black pieces there would not be my --

Q    And that's Mr. Vanderbilt, correct?

A    I believe so. Sounds like that's the response comes in the next email.

Q    Yeah, you're right. So you said do we need to pay the Skycam, and Mr. Vanderbilt says, I was holding that payment hostage until we entered into contract. Is that --

A    Yes. That's the --

Q    -- correct?

A    -- clarification I --

Q    Thank you for --

A    -- was trying to make.

Q    -- noticing that for me.

And then at the top, again on March 15th, 2019, you respond to Mr. Vanderbilt and Mr. Kulas. And on number one, talking about the Skycam, you say if we believe they won't turn off Skycam this weekend, I'd prefer not to pay and negotiate from a place of leverage; is that what you said?

A    Correct.

Q    And that's the direction that's going to be given to the AAF employees, correct?

A    I'm not sure what communication came out subsequent to this but it seems reasonable.

Q    Okay. And then you end it with saying, I'm okay to wire

the amount you suggest provided they they -- I think that's just a mistake --

A    Yeah.

Q    -- are not permitted to pay the credit card without us knowing more.  Is that what you wrote?

A    Correct.

Q    And "they" refers in this case to the AAF, correct?

A    Correct.

Q    And us refers to your team, correct?

A    Yes.

        **MS. WILLIAMS:**  Okay.  Let's look at Trustee's Exhibit 423, which I'd like to offer and I do not believe there are objections (inaudible) 423.

        **MR. HOCKADAY:**  No objection, Your Honor.

        **THE COURT:**  All right.  Thank you.  Ms. Flores, would you note that Trustee's 423 is admitted?

   **(Trustee's Exhibit Number 423 received in evidence)**

        **MS. WILLIAMS:**  Let me know when you're ready, Mr. Zutter.

   **(Pause from 2:01 p.m. to 2:02 p.m.)**

        **THE WITNESS:**  Okay.

**BY MS. WILLIAMS:**

Q    Starting at page two, there's an email from Mr. Vanderbilt on March 15th, 2019.  It's addressed to Jason and John.  Is that you and Mr. Kulas?

Zutter - Direct / By Ms. Williams          173

A    I can't see who the to is but it -- I would suspect so,
yes.

Q    Okay.  If you look at the email above that, you and
Mr. Kulas are both on that, correct?

A    Correct.

Q    Okay.  And Mr. Vanderbilt says, below is a summary of the
settlements the AAF team has negotiated to date.  They are
pushing that we pay the negotiated amount ASAP as the promise
for timely payment was vital to getting the respective vendors
to agree to a discount.  As you can see, we're averaging a 12
percent discount; is that correct?

A    Correct.

Q    And then at the end he says, wanted to get your thoughts
on moving forward with settling these items; is that right?

A    Correct.

Q    Okay.  And Mr. Dundon responds to you, Mr. Zutter,
Mr. Kulas, and Mr. Ebersol and says, are we better off doing a
legal recap; do you see that?

A    Yes.

Q    Okay.  If we go to page one, you respond and you say in
the second sentence, we've been holding on paying those
balances until we saw what they were for, referring to the
credit card detail, correct?

A    Yes.

Q    And then in the second paragraph you go on to say, most of

Zutter - Direct / By Ms. Williams                    174

the detail looks reasonable on first minute's glance, e.g.,

flights, hotels.  But I think we want to limit the folks with a

corporate card or access to a corporate card and run the vast

majority through Expensify on a reimbursement basis and with

new expense policy.  Think that will give us more control.  Do

you see that?

A    Correct.

Q    Is the "us" referring to you and Mr. Dundon?

A    In this case I would characterize that to mean give us,

meaning the AAF, more control over its expenses.

Q    Okay.  But you're saying it doesn't look like what's on

the credit cards is improper, correct?

A    I think I said most of it at first glance, so with a quick

glance of only the benefit of a few minutes seemed reasonable.

     But the fact that it had taken so long to get and there

was still questions as to, you know, what were the policies,

what were the rules, we wanted to make sure that given there

was limited capital, that we had rules and governance and

process in place so that money was used very wisely, and we

extended the duration of the league as long as possible, and

gave ourselves the best chance of success.

Q    A corporate credit card is billed to the company, correct?

A    Yes.

Q    And so then paid by the company theoretically, correct?

A    Uh-huh.

Q    And what you're suggesting that you switch to where people at AAF don't have a corporate card and they go through Expensify on a reimbursement basis.  That means those employees of AAF would be incurring the expense themselves, correct?

A    They wouldn't incur the expense but they'd have to front the money for it.  The expense is still ultimately the company's as per an expense policy.  But the person has to submit those expenses and then get them reimbursed.

So it's not -- you know, from a tax perspective, it's not a deductible expense the person has.  It's not their liability, you know, per a expense policy between company and its employees.  It's a company's expense but it's a matter of the procedure of how you do it.

And what our experience in earlier stage business is in particular would suggest that, you know, when you have a policy like this, people don't take advantage of it as much.

Whereas if someone has a credit card and you're operating in an environment where there aren't as established rules and there isn't as much kind of maturity, sometimes people take advantage of that.

And we wanted to limit the degree to which someone might inappropriately or outside of expense policies or outside of things that were going to be in the best interest of the business, swiping that card.

**MS. WILLIAMS:** Okay.  Mr. Zutter, I thank you for the

detail but this will go faster if you just answer my question.

Q    But let's use your language. So in the situation you're suggesting, employees would go from, for example, putting their flights and hotels on a company card paid by the company to having to front that money themselves and then submit it to the company and hope the company decides to reimburse it, correct?

A    Well, yes and no. Expensify, with respect to travel, can still be on a corporate card or a corporate account but automatically put rules in place so that the person can't just swipe their card and get a first class seat, for example.

It would actually kind of have some of those policies put in place but still billed to the company. So that's one example.

Another example would be the person's in the airport and there they'd swipe their personal card, then they through Expensify notate that receipt and then, you know, through the next payroll get reimbursed for it.

Q    Right. And part of the more control over that process is then AAF could decide whether or not to actually reimburse those expenses or decide whether they were proper or not, correct?

A    They could compare them against the policy and ensure compliance with the policy.

Q    Okay. And at this time in March 15th, 2019, you're already not paying AP that's due, correct?

A    There is a lot of AP that we're not paying every week, that's correct.

Q    Okay.  And then Mr. Dundon responds to your email and says, get controls in place, correct?

A    Correct.

Q    And then Mr. Ebersol responds to that email to all of you all and says, there are controls in place that are "D" co (phonetic) approved; is that right?

A    I see that, yes.

        MS. WILLIAMS:  Let's look at Trustee's Exhibit 1127, which I believe is admitted.  Let me know when you're ready, Mr. Zutter.

    (Pause)

        MR. HOCKADAY:  Our records indicate that it's in so I have no objection.

        THE COURT:  All right.  Thank you.

        MS. WILLIAMS:  I think we're just waiting on Mr. Zutter.

        THE COURT:  That's -- I appreciate it nonetheless, thank --

        MR. HOCKADAY:  I'm sorry.  I thought (inaudible).

        THE COURT:  No, that's fine.  Thank you nonetheless.

        MS. WILLIAMS:  Your Honor, when I get done with this email, I'm actually at a stopping point if anyone needs a break.

THE COURT: Okay. How much longer do you think you'll have with this witness?

MS. WILLIAMS: I'm about halfway through.

THE COURT: Okay. You -- I apologize in advance but you know I've got to leave about 4:00.

MS. WILLIAMS: Oh, no, absolutely understand, Your Honor.

THE COURT: I bumped into Mr. Salts and Mr. Ebersol's (inaudible) and said, God, you guys -- you look bad, Judge, you look really bad.

(Laughter)

MS. WILLIAMS: I do want you to take care of yourself so --

MR. SPEAKER: (Inaudible) those are the words we used, Your Honor.

(Laughter)

THE COURT: Yeah, no, you're not. No. I just need to get this taken care of because it's hard to see with the -- in any event. So thank you.

MS. WILLIAMS: I know. And I'm trying to move.

THE COURT: I know you are, and that's fine. I just -- we'll take a break after -- just signal to me when you're ready and we'll take a break. And then we'll go until about 3:55 so it gives me a little bit over 30 minutes to get to my doctor appointment.

THE WITNESS:  I'm ready when you are.

MS. WILLIAMS:  All right.

**BY MS. WILLIAMS:**

Q    Let's start on page three of this one.  There's an email from Mr. Vanderbilt on March 18th, 2019.  And it says, so are we all good sending nine million all at one time to Mario and only turn the estimate items green for payment once we have the actual details?  Is that correct?

A    I see that, yes.

Q    And then you respond, do we want to prefund?  Makes me nervous but administratively easier.  We lose control, though.  Do you see that?

A    Yes.

Q    And Mr. Kulas responds, how much have we already prefunded?  Do you see that?

A    Yes.

Q    And the "we" that's being referred to here is Dundon Capital Partners, correct?

A    Yes.

Q    All right.  And then on March 18th, 2019, looking at page two, you respond, we have been avoiding the prefund leaving their cash balance real low; did you write that?

A    Yes.

Q    And the "we" there is referring to Dundon Capital Partners, correct?

A    I think it could apply to Dundon Capital Partners and to Tom and my approval of weekly budgets and how those budgets turned into funding requests.  So it could apply to both.

Q    Okay.  And then when you say their cash balance, you're referring to the AAF, correct?

A    Correct.

Q    I'm sorry, did you say yes?

A    Correct, yes.

Q    Okay.  So with a low cash balance, the AAF wouldn't have money to make payments that hadn't been approved and funded, correct?

A    Correct.

Q    So they -- essentially the AAF had to get that request approved first to have the funds to make a payment, correct?

A    Not necessarily.  Like me to elaborate?

Q    No.  Let me ask a different question.  Were you here on May 29th for Mr. Vanderbilt's testimony?

A    No, ma'am.

Q    Okay.  Let me ask you.  Are you aware that he testified that in the week from March 18th to 23rd, which is the week of this email we're looking at, he said:  "It became clear that it was looking increasingly unlikely that we were going to make it."

A    Am I aware that he said that --

Q    Yes.

A    -- in the room?  I didn't read the transcript so I had the summarization so --

Q    Okay.

A    -- I didn't -- not aware of that specific quote.

Q    Are you aware that around this week of March 18th it became clear that it looked unlikely that the first season was going to be able to be fully funded for $70 million?

A    I think we became kind of gradually increasingly concerned about that over the duration.  So I'm not sure if kind of we hit the point of a high degree of concern this week or the week prior or the week after.  But on or around this time that would be a fair characterization of sentiments.

Q    Okay.  If Mr. Vanderbilt said he told you his conclusion around this time and this week of March 18th, would you have a reason to dispute that?

A    No.

Q    Okay.  And that's even with the cuts, the -- that we've been discussing that were being made, correct?

A    Correct.

Q    And that's with not paying all the accounts payable that were owed, correct?

A    Correct.

Q    Did you tell Mr. Ebersol at this time during this week of March 18th that Dundon Capital Partners wasn't going to be able to fund completion of the first season?

Zutter - Direct / By Ms. Williams                          182

A    I think we were having conversations about whether or not the season could be completed like probably daily.

I mean, we were talking about liquidating and lack thereof and uncertainty as to how much was owed versus what we expected, and revenues being less than expected almost every day.

So can I tell you that Charlie and I spoke about this topic on March 18th?  I can't say that with specificity.

I can say we were talking countless times a week across all the board members, voting and non, about the status, about the risks, about prospects, you know, performance of the business, etcetera.

Q    Did you tell the employees, like Mr. Freedman and Mr. Farrell, who were negotiating with the vendors that you didn't think they were going to make it, they weren't actually going to get paid?

A    I don't recall.

Q    What about the employees who were going to be asked to put things on their own cards to up front the money?

A    I'm not sure we ever actually implemented that policy.  If we had, we would have had to put out a communication in terms of a change in expense management policy to individuals, employees credit cards.  I don't think that ever actually happened.

Q    Okay.  Do you know if you told the AAF employees at this

time on March 18th that it didn't look like it was going to make it?

A    I think we weren't certain.  There's concerns as to viability of the business.  But I don't think there was a communication to employees about that at that point in time, nor was it a certainty.

MS. WILLIAMS:  Okay.  Your Honor, I think I'm at a breaking point.

THE COURT:  All right.  Thank you.

Ladies and gentlemen, it is 2:14.  We'll come back at 2:30 and we'll resume with Mr. Zutter's testimony.  Thank you, ladies and gentlemen.  We're on recess for about 15 minutes.

You can step down, sir.

THE WITNESS:  Thank you.

THE CLERK:  All rise.

**(Recess taken at 2:15 p.m.; reconvened at 2:34 p.m.)**

THE COURT:  Mr. Anwar, did you have --

MR. ANWAR:  I'm just standing to report that Ms. Williams stepped out momentarily but should be back in just a second.

THE COURT:  That's not a problem, sir.  Thank you for letting me know.

MR. LOWENSTEIN:  While she's out, Your Honor, can --

THE COURT:  Yes.

MR. LOWENSTEIN:  -- we take up a minor housekeeping

matter?  I propose D-273 under Rule 107 based on my cross

examination of Ms. Desai.  My understanding is there's no

objection under 107.

        **MR. TREYZON:**  That is correct, Your Honor.  Boris

Treyzon speaking.

        **THE COURT:**  Thank you.  Then it's admitted on that

basis.  Thank you, Mr. Lowenstein.

    **(Defendants' Exhibit Number 273 received in evidence)**

        **MR. LOWENSTEIN:**  Thank you.

        **THE CLERK:**  (Inaudible)

        **MR. LOWENSTEIN:**  D-273.

        **THE COURT:**  Anything else before we get started?

    (No audible response.)

        All right.  Ms. Williams, when you're ready.

        **MS. WILLIAMS:**  Thank you, Your Honor.

                **DIRECT EXAMINATION (CONTINUED)**

**BY MS. WILLIAMS:**

Q    Mr. Zutter, you and Mr. Dundon had discussed bankruptcy as
an option for AAF as early as February, 2019, correct?

A    Correct.

Q    And you also discussed the possibility with Mr. Dundon of
doing an asset purchase deal for AAF as early as February,
2019, correct?

A    Correct.

Q    And that continued to be discussed in March, 2019,

correct?

A    Correct.

Q    How far along did you get in considering doing an asset purchase deal for AAF?

A    Not very.

Q    Not very?

A    No.

Q    There was no draft of an asset purchase agreement for AAF?

A    I'm not aware of a draft of a asset purchase agreement for AAF, no.

        **MS. WILLIAMS:**  All right.  Your Honor, I'd like to mark and offer as Exhibit 1440 the privilege log we received from the Defendants.

        **THE COURT:**  Okay.  And that -- I didn't catch the number, please.

        **MS. WILLIAMS:**  One, four, four, zero.  I'm offering it for rebuttal purposes.

        **(Pause)**

        **MR. SPEAKER:**  Which entry are you referring to?

        **MS. WILLIAMS:**  Page three at the bottom.  There's two March 14th, 2019 entries.

        **(Pause)**

        **MR. HOCKADAY:**  So, Your Honor, (inaudible) yeah, we object to the admission of a privilege log.  First of all, this is a discovery item.  If there was going to be a challenge to a

privilege log, that would have been the time to do it.

Second of all, privilege log isn't evidence of anything.  It's just an assertion of privilege for a particular document.

THE COURT:  Okay.  Your response.

MS. WILLIAMS:  Yes.  And, Your Honor, it might help, if you don't mind, if we put up the entries on the screen. There are two entries in this privilege log showing that Mr. Skochdopole sent to Mr. Zutter a draft asset purchase agreement for AAF on March 14th, 2019.

If Mr. Zutter were agreeing that this existed, I wouldn't be needing to present this.  But this log is evidence that such a document existed.

And it might be privileged, but the issue of whether or not they drafted and had something they were looking at goes directly to a relevant question.

MR. HOCKADAY:  I'm sorry but, Your Honor, may I --

THE COURT:  Of course you may.

MR. HOCKADAY:  -- (inaudible) co-counsel?  Thank you.

So generally speaking (inaudible) tagged on to what I was going to get at earlier is that what we have here are (inaudible) microphone, I'm sorry.

THE COURT:  Yes, please.

MR. HOCKADAY:  It's -- apologies.  It's not actual evidence of anything.  It's a title of something.  And the only

Zutter - Direct / By Ms. Williams                    187

way to rebut it or get into it would be to waive the privilege.

Now, I believe Mr. Zutter's testimony was I don't recall, I don't -- we didn't get very far. And now she's -- Ms. Williams is showing him a privilege log.

I don't know if it's to refresh her recollection. But it's certainly not admissible, and it's not evidence of anything.

**MS. WILLIAMS:** I believe, Your Honor, I not only asked how far along they were, and he said not very, I asked was there a draft, and I think he said, no. But I'm happy to ask it again.

**THE COURT:** All right. But this is a new one on me. It's -- in all sincerity, to introduce a privilege log as a way to, what, refresh his recollection, impeach his testimony?

What's -- I mean, I agree with Mr. Hockaday. Usually you get a privilege log for just so you can keep track of what documents are withheld such that it becomes a battle later, you can say, well, this is why we withheld it, here's the privilege invoked.

But I've not seen it being used, for lack of a better word, as affirmative evidence.

**MS. WILLIAMS:** Well, it shows that a document exists that we didn't get. And like I said, I -- we're not challenging the privilege of the document. But what this does show is that such an agreement existed.

I'm happy to use it to refresh his recollection. And I was considering it rebuttal or impeachment testimony to show that what he just said wasn't correct because I have a draft on this log that shows it went to him.

But, Your Honor, I agree it's a bit unusual that I don't have the document itself. But this is what I have that shows it.

**THE COURT:** Okay. So another evidentiary question. So are -- is this witness being offered right now, is he being offered for -- you said rebuttal purposes. Rebuttal to what?

**MS. WILLIAMS:** (No audible response.)

**THE COURT:** Right? He's an adverse witness. You see my point? He --

**MS. WILLIAMS:** Oh, I do.

**THE COURT:** Yes.

**MS. WILLIAMS:** Impeachment may be more correct --

**THE COURT:** Okay.

**MS. WILLIAMS:** -- of a term, Your Honor. I said both but --

**THE COURT:** I say this with respect, it does matter, rebuttal versus impeachment.

**MS. WILLIAMS:** I understand, Your Honor. He --

**THE COURT:** Okay.

**MS. WILLIAMS:** -- said something I don't believe is true, and I believe the privilege log shows that it's not true.

And, you know, I don't know if he purposely said it or not so impeachment versus refreshing recollection, those are two sides of the same coin.

MR. HOCKADAY: I don't think it's proper impeachment because it's not affirmative fact of that there was an asset purchase agreement. It's a line item from a discovery tool.

It also doesn't prove or establish anything.

But more to the point, where we started was Ms. Williams trying to offer this into evidence. So I'm objecting to its admissibility.

THE COURT: Yeah. I'm not going to admit it into evidence because you're right, it's not evidence.

Now that we've had this long discussion on the record about a document that isn't entered into the record, you can ask him again, are you sure you didn't see an APA or one wasn't drafted. And if the answer is consistent, you move on.

MS. WILLIAMS: Okay.

THE COURT: Okay.

MS. WILLIAMS: Thank you, Your Honor.

BY MS. WILLIAMS:

Q    Mr. Zutter, do you recall that Mr. Skochdopole did draft an AAF asset --

MR. HOCKADAY: Your Honor, we -- oh, thank you.

THE COURT: Yeah. It's all -- go ahead, please.

//

**BY MS. WILLIAMS:**

Q    Mr. Zutter, do you now recall that on or around March 14th, 2019, that Mr. Skochdopole did draft an AAF asset purchase agreement that was sent to you?

A    I don't recall that.  And I don't recall ever being at a point where our view of transaction structure was mature enough to know exactly how we would ultimately document it with any degree of precision.  So I don't recall receiving a draft asset purchase agreement.

Q    If you were going to do an asset purchase agreement, if Mr. Skochdopole at Bell Nunnally, the outside counsel, that would be helping you with that?

A    He could be.

        **MS. WILLIAMS:**  All right.  Let's look at Trustee's Exhibit 274, which I believe has already been admitted.

        **THE COURT:**  (Inaudible) check but I think you're right.

        **MR. HOCKADAY:**  That comports with our understanding, Your Honor.

        **THE COURT:**  Yes.  I'm getting acknowledgment from Ms. Flores.  So it's in evidence, go ahead, please.

        **MS. WILLIAMS:**  Let me know when you're ready, Mr. Zutter.

        **THE WITNESS:**  Two seventy-four?

        **MS. WILLIAMS:**  Yes.

THE WITNESS:  I am ready when you are.

MS. WILLIAMS:  Okay.

BY MS. WILLIAMS:

Q    This is an email from you to Mr. Ebersol, Tom Dundon, and Mr. Kantowitz on February 20th, 2019, correct?

A    Correct.

Q    And you say to them on this date, let's make sure it's clear across the organization that all new contracts have to run through DCP prior to execution; is that correct?

A    That's what it says here, yes.

Q    And when you say the organization, you mean AAF, correct?

A    Yes.  I mean AAF.

Q    And were all new contracts after this running through DCP prior to execution?

A    I'm not sure I can affirmatively say that they were.  Part of the process we were talking about earlier is that we had a set of kind of preexisting payables, straight payables that were there prior to February 13th or 14th.  And we were trying to identify and triage and process that.

We wanted to make sure that in all instances any new obligations that the company took on, we had the means to pay and they were things that we were prioritizing appropriately.

I can't say affirmatively that we ultimately boxed that risk appropriately.

But our objective was to make sure that we only took on

obligations that we were going to pay, that there were things that were going to be most important to the longevity of the league and the success of the league, and that we were separately thinking about the preexisting trade payables that we were trying to figure out where they sat in terms of prioritization.

But did we get all of the contracts through this process? That was certainly our effort. I can't say that it happened with perfect effectiveness.

Q   Okay. But your directive at least to AAF was that the new contracts needed to run through DCP, correct?

A   Yes. So Tom and I as board members were leveraging the DCP (inaudible) team to be able to help in that triaging packaging understanding process as we were kind of concurrently running diligence and triaging, budgeting, and cash management.

And so we were leveraging them to be kind of additional resources to understand all the different pieces that were going on.

So, yes, we gave that directive. Was it disseminated, was it made clear, did they actually all go through that process after? I can't say that they did affirmatively.

I know we said we need to set up a contract governance process. We certainly never put in place a contract management system from a technology perspective.

I'm not sure we ever got to the point where we had fully

documented kind of contract rules across different departments of the organization.

So it was the intent to manage that. But I can't say that there isn't an example of something that came through that we didn't know about.

Q   Okay. So, Mr. Zutter, was that a, yes, that your directive was that the contracts run through DCP, the new ones?

A   Yes to the directive.

**MS. WILLIAMS:** Okay. Let's look at Exhibit 1117, which I'd like to offer, and I don't believe there's an objection.

**(Pause)**

**MR. HOCKADAY:** No objection, Your Honor.

**THE COURT:** Thank you, sir.

Please note, Ms. Flores, that Trustee 1117 is admitted.

**(Trustee's Exhibit Number 1117 received in evidence)**

And, sir, take a look at it and, when you're ready, let us know.

**THE WITNESS:** Thank you, sir. Okay.

**BY MS. WILLIAMS:**

Q   All right. I'm going to start on page two. The email at the bottom is from Mr. Farrell to Mr. Vanderbilt and Mr. Kulas on March 15th, 2019; do you see that?

A   Yes.

Q    And Mr. Farrel's sending these are the proposed deals that need payment this week to close.  So this is another one of those settlement or cashflow trackers, correct?

A    Of one sort or another, yes.

Q    Okay.  And Mr. Vanderbilt responds on March 15th, 2019, says, as discussed yesterday, can you please confirm that these are all deemed to be tier one vendors needed to continue planned operations for the remainder of the season; is that correct?

A    That's correct.

Q    And you were discussing earlier that there was at some point a tier system put in place to decide which vendors would be paid and which ones would not, correct?

A    Yeah.  There was a prioritization approach.

Q    Okay.  If we go to page one, Mr. Farrell responds and said, no, not all are considered tier one based on planned operations.  From our last conversation with Tom, it was to settle all AP by the best deals we could get; is that correct?

A    That's what it says there, yes.

Q    Okay.

        THE COURT:  Well, wait a minute.  She asked if it was correct and you said that's what it says so --

        THE WITNESS:  Oh, I thought she read the sentence, sorry.

        THE COURT:  Okay.  I'm sorry.  So is it correct to

the best of your understanding?

THE WITNESS: We're talking about the first sentence here --

MS. WILLIAMS: Well the second sentence.

THE WITNESS: Can you ask me the second question again?

BY MS. WILLIAMS:

Q It was the directive to settle all AP by the best deals we could get.

A I wasn't -- I'm not sure that I was a party to that conversation with Tom.

The consistent directive that we had, we -- was to identify the things that were required for the payment for services rendered around that upcoming weekend like what was required to keep the lights on, so to speak.

And then for everything else, think about how important it is in their qualitative judgments associated with that. And then to the extent that we could negotiate, we would try and do so, or the team would try and do so.

But our -- again, it was prioritize limited resources towards the execution of the immediate activities and make sure we were paying. For those for the things that were kind of already occurred, run through an assessment of could we negotiate a better deal, could we negotiate --

THE COURT: I appreciate the response. It's really

yes or no.  Is that second sentence to the best of your

understanding accurate?

          **THE WITNESS:**  No, it's not accurate.

          **THE COURT:**  Okay.

          **THE WITNESS:**  Sorry.

          **MS. WILLIAMS:**  Okay.

**BY MS. WILLIAMS:**

Q    So you don't believe that Mr. Dundon told that to

Mr. Farrell.

A    I don't think he said immediately settle all AP.

Q    Okay.  Mr. Farrell says at the end of that email, as we

sort this out, I am holding off on additional dealmaking; is

that what he said?

A    That's what it says here.

Q    Okay.  And then Mr. Vanderbilt forwarded you this email on

March 15th, 2019 and asked you to see below, correct?

A    Yes.

Q    And then you respond also on March 15th, which are needed

for football weekend they shouldn't hold off on the dealmaking;

is that what you wrote?

A    Correct.

Q    Is that your directive to AAF to continue to settle things

that aren't tier one, even if they're not going to be paid

immediately?

A    I think our objective was to try and negotiate the best

Zutter - Direct / By Ms. Williams                197

deals that we could.  It certainly wasn't don't work on things that are not related to this week, work on the other things, too.

But in terms of managing cashflow is manage the immediate thing and then work on the secondary workstream.  So I'm not sure that this email became a directive.

But this is certainly the intention, which is we should be working on all of the AP to try and get to a resolution for all of it.  But what are we going to manage from a cashflow perspective this week?  We're going to manage the tier one items.

Q    Do you understand Mr. Farrell's concern that he's out there negotiating agreements with promises of payment, and that doesn't appear to be what's happening?

**MR. HOCKADAY:**  Well, --

**THE COURT:**  Go ahead.

**MR. HOCKADAY:**  I'm going to object.  I think it definitely calls for speculation.  And I'm going to say it misstates the evidence, too, this idea that Farrell's expressing concerns.  But calls for speculation is the main one.

**MS. WILLIAMS:**  I can rephrase the question, Your Honor.

**THE COURT:**  Right.  Go ahead and rephrase.  Sustained.

**BY MS. WILLIAMS:**

Q    Mr. Zutter, do you understand that there might be a concern with having employees of AAF out there negotiating settlements on the basis that immediate payment's being promised when the employee is aware or suspects that immediate payment may not be forthcoming?

A    I understand the concern as you just described it, yes. I'm not sure that applies entirely to the circumstances here.

Q    Okay.  But you do understand that concern that I just expressed.

A    In that hypothetical, yes.

Q    Okay.  During this time, in March, 2019 specifically, you and Mr. Dundon were operating the AAF in a cash preservation mode; is that fair?

A    I think that's a fair characterization.

Q    And the expenses that you and Mr. Dundon were approving were limited only to mission critical expenses for games; is that fair?

A    I'm not sure that's universally true but that was certainly the priority.

Q    Okay.  Are you aware of previously testifying that the expenses that were being approved were those that were mission critical?

A    Again, that was certainly the intention of what we were doing.  I'm acknowledging that of all the bills paid, there

could have been ones that might not have met that

characterization.  But that was certainly the intention.

**MS. WILLIAMS:**  Okay.  if you'll move to 1116,

Trustee's Exhibit 1116, we'd like to offer this.  And I don't

know if there's an objection.

**(Pause)**

**MR. HOCKADAY:**  No objection, Your Honor.

**THE COURT:**  All right.  Would you note, Ms. Flores,

that 1116 is admitted?

**(Trustee's Exhibit Number 1116 received in evidence)**

Go ahead, ma'am.

**MS. WILLIAMS:**  All right.  Are you ready, Mr. Zutter?

**THE WITNESS:**  Yes, ma'am.

**MS. WILLIAMS:**  Okay.

**BY MS. WILLIAMS:**

Q    We've seen this bottom email before for Mr. Vanderbilt

where he's giving a summary of the settlements that have been

negotiated to date; do you remember that?

A    Yes.

Q    Okay.  And then Mr. Dundon replies, are we better off

doing a legal recap?  Do you see that?

A    Yes, I see it.

Q    And then you respond in this chain, and you say, a

prepackaged BK?  Does that mean bankruptcy?

A    Yes.

Q    Okay.  And then you say, that's kind of how I was headed with the asset deal that leaves assets and obligations behind; did I read that correctly?

A    Yes.

Q    And this is March 15th, 2019, correct?

A    Yes.

Q    Does this refresh your recollection that around March 14th, 2019 there was in fact an asset deal -- an asset purchase agreement draft being discussed?

A    It does not refresh my recollection of an asset --

**MR. HOCKADAY:**  It also misstates the evidence, Your Honor.

**THE COURT:**  In what way?

**MR. HOCKADAY:**  So she's -- she just suggested that there was an asset purchase deal that was being worked on.

This is Mr. Dundon asking conceptually are we better off doing a legal recap.  And then Mr. Zutter saying -- asking him a question and saying, that's kind of where I was headed with that.

This is a discussion.  It's not evidence to refresh --

**THE COURT:**  Okay.

**MR. HOCKADAY:**  -- your recollection.

**THE COURT:**  He doesn't remember anyway.  But I understand why you might want to interpose the objection.

All right. Go ahead, please.

MS. WILLIAMS: Is the objection overruled, Your Honor?

THE COURT: Objection overruled. But I understand the point of it.

MS. WILLIAMS: Okay.

BY MS. WILLIAMS:

Q   Mr. Zutter, in your statement, that's kind of how I was headed with the asset deal that leaves assets and obligations behind. Were you having a conversation with Mr. Dundon prior to this email where an asset deal that left assets and obligations behind came up?

A   We had had numerous conversations over the previous month plus about different structural alternatives for a transaction.

Q   Okay. And so your reference here is saying -- and correct me if I'm wrong, but saying that your idea of this potential asset deal would be similar to a prepackage bankruptcy; is that what you're saying?

A   I think I was using prepackaged bankruptcy as kind of an analogy to a transaction structure where we would go through a restructuring process and identify a set of assets and liabilities that would allow the company to potentially raise capital and be successful in the future and ring-fence those two.

Importantly, this is after we've already stepped into the

transaction. And so we're already, you know, like in this. It isn't about, you know, us getting some and leaving others.

But like we are at this point representing the company and so it's thinking about a multitude of different permutations where we might be able to find an optimal path that maximizes the chance of success for the future.

Q You're --

A This was one of many different structures we thought about.

Q You're representing AF as voting directors. But you're also still representing DCP as fiduciaries, correct?

A We had obligations to both.

Q And you said this conversation started happening before this email, correct? They were ongoing conversations.

A The conversation related to different transaction structures, yes, certainly.

Q Okay. And in fact, in this time, March 15, 2019, there still haven't been any definitive documents, correct?

A No.

Q That was on DCP's plate to have taken care of, correct?

A Correct.

Q Around this -- well, not even around this time. But earlier, beginning pretty shortly after you and Mr. Dundon became the voting directors of the company, you were involved in directing layoffs of AAF employees; isn't that right?

A    As a board member, I think we had a variety of conversations around personnel changes.  Are you talking about before this date?  Sorry, just to clarify --

Q    Yes, before this.

A    -- your question.  Prior to March 15th?

Q    Ignore this date.

MS. WILLIAMS:  You can take this down.

A    Okay.  At various times between the term sheet's execution and the ultimate cessation of operations we had conversations about personnel changes, including letting folks go.

Q    And when you say the execution of the term sheet, you mean when it was signed --

A    February 14th.

Q    -- by Mr. Ebersol, correct?

A    Yeah.  From February 14th through April we had a variety of conversations about personnel decisions.

MS. WILLIAMS:  Okay.  Sorry.  Let me ask.

MS. WILLIAMS:  All right.  Let's look at Trustee's Exhibit 420 which I'd like to offer into evidence.

THE COURT:  Mr. Hockaday, look it over.

(Pause from 2:59 p.m. to 3:00 p.m.)

MR. HOCKADAY:  No objections, Your Honor.

THE COURT:  All right.  Thank you, sir.

Ms. Flores, note that Trustee 420 is admitted.

(Trustee Exhibit Number 420 received in evidence)

**MS. WILLIAMS:** Mr. Zutter, let me know when you're ready.

**THE WITNESS:** I've read the email. There's obviously a lot of attachments. So in the interest of time, I'll --

**MS. WILLIAMS:** Okay.

**THE WITNESS:** -- just focus on this.

**BY MS. WILLIAMS:**

Q    If you'll start on page two with the bottom email, there's an email from Mr. Kantowitz on February 21st, 2019 directed to John. Is that directed to you?

A    I presume. I can't see the to field of the email, but no reason why I would think it's not to me.

Q    Okay. And he's attaching two documents that we're not going to discuss in detail. But he describes them in this first paragraph as column "I" contains our proposed cuts after week five of the season, while column "J" contains the proposed cuts/salary reductions for after the season.

Once you've had a chance to review, we should set up a call to discuss Tom -- and Tom can walk you through everything. Do you see that?

A    I do.

Q    Do you recall you or Mr. Dundon directing Mr. Kantowitz and Mr. Veit to look at what could be done regarding the personnel costs of the AAF?

A    I know that that was a topic we raised, and numerous times

Zutter - Direct / By Ms. Williams          205

it was in one of the original agenda for discussion that we looked at in the morning.

Do I recall this very specific email? Not at the moment.

Q    Okay. But it looks like on February 21st, 2019, Mr. Kantowitz is sending you some proposed cuts for consideration, correct?

A    That sounds fair.

Q    Okay. And then you respond on that same day and you say, no additional opportunity? Is that right?

A    Yes.

Q    Are you referring to is there no additional opportunity for more personnel cuts?

A    Again, I -- as I just said, I don't specifically remember this email. But if I were to hypothesize what I was thinking, it would have been that, right. Is there anything more versus whatever they proposed.

Q    Okay. And then again on February 21st, 2019 Mr. Veit responds to you and says, John, this would represent the deepest cuts without adversely affecting our ability to generate revenue or produce the event at a proper level. Is that what Mr. Veit's telling you?

A    That's what it says here.

MS. WILLIAMS: Okay. Let's look at Exhibit D-99, which will be in the back. And I believe this was already admitted.

Zutter - Direct / By Ms. Williams                206

**THE COURT:** All right. Thank you. Ms. Flores has verified it has been admitted.

**(Pause)**

**MS. WILLIAMS:** And right now we're just going to look at the last page, Mr. Zutter, but feel free to look at whatever you would like before we start.

**THE WITNESS:** I'm just getting to it. Okay.

**BY MS. WILLIAMS:**

Q     These were produced by the Defendants here. And are you aware that these are screenshots from your iPhone of text messages between you and Mr. Ebersol?

A     Looks that way, yes.

Q     Okay. And just to orient us on the iPhone, Mr. Ebersol's are in the gray bubbles on the left and yours are in the blue bubbles on the right, correct?

A     That looks correct.

Q     Okay. So if we're looking on the last page, these are texts from February 16th, 2019 at the bottom; do you see that?

A     Yes.

Q     And you texted Mr. Ebersol, when we meet next, can we talk through how you would take 40 percent or more out of headcount spend? Let's go department by department. Is that what you told Mr. Ebersol?

A     I see that here, yes.

Q     So you're suggesting to Mr. Ebersol in this text that

you'd like to get the employee or FTE, whatever you want to call it, costs down by about 40 percent.

A    No.  I think what I wanted to do is pressure test assumptions and staffing and get a better understanding of how important different expenses that we had -- so this -- I don't think -- I think we -- the text that you just talked about on February 16th at 9:38, I think that's even the day before we all met in the room.

And so I certainly didn't have a very firm opinion that I was -- I knew that we were going to try and figure out how to be efficient with money, and I wanted to get Charlie thinking about different ways that we could try and streamline the expense structure of the business.

Q    Aren't you asking him directly how would you take 40 percent or more out of headcount spend?

A    Yeah.  I'm asking him to think about scenarios where we could be more efficient, and that would be a conversation for discussion.

Q    Okay.  Mr. Zutter, it's just a yes or no question.  Were you asking Mr. Ebersol how he would take 40 percent or more out of headcount spend?

A    Yes.  That's what it says right here.

Q    Okay.  And then Mr. Ebersol responds, yes, I'm working on that list now; is that right?

A    Yes.

Zutter - Direct / By Ms. Williams                    208

Q    And then your response back to him is, great, going to be some tough decisions and conversations, but we have to focus on tomorrow.  Is that what you told him?

A    Yes.

Q    And then Charlie, Mr. Ebersol, responds, sure thing.  The key is cutting to tomorrow without gutting the next day.  Is that what he told you?

A    Yes, that's what he wrote there.

        MS. WILLIAMS:  Okay.  Let's look at Trustee's Exhibit 1071.  And I'd like to offer this into evidence.

    **(Pause)**

        **MR. HOCKADAY:**  No objection.

        **THE COURT:**  Thank you, sir.  Trustee's 1071 is admitted.

    **(Trustee's Exhibit Number 1071 received in evidence)**

        **MS. WILLIAMS:**  Are you ready, Mr. Zutter?

        **THE WITNESS:**  I'm ready, yes.

        **MS. WILLIAMS:**  Okay.

**BY MS. WILLIAMS:**

Q    The bottom email here is from you on March 9th, 2019; is that correct?

A    It appears that way, yes.

Q    And you're addressing it to Charlie and Jason, correct?

A    Yes.

Q    All right.  Are those Mr. Ebersol and Mr. Kulas?

A    Without the to field, can't confirm, but I see no reason why it wouldn't be.

Q    Okay.  And are they the two at the top of the email when you look at the top one?

A    That way.

Q    Okay.

A    I'm sorry to give it that nuance.  When they're produced here, for some reason like the --

Q    Yeah.

A    -- back and forth goes away.  So not trying to be difficult about that.

        **MS. WILLIAMS:**  I understand.

Q    So in your email, you tell Mr. Ebersol and Mr. Kulas, thinking about ways to create cost containment measures and alignment.  Am wondering whether there's an opportunity to broadly restructure compensation in the organization.  Is that what you wrote?

A    Yes.

Q    And then you go on to say, my thought is to do a change in how folks get paid.  If they make a hundred "K" cash today, restructure to 60 or something like that, and give other 40 or even a premium to that if we do a season two either as a stock or as a cash bonus; is that what you wrote?

A    Yes.  It's what's written.

Q    This is a suggestion you're making to Mr. Ebersol and

Mr. Kulas, correct?

A    I'd characterize it purely as brainstorming but it was a idea that I had with respect to thinking about how we compensate people as a way to manage cash and find long-term alignment.

Q    Okay.  And if we take your hypothetical that you put in here of a person who makes a hundred "K" cash and you restructure to 60 and put the other 40 somewhere else, that would be a 40 percent reduction in their original compensation, correct?

A    Not necessarily.

Q    Not necessarily?

A    Yeah.

Q    If you take -- well, let me just ask you a hypothetical outside this email.

Someone makes a hundred thousand cash and you restructure their salary so they get 60,000 cash a year and then the other 40 comes at some point in the future maybe, is that not an immediate 40 percent reduction, even if they have the ability to get some on the backend?

A    It would be an immediate reduction in their cash income for certain.  It doesn't necessarily mean it's a reduction their overall compensation.

Q    Okay.  But then if season two or whatever the other contingency is never happens, then it would be a firmed up 40

Zutter - Direct / By Ms. Williams                211

percent reduction, correct?

A    In that structure, yes.

Q    Okay.  And then you end that email by saying, separately, I'd love to spend some of our time this week going through headcount by team and who we think is necessarily in critical, particularly on the tech side; is that what you wrote?

A    Correct.

Q    You understand that the AAF at the time that you and Mr. Dundon became involved already had media deals that were entered into prior to that time, correct?

A    I'm aware that they had some, yes.

Q    And after you became a director, you looked at those media deals that the AAF had and were determining what could be done with them; is that fair?

A    I'd say we as a board, yes, and Dundon capital, yes.  I'm not sure that I as an individual spend as -- it was an area of focus for me with respect to the media deals themselves.

Q    Did Mr. Dundon ever ask you to look at the media deals and do an analysis of whether they could be changed or renegotiated or something else?

A    I don't recall if he did or didn't ask that question.

        MS. WILLIAMS:  Okay.  Let's look at some emails then. Trustee's Exhibit 390, which I believe is already admitted.

        THE COURT:  It's been admitted, you're correct.

        MS. WILLIAMS:  Let me know when you're ready,

EXCEPTIONAL REPORTING SERVICES, INC

Mr. Zutter.

(Pause from 3:11 p.m. to 3:12 p.m.)

THE WITNESS:  Okay.

BY MS. WILLIAMS:

Q    Does Exhibit 390 refresh your recollection that you were doing an analysis of the existing media deals?

A    I can see that I did.  I don't specifically remember doing that work, though.

Q    Okay.  When you were doing the analysis -- and I will discuss this specifically in a minute -- but did you talk to Mr. Ebersol about these media deals and why the terms were the way they were?

A    I don't recall doing this specific work.

I know over the course of the time that we were all working together, Charlie articulated his perspective around pros and cons of the way in which they had structured their deals.  I'm not sure we always agreed with all of that.

But I know we had conversations as to Charlie's perspective on these media deals.  I don't know whether I talked to him as I was doing this specific review as I don't recall doing this specific review.  But I know thematically we did talk about them.

Q    Okay.  And you're aware that Charlie's Ebersol's father is Dick Ebersol, correct?

A    Yes.  He's made that clear.

Zutter - Direct / By Ms. Williams                     213

Q    And you know who Dick Ebersol is, correct?

A    I really don't have a huge amount of background on him but I've learned about that through this experience.

Q    Okay.  Are you aware that he has a significant amount of experience in dealing with media deals, and specifically network deals?

A    Yes.  We've heard that.

Q    Okay.  But you don't remember talking to either Charlie Ebersol or his dad, Dick Ebersol, who was involved with the AAF about your analysis of these deals.

A    I don't recall who I spoke about this analysis with.  I don't remember doing this analysis.

Q    Okay.  Were you aware of the importance of having the games on networks like CBS and NFL Network?

A    I think we have it -- likely had a different perspective in terms of the optimal way to pursue distribution.  But the importance of distribution of the games we understood the importance of.

Q    Okay.  So is the answer to that, yes, you understood the importance of having the games televised on major networks?

A    We understood the importance of it.  Like how much the importance of it and the relative merits of different structures I think would be a question.  But simple answer yes.

Q    Okay.  So let's look at your analysis.  The first one in the email that starts at the bottom of page one you sent to

Mr. Dundon and Mr. Kulas on February 26th, 2019; is that correct?

A    It looks that way, yes.

Q    And it's called the NFL media deal review.

A    Yes.

Q    Okay.  And you're listing kind of your points about what's in those deal documents.  I assume that you were looking at the deal documents.

A    That's a fair assumption.  Again, I don't remember doing the work.

Q    Okay.  And then on page two of this exhibit you say the bottom line is if you want to force a renegotiation of this, we need to do an asset deal, not assume the contract, and then go back to them and start over; is that what you said?

A    That's what I wrote here.

Q    And when we're talking about an asset deal and then not assuming the contract, is this going back to the prepackaged bankruptcy idea that's referenced in another email we saw?

A    Again, I don't remember doing this work or writing this email specifically.

But I think it stands to reason that this is in the context of how do we think about a transaction structure that's going to allow the business to be successful long-term?  And those two conversations were very likely connected, yes.

Q    And not assume the contract essentially means that in

Zutter - Direct / By Ms. Williams                    215

whatever deal you were considering, that this media deal wouldn't carry over, correct?

A    In a hypothetical transaction structure that could be one of the permutations.

Q    And then your conclusion at the bottom of this email is there doesn't appear to be a great path with this one, correct?

A    It didn't appear that way is what I wrote down there.

Q    Okay.  And then if we go back to Page 1 you send a similar email to Mr. Dundon and Mr. Kulas on the same day, February 26, 2019, and this one's titled CBS Media Deal Review, correct?

A    Yes, I see that.

Q    Okay.  And you list some points and then at the end you say bottom line, same as NFL in terms of how we can force change, correct?

A    Yes.

Q    Let's look at Exhibit 980.

        **MS. WILLIAMS:**  Which I believe is also in evidence already.

        **THE CLERK:**  What's --

        **MS. WILLIAMS:**  Exhibit 980.

    **(Court confers with Clerk)**

        **THE COURT:**  Trustee's 980 has previously been admitted.

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

**BY MS. WILLIAMS:**

Q    Are you ready?

    **(Pause)**

        Let me know when you're ready, Mr. Zutter.

A    One more paragraph.

    **(Pause)**

        I'm ready.

Q    Okay.  On Page 1 of this exhibit Mr. Ebersol forwards you this email on February 26, 2019, correct?

A    Yes.

Q    And the subject line is Vanech Next Steps Privileged and Confidential, is that correct?

A    Yes.

Q    And it says see below from our internal counsel and relates to a lawsuit that's being threatened, correct?

A    Yes.

Q    Okay.  Then you forward this email to Mr. Dundon, I'm at the top of Page 1, on February 26, 2019, is that right?

A    Yes, I did.

Q    And you say to Mr. Dundon -- and Mr. Ebersol's off the chain at this point, correct?

A    Correct.

Q    You say,

        "We can help with cheaper counsel but key question for me is do we want to be involved at all or do we

Zutter - Direct / By Ms. Williams                217

evaluate buying the assets and leaving this liability behind? Not sure if that's possible but want to explore."

Is that what you said to Mr. Dundon?

A    Yeah, this -- you know, we had identified I think that this was another preexisting matter related to the company and so in the context of all the different transaction documentation I think we were trying to figure out what were the right approaches for us to do and, you know --

Q    Mr. Zutter, my question was simply is this what you said to Mr. Dundon?

A    Yes, that's right.

Q    Okay. And this idea of buying the assets and leaving the liability behind, similar to the not assuming the media deals, similar to the prepackaged bankruptcy, those are all similar concepts, correct?

A    There's a variety of different permutations and structures we were considering. Ultimately we didn't land on any of them. But, you know, we were trying to think about all the different opportunities to make sure that we maximized the value of the company in the long term.

Q    And in those scenarios an asset deal where you buy the assets and leave the liability behind, that would be DCP buying that asset, correct?

A    Not necessarily.

Zutter - Direct / By Ms. Williams                  218

Q    Or another Dundon related entity?

A    Not necessarily.

Q    It wouldn't be AAF, would it?

A    You can have a structure where the existing investors are the exact same and you bifurcate the company between some assets and liabilities.  And this is the point I was saying, we were already invested into the business at this point in time so there's a structure you could come up with where you say there are certain liabilities that we don't want on a go forward basis because they're not going to be conducive to raising more capital or being successful in the marketplace and so can you do -- you know, carve the business up with ownership staying exactly the same but it allows one side to be more successful on a go forward basis than the other side.

And so, you know, that doesn't necessarily mean that incremental capital comes from Dundon or doesn't come from Dundon or one goes to one group and one goes to the other.  It could be the exact same ownership structure where you just bifurcate business between here are some things that are problematic and we're going to isolate those and here are things that are, you know, more attractive and that sets that business up for the long term success and the sum of the parts of those two things could be worth more than them combined.

So that would be one of the permutations that we were thinking about in this context.

Zutter - Direct / By Ms. Williams                    219

Q    In the conversations that we've seen where you're referring to these asset deals, you're having those conversations with Mr. Dundon, correct?

A    Yes.

Q    Did you ever make a proposal to Mr. Ebersol that there would be an asset deal that he was involved in dividing other assets along with Dundon Capital Partners or some other Dundon entity?

A    I think the three of us were talking about a variety of different ways for the business to proceed on a daily basis. This certainly wasn't a conversation we were trying to think about in isolation and, you know, the various different permutations, I'm not sure which of those permutations I talked about with Charlie and which ones I didn't.  You know, we were trying to think about every opportunity that we could to make the thing more successful, the most important pieces.  We didn't actually proceed with a separation of the business.  We didn't do an asset transaction.  We were trying to in the course of being diligent and thoughtful and comprehensive think about all the different opportunities that might be out there.

Q    Mr. Zutter, I really wish you would just listen to my question so we can move faster.

        I simply asked if you had talked to Mr. Ebersol about it and I think the first part answered it but now I don't know where we're at.

A    Do you want me to give the first part again?

Q    Let me just ask the question and just get the first part. Do you recall a specific conversation with Mr. Ebersol about an asset deal in which he would emerge on the other side as still being an investor?

A    I don't recall specific conversations but I know we talked about transaction structures regularly.

Q    Okay. Did you ever have a draft of any asset purchase agreement that you shared with Mr. Ebersol?

A    I'm not aware of a draft of an asset purchase agreement, as we talked about earlier, so no.

Q    Shortly after you and Mr. Dundon became involved in the AAF you talked to PwC about engaging them for various considerations of the transaction, is that right?

A    Yes.

       MS. WILLIAMS:  And Your Honor, I am about to switch topics. I'm fine to get part way through it if you want to keep going till 3:55 but I just wanted to let you know I was totally switching topics.

       THE COURT:  That's fine. Thank you. Yes, I'd like to go through to 3:55.

       MS. WILLIAMS:  Okay.

       THE COURT:  And since you took a pause, we'll start at 8:30 tomorrow and go to 5:30 and kind of see where we are. Okay? Because I know you've got to plan witnesses ahead for

both sides I just wanted to kind of point that out.

**BY MS. WILLIAMS:**

Q    And PwC had done work for other Dundon entities and investments, is that right?

A    Yes.

Q    Let's look at Exhibit 169, Trustee's Exhibit 169.

**MS. WILLIAMS:**  Which I'd like to offer into evidence and I believe there is going to be an objection.

**THE COURT:**  I'm sorry, could you repeat that, please? My apologies.

**MS. WILLIAMS:**  I'm sorry.  Trustee's Exhibit 169, which I'd like to offer but I believe there is going to be an objection.

**THE COURT:**  Okay.

**(Pause)**

**MR. HOCKADAY:**  We have no objection, Your Honor.

**THE COURT:**  All right, thank you.

Ms. Flores, note that Trustee 169 is admitted.

**(Trustee's Exhibit Number 169 received in evidence)**

Go ahead, ma'am.

**BY MS. WILLIAMS:**

Q    Are you ready, Mr. Zutter?

A    I am.

Q    Okay.  This is an email between you and Walter Ballard at PwC, is that correct?

A    Yes.

Q    And there are some other people on the chain from PwC, is that right?

A    It looks that way.

Q    And then Mr. Vanderbilt and Mr. Kulas are on here also, correct?

A    Correct.

Q    But there's not anyone who's an employee of AAF on here, correct?

A    There's not anyone who's an employee of AAF, that's true.

Q    And if we look at Page 2 and then kind of going out to the bottom, Mr. Ballard's asking you some questions and asking you to set up a phone call, correct?

A    Yes.

Q    Specifically to talk about AAF's tax documentation, is that correct?

A    Amongst other things I believe, yes.

Q    Okay.  And your statement at the top email on Page 1 of this exhibit to Mr. Ballard and the group is on February 22nd, 2019, "We need due diligence but we think they are probably a mess."  Is that what you wrote?

A    That is what I wrote.

Q    And they refers to whatever the documentation was that AAF might have?

A    Yes, that's correct.

Q    Let's look at Trustee's Exhibit 173, which I believe is already admitted.

Let me know when you're ready, Mr. Zutter.

On February 25th, 2019, this is Mr. Renner who's also with PwC, is that correct?

A    Correct.

Q    And on this date he's sending an email to you, is that correct?

A    Amongst others, yes.

Q    And the others who are copied are either Mr. Vanderbilt, Mr. Kulas, or with PwC, correct?

A    Correct.

Q    So we still don't have any AAF employees on this chain, right?

A    No, just an AAF board member.

Q    Okay.  And he directs it to you, Mr. Renner does, and says, "John, hope you had a good weekend.  Wanted to update you on what we're thinking for next steps as of this morning."

Did I read that correctly?

A    Yes.

Q    And the subject line for this is AAF Acquisition Tax Update, correct?

A    Correct.

Q    And I'm going down to the second to last bullet.  One of the things he identifies as a topic is legal considerations,

which he describes as,

"Legal limitations on transferring assets, contracts,

and identifying liabilities that may be excluded from

the proposed structure is a key open item that will

guide our tax structuring considerations.  Please

keep us posted as more detail on this comes

available."

Is that what Mr. Renner wrote to you?

A    Yes, it is.

Q    And he's asking you to keep PwC posted on this open item, correct?

A    Posted as when detail becomes available.

Q    Okay.  And then the last bullet is Dundon capital commitments and Mr. Renner says to you,

"We're struggling a little to connect the dots on the

250 million number in the press.  Is this in addition

to the $70 million commitment signed a few weeks

ago?"

Is that what he wrote to you?

A    That is what he wrote.

Q    And then he also says they're pulling together a statement of work to provide under the existing general tax consulting engagement letter which will cover a number of the topics we have discussed so far, tax diligence, Section 382, NOL limitation analysis, acquisition tax structure and planning,

Zutter - Direct / By Ms. Williams                225

et cetera.

Do you see that?

A    Yes.

Q    The existing general tax consulting engagement letter he's referring to, is that between DCP and PwC?

A    I'd have to go and refresh.  I don't recall the particulars of that, but it stands to reason.

Q    Okay.  It's not with AAF, right?

A    No.

Q    Okay.  And then the topics he lists here, tax diligence, the limitation analysis, tax structuring for the acquisition, are those all things that you asked PwC to work on on DCP's behalf?

A    Yes, amongst others.

Q    Okay.  Let's look at Trustee Exhibit 290.

MS. WILLIAMS:  Which I'd like to offer.

(Pause)

MR. HOCKADAY:  I think it's hearsay but we don't have an objection if she wants to use it.

THE COURT:  All right.  So we're going to admit it.

(Trustee's Exhibit Number 290 received in evidence)

MS. WILLIAMS:  I won.

(Laughter)

//

//

**BY MS. WILLIAMS:**

Q    All right, Mr. Zutter, are you ready?

A    I am.

Q    This is a Google calendar invite sent to you by Mr. Renner at PwC, correct?

A    It looks that way.

Q    And this one also includes on it other people from PwC, correct?

A    Correct.

Q    And then there are some other folks related to Dundon or dundon.co emails, correct?

A    Correct.

Q    And then Mr. Skochdopole's on here from Bell Nunnally as well, correct?

A    Correct.

Q    Was he involved in the structuring analysis that PwC was doing for DCP?

A    I think I'm not sure that PwC would characterize outside counsel as being involved in their work, but was he involved in this conversation?  It looks that way.

Q    And the subject line for this call is Op Zone AAF DCP, correct?

A    Correct.

Q    Do you recall that one of the things PwC was considering in their analysis for DCP was whether opportunity zone funds

could be used in some way for the AAF?

A    Yes.

Q    Mr. Dundon had an opportunity zone fund already set up, is that correct?

A    He had -- yes.

Q    And was there somewhere in the neighborhood of $200 million in that opportunity zone fund around the early 2019 time period?

A    Order of magnitude, that's about right.

Q    Do you recall if an entity was actually set up in February of 2019 to be a holding entity for the AAF?

A    No, we didn't get there.

Q    Sorry?

A    We didn't get that far.

Q    So you don't recall setting up an entity called AAF League Holdings LLC?

A    If we did, I'm misremembering.  I don't recall setting up that entity, so if we did I don't recall doing that.

Q    Okay.

        **MS. WILLIAMS:**  Your Honor, I have a document that might refresh his recollection on this, but I'll have to mark it as an exhibit.

        **THE COURT:**  Okay.  Make sure you show it to Mr. Hockaday before you present it to the witness.

        **MS. WILLIAMS:**  Yeah, I don't think I have a printed

Zutter - Direct / By Ms. Williams                           228

copy.  Can we email it to you or do you just want to go look at Mr. Anwar's screen, that's fine with me.

**(Background voices heard)**

**MS. WILLIAMS:**  It's a Delaware certified filing that I got yesterday.

**MR. HOCKADAY:**  It's a public filing?

**MS. WILLIAMS:**  Yes, public filing.

**MR. HOCKADAY:**  Okay.  Can I look at it?  Was this part of what was emailed yesterday and part of the Joint Pretrial Order?

**MS. WILLIAMS:**  No, we just got this yesterday.

**MR. HOCKADAY:**  Okay.  May I consult, Judge?

**THE COURT:**  Yes, you may.  Go ahead.

**(Defense counsel consult)**

**MS. WILLIAMS:**  Your Honor, if they'd prefer, instead of me offering it into evidence, for you to take judicial notice of a Delaware public filing, I'm happy to do it that way too.

**MR. HOCKADAY:**  Your Honor, my understanding of how the Local Rules are set up is rule -- FRCP-26 is the disclosure happened to have been made prior to this.  This was something that was known, it was a public filing.  Certainly if it was a public entity that was filed in the 2019 time period.  Because it wasn't part of the disclosure we're going to object to any admissibility of it and then I believe that judicial notice is

limited to the filings in this case, but --

THE COURT: No. No, that's not correct. I can take judicial notice of a filing --

MR. HOCKADAY: Fair enough.

THE COURT: All right, so --

MS. WILLIAMS: Your Honor, I can put this off till tomorrow and discuss it with Mr. Hockaday tonight and see if we can reach an agreement.

THE COURT: That's fine.

MS. WILLIAMS: Okay. Pause. We'll talk --

**(Voices overlap)**

THE COURT: It's hard when you have two people talking at the same time.

**(Voices overlap)**

THE COURT: I understand.

MR. SPEAKER: Thank you.

**BY MS. WILLIAMS:**

Q    Okay. We'll come back to that, Mr. Zutter.

Let's look at Trustee's Exhibit 167.

MS. WILLIAMS: Which I'd like to offer into evidence.

**(Pause)**

MR. HOCKADAY: I don't have any objection to this, Your Honor.

//

//

THE COURT:  Thank you.

Trustee's 167 is admitted.  Thank you.

**(Trustee's Exhibit Number 167 was received in evidence)**

Please continue.

BY MS. WILLIAMS:

Q    Mr. Zutter, have you had a chance to look at this?

A    Briefly, yes.

Q    Okay.  This is a statement of work for PwC to provide services for Project Football, MNA Tax Consulting Services, is that right?

A    It looks that way.

Q    Now, was Project Football the name that you used with PwC to refer to the AAF?

A    I'm not sure we used that name, but they might have set that up as a deal name on their side.  We might have too.  I don't recall that being a deal name, but that doesn't mean it doesn't apply to the situation.

Q    Okay.  This statement of work is referring to work for the AAF structuring though, correct?

A    Yes.  I'm just saying I don't remember using Project Football as the project name.

Q    Okay.  You don't know who made that name up.

A    Yeah.

Q    Got you.  Okay.

If we look at Page 4 of this document, this is signed

by Mr. Ballard for PricewaterhouseCoopers on March 2nd, 2019,
is that correct?

A    Yes.

Q    And that's signed by you on behalf of Dundon Capital
Partners also on March 2nd, 2019, is that correct?

A    Correct.

Q    So the client for PwC in this case is Dundon Capital
Partners, not the AAF, correct?

A    Correct.

Q    If we look back at the front, it says,

      "This statement of work dated March 2nd, 2019, is

      governed by and subject to the provisions of the

      engagement letter dated February 21st, 2019, the

      terms of which are incorporated herein between Dundon

      Capital Partners LLC and PricewaterhouseCoopers LLP."

      Do you see that?

A    Yes, I do.

Q    We were discussing earlier whether the -- in a prior email
there was a reference to an older engagement letter by
Mr. Ballard and I asked if you knew who that was between and
you said you didn't know.  Does this refresh your recollection
that that older letter, slightly older letter is between DCP
and PwC?

A     It doesn't refresh my recollection so much as it -- it
makes sense.  I understand.  It suggests that there is and I

have no reason to refute that there was one.

Q    Okay.  Do you happen to know if a copy of that was ever provided in this case?

A    No idea.

Q    Okay.  Do you have any idea what's covered by that February 21st, 2019, letter?

A    No.

Q    Okay.  Under purpose and scope just underneath that it says,

        "This SOW covers services to be performed in connection with the potential investment in Ebersol Sports Media Group, Inc. or its underlying assets."
        Correct?

A    Yes.

Q    The date of this engagement letter, March 2nd, 2019, that's after you and Mr. Dundon assumed control of the AAF, correct?

A    Inasmuch as we thought we had control, correct.

Q    You were the two voting board members, correct?

A    Yes, for simplicity.

Q    Let's look at Trustee's Exhibit 1019, which has already been admitted I believe.

    **(Pause)**

        Are you ready?

A    Yes, ma'am.

Zutter - Direct / By Ms. Williams                233

Q    Okay.  This is an email chain between you and Mr. Dundon

on March 1st, 2019, is that correct?

A    Yes.

Q    And you are telling Mr. Dundon,

            "We negotiated a 20 percent discount with PwC on

            rates.  Estimate for the structuring work for AAF is

            in the 150k range.  Seeking approval before I

            proceed."

            Is that what you wrote Mr. Dundon?

A    That's what I wrote.

Q    And then he says okay, correct?

A    Yes.

Q    And then the day after this is when you signed the

statement of work that we just looked at as Trustee's

Exhibit 167, correct?

A    Yes.

Q    Do you believe this email was referring to that work?

A    I believe it is.

Q    Okay.  Let's look at Trustee's Exhibit 1032.

        **MS. WILLIAMS:**  And I'd like to offer this into

evidence.

        **(Pause)**

        **MR. HOCKADAY:**  And Your Honor, this is hearsay and I

also question the relevance of it, but -- yeah, I'm going to

object to this.  This is hearsay.

THE COURT: Your response?

MS. WILLIAMS: Your Honor, the parts of the conversation that are from Mr. Zutter are not hearsay, they're admission of a party opponent, and the other parts of the conversation are necessary as context to understand what Mr. Zutter is responding to. And I do actually -- I don't have a copy, but I do have a case cite on that, *United States v. Dixon*, 132 F.3d 192 at Page 199. It's a Fifth Circuit case, 1997. And it essentially says when one side of a conversation is admission of a party opponent the other side of that conversation is context for the side that you're able to use for non-hearsay purposes.

THE COURT: Mr. Hockaday?

MR. HOCKADAY: I can't speak to that case. At least as to the way the Court has proceeded thus far is regardless of whether it is just an isolated communication or a communication amongst others, if it's hearsay it's hearsay and treated as such.

Also I don't understand what the relevance is as to whether or not they got a deal or a 20 percent discount on PwC. I don't think there's any dispute in this case that they retained PwC to evaluate potential scenarios, none of which they actually did. I mean at this point we're just reading documents. So I'm going to object to relevance as well.

MS. WILLIAMS: Happy to respond on relevance, Your

Honor. I feel like there was a relevance objection for the prior exhibit so I'll explain it, because the estimate given for what PwC was going to do ends up being way less than was actually charged to AAF for that and was deemed a contribution by DCP, so that's going to become important later on some other documents.

As to this one in particular, Mr. Zutter is discussing the scope of work with Mr. Ballard and trying to make sure that it specifically includes the opportunity zone analysis and structuring and evaluation of offshore entities, and those are relevant to some of the things we discussed in the summary judgment hearing regarding the motive of DCP and what their plan was with AAF in the structuring.

**MR. HOCKADAY:** If I may respond to that?

**THE COURT:** Yes.

**MR. HOCKADAY:** So first of all, there's not one iota of evidence in this case, in the summary judgment record or anywhere in this case from Mr. Zutter's tax returns. He's not received a material benefit in this case in any which way. I think his testifying to what deal that DCP got on its fees to its public accounting firm that it retained has no bearing on anything in this case. It's not a material benefit. It's not the result of any kind of self-healing or anything that is germane to the actual pending matter in this case.

**THE COURT:** Anything else?

**MS. WILLIAMS:**  Not unless you want me to explain my theory more, Your Honor.

**THE COURT:**  I'll give you a little leeway.  Not too much time.

**MS. WILLIAMS:**  Okay.  So -- and this is going to come up in later documents and I think it came up with Mr. Vanderbilt.  There was a $280,000 invoice sent to DCP that Mr. Vanderbilt created that has no detail, that he has no recollection of where that number came from and how it was calculated.  I've got Mr. Zutter estimating PwC's fees to be way below that.  So the argument and one of the things I'm going to discuss with Mr. Zutter later is what's going into that number and is it the time of people at DCP or other Dundon companies who were loaned to this, is it outside counsel for DCP, like where is this number coming from?  And all of that is charged to AAF as though it was beneficial to them and it wasn't and so that's what it goes to.

**MR. HOCKADAY:**  May I respond to that?  That is the basis for their damages of their breach of written contracts claim that they withdrew or the court found moot after the summary judgment ruling.  It has no relevance to the pending claims in this matter.

**MS. WILLIAMS:**  I don't believe that's correct, Your Honor.  It could go to unjust enrichment of DCP and Mr. Zutter and Mr. Dundon and it could also go to this Court certainly has

the right to find that as damages for other claims, such as breach of fiduciary duty, charging to AAF fees that shouldn't have been.

**MR. HOCKADAY:** Once more, Your Honor. So first of all, none of this is actually a disclosed damages -- I'm sorry, none of that is an actual disclosed damages calculation, so that doesn't answer that.

Second of all, Mr. Zutter is a non-equity partner. He's not a partner. He never got a K-1. He's not a partner in the sense he got any benefit from being at DCP.

So the argument that we just heard doesn't go to any of those things.

**THE COURT:** So your representation about the case has been corroborated by one of my law clerks. Not that I'm suggesting it wouldn't have been otherwise.

**MS. WILLIAMS:** I'm glad it was. That would have been embarrassing.

**THE COURT:** I mean but you realize Mr. Hockaday pointed out that it's his opinion that I've been consistent in not allowing these statements in. If I allow your -- this opportunity for those statements to come in it also benefits them. You understand that. You can't have it both ways.

**MS. WILLIAMS:** I think it's the right ruling, Your Honor.

**THE COURT:** All right. So under the *Dixon* case, what

you said is correct, I can allow it in because it's of a party opponent.

As to relevancy, which is a low threshold, it can come in. I think it goes to a number of theories in this case that I could postulate right now, which I'm not going to.

And finally, the issue about damages, I'm just listening to his testimony, whether or not it is dispositive of damages is something I'll determine later. Okay? The mere fact that I allow it in over an objection doesn't mean I've made a finding as to the entitlement of damages at this point in time.

I understand, Mr. Lowenstein educated me --

**(Laughter)**

-- educated me when Ms. Desai was testifying about what should and should not be properly considered damages. I've been sufficiently sensitized to that because that's a concern for the Defendants.

So I'm just letting it in because I think you're right under the Rules of Evidence it comes in. What weight and how I treat it is an entirely different thing. Okay?

So the objection is overruled.

So now you have to remember the question you asked.

**(Laughter)**

**MS. WILLIAMS:** I think I just offered Exhibit 1032, which wasn't even the exhibit we were actually arguing about.

Is Exhibit 1032 in, Your Honor?

          **THE COURT:**  Yes.

          **MS. WILLIAMS:**  Okay.

          **THE COURT:**  It's admitted.

     **(Trustee's Exhibit Number 1032 was received in evidence)**

**BY MS. WILLIAMS:**

Q     Mr. Zutter, do you have 1032 in front of you?

A     (No audible response)

Q     Okay.  Just looking at the first page there's an email from you to Mr. Ballard on March 2nd, 2019.  Do you see that?

A     I'm sorry, which of the two?  It seems like a chain.

Q     I'm sorry, the third email down that starts scope of work.

A     Got it.  Yes, I see that.

Q     Okay.  And you say to Mr. Ballard, "Scope of work doesn't include evaluation of foreign tax jurisdictions for offshore entities or opportunity zone analysis and structuring."  Is that correct?

A     I wrote that, yes.

Q     Okay.  And you wrote this after you reviewed the statement of work that he sent to you on March 1st, 2019, correct?

A     Correct.

Q     And you're asking it sounds like because you want to make sure those aren't included, is that fair?

A     Yes.

Q     Okay.  So that was part of what you wanted to have PwC

Zutter - Direct / By Ms. Williams          240

look at for the AAF, was foreign tax jurisdictions for offshore entities potentially and opportunity zone analysis and structuring potential.

A    We wanted to look at those things amongst other potential structures.

Q    Okay.  And then on March 2nd, 2019, Mr. Ballard responds back to you and says, "We can clarify those but we'll do that as part of structuring and implementing the final structure." Is that correct?

A    Yes, that's what he wrote.

Q    So Mr. Ballard's essentially telling you --

A    It's already in there.

Q    -- it is already in there, just not --

A    It's just vague, yeah.

Q    -- specifically, correct?

A    Yeah.

Q    Okay.

A    That's what he's saying.

Q    And you took that to understand that the statement of work did include those two things, correct?

A    Yes.

Q    And then you signed it shortly after this, correct?

A    Correct.

Q    Okay.  And PwC did look at the opportunity zone potential, is that correct?

A    They looked at that -- I would say they began their work on that but we didn't actually finish any of the tax structuring analysis before the story found a different chapter.

Q    Okay.  And Mr. Vanderbilt, I know you weren't for his testimony, but he said he thought that the opportunity zone was determined that it probably wasn't going to apply within the first couple of weeks of PwC's analysis.  Does that sound about right?

A    I'm not sure I would characterize it exactly the same way as he did.

Q    Is it correct that PwC did give you some kind of, I think you may have previously called it a directional indication that the opportunity zone wasn't, probably wasn't going to work?

A    In totality for the entirety of the business to be an opportunity zone qualified business, directionally yes.  With respect to utilization of some of those provisions for other tax efficiencies as it relates to, you know, subcomponents of the business, I wouldn't agree with that answer.

Q    Okay.  Do you recall, and Mr. Vanderbilt thought it was the first couple of weeks which I guess would be early March, do you have a different recollection of the timeline when PwC made that indication about the opportunity zone issue?

A    That sounds reasonable.

            **MS. WILLIAMS:**  Your Honor, I think we're at like

242

three minutes.

THE COURT:  Yeah, I was going to ask if you wouldn't mind --

MS. WILLIAMS:  Okay.

THE COURT:  -- if we stop here, please.

MS. WILLIAMS:  Yeah.

THE COURT:  I certainly appreciate the accommodations allowing me to attend to this.  We'll start at 8:30 in the morning.  I guess we'll see where we are tomorrow.  I don't know if it's appropriate at this time to discuss witnesses coming up because I don't know how much longer you're going to take and, of course, Mr. Hockaday is going to be given his opportunity.

Who would be the next witness just theoretically?

MR. FARAHI:  Do you (indisc.).

MS. WILLIAMS:  Yeah.  Yeah, I don't know.

MR. FARAHI:  Good afternoon, Your Honor.  Jonathon Farahi.  Plaintiff has two experts flying in this afternoon. They'll be ready to go tomorrow.  One is Joseph Petrucelli, who is a -- I believe a CFA and a tax expert.  The other one is Ken Schanzer, the former head or vice president of NBC Sports, who's a rebuttal witness for their expert, Robert Whitsitt.

THE COURT:  All right.  And they understand we may or may not get to them tomorrow?

MR. FARAHI:  I am not sure about that.  I think if we

can ask the Court to have them just hop on and off quick. I believe they're less than an hour each.

**THE COURT:** Mr. Hockaday?

**MR. HOCKADAY:** I'm all for -- thank you, Your Honor. Brent Hockaday on behalf of the Defendants. I'm fine with being flexible but Mr. Zutter is a party in this case so I don't want his testimony interrupted. That would be my request.

**THE COURT:** Well, that's why I asked. You all can talk off mike and we'll go from there. That was the -- that's fine. That's why I wanted to ask, so we don't get here tomorrow and we've got our hands in our pockets going, well, we didn't talk about this.

I'm not throwing stones at you. I'm just saying let's get it worked out in advance. Okay?

All right, I'll see --

Mr. Zutter, you can step down. Thank you.

**MS. WHITLEY:** Your Honor? Just while we have one minute. I do want to make you aware that there is an issue with the record that has been taken in this case and I've talked to opposing counsel about how to get it fixed and at some point we're going to need to take that up with you. We don't need to do it right now, but we don't want to wait until the end of the trial to do it. Because my understanding is we need an order from you to tell the reporter they have to

244

conform the record to what actually happened. And we're in agreement on that, but I just wanted to make sure we know that that needs to happen.

**THE COURT:** Okay. And I -- Ms. Flores, I thought you had looked into this. Is this something else?

**THE CLERK:** (indisc.)

**THE COURT:** Is it the playing of the videotapes?

**MS. WHITLEY:** It's not only that, all of the depositions are in really, really unusable shape.

**THE COURT:** I'm sorry, in really what? Forgive me.

**MS. WHITLEY:** Unusable shape. They just say every other sentence is inaudible, indiscernible.

**THE COURT:** All right. So I was not -- I was aware that there was a concern about playing the testimony and we were going to instruct and everything. I didn't know about this. So maybe in the morning before we get started we can have a little talk about that or you can talk to Ms. Flores first so we can get this resolved. And if I need to issue an order, of course I'm going to do that.

**MS. WHITLEY:** Right. We're prepared and I think we're in agreement about how to do it. Thank you.

**THE COURT:** Thank you.

All right, ladies and gentlemen, if you just tidy up your area I'll have you back at 8:30 sharp in the morning. Thank you. We're in recess and off the record.

245

THE CLERK:  All rise.

(This proceeding was adjourned at 3:55 p.m.)


## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    June 4, 2025

                Signed                                              Dated

                    TONI HUDSON, TRANSCRIBER