UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF TEXAS

-------------------------------x

RANDOLPH N. OSHEROW, CHAPTER 7    :

TRUSTEE,                          :

          Plaintiff,             :

    v.                            : Case No.

THOMAS DUNDON, ET AL,             : 22-05078-cag

          Defendants.             :

                                  :

-------------------------------x

HEARING

DATE:          Tuesday, June 3, 2025

TIME:

BEFORE:        Honorable Craig A. Gargotta

LOCATION:      615 East Houston Street

               San Antonio, Texas 78205

JOB No.:       7419892

Page 1

A P P E A R A N C E S

ON BEHALF OF TRUSTEE:

NICOLE WILLIAMS, ESQUIRE

KATHERINE BATTAIA CLARK, ESQUIRE

Thompson Coburn, LLP

2100 Ross Avenue

Dallas, Texas 75201

nwilliams@thompsoncoburn.com

kclark@thompsoncoburn.com

(972) 629-7100

JONATHON S. FARAHI, ESQUIRE

Abir Cohen Treyzon Salo, LLP

1600 Ventura Boulevard, Suite 200

Encino, California 91436

JFarahi@actslaw.com

(424) 288-4367

Page 2

A P P E A R A N C E S (CONT'D)

ON BEHALF OF TRUSTEE:

BORIS TREYZON, ESQUIRE

Abir, Cohen, Treyzon, Salo, LLP

1600 Ventura Boulevard, Suite 200

Encimo, California 91436

(424) 288-4367


ON BEHALF OF DEFENDANTS:

BRENT HOCKADAY, ESQUIRE

K&L Gates, LLP

1717 Main Street, Suite 2800

Dallas, Texas 75201

brent.hockaday@klgates.com

(214) 939-5677


LAURA K. LAVERNIA, ESQUIRE

Bell Nunnally & Martin, LLP

2323 Ross Avenue, Suite 1900

Dallas, Texas 75201

llavernia@bellnunnally.com

(214) 740-1429

Page 3

A P P E A R A N C E S (CONT'D)

ON BEHALF OF DEFENDANT:

JEFFREY S. LOWENSTEIN, ESQUIRE

Bell Nunnally & Martin, LLP

2323 Ross Avenue, Suite 1900

Dallas, Texas 75201

jlowenstein@bellnunnally.com

(214) 740-1410

GWEN IRENE WALRAVEN, ESQUIRE

Bell Nunnally & Martin, LLP

2323 Ross Avenue, Suite 1900

Dallas, Texas 75201

gwalraven@bellnunnally.com

(214) 740-1400

BEVERLY WHITLEY, ESQUIRE

Bell Nunnally & Martin, LLP

2323 Ross Avenue, Suite 1900

Dallas, Texas 75201

bwhitley@bellnunnally.com

(214) 740-1429

Veritext Legal Solutions
800-336-4000

C O N T E N T S

WITNESS:                                    DX   CX   RDX  RCX

JOHN ZUTTER

    By Mr. Hockaday                              98/320

    By Ms. Williams                         10        289


E X H I B I T S

| EXHIBIT | DESCRIPTION | MARKED | ADMITTED |
|---|---|---|---|
| TRUSTEE'S NO. | | | |
| 23 | April 24, 2019 Email | 37 | |
| 126 | Mr. Kantowitz, April 12 | 81 | |
| 302 | April 10, 2019 Email | 28 | |
| 531 | April 3, 2019 Email | 320 | |
| 1052 | March 5, 2019 Email | 13 | |
| 1171 | Mr. Ebersol's Email | 189 | |
| 1232 | April 12, 2019 Email | 85 | |
| 1234 | Vendor Relationships Email | 88 | |
| 1236 | Forwarded April 12 Email | 84 | |

Veritext Legal Solutions
800-336-4000

E X H I B I T S (CONT'D)

DEFENDANT'S NO.

| | | |
|---|---|---|
| 147 | AP Tracker | 230 |
| 187 | Jason Cohen Email | 266 |
| 237 | Proof of Claim | 173 |
| 261 | Mr. Zutter's Diagram | 265 |
| 274 | Megan Hanson Email | 287 |
| 1350 | April 1, 2019 Email | 272 |

Page 6

P R O C E E D I N G S

THE COURT:  Please be seated.  Are there any housekeeping matters that we need to deal with before we get started?

MS. WILLIAMSON:  Just one, Your Honor, on the Delaware Secretary of State records we were discussing.

THE COURT:  Yes.  You are on the record please.

MS. WILLIAMS:  Sorry.  Nicole Williams for the Trustee.

THE COURT:  Yes.  Go ahead please.

MS. WILLIAMSON:  We have agreed that the court can take judicial notice of what we've marked as trustee's exhibit 1437, 1438, and 1439.  These are certified Delaware Secretary of State records for an entity called AAF League Holdings, LLC that are signed by Mr. Vanderbilt.  And for an entity called DCP OP Zone, LLC that are signed by Mr. Scotch Topol (ph).  I -- do you want new copies?

THE COURT:  Oh yeah.  I do thank you.

MS. WILLIAMSON:  And should I just give the copies to the clerk, Your Honor?

THE COURT:  Please.  And that you're in agreement with that, Mr. Hockaday.

Page 7

MR. HOCKADAY: Yes. Just for clarity purposes though, we -- I -- as we pointed out yesterday, the Court can take judicial notice of obviously what the Court wants. We have no objection to that. We do have an objection though to its admission under Rule 26 because it was not disclosed prior to it, so.

THE COURT: Do you want to deal with the Rule 26 argument, or do you want me to just take two judicial notice?

MS. WILLIAMSON: We're fine with judicial notice, Your Honor.

THE COURT: So the extent you made, the objection is sustained.

MR. HOCKADAY: Thank you, Your Honor.

THE COURT: All right. Just one moment please, I didn't call the matter, let me do that. Ladies and gentlemen, this is the trial on the merits in case Adversary Number 22-05078, Osherow in his capacity as Chapter 7 Trustee versus Dundon et al. Let's get appearances, please, and then we'll resume trial.

MS. WILLIAMSON: Good morning, Your Honor. Nicole Williams, Katie Clark, Kamran Anwar, Boris Treyzon, Jonathon Farahi, and Matti Ramos (ph), for

Veritext Legal Solutions
800-336-4000

the Trustee.

THE COURT:  Thank you.

MR. HOCKADAY:  Good morning, Your Honor, and everyone.  David Webster (ph), Gwen Walraven.  Lavernia here?

MS. CLARK:  After lunch.

MR. HOCKADAY:  Ms. Lavernia, Laura Lavernia may be here this afternoon.  Jeff Lowenstein, Beverly Whitley, and Brent Hockaday, on behalf of the defendants.

THE COURT:  Thank you.  And just for my education, Ms. Flores (ph), is there someone listening in this morning?

MS. FLORES:  There (inaudible).

THE COURT:  (Inaudible).

MS. FLORES:  What?

THE COURT:  All right.  (Inaudible).  All right.  Thank you.

MS. FLORES:  All right.

THE COURT:  I think we're ready to go.

MR. HOCKADAY:  That's fine.

THE COURT:  Mr. Zutter, if you'll come up please, and take your seat in the witness box.  A friendly reminder you're still under oath, sir.

MR. ZUTTER:  Yes.  Sir.

Page 9

THE COURT: Thank you. You may proceed, counsel.

MS. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

Q Mr. Zutter, you recall when we ended yesterday, we were talking about the work that DCP was having PWC do related to the AAF structuring. Is that right?

A Correct.

MS. WILLIAMS: Okay. Let's look at Trustee's Exhibit 286, which I believe has been admitted already.

THE COURT: You're correct. Go ahead, please.

BY MS. WILLIAMS:

Q When you're ready, Mr. Zutter.

A Okay.

Q All right. Let's start on page one, this is an email from yourself on February 25, 2019. Is that correct?

A Yes.

Q And it attaches a document called AAF structure thoughts PDF, correct?

A Yes.

Q And if we look at who you sent this to it

Page 10

includes a lot of folks at PWC, correct?

A   Looks that way.

Q   Can -- went to Mr. Scotch Topol (ph) DCP'S outside counsel, correct?

A   Correct.

Q   And it went to some other folks on the DCP team, Mr. Vanderbilt, Mr. Kulas, et cetera.  Is that correct?

A   As well as Alan Kantowitz from AAF, yes.

Q   Okay.  Looks at at page four and five are some handwritten notes, correct?

A   Yes.

Q   Are these your handwritten notes?

A   Yes.  You'll have to forgive my handwriting.

Q   I can read it actually.

A   (Inaudible) up and down, I think.

Q   All right.  So on page four, this one's called Structure Considerations at the top.

A   Yes.

Q   And then there's a box below that and I believe that says initial transaction, correct?

A   Correct.

Q   And then below that it looks like there's two options in sideways triangles.  The first says asset deal, correct?

Page 11

A    Correct.

Q    And the second says stock deal?

A    Correct.

Q    And then each of those has some checks by it and some Xs by it, correct?

A    Correct.

Q    Is that similar to like a pro and con list?

A    Sure.

Q    I mean, is that fair?

A    I think that's perfectly reasonable --

Q    Okay.

A    -- way of describing it.

Q    And if we look under asset deal, the first check mark, that says leave behind certain liabilities, litigation, AP, et cetera, is that correct?

A    Correct.

Q    And then the second one says, easier to rewrite media deals and other contracts.  Is that correct?

A    Correct.

Q    And then on the right there's another box and that says, Go forward Structure considerations.  Is that correct?

A    Correct.

Page 12

Q    And then the second one there says Op zone versus offshore.  Is that correct?

A    Correct.

Q    And is Op zone referring to Opportunity Zone?

A    Correct.

Q    Okay.  If we look at page five, you've titled this one Pro forma structure.  Is that right?

A    Correct.

Q    And you show a league CO LLC coming down from the top in the center, is that correct?

A    In the center, correct.

Q    Okay.  And then there's a few times on this particular document where you write the abbreviation OZ, does that stand for opportunities zone?

A    Yes, ma'am.

Q    Okay. All right.  Let's look at Trustee's Exhibit 1052, which I'd like to offer, and I don't believe there's an objection.

MR. HOCKADAY:  1052?

MS. WILLIAMS:  Yes.

MR. HOCKADAY:  That's correct.  No objection.

THE COURT:  Thank you, sir.  All right.  Would you reflect, Ms. Flores, 1052, the Trustee's 1052.

(TRUSTEE'S Exhibit 1052 was marked for

Page 13

identification.)

THE COURT:  Go ahead.

BY MS. WILLIAMS:

Q   So in Exhibit 1052, you send another email -- it might not be the exact same, but it's a similar group to the last one on March 5, 2019.  Is that correct?

A   Looking at it correctly looks the same.

Q   And you send a document called Jay-Z structure ideas PDF, and your email says updated thoughts.  Is that correct?

A   Correct.

Q   And if we look at page two, is this again your handwriting?

A   It sure is.

Q   Okay.  And I see some of those OZ references again, those still stand for opportunity zone, correct?

A   Correct.

Q   Okay.  Let's look at Trustee's Exhibit 1176, which I believe has already been admitted.

THE COURT:  Question.

MS. WILLIAMS:  Yes.

THE COURT:  Is there a difference between the two emails?  I mean there -- what's the primary

Page 14

difference between this one and the prior diagram that you did? If You could briefly summarize it.

MR. ZUTTER: Can you tell me the number of the prior one just so I pull both of them up and I can explain to you.

MS. WILLIAMS: It was 286 and 1052.

THE COURT: I don't want you to spend a lot of time on this.

MR. ZUTTER: Yeah.

THE COURT: I'm just try -- obviously you sent --

MR. ZUTTER: No.

THE COURT: -- it's an updated.

MR. ZUTTER: Yeah. No. It'll take me two seconds I just want to have the other one in front of me. So in one structure, in the first one, you have the potential for there to be three distinct companies. Where one is essentially a company comprising of all the teams with a team holding company at the top, and then all the tools underneath it, right? Could be the individual ownership of the teams, or it could be one consolidated thing. League administration in the middle, and then the technology off to the right. Has three separate companies, right? Because they might have separate tax

Page 15

attributes, separate valuation dynamics, separate earnings profiles, et cetera.

If you could zoom out show me the other one, that would be really helpful.  So the one on the left here we're kind of, further bifurcating what those all could be to start bringing into effect some of the specific features of what works in an opportunity zone and what doesn't.  So if you try and make an entire company an opportunity zone, right?  If you make the parent company an opportunity zone, then all of its attributes need to qualify for all the rules under the opportunity zone rules, which is business activity types, asset types, locations, et cetera.

If you bifurcate between the business at subsidiary levels, you can optimize and say well, this portion of the business qualifies for being an opportunity zone entity.  This portion of the business does not.  And it -- by kind of ring fencing them, you can isolate where in fact you do get those benefits versus where you don't get those benefits.  So that's part one of the distinction between these, if you bring it back up.  Yeah.

THE COURT:  Yeah.  I don't want a real long answer, I very much appreciate the answer.  I'm just trying to understand (crosstalk).

Page 16

MR. ZUTTER: There's just one other dynamic to it, which is off the screen now, but -- the other piece is we're starting to bring in what's onshore versus offshore. Part of my past experience is doing a bunch of this for large companies in the past where if you can identify certain income streams or business activities where you can parse out the income to be domiciled in other jurisdictions, you can have favorable tax attributes. And the reason that that's super important is it changes both the long-term profitability of the company from a cashflow perspective, but also which types of investors can participate.

There are pools of capital that are specifically focused on investing in opportunity zones because of the tax attributes. There are pools of capital that can only do domestic things, pools of capital that do international, and then pools that do all of the above. And so, by having it structured in this way would allow us to say, oh, this piece can get investors from this place, this piece can get it that way. Minimize tax obligations, maximize cash flow, you Know, make business as attractive as possible.

THE COURT: Thank you for the answer.

MR. ZUTTER: Sure.

Page 17

THE COURT: I'm sorry, counsel. I just wanted to know. Thank you.

MR. HOCKADAY: No problem, Your Honor.

MR. ZUTTER: Did -- I'm on 286 now. Do you want me to go back to --

BY MS. WILLIAMS:

Q No. We're fine. We can take that down. Mr. Zutter, this -- the work by PWC for AAF and that you were sending these documents related to, that did not result in any final analysis by PWC, correct?

A They had provided some directional thoughts with respects to the overall top level that I was just articulating to Judge Gargotta. We had never gotten to a conclusion on opportunity zone, on asset, on stock deal, on carve outs, on separations. We never got to the point of getting to a (inaudible) structure.

Q And it didn't result in the preparation of any actual transactional or restructuring documents or anything like that, correct?

A To my knowledge, no advanced documentation was ever prepared.

Q Okay. So nothing that PWC did was ever actually used for an AAF transaction. Is that fair?

A I think the preparation and evaluation of

Page 18

structures for the elimination of opportunities is itself something that you use in the ordinary course of doing deal work. You have to look at a variety of things, just because you don't do them doesn't mean that that work wasn't used. Often the elimination of opportunities is itself incredibly valuable work, so I would disagree with your assertion.

Q   Okay. But you said they didn't reach a final conclusion on any of those things, correct?

A   We've reached directional views on some, we ruled out some. What we got to as a final structure, we never got to a final structure, we obviously didn't. But did we get to determinative answers on individual components? Certainly.

Q   Which component?

A   For example, there are certain rules that in the first phone call as an example, we would've gone through, and I don't remember the call verbatim, but like in an ordinary phone call like this.

Q   I'm sorry. Are you talking about a call with PWC?

A   Yes.

Q   Okay.

A   If we brought in their opportunity zone experts, right? As a hypothetical, and you have

Page 19

people on the phone like Alan Kantowitz who has never had experienced with an opportunity zone before. I would've said, "PWC team, can you explain the rules of the opportunity zone to the team here so that as we're thinking about structures. We can start assembling which of the pieces work and which of the pieces don't." And they would've said something like, "Interest income is definitionally not allowed in an opportunity zone for optimization." And that would've been a learning and that would've been a value add. So that would've been one determinative thing that would've been established in the first five minutes.

Q Okay. So let me make sure I understand because I thought your testimony yesterday was that there was some directional indication but no final opinion was reached on opportunity zone. And I think you might be saying something different today.

A What I'm saying is, it's a dramatically more nuanced situation than how you just characterized it. There is a directional view that the entirety of the business would not qualify as an opportunity zone. And that's consistent with the evolution of the org charts that you just saw, right? The first one has an opportunity zone at the top of the pyramid with three subsidiaries underneath it, right? In the bracket

Page 20

zone in 286.  What you see in the second one is a bifurcation of businesses with more nuance to it. That is an evolution of thought that says the top can't be the opportunity zone.  That was directional guidance.

Did we know then when there all those -- this kind of additional splintering of the business to practice in different ways and add complexity to it would work?  Parts of it certainly would, parts of it may, or may not have.  We didn't get to a final determination as to that.  I think where we got directional guidance was the top company.

Q   Okay.  And that could not be an opportunity zone, correct?

A   That would not qualify as an entirety based on the activities of the business at the time.

Q   Okay.  And then you didn't reach a final conclusion on the other potential issues that you were describing about opportunity zone before PWC ceased to do work, correct?

A   Some elements we had firm understanding, some elements were a question, some elements, you know, were more or less certain.

Q   Okay.

MS. WILLIAMS:  Let's look at Trustee's

Page 21

Exhibit 1176, which I believe has been admitted already.

THE COURT: Pretty sure it has. Go ahead, please. Thank you, Ms. Flores.

BY MS. WILLIAMS:

Q This was a March 26, 2019 email from you to Mr. Ballard at PWC, correct?

A Correct.

Q And you tell Mr. Ballard pencils down on AAF, correct?

A Correct.

Q So you're essentially directing PWC on March 26, 2019 not to do any further work on the structuring assignment we've been discussing, correct?

A I'm not sure this is specific to just structuring work because this is right around the time we were starting to think about long-term viability of the business. And I know we had asked him some -- we had started thinking about viability of the business and I know we started engaging with Bracewall and at one point we had asked PWC to help participate in that. And so, I'm not sure exactly whether this date is before or after that, but we basically said, yes, pencils down and stop work.

Q Okay. To PWC?

Page 22

A    Yes.

Q    Okay.  And Mr. Ballard responds okay.
Acknowledging that, correct?

A    Correct.

Q    Was the work that PWC was doing, was that
part of what DCP was expecting AAF to cover as
transaction costs?

A    In some context, yes.

Q    Okay.  And that work included the opportunity
zone analysis we've been discussing, correct?

A    Correct.

Q    The offshore issue you described, correct?

A    Correct.

Q    A potential asset deal.  Is that correct?

A    Amongst others, yes.

Q    Okay.  And the opportunity zone never came to
any kind of fruition, correct?

A    That's correct.

Q    The offshore, nothing was ever offshored,
correct?

A    Correct.

Q    And then there --

A    (Inaudible).

Q    -- wasn't any asset deal or transactional
documents for anything like that, is what you

Veritext Legal Solutions
800-336-4000

testified?

A   We've never -- we did not complete the work, that is correct.

Q   Okay.  Are you aware the AAF was billed $280,000 by DCP for transaction costs?

A   I'm aware they were billed a specific number. I don't recall.

Q   Okay.  Were you involved in the determination of that amount of $280,000?

A   No.  That would've been done by our CFO.

Q   Mr. Vanderbilt?

A   Yes.

Q   Mr. Vanderbilt testified that he could not recall what went into the calculation of that number. Do you have any recollection of that?

A   Again, that would've been work that our CFO Jeff Vanderbilt would've done.

Q   You signed the engagement letter of PWC on behalf of DCP, correct?

A   Correct.

Q   Did you get the bills from PWC?

A   I don't know.  I would've expected them to go to Jeff.  Ordinary courses I'm often a signatory, but good governance and companies generally is that there's separation of powers from signatory versus the

Page 24

person paying the bills. And so, as a standard practice, bills will go to Jeff as a CFO, I will often be the one that's negotiating a deal. And that's purposefully meant to create some degree of separation and tension to ensure that I'm not doing things off the reservation. He doesn't have the ability to write checks to himself, and so there's kind of additional audit provisions that drive to. Not only that, but operational simplicity like, the person who's in charge of AP, the person who's in charge of treasury functions often is the one that actually receives the invoice, processes, and manages the invoice relative to the contract. That -- I would've been the person who is negotiating the relationship with PWC, but not the one that's receiving a bill or paying the bill from (inaudible).

Q   Okay. Mr. Zutter, I really don't need all this information. I just asked if you received the bills from PWC, yes or no?

A   (crosstalk).

Q   Okay. So you don't have a recollection of reviewing the bills from PWC?

A   No, ma'am.

Q   Do you have a recollection of what the amount of the bills from PWC was?

A    Not at this time.

Q    Do you remember the email we looked at yesterday where you were providing an estimate to Mr. Dundon that you thought the work would cost around $150,000?

A    Yes.  I remember looking at that with you yesterday.

Q    Okay.  And $280,000 is almost twice that estimate, correct?

A    Correct.

Q    Do you believe that $280,000 was just work from PWC?

A    I have no reason to believe it would not be. This was an incredibly complicated circumstance where I think, when we started that engagement, we thought we were moving forward on path one.  And then we had to look at a whole host of different paths.  And these folks are billed hourly, and as we sell under the engagement rate, you know, despite its 25 percent discount, those rates are pretty high, so it stacks up pretty quickly when you're trying to evaluate a broad range of circumstances to allow for the league to find a successful outcome.  And so, it's not remotely unusual that you can have fluctuations in professional services bills in M&A contexts of that magnitude or

Page 26

material, or more.

Q   Is it possible that $280,000 included outside counsel fees for Mr. Scotch Topol and others at (inaudible)?

A   I don't know how the 280 was calculated so I don't have the ability to answer that.

Q   If Mr. Scotch Topol was preparing for example, draft transaction documents, would that be something you might have included as a transaction cost for DCP?

MR. HOCKADAY:  Your Honor, I'm just going to say calls for speculation, asked and answered, and no foundation.  He's testified now about seven times he doesn't have firsthand knowledge as to where this came from and --

THE COURT:  And he has testified to that effect.  He -- so I think this objection -- sir, do you know?  I mean, do you know?

MR. ZUTTER:  No.

THE COURT:  Okay.  The objection's sustained. I think we need to move on from this please.

MS. WILLIAMS:  Okay.  All right.  Let's look at exhibit 302.  I'd like to offer this, Your Honor, and I don't believe there's any objection.

THE COURT:  Trustee 302, correct?

Page 27

MS. WILLIAMS:  Correct, Your Honor.  Sorry.

THE COURT:  No problem.

MR. HOCKADAY:  No, objection, Your Honor.

THE COURT:  Ms. Flores, would you note Trustee 302.  Go ahead, please.

(TRUSTEE'S Exhibit 302 was marked for identification.)

MS. WILLIAMS:  Mr. Zutter, we don't need to look at this.

MR. ZUTTER:  Sorry.  Can I just do a (crosstalk).

MS. WILLIAMS:  Oh, yeah.  Sure.

MR. ZUTTER:  Thank you.  Okay.

BY MS. WILLIAMS:

Q   And we don't need to belabor this, but I just wanted to show you the email in the middle from Mr. Vanderbilt to yourself on April 10, 2019 where Mr. Vanderbilt references the deemed contribution of 280,000.  Do you see that?

A   Yes.

Q   Is that the transaction cost we've been discussing?

A   I'm not sure if it is or isn't.  No reason to think it is or isn't.

Q   Okay.  No reason to think it's not or?

Page 28

A   Again, I'm saying I don't know what he was referring to by the 280.

Q   Okay.  Mr. Vanderbilt had also testified that DCP had some significant checks to write in 2019.  I know you weren't here, but have you read that summary?

A   I'm not aware of what you're talking about.

Q   Okay.  Well, Mr. Vanderbilt testified that DCP had some significant checks to write for other investments in 2019 but he did not remember what they were.  Do you know what those were?

A   There's -- I think we'd have to define significance the -- for me to be able to qualify that.  And then I'd have to go back and look at all the history of that time to be able to answer subject to whatever threshold you're describing.  But, in the ordinary course, like, in a given year there's hundreds of millions going back and forth between investments and coming in from investments.  It's -- the bank accounts of the Dundon Enterprise (inaudible).

Q   As you sit here today in 2019, do you recall any outlays of investments that were coming that you would consider significant, that you can recall as you sit here today?

A   Nothing that would've been problematic to

Page 29

cover.

Q   I'm not asking if it would be problematic to cover.  I'm just asking about significant outlays.

A   Again, without a definition of what significance is, I'm not sure how to answer your question.

Q   Well, let's say over $20 million.

A   Frankly, that wasn't that significant in this.

Q   Okay.  What would you call significant?

A   (Crosstalk) lots of them.  I can't remember them specifically that wouldn't have been a significant number.

Q   Okay.  Can you remember any that were over $20 million in 2019 for Dundon Capital Partners?

A   AAF.

Q   Okay.  Anything else?

A   I don't remember that.  I have spent a lot of time refreshing my memory on this particular part of 2019.  But I have not spent time refreshing my memory in all other Dundon activities related to 2019, so, I'm sorry.  I don't recall.

Q   No.  Prior to Mr. Dundon and Dundon Capital Partners investing in AAF there were --

A   Actually, I don't -- I'm -- I can't

Page 30

specifically say the day of some other (inaudible) so, no -- never mind.

Q  Okay.  You don't have anything to add?

A  No.

Q  Okay.  Prior to Mr. Dundon and Dundon Capital Partners investing in AAF, you're aware that AAF had other investors, correct?

A  Yes.

Q  Mr. Ebersol was an investor.  Is that right?

A  Yes.

Q  MGM also?

A  Yes.

Q  Mr. Fowler (ph) through his entity, FO2?

A  Yes.

Q  Founders' Fund was an investor?

A  Yes.

Q  Mr. Murad (ph) was an investor?

A  I believe so I don't have the cap table in front of me, but these all sound right.

Q  Okay.  Are you aware that there were others who were interested in potentially investing in AAF as well?

A  Not in a credible fashion.

Q  Are you aware that Mr. Lee Bird had committed to invest a million dollars in AAF around February of

Page 31

2019?

A I don't recall that name.

Q You don't recall that Mr. Bird had actually already sent a million dollars to AAF at that time?

A I don't recall the name so I obviously don't recall things about (inaudible).

Q Okay. Mr. Bird's million dollars was returned after February 14, 2019. Did you have any involvement in that decision?

A Absolutely not.

Q Do you know if Mr. Dundon did?

A Not to my knowledge.

Q Is an investment credible when someone actually sends the money to the company?

A Maybe.

Q Maybe? Okay. You were aware that CBS was negotiating an equity term sheet with the AAF around the time of February 14, 2019, correct?

A I'm not aware of the particulars of it.

Q You're not aware that that deal was pretty far along on February 14, 2019?

A That's not my understanding.

MS. WILLIAMS: Okay. Let's look at Trustee's Exhibit 917, which I believe has already been admitted.

Veritext Legal Solutions
800-336-4000

THE COURT: That's correct. Go ahead, please.

MR. ZUTTER: Okay.

BY MS. WILLIAMS.

Q If we look at the email at the bottom of page one, this is for Mr. Kantowitz to you and some others on February 21, 2019. Is that correct?

A Seems that way.

Q And he says, "John, please see attached for latest term sheet on Red Line. We were planning on sending back to CBS. As I understand it, Charlie and TD have discussed honoring this deal and allowing CBS to invest at the series one valuation terms per this term sheet 150 million pre-money valuation." Is that what Mr. Kantowitz told you?

A That's what's written here, yes.

Q Okay. So on February 1, 2019, he is --

A February 21st. 21st.

Q Oh, I'm sorry. I misspoke. So on February 21, 2019 there is already a draft term sheet that's going back and forth, correct?

A There's been -- it appears there's discussions of it. Again, I don't recall the specific term sheet, but.

Q Okay. And then Mr. Dundon, responds and it's

Page 33

hard to tell in this middle email as you mentioned, the header's gone, but the header at the top is just between you and Mr. Dundon, correct?

A    The header at the -- yes, it -- the data at the top is.

Q    Okay.  So it looks like Mr. Dundon says to you on February 21st, 2019, "They have to be diluted from here by the 250 or it's not fair.  Let's figure this out TMRE."  Is that correct?

A    That's what's written.

Q    Okay.  And you think TMRE is tomorrow?

A    Reasonable assumption.

Q    Okay.  And then you respond to Mr. Dundon and you say, "Def want input as I start the structuring exercise?  I think we can do and create leverage.  So the politics and what's fair are more driving than the current framework."  Is that what you said to Mr. Dundon?

A    Seems that's what I wrote.  Yes.

Q    Okay.  You don't ask Mr. Dundon what he means by 250, correct?

A    I don't see that on this chain.

Q    You don't ask Mr. Dundon what he means from diluted by here from here by the 250, is that right?

A    No.  Ms. Chair.

Page 34

Q    Are you aware that Mr. Dundon has testified that that 250 is a reference to his $250 million commitment?

A    Yeah.

MR. HOCKADAY:  Hold on.  His $250 million commitment, I don't have an objection to that.  You can --

THE COURT:  All right.  So go ahead.  You may answer the question.

MR. ZUTTER:  The marketing commitment press release, you mean?

BY MS. WILLIAMS

Q    Okay.  Let's go back to that then, Mr. Zutter.  I thought you said yesterday when I asked you if you agreed with Mr. Dundon's statement that he didn't have to tell the truth.  In marketing statements that you thought the 250 million was the truth.  The $250 million commitment was a true statement.

A    I think that the word commitment in the context of marketing can suggest a desire or a hypothetical intent, but not necessarily anything that's remotely close to a investment.  Those are different things in my mind.

THE COURT:  With all due respect, you know, I

Page 35

do listen very carefully to what people have to say and that's not what I heard yesterday.  The question was precise, you acknowledged that he -- for marketing purposes, this is what Mr. Dundon said, that the $250 number he used in the press release was to drum up interest in the league.

MR. HOCKADAY:  I agree with that, it is true. Yeah.

MR. ZUTTER:  If I just said something inconsistent with that, I'm sorry.

THE COURT:  You did say something entirely inconsistent with what was just said, so let's try it again.  Do you agree that yesterday you acknowledged that Mr. Dundon had said, in a media -- and I'm defining the context, in a media press release a $250 million commitment, right?

MR. ZUTTER:  100 percent.  Yeah.

THE COURT:  Okay.  So now let's look at the email.  Go ahead, Ms. Williams.  Sorry to interrupt you.

MS. WILLIAMS:  No it's okay.  I'm just trying to figure out where to go from there.

BY MS. WILLIAMS:

Q   So you understand that Mr. Dundon agreed that the 250 in this email was a reference to the $250

Page 36

million commitment?

A   That sounds reasonable, yes.

Q   So you have no reason to dispute that that's what this is a reference to?

A   No.

Q   Okay.  Regarding Mr. Fowler and FO2, after you and Mr. Dundon became involved with the AAF, you were pushing Mr. Ebersol to get a release signed by Mr. Fowler.  Is that correct?

A   Yes.

MS. WILLIAMS:  Look at Trustee's Exhibit 23, which I would like to offer, and I don't believe there's an objection.

THE COURT:  One -- I didn't hear that.  I'm sorry.

MS. FLORES:  23.

THE COURT:  23.

MS. WILLIAMS:  It's 23.

MR. HOCKADAY:  I have no objection, Your Honor.

THE COURT:  Thank you, sir.  All right. Trustee 23 is admitted.  Thank you.

(TRUSTEE'S Exhibit 23 was marked for identification.)

MS. WILLIAMS:  Let me know when you're ready,

Page 37

Mr. Zutter.

MR. ZUTTER: Okay.

BY MS. WILLIAMS:

Q Mr. Zutter, before I dig into this document, the one that we were just looking at, Trustee's 917, where Mr. Dundon references the $250 million commitment in terms of a dilution of CBS. Can you explain to me how that comports with your previous testimony that, in your opinion, the 250 number was made up?

A So we had put out a press release to drum up interest and have the marketing benefit against the XFO against, you know, just the market in general. And so, in that context, we wanted to make sure that conversations we were having with some of those same counterparts that we wanted to highlight the viability, that they had confidence that the league was going to be there. And so, you know, I don't think that those things are definitionally contradictory in until -- and at such point as you actually get into more advanced negotiations. But I think at this point in time, I don't see them as such.

Q Okay. So let me make sure I have this straight. In your mind the 250 million commitment languages is made up, do I have that right?

Page 38

A    Correct.

Q    And it has no basis in reality?  That's correct?

A    I think it has a basis in marketing reality, it is not an investment.  But that -- I think -- like I said yesterday, and I'm not trying to be inconsistent with that, there was a statement made. It was a statement made for marketing purposes.  So that is a real statement and -- but it's not an investment.

Q    Okay.  I want to be real --

A    (Crosstalk) --

Q    -- clear I understand this, Mr. Zutter. Because you testified earlier, including yesterday, that the $250 million number had no basis in reality.

A    As an investment.

Q    That was not the -- that wasn't qualified that way.  Do you think it was?

A    I don't recall the exact words I used yesterday, but I think the distinction I've been trying to make is, yes, there was a statement made to the media.  It said 250 million, it said commitment during -- and that's part of why yesterday you asked a question of commitment to invest.  And I corrected saying, no, I think it just said commitment because it

Page 39

never had that word invest. That is an important distinction. I don't think that we ever talked about making a $250 million investment in any substantive or detailed fashion whatsoever. Was there a marketing effort to create additional, kind of, momentum behind the league? Certainly, there was. It was put out there as a press release.

Q Okay. Mr. Zutter, I want to answer -- you to answer a very specific question that I believe I asked yesterday and you answered, but I want to hear it again. You've said the $250 million number has no basis in reality, correct?

A As an investment.

Q I don't want that qualifier on it. I want you to answer my question. You've said the $250 million number has no basis in reality?

A I think that answered the (inaudible).

Q You answered it the way you wanted to it's a yes or no question, Mr. Zutter. You've said the $250 million number has no basis in reality?

A I said I -- if you're reading my transcript from yesterday, then yes, I said that yesterday.

Q Again, not the question.

A I thought you (crosstalk).

THE COURT: Mr. Zutter, listen to the

Page 40

Veritext Legal Solutions
800-336-4000

question and answer, please.

BY MS. WILLIAMS

Q   You said the $250 million number has no basis in reality?

A   That was a statement is -- what was the question?  Is the question, did I say that?

Q   That's a good question.  You've said that, right?

A   Yes.

Q   And you've also said the $250 million number was made up, right?

A   Yes.

Q   Okay.  But now you've seen it, the $250 million commitment referenced in a press release, correct?

A   Yes.

Q   And we've seen it referenced by Mr. Dundon in an email talking about the subordination of another investor, correct?

A   Yes.

Q   Okay.  All right.  Now let's look at Exhibit 23.  Did you have a chance to review Trustee's 23?

A    I haven't exhaustively read the voting agreement.  If you'd like me to, I can, but.

Q   Are you ready for me to ask you questions?

Page 41

A    Ask a question and if I need to read it, I will.

Q    Okay.  Let's look at page two of Exhibit 23 actually, let's look at page three.  You send an email on February 24, 2019 and it says, "Did you get Reggie's signatures yesterday?"  Is that correct?

A    Yes.

Q    And Reggie's a reference to Mr. Fowler, correct?

A    Yes.

Q    And you're referring to getting signatures on a release agreement.  Do you recall that?

A    Yes.

Q    Let's look at page two, Mr. Ebersol responds to you and Mr. Dundon on February 24, 2019.  Do you see that?

A    Yes.

Q    And he says, "Yes.  And we have the board resolution vote and it was approved."  Is that correct?

A    Yes.

Q    And then you respond on page one, and you say that you're following up on documentation February 25, 2019.  Is that correct?

A    Correct.

Page 42

Q    And then Mr. Ebersol says, "For you to see attached."  Is that correct?

A    Correct.

Q    Okay.  If we look at the attachment page 22 it has several attachments, correct?

A    It appears so.

Q    Okay.  But I'm looking at the one -- page 22 has Mr. Fowler's signature for FO2 LLC.  Is that correct?

A    Yes.

Q    And if you look at page 17 it shows that he's signing a release agreement, correct?

A    Page 17.  Yes.

Q    Okay.  And if we go back to page two, when you were talking to Mr. Ebersol on February 24, 2019, you say, "Thanks, Charlie, this is important.  Now we just need to get to MGM to have them subordinate to DCP and we are back on track."  Is that what you told Mr. Ebersol?

A    That's what I wrote there, yes.

MS. WILLIAMS:  Let's look at Trustee's Exhibit 967, which I believe is already admitted, Your Honor.

THE COURT:  Okay.  (Inaudible).

MS. WILLIAMS:  Let me know when you're ready,

Page 43

Mr. Zutter.

MR. ZUTTER: Okay. Excuse me. Yes.

BY MS. WILLIAMS:

Q Okay. Let's start on page three. This is the email you and I were just looking at where you say to Charlie that he needs to get MGM to subordinate to DCP, correct?

A Correct.

Q And then this chain diverges from the last one. If you look at page two on February 24, 2019, you add Mr. Scotch Topol from (inaudible) to the chain, correct?

A Looks that way, yes.

Q And there's some references in your email directed to Jim. Is that Mr. Scotch Topol?

A Yes.

Q Okay. And you say, "Jim, can your team draft a simple subordination acknowledgement and approval agreement for MGM relative to our commitment?" Do you see that?

A Yes.

Q And that's a reference to DCP's commitment?

A To our investment I believe.

Q Okay. And you are directing DCP's outside counsel to draft that subordination acknowledgement

Page 44

and approval agreement, correct?

A   Yes.

Q   For MGM relative to DCP's commitment, correct?

A   Correct.

Q   Okay.  Was that ever prepared?

A   I don't recall.

Q   On page one of Exhibit 967, Mr. Ebersol responds to the chain and says, "John Re MGM this is a larger discussion with Tom with respect to how to handle the folks at MGM as this is more political than practical."  Is that correct?

A   That's what you -- yes.

Q   And then you respond to Mr. Ebersol also on February 25, 2019, correct?

A   Correct.

Q   And you tell Mr. Ebersol, "My current understanding is that in the absence of a subordination agreement and them agreeing to the deal as presented we won't be able to fend further dollars."  Correct?

A   Correct.

Q   And we refers to Mr. Dundon and DCP, correct?

A   Correct.

Q   And that was your direction and Mr. Ebersol?

Page 45

A    That was a representation of my understanding.

MS. WILLIAMS:  Okay.  Let's look at a Trustee's Exhibit 223, and this is not in evidence yet, Your Honor.  And I am --

THE COURT:  You said 273 or 223?

MS. WILLIAMS:  223, and I'm offering this, Your Honor.

THE COURT:  (Inaudible).

MR. HOCKADAY:  Your Honor, I think the only issue I have is that the top email, Mr. Ebersol is referencing hearsay.  And I actually know the truth of these because I spoke with the representatives, but I'm not testifying of course.  So I would object to the top email.  I mean, I would try to parse it like we did, but under the -- you know, I guess, change direction we're going.  It's hearsay because it's talking about the communications from Mark Wahlberg's (ph) team and Marshall Mathers (ph) agent.  And I -- as I said, actually know the truth of those conversations.

THE COURT:  Your response?

MS. WILLIAMS:  Your Honor, I'm fine at the top email is admitted for purposes of showing notice and the response to Mr. Zutter because that's the

Page 46

relevance of it. It's the response to a question Mr. Zutter asked.

MR. HOCKADAY: That doesn't -- I don't think that's notice when it's the final email. Like, if it was the first email then it could be responding to it and they're on notice of it. There's no response from Mr. Zutter. This is a communication with Charlie, his lawyer Dawn Belt to Mr. Zutter. And (crosstalk) --

THE COURT: (Crosstalk).

MS. WILLIAMS: In response to a question.

THE COURT: Hold on. Let him finish. Let him finish.

MR. HOCKADAY: -- adding hearsay to that. It's only offered for the truth. So it's -- the entire thing needs to stay out, it's hearsay. And if we're going to go under the rule that we're not going to parse through documents, either all comes in or it doesn't, this is clearly qualified for that.

THE COURT: We've established a rule I'm not going to go back and revisit 15 days of rulings. But I do agree with you the ruling the Court made yesterday. Your response?

MS. WILLIAMS: Your Honor, the relevance of this email, which is important to why we can consider other purposes for it is Mr. Zutter is asking a

Page 47

question to Mr. Ebersol.

THE COURT: About other investors?

MS. WILLIAMS: In the bottom email. Yes. And then Mr. Ebersol responds with his knowledge as to that, and I'm fine if they don't want the top email for the truth. I understand their hearsay issue, but it shows how Mr. Ebersol answered Mr. Zutter's question and information that Mr. Zutter was given at that time that he would need to consider as part of his duties to AAF frankly.

THE COURT: Your response?

MR. HOCKADAY: My colleague, Mr. Webster, educated me -- my understanding of the ruling, or at least our team's understand the ruling is that it does not allow substantive information to come in. So if it is going to be excluded, the entire thing needs to be excluded. And once again, I don't think we argued relevance, although you could make that argument. We argued that it's not in response that it's not noticed because Charlie's comments about hearsay -- this is really hearsay within hearsay. Charlie's comments about third parties telling third parties things is not noticed of any subsequent response. So it doesn't work in reverse. It can only be offered for notice if that puts Mr. Zutter on notice that he needs to

Page 48

respond to something and then he makes a statement, then I think it's a different analysis. But otherwise, it's only -- it's pure hearsay. And my team's understanding of that ruling is not -- you can't do an end run around to get in otherwise admissible evidence.

MS. WILLIAMS: Your Honor, if I could respond, I don't quite understand that very narrow version of notice. If Mr. Ebersol sent Mr. Zutter this information, Mr. Zutter had that information and was aware of it, and then we can argue what he should or should not have done with it or whatever other information was available. But showing that he got this, and that he knew that, and that this is how Mr. Ebersol answered his question, is absolutely notice, whether there's a subsequent email or not.

MR. HOCKADAY: Your Honor, the Giordano email is hearsay. So this entire thing's hearsay.

THE COURT: Well, for purposes of this document, I agree with you that it'll come in as notice only that he received this information on March 27th, which is six days before the league shut down. So it -- the objection's overruled. I'll allow an unlimited basis for notice.

MS. WILLIAMS: Thank you, Your Honor.

Page 49

BY MS. WILLIAMS.

Q Mr. Zutter, looking at Trustee's Exhibit 223. I just want to confirm that if we look at the bottom of page one on March 27, 2019, Mr. Ebersol is forwarding you information he got from Mr. Giordano that same day, correct?

A It appears that way.

Q Okay. And then you asked Mr. Ebersol any details on specific names or inbounds, correct?

A Correct.

Q And then later that same day on March 27, 2019 --

THE COURT: I only think that we were going to -- I was going to allow him -- was the -- that the notice? You can ask him about the top part, but not anything else because it is hearsay. I agree with you.

MR. HOCKADAY: Thank you, Your Honor. Can I just move to strike any testimony questions?

THE COURT: I'm going to disregard all this.

MR. HOCKADAY: Thank you.

THE COURT: The rule is very limited.

MS. WILLIAMS: Okay.

THE COURT: It's notice only as to what Mr. Zutter got with -- what he received about these two

Page 50

individuals. Do I want to say Marky (ph)? Wasn't he marking Mark? He was marking Mark.

MR. HOCKADAY: Yeah. He was.

THE COURT: And --

MS. WILLIAMS: Your Honor, if I --

THE COURT: (Inaudible) movies (inaudible).

MS. WILLIAMS: Your Honor, if I could just point out -- and the reason I'm saying this is Mr. Ebersol does respond directly to Mr. Zutter's question with the top. But he also forwards Mr. Zutter the other information at the bottom. So Mr. Zutter has all of it for notice purposes, and that's all I'm trying to establish.

THE COURT: Just the top part.

MS. WILLIAMS: Okay.

THE COURT: So the Objection is sustained on that basis. I'll disregard any testimony as it relates to those other components of the email.

MR. HOCKADAY: Thank you, Your Honor.

MS. WILLIAMS: Okay.

BY MS. WILLIAMS.

Q So, Mr. Zutter, after you ask the question, "Any detail on specific names or inbounds?" Mr. Ebersol responds on March 27, 2019. Correct?

A He responds on March 27, 2019, correct.

Page 51

Q   Okay.  And he provides you some information and you received this, correct?

A   I received this correct.

Q   Okay.  You and Mr. Dundon ever tried to look for any additional investors for AAF yourselves, did you?

A   I did not, personally.

Q   Do you know if Mr. Dundon did?

A   I'm not aware of whether he did or didn't.

Q   Okay.  When did you know that Mr. Dundon or Dundon Capital Partners would not be putting in a penny more than 70 million into the AAF?

A   I think the exact date, but it became clear that we didn't see long-term viability for the business towards the end of March.  That's when we engaged with price ball and at the same time when we made it clear to the team that our commitment to invest 70 million was the commitment that we were making.  And we weren't making at that time any incremental commitments unless -- until things materially changed.  So towards the end of March would be the time that it became more definitive.  I think before that there wasn't any indication that we definitively would, but just that we were open to it -- investing further if things were, you know,

Page 52

compelling.

Q Do you believe that prior to the end of March it was understood by the AAF that DCP and Mr. Dundon were at least open to committing more than 70 million?

A I think if there was an attractive investment opportunity, we would always be open to hearing about that and we had the means to do so.

Q Do you think that's what AAF understood?

A That if the investment was attractive, were we open and –

MR. HOCKADAY: These calls for speculation?

THE COURT: How can he know that?

MS. WILLIAMS: Okay. Let me ask a different question.

THE COURT: You do need to ask a different question.

MS. WILLIAMS: Okay.

THE COURT: The objection is sustained.

BY MS. WILLIAMS:

Q Mr. Zutter, do you believe that prior to the end of March, 2019 that you had expressed to people at AAF that Mr. Dundon or DCP was open to committing more than 70 million?

A No. I do not agree with that statement.

Q Okay.

Page 53

A    I have not.

THE COURT:  Can you answer the question?

MR. ZUTTER:  Okay.

BY MS. WILLIAMS.

Q    Do you know if Mr. Dundon or anyone else on the DCP team did?

A    I'm not aware of this -- all the conversations Tom might have had.

Q    Okay.  And we were discussing yesterday that you determined -- and I believe the date we were talking about yesterday was the week of March 18th. That it looked like 70 million was not going to be enough to finish the first season, correct?

A    It became increasingly hard to evaluate scenarios where that would work in a -- with the expense footprint of the business.

Q    At that point, did you affirmatively state to anyone at AAF we're not going to put in more than 70 million now?

A    I don't recall when I said it that (crosstalk) --

Q    Do you know?

A    -- that over the course of --

Q    Oh, I'm sorry.

A    Go ahead.

Page 54

Q   No.  Finish.

A   Over the course of March we certainly made that clear, but as to the specific dates that we made those express statements, I don't know.  I know that Charlie, Tom and myself were chatting multiple times a day in most cases and I think it was pretty clear throughout most of that what the investment was.

Q   Okay.  When it looked like 70 million was not going to be enough to finish the first season, did you affirmatively inform the shareholders of AAF that that was true and that DCP wasn't going to put in a penny more than 70 million?

A   I'm not aware we did a shareholder notice, no.

Q   Okay.  Did you tell the vendors that AAF was negotiating new contracts with?

A   No, ma'am.

Q   Did you tell the vendors who were working with AAF to try to settle outstanding debts?

A   No.

Q   Did you tell the employees of AAF?

A   At the point in which we made changes we told those employees, but we didn't tell them that we were having increasing concerns, no.

Q   Okay.  And when you say when you made

Page 55

changes, you're talking about employees that were laid off essentially?

A    Yes.

Q    Okay.

A    And or those that were hoping to think through the actual transition process like Alan Kantowitz and Kevin Freedman, and others were helping to think through those scenarios.  So they certainly had visibility along with Charlie and others.

Q    Okay.  And when you reached the conclusion that, that finite –

THE COURT:  I'm sorry.  You might want me to ask this question.

MS. WILLIAMS:  Sure.

THE COURT:  When you say employees, does that include the players?

MS. WILLIAMS:  Are you asking me or him?

THE COURT:  Yes.  So was that the intent of your question?  Because you might want to elicit an answer from him if he -- if his -- as Mr. Zutter has testified about dealing with management and then people not -- yeah, that I'll call lower management, but he never mentioned players.  When you talk -- may I?

MS. WILLIAMS:  Yes, you may.

Page 56

THE COURT: So when -- did you ever tell the players that the league was going to fold?

MR. ZUTTER: No communication directly with players.

THE COURT: And I would've been surprised by another answer. I just wanted to confirm that. Go ahead.

MS. WILLIAMS: Thank you for the clarification, Your Honor.

BY MS. WILLIAMS:

Q When you knew the 70 million wasn't going to be enough to finish the first season and the DCP wasn't going to put in more, you also knew all the accounts payable was not going to be able to be paid, correct?

A Correct.

Q Okay. So you knew DCP was -- not DCP, AAF was incurring expenses that weren't going to be paid, correct?

A I do not agree with that statement.

Q You don't agree? Okay. You said yesterday that all the cuts we were discussing to operations, and the vendor settlements, that you were trying to extend the runway as long as possible. Do you remember saying that?

Page 57

A   Correct.

Q   Were you trying to extend the runway until you could confirm what deal type DCP was ultimately going to document?

A   Amongst other reasons.

Q   And that might be for example, the potential asset deal that would leave certain liabilities behind?

A   Right.  Amongst other reasons.

Q   The first season could have been finished if there really was a $250 million commitment, correct?

A   I think that's a speculative comment, but I --

MR. HOCKADAY:  I'm going to object to your speculation and lack of foundation.

THE COURT:  Overruled.  Just please answer the question.

MR. ZUTTER:  If it had $250 million, more than likely it could have finished, but --

BY MS. WILLIAMS:

Q   Just more than likely?  You don't think it's clear the first season could have been finished with 180 million more dollars?

A   I think there are a variety of factors to the business continuity besides liquidity, it would've

Page 58

been adequate liquidity to complete the season.

Q That would've been enough to pay all the accounts payable, right? Okay. After you and Mr. Dundon became the two voting board members of AAF, the only two, were there any board meetings?

A The board met as a -- the three of us were talking almost every single day. I -- in my lay person speak -- that we probably had 100 board meetings.

Q Are there any formal notice board meetings?

A Not noticed, no.

Q Were there any minutes taken of board meetings?

A Not to my knowledge.

Q And I believe you just said earlier you didn't think there were any notices to shareholders issued?

A I don't know whether there were or weren't.

Q Do you recall any?

A I do not recall.

Q Okay. Why were you doing the work for AAF and serving as a board member?

A Tom asked me to.

Q Any other reasons?

A No.

Page 59

Q   Is it your testimony that you had no expectation of any personal benefit for the work you were doing with AAF?

A   100 percent.

Q   Eventually, ESMG and the other entities associated with AAF those were all placed into bankruptcy, correct?

A   I said correct.

Q   Oh, I'm sorry.  I didn't hear you.  Into a Chapter 7 bankruptcy, correct?

A   I believe so, yes.

Q   And that was your and Mr. Dundon's decision as the only two voting members, correct?

A   On the advice of counsel.  Yes,

MS. WILLIAMS:  Your Honor.  I just want to state for the record that there is no advice of counsel affirmative defense pled in this case.  They put it in their trial brief.  We don't believe we were on adequate notice of it.  We believe it's been waived and I just want to say that from the record because I anticipate Mr. Zutter is going to keep making that reference.

THE COURT:  Okay.  But I think the point of the question was who were the two people, the decision makers who had to file bankruptcy?  And the evidence

Page 60

is clear it was Mr. Zutter and Mr. Dundon?

MS. WILLIAMS:  That's correct, Your Honor. That's what I was eliciting.

THE COURT:  Right.  I understood that.

MS. WILLIAMS:  Thank you, Your Honor.

THE COURT:  Most people don't file Chapter 7 cases of this magnitude without counsel.  We all acknowledge that.  Okay.

MS. WILLIAMS:  If you could look at Trustee's Exhibit 1415, Mr. Zutter.  And I believe this was already admitted.

THE COURT:  What number?

MS. WILLIAMS:  1415?

THE COURT:  That's correct.  Go ahead, please.

MS. WILLIAMS:  Mr. Zutter, if you could just look at page eight.

THE COURT:  We put that up on the screen, please.  Thank you, Ms. Anwar.

MS. WILLIAMS:  Let me know when you're there, Mr. Zutter.

MR. ZUTTER:  Yes.

MS. WILLIAMS:  It's a bankruptcy filing, I don't know that you want to read the whole thing, but I can point you the --

Page 61

MR. ZUTTER: If you were to ask me a question, I just want to make sure I know what the document says.

MS. WILLIAMS: Okay.

THE COURT: If you read it sir, go ahead.

MR. ZUTTER: Okay. Page seven?

MS. WILLIAMS: Page eight.

MR. ZUTTER: Page eight.

BY MS. WILLIAMS:

Q   This is a written consent of the board of Directors of Ebersol Sports Media Group. Is that correct?

A   Correct.

Q   And it starts with the undersigned being all the voting members of the Board of Directors of ESMG, correct?

A   Correct.

Q   And it's signed by you and Mr. Dundon, correct?

A   Correct.

Q   And it references an Exhibit A that's being approved and that is -- starts on page nine. Is that correct?

A   Correct.

Q   And that's the resolution that approves the

Page 62

Chapter 7 filing, correct?

A    Correct.

Q    Okay.  If we look at page six of this document, it's the corporate ownership statement of Ebersol Sports Media Group, Inc.  Do you see that?

A    Yes.

Q    There's a footnote two in this document if you can look at that.  It says, on February 14, 2019 Dundon Capital Partners LLC acquired the right to 75 percent senior ownership and control and ever sell Sports Media Group, Inc.  The form of such capital security to be defined in definitive documentation at the sole direction of Dundon Capital Partners, LLC -- sorry, sole discretion of Dundon Capital Partners, LLC, but in all events senior to any other existing capital securities of Ebersol Sports Media Group, Inc. Such definitive documentation was not completed prior to filing.  Is that a correct statement, Mr. Zutter?

A    Yes.

Q    And you were involved in the drafting of this statement, correct?

A    Legal counsel probably actually drafted it, but I was involved in the process, yes.

Q    Okay.  And you approved that, correct?

A    Yes.

Page 63

MS. WILLIAMS:  All right.  Let's look at Trustee's Exhibit 27, which I believe is already admitted.

THE COURT:  Is that correct?  It's been admitted.  Go ahead, please.

MS. WILLIAMS:  Let me know when you're ready, Mr. Zutter.

MR. ZUTTER:  Okay.

BY MS. WILLIAMS:

Q   I am on page one.  Mr. Ebersol sent this email to you, Mr. Dundon, Mr. Kulas, and others on March 27, 2019, correct?

A   Correct.

Q   And his subject line was go forward options?

A   Correct.

Q   And before he lays out those options -- it's okay.

A   Sorry.

Q   It's okay.  Before he lays out those options, he lists some global notes, correct?

A   Yep.

Q   And the second note is the more time we have to close potential investors, buyers, and the more of the season that is completed, the higher likelihood of their investing, correct?

Page 64

A    Correct.

Q    And he says, "Example top potential investor may not be in LA until Monday, April 1st."  Is that what he said?

A    Correct.

Q    The third note is, "NFLPA has indicated that time is the primary reason for their reservation. Rushing them into signing has led them to a no."  Is that what he told you?

A    That's what he said.

Q    Do you recall that you and Mr. Ebersol were texting about the NFLPA issue?

A    I know we had texts about it.  These specific texts I can't immediately recall.

MS. WILLIAMS:  Okay.  Let's look at them then and mark that one because we're going to come back to it.  But D 99 are your texts with Mr. Ebersol?  And this is already admitted, Your Honor.

THE COURT:  Thank You.

MS. WILLIAMS:  Let me know when you're there Mr. Zutter, and I can give you the page number.  It's actually the third page of the exhibit.

MR. ZUTTER:  Okay.

BY MS. WILLIAMS:

Q    And just as a reminder, we discussed

Page 65

yesterday Mr. Ebersol's on the gray bubbles on the left, correct?

A    Yes.

Q    And you're in the blue bubbles on the right, correct?

A    Correct.

Q    So if we look -- you have to look at -- well we can see -- just trying to estimate the date.  On this page at the bottom of the page you can see it's March 27, 2019, right?

A    I can see that's the following texts are of that, yes.

Q    Okay.  And you say to Mr. Ebersol, I'm on the fourth bubble down on page three, "Just emailed everyone to dial in now.  How was PA?"  Is that what you said?

A    Yes.

Q    And Mr. Ebersol responds, "Okay.  Not great."

A    Yes.

Q    And then you respond, "That's too bad."  Correct?

A    Yes.

Q    And then Mr. Ebersol says, "The forced timeline is the issue, forced to make a fast call.  They will always choose no just to be safe."  Is that

Page 66

what Mr. Ebersol told you?

A   That's what he said.

Q   And then you respond, "I know."  Is that right?

A   Yes.

Q   Okay.  I believe you previously said that you don't recall anything about the NFLPA negotiations. Is that correct?

A   I wasn't involved with them personally and I don't recall the details of them.  No.

Q   Okay.  All right.  Let's go back to the email that was Trustee's Exhibit 27.

A   Okay.

Q   And option one is, wind down ASAP.  Correct?

A   That's a fair -- yes.

Q   And that's essentially what happened here. Would you agree with that?

A   Can you read the bullets?  But I think probably yes.  I think some of the dates might be off by a day or two, but --

Q   Essentially, yes.

A   Essentially, yes.

Q   Okay.  And Mr. Ebersol under option one lays out the risks as he sees them, correct?

A   He does.

Page 67

Q    And those include the highest likelihood of total loss of investment, correct?

A    Correct.

Q    Limited time to find potential new investors, correct?

A    Correct.

Q    Limited time to negotiate with the NFLPA to get a deal done?

A    Correct.

Q    Significant PR backlash for abruptly ending the season?

A    Correct.

Q    Likely releases players from non-competes thus furthering devaluing the company or making it less attractive?

A    Yes.

Q    Potentially losing all national sponsor revenue due to not completing the season?

A    Yes.

Q    Okay.  The second option he provides says move championship game to week nine, and he estimates that would cost 70 million plus another 4 million.  Is that correct?

A    Yes.

Q    He identifies that this option would allow

Page 68

the AAF to say they completed the season, which would give a better chance to sell the league.  Is that correct?

A    Yes.

Q    And this option didn't happen, correct?

A    This did not happen.

Q    The additional 4 million that Mr. Ebersol would be needed, that wouldn't have to necessarily come from DCP or Mr. Dundon, would it?  All right. His third option is to complete --

MR. HOCKADAY:  Your Honor, I'm trying to be respectful and I don't want to interject here, but for the last -- since lunch yesterday we've been essentially reading documents into the record and this document I think has come up on that, I would object that all those questions are cumulative.  If we could just have Ms. Williams maybe ask Mr. Zutter a question rather than just read it and say, is that what it says?  That would probably help us move on.  I'm eager to get Mr. Zutter so I can ask him questions to provide his story because he is a party in this case.

THE COURT:  Your response?

MS. WILLIAMS:  Yes.  Importantly, a lot of my questions are not, is that what this says?  There's something else.

Page 69

THE COURT: Right. You could -- I understand what you're saying, Mr. Hockaday, but she can ask him what about a content of a document. She's permitted to do that. I should say Ms. Williams, excuse me, but -- so I -- believe me, if there's anything we're all in agreement on, we're all interested in getting this done on time, and I understand how critical a witness he is, and I'm not going to preclude you from asking him whatever question you want. But if I think it becomes over -- too much time consuming, I'll let you know, but I don't think it is at this point.

MR. HOCKADAY: Understood. Thank you, Your Honor.

THE COURT: All right. It's overruled. So please continue, Ms. Williams.

MS. WILLIAMS: Thank you.

BY MS. WILLIAMS:

Q There is an option three for Mr. Ebersol in this document that he says would be an additional 11 million on top of the 70 million, correct?

A Correct.

Q And that additional 11 million also wouldn't have to come from Dundon or DCP necessarily, would it?

A No.

Q And on that option three in particular he

Page 70

calls out that it would leave one of the most valuable assets in place for player contracts, correct?

A    Yes.  He says that.

Q    Okay.  And then finally he has an option four that he says would cost an additional 70 million plus 20 million, correct?

A    Yes.

Q    And again, that 20 million wouldn't necessarily need to come from Dundon or DCP, correct?

MR. HOCKADAY:  At this point, Your Honor, I'm going to -- I'm just going to object to calls for speculation.  This is Charlie Ebersol's language as to what he is referencing and she's asking him what Charlie meant by it.

MS. WILLIAMS:  I don't believe I'm asking him what Charlie meant.  I'm asking him his opinion of where this money would or wouldn't come from.

THE COURT:  And I'm treating it as his opinion because he -- clearly, Mr. Zutter knew, was there on the ground, knew what was going on, and that's how I'm accepting his testimony.

MR. HOCKADAY:  Understood.

THE COURT:  So it's overruled.

MS. WILLIAMS:  All right.  Let's look at Trustee Exhibit 1225, which I believe is already

Page 71

admitted.

MR. ZUTTER:  1225?

MS. WILLIAMS:  Yes.

THE COURT:  It's admitted.

MS. WILLIAMS:  Your Honor, there's some confusion as to whether Mr. Zutter answered that last question.  Can I re-ask it just in case he did not?

THE COURT:  Yes, ma'am.

BY MS. WILLIAMS:

Q    The extra 20 million for option four would not necessarily have to come from DCP or Dundon, correct?

A    Not necessarily.

Q    Okay.  All right.  Sorry.  Now we can look at 1225.  Let me know when you're ready.

A    Okay.

Q    Bracewall was engaged as counsel for the AAF in the bankruptcy, correct?

A    Correct.

Q    Okay.  If we look at page two, Mr. Wood at Bracewall on March 29, 2019 is sending you and Mr. Vanderbilt an engagement letter for that engagement, correct?

A    Correct.

Q    And Mr. Vanderbilt responds and asks, "Could

Page 72

you please modify the engagement letter to be addressed to Charlie Ebersol rather than John's letter."  Is that right?

    A   Correct.

    Q   So Bracewell had originally -- if I'm understanding, drafted an engagement letter for you to sign, correct?

    A   It looks that way from this email chain.

    Q   Okay.  And then Mr. Vanderbilt's saying, no, Mr. Zutter change it to Mr. Ebersol, not Mr. Zutter, correct?

    A   Yeah.  I think you directed that comment to Mr. Wood versus me, but yes.

    Q   Correct.  And then Mr. Wood, does that correct?  On April 1, 2019?

    A   Yes.

    Q   And then Mr. Ebersol on April 1st, 2019 says to you, "With respect I do not believe I have authority to sign this."  Correct?

    A   She says that, yes.

    Q   At this point, Mr. Ebersol's not a voting director, correct?

    A   No, he isn't.

    Q   And he did not vote on the bankruptcy, correct?

Page 73

A    No, ma'am.

Q    Okay.  And you respond to Mr. Ebersol on April 1, 2019 and you say you are authorized to sign it, correct?

A    Yes.

Q    Do you direct Mr. Ebersol to sign that letter?

A    I was providing him authorization to sign it.

MS. WILLIAMS:  Okay.  Let's look at Trustee's Exhibit 1208.  This is not in evidence, Your Honor, yet, and I'd like to offer it.  I believe I'm waiting on your counsel.

MR. HOCKADAY:  Your Honor, I think at least this iteration here.  I think is all hearsay.

THE COURT:  Okay.  Let's see.

MS. WILLIAMS:  The first page includes an email from Mr. Vanderbilt.

MR. ZUTTER:  My apologies, Your Honor.

THE COURT:  Okay.

MR. HOCKADAY:  So we have a communication from PWC, then an unsigned contract.  So I think this version of -- there's probably another version of it could be admissible, but I think as presented here it's hearsay.

THE COURT:  Your response?

Page 74

MS. WILLIAMS:  I don't need the contract, Your Honor.  I need in the emails between Mr. Vanderbilt, which is -- he's associated with DCP.  So submission of a party opponent and then the response from PWC.  But if they want to exclude the exhibit, I don't have a problem with that.

MR. HOCKADAY:  It's the same issue with the email.  This is a communication from PWC actually, when you look at it, and if she wants --

THE COURT:  I don't have it up on the screen so I need it, please.

MS. WILLIAMS:  You need page one (inaudible).

THE COURT:  Go ahead, please.

MR. HOCKADAY:  Oh, thank you.  So it's a communication from PWC, and if it's related to -- could you modified on that, we just looked at that in the last exhibit so you (inaudible) this part is all hearsay here, so it doesn't --

MS. WILLIAMS:  Your Honor, the last exhibit was between Bracewall and the DCP team and the (crosstalk) --

THE COURT:  (Crosstalk) hearsay?

MR. HOCKADAY:  Yeah.  No.  She's right on that.  I still think it's hearsay.  I think there's probably admissible version of this, but this one here

Page 75

isn't inadmissible, so.

THE COURT: Objection's sustained. Let's try elsewhere.

MS. WILLIAMS: Okay. I'm sorry, Your Honor. Just to make sure I'm clear, you're ruling that the email from Mr. Vanderbilt's not admission of a party opponent?

THE COURT: No. I'm willing that email from Mr. Fleming (ph) to Mr. Zutter is hearsay. The bottom part, I don't know what it tells us. I mean, there's -- I say this with respect, there's not much dispute. I understand the importance of this, but there's not much dispute that (inaudible) was retained from bankruptcy, right?

MS. WILLIAMS: Correct. Your Honor, what we're showing is that Mr. Zutter and Mr. Dundon purposely avoided signing the documents. Enforced Mr. Ebersol to sign them by having the engagement large change, that's the purpose. So if Your Honor just wants to let me admit the second email on the first page that's all I need. And I think that's admission of a party opponent.

THE COURT: What about that?

MR. HOCKADAY: I think it's the same issue that we have with the entire email. We can't parse

through emails here. If it's hearsay, the whole thing stays out. We can't do and run around and get other admission hired.

THE COURT: I agree, this one's going to stay out. You'll have to try it out another way, Ms. Williams.

MS. WILLIAMS: Okay.

THE COURT: So it's sustained.

MR. HOCKADAY: And I would note for the record too in response to the getting other people to Mr. Ebersol. Okay.

THE COURT: I'm not -- that document for what it's worth does not say that, okay? So we'll see if it comes in or not. Go ahead, please.

BY MS. WILLIAMS:

Q All right. Mr. Zutter -- or were you involved in the engagement of PWC for some work on the bankruptcy?

A Yes.

Q You were? Okay. Do you recall the date of that engagement?

A I don't recall the specific date of that engagement.

Q Okay. And your --

MR. HOCKADAY: And --

Page 77

MS. WILLIAMS: Your --

MR. HOCKADAY: Oh, sorry, Your Honor. Are we close to a natural -- I can use a nature break.

MS. WILLIAMS: I'm happy to break here, Your Honor. But the question I was going to ask was if Mr. Zutter doesn't remember the dates, could I use the engagement letter to refresh his recollection on the date?

THE COURT: Well, we'll pick that up after a comfort break. How much work do you think you have with the witnesses?

MS. WILLIAMS: 20 minutes.

THE COURT: Yeah. Let's go ahead. I'm sure that your time estimate is accurate, but given that there's one request it means that one's probably needed.

MR. HOCKADAY: Yeah.

THE COURT: So we'll take a 15 minute break roughly until 10:15. We're on record off the record. In recess, ladies and gentlemen.

COURT CLERK: All rise.

(Off the record.)

THE COURT: Thank you, ladies and gentlemen. Please be seated.

MR. ZUTTER: Thank you. Please proceed.

Page 78

THE COURT:  Go ahead, please.

MS. WILLIAMS:  Your Honor, I believe right before we broke, I was asking if I could have Mr. Zutter look at 1208, not to put in evidence, but to refresh his recollection regarding the date of the engagement for PWC on the bankruptcy.

THE COURT:  Okay.  Do you have an objection to that or is that acceptable?

MR. HOCKADAY:  I don't have an objection to her using a document to refresh Mr. Zutter's recollection.

THE COURT:  Perfect.  All right.  You may proceed.

MS. WILLIAMS:  Thank you.

BY MS. WILLIAMS

Q   Mr. Zutter, if you wouldn't mind looking at Trustee's Exhibit 1208, which is not in evidence.  But I would just like you to look at it to see if it can jog your memory as to the date that PWC was engaged to do bankruptcy work for AAF.

A   And again, I don't know the specific date that we signed the engagement letter.

Q   If you look at 1208, does that help you recall the date of the engagement letter?

A   Rules out before 5:36 Central Time on March

Page 79

29th, but I don't know if we signed it that day, the day after, if it --

Q   Okay.  That's fair, Mr. Zutter.  So it was at least March 29, 2019, but maybe later.  Is that correct?

A   Yeah.  I just don't recall the specific date.

Q   Okay.

A   (Inaudible) the signature.

Q   Well that's helpful because if you wouldn't mind looking back at Trustee's exhibit 1176, which is already in evidence.  That's the pencils down email you and I were discussing earlier.

A   Okay.

Q   That pencils down email was on March 26, 2019, correct?

A   Yep.

Q   So that must be referring to the structuring work not the bankruptcy work, correct?

A   Yep.  Based on the two things that make sense.

MS. WILLIAMS:  Okay.  Thank you.  All right. Let's look at Trustees Exhibit 126, which I'd like to offer, and I don't believe there's an objection.

THE COURT:  126?

MS. WILLIAMS:  126.  Yes.

Page 80

MR. HOCKADAY:  Oh, no objections, Your Honor.

THE COURT:  Thank you.  Would you note, please, that Trustee 126 is admitted.  Go ahead, Ms. Williams.

(TRUSTEE'S Exhibit 126 was marked for identification.)

MS. WILLIAMS:  Let me know when you're ready Mr. Zutter.

MR. ZUTTER:  I'm ready.

BY MS. WILLIAMS:

Q    Okay.  So if we look at the bottom email on page one, this is an email from Mr. Kantowitz on April 12, 2019.  Is that correct?

A    April 2nd, yes.

Q    Sorry, but that's not what that says.

A    You said 12th.

Q    Oh, I apologize.  April 2, 2019, correct?

A    Correct.

Q    Okay.  And Mr. Kantowitz says, he's attaching an updated working draft for the 12-week plan.  Is that correct?

A    Correct.

Q    And that's 12-week plan is what would accompany in chapter 11 filing, correct?

A    Correct.

Page 81

Q   And then a Chapter 11 filing under a 12 week plan the business AAF would've stated going concern, correct?

A   That would be the hope.

Q   Okay.  And Mr. Kantowitz lists out some details, but he says, "Currently we have another $2,842,742 for the 12-week plan, which would bring the total funding required to $71,093,874."  Correct?

A   Correct.

Q   So Mr. Kantowitz is essentially saying that for the 12-week plan as they're currently working on it, you need a little more than 71 million total investment, correct?

A   That was his assumptions as presented on this email.

Q   Okay.  And then you respond on April 2, 2019 also and you say, "Why aren't we targeting 70?  We don't have $71 million."  Correct?

A   Correct.

Q   Are you stating in this email that Dundon Capital Partners is not willing to put in the 1,093,874 currently estimated for that 12-week plan?

A   Is your question, were we willing to invest an incremental 1.7 million on top of the 70 million?

Q   1.09 million, but, yes.

Page 82

A    Excuse me.

Q    Yes.

A    Yes.  I was saying we as the AAF do not have a $71 million investment.  We have a $70 million investment.

Q    Okay.  Do you know at that time if Dundon Capital Partners was willing to put in an additional 1.09 million?

A    We were not.

Q    Okay.  So what hat are you wearing in this April 2, 2019 email?  AAF or DCP?

A    We -- I'm speaking on as a board member saying, why are we targeting 70 in terms of our plan?  Why are we not targeting -- or why are we targeting 71 instead of 70, as the AAF?

Q    Okay.  So you're wearing the AAF hat in this email, but you knew DCP wouldn't put in the 1.09 million for the 12-week plan?

A    Correct.  And --

Q    Okay.

A    -- it also -- the plan didn't contemplate paying off all the other payables as well, which would be incremental to this, but yes.

            MS. WILLIAMS:  Okay.  All right.  Let's look at Trustee Exhibit 1236, which I'd like to offer into

Page 83

evidence.  Brent, if it helps, I think the only part of this was not duplicative it's the very top.

MR. HOCKADAY:  I got you.  Yeah.  I -- that's what I was -- I think you're right.

MS. WILLIAMS:  Okay.

MR. HOCKADAY:  Yeah.  Your Honor, I have no objection to this.

THE COURT:  All right.  Thank you.  So 1230 -- Trustee 1236 is admitted.  Go ahead, please.

(TRUSTEE'S Exhibit 1236 was marked for identification.)

MS. WILLIAMS:  Thank you.

BY MS. WILLIAMS:

Q   Mr. Zutter, you're free to look at it, but I'll represent to you this is the same chain that we just looked at with Mr. Kantowitz up until the top email.  Is that fair?

A   Yep.

Q   Okay.  So you essentially start a new chain also on April 2, 2019 by forwarding Mr. Kantowitz's email to Mr. Kulas, Mr. Dundon, Mr. Vanderbilt and Mr. Wood, correct?

A   Correct.

Q   And you state in this email, based on the below, and that's referring to Mr. Kantowitz's 12-week

Page 84

plan that needs $71.09 million, right?

A    Yes.

Q    "So based on that I think it's imperative to do the layoff immediately."  You're referring to the layoff of the AAF employees?

A    Of a substantial portion of them, yeah.

Q    Okay.  And you say, "Doing so would allow us to pay folks rateably today, which a alone gets us halfway to the 70 million target.  We can spend the next two days getting the plan to be at 70 million."  Is that what you said?

A    Correct.

Q    Okay.  Which hat are you wearing here in this email?  AAF or DCP?

A    AAF.

MS. WILLIAMS:  Okay.  All right.  Let's look at Trustee's Exhibit 1232.  And I'd like to offer this into evidence.  Same thing, Brent, it's just kind of building.

MR. HOCKADAY:  Yeah.  I don't have an objection to this, Your Honor.

THE COURT:  Thank you, Mr. Hockaday.  Trustee 1232 is admitted.

(TRUSTEE'S Exhibit 1232 was marked for identification.)

Page 85

BY MS. WILLIAMS:

Q   Mr. Zutter, I think -- and tell me if you think I'm wrong.  I think just the first top two emails are new on this one.

A   That looks correct.

Q   Okay.  So just looking at the top email from you to Mr. Dundon, Mr. Kulas, Mr. Wood, and Mr. Vanderbilt on April 2, 2019, you say, "I think we should do a call with Charlie and this group ASAP." Correct?

A   Yes.

Q   Okay.  Mr. Ebersol is not on this chain, correct?

A   No.  He's not.

Q   And you say, "We agree on immediately as a board, that's you and me, then we plan on sending out the company email immediately."  Is that what you said?

A   Correct.

Q   And when you say we agree or you're referring to the AAF here?

A   Yes.

Q   So you're wearing your AAF hat here?

A   Correct.

Q   And you're talking about you and Mr. Dundon

Page 86

just agreeing as the board and letting Charlie know what that decision is, right?

A    Yeah.  And as the voting members of the board.

Q    Okay.  And then you say, "Charlie may resign in disagreement positioning that this isn't his idea and we are to blame."  Is that what you said?

A    Correct.

MS. WILLIAMS:  Okay.  Let's look at Trustee's Exhibit 1234.  And I don't believe there's any objection to this exhibit that I'd like to offer.

THE COURT:  It was 12?  I didn't get the number.

MS. WILLIAMS:  Sorry.  1234.

THE COURT:  All right.  Thank you.  Mr. Hockaday?

MR. HOCKADAY:  (Inaudible).

THE COURT:  That's fine.  You can take a moment.

MR. HOCKADAY:  Oh, thank you, Your Honor.  I was asking Mr. Webster if you could scroll down because I'm maxed out on my PFD on the computer.  Oh, it's just that.  I have no objection to this, Your Honor.

THE COURT:  Thank you.  1234 -- Trustee 1234

Page 87

is admitted.

(TRUSTEE'S Exhibit 1234 was marked for identification.)

BY MS. WILLIAMS:

Q   And this is an email, Mr. Zutter, that you sent on April 2, 2019?

A   Correct.

Q   And in this email you're saying, the board authorizes the termination of all vendor relationships.  Is that correct?

A   Correct.

Q   And the board is you and Mr. Dundon as the voting members, correct?

A   That is our understanding at the time, correct.

MS. WILLIAMS:  Okay.  Let's look at Trustee's Exhibit 311, which I believe is already admitted.

THE COURT:  Okay.  Yes.  311 has previously been admitted.

MS. WILLIAMS:  Let me know when you're ready, Mr. Zutter.

MR. ZUTTER:  Let me quickly read.  Okay.

BY MS. WILLIAMS:

Q   Looking at the email in the middle of page one, that's from you to Charlie on April 1, 2019.  Do

Page 88

you see that?

A    Yes.

Q    And in this email, I'm looking at the second paragraph, you say, "Jason, I'll let you speak formally for DCP in this context, but I understand that DCP's position is that it is not committing any more than the 70 million at this time."  Is -- did you write that?

A    Yes.

Q    And are you referring to Jason Kulas there?

A    Correct.

Q    Why was Jason Kulas speaking formally for DCP in this context?

A    As we were going into a bankruptcy process, we wanted to make sure that we were being as thoughtful as possible.  And so, we tried to the best of our abilities, segregate duties whereby, Jason was thinking from the DCP perspective, and I was trying to the maximum extent possible recognizing I had multiple roles to limit my focus during this time period to that of acting as a board member of the AAF.

Q    Prior to this bankruptcy process, was Mr. Kulas ever speaking formally for DCP?

A    I think in many contexts he was speaking formally for DCP.

Page 89

Q   Do you ever use those words in any other email you've seen that Jason's speaking formally for DCP?

A   I'm not sure if I've used those specific words or not.

Q   Okay.  And then in the next paragraph you say as an AAF board member referring to yourself.  Is that correct?

A   Correct.

Q   Then you say, "DCP has not made any further commitment after 70 and has made clear that there is no further capital from DCP unless until things change."  Is that correct what you said?

A   Correct.

Q   So you're confirming what you had Mr. Kulas formally saying for DCP?

A   Can you repeat your question?

Q   Yes.  So you're confirming what you were asking Mr. Kulas if he was formally saying for DCP?

A   I was confirming my understanding of DCP's position at that point in time.  And what I had understood it to be fairly consistently throughout the period of time.  So I was giving an opportunity for Jason to provide a DCP perspective separate from mine. I was providing my understanding as a board member of

Page 90

what DCP's position was.

Q   Okay.  And you had known, previously, you've said, DCP'S position was, it wasn't independent of Penny more than 70 million before this process, right?

A   Correct.

Q   Okay.  And you and Mr. Kulas had talked about that before, correct?

A   As said, all of us on this chain, yes.

Q   Okay.  Were you aware of Mr. Dundon offering to Mr. Ebersol at some point during this process that he was willing to give the league back to Mr. Ebersol?

A   I've understood that there were conversations saying -- you know, when we got to a certain point that we were looking at and open to all alternatives, up to, and including essentially selling the business for $0 as is where to, you know, anyone who wanted to assume the ongoing obligation to the business.

THE COURT:  So that's a yes?

MR. ZUTTER:  Yes.  Sorry.

THE COURT:  Thank you.

BY MS. WILLIAMS:

Q   But that didn't happen, correct?

A   No.  It did not happen.

MS. WILLIAMS:  Okay.  Let's look at Trustee's Exhibit 298, which I believe is already in evidence.

Page 91

THE COURT: (Inaudible).

MS. WILLIAMS: Let me know when you're ready, Mr. Zutter.

THE COURT: Thank you. It's a little small for my age, and even though things are much better, it's still -- I need a little help, so, I appreciate you loan it up, Mr. Zutter.

MR. ZUTTER: You're welcome, Your Honor.

THE COURT: I'm not 25 anymore.

MR. ZUTTER: Okay.

THE COURT: Okay.

BY MS. WILLIAMS:

Q   All right. I'm going to start on page three of Trustee's Exhibit 298. There's an email from Mr. Cohen at Bracewell on April 16, 2019 to Mr. Farrell, Mr. Ebersol, and Mr. Vanderbilt, correct?

A   Correct.

Q   Okay. And then if we look at the bottom of page two, and then it's going to go on three -- the bottom of page two, Mr. Vanderbilt responds to Mr. Cohen at Bracewell and copies you, but takes everyone else off the chain, correct?

A   Correct.

Q   And Mr. Vanderbilt says, "Shouldn't Dundon Capital Partners LLC be listed in the credit matrix

Page 92

for the 70 million?" That's what Mr. Vanderbilt asks, correct?

A Correct.

Q And then Mr. -- If we go back to page two, Mr. Cohen responds, and then you respond, again, just to Mr. Cohen and Mr. Vanderbilt also on April 16, 2019, correct?

A Correct.

Q And you say, "Want to make sure we are characterized like we put in the footnote last night." Is that correct?

A Correct.

Q And, we, refers to DCP in this context, correct?

A Correct.

Q That footnote is the one that you and I looked at in trustee's Exhibit 1415, the bankruptcy filing. Correct?

A Think that's fair.

Q Okay.

THE COURT: It -- for clarity on the record, the footnote too said what, with regard to their financial relationship to the debtor? I don't know how else to denominate that.

MS. WILLIAMS: Yes, it was on page -- oh,

Page 93

great.  Thank you.  It was on page six of trial Exhibit 1415.

THE COURT:  Thank you.

MS. WILLIAMS:  It was describing Dundon Capital Partner's rights and the definitive documentation issue.

THE COURT:  Thank you.  Go ahead please.

BY MS. WILLIAMS:

Q   All right.  Going back to Exhibit 298.  If we go to page one, and it's going to carry over on page two, but Mr. Vanderbilt responds to you, correct?

A   He does.

Q   Okay.  And he tells you that he's talked to Mr. Corner Bracewell, and he is clarifying where DCP will be mentioned in the bankruptcy filing, correct?

A   Correct.

Q   And he says, "The 70 million will not be included, nor will DCP be mentioned in any of the schedules or summaries as the investment was never clearly defined as debt."  Correct?

A   Correct.

Q   And then you respond, going to page one, and you add to this chain, so it's you, Mr. Vanderbilt, Mr. Cohen, and you add Mr. Scotch Topol, correct?

A   Yes.

Veritext Legal Solutions
800-336-4000

Q And he's DCPS outside Counsel, correct?

A Yes.

Q And you say, "Since the board is obligated to agree with documents, should we do a one page document defining our security before filing?" That's what you suggested, correct?

A Correct.

Q And when you say our security, you mean DCP security, correct?

A I mean the 70 million investment.

Q But our --

A The DCP made, yes.

Q Our security is DCP security, right?

A Correct.

Q Okay. And when you say the board, you're talking about AAF's board, correct?

A Yes.

Q Okay. And then Mr. Cohen responds to this chain that's still got you, Mr. Vanderbilt, and now Mr. Scotch Topol on it, is that correct?

A Correct.

Q And he says, "Documentation read the security is up to DCP and DCPS Counsel?" That's what he said, correct?

A Correct.

Page 95

Q   And then he said that, "I would point out that the BOD, that means board of directors." Correct?

A   Correct.

Q   "Is not certifying whether the schedules are accurate.  It's also important to remember what hat you were wearing at each such moment, and the BOD hat would not be agreeing to any new debt documents on the year of filing."  That's what Mr. Cohen said to you, correct?

A   Correct.

Q   And you respond, he was making a good point, right?

A   Yes.

Q   And this whole discussion that we've just looked at in Trustee's Exhibit 298, about where DCP should be on the schedule and what debt documents or security documents that might have, there's no one from AAF except yourself copied on these, correct?

A   In the few that we're looking at right now, yes, I'm the sole representative of AAF.

MS. WILLIAMS:  Okay.  Your Honor, I'll pass the witness at this time.

THE COURT:  Are you ready, Mr. Hockaday?

MR. HOCKADAY:  I am, Your Honor.

Page 96

THE COURT:  Sir, do you need a minute to collect your notes or anything?  I'll happily to accommodate that if you'd like a couple minutes to do that.

MR. ZUTTER:  I appreciate that.  I think I'm ready to roll, but let me -- if -- actually, I think my team might need a minute for audio (inaudible).

THE COURT:  Sure.  You need, like, five minutes or so?

MR. ZUTTER:  Yes, that would be great.

THE COURT:  Okay.  So I'll step away and if anyone missed a comfort break last time, they got a second one this time.  So we'll come back in about -- I'll come back at 10:55, and then we'll get things set up and go from there.  So, short recess, ladies and gentlemen.

COURT CLERK:  All rise.

(Off the record.)

THE COURT:  Thank you.  Ladies and gentlemen, please be seated.  Mr. Zutter, take your seat.  Mr. Hockaday, when you're ready, you may proceed.

MR. HOCKADAY:  Your Honor, I'll wait until everybody's situated.

THE COURT:  Okay.  Go ahead, sir, when you're ready.

Page 97

MR. HOCKADAY: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. HOCKADAY:

Q Good morning still, Mr. Zutter. How are you?

A I'm doing just fine.

Q Excellent. Now, we've had the privilege of listening to your testimony now for about a day and a half almost. And what we haven't done is given Judge Gargotta, kind of, a foundation as far as who it is you are. Now, have you ever been sued before?

A No, sir.

Q All right. So this is your first time in a courtroom as a party?

A Yes.

Q All right. I want to give you the opportunity to tell your story to Judge Gargotta. So briefly, can you share with Judge Gargotta a little bit about your educational background?

A Sure. So, I went to university at Colgate University in upstate New York. Started out thinking I'd be a history major in -- 911 happened as I was a freshman and I'd lived right down the street from World Trade Tower, so I found myself taking international relations classes, took one, then took a bunch of them, specifically on the Middle East and

Page 98

international relations, things like that. And, you know, I ultimately did my honor thesis on -- like a comparative analysis of Islamic terrorism of all things compared to the IRA and other things. And I thought I wanted to be a lawyer. So during the summers, I actually paralegals at a law firm called Boy Schiller.

Q We'll get to -- we'll break it up just a little bit here. So, can you tell Judge Gargotta what you got your degree in?

A In political science.

Q All right. And what year was that?

A I graduated in 2005, and then immediately after did a business program at Dartmouth's business Program.

Q Okay. And did you obtain any certifications through that program?

A That's not a degree conferring program. It's more of a management training program.

Q Can you --

THE COURT: Did you say management training program?

MR. ZUTTER: Yes. So, I believe it was McKenzie who did this way back when they were hiring people from technical schools like Wharton, and

Page 99

others.  And they wanted to be able to hire people from liberal arts schools, but those folks didn't necessarily come with some of the technical skills. So they partnered with Dartmouth University to do like a micro MBA in a three month period.

And so, it was kind of tailored for folks coming out of liberal arts education to give them a crash course, graduate school level set of tools to be able to go into more of a traditional corporate job. Started with McKinsey, but then broadened to be something that you could apply to from a variety of places.

THE COURT:  Thank you.

BY MR. HOCKADAY:

Q   Thank you.  And after you obtained your degree and participated in the program, what did you -- can you explain to Judge Gargotta, let's talk about first step, what you did professionally.

A   Yeah, so I was -- during college, I was a summer paralegal at Boy Schiller.  I realized during that time period, with all due respect to all the lawyers in the room, I wasn't sure I wanted to be a lawyer.  And I decided, I thought I wanted to go into the business side and specifically finance.  My studies didn't necessarily make myself the most

Page 100

logical candidate to go into investment banking.  So I went and did that Dartmouth program to give myself more tools.  And then at the end of that, went back to work at Boys Schiller while I was interviewing for jobs on Wall Street as a investment banker.

Q  Talk to -- let's talk a little bit about that process.  Can you share with Judge Gargotta what the process is like for somebody interviewing for an investment banking job coming out of college?

A  Yeah.  So, it's pretty formulaic.  Most of the time, I'm kind of the exception to the rule.  Most of the time it's probably at least 90 percent of entry level people actually do their summer internship.  Those summer internships are through very focused recruiting programs.  Typically the top, call it 15 schools, and it's the top 10 or 15 percent of students from them.  And so, that's kind of the feeder program generally into the analyst program.  I didn't do one of those since I was, you know, considering a legal profession at the time.  And so, I had to kind of go through the side door, so to speak.  So, you know, tried to network with alumni and other people as best I could.  I think it actually took me like 104 in person interviews before I actually got a job, which was -- required a degree of persistence, I guess.

Page 101

Q   And where did you get that first job?

A   So I got that job at JP Morgan, and specifically in the financial institutions investment banking group.

Q   Can you share with Judge Gargotta, just briefly, what that entails?  What that group entails?

A   Yeah, and --

MR. HOCKADAY:  Bless you.

THE COURT:  Thank you.

MR. ZUTTER:  Even how I got into it was a little bit strange.  So I had a senior banker who knew through another student at university had kind of opened a door for me.  The door didn't really want to stay open, so, again, most people go into --

MR. HOCKADAY:  Bless you.

MR. ZUTTER:  -- formal analyst class, which starts with a training program and then proceeds.  I got hired off cycle, so in January of 2006, so about six months after I graduated.  And I got hired on a month-to-month program.  And so, each month I would work, and then on the last Friday of the month, they tell me if I had a job on the Monday after.  So, that was a little stressful.  But I was fortunate to be able to make it through those six months.  And then once you get through those six months, you go into the

Page 102

formal training program. So that's, all the analysts across the globe that are going to work for the bank in my year. There are 168 analysts globally. And so, you all meet in New York and you have a couple months very intensive training program.

BY MR. HOCKADAY:

Q Let's pause right there for a second. So, if I understood your testimony, you said you worked a full week and then you'd find out if you continued to have a job on the following Monday. Is that correct?

A At least once a month, not once a week.

Q Once a month, sorry. Okay. That is stressful. Can you -- so is it fair to characterize -- and then after that you went into the analyst training program?

A So then I went into the more normal ordinary funnel.

Q And is it fair to say that it was almost like a six-month tryout?

A It was 100 percent. It was really a one month tryout with five extension periods, but, yes, it was a subcontract.

Q And can you share with Judge Gargotta the scrutiny you had to go under during that period?

A Yeah, I mean, I had reviews every month when

Page 103

most people had reviews once a year.

Q   And can you share with Judge Gargotta the people who were conducting these types of reviews?

A   Yeah.  They would've been the vice presidents, executive directors, managing directors of the group.  So people, generally speaking, with 15 to 35 years of experience.

Q   And to your knowledge, I think now it is, I don't know what it was in 2006, how large of a bank is JP Morgan Chase?

A   Top four in the US.  Today it's definitively the largest in the US.  And our group was one that's particularly interesting.  So I was in the financial institutions group, which means we provide advice, advisory work and other investment banking services to financial services companies themselves.  And the distinction there is, I think, important because if you're an investment banker trying to talk about the capital markets or an investment security, or an M&A situation, or a restructuring to the CEO of a company that makes, you know, plastic bottles or something, they're going to be an expert at plastic bottles.  And you're going to be an expert corporate finance.  If your counterpart is the CEO of incredibly large private equity firm, they know your business as well

Page 104

or better than you do.

Q  I want to pause there for a second.  So when you're in the analyst program, let's pivot to that. Let's talk about that for a second.  Can you share with Judge Gargotta just the time period the analyst program takes?

A  Yes.  Typically, it's a two-year program.  So you get hired out of college and it's on an academic cycle basis.  So you're generally given an offer that is expected to last two years.  So that'll be from, call it July on an annual basis for two years.  Of course, people might be let go, but the expectations, you're there for two years.  And that's kind of a set tradition in Wall Street.  For those that are high performers, you are often, or a select group might be given a third year and where you're called the third-year analyst.

After that, the overwhelming majority then exit and do other things.  They'll go work at a company, they'll work at an investment company, they'll get some more experience, then they typically go to business school.  And then from business school is when investment banks hire what's called an associate, which is the second level.  And so those first two years is a two-year program, typically.

Page 105

Q   Let's talk about that two-year program just briefly, then we'll go to the associate program next. In the analyst program, the two-year period, can you share with Judge Gargotta some of the training and expertise that you developed during that period?

A   Yes.  So, you work hours similar with lawyers and then -- and other incredibly hardworking professional services folks --

Q   Parents of newborns?

A   What's that?

Q   It was a joke, sorry.  And parents of newborns.

A   Yeah.

Q   As you know.

A   I got it.  So, you work around the clock and you're working on a variety of different transactions on any given point in time, and you're working on, you know, somewhere between 5 and 10 different things across a range of different types of transactions.  So as an investment banker, you're doing debt, you're doing equity, you could be doing restructurings, you could be doing regulatory advisory work, you could be doing mergers, acquisitions, carve out spinoffs, et cetera.

So the whole, kind of, range of transactional

Page 106

things for companies.  And at JP Morgan, as one of the larger banks, the investment bank generally is looking at companies that are a billion dollars of value up, with kind of an exception to go down to the millions or the hundreds of millions.  Below that is generally managed out of the commercial bank rather than the investment bank.  So it's generally companies that can be across a pretty broad range of maturity, but they're of some degree of scale from a value perspective.  So 300 million at the low end to hundreds and hundreds and hundreds of billions on the high end.

Q   Thank you.  And after you completed the analyst period, the two-year period, I think you said there was a third.  Can you explain to Judge Gargotta what you did after that?

A   Well, we were in a particularly unique situation because I went and started my career covering financial services.  And within financial services, we call it FIG, Financial Institutions Group.  So if I abbreviate, that's what I mean.  So within FIG, there's a bunch of subgroups.  So you had banks, which are pretty self-explanatory.  They're covering banks, market structure, which is the exchanges, New York Stock Exchange and Nasdaq, et

Page 107

cetera.  Insurance companies, asset managers, and then specialty finance, which was miscellaneous for anything else that didn't fit into a single box.

I went into specialty finance.  And within that, I was principally focused on subprime finance and subprime mortgage in particular.  And this is the time that the financial crisis kicked off.  So, I was kind of in the heart of the storm during the worst part of it and covering subprime mortgage companies.  So got a degree of familiarity with companies that were going through liquidity constraints and other problems, and the value of making sure that companies had adequate liquidity to kind of make it through and the tough decisions that came with that.

While I principally focused there, I also got some experience across all the different verticals over time.  But I spent most of my time there, so that -- the first two years I got to work on some pretty interesting things right as the financial crisis started really exploding, you know, I worked on my -- my first transaction was the last kind of opportunistic acquisition of a subprime mortgage company.  All the rest of them were (inaudible) recissions, that was called Credited Home Lenders were buying a company called Ames in southern California. I

Page 108

got to work on the second largest, the sale of the second largest non-prime mortgage company, which was called Ameriquest.  We sold that to Citibank right at -- as the financial crisis were like kicking off.  So we were doing that, like kind of, as a lot of the folks were starting to see some of these emerging trends.  We had a front row seat for it.

I got to work on the largest ever financial services transaction to date, which was when JP Morgan Bank of America and a private equity firm called JC Flowers went to buy Sallie Mae, the student lending business that was a $25 billion equity check, $231 billion committed financing for it, which was super interesting because I was kind of cutting my teeth as the analyst on the front side of it.

And then the associate who was doing a lot of the analytical work went on his honeymoon right as the auction rate markets collapsed, and the entire business was a big question.  In fact, it's one of the few huge deals where you had to look at the material adverse change provisions as a way to, you know, think about restructuring the transaction.  You know --

Q   Oh, sorry.  No --

A   I had a number of other really interesting experiences during that time period.  Like I worked on

Page 109

AIG when we tried to rescue that before the government had to intervene, we were unsuccessful in that one.  I was on the four-person team, where JP Morgan bought Bear Stears in a weekend.  And so, the four of us from the investment bank led that transaction bringing in about 250 senior bankers across the globe to try and due diligence in a 72-hour period.  That one we were successful with and were able to rescue that business.  So I had a range of different opportunities over that time period.

Q  I believe there was an HBO movie that covered some of that a few years ago.  I want to talk about -- let's talk about your -- it sounds like you had an incredible amount of experience from a bread standpoint.  Can we talk about how your performance was?  Can you share with Judge Gargotta just a little bit so he can understand how you did rather than just I did these things, just how you performed.

A  So, banks are pretty ruthless about this.  Everything is on a forced curve no matter how good everyone is.  So 20 percent, 20 percent, 20 percent, 20 percent, 20 percent, the bottom 20 are just definitionally out.  Top 20, you know, are generally going to have a good outcome and maybe acceleration of a career.  I was in the top bucket every year.  I was

Page 110

fortunate to be there.  It's particularly relevant though, because during the financial crisis, we ended up terminating people that were exceeding expectations.  So we fired all the way up to the 75th percentile, as we were kind of going through that time period.  But I was fortunate to be able to make it through that.

Q   Overall, how many years did you work for JP Morgan?

A   Until 2014, so a little less than nine years, and I was -- during that time period, I was fortunate to get the third-year promotion, then I got the A to A promotion.  So just for context there, there were 168 analysts in my analyst class.  Only eight of them globally got that direct promotion.  Four of them happened to be in the favor.  So we were kind of the CL team during that tough time from an economic crisis perspective.  And I think only two of us made it to VP.

Q   Who else did you work with at JP Morgan?

A   So one of the -- I had a lot of great fortune to work with a bunch of really, really interesting, impressive people that many of them are now in really big roles.  So my mentor over that whole time here, the guy who had run specialty finance when I started

Page 111

it, he now runs the entire commercial investment bank. And this mentor to this day. Got to work personally on a number of transactions with Jamie Diamond himself. He was on the Sallie Mae transaction at our Sterns transaction.

I got put on a four-person task force on housing reform. The government asked for public comments from all the banks, and so there was a small group of us reporting directly to Jamie in terms of coming up with what was the bank's perspective on how to think about housing reform for the United States. My -- another mentor is -- became the CFO of UBS. She's now the CFO of the Nasdaq. The other co-head of my group is now the CEO of the Commercial Investment Bank at Wells Fargo. So the -- I was in a very unique group at a very unique time that the training that they got has allowed those people to be in a lot of really interesting positions today.

Q Yeah. After JP Morgan, you went to Santander Consumer, correct?

A I did.

Q Can --

A You know --

Q Can you share with Judge Gargotta when that happened?

Page 112

A Well, I think some context is helpful too, right? So, the financials group at JP Morgan covers about 350 companies in the United States that range in those size buckets that I talked about. And generally, like the kind of politics of it, when you're thinking about who's going to work on different things is the higher performing people work on some of the bigger clients and lower performing people generally work in kind of the middle. And then the higher performing ones are often given a little bit of autonomy to work on the small ones too, where maybe there's a little bit less risk for the bank and a good development opportunity. Tom was running one of the companies that, at the time, was absolutely a tier one high performing financial institution. It was the largest non-bank consumer finance company in the United States at the time.

And I started working with Tom, where I was the junior guy on the deal team, probably in something like 2007. So it was during my analyst years, maybe 2008, and I had to work -- the opportunity of both, for him to work across the table where I was advising a business he might have been thinking about acquiring. And so, you know, being in a kind of adversarial position, but also working with them as a

Page 113

client.  So, Santander Consumer became a client when I was an analyst and then proceeded to be a client as my associate and VP years.  So we worked on numerous M&A transactions together in that context, both sides of the table.  And then in 2014, we successfully completed their initial public offering or IPO At the time it was the largest financial services IPO to date, since that it's been beaten by a number of companies.

Visa, that I worked on, for example, was about twice the size of it, but at the time it was close to a $10 billion market cap, $50 billion asset business.  And was a, you know, it was truly differentiated business.  And I'll give you a little bit of context of what I mean by differentiated. During the financial services or during the global financial crisis, if you were doing subprime finance, you generally weren't making a lot of money because there were really hard times for those things.  Losses were much higher than people thought.  Liquidity became much more expensive.

I think in 2011 or '12, Santander consumer had an 85 percent return on equity.  Good years normally would be 15.  Most companies were zero or negative.  And so, the team was like the all-stars of

Page 114

the consumer finance space. And after leading their IPO along with a lot of other banks, I had the opportunity to join the team and lead their M&A and corporate development function.

Q Let's talk about that. What was your final position -- before we get to that, just real quickly, what was your final position at JP Morgan?

A So I was a vice president, and there's kind of some tiering within that too. So, you -- I'm going to take a step back for a second. When you go from analyst to associate, most of those are MBAs, so they're kind of more life experience. They've done a more range of things. And it doesn't help that I look young too. But I had the opportunity then to be appointed to actually run the MBA training program despite not having an MBA. So that was a cool opportunity. As the vice president, I was tasked with not only driving a number of transactions but also managing all of the analysts and associates in my group. So my job is to make sure that they were trained, developed, put on the right projects resourced appropriately and all of that.

Q Okay. So you leave JP Morgan after about a -- was it eight years?

A Between eight and nine years.

Page 115

Q   Eight and nine years.  You go to Santander, what do you do at -- and just so we're clear, when you said Tom, I think we all know what you're talking about, just for the record -- thank you.  After you -- did you get recruited by Mr. Dundon?

A   Yeah, it was during the IPO process.  You're traveling all over, meeting investors.

Q   The road show?

A   Yes.  And during that process, we started -- he started asking me about how he might, kind of, professionalize, and build out further, like the corporate development function itself within his organization as he and Jason Kulas, who was the president at the time, kind of led much of the deal work, but they didn't have kind of, it as a established function itself.  And so, we started talking about it then.  Over the course of the next month or two, we did number more transaction -- not transactions, discussions around like what that role might look like and whether I might be a good fit for it.  And ultimately, he gave an offer and I decided to try.

Q   What did you do at SCUSA?  And if I call it SCUSA, do you understand that to be Santander Consumer USA?

Page 116

A     Yes.   And also saves a lot of time.

Q     Yes.   Can you share with Judge Gargotta what you did?   How long did you work there first?

A     So I worked there from, I believe, March of '14 to, maybe, October of '15.

Q     Okay.   Can you share with Judge Gargotta what you did there?

A     So I joined as Senior Vice President of Corporate Development, where my job was to, kind of, institutionalize that corporate development, corporate strategy function.   The -- pretty shortly after being in the seat, I was promoted to executive vice president and was given a broader remit where I also had capital markets.   I also had asset management.   So capital markets isn't -- is a important one here. They were the largest issuer of asset backed securities in the United States at the time.

We did something like a billion dollars of securitization issuance per month across four different securitization shelves.   I can go into more on what that means if helpful, but probably not necessary here.   We had a $32 billion forward flow agreement with Bank of America, where we were essentially originating loans on their behalf.   We were Chrysler Capital as a DBA, so, you know, anytime

Page 117

people were buying a Chrysler, we were originating those loans or leases respectively.

And then my job is to figure out how we financed them or where we packaged and distributed them to from an investor or investor perspective.  So we had insurance companies that bought assets, we had banks that bought assets.  We had to finance them both in the short and the long term.  I think we had about $20 billion of committed financing across 16 or 17 major banks.  I think we were the largest borrower for four of the largest global banks in the United States.

So we were the largest borrower at JP Morgan and RBC, at Deutsche Bank, and maybe Citi, I forget the fourth one.  But for each of those, we were one of the most significant clients, in terms of where they were allocating their balance sheet.  And so, I was responsible for our balance sheet, how we were distributing assets for the benefit of other people's balance sheet, securitizations, all the issuance, all the investor dynamics.  I sat around the liability side of the equation.

Q   So we're in 2015, you end with SCUSA.  What did you do next?

A   And just one other thing that I -- I had a -- as one of the executives right, in the core leadership

Page 118

team, in the business, a lot of involvement with the board, a lot of involvement with certain regulatory committees.  We were an incredibly regulated business, right?  As a non-bank owned by a globally, significant by board (inaudible), it's called US Bank Holding Company, which is publicly traded, but majority held by a independent, you know, international global bank, but also three private equity firms.  We were regulated by 50 states, departments of financial institutions, and in some cases, consumer financial protection bureaus.  We were regulated by the federal CFPB, the Federal Reserve, the OCC, the New York Stock Exchange, the Bank of Scotland, and the European Central Bank.  And so, there were a lot of committees around all that, making sure that you were compliant with a incredibly complex set of rules.

And when I got there, also, one of the sister companies had some degree of distress, and it put us, kind of, in a regulatory box where we weren't going to do M&A.  And so, we deployed that kind of transactional sophistication in a variety of other ways.  And this is germane to some of the conversation earlier today.  One of the things that we did during that year and a half, two-year period that I was there is restructure some of our operations by using

Page 119

offshore jurisdictions. We had already had -- go ahead.

Q Oh, let's pause there for a second. Just so that's exactly what I want to talk about, restructuring. Just real quick, yes or no, can you share -- explain to Judge Gargotta the number of years of experience you have working on restructuring deals?

A I mean, I think you, in a way could, kind of, say my entire career has been working on restructuring deals.

Q All right. Can you share with Judge Gargotta, typically, how that process went down when you were at SCUSA?

A You're saying what is -- kind of, what is the normal process of doing an M&A transaction --

Q Yes.

A -- in particular, one where there might be some degree of distress?

Q Yes, you could -- and actually I want to broaden that out, not just SCUSA, but just throughout your entire career, what is the typical way that you have experienced that process to go down?

A Probably helps to say like, what is a normal transaction and --

Q Yes --

Page 120

A    -- what is an urgent transaction?

Q    Yeah, let's start there.  What is a normal transaction?

A    So a normal transaction, and I've done this not just as an advisor, where I -- probably hundreds of them.  As an investor, as an issuer, and now as an operator, we've raised capital more than a handful of times from institutions, so some experience doing this.  You set up a process first to kind of collect information.  This, I'm speaking on behalf of a company --

Q    Yeah.

A    -- that might go through this.  So, if I'm a company that's going to go either pursue an M&A transaction or a investment from a third party, whether that's debt or equity, I'm going to start by establishing what is the objectives and like, try and set a strategy.  I want to raise 100 million dollars, whatever the number might be, and for whatever purpose.  We're then going to collect a bunch of information to make sure that we're prepared to go and talk to people about why would they want to do that.  Where are we as a business?  What are the competitive differentiators?  What are our financials?  What are our legal obligations?  What are -- does our

Veritext Legal Solutions
800-336-4000

employment look like?  Do we have any material litigation?  Where are our formation documents?  All the different things that someone is going to need to be able to comprehensively review the business.  We want to get that all assembled.  We also want to put together kind of our story of what is the business' opportunities and, and, and so forth.

At that point, you're going to either pursue engaging with third parties directly, or you might hire an agent, which could be a investment banker as an example.  Smaller companies often do it themselves.  Larger companies often hire an agent to do that.  You'll go out and, and talk to a bunch of investors.  Typically, you're going to have some sort of short form information that you share with them, we might call that a teaser or a tar sheet or something of that nature.  That gives the person enough to say, I have some degree of interest.  Normally you're doing that to a broad funnel of potential investors, at which point they're going to say, I have an indication of interest.  So normally you'll define a process, and normally like a three-step process is probably the most typical where you have a IOI, an LOI, and then you move into definitive documentation.  So an IOI would be the top of the funnel.  I'm going to go to

Page 122

everyone in this room and say, here's about our business. Would you like to participate?

And some subset will say, that sounds interesting. Here's on the basis of the limited information you've given me, I might have an interest at this degree of level. At which point you'd say, okay, cool. Now I'm going to call the field. I'm going to provide an NDA and much more exhaustive information, and say in three weeks or 12 weeks or whatever the time period is, I'd like a more refined view. That would be called an LOI. Those typically are more binding, not entirely. So normally subject to, you know, confirmatory diligence and definitive documentation, but you've narrowed the field of where you're providing sensitive information.

It's generally at that LOI phase that you're going to bring in third party advisors. So that's when you're going to bring in legal counsel, accountants, tax advisors, customer interviews, tech consultants to review a technology stack, a variety of others depending on the type of business that you might have. But normally you'll have a handful of advisors that come in generally after that phase. And then you are -- normally, you're down to one or two parties at that point, because that becomes a lot of

Page 123

expense, and people don't want to deploy that degree of expense if they don't know that they have some degree of exclusivity. So you're down to an (inaudible).

THE COURT: Hang on. Yes.

MS. WILLIAMS: Okay. Your Honor, I was going to let this go, but Mr. Zutter's not been designated as an expert in any way, and I think we're getting a little far field and into what I might normally call expert testimony.

THE COURT: Your response?

MR. HOCKADAY: I -- the intent of this is not to establish him as an expert, it's just to talk about his experience. There was a day and a half of testimony about decisions he made. So I think, in fairness, he needs an opportunity to explain his experience and foundation. So this afternoon, when we come back after a break, he's going to walk through and he's going to speak to it from a level of sophistication.

THE COURT: Anything else?

MS. WILLIAMS: No, Your Honor. I just wanted to have that on the record.

THE COURT: It is overruled. So I understand you're trying to develop the gentleman's credentials

Page 124

as it relates to what his involvement was with AAF, so it's not lost from the court.  Go ahead, sir.

MR. HOCKADAY:  Thank you, Your Honor.

THE COURT:  But there has to be at some point an ending point, not --

MR. HOCKADAY:  I agree.

THE COURT:  -- (crosstalk) his career.

MR. HOCKADAY:  I -- yes.  I want to finish this piece.  We'll go to the career and then we'll come back.  If it's okay with the Court, I don't know if it had a schedule on lunch, but if we could finish this part of it before that would be --

THE COURT:  Yes.  We -- I'll happily accommodate.

MR. HOCKADAY:  Okay.  Thank you.

THE COURT:  That's naturally -- that's the natural break.

MR. HOCKADAY:  It seemed most logical.  Yes. Thank you.

BY MR. HOCKADAY:

Q   Okay.  Mr. Zutter, so can you just briefly conclude how a normal --

A   Sure.

THE COURT:  Let him -- hang on, let him finish his question, then you may answer.

Page 125

BY MR. HOCKADAY:

Q   Yeah.  Just slow down just a little bit. You're doing great.  Just slow down a little bit.  So can you tell Judge Gargotta, just kind of conclude how a normal process would work?

A   Absolutely.  I'll try and speak slower and more concisely.

Q   All good.

A   So IOI, broad limited information, LOI, some degree of binding narrower group of people getting into more detailed, thorough work.  Then you select one party, go into confirmatory diligence, and finish documentation.  Typically, you would sign definitive documentation and close, unless there are certain regulatory approvals that sometimes, depending on the business, the size, et cetera, there might be some of those.  So normally you'd have all the work done that is in both parties control, you give up your control, and now the only thing you're waiting for might be a regulatory approval or something of that nature.

Q   And let's talk about a --

A   Process is probably normally --

Q   Yes.

A   -- someone might say, like, bankers would say that that takes three or four months and it normally

Page 126

takes six or eight.

Q   Understood.  So it's a thoughtful and deliberate process?

A   And it always takes longer than you expect.

Q   As with many things in law too.  I can relate.  Now let's talk about an emergency or rescue situation.  How can that differ?

A   So in those sorts of scenarios, there isn't -- time isn't an adequate variable to allow you to do those things.  And so, there is a degree of risk that the transaction definitionally has.  And normally the way that you would think about that, if you are still going to pursue, the transaction is, to try and mitigate that risk in other ways.  So variety of ways that you can do that.  You can do that with conditional payments from a price perspective, you could do that just with absolute price, you can do that with reps and warrants, you could do that with certain insurance things, you could do that with governance, you can also try and bring an enormous amount of resources to bear an incredibly short period of time.  So like, I'll give an example that isn't the AAF.  We started the acquisition of Bear Stearns on a Friday at about 3:00 p.m., and we finished and announced it on Sunday afternoon before the Asian

Page 127

markets opened.  That's an incredibly short period of time to buy a globally known financial institution.  We brought like 250 people in.  At all hours of the night over a course of a short period of time.  So you might have done three months' worth of work in a very short period of time.  The reason you were able to do that is the counterpart was a highly regulated company with availability of books and records and all the rest of it, so we just needed to marshal resources faster.  When those -- that information isn't available, you have to solve it with structure or with governance as a way to mitigate your risk.

Q  Understood.  And is this -- does -- is this reflective of your experience, which sounds like going on almost 20 years.

A  Something like that.

Q  All right.  Now, after SCUSA, what did you do next?

A  So Tom departed from his role as CEO and co-founder of -- and director of Santander Consumer in 2015 and asked me to come and kind of build out his family office, to look at transactions, and execute transactions, and manage the portfolio of investments that he already had assembled and to build a team around that and potentially take some of those

Page 128

businesses public and manage other of those businesses. So kind of formalize and professionalize his family office. And so, I agreed to do that.

Q And then sent -- and we'll get to DCP a little bit after lunch, but how long were you working for DCP?

A So I was an employee from, I believe, October of '15. There was a period where I had overlap between Santander and DCP. That was agreed between the parties that I helped transition while starting new stuff, so I'm not sure exactly when the employment started there. And a few years later, prior to this transaction, I actually transitioned to a principally operating role with one of the companies that we had invested in. The specific date is escaping me this moment.

Q Now, this has been a point of issue, I think, for most of this case here, and this is the first time that you are now able to really testify to it. And I want to make this abundantly clear for everybody because I think there is a big distinction here. You have a -- you were given, at the time, or at least during the time of the investment, bless you, the title of partner. Are you familiar with that?

A I remember when I got it. We were --

Page 129

Q   Hold on, hold on.  Are -- sorry.  Just answer that piece.  Are you familiar with that?

A   Yes.

Q   Okay.  Can you tell Judge Gargotta to what that title was?

A   So, when Tom recruited me from Santander Consumer to his family office, we knew we were going to be building something that wasn't already established, and there was some degree of uncertainty with that.  You know, Santander Consumer was a publicly traded company with institutional investors, and I'd come from JP Morgan, very big and established to this business, and now I was going to go do something more entrepreneurial and I perceived some risk in that.  And so, I said, hey, Tom, you know, I don't, I don't know whether or not you are going to decide you want to keep doing this, and in a year you might decide you've made a substantial sum of money and you just want to retire.  And then I would've gone to a newly formed entity, and that's not so great for my resume.  And so, it would be helpful for me if the title I have is not managing director of Dundon Capital Partners or senior vice president, but partner because it credentializes me as an -- in a different light.  And so, we'd negotiated that and he said,

Page 130

okay, I'm fine with you having the title of partner. But at no time was I an equity partner. It was always a Dundon family money and ownership.

Q At any point in time, did you, John Zutter, or any of your affiliates have any ownership interest in Dundon Capital Partners, DDFS management, DDF partnership, DDFS partnership, or any Dundon related entity?

A Did I have ownership in the company that I operate today, which used to be a Dundon related entity?

Q Yes.

A But DDFS and Dundon Capital Partners, absolutely not, zero. Never.

Q Were you ever issued a K-1 from Dundon Capital Partners or its affiliates?

A The only K-1 that I've ever received is related to my ownership in what's now called Lantern.

Q Understood. During the 2019 period when DCP was invested in the AAF, did DCP issue you a K-1?

A No.

Q At that period in time, was DCP paying you anything?

A No.

Q All right. You mentioned Employer Direct

Page 131

Healthcare, which is now Lantern. When did that opportunity arise?

A So when we started the family office in 2015, we started seeing a flow of potential transactions and we had a day in Dallas where a number of different smaller family offices came and had their companies sort of present to us as, you know, a potential investor for the next stage of growth of those businesses. And so, we looked at a range of different companies over the course of a couple days, one of which was Employer Direct Healthcare, LLC. Ironically, I voted against doing the transaction. Tom saw an opportunity that wasn't obvious to me at the time. And so, we started looking at it in the fall of -- summer or -- late summer or fall, I think Q3 of 2015, entered into a term sheet to buy a majority stake in that business that would all be -- or substantially all be primary capital meaning, company going into the company rather than paying off ex investors, but buying a majority stake in the business. And we consummated that transaction in, I believe, January 6, 2016.

Q Can you share with Judge Gargotta to what Lantern, at the time Employer Direct Healthcare, does?

A Today or then?

Page 132

Q   Let's talk about then, and then we'll go to today.

A   Yeah.  So Employer Direct Healthcare is a -- in 2015 and '16 is a very small startup that is in the healthcare services space.  It's built a network of incredibly high performing surgeons.  It's put a concierge team together, and then it's gone to large employers and said, we will facilitate access to your employees and their family members to great doctors at fair prices as a service, as part of their kind of employee benefits.  And so, at this point, we had something like 100,000 members.  Well, at this point it was about 200,000 members.  I'll get to the 100 in a second.  Maybe 20 clients, something like 20 employees, so it was -- and it was, you know, losing substantial money.  And when it came to us, they actually were, ironically, in a position where they also were very cash strapped and, you know, kind of going paycheck to paycheck.  And, you know, they were kind of at that early stage of formation where some things were less concrete than they might have needed to be.

Q   What does Employer Direct Healthcare, DBA Lantern Specialty Care do today?

A   So today we are the largest specialty care

Page 133

platform in the United States. We serve over 6 million members across the United States. Our mission is to transform access to care for the moments that matter most. To us. that's cancer infusions and complex surgeries. We work for some of the largest, both public and private sector organizations. And in the United States, you know, Teachers' Retirement System of Texas, for example, is, is a client which represents 80 percent of the schools in the State of Texas. American Airlines, Home Depot, Target. You know, very large State of Florida, State of Delaware, State of Alaska, large unions, the National Rail Union. So we represent companies across a broad range where we help their employees and their family members get access to the care they need at fair prices with concierge service behind it. So we try and help people in those really difficult moments.

Q What is your current role at Lantern?

A I am the CEO and director.

Q How long have you been the CEO and director?

A When we bought the business January of 2016, I was a -- the lead director, so chairman for the business after we had finished our transaction. I didn't take the executive role until December 16th, I believe, of 2016. During that time period, things

Page 134

didn't go exactly as we planned. So we lost about 50 percent of our revenue during that time period and a bunch of clients as well. We were doing some things right, and we were doing some things wrong, and we needed to really get in there and figure it out. We had to let the CEO go.

And I went in to figure out are we going to hire a new CEO who has healthcare experience and start up -- more startup experience than me at that time, or are we going to try and do an orderly liquidation of the business? And so, for the next four years, I did both things. I ran the investment business and I did a turnaround early stage healthcare services startup. And we were fortunate to go from negative 50 percent growth in that first year. The next four years, we grow a 100 percent a year. We've now, on basically every fundamental metric, grown by about a 100X. Since then, we're a profitable business. We've done numerous rounds of raising investment capital. Every single one of our investors has made money on the transaction, some quite materially. And now we have four very substantial institutional investors that back us. One of the largest banks, so JP Morgan's our bank today, tomorrow it's going to be Wells Fargo, but maybe don't put that in public record yet.

Page 135

THE COURT: It's already in the public record now.

MR. ZUTTER: I'm kidding. They already know.

MR. HOCKADAY: We won't be on a transcript until tomorrow though.

MR. ZUTTER: They know.

MR. HOCKADAY: So you've got 24 hours to.

MR. ZUTTER: That's fine. But we've got four very large in institutional investors, ranging from private equity to Venture Capital, one of which is, you know, top 20 institutional investors in the world. So we've had a good run.

BY MR. HOCKADAY:

Q So it sounds like EDHC or Lantern was a struggling business when you first arrived and now it's doing pretty well. What were some of the strategies that you deployed as CEO and a leader of the institution that have led it to that current position?

A We had to look at everything and we started working --

MS. WILLIAMS: Your Honor?

THE COURT: There's an objection.

MS. WILLIAMS: I'm sorry, I'm going to object again, and this time to relevance. I just don't know

Page 136

why we're getting into this level of detail.

MR. HOCKADAY:  I would love to explain.

THE COURT:  Go ahead.

MR. HOCKADAY:  Mr. Zutter just testified multiple times yesterday and today in very great detail of things that he did and deployed with the AAF for the purpose of seeing the league succeed and the stakeholders and the shareholders as well.  What he's about to testify to is a very similar distress situation that he came into with EDHC.  He deployed those very same tactics and it led to the success.  So he has a track record of what he's talking about and an experience of success with it.  And one of the claims that they have -- actually, their only claim that they have against Mr. Zutter, which should be waive because it's a duty of care, are his fiduciary responsibilities.  So he's going to explain in good detail before lunch what it was he did at EDHC, and then later how he deployed the similar strategies with the AAF and why that was successful.

THE COURT:  Ms. Williams?

MS. WILLIAMS:  First, I'll just say we addressed the duty of care issue on the summary judgment motion.  That's not our only claim against Mr. Zutter, and I'll let the record speak for itself

Page 137

on that.  EDHC being a healthcare company that I feel like has already been described in detail is not the same as the Sports League, and I don't think that the relevance of explaining that and comparing it to here has anything to do with what happened here.

THE COURT:  Okay.  So the objection is overruled.  I understood the point of Mr. Hockaday's questions.  I'll give it the appropriate weight, but I think in fairness to the witness in which transpired in this proceeding, the Court will accept direct testimony from the gentleman about what his prior experience is.  So go ahead, please.

MR. HOCKADAY:  Understood.

BY MR. HOCKADAY:

Q   Can you explain to Judge Gargotta to briefly some of the strategies that you deployed at Lantern or EDHC at the time that led to it to getting to the position that it did today?

A   Yeah, I will.  And we actually deployed a number of the strategies I'm about to tell you when we bought the Carolina Hurricanes, which is a sports business, and so some of those strategies were directly applicable to a business there that wasn't performing as well and then performed substantial.

THE COURT:  Please, let's talk about EDHC,

Page 138

please, and keep it direct.

MR. ZUTTER:  All right.  Prior to consummating the transaction, we started collaborating with the leadership team, looking at employee census, looking at bills, looking at all the different vendors, looking at their analytics, looking at their systems.  Continuing after, we looked at things like, what are your expense policies?  We looked at things like, how are they reimbursing for phone bills?  We looked at things like, are they paying for home office equipment or not?  We looked for the people that were working remotely and what were the rules around that?  And these things sound silly, but pennies really add up when you're short on dollars.  And so, it also changes a culture of behavior.  And that culture of behavior, you know, is to me, you know, transcends industries where, like putting in place policies around how do you manage expenses, change the way people behave with company dollars.

So we looked at benefits, we looked at travel policies, we looked at technology stacks.  We had some tech that was valuable and some that wasn't.  We looked at the way in which we were paying people.  We changed incentive structures to in -- put in place long-term incentives and compensation that was based

Page 139

on performance rather than just certainty.  So both equity incentive structures, but also performance-based cash compensation so that there was alignment around the performance of the business.

And so, we looked at a variety of different things, both from an organizational design perspective, from a corporate structure perspective. We restructured the business to make it more tax efficient.  We looked at kind of the whole range of legal structure, organizational structure, business processes, business governance, business strategy that, you know, previous leadership had a specific view on a variety of strategies.  We agreed with some of it, we didn't agree with others, we pivoted it. Many ways we were right and sure in some ways we were wrong.

BY MR. HOCKADAY:

Q   Can you share with Judge Gargotta to what you did with that work on the Carolina Hurricanes and the professional sports realm?

A   Yeah.  We looked at, again, the expense policies.  We looked at who we had in different roles, you know, the -- we had a somewhat unconventional coach that we put in place that didn't have as much experience as a lot of the other coaches in the

Veritext Legal Solutions
800-336-4000

leagues now pretty well thought of. But we were able to do that at a much more --

THE COURT: You were a player on the team, right?

MR. ZUTTER: That's true.

THE COURT: Uh-huh.

MR. ZUTTER: And, you know, we did that in a way that associate was getting a huge career opportunity and that has certainly come true. We also were able to manage cash and find alignment. And so, you know, looking at the org structure, we looked at employee benefits there with their head of HR, woman named Keitha (ph), and said, where are we doing too much? Where are we doing too little? We looked at the way in which we were deploying expenses in the stadium and how we were manning concessions in the staffing ratios that we had for each of those things, and whether we were going to turn the lights on the top of the stands versus the bottom of the stands when games were on. Like, we looked at a lot of different creative structures to try and make the business successful.

BY MR. HOCKADAY:

Q Were those similar tactics that you deployed with the AAF?

Page 141

A    Absolutely.

Q    Very quickly, you were the -- you've been the CEO of EDHC or Lantern for how long?

A    Since December 16, 2016.

Q    Are you aware of any benefit that EDHC or Lantern received from Dundon Capital Partners investment in the AAF.

A    Absolutely zero.

MR. HOCKADAY:  Your Honor, I have about five minutes, if that's okay?

THE COURT:  Sure.

MR. HOCKADAY:  Okay.  Thank you.

BY MR. HOCKADAY:

Q    Can you just describe briefly with Judge Gargotta to your history of working with boards of directors?

A    Yeah.  So I've been able to be in a lot of different boardrooms over my career.  As an advisor, you are often presenting to them, so you're presenting things like fairness opinions, so in an M&A context between two public companies, often an investment bank will kind of put its reputation and take some legal risk and say like, this is what we think a fair valuation is, and our team would do the work to determine a fair valuation.  You're also presenting

Page 142

regularly on strategic alternatives or how an IPO is going or what it's to expect from an IPO. So in the context as a banker, I was in a lot of boardrooms. At Santander Consumer, I presented to the board quite regularly and to subcommittees of the board. At Dundon Capital Partners, I've been on a number of boards. And then in my current role I have a very highly engaged board.

Q Last brief bit of question before we break through to lunch. I want to talk about Mr. Dundon just very briefly. You've worked with him -- or you worked with him for a period of time. How many years would you say?

A One way or another, getting close to 20 years.

Q All right. How would you describe his business acumen?

A So there's this really good quote, I think it's in about Dallas Business News. They did a profile on him a number of years ago, and there's a guy named Dan Silberman who's one of the operating committee members of Warburg.

MS. WILLIAMS: I'm just going to object to, we're about to get into hearsay.

THE COURT: Yeah. That is hearsay. Let's

Page 143

avoid that.  Let's hear what your impression is of him.  That's what the Court wants to hear.  The objection's sustained.

MR. ZUTTER:  Okay.  I think he's one of the best operators I've ever seen.  I don't think it's absolutely close.  Like, when he is focused on something, nobody is better and it's hard to keep up with him.  He's tough, he's not always popular, he doesn't always follow conventional wisdom but -- I've been in a lot of rooms with a lot of successful executives and I think he's in the league of his own when it comes to really complex things and the speed at which he operates and the way in which he can assemble details and understand them.

BY MR. HOCKADAY:

Q   Have you ever known him to make a deal intended to harm investors or creditors or to raid a company?

A   Absolutely not.

MR. HOCKADAY:  Your Honor, I'm glad to continue, but if the Court would like to break for lunch.

THE COURT:  You don't want me to get hangry now?

MR. HOCKADAY:  I certainly don't.  I have a

Page 144

four week old who does that every couple hours, so.

THE COURT:  Yeah.  I understand.  So let's do this, ladies and gentlemen, it's 11:58.  Can we come back at 1:00?  Will that be enough time for lunch?

MR. HOCKADAY:  Perfect.

THE COURT:  Okay.  So we're going to be in recess and off the record.  The courtroom will be open up 15 minutes beforehand, but you can sit down until then.  So we have a lunch recess, ladies and gentlemen, until 1:00 o'clock.  We are in recess.  Thank you.

COURT CLERK:  All rise.

(Off the record.)

THE COURT:  Okay.  Ladies, gentlemen, we are on the record.  Are we ready to proceed?

MR. TREYZON:  Can we take a picture before we have --

MR. HOCKADAY:  Yeah.  Have you all done that?

MR. TREYZON:  We need a picture.

MR. HOCKADAY:  Take one.

MS. WILLIAMS:  Did you get a picture?

THE COURT:  Yeah, thanks.

MR. HOCKADAY:  Yes, Your Honor.  We are prepared to proceed.

THE COURT:  Okay.  Any housekeeping matters

before we get started?

MR. HOCKADAY: The only housekeeping matter is we need to erase the blackboard at some point, but we can wait until Mr. Zutter comes and does that. If the Court prefers, or I can do that real quick.

THE COURT: Mr. Treyzon, did you take a picture? You got what you need?

MR. TREYZON: We did, Your Honor. There was a motion made to nominate this with a plaque and putting my name on the bottom of it, but I waived that out of the humility.

THE COURT: Okay. Erase.

MR. HOCKADAY: Name on the (crosstalk).

MR. TREYZON: (Crosstalk).

THE COURT: I must tell you this, age of technology, it's still -- I enjoy the fact that we're using a blackboard.

MS. WILLIAMS: Pretty straight line. Mr. Hockaday.

THE COURT: Thank you, everybody.

MR. HOCKADAY: Mr. Zutter, I want to pick up -- oh, may I proceed, Your Honor?

THE COURT: Yes, you may, sir.

MR. HOCKADAY: Thank you.

BY MR. HOCKADAY:

Page 146

Q   Mr. Zutter, I want to talk about a couple global issues and then we're going to zoom in on some specific ones that you covered with Ms. Williams.  At any point in time during the AAF investment, did you John Zutter, or any affiliate of yours obtain any ownership interest or right in the Alliance of American Football or any of its affiliates?

A   No.

Q   Did you receive any compensation for your work in the Alliance of American Football?

A   No.

Q   Did you confer any sort of monetary or even a non-monetary benefit from your work in the Alliance of American Football?

A   No.

Q   Did you receive any tax write off, benefit, credit offset against gains or anything related to your taxes that you're aware of in regards to your work with the Alliance of American Football?

A   No.

Q   And we already established you never received a K-1 from DCP.  And just to be clear though, when the transaction went through, did you, John Zutter, have any claim of ownership in the AAF or DCP as a partner or otherwise, regardless whatever your work title was

Page 147

at one point?

A No.

Q And did you receive any monetary benefit or equivalent from any of the advertising arrangements between DCP and any third parties during the investment with the AAF?

A No.

Q And finally, as an AAF board member, did you John Zutter, receive any financial aid or other benefits that you're aware of?

A Nope.

Q Now, I want to talk about how you first got involved with the AAF. If we could pull up, Laura, Exhibit T 805. And, Mr. Sutter, what I'm showing you here is an exhibit you spoke with Ms. Williams about in some detail yesterday. It's an exchange that started with Mr. Ebersol and then it made its way to you and then you gave some feedback. Do you recall that?

A Yep.

Q All right. And this is on Wednesday the 13, 2019. I want to talk about some of the specific issues that you gave and the reason behind it. We heard a lot of testimony yesterday and today as far as what you said and what Mr. Ebersol said, but I want to

Page 148

make sure that Judge Gargotta to and his staff is very clear as to what you meant by each one and the implications behind them. Sound good?

A Sure.

Q All right. I'm going to drop your -- I want to go down to bullet point number two here. If we could blow that out. Laura, number two. It says, "No clear plan for rest of capital and not clear what happens if they need more money next month." Do you see that?

A Yes.

Q Can you explain to Judge Gargotta to what you meant by that?

A So this was for a very small -- relatively speaking, small sum of money that in the context of the company's needs, was not going to satisfy their needs in any sort of material amount of time. And so, you know, it was kind of a bridge to nowhere, like they were calling a bridge loan, but bridge to nothing in the context of not having a clear articulation of how this was going to get to a place where either more capital came in or the company became self-sustaining.

Q In the following line, number three, you said they can prime you. What did you mean by that?

A So, what I mean by that is they could

Page 149

theoretically -- they being the AAF or a -- in the context of the AAF, a future investor into the AAF, could make an investment that sits in a senior position to the capital that we put in, in a way that might be detrimental to that investment in terms of its ability to recoup its monies or participate in upside.

Q   The next one I want to talk about briefly here, and we're going to get into more detail later when we talk about MGM, the David Pottruck loan as well as the CBS term sheet he spoke with Ms. Williams about this morning.  And number four here it says you are actually defined as subordinated to all debt.  Why is that a problem?

A   Well, we, at that point, didn't have a clear picture of the financial situation of the company. And the context that I understood was that we were coming in with a senior financing.  And in the document it was defining us as not being in a senior position, which meant either at that point or at some future point, liability could come into the company that would be in a senior position to us and again, subordinate us relative to the opportunity to get recoupment of our monies and or participate in upside.

Q   Can you explain to Judge Gargotta to why that

Page 150

can be problematic for a new investor?

A   So if I'm putting money into the business and I'm not -- I don't have control over all aspects of it, let's say I put $10 million into a company, and I think that I'm senior in the capital table and I think the company's worth $20 million.  Well, if it goes down to 10 and then it's liquidated, I'll still get my money back.  And so, I know where I sit from a rank order perspective.  If you were defined as subordinated, then the company theoretically could go the next day and raise debt from some third party with terms that effectively take away your ability to be repaid or it -- I mean, debt isn't universally a bad thing, but having this where you are definitionally subordinated means that the company would be able to bring other monies in above you and change your relative ranking.  And I think we were going into this with a very clear objective of having that ranking firmly established.

Q   Understood.  The next one you talked about a little bit in the strategies with EDHC and the Carolina Hurricanes and also with Ms. Williams.  If we look at number five, it says you have zero governance. What was your -- what were you meaning by this here from a feedback standpoint?

Page 151

A    Yeah.  It -- you -- it's kind of the reciprocal of complete control.  I -- my recollection is it had zero control or influence.  So you'd put the money in and then you'd hope, and you didn't have much more than that.

Q    And why is that problematic to a startup that's bleeding cash?

A    Well, I think it was pretty clear that they found themselves in a position where they were desperately in need of additional capital and that (inaudible) desperately in need of a change in the way in which they were operating.  We were putting money in and -- well under this term sheet, we would've been putting money in, in a position in the capital table where we could get pushed down and we had no controls over whether or not we were pushed down.  So the rights that we were establishing for ourselves and our expectations, how the business might operate, could be changed the following day.

Q    So it sounds like you would be putting your money in and then you could completely lose it the next day?

A    That was my concern.

Q    And let's look at all the way down here where you said, "If I were them, and someone did this

Page 152

financing, the next day I could do a $1 senior loan with foreclosure rights and wipe you out and restructure the equity." Do you see that?

A I do.

Q And what can you explain to Judge Gargotta to, just very succinctly --

A Okay.

Q -- what --

A Right.

Q -- it may be my question answered it, but what you meant by that?

A Again, I apologize, the note's a little hyperbolic, but what I was trying to say to Tom is, you were in such an adverse position from -- or in a disadvantageous position in the capital structure here that someone could do something as preposterous as put a dollar in with a bunch of features that say this dollar translates to, you know, 99.99999 percent of the company if the following thing doesn't happen. And I know that that's a hyperbolic example, but the point was to really draw emphasis to, you're in a position where you don't know what you're going to have and you don't have control over what you're going to have and it's expressly saying that people can change things around you.

Page 153

Q   If we could go to Exhibit T 21, please.

THE COURT:  Is it your understanding that it's been admitted?

MR. HOCKADAY:  Oh yes, Your Honor.  I believe Ms. Williams and Mr. Lowenstein also questioned witnesses on that exhibit.

THE COURT:  That's fine.

MR. HOCKADAY:  But if I'm mistaken.

BY MR. HOCKADAY:

Q   All right.  Mr. Zutter, what we have here is an email exchange involving Kevin Freedman, yourself, Dawn Belt, Charlie Ebersol, Jordan Roberts, and then a couple folks from an IT crowd marketing.  You see that?  And Alan Kantowitz.

A   Yes.

Q   And then you responded, you forwarded the message to Mr. Vanderbilt, Mr. Rosonkowski, Ms. Lee, and Mr. Kulas.  Do you see that?

A   Yes.

Q   All right.  I want to talk about this a little bit.  Did -- prior to the entry of the term sheet, did you have contact with the AAF and its representatives in relation to negotiations of the transaction?

A   Yes.  I testified to that yesterday.

Page 154

Q   All right.  And that was surrounding the term sheet?

A   Yes.

Q   All right.  And is your understanding Dawn Belt was the attorney for the AAF.  Is that correct?

A   That's correct.

Q   So was Ms. Belt part of those negotiations and discussions from the AAF side in relation to the DCP or Dundon side?

A   Yes.

Q   All right.  So as far as you know, the AAF was represented by counsel at this time?

A   Yes.

Q   All right.  Now, I want to talk a little bit about some of the substance here.  I don't want to go over too much stuff that we've already covered, but there was a big deal made about 0.2 M, which I believe is million, credit card pay down.  Do you see that?

A   You want to scroll down?

Q   Yeah.  If we could go down to the first email.  This is the one that was sent on at 2:09 Central?

A   Yes.

Q   Okay.  And if we look up a little bit higher, it said also we did a review on payments needed to

Page 155

ensure this weekend happens without any material issues and the total amount needed is 5.1 million or in. This consists of the following items, and then it identifies those. Do you see that?

A Correct.

Q All right. There was a big deal made during the first part of your examination about, hey, there's reference to credit card payment here. You -- do you recall that?

A Yes.

Q Okay. So is this an indication to you, or Dundon Capital Partners, or anyone the level of accounts payable that is owed at that point in time?

A No, it's not.

Q All right. And were you, to your knowledge, provided any information as to the level of accounts payable, you or anyone at DCP, prior to the entry of the term sheet?

A No. Aside from these here, no.

Q Was DCP aware of any outstanding obligations other than the 5.1 million that Mr. Freedman identified here prior to the entry of the term sheet?

A No.

Q What was DCP's understanding as far as the obligations it would take to get through the end of

Page 156

the season?

A   Based on the conversations that Tom and Charlie had, that number was between 55 and $70 million.

MS. WILLIAMS:  Your Honor, I'd like to object.  Anything that Mr. Dundon told Mr. Zutter is hearsay, that there's not an exception to you.  And I'd also like to object.  He appears to be speaking not about his personal knowledge, but saying what DCP "knew" and I think he needs to testify about what he knew or didn't know.

MR. HOCKADAY:  Mr. Dundon -- or excuse me, Mr. Zutter was representing Dundon Capital Partners. Our position all along has been Dundon Capital Partners is the party that entered into the contract with Ebersol Sports Media Group.  He can testify on behalf of Dundon Capital Partners.  And the statements that Charlie Ebersol made are party opponent admissions, and candidly, they're ones that have already come in in this case.  and she questioned -- Ms. Williams's questioned Mr. Zutter about those statements yesterday morning.  I took pretty detailed notes on that.

MS. WILLIAMS:  Your Honor, if Mr. Ebersol spoke directly to Mr. Zutter, that's one thing.  Mr.

Page 157

Zutter's getting this content from Mr. Dundon, Mr. Vanderbilt, Mr. Kulas.  That's another layer of hearsay that we're not waiving the exception to.  And also, that wouldn't be within Mr. Zutter's personal knowledge because it could only have come from hearsay discussions.

MR. HOCKADAY:  Mr. Zutter was designated as a corporate representative as it related to the term sheet during the depositions.  He's capable of speaking on behalf of DCP in this capacity.

THE COURT:  What about that?

MS. WILLIAMS:  I don't believe that the rulings were allowing Mr. Ebersol to testify by the AAF on that behalf, and they've made the same objection to all of our AAF witnesses.

THE COURT:  Forgive me, I didn't understand what you meant by that response.

MS. WILLIAMS:  Oh, yes, Your Honor.  I believe we've made the same argument that several of the other AAF employees or Mr. Ebersol could speak on behalf of the AAF and they made this hearsay objection, which was sustained.  And so it should be the same for DCP.

MR. HOCKADAY:  I'll stand on the first piece, but I also think he, on behalf of DCP, is allowed to

Page 158

testify as to what his understanding of what the obligations were.

THE COURT: Okay. Would you agree or disagree that he can testify as to his understanding?

MS. WILLIAMS: If his understanding didn't come from hearsay conversations, Your Honor. But if he's just going to recast all of those conversations into what he understood after the conversation, then that is just hearsay. I'd also point out the 30 B --

THE COURT: I'm about sustain your objection unless you want to keep talking.

MS. WILLIAMS: Sorry, Your Honor.

THE COURT: Okay. So, I'm going to -- I agree with you that I'm going to sustain the objection as to hearsay. Mr. Zutter, to the extent that you can comment based upon your own understanding of what transpired, you're free to do so. It can't be based on what other people told you. So the objection is sustained.

MR. ZUTTER: Can you repeat the question?

BY MR. HOCKADAY:

Q Yes. What was your understanding as to how much capital was needed to get through the first season?

A Things I'm not going to -- I'm not allowed to

Page 159

talk about, approximately, $70 million based off the remainder in the projections.

Q I want to pull up T 20 -- or actually, I'm sorry, D 86. And what we have here is an email that you sent to Mr. Ebersol, Dawn Belt, Jordan Roberts, Kevin Freedman, and then you copied Jim Scotch Topol. And it was sent on Thursday, February 14, 2019 at 1:13 p.m. Do you see that?

A I do.

Q All right. And attached to it were red lines to a term sheet. You see that?

A Correct.

Q Okay. So first, I think you testified yesterday, and we can go back to T 21, the term sheet -- the draft of the term sheet was provided by who?

A Kevin Freedman and Alan Kantowitz.

Q On behalf of the AAF?

A On behalf of AAF.

Q Is it your understanding that their counsel was included in those --

A Yes.

Q -- conversations? Okay. Now I want to talk about the red lines. These were the red lines that you prepared in response?

A Correct.

Page 160

Q   And you're putting on notice here, not only Mr. Ebersol, not only Mr. Freedman, who are officers of the company, or at least Mr. Ebersol was, but they are a of counsel Dawn Belt and Jordan Roberts?

A   That's correct.

Q   And where did Dawn Belt and Jordan Roberts, where are they -- where do they work?

A   Dawn Belt worked at -- I'm blanking on the name of the law firm.  Very expensive law firm.

Q   Fenwick & West?

A   Yes.

Q   They have an NDA to walk into their lobby.

A   Yeah.  They're famous for that.

THE COURT:  Run that by me again.  I'm just curious.  You said?

MR. HOCKADAY:  Oh, they have an NDA you have to sign if you go into their lobby.

THE COURT:  That's what I thought.

MR. HOCKADAY:  Yeah.

THE COURT:  Okay.

BY MR. HOCKADAY:

Q   Do you understand them to be a sophisticated law firm?

A   They have a very prestigious law firm.

Q   Understood.  I want to talk a little bit

Page 161

about some of the red lines here. If we look under the funding commitment section, there was a red line that added subject to a maximum cumulative commitment of $70 million. Do you see that?

A I do.

Q And it says, within five calendar days of receipt of such request, investor will invest into the company the full funding amount listed in such request. Do you see that?

A Yes.

MR. HOCKADAY: Oh, Your Honor, I was just notified the D 86. I think it's a -- I think it's duplicative of T 75. But can I just for -- because I have it up here. Can I move to admit that?

THE COURT: Any objection?

MS. WILLIAMS: We have it admitted already.

COURT CLERK: It's admitted.

THE COURT: It's admitted.

MR. HOCKADAY: Oh, okay. Sorry. Just wanted to be clear.

THE COURT: That's fine.

BY MR. HOCKADAY:

Q Mr. Zutter, why did you add this $70 million commitment language?

A So in the prior document, there wasn't a

Page 162

clear definition of what the consideration actually was, right? So it didn't define what the investment started or stopped at. And so, we were trying to clarify and make sure it was explicitly clear that we were making an investment that started at 5.1 and that would end at a cumulative commitment of $70 million. We wanted to have no lack of understanding as to the extent of our investment here.

Q  If we go down a little bit further. If we got a closing on the second page, second page of the agreement. The closing said, the investor shall provide definitive documentation. Do you see that?

A  Yes.

Q  All right. Now, you've testified that definitive documentation was not complete in this matter, correct?

A  Correct.

Q  Okay. Tell -- can you share with Judge Gargotta to your reasoning for per footing -- putting definitive documentation in the term sheet at that time, and then we'll get to the why after.

A  We were in a tremendous rush. We were trying to get to a term sheet that would define the kind of broad scope of the transaction such that we could wire the money so that they would hit their payroll

Page 163

obligations before that became a big problem for the business. And we knew that we were going to have to learn more and evaluate what are the different structural alternatives? How are we actually going to, you know, make this investment happen? We hadn't had time to review company formation documents, operating agreements, all of the things that normally would inform the specificity that you need for any form of purchase agreement or merger agreement. And so, we knew that those things would have to follow so that you could make sure that it was appropriately documented and this was meant to allow us to get on that road.

Q Based on your testimony, right before lunch when you were talking about the idea of a normal transaction, how does that fit within that paradigm?

A And at a normal transaction, you would be doing all that work in advance of funding the documents. And so, that would be during that confirmatory period where you'd -- you've done some work but not all, and then you do the rest of the work and you get all the details, you get all the structuring stuff done, and then sign and close. Here we were trying to do everything, you know, in a fire drill, essentially.

Page 164

Q   Understood.  Now, ultimately, I think we saw in the bankruptcy filings, which we're going to pull up here in a little bit, definitive documentation was not completed before the filing of bankruptcy.  Is that your understanding?

A   Yes, that's correct.

Q   Can you explain to Judge Gargotta to just high level why that is and we'll get into the details in a few?

A   There were a variety of conditions precedent that we learned very shortly after making the initial investment that needed to be rectified to be able to actually put in place the transaction we originally were working on.  You know, there was approvals, there were consents, there were waivers.  And so, we created a checklist working with counsel and with the AAF team say, here's a bunch of stuff we have to go in and essentially clean up.  And we started working through that process of cleaning up, while concurrently trying to better understand what's going on in the business, while concurrently trying to figure out what's the right ideal structure.  So kind of doing that last step of normally what happens before.  we're trying to work on all those work streams at the same time.  But the thing that kind of threw a wrench in it is,

Page 165

shortly after executing this term sheet within the next, you know, number of days, we identified there were some major gaps that put at risk whether or not we even could do the transaction or whether it was enforceable or those sorts of things.

MR. HOCKADAY:  Understood.  And we'll get to those here in a second.  I want to pull up Exhibit 830, T 830.  And I believe this is admitted, Your Honor, but I'm sure they'll correct -- people will correct me if I'm wrong.

THE COURT:  Yes, you're correct.

MR. HOCKADAY:  Thank you, Your Honor.

BY MR. HOCKADAY:

Q  So, Mr. Zutter, what we have here is an email, it's at 2:58 Central Time.  You sent it to Mr. Ebersol, you forwarded its attachment SMG series two term sheet, and then a DOCX, which looks like a Word document.  And you told Mr. Ebersol, "Calling you now."  Do you see that?

A  I do.

Q  All right.  And if we go back to -- if we go to the attachment, the binding term sheet, I think you went over this with Ms. Williams yesterday.  There was a minor tweak to it from the previous exhibit.  Is that your understanding?

Page 166

A    Yeah.  I think with respect to governance and adding the non-voting share -- non-voting board members.

Q    Understood.  But not to the dollar amount, correct?

A    No.

Q    So to your knowledge, was the AAF's counsel aware of the dollar amount that was being discussed in the term sheet?

A    Absolutely.

Q    All right.  Now, I know you don't remember specific details of who said what six years ago, and that's difficult, but at any point in time during your conversations with Mr. Ebersol, prior to Mr. Ebersol signing the term sheet and DCP funding the term sheet, did Mr. Ebersol ever tell you that there was a $250 million investment?

A    Not to my knowledge.

Q    Is that something you would've remembered?

A    I certainly think so.

Q    Can you just -- this may be an elementary question, but can you just explain to Judge Gargotta to why?

A    Well, it's a multiple of the size that we had been talking about in drafting and going back and

Page 167

forth with their counsel, with their employees, with our side -- with our outside counsel. If a transaction is three and a half times different than what you're iterating around, normally someone brings that up, there's a pretty big difference between 70 million and 250 million. That's -- that would be a difference I'd probably notice.

Q   I want to pull up Exhibit T 22. This one is also admitted. And what we have here is the DocuSign copy that you forwarded to Mr. Kulas, Mr. Rosonkowski, and then it's a forward from Alan Kantowitz that sent to you. Do you see that?

A   I do.

Q   All right. Now, if you see in the subject line, it says completed term sheet. Do you see that?

A   I do.

Q   All right. Now, if we scroll down a little bit further. Oh, oh, I'm sorry. Can you scroll up a little bit more? It was Alan Kantowitz sent you the completed term sheet at 3:28 p.m. Central. Do you see that?

A   I do.

Q   What is the significance of that time period?

A   We had a --

Q   Or that exact time? I'm sorry.

Page 168

A    We had 120 seconds to get a wire in.

Q    Why not?  What would happen if you didn't?

A    Then we'd miss the deadline and then, you know, wouldn't be able to make the payroll that was the objective of going so quickly.

Q    There's a big issue in this case as far as whether or not a -- and the Court's already made a ruling on certain items with it, but just from a factual standpoint, there's an issue as to whether or not anyone can locate a signed copy of the term sheet from the DCP side.  Are you aware of that?

A    I'm aware of that.

Q    Okay.  Are you aware one way or another whether you did or didn't sign?

A    I don't recall whether I did or didn't sign.

Q    From your vantage point, the DCP had an understanding that it was under the obligation to perform under the term sheet.

MS. WILLIAMS:  Your Honor, objection again. I think he can give his understanding, but he can't speak for --

THE COURT:  Right.

MS. WILLIAMS:  -- a group of people.  He is not --

THE COURT:  That's exactly what he said.

Page 169

MS. WILLIAMS:  Oh, okay.  I'm sorry, Your Honor.

THE COURT:  So the objection is overruled. You can answer the question, sir.

MR. ZUTTER:  Sorry, just repeat it again, sir, to make sure I answer it appropriately.

BY MR. HOCKADAY:

Q   Of course, yeah.  Was it your understanding that DCP had an obligation to perform after it funded under the term sheet?

A   Absolutely.

Q   Did it govern itself accordingly after that piece?

A   Yes.  We wired the money shortly thereafter and acted accordingly.

MR. HOCKADAY:  I want to pull up the envelope that we looked at yesterday.  I think it is D -- or I'm sorry, T --

MS. WILLIAMS:  821A.

MR. HOCKADAY:  Thank you.

MS. WILLIAMS:  You're welcome.

MR. HOCKADAY:  T 821A, please.  (Inaudible). We can do the second page, Laura.  All right, Mr. Zutter, you --

THE COURT:  Can you please come back to the

Page 170

microphone. Thank you.

MR. HOCKADAY: Oh, thank you.

BY MR. HOCKADAY:

Q Mr. Zutter, this is a copy of the DocuSign envelope that was subpoenaed at the very -- right before trial, essentially, or at least the first scheduling of the trial, but after the close of discovery. And we -- or it was -- I think it was subpoenaed before, but we received it afterwards. Either way. This right here represents, or at least our understanding of it, kind of the historical activity as it relates to the DocuSign. Do you see that?

A I do.

Q All right. So I want to -- if we look at the timestamp on the top where it says copied, and it says sent at 1:27:59 p.m. Do you see that?

A Yes. And that's Pacific Time, I believe, right?

Q Yes. And then it was viewed Central Time 3:22:47 p.m. You see that?

A Yes.

Q Side by side, Laura, with T 22. Thank you. And if we look at the completed DocuSign being sent to you, it looks like it was sent right at 3:28,

Page 171

literally the next second, 3:28:00. Do you see that?

A Yes.

Q Yeah. I understand you're not DocuSign, but is it your understanding that this reflects the copy that you received?

A I believe that's correct.

Q All right. And then if we can zoom out and go back to 821A. And if you look here under electronic record and signature disclosure, it says, not offered via DocuSign. Do you see that?

A I do.

Q Do you have any recollection of whether Mr. Kantowitz or anyone from the AAF even gave you an opportunity to sign the DocuSign at least based on what we see here on the record?

A I don't.

Q Okay. We can take that down. Thank you. And just so we're clear, during this time period when you're receiving emails and you see completed, what was your understanding?

A Ordinary of course is when a DocuSign says, completed, the document's complete. And we were moving very fast on the day.

MR. HOCKADAY: All right. I want to pull up Exhibit D 237. I don't know if this has been offered

Page 172

yet.

MS. WILLIAMS: I don't believe it has, Your Honor, but we don't have an objection.

THE COURT: Thank you, Ms. Williams. When you're ready, Ms. Flores, would you note that D 237 is admitted?

(DEFENDANT'S Exhibit 237 was marked for identification.)

BY MR. HOCKADAY:

Q Mr. Zutter, what I'm showing you here is a proof of claim that was filed on behalf of Dundon Capital Partners. Do you see that?

A Yes, I do.

Q All right. Now, do you recall -- I don't want -- so before we get into these questions, I want to just be very clear, I think everybody's on the same page, but just so you know, kind of where the guardrails are. There's attorney-client privilege, there's a line. So there's certain information you can testify to that doesn't talk about conversations with counsel, but there is information you can when it relates to information that you are providing. Do you understand?

A I think so.

Q Okay. We'll do all this if we go too far.

Page 173

So what I want to know is just kind of factually what your understanding of the source of the information and DCP's ability to speak on that.

A   Okay.

Q   All right.  So did you help provide information to counsel in preparation for this proof of claim?

A   Yes, we did.

Q   All right.

A   Yes, I did.

Q   Okay.  Thank you.  Now, I don't think there's any dispute here that the conversations between Mr. Dundon and Mr. Ebersol were between those two as far as leading up to the term sheet, correct?

A   Correct.

Q   Was Mr. Dundon, though, in the weeds as far as the specific AP and details of things that you discovered after the investment?

MS. WILLIAMS:  Objection, Your Honor.  Speculation, foundation of whether Mr. Zutter would know what Mr. Dundon knew.

THE COURT:  I have actually -- let's try the form of the question, but it's sustained.  Go ahead.

MR. HOCKADAY:  Okay.  Let's back up.

BY MR. HOCKADAY:

Page 174

Q   Who's the one person at DCP who has firsthand personal knowledge or at DCP at the time, who has firsthand personal knowledge and experience, both as to the discussions and negotiations into the term sheet prior to investment and then the details of what was discovered after the fact?

A   That would be me.

Q   All right.  And Mr. Vanderbilt was not part of those discussions prior to the negotiation of the term sheet?

A   No.

Q   All right.  So are you the best person to testify as to the contents of this?

A   I believe so.

Q   All right.  Let's go to the Exhibit A and I want to

THE COURT:  (Inaudible).

MR. HOCKADAY:  Oh, yes, I'm sorry.  Exhibit A to exhibit D 237.

THE COURT:  Thank you.

MR. HOCKADAY:  Thank you.

BY MR. HOCKADAY:

Q   Now, if we look at paragraph three, if we can blow that out.  Blow that up.  It says the AAF also told DCP that had all the authority necessary to

Page 175

consummate this transaction with DCP.  Proper authority was important because the AAF was committing to give 75 -- DCP 75 percent ownership of the SMG and voting control of the board of directors with the specific terms and transaction structure subject to DCP's discretion.  Do you see that?

A   Yes, I do.

Q   All right.  I want to pull up T 22 again.  If we do side by side, that'd be great.  Thank you, Laura.  Now, if we go to T 22, we go to the last page, I don't think there's any dispute that Mr. Ebersol signed this agreement on behalf of Ebersol Sports Media Group and its Chief Executive Officer.  Is that your understanding?

A   Yes.

Q   Now, you were talking to Ms. Williams yesterday a little bit about authority and representations in writing here.

A   Uh-huh.

Q   Can you share with Judge Gargotta to your understanding --

A   Yeah.

Q   -- and how you came to the -- provide the information as it relates to paragraph three?  And just your understanding generally.

Page 176

A    I think the CEO of the business had signed a binding document on behalf of his company entering into the terms.

Q    And at this point in time, did DCP have the belief when he did this on February 14, 2019, Mr. Ebersol had the authority to enter to the transaction?

A    Absolutely.

Q    I want to go to paragraph five.  Thank you. You can take T 22 down, Laura.  If we go to paragraph five, which is on page two of Exhibit A of D 237. During the following weeks, the execution of the term sheet, DCP learned a number of alarming facts that revealed that the AAF was not forthcoming with Dundon and DCP.  Do you see that?

A    I do.

Q    Is that your belief?

A    Yes.

Q    All right.  I want to direct your attention now to -- get the right paragraph, paragraph nine, if we could pull that out.  It says, in February of -- in March, 2019, DCP also learned that despite representations by the AAF, that it had the requisite authority to enter into and perform its obligations under the term sheet with DCP.  It actually did not. The board of SMG had not, in fact, formally approved

Page 177

the transaction. In addition, the transaction was not authorized by the requisite shareholders of SMG. And although the term sheet promised preferred stock to DCP for its equity investment, the AAF actually did not have enough shares authorized to satisfy the issuance required under the term sheet. And we carry onto the next page. The AAF and its executives never disclosed this information to DCP, until after DCP executed the term sheet. You see that?

A    I do.

Q    Is it your testimony that that is 100 percent true?

A    100 percent true.

Q    Let's look at some documents.

MS. WILLIAMS:  Sorry.

MR. ZUTTER:  Yes.

MS. WILLIAMS:  I just want to make sure that Mr. Zutter is testifying as to his personal knowledge. The prior questions were what his understanding was, but I just want to make sure we're not bleeding into information he got from other people that's in this paragraph.

THE COURT:  Based upon your personal understanding?

MR. ZUTTER:  Yes.

Page 178

THE COURT: All right. Go ahead.

MS. WILLIAMS: Thank you, Your Honor.

MR. HOCKADAY: All right. I want to parse out paragraph nine. We saw a representation by Mr. Ebersol on T 22 when he entered into the transaction. I would like to direct the Court's attention to -- or actually, let's pull up Exhibit, it's D 136.

MS. WILLIAMS: Your Honor, I'll just object to the premise of that question that Mr. Ebersol made a specific representation of authority just because that's not in that document.

THE COURT: I -- forgive me. You -- I didn't hear what you said, are you saying that in the proof of claim that that's a misstatement or not contained therein?

MS. WILLIAMS: I'm saying that Mr. Hockaday, in introducing that question, made a comment that Mr. Ebersol had confirmed authority in that trustee's Exhibit 22, and we went through that language yesterday and it doesn't have the authority representation, warranty. So I just wanted to object to that premise but I understand the question he's asking.

MR. HOCKADAY: I don't know that that's a formal objection, but I will respond to it

Page 179

substantively.

THE COURT:  Go ahead.

MR. HOCKADAY:  He testified specific.  She asked him yesterday -- I remember this pretty well.  She asked him yesterday, were there a written documentation where Mr. Ebersol had represented he had authority?  He said, yes.  In my belief, when you signed a document on behalf -- as a CEO on behalf of an organization that you can enter into a transaction, that is a written representation.  That is consistent with what we've said all along and what he's testified to.  That's his testimony.  That's not my words.  I'm pulling from what his testimony was, so.

THE COURT:  (Inaudible).  Please continue.

MR. HOCKADAY:  Thank you, Your Honor.

BY MR. HOCKADAY:

Q  So if we look at D 136, this is an email exchange between Jordan Roberts, Dawn Belt, Jim Scotch Topol, you're copied, Charlie Ebersol's copied, and Peter Kosar's copied.  Do you see that?

A  I do.

Q  Can you, just for the Judge, for Judge Gargotta, just very quick, quickly, Peter Kosar and Jim Scotch Topol, who were they counsel for?

A  They were counsel for DCP.

Page 180

Q   And Mr. -- Ms. Belt and Mr. Roberts, who were they counsel for?

A   The AAF.

Q   So this email was sent on Monday, February 25, 2019, correct?

A   Correct.

Q   All right.  So we have counsel for the AAF and counsel for DCP having a discussion here.  And what we have is a change of control gap analysis.  Do you see that?

A   I do.

Q   Without going into the detail here, what was your high-level understanding of the issues, as far as authority?

A   My understanding is that upon a thorough --

MR. HOCKADAY:  Bless you, Your Honor.

MR. ZUTTER:  -- (crosstalk) documents, there were a number of major gaps that needed to be dealt with.  A board vote being one, a shareholder vote being two, a discrepancy between an existing agreement with Reggie Fowler that had a number of features that were directly in contradiction to those of our term sheet, and a number of different debt like -- debt instruments that between either MGM or Patrick that had provisions around change of controls that had to

Page 181

be dealt with.

And so, there was a handful of things that were identified by lawyers for the AAF, working with lawyers for DCP that we then -- were trying to work collaboratively to resolve overtime. Essentially, conditions precedent to being able to put definitive documentation together.

BY MR. HOCKADAY:

Q And if we could pull up exhibit D 135. And what we have here is an email exchange that Mr. Ebersol sent to you, copied, Mr. Dundon, his attorney, Dawn Belt, or the AAF's attorney Dawn Belt and Kevin Freedman. So again, we've got everybody at the party, correct?

A Yeah, we're all working together.

Q All working together. Now, if we go to the minutes of the special meeting of the board, which is the second attachment, I believe. It's DCP parties 250 (inaudible). Thank you.

A So this right here --

Q We already heard testimony from both Mr. Ebersol and Mr. Dundon. and I imagine we'll probably hear some more from other witnesses potentially, but this is a -- and Ms. Belt herself, she testified to the board meeting minutes. So we don't need to go

Page 182

into great detail here, but what was the purpose of having this board meeting from your understanding? From DCP's understanding.

A    Yes.

Q    Go ahead.

A    The meeting of the board of AAF was a condition precedent, or a requirement to approve the transaction described in the term sheet.

Q    So when Charlie Ebersol signed on behalf of the Ebersol Sports Media Group on February 14, 2019, is it your understanding that he had authority to do so to enter the transaction?

A    Based on what we know now?

Q    Yes.

A    No.

Q    And if we go to DCP parties 51, just so we're clear here, the Court obviously can read the document. We've already testified to it, but now therefore be it resolved in the middle, the board hereby approves and ratifies the term sheet.  You see that?

A    Yes.

Q    Okay.  So this was the requisite approval that was needed before the investment, correct?

A    This was the requisite board approval, yes.

Q    Board approval.  Thank you for clarifying.

Page 183

All right.  Let's go back to D 237, Exhibit A.  The last part of that where it says, although the term sheet promised preferred stock to DCP for its equity investment, the AAF actually did not have enough shares authorized to satisfy the issuance under the term sheet.  The AAF and its executives never disclosed this information to DCP.  You mentioned the stockholder consent.  I want to pull that up.  Can we pull up the stockholder?  What exhibit number is that stockholder consent?

MS. WILLIAMS:  Your Honor.  I'm just going to object again on the basis of personal knowledge because Mr. Zutter's testified that he wasn't in any conversations with Mr. Dundon that Mr. Ebersol was in, and so, I don't know where he's getting the knowledge for some of these things if it's not from hearsay.

THE COURT:  Your response?

MR. HOCKADAY:  I haven't asked a question yet.  I just pulled up the -- asked her to pull up the exhibit, which is D 182, please, which has been admitted.  He testified he provided counsel with information, based on his understanding, on behalf of DCP before I even started all this.  He's talking about what he knows and DCP's understanding.  And he's on all these emails.  He's on -- he's part of the --

Page 184

he's testified that he already knows it, and he is also on the change of control emails.

And he is testified as to what the issues were and the issues were, they didn't have board approval and they also didn't have stockholder approval.  He has first stamp personal knowledge as John Zutter and as DCP to testify to this.  He's perfectly competent too.

THE COURT:  Ms. Williams?

MS. WILLIAMS:  Your Honor, I think there's two problems.  One, there's not a 30(b)(6) mechanism outside of a deposition.  So Mr. Zutter's not a 30(b)(6) witness here on behalf of DCP, you can talk about all of DCP's knowledge.  He's Mr. Zutter testifying as Mr. Zutter.  The problem with the term understanding is without him saying, yes, I heard this, or, yes, I got this, that understanding can be from conversations with Mr. Dundon and Mr. Vanderbilt.  And some of the things in this Exhibit A, frankly, had to have come from a conversation with Mr. Dundon that Mr. Zutter say that's on personal knowledge of so.  That's my concern with the vagueness of the understanding questions, is that I don't know where it's coming from and that it's actually Mr. Zutter's knowledge and not repeating something else someone

Page 185

told him.

THE COURT: Okay. Well, wouldn't be the best way to approach, make it clear that -- I mean, that his testimony has to be based upon his personal knowledge and not anything he heard from another individual. I mean, I think that's the way to square it so that -- do what you said. So, we'll just do -- with regard to this document, you need to constrain your testimony as to your personal knowledge. Do you understand that?

MR. ZUTTER: Yes, sir.

THE COURT: All right. Go ahead.

MR. ZUTTER: Thank you, Your Honor.

MS. WILLIAMS: Thank you.

MR. HOCKADAY: My only comment too is that he is literally on the email exchange and commenting on D 136. He's -- and he's testified from the very beginning. He has personal knowledge about this very issue, so.

THE COURT: And I heard what you said, and I've told you how we should approach this.

MR. HOCKADAY: Thank you, Your Honor.

THE COURT: Is that fair enough?

MR. HOCKADAY: Okay. Thank you, Your Honor. Yes.

Page 186

All right. If we look at -- give me one second, I apologize.

THE COURT: Sure.

MR. HOCKADAY: Thank you.

BY MR. HOCKADAY:

Q We look at Exhibit D 182. We've got an email exchange from Dawn Belt, Peter Kosar, copying Jordan Roberts, Jim Scotch Topol, Jason Kulas, yourself, Jeff Vanderbilt and Charlie Ebersol. You see that?

A I do.

Q So again, this is both representatives and counsel from the AAF and DCP on this communication, correct?

A Correct.

Q All right. Now, if we look at the attachment, the first one, we have dated March 27, 2019, action by written consent of the stockholders. Do you see that?

A I do.

Q All right. Who did you understand had control over a majority of the stock at the time of the transaction and at the time of the bankruptcy?

A Mr. Ebersol?

Q And if we go back, or if we go down to page five of the PDF, we have Teddy Bright Pictures

Page 187

Incorporated, signed by Mr. Ebersol on 3/27/2019.  You see that?

A   Yes.

Q   And on the next page, as a proxy for FO2 LLC, which you obtained from the Reggie Release, which we'll talk about in a second, 3/27/2019, you see that?

A   Yes.

Q   And then on the page seven of the PDF, Ebersol, St. James Family Trust dated November 14, 2007, we've got a signature from Dick Ebersol 3/27/2019.  Do you see that?

A   I do.

Q   And then, of course, Exhibit A has reference to the term sheet.  Do you see that?

A   Yes.

Q   And is it your understanding that the -- that reference is the same term sheet as Exhibit T 22?

A   Yes.

Q   All right.

MS. WILLIAMS:  She didn't have the (inaudible).

MR. HOCKADAY:  I -- yeah.  Okay.  While we're on this topic here, I want to pull up Exhibit T 1171.  I don't believe this has been offered yet, Your Honor, but we're going to move to admit it.

Page 188

THE COURT: 1171 (inaudible)?

MR. HOCKADAY: Yes, sir.

THE COURT: Thank you. Any objection?

MS. WILLIAMS: Okay. This wasn't on the list she gave me, so I need to pull it up.

THE COURT: Okay. Yeah, take your time.

MS. WILLIAMS: Thanks. No objection, Your Honor.

THE COURT: You do not?

MS. WILLIAMS: I do not, Your Honor.

THE COURT: All right. Thank you. Then 11 -- Trustee 1171 is admitted.

(TRUSTEE'S Exhibit 1171 was marked for identification.)

BY MR. HOCKADAY:

Q  All right. If we can go to the next page, just real quick. Actually, go back to the front page. So there was some testimony earlier today about when communication was made, I think, to -- whether the -- or I'm sorry, it was -- whether it was -- there was communication, a formal shareholder notice. Do you recall that?

A  Yes.

Q  All right. Did you, John Zutter, on behalf of DCP communicate to the majority of those who had

Page 189

control of the shares of the AAF at the time, Dundon Capital Partner's limitation of $70 million?

A   Yes.

Q   All right.  If we look at the top email that Mr. Ebersol sent to his attorney, Dawn Belt and copied Kevin Freedman, that you're not a part of, he says, "Dawn, Dundon and Zutter informed me today they plan on only funding up to the 70 million as described in the short form agreement."  Do you see that?

A   I do.

Q   And then he says, "They obviously still have not sent the below.  Do you think I should send Zutter an email asking for the below to ratify the stockholder consent?"  Do you see that?

A   I do.

Q   All right.  So this is on March 26, 2019. Does that refresh your recollection that you informed Mr. Ebersol that 70 was the max?

A   Yes.

Q   All right.  And if we go back to D 182.  Can we go back to D 182?  Thank you.  Go over one page. Mr. Ebersol, on behalf of the stockholders and his father, Dick Ebersol, executed that consent ratifying the term sheet, correct?

A   Yes, the next day.

Page 190

Q   All right.  Could we go -- we can take that down.  Can we go back to Exhibit D -- Oh, actually -- yeah, no, we're -- yeah, we're -- can we go back to D 237?  I think we've talked about paragraph nine.  I want to go back up a little bit to paragraph six.  Could you go to page two for me please, Laura?  Oh, I'm sorry, two of Exhibit A.  Now I want to focus on paragraph six.  Could you pull that up please, Laura?  It says, DCP learned that in addition to not having the funds to pay salaries after the first week of the league's games, the AAF had -- also had accumulated more than 13 million in unpaid debts and commitments.  The AAF did not disclose these unpaid debts or commitments to DCP prior to the execution of the February 14, '29 teen term sheet.  Do you see that?

A   I do.

Q   Okay.  Is that your testimony based on your understanding and personal knowledge?

A   Yes.

Q   All right.  I want to direct your attention to Exhibit D 50.

THE COURT:  (Inaudible) my knowledge done.

BY MR. HOCKADAY:

Q   This is an email that we've seen a couple times.  It's dated on January 22, 2019.  Mr. Kantowitz

Page 191

is informing Charlie Ebersol directly, Mr. Freedman and Mr. Farrell. And Mr. Farrell's already testified to this, I believe, although we're in the middle of his testimony, so he will, if he hasn't, as to the veracity of this. And if we look, I want to blow up the paragraph that starts with, again, right at the bottom.

It reads, "Again, I would be remiss if I did not point out the following. We have about 8 million of invoices that are overdue and maybe in probably another 8 million that will continue to push past opening weekend eve, though they will arise between now and then." Do you see that?

A   I do.

Q   All right. I --

MS. WILLIAMS: Sorry, Mr. Hockaday, I missed what exhibit you moved.

MR. HOCKADAY: Oh, D 50.

MS. WILLIAMS: D 50.

THE COURT: Has this been admitted?

MR. HOCKADAY: It's been admitted, previously. Sorry, I can slow down for you.

MS. WILLIAMS: I just missed the number when you -- and I can't see it on the screen.

MR. HOCKADAY: It's probably my face moving

Page 192

away from the mic.  Sorry.

BY MR. HOCKADAY:

Q   So what we have here is an acknowledgement from Mr. Kantowitz to Mr. Ebersol directly putting him on notice that there's at least 16 million of anticipated unpaid liabilities that would become due before Dundon Capital Partners, Mr. Zutter or Mr. Dundon even entered the picture.  Is that your understanding?

A   It certainly is.

Q   All right.  So does that square with the at least 13 million that we looked at paragraph six on the proof of claim.  Now I want to pull up exhibit -- I want to go back to -- okay.  I want to go back to Exhibit Trustee 805.  Oh wait, I'm sorry.  It wasn't there.  I thought it was -- T 21.  T 21.  Now, again, you just testified that the 5.1 million that Kevin Freedman informed you about that was -- was that your only understanding of the outstanding liabilities?

A   At that point in time.

Q   Are you aware of anyone at DCP having an understanding of anything different than what Kevin Freedman represented here on behalf of the clients of American Football on February 14th?

A   I'm not aware.

Page 193

Q   And you were having conversations with Charlie during that period?

A   Yes.

Q   And again, I know you don't remember specifics because it was six years ago.  Candidly, at this moment, I can't even remember six minutes ago, but I also have a newborn, so that's my fault.  Not my fault, but my problem.  Do you have any recollection of an AP deficit of nearly $16 million that was disclosed to you or shared with you during any of your conversations with Mr. Ebersol during that 24-hour period?

A   Certainly not.

Q   All right.  Would that have been material and something you would've remembered?

A   I absolutely would've.

Q   Can you explain to Judge Gargotta why, in the context of this particular deal, a number like 16 million unpaid, or 13 million unpaid, or any eight-digit figure of unpaid liabilities would be something you would remember?

A   Well, it would be -- if we had looked at the projections based on where they were in the year, there was about 70 million left.  We had heard that as well as a statement of what we expected for the rest

Page 194

of the year.  But the key to answer to your question is that 60 million of incremental liabilities would've been essentially a 20 percent incremental need for capital just to get through the end of the season. It's 20 percent difference and expectations is certainly material, and very well likely could have led to us not doing the transaction in the first place.

Q   Thank you.  You can take that down.  Can we go to -- back to Exhibit A of D 237?  And, Laura, if you could blow up paragraph eight for me.  So we're back on the proof of claim here.  Now we're looking at a different paragraph.  It says DCP also learned, after it executed the term sheet, that the AAF had an ongoing threatened litigation from a past associate who claimed to be a co-founder of the league and who was suing to obtain 50 percent interest in the AAF. The AAF and its executives never disclosed this information to DCP until after DCP executed the term sheet.  Do you see that?

A   I do see that.

THE COURT:  Hockaday, excuse me.

MR. HOCKADAY:  Oh, yes, Your Honor.

THE COURT:  I know you're on a roll here and I hate to interrupt you, but I I'd like to take a

Page 195

five-minute break if you could, please.

MR. HOCKADAY: Yes, sir. I would say yes, even if you didn't ask me, but I -- of all people, I'm sympathetic to that.

THE COURT: I just need a five-minute recess.

MR. HOCKADAY: Understood. Thank you.

THE COURT: And we'll come back and we'll pick up with that exact point, okay?

MR. HOCKADAY: Thank you.

THE COURT: Thank you.

COURT CLERK: All rise.

(Off the record.)

THE COURT: Thank you, everyone. Please be seated. Are you ready to proceed.

MR. HOCKADAY: We are, Your Honor. Thank you.

THE COURT: And I'm sorry, go ahead, please.

MR. HOCKADAY: Oh, no, no problem. Thank you, Your Honor.

BY MR. HOCKADAY:

Q Mr. Zutter, before we broke, we were talking about paragraph eight. I'll just start fresh. Paragraph eight of Dundon Capital Partners proof of claim says DCP also learned, after it executed the term sheet, that the AAF have an -- had ongoing

Page 196

threatened litigation from a past associate who claimed to be a co-founder of the league and who was suing to obtain 50 percent interest in the league. Excuse me. The AAF and its executives never disclosed this information to DCP until after the DCP term sheet -- DCP executed term sheet.

I want to direct your attention to D 114. And what we have here, this was an email correspondence that Mr. Dundon testified to. It was from Kevin Freedman on February 20th, at 8:04. Do you see that?

A   Yes.

Q   And of course, February 20th is six days after the term sheet, correct?

A   Correct.

Q   All right. And if we go to the second paragraph, I want to read just a couple sentences. It says, in March of 2016, while Charlie directed the 30 for 30 about the original XFL, in which Dick and Vince discussed contemplate relaunching the league, he explored the idea of relaunching the XFL with the help of future AAF CRO, Tom Vet. After the film premiered on ESPN in February 2017, Bob Vanek, a friend of Charlie, approached Charlie and proposed a way to crowdfund the relaunch of the XFL through regulation A

Page 197

raises.

If we go down a little bit where it says they stop talking. It says they stopped talking in June of 2018, Vannock came out of the shadows seeking 50 percent of the company. The board of directors attempted to mediate to eliminate the distraction, but he continues to demand millions of dollars of cash plus significant equity. After yesterday's announcement, Vannock's attorneys resurfaced for a demand or written offer from us by Friday or else. You see that?

A   Yes.

Q   Okay. Does this comport with your understanding of a threat and litigation that was not disclosed prior to DCP's entry of the term sheet or its transaction, however it's defined?

A   Yes, it does.

Q   All right. And I want to --

MR. HOCKADAY: Your Honor, I want to pull up exhibits D 10 and D 53, and I know Ms. Williams is going to object to those, but I'm only going to be offering them for notice purposes.

MS. WILLIAMS: Your Honor --

MR. HOCKADAY: 10 and 53.

MS. WILLIAMS: -- we do object to both of

Page 198

those on foundation and hearsay.  And as to D 10, an additionally inadmissible opinion because it has a lot of legal conclusions in it from the counsel that sent it.  And I don't know what Mr. Hockaday is offering them as notice of, given the notice argument he was making when I was introducing exhibits, that if there is no response to that, to which to use it as notice context, then it's not notice.  There is no -- these are letters from counsel that don't represent any of the parties in this case.

THE COURT:  Okay.  Right.  Can I see them?  All right.  So --

MR. HOCKADAY:  Yes.

THE COURT:  -- let's talk about D 10 first.  That's a letter addressed to Mr. Ebersol from counsel for Mr. Vannock, right?

MR. HOCKADAY:  Yes, sir.

THE COURT:  Okay.  And you want to introduce this for notice purposes only?

MR. HOCKADAY:  Yes.  Just that the AAF was on notice.  And to respond briefly to Ms. Williams's comment, I think you overruled my objection and did allow that exhibit on notice purposes.  So it'd be the same purposes here as for D 10 and D 53.

THE COURT:  So --

Page 199

MS. WILLIAMS: Right.

THE COURT: Hang on.

MS. WILLIAMS: Sorry. Sorry, Your Honor.

THE COURT: If I may -- I'll let you respond. And let's look at D 53. Remember, I haven't seen everything in this case. I have not seen these documents before. And so D 53 seems to be similarly another letter addressed to -- well, it's addressed to Mr. Chippy (ph)?

MR. HOCKADAY: He is the attorney -- he was the Morgan Lewis attorney with Baird Fogle who was also Tom Vet's attorney and the AAF's attorney for some aspects.

THE COURT: All right. And this letter purport to show what?

MR. HOCKADAY: That the league was put on notice of threatened litigation.

THE COURT: Okay. Now you may respond. Go ahead, please.

MS. WILLIAMS: Yes, Your Honor. We do have the hearsay objection, which we've already discussed. You did, in fact, sustain the objection on the notice issue we were arguing about. That was about the PWC communications on their scope of work. But also, there's a foundation issue here because both of these

Page 200

are produced by the DCP parties, not by the trustee. I don't believe D 10 was shown to Mr. Ebersol to establish that he received it or reviewed it or anything like that.

And the other one didn't even go to Mr. Ebersol. It went to Morgan Lewis. And certainly, no one said they got that or who it was forwarded to or anything like that.

THE COURT: Okay.

MS. WILLIAMS: And then as well, the inadmissible opinion in at least D 10, which is a very long letter.

THE COURT: Okay. Your response?

MR. HOCKADAY: Your Honor, I'm not offering any of the allegations that are in there, which candidly may be ironically similar to some of the arguments being made in this case. I'm not offering any of that for the truth of the matter asserted. It is literally purely for notice purposes, so.

THE COURT: Well, wouldn't that be inconsistent with -- if I allowed this in when I sustained your objection to Ms. Williams?

MR. HOCKADAY: No, I think -- so, if I may, my memory, and I could be wrong, so if I am, please correct me. But the exhibit she's talking about where

Page 201

you did sustain was the PWC email, and that was hearsay.  The one that I'm talking about where the court overruled was the one that involved Gabe Giordano, Marshall Mathers and Mark Wahlberg.  That was -- you did allow that in for notice purposes.  So it's akin to that.  That's what I'm talking about.  Not -- the PWC one was pure hearsay because it had the attachment.  That's not what we're discussing.

THE COURT:  So just to complete the loop, Ms. Williams, please stipulate that it's hearsay and it's got legal opinions.  It's got all sorts of bad things in it.  Why can't this be for the very limited purpose of notice that Mr. Ebersol knew predating DCP's involvement, that he was threatened with litigation?

MS. WILLIAMS:  Because they haven't laid a foundation that Mr. Ebersol or anyone at the AAF received these.  They produced them.  They didn't ask Mr. Ebersol about them.  They haven't asked anyone at Morgan Lewis, especially whether they sent Mr. Zutter.

THE COURT:  I'm going -- to keep talking. I'm getting ready.

MS. WILLIAMS:  I'll stop.

THE COURT:  I think she makes a good point. So it's sustained.  It's not going to come in.

MR. HOCKADAY:  Understood.  Thank you, Your

Page 202

Honor.

BY MR. HOCKADAY:

Q   But going back to D 114, which is admitted, is that your understanding of the first time that anyone associated with DCP became aware of threatened litigation that the AAF knew about before the transaction?

A   Yes.

Q   I want to go to paragraph 10 in Exhibit A of D 237.  If we can blow up paragraph 10.  It says the AAF, prior to DCP's involvement had a pattern of willful omission of material facts, in particular regarding its prospects obligations and opportunities. AAF did not appropriately disclose material facts to DCP prior to the commitment.  So, that's kind of a general high-level statement.  So I want to look at a couple exhibits here.  Can we pull up D 124?

And what we have here is an email that we've already heard some testimony about.  It's an exchange that involved Mr. Vanderbilt, Mr. Kantowitz and Mr. Freedman.  Now, if we go to the second sentence, or let's just read the top part of the email that was sent on February 21, 2019.  And again, that's seven days after the transaction as you understand it, correct?

Page 203

A    Correct.

Q    It says, "Jeff, sorry for the delayed response here, behind on a few emails.  The only outstanding debt is to MGM, Dave Pottruck and Dick Ebersol.  All the other relevant documents for those transactions should be in the data room within the financing folder."  You see that?

A    Yes.

Q    All right.  And if we go lower, it says, "The Jan, Feb Pottruck and Ebersol notes, (inaudible) million dollars become due within five days of the company receiving $10 million in financing.  If that amount is never raised, the notes become due in early 2021, the December Pottruck and Ebersol notes 2 million become due on March 10, 2019, upon change of control.  Pottruck and Ebersol can call all the notes due.  Do you see that?

A    Yes.

Q    Okay.  Prior to entry of the transaction, were you or anybody at DCP that you're aware of -- did you note that there were notes due to David Pottruck and Dick Ebersol in MGM?

A    No.

Q    Can you explain to Judge Gargotta why that's significant?

Page 204

A   Well, a couple of things.  The fact that they have a change of control, I might use the wrong words, but a default whereby they become payable at that point means that there's incremental capital that the company would need to get through the end of the season.  And another, kind of, need for liquidity on top of the 70 that we had previously thought about.

The other is we had specifically talked about being senior in the capital table.  Now that's in question.  And then third is, there's a approval provisions, as I recall within some of these notes that you can't actually document our term sheet without getting waivers or releases or satisfying some sort of changes within the terms of these specific data obligations.

Q   Doesn't it also increase the amount of liability obligations that are due almost immediately?

A   Yeah.  That's kind of what I meant originally.  Right.  We thought there was 70, but this is adding to that immediately.

Q   Now, let's talk about the -- I want to talk about the Reggie Fowler release.  We've heard testimony on that quite a bit.  I don't think I need to show you a document.  Are you familiar with Fowler release?

Page 205

A    I've spent time looking at it.  Yes.

Q    Okay.  Can you share with Judge Gargotta the importance of entering the Fowler release?

A    There's essentially two things that were in direct contravention of the transaction that we had proposed.  One is that the board was described in the Reggie Fowler agreement as being a five-member board (inaudible), and ours is going to be two voting members and the non-voting members.  And so, those two both can't coexist.  They're -- they don't align.  The second is that we had signed up for ownership of 75 percent, even more than 25 percent.  You can't have more than 100 percent composition of the company.  So those are in direct contradiction to each other. Those two things needed to be resolved for our transaction to be able to be consummated in, like, in a complete way.

Q    And who's your under -- and who was the board that had to approve that transaction based on your understanding?

A    Board prior to our existence.

Q    Did that consist of you, Mr. Dundon or any DCP representative?

A    No.

Q    Oh, you know what?  I forgot one thing before

Page 206

-- I wanted to move topics, but before we do, can we go back, I'm sorry, to T 1171.  Now, I just want to get some clarity here on the record because there may be some questions about this later.  But if we go down, the email that you sent to Jordan Roberts, who, again, is the attorney for the AAF, correct?

A   Yes.

Q   All right.  You sent it to Jordan Roberts. He copied Charlie Ebersol, Dawn Belt, also an attorney for the AAF, Jim Scotch and Peter Kosar, who are attorneys for DCP, and Jason Kulas.  And it says, "Thanks for saying this.  Charlie and I discussed this at length."  Can we go to the next page?  There's reference here to indemnification and fraudulent conveyance.  Can you just explain to Judge Gargotta what's going on here?

A   Yeah.  So we were trying to resolve all the issues associated with making sure the term sheet was enforceable and complete, and then moving to definitive documentation.  One of those was going to be shareholder consent.  Charlie, back in February had gotten proxy to sign on behalf of Reggie, and was about to sign the shareholder consent and was worried that he might be in some sort of position where someone might make an allegation or put him in a

Page 207

position of legal jeopardy.  He wanted to have --

MR. HOCKADAY:  Bless you.

THE COURT:  Thank you.

MR. ZUTTER:  -- comfort that we were going to -- this is my understanding at least, was he wanted to have comfort that he would still remain under, you know, traditional director and officer insurance protections and indemnities under the corporate documents associated with that course of action.  And then we had also been talking about a variety of other transaction structures that we might pursue once we get those cleanup items done, which could be an asset deal, could be a stock deal, could be a variety of different structures.

And he wanted to make sure that he was going to be protected as the CEO in a normal, ordinary course from a DNO and indemnity perspective.  And what we were trying to clarify was that, one, those that he had -- those protections he had before we were involved weren't changing with respect to what they would cover, and that on a go forward basis, we would expect to have ordinary course director and officer, you know, protections and indemnities.

And that we wanted to make him comfortable that -- we certainly weren't trying to pursue any sort

Page 208

of transaction structure that was untoured in any way, but -- and he was, I think, concerned that if he's making a large corporate action, if someone were to come and take an action against him, he wanted to make sure he had ordinary course protections and we were trying to give him comfort.

Q   Thank you.  Thank you, Mr. Zutter.  Okay. Yeah, we'll do it later.  Right now.  All right, Mr. Zutter.  Thank you.  Now, what I'm going to ask with the Court's permission is that you take us to school a little bit.  I want to talk about the flow of funds through DCP.

A   Okay.

Q   Your Honor, with the Court's permission, can Mr. Zutter step to the chalkboard and prepare some demonstrative for us?

THE COURT:  We won't be able to pick him up. So if you want him to first put it up there and then ask him questions about what he is written on the board, that's fine, but we won't hear him.

MR. HOCKADAY:  Understood.

THE COURT:  Does that make sense?

MR. HOCKADAY:  Makes perfect sense.  Okay. If that's okay with the Court, then I'll just have Mr. Zutter do that and then we can ask questions.

Page 209

THE COURT:  Then we -- you can ask some questions subject to any objections.  So go ahead, sir.  I'm going to permit you to do that.

MR. HOCKADAY:  Thank you.

THE COURT:  It's the only way this is going to work.

MR. HOCKADAY:  Makes sense.

MR. ZUTTER:  Yes.  I apologize for what you might actually hear from a chalkboard perspective, but --

MR. HOCKADAY:  That's okay.

THE COURT:  I remember those Catholic school days.  (Inaudible) over my shoulder.

MS. WILLIAMS:  Your Honor, I am going to have an objection.  Would you prefer I make it while he is drawing?  Or we should wait?

THE COURT:  Can we wait please?

MS. WILLIAMS:  Sure.

MR. HOCKADAY:  All done.

THE COURT:  Okay.  Your objection is what?

MR. ZUTTER:  Your Honor, may I walk around just so I can see?

THE COURT:  Sure.

MR. ZUTTER:  Yeah.  I apologize.

MS. WILLIAMS:  Your Honor, my objection's

Page 210

going to be lack of personal knowledge and foundation in his deposition, and I'm happy to do it later if that's what I need to do. But Mr. Zutter testified in his deposition that he didn't recall any of the specific documentation or treasury functions between any of the specific entities. And it looks like we're about to talk specifically about that.

THE COURT: Okay. Well, I think that you preface for me, we'll see where the testimony goes. I will say -- no, I'm not going to say. We'll just see where this goes, okay?

MS. WILLIAMS: Okay. Thank you, Your Honor.

THE COURT: Treyzon, want to take a picture?

MR. TREYZON: It will be fast (inaudible).

MR. HOCKADAY: (Inaudible).

THE COURT: You'll be asked the question.

MR. HOCKADAY: You want to get a picture too, Mr. Saltz?

THE COURT: Of course. Absolutely. Nice bow tie, by the way.

MR. SALTZ: Thank you, Your Honor. It only took me 45 minutes to tie this.

THE COURT: That's why I stopped wearing them. They're hard to tie without the assistance of someone.

Page 211

MR. SALTZ:  Some days it goes and some days the blood comes out of my arms.

THE COURT:  Yes.  All right.  Everyone's got the picture.  Ms. Williams is prefaced for me that she might have some objections to this.  I think the only way to go is he's got it on the board, you ask him questions and we see where this goes.

MR. HOCKADAY:  Thank you, Your Honor.

BY MR. HOCKADAY:

Q   Now, Mr. Zutter, do you mind if I stand kind of on the side so I can look --

A   Of course.

Q   -- at that?  Okay.  Thank you.  Thank you, Mr. Zutter.  Now, it looks like, from my observation, you drew this from memory.  Is that correct?

A   That's my personal knowledge.

Q   That's your personal knowledge?  Okay.  So what Ms. Williams said, any basis in that?  I'm sorry, I couldn't hear you.  All right.  Now, I want to share -- I want you to kind of explain to us what's going on here.  First, can you explain to Judge Gargotta to what CT and T&V are?

A   Yeah.  And -- never mind.  Sure.  I'll just answer the question.  So CT, these aren't necessarily the exact legal names, but meant to be, you know,

Page 212

demonstrative. CT is Children's Trust. So the family has a trust on behalf of the kids. T&V Dundon is Tom and Veruschka Dundon, the couple. And so, the top is those two entities. Do you want me to just walk through all of it?

Q Let's back up actually real quick. That's helpful, what you just said. Let me get to the mic. What is this, what are we looking at?

A We're looking at a simplified organizational structure of the Dundon's Family Enterprises.

Q It was based on your personal knowledge?

A Yes.

Q Okay. And was this based on what you understood the Family of Enterprises in 2019?

A Yeah. It evolved since then, but this is accurate at that time.

THE COURT: Your objection?

MS. WILLIAMS: Your Honor, I would like to object and ask if I can ask when he got this personal knowledge, because I can play deposition clips where he does not have any of this information.

THE COURT: Okay. So it's -- when did you acquire this knowledge, sir?

MR. ZUTTER: It's an evolving thing, but over the course of 2014, is -- no before that I -- some of

Page 213

the structure here is related to Tom's creation of and success from Santander Consumer and so we actually had to understand some of the ownership there because some of these entities were significant investors in Santander Consumer so it goes back to the JP Morgan (crosstalk) --

THE COURT:  Let's try a different question. Does your -- the knowledge that's displayed up there -- I appreciate you trying to answer the question, but does this knowledge predate your deposition or postdate your deposition?

MR. ZUTTER:  Predate.

THE COURT:  Okay.  And you object because you say that conflicts with his testimony.  Is that correct?

MS. WILLIAMS:  It does, Your Honor.  As well as this is information we've been trying to get from everyone and no one recalls.

THE COURT:  So to that point, you -- I'm going to allow you to have a chance to examine him after.  It's appropriate grounds for cross examination.  And depending on what you show, it'll factor into the Court's credibility and weighing with the evidence.

MS. WILLIAMS:  Thank you, Your Honor.

Page 214

THE COURT: You may proceed.

MR. HOCKADAY: All right. Thank you, Miss. Thank you, Your Honor.

BY MR. HOCKADAY:

Q Mr. Zutter, so just backing up here, what is this that you're drew for us for demonstrative purposes?

A It's a very simplified version of the legal org chart of the Dundon family as an enterprise for -- that's probably not the right legal way to describe it, but that's how I would think about it.

Q And you said CT is the Children's Trust, T&D is Tom and Veruschka, correct?

A Correct.

Q Okay. What's -- what -- can you explain to Judge Gargotta to what we're looking at underneath the Children's Trust by box and where -- what that means?

A Yeah. And so, Tom and the -- I'll call it Tom. When I say Tom, I mean Tom and Veruschka because they filed -- this is also a tax -- like, tax structure, so Tom and Veruschka filed jointly. But the Children's Trust and Tom collectively have an interest in DDFS, LP. DDFS, LP is one of the predominant, basically, intermediate holding companies that holds a bunch of different assets underneath it.

Page 215

Underneath that, there are a series of different entities that are for various purposes. And so, on the right hand side, I write various because it's, like, there might be a whole stack that's for real estate. There might be a stack that's for operating businesses, stack that's for, you know, public securities and those sorts of things, bank accounts and your Fidelity account or things like that.

And so, DDFS is the kind of majority of the family enterprise sits under that as a intermediate holding company. The reason I drew the line off the top, because I just -- it's kind of hard to depict it here is, DCP fund one was one of the few things that was separate from that. That started when I first got involved in 2015 where we were thinking about raising third party capital and we wanted to carve out a set of legal entities that investments over a period of time might go into that we bring in third party investors.

So it was kind of a before and after view. Ultimately, that went to the side. But the reason I bring it up is Brent had asked did I get a K-1 from Dundon when I -- well, the K-1 I got is from DCP Holdings, which is under fund 1, which is actually the only vertical in the family enterprise that's not

Page 216

connected to DDFS. And so, it's apart and separate. That's why I put that up there. The other piece that I wanted to articulate with this is, it's kind of a common GP LP private equity structure applied just to a personal enterprise. The -- if you look under CT, immediately down to the left, you see DDFS manager, that's the GP. And then DDFS to the right is the LP. And that's why it's -- you see the ownership of 39, 60, and 1. The manager has 1 percent stake in that. That manager is kind of the active entity.

DCP below that is Dundon Capital Partners, LLC, that's the party in question here. That business is owned entirely by DDFS manager. Underneath DDFS on the right hand side is where all the investments are held. So that's kind of like, there's passively held and actively managed. On the right hand side, that's where, you know, illiquid investments in something like the AF would go as well as liquid investments for, you know, stocks, bonds, cash, et cetera. And the point that I want draw out is, where the money from DDFS comes from is the bottom, the -- in the middle section left, DDFS LP, that would've been Interactive Brokers or Fidelity or Raymond James, something like that, that's holding stocks and bonds.

And while I am not aware of the exact

Page 217

specific fund flow that we followed for this transaction, the ordinary course of what we would do would've been one of two things. If we were in a rush to fund something, we would fund directly from the DDFS entity that had this -- the source of liquidity, which is that middle one. Two, whatever the ultimate entity was. And then we could do book entries to rectify the accounting for that and the tax for that. And the reason that we were able to have that flexibility versus if you had more time, you would wire money up to the top and wire money down to the right vertical, then down to the right entities.

The reason that it was okay for us to do that concurrently versus have to always follow the flow of funds is that both DDFS manager and DDFS, in the middle, they're both 1065 reporters, meaning you report, but it's a disregarded entity. They consolidate up to the exact same functional ownership. And so, the same functional ownership means there is, from a tax perspective, absolutely no distinction between the middle and the right hand side. And so, we could, for simplicity and expediency, move money between entries and then follow up with accounting and follow up with documentation to follow that. So that -- those were the things I was trying to articulate

Page 218

with that.

THE COURT:  Please continue.

MR. HOCKADAY:  Thank you, Your Honor.  Thank you, Mr. Zutter.

BY MR. HOCKADAY:

Q   So from your understanding at the time, if DCP made an investment and the source of funds came from a DDFS entity, would you understand that to be a DCP investment?

A   They go to the exact same consolidated ownership at the top.  There's functionally no difference.

Q   Thank you.  And I just --

MS. WILLIAMS:  Your Honor --

MR. HOCKADAY:  -- want to be very --

MS. WILLIAMS:  I'm sorry.

MR. HOCKADAY:  Hold on.  No, you --

THE COURT:  I think an objection was made.

MR. HOCKADAY:  Oh.

MS. WILLIAMS:  I'm just objecting now that I've heard the answer to a legal conclusion from Mr. Zutter.

THE COURT:  I'm treating it -- sustained, but I'm treating it as a factual answer.  It's -- I'm not giving any legal significance thought.

Page 219

MS. WILLIAMS:  Okay.  Thank you, Your Honor.

MR. HOCKADAY:  Thank you, Your Honor.  And I apologize, Ms. Williams, I didn't mean to cut you off.

And just note to the record, we're still looking at the deposition, but the testimony she's referring to was whether or not he was aware at that time of documents, so.

THE COURT:  That's fine.  And let's just say this, I -- Ms. Williams, like you, is a very good lawyer and I'm sure she can point out what she thinks are the inconsistencies and I'm confident you'll have a response.

MR. HOCKADAY:  Thank you, Your Honor.  Thank you, Mr. Zutter.  To avoid me putting this all over my hands.

THE COURT:  No, no, no.  What'd you say?

MR. HOCKADAY:  Yeah.

THE COURT:  Put the chalk back.

MR. HOCKADAY:  Oh.

THE COURT:  Go ahead.  Yeah.  Because (inaudible) last the next 10 years, so.

MR. LOWENSTEIN:  Pitch here.

MR. HOCKADAY:  Yeah.

MR. LOWENSTEIN:  (Crosstalk).

MR. HOCKADAY:  No, that's fine.

Page 220

THE COURT:  I don't know how long that chalk's been there.  People want to keep it as long as possible.

MR. HOCKADAY:  All right.  I want to get back to BAF timeline and some of the things you testified to Judge Gargotta to about that Ms. Williams questioned you.  Now, immediately after the term sheet --

THE COURT:  Go ahead.

MR. HOCKADAY:  -- you --

THE COURT:  -- Ms. Whitley, you can give him the paper towel.

MR. HOCKADAY:  Oh.

THE COURT:  That -- thank you for the courtesy.

MR. HOCKADAY:  Oh.

THE COURT:  Thanks.  I just don't want to make with those chalk hands.

MR. HOCKADAY:  Yeah.

BY MR. HOCKADAY:

Q   There was a series of meetings in Dallas, I believe it was that following week.  Do you recall testifying about that?

A   Yes.

Q   All right.  I'm going to pull up Exhibit D98.

Page 221

Now, we heard some testimony from Ms. Williams for questioning of you around this document, so I don't want to go over too much, but I want to focus on Alan Kantowitz's email that was sent on Sunday evening at 9:28 p.m., February 17, 2019. Do you see that?

A Yes.

Q It was Mr. Kantowitz to yourself. He copied Mr. Vanderbilt, Mr. Farrell, Mr. Ebersol, Elisa Lee, Ryan Rosonkowski, and Kevin Freedman. And he says, John, please see below for a proposed agenda tomorrow. I will send out invites tonight to everyone on this thread along with the folks from our team for their respective sessions. Let me know what you think -- let me know if you think I should include TD as well in these invites. I know TD and Charlie are planning on meeting with AT&T tomorrow at 11:30 a.m., and so forth. I don't need to read the whole thing for you. So can you just explain to Judge Gargotta to the purpose of these meetings in Dallas with the legacy AF ownership -- or leadership and the new DCP board?

A We were trying to get a handle on what was going on in the business. We were trying to do a bunch of the legal diligence -- not legal diligence, business diligence, excuse me that we, in an ordinary course, would've done before signing and funding

Page 222

anything.  So we were trying to understand the nature and quality and composition of the team, of the processes, of the systems, of the performance, of the business, of the key metrics, as well as start getting up to speed on what things could or should or need to change in order to have the business have the, you know, maximum prospects of success.

Q   Is that something you think was in the best interest of the Alliance of American Football?

A   Yeah.

Q   Anybody with the Alliance of American Football protests the strategy meetings or the purpose behind them?

A   No.

Q   Mr. Ebersol ever raise an objection to it?

A   No.

Q   I want to talk about some of the items, uh, that were discussed during the meetings.  We've heard some testimony in this case, some of which you may have been present for, some of which you may have not.  Particularly from Mr. Ebersol as far as criticisms that he observed or believed to have happened in relation to some of the decision making that you, Mr. Vanderbilt and or Mr. Dundon may have deployed when it came to negotiating creditors.  Are you familiar with

Page 223

that testimony?

A    I believe so, yes.

Q    Okay.  First of all, did anyone protest to you or complain to you while you were having the discussion on renegotiating AP?

A    No.

Q    And let's talk about the AP here.  We're -- I want to make sure we're not conflating anything.  When we heard all that testimony yesterday, a little bit of it this morning, about renegotiating and triaging, we heard this from Mr. Vanderbilt too.  Are you talking about liabilities that were incurred after the transaction on February 14th, or were you talking about preexisting liabilities?

A    Preexisting.

Q    Can you explain to Judge Gargotta to, just briefly, the difference in significance as it pertains to paying those?

A    Yeah.  As we were thinking about our prioritization framework, the only incremental obligations that we wanted the company to even consider taking were those in the direct pursuit of games on the weekends.  Everything else that was a preexisting thing, we were trying to figure out where it sat in terms of priority for the business and

Page 224

whether there was opportunity to change things and how important it was for the ongoing successful business. So we -- some of those things weren't even fully documented. We were trying to get our hands around all the pre-existing liabilities and they grew over time. And so, we were trying to be very focused around approve that, which is fundamentally necessary for continuing operations while we get a handle on the full inventory of what had existed yesterday.

Q Was the idea or the intent ever to not pay obligations that you were incurring on a forward looking basis based on putting games on the field?

A Absolutely not.

Q Was it -- was there even an intention to not necessarily not pay preexisting liabilities? I know there were some about negotiation, which we'll get into, but generally speaking, was the intent to not pay preexisting creditors?

A The intent was to pay every single creditor. Of course, get negotiations where you could, but pay all the obligations of the business.

Q You've served in a lot of leadership capacities. You work for the world, or at least the United States largest bank and leadership teams. You're currently a CEO. Based on your experience, is

Page 225

that something that is helpful to a startup business that's bleeding cash, or is it something that is harmful to a business?

A    100 percent helpful.

Q    Can you explain to Judge Gargotta to why, as elementary as that may sound?

A    Why it's helpful to?

Q    The business?

A    Can you repeat the question because I'm not sure if I'm following.

Q    I was talking too fast.

A    Yeah.

Q    I get that way.  Sorry.  Can you explain to Judge Gargotta to why it is helpful to a business to have them renegotiate AP or pay less cash out the door?

A    Yeah.  Because the cash goes further.  And many of your counterparts, it's part of ordinary course they were willing to and able to make sense those concessions.  You see that in the discussion around PWC agreeing to a discount.  It happens quite regularly with a lot of different professional services firms.  But more importantly, this company had gotten over it skis with respect to its obligations prior to us getting there and we wanted to

Page 226

give the business the greatest long-term opportunity. And it's frankly, often in the best interest of that counterpart too, because if we can resolve today's challenge and have many, many more days in the future, there's a longer relationship that's worth more. And so, I think it's absolutely in the best interest of a business to try and be as frugal with your money, and be as thoughtful about capital allocation as you can be.

Q   Did you, John Zutter, receive any benefit from those decisions?

A   No.

Q   I want to pull up Exhibit D147. Now, what we have here is an email, we talked about a little bit earlier from Alan Kantowitz to yourself. It's a responsibilities matrix. This one was sent at the -- the final email was sent at the end of February. But it looks like this discussion started -- actually it started at the end of February, February 28th. But I -- what I want to focus on are the -- is the attachments. I think you -- I think it was page seven and eight and Ms. Williams was questioning about yesterday, which is the printout pages of the attached Excel file. Do you see that here?

A   Yeah. And I think that's the one. There we

Page 227

go now.

Q   Okay.  Can you just explain to Judge Gargotta to the importance of delineating responsibilities here and what you're trying to accomplish?

A   We were trying to learn a lot in a very short period of time so that we could make the best decisions that we could.  And so, what we were trying to do is take folks from the DCP team and kind of divide them across a number of work streams, find the best counterpart at the AF to help us get up to speed and be able to work through those so that we could get a solid handle on what was going on in the business as quickly as possible and make the best and most prudent decisions we could as quickly as possible.

MR. HOCKADAY:  I want to pull up Team 955. And, Laura, when you have that up, if you could -- well, actually real quick, let me just establish.  Mr. Zutter, this is an email from Alan Kantowitz to yourself on February 25th titled, action Items.  I think you also talked to Ms. Williams about this.  I just want a little bit more -- I want to go a layer deeper though on a couple items.  Could you zoom out number 10 for us, Laura?  Thank you.  Okay.

MS. LAVERNIA:  I don't know.  I just thought (inaudible) --

Page 228

MR. HOCKADAY:  Oh, sorry.

MS. LAVERNIA:  -- check.

MR. HOCKADAY:  I thought this was the one I took notes on from here, so that's why.

THE COURT:  Are you asking if it's been admitted?

MR. HOCKADAY:  Oh, yes, Your Honor.  I think it was.  It's the same.  Or if it wasn't, it was another version of it, but.

UNIDENTIFIED SPEAKER 2:  I can -- I just handed you.

MR. HOCKADAY:  That's 147.  That's different.

UNIDENTIFIED SPEAKER 2:  Oh, this one's it.

MR. HOCKADAY:  Oh, this one's it. (Crosstalk).

THE COURT:  (Crosstalk) let me thank you. But let me check with the official source.

UNIDENTIFIED SPEAKER 2:  Of course, Your Honor.

MS. WILLIAMS:  Trustee?

UNIDENTIFIED SPEAKER 2:  Trustee admitted, but Defendant's 147.

THE COURT:  Okay.  So we have Trustee 955, but not Defendant's 147?  (Inaudible).

MR. HOCKADAY:  And my understanding, thanks

Page 229

to my talented team, is that Trustee's -- or Defendant's 147 is the same as Trustee's 120. Is that what you guys said?

UNIDENTIFIED SPEAKER 2: And there were no objections.

MR. HOCKADAY: And there were no objections. But retroactively, just because we asked those questions, for purposes of the record, we'll move to admit 147 and I'll wait for Ms. Williams and Mr. Raza (ph).

MR. RAZA: Conrad Raza, on behalf of the Trustee. It is the same as Trustee's 120.

THE COURT: Okay. So that is admitted.

(DEFENDANT'S Exhibit 147 was marked for identification.).

THE COURT: Thank you, sir. The Court does appreciate the diligence both sides are reporting with regard to the entry of exhibits and evidence. It's helpful.

MR. HOCKADAY: Thank you, Your Honor.

BY MR. HOCKADAY:

Q So, Mr. Zutter, I want to talk to you about this line item here, which is the AP tractor -- AP tracker. Now, we can read what it says here. Can you just tell -- excuse me, tell Judge Gargotta to the --

Page 230

apologies, Your Honor. Can you please explain to Judge Gargotta to why you implemented the AP tracker?

A There was not a -- there was not real clarity around the financial books and records of this company, right? It was, I described, I think I used the words left hand, right hand, not necessarily talking to each other. And so, we were trying to put some structure in place so that we could collect an inventory all of the obligations that the company had or was taking on. And then prioritize them, put some controls around them and make sure that we were funding those that absolutely needed to be funded for continuing operations. And then really understanding the broader inventory and then working through that same prioritization framework. The other key attribute is that, you know, as you can see from the first couple of words here, it was an evolving tracker. Like it wasn't, hey, can you show me all the payables? And here they are. It was, we had to continue to kind of ask questions and --

Q Bless you.

THE COURT: Excuse me. Thank you.

MR. ZUTTER: -- poke and prod and more things would come in and more things would come in.

BY MR. HOCKADAY:

Page 231

Q   Thank you.  I want to go to the next bullet, which is -- or number, which is 11 where it says, working to integrate a schedule of upcoming payments so we have more clarity into what the weekly cash requirements are ahead of time for Jeff.  This will include things like talent payments, stadium deposits, production, expenses, travel, insurance, medical partnerships, in season housing, et cetera.  So can you just explain to Judge Gargotta to the purpose of this?

A   Yeah.  It was to try and understand with more than, you know, one day or one hour of heads up what the obligations of the business were coming.  So we were trying to in -- you know, in a more traditional process, you'd have a longer duration budget, right?  Like an annual budget that you approve.  In this context, what we were trying to do is let's get to a weekly budget to a two week budget.  And we're trying to build out forward visibility around what those obligations were.  And we're asking the team to try and put that in a -- in one place that we could actually understand what we had to do and what the choices were, and, and then make decisions accordingly.

Q   Was this designed to benefit the AAF?

Page 232

A   Of course.

Q   Did anyone protest this?

A   No.

MR. HOCKADAY:  I want to shift gears a little bit and talk about tax, taxes.  Could we pull up Exhibit T 168?  I think that's it.

MS. WILLIAMS:  I believe you objected to this when we tried to admit it with, Mr. Bauer.

MR. HOCKADAY:  Oh, did we?

MS. WILLIAMS:  Uh-huh.  I don't have an objection.

MR. HOCKADAY:  Yeah, I figured.  (Inaudible).

THE COURT:  So, Ms. Williams, given that probably between yourself, do you object to the admission of this exhibit?

MR. HOCKADAY:  Your Honor, I apologize.  I can use another one that has it.

THE COURT:  Ms. Williams, you can answer one way or the other.

MS. WILLIAMS:  I don't have an objection.  I was just pointing out.

THE COURT:  That (inaudible.)

MS. WILLIAMS:  That it was in Mr. Bauer's deposition.  So if we are going to admit it.

THE COURT:  So can I admit it or not?

Page 233

MR. HOCKADAY: I'm withdrawing that. I'm going to use another exhibit.

THE COURT: Okay. Very good.

MR. HOCKADAY: Thank you.

THE COURT: I put you -- remove you from the difficult posture of having objected to an exhibit and then change ways and trying to get it in. So let's try a different way.

MR. HOCKADAY: Yes, thank you, Your Honor. Let's do T 290. There it is. Previously admitted.

MS. LAVERNIA: Yeah.

MR. HOCKADAY: Thank you. Thank you, everybody.

BY MR. HOCKADAY:

Q Mr. Zutter, what I'm showing you is exhibit T 290, and this is a calendar invite for a -- looks like a group call regarding op zone, AFDCP. Do you see that?

A Yes.

Q I think everybody's pretty well versed in that, but could you, just for clarity on the record, demystify the whole opportunity zone. Can you explain what your understanding of an opportunity zone is?

A Sure. An opportunity zone vehicle is one that allows investors that have realized a capital

Page 234

gain to potentially defer, reduce or eliminate the obligations associated with those capital gains taxes, provided that they make investments that meet certain qualifications over certain time horizons. There's a whole range of things that are qualified investments and qualified activities for those investments. And then there are time horizons whereby you either get basis step up or elimination of your original game and get 2 over 7, 10 years respectively depending on technicalities. But you can have an entity, like a whole company, be an opportunity zone business. You can have components of that company, subsidiaries be opportunity zone entities. You can have something as confined as a building be an opportunity zone investment. So it can be very broadly overarching provided that the entirety of that complies with certain tests around activities and location and duration, or it can be more confined. It is a structure that allows you to potentially reach a different pool of investors, those that have a certain tax attribute and are looking to benefit from that tax attribute, therefore reducing cost of capital and increasing valuation of the business.

    Q   To get the benefit of an opportunity zone, how long would you need to be in the investment?

Page 235

A   You -- to get the first basis step up from memory, it's seven years.  To get the full benefit, it's 10 years.

Q   So in your judgment and experience, would it even be worth doing an opportunity zone if you were not going to be in the business for that long?

A   100 percent.

Q   Now, what was the purpose of this call that you were -- from your memory?

A   To evaluate --

Q   Maybe not this particular call, but your discussions with PWC generally, as to opportunity zones.

A   To evaluate what -- I kind of lumped the -- these calls into two topics.  One is, is there a way that either the entirety of the company or components of it could be compliant with opportunity zone rules so we get that tax efficiency?  And then two, more broadly, what are appropriate structures for the business to consider on a go forward basis to optimize around tax to increase the overall value of the business?

Q   And then of course, here, it looks like Alan Kantowitz is invited to this call, if I'm reading it correctly.

Page 236

A    Yes.

Q    He is.  Did you include Mr. Kantowitz and the AAF leadership on these calls and discussions with PWC?

A    Yeah.  Alan Kantowitz is on this call, and then I believe a number of others.

Q    In your -- based on your experience, were you working together with the legacy AAF leadership on these discussions and determining what the path -- best path forward was?

A    Yeah.  It was a collaborative effort one where I probably had a little bit more experience than some others to drive some of those conversations, but 100 percent collaborative.

Q    So this wasn't something that you were doing behind the non DCP affiliated AAF members' back?

A    No.

Q    And ultimately, did you go through with any of the opportunity zone?

A    We didn't pursue an opportunity zone or any of the other structural alternatives from there.

MR. HOCKADAY:  I want to talk a little bit about some of the structural pieces that we looked at. Can we pull up T 286?  This is an exhibit you spoke with Ms. Williams about earlier this morning.

Page 237

THE COURT: T? I'm sorry, I didn't catch the --

MR. HOCKADAY: I apologize. T 286.

THE COURT: (Inaudible).

BY MR. HOCKADAY:

Q And what we have here is an email that you sent to Mr. Vanderbilt, among others, Mr. Kantowitz, your team and then the team at PWC. Do you see that?

A Yes.

Q All right. If we scroll down structural thoughts, and if we go to the next page, there's that. Let's go to the following page. Is that the end of it? There we go. Can we go one more? We've got a pro forma structure here. Do you see that?

A Yes.

Q Okay. Is this your creation?

A Yes.

Q . Okay. Is it common for you to be able to create structures off memory or off knowledge or off experience like that?

A Yes.

Q Okay. Is that what you did here?

A Yes.

Q On February 25, 2019?

A Yes.

Page 238

Q   Okay.  Can you just explain to Judge Gargotta to what the purpose of this exercise was?

A   This was to tease out a conversation with tax advisors around the feasibility of a variety of different things.  Like this was, I think it was described as thoughts.  It's merely kind of thoughts to originate a conversation around being creative.  And it was meant to represent one potential go forward structure to create the most efficiency.  This one was one where we were saying potentially the whole company could operate as a opportunity zone business.  We got directional guidance that that likely wasn't as feasible, and I think led to a subsequent permutation of more kind of creative thought processes.

Q   What was the goal in all this, though, when you're considering structures and things like that, whose benefit is that for?

A   The shareholders.

Q   In the business itself.

A   Yes.

Q   Can we pull up Exhibit D 132?  Now, we heard some testimony earlier today regarding MGM and Subordination.  Ms. Williams asked you some questions on this document here.  I want to get it layered deeper though into the substance of it.  If we look

Page 239

here, you sent an email to Mr. Ebersol on February 25, 2019 at 11:53 a.m., copied Mr. Dundon and then Jim Scotch Topol, and you said, "Understand my current understanding is that in the absence of a subordination agreement and them agreeing to the deal as presented, we won't be able to fund any dollars." Can you tell Judge Gargotta to where you got that -- what you're talking about and where you got that understanding?

     A    So my understanding was that the MGM agreement was in direct contradiction to our term sheet and so we were trying to rectify that by getting them to accept the term sheet through some modification of their agreement.  And what I'm suggesting is that in the absence of resolving that, we might not be able to fund further dollars because our term sheet itself may be deemed to be, you know, ineffective.

     Q    You can take that down.  Thank you.  Now, I want to talk a little bit generally, once the initial funding was done and you have the meetings with the AAF people and you have responsibilities matrix and you're into the day to day, at the outset of your engagement, what were your general -- what was your general assessment of how the AAF was running its

Page 240

operations?

A    It's highly disorganized.

Q    Can you elaborate on that just briefly?

A    Things that you would expect for a company that was spending that amount of money were not in place.  It didn't seem to have established processes.  It didn't seem to have consistent information.  The left hand and the right hand weren't in sync.  Seemed to be operating in a fairly siloed fashion.  I think from an expense perspective, like there was some sort of conflation between, are they the NFL or are they not like -- they're spending money like they were the NFL, but they were a startup.  And those things were putting it in a position where it was imprudent to be spending the amount of money as a startup without the proof of performance that you'd normally see before you kind of continue moving down that path.  So there were a lot of surprises.

Q    And what were some of the things that you and your -- and the AAF management did to try to address those?

A    We looked at headcount reductions.  We looked at ways in which we could change and align the compensation structures of employees to be long-term aligned with the business.  We looked at whether or

Page 241

not certain vendor relationships were in fact necessary.  You know, there's one brought up yesterday as an example where I had a called into question whether we needed a specific vendor to identify without any lag, whether there's been lightning.  And while that, I think might be the standard in the NFL, like, you know, in high school you just hear if there's thunder.  And like as a startup, maybe you didn't need the NFL standard.  Those were the types of questions that we were asking is -- are, do we need to be spending the amount of money that we're spending?  Is that the most prudent thing to establish proof that this business can be successful?  And our judgment was that we should be pressure testing all of those assumptions and asking lots of questions about all of it.

Q   Let me ask you this, and I'm glad you brought up on like the weather issue.  Now, there's been allegations made as to player safety.  Was it ever your intention, was it ever your experience that you or anyone associated with VCP put the players at -- safety at jeopardy at any point in time?

A   Of course not.

Q   Okay.  And you just asking these questions.  What is the -- you're not saying cut it all together.

Page 242

You're just asking the question.

A It's to be -- I think a key responsibility is to become informed. And every time we're asking questions and pushing on different things, it's to understand the relative importance, to understand the merits of something, to hear different and opposing perspectives, to allow yourself to come to the most informed, educated, thoughtful perspective. Like I think you're supposed to ask questions.

Q Sounds like whenever your child comes to you and asks to buy something expensive and you ask them why they need it and what are the purpose for it. Is that fair?

A Those would be your words.

Q Fair enough. But generally speaking, though, the point of the exercise, can you just share with Judge Gargotta to what the point of the exercise was?

A To get a really good sense of what's actually going on, to make sure that we were putting in place financial and operating discipline in a business that didn't seem to have any so that we were both thoughtful, responsible, and frugal with respect to the capital that was being allocated. That we didn't take on more liabilities that the company may or may not have the opportunity to, or the ability to pay in

Page 243

the future. We were trying to kind of stem the bleeding of past liabilities and limit the amount that were taken on only to those that were clearly in the best interests of business from maximization of probability of success or survival perspective.

Q I want to pull up exhibit T 980 and T 116. Actually just T -- let's do T 116 for now. Now, what we have here, Mr. Zutter, is an email that you -- between you and Mr. Dundon, Mr. Vanderbilt, Mr. Ebersol and Mr. Kulas are a part of, and it's on March 15th. Do you see that?

A Uh-huh. Yes.

Q Okay. Thank you. So Mr. Ebersol's being included in this discussion, fair?

A Correct.

Q All right. And you posed a question, a pre-packaged DK, that's kind of how I was headed with the asset deal that leaves assets and obligations behind you. See that?

A Yes.

Q We've heard a whole lot of testimony about asset deal that you haven't had the chance to really explain what the purpose of and what the thought process was. Can you explain to Judge Gargotta to the purpose of posing the question as to whether or not a

Page 244

pre-packaged bankruptcy made sense?

A    Yeah.  So we talked about a few different contexts of a asset deal.  But with respect to a pre-packaged bankruptcy, at this point, we are two months in -- excuse me, one month into our investment.  And it's increasingly clear that we don't know all the liabilities of business and revenue is not meeting the expectations of the business.  And so, one of the permutations we thought about was, should we think about a situation where we were to go and -- through a bankruptcy process, work on recapitalizing the business?  And that would be inclusive of creditors.  And I think at this point, we were like starting to think about whether or not bankruptcy was an inevitability, but we were also thinking about whether actually like proactively bringing your creditors into that discussion and working through that process through a bankruptcy proceeding might be in the best interest of business.

THE COURT:  So let me see if I'm following this.  Essentially, you filed bankruptcy, you might inject some cash and then work out a deal where you just -- you discount your creditors to get a plan confirmed?

MR. ZUTTER:  That, or potentially some of

Page 245

your creditors become equity holders too --

THE COURT: Right.

MR. ZUTTER: -- into the long term viability of the business transfer of debt for equity.

THE COURT: Right. So in other words, to get their acquiescence, you, what, make the offer of debt for equity. Is that correct?

MR. ZUTTER: Potentially, yes.

THE COURT: Okay. I interrupted your testimony, but I wanted to make sure I was following along.

MR. ZUTTER: No, that's fine. Thank you.

BY MR. HOCKADAY:

Q And I think that brings up an important point. At this point, you're still whiteboarding it essentially and trying to figure out the best possible path forward, correct?

A Yes.

Q And in doing this, are you -- whose best interest are you looking out for?

A The company.

MR. HOCKADAY: Sorry, Your Honor. I'm just going through my --

THE COURT: That's fine.

MR. HOCKADAY: Thank you. Try not to re

Page 246

plow.

THE COURT: Oh, I get.

BY MR. HOCKADAY:

Q Mr. Zutter, I want to fast forward a little bit on and talk about -- Laura, could we pull up Exhibit D 177, which I think is also Trustee's 27? Actually, let's just do Trustee's 27 because I think that's what Ms. Williams was questioning from. Yeah. All right. Now, we already heard your testimony both earlier and then during our examination of the communication that was related to Mr. Ebersol as far as 70 being the maximum that's going to be contributed. And then of course, the next day he files -- or he signs on behalf of control of majority shares -- shareholders, the consent form. Now, there's an email here that he sends early in the morning on March 27th at 12:27 p.m., and there are four options on a go forward basis. Do you see that?

A Yes.

Q Okay. Do you recall receiving this email?

A Yes.

Q All right. Can you share with Judge -- we've heard a lot of testimony on the viability and whether these are good from Mr. Dundon, Mr. Ebersol, oh, with only just a million dollars more, we could have done

Page 247

this, we could have done that. I want to get your perspective of it because you were close -- closest to it from the Dundon Capital partner side. If I direct your attention down to option one, where it says, wind down ASAP. Costs 19 million from today through 70 million total. Based on your memory as you sit here today, what was your understanding as to the viability of that option?

A I think that ended up becoming essentially the outcome where we are today.

Q Okay. Let's talk about -- let's go to the next page and talk about option two. Ultimately, you decide -- DCP decided not to do option two. Do you see that?

A Yes.

Q Okay. Can you explain to Judge Gargotta to why?

A Yeah. I think this might be a broad answer to each of them. But with respect to option two, I'll just live in my answer to your question. We moving the championship game up just one week, while it adds 4 million of additional capital requirement. It doesn't solve any of the actual core problems, which is long-term viability of the business and essentially give it, in our opinion, a very, very, very short,

Page 248

incremental amount of time with no material difference. It also didn't pay down any of the payable. So you're leaving in place the same core problem.

Q Based on your understanding, had you gone through with option two, was that going to do anything to address the existing accounts payable?

A No.

Q What would it have done to incur in future debts?

A Would've taken out more?

Q And we saw that from Mr. Vanderbilt's testimony, which we won't retread here. So every week that you keep football operations on, is it your understanding that you incur more debt or less debt?

A More.

THE COURT: Your colleague wants to (inaudible).

MR. HOCKADAY: Yeah.

UNIDENTIFIED SPEAKER 2: Oh, thank you.

MR. HOCKADAY: Thank you, Your Honor.

BY MR. HOCKADAY:

Q I want to direct your attention. Laura, if you could blow up risks on option two, bullet 0.3 where it says, eliminates. It says, eliminates any

Page 249

potential cash on hand, thus significantly increasing risk. Vendors take action between April 1st and April 6th. This is Mr. Ebersol saying it to you, but what's your understanding of that?

A So my understanding is that it's, let's use all of the money to continue playing the games and leave nothing for creditors that we know are out there and that that's going to increase risk associated with them taking action between those time periods.

THE COURT: (Inaudible).

MR. HOCKADAY: Can we pull back up Exhibit D 50?

MS. WILLIAMS: Your Honor, when we get to a stopping point, I'd appreciate a break.

THE COURT: Sure. Can we stop now? Is that all right?

MR. HOCKADAY: Oh, thank you, Your Honor. I was just --

THE COURT: Let him finish his point.

MR. HOCKADAY: Yeah. That's what I was going to -- just the hanging, if that's okay.

MS. WILLIAMS: No, that's totally fine.

MR. HOCKADAY: Sorry, I --

MS. WILLIAMS: I just wanted --

MR. HOCKADAY: I just needed to --

Page 250

MS. WILLIAMS: -- to give some warning.

THE COURT: It was me who asked.

MR. HOCKADAY: Oh. You can just (crosstalk) --

THE COURT: (Crosstalk) on your next (inaudible) and we could do that.

MR. HOCKADAY: Thank you. No. I'll do it right after this document, Your Honor. I would be the biggest hypocrite in the world if I (inaudible).

THE COURT: We don't want to slip Mr. Treyzon in any distress, so let's (inaudible).

MR. HOCKADAY: Of course not.

BY MR. HOCKADAY:

Q Hey, if we can blow up the second paragraph, please note. So, Mr. Kantowitz is telling Mr. Ebersol here, this is again, January of 2019. Please note that this is my estimation of what is critical along with (inaudible) second eyes. I did not include the majority of CDS fees and other large vendors like XOs and SMT we owe. I would consider these "critical" given they have raised them to us and they are long overdue. But in the interest of this exercise, in this game of chicken, I have assumed we continue to push a bunch of these when in reality I have no clue whether or not we will be able to. You see that?

Page 251

A    I do.

Q    So that's the sentiment in January of 2019. Laura, can we go back to March 27, 2019?  Page two under option two.  And again, if we look at option two, eliminates potential cash on hand, thus significantly increasing risk to vendors.  And if we go down just a little bit more to option three, AP, like under risks, first bullet, AP likely to continue to grow, thus increased risk with debtors.  And then once again, option four, risks, increased risk with debtors, significant AP will continue to grow.  Mr. Zutter, you've been a leader of multiple companies. What does this tell you about the mindset of the AAF as it relates to creditors?

A    It was quite a problem.

THE COURT:  Hang on.

MS. WILLIAMS:  Sorry, I'm just going to object, Your Honor.  That's speculation.  And he doesn't have personal knowledge of that.

THE COURT:  How would he know that?

MR. HOCKADAY:  Well, the email was sent to him.  He's -- I'm asking what his understanding is or that's what my intent was.  I can re-ask the question.

THE COURT:  I think you need to re-ask the question.  Sustained.

Page 252

MR. HOCKADAY:  Thank you, Your Honor.

BY MR. HOCKADAY:

Q   Your -- Mr. Zutter, taking into account what you've seen now from the AAF and their communications, what is your understanding of this email that Mr. Ebersol sent to you?

A   My understanding is one, that the options were not credible or thoughtful.  We were provided with four distinct choices.  Not one choice even considered the concept of paying down AP.  Not one choice even quantified the AP or had, you know, even a sense of respect for it, the existing creditors of the business.  We were -- we asked for choices.  There was no limit on choices.  There could have been an option five that said, and here's the way we pay back our creditors.  So my takeaway from this is we were dealing with someone who considers business a game of chicken, not someone who takes their obligations with the degree of responsibility that is appropriate for being the CEO of a business or an officer of a company.  To me, you know, presenting choices when you're in this dire of a situation and you don't even consider or raise the concept of one of them that pays off your obligations or provides the company with enough capital to even consider that as a choice is

Page 253

just like malfeasant.

MR. HOCKADAY:  Thank you.  Your Honor, I -- we're at a natural stopping point.

THE COURT:  Right.  So let's take -- it's 3:30.  Let's take a 10 minute break to 3:40 and then we'll resume with your examination.  All right.  Short recess.  We're off record.

COURT CLERK:  All rise.

(Off the record.)

THE COURT:  All right.  Thank you, everybody. Please be seated.  Mr. Zutter, you take a seat.  We're back on the record when you're ready, sir.

MR. HOCKADAY:  Thank you, Your Honor.  Thank you, Your Honor.  I'll wait until everybody's situated.  May I proceed, Your Honor?

THE COURT:  Yes, sir.  You may.

MR. HOCKADAY:  Thank you.  Mr. Zutter, just -- actually, probably about an hour before the break, there was an exchange between Ms. Williams and myself and Judge Gargotta to in regards to the diagram that you drew off the board.  There was reference to your deposition.  I just want to make sure that we're very crystal clear here on the record, and so Judge Gargotta to understands.  So I'm going to read a little bit from your deposition and just ask you to

Page 254

explain to Judge Gargotta to what you understood you were answering, what you understood you're answering here so we can square that up.

MR. ZUTTER:  Go ahead.

MS. WILLIAMS:  Your Honor, I realize I'm probably going to use that to impeach him, but I don't believe that they have the right to use this deposition for any purpose.  They wish as a non-ad adverse party.

THE COURT:  So --

MS. WILLIAMS:  I don't know if he's going to read the part --

MR. HOCKADAY:  I --

MS. WILLIAMS:  -- that I plan to play, but there's several.

MR. HOCKADAY:  You don't hear (inaudible).  Okay.

THE COURT:  And I know you have to -- you got to know your judge.  You got to know how the judge is going to react.  I was a bit surprised when you jumped up and said, this isn't what he said in his deposition, and highlighted for the Court and for counsel that this was an issue.  You're right, that there's, you know -- this may or may not be impeachable, I don't know at this point in time.  But

Page 255

given that you raised it, doesn't he have the opportunity to clarify what his client said at the deposition?

MS. WILLIAMS: I guess I'd ask them that just like if we were doing impeachment because it's a little backwards, I'd like to know which part he's going to read so that I can complete it if I --

THE COURT: Absolutely.

MS. WILLIAMS: -- so choose.

THE COURT: And as I -- and again, let me emphasize, as I previously told you, it goes to the weight and credibility of this testimony. I'm acutely aware of that. So go ahead.

MR. HOCKADAY: Thank you, Your Honor. And my position is the two, he is not testifying any differently from his deposition, and that's the whole point.

THE COURT: I understand that.

MR. HOCKADAY: Yeah.

THE COURT: And, Ms. Williams, if she thinks that it is, I am certain she will draw that out.

MR. HOCKADAY: Thank you, Your Honor. Ms. Williams?

MS. WILLIAMS: You need to tell me?

MR. HOCKADAY: Yeah. Page 318 is where I'm

Page 256

starting.

THE COURT: Now, no joke, was he only deposed once?

MR. HOCKADAY: Yes.

THE COURT: All right. So page 318 of his deposition?

MR. HOCKADAY: Yes, Your Honor. All right. So Mr. Zutter, Mr. Treyzon --

MS. WILLIAMS: I'm sorry, Your Honor. And I realize this was a little not normal.

THE COURT: Right. I totally agree with you.

MS. WILLIAMS: Do you want me to tell Mr. Hockaday now the portions I think should all be read with this, or you just want me to do it on recross? And I'm fine either way, Your Honor.

THE COURT: Then you can do it either way. I can let him -- we can do it one or two ways. I can let him identify what he wants to ask his client about and then either for optional completeness on re-cross, it's reserved either way.

MS. WILLIAMS: Okay.

THE COURT: So if you want to get up and say, Judge, that's -- I'd like you to hear this as well now. Fine. Or if you want to reserve it for re-cross, because I'm certainly going to give you a

Page 257

chance to re-cross the witness.  I'll leave it up to you.

MR. TREYZON:  It's good now.

MS. WILLIAMS:  Okay.  We can just do it now, Your Honor.  I have the clips that I think incorporate what you're about to read also.

THE COURT:  God bless you.  Go ahead, please.

MR. HOCKADAY:  Okay.  So I'm reading from page 318, line one.  Mr. Treyzon, who took Mr. Zutter's deposition said, "And let me give you a lineup.  Our records indicate that all of the money came from DDFS, the holding entity, not the management.  The other one.  I'm drawing a blank on the name."  I, Brent Hockaday objected to form.  Mr. Zutter answered," I don't recall the specific treasury functions within the broader Dundon Enterprises."  And then Mr. Treyzon asked, "Is there a formal agreement between DCP and DDF -- and DDFS entities?"  I objected to form.  We went back and forth.  And then the answer was -- there was a sidebar.  The answer was on line 22, "I do not recall the specific documentation between the various different related Dundon entities."  And Mr. Zutter's testimony wasn't about documentation, which is what the question was, nor was it about specific money.  We were asking how generally

Page 258

the funds flow and his understanding of it.  So I think those two things are different.  But I will let Mr. Zutter clarify specifically what?

THE COURT:  Okay.  I want --

MR. HOCKADAY:  Okay.

THE COURT:  -- Ms. Williams to be afforded a chance to have the additional information.

MR. HOCKADAY:  Oh, that's right.  Yes. Sorry.

THE COURT:  And then you can ask the witness questions.

MR. HOCKADAY:  Yeah.

THE COURT:  So that was one portion I was referring to.  The second portion actually starts on page 36, line 12 and goes through page 37, line 15. Do we have it clipped or no?

UNIDENTIFIED SPEAKER 1:  We do.

MS. WILLIAMS:  Okay.  I have it clipped, Your Honor, if I can do that.

THE COURT:  Okay.  Thank you.

MS. WILLIAMS:  It's clip number 45.

(A recording was played.)

THE COURT:  Okay.  Are you going to continue to elicit testimony on this corporate structure?

MR. HOCKADAY:  Yes.

Page 259

BY MR. HOCKADAY:

Q    All I was -- I guess just one question I have, Mr. Zutter, can you explain to Judge Gargotta to what you were doing in this diagram that you drew in the courtroom today?

A    Your Honor, I was trying to provide a framework of, like, at a high level, the way in which we organized the overall enterprise.  There are in fact probably 100 more legal entities in the structure that I don't remember the exact locations of with respect to treasury.  I didn't ever -- that was never part of my remit.  That would've been Jeff's job.  I wasn't responsible for putting in cash flow entries or, you know, moving specific cash between entities.  We at one point used Raymond James and another point we use Interactive Brokers at another point.  Fidelity.  I don't know who we used at this point in time.  I don't recall the specific movement of money mechanisms.  I do know the general framework of how the organization was structured from a kind of tax and strategic framework.  I think with respect to the video that just played, I'm not sure I know the specific managers from the organizational documents in each of these either.

Q    And that was going to be my question.  I

Page 260

didn't hear in your testimony today you identify specific management structure as far as this was a general partner, this was a managing member. Was that your intent, or from your recollection, your testimony when you put together this diagram?

A   Yeah.  My general understanding is every one of these, of the actual entities behind that illustrative would have defined within it who's the officers, or managers, or managing members, or board of managers, or board of directors, depending on the structure.  I don't recall those details.  I don't recall the specific functions that we were using to pass money through, you know, in terms of our ERP or third party banking mechanisms or approval mechanisms. That's a level of detail I don't remember, but frankly was never part of my remit.  That would've been the CFO's job or the GCs job with respect to documenting all of those details.  I understood the high-level framework of how things moved kind of strategically.

MR. HOCKADAY:  Understood.  Your Honor, at this time, we've taken a photograph of this diagram that Mr. Zutter drew from the high-level framework. We'd like to offer it as D 261 for illustrative purposes.

THE COURT:  Any objection.

Page 261

MS. WILLIAMS:  Not for illustrative purposes.

THE COURT:  Okay.  It's admitted on that basis.  Are you leaving this topic -- the diagram, that is.

MR. HOCKADAY:  Am I leaving -- I'm sorry. What?

THE COURT:  Are you going to have any more examination on the diagram?

MR. HOCKADAY:  I'm not, Your Honor.

THE COURT:  Okay.  I just want to note that it was drawn to my attention that the diagram that you all put and your response to Ebersol's motion for summary judgment in 22-05077 is a much more basic, and I will use his words, simplistic representation of the structure between DDFS and the other entities.  This is much more elaborate than what we got when we received summary judgment.  Were you aware of that? I,

MR. HOCKADAY:  I can't speak to the Court's understanding of what was more specific in general. My understanding just based on (crosstalk) --

THE COURT:  (Crosstalk) --

MR. HOCKADAY:  -- Mr. --

THE COURT:  -- start this way.

MR. HOCKADAY:  Okay.

Page 262

THE COURT:  The diagram I'm looking at --

MR. HOCKADAY:  Uh-huh.

THE COURT:  -- which the law clerk sent to me, is a much more simplistic rendition than what is put up there on the board.  That's my point.

MR. HOCKADAY:  Understood.

THE COURT:  Are you aware of that?

MR. HOCKADAY:  Not specifically, but I don't think that necessarily is different from what he's saying.  He's saying this is his high-level understanding.  Maybe he goes one level deeper, but he's not going into -- Mr. Treyzon's questions to him are about, do you know who the general partner was?  Do you know who it is?  He didn't testify to that.  That's not inconsistent.  Both things can be true.  I can say this is how I understand the framework is, and this is -- and I don't know who was the general partner.  I don't know who had a 50 percent ownership in it.  And I think that's where the distinction is.  If Ms. Williams wants to get up and ask him questions about that, she's obviously welcome to do that.  But I don't view that as inconsistent.

UNIDENTIFIED SPEAKER 1:  Question was, why is there more detail in this chart.

MR. HOCKADAY:  Oh, sorry.  As far as why is

Page 263

there more detail in this chart than last chart. Mr. Lowenstein just informed me what your actual question was.

UNIDENTIFIED SPEAKER 1: Yeah. That's what I thought.

THE COURT: I was a -- I just wanted to put on the record that what we got at the summary judgment stage is a much more simplistic rendition than what the witness put up there. That's all I was saying.

MR. HOCKADAY: Oh, I -- all I can say there is that Mr. Zutter wasn't preparing the summary judgment response, so.

THE COURT: That's fine. I just wanted to share with you that I have eagle eyes in the courtroom, and they were just saying, Judge, this is what was not given to us in the summary judgement stage. It's all -- that's all I meant by that. And we can go from there. So, okay. And I will admit it on -- for a -- you want it for illustrative purposes?

MR. HOCKADAY: Yes, Your Honor.

THE COURT: It's admitted on that basis.

MR. HOCKADAY: Thank you.

THE COURT: That's 261.

MR. HOCKADAY: Yes.

THE COURT: Okay.

Page 264

(DEFENDANT'S Exhibit 261 was marked for identification.)

MR. HOCKADAY:  And while we're on the topic -- actually let me get to the exam and then I'll go back to a couple of other exhibits that we went through.  So Mr. Zutter, I want to pick up where -- on the bankruptcy decision.  We had a lot of conversation about that this morning.  Can we pull up D 187?  I was asking if it was admitted, so.

THE COURT:  Okay.

MR. HOCKADAY:  You got to show it.

UNIDENTIFIED SPEAKER 1:  187?  We don't show that it's admitted.

MR. HOCKADAY:  Okay.

MS. WILLIAMS:  Oh, I'm sorry, Your Honor. Yeah, no objection.

MR. HOCKADAY:  There's no objections, Your Honor.  I -- do you guys have --

THE COURT:  Let me give Ms. Williams a chance to take a look.

MR. HOCKADAY:  Okay.

MS. WILLIAMS:  No objection, Your Honor.  I just did want to note for the record, it's a duplicate of Trustee Exhibit 1204, which was excluded during Ms. Vugrincic's depo.  I don't know how to spell that.

Page 265

THE COURT:  Oh, I --

MS. WILLIAMS:  I butchered her name.

THE COURT:  You're not the only one.  But you don't have objection to it being admitted now.  Do you?

MS. WILLIAMS:  I don't.  I just wanted to make that note.

THE COURT:  Thank you.  D 187 is admitted.  Please continue, Mr. Hockaday.

(DEFENDANT'S Exhibit 187 was marked for identification.)

MR. HOCKADAY:  Thank you, Your Honor.

BY MR. HOCKADAY:

Q  And what we have here is an email that was sent from Jason Cohen to yourself, Charlie Ebersol, Kevin Ferrell, Kelly Vugrincic.  It took me about two weeks to get her name right.  And then there's several other folks with the Bracewall team.  So can you just high level, did the AAF retain outside counsel for this bankruptcy?

A  Yes.

Q  Okay.  And who was that?

A  Bracewall.

Q  Okay.  And did the AAF rely on Bracewall's advice in making its decision?

Page 266

A    Absolutely,

MS. WILLIAMS:  Your Honor, I just, again, wanted to note for the record that we believe they've waived an advice of counsel defense, and so I don't want to try anything by consent here.

THE COURT:  Okay.  Duly noted.

BY MR. HOCKADAY:

Q    Thank you, Mr. Zutter.  And then did you rely on your counsel or did the -- let me back up real quick.  From your recollection, who were the individuals on the AAF that were involved in the bankruptcy process?

A    Charlie, Alan Kantowitz, Kevin Farrell were the key people that were working on it with (inaudible).

Q    Okay.  And as I understand it, the bankruptcy started out as a consideration for a Chapter 11 and then ultimately went to a Chapter 7.  Is that right?

A    Correct.

Q    Okay.  Can you just share with Judge Gargotta to it briefly, just kind of the evolution of that?

A    Well, we had every hope to find a path that the business could be successful.  And that's part of the Prepac bankruptcy discussion we had earlier.  And going into Chapter 7 -- or excuse me, Chapter 11 was -

Page 267

- is there any sort of viable path that gets us to a way in which the league can continue? And so, we tried to run through analysis of that and I don't recall the specific analysis that was done, but I know that we had a number of conversations around, is there any way we can do Chapter 11? And we wanted to exhaust that as a possibility before we went to 7.

Q Now, during that process though, as I understand it, Mr. Ebersol was going out and seeking or seeing if there were exist -- or any additional investors you might be interested. Do you recall that?

A Yes.

Q Okay. Now, initially Mr. Dundon testified that at the beginning of the investment that DCP did not feel comfortable doing that because they didn't feel they had sufficient information to rep and warranty or provide representations and warranties to potential investors because they know what they had. You understand?

A Correct.

Q And later on though, Mr. Dundon's testimony was that Charlie had the green light to go out and do that. Does that comport with your recollection?

A 100 percent.

Page 268

Q   Can you explain to Judge Gargotta to just the thought process at the very end?

A   I think at the very end we acknowledged that we weren't going to be able to, in a reasonable period of time, get to a handle around what all the liabilities and obligations of the business were.  And so, if there was an investor who wanted to step in and essentially buy it or assume those obligations as is, whereas without those representations that if that was going to give the league a reasonable chance of success, that we would gladly do that.  I think we had kind of come to a realization that it was unlikely that this was going to be a successful investment for us.

Q   And we've seen some -- I'm going to pull up actually a couple of exhibits where it's referenced so we're not pulling off memory.  Let's go to Exhibit 13 -- Trustee's 1350.  And this was an exhibit that Ms. Williams questioned you about earlier today.  If we go to the very beginning, there's an email that you wrote on April 1, 2019 at 6:01.  You say, "Charlie, Trey and team."  Do you understand that to be Charlie Ebersol?

A   Yes.

Q   Can you tell Judge Gargotta to who Trey is?

A   Counsel from Bracewall.

Page 269

Q   Okay.  And in here, if we can blow up, it says, as I -- it's the third sentence, it says, as I understand, the preliminary -- oh wait.  Let me back up." Charlie, Trey and team, I understand that there was some discussion of a potential offer for 10 million in equity capital and that DCP had dismissed such offer.  I want to make sure the record is clear or that we had a chance to clear it appropriately.  As I understand, the preliminary interest registered was for $10 million for an AAF franchise, which was conditioned on DCP or another investor fully funding the league and the league operations beyond DCPs current $70 million commitment, and at a minimum, through the end of the season."  See that?

A   Yes, I do.

Q   Can you share with Judge Gargotta to what you recall about that, where you got that information?

A   There was some discussions going around that, you know, perhaps we were not taking this offer seriously, but I wanted to make sure that it was abundantly clear that it's not a credible offer if the offer is conditioned on another, you know, precedent that isn't real.

Q   Right.

A   And so, I was -- I wanted to make sure that

Veritext Legal Solutions
800-336-4000

it was very clear that, we, as DCP, the limit was 70. We had made that clear to the parties, that we wanted to hear any potential investment offer from anyone that was credible.  But credible is not someone saying, I'll put 10 million in if somebody else puts a billion in.  Well, it had to be on the basis of realistic assumptions and I wanted to make sure that it was clear that that one was based on a condition that was not realistic, but that we were interested in anything that could, in fact (inaudible).

Q    At any point in time did Mr. Ebersol present you with a potential investor who was willing to sign an NDA or start discussions in a diligence process to consider an investment?

A    No.

MR. HOCKADAY:  Your Honor, my team informed me that 1350, they don't have it in.  I thought it was because I thought --

THE COURT:  It's not in.

MR. HOCKADAY:  Oh.

THE COURT:  (Inaudible).

MR. HOCKADAY:  Well, I'll move to admit it. I assume that'll be your final (inaudible).

THE COURT:  I would.  I would afford you the opportunity, but.

Page 271

MR. TREYZON:  Yes.

MR. HOCKADAY:  I agree with you.

MS. WILLIAMS:  Yeah, no objection.

THE COURT:  All right.  So 1350 comes in, it's admitted.  Thank you.

(DEFENDANT'S Exhibit 1350 was marked for identification.)

BY MR. HOCKADAY:

Q   At any point in time after Mr. Ebersol, on behalf of the majority, the control interest of the majority shareholders signed the stock consent and you informed them that where there was no more 70 -- more than $70 million.  At any point in time did Mr. Ebersol or any of his colleagues with the AAF present an investment opportunity that would've allowed, in your judgment, the league to continue operating?

A   None.

MR. HOCKADAY:  Your Honor, I may be nearing a stopping point.  I just want to confirm that on some exhibits.  So the Court just gives me a couple minutes.

THE COURT:  Yes, sir.

MR. HOCKADAY:  Thank you.

UNIDENTIFIED SPEAKER 2:  (Inaudible).

MR. HOCKADAY:  Yes, yes.

Page 272

BY MR. HOCKADAY:

Q   Mr. Dundon -- or I'm sorry.  That's what happens at the end of the day.  Mr. Zutter, I'm going to ask you a series of questions and there's a couple documents and I think we'll be able to move forward.  You were part of this deal with DCP between February 13th, and April 16th is when the bankruptcy was filed, April 2nd is when the league suspended operation.  Is that comport with your recollection?

A   Yes.

Q   At any point in time during then, or because of your involvement, John Zutter, did you ever receive any monetary benefit through your actions or your affiliations or anything you did on behalf of the AAF or with the AAF?

A   Absolutely not.

Q   What about a non-monetary benefit?

A   No.

Q   Did you receive any tax benefits?

A   No.

Q   Were you compensated for your time at the AAF?

A   No.

Q   So was it effectively high paid volunteer work?  Excuse me.  Wait, strike that.

Page 273

Was it effectively high stress volunteer work?

A    It could be characterized as such.

Q    And you've been accused of a lot of nasty things in this lawsuit.  I want to touch on some of them that we haven't heard any testimony about.  Specifically, you were accused of not papering up a $250 million deal.  Are you aware of that?

A    I am.

Q    What is your response to that?

A    It says ludicrous is accusing me of not papering up any other hypothetical amount, but there never was a $250 million transaction.  No one asked me to paper a $250 million transaction.  Their board didn't talk about a $250 million one, Charlie didn't talk about a $250 million one, their resolutions didn't include a $250 million one.  Their lawyers never contemplated it and back and forth between me or our lawyers.  And so, it just seems preposterous.

Q    Let me ask you this.  Mr. Ebersol has made the claim that while I wasn't in charge of the league anymore, I was under you.  Do you understand Mr. Ebersol had the controlling interest of 71 percent of the shareholders?

A    Yes.

Page 274

Q   And you've been in business for a long time. Who do board of directors report to shareholders?

A   Charlie Ebersol.

Q   So Charlie was in charge?

A   Sounds that way.

Q   Did Mr. Ebersol ever come to you at any point in time in the history of the universe and say, John Zutter, I need you to paper up a $250 million deal?

A   No.

Q   Did anyone associated with the AAF, Don Belt, Jordan Roberts, or anyone ever tell you of what terms would be part of a $250 million deal?

A   No.

Q   Is it possible to draft a contract or paper up a deal that you don't know the terms to?

A   That would be quite challenging.

Q   As I understand, we've heard testimony today that -- or actually we've heard testimony from Ms. Belt that said, in order for there to be a change in control, it would've had to have board approval, and that was the purpose of the retroactive board meeting on February 24th.  Does that comport with your understanding?

A   Yes.

Q   Okay.  Based on your understanding, would a

Page 275

$250 million deal have required board approval?

A Certainly.

Q Are you aware of the board of the AAF ever approving a $250 million deal?

A No.

Q I want to be very careful not to plow too hard on things that have already been covered, but have you benefited, you, John Zutter in any way from your association with the AAF?

A Quite the opposite, I'd say.

Q What have you experienced since the filing of this lawsuit?

A I'll give you a few examples. Our company is a, Lantern, is highly regulated in 43 or 44 states. We have to provide various filings with Department of Insurance, and in a great number of those, I have to represent any lawsuits that I'm a party of and that certainly creates question. We've raised capital from a number of highly regarded institutions. And in each of those, you know, when they're conducting the fulsome diligence process that I described before, this is something that comes up and, you know, it's pretty hard to explain accusations of this magnitude when folks are looking at potentially investing in a company. Luckily I've been fortunate that each of

Page 276

those four, you know, international, like, widely respected investment firms as they went through that diligence with third party advisors with their outside counsel, all the stuff that we were describing before reviewed --

MS. WILLIAMS: Your Honor, I'm sorry, I'm going to object as to relevance of this and also the advice of counsel issue of previous.

THE COURT: What's the relevance of this?

MR. HOCKADAY: The relevance of this is he's being accused of having a material benefit, which they've proven nothing so far. They've haven't proven one red sign of a material benefit that he has obtained. He -- that he is being accused of a lot of nasty things. His reputation has been tarnished and he wants to share publicly what -- in fact the exact opposite. He hasn't received a benefit of it, but it's been to his detriment. And I can give Mr. Zutter to kind of round it out to condense.

THE COURT: Could you please.

MR. HOCKADAY: Thank you.

THE COURT: You've asked him respectfully, multiple times about getting any material benefit and he -- in each instance he says no. So I'm going to give him a little bit of leeway. Relevance is a low

Page 277

threshold. He's a defendant in this lawsuit, so I'm going to allow him to respond. So the objections overruled. Go ahead.

MR. HOCKADAY: Yeah.

MR. ZUTTER: I just conclude by saying, I've been fortunate that each of those four times when people did comprehensive reviews, they determined that it was frivolous and moved forward but it's been --

MS. WILLIAMS: Objection, Your Honor. I'm sorry. I'd moved to strike that. I think that's both hearsay and a legal conclusion.

THE COURT: (Crosstalk) I disregard it. Just, please continue.

MR. ZUTTER: Thanks. I've had to explain it. Sorry.

THE COURT: That's fine.

MR. HOCKADAY: Yes.

THE COURT: I got that.

BY MR. HOCKADAY:

Q So has that helped or harmed your professional life?

A Certainly has not helped.

MR. HOCKADAY: Your Honor, just one sec. If I can confirm my --

THE COURT: Yes, you may.

Page 278

MR. HOCKADAY:  Thank you.  Your Honor, may I check?

THE COURT:  Sure.

MR. HOCKADAY:  Thank you.

MS. WILLIAMS:  (Inaudible).

MR. HOCKADAY:  Got it.

MS. WILLIAMS:  Got it.

MR. HOCKADAY:  Thank you.  Your Honor, at this time, we talked about D 53 and D 10 earlier, and my colleagues were able to -- I believe the objection was foundation or authentication.  We were able to find production of Exhibits D 53 and D 10 that were produced by the Trustee.  So we would like to move to offer them, again, not for notice purposes and not for the truth of the matter asserted, but that third parties had made claims against the AAF.

MS. WILLIAMS:  Your Honor, that might resolve the authentication issue.  I don't think that resolves the foundation issue.  We still don't have any testimony that Mr. Ebersol received either one of those letters, one of which is not even on its face directed at him.

MR. HOCKADAY:  Mr. Ebersol is not suing in his personal capacity.  In this case, the Trustee is. These are the Trustee's documents.  Mr. Ebersol speaks

Page 279

on behalf of the Trustee, but if it's their documents, they have it. They produced it. And it -- and again, it's not offered for the truth of the matter asserted, it's offered for --

MS. WILLIAMS: Your Honor, I think it's important to point out that the documents the Trustee has are not just those that were in the AAF's possession at the time, but are also the ones that were gathered by the Trustee after. So we've double produced a lot of things we got from them or from Morgan Lewis or from other places. And so, frankly, that does not resolve the foundation issue.

MR. HOCKADAY: I don't --

THE COURT: (Inaudible) or authentication, so. Both?

MS. WILLIAMS: I think it's probably neither, but if it resolves anything, it's only --

THE COURT: Yeah.

MS. WILLIAMS: -- authentication --

THE COURT: Right.

MS. WILLIAMS: -- and not --

THE COURT: Right.

MS. WILLIAMS: -- foundation.

MR. HOCKADAY: It is utterly impossible that he got this from us. One, the date of it, we wouldn't

Page 280

have it. And second of all, we have two separate Trustees stamps here. This is their --

THE COURT: Let's put that aside for a minute.

MR. HOCKADAY: Yeah.

THE COURT: Because I seem to recall that in our local rules, documents that are produced in advance of trial are deemed by the adversary are authenticated. Maybe one of my right law clerks can take a quick look at the local rules to determine that. But I don't think that's going to resolve this issue. The issue is whether or not there's been a proper foundation for this.

MS. WILLIAMS: Same with the other one.

MR. HOCKADAY: And, Your Honor, my colleagues also -- oh, I'm sorry. I didn't mean to interrupt --

MS. WILLIAMS: (Crosstalk) --

MR. HOCKADAY: -- the Court. And they also just informed me that any foundation objection is waived.

MS. WILLIAMS: No, no. Not foundation, authentication.

MR. HOCKADAY: Oh, authentication. Well, he just said authentication. It was resolved.

THE COURT: I think it's resolved by the

fact, I think under our local rules (crosstalk) --

MR. HOCKADAY: (Crosstalk) --

THE COURT: -- that it's provided trial, you don't have to go through an authentication. But like I said, maybe one of my gifted law clerks tell me (inaudible).

MS. WILLIAMS: I know that's the Texas State Court rule, but not the general federal rule.

THE COURT: I agree with you, but I seem to recall when I go hopefully to my great reward, and I have all these sins here, two things in my favor are I did the local rules in 2011, did them again. And when I talk to St. Peter's and go, dude, (inaudible).

MS. WILLIAMS: But, Your Honor, I will agree. I'm looking at our written objections and we did assert many, including foundation, but not authentication. So I'm fine to just stand on the foundation objection and resolve that issue.

THE COURT: Then if we could continue to look to satisfy my (crosstalk) --

MS. WILLIAMS: I would like to know.

THE COURT: And I'll let you know. But, so what about foundation?

MR. HOCKADAY: I think Mr. Ebersol has testified. I'm pulling from memory here, so --

Page 282

THE COURT:  Yeah.

MR. HOCKADAY:  -- please forgive me if I'm -- I'm not trying to quote.  But Mr. Ebersol testified for six days the topic of litigation came up specifically.  I also had an accompanying exhibit that has been admitted already that Mr. Ebersol, Mr. Freedman, or definitely Mr. Ebersol and Mr. Dundon, I think Mr. Freedman also testified too in his deposition regarding this lawsuit.  I don't think it's any big secret.  I don't think there's a dispute here.  And if we're not offering it for the truth of the matter asserted and only for the purpose that third parties had made claims, I don't think their foundation objection applies.

THE COURT:  Okay.  Hang on.  Let's solve the mystery first of all.  Rule 7026-1, D, authentication of documents.  A party's production of a document in response to written discovery authenticates the document for use against that party in any pretrial proceeding or at trial, unless within 14 days or a longer or a shorter period ordered by the Court. After the producing party has actual notice that the document will be used, the party objects to authenticity of the document or any part thereof stating the specific basis for objection.

Page 283

An objection must either on the record -- must be either on the record or in writing.  It must have a good factual and legal basis.  An objection made to authenticity of only part of a document does not affect the authenticity of the remainder.  If the objection is made, the party attempting to use the document should be given a reasonable opportunity to establish his authenticity.  There we go.

MS. WILLIAMS:  That's good to know, Your Honor.  Because in the Northern District, we don't have this rule, and Ms. Anwar and I had to serve 400 requests for admissions to (inaudible).

THE COURT:  So let's -- foundation, last word.

MR. HOCKADAY:  I forgot where we were.  I'm sorry.

THE COURT:  No.  It still doesn't cure to -- if -- restate your last statement again, I don't want to misspeak, if you could.

MS. WILLIAMS:  No.  Correct, Your Honor.  If the point of these is to show that Mr. Ebersol or someone else at AAF had some knowledge that they were not imparting to Mr. Zutter, that doesn't have any meaning if you don't show that these documents were actually given and shown and read to by Mr. Ebersol or

Page 284

someone else at AAF.  Again, like I said, one of them's not even addressed to him.  And they may have asked Mr. Ebersol about that other exhibit and it's in, but they didn't ask about either of these.

THE COURT:  (Inaudible).

MS. WILLIAMS:  The email that's in evidence that I've questioned him about.  There's also a couple that Mr. Lowenstein questioned Mr. Ebersol about, specifically talk about this lawsuit.  There's not a number of different lawsuits.  This is the only one.

THE COURT:  The notice.

MS. WILLIAMS:  The claim of lawsuit.

MR. HOCKADAY:  Yeah.  Notice, yes.  The notice.

THE COURT:  It still lacks foundation.  But I think we're making a mountain out of a mole hill.  If your memory is that, and I think it comports with mine that there were previous testimony on this.  I have the testimony.

MR. HOCKADAY:  Understood.

THE COURT:  So the objection is sustained.

MR. HOCKADAY:  Your Honor, can I confer with my --

THE COURT:  Of course.

MR. HOCKADAY:  -- people for a second.

Page 285

THE COURT:  Remember, those microphones are sensitive.

MR. HOCKADAY:  Yes.  Your Honor, just for purposes of the record, I would ask the Court for -- to put in D 10A and D 53A as an offer of proof.

THE COURT:  Granted.

MR. HOCKADAY:  Thank you.  And there's one more I need to check, Your Honor, and then I think --

THE COURT:  Yes, that's fine.

MR. HOCKADAY:  Thank you.  Oh, actually this one, I think (inaudible).  Your Honor, can we pull up Exhibit D 274?

UNIDENTIFIED SPEAKER 1:  They don't have it.

MS. WILLIAMS:  It's in the --

MR. HOCKADAY:  Oh.

MS. WILLIAMS:  I don't have it.

UNIDENTIFIED SPEAKER 1:  Another way.

THE COURT:  Which one is this please?

MR. HOCKADAY:  So this is the document that my team located that the Trustee produced, and it's an email from Megan Hanson to Charlie Ebersol, it copies of David at AAF, and it's in reference to the Vanika lawsuit.  It would be a statement by a party opponent.  And I would offer it as a rebuttal exhibit because this issue of notice was raised, even though I know

Page 286

the Court is her testimony on it, we just would like to move it for admission.

MS. WILLIAMS:  Your Honor, no objection.

THE COURT:  Admitted.

MR. HOCKADAY:  Thank you, Your Honor.

THE COURT:  D 274 is admitted.

(DEFENDANT'S Exhibit 274 was marked for identification.)

MR. HOCKADAY:  Thank you.  May I approach, Your Honor, so I can give your team the --

THE COURT:  Yes, please.

MR. HOCKADAY:  Or do you guys want electronic or --

MS. FLORES:  No.  We can have it.

MR. HOCKADAY:  Okay.

UNIDENTIFIED SPEAKER 1:  This is the (inaudible).

MR. HOCKADAY:  Your Honor, at this time we will pass the witness.

THE COURT:  Thank you, sir.  Ms. Williams, do you need a couple minutes or are you ready to go? I'll give you a couple minutes if you need it.

MS. WILLIAMS:  Yeah.  Just a couple minutes to talk to my co-counsel, but then we can start it. And I -- there's no reason we shouldn't be able to get

Page 287

done today.

THE COURT: 5:00. (Inaudible).

MS. WILLIAMS: Oh, I thought you said we were ending by 5:30, so.

THE COURT: That's exactly what I said. So you think we can be done by 5:30?

MS. WILLIAMS: Yes, Your Honor. I think so.

THE COURT: Bless you. All right. Five minute recess. All right.

COURT CLERK: All rise.

(Off the record.)

COURT CLERK: All rise.

THE COURT: Thank you, ladies and gentlemen. Mr. Zutter, if you please be seated. Log in (inaudible).

MR. HOCKADAY: Your Honor, if I may, while you're logging in, I know we had a brief discussion about our 72 boxes, but I am happy to inform you they've been removed from the courtroom.

THE COURT: Is that it? Where are they gone? Are they still in the building?

MR. HOCKADAY: They have left the premises.

THE COURT: Okay. Thank you. I don't know if that's a good or bad thing. I'm going to say it's a good thing. All right. Thank you. Ms. Williams,

Page 288

you may proceed.  Thank you.

MS. WILLIAMS:  Thank you, Your Honor.

RECROSS-EXAMINATION

BY MS. WILLIAMS:

Q  Mr. Zutter, first I want to start off by talking about what you drew on the board up here.  I think you said it was common for you to create corporate structures, draw them like this from your memory.  Is that correct?

A  I've done it before.  I'm not sure how common it is, but yes, I've driven corporate structures before.

MS. WILLIAMS:  Okay.  And you said you knew all the information that you drew on the board back here and actually can -- what number was that, Brent?

MR. ZUTTER:  It was D 271.

MS. WILLIAMS:  Okay.  The -- it's illustrative Exhibit D 271.

THE COURT:  (Inaudible) 261.

MS. WILLIAMS:  261.

THE COURT:  (Inaudible).

MR. ZUTTER:  Ms. Williams, D 261.

MS. WILLIAMS:  Okay.  When I say D 261 to you and Mr. Zutter, I'm referring to what's physically on the chalkboard.

Page 289

MR. ZUTTER: Sounds good.

MS. WILLIAMS: Okay.

BY MS. WILLIAMS:

Q So you knew all the information that you drew on D 261 on this board, I believe you said years before now, correct?

A Yeah. And as a general framing, yes. That's not intended to be the exact precise organizational structure, but illustrative to talk about the topics earlier too.

Q All right. If it's not precise, what's not precise about it? Because I need to understand that.

A There are a variety of other entities that exist inside the overall kind of Dundon Enterprise that aren't listed there that I don't recall their specific names. DCPF 2 is not the actual precise name. I know that there was a fund 2, I don't know the precise name of it. So there's a variety of details like that that I -- this was meant to represent a approximation of how the organization was structured. But to -- it's to the best of my recollection of framing of the pertinent parts for the conversation we had before.

Q Okay. So -- and I'm going to write this number down because I'm going to forget it. So on D

Page 290

261, you've identified that some of the names aren't the proper names, correct?

A    That's correct.

Q    What else about it isn't precise?

A    I don't know what is or isn't precise about it.  It's -- this is just meant to be a rough approximation of the organizational structure.

Q    Okay.  Do you think it accurately represents what entities are going into what other entities?

A    I think that it is a very -- it is the best recollection I have of what the organizational structure looked like with respect to the parts that are pertinent to the conversation we were having earlier.

Q    Don't know if the lines are accurately representing which entities go into which other entities?

A    It is the best recollection that I have.

Q    Okay.  Are you sure that recollection's accurate?

A    I'm not a hundred percent sure that that is the exact organization.

Q    Okay.  Because let me show you what the judge brought up, which is Trustee's Exhibit 166.  And if you could zoom in on the structure.  Do I understand

Page 291

correctly, you didn't see this before today, Mr. Zutter?

A No, I've never seen this.

Q So you didn't play a role in preparing this?

A I did not.

Q Do you see, when we look at DDFS management that the sole members, Mr. Dundon, do you see that?

A I do see that.

Q Okay. And then if we look at D 261, we have both Dundon and the Children's Trust going into DDFS management, correct?

A Correct.

Q Do you know which of these is correct?

A I would've to go ahead and look at documents. I don't know which of them is correct.

Q Okay. Do you --

THE COURT: (Inaudible). There's a reason I brought that up. My very smart law clerk pointed out and then wanted to see whether you picked up on the inconsistency. So now is your testimony that neither chart is correct?

MR. ZUTTER: I -- my -- I've never seen this chart before.

THE COURT: Okay.

MR. ZUTTER: I think that this chart is a

Page 292

simplification and there's dramatically more entities than that.

THE COURT: That -- no, no. That went to your question which was who was the partners in --

MS. WILLIAMS: DDFS management.

THE COURT: Right. And there's a representation up here on the screen and then there's a representation up here on the board. And you said, I'm not certain either one is correct. So that part required me to ask you, okay, are they both incorrect or not? And then you can pull up -- you want to raise an objection?

MR. HOCKADAY: Your Honor, if I may, the -- what you or your clerk's pointed out was something that was part of a Jeff Vanderbilt testimony that -- or affidavit I believe that was put together. Mr. Zutter did not testify as to specific member interests. This shows a member interest. Both of these things can be true. That's --

THE COURT: Okay.

MR. HOCKADAY: He's talking about a general understanding of the flow and what he said to the best of visibility. Here we're looking at -- we've got Tom Dundon and there's a specific identification of a member. That is different. We're not talking about -

Page 293

- they can both be true.  I don't even know where they're inconsistent.  He's talking about how generally the organizations and the entities are connected based on the best of his recollection.  Here we have an affidavit of Jeff Vanderbilt who was talking (crosstalk) --

THE COURT:  (Crosstalk) it's not an affidavit.

MR. HOCKADAY:  Or testimony.

THE COURT:  It's a testimony.

MR. HOCKADAY:  Testimony from Jeff Vanderbilt that goes into specific titles.  And Mr. Vanderbilt, I believe, was the corporate representative designated for that in his deposition.  So that's why we have that.  There's no fast and loose or difference or inconsistencies, but I -- so I -- and the only reason why I'm doing this speaking is because it wasn't raised as a question, it was more of a conversation.  So I just want to make sure that's very clear.

THE COURT:  Okay.  Well, you can follow -- you can ask the witness questions then.  Go ahead.

MS. WILLIAMS:  Okay.

BY MS. WILLIAMS:

Q   Mr. Dundon (sic), I thought I understood -- let's address Mr. Hockaday's point.  I thought I

Page 294

understood when we were talking about this.  That you had said the lines represented which entities floated into the other entities.  Isn't that what you said?

A   It was meant to be a kind of illustration of the general way in which funds flew through from a kind of -- through the structure.  I don't know the specific legal ownership of each of those entities.

Q   Okay.  And I understand that.  And that's what you said in your deposition, correct?

A   Correct.

Q   You draw a lot of structure charts like this, right?  The lines have meaning, right, Mr. Zutter?

A   You can have a variety of different meanings depending on that.

Q   You don't just draw lines between two organizations that aren't related in some way, do you?

A   It depends on the context.

Q   Okay.  So you're telling me I can't rely on these lines on D 261 --

MR. HOCKADAY:  That (crosstalk) --

MS. WILLIAMS:  -- that to show me any --

THE COURT:  No, no, no, no.  Sit down.  To the extent it's an objection, it's overruled.  You can follow up.

BY MS. WILLIAMS:

Page 295

Q   So Mr. Zutter, you're telling me these lines that you drew on D 261 are not meant to represent which entities are actually officially related to each other through membership or partnership, et cetera?

A   I think they are related to each other.

Q   Okay.  So let's go back to where we started before we had an objection.  The way that you've drawn the lines, we have Mr. Dundon and his wife.  I understand why you said that.  Mr. Dundon and his wife and the Children's Trust both their lines going into DDFS management, correct?

A   Correct.

Q   And if we looked at the one on Trustee's Exhibit 166, we have Mr. Dundon noted as the sole member of DDFS management, correct?

A   Correct.

Q   And we also have the Dundon Children's Trust on this chart on the right with no kind of line filled in, dotted whatever going into DDFS management, correct?

A   I see that, yes.

Q   Okay.  And if I also understand you correctly, what's in D 261 is the best of your recollection and perhaps not precise.  Is that fair?

A   That's correct.

Page 296

Q   Okay.  All these entities that you've drawn on the board are separate legal entities, correct?

A   Yes.

Q   Would you agree with me that the corporate formalities between separate entities matter?

A   As a general rule, yes.  And in practical application, it depends.

Q   Okay.  Well, what about asset transfers?  Do you agree that there should be paperwork between asset transfers between separate legal entities?

A   In some form, yes.

Q   Okay.  And you testified before, and I think Mr. Hockaday read you this portion of your deposition, that you don't recall the specific treasury functions within the broader Dundon set of companies, correct?

A   That's correct.

Q   And by that you mean how the money moves around, correct?

A   I meant the specificity of the exact money movements and mechanisms of those.  At a high level, I understood the flow.  With precision, no, I do not.

Q   Okay.  And as you sit here today, you still don't know that, correct?

A   Correct.

Q   Okay.  And you also don't know, and this was

Page 297

in part of the deposition that Mr. Hockaday read, you don't know what specific documentation exists between these different Dundon related companies, correct?

A    That's correct.

Q    So you don't know what the treasury functions are, for example, between DDFS management and DCP, correct?

A    I did high level.  I have an understanding at a precise legal or financial, you know, reporting level?  No.

Q    Okay.  And the same for between DDFS partnership and DDFS management, correct?

A    Correct.

Q    Or from DDFS partnership to DCP, correct?

A    Yes.

Q    And you also said you didn't know what specific -- and I'm sorry if I asked this again, I think I backed up.  When you said you didn't know what specific documentation exists between the different Dundon related entities, would that include between DDFS management and DCP?

A    Correct.

Q    And between DDFS management and DDFS partnership?

A    Yeah.  I don't recall any of the specific

Page 298

documentation.

Q   Okay.  Let me just ask one more.  DDFS partnership to DCP?

A   Yes.

Q   Okay.  You can take that down.  I can put up Trustee's Exhibit 27 again.  But this is the email from Mr. Ebersol to the group at the four go forward options.  And in your direct, you took issue with the options that Mr. Ebersol gave you and you said there should be at least one more option that addresses accounts payable.  Is that a fair summary of what you said?

A   I'm not sure.  That's how I would summarize what I said.

Q   Okay.  Did you take issue with the issues -- with the options Mr. Ebersol gave you?

A   Yes.

Q   And did you say at least one option he gave you should have addressed the accounts payable outstanding?

A   I don't recall what conversations we had following this.

Q   You don't recall saying that?

THE COURT:  Wait, hold on.  I think you misunderstood your question.

Page 299

MS. WILLIAMS: Oh, I'm talking about your testimony, Mr. Zutter testimony.

THE COURT: (Inaudible) not with (inaudible).

MS. WILLIAMS: I'm talking about --

THE COURT: (Inaudible).

BY MS. WILLIAMS:

Q Sorry. When you were testifying with Mr. Hockaday, you said that at least one of these options Mr. Ebersol had sent you if he was acting appropriately, should have addressed the outstanding accounts payable?

A Yes.

Q Okay.

A Sorry, I thought -- I misunderstood your question.

Q Thank you, Your Honor, for clearing that up. Did you respond to this email and propose any other options to Mr. Ebersol?

A I don't recall.

Q Okay. Did you -- you didn't prepare any options yourself, did you, that accounted for accounts payable?

A No, I did not.

Q And instead, after this email, you as a voting director of AAF voted to put the league into

Page 300

Chapter 7 bankruptcy, correct?

A    Eventually, yes.

Q    Okay.  And when that happened, or right before that happened, hundreds of employees were terminated from AAF, right?

A    I don't recall the exact number, but, yes.

Q    A lot, right?

A    Yes.

Q    And none of that accounts payable after that time was paid, correct?

A    I don't believe that's correct.

Q    You understand there's still tens of millions of dollars in claims in this case, correct, by vendors, et cetera?

MR. HOCKADAY:  Your Honor, I object to relevance here for leading into the damages issue.

MS. WILLIAMS:  Your Honor, I'm addressing the fact that he suggested that Mr. Ebersol's options here were irresponsible, including for reasons that are not resolved by what actually happened.

THE COURT:  (Inaudible) and the objection is overruled.

MR. HOCKADAY:  Thank you.

BY MS. WILLIAMS:

Q    And are you aware, Mr. Zutter, that almost

Page 301

half a million dollars was paid to the bankruptcy professionals for the preparation of the Chapter 7 bankruptcy?

A   I don't recall the specific number that was paid to them.

Q   Okay.  But you know Bracewall was paid?

A   Yes.

Q   Correct?

A   Yes.

Q   And you know PWC was paid?

A   Yes.

Q   And that money came from AAF, correct?

A   Yes.

Q   Okay.  And the player contracts were breached when the Chapter 7 was filed, correct?

MR. HOCKADAY:  Objection.  Calls for a legal conclusion.

THE COURT:  I'm (inaudible).

MR. HOCKADAY:  Understood that.  I'm treating it --

THE COURT:  So if you know, you can answer the question.

MR. HOCKADAY:  That was going to be my other objection, Your Honor.  Just calls for speculation.  I don't know that he's testified once actually about

Page 302

player contracts.

THE COURT: Okay. Well, let's back it up and see whether or not he knows anything about it. So I'll sustain your objection just so that Ms. Williams can further develop it. Go on, please.

BY MS. WILLIAMS:

Q Do you have an understanding that the player contracts are being terminated and breached as part of declaring Chapter 7 bankruptcy for the AAF?

A I'm not sure I'd characterize it as -- I don't know that they were being breached.

Q Okay. The player contracts didn't continue, correct?

A Correct.

Q The players were released, correct?

A Yes.

Q Okay. And in the Chapter 7 bankruptcy the assets of the AAF were not preserved, whatever they were, correct?

A I don't know the answer.

MR. HOCKADAY: Calls for speculation.

THE COURT: What -- if he knows. So overruled. So let's take a step back on the question about the assets, please.

MS. WILLIAMS: Okay. I think you said he

Page 303

didn't know, so I'll --

MR. ZUTTER:  Yes, I said I didn't know.

THE COURT:  Okay.  Very good.  Well, after the bankruptcy was filed, did -- what involvement did you have, if any, with the case itself?

MR. ZUTTER:  Helped prepare some of the forms and helped prepare some of the schedules, and there's been years since then.  I think the specifics of her question was -- now I'm forgetting your exact wording.  I don't --

THE COURT:  Well, I interjected a question, so answer mine first, okay?  And then I'll allow you switch.

MR. ZUTTER:  Okay.

THE COURT:  I just want to know what -- you have testified that you assisted counsel in the preparation of schedules and other bankruptcy documents.  After that, did you have any involvement in the case?

MR. ZUTTER:  Aside from preparing with my counsel for the variety of different actions that have happened since then?

THE COURT:  Right.

MR. ZUTTER:  No.

THE COURT:  But now at the time, no other

Page 304

actions, right?

MR. ZUTTER: No.

THE COURT: Okay. Go ahead, please.

MR. ZUTTER: Okay.

BY MS. WILLIAMS:

Q You understand -- I know you're not a lawyer, Mr. Zutter, but conceptually you understand the difference between a Chapter 7 liquidation and a Chapter 11 reorganization, correct?

A At a very high level.

Q You what?

A At a high level.

Q Okay. And in Chapter 11, you're trying to preserve the business to have a go forward plan and to try to keep its assets, right?

A Yes.

Q And in Chapter 7, the company's not going to continue, right?

A That's my understanding.

Q Okay. So you understood when 7 was done instead of 11 that AAF is going to cease to exist, correct?

A Correct.

Q Okay. But there was a consideration of Chapter 11 and that's that 12 week go forward plan we

Page 305

looked at that Mr. Kantowitz was distributing, correct?

A    Yes.

Q    Okay.  And that was the one that you and I looked at earlier.  I don't want to go back if we don't have to, but it had the 71.09 million number.

A    I remember.

Q    You remember that?

A    Yes.  Okay.

Q    You also said, and I can't remember if it was to me or Mr. Hockaday, but you said that you had looked at selling the business as is where is, correct?

A    We had come to the perspective that we were okay with that.

Q    Okay.  And because -- if you're selling it as is where is, the issues you were raising regarding representations and what documentation we have, that kind of thing, it wouldn't matter in an as is where is sale, correct?

MR. HOCKADAY:  Lack of foundation.

THE COURT:  Overruled.  You can answer the question.

MR. ZUTTER:  I'm not sure they don't matter, but they're -- my own layman's non-legal understanding

Page 306

would be that it'd be substantially less and maybe manageable.

BY MS. WILLIAMS:

Q   Okay.  But you didn't actually set any kind of process to market the business for an as is where is sale, did you?

A   No.

Q   Okay.  And some of the things that Mr. Ebersol is talking about in his options, like finishing the league, preserving the player contracts, those could matter in a sale for as is where is of AAF, couldn't it?

MR. HOCKADAY:  Calls for speculation, lack of foundation.

THE COURT:  Your response?

MS. WILLIAMS:  Your Honor, he testified at length about all of his business experience, and all of the other things he'd been in, and how he's applying that here.  And so, I think this is a perfectly fair question.

THE COURT:  (Crosstalk) --

MR. HOCKADAY:  (Crosstalk).  Sorry, Your Honor.

THE COURT:  That's okay.  But I think it's appropriate.  The objection is overruled.  Please

Page 307

answer the question.

MR. ZUTTER:  Could you repeat the question for me, please?

BY MS. WILLIAMS:

Q   Yeah.  The question was, if you were going to do an as is where is sale and market, that process, some of the things that Mr. Ebersol is bringing up in Trustee's Exhibit 27, like finishing the season, like preserving the player contracts, those could matter in that kind of sale, right?

A   Yes.  As well as having capital to do it and paying off payables and a variety of other factors.

Q   You gave a little more detail and direct on the opportunity zone that you were discussing with PWC.  And did I understand correctly that you said to get the benefits from an opportunity zone investment, it would need to essentially last at least 7 to 10 years?

A   To get certain features of the benefit.  My -- best of my recollection is that the rules for the time that you have to hold it are 7 to 10 years, but that's for an aspect of it, which is basic step up.

Q   Okay.  And 70 million was never going to fund 70 years, correct?

A   Not in the plans that were provided to us.

Page 308

Q   Okay.  But 250 million would or would at least get close, right?

THE COURT:  I --

MR. HOCKADAY:  Calls for speculation.

THE COURT:  How would he know that?

MS. WILLIAMS:  Okay.  Well, let's look at Trustee's.

THE COURT:  Sustained.

MS. WILLIAMS:  Understood, Your Honor.  Let's look at Trustee's Exhibit 807.

THE COURT:  Has this been previously admitted?

BY MS. WILLIAMS:

Q   It has been previously admitted, Your Honor. I want to look at page 34 and actually showed him the email first, Mr. Anwar.  Mr. Zutter, this is the email.  I don't know if you recall us discussing it earlier where Mr. Dundon forwarded you the materials for Mr. Ebersol?

A   Yes.

Q   And you recall one of those was an Excel spreadsheet that had financial projections, correct?

A   Correct.

Q   Okay.  So let's look at page 34, which is one of the pages from those financial projections.  Do you

Page 309

remember looking at this?

A    Yes.

Q    Okay.  If we go into the cumulative net cash flow line, and this is adding up, just to be clear. This is adding up every year, kind of building on itself, correct?

A    Yes.

Q    Okay.  And it peaks at 268 million in 2021, correct?

A    In this scenario, yes.

Q    Okay.  And then it starts to go down and starts giving a cumulative positive cash flow in 2025, correct?

A    The column headers had moved over, so.

Q    Oh, I'm sorry.  Sorry.

A    Yes.

Q    Okay.  And this is the information that you and Mr. Dundon had before February 14, 2019, correct?

A    Yes.

Q    Okay.  And I believe you testified earlier, but let me just be clear, that you did not ask the AAF for any other specific information before Mr. Ebersol signed the term sheet, correct?

A    Not to my knowledge.

Q    Okay.  So you didn't ask, for example, for an

Page 310

accounts payable report, correct?

A    Not to my knowledge.

Q    You didn't ask about what litigation may or may not have been threatened, correct?

A    No.

Q    You didn't ask to see copies of debt documents, correct?

A    No.

Q    I'm going to ask briefly about Employer Direct Healthcare.  I think you testified that you did get K-1s from Employer Direct Healthcare, correct?

A    From an entity above it, yes.

Q    Okay.  Before the work that you did with Employer Direct Healthcare?

A    Yes.

Q    And is the entity that you got a K-1 from a Dundon related entity?  In 2019, was it?

A    2019, yes.

Q    Okay.  And in 2019, you would've gotten a K-1 from that Dundon related entity?

A    Yes.

Q    Okay.  And I think you said that EDHC was acquired in 2016.  Is that correct?

A    DCP acquired a majority stake of it in 2016, correct.

Page 311

Q    Okay.  And am I correct that that company had been around and been founded in 2011?

A    That sounds correct.

Q    Okay.  And you referred to that as a startup having been in existence five years?

A    It had like $2 million in revenue and 10 employees.  It had gone through a couple of start fits and sparks, but yes, it very much was a startup.

Q    Okay.  Has FedEx ever been a client of EDHC?

A    No.

Q    How about Carvana?

A    Yes.

MS. WILLIAMS:  Let's look at Exhibit 426.  Trustee's Exhibit 426, I apologize.  This has been previously admitted.  Do I have a -- is your book still up there?  I know you like to see the paper copies.  If you want to pull it.

THE COURT:  We can use the screen, it's fine.

MS. WILLIAMS:  Okay.

BY MS. WILLIAMS:

Q    I'm looking at page two.  Are you familiar with Ernie Garcia at Carvana?

A    Yes.  I've known him since 2006 or 7.

Q    Okay.

A    He was a client of mine at JP Morgan and then

Page 312

a relationship at Santander Consumer and Subsequent.

Q   Okay.  I'm looking at this email at the bottom of page two.  You sent an email to Mr. Garcia at Carvana on February 18, 2019.  Is that correct?

A   Correct.

Q   And you're offering to put a Carvana spot on the AAF games free of charge, correct?

A   Correct.

Q   And that actually happened, correct?

A   I believe so.

Q   Okay.  And then the second paragraph, you're telling him, "Separately, I wanted to quickly touch base on the employer direct healthcare topic.  We spent some time with your HR benefits team during the second half of 2018, but everyone was busy and the conversation got pushed.  We've been in place with DriveTime for over a year now and would love to see if we can be helpful to Carvana employees as well."  Do you see that?

A   Yes.

Q   And that's what you're telling Mr. Garcia at Carvana in this email, correct?

A   Yes.

Q   So it doesn't appear that ADHC has Carvana as a client yet, correct?

Page 313

A    No.  It had its sister company, DriveTime, but not Carvana at that point.

MS. WILLIAMS:  Okay.  Checking the clock, Your Honor.

THE COURT:  Thank you.

BY MS. WILLIAMS:

Q    All right.  Let's talk about Exhibit D 237, which Mr. Hockaday talked to you about.  This was the proof of claim Exhibit A.  Do you remember that?

A    Let's take a quick look.

Q    Do you need a paper copy?

A    No, I just need to read it real quick.

Q    Okay.

A    You wanted me to go to a different exhibit or a different (crosstalk).

Q    Oh yeah, sorry.  D 237.  Go to Exhibit A, please.  Do you remember talking to Mr. Hockaday about this document?

A    Yes.

Q    And I believe you testified that you thought you were the best person to talk about the allegations made in this Exhibit A.  Is that fair?

A    Correct.

Q    To your understanding, are you the only person who provided information for this Exhibit A?

Page 314

A    I don't think I'm the only person.

Q    Okay.  Do you know who else?

A    I don't know the specific people that provided information.

Q    Okay.  Let's go to paragraph two.

You testified earlier that the $70 million number given prior to February 14, 2019, from your side's point of view, you said that number was not said to you directly by Mr. Ebersol, correct?

A    I said, verbally, it was not said to me directly, but could be also interpolated by the projections in terms of the rest of the months of the season.

Q    And you mean interpolated by you from looking at a document?

A    Yes.

Q    But Mr. Ebersol or someone else at AAF didn't say that number to you, correct?

A    To me directly, no.

Q    Okay.  All right.  So you're not the source of this paragraph two, are you?

A    Interpret told to be limited to only verbal.

Q    Okay.  So you think your interpolation of a document would be fairly characterized as them telling you?

Page 315

A   I think when a company provides you with projections, it is them telling you perspective.

Q   Is that a yes, Mr. Zutter?

A   Yes.

Q   Okay.  And then the last sentence here says there was never a commitment provided by DCP to invest anything more than up to 70 million, correct?

A   Correct.

Q   Do you think that's a true statement?

A   In the context of a legal commitment?  Yes.

Q   Okay.  And you understand we've seen a lot of documents, and you and I looked at some of them that Mr. Dundon and you were involved in talking about a 250 million commitment, correct?

A   Not in the context of a legal commitment.

Q   Okay.  Well, let's look at paragraph 11 where we use the word commitment again and we allege -- DCP's alleging here.  The AAF is misrepresented to the public employees and players the details of DCP's financial commitment to the league.  Do you think that's a true statement?

A   Yes.

Q   Even though we've seen all the media releases that you and Mr. Dundon approved saying $250 million commitment?

Page 316

A    Yes.

MR. HOCKADAY: I'm going to object, Your Honor, just to the characterization of you and Mr. Dundon approved. I don't think Mr. Zutter testified that he approved the press release. I think that was all. Mr. Dundon.

THE COURT: Thank you.

MS. WILLIAMS: I can ask a few follow ups, Your Honor.

THE COURT: Sure. That's fine. So why don't you follow it up then? So, sustained. I'll let her follow it up.

MS. WILLIAMS: Okay.

BY MS. WILLIAMS:

Q    Mr. Zutter, you and I looked at some documents with press releases when I was doing your earlier examination, correct?

A    Correct.

Q    Do you recall the email where you asked Megan Hansen to copy you specifically on a press release?

A    Yes.

Q    And you remember the emails where you are copied on the press release, correct?

A    Yes.

Q    And you saw that those press releases

Page 317

referenced a $250 million commitment, correct?

A   Yes.

Q   Did you respond in any way to those emails and say, we better not say $250 million commitment. This is inaccurate.  Don't do this.

A   You did not respond saying those things.

Q   Did you respond anything like that?

A   I don't recall the specific response to that. I might or might not.

Q   Okay.  But you still think paragraph 11, the first sentence is true?

A   Yes.

MS. WILLIAMS:  Okay.  No more questions, Your Honor.

THE COURT:  Okay.  Are you ready to pass the witness?

MS. WILLIAMS:  Oh, yes, Your Honor.

THE COURT:  Thank you.  Mr. Hockaday?

MR. HOCKADAY:  Thank you, Your Honor.  If I can just check with my --

THE COURT:  Yeah.  It'll be --

MR. HOCKADAY:  -- colleagues real quick?

THE COURT:  -- very limited, if at all, but I'll let you check with your team.

MR. HOCKADAY:  Thank you.  Your Honor, just a

Page 318

couple brief questions on one exhibit.

THE COURT: That's okay.

MR. HOCKADAY: That's all I have. If that's okay?

THE COURT: Yes. I'll let you.

MR. HOCKADAY: Thank you

THE COURT: Emphasis on a couple brief questions on one exhibit. I'll allow that. I'll tell you this, God rest his soul, Judge Glanon (ph), I only appeared in front of him a couple times. And if you said two questions and you did three, he lost it. And so, that's why I just wanted to emphasize it. But yes, I will allow a couple brief questions on one exhibit.

MR. HOCKADAY: Thank you, Your Honor. And we appreciate you -- the Court accommodating. We want to be very, very brief. Your Honor --

THE COURT: You're not (inaudible)

MR. HOCKADAY: Yeah, yeah. No, I'm not going though. Your Honor, I would like if we could pull up exhibit, Trustee's 531. I just want to offer this into evidence.

MS. WILLIAMS: I'm going blind. Your Honor. I don't know what your rules are in redirect, but this is certainly outside my re-cross, outside the scope.

Page 319

It's a new document.

THE COURT: Yeah. Your response?

MR. HOCKADAY: It's absolutely not. It's related to the bankruptcy. She just asked questions about Chapter 7 and Chapter 11. This goes directly to that. All I need to do is admit the exhibit, ask him his understanding, and then sit back down.

THE COURT: Ms. Williams?

MS. WILLIAMS: Huh?

MR. HOCKADAY: It's their exhibit or their --

THE COURT: Yes, I understand.

MS. WILLIAMS: No objection, Your Honor. Just subject to my advice of counsel statement.

THE COURT: That's fine. This is Trustee?

MR. HOCKADAY: 531.

(TRUSTEE'S Exhibit 531 was marked for identification.)

THE COURT: I just wanted to make sure I was reading it right on the screen. Go ahead, sir.

MR. HOCKADAY: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. HOCKADAY:

Q Mr. Zutter, I'm directing your attention to Exhibit 531. This is an exchange between Mr. Wood and yourself as well as Charlie Ebersol and various

Page 320

others.  Do you see that?

A  Yes.

Q  And I'm just going to summarize briefly, the record will reflect it.  It looks like there is some legal advice that Mr. Wood is giving you all in relation to Chapter 11 and Chapter 7.  Do you see that?  Why don't you read the paragraph, the -- from the email on April 3, 2019 at 12:40 a.m., silently, and then let us know when you're finished.

A  Yep.

Q  Does this reflect your understanding of the advice that you received and followed in filing Chapter 7?

A  Yes.

MR. HOCKADAY:  No further questions, Your Honor.

THE COURT:  All right.  Thank you.  Okay.  I excuse the witness at this time.  Mr. Hockaday?

MR. HOCKADAY:  Yes, sir.  Yes, Your Honor.

THE COURT:  Ms. Williams?

MS. WILLIAMS:  Yes, Your Honor.

THE COURT:  Mr. Zutter, you're excused. Thank you.

MR. ZUTTER:  Thank you, sir.

THE COURT:  All right.  So we're calling

Page 321

today.  Good job.  We got done before 5:30.  So who's on first in the morning?  You all have a witness?

MR. HOCKADAY:  This is where I get to understand.

THE COURT:  Okay.  Okay.

MR. TREYZON:  Good afternoon, Your Honor.

THE COURT:  I ask a question for the record, please.

MR. TREYZON:  Good afternoon, Your Honor. Boris Treyzon, for the plaintiff.  My understanding is we have Mr. Petrucelli tomorrow, Mr. Schanzer tomorrow, and I think --

MS. WILLIAMS:  We have a deposition claim.

MR. TREYZON:  We have some?

MS. WILLIAMS:  No, they do.  They do.  Oh, they do.  (Crosstalk).

MR. TREYZON:  (Crosstalk).  Well, we're not calling (crosstalk).

MS. WILLIAMS:  (Crosstalk).  Correct.

MR. TREYZON:  Yeah.  So, Your Honor, I think for our sake, and we're happy to work with counsel, to work with witness availability, Mr. Schanzer, Mr. Petrucelli in reverse order, and then some deposition claim.

THE COURT:  Does that include Mr. Farrell and

Page 322

Mr. Kantowitz?

MR. TREYZON:  I believe so.

MR. LOWENSTEIN:  I don't --

MR. TREYZON:  Huh?  Oh, and possibly Mr. Vet. I'm not sure if he's (inaudible).

MR. LOWENSTEIN:  Okay.  Hold on.

THE COURT:  Let him talk.  And then, Mr. Lowenstein, I'll give you all the time you need.

MR. LOWENSTEIN:  I'm not -- I was just trying to --

THE COURT:  I know.

MR. LOWENSTEIN:  I'm just trying to shut out all the --

THE COURT:  I know.

MR. LOWENSTEIN:  -- (crosstalk).

THE COURT:  Trying to listen, as am I, as to what Mr. Treyzon is saying.

MR. TREYZON:  So if I may start again, Your Honor --

THE COURT:  Go ahead.

MR. TREYZON:  -- so it comes through not disjointed.  Mr. Petrucelli, Mr. Schanzer, possibly Mr. Vet depositions of, I believe, Mr. Kantowitz and Mr. Farrell possibly.  That's what I'm aware of right now.

Page 323

THE COURT: Okay. Now, Mr. Lowenstein, if you need to talk, that's fine.

MR. LOWENSTEIN: I think I got this, Your Honor. All right. So the live witnesses are priorities for us because Ms. Lee has flown in from California. Mr. Whitsitt is here. She is here. Mr. Whitsitt is here from Seattle. And obviously, Ms. Bramer and Mr. Quilling have been here all throughout. The biggest time crunch is Mr. Whitsitt, he has got to be back to a -- something in Seattle relating to important things that I don't remember the details of. So he's got to testify tomorrow. I think we've got flexibility on Lee to go to -- when is tomorrow? Wednesday?

THE COURT: Wednesday.

MR. LOWENSTEIN: I think Ms. Lee can go to Thursday. And obviously, Mr. -- Ms. Bramer and Mr. Quilling can go towards the end of the week as well. So our one need is that Mr. Whitsitt get on and off tomorrow. The depositions, we can play them when we can play them.

THE COURT: Right.

MR. FARAHI: And you, Your Honor, just --

THE COURT: (Inaudible).

MR. FARAHI: Your Honor, Jonathon Farahi, for

Page 324

the record.  We have a little bit of a debate internally.  We want some guidance from the Court.  We have a motion in limine design for Elisa Lee.  She testified she doesn't recall 96 times, I believe, in her deposition.  She testified she didn't speak to Mr. Dundon before the deal.  She doesn't recall any conversations with Mr. Dundon, doesn't recall any conversations with Mr. Zutter, does not recall what documents she reviewed.  So whether you want us to file that formal motion or have us just deal with it when they call her, we just want to ask the Court for some guidance.

MR. LOWENSTEIN:  I don't -- wasn't aware of a jury, so motion limine is a shock to me.  I'm not sure I've seen that.

THE COURT:  Oh, I've received it in court.  I have.  An expert.

MR. LOWENSTEIN:  So and I don't know that they know what we're going to ask Ms. Lee.  They deposed her.  They asked her specific questions.  She didn't know the answer to was this specific invoice in this specific data room on this specific date.  She does know the work product she's created.  You've seen some of it.  So I don't understand that.  I'm sure she can be cross examined with her deposition when she's

Page 325

offered to testify that she is a fact witness that was involved. So I don't really know what exclusionary rule would apply to keeping us from putting on a witness that we want to defend ourselves.

THE COURT: It's a fact witness, correct?

MR. LOWENSTEIN: It's a fact witness.

THE COURT: Usually, Mr. Farahi, when I see a motion in limine, it says to an expert. On a fact witness, to Mr. Lowenstein's point, usually what happens is judge shouldn't recall anything. I get elicited through direct or cross-examination, so.

MR. FARAHI: Totally understand, Your Honor. We just -- there's been complaints about how long this is taking, so we're trying to truncate where we can.

THE COURT: I don't think in this context, Mr. Lowenstein's point, a motion in limine is necessary. I'll deal with it through the examination. If you're of the opinion that the witness steadily has a recollection on events that she previously did not in her deposition, sort of what was suggested today, we'll deal with it on cross-examination.

MR. FARAHI: Thank you, Your Honor.

THE COURT: And I appreciate you bringing this to the Court's attention. Okay. So now with that done, can we get -- the one witness that you

Page 326

communicated in tomorrow, sir, was?

MR. LOWENSTEIN: Ours was Mr. Whitsitt, who's one of our experts.

THE COURT: Can we get Mr. Whitsitt tomorrow?

MR. HOCKADAY: So I think if Mr. Petrucelli is the first witness in the morning, I think Mr. Whitsitt can follow that.

MR. LOWENSTEIN: Yeah. And Mr. Schandler was designated as a rebuttal to Whitsitt --

MR. HOCKADAY: Yeah.

MR. LOWENSTEIN: -- so it kind of makes --

MR. HOCKADAY: Yeah.

MR. LOWENSTEIN: -- sense to be a good order and they'll all be very efficient witnesses, I believe.

THE COURT: So we'll at least get through those three individuals, would that be accurate tomorrow?

MR. LOWENSTEIN: I think that that would be a good pace to get through.

MR. TREYZON: Your Honor, Boris Treyzon once again. I believe so. We will -- once again, a plan to -- it is our plan to use the depositions so there is no dead time so you use it efficiently. With Court's permission, if it is used for those purposes,

Page 327

we can play that.  But we can stop the depo to accommodate the witness and go back and forth, and we will do our very best.  And, Your Honor, I don't know how long, from when to when, the Court was planning to go tomorrow.  We don't want to strain the Court in any way, but I -- absent something unpredictable, I cannot imagine not being able to get Mr. Whitsitt done.  And I'll represent the Court if I have to interrupt the witness.

THE COURT:  So the real question you're sort of asking is, Judge, how much more time are we going to get?  We got three days.  And, you know, I'm going to -- I can do this one of two ways.  I won't tell you and say you got until 5:30 on Friday and let you figure it out.  But that's kind of a crummy way of dealing with things.  And if I were in your shoes, I wouldn't like that very much.  But I think for tomorrow and tomorrow only, and I don't want my law clerks to fly with chairs, clear this with frankly the most important person to me, which is this young lady in front of me, we can start at 8:00 in the morning, but we're going to be done by 5:30.

MR. TREYZON:  Makes perfect sense.

THE COURT:  A little bit -- I prefer to start earlier then go later because then the problem is I

Page 328

know you guys are preparing. You got to eat. My staff needs to get home. Who's our ERO tomorrow?

MS. FLORES: (Inaudible).

THE COURT: You think you'll have any problem coming at 8:00? So we'll come in at 8:00 tomorrow. My law clerks might not appear exactly at 8:00 because they -- but that's not a problem, then we'll go to 5:30.

MR. TREYZON: Perfect, Your Honor. Thank you so much for the accommodation.

THE COURT: Sure. Anything else, Mr. Farahi?

MR. FARAHI: Yes, Your Honor. I'd be remiss on behalf of all the attorneys not to ask how your wasp is, your wasp thing is doing?

THE COURT: I bumped into -- in full disclosure, I bumped into -- I think I indicated the other, Mr. Ebersol and Mr. Saltz and his daughter, and Mr. Ebersol said they're going to give you a steroid shot. And so, sure enough I went in and she goes, "Ooh, that's really bad. Would you like a steroid shot?" "Yes, I would." And I can tell abated it's not completely gone. And tomorrow I start on steroids to finish it up. And thank you for asking. I'm feeling much better. My law clerks expressed some concern because that was very sweet about my wellbeing

Veritext Legal Solutions
800-336-4000

because I was not at my best. So they were concerned.

MR. LOWENSTEIN: The answer to, you want a steroid shot, is always yes.

MR. HOCKADAY: Yeah.

THE COURT: No matter what's happening. You see, and it did really help tone things down a bit. I'm still red in the face, but it's not nearly as much.

MR. LOWENSTEIN: That's great.

MR. TREYZON: But you can see you're red in the face.

THE COURT: I can see that. Honestly, that was a problem yesterday. With all the puffing, it was hard to focus on everything because it was just really straining me. So thank you for asking.

MR. FARAHI: Of course, Your Honor.

THE COURT: All right. So Mr. Whitsitt 8:00 o'clock sharp, right?

MR. TREYZON: We're going to start -- we're going to do Mr. Whitsitt after --

MR. FARAHI: Petrucelli first.

MR. TREYZON: -- Petrucelli first.

THE COURT: I'm just going to warn you, my -- I had to schedule some first day motions tomorrow. They're at 8:30, but let's take advantage of the half

Page 330

hour. I'll stop. I can usually prep this counsel to get things done in about 20 minutes.

MR. TREYZON: Perfect, Your Honor. So as we said, Mr. Whitsitt can plan on going first immediately after lunch, regardless of what's up. By what's up I mean which witness --

THE COURT: Yeah, I know.

MR. TREYZON: -- which witness is up. And if we have any dead time, we'll fill it useful.

THE COURT: Okay. So who's first in the morning then? Just so we're clear.

MR. TREYZON: Mr. Petrucelli.

THE COURT: Great. Okay.

MR. LOWENSTEIN: And just so we're clear, it's Petrucelli first, then Whitsitt, then Schanzer?

MR. TREYZON: Correct.

MR. LOWENSTEIN: And then video, if any, at the time after that.

MR. TREYZON: Correct. My only -- the only caveat I put in there, if we have dead time in between, we're happy to fill it in with someone else.

THE COURT: Oh, I completely agree. That's fine. We can go back and forth. Yeah.

MR. LOWENSTEIN: Oh yeah. Could -- our request would be if we finished with Schanzer, those

are the three, we get started with Lee because she's early.

MR. TREYZON:  Yeah.

MR. HOCKADAY:  Yeah.

MR. TREYZON:  Absolutely.

MR. LOWENSTEIN:  I think that's --

MR. TREYZON:  Yeah.  that was understood, Your Honor.

THE COURT:  Okay.

MR. TREYZON:  I should have set it out.

MR. LOWENSTEIN:  I figured that was --

MR. TREYZON:  Yeah.

MR. LOWENSTEIN:  -- what it was.  Okay.

THE COURT:  Anything else?

MR. TREYZON:  No, Your Honor.

THE COURT:  All right.  Thank you.  I'll see you at 8:00 in the morning.

MR. LOWENSTEIN:  Thank you, Your Honor.  Thank you everybody.

THE COURT:  Court's in recess.

COURT CLERK:  All rise.

(Whereupon, the proceeding was concluded.)

Page 332

CERTIFICATE OF TRANSCRIBER

I, RODIE DEAN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Rodie Dean*

RODIE DEAN

Page 333

**[& - 14th]**

| | | | |
|---|---|---|---|
| **&** | 228:23 235:9 | **114** 197:7 | **124** 203:17 |
| **&** 3:18 4:4,11 | 236:3 254:5 | 203:3 | **126** 5:12 80:22 |
| 4:18 161:10 | 270:5,10 271:5 | **116** 244:6,7 | 80:24,25 81:3 |
| **0** | 279:9,12 | **1171** 5:16 | 81:5 |
| | 308:17,21 | 188:23 189:1 | **12:27** 247:17 |
| **0** 91:16 | 312:6 | 189:12,13 | **12:40** 321:8 |
| **0.2** 155:17 | **100** 36:17 59:8 | 207:2 | **12th** 81:16 |
| **0.3** 249:24 | 60:4 103:20 | **1176** 14:20 | **13** 5:15 148:21 |
| **1** | 121:18 133:13 | 22:1 80:10 | 191:12 193:12 |
| | 135:16 178:11 | **11:30** 222:16 | 194:19 269:17 |
| **1** 6:9 33:17 | 178:13 206:13 | **11:53** 240:2 | **132** 239:21 |
| 73:15 74:3 | 226:4 236:7 | **11:58** 145:3 | **135** 182:9 |
| 88:25 131:15 | 237:14 260:9 | **12** 5:12,17,19 | **1350** 6:9 |
| 131:17,20 | 268:25 | 81:13,20,23 | 269:18 271:17 |
| 147:22 153:1 | **100,000** 133:12 | 82:1,7,11,22 | 272:4,6 |
| 216:22,23,24 | **100x** 135:17 | 83:18 84:25 | **136** 179:7 |
| 217:9,9 259:17 | **104** 101:23 | 87:12 114:22 | 180:17 186:17 |
| 263:23 264:4 | **1052** 5:15 | 123:9 259:15 | **13th** 273:7 |
| 265:12 269:21 | 13:17,19,23,24 | 305:25 | **14** 32:8,18,21 |
| 286:13,17 | 13:25 14:4 | **120** 169:1 | 63:8 117:5 |
| 287:16 311:16 | 15:6 | 230:2,12 | 160:7 177:5 |
| 311:19 | **1065** 218:16 | **1204** 265:24 | 183:10 188:9 |
| **1,093,874** 82:22 | **10:15** 78:19 | **1208** 74:10 | 191:15 283:20 |
| **1.09** 82:25 83:8 | **10:55** 97:14 | 79:4,17,23 | 310:18 315:7 |
| 83:17 | **10a** 286:5 | **1225** 71:25 | **1415** 61:10,13 |
| **1.7** 82:24 | **11** 70:19,22 | 72:2,15 | 93:17 94:2 |
| **10** 5:6,13 28:17 | 81:24 82:1 | **1230** 84:8 | **1437** 7:15 |
| 101:16 106:18 | 189:11 232:2 | **1232** 5:17 | **1438** 7:15 |
| 114:12 151:4,7 | 267:17,25 | 85:17,23,24 | **1439** 7:15 |
| 198:20,24 | 268:6 305:9,13 | **1234** 5:18 | **147** 6:4 229:12 |
| 199:1,14,24 | 305:21,25 | 87:10,14,25,25 | 229:22,24 |
| 201:2,11 203:9 | 316:16 318:10 | 88:2 | 230:2,9,14 |
| 203:10 204:12 | 320:5 321:6 | **1236** 5:19 | **14th** 193:24 |
| 204:15 220:21 | | 83:25 84:9,10 | 224:13 |

Veritext Legal Solutions
800-336-4000

**[15 - 214]**

**15** 47:20 78:18
101:15,16
104:6 114:24
117:5 129:8
145:8 259:15
**150** 33:14
**150,000** 26:5
**15th** 244:11
**16** 92:15 93:6
118:9 133:4
142:4 193:5
194:9,18
**1600** 2:15 3:5
**166** 291:24
296:14
**168** 103:3
111:13 233:6
**16th** 134:24
273:7
**17** 43:11,13
118:9 222:5
**1717** 3:12
**173** 6:6
**177** 247:6
**18** 313:4
**180** 58:23
**182** 184:20
187:6 190:20
190:21
**18266** 333:14
**187** 6:5 265:8
265:12 266:8
266:10

**189** 5:16
**18th** 54:11
**19** 248:5
**1900** 3:19 4:5
4:12,19
**1:00** 145:4,10
**1:27:59** 171:17
**1s** 311:11
**1st** 65:3 73:17
250:2

---

**2**

**2** 81:17 82:16
83:11 84:20
86:8 88:6
204:14 229:10
229:13,18,21
230:4 235:9
249:20 272:24
290:16,17
312:6
**2,842,742** 82:7
**20** 30:7,15 71:6
71:8 72:10
78:12 110:21
110:21,21,22
110:22,22,23
118:9 128:15
133:14,14
136:11 143:14
151:6 160:3
195:3,5 331:2
**200** 2:15 3:5

**200,000** 133:13
**2005** 99:13
**2006** 102:18
104:9 312:23
**2007** 113:20
188:10
**2008** 113:21
**2011** 114:22
282:12 312:2
**2014** 111:10
114:5 213:25
**2015** 118:22
128:21 132:3
132:16 133:4
216:15
**2016** 132:22
134:21,25
142:4 197:18
311:23,24
**2017** 197:23
**2018** 198:4
313:15
**2019** 5:11,13,14
5:15,17 6:9
10:19 14:6
22:6,13 28:17
29:4,9,21
30:15,20,21
32:1,8,18,21
33:7,17,20
34:7 42:5,15
42:24 43:15
44:10 45:15
50:4,12 51:24

51:25 53:21
63:8 64:12
66:10 72:21
73:15,17 74:3
80:4,15 81:13
81:17 82:16
83:11 84:20
86:8 88:6,25
92:15 93:7
131:19 148:22
160:7 177:5,21
181:5 183:10
187:17 190:16
191:25 203:23
204:15 213:14
222:5 238:24
240:2 251:16
252:2,3 269:21
310:18 311:17
311:18,19
313:4 315:7
321:8
**2021** 204:14
310:8
**2025** 1:13
310:12
**20th** 197:10,13
**21** 33:7,20
154:1 160:14
193:16,16
203:23
**2100** 2:6
**214** 3:15,22 4:8
4:15,22

Veritext Legal Solutions
800-336-4000

**[21st - 3:30]**

**21st** 33:18,18
 34:7
**22** 43:4,7 168:8
 171:23 176:8
 176:10 177:9
 179:5,19
 188:17 191:25
 258:21
**22-05077**
 262:13
**22-05078** 1:8
 8:19
**223** 46:4,6,7
 50:2
**23** 5:11 37:11
 37:16,17,18,22
 37:23 41:22,22
 42:3
**230** 6:4
**231** 109:12
**2323** 3:19 4:5
 4:12,19
**237** 6:6 172:25
 173:5,7 175:19
 177:10 184:1
 191:4 195:10
 203:10 314:7
 314:16
**24** 5:11 42:5,15
 43:15 44:10
 136:7 194:11
**24th** 275:22
**25** 10:19 26:19
 42:23 45:15

92:9 109:12
 181:5 206:12
 238:24 240:1
**250** 34:8,21,24
 35:2,2,5,17,18
 36:4,15,25,25
 38:6,9,24
 39:15,22 40:3
 40:11,15,19
 41:3,10,13
 58:11,18 110:6
 128:3 167:16
 168:6 182:19
 274:8,13,14,15
 274:16,17
 275:8,12 276:1
 276:4 309:1
 316:14,24
 318:1,4
**25th** 228:19
**26** 8:6,9 22:6
 22:13 80:14
 190:16
**261** 6:7 261:23
 264:23 265:1
 289:19,20,22
 289:23 290:5
 291:1 292:9
 295:19 296:2
 296:23
**265** 6:7
**266** 6:5
**268** 310:8

**27** 50:4,11
 51:24,25 64:2
 64:12 66:10
 67:12 187:16
 247:6,7 252:3
 299:6 308:8
**271** 289:16,18
**272** 6:9
**273** 46:6
**274** 6:8 286:12
 287:6,7
**27th** 49:22
 247:17
**28** 5:13
**280** 27:5 29:2
**280,000** 24:5,9
 26:8,11 27:2
 28:19
**2800** 3:12
**286** 10:11 15:6
 18:4 21:1
 237:24 238:3
**287** 6:8
**288-4367** 2:18
 3:7
**289** 5:6
**28th** 227:19
**29** 72:21 80:4
 191:15
**290** 234:10,16
**298** 91:25
 92:14 94:9
 96:16

**29th** 80:1
**2:58** 166:15
**2nd** 81:14
 273:8

**3**

**3** 1:13 5:14
 321:8
**3/27/2019**
 188:1,6,11
**30** 159:9
 185:11,13
 197:18,19
**300** 107:10
**302** 5:13 27:23
 27:25 28:5,6
**311** 88:17,18
**318** 256:25
 257:5 258:9
**32** 117:22
**320** 5:14
**34** 309:15,24
**35** 104:7
**350** 113:3
**36** 259:15
**37** 5:11 259:15
**39** 217:8
**3:00** 127:24
**3:22:47** 171:21
**3:28** 168:20
 171:25
**3:28:00** 172:1
**3:30** 254:5

Page 3

**[3:40 - 99.99999]**

| | | | |
|---|---|---|---|
| **3:40**  254:5 | **5:30**  288:4,6 | 93:1 94:17 | **8** |
| **4** | 322:1 328:14 | 95:10 157:3 | **8**  192:9,11 |
| **4**  68:22 69:7 | 328:22 329:8 | 160:1 162:4,23 | **80**  134:9 |
| 248:22 | **5:36**  79:25 | 163:6 168:5 | **805**  148:14 |
| **400**  284:11 | **6** | 190:2,8,18 | 193:15 |
| **424**  2:18 3:7 | **6**  132:22 134:1 | 194:24 205:7 | **807**  309:10 |
| **426**  312:13,14 | 185:11,13 | 205:19 247:12 | **81**  5:12 |
| **43**  276:14 | **60**  195:2 217:9 | 248:5 270:13 | **821a**  170:19,22 |
| **44**  276:14 | **615**  1:16 | 271:1 272:12 | 172:8 |
| **45**  211:22 | **629-7100**  2:10 | 272:13 308:23 | **830**  166:8,8 |
| 259:21 | **6:01**  269:21 | 308:24 315:6 | **84**  5:19 |
| **5** | **6th**  250:3 | 316:7 | **85**  5:17 114:23 |
| **5**  5:15 14:6 | **7** | **7026-1**  283:16 | **86**  160:4 |
| 106:18 | **7**  1:4 8:20 | **71**  82:12,18 | 162:12 |
| **5.1**  156:2,21 | 60:10 61:6 | 83:4,14 274:23 | **88**  5:18 |
| 163:5 193:17 | 63:1 235:9 | **71,093,874**  82:8 | **8:04**  197:10 |
| **50**  114:12 | 267:18,25 | **71.09**  85:1 | **8:30**  330:25 |
| 119:9 135:1,14 | 268:7 301:1 | 306:6 | **9** |
| 191:21 192:18 | 302:2,15 303:9 | **72**  110:7 | **90**  101:12 |
| 192:19 195:17 | 303:17 305:8 | 288:18 | **911**  98:21 |
| 197:3 198:4 | 305:17,20 | **740-1400**  4:15 | **91436**  2:16 3:6 |
| 250:12 263:18 | 308:17,21 | **740-1410**  4:8 | **917**  32:24 38:5 |
| **51**  183:16 | 312:23 320:5 | **740-1429**  3:22 | **939-5677**  3:15 |
| **53**  198:20,24 | 321:6,13 | 4:22 | **955**  228:15 |
| 199:24 200:5,7 | **70**  52:12,18 | **7419892**  1:18 | 229:23 |
| 279:9,12 | 53:4,23 54:12 | **75**  63:9 162:13 | **96**  325:4 |
| **531**  5:14 | 54:18 55:8,12 | 176:3,3 206:11 | **967**  43:22 45:8 |
| 319:21 320:15 | 57:11 68:22 | **75201**  2:7 3:13 | **972**  2:10 |
| 320:16,24 | 70:20 71:5 | 3:20 4:6,13,20 | **98/320**  5:5 |
| **53a**  286:5 | 82:17,24 83:4 | **75th**  111:4 | **980**  244:6 |
| **55**  157:3 | 83:13,15 85:9 | **78205**  1:17 | **99**  65:17 |
| **5:00**  288:2 | 85:10 89:7 | | **99.99999** |
| | 90:11 91:4 | | 153:18 |

Veritext Legal Solutions
800-336-4000

**[9:28 - accommodation]**

| | | | |
|---|---|---|---|
| **9:28** 222:5 | 175:24 176:2 | **abated** 329:21 | **absent** 328:6 |
| **a** | 177:13,22 | **abbreviate** | **absolute** |
| **a.m.** 222:16 | 178:4,7 181:3 | 107:21 | 127:17 |
| 240:2 321:8 | 181:7 182:3 | **abbreviation** | **absolutely** |
| **aaf** 7:17 10:7 | 183:6 184:4,6 | 13:13 | 32:10 49:15 |
| 10:22 11:9 | 187:12 190:1 | **abilities** 89:17 | 113:14 126:6 |
| 18:8,24 22:9 | 191:11,13 | **ability** 25:6 | 131:14 142:1,8 |
| 23:6 24:4 | 195:14,17,18 | 27:6 150:6 | 144:6,19 |
| 30:16,24 31:6 | 196:25 197:4 | 151:12 174:3 | 167:10 170:11 |
| 31:6,21,25 | 197:22 199:20 | 243:25 333:7 | 177:7 194:16 |
| 32:4,17 37:7 | 202:16 203:6 | **abir** 2:14 3:4 | 211:19 218:20 |
| 48:10 52:5,12 | 203:11,14 | **able** 29:12,14 | 225:13 227:6 |
| 53:3,8,22 | 207:6,10 | 45:20 57:14 | 231:12 256:8 |
| 54:18 55:10,15 | 232:25 237:3,8 | 100:1,9 102:24 | 267:1 273:16 |
| 55:19,21 57:17 | 237:16 240:22 | 110:8 111:6 | 320:3 332:5 |
| 59:4,21 60:3,6 | 240:25 241:20 | 122:4 128:6 | **abundantly** |
| 69:1 72:17 | 252:13 253:4 | 129:19 141:1 | 129:20 270:21 |
| 79:20 82:2 | 266:19,24 | 141:10 142:17 | **academic** 105:8 |
| 83:3,11,15,16 | 267:11 270:10 | 151:15 165:12 | **acceleration** |
| 85:5,14,15 | 272:14 273:14 | 169:4 182:6 | 110:24 |
| 86:21,23 89:21 | 273:15,22 | 206:16 209:17 | **accept** 138:10 |
| 90:7 96:19,21 | 275:10 276:3,9 | 218:9 226:19 | 240:13 |
| 125:1 127:23 | 279:16 284:22 | 228:11 238:18 | **acceptable** 79:8 |
| 131:20 137:6 | 285:1 286:22 | 240:6,16 | **accepting** |
| 137:20 141:25 | 300:25 301:5 | 251:25 269:4 | 71:21 |
| 142:7 147:4,24 | 302:12 303:9 | 273:5 279:10 | **access** 133:8 |
| 148:6,8,13 | 303:18 305:21 | 279:11 287:25 | 134:3,15 |
| 150:1,2,2 | 307:12 310:21 | 328:7 | **accommodate** |
| 154:22 155:5,8 | 313:7 315:17 | **above** 17:19 | 97:3 125:14 |
| 155:11 158:14 | 316:18 | 151:16 311:12 | 328:2 |
| 158:15,20,21 | **aaf's** 95:16 | **abruptly** 68:10 | **accommodati...** |
| 160:17,18 | 167:7 182:12 | **absence** 45:18 | 319:16 |
| 165:16 172:13 | 200:12 280:7 | 240:4,15 | **accommodati...** |
| | | | 329:10 |

Veritext Legal Solutions
800-336-4000

**[accompany - addressed]**

| | | | |
|---|---|---|---|
| **accompany** 81:24 | **accusing** 274:11 | 235:6,17 | 269:16 275:18 |
| **accompanying** 283:5 | **acknowledge** 61:8 | **activity** 16:12 171:12 | 284:25 286:10 289:15 296:3 |
| **accomplish** 228:4 | **acknowledged** 36:3,13 269:3 | **actslaw.com** 2:17 | 301:20 302:25 307:4 309:15 |
| **account** 216:8 253:3 | **acknowledge...** 44:18,25 193:3 | **actual** 18:19 56:6 248:23 | 313:9 |
| **accountants** 123:19 | **acknowledging** 23:3 | 261:7 264:2 283:22 290:16 | **acumen** 143:17 **acutely** 256:12 |
| **accounted** 300:21 | **acquiescence** 246:6 | **actually** 11:15 18:24 25:11 | **ad** 255:8 **add** 20:10 21:8 |
| **accounting** 218:8,23 | **acquire** 213:23 | 30:25 32:3,14 38:21 42:4 | 31:3 44:11 94:23,24 |
| **accounts** 29:19 57:14 59:3 | **acquired** 63:9 311:23,24 | 46:12,20 63:22 65:22 75:8 | 139:13 162:23 **added** 162:3 |
| 156:13,16 216:7 249:7 | **acquiring** 113:24 | 97:6 99:6 101:13,23,24 | **adding** 47:13 167:2 205:20 |
| 299:11,19 300:11,21 | **acquisition** 108:22 127:23 | 115:15 120:19 129:13 133:17 | 310:4,5 **addition** 178:1 |
| 301:9 311:1 | **acquisitions** 106:23 | 137:14 138:19 150:13 160:3 | 191:9 |
| **accumulated** 191:11 | **acted** 170:15 | 163:1 164:4 165:13 174:22 | **additional** 21:7 25:7 40:5 52:5 |
| **accurate** 78:14 96:6 213:16 | **acting** 89:21 300:9 | 177:24 178:4 179:7 184:4 | 69:7 70:19,22 71:5 83:7 |
| 291:20 327:17 333:5 | **action** 187:17 208:9 209:3,4 | 185:24 189:17 191:2 205:12 | 152:10 248:22 259:7 268:10 |
| **accurately** 291:8,15 | 228:19 250:2,9 333:8,12 | 210:9 213:6 214:2 216:24 | **additionally** 199:2 |
| **accusations** 276:23 | **actions** 273:13 304:21 305:1 | 227:18 228:17 232:22 243:18 | **address** 241:20 249:7 294:25 |
| **accused** 274:4 274:7 277:11 | **active** 217:10 **actively** 217:16 | 244:7 245:16 247:7 254:18 | **addressed** 73:2 137:23 199:15 |
| 277:14 | **activities** 17:7 21:16 30:21 | 259:14 265:4 | 200:8,8 285:2 299:19 300:10 |

Veritext Legal Solutions
800-336-4000

**[addresses - ahead]**

| | | | |
|---|---|---|---|
| **addresses** 299:10 | 166:8 168:9 173:6 184:21 189:12 192:20 192:21 203:3 229:6,21 230:13 234:10 262:2 264:21 265:9,13 266:4 266:8 272:5 283:6 287:4,6 309:12,14 312:15 | **advisor** 121:5 142:18 | **ago** 110:12 143:20 167:12 194:5,6 |
| **addressing** 301:17 | | **advisors** 123:17,19,23 239:4 277:3 | **agree** 36:7,13 47:21 49:20 |
| **adds** 248:21 | | **advisory** 104:15 106:22 | 50:16 53:24 57:20,21 67:17 |
| **adequate** 59:1 60:19 108:13 127:9 | | **af** 217:18 222:19 228:10 | 77:4 86:15,20 95:4 125:6 |
| **adhc** 313:24 | | **afdcp** 234:17 | 140:14 159:3 159:14 257:11 |
| **administration** 15:23 | | **affect** 284:5 | 272:2 282:9,14 297:4,9 331:22 |
| **admissible** 49:6 74:23 75:25 | | **affidavit** 293:16 294:5,8 | **agreed** 7:13 35:15 36:24 |
| **admission** 8:6 76:6,21 77:3 233:15 287:2 | **advance** 164:18 281:8 | **affiliate** 147:5 | 129:3,9 140:13 |
| **admissions** 157:19 284:12 | **advanced** 18:21 38:21 | **affiliated** 237:16 | **agreeing** 45:19 87:1 96:8 226:21 240:5 |
| **admit** 76:20 162:14 188:25 230:9 233:8,24 233:25 264:18 271:22 320:6 | **advantage** 330:25 | **affiliates** 131:5 131:16 147:7 | **agreement** 7:25 41:24 42:12 43:12 44:19 45:1,19 70:6 |
| | **adversarial** 113:25 | **affiliations** 273:14 | 117:23 163:11 164:9,9 176:12 |
| | **adversary** 8:19 281:8 | **affirmative** 60:17 | 181:20 190:9 206:7 240:5,11 |
| **admitted** 5:9 10:11 14:21 22:1 32:25 37:22 43:22 46:24 61:11 64:3,5 65:18 72:1,4 81:3 84:9 85:23 88:1,17,19 154:3 162:16 162:17,18 | **adverse** 109:21 153:14 255:9 | **affirmatively** 54:17 55:10 | 240:14 258:17 |
| | **advertising** 148:4 | **afford** 271:24 | **agreements** 164:7 |
| | **advice** 60:14,16 104:14 266:25 267:4 277:8 320:13 321:5 321:12 | **afforded** 259:6 | **ahead** 7:12 10:13 14:2 22:3 28:5 33:1 35:8 36:19 |
| | | **afternoon** 9:8 124:17 127:25 322:6,9 | |
| | | **age** 92:5 146:15 | |
| | | **agenda** 222:10 | |
| | **advising** 113:22 | **agent** 46:19 122:10,12 | |

Veritext Legal Solutions
800-336-4000

**[ahead - answer]**

| | | | |
|---|---|---|---|
| 54:25 57:7 | **align** 206:10 | **allowing** 33:12 | 106:3 107:14 |
| 61:14 62:5 | 241:23 | 158:13 | 109:15 111:14 |
| 64:5 75:13 | **aligned** 241:25 | **allows** 234:25 | 113:20 114:2 |
| 77:14 78:13 | **alignment** | 235:19 | 115:11 |
| 79:1 81:3 84:9 | 140:3 141:10 | **alternatives** | **analysts** 103:1 |
| 94:7 97:24 | **allegation** | 91:14 143:1 | 103:3 111:14 |
| 120:2 125:2 | 207:25 | 164:4 237:21 | 115:19 |
| 137:3 138:12 | **allegations** | **alumni** 101:22 | **analytical** |
| 174:23 179:1 | 201:15 242:19 | **america** 109:10 | 109:17 |
| 180:2 183:5 | 314:21 | 117:23 | **analytics** 139:6 |
| 186:12 196:17 | **allege** 316:17 | **american** | **announced** |
| 200:19 210:2 | **alleging** 316:18 | 134:10 147:7 | 127:25 |
| 220:20 221:9 | **alliance** 147:6 | 147:10,14,19 | **announcement** |
| 232:5 255:4 | 147:10,13,19 | 193:24 223:9 | 198:9 |
| 256:13 258:7 | 223:9,11 | 223:11 | **annual** 105:11 |
| 278:3 292:14 | **allocated** | **ameriquest** | 232:16 |
| 294:21 305:3 | 243:23 | 109:3 | **answer** 16:24 |
| 320:19 323:20 | **allocating** | **ames** 108:25 | 16:24 17:24 |
| **aid** 148:9 | 118:16 | **amount** 24:9 | 27:6 29:14 |
| **aig** 110:1 | **allocation** | 25:24 110:14 | 30:5 35:9 40:8 |
| **airlines** 134:10 | 227:8 | 127:21 149:17 | 40:9,15 41:1 |
| **akin** 202:6 | **allow** 17:20 | 156:2 162:8 | 54:2 56:20 |
| **al** 1:8 8:20 | 26:22 48:15 | 167:4,8 204:13 | 57:6 58:16 |
| **alan** 11:9 20:1 | 49:23 50:14 | 205:16 241:5 | 125:25 130:1 |
| 56:6 154:14 | 68:25 85:7 | 241:15 242:11 | 170:4,6 195:1 |
| 160:16 168:11 | 127:9 164:12 | 244:2 249:1 | 212:24 214:9 |
| 168:19 222:3 | 199:23 202:5 | 274:12 | 219:21,24 |
| 227:15 228:18 | 214:20 243:7 | **analysis** 18:10 | 233:18 248:18 |
| 236:23 237:5 | 278:2 304:12 | 23:10 49:2 | 248:20 258:19 |
| 267:13 | 319:8,13 | 99:3 181:9 | 258:20 302:21 |
| **alarming** | **allowed** 20:8 | 268:3,4 | 303:20 304:12 |
| 177:12 | 112:17 158:25 | **analyst** 101:18 | 306:22 308:1 |
| **alaska** 134:12 | 159:25 201:21 | 102:16 103:14 | 325:21 330:2 |
| | 272:15 | 105:3,5,17 | |

Veritext Legal Solutions
800-336-4000

**[answered - asked]**

**answered**
27:12 40:10,17
40:18 48:7
49:15 72:6
153:10 258:15
**answering**
255:2,2
**answers** 19:13
**anticipate**
60:21
**anticipated**
193:6
**antonio** 1:17
**anwar** 8:24
61:19 284:11
309:16
**anybody**
204:20 223:11
**anymore** 92:9
274:22
**anytime** 117:25
**ap** 6:4 12:15
25:10 174:17
194:9 224:5,7
226:15 230:23
230:23 231:2
252:7,8,11
253:10,11
**apart** 217:1
**apologies** 74:18
231:1
**apologize** 81:17
153:12 187:2
210:8,24 220:3

233:16 238:3
312:14
**appear** 313:24
329:6
**appearances**
8:21
**appeared**
319:10
**appears** 33:22
43:6 50:7
157:8
**applicable**
138:23
**application**
297:7
**applied** 217:4
**applies** 283:14
**apply** 100:11
326:3
**applying**
307:19
**appointed**
115:15
**appreciate**
16:24 92:6
97:5 214:9
230:17 250:14
319:16 326:23
**approach**
186:3,21 287:9
**approached**
197:24
**appropriate**
138:8 214:21

236:19 253:19
307:25
**appropriately**
115:22 164:11
170:6 203:14
270:8 300:10
**approval** 44:18
45:1 126:20
183:22,24,25
185:5,6 205:10
261:14 275:20
276:1
**approvals**
126:15 165:14
**approve** 183:7
206:19 225:7
232:16
**approved**
42:19 62:22
63:24 177:25
316:24 317:4,5
**approves** 62:25
183:19
**approving**
276:4
**approximately**
160:1
**approximation**
290:20 291:7
**april** 5:11,12
5:13,14,17,19
6:9 28:17 65:3
73:15,17 74:3
81:12,14,17

82:16 83:11
84:20 86:8
88:6,25 92:15
93:6 250:2,2
269:21 273:7,8
321:8
**argue** 49:11
**argued** 48:17
48:19
**arguing** 200:23
**argument** 8:9
48:18 158:19
199:5
**arguments**
201:17
**arms** 212:2
**arrangements**
148:4
**arrived** 136:15
**articulate**
217:3 218:25
**articulating**
18:13
**articulation**
149:20
**arts** 100:2,7
**asap** 67:14 86:9
248:5
**asian** 127:25
**aside** 156:19
281:3 304:20
**asked** 22:18,21
25:18 27:12
35:14 39:23

Veritext Legal Solutions
800-336-4000

[asked - authentication]

40:9 47:2 50:8
59:23 112:7
128:21 180:4,5
184:18,19
202:18 211:16
216:22 230:7
239:23 251:2
253:13 258:17
274:13 277:22
285:3 298:17
317:19 320:4
325:20
**asking** 30:2,3
47:25 56:17
70:8 71:13,15
71:16 79:3
87:21 90:19
116:10 179:23
190:13 229:5
232:20 242:10
242:15,24
243:1,3 252:22
258:25 265:9
328:11 329:23
330:15
**asks** 72:25 93:1
243:11
**aspect** 308:22
**aspects** 151:3
200:13
**assemble**
144:14
**assembled**
122:5 128:24

**assembling**
20:5
**assert** 282:16
**asserted** 201:18
279:15 280:3
283:12
**assertion** 19:7
**assessment**
240:25
**asset** 11:24
12:13 16:13
18:14 23:14,24
58:7 108:1
114:12 117:14
117:16 208:12
244:18,22
245:3 297:8,9
**assets** 71:2
118:6,7,18
215:25 244:18
303:18,24
305:15
**assignment**
22:14
**assistance**
211:24
**assisted** 304:16
**associate**
105:24 106:2
109:16 114:3
115:11 141:8
195:15 197:1
**associated** 60:6
75:3 203:5

207:18 208:9
235:2 242:21
250:8 275:10
**associates**
115:19
**association**
276:9
**assume** 91:17
269:8 271:23
**assumed**
251:23
**assumption**
34:12
**assumptions**
82:14 242:15
271:7
**at&t** 222:16
**attached** 33:9
43:2 160:10
227:23
**attaches** 10:22
**attaching** 81:19
**attachment**
43:4 166:16,22
182:18 187:16
202:8
**attachments**
43:5 227:21
**attempted**
198:6
**attempting**
284:6
**attention**
177:18 179:6

191:20 197:7
248:4 249:23
262:11 320:23
326:24
**attorney** 155:5
173:18 182:11
182:12 190:5
200:10,11,12
200:12 207:6,9
333:10
**attorneys** 198:9
207:11 329:13
**attractive**
17:23 53:5,9
68:15
**attribute**
231:16 235:21
235:22
**attributes** 16:1
16:11 17:9,16
**auction** 109:18
**audio** 97:7
333:3
**audit** 25:8
**authenticated**
281:9
**authenticates**
283:18
**authentication**
279:11,18
280:14,19
281:22,23,24
282:4,17
283:16

Veritext Legal Solutions
800-336-4000

[authenticity - bankruptcy]

**authenticity** 283:24 284:4,5 284:8
**authority** 73:19 175:25 176:2 176:17 177:6 177:23 179:10 179:18,20 180:7 181:14 183:11
**authorization** 74:8
**authorized** 74:3 178:2,5 184:5
**authorizes** 88:9
**autonomy** 113:11
**availability** 128:8 322:22
**available** 49:13 128:11
**avenue** 2:6 3:19 4:5,12,19
**avoid** 144:1 220:14
**avoided** 76:17
**aware** 24:4,6 29:6 31:6,20 31:24 32:16,19 32:20 35:1 49:11 52:9 54:7 55:13 91:9 142:5

147:18 148:10 156:20 167:8 169:11,12,13 193:21,25 203:5 204:20 217:25 220:6 256:13 262:17 263:7 274:8 276:3 301:25 323:24 325:13

**b**

**b** 5:8 6:1 159:9 185:11,13
**back** 16:22 18:5 29:13,17 33:11,21 35:13 43:14,18 47:20 65:16 67:11 80:10 91:11 93:4 94:9 97:13,14 99:24 101:3 115:10 124:18 125:10 135:23 145:4 151:8 160:14 166:21 167:25 170:25 172:8 174:24 184:1 187:24 189:17 190:20,21 191:2,3,5 193:14,14 195:10,12

196:7 203:3 207:2,21 213:6 214:5 220:18 221:4 237:16 250:11 252:3 253:15 254:12 258:19 265:5 267:9 270:3 274:18 289:14 296:6 303:2,23 306:5 320:7 324:10 328:2 331:23
**backed** 117:16 298:18
**background** 98:18
**backing** 215:5
**backlash** 68:10
**backwards** 256:6
**bad** 66:20 151:13 202:11 288:24 329:20
**baf** 221:5
**baird** 200:11
**balance** 118:16 118:17,19
**ball** 52:16
**ballard** 22:7,9 23:2
**bank** 29:19 103:2 104:9 107:2,6,7

109:10 110:5 112:1,15 113:12,16 117:23 118:13 119:4,5,7,13,14 135:24 142:21 216:7 225:24
**bank's** 112:10
**banker** 101:5 102:11 104:18 106:20 122:10 143:3
**bankers** 110:6 126:24
**banking** 101:1 101:9 102:4 104:15 261:14
**bankruptcy** 1:1 60:7,10,25 61:23 72:18 73:24 76:14 77:18 79:6,20 80:18 89:14,22 93:17 94:15 165:2,4 187:22 245:1,4,11,14 245:18,21 265:7 266:20 267:12,16,24 273:7 301:1 302:1,3 303:9 303:17 304:4 304:17 320:4

Page 11

[banks - best]

| | | | |
|---|---|---|---|
| **banks** 105:23 107:2,23,24 110:19 112:8 115:2 118:7,10 118:11 135:23 | 247:18 262:3 264:21 271:6 283:25 284:3 | **belief** 177:5,16 180:7 | 323:23 325:4 327:15,22 |
| **base** 313:13 | **battaia** 2:4 | **believe** 10:11 | **believed** 223:22 |
| **based** 21:15 80:19 84:24 85:3 139:25 140:3 157:2 159:16,17 160:1 164:14 172:14 178:23 183:13 184:22 186:4 191:17 194:23 206:19 213:11,13 225:12,25 237:7 248:6 249:5 262:21 271:8 275:25 294:4 | **bauer** 233:8 | 11:21 13:18 | **bell** 3:18 4:4,11 |
| | **bauer's** 233:23 | 14:21 22:1 | 4:18 |
| | **bear** 110:4 127:21,23 | 26:11,13 27:24 | **bellnunnally....** |
| | | 31:18 32:24 | 3:21 4:7,14,21 |
| | **beaten** 114:8 | 37:12 40:9 | **belt** 47:8 |
| | **becoming** 248:9 | 43:22 44:23 | 154:12 155:5,7 |
| | | 53:2,20 54:10 | 160:5 161:4,6 |
| | **beginning** 186:18 268:15 269:20 | 59:15 60:11,18 | 161:8 180:18 |
| | | 60:19 61:10 | 181:1 182:12 |
| | | 64:2 67:6 70:5 | 182:12,24 |
| | | 71:15,25 73:18 | 187:7 190:5 |
| | **behalf** 2:2 3:2,9 4:2 9:9 24:19 117:24 121:10 157:17 158:10 158:14,21,25 160:17,18 173:11 176:12 177:2 180:8,8 183:9 184:22 185:13 189:24 190:22 193:23 207:22 213:2 230:11 247:14 272:10 273:14 280:1 329:13 | 74:11 79:2 | 207:9 275:10 |
| | | 80:23 87:10 | 275:19 |
| | | 88:17 91:25 | **benefit** 38:12 |
| | | 99:23 110:11 | 60:2 118:18 |
| | | 117:4 129:7 | 142:5 147:13 |
| | | 132:22 134:25 | 147:16 148:3 |
| | | 154:4 155:17 | 227:10 232:25 |
| | | 158:12,19 | 235:21,24 |
| | | 166:8 171:18 | 236:2 239:17 |
| | | 172:6 173:2 | 273:13,17 |
| | | 175:14 182:18 | 277:11,13,17 |
| | | 188:24 192:3 | 277:23 308:19 |
| **basic** 262:13 308:22 | | 201:2 221:22 | **benefited** 276:8 |
| | | 224:2 233:7 | **benefits** 16:19 |
| **basically** 22:23 135:16 215:24 | | 237:6 255:7 | 16:20 133:11 |
| | **behave** 139:19 | 267:3 279:10 | 139:20 141:12 |
| **basis** 39:2,4,15 40:12,16,20 41:3 49:24 51:17 105:9,11 123:4 184:12 208:21 212:18 225:12 235:8 236:1,20 | **behavior** 139:15,16 | 290:5 293:16 | 148:10 273:19 |
| | | 294:13 301:11 | 308:16 313:14 |
| | **belabor** 28:15 | 310:20 313:10 | **best** 89:16 |
| | | 314:20 323:2 | 101:22 144:5 |

Veritext Legal Solutions
800-336-4000

**[best - bottom]**

175:12 186:2
223:8 227:2,6
228:6,10,13
237:10 244:4
245:18 246:16
246:19 290:21
291:10,18
293:22 294:4
296:23 308:20
314:21 328:3
330:1 333:6
**better** 69:2
92:5 105:1
144:7 165:20
318:4 329:24
**beverly** 4:17
9:8
**beyond** 270:12
**bifurcate** 16:14
**bifurcating**
16:5
**bifurcation**
21:2
**big** 109:19
111:24 129:21
130:12 155:17
156:6 164:1
168:5 169:6
283:10
**bigger** 113:8
**biggest** 251:9
324:9
**bill** 25:15,15

**billed** 24:4,6
26:18
**billion** 107:3
109:12,13
114:12,12
117:18,22
118:9 271:6
**billions** 107:11
**bills** 24:21 25:1
25:2,19,22,25
26:25 139:5,9
**binding** 123:12
126:10 166:22
177:2
**bird** 31:24 32:3
**bird's** 32:7
**bit** 98:18 99:9
101:6 102:11
110:17 113:10
113:12 114:15
126:2,3 129:5
143:9 151:21
154:21 155:14
155:24 161:25
163:9 165:3
168:18,19
176:17 191:5
198:2 205:23
209:11 224:9
227:14 228:21
233:5 237:12
237:22 240:20
247:5 252:7
254:25 255:20

277:25 325:1
328:24 330:6
**blackboard**
146:3,17
**blame** 87:7
**blank** 258:13
**blanking** 161:8
**bleeding** 152:7
178:20 226:2
244:2
**bless** 102:8,15
129:23 181:16
208:2 231:21
258:7 288:8
**blind** 319:23
**blood** 212:2
**blow** 149:7
175:24,24
192:5 195:11
203:10 249:24
251:14 270:1
**blue** 66:4
**board** 42:18
59:4,5,6,8,10
59:12,22 62:10
62:15 83:12
86:16 87:1,4
88:8,12 89:21
90:7,25 95:3
95:15,16 96:2
119:2,5 143:4
143:5,8 148:8
167:2 176:4
177:25 181:19

182:17,25
183:2,6,19,24
183:25 185:4
198:5 206:6,7
206:18,21
209:20 212:6
222:20 254:21
261:9,10 263:5
274:14 275:2
275:20,21
276:1,3 289:6
289:14 290:5
293:8 297:2
**boardrooms**
142:18 143:3
**boards** 142:15
143:7
**bob** 197:23
**bod** 96:2,7
**bonds** 217:19
217:24
**book** 218:7
312:15
**books** 128:8
231:4
**boris** 3:3 8:24
322:10 327:21
**borrower**
118:10,12
**bottles** 104:21
104:22
**bottom** 33:5
48:3 50:3
51:11 66:9

Veritext Legal Solutions
800-336-4000

**[bottom - business]**

76:9 81:11 92:18,20 110:22 141:19 146:10 192:7 217:21 313:3

**bought** 110:3 118:6,7 134:21 138:21

**boulevard** 2:15 3:5

**bow** 211:19

**box** 9:23 11:20 12:22 108:3 119:19 215:17

**boxes** 288:18

**boy** 99:7 100:20

**boys** 101:4

**bracewall** 22:20 72:17,21 75:20 266:18 266:23 269:25 302:6

**bracewall's** 266:24

**bracewell** 73:5 92:15,21 94:14

**bracket** 20:25

**bramer** 324:8 324:17

**breached** 302:14 303:8 303:11

**bread** 110:14

**break** 78:3,4,10 78:18 97:12 99:8 124:18 125:17 143:9 144:21 196:1 250:14 254:5 254:18

**brent** 3:10 9:9 84:1 85:18 216:22 258:14 289:15

**brent.hockaday** 3:14

**bridge** 149:18 149:19,19

**brief** 60:18 143:9 288:17 319:1,7,13,17

**briefly** 15:2 98:17 102:6 106:2 125:21 138:15 142:14 143:11 150:8 199:21 224:17 241:3 267:21 311:9 321:3

**bright** 187:25

**bring** 16:22 17:3 82:7 123:17,18 127:20 151:16 216:18,22

**bringing** 16:6 110:5 245:16 308:7 326:23

**brings** 168:4 246:14

**broad** 26:21 107:8 122:19 126:9 134:13 163:24 248:18

**broaden** 120:20

**broadened** 100:10

**broader** 117:13 231:14 258:16 297:15

**broadly** 235:15 236:19

**broke** 79:3 196:21

**brokers** 217:23 260:16

**brought** 19:24 128:3 242:2,17 291:24 292:18

**bubble** 66:14

**bubbles** 66:1,4

**bucket** 110:25

**buckets** 113:4

**budget** 232:15 232:16,18,18 232:19

**build** 116:11 128:21,24 232:19

**building** 85:19 130:8 235:14 288:21 310:5

**built** 133:5

**bullet** 149:6 232:1 249:24 252:8

**bullets** 67:18

**bumped** 329:15 329:16

**bunch** 17:5 98:25 107:22 111:22 121:20 122:13 135:3 153:17 165:17 215:25 222:23 251:24

**bureaus** 119:11

**business** 16:12 16:14,16,17 17:6,23 20:21 21:7,16 22:18 22:19 52:15 54:16 58:25 82:2 91:15,17 99:14,14 100:24 104:25 105:22,22 109:12,19 110:8 113:23 114:13,14 119:1,3 121:23 122:4,6 123:2 123:21 126:16

Page 14

**[business - career]**

130:13 132:17
132:21 134:21
134:23 135:11
135:12,18
136:15 138:22
138:23 140:4,8
140:10,11,11
141:21 143:17
143:19 151:2
152:18 164:2
165:20 177:1
217:12 222:22
222:24 223:4,6
224:25 225:2
225:21 226:1,3
226:8,14 227:1
227:7 228:12
232:13 235:11
235:23 236:6
236:20,22
239:11,19
241:25 242:13
243:20 244:4
245:7,8,12,19
246:4 248:24
253:13,17,20
267:23 269:6
275:1 305:14
306:12 307:5
307:17
**businesses**  21:2
129:1,2 132:9
216:6

**busy**  313:15
**butchered**
  266:2
**buy**  109:11
  128:2 132:16
  243:11 269:8
**buyers**  64:23
**buying**  108:25
  118:1 132:20
**bwhitley**  4:21

**c**

**c**  2:1 3:1 4:1 5:1
  7:1
**cag**  1:8
**calculated**  27:5
**calculation**
  24:14
**calendar**  162:6
  234:16
**california**  2:16
  3:6 108:25
  324:6
**call**  8:17 19:17
  19:18,19,20
  30:10 56:22
  66:24 86:9
  101:15 105:11
  107:20 116:23
  122:16 123:7
  124:9 204:16
  215:18 234:17
  236:8,11,24
  237:5 325:11

**called**  7:17,18
  10:22 11:18
  14:9 99:6
  105:16,23
  108:24,25
  109:3,10 119:5
  123:11 131:18
  242:3
**calling**  149:19
  166:18 321:25
  322:18
**calls**  27:12
  53:11 71:1,11
  236:15 237:3
  302:16,24
  303:21 307:13
  309:4
**cancer**  134:4
**candidate**
  101:1
**candidly**
  157:19 194:5
  201:16
**cap**  31:18
  114:12
**capable**  158:9
**capacities**
  225:23
**capacity**  8:20
  158:10 279:24
**capital**  17:14
  17:17,18 30:15
  30:23 31:5
  52:11 63:9,11

63:13,14,16
82:21 83:7
90:12 92:25
94:5 104:19
117:14,15,25
121:7 130:23
131:6,13,16
132:18 135:19
136:10 142:6
143:6 149:8,22
150:4 151:5
152:10,14
153:15 156:12
157:13,14,17
159:23 173:12
190:2 193:7
195:4 196:23
205:4,9 216:16
217:11 227:8
234:25 235:2
235:22 243:23
248:3,22
253:25 270:6
276:18 308:11
**card**  155:18
  156:8
**care**  133:24,25
  134:3,15
  137:16,23
**career**  107:18
  110:25 120:9
  120:21 125:7,9
  141:8 142:18

Page 15

**[careful - changing]**

careful 276:6
carefully 36:1
carolina 138:21
 140:19 151:22
carry 94:10
 178:6
carvana 312:11
 312:22 313:4,6
 313:18,22,24
 314:2
carve 18:15
 106:23 216:16
case 1:7 8:19
 60:17 69:21
 72:7 129:18
 157:20 169:6
 199:10 200:6
 201:17 223:19
 279:24 301:13
 304:5,19
cases 55:6 61:7
 119:10
cash 17:22
 133:18 140:3
 141:10 152:7
 198:7 217:19
 226:2,15,17
 232:4 245:22
 250:1 252:5
 260:13,14
 310:3,12
cashflow 17:11
catch 238:1

catholic 210:12
caveat 331:20
cbs 32:16 33:11
 33:12 38:7
 150:11
cds 251:19
cease 305:21
ceased 21:19
census 139:4
center 13:10,11
central 79:25
 119:14 155:22
 166:15 168:20
 171:20
ceo 104:20,24
 112:14 128:19
 134:19,20
 135:6,8 136:17
 142:3 177:1
 180:8 208:16
 225:25 253:20
certain 12:14
 17:6 19:16
 21:23 58:7
 91:13 119:2
 126:14 127:19
 169:8 173:19
 235:3,4,17,20
 242:1 256:21
 293:9 308:19
certainly 19:14
 21:9 40:6 55:2
 56:8 141:9
 144:25 167:20

 193:10 194:13
 195:6 201:6
 208:25 257:25
 276:2,18
 278:22 319:25
certainty 140:1
certificate
 333:1
certifications
 99:16
certified 7:16
certify 333:2
certifying 96:5
cetera 11:7
 12:15 16:2,13
 106:24 108:1
 126:16 217:19
 232:8 296:4
 301:14
cfo 24:10,16
 25:2 112:12,13
cfo's 261:17
cfpb 119:12
chain 34:22
 44:9,12 45:9
 73:8 84:15,19
 86:12 91:8
 92:22 94:23
 95:19
chair 34:25
chairman
 134:22
chairs 328:19

chalk 220:18
 221:18
chalk's 221:2
chalkboard
 209:15 210:9
 289:25
challenge 227:4
challenging
 275:16
championship
 68:21 248:21
chance 41:22
 69:2 214:20
 244:22 258:1
 259:7 265:19
 269:10 270:8
change 46:16
 73:10 76:19
 90:13 109:21
 139:18 151:16
 152:11 153:25
 181:9,25 185:2
 204:15 205:2
 223:6 225:1
 234:7 241:23
 275:19
changed 52:21
 139:24 152:19
changes 17:10
 55:22 56:1
 139:15 205:14
changing
 208:20

Veritext Legal Solutions
800-336-4000

**[chapter - clear]**

| | | | |
|---|---|---|---|
| **chapter** 1:4 8:20 60:10 61:6 63:1 81:24 82:1 267:17,18,25 267:25 268:6 301:1 302:2,15 303:9,17 305:8 305:9,13,17,25 320:5,5 321:6 321:6,13 | 267:13 268:23 269:21,22 270:4 274:15 275:3,4 286:21 320:25 | **chippy** 200:9 **choice** 253:9,11 253:25 **choices** 232:23 253:9,13,14,21 **choose** 66:25 256:9 | **clarifying** 94:14 183:25 **clarity** 8:1 93:21 207:3 231:3 232:4 234:21 |
| **characterizati...** 317:3 | **charlie's** 48:20 48:21 **chart** 215:9 263:24 264:1,1 292:21,23,25 296:18 | **chrysler** 117:25 118:1 **circumstance** 26:14 | **clark** 2:4 8:24 9:6 **class** 102:16 111:14 |
| **characterize** 103:13 303:10 | **charts** 20:23 295:11 | **circumstances** 26:22 **citi** 118:13 | **classes** 98:24 **clean** 165:18 **cleaning** 165:19 |
| **characterized** 20:19 93:10 274:3 315:24 | **chase** 104:10 **chatting** 55:5 **check** 12:14 109:12 229:2 229:17 279:2 286:8 318:20 318:24 | **citibank** 109:3 **cl** 111:17 **claim** 6:6 137:14,24 147:24 173:11 174:7 179:14 193:13 195:12 196:24 274:21 285:12 314:9 322:13,24 | **cleanup** 208:12 **clear** 39:13 52:13,17 55:3 55:6 58:22 61:1 76:5 90:11 116:2 129:20 147:22 149:2,8,8,20 |
| **charge** 25:10 25:10 274:21 275:4 313:7 | **checking** 314:3 **checklist** 165:16 | | 150:15 151:18 152:8 162:20 163:1,4 172:18 173:16 183:17 |
| **charlie** 33:11 43:16 44:6 47:7 55:5 56:9 71:12,14,16 73:2 86:9 87:1 87:5 88:25 154:12 157:3 157:18 180:19 183:9 187:9 192:1 194:2 197:18,24,24 207:9,12,21 222:15 266:15 | **checks** 12:4 25:7 29:4,8 **chicken** 251:23 253:18 **chief** 176:13 **child** 243:10 **children's** 213:1 215:12 215:17,22 292:10 296:10 296:17 | **claimed** 195:16 197:2 **claims** 137:14 279:16 283:13 301:13 **clarification** 57:9 **clarify** 163:4 208:18 256:2 259:3 | 186:3 245:6 254:23 270:7,8 270:21 271:1,2 271:8 294:19 310:4,21 328:19 331:11 331:14 |

Veritext Legal Solutions
800-336-4000

**[clearing - committee]**

| | | | |
|---|---|---|---|
| **clearing** 300:16 | 164:23 171:7 | **college** 100:19 | 150:18 185:24 |
| **clearly** 47:18 | 248:2 309:2 | 101:9 105:8 | 232:13 329:5 |
| 71:19 94:20 | **closest** 248:2 | **column** 310:14 | **comment** 58:12 |
| 244:3 | **closing** 163:10 | **come** 9:22 | 73:12 159:16 |
| **clerk** 7:23 | 163:11 | 48:15 49:20 | 179:17 186:15 |
| 78:21 97:17 | **clue** 251:24 | 65:16 69:9,15 | 199:22 |
| 145:12 162:17 | **coach** 140:24 | 70:23 71:9,17 | **commenting** |
| 196:11 254:8 | **coaches** 140:25 | 72:11 97:13,14 | 186:16 |
| 263:3 288:10 | **coburn** 2:5 | 100:3 123:23 | **comments** |
| 288:12 292:18 | **coexist** 206:10 | 124:18 125:10 | 48:20,21 112:8 |
| 332:21 | **cohen** 2:14 3:4 | 128:21 130:12 | **commercial** |
| **clerk's** 293:14 | 6:5 92:15,21 | 141:9 145:3 | 107:6 112:1,14 |
| **clerks** 281:9 | 93:5,6 94:24 | 150:21 157:20 | **commitment** |
| 282:5 328:19 | 95:18 96:9 | 158:5 159:6 | 35:3,6,10,18,20 |
| 329:6,24 | 266:15 | 170:25 185:20 | 36:16 37:1 |
| **client** 114:1,1,2 | **colgate** 98:19 | 196:7 202:24 | 38:7,24 39:22 |
| 134:8 173:18 | **collaborating** | 209:4 231:24 | 39:24,25 41:14 |
| 256:2 257:18 | 139:3 | 231:24 243:7 | 44:19,22 45:3 |
| 312:9,25 | **collaborative** | 269:12 275:6 | 52:17,18 58:11 |
| 313:25 | 237:11,14 | 306:14 329:5 | 90:11 162:2,3 |
| **clients** 113:8 | **collaboratively** | **comes** 47:17 | 162:24 163:6 |
| 118:15 133:14 | 182:5 | 77:14 144:12 | 203:15 270:13 |
| 135:3 193:23 | **collapsed** | 146:4 212:2 | 316:6,10,14,15 |
| **clip** 259:21 | 109:18 | 217:21 243:10 | 316:17,20,25 |
| **clipped** 259:16 | **colleague** 48:12 | 272:4 276:22 | 318:1,4 |
| 259:18 | 249:17 | 323:21 | **commitments** |
| **clips** 213:20 | **colleagues** | **comfort** 78:10 | 52:20 191:12 |
| 258:5 | 272:14 279:10 | 97:12 208:4,6 | 191:14 |
| **clock** 106:15 | 281:15 318:22 | 209:6 | **committed** |
| 314:3 | **collect** 97:2 | **comfortable** | 31:24 109:13 |
| **close** 35:23 | 121:9,20 231:8 | 208:24 268:16 | 118:9 |
| 64:23 78:3 | **collectively** | **coming** 13:9 | **committee** |
| 114:12 126:14 | 215:22 | 29:18,22 100:7 | 143:22 |
| 143:14 144:6 | | 101:9 112:10 | |

Veritext Legal Solutions
800-336-4000

[committees - comprehensively]

| | | | |
|---|---|---|---|
| **committees** 119:3,14 | **company** 15:18 15:20 16:9,10 | **comparative** 99:3 | **completely** 152:21 329:22 |
| **committing** 53:4,22 89:6 176:2 | 17:11 21:12 32:14 68:14 86:17 104:20 | **compared** 99:4 **comparing** 138:4 | 331:22 **completeness** 257:19 |
| **common** 217:4 238:18 289:7 289:10 | 105:20,20 108:23,25 109:2 113:16 | **compelling** 53:1 **compensated** | **completing** 68:18 **complex** |
| **communicate** 189:25 | 119:6 121:11 121:14 128:7 | 273:21 **compensation** | 119:16 134:5 144:12 |
| **communicated** 327:1 | 130:11 131:9 132:19,19 | 139:25 140:3 147:9 241:24 | **complexity** 21:8 |
| **communication** 47:7 57:3 | 138:1 139:19 144:18 149:22 | **competent** 185:8 | **compliant** 119:15 236:17 |
| 74:20 75:8,15 187:12 189:19 | 150:16,21 151:4,10,15 | **competes** 68:13 **competitive** | **complicated** 26:14 |
| 189:21 247:11 | 153:19 161:3 162:8 164:6 | 121:23 | **complies** 235:16 |
| **communicati...** 46:18 200:24 | 177:2 198:5 204:12 205:5 | **complain** 224:4 **complaints** | **component** 19:15 |
| 253:4 | 206:13 216:11 224:21 226:23 | 326:13 **complete** 24:2 | **components** 19:14 51:18 |
| **companies** 15:18,24 17:5 | 231:5,9 235:11 235:12 236:16 | 59:1 69:10 152:2 163:15 | 235:12 236:16 **comport** |
| 24:24 104:16 107:1,3,7 | 239:10 241:4 243:24 246:21 | 172:22 202:9 206:17 207:19 | 198:13 268:24 273:9 275:22 |
| 108:1,9,10,12 113:3,14 114:9 | 253:21,24 276:13,25 | 256:7 **completed** | **comports** 38:8 285:17 |
| 114:24 118:6 119:18 122:11 | 312:1 314:1 316:1 | 63:17 64:24 69:1 107:13 | **composition** 206:13 223:2 |
| 122:12 129:14 132:6,10 | **company's** 149:16 151:6 | 114:6 165:4 168:15,20 | **comprehensive** 278:7 |
| 134:13 142:21 215:24 252:12 | 305:17 | 171:24 172:19 172:22 | **comprehensi...** 122:4 |
| 297:15 298:3 | | | |

Page 19

[comprising - consummating]

comprising
  15:19
computer
  87:22
con   12:7
concept   253:10
  253:23
conceptually
  305:7
concern   82:2
  152:23 185:22
  329:25
concerned
  209:2 330:1
concerns   55:24
concessions
  141:16 226:20
concierge
  133:7 134:16
concisely   126:7
conclude
  125:22 126:4
  278:5
concluded
  332:22
conclusion
  18:14 19:9
  21:18 56:10
  219:21 278:11
  302:17
conclusions
  199:3
concrete
  133:21

concurrently
  165:19,21
  218:14
condense
  277:19
condition   183:7
  271:8
conditional
  127:16
conditioned
  270:11,22
conditions
  165:10 182:6
conducting
  104:3 276:20
confer   147:12
  285:22
conferring
  99:18
confidence
  38:17
confident
  220:11
confined
  235:14,18
confirm   50:3
  57:6 58:3
  272:19 278:24
confirmatory
  123:13 126:12
  164:20
confirmed
  179:18 245:24

confirming
  90:15,18,20
conflating
  224:8
conflation
  241:11
conflicts
  214:14
confusion   72:6
connected
  217:1 294:4
conrad   230:11
consent   62:10
  184:8,10
  187:17 190:14
  190:23 207:21
  207:23 247:15
  267:5 272:11
consents
  165:15
consider   29:23
  47:24 48:9
  224:22 236:20
  251:20 253:23
  253:25 271:14
consideration
  163:1 267:17
  305:24
considerations
  11:18 12:23
considered
  253:10
considering
  101:19 239:16

considers
  253:17
consist   206:22
consistent
  20:22 180:10
  241:7
consistently
  90:22
consists   156:3
consolidate
  218:18
consolidated
  15:22 219:10
constrain   186:8
constraints
  108:11
consultants
  123:20
consumer
  112:20 113:16
  114:1,22 115:1
  116:24 119:10
  128:20 130:7
  130:10 143:4
  214:2,5 313:1
consuming
  70:10
consummate
  176:1
consummated
  132:21 206:16
consummating
  139:3

Page 20

**[cont'd - correct]**

cont'd 6:1
contact 154:22
contained
 179:14
contemplate
 83:21 197:20
contemplated
 274:18
content 70:3
 158:1
contents
 175:13
context 23:8
 35:21 36:15
 38:14 89:5,13
 93:13 111:13
 113:1 114:4,15
 142:20 143:3
 149:15,20
 150:2,17
 194:18 199:8
 232:17 295:17
 316:10,15
 326:15
contexts 26:25
 89:24 245:3
continue 70:15
 144:21 180:14
 192:11 219:2
 231:20 241:17
 250:6 251:23
 252:8,11
 259:23 266:9
 268:2 272:16

278:13 282:19
 303:12 305:18
continued
 103:9
continues
 198:7
continuing
 139:7 225:8
 231:13
continuity
 58:25
contract 25:13
 74:21 75:1
 157:15 275:14
contracts 12:19
 55:16 71:2
 302:14 303:1,8
 303:12 307:10
 308:9
contradiction
 181:22 206:14
 240:11
contradictory
 38:20
contravention
 206:5
contributed
 247:13
contribution
 28:18
control 63:10
 126:18,18
 151:3 152:2,3
 153:23 176:4

181:9 185:2
 187:21 190:1
 204:16 205:2
 247:14 272:10
 275:20
controlling
 274:23
controls 152:15
 181:25 231:11
cont'd 3:1 4:1
conventional
 144:9
conversation
 119:22 159:8
 185:20 239:3,7
 265:7 290:23
 291:13 294:18
 313:16
conversations
 38:15 46:21
 54:8 91:12
 157:2 159:6,7
 160:22 167:14
 173:20 174:12
 184:14 185:18
 194:1,11
 237:13 268:5
 299:21 325:7,8
conveyance
 207:15
cool 115:16
 123:7
copied 96:19
 160:6 171:16

180:19,19,20
 182:11 190:5
 207:9 222:7
 240:2 317:23
copies 7:20,23
 92:21 286:21
 311:6 312:17
copy 168:10
 169:10 171:4
 172:4 314:11
 317:20
copying 187:7
core 118:25
 248:23 249:3
corner 94:14
corporate 63:4
 100:9 104:23
 115:4 116:12
 117:9,10,10
 140:7 158:8
 208:8 209:3
 259:24 289:8
 289:11 294:13
 297:4
correct 10:9,13
 10:20,23 11:1
 11:4,5,8,11,21
 11:22,25 12:1
 12:3,5,6,16,17
 12:20,21,24,25
 13:2,3,5,8,10
 13:11,21 14:7
 14:11,12,18,19
 18:10,20 19:9

Page 21

**[correct - counsel]**

| | | | |
|---|---|---|---|
| 21:14,20 22:7 | 69:3,5 70:20 | 174:14,15 | 313:4,5,7,8,9 |
| 22:8,10,11,14 | 70:21 71:2,6,9 | 181:5,6 182:14 | 313:22,25 |
| 23:3,4,10,11,12 | 72:12,18,19,23 | 183:23 187:13 | 314:23 315:9 |
| 23:13,14,17,18 | 72:24 73:4,7 | 187:14 190:24 | 315:18 316:7,8 |
| 23:20,21 24:3 | 73:11,14,15,19 | 197:14,15 | 316:14 317:17 |
| 24:19,20 26:9 | 73:22,25 74:4 | 201:25 203:25 | 317:18,23 |
| 26:10 27:25 | 76:15 80:5,15 | 204:1 207:6 | 318:1 322:19 |
| 28:1 31:7 | 80:18 81:13,17 | 212:15 214:15 | 326:5 331:16 |
| 32:18 33:1,7 | 81:18,21,22,24 | 215:13,14 | 331:19 |
| 33:21 34:3,9 | 81:25 82:3,8,9 | 244:15 246:7 | **corrected**  39:24 |
| 34:21 37:9 | 82:13,18,19 | 246:17 267:19 | **correctly**  14:8 |
| 39:1,3 40:12 | 83:19 84:22,23 | 268:21 284:20 | 236:25 292:1 |
| 41:15,19 42:6 | 85:12 86:5,10 | 289:9 290:6 | 296:23 308:15 |
| 42:9,20,24,25 | 86:13,19,24 | 291:2,3 292:11 | **corresponden...** |
| 43:2,3,5,9,12 | 87:8 88:7,10 | 292:12,13,15 | 197:9 |
| 44:7,8,12 45:1 | 88:11,13,15 | 292:21 293:9 | **cost**  26:4 27:10 |
| 45:4,5,12,15,16 | 89:11 90:8,9 | 295:9,10 | 28:21 68:22 |
| 45:21,22,23,24 | 90:13,14 91:5 | 296:11,12,15 | 71:5 235:22 |
| 50:6,9,10 | 91:7,22 92:16 | 296:16,20,25 | **costs**  23:7 24:5 |
| 51:24,25 52:2 | 92:17,22,23 | 297:2,15,16,18 | 248:5 |
| 52:3 54:13 | 93:2,3,7,8,11 | 297:23,24 | **counsel**  10:2 |
| 57:15,16,19 | 93:12,14,15,18 | 298:3,4,7,12,13 | 11:4 18:1 27:3 |
| 58:1,11 60:7,8 | 94:11,15,16,20 | 298:14,22 | 44:25 60:14,17 |
| 60:10,13 61:2 | 94:21,24 95:1 | 301:1,10,11,13 | 61:7 63:22 |
| 61:14 62:12,13 | 95:6,7,9,14,16 | 302:8,12,15 | 72:17 74:12 |
| 62:16,17,19,20 | 95:20,21,24,25 | 303:13,14,15 | 95:1,23 123:18 |
| 62:23,24 63:1 | 96:3,4,10,11,19 | 303:19 305:9 | 155:12 160:19 |
| 63:2,18,21,24 | 103:10 112:20 | 305:22,23 | 161:4 165:16 |
| 64:4,12,13,15 | 155:5,6 156:5 | 306:2,13,20 | 167:7 168:1,2 |
| 64:20,25 65:1 | 160:12,25 | 308:24 309:22 | 173:21 174:6 |
| 65:5 66:2,5,6 | 161:5 163:16 | 309:23 310:6,9 | 180:24,25 |
| 66:21 67:8,14 | 163:17 165:6 | 310:13,18,23 | 181:2,7,8 |
| 67:24 68:2,3,5 | 166:9,10,11 | 311:1,4,7,11,23 | 184:21 187:12 |
| 68:6,9,12,23 | 167:5 172:6 | 311:25 312:1,3 | 199:3,9,15 |

Page 22

**[counsel - court]**

| | | | |
|---|---|---|---|
| 255:23 266:19 | 212:12 213:25 | 65:19 69:22 | 159:10,13 |
| 267:4,9 269:25 | 218:2 222:25 | 70:1,14 71:18 | 161:14,18,20 |
| 277:4,8 287:24 | 225:20 226:19 | 71:23 72:4,8 | 162:15,17,18 |
| 304:16,21 | 229:18 233:1 | 74:15,19,25 | 162:21 166:11 |
| 320:13 322:21 | 236:23 242:23 | 75:10,13,22 | 169:22,25 |
| 331:1 333:7,10 | 247:13 251:12 | 76:2,8,23 77:4 | 170:3,25 173:4 |
| **counterpart** | 285:24 330:16 | 77:8,12 78:9 | 174:22 175:17 |
| 104:24 128:7 | **courses** 24:23 | 78:13,18,21,23 | 175:20 178:23 |
| 227:3 228:10 | **court** 1:1 7:2,8 | 79:1,7,12 | 179:1,12 180:2 |
| **counterparts** | 7:12,14,21,24 | 80:24 81:2 | 180:14 183:17 |
| 38:16 226:18 | 8:3,4,8,13,16 | 84:8 85:22 | 184:17 185:9 |
| **couple** 97:3 | 9:2,11,15,17,20 | 87:12,15,18,25 | 186:2,12,20,23 |
| 103:4 132:10 | 9:22 10:1,13 | 88:18 91:18,20 | 187:3 189:1,3 |
| 145:1 147:1 | 13:22 14:2,22 | 92:1,4,9,11 | 189:6,9,11 |
| 154:13 191:24 | 14:24 15:7,10 | 93:21 94:3,7 | 191:22 192:20 |
| 197:17 203:17 | 15:13 16:23 | 96:24 97:1,8 | 195:22,24 |
| 205:1 213:3 | 17:24 18:1 | 97:11,17,19,24 | 196:5,7,10,11 |
| 228:22 231:17 | 22:3 27:16,20 | 99:21 100:13 | 196:13,17 |
| 265:5 269:16 | 27:25 28:2,4 | 102:9 124:5,11 | 199:11,14,18 |
| 272:20 273:4 | 33:1 35:8,25 | 124:21,24 | 199:25 200:2,4 |
| 285:7 287:21 | 36:11,18 37:14 | 125:2,4,7,10,13 | 200:14,18 |
| 287:22,23 | 37:17,21 40:25 | 125:16,24 | 201:9,13,20 |
| 312:7 319:1,7 | 43:24 46:6,9 | 136:1,23 137:3 | 202:3,9,20,23 |
| 319:10,13 | 46:22 47:9,11 | 137:21 138:6 | 208:3 209:17 |
| **course** 19:2 | 47:19,21 48:2 | 138:10,25 | 209:22,24 |
| 29:16 46:14 | 48:11 49:19 | 141:3,6 142:11 | 210:1,5,12,17 |
| 54:23 55:2 | 50:13,20,22,24 | 143:25 144:2 | 210:20,23 |
| 100:8 105:12 | 51:4,6,14,16 | 144:21,23 | 211:8,13,16,19 |
| 116:17 128:4 | 53:12,15,18 | 145:2,6,12,14 | 211:23 212:3 |
| 132:10 170:8 | 54:2 56:12,15 | 145:22,25 | 213:17,22 |
| 172:21 188:13 | 56:18 57:1,5 | 146:5,6,12,15 | 214:7,13,19 |
| 197:13 208:9 | 58:16 60:23 | 146:20,23 | 215:1 219:2,18 |
| 208:17,22 | 61:4,6,12,14,18 | 154:2,7 158:11 | 219:23 220:8 |
| 209:5 211:19 | 62:5 64:4 | 158:16 159:3 | 220:16,18,20 |

Page 23

**[court - crisis]**

| | | | |
|---|---|---|---|
| 221:1,9,11,14 | 281:18,25 | 324:15,22,24 | 238:19 239:9 |
| 221:17 229:5 | 282:3,8,9,19,22 | 325:2,11,16,16 | 289:7 |
| 229:16,23 | 283:1,15,21 | 326:5,7,15,23 | **created** 165:15 |
| 230:13,16,16 | 284:13,17 | 327:4,16 328:4 | 325:23 |
| 231:22 233:13 | 285:5,11,15,21 | 328:5,8,10,24 | **creates** 276:18 |
| 233:18,22,25 | 285:24 286:1,4 | 329:4,11,15 | **creation** 214:1 |
| 234:3,5 238:1 | 286:6,9,18 | 330:5,12,17,23 | 238:16 |
| 238:4 245:20 | 287:1,4,6,11,20 | 331:7,10,13,22 | **creative** 141:21 |
| 246:2,5,9,24 | 288:2,5,8,10,12 | 332:9,14,16,20 | 239:7,14 |
| 247:2 249:17 | 288:13,20,23 | 332:21 | **credentializes** |
| 250:10,15,19 | 289:19,21 | **court's** 169:7 | 130:24 |
| 251:2,5,10 | 292:17,24 | 179:6 209:10 | **credentials** |
| 252:16,20,24 | 293:3,6,20 | 209:14 214:23 | 124:25 |
| 254:4,8,10,16 | 294:7,10,20 | 262:19 326:24 | **credibility** |
| 255:10,18,22 | 295:22 299:24 | 327:25 332:20 | 214:23 256:12 |
| 256:8,10,18,20 | 300:3,5 301:21 | **courtesy** | **credible** 31:23 |
| 257:2,5,11,16 | 302:18,21 | 221:15 | 32:13 253:8 |
| 257:22 258:7 | 303:2,22 304:3 | **courtroom** | 270:21 271:4,4 |
| 259:4,6,10,13 | 304:11,15,23 | 98:13 145:7 | **credit** 92:25 |
| 259:20,23 | 304:25 305:3 | 260:5 264:15 | 147:17 155:18 |
| 261:25 262:2,7 | 306:22 307:15 | 288:19 | 156:8 |
| 262:10,22,24 | 307:21,24 | **cover** 23:6 30:1 | **credited** 108:24 |
| 263:1,3,7 | 309:3,5,8,11 | 30:3 208:21 | **creditor** 225:19 |
| 264:6,13,21,23 | 312:18 314:5 | **covered** 110:11 | **creditors** |
| 264:25 265:10 | 317:7,10 | 147:3 155:16 | 144:17 223:25 |
| 265:19 266:1,3 | 318:15,18,21 | 276:7 | 225:18 245:12 |
| 266:8 267:6 | 318:23 319:2,5 | **covering** | 245:16,23 |
| 271:19,21,24 | 319:7,16,18 | 107:19,24 | 246:1 250:7 |
| 272:4,20,22 | 320:2,8,11,14 | 108:9 | 252:14 253:12 |
| 277:9,20,22 | 320:18 321:17 | **covers** 113:2 | 253:16 |
| 278:12,16,18 | 321:20,22,25 | **craig** 1:15 | **crisis** 108:7,19 |
| 278:25 279:3 | 322:5,7,25 | **crash** 100:8 | 109:4 111:2,17 |
| 280:14,18,20 | 323:7,11,14,16 | **create** 25:4 | 114:17 |
| 280:22 281:3,6 | 323:20 324:1 | 34:15 40:5 | |

Veritext Legal Solutions
800-336-4000

**[critical - day]**

| | | | |
|---|---|---|---|
| **critical** 70:7 | **crystal** 254:23 | 177:10 179:7 | **dan** 143:21 |
| 251:17,20 | **ct** 212:22,24 | 180:17 182:9 | **dartmouth** |
| **criticisms** | 213:1 215:12 | 184:1,20 | 100:4 101:2 |
| 223:21 | 217:5 | 186:16 187:6 | **dartmouth's** |
| **cro** 197:22 | **culture** 139:15 | 190:20,21 | 99:14 |
| **cross** 10:4 | 139:15 | 191:2,3,21 | **data** 34:4 204:6 |
| 214:21 257:19 | **cumulative** | 192:18,19 | 205:15 325:22 |
| 257:25 258:1 | 69:16 162:3 | 195:10 197:7 | **date** 1:13 22:22 |
| 319:25 325:25 | 163:6 310:3,12 | 198:20,20 | 52:13 54:10 |
| 326:11,21 | **cure** 284:17 | 199:1,14,24,24 | 66:8 77:20,22 |
| **crosstalk** 16:25 | **curious** 161:15 | 200:5,7 201:2 | 78:8 79:5,19 |
| 25:20 28:11 | **current** 34:17 | 201:11 203:3 | 79:21,24 80:6 |
| 30:11 39:12 | 45:17 134:18 | 203:10,17 | 109:9 114:8 |
| 40:24 47:8,9 | 136:18 143:7 | 239:21 247:6 | 129:15 280:25 |
| 54:21 75:21,22 | 240:3 270:13 | 250:11 261:23 | 325:22 |
| 125:7 146:13 | **currently** 82:6 | 265:8 266:8 | **dated** 187:16 |
| 146:14 181:17 | 82:11,22 | 279:9,9,12,12 | 188:9 191:25 |
| 214:6 220:24 | 225:25 | 283:16 286:5,5 | **dates** 55:3 |
| 229:15,16 | **curve** 110:20 | 286:12 287:6 | 67:19 78:6 |
| 251:3,5 262:21 | **customer** | 289:16,18,22 | **daughter** |
| 262:22 278:12 | 123:19 | 289:23 290:5 | 329:17 |
| 281:17 282:1,2 | **cut** 220:3 | 290:25 292:9 | **dave** 204:4 |
| 282:20 294:6,7 | 242:25 | 295:19 296:2 | **david** 9:4 |
| 295:20 307:21 | **cuts** 57:22 | 296:23 314:7 | 150:10 204:21 |
| 307:22 314:15 | **cutting** 109:14 | 314:16 | 286:22 |
| 322:16,17,18 | **cx** 5:3 | **d147** 227:13 | **dawn** 47:8 |
| 322:19 323:15 | **cycle** 102:18 | **d98** 221:25 | 154:12 155:4 |
| **crowd** 154:13 | 105:9 | **dallas** 2:7 3:13 | 160:5 161:4,6 |
| **crowdfund** | | 3:20 4:6,13,20 | 161:8 180:18 |
| 197:25 | **d** | 132:5 143:19 | 182:12,12 |
| **crummy** | **d** 7:1 65:17 | 221:21 222:19 | 187:7 190:5,7 |
| 328:15 | 160:4 162:12 | **damages** | 207:9 |
| **crunch** 324:9 | 170:17 172:25 | 301:16 | **day** 31:1 50:6 |
| | 173:5 175:19 | | 50:11 55:6 |

Veritext Legal Solutions
800-336-4000

**[day - debt]**

| | | | |
|---|---|---|---|
| 59:7 67:20 | 90:12,16,19,24 | 258:18 268:15 | **dead** 327:24 |
| 80:1,2 98:7 | 93:13 94:14,18 | 270:6,11 271:1 | 331:9,20 |
| 112:2 124:14 | 95:8,12,13,23 | 273:6 298:6,14 | **deadline** 169:3 |
| 132:5 151:11 | 96:16 129:4,6 | 298:21 299:3 | **deal** 7:3 8:8 |
| 152:19,22 | 129:9 131:19 | 311:24 316:6 | 11:25 12:2,13 |
| 153:1 172:23 | 131:20,22 | **dcp's** 156:24 | 18:15 19:3 |
| 190:25 232:12 | 147:22,24 | 174:3 176:6 | 23:14,24 25:3 |
| 240:23,23 | 148:5 155:9 | 183:3 184:24 | 32:20 33:12 |
| 247:13 273:3 | 156:17,20 | 198:15 203:11 | 45:19 58:3,7 |
| 330:24 | 157:9 158:10 | 316:18,19 | 68:8 113:19 |
| **days** 47:20 | 158:23,25 | **dcpf** 290:16 | 116:14 144:16 |
| 49:22 85:10 | 167:15 169:11 | **dcps** 95:1,23 | 155:17 156:6 |
| 132:10 162:6 | 169:16 170:9 | 270:12 | 194:18 208:13 |
| 166:2 197:13 | 175:1,2,25 | **dcp's** 11:3 | 208:13 240:5 |
| 203:24 204:11 | 176:1,3 177:4 | 44:22,24 45:3 | 244:18,22 |
| 210:13 212:1,1 | 177:12,14,21 | 89:6 90:20 | 245:3,22 273:6 |
| 227:4 283:4,20 | 177:24 178:4,8 | 91:1,3 185:14 | 274:8 275:8,12 |
| 328:12 | 178:8 180:25 | 202:13 | 275:15 276:1,4 |
| **dba** 117:25 | 181:8 182:4,18 | **ddf** 131:6 | 325:6,10 |
| 133:23 | 183:16 184:3,7 | 258:18 | 326:17,21 |
| **dcp** 7:18 10:6 | 184:23 185:7 | **ddfs** 131:6,7,13 | **dealing** 56:21 |
| 11:6 23:6 24:5 | 185:13 187:12 | 215:23,23 | 253:17 328:16 |
| 24:19 27:10 | 189:25 191:9 | 216:9 217:1,6 | **deals** 12:19 |
| 29:4,8 43:18 | 191:14 193:21 | 217:7,13,13,21 | 109:20 120:7 |
| 44:7 45:23 | 195:13,19,19 | 217:22 218:5 | 120:10 |
| 53:3,22 54:6 | 196:24 197:5,5 | 218:15,15 | **dealt** 181:18 |
| 55:11 57:12,17 | 197:6 201:1 | 219:8 258:12 | 182:1 |
| 57:17 58:3 | 203:5,15 | 258:18 262:15 | **dean** 333:2,15 |
| 69:9 70:23 | 204:20 206:23 | 292:6,10 293:5 | **debate** 325:1 |
| 71:9 72:11 | 207:11 209:12 | 296:11,15,19 | **debt** 94:20 96:8 |
| 75:3,20 83:11 | 216:13,23 | 298:6,11,12,14 | 96:17 106:20 |
| 83:17 85:14 | 217:11 219:7,9 | 298:21,23,23 | 121:16 150:13 |
| 89:5,12,18,23 | 222:20 228:8 | 299:2 | 151:11,13 |
| 89:25 90:3,10 | 237:16 248:13 | | 181:23,23 |

Page 26

**[debt - deposition]**

204:4 246:4,6
249:15,15
311:6
**debtor**  93:23
**debtors**  252:9
252:11
**debts**  55:19
191:12,13
249:10
**december**
134:24 142:4
204:14
**decide**  130:17
130:18 248:13
**decided**  100:23
116:21 248:13
**decision**  32:9
60:12,24 87:2
223:23 265:7
266:25
**decisions**
108:14 124:15
227:11 228:7
228:14 232:23
**declaring**  303:9
**deemed**  28:18
240:17 281:8
**deeper**  228:22
239:25 263:11
**def**  34:14
**default**  205:3
**defend**  326:4
**defendant**  4:2
278:1

**defendant's**
173:7 229:22
229:24 230:2
230:14 265:1
266:10 272:6
287:7
**defendants**  1:9
3:9 9:10
**defendant's**  6:3
**defense**  60:17
267:4
**defer**  235:1
**deficit**  194:9
**define**  29:11
122:21 163:2
163:23
**defined**  63:12
94:20 150:13
151:9 198:16
261:8
**defining**  36:15
95:5 150:19
**definitely**  283:7
**definition**  30:4
163:1
**definitionally**
20:8 38:19
110:23 127:11
151:14
**definitive**  52:22
63:12,17 94:5
122:24 123:13
126:13 163:12
163:15,20

165:3 182:6
207:20
**definitively**
52:24 104:11
**degree**  25:4
99:10,18
100:16 101:25
107:9 108:10
119:18 120:18
122:18 123:6
124:1,3 126:10
127:10 130:9
253:19
**delaware**  7:6
7:16 134:11
**delayed**  204:2
**deliberate**
127:3
**delineating**
228:3
**demand**  198:7
198:10
**demonstrative**
209:16 213:1
215:6
**demystify**
234:22
**denominate**
93:24
**departed**
128:19
**department**
276:15

**departments**
119:9
**depending**
123:21 126:15
214:22 235:9
261:10 295:14
**depends**  295:17
297:7
**depict**  216:12
**deploy**  124:1
**deployed**
119:20 136:17
137:6,10,19
138:16,19
141:24 223:24
**deploying**
141:15
**depo**  265:25
328:1
**deposed**  257:2
325:20
**deposition**
185:12 211:2,4
213:20 214:10
214:11 220:5
233:24 254:22
254:25 255:8
255:22 256:3
256:16 257:6
258:10 283:9
294:14 295:9
297:13 298:1
322:13,23
325:5,25

Veritext Legal Solutions
800-336-4000

[deposition - dire]

326:20
**depositions**
  158:9 323:23
  324:20 327:23
**deposits** 232:6
**depot** 134:10
**describe**
  142:14 143:16
  215:10
**described**
  23:12 138:2
  183:8 190:8
  206:6 231:5
  239:6 276:21
**describing**
  12:12 21:19
  29:15 94:4
  277:4
**description** 5:9
**design** 140:6
  325:3
**designated**
  124:7 158:7
  294:13 327:9
**designed**
  232:25
**desire** 35:21
**desperately**
  152:10,11
**despite** 26:19
  115:16 177:21
**detail** 51:23
  137:1,6,18
  138:2 148:16

150:9 181:12
183:1 261:15
263:24 264:1
308:13
**detailed** 40:4
  126:11 157:22
**details** 50:9
  67:10 82:6
  144:14 164:22
  165:8 167:12
  174:17 175:5
  261:11,18
  290:19 316:19
  324:11
**determination**
  21:11 24:8
**determinative**
  19:13 20:11
**determine**
  142:25 281:10
**determined**
  54:10 278:7
**determining**
  237:9
**detriment**
  277:18
**detrimental**
  150:5
**deutsche**
  118:13
**devaluing**
  68:14
**develop** 124:25
  303:5

**developed**
  106:5 115:21
**development**
  113:13 115:4
  116:12 117:9
  117:10
**diagram** 6:7
  15:1 254:20
  260:4 261:5,21
  262:3,8,11
  263:1
**dial** 66:15
**diamond** 112:3
**dick** 188:10
  190:23 197:19
  204:4,22
**differ** 127:7
**difference**
  14:24 15:1
  168:5,7 195:5
  219:12 224:17
  249:2 294:15
  305:8
**different** 20:17
  21:8 26:17
  35:24 49:2
  53:13,15
  106:16,18,19
  108:16 110:9
  113:6 117:20
  122:3 130:24
  132:5,9 139:5
  140:5,22
  141:20 142:18

164:3 168:3
181:23 193:22
195:13 208:14
214:7 215:25
216:1 226:22
229:12 234:8
235:20 239:5
243:4,6 245:2
258:22 259:2
263:9 285:10
293:25 295:13
298:3,19
304:21 314:14
314:15
**differentiated**
  114:14,15
**differentiators**
  121:24
**differently**
  256:16
**difficult** 134:17
  167:13 234:6
**dig** 38:4
**digit** 194:20
**digital** 333:3
**diligence** 110:7
  123:13 126:12
  222:23,23,24
  230:17 271:13
  276:21 277:3
**diluted** 34:7,24
**dilution** 38:7
**dire** 253:22

Page 28

**[direct - document]**

| | | | |
|---|---|---|---|
| **direct**  74:6 | 208:7,22 | **discussed**  33:12 | 283:10 |
| 111:15 131:25 | 300:25 | 65:25 167:8 | **disregard** |
| 132:11,24 | **directors**  62:11 | 197:20 200:21 | 50:20 51:17 |
| 133:3,23 | 62:15 96:2 | 207:12 223:18 | 278:12 |
| 138:10 139:1 | 104:5,5 142:16 | **discussing**  7:7 | **disregarded** |
| 177:18 179:6 | 176:4 198:5 | 22:14 23:10 | 218:17 |
| 191:20 197:7 | 261:10 275:2 | 28:22 54:9 | **distinct**  15:17 |
| 206:5,14 | **disadvantage...** | 57:22 80:12 | 253:9 |
| 224:22 240:11 | 153:15 | 202:8 308:14 | **distinction** |
| 248:3 249:23 | **disagree**  19:7 | 309:17 | 16:21 39:20 |
| 299:8 308:13 | 159:4 | **discussion** | 40:2 104:17 |
| 311:10,11,14 | **disagreement** | 45:10 96:15 | 129:21 218:20 |
| 313:13 326:11 | 87:6 | 181:8 224:5 | 263:19 |
| **directed**  44:15 | **discipline** | 226:20 227:18 | **distraction** |
| 73:12 197:18 | 243:20 | 244:14 245:17 | 198:6 |
| 279:22 | **disclose**  191:13 | 267:24 270:5 | **distress**  119:18 |
| **directing**  22:12 | 203:14 | 288:17 | 120:18 137:9 |
| 44:24 320:23 | **disclosed**  8:6 | **discussions** | 251:11 |
| **direction**  45:25 | 178:8 184:7 | 33:23 116:19 | **distributed** |
| 46:17 63:13 | 194:10 195:18 | 155:8 158:6 | 118:4 |
| **directional** | 197:4 198:15 | 175:4,9 236:12 | **distributing** |
| 18:11 19:10 | **disclosure** | 237:3,9 270:18 | 118:18 306:1 |
| 20:15,20 21:4 | 172:9 329:16 | 271:13 | **district**  1:2 |
| 21:12 239:12 | **discount**  26:20 | **disjointed** | 284:10 |
| **directly**  51:9 | 226:21 245:23 | 323:22 | **diverges**  44:9 |
| 57:3 112:9 | **discovered** | **dismissed** | **divide**  228:9 |
| 122:9 138:23 | 174:18 175:6 | 270:6 | **dk**  244:17 |
| 157:25 181:22 | **discovery** | **disorganized** | **dno**  208:17 |
| 192:1 193:4 | 171:8 283:18 | 241:2 | **doctors**  133:9 |
| 218:4 315:9,11 | **discrepancy** | **displayed** | **document** |
| 315:19 320:5 | 181:20 | 214:8 | 10:22 13:13 |
| **director**  73:22 | **discretion** | **dispute**  37:3 | 14:9 38:4 |
| 128:20 130:22 | 63:14 176:6 | 76:11,13 | 49:20 58:4 |
| 134:19,20,22 | | 174:12 176:11 | 62:3 63:4,7 |

Page 29

**[document - due]**

| | | | |
|---|---|---|---|
| 69:15 70:3,19 77:12 79:10 95:4 150:19 162:25 166:18 177:2 179:11 180:8 183:17 186:8 205:12 205:24 222:2 239:24 251:8 283:17,19,23 283:24 284:4,7 286:19 314:18 315:15,24 320:1 **document's** 172:22 **documentation** 18:21 42:23 63:12,17 94:6 95:22 122:24 123:14 126:13 126:14 163:12 163:15,20 165:3 180:6 182:7 207:20 211:5 218:24 258:21,24 298:2,19 299:1 306:18 **documented** 164:12 225:4 **documenting** 261:17 | **documents** 18:9,19 23:25 27:8 47:17 69:14 76:17 95:4 96:8,17 96:18 122:2 164:6,19 178:14 181:17 200:7 204:5 208:9 220:7 260:23 273:5 279:25 280:1,6 281:7 283:17 284:24 292:14 304:18 311:7 316:12 317:16 325:9 **docusign** 168:9 171:4,12,24 172:3,10,14,21 **docx** 166:17 **doing** 17:4 19:3 23:5 25:5 59:21 60:3 85:7 98:5 106:20,21,21 106:22,23 109:5,16 114:17 120:15 121:8 122:18 126:3 130:17 132:12 135:3,4 136:16 141:13 141:14 164:18 | 165:22 195:7 236:5 237:15 246:19 256:5 260:4 268:16 294:17 317:16 329:14 **dollar** 153:17 153:18 167:4,8 **dollars** 31:25 32:4,7 45:21 58:23 107:3 117:18 121:18 139:14,19 198:7 204:11 240:6,16 247:25 301:13 302:1 **domestic** 17:17 **domiciled** 17:8 **don** 275:10 **don't** 228:24 288:23 **door** 101:21 102:13,13 226:16 **dotted** 296:19 **double** 280:9 **draft** 27:8 33:20 44:17,25 81:20 160:15 275:14 **drafted** 63:22 73:6 | **drafting** 63:20 167:25 **dramatically** 20:18 293:1 **draw** 153:21 217:20 256:21 289:8 295:11 295:15 **drawing** 210:16 258:13 **drawn** 262:11 296:7 297:1 **drew** 212:15 215:6 216:11 254:21 260:4 261:22 289:6 289:14 290:4 296:2 **drill** 164:25 **drive** 25:8 237:13 **driven** 289:11 **drivetime** 313:17 314:1 **driving** 34:16 115:18 **drop** 149:5 **drum** 36:5 38:11 **dude** 282:13 **due** 35:25 68:18 100:21 110:7 193:6 204:11,13,15 |

Veritext Legal Solutions 800-336-4000

**[due - ebersol]**

204:17,21
205:17
**duly** 267:6
**dundon** 1:8
8:20 26:4
29:19 30:15,21
30:23,23 31:5
31:5 32:11
33:25 34:3,6
34:13,18,20,23
35:1 36:4,14
36:24 37:7
38:6 41:17
42:15 45:23
52:4,8,10,11
53:3,22 54:5
59:4 61:1
62:18 63:9,13
63:14 64:11
69:9 70:23
71:9 72:11
76:16 82:20
83:6 84:21
86:7,25 88:12
91:9 92:24
94:4 116:5
130:22 131:3,6
131:7,10,13,15
142:6 143:6,10
155:9 156:12
157:6,12,13,14
157:17 158:1
173:11 174:13
174:16,21

177:13 182:11
182:22 184:14
185:18,20
190:1,7 193:7
193:8 196:23
197:9 206:22
213:2,3 215:9
216:23 217:11
223:24 240:2
244:9 247:24
248:3 258:16
258:22 268:14
273:2 283:7
290:14 292:7
292:10 293:24
294:24 296:8,9
296:14,17
297:15 298:3
298:20 309:18
310:18 311:17
311:20 316:13
316:24 317:4,6
325:6,7
**dundon's** 35:15
60:12 213:10
268:22
**duplicate**
265:23
**duplicative**
84:2 162:13
**duration**
232:15 235:18
**duties** 48:10
89:17

**duty** 137:16,23
**dx** 5:3
**dynamic** 17:1
**dynamics** 16:1
118:20

**e**

**e** 2:1,1 3:1,1 4:1
4:1 5:1,8 6:1
7:1,1
**eager** 69:19
**eagle** 264:14
**earlier** 39:14
59:15 80:12
119:23 189:18
227:15 237:25
239:22 247:10
267:24 269:19
279:9 290:10
291:14 306:5
309:18 310:20
315:6 317:17
328:25
**early** 133:20
135:13 204:13
247:16 332:2
**earnings** 16:2
**easier** 12:18
**east** 1:16 98:25
**eat** 329:1
**ebersol** 31:9
37:8 42:14
43:1,15,19
45:8,14,17,25

46:11 48:1,4,7
49:9,15 50:4,8
51:9,24 62:11
63:5,16 64:10
65:11,17 66:13
66:18,23 67:1
67:23 69:7
70:18 73:2,10
73:17 74:2,6
76:18 77:11
86:12 91:10,11
92:16 148:17
148:25 154:12
157:16,18,24
158:13,20
160:5 161:2,3
166:16,18
167:14,14,16
174:13 176:11
176:12 177:6
179:5,9,18
180:6 182:11
182:22 183:9
183:10 184:14
187:9,23 188:1
188:9,10 190:5
190:18,22,23
192:1 193:4
194:11 199:15
201:2,6 202:13
202:16,18
204:5,10,14,16
204:22 207:9
222:8 223:15

Veritext Legal Solutions
800-336-4000

**[ebersol - emails]**

223:21 240:1
244:10 247:11
247:24 250:3
251:15 253:6
266:15 268:9
269:22 271:11
272:9,14
274:20,23
275:3,6 279:20
279:23,25
282:24 283:3,6
283:7 284:21
284:25 285:3,8
286:21 299:7,9
299:16 300:9
300:18 307:9
308:7 309:19
310:22 315:9
315:17 320:25
329:17,18
**ebersol's**  66:1
71:12 73:21
180:19 244:13
262:12 301:18
**ebersol's**  5:16
**economic**
111:17
**edhc**  136:14
137:10,18
138:1,17,25
142:3,5 151:21
311:22 312:9
**educated**  48:13
243:8

**education**  9:12
100:7
**educational**
98:18
**effect**  16:6
27:17
**effectively**
151:12 273:24
274:1
**efficiency**
236:18 239:9
**efficient**  140:9
327:14
**efficiently**
327:24
**effort**  40:5
237:11
**eight**  61:17
62:7,8 111:14
115:24,25
116:1 127:1
194:19 195:11
196:22,23
227:22
**either**  47:17
121:14 122:8
149:21 150:20
171:10 181:24
235:7 236:16
257:15,16,19
257:20 260:24
279:20 284:1,2
285:4 293:9

**elaborate**  241:3
262:16
**electronic**
172:9 287:12
**elementary**
167:21 226:6
**elements**  21:21
21:22,22
**elicit**  56:19
259:24
**elicited**  326:11
**eliciting**  61:3
**eliminate**  198:6
235:1
**eliminates**
249:25,25
252:5
**elimination**
19:1,5 235:8
**elisa**  222:8
325:3
**email**  5:11,13
5:14,15,16,17
5:18,19 6:5,8,9
10:19 14:4,10
22:6 26:2
28:16 33:5
34:1 36:19,25
41:18 42:4
44:5,14 46:11
46:15,24 47:4
47:5,24 48:3,5
49:16,17 51:18
64:11 67:11

73:8 74:17
75:8 76:6,8,20
76:25 80:11,14
81:11,12 82:15
82:20 83:11,17
84:17,21,24
85:14 86:6,17
88:5,8,24 89:3
90:2 92:14
154:11 155:21
160:4 166:15
180:17 181:4
182:10 186:16
187:6 190:4,13
191:24 197:8
202:1 203:18
203:22 207:5
222:4 227:14
227:17 228:18
238:6 240:1
244:8 247:16
247:20 252:21
253:5 266:14
269:20 285:6
286:21 299:6
300:17,24
309:16,17
313:2,3,22
317:19 321:8
**emailed**  66:14
**emails**  14:25
75:2 77:1 86:4
172:19 184:25
185:2 204:3

Veritext Legal Solutions
800-336-4000

**[emails - escaping]**

317:22 318:3
**emergency**
127:6
**emerging** 109:6
**emphasis**
153:21 319:7
**emphasize**
256:11 319:12
**employed**
333:8,11
**employee** 129:7
133:11 139:4
141:12 333:10
**employees**
55:21,23 56:1
56:15 85:5
133:9,15
134:14 158:20
168:1 241:24
301:4 312:7
313:18 316:19
**employer**
131:25 132:11
132:24 133:3
133:23 311:9
311:11,14
313:13
**employers**
133:8
**employment**
122:1 129:11
**encimo** 3:6
**encino** 2:16

**ended** 10:5
111:2 248:9
**enforceable**
166:5 207:19
**enforced** 76:17
**engaged** 52:16
72:17 79:19
143:8
**engagement**
24:18 26:15,19
72:22,22 73:1
73:6 76:18
77:17,21,23
78:7 79:6,22
79:24 240:24
**engaging** 22:20
122:9
**enjoy** 146:16
**enormous**
127:20
**ensure** 25:5
156:1
**entails** 102:6,6
**enter** 177:6,23
180:9 183:12
**entered** 132:16
157:15 179:5
193:8
**entering** 177:2
206:3
**enterprise**
29:19 215:9
216:10,25
217:5 260:8

290:14
**enterprises**
213:10,14
258:16
**entire** 16:8
47:15 48:16
49:18 76:25
109:18 112:1
120:9,21
**entirely** 36:11
123:12 217:13
**entirety** 20:20
21:15 235:16
236:16
**entities** 60:5
211:6 213:4
214:4 216:2,17
218:12 235:13
258:18,23
260:9,14 261:7
262:15 290:13
291:9,9,16,17
293:1 294:3
295:2,3,7
296:3 297:1,2
297:5,10
298:20
**entity** 7:17,18
16:17 31:13
130:20 131:8
131:11 217:10
218:5,7,17
219:8 235:10
258:12 311:12

311:16,17,20
**entrepreneurial**
130:14
**entries** 218:7
218:23 260:13
**entry** 101:12
154:21 156:17
156:22 198:15
204:19 230:18
**envelope**
170:16 171:5
**equation**
118:21
**equipment**
139:11
**equity** 32:17
104:25 106:21
109:10,12
114:23 119:8
121:16 131:2
136:10 140:2
153:3 178:4
184:3 198:8
217:4 246:1,4
246:7 270:6
**equivalent**
148:4
**erase** 146:3,12
**ernie** 312:22
**ero** 329:2
**erp** 261:13
**escaping**
129:15

Page 33

**[esmg - excluded]**

esmg  60:5
62:15
**especially**
202:19
**espn**  197:23
**esquire**  2:3,4
2:13 3:3,10,17
4:3,10,17
**essentially**
15:18 22:12
56:2 67:16,21
67:22 69:14
82:10 84:19
91:15 117:24
164:25 165:18
171:6 182:5
195:3 206:4
245:21 246:16
248:9,24 269:8
308:17
**establish**  51:13
124:13 201:3
228:17 242:12
284:8
**established**
20:12 47:19
116:16 130:9
130:12 147:21
151:19 241:6
**establishing**
121:17 152:17
**estate**  216:5
**estimate**  26:3,9
66:8 78:14

**estimated**
82:22
**estimates**  68:21
**estimation**
251:17
**et**  1:8 8:20 11:7
12:15 16:2,13
106:23 107:25
126:16 217:19
232:8 296:4
301:14
**european**
119:13
**evaluate**  26:21
54:14 164:3
236:10,14
**evaluation**
18:25
**eve**  192:12
**evening**  222:4
**events**  63:15
326:19
**eventually**  60:5
301:2
**everybody**
129:20 146:20
182:13 234:13
254:10 332:19
**everybody's**
97:23 173:16
234:20 254:14
**everyone's**
212:3

**evidence**  46:4
49:6 60:25
74:10 79:4,17
80:11 84:1
85:18 91:25
214:24 230:18
285:6 319:22
**evolution**  20:22
21:3 267:21
**evolved**  213:15
**evolving**
213:24 231:17
**ex**  132:20
**exact**  14:5
39:19 52:13
168:25 196:8
212:25 217:25
218:18 219:10
260:10 277:16
290:8 291:22
297:19 301:6
304:9
**exactly**  22:22
120:4 129:11
135:1 169:25
288:5 329:6
**exam**  265:4
**examination**
10:4 98:2
156:7 214:22
247:10 254:6
262:8 289:3
317:17 320:21
326:11,17,21

**examine**
214:20
**examined**
325:25
**example**  19:16
19:17 27:8
58:6 65:2
114:10 122:11
127:22 134:8
153:20 242:3
298:6 310:25
**examples**
276:13
**exceeding**
111:3
**excel**  227:24
309:21
**excellent**  98:6
**except**  96:19
**exception**
101:11 107:4
157:7 158:3
**exchange**
107:25 119:13
148:16 154:11
180:18 182:10
186:16 187:7
203:19 254:19
320:24
**exchanges**
107:25
**exclude**  75:5
**excluded**  48:16
48:17 265:24

Veritext Legal Solutions
800-336-4000

[exclusionary - experience]

| | | | |
|---|---|---|---|
| **exclusionary** 326:2 | **exhaustively** 41:23 | 195:10 199:23 201:25 203:9 | 249:7 253:12 **exists** 298:2,19 |
| **exclusivity** 124:3 | **exhibit** 5:9 7:15 10:11 13:17,25 | 221:25 227:13 230:14 233:6 | **exit** 105:19 **expect** 127:4 |
| **excuse** 44:2 70:4 83:1 | 14:4,20 22:1 27:23 28:6 | 233:15 234:2,6 234:15 237:24 | 143:2 208:22 241:4 |
| 157:12 195:22 197:4 222:24 | 32:24 37:11,23 41:21 42:3 | 239:21 244:6 247:6 250:11 | **expectation** 60:2 |
| 230:25 231:22 245:5 267:25 | 43:22 45:8 46:4 50:2 | 265:1,24 266:10 269:17 | **expectations** 105:12 111:4 |
| 273:25 321:18 | 61:10 62:21 64:2 65:22 | 269:18 272:6 283:5 285:3 | 152:18 195:5 245:8 |
| **excused** 321:22 **execute** 128:22 | 67:12 71:25 74:10 75:5,17 | 286:12,24 287:7 289:18 | **expected** 24:22 105:10 194:25 |
| **executed** 178:9 190:23 195:14 | 75:19 79:17 80:10,22 81:5 | 291:24 296:14 299:6 308:8 | **expecting** 23:6 **expediency** |
| 195:19 196:24 197:6 | 83:25 84:10 85:17,24 87:10 | 309:10 312:13 312:14 314:7,9 | 218:22 **expense** 54:16 |
| **executing** 166:1 | 87:11 88:2,17 91:25 92:14 | 314:14,16,22 314:25 319:1,8 | 124:1,2 139:8 140:21 241:10 |
| **execution** 177:11 191:14 | 93:17 94:2,9 96:16 148:14 | 319:14,21 320:6,10,16,24 | **expenses** 57:18 139:18 141:15 |
| **executive** 104:5 117:12 134:24 | 148:15 154:1,6 166:7,24 168:8 | **exhibits** 198:20 199:6 203:17 | 232:7 **expensive** |
| 176:13 | 172:25 173:7 175:15,18,19 | 230:18 265:5 269:16 272:20 | 114:21 161:9 243:11 |
| **executives** 118:25 144:11 | 177:10 179:7 179:19 182:9 | 279:12 **exist** 268:10 | **experience** 17:4 104:7 105:21 |
| 178:7 184:6 195:18 197:4 | 184:1,9,20 185:19 187:6 | 290:14 305:21 **existed** 225:9 | 108:16 110:14 115:12 120:7 |
| **exercise** 34:15 239:2 243:16 | 188:13,17,23 189:13 191:2,7 | **existence** 206:21 312:5 | 121:8 124:14 124:17 128:14 |
| 243:17 251:22 **exhaust** 268:7 | 191:21 192:17 193:13,15 | **existing** 63:15 181:20 225:5 | 135:8,9 137:13 138:12 140:25 |
| **exhaustive** 123:8 | | | |

Page 35

[experience - fast]

175:3 225:25 236:4 237:7,12 238:20 242:20 307:17

**experienced** 20:2 120:22 276:11

**experiences** 109:25

**expert** 104:22 104:23 124:8 124:10,13 325:17 326:8

**expertise** 106:5

**experts** 19:25 327:3

**explain** 15:5 20:3 38:8 100:17 107:15 120:6 124:16 137:2,17 138:15 149:12 150:25 153:5 165:7 167:22 194:17 204:24 207:15 212:20 212:21 215:15 222:18 224:16 226:5,13 228:2 231:1 232:9 234:22 239:1 244:23,24 248:16 255:1 260:3 269:1

276:23 278:14

**explaining** 138:4

**explanatory** 107:23

**explicitly** 163:4

**exploding** 108:20

**explored** 197:21

**express** 55:4

**expressed** 53:21 329:24

**expressly** 153:24

**extend** 57:24 58:2

**extension** 103:21

**extent** 8:13 89:19 159:15 163:8 295:23

**extra** 72:10

**eyes** 251:18 264:14

---

**f**

---

**face** 192:25 279:21 330:7 330:11

**facilitate** 133:8

**fact** 16:19 109:19 146:16 175:6 177:25

200:22 205:1 242:1 260:9 271:10 277:16 282:1 301:18 326:1,5,6,8

**factor** 214:23

**factors** 58:24 308:12

**facts** 177:12 203:12,14

**factual** 169:9 219:24 284:3

**factually** 174:1

**fair** 12:9 18:24 34:8,16 67:15 80:3 84:17 93:19 103:13 103:18 133:10 134:15 142:23 142:25 186:23 243:13,15 244:14 296:24 299:11 307:20 314:22

**fairly** 90:22 241:9 315:24

**fairness** 124:16 138:9 142:20

**fall** 132:15,15

**familiar** 129:24 130:2 205:24 223:25 312:21

**familiarity** 108:10

**family** 128:22 129:3 130:7 131:3 132:3,6 133:9 134:14 188:9 213:1,10 213:14 215:9 216:10,25

**famous** 161:13

**far** 32:21 98:9 124:9 148:24 155:11 156:24 169:6 173:25 174:13,16 181:13 223:21 247:11 261:2 263:25 277:12

**farahi** 2:13 8:25 324:23,25 324:25 326:7 326:12,22 329:11,12 330:16,21

**fargo** 112:15 135:24

**farrell** 92:15 192:2 222:8 267:13 322:25 323:24

**farrell's** 192:2

**fashion** 31:23 40:4 241:9

**fast** 66:24 172:23 211:14 226:11 247:4

Veritext Legal Solutions
800-336-4000

**[fast - finish]**

| | | | |
|---|---|---|---|
| 294:15 | fedex 312:9 | files 247:14 | 148:9 150:16 |
| faster 128:10 | feedback | filing 61:23 | 231:4 243:20 |
| father 190:23 | 148:18 151:25 | 63:1,18 81:24 | 298:9 309:22 |
| fault 194:7,8 | feeder 101:17 | 82:1 93:18 | 309:25 316:20 |
| favor 111:16 | feel 138:1 | 94:15 95:5 | financially |
| 282:11 | 268:16,17 | 96:9 165:4 | 333:11 |
| favorable 17:9 | feeling 329:24 | 276:11 321:12 | financials |
| feasibility | fees 27:3 | filings 165:2 | 113:2 121:24 |
| 239:4 | 251:19 | 276:15 | financing |
| feasible 239:13 | fencing 16:18 | fill 331:9,21 | 109:13 118:9 |
| features 16:7 | fend 45:20 | filled 296:18 | 150:18 153:1 |
| 153:17 181:21 | fenwick 161:10 | film 197:22 | 204:7,12 |
| 308:19 | ferrell 266:16 | final 18:10 19:8 | find 26:22 68:4 |
| feb 204:10 | fidelity 216:8 | 19:11,12 20:15 | 103:9 141:10 |
| february 10:19 | 217:23 260:17 | 21:10,17 47:4 | 228:9 267:22 |
| 31:25 32:8,18 | fiduciary | 115:5,7 227:17 | 279:12 |
| 32:21 33:7,17 | 137:16 | 271:23 | fine 8:11 9:21 |
| 33:18,19 34:7 | field 123:7,14 | finally 71:4 | 18:7 46:23 |
| 42:5,15,23 | 124:9 225:12 | 148:8 | 48:5 87:18 |
| 43:15 44:10 | fig 107:20,22 | finance 100:24 | 98:5 131:1 |
| 45:15 63:8 | figure 34:8 | 104:23 108:2,4 | 136:8 154:7 |
| 160:7 177:5,20 | 36:22 118:3 | 108:5 111:25 | 162:21 209:20 |
| 181:4 183:10 | 135:5,7 165:21 | 113:16 114:17 | 220:8,25 |
| 191:15 193:24 | 194:20 224:24 | 115:1 118:7 | 246:12,24 |
| 197:10,13,23 | 246:16 328:15 | financed 118:4 | 250:22 257:15 |
| 203:23 207:21 | figured 233:12 | financial 93:23 | 257:24 264:13 |
| 222:5 224:13 | 332:11 | 102:3 104:13 | 278:16 282:17 |
| 227:17,19,19 | file 60:25 61:6 | 104:16 107:19 | 286:9 312:18 |
| 228:19 238:24 | 227:24 325:10 | 107:19,20 | 317:10 320:14 |
| 240:1 273:6 | filed 173:11 | 108:7,19 109:4 | 324:2 331:23 |
| 275:22 310:18 | 215:20,21 | 109:8 111:2 | finish 47:11,12 |
| 313:4 315:7 | 245:21 273:7 | 113:15 114:7 | 54:13 55:1,9 |
| federal 119:11 | 302:15 304:4 | 114:16,17 | 57:12 125:8,11 |
| 119:12 282:8 | | 119:9,10 128:2 | 125:25 126:12 |

Page 37

[finish - forget]

| | | | |
|---|---|---|---|
| 250:19 329:23 | 195:7 199:14 | 287:14 329:3 | **follow** 144:9 |
| **finished** 58:10 | 203:4 209:18 | **florida** 134:11 | 164:10 218:14 |
| 58:19,22 | 212:21 216:14 | **flow** 17:22 | 218:23,24,24 |
| 127:24 134:23 | 224:3 231:17 | 117:22 132:4 | 294:20 295:24 |
| 321:9 331:25 | 236:1 252:8 | 209:11 218:1 | 317:8,11,12 |
| **finishing** | 283:16 289:5 | 218:14 259:1 | 327:7 |
| 307:10 308:8 | 304:12 309:16 | 260:13 293:22 | **followed** 218:1 |
| **finite** 56:11 | 318:11 322:2 | 297:21 310:4 | 321:12 |
| **fire** 164:24 | 327:6 330:21 | 310:12 | **following** 42:23 |
| **fired** 111:4 | 330:22,24 | **flowers** 109:11 | 66:11 103:10 |
| **firm** 21:21 99:6 | 331:4,10,15 | **flown** 324:5 | 149:23 152:19 |
| 104:25 109:10 | **firsthand** 27:14 | **fluctuations** | 153:19 156:3 |
| 161:9,9,23,24 | 175:1,3 | 26:24 | 177:11 192:9 |
| **firmly** 151:19 | **fit** 108:3 116:20 | **fly** 328:19 | 221:22 226:10 |
| **firms** 119:8 | 164:16 | **fo2** 31:13 37:6 | 238:12 245:20 |
| 226:23 277:2 | **fits** 312:7 | 43:8 188:4 | 246:10 299:22 |
| **first** 11:24 | **five** 11:10 13:6 | **focus** 89:20 | **football** 147:7 |
| 12:13 15:16 | 20:12 97:8 | 191:7 222:3 | 147:10,14,19 |
| 19:17 20:12,23 | 103:21 142:9 | 227:20 330:14 | 193:24 223:9 |
| 47:5 54:13 | 151:23 162:6 | **focused** 17:15 | 223:12 249:14 |
| 55:9 57:12 | 177:8,10 | 101:14 108:5 | **footing** 163:19 |
| 58:10,22 74:16 | 187:25 196:1,5 | 108:15 144:6 | **footnote** 63:7 |
| 76:20 86:3 | 204:11 206:7 | 225:6 | 93:10,16,22 |
| 98:12 100:18 | 253:15 288:8 | **fogle** 200:11 | **footprint** 54:16 |
| 102:1 105:25 | 312:5 | **fold** 57:2 | **force** 112:6 |
| 108:18,21 | **fleming** 76:9 | **folder** 204:7 | **forced** 66:23,24 |
| 117:3 121:9 | **flew** 295:5 | **folks** 11:1,6 | 110:20 |
| 129:18 135:15 | **flexibility** | 26:18 45:11 | **foreclosure** |
| 136:15 137:22 | 218:10 324:13 | 85:8 100:2,6 | 153:2 |
| 148:12 155:20 | **floated** 295:2 | 106:8 109:6 | **foregoing** |
| 156:7 158:24 | **flores** 9:12,14 | 154:13 222:12 | 333:4 |
| 159:23 160:13 | 9:16,19 13:23 | 228:8 266:18 | **forget** 118:13 |
| 171:6 185:6 | 22:4 28:4 | 276:24 | 290:25 |
| 187:16 191:10 | 37:16 173:5 | | |

Page 38

**[forgetting - friday]**

| | | | |
|---|---|---|---|
| **forgetting** 304:9 | **forth** 29:17 33:21 122:7 168:1 222:17 258:19 274:18 328:2 331:23 | 174:20 199:1 200:25 202:16 211:1 279:11 279:19 280:12 280:23 281:13 281:19,21 282:16,18,23 283:14 284:13 285:15 306:21 307:14 | **fowler's** 43:8 **framework** 34:17 224:20 231:15 260:7 260:19,21 261:19,22 263:16 |
| **forgive** 11:14 158:16 179:12 283:2 | | | |
| **forgot** 206:25 284:15 | **forthcoming** 177:13 | | **framing** 290:7 290:22 |
| **form** 63:11 122:15 164:9 174:23 190:9 247:15 258:14 258:19 297:11 | **fortunate** 102:23 111:1,6 111:11 135:14 276:25 278:6 | | **franchise** 270:10 |
| | | **founded** 312:2 | |
| **forma** 13:7 238:14 | **fortune** 111:21 | **founder** 128:20 195:16 197:2 | **frankly** 30:8 48:10 185:19 227:2 261:15 280:11 328:19 |
| **formal** 59:10 102:16 103:1 179:25 189:21 258:17 325:10 | **forward** 12:23 26:16 64:14 117:22 168:11 208:21 225:11 232:19 236:20 237:10 239:8 246:17 247:4 247:18 273:5 278:8 299:7 305:14,25 | **founders'** 31:15 | |
| | | **four** 11:10,17 71:4 72:10 104:11 110:3,4 111:15 112:6 117:19 118:11 126:25 135:11 135:15,22 136:8 145:1 150:12 247:18 252:10 253:9 277:1 278:6 299:7 | **fraudulent** 207:14 |
| | | | **free** 84:14 159:17 313:7 |
| **formalities** 297:5 | | | **freedman** 56:7 154:11 156:21 160:6,16 161:2 182:13 190:6 192:1 193:18 193:23 197:10 203:21 222:9 283:7,8 |
| **formalize** 129:2 | | | |
| **formally** 89:5 89:12,23,25 90:2,16,19 177:25 | **forwarded** 5:19 154:16 166:16 168:10 201:7 309:18 | | |
| | | | |
| | **forwarding** 50:5 84:20 | **fourth** 66:14 118:14 | **fresh** 196:22 |
| **formation** 122:2 133:20 164:6 | | | **freshman** 98:22 |
| | **forwards** 51:10 | **fowler** 31:13 37:6,9 42:8 181:21 205:22 205:24 206:3,7 | |
| **formed** 130:20 | **found** 98:23 152:9 | | **friday** 102:21 127:24 198:10 328:14 |
| **forms** 304:6 | | | |
| **formulaic** 101:10 | **foundation** 27:13 58:15 98:9 124:17 | | |

Veritext Legal Solutions
800-336-4000

**[friend - gentleman]**

**friend** 197:23
**friendly** 9:24
**frivolous** 278:8
**front** 15:15
  31:19 109:7,15
  189:17 319:10
  328:21
**frugal** 227:7
  243:22
**fruition** 23:17
**full** 103:9 162:8
  225:9 236:2
  329:15
**fully** 225:3
  270:11
**fulsome** 276:21
**function** 115:4
  116:12,16
  117:11
**functional**
  218:18,19
**functionally**
  219:11
**functions** 25:11
  211:5 258:16
  261:12 297:14
  298:5
**fund** 31:15
  216:13,24
  218:1,4,4
  240:6,16
  290:17 308:23
**fundamental**
  135:17

**fundamentally**
  225:7
**funded** 170:9
  231:12
**funding** 82:8
  162:2,8 164:18
  167:15 190:8
  222:25 231:12
  240:21 270:11
**funds** 191:10
  209:11 218:15
  219:7 259:1
  295:5
**funnel** 103:17
  122:19,25
**further** 16:5
  22:13 45:20
  52:25 90:10,12
  116:11 163:9
  168:18 226:17
  240:16 303:5
  321:15 333:9
**furthering**
  68:14
**future** 150:2,21
  197:22 227:4
  244:1 249:9

**g**

**g** 7:1
**gabe** 202:3
**gain** 235:1
**gains** 147:17
  235:2

**game** 68:21
  235:8 248:21
  251:23 253:17
**games** 141:20
  191:11 224:23
  225:12 250:6
  313:7
**gap** 181:9
**gaps** 166:3
  181:18
**garcia** 312:22
  313:3,21
**gargotta** 1:15
  18:13 98:9,16
  98:17 99:9
  100:17 101:7
  102:5 103:23
  104:2 105:5
  106:4 107:15
  110:16 112:24
  117:2,6 120:6
  120:12 126:4
  130:4 132:23
  138:15 140:18
  142:15 149:1
  149:12 150:25
  153:5 163:19
  165:7 167:22
  176:20 180:23
  194:17 204:24
  206:2 207:15
  212:21 215:16
  221:6 222:18
  224:16 226:5

  226:14 228:2
  230:25 231:2
  232:9 239:1
  240:7 243:17
  244:24 248:16
  254:20,24
  255:1 260:3
  267:20 269:1
  269:24 270:16
**gates** 3:11
**gathered** 280:9
**gcs** 261:17
**gears** 233:4
**general** 38:13
  203:16 240:24
  240:25 260:19
  261:3,6 262:20
  263:13,17
  282:8 290:7
  293:21 295:5
  297:6
**generally** 24:24
  101:18 104:6
  105:9 107:2,5
  107:7 110:23
  113:5,9 114:18
  123:16,23
  176:25 225:17
  236:12 240:20
  243:15 258:25
  294:3
**gentleman**
  138:11

Veritext Legal Solutions
800-336-4000

**[gentleman's - go]**

| | | | |
|---|---|---|---|
| **gentleman's** 124:25 | 287:10,22 323:8 329:18 | 36:19,22 43:14 47:16,20 54:25 | 180:2 182:16 182:25 183:5 |
| **gentlemen** 8:18 78:20,23 97:16 97:19 145:3,10 145:14 288:13 | **given** 29:16 48:8 78:14 98:8 105:9,16 106:17 113:10 117:13 123:5 | 57:6 61:14 62:5 64:5,14 67:11 75:13 77:14 78:13 79:1 81:3 84:9 | 183:16 184:1 186:12 187:24 187:24 189:16 189:17 190:20 190:21,21 |
| **germane** 119:22 | 129:22 199:5 233:13 251:21 | 92:19 93:4 94:7,10 97:15 | 191:1,2,3,5,6 193:14,14 |
| **getting** 18:16 42:11 70:6 77:10 85:10 124:8 126:10 137:1 138:17 141:8 143:14 158:1 184:15 202:21 205:13 223:4 226:25 240:12 277:23 | 256:1 264:16 284:7,25 315:7 | 97:24 100:9,23 101:1,20 102:14,25 103:24 105:12 105:19,22 106:2 107:4 115:10 116:1 117:20 120:1 120:22 121:13 | 195:10 196:17 197:16 198:2 200:18 201:5 203:9,21 204:9 207:2,4,13 208:21 210:2 212:6 216:18 217:18 219:10 220:20 221:9 |
| | **gives** 122:17 272:20 | | |
| | **giving** 90:23 219:25 310:12 321:5 | | |
| | **glad** 144:20 242:17 | 121:14,21 122:13,25 | 222:3 228:1,21 232:1 236:20 |
| **gifted** 282:5 | **gladly** 269:11 | 124:7 125:2,9 | 237:18 238:11 |
| **giordano** 49:17 50:5 202:4 | **glanon** 319:9 | 126:12 130:13 133:1 135:1,6 | 238:12,13,13 239:8 245:10 |
| | **global** 64:20 114:16 118:11 119:7 147:2 | 135:14 137:3 138:12 149:6 151:10 154:1 | 247:18 248:11 252:3,7 255:4 256:13 258:7 |
| **give** 7:22 65:21 69:2 91:11 98:15 100:7 101:2 114:14 126:18 127:22 138:8 169:20 176:3 187:1 209:6 221:11 227:1 248:25 251:1 257:25 258:10 265:19 269:10 276:13 277:18,25 | **globally** 103:3 111:15 119:4 128:2 | 155:15,20 160:14 161:17 163:9 165:17 166:21,21 172:8 173:25 174:23 175:15 176:10,10 177:8,9 179:1 | 264:18 265:4 268:23 269:17 269:19 278:3 282:4,10,13 284:8 287:21 291:16 292:14 294:21 296:6 299:7 303:5 |
| | **globe** 103:2 110:6 | | |
| | **go** 7:12 9:20 10:13 12:23 14:2 18:5 22:3 24:22 25:2 28:5 29:13 33:1 35:8,13 | | |

Veritext Legal Solutions
800-336-4000

**[go - great]**

| | | | |
|---|---|---|---|
| 305:3,14,25 | 110:24 111:5 | 234:2 236:6 | 143:18 149:3 |
| 306:5 310:3,11 | 113:6 115:9 | 243:19 246:23 | 202:23 220:9 |
| 314:14,16 | 119:19 121:14 | 247:12 249:6 | 234:3 243:18 |
| 315:5 320:19 | 121:16,20 | 250:8,20 | 247:24 258:3 |
| 323:20 324:13 | 122:3,8,14,20 | 252:17 254:24 | 284:3,9 288:24 |
| 324:16,18 | 122:25 123:7,8 | 255:6,11,20 | 288:25 290:1 |
| 328:2,5,25 | 123:17,18 | 256:7 257:25 | 304:3 322:1,6 |
| 329:7 331:23 | 124:6,18,19 | 259:23 260:25 | 322:9 327:13 |
| **goal**  239:15 | 127:13 128:14 | 262:7 263:12 | 327:20 |
| **god**  258:7 | 130:7,13,16 | 267:25 268:9 | **gotten**  18:13 |
| 319:9 | 132:19 133:19 | 269:4,10,13,15 | 207:22 226:24 |
| **goes**  151:6 | 135:7,10,24 | 270:18 273:3 | 311:19 |
| 211:9,11 212:1 | 136:24 137:17 | 277:7,24 278:2 | **govern**  170:12 |
| 212:7 214:5 | 141:18 143:2 | 281:11 288:24 | **governance** |
| 226:17 256:11 | 143:23 145:6 | 290:24,25 | 24:24 127:20 |
| 259:15 263:11 | 147:2 149:5,16 | 291:9 292:10 | 128:12 140:11 |
| 294:12 320:5 | 149:21 150:9 | 296:10,19 | 151:23 167:1 |
| 329:19 | 151:17 153:22 | 302:23 305:17 | **government** |
| **going**  27:11 | 153:23 159:7 | 305:21 308:5 | 110:1 112:7 |
| 29:17 33:21 | 159:13,14,25 | 308:23 311:9 | **gp**  217:4,7 |
| 38:18 46:17 | 164:2,4 165:2 | 317:2 319:19 | **graduate**  100:8 |
| 47:16,16,20 | 165:20 167:25 | 319:23 321:3 | **graduated** |
| 48:16 50:13,14 | 169:5 181:12 | 325:19 328:11 | 99:13 102:19 |
| 50:20 54:12,18 | 184:11 188:25 | 328:12,22 | **granted**  286:6 |
| 55:9,11 57:2 | 198:21,21 | 329:18 330:19 | **gray**  66:1 |
| 57:11,13,14,18 | 202:20,24 | 330:20,23 | **great**  66:18 |
| 58:4,14 60:21 | 203:3 206:8 | 331:4 | 94:1 97:10 |
| 65:16 70:8 | 207:16,20 | **good**  8:23 9:3 | 111:21 126:3 |
| 71:11,11,20 | 208:4,15 209:9 | 24:24 41:7 | 130:20 133:9 |
| 77:4 78:5 82:2 | 210:3,5,14 | 96:12 98:4 | 137:5 176:9 |
| 89:14 92:13,19 | 211:1,10 | 110:20,24 | 183:1 276:16 |
| 94:9,10,22 | 212:20 214:20 | 113:12 114:23 | 282:10 330:9 |
| 103:2 104:22 | 221:25 222:22 | 116:20 126:8 | 331:13 |
| 104:23 108:11 | 228:12 233:24 | 136:12 137:17 | |

Veritext Legal Solutions
800-336-4000

**[greatest - heard]**

| | | | |
|---|---|---|---|
| **greatest** 227:1 | 329:1 | **hansen** 317:20 | **harmful** 226:3 |
| **green** 268:23 | **gwalraven** 4:14 | **hanson** 6:8 | **hat** 83:10,16 |
| **grew** 225:5 | **gwen** 4:10 9:4 | 286:21 | 85:13 86:23 |
| **ground** 71:20 | **h** | **happen** 69:5,6 | 96:6,7 |
| **grounds** 214:21 | | 91:22,23 | **hate** 195:25 |
| **group** 14:6 | **h** 5:8 6:1 | 153:19 164:5 | **hbo** 110:11 |
| 62:11 63:5,11 | **half** 98:8 | 169:2 | **head** 112:13 |
| 63:16 86:9 | 119:24 124:14 | **happened** | 141:12 |
| 102:4,6 104:6 | 168:3 302:1 | 67:16 98:21 | **headcount** |
| 104:12,14 | 313:15 330:25 | 111:16 112:25 | 241:22 |
| 105:15 107:21 | **halfway** 85:9 | 138:5 223:22 | **headed** 244:17 |
| 112:9,14,16 | **hand** 216:3 | 301:3,4,20 | **header** 34:2,4 |
| 113:2 115:20 | 217:14,16 | 304:22 313:9 | **header's** 34:2 |
| 126:10 157:16 | 218:21 231:6,6 | **happening** | **headers** 310:14 |
| 169:23 176:13 | 241:8,8 250:1 | 330:5 | **heads** 232:12 |
| 183:10 234:17 | 252:5 | **happens** 149:9 | **healthcare** |
| 299:7 | **handed** 229:11 | 156:1 165:23 | 132:1,11,24 |
| **grow** 135:16 | **handful** 121:7 | 226:21 273:3 | 133:3,5,23 |
| 252:9,11 | 123:22 182:2 | 326:10 | 135:8,13 138:1 |
| **grown** 135:17 | **handle** 45:11 | **happily** 97:2 | 311:10,11,14 |
| **growth** 132:8 | 222:21 225:8 | 125:13 | 313:13 |
| 135:15 | 228:12 269:5 | **happy** 78:4 | **hear** 37:14 |
| **guardrails** | **hands** 220:15 | 211:2 288:18 | 40:10 60:9 |
| 173:18 | 221:18 225:4 | 322:21 331:21 | 144:1,2 179:13 |
| **guess** 46:16 | **handwriting** | **hard** 34:1 | 182:23 209:20 |
| 101:25 256:4 | 11:14 14:14 | 54:14 114:19 | 210:9 212:19 |
| 260:2 | **handwritten** | 144:7 211:24 | 242:7 243:6 |
| **guidance** 21:5 | 11:11,13 | 216:12 276:7 | 255:16 257:23 |
| 21:12 239:12 | **hang** 124:5 | 276:23 330:14 | 261:1 271:3 |
| 325:2,12 | 125:24 200:2 | **hardworking** | **heard** 36:2 |
| **guy** 111:25 | 252:16 283:15 | 106:7 | 148:24 182:21 |
| 113:19 143:21 | **hanging** 250:21 | **harm** 144:17 | 185:16 186:5 |
| **guys** 230:3 | **hangry** 144:23 | **harmed** 278:20 | 186:20 194:24 |
| 265:18 287:12 | | | 203:19 205:22 |

Page 43

**[heard - hockaday]**

| | | | |
|---|---|---|---|
| 219:21 222:1 | **helpful** 16:4 | **hill** 285:16 | 98:1,3 100:14 |
| 223:18 224:9 | 80:9 113:1 | **hire** 100:1 | 102:8,15 103:6 |
| 224:11 239:21 | 117:21 130:21 | 105:23 122:10 | 124:12 125:3,6 |
| 244:21 247:9 | 213:7 226:1,4 | 122:12 135:8 | 125:8,15,18,20 |
| 247:23 274:6 | 226:7,14 | **hired** 77:3 | 126:1 136:4,7 |
| 275:17,18 | 230:19 313:18 | 102:18,19 | 136:13 137:2,4 |
| **hearing** 1:12 | **helping** 56:7 | 105:8 | 138:13,14 |
| 53:6 | **helps** 84:1 | **hiring** 99:24 | 140:17 141:23 |
| **hearsay** 46:12 | 120:23 | **historical** | 142:9,12,13 |
| 46:17 47:13,15 | **hereto** 333:11 | 171:11 | 144:15,20,25 |
| 48:6,20,21,21 | **hey** 130:15 | **history** 29:14 | 145:5,18,20,23 |
| 49:3,18,18 | 156:7 231:18 | 98:21 142:15 | 146:2,13,19,21 |
| 50:16 74:14,24 | 251:14 | 275:7 | 146:24,25 |
| 75:18,22,24 | **high** 26:20 | **hit** 163:25 | 154:4,8,9 |
| 76:9 77:1 | 105:14 107:12 | **hockaday** 3:10 | 157:12 158:7 |
| 143:24,25 | 113:15 133:6 | 5:5 7:25 8:1,15 | 158:24 159:21 |
| 157:7 158:3,5 | 165:8 181:13 | 9:3,7,9,21 | 161:16,19,21 |
| 158:21 159:6,9 | 203:16 242:7 | 13:19,21 18:3 | 162:11,19,22 |
| 159:15 184:16 | 260:7 261:18 | 27:11 28:3 | 166:6,12,13 |
| 199:1 200:21 | 261:22 263:10 | 35:5 36:7 | 170:7,16,20,22 |
| 202:2,7,10 | 266:19 273:24 | 37:19 46:10 | 171:2,3 172:24 |
| 278:11 | 274:1 297:20 | 47:3,13 48:12 | 173:9 174:24 |
| **heart** 108:8 | 298:8 305:10 | 49:17 50:18,21 | 174:25 175:18 |
| **held** 119:6 | 305:12 | 51:3,19 53:11 | 175:21,22 |
| 217:15,15 | **higher** 64:24 | 58:14 69:11 | 179:3,16,24 |
| **help** 22:21 | 113:7,10 | 70:2,12 71:10 | 180:3,15,16 |
| 69:19 79:23 | 114:20 155:24 | 71:22 74:13,20 | 181:16 182:8 |
| 92:6 115:13 | **highest** 68:1 | 75:7,14,23 | 184:18 186:15 |
| 134:14,16 | **highlight** 38:16 | 76:24 77:9,25 | 186:22,24 |
| 174:5 197:21 | **highlighted** | 78:2,17 79:9 | 187:4,5 188:22 |
| 228:10 330:6 | 255:22 | 81:1 84:3,6 | 189:2,15 |
| **helped** 129:10 | **highly** 128:7 | 85:20,22 87:16 | 191:23 192:16 |
| 278:20,22 | 143:8 241:2 | 87:17,20 96:24 | 192:18,21,25 |
| 304:6,7 | 276:14,19 | 96:25 97:21,22 | 193:2 195:22 |

Page 44

**[hockaday - honor]**

| | | | |
|---|---|---|---|
| 195:23 196:2,6 | 256:14,19,22 | 301:15,23 | **honeymoon** |
| 196:9,15,18,20 | 256:25 257:4,7 | 302:16,19,23 | 109:17 |
| 198:19,24 | 257:13 258:8 | 303:21 306:11 | **honor**  7:5,23 |
| 199:4,13,17,20 | 258:14 259:5,8 | 306:21 307:13 | 8:12,15,23 9:3 |
| 200:10,16 | 259:12,25 | 307:22 309:4 | 10:3 18:3 |
| 201:14,23 | 260:1 261:20 | 314:8,17 317:2 | 27:11,23 28:1 |
| 202:25 203:2 | 262:5,9,19,23 | 318:18,19,22 | 28:3 37:20 |
| 208:2 209:21 | 262:25 263:2,6 | 318:25 319:3,6 | 43:23 46:5,8 |
| 209:23 210:4,7 | 263:8,25 | 319:15,19 | 46:10,23 47:23 |
| 210:11,19 | 264:10,20,22 | 320:3,10,15,20 | 49:7,17,25 |
| 211:15,17 | 264:24 265:3 | 320:22 321:15 | 50:18 51:5,7 |
| 212:8,9 215:2 | 265:11,14,17 | 321:18,19 | 51:19 57:9 |
| 215:4 219:3,5 | 265:21 266:9 | 322:3 327:5,10 | 60:15 61:2,5 |
| 219:15,17,19 | 266:12,13 | 327:12 330:4 | 65:18 69:11 |
| 220:2,13,17,19 | 267:7 271:16 | 332:4 | 70:13 71:10 |
| 220:23,25 | 271:20,22 | **hockaday's** | 72:5 74:10,13 |
| 221:4,10,13,16 | 272:2,8,18,23 | 138:7 294:25 | 74:18 75:2,19 |
| 221:19,20 | 272:25 273:1 | **hold**  35:5 47:11 | 76:4,15,19 |
| 228:15 229:1,3 | 277:10,21 | 130:1,1 219:17 | 78:2,5 79:2 |
| 229:7,12,14,25 | 278:4,17,19,23 | 299:24 308:21 | 81:1 84:6 |
| 230:6,20,21 | 279:1,4,6,8,23 | 323:6 | 85:21 87:20,24 |
| 231:25 233:4,9 | 280:13,24 | **holders**  246:1 | 92:8 96:22,25 |
| 233:12,16 | 281:5,15,18,23 | **holding**  15:19 | 97:22 98:1 |
| 234:1,4,9,12,14 | 282:2,24 283:2 | 119:5 215:24 | 99:2 124:6,22 |
| 237:22 238:3,5 | 284:15 285:13 | 216:11 217:24 | 125:3 136:22 |
| 246:13,22,25 | 285:20,22,25 | 258:12 | 142:9 144:20 |
| 247:3 249:19 | 286:3,7,10,15 | **holdings**  7:17 | 145:23 146:8 |
| 249:21,22 | 286:19 287:5,9 | 216:24 | 146:22 154:4 |
| 250:11,17,20 | 287:12,15,18 | **holds**  215:25 | 157:5,24 |
| 250:23,25 | 288:16,22 | **home**  108:24 | 158:18 159:6 |
| 251:3,7,12,13 | 293:13,21 | 134:10 139:10 | 159:12 162:11 |
| 252:21 253:1,2 | 294:9,11 | 329:2 | 166:9,12 |
| 254:2,13,17 | 295:20 297:13 | **honestly** | 169:19 170:2 |
| 255:13,16 | 298:1 300:8 | 330:12 | 173:3 174:19 |

Veritext Legal Solutions
800-336-4000

[honor - identify]

179:2,8 180:15 181:16 184:11 185:10 186:13 186:22,24 188:24 189:8 189:10 195:23 196:15,19 198:19,23 200:3,20 201:14 203:1 209:14 210:14 210:21,25 211:12,21 212:8 213:18 214:16,25 215:3 219:3,14 220:1,2,13 229:7,19 230:20 231:1 233:16 234:9 246:22 249:21 250:13,17 251:8 252:18 253:1 254:2,13 254:14,15 255:5 256:14 256:22 257:7,9 257:15 258:5 259:19 260:6 261:20 262:9 264:20 265:15 265:18,22 266:12 267:2 271:16 272:18

277:6 278:9,23 279:1,8,17 280:5 281:15 282:14 284:10 284:20 285:22 286:3,8,11 287:3,5,10,18 288:7,16 289:2 293:13 300:16 301:15,17 302:24 307:16 307:23 309:9 309:14 314:4 317:3,9 318:14 318:17,19,25 319:15,17,20 319:23 320:12 320:20 321:16 321:19,21 322:6,9,20 323:19 324:4 324:23,25 326:12,22 327:21 328:3 329:9,12 330:16 331:3 332:8,15,18

**honorable** 1:15
**honoring** 33:12
**hope** 82:4 152:4 267:22
**hopefully** 282:10

**hoping** 56:5
**horizons** 235:4 235:7
**host** 26:17
**hour** 110:7 194:11 232:12 254:18 331:1
**hourly** 26:18
**hours** 106:6 128:3 136:7 145:1
**housekeeping** 7:3 145:25 146:2
**housing** 112:7 112:11 232:8
**houston** 1:16
**hr** 141:12 313:14
**huge** 109:20 141:8
**huh** 141:6 176:19 233:10 244:12 263:2 320:9 323:4
**humility** 146:11
**hundred** 291:21
**hundreds** 29:17 107:5,11 107:11,11 121:5 301:4

**hurricanes** 138:21 140:19 151:22
**hyperbolic** 153:13,20
**hypocrite** 251:9
**hypothetical** 19:25 35:22 274:12

i

**idea** 87:6 164:15 197:21 225:10
**ideal** 165:22
**ideas** 14:10
**identification** 14:1 28:7 37:24 81:6 84:11 85:25 88:3 173:8 189:14 230:15 265:2 266:11 272:7 287:8 293:24 320:17
**identified** 156:22 166:2 182:3 291:1
**identifies** 68:25 156:4
**identify** 17:6 242:4 257:18 261:1

Veritext Legal Solutions
800-336-4000

[illiquid - increasing]

illiquid 217:17
illustration
295:4
illustrative
261:8,23 262:1
264:19 289:18
290:9
imagine 182:22
328:7
immediately
65:14 85:4
86:15,17 99:13
205:17,20
217:6 221:7
331:4
imparting
284:23
impeach 255:6
impeachable
255:25
impeachment
256:5
imperative
85:3
implemented
231:2
implications
149:3
importance
76:12 206:3
228:3 243:5
important
17:10 40:1
43:16 47:24

96:6 104:17
117:15 176:2
225:2 246:14
280:6 324:11
328:20
importantly
69:23 226:23
impossible
280:24
impression
144:1
impressive
111:23
imprudent
241:14
inaccurate
318:5
inadmissible
76:1 199:2
201:11
inaudible 9:14
9:15,17 11:16
18:16 23:23
25:16 27:4
29:20 31:1
32:6 40:17
43:24 44:11
46:9 51:6,6
75:12,17 76:13
80:8 87:17
92:1 97:7
108:23 119:5
124:4 152:11
170:22 175:17

180:14 182:19
188:21 189:1
191:22 204:10
206:8 210:13
211:14,15
220:21 228:25
229:24 233:12
233:22 238:4
249:18 250:10
251:6,9,11,18
255:16 267:15
271:10,21,23
272:24 279:5
280:14 282:6
282:13 284:12
285:5 286:11
287:17 288:2
288:15 289:19
289:21 292:17
300:3,3,5
301:21 302:18
319:18 323:5
324:24 329:3
inbounds 50:9
51:23
incentive
139:24 140:2
incentives
139:25
include 56:16
68:1 222:14
232:6 237:2
251:18 274:17
298:20 322:25

included 23:9
27:2,9 94:18
160:20 244:14
includes 11:1
74:16
including 39:14
91:15 282:16
301:19
inclusive
245:12
income 17:6,7
20:8
inconsistencies
220:11 294:16
inconsistency
292:20
inconsistent
36:10,12 39:7
201:21 263:15
263:22 294:2
incorporate
258:5
incorporated
188:1
incorrect
293:10
increase 205:16
236:21 250:8
increased
252:9,10
increasing
55:24 235:23
250:1 252:6

Veritext Legal Solutions
800-336-4000

**[increasingly - interests]**

| | | | |
|---|---|---|---|
| **increasingly** 54:14 245:6 | **individual** 15:21 19:14 186:6 | **informed** 190:7 190:17 193:18 243:3,8 264:2 271:16 272:12 281:19 | **integrate** 232:3 |
| **incredible** 110:14 | **individuals** 51:1 267:11 327:17 | | **intended** 144:17 290:8 |
| **incredibly** 19:6 26:14 104:24 106:7 119:3,16 127:21 128:1 133:6 | **industries** 139:17 | **informing** 192:1 | **intensive** 103:5 |
| | **ineffective** 240:18 | **infusions** 134:4 | **intent** 35:22 56:18 124:12 225:10,17,19 252:23 261:4 |
| | | **initial** 11:21 114:6 165:11 240:20 | |
| **incremental** 52:20 82:24 83:23 195:2,3 205:4 224:20 249:1 | **inevitability** 245:15 | **initially** 268:14 | **intention** 225:14 242:20 |
| | **influence** 152:3 | **inject** 245:22 | **interactive** 217:23 260:16 |
| | **inform** 55:10 164:8 288:18 | **input** 34:14 | **interest** 20:8 36:6 38:12 122:18,21 123:5 131:5 147:6 195:17 197:3 215:23 223:9 227:2,6 245:19 246:20 251:22 270:9 272:10 274:23 293:18 |
| **incur** 249:9,15 | | **inside** 290:14 | |
| **incurred** 224:12 | **information** 25:18 48:8,15 49:10,10,13,21 50:5 51:11 52:1 121:10,21 122:15 123:5,9 123:15 126:9 128:10 156:16 173:19,21,22 174:2,6 176:24 178:8,21 184:7 184:22 195:19 197:5 213:21 214:17 241:7 259:7 268:17 270:17 289:14 290:4 310:17 310:22 314:25 315:4 | **instance** 277:24 | |
| **incurring** 57:18 225:11 | | **institution** 113:15 128:2 136:18 | |
| **indemnificati...** 207:14 | | **institutional** 130:11 135:22 136:9,11 | |
| **indemnities** 208:8,23 | | **institutionalize** 117:10 | |
| **indemnity** 208:17 | | **institutions** 102:3 104:14 107:20 119:10 121:8 276:19 | **interested** 31:21 70:6 268:11 271:9 333:12 |
| **independent** 91:3 119:7 | | | |
| **indicate** 258:11 | | | |
| **indicated** 65:6 329:16 | | **instruments** 181:24 | **interesting** 104:13 108:19 109:14,24 111:22 112:18 123:4 |
| **indication** 20:15 52:23 122:20 156:11 | | **insurance** 108:1 118:6 127:19 208:7 232:7 276:16 | **interests** 244:4 293:18 |

Veritext Legal Solutions
800-336-4000

**[interject - irresponsible]**

interject 69:12
interjected
 304:11
intermediate
 215:24 216:10
internally
 325:2
international
 17:18 98:24
 99:1 119:7
 277:1
internship
 101:13
internships
 101:14
interpolated
 315:11,14
interpolation
 315:23
interpret
 315:22
interrupt 36:19
 195:25 281:16
 328:8
interrupted
 246:9
intervene 110:2
interviewing
 101:4,8
interviews
 101:24 123:19
introduce
 199:18

introducing
 179:17 199:6
inventory
 225:9 231:9,14
invest 31:25
 33:13 39:24
 40:1 52:18
 82:23 162:7
 316:6
invested 129:15
 131:20
investing 17:15
 30:24 31:6,21
 52:25 64:25
 276:24
investment
 32:13 35:23
 39:5,10,16
 40:3,13 44:23
 53:5,9 55:7
 68:2 82:13
 83:4,5 94:19
 95:10 101:1,5
 101:9 102:3
 104:15,18,19
 105:20,23
 106:20 107:2,7
 110:5 112:1,14
 121:15 122:10
 129:23 135:12
 135:19 142:7
 142:21 147:4
 148:6 150:3,5
 163:2,5,8

164:5 165:12
 167:17 174:18
 175:5 178:4
 183:23 184:4
 219:7,9 235:15
 235:25 245:5
 268:15 269:13
 271:3,14
 272:15 277:2
 308:16
investments
 29:9,18,18,22
 128:23 216:17
 217:14,17,18
 235:3,5,6
investor 31:9
 31:15,17 41:19
 65:2 118:5,5
 118:20 121:6
 132:8 150:2
 151:1 162:7
 163:11 269:7
 270:11 271:12
investors 17:12
 17:21 31:7
 48:2 52:5
 64:23 68:4
 116:7 122:13
 122:19 130:11
 132:20 135:20
 135:22 136:9
 136:11 144:17
 214:4 216:19
 234:25 235:20

268:11,19
invite 234:16
invited 236:24
invites 222:11
 222:15
invoice 25:12
 25:12 325:21
invoices 192:10
involved 24:8
 37:7 63:20,23
 67:9 77:17
 148:13 202:3
 203:20 208:20
 216:15 267:11
 316:13 326:2
involvement
 32:9 119:1,2
 125:1 202:14
 203:11 273:12
 304:4,18
involving
 154:11
ioi 122:23,24
 126:9
ipo 114:6,7
 115:2 116:6
 143:1,2
ira 99:4
irene 4:10
ironically
 132:12 133:17
 201:16
irresponsible
 301:19

Page 49

**[islamic - judge]**

**islamic**  99:3
**isolate**  16:19
**issuance**
  117:19 118:19
  178:6 184:5
**issue**  23:12
  46:11 48:6
  65:12 66:24
  75:7 76:24
  94:6 129:17
  131:20 137:23
  169:6,9 186:19
  200:23,25
  242:18 255:23
  277:8 279:18
  279:19 280:12
  281:12,12
  282:18 286:25
  299:8,15
  301:16
**issued**  59:17
  131:15
**issuer**  117:16
  121:6
**issues**  21:18
  147:2 148:23
  156:2 181:13
  185:3,4 207:18
  299:15 306:17
**it'd**  199:23
  307:1
**it'll**  15:14 49:20
  214:22 318:21

**item**  230:23
**items**  156:3
  169:8 208:12
  223:17 228:19
  228:22
**iterating**  168:4
**iteration**  74:14
**it's**  63:4 72:4

**j**

**james**  188:9
  217:23 260:15
**jamie**  112:3,9
**jan**  204:10
**january**  102:18
  132:22 134:21
  191:25 251:16
  252:2
**jason**  6:5 89:4
  89:10,12,17
  90:24 116:13
  187:8 207:11
  266:15
**jason's**  90:2
**jay**  14:9
**jc**  109:10
**jeff**  9:8 24:17
  24:23 25:2
  187:8 204:2
  232:5 293:15
  294:5,11
**jeff's**  260:12
**jeffrey**  4:3

**jeopardy**  208:1
  242:22
**jfarahi**  2:17
**jim**  44:15,17
  160:6 180:18
  180:24 187:8
  207:10 240:2
**jlowenstein**  4:7
**job**  1:18 100:9
  101:9,24 102:1
  102:2,22
  103:10 115:20
  117:9 118:3
  260:12 261:17
  261:17 322:1
**jobs**  101:5
**jog**  79:19
**john**  5:4 33:9
  45:9 131:4
  147:5,23 148:9
  185:7 189:24
  222:10 227:10
  273:12 275:7
  276:8
**john's**  73:2
**join**  115:3
**joined**  117:8
**jointly**  215:21
**joke**  106:11
  257:2
**jonathon**  2:13
  8:25 324:25
**jordan**  154:12
  160:5 161:4,6

  180:18 187:7
  207:5,8 275:11
**jp**  102:2 104:10
  107:1 109:9
  110:3 111:8,20
  112:19 113:2
  115:7,23
  118:12 130:12
  135:23 214:5
  312:25
**judge**  18:13
  98:8,16,17
  99:9 100:17
  101:7 102:5
  103:23 104:2
  105:5 106:4
  107:15 110:16
  112:24 117:2,6
  120:6,11 126:4
  130:4 132:23
  138:15 140:18
  142:14 149:1
  149:12 150:25
  153:5 163:18
  165:7 167:22
  176:20 180:22
  180:22 194:17
  204:24 206:2
  207:15 212:21
  215:16 221:6
  222:18 224:16
  226:5,14 228:2
  230:25 231:2
  232:9 239:1

Page 50

**[judge - know]**

240:7 243:17
244:24 247:22
248:16 254:20
254:23 255:1
255:19,19
257:23 260:3
264:15 267:20
269:1,24
270:16 291:23
319:9 326:10
328:11
**judgement**
264:16
**judgment**
137:24 236:4
242:13 262:13
262:17 264:7
264:12 272:16
**judicial**  7:14
8:3,10,11
**july**  105:11
**jumped**  255:20
**june**  1:13 198:3
**junior**  113:19
**jurisdictions**
17:8 120:1
**jury**  325:14

**k**

**k**  3:17 131:15
131:17,20
147:22 216:22
216:23 311:11
311:16,19

**k&l**  3:11
**kamran**  8:24
**kantowitz**  5:12
11:9 20:1 33:6
33:15 56:7
81:12,19 82:5
82:10 84:16
154:14 160:16
168:11,19
172:13 191:25
193:4 203:20
222:7 227:15
228:18 236:24
237:2,5 238:7
251:15 267:13
306:1 323:1,23
**kantowitz's**
84:20 222:4
**kantowitz's**
84:25
**katherine**  2:4
**katie**  8:24
**kclark**  2:9
**keep**  60:21
130:17 139:1
144:7 159:11
202:20 221:2
249:14 305:15
**keeping**  326:3
**keitha**  141:13
**kelly**  266:16
**kevin**  56:7
154:11 160:6
160:16 182:12

190:6 193:17
193:22 197:10
222:9 266:16
267:13
**key**  195:1 223:4
231:15 243:2
267:14
**kicked**  108:7
**kicking**  109:4
**kidding**  136:3
**kids**  213:2
**kind**  16:5,18
21:7 23:17
25:7 40:5
85:18 98:9
100:6 101:11
101:17,20
102:12 105:13
106:25 107:4
108:8,13,21
109:5,14 111:5
111:16 113:5,9
113:24 115:8
115:12 116:10
116:14,15
117:9 119:19
119:20 120:8
120:14 121:9
122:6 126:4
128:21 129:2
133:10,18,20
140:9 142:22
149:18 152:1
163:23 165:22

165:25 171:11
173:17 174:1
203:15 205:6
205:18 212:10
212:20 216:9
216:12,20
217:3,10,15
228:8 231:20
236:14 239:6
239:14 241:17
244:1,17
260:20 261:19
267:21 269:12
277:19 290:14
295:4,6 296:18
306:19 307:4
308:10 310:5
327:11 328:15
**klgates.com**
3:14
**knew**  49:14
57:11,13,17
71:19,20 83:17
102:11 130:7
157:10,11
164:2,10
174:21 202:13
203:6 289:13
290:4
**know**  17:23
18:2 21:6,22
22:18,20 24:22
26:19 27:5,18
27:18 29:1,5

Page 51

**[know - lag]**

| | | | |
|---|---|---|---|
| 29:10 32:11 | 153:18,20,22 | 282:22 284:9 | 214:8,10 |
| 35:25 37:25 | 155:11 157:11 | 286:25 288:17 | 238:19 252:19 |
| 38:13,18 43:25 | 164:5,24 | 288:23 290:17 | 284:22 310:24 |
| 46:12,16,20 | 165:14 166:2 | 290:17 291:5 | 311:2 333:6 |
| 52:8,10,25 | 167:11 169:4 | 291:15 292:13 | **known**  91:2 |
| 53:12 54:5,22 | 172:25 173:17 | 292:15 294:1 | 128:2 144:16 |
| 55:4,4 59:18 | 174:1,21 | 295:6 297:23 | 312:23 |
| 61:20,24 62:2 | 179:24 183:13 | 297:25 298:2,5 | **knows**  184:24 |
| 64:6 65:13,20 | 184:15 185:23 | 298:9,16,18 | 185:1 303:3,22 |
| 67:3 70:11 | 194:4 195:24 | 302:6,10,21,25 | **kosar**  180:23 |
| 72:15 76:10 | 198:20 199:4 | 303:11,20 | 187:7 207:10 |
| 79:21 80:1 | 206:25 208:7 | 304:1,2,15 | **kosar's**  180:20 |
| 81:7 83:6 87:1 | 208:23 212:25 | 305:6 309:5,17 | **kulas**  11:7 |
| 88:20 91:13,16 | 216:6 217:17 | 312:16 315:2,3 | 64:11 84:21 |
| 92:2 93:23 | 217:19 221:1 | 319:24 321:9 | 86:7 89:10,12 |
| 99:2 101:19,21 | 222:13,14,15 | 323:11,14 | 89:23 90:15,19 |
| 104:9,21,25 | 223:7 225:15 | 325:18,19,21 | 91:6 116:13 |
| 106:14,18 | 228:24 231:16 | 325:23 326:2 | 154:18 158:2 |
| 108:20 109:21 | 232:12,14 | 328:3,12 329:1 | 168:10 187:8 |
| 109:22 110:23 | 240:17 242:2,7 | 331:7 | 207:11 244:10 |
| 112:23 113:24 | 245:6 250:7 | **knowledge** | **l** |
| 114:13 116:3 | 252:20 253:11 | 18:21 27:14 | |
| 117:25 119:7 | 253:21 255:11 | 32:12 48:4 | **la**  65:3 |
| 123:13 124:2 | 255:18,19,19 | 59:14 104:8 | **lack**  58:15 |
| 125:10 130:10 | 255:24,25 | 156:15 157:9 | 163:7 211:1 |
| 130:15,16 | 256:6 260:14 | 158:5 167:7,18 | 306:21 307:13 |
| 132:7 133:15 | 260:17,19,22 | 175:2,3 178:18 | **lacks**  285:15 |
| 133:18,19 | 261:13 263:13 | 184:12,15 | **ladies**  8:18 |
| 134:7,11 136:3 | 263:14,17,18 | 185:6,14,21,25 | 78:20,23 97:15 |
| 136:6,11,25 | 265:25 268:4 | 186:5,9,18 | 97:19 145:3,9 |
| 139:16,16 | 268:19 270:19 | 191:18,22 | 145:14 288:13 |
| 140:12,23 | 270:22 275:15 | 211:1 212:16 | **lady**  328:20 |
| 141:7,11 | 276:20,22 | 212:17 213:11 | **lag**  242:5 |
| 149:18 151:8 | 277:1 282:7,21 | 213:20,23 | |

Veritext Legal Solutions
800-336-4000

**[laid - legal]**

| | | | |
|---|---|---|---|
| **laid**  56:1 | 252:3 | **leader**  136:17 | **leases**  118:2 |
| 202:15 | **lavernia**  3:17 | 252:12 | **leave**  12:14 |
| **language**  71:12 | 9:5,7,7 228:24 | **leadership** | 58:7 71:1 |
| 162:24 179:19 | 229:2 234:11 | 118:25 139:4 | 115:23 250:7 |
| **languages** | **law**  99:6 127:5 | 140:12 222:20 | 258:1 |
| 38:25 | 161:9,9,23,24 | 225:22,24 | **leaves**  244:18 |
| **lantern**  131:18 | 263:3 281:9 | 237:3,8 | **leaving**  249:3 |
| 132:1,24 | 282:5 292:18 | **leading**  115:1 | 262:3,5 |
| 133:24 134:18 | 328:18 329:6 | 174:14 301:16 | **led**  65:8 110:5 |
| 136:14 138:16 | 329:24 | **league**  7:17 | 116:14 136:18 |
| 142:3,6 276:14 | **lawsuit**  274:5 | 13:9 15:22 | 137:11 138:17 |
| **large**  17:5 | 276:12 278:1 | 26:22 36:6 | 195:7 239:13 |
| 76:18 104:9,24 | 283:9 285:9,12 | 38:17 40:6 | **lee**  31:24 |
| 133:7 134:11 | 286:23 | 49:22 57:2 | 154:17 222:8 |
| 134:12 136:9 | **lawsuits**  276:17 | 69:2 91:11 | 324:5,13,16 |
| 209:3 251:19 | 285:10 | 137:7 138:3 | 325:3,19 332:1 |
| **larger**  45:10 | **lawyer**  47:8 | 144:11 195:16 | **leeway**  277:25 |
| 107:2 122:12 | 99:5 100:23 | 197:2,3,20 | **left**  16:4 66:2 |
| **largest**  104:12 | 220:10 305:6 | 200:16 268:2 | 194:24 217:6 |
| 109:1,2,8 | **lawyers**  100:22 | 269:10 270:12 | 217:22 231:6 |
| 113:16 114:7 | 106:6 182:3,4 | 270:12 272:16 | 241:8 288:22 |
| 117:16 118:10 | 274:17,19 | 273:8 274:21 | **legacy**  222:19 |
| 118:11,12 | **lay**  59:7 | 300:25 307:10 | 237:8 |
| 133:25 134:5 | **layer**  158:2 | 316:20 | **legal**  63:22 |
| 135:23 225:24 | 228:21 | **league's**  191:11 | 101:19 121:25 |
| **late**  132:15 | **layered**  239:24 | **leagues**  141:1 | 123:18 140:10 |
| **latest**  33:10 | **layman's** | **learn**  164:3 | 142:22 199:3 |
| **laura**  3:17 9:7 | 306:25 | 228:5 | 202:11 208:1 |
| 148:13 149:7 | **layoff**  85:4,5 | **learned**  165:11 | 212:25 215:8 |
| 170:23 171:23 | **lays**  64:16,19 | 177:12,21 | 215:10 216:17 |
| 176:10 177:9 | 67:23 | 191:9 195:13 | 219:21,25 |
| 191:6,8 195:10 | **lead**  115:3 | 196:24 | 222:23,23 |
| 228:16,23 | 134:22 | **learning**  20:10 | 260:9 278:11 |
| 247:5 249:23 | | | 284:3 295:7 |

Page 53

**[legal - lived]**

| | | | |
|---|---|---|---|
| 297:2,10 298:9 | 280:11 | **line** 33:10 | **litigation** 12:15 |
| 302:16 306:25 | **liabilities** 12:15 | 64:14 146:18 | 122:2 195:15 |
| 316:10,15 | 58:7 193:6,19 | 149:23 162:2 | 197:1 198:14 |
| 321:5 | 194:20 195:2 | 168:15 173:19 | 200:17 202:14 |
| **lenders** 108:24 | 224:12,14 | 216:11 230:23 | 203:6 283:4 |
| **lending** 109:11 | 225:5,15 | 258:9,20 | 311:3 |
| **length** 207:13 | 243:24 244:2 | 259:15,15 | **little** 82:12 92:4 |
| 307:17 | 245:7 269:6 | 296:18 310:4 | 92:6 98:17 |
| **letter** 24:18 | **liability** 118:20 | **lines** 160:10,23 | 99:9 101:6 |
| 72:22 73:1,3,6 | 150:21 205:17 | 160:23 162:1 | 102:11,23 |
| 74:7 78:7 | **liberal** 100:2,7 | 291:15 295:2 | 110:16 111:10 |
| 79:22,24 | **life** 115:12 | 295:12,15,19 | 113:10,12 |
| 199:15 200:8 | 278:21 | 296:1,8,10 | 114:14 124:9 |
| 200:14 201:12 | **light** 130:25 | **lineup** 258:11 | 126:2,3 129:5 |
| **letters** 199:9 | 268:23 | **liquid** 217:18 | 141:14 151:21 |
| 279:21 | **lightning** 242:5 | **liquidated** | 153:12 154:21 |
| **letting** 87:1 | **lights** 141:18 | 151:7 | 155:14,24 |
| **let's** 76:2 | **likelihood** | **liquidation** | 161:25 163:9 |
| **level** 18:12 | 64:24 68:1 | 135:10 305:8 | 165:3 168:17 |
| 100:8 101:13 | **likely** 58:19,21 | **liquidity** 58:25 | 168:19 176:17 |
| 105:24 123:6 | 68:13 195:6 | 59:1 108:11,13 | 191:5 198:2 |
| 124:19 137:1 | 239:12 252:8 | 114:20 205:6 | 209:11 224:9 |
| 156:12,16 | **limine** 325:3,14 | 218:5 | 227:14 228:21 |
| 165:8 181:13 | 326:8,16 | **list** 12:7 189:4 | 233:4 237:12 |
| 203:16 260:7 | **limit** 89:20 | **listed** 92:25 | 237:22 240:20 |
| 261:15,18,22 | 244:2 253:14 | 162:8 290:15 | 247:4 252:7 |
| 263:10,11 | 271:1 | **listen** 36:1 | 254:25 256:6 |
| 266:19 297:20 | **limitation** | 40:25 323:16 | 257:10 277:25 |
| 298:8,10 | 190:2 | **listening** 9:12 | 308:13 325:1 |
| 305:10,12 | **limited** 50:22 | 98:7 | 328:24 |
| **levels** 16:15 | 68:4,7 123:4 | **lists** 64:20 82:5 | **live** 248:20 |
| **leverage** 34:15 | 126:9 202:12 | **literally** 172:1 | 324:4 |
| **lewis** 200:11 | 315:22 318:23 | 186:16 201:19 | **lived** 98:22 |
| 201:6 202:19 | | | |

Page 54

Veritext Legal Solutions
800-336-4000

**[llavernia - losses]**

| | | | |
|---|---|---|---|
| **llavernia** 3:21 | 117:3 118:8 | 116:20 122:1 | **looking** 14:8 |
| **llc** 7:17,19 13:9 | 129:5 134:20 | 128:22 136:20 | 26:6 38:5 43:7 |
| 43:8 63:9,13 | 139:25 142:3 | 151:23 152:24 | 44:5 50:2 |
| 63:15 92:25 | 201:12 221:1,2 | 155:24 162:1 | 79:16 80:10 |
| 132:11 188:4 | 227:1 235:25 | 171:15,24 | 86:6 88:24 |
| 217:12 | 236:6 241:24 | 172:8 175:23 | 89:3 91:14 |
| **llp** 2:5,14 3:4 | 246:3 248:24 | 178:14 180:17 | 96:20 107:2 |
| 3:11,18 4:4,11 | 251:21 275:1 | 187:1,6,15 | 132:14 139:4,5 |
| 4:18 | 326:13 328:4 | 190:4 192:5 | 139:5,6,6 |
| **loan** 92:7 | **longer** 127:4 | 200:5 203:16 | 141:11 195:12 |
| 149:19 150:10 | 227:5 232:15 | 212:11 217:5 | 206:1 213:8,9 |
| 153:1 | 283:21 | 239:25 252:4 | 215:16 220:5 |
| **loans** 117:24 | **look** 10:10,25 | 265:20 281:10 | 225:12 235:21 |
| 118:2 | 12:13 13:6,16 | 282:19 292:6,9 | 246:20 263:1 |
| **lobby** 161:12 | 14:13,20 19:3 | 292:14 309:6 | 276:24 282:15 |
| 161:17 | 21:25 26:17 | 309:10,15,24 | 293:23 310:1 |
| **local** 281:7,10 | 27:22 28:9 | 312:13 314:10 | 312:21 313:2 |
| 282:1,12 | 29:13 32:23 | 316:16 | 315:14 |
| **locate** 169:10 | 33:5 36:18 | **looked** 26:2 | **looks** 11:2,10 |
| **located** 286:20 | 37:11 41:21 | 54:12 55:8 | 11:23 14:8 |
| **location** 1:16 | 42:3,4,14 43:4 | 75:16 84:16 | 34:6 44:13 |
| 235:17 | 43:11,21 44:10 | 93:17 96:16 | 73:8 86:5 |
| **locations** 16:13 | 46:3 50:3 52:4 | 132:9 139:7,8 | 166:17 171:25 |
| 260:10 | 61:9,17 63:3,8 | 139:10,11,20 | 211:6 212:14 |
| **log** 288:14 | 64:1 65:15 | 139:20,21,23 | 227:18 234:16 |
| **logging** 288:17 | 66:7,7 71:24 | 140:5,9,21,22 | 236:23 321:4 |
| **logical** 101:1 | 72:14,20 74:9 | 141:11,14,20 | **loop** 202:9 |
| 125:18 | 75:9 79:4,18 | 170:17 193:12 | **loose** 294:15 |
| **loi** 122:23 | 79:23 80:22 | 194:22 237:23 | **lose** 152:21 |
| 123:11,16 | 81:11 83:24 | 241:22,22,25 | **losing** 68:17 |
| 126:9 | 84:14 85:16 | 291:12 296:13 | 133:15 |
| **long** 16:23 | 87:9 88:16 | 306:1,5,12 | **loss** 68:2 |
| 17:10 22:17 | 91:24 92:18 | 316:12 317:15 | **losses** 114:19 |
| 52:14 57:24 | 109:20 115:13 | | |

Page 55

**[lost - making]**

| | | | |
|---|---|---|---|
| **lost** 125:2 | 327:2,8,11,13 | 55:2,3,22,25 | 48:18 62:2 |
| 135:1 319:11 | 327:19 330:2,9 | 90:10,11 95:12 | 66:24 76:5 |
| **lot** 11:1 15:7 | 331:14,17,24 | 111:18 124:15 | 80:19 89:15 |
| 30:18 69:23 | 332:6,11,13,18 | 130:18 135:20 | 93:9 100:25 |
| 109:5,16 | **lowenstein's** | 146:9 148:17 | 102:24 108:13 |
| 111:21 112:17 | 326:9,16 | 155:17 156:6 | 111:6 115:20 |
| 114:18 115:2 | **lower** 56:22 | 157:18 158:14 | 121:21 129:20 |
| 117:1 119:1,2 | 113:8 204:9 | 158:19,21 | 140:8 141:21 |
| 119:14 123:25 | **lp** 215:23,23 | 169:7 179:9,17 | 144:16 149:1 |
| 140:25 141:20 | 217:4,7,22 | 189:19 201:17 | 150:3 163:4 |
| 142:17 143:3 | **luckily** 276:25 | 219:7,18 | 164:5,11 169:4 |
| 144:10,10 | **ludicrous** | 242:19 245:1 | 170:6 178:17 |
| 148:24 199:2 | 274:11 | 271:2 274:20 | 178:20 186:3 |
| 225:22 226:22 | **lumped** 236:14 | 279:16 283:13 | 207:25 208:15 |
| 228:5 241:18 | **lunch** 9:6 69:13 | 284:4,6 314:22 | 208:24 209:4 |
| 244:21 247:23 | 125:11 129:5 | **mae** 109:11 | 209:22 210:15 |
| 265:7 274:4 | 137:18 143:10 | 112:4 | 221:18 224:8 |
| 277:14 280:10 | 144:22 145:4,9 | **magnitude** | 226:19 228:6 |
| 295:11 301:7 | 164:14 331:5 | 26:25 61:7 | 228:13 231:11 |
| 316:11 | | 276:23 | 232:23 235:3 |
| **lots** 30:11 | **m** | **main** 3:12 | 243:19 246:6 |
| 242:15 | **m** 155:17 | **major** 98:21 | 246:10 254:22 |
| **love** 137:2 | **m&a** 26:25 | 118:10 166:3 | 266:7 270:7,20 |
| 313:17 | 104:19 114:3 | 181:18 | 270:25 271:7 |
| **low** 107:10 | 115:3 119:20 | **majority** | 294:19 320:18 |
| 277:25 | 120:15 121:14 | 105:18 119:6 | **makers** 60:25 |
| **lowenstein** 4:3 | 142:20 | 132:17,20 | **makes** 49:1 |
| 9:8 154:5 | **ma'am** 13:15 | 187:21 189:25 | 104:21 202:23 |
| 220:22,24 | 25:23 55:17 | 216:9 247:14 | 209:23 210:7 |
| 264:2 285:8 | 72:8 74:1 | 251:19 272:10 | 327:11 328:23 |
| 323:3,6,8,9,12 | **made** 8:13 | 272:11 311:24 | **making** 40:3 |
| 323:15 324:1,3 | 38:10,25 39:7 | **make** 16:8,9 | 52:19,19 60:21 |
| 324:16 325:13 | 39:8,21 41:11 | 17:23 20:13 | 68:14 96:12 |
| 325:18 326:6 | 47:21 52:17 | 38:14,23 39:21 | 108:12 114:18 |

Page 56

**[making - meaning]**

119:15 163:5
165:11 199:6
207:18 209:3
223:23 266:25
285:16
**malfeasant**
254:1
**manage**  128:23
129:1 139:18
141:10
**manageable**
307:2
**managed**  107:6
217:16
**management**
56:21,22 99:19
99:21 117:14
131:6 241:20
258:13 261:2
292:6,11 293:5
296:11,15,19
298:6,12,21,23
**manager**  217:6
217:9,10,13
218:15
**managers**
108:1 260:23
261:9,10
**manages**  25:12
**managing**
104:5 115:19
130:22 261:3,9
**manning**
141:16

**march**  5:15
14:6 22:6,12
49:21 50:4,11
51:24,25 52:15
52:21 53:2,21
54:11 55:2
64:12 66:10
72:21 79:25
80:4,14 117:4
177:21 187:16
190:16 197:18
204:15 244:10
247:17 252:3
**mark**  12:14
46:18 51:2,2
65:16 202:4
**marked**  5:9
7:14 13:25
28:6 37:23
81:5 84:10
85:24 88:2
173:7 189:13
230:14 265:1
266:10 272:6
287:7 320:16
**market**  38:13
107:24 114:12
307:5 308:6
**marketing**
35:10,16,21
36:3 38:12
39:4,8 40:4
154:13

**markets**  104:19
109:18 117:14
117:15 128:1
**marking**  51:2,2
**marky**  51:1
**marshal**  128:9
**marshall**  46:19
202:4
**martin**  3:18 4:4
4:11,18
**material**  27:1
109:20 122:1
149:17 156:1
194:14 195:6
203:12,14
249:1 277:11
277:13,23
**materially**
52:21 135:21
**materials**
309:18
**mathers**  46:19
202:4
**matrix**  92:25
227:16 240:22
**matter**  8:17
110:20 134:4
146:2 163:16
201:18 279:15
280:3 283:12
297:5 306:19
306:24 307:11
308:9 330:5

**matters**  7:3
145:25
**matti**  8:25
**maturity**  107:8
**max**  190:18
**maxed**  87:22
**maximization**
244:4
**maximize**
17:22
**maximum**
89:19 162:3
223:7 247:12
**mba**  100:5
115:15,16
**mbas**  115:11
**mckenzie**  99:24
**mckinsey**
100:10
**mean**  12:9
14:25 19:4
27:18 35:11
46:15 76:10
95:8,10 103:25
107:21 114:15
120:8 149:24
149:25 151:13
186:3,6 215:19
220:3 281:16
297:17 315:14
331:6
**meaning**
132:18 151:24
218:16 284:24

Page 57

**[meaning - million]**

| | | | |
|---|---|---|---|
| 295:12 | **meeting** 116:7 | **mentioned** 34:1 | **million** 30:7,15 |
| **meanings** | 182:17,25 | 56:23 94:15,18 | 31:25 32:4,7 |
| 295:13 | 183:2,6 222:16 | 131:25 184:7 | 33:14 35:2,5 |
| **means** 34:20,23 | 245:7 275:21 | **mentor** 111:24 | 35:17,18 36:16 |
| 53:7 78:15 | **meetings** 59:5,9 | 112:2,12 | 37:1 38:6,24 |
| 96:2 104:14 | 59:10,13 | **merely** 239:6 | 39:15,22 40:3 |
| 117:21 151:15 | 221:21 222:19 | **merger** 164:9 | 40:11,16,20 |
| 205:4 215:17 | 223:12,18 | **mergers** 106:23 | 41:3,10,14 |
| 218:19 | 240:21 | **merits** 8:18 | 52:12,18 53:4 |
| **meant** 25:4 | **megan** 6:8 | 243:6 | 53:23 54:12,19 |
| 71:14,16 149:2 | 286:21 317:19 | **message** 154:17 | 55:8,12 57:11 |
| 149:13 150:20 | **member** 59:22 | **met** 59:6 | 58:11,18,23 |
| 153:11 158:17 | 83:12 89:21 | **metric** 135:17 | 68:22,22 69:7 |
| 164:12 205:18 | 90:7,25 148:8 | **metrics** 223:4 | 70:20,20,22 |
| 212:25 239:8 | 206:7 261:3 | **mgm** 31:11 | 71:5,6,8 72:10 |
| 264:17 290:19 | 293:17,18,25 | 43:17 44:6,19 | 82:12,18,24,24 |
| 291:6 295:4 | 296:15 | 45:3,9,11 | 82:25 83:4,4,8 |
| 296:2 297:19 | **members** 59:4 | 150:10 181:24 | 83:18 85:1,9 |
| **mechanism** | 60:13 62:15 | 204:4,22 | 85:10 89:7 |
| 185:11 | 87:3 88:13 | 239:22 240:10 | 91:4 93:1 |
| **mechanisms** | 133:9,12,13 | **mic** 193:1 | 94:17 95:10 |
| 260:19 261:14 | 134:2,14 | 213:7 | 107:10 121:18 |
| 261:14 297:20 | 143:22 167:3 | **micro** 100:5 | 134:2 151:4,6 |
| **media** 12:19 | 206:9,9 237:16 | **microphone** | 155:18 156:2 |
| 36:14,15 39:22 | 261:9 292:7 | 171:1 | 156:21 157:4 |
| 62:11 63:5,11 | **membership** | **microphones** | 160:1 162:4,23 |
| 63:16 157:16 | 296:4 | 286:1 | 163:6 167:17 |
| 176:13 183:10 | **memory** 30:19 | **middle** 15:23 | 168:6,6 190:2 |
| 316:23 | 30:20 79:19 | 28:16 34:1 | 190:8 191:12 |
| **mediate** 198:6 | 201:24 212:15 | 88:24 98:25 | 192:9,11 193:5 |
| **medical** 232:7 | 236:2,9 238:19 | 113:9 183:19 | 193:12,17 |
| **meet** 103:4 | 248:6 269:17 | 192:3 217:22 | 194:9,19,19,24 |
| 235:3 | 282:25 285:17 | 218:6,16,21 | 195:2 204:11 |
| | 289:9 | | 204:12,15 |

Page 58

**[million - motions]**

247:25 248:5,6 248:22 270:6 270:10,13 271:5 272:13 274:8,13,14,15 274:16,17 275:8,12 276:1 276:4 302:1 306:6 308:23 309:1 310:8 312:6 315:6 316:7,14,24 318:1,4
**millions** 29:17 107:4,5 198:7 301:12
**mind** 31:2 35:24 38:24 79:16 80:10 212:10,23
**mindset** 252:13
**mine** 90:24 285:17 304:12 312:25
**minimize** 17:22
**minimum** 270:13
**minor** 166:24
**minute** 78:18 97:1,7 196:1,5 254:5 281:4 288:9
**minutes** 20:12 59:12 78:12

97:3,9 142:10 145:8 182:17 182:25 194:6 211:22 272:21 287:21,22,23 331:2
**miscellaneous** 108:2
**misrepresented** 316:18
**missed** 97:12 192:16,23
**mission** 134:2
**misspeak** 284:19
**misspoke** 33:19
**misstatement** 179:14
**mistaken** 154:8
**misunderstood** 299:25 300:14
**mitigate** 127:14 128:12
**modification** 240:14
**modified** 75:16
**modify** 73:1
**mole** 285:16
**moment** 8:16 87:19 96:7 129:16 194:6
**moments** 134:3 134:17

**momentum** 40:5
**monday** 65:3 102:22 103:10 181:4
**monetary** 147:12,13 148:3 273:13 273:17
**money** 32:14 33:14 71:17 114:18 130:18 131:3 133:16 135:20 149:9 149:15 151:2,8 152:4,12,14,21 163:25 170:14 217:20 218:11 218:11,22 227:7 241:5,12 241:15 242:11 250:6 258:11 258:25 260:18 261:13 297:17 297:19 302:12
**monies** 150:6 150:24 151:16
**month** 100:5 102:20,20,20 102:21 103:11 103:12,19,21 103:25 116:18 117:19 149:9 245:5

**months** 102:19 102:24,25 103:4 126:25 245:4 315:12
**months'** 128:5
**morgan** 102:2 104:10 107:1 109:9 110:3 111:9,20 112:19 113:2 115:7,23 118:12 130:12 200:11 201:6 202:19 214:5 280:11 312:25
**morgan's** 135:23
**morning** 8:23 9:3,13 98:4 150:12 157:22 224:10 237:25 247:17 265:8 322:2 327:6 328:21 331:11 332:17
**mortgage** 108:6,9,22 109:2
**motion** 137:24 146:9 262:12 325:3,10,14 326:8,16
**motions** 330:24

Page 59

**[mountain - net]**

| | | | |
|---|---|---|---|
| **mountain** 285:16 | **name** 32:2,5 146:10,13 161:9 258:14 266:2,17 290:17,18 | **necessarily** 35:22 69:8 70:23 71:9 72:11,13 100:3 100:25 212:24 225:15 231:6 263:9 | 314:11,12 320:6 323:8 324:2,19 |
| **move** 27:21 50:19 68:21 69:19 122:24 162:14 188:25 207:1 218:22 230:8 271:22 273:5 279:13 287:2 | **named** 141:13 143:21 | | **needed** 69:8 78:16 128:9 133:21 135:5 155:25 156:2 159:23 165:12 181:18 183:23 206:15 231:12 242:4 250:25 |
| **moved** 192:17 261:19 278:8 278:10 310:14 | **names** 50:9 51:23 212:25 290:16 291:1,2 | **necessary** 117:22 175:25 225:7 242:2 326:17 | |
| **movement** 260:18 | **narrow** 49:8 | **need** 7:3 16:11 25:17 27:21 28:8,15 42:1 43:17 48:9 53:15 71:9 75:1,2,11,12 76:21 82:12 92:6 97:1,7,8 122:3 134:15 145:19 146:3,7 149:9 152:10 152:11 164:8 182:25 186:8 189:5 195:3 196:5 205:5,6 205:23 211:3 222:17 223:5 235:25 242:9 242:10 243:12 252:24 256:24 275:8 286:8 287:21,22 290:12 308:17 | **needs** 44:6 47:15 48:16,25 85:1 124:16 149:16,17 157:10 329:2 |
| **movements** 297:20 | **narrowed** 123:14 | | |
| **moves** 297:17 | **narrower** 126:10 | | **negative** 114:25 135:14 |
| **movie** 110:11 | **nasdaq** 107:25 112:13 | | **negotiate** 68:7 |
| **movies** 51:6 | **nasty** 274:4 277:15 | | **negotiated** 130:25 |
| **moving** 26:16 172:23 192:25 207:19 241:17 248:20 260:14 | **national** 68:17 134:12 | | **negotiating** 25:3,14 32:17 55:16 223:25 |
| | **natural** 78:3 125:17 254:3 | | |
| **multiple** 55:5 89:19 137:5 167:24 252:12 277:23 | **naturally** 125:16 | | **negotiation** 175:9 225:16 |
| | **nature** 78:3 122:17 126:20 223:1 | | **negotiations** 38:21 67:7 154:23 155:7 175:4 225:20 |
| **murad** 31:17 | **nda** 123:8 161:12,16 271:13 | | **neither** 280:16 292:20 333:7 |
| **mystery** 283:16 | | | |
| **n** | **nearing** 272:18 | | **net** 310:3 |
| **n** 1:4 2:1 3:1 4:1 5:1,1 7:1 | **nearly** 194:9 330:7 | | |

Veritext Legal Solutions
800-336-4000

[network - number]

| | | | |
|---|---|---|---|
| **network** 101:22 133:5 | **nicole** 2:3 7:10 8:24 | **note** 28:4 64:22 65:6 77:9 81:2 | **noticed** 48:19 48:23 59:11 |
| **never** 18:13,15 19:12 20:1 23:16 24:2 31:2 40:1 56:23 94:19 131:14 147:21 178:7 184:6 195:18 197:4 204:13 212:23 260:11 261:16 274:13,18 292:3,22 308:23 316:6 | **night** 93:10 128:4 **nine** 62:22 68:21 111:10 115:25 116:1 177:19 179:4 191:4 **nominate** 146:9 **non** 68:13 109:2 113:16 119:4 147:13 167:2,2 206:9 237:16 255:8 273:17 306:25 | 173:5 204:21 220:4 251:15 251:16 262:10 265:23 266:7 267:3 **note's** 153:12 **noted** 267:6 296:14 **notes** 11:11,13 64:20 97:2 157:23 204:10 204:13,14,16 204:21 205:11 229:4 | **notices** 59:16 **notified** 162:12 **november** 188:9 **nuance** 21:2 **nuanced** 20:19 **number** 8:19 15:3 24:6,14 30:13 36:5 38:9 39:15 40:11,16,20 41:3,10 61:12 65:21 87:13 109:24 112:3 |
| **new** 7:20 55:16 68:4 84:19 86:4 96:8 98:20 103:4 107:25 119:12 129:11 135:8 151:1 222:20 320:1 | **nope** 148:11 **normal** 103:16 120:15,23 121:2,4 125:22 126:5 164:15 164:17 208:16 257:10 | **notice** 7:14 8:3 8:10,12 46:24 47:4,6 48:24 48:25 49:9,15 49:21,24 50:15 50:24 51:12 55:13 59:10 | 114:8 115:18 116:18 120:6 121:19 132:5 138:20 143:6 143:20 149:6,7 149:23 150:12 151:23 157:3 166:2 177:12 |
| **newborn** 194:7 **newborns** 106:9,12 **newly** 130:20 **news** 143:19 **nfl** 241:11,13 242:6,9 **nflpa** 65:6,12 67:7 68:7 **nice** 211:19 | **normally** 114:24 122:18 122:21,22 123:12,22,24 124:9 126:17 126:22,25 127:11 164:7 165:23 168:4 241:16 **northern** 284:10 | 60:19 161:1 168:7 189:21 193:5 198:22 199:5,5,7,8,19 199:21,23 200:17,22 201:19 202:5 202:13 279:14 283:22 285:11 285:13,14 286:25 | 181:18,21,23 184:9 192:23 194:18 228:9 228:23 232:2 237:6 259:21 268:5 276:16 276:19 285:10 289:15 290:25 301:6 302:4 306:6 315:7,8 |

Page 61

**[number - officers]**

315:18
**numerous**
114:3 135:19
**nunnally** 3:18
4:4,11,18
**nwilliams** 2:8

**o**

**o** 5:1 7:1
**o'clock** 145:10
330:18
**oath** 9:24
**object** 46:14
58:14 69:15
71:11 136:24
143:23 157:6,8
179:8,21
184:12 198:21
198:25 213:19
214:13 233:14
252:18 277:7
301:15 317:2
**objected** 233:7
234:6 258:14
258:18
**objecting**
219:20
**objection** 8:4,5
8:14 13:18,21
27:17,24 28:3
35:6 37:13,19
51:16 53:18
79:7,9 80:23
84:7 85:21

87:11,23
136:23 138:6
158:15,22
159:10,14,18
162:15 169:19
170:3 173:3
174:19 179:25
189:3,7 199:22
200:21,22
201:22 210:15
210:20 213:17
219:18 223:15
233:11,20
261:25 265:16
265:22 266:4
272:3 278:9
279:10 281:19
282:18 283:14
283:25 284:1,3
284:6 285:21
287:3 293:12
295:23 296:7
301:21 302:16
302:24 303:4
307:25 320:12
**objection's**
27:20 49:23
144:3 210:25
**objections** 81:1
210:2 212:5
230:5,6 265:17
278:2 282:15
**objection's**
76:2

**objective**
151:18 169:5
**objectives**
121:17
**objects** 283:23
**obligated** 95:3
**obligation**
91:17 169:17
170:9
**obligations**
17:22 121:25
156:20,25
159:2 164:1
177:23 203:13
205:15,17
224:21 225:11
225:21 226:25
231:9 232:13
232:20 235:2
244:18 253:18
253:24 269:6,8
**observation**
212:14
**observed**
223:22
**obtain** 99:16
147:5 195:17
197:3
**obtained**
100:15 188:5
277:14
**obvious** 132:13
**obviously** 8:4
15:10 19:12

32:5 183:17
190:11 263:21
324:7,17
**occ** 119:12
**october** 117:5
129:7
**offer** 13:17
27:23 37:12
74:11 80:23
83:25 85:17
87:11 105:9
116:21 198:10
246:6 261:23
270:5,7,19,21
270:22 271:3
279:14 286:5
286:24 319:21
**offered** 47:14
48:24 172:10
172:25 188:24
280:3,4 326:1
**offering** 46:7
91:9 114:6
198:22 199:4
201:14,17
283:11 313:6
**office** 128:22
129:3 130:7
132:3 139:10
**officer** 176:13
208:7,22
253:20
**officers** 161:2
261:9

Veritext Legal Solutions
800-336-4000

**[offices - okay]**

| | | | |
|---|---|---|---|
| **offices** 132:6 | 281:16,23 | 55:25 56:4,10 | 145:6,14,25 |
| **official** 229:17 | 286:10,15 | 57:17,21 59:3 | 146:12 153:7 |
| **officially** 296:3 | 288:3 300:1 | 59:21 60:23 | 155:24 156:11 |
| **offset** 147:17 | 310:15 314:16 | 61:8 62:4,6 | 159:3,13 |
| **offshore** 13:2 | 318:17 322:15 | 63:3,24 64:8 | 160:13,22 |
| 17:4 23:12,19 | 323:4 325:16 | 64:17,19 65:15 | 161:20 162:19 |
| 120:1 | 331:22,24 | 65:23 66:13,18 | 163:18 169:13 |
| **offshored** | **okay** 10:10,17 | 67:6,11,13,23 | 170:1 172:17 |
| 23:19 | 11:10 12:11 | 68:20 71:4 | 173:25 174:4 |
| **oh** 7:21 17:20 | 13:6,12,16 | 72:14,16,20 | 174:11,24 |
| 28:12 33:19 | 14:16,20 18:23 | 73:9 74:2,9,15 | 183:22 186:2 |
| 54:24 60:9 | 19:8,23 20:13 | 74:19 76:4 | 186:24 188:22 |
| 75:14 78:2 | 21:13,17,24 | 77:7,11,13,20 | 189:4,6 191:17 |
| 81:1,17 87:20 | 22:25 23:2,2,9 | 77:24 79:7 | 193:14 196:8 |
| 87:22 93:25 | 23:16 24:4,8 | 80:3,7,13,21 | 198:13 199:11 |
| 109:23 120:3 | 25:17,21 26:8 | 81:11,19 82:5 | 199:18 200:18 |
| 146:22 154:4 | 27:20,22 28:13 | 82:16 83:6,10 | 201:9,13 |
| 158:18 161:16 | 28:25 29:3,7 | 83:16,20,24 | 204:19 206:2 |
| 162:11,19 | 30:10,14,17 | 84:5,19 85:7 | 209:7,13,23,24 |
| 168:18,18 | 31:3,5,20 32:7 | 85:13,16 86:6 | 210:11,20 |
| 170:1 171:2 | 32:16,23 33:3 | 86:12 87:5,9 | 211:8,11,12 |
| 175:18 191:2,6 | 33:17,25 34:6 | 88:16,18,22 | 212:13,17 |
| 192:18 193:15 | 34:11,13,20 | 90:6 91:2,6,9 | 213:13,22 |
| 195:23 196:18 | 35:13 36:18,21 | 91:24 92:10,11 | 214:13 215:15 |
| 206:25 219:19 | 37:6 38:2,23 | 92:18 93:20 | 218:13 220:1 |
| 220:19 221:13 | 39:11 40:8 | 94:13 95:15,18 | 224:3 228:2,23 |
| 221:16 229:1,7 | 41:13,21 42:3 | 96:22 97:11,24 | 229:23 230:13 |
| 229:13,14 | 43:4,7,14,24 | 99:16 103:12 | 234:3 238:16 |
| 233:9 247:2,24 | 44:2,4,17,24 | 115:23 117:6 | 238:18,22 |
| 249:20 250:17 | 45:6 46:3 50:8 | 123:7 124:6 | 239:1 242:24 |
| 251:3 259:8 | 50:23 51:15,20 | 125:10,15,21 | 244:13 246:9 |
| 263:25 264:10 | 52:1,4,10 | 130:4 131:1 | 247:20 248:11 |
| 265:15 266:1 | 53:13,17,25 | 138:6 142:10 | 248:16 250:21 |
| 270:3 271:20 | 54:3,9 55:8,15 | 142:12 144:4 | 255:17 257:21 |

Veritext Legal Solutions
800-336-4000

**[okay - opportunity]**

| | | | |
|---|---|---|---|
| 258:4,8 259:4 | 312:1,4,9,19,24 | **op** 7:18 13:1,4 | **opinions** |
| 259:5,18,20,23 | 313:2,11 314:3 | 234:17 | 142:20 202:11 |
| 262:2,10,25 | 314:13 315:2,5 | **open** 52:24 | **opponent** 75:4 |
| 264:18,25 | 315:20,23 | 53:4,6,10,22 | 76:7,22 157:18 |
| 265:10,14,21 | 316:5,11,16 | 91:14 102:14 | 286:23 |
| 266:22,24 | 317:13 318:10 | 145:7 | **opportunistic** |
| 267:6,16,20 | 318:13,15 | **opened** 102:13 | 108:22 |
| 268:14 270:1 | 319:2,4 321:17 | 128:1 | **opportunities** |
| 275:25 283:15 | 322:5,5 323:6 | **opening** 192:12 | 13:14 19:1,6 |
| 287:15 288:23 | 324:1 326:24 | **operate** 131:10 | 110:9 122:7 |
| 289:13,17,23 | 331:10,13 | 152:18 239:11 | 203:13 |
| 290:2,24 291:8 | 332:9,13 | **operates** | **opportunity** |
| 291:19,23 | **old** 145:1 | 144:13 | 13:4 14:17 |
| 292:9,16,24 | **omission** | **operating** | 16:7,9,10,12,17 |
| 293:10,20 | 203:12 | 129:14 143:21 | 17:15 18:14 |
| 294:20,22 | **once** 48:17 | 152:12 164:7 | 19:24 20:2,4,9 |
| 295:8,18 296:6 | 102:25 103:11 | 216:5 241:9 | 20:16,21,24 |
| 296:22 297:1,8 | 103:11,12 | 243:20 272:16 | 21:4,13,19 |
| 297:12,22,25 | 104:1 208:11 | **operation** | 23:9,16 53:6 |
| 298:11 299:2,5 | 240:20 252:10 | 273:8 | 90:23 98:16 |
| 299:15 300:13 | 257:3 302:25 | **operational** | 113:13,21 |
| 300:20 301:3 | 327:21,22 | 25:9 | 115:3,14,17 |
| 302:6,14 303:2 | **one's** 11:17 | **operations** | 124:16 132:2 |
| 303:12,17,25 | 77:4 78:15 | 57:22 119:25 | 132:13 141:9 |
| 304:3,12,14 | 229:13,14 | 225:8 231:13 | 150:23 172:14 |
| 305:3,4,13,20 | **ones** 113:10,11 | 241:1 249:14 | 225:1 227:1 |
| 305:24 306:4,9 | 147:3 157:19 | 270:12 | 234:22,23,24 |
| 306:15,16 | 280:8 | **operator** 121:7 | 235:11,13,14 |
| 307:4,8,24 | **ongoing** 91:17 | **operators** | 235:24 236:5 |
| 308:23 309:1,6 | 195:15 196:25 | 144:5 | 236:12,17 |
| 309:24 310:3,8 | 225:2 | **opinion** 20:16 | 237:19,20 |
| 310:11,17,20 | **onshore** 17:3 | 38:9 71:16,19 | 239:11 243:25 |
| 310:25 311:13 | **ooh** 329:20 | 199:2 201:11 | 256:2 271:25 |
| 311:19,22 | | 248:25 326:18 | 272:15 284:7 |

Page 64

**[opportunity - page]**

308:14,16
**opposing** 243:6
**opposite**
276:10 277:17
**optimization**
20:9
**optimize** 16:15
236:20
**option** 67:14,23
68:20,25 69:5
69:10 70:18,25
71:4 72:10
248:4,8,12,13
248:19 249:6
249:24 252:4,4
252:7,10
253:14 299:10
299:18
**optional** 257:19
**options** 11:24
64:14,16,19
247:18 253:7
299:8,9,16
300:8,18,21
301:18 307:9
**order** 151:9
223:6 275:19
322:23 327:13
**ordered** 283:21
**orderly** 135:10
**ordinary** 19:2
19:19 24:23
29:16 103:16
172:21 208:16

208:22 209:5
218:2 222:24
226:18
**org** 20:22
141:11 215:9
**organization**
116:13 180:9
260:20 290:20
291:22
**organizational**
140:6,10 213:9
260:23 290:8
291:7,11
**organizations**
134:6 294:3
295:16
**organized**
260:8
**original** 197:19
235:8
**originally** 73:5
165:13 205:19
**originate** 239:7
**originating**
117:24 118:1
**osherow** 1:4
8:19
**outcome** 26:23
110:24 248:10
333:12
**outlays** 29:22
30:3
**outs** 18:15

**outset** 240:23
**outside** 11:4
27:2 44:24
95:1 168:2
185:12 266:19
277:3 319:25
319:25
**outstanding**
55:19 156:20
193:19 204:4
299:20 300:10
**overall** 18:12
111:8 236:21
260:8 290:14
**overarching**
235:15
**overdue** 192:10
251:22
**overlap** 129:8
**overruled**
49:23 58:16
70:14 71:23
124:24 138:7
170:3 199:22
202:3 278:3
295:23 301:22
303:23 306:22
307:25
**overtime** 182:5
**overwhelming**
105:18
**owe** 251:20
**owed** 156:13

**own** 144:11
159:16 306:25
**owned** 119:4
217:13
**ownership**
15:21 63:4,10
131:3,5,9,18
147:6,24 176:3
206:11 214:3
217:8 218:18
218:19 219:11
222:20 263:18
295:7
**oz** 13:14 14:16

**p**

**p** 2:1,1 3:1,1
4:1,1 7:1
**p.m.** 127:24
160:8 168:20
171:17,21
222:5 247:17
**pa** 66:15
**pace** 327:20
**pacific** 171:18
**packaged**
118:4 244:17
245:1,4
**page** 10:18
11:10,17 13:6
14:13 33:5
42:3,4,14,22
43:4,7,11,13,14
44:4,10 45:8

Veritext Legal Solutions
800-336-4000

[page - party]

| | | | |
|---|---|---|---|
| 50:4 61:17 | **papering** 274:7 | 84:1 108:9 | 283:13 333:8 |
| 62:6,7,8,22 | 274:12 | 125:12 133:10 | 333:11 |
| 63:3 64:10 | **paperwork** | 155:7 156:7 | **partner** 129:24 |
| 65:21,22 66:9 | 297:9 | 175:8 184:2,25 | 130:23 131:1,2 |
| 66:9,14 72:20 | **paradigm** | 190:6 203:22 | 147:24 248:3 |
| 74:16 75:12 | 164:16 | 226:18 244:10 | 261:3 263:13 |
| 76:21 81:12 | **paragraph** | 255:12 256:6 | 263:18 |
| 88:24 92:13,19 | 89:4 90:6 | 260:12 261:16 | **partner's** 94:5 |
| 92:20 93:4,25 | 175:23 176:24 | 267:23 273:6 | 190:2 |
| 94:1,10,10,22 | 177:8,9,19,19 | 275:12 283:24 | **partnered** |
| 95:4 163:10,10 | 178:22 179:4 | 284:4 293:9,15 | 100:4 |
| 170:23 173:17 | 191:4,5,8 | 298:1 303:8 | **partners** 30:15 |
| 176:10 177:10 | 192:6 193:12 | **participate** | 30:24 31:6 |
| 178:7 187:24 | 195:11,13 | 17:13 22:21 | 52:11 63:9,13 |
| 188:4,8 189:16 | 196:22,23 | 123:2 150:6,24 | 63:14 82:21 |
| 189:17 190:21 | 197:17 203:9 | **participated** | 83:7 92:25 |
| 191:6 207:13 | 203:10 251:14 | 100:16 | 130:23 131:6 |
| 227:21 238:11 | 313:11 315:5 | **particular** | 131:13,16 |
| 238:12 248:12 | 315:21 316:16 | 13:13 30:19 | 142:6 143:6 |
| 252:3 256:25 | 318:10 321:7 | 70:25 108:6 | 156:12 157:13 |
| 257:5 258:9 | **paralegal** | 120:17 194:18 | 157:15,17 |
| 259:15,15 | 100:20 | 203:12 236:11 | 173:12 193:7 |
| 309:15,24 | **paralegals** 99:6 | **particularly** | 196:23 217:11 |
| 312:21 313:3 | **parent** 16:10 | 104:13 107:17 | 293:4 |
| **pages** 227:23 | **parents** 106:9 | 111:1 223:21 | **partnership** |
| 309:25 | 106:11 | **particulars** | 131:7,7 296:4 |
| **paid** 57:14,18 | **parse** 17:7 | 32:19 | 298:12,14,24 |
| 273:24 301:10 | 46:15 47:17 | **parties** 48:22 | 299:3 |
| 302:1,5,6,10 | 76:25 179:3 | 48:22 122:9 | **partnerships** |
| **paper** 221:12 | **part** 16:21 17:4 | 123:25 126:18 | 232:8 |
| 274:14 275:8 | 23:6 30:19 | 129:10 148:5 | **parts** 21:9,9 |
| 275:14 312:16 | 39:23 48:9 | 182:18 183:16 | 290:22 291:12 |
| 314:11 | 50:15 51:14 | 199:10 201:1 | **party** 69:21 |
| | 75:17 76:10 | 271:2 279:16 | 75:4 76:6,22 |

Veritext Legal Solutions
800-336-4000

**[party - period]**

98:13 121:15
123:17 126:12
151:11 157:15
157:18 182:13
216:16,18
217:12 255:9
261:14 276:17
277:3 283:19
283:22,23
284:6 286:23
**party's** 283:17
**pass** 96:22
261:13 287:19
318:15
**passively**
217:15
**past** 17:4,5
192:11 195:15
197:1 244:2
**path** 26:16
237:9,10
241:17 246:17
267:22 268:1
**paths** 26:17
**patrick** 181:24
**pattern** 203:11
**pause** 103:7
105:2 120:3
**pay** 59:2 85:8
155:18 191:10
225:10,15,18
225:19,20
226:15 243:25
249:2 253:15

**payable** 57:14
59:3 156:13,17
205:3 249:3,7
299:11,19
300:11,22
301:9 311:1
**payables** 83:22
231:19 308:12
**paycheck**
133:19,19
**paying** 25:1,15
83:22 131:22
132:19 139:10
139:23 224:18
253:10 308:12
**payment** 156:8
**payments**
127:16 155:25
232:3,6
**payroll** 163:25
169:4
**pays** 253:23
**pdf** 10:23 14:10
187:25 188:8
**peaks** 310:8
**pencils** 22:9,24
80:11,14
**pennies** 139:13
**penny** 52:12
55:11 91:4
**people** 20:1
36:1 53:21
56:22 60:24
61:6 77:10

99:25 100:1
101:13,22
102:14 104:1,3
104:6 105:12
111:3,23
112:17 113:7,8
114:20 118:1
121:22 124:1
126:10 128:3
134:17 139:11
139:19,23
153:24 159:18
166:9 169:23
178:21 196:3
221:2 240:22
267:14 278:7
285:25 315:3
**people's** 118:18
**perceived**
130:14
**percent** 26:19
36:17 60:4
63:10 101:12
101:16 103:20
110:21,21,21
110:22,22
114:23 134:9
135:2,14,16
153:18 176:3
178:11,13
195:3,5,17
197:3 198:5
206:12,12,13
217:9 226:4

236:7 237:14
263:18 268:25
274:23 291:21
**percentile**
111:5
**perfect** 79:12
145:5 209:23
328:23 329:9
331:3
**perfectly** 12:10
185:8 307:20
**perform** 169:18
170:9 177:23
**performance**
110:15 140:1,2
140:4 223:3
241:16
**performed**
110:18 138:24
**performers**
105:15
**performing**
113:7,8,10,15
133:6 138:24
**period** 89:20
90:23 100:5,21
103:24 105:5
106:3,5 107:14
107:14 109:25
110:7,10 111:6
111:11 119:24
123:10 127:21
128:1,4,6
129:8 131:19

Page 67

**[period - player]**

131:22 134:25
135:2 143:12
164:20 168:23
172:18 194:2
194:12 216:17
228:6 269:4
283:21
**periods** 103:21
250:9
**permission**
209:10,14
327:25
**permit** 210:3
**permitted** 70:3
**permutation**
239:13
**permutations**
245:9
**persistence**
101:25
**person** 25:1,9
25:10,13 59:8
101:24 110:3
112:6 122:17
175:1,12
314:21,25
315:1 328:20
**personal** 60:2
157:9 158:4
175:2,3 178:18
178:23 184:12
185:6,21 186:4
186:9,18
191:18 211:1

212:16,17
213:11,19
217:5 252:19
279:24
**personally** 52:7
67:9 112:2
**perspective**
17:12 89:18
90:24 107:10
111:18 112:10
118:5 127:16
140:7,7 151:9
208:17 210:9
218:20 241:10
243:8 244:5
248:2 306:14
316:2
**perspectives**
243:7
**pertains** 224:17
**pertinent**
290:22 291:13
**peter** 180:20,23
187:7 207:10
**peter's** 282:13
**petrucelli**
322:11,23
323:22 327:5
330:21,22
331:12,15
**pfd** 87:22
**ph** 7:19 8:25
9:4,12 11:3
31:13,17 46:19

46:19 51:1
76:9 141:13
200:9 230:10
319:9
**phase** 123:16
123:23
**phone** 19:17,19
20:1 139:9
**photograph**
261:21
**physically**
289:24
**pick** 78:9
146:21 196:8
209:17 265:6
**picked** 292:19
**picture** 145:16
145:19,21
146:7 150:16
193:8 211:13
211:17 212:4
**pictures** 187:25
**piece** 17:3,20
17:21 125:9
130:2 158:24
170:13 217:2
**pieces** 20:6,6
237:23
**pitch** 220:22
**pivot** 105:3
**pivoted** 140:14
**place** 17:21
71:2 139:17,24
140:24 149:21

165:13 195:8
231:8 232:21
241:6 243:19
249:3 313:16
**placed** 60:6
**places** 100:12
280:11
**plaintiff** 1:6
322:10
**plan** 81:20,23
82:2,7,11,22
83:13,18,21
85:1,10 86:16
149:8 190:7
245:23 255:14
305:14,25
327:22,23
331:4
**planned** 135:1
**planning** 33:10
222:15 328:4
**plans** 308:25
**plaque** 146:9
**plastic** 104:21
104:22
**platform** 134:1
**play** 213:20
255:14 292:4
324:20,21
328:1
**played** 259:22
260:22
**player** 71:2
141:3 242:19

Page 68

**[player - postdate]**

302:14 303:1,7
303:12 307:10
308:9
**players** 56:16
56:23 57:2,4
68:13 242:21
303:15 316:19
**playing** 250:6
**please** 7:2,9,12
7:24 8:17,21
9:23 10:14
22:4 27:21
28:5 33:2,9
41:1 58:16
61:15,19 64:5
70:15 73:1
75:11,13 77:14
78:24,25 79:1
81:3 84:9 94:7
97:20 138:12
138:25 139:1
154:1 170:22
170:25 180:14
184:20 191:6,8
196:1,13,17
200:19 201:24
202:10 210:17
219:2 222:10
231:1 251:15
251:16 254:11
258:7 266:9
277:20 278:13
283:2 286:18
287:11 288:14

303:5,24 305:3
307:25 308:3
314:17 322:8
**pled** 60:17
**plow** 247:1
276:6
**plus** 68:22 71:5
198:8
**point** 18:16
22:21 38:20,22
51:8 54:17
55:22 60:23
61:25 70:11
71:10 73:21
90:21 91:10,13
96:1,12 106:17
122:8,20 123:6
123:25 125:4,5
129:17 131:4
133:11,12
138:7 146:3
147:4 148:1
149:6 150:15
150:20,21
153:21 156:13
159:9 167:13
169:16 177:4
192:9 193:20
196:8 202:23
205:4 214:19
217:20 220:10
242:22 243:16
243:17 245:4
245:13 246:15

246:15 250:14
250:19 254:3
255:25 256:17
260:15,15,16
260:17 263:5
271:11 272:9
272:13,19
273:11 275:6
280:6 284:21
294:25 314:2
315:8 326:9,16
**pointed** 8:2
292:18 293:14
**pointing**
233:21
**poke** 231:23
**policies** 139:8
139:17,21
140:22
**political** 45:11
99:11
**politics** 34:16
113:5
**pool** 235:20
**pools** 17:14,16
17:17,18
**popular** 144:8
**portfolio**
128:23
**portion** 16:16
16:17 85:6
259:13,14
297:13

**portions**
257:13
**posed** 244:16
**posing** 244:25
**position** 89:6
90:21 91:1,3
113:25 115:6,7
133:17 136:19
138:18 150:4
150:20,22
152:9,14
153:14,15,22
157:14 207:24
208:1 241:14
256:15
**positioning**
87:6
**positions**
112:18
**positive** 310:12
**possession**
280:8
**possibility**
268:7
**possible** 17:23
27:2 57:24
89:16,19 221:3
228:13,14
246:16 275:14
**possibly** 323:4
323:22,24
**postdate**
214:11

Page 69

[posture - prime]

| | | | |
|---|---|---|---|
| **posture** 234:6 | **precision** 297:21 | **prepared** 18:22 | 317:5,16,20,23 |
| **potential** 15:17 | **preclude** 70:8 | 45:6 121:21 | 317:25 |
| 21:18 23:14 | **predate** 214:10 | 145:24 160:24 | **pressure** |
| 58:6 64:23 | 214:12 | 333:3 | 242:14 |
| 65:2 68:4 | **predating** | **preparing** 27:7 | **prestigious** |
| 122:19 132:4,7 | 202:13 | 264:11 292:4 | 161:24 |
| 239:8 250:1 | **predominant** | 304:20 329:1 | **pretrial** 283:19 |
| 252:5 268:19 | 215:24 | **preposterous** | **pretty** 22:3 |
| 270:5 271:3,12 | **preexisting** | 153:16 274:19 | 26:20,21 32:20 |
| **potentially** | 224:14,15,24 | **present** 132:7 | 55:6 101:10 |
| 31:21 68:17 | 225:15,18 | 223:20 271:11 | 107:8,23 |
| 128:25 182:23 | **preface** 211:9 | 272:14 | 108:18 110:19 |
| 235:1,19 | **prefaced** 212:4 | **presented** | 117:11 136:16 |
| 239:10 245:25 | **prefer** 210:15 | 45:20 74:23 | 141:1 146:18 |
| 246:8 276:24 | 328:24 | 82:14 143:4 | 152:8 157:22 |
| **pottruck** | **preferred** | 240:6 | 168:5 180:4 |
| 150:10 204:4 | 178:3 184:3 | **presenting** | 234:20 276:23 |
| 204:10,14,16 | **prefers** 146:5 | 142:19,19,25 | **previous** 38:8 |
| 204:21 | **preliminary** | 253:21 | 140:12 166:24 |
| **powers** 24:25 | 270:3,9 | **preserve** | 277:8 285:18 |
| **pr** 68:10 | **premiered** | 305:14 | **previously** 67:6 |
| **practical** 45:12 | 197:22 | **preserved** | 88:18 91:2 |
| 297:6 | **premise** 179:9 | 303:18 | 192:22 205:7 |
| **practice** 21:8 | 179:22 | **preserving** | 234:10 256:11 |
| 25:2 | **premises** | 307:10 308:9 | 309:11,14 |
| **pre** 33:14 225:5 | 288:22 | **president** 115:8 | 312:15 326:19 |
| 244:16 245:1,3 | **prep** 331:1 | 115:17 116:14 | **price** 52:16 |
| **precedent** | **prepac** 267:24 | 117:8,13 | 127:16,17 |
| 165:10 182:6 | **preparation** | 130:23 | **prices** 133:10 |
| 183:7 270:22 | 18:18,25 174:6 | **presidents** | 134:15 |
| **precise** 36:3 | 302:2 304:17 | 104:5 | **primary** 14:25 |
| 290:8,11,12,16 | **prepare** 209:15 | **press** 35:10 | 65:7 132:18 |
| 290:18 291:4,5 | 300:20 304:6,7 | 36:5,15 38:11 | **prime** 109:2 |
| 296:24 298:9 | | 40:7 41:14 | 149:24 |

Veritext Legal Solutions
800-336-4000

[principally - program]

| principally | probability | proceeded | producing |
|---|---|---|---|
| 108:5,15 | 244:5 | 114:2 | 283:22 |
| 129:13 | **probably** 59:8 | **proceeding** | **product** 325:23 |
| **printout** | 63:22 67:19 | 138:10 245:18 | **production** |
| 227:23 | 69:19 74:22 | 283:20 332:22 | 232:7 279:12 |
| **prior** 8:7 15:1,4 | 75:25 78:15 | 333:4 | 283:17 |
| 30:23 31:5 | 101:12 113:19 | **proceedings** | **profession** |
| 53:2,20 63:17 | 117:21 120:23 | 333:6 | 101:20 |
| 89:22 129:12 | 121:5 122:22 | **proceeds** | **professional** |
| 138:11 139:2 | 126:22 168:7 | 102:17 | 26:24 106:8 |
| 154:21 156:17 | 182:22 192:10 | **process** 56:6 | 140:20 226:22 |
| 156:22 162:25 | 192:25 215:10 | 63:23 89:14,22 | 278:21 |
| 167:14 175:5,9 | 233:14 237:12 | 91:4,10 101:7 | **professionalize** |
| 178:19 191:14 | 254:18 255:6 | 101:8 116:6,9 | 116:11 129:2 |
| 198:15 203:11 | 260:9 280:16 | 120:12,15,22 | **professionally** |
| 203:15 204:19 | **problem** 18:3 | 121:9 122:21 | 100:18 |
| 206:21 226:25 | 28:2 75:6 | 122:22 126:5 | **professionals** |
| 315:7 | 150:14 164:1 | 126:22 127:3 | 302:2 |
| **priorities** 324:5 | 185:15 194:8 | 165:19 232:15 | **profile** 143:20 |
| **prioritization** | 196:18 249:4 | 244:24 245:11 | **profiles** 16:2 |
| 224:20 231:15 | 252:15 328:25 | 245:17 267:12 | **profitability** |
| **prioritize** | 329:4,7 330:13 | 268:8 269:2 | 17:11 |
| 231:10 | **problematic** | 271:13 276:21 | **profitable** |
| **priority** 224:25 | 29:25 30:2 | 307:5 308:6 | 135:18 |
| **private** 104:25 | 151:1 152:6 | **processes** 25:12 | **program** 99:14 |
| 109:10 119:8 | **problems** | 140:11 223:3 | 99:15,17,18,19 |
| 134:6 136:10 | 108:12 185:11 | 239:14 241:6 | 99:22 100:16 |
| 217:4 | 248:23 | **prod** 231:23 | 101:2,17,18 |
| **privilege** 98:6 | **proceed** 10:1 | **produced** | 102:17,20 |
| 173:18 | 78:25 79:13 | 201:1 202:17 | 103:1,5,15 |
| **pro** 12:7 13:7 | 97:21 145:15 | 279:13 280:2 | 105:3,6,7,25 |
| 238:14 | 145:24 146:22 | 280:10 281:7 | 106:1,2,3 |
| **proactively** | 196:14 215:1 | 286:20 | 115:15 |
| 245:16 | 254:15 289:1 | | |

Page 71

**[programs - put]**

programs
  101:15
projections
  160:2 194:23
  309:22,25
  315:12 316:2
projects  115:21
promised  178:3
  184:3
promoted
  117:12
promotion
  111:12,13,15
proof  6:6
  173:11 174:6
  179:13 193:13
  195:12 196:23
  241:16 242:12
  286:5 314:9
proper  176:1
  281:13 291:2
propose  300:17
proposed
  197:24 206:6
  222:10
prospects
  203:13 223:7
protected
  208:16
protection
  119:11
protections
  208:8,19,23
  209:5

protest  224:3
  233:2
protests  223:12
proven  277:12
  277:12
provide  69:21
  90:24 104:14
  123:8 163:12
  174:5 176:23
  260:6 268:18
  276:15
provided  18:11
  156:16 160:15
  184:21 235:3
  235:16 253:8
  282:3 308:25
  314:25 315:4
  316:6
provides  52:1
  68:20 253:24
  316:1
providing  26:3
  74:8 90:25
  123:15 173:22
provisions  25:8
  109:21 181:25
  205:11
proxy  188:4
  207:22
prudent  228:13
  242:12
public  112:7
  114:6 129:1
  134:6 135:25

136:1 142:21
  216:6 316:19
publicly  119:6
  130:11 277:16
puffing  330:13
pull  15:4
  148:13 160:3
  165:2 166:7
  168:8 170:16
  172:24 176:8
  177:20 179:7
  182:9 184:8,9
  184:19 188:23
  189:5 191:8
  193:13 198:19
  203:17 221:25
  227:13 228:15
  233:5 237:24
  239:21 244:6
  247:5 250:11
  265:8 269:15
  286:11 293:11
  312:17 319:20
pulled  184:19
pulling  180:13
  269:17 282:25
purchase  164:9
pure  49:3 202:7
purely  201:19
purport  200:15
purpose  76:19
  121:20 137:7
  183:1 202:12
  222:19 223:12

232:9 236:8
  239:2 243:12
  244:23,25
  255:8 275:21
  283:12
purposefully
  25:4
purposely
  76:17
purposes  8:2
  36:4 39:8
  46:24 47:25
  49:19 51:12
  198:22 199:19
  199:23,24
  201:19 202:5
  215:7 216:2
  230:8 261:24
  262:1 264:19
  279:14 286:4
  327:25
pursue  121:14
  122:8 127:13
  208:11,25
  237:20
pursuit  224:22
push  192:11
  251:24
pushed  152:15
  152:16 313:16
pushing  37:8
  243:4
put  38:11 40:6
  54:18 55:11

Veritext Legal Solutions
800-336-4000

**[put - quickly]**

57:13 60:18
61:18 79:4
82:21 83:7,17
93:10 112:6
115:21 119:18
122:5 133:6
135:25 139:24
140:24 142:22
150:4 151:4
152:3 153:16
165:13 166:3
182:6 200:16
207:25 209:18
217:2 220:18
231:7,10
232:21 234:5
242:21 261:5
262:12 263:5
264:6,9 271:5
281:3 286:5
293:16 299:5
300:25 313:6
331:20
**puts** 48:25
271:5
**putting** 52:11
139:17 146:10
151:2 152:12
152:14,20
161:1 163:19
193:4 220:14
225:12 241:14
243:19 260:13
326:3

**pwc** 10:7 11:1
18:8,10,23
19:21 20:3
21:19 22:7,12
22:21,25 23:5
24:18,21 25:14
25:19,22,25
26:12 74:21
75:5,8,15
77:17 79:6,19
200:23 202:1,7
226:21 236:12
237:4 238:8
302:10 308:15
**pyramid** 20:24

**q**

**q3** 132:16
**qualifications**
235:4
**qualified** 39:17
47:18 235:5,6
**qualifier** 40:14
**qualifies** 16:16
**qualify** 16:11
20:21 21:15
29:12
**quality** 223:2
**quantified**
253:11
**question** 14:22
21:22 30:6
35:9 36:2
39:24 40:9,15

40:19,23 41:1
41:6,6,7 42:1
47:1,10 48:1,8
49:15 51:9,22
53:14,16 54:2
56:13,19 58:17
60:24 62:2
69:17 70:9
72:7 78:5
82:23 90:17
109:19 125:25
143:9 153:10
159:20 167:22
170:4 174:23
179:9,17,22
184:18 195:1
205:10 211:16
212:24 214:7,9
217:12 226:9
242:3 243:1
244:16,25
248:20 252:23
252:25 258:24
260:2,25
263:23 264:2
276:18 293:4
294:18 299:25
300:15 302:22
303:23 304:9
304:11 306:23
307:20 308:1,2
308:5 322:7
328:10

**questioned**
154:5 157:20
157:21 221:7
269:19 285:7,8
**questioning**
222:2 227:22
247:8
**questions** 41:25
50:19 69:16,20
69:24 138:8
173:15 178:19
185:23 207:4
209:19,25
210:2 212:7
230:8 231:20
239:23 242:10
242:15,24
243:4,9 259:11
263:12,20
273:4 294:21
318:13 319:1,8
319:11,13
320:4 321:15
325:20
**quick** 120:5
146:5 180:23
189:17 213:6
228:17 267:10
281:10 314:10
314:12 318:22
**quickly** 26:21
88:22 115:6
142:2 169:5
180:23 228:13

Page 73

**[quickly - reason]**

| | | | |
|---|---|---|---|
| 228:14 313:12 | **ranging** 136:9 | 183:17 197:17 | **reality** 39:2,4 |
| **quilling** 324:8 | **rank** 151:8 | 203:22 222:17 | 39:15 40:12,16 |
| 324:18 | **ranking** 151:17 | 230:24 254:24 | 40:20 41:4 |
| **quite** 49:8 | 151:18 | 255:12 256:7 | 251:24 |
| 135:21 143:4 | **rate** 26:19 | 257:13 258:6 | **realization** |
| 205:23 226:21 | 109:18 | 284:25 297:13 | 269:12 |
| 252:15 275:16 | **rateably** 85:8 | 298:1 314:12 | **realize** 255:5 |
| 276:10 | **rates** 26:20 | 321:7 | 257:10 |
| **quote** 143:18 | **rather** 69:18 | **reading** 40:21 | **realized** 100:20 |
| 283:3 | 73:2 107:6 | 69:14 236:24 | 234:25 |
| | 110:17 132:19 | 258:8 320:19 | **really** 16:4 |
| **r** | 140:1 | **reads** 192:8 | 25:17 48:21 |
| **r** 2:1 3:1 4:1 7:1 | **ratifies** 183:20 | **ready** 9:20 | 58:11 102:13 |
| **raid** 144:17 | **ratify** 190:13 | 10:16 37:25 | 103:20 108:20 |
| **rail** 134:12 | **ratifying** | 41:25 43:25 | 109:24 111:22 |
| **raise** 121:18 | 190:23 | 64:6 72:15 | 111:22,23 |
| 151:11 223:15 | **ratios** 141:17 | 81:7,9 88:20 | 112:18 114:19 |
| 253:23 293:11 | **raymond** | 92:2 96:24 | 129:19 134:17 |
| **raised** 121:7 | 217:23 260:15 | 97:6,21,25 | 135:5 139:13 |
| 204:13 251:21 | **raza** 230:9,11 | 145:15 173:5 | 143:18 144:12 |
| 256:1 276:18 | 230:11 | 196:14 202:21 | 153:21 231:13 |
| 286:25 294:18 | **rbc** 118:13 | 254:12 287:21 | 243:18 244:22 |
| **raises** 198:1 | **rcx** 5:3 | 318:15 | 326:2 329:20 |
| **raising** 135:19 | **rdx** 5:3 | **real** 16:23 39:9 | 330:6,14 |
| 216:15 306:17 | **reach** 19:8 | 39:11 115:6 | **realm** 140:20 |
| **ramos** 8:25 | 21:17 235:19 | 120:5 146:5 | **reason** 17:9 |
| **ran** 135:12 | **reached** 19:10 | 189:17 213:6 | 26:13 28:23,25 |
| **randolph** 1:4 | 20:16 56:10 | 216:4 228:17 | 37:3 51:8 65:7 |
| **range** 26:22 | **react** 255:20 | 231:3 267:9 | 128:6 148:23 |
| 106:19,25 | **read** 11:15 29:5 | 270:23 314:12 | 216:11,21 |
| 107:8 110:9 | 41:23 42:1 | 318:22 328:10 | 218:9,13 |
| 113:3 115:13 | 61:24 62:5 | **realistic** 271:7 | 287:25 292:17 |
| 132:9 134:13 | 67:18 69:18 | 271:9 | 294:16 |
| 140:9 235:5 | 88:22 95:22 | | |

Veritext Legal Solutions
800-336-4000

[reasonable - reference]

reasonable
  12:10 34:12
  37:2 269:4,10
  284:7
reasoning
  163:19
reasons 58:5,9
  59:24 301:19
rebuttal 286:24
  327:9
recall 10:5 24:7
  24:14 29:21,23
  30:22 32:2,3,5
  32:6 33:23
  39:19 42:12
  45:7 54:20
  59:19,20 65:11
  65:14 67:7,10
  77:20,22 79:24
  80:6 148:18
  156:9 169:15
  173:14 189:22
  205:11 211:4
  221:22 247:20
  258:15,21
  260:18 261:11
  261:12 268:4
  268:11 270:17
  281:6 282:10
  290:15 297:14
  298:25 299:21
  299:23 300:19
  301:6 302:4
  309:17,21

  317:19 318:8
  325:4,6,7,8
  326:10
recalls 214:18
recapitalizing
  245:11
recast 159:7
receipt 162:7
receive 147:9
  147:16 148:3,9
  227:10 273:12
  273:19
received 25:18
  49:21 50:25
  52:2,3 131:17
  142:6 147:21
  171:9 172:5
  201:3 202:17
  262:17 277:17
  279:20 321:12
  325:16
receives 25:11
receiving 25:15
  172:19 204:12
  247:20
recess 78:20
  97:15 145:7,9
  145:10 196:5
  254:7 288:9
  332:20
reciprocal
  152:2
recissions
  108:24

recognizing
  89:19
recollection
  24:15 25:21,24
  78:7 79:5,11
  152:2 172:12
  190:17 194:8
  261:4 267:10
  268:24 273:9
  290:22 291:11
  291:18 294:4
  296:24 308:20
  326:19
recollection's
  291:19
record 7:8
  60:16,20 69:14
  77:10 78:19,19
  78:22 93:21
  97:18 116:4
  124:23 135:25
  136:1 137:12
  137:25 145:7
  145:13,15
  172:9,15
  196:12 207:3
  220:4 230:8
  234:21 254:7,9
  254:12,23
  264:7 265:23
  267:3 270:7
  284:1,2 286:4
  288:11 321:4
  322:7 325:1

  333:5
recording
  259:22 333:4
records 7:6,16
  128:8 231:4
  258:11
recoup 150:6
recoupment
  150:24
recross 257:14
  289:3
recruited 116:5
  130:6
recruiting
  101:15
rectified
  165:12
rectify 218:8
  240:12
red 33:10
  160:10,23,23
  162:1,2 277:13
  330:7,10
redirect 98:2
  319:24 320:21
reduce 235:1
reducing
  235:22
reductions
  241:22
reference 35:2
  36:25 37:4
  42:8 44:22
  60:22 156:8

Page 75

**[reference - remember]**

| | | | |
|---|---|---|---|
| 188:13,17 207:14 254:21 286:22 | **regard** 93:22 186:8 230:18 | 75:15 131:7,10 131:18 147:17 | **release** 35:11 36:5,15 37:8 |
| **referenced** 41:14,17 269:16 318:1 | **regarded** 276:19 | 158:8 214:1 247:11 258:22 | 38:11 40:7 41:14 42:12 |
| **references** 14:16 28:18 | **regarding** 37:6 79:5 203:13 | 295:16 296:3,5 298:3,20 | 43:12 188:5 205:22,25 |
| 38:6 44:14 62:21 | 234:17 239:22 283:9 306:17 | 311:17,20 320:4 333:7 | 206:3 317:5,20 317:23 |
| **referencing** 46:12 71:13 | **regardless** 147:25 331:5 | **relates** 51:18 125:1 171:12 | **released** 303:15 |
| **referred** 312:4 | **regards** 147:18 254:20 | 173:22 176:24 252:14 | **releases** 68:13 205:13 316:23 |
| **referring** 13:4 29:2 42:11 | **reggie** 181:21 188:5 205:22 | **relating** 324:10 | 317:16,25 |
| 80:17 84:25 85:4 86:20 | 206:7 207:22 | **relation** 154:23 155:8 223:23 | **relevance** 47:1 47:23 48:18 |
| 89:10 90:7 220:6 259:14 | **reggie's** 42:6,8 | 321:6 | 136:25 138:4 277:7,9,10,25 |
| 289:24 | **registered** 270:9 | **relations** 98:24 99:1 | 301:16 |
| **refers** 45:23 93:13 | **regularly** 143:1 143:5 226:22 | **relationship** 25:14 93:23 | **relevant** 111:1 204:5 |
| **refined** 123:10 | **regulated** 119:3,9,11 | 227:5 313:1 | **rely** 266:24 267:8 295:18 |
| **reflect** 13:23 321:4,11 | 128:7 276:14 | **relationships** 5:18 88:10 | **remain** 208:6 |
| **reflective** 128:14 | **regulation** 197:25 | 242:1 | **remainder** 160:2 284:5 |
| **reflects** 172:4 | **regulatory** 106:22 119:2 | **relative** 25:12 44:19 45:3 | **remember** 19:18 26:2,6 |
| **reform** 112:7 112:11 | 119:19 126:15 126:20 | 150:23 151:17 243:5 333:10 | 29:9 30:11,14 30:18 57:25 |
| **refresh** 78:7 79:5,10 190:17 | **reimbursing** 139:9 | **relatively** 149:14 | 78:6 96:6 129:25 167:11 |
| **refreshing** 30:19,20 | **relate** 127:6 | **relaunch** 197:25 | 180:4 194:4,6 194:21 200:5 |
| | **related** 10:7 18:9 30:21 | **relaunching** 197:20,21 | 210:12 260:10 261:15 286:1 |

Veritext Legal Solutions
800-336-4000

[remember - respond]

306:7,8,10 310:1 314:9,17 317:22 324:11
**remembered** 167:19 194:15
**reminder** 9:24 65:25
**remiss** 192:8 329:12
**remit** 117:13 260:12 261:16
**remotely** 26:23 35:23 139:12
**remove** 234:5
**removed** 288:19
**rendition** 263:4 264:8
**renegotiate** 226:15
**renegotiating** 224:5,10
**reorganization** 305:9
**rep** 268:17
**repaid** 151:13
**repeat** 90:17 159:20 170:5 226:9 308:2
**repeating** 185:25
**report** 218:17 275:2 311:1

**reporters** 218:16
**reporting** 112:9 230:17 298:9
**represent** 84:15 134:13 199:9 239:8 276:17 290:20 296:2 328:8
**representation** 46:1 179:4,10 179:21 180:10 262:14 293:7,8
**representations** 176:18 177:22 268:18 269:9 306:18
**representative** 96:21 158:8 206:23 294:13
**representatives** 46:13 154:23 187:11
**represented** 155:12 180:6 193:23 295:2
**representing** 157:13 291:16
**represents** 134:9 171:10 291:8
**reps** 127:18

**reputation** 142:22 277:15
**request** 78:15 162:7,9 331:25
**requests** 284:12
**required** 82:8 101:25 178:6 276:1 293:10
**requirement** 183:7 248:22
**requirements** 232:5
**requisite** 177:22 178:2 183:22,24
**rescue** 110:1,8 127:6
**reservation** 25:6 65:7
**reserve** 119:12 257:24
**reserved** 257:20
**resign** 87:5
**resolution** 42:19 62:25
**resolutions** 274:16
**resolve** 182:5 207:17 227:3 279:17 280:12 281:11 282:18

**resolved** 183:19 206:15 281:24,25 301:20
**resolves** 279:18 280:17
**resolving** 240:15
**resourced** 115:22
**resources** 127:21 128:9
**respect** 35:25 45:10 73:18 76:11 100:21 167:1 208:20 226:24 243:22 245:3 248:19 253:12 260:11 260:21 261:17 291:12
**respected** 277:2
**respectful** 69:12
**respectfully** 277:22
**respective** 222:13
**respectively** 118:2 235:9
**respects** 18:12
**respond** 34:13 42:22 45:14

Page 77

## [respond - right]

49:1,8 51:9 66:20 67:3 74:2 82:16 93:5 94:22 96:12 179:25 199:21 200:4 200:18 278:2 300:17 318:3,6 318:7

**responded** 154:16

**responding** 47:5

**responds** 23:2 33:25 42:14 45:9 48:4 51:24,25 66:18 72:25 92:20 93:5 94:11 95:18

**response** 46:22 46:25 47:1,6 47:10,22 48:11 48:19,23 69:22 74:25 75:4 77:10 124:11 158:17 160:24 184:17 199:7 201:13 204:3 220:12 262:12 264:12 274:10 283:18 307:15 318:8 320:2

**responsibilities** 137:17 227:16 228:3 240:22

**responsibility** 243:2 253:19

**responsible** 118:17 243:22 260:13

**rest** 108:23 128:9 149:8 164:21 194:25 315:12 319:9

**restate** 284:18

**restructure** 119:25 153:3

**restructured** 140:8

**restructuring** 18:19 104:20 109:22 120:5,7 120:9

**restructurings** 106:21

**result** 18:10,18

**resume** 8:21 130:21 254:6

**resurfaced** 198:9

**retain** 266:19

**retained** 76:13

**retire** 130:19

**retirement** 134:7

**retread** 249:13

**retroactive** 275:21

**retroactively** 230:7

**return** 114:23

**returned** 32:8

**revealed** 177:13

**revenue** 68:18 135:2 245:7 312:6

**reverse** 48:24 322:23

**review** 41:22 122:4 123:20 155:25 164:6

**reviewed** 201:3 277:5 325:9

**reviewing** 25:22

**reviews** 103:25 104:1,3 278:7

**revisit** 47:20

**reward** 282:10

**rewrite** 12:19

**right** 8:16 9:17 9:18,19 10:8 10:18 11:17 12:22 13:7,16 13:22 15:21,24 15:25 16:9 19:25 20:23,25 22:16 27:22

31:9,19 34:24 35:8 36:16 37:21 38:25 41:8,11,21 58:9 59:3 61:4 63:9 64:1 66:4 66:10 67:4,11 69:9 70:1,14 71:24 72:14 73:3 75:23 76:14 77:16 79:2,12 80:21 83:24 84:4,8 85:1,16 87:2 87:15 91:4 92:13 94:9 95:13 96:13,20 98:12,15,22 99:12 103:7 108:19 109:3 109:17 113:2 115:21 118:25 119:4 120:11 128:17 131:25 135:4 139:2 140:15 141:4 143:16 147:6 148:21 149:5 153:9 154:10 154:20 155:1,4 155:11,14 156:6,15 160:10 163:2 163:14 164:14

Veritext Legal Solutions
800-336-4000

**[right - ryan]**

| | | | |
|---|---|---|---|
| 165:22 166:21 | 250:16 251:8 | 252:9,10 | **row** 109:7 |
| 167:11 168:14 | 254:4,6,10 | **risks** 67:24 | **rule** 8:6,8 47:16 |
| 168:17 169:22 | 255:7,23 257:5 | 249:24 252:8 | 47:19 50:22 |
| 170:23 171:5 | 257:7,11 259:8 | 252:10 | 101:11 282:8,8 |
| 171:10,15,19 | 266:17 267:18 | **road** 116:8 | 283:16 284:11 |
| 171:25 172:7 | 270:24 272:4 | 164:13 | 297:6 326:3 |
| 172:24 173:14 | 280:20,22 | **roberts** 154:12 | **ruled** 19:11 |
| 174:5,9 175:8 | 281:9 288:8,9 | 160:5 161:4,6 | **rules** 16:11,12 |
| 175:12,15 | 288:25 290:11 | 180:18 181:1 | 19:16 20:3 |
| 176:8 177:18 | 293:6 295:12 | 187:8 207:5,8 | 79:25 119:16 |
| 177:19 179:1,3 | 295:12 296:18 | 275:11 | 139:12 236:17 |
| 181:7 182:20 | 301:3,5,7 | **rodie** 333:2,15 | 281:7,10 282:1 |
| 184:1 186:12 | 304:23 305:1 | **role** 116:19 | 282:12 308:20 |
| 187:1,15,20 | 305:15,18 | 128:19 129:14 | 319:24 |
| 188:19 189:11 | 308:10 309:2 | 134:18,24 | **ruling** 47:21 |
| 189:16,24 | 314:7 315:20 | 143:7 292:4 | 48:13,14 49:4 |
| 190:4,16,20 | 320:19 321:17 | **roles** 89:20 | 76:5 169:8 |
| 191:1,20 192:6 | 321:25 323:24 | 111:24 140:22 | **rulings** 47:20 |
| 192:15 193:11 | 324:4,22 | **roll** 97:6 | 158:13 |
| 194:14 197:16 | 330:17,18 | 195:24 | **run** 49:5 77:2 |
| 198:18 199:11 | 332:16 | **room** 100:22 | 111:25 115:15 |
| 199:12,16 | **rights** 94:5 | 123:1 204:6 | 136:12 161:14 |
| 200:1,14 204:9 | 152:17 153:2 | 325:22 | 268:3 |
| 205:19 207:8 | **ring** 16:18 | **rooms** 144:10 | **running** 113:13 |
| 209:8,8 212:3 | **rise** 78:21 | **rosonkowski** | 240:25 |
| 212:19 215:2 | 97:17 145:12 | 154:17 168:10 | **runs** 112:1 |
| 215:10 216:3 | 196:11 254:8 | 222:9 | **runway** 57:24 |
| 217:7,14,16 | 288:10,12 | **ross** 2:6 3:19 | 58:2 |
| 218:12,12,21 | 332:21 | 4:5,12,19 | **rush** 163:22 |
| 221:4,25 231:5 | **risk** 113:12 | **rough** 291:6 | 218:3 |
| 231:6 232:15 | 127:10,14 | **roughly** 78:19 | **rushing** 65:8 |
| 238:10 241:8 | 128:12 130:15 | **round** 277:19 | **ruthless** 110:19 |
| 244:16 246:2,5 | 142:23 166:3 | **rounds** 135:19 | **ryan** 222:9 |
| 247:9,22 | 250:2,8 252:6 | | |

Page 79

**[s - scusa]**

| s | saves 117:1 | 95:22 149:7 | scheduling |
|---|---|---|---|
| **s** 2:1,13 3:1 4:1 4:3 5:1,8 6:1 7:1 | **saw** 20:23 132:13 165:1 179:4 249:12 317:25 | 150:12 151:23 162:6 168:15 171:16,16 172:9,21 | 171:7 |

s 2:1,13 3:1 4:1
4:3 5:1,8 6:1
7:1
**safe** 66:25
**safety** 242:19
242:22
**sake** 322:21
**salaries** 191:10
**sale** 109:1
306:20 307:6
307:11 308:6
308:10
**sallie** 109:11
112:4
**salo** 2:14 3:4
**saltz** 211:18,21
212:1 329:17
**san** 1:17
**santander**
112:19 114:1
114:22 116:1
116:24 128:20
129:9 130:6,10
143:4 214:2,5
313:1
**sat** 118:20
224:25
**satisfy** 149:16
178:5 184:5
282:20
**satisfying**
205:13

**saves** 117:1
**saw** 20:23
132:13 165:1
179:4 249:12
317:25
**saying** 20:17,18
29:1 39:25
51:8 57:25
70:2 73:9
82:10 83:3,13
88:8 90:16,19
91:13 120:14
153:24 157:9
179:13,16
185:16 207:12
239:10 242:25
250:3 263:10
263:10 264:9
264:15 271:5
278:5 299:23
316:24 318:6
323:17
**says** 11:21,24
12:2,14,18,23
13:1 14:10
21:3 33:9 34:6
42:5,18 43:1
45:9 62:3 63:8
65:2 66:23
68:20 69:19,24
70:19 71:3,5
73:17,20 81:15
81:19 82:6
92:24 94:17

95:22 149:7
150:12 151:23
162:6 168:15
171:16,16
172:9,21
175:24 177:20
184:2 190:6,11
191:9 195:13
196:24 197:18
198:2,3 203:10
204:2,9 207:11
222:9 230:24
232:2 248:4
249:25,25
270:2,2 274:11
277:24 316:5
326:8
**scale** 107:9
**scenario**
310:10
**scenarios** 54:15
56:8 127:8
**schandler**
327:8
**schanzer**
322:11,22
323:22 331:15
331:25
**schedule** 96:17
125:11 232:3
330:24
**schedules**
94:19 96:5
304:7,17

**scheduling**
171:7
**schiller** 99:7
100:20 101:4
**school** 100:8
105:22,22
209:10 210:12
242:7
**schools** 99:25
100:2 101:16
134:9
**science** 99:11
**scope** 163:24
200:24 319:25
**scotch** 7:19
11:3 27:3,7
44:11,15 94:24
95:20 160:6
180:18,24
187:8 207:10
240:3
**scotland**
119:13
**screen** 17:2
61:18 75:10
192:24 293:7
312:18 320:19
**scroll** 87:21
155:19 168:17
168:18 238:10
**scrutiny** 103:24
**scusa** 116:23
116:24 118:22
120:13,20

Veritext Legal Solutions
800-336-4000

**[scusa - sending]**

| | | | |
|---|---|---|---|
| 128:17 | 281:1 285:25 | 168:14,15,20 | **seeing** 132:4 |
| **season** 54:13 | 313:11,15 | 171:12,17,21 | 137:7 268:10 |
| 55:9 57:12 | **seconds** 15:15 | 172:1,10,15,19 | **seeking** 198:4 |
| 58:10,22 59:1 | 169:1 | 173:12 176:6 | 268:9 |
| 64:24 68:11,18 | **secret** 283:10 | 177:14 178:9 | **seem** 241:6,7 |
| 69:1 157:1 | **secretary** 7:6 | 180:20 181:10 | 243:21 281:6 |
| 159:24 195:4 | 7:16 | 183:20 187:9 | 282:9 |
| 205:6 232:8 | **section** 162:2 | 187:18 188:2,6 | **seemed** 125:18 |
| 270:14 308:8 | 217:22 | 188:11,14 | 241:8 |
| 315:13 | **sector** 134:6 | 190:9,14 | **seems** 33:8 |
| **seat** 9:23 97:20 | **securities** 63:16 | 191:15 192:13 | 34:19 200:7 |
| 109:7 117:12 | 117:17 216:7 | 192:24 195:20 | 274:19 |
| 254:11 | **securitization** | 195:21 197:11 | **seen** 41:13,17 |
| **seated** 7:2 | 117:19,20 | 198:11 199:11 | 90:2 144:5 |
| 78:24 97:20 | **securitizations** | 204:7,17 | 191:24 200:5,6 |
| 196:14 254:11 | 118:19 | 210:22 211:9 | 253:4 269:15 |
| 288:14 | **security** 63:12 | 211:10 212:7 | 292:3,22 |
| **seattle** 324:7,10 | 95:5,8,9,13,13 | 217:6,8 222:5 | 316:11,23 |
| **sec** 278:23 | 95:22 96:18 | 222:10 226:20 | 325:15,23 |
| **second** 12:2,18 | 104:19 | 227:24 231:16 | **sees** 67:24 |
| 13:1 21:1 | **see** 14:16 21:1 | 234:17 238:8 | **segregate** 89:17 |
| 64:22 68:20 | 28:19 33:9 | 238:14 241:16 | **select** 105:15 |
| 76:20 89:3 | 34:22 38:22 | 244:11,19 | 126:11 |
| 97:13 103:7 | 42:16 43:1 | 245:20 247:18 | **self** 107:23 |
| 105:2,4,24 | 44:20 52:14 | 248:14 251:25 | 149:22 |
| 109:1,2 115:10 | 63:5 66:8,9,11 | 270:14 292:1,6 | **sell** 26:18 63:10 |
| 120:3 133:14 | 74:15 77:13 | 292:7,8,19 | 69:2 |
| 163:10,10 | 79:18 89:1 | 296:21 303:3 | **selling** 91:15 |
| 166:7 170:23 | 109:6 149:10 | 311:6 312:16 | 306:12,16 |
| 172:1 182:18 | 153:3 154:13 | 313:17,19 | **send** 14:4,9 |
| 187:2 188:6 | 154:18 155:18 | 321:1,6 326:7 | 42:4 190:12 |
| 197:16 203:21 | 156:4 160:8,11 | 330:6,10,12 | 222:11 |
| 206:11 251:14 | 162:4,9 163:12 | 332:16 | **sending** 18:9 |
| 251:18 259:14 | 166:19 168:12 | | 33:11 72:21 |

Page 81

[sending - sheet]

| | | | |
|---|---|---|---|
| 86:16 | sentence | serving 59:22 | shareholder |
| **sends** 32:14 | 203:21 270:2 | **sessions** 222:13 | 55:13 181:19 |
| 247:16 | 316:5 318:11 | **set** 97:14 100:8 | 189:21 207:21 |
| **senior** 63:10,15 | **sentences** | 105:13 119:16 | 207:23 |
| 102:11 110:6 | 197:17 | 121:9,18 | **shareholders** |
| 117:8 130:23 | **sentiment** | 216:16 297:15 | 55:10 59:16 |
| 150:3,18,19,22 | 252:2 | 307:4 332:10 | 137:8 178:2 |
| 151:5 153:1 | **separate** 15:24 | **settle** 55:19 | 239:18 247:15 |
| 205:9 | 15:25 16:1,1 | **settlements** | 272:11 274:24 |
| **sense** 80:20 | 90:24 216:14 | 57:23 | 275:2 |
| 209:22,23 | 217:1 281:1 | **seven** 27:13 | **shares** 178:5 |
| 210:7 226:19 | 297:2,5,10 | 62:6 188:8 | 184:5 190:1 |
| 243:18 245:1 | **separately** | 203:23 227:21 | 247:15 |
| 253:12 327:13 | 313:12 | 236:2 | **sharp** 330:18 |
| 328:23 | **separation** | **several** 43:5 | **sheet** 32:17 |
| **sensitive** | 24:25 25:4 | 158:19 255:15 | 33:10,14,20,24 |
| 123:15 286:2 | **separations** | 266:17 | 118:16,17,19 |
| **sent** 10:25 | 18:15 | **shadows** 198:4 | 122:16 132:16 |
| 15:11 32:4 | **series** 33:13 | **share** 98:17 | 150:11 152:13 |
| 49:9 64:10 | 166:16 216:1 | 101:7 102:5 | 154:22 155:2 |
| 88:6 129:4 | 221:21 273:4 | 103:23 104:2 | 156:18,22 |
| 155:21 160:5,7 | **seriously** | 105:4 106:4 | 158:9 160:11 |
| 166:15 168:11 | 270:20 | 110:16 112:24 | 160:14,15 |
| 168:19 171:17 | **serve** 134:1 | 117:2,6 120:6 | 163:20,23 |
| 171:24,25 | 284:11 | 120:11 122:15 | 166:1,17,22 |
| 181:4 182:11 | **served** 225:22 | 132:23 140:18 | 167:9,15,15 |
| 190:5,12 199:3 | **service** 133:10 | 163:18 167:2 | 168:15,20 |
| 202:19 203:23 | 134:16 | 176:20 206:2 | 169:10,18 |
| 207:5,8 222:4 | **services** 26:25 | 212:19 243:16 | 170:10 174:14 |
| 227:16,17 | 104:15,16 | 247:22 264:14 | 175:5,10 |
| 238:7 240:1 | 106:8 107:19 | 267:20 270:16 | 177:12,24 |
| 252:21 253:6 | 107:20 109:9 | 277:16 | 178:3,6,9 |
| 263:3 266:15 | 114:7,16 133:5 | **shared** 194:10 | 181:23 183:8 |
| 300:9 313:3 | 135:13 226:23 | | 183:20 184:3,6 |

Page 82

**[sheet - sir]**

188:14,17 190:24 191:15 195:14,20 196:25 197:5,6 197:14 198:15 205:12 207:18 221:7 240:12 240:13,17 310:23

**shelves** 117:20

**shift** 233:4

**shock** 325:14

**shoes** 328:16

**short** 97:15 118:8 122:14 127:21 128:1,4 128:6 139:14 190:9 228:5 248:25 254:6

**shorter** 283:21

**shortly** 117:11 165:11 166:1 170:14

**shot** 329:19,21 330:3

**shoulder** 210:13

**show** 13:9 16:3 28:16 116:8 200:15 205:24 214:22 231:18 265:11,12 284:21,24 291:23 295:21

**showed** 309:15

**showing** 46:24 49:13 76:16 148:14 173:10 234:15

**shown** 201:2 284:25

**shows** 43:11 48:7 293:18

**shut** 49:22 323:12

**sic** 294:24

**side** 100:24 101:21 109:15 118:21 155:8,9 168:2 169:11 171:23,23 176:9,9 212:11 216:3,21 217:14,16 218:21 248:3

**side's** 315:8

**sidebar** 258:20

**sides** 114:4 230:17

**sideways** 11:24

**sign** 73:7,19 74:3,6,8 76:18 126:13 161:17 164:23 169:14 169:15 172:14 207:22,23 271:12 277:13

**signatory** 24:23 24:25

**signature** 43:8 80:8 172:9 188:10 333:14

**signatures** 42:6 42:11

**signed** 7:17,19 24:18 37:8 62:18 79:22 80:1 169:10 176:12 177:1 180:8 183:9 188:1 206:11 272:11 310:23

**significance** 29:12 30:5 168:23 219:25 224:17

**significant** 29:4 29:8,23 30:3,8 30:10,13 68:10 118:15 119:4 198:8 204:25 214:4 252:11

**significantly** 250:1 252:6

**signing** 43:12 65:8 76:17 167:15 222:25

**signs** 247:14

**silberman** 143:21

**silently** 321:8

**silly** 139:13

**siloed** 241:9

**similar** 12:7 14:5 106:6 137:9,19 141:24 201:16

**similarly** 200:7

**simple** 44:18

**simplicity** 25:9 218:22

**simplification** 293:1

**simplified** 213:9 215:8

**simplistic** 262:14 263:4 264:8

**single** 59:7 108:3 135:20 225:19

**sins** 282:11

**sir** 9:24,25 13:22 27:17 37:21 62:5 97:1,24 98:11 125:2 146:23 170:4,6 186:11 189:2 196:2 199:17 210:3 213:23 230:16 254:12,16 272:22 287:20 320:19 321:19

Page 83

**[sir - speaker]**

321:24 327:1
**sister** 119:17
  314:1
**sit** 29:21,24
  145:8 151:8
  248:6 295:22
  297:22 320:7
**sits** 150:3
  216:10
**situated** 97:23
  254:15
**situation** 20:19
  104:20 107:18
  127:7 137:10
  150:16 245:10
  253:22
**six** 49:22 63:3
  94:1 102:19,24
  102:25 103:19
  127:1 167:12
  191:5,8 193:12
  194:5,6 197:13
  283:4
**size** 113:4
  114:11 126:16
  167:24
**skills** 100:3
  333:6
**skis** 226:24
**slip** 251:10
**slow** 126:2,3
  192:22
**slower** 126:6

**small** 92:4
  112:8 113:11
  133:4 149:14
  149:15
**smaller** 122:11
  132:6
**smart** 292:18
**smg** 166:16
  176:3 177:25
  178:2
**smt** 251:20
**sold** 109:3
**sole** 63:13,14
  96:21 292:7
  296:14
**solid** 228:12
**solve** 128:11
  248:23 283:15
**somebody**
  101:8 271:5
**somewhat**
  140:23
**sophisticated**
  161:22
**sophistication**
  119:21 124:20
**sorry** 7:10 18:1
  19:20 28:1,10
  30:22 33:19
  36:10,19 37:15
  54:24 56:12
  60:9 63:14
  64:18 72:14
  76:4 78:2

81:15 87:14
  91:19 103:12
  106:11 109:23
  130:1 136:24
  159:12 160:4
  162:19 168:18
  168:25 170:1,5
  170:18 175:18
  178:15 189:20
  191:7 192:16
  192:22 193:1
  193:15 196:17
  200:3,3 204:2
  207:2 212:18
  219:16 226:13
  229:1 238:1
  246:22 250:23
  252:17 257:9
  259:9 262:5
  263:25 265:15
  273:2 277:6
  278:10,15
  281:16 284:16
  298:17 300:7
  300:14 307:22
  310:15,15
  314:16
**sort** 122:14
  132:7 147:12
  149:17 205:14
  207:24 208:25
  241:10 268:1
  326:20 328:10

**sorts** 127:8
  166:5 202:11
  216:7
**soul** 319:9
**sound** 31:19
  139:13 149:3
  226:6
**sounds** 37:2
  110:13 123:3
  128:14 136:14
  152:20 243:10
  275:5 290:1
  312:3
**source** 174:2
  218:5 219:7
  229:17 315:20
**southern**
  108:25
**space** 115:1
  133:5
**sparks** 312:8
**speak** 59:8 89:4
  101:21 124:19
  126:6 137:25
  158:20 169:21
  174:3 262:19
  325:5
**speaker** 229:10
  229:13,18,21
  230:4 249:20
  259:17 263:23
  264:4 265:12
  272:24 286:13
  286:17 287:16

Page 84

**[speaking - started]**

| | | | |
|---|---|---|---|
| **speaking** 83:12 | 298:17,19,25 | **spent** 30:18,20 | **stake** 132:17,20 |
| 89:12,23,24 | 302:4 310:22 | 108:17 206:1 | 217:9 311:24 |
| 90:2 104:6 | 315:3 318:8 | 313:14 | **stakeholders** |
| 121:10 149:15 | 325:20,21,22 | **spinoffs** 106:23 | 137:8 |
| 157:8 158:10 | 325:22 | **splintering** | **stamp** 185:6 |
| 225:17 243:15 | **specifically** | 21:7 | **stamps** 281:2 |
| 294:17 | 17:15 30:12 | **spoke** 46:13 | **stand** 13:14 |
| **speaks** 279:25 | 31:1 98:25 | 148:15 150:11 | 14:17 158:24 |
| **special** 182:17 | 100:24 102:3 | 157:25 237:24 | 212:10 282:17 |
| **specialty** 108:2 | 205:8 211:7 | **sponsor** 68:17 | **standard** 25:1 |
| 108:4 111:25 | 259:3 263:8 | **sports** 62:11 | 242:6,9 |
| 133:24,25 | 274:7 283:5 | 63:5,11,16 | **standpoint** |
| **specific** 16:7 | 285:9 317:20 | 138:3,21 | 110:15 151:25 |
| 22:15 24:6 | **specificity** | 140:20 157:16 | 169:9 |
| 33:23 40:9 | 164:8 297:19 | 176:12 183:10 | **stands** 141:19 |
| 50:9 51:23 | **specifics** 194:5 | **spot** 313:6 | 141:19 |
| 55:3 65:13 | 304:8 | **spreadsheet** | **stars** 114:25 |
| 77:22 79:21 | **speculation** | 309:22 | **start** 10:18 |
| 80:6 90:4 | 27:12 53:11 | **square** 186:6 | 16:6 20:5 |
| 129:15 140:12 | 58:15 71:12 | 193:11 255:3 | 34:14 44:4 |
| 147:3 148:22 | 174:20 252:18 | **st** 188:9 282:13 | 84:19 92:13 |
| 167:12 174:17 | 302:24 303:21 | **stack** 123:20 | 121:2,16 135:8 |
| 176:5 179:10 | 307:13 309:4 | 216:4,5,6 | 196:22 223:4 |
| 180:3 205:14 | **speculative** | **stacks** 26:20 | 262:24 271:13 |
| 211:5,6 218:1 | 58:12 | 139:21 | 287:24 289:5 |
| 242:4 258:15 | **speed** 144:12 | **stadium** 141:16 | 312:7 323:18 |
| 258:21,25 | 223:5 228:10 | 232:6 | 328:21,24 |
| 260:14,18,23 | **spell** 265:25 | **staff** 149:1 | 329:22 330:19 |
| 261:2,12 | **spend** 15:7 | 329:2 | **started** 7:4 |
| 262:20 268:4 | 85:9 | **staffing** 141:17 | 22:19,20 26:15 |
| 283:25 290:16 | **spending** 241:5 | **stage** 132:8 | 98:20 100:10 |
| 293:17,24 | 241:12,15 | 133:20 135:13 | 107:18 108:20 |
| 294:12 295:7 | 242:11,11 | 264:8,17 | 111:25 113:18 |
| 297:14 298:2 | | | 116:9,10,16 |

Page 85

## [started - structure]

| | | | |
|---|---|---|---|
| 127:23 129:12 | 203:16 284:18 | **stock**  12:2 | **strategically** |
| 132:3,4,14 | 286:23 316:9 | 18:15 107:25 | 261:19 |
| 136:20 139:3 | 316:21 320:13 | 119:12 178:3 | **strategies** |
| 146:1 148:17 | **statements** | 184:3 187:21 | 136:17 137:19 |
| 163:3,5 165:18 | 35:17 55:4 | 208:13 272:11 | 138:16,20,22 |
| 184:23 216:14 | 157:17,22 | **stockholder** | 140:13 151:21 |
| 227:18,19 | **states**  1:1 | 184:8,9,10 | **strategy**  117:11 |
| 267:17 296:6 | 112:11 113:3 | 185:5 190:14 | 121:18 140:11 |
| 332:1 | 113:17 117:17 | **stockholders** | 223:12 |
| **starting**  17:3 | 118:11 119:9 | 187:17 190:22 | **streams**  17:6 |
| 22:17 109:6 | 134:1,2,7 | **stocks**  217:19 | 165:24 228:9 |
| 129:10 245:13 | 225:24 276:14 | 217:24 | **street**  1:16 3:12 |
| 257:1 | **stating**  82:20 | **stop**  22:24 | 98:22 101:5 |
| **starts**  62:14,22 | 283:25 | 198:3 202:22 | 105:14 |
| 102:17 192:6 | **stay**  47:15 77:4 | 250:15 328:1 | **stress**  274:1 |
| 259:14 310:11 | 102:14 | 331:1 | **stressful** |
| 310:12 | **stays**  77:2 | **stopped**  163:3 | 102:23 103:13 |
| **startup**  133:4 | **steadily**  326:18 | 198:3 211:23 | **strike**  50:19 |
| 135:9,13 152:6 | **stearns**  127:23 | **stopping** | 273:25 278:10 |
| 226:1 241:13 | **stears**  110:4 | 250:14 254:3 | **structural** |
| 241:15 242:8 | **stem**  244:1 | 272:19 | 164:4 237:21 |
| 312:4,8 | **step**  97:11 | **storm**  108:8 | 237:23 238:10 |
| **state**  7:6,16 | 100:18 115:10 | **story**  69:21 | **structure**  10:23 |
| 54:17 60:16 | 122:22 165:23 | 98:16 122:6 | 11:18 12:23 |
| 84:24 134:9,11 | 209:15 235:8 | **straight**  38:24 | 13:7 14:10 |
| 134:11,12 | 236:1 269:7 | 146:18 | 15:16 18:17 |
| 282:7 | 303:23 308:22 | **strain**  328:5 | 19:11,12 |
| **stated**  82:2 | **sterns**  112:5 | **straining** | 107:24 128:11 |
| **statement** | **steroid**  329:18 | 330:15 | 140:7,10,10 |
| 35:15,19 39:7 | 329:20 330:3 | **strange**  102:11 | 141:11 153:15 |
| 39:8,9,21 41:5 | **steroids**  329:22 | **strapped** | 165:22 176:5 |
| 49:1 53:24 | **stipulate** | 133:18 | 209:1 213:10 |
| 57:20 63:4,18 | 202:10 | **strategic**  143:1 | 214:1 215:21 |
| 63:21 194:25 | | 260:21 | 217:4 231:8 |

Page 86

**[structure - sure]**

235:19 238:14
239:9 259:24
260:9 261:2,11
262:15 290:9
291:7,12,25
295:6,11
**structured**
17:19 260:20
290:21
**structures** 19:1
20:5 139:24
140:2 141:21
208:11,14
236:19 238:19
239:16 241:24
289:8,11
**structuring**
10:7 22:13,16
34:14 80:17
164:23
**struggling**
136:15
**student** 102:12
109:11
**students**
101:16
**studies** 100:25
**stuff** 129:11
155:16 164:23
165:17 277:4
**subcommittees**
143:5
**subcontract**
103:22

**subgroups**
107:22
**subject** 29:14
64:14 123:12
162:3 168:14
176:5 210:2
320:13
**submission**
75:4
**subordinate**
43:17 44:6
150:23
**subordinated**
150:13 151:10
151:15
**subordination**
41:18 44:18,25
45:19 239:23
240:5
**subpoenaed**
171:5,9
**subprime**
108:5,6,9,22
114:17
**subsequent**
48:23 49:16
239:13 313:1
**subset** 123:3
**subsidiaries**
20:25 235:12
**subsidiary**
16:15
**substance**
155:15 239:25

**substantial**
85:6 130:18
133:16 135:22
138:24
**substantially**
132:18 307:1
**substantive**
40:3 48:15
**substantively**
180:1
**succeed** 137:7
**success** 137:11
137:13 214:2
223:7 244:5
269:11
**successful**
26:23 110:8
137:20 141:22
144:10 225:2
242:13 267:23
269:13
**successfully**
114:5
**succinctly**
153:6
**sued** 98:10
**sufficient**
268:17
**suggest** 35:21
**suggested** 95:6
301:18 326:20
**suggesting**
240:15

**suing** 195:17
197:3 279:23
**suite** 2:15 3:5
3:12,19 4:5,12
4:19
**sum** 130:18
149:15
**summaries**
94:19
**summarize**
15:2 299:13
321:3
**summary** 29:5
137:23 262:13
262:17 264:7
264:11,16
299:11
**summer** 100:20
101:13,14
132:15,15
**summers** 99:6
**sunday** 127:25
222:4
**super** 17:10
109:13
**supposed** 243:9
**sure** 12:8 14:15
17:25 20:13
22:3,15,22
28:12,23 30:5
38:14,23 56:14
62:2 76:5
78:13 89:15
90:4 93:9 97:8

Page 87

**[sure - talk]**

98:19 100:22
108:12 115:20
119:15 121:21
125:23 129:11
140:15 142:11
149:1,4 163:4
164:11 166:9
170:6 178:17
178:20 187:3
207:18 208:15
209:5 210:18
210:23 212:23
220:10 224:8
226:10 231:11
234:24 243:19
246:10 250:15
254:22 260:22
270:7,20,25
271:7 279:3
289:10 291:19
291:21 294:19
299:13 303:10
306:24 317:10
320:18 323:5
325:14,24
329:11,19
**surgeons** 133:6
**surgeries** 134:5
**surprised** 57:5
255:20
**surprises**
241:18
**surrounding**
155:1

**survival** 244:5
**suspended**
273:8
**sustain** 159:10
159:14 200:22
202:1 303:4
**sustained** 8:14
27:20 51:16
53:18 76:2
77:8 144:3
158:22 159:19
174:23 201:22
202:24 219:23
252:25 285:21
309:8 317:11
**sustaining**
149:22
**sutter** 148:14
**sweet** 329:25
**switch** 304:13
**sympathetic**
196:4
**sync** 241:8
**system** 134:8
**systems** 139:7
223:3

**t**

**t** 5:1,1,8 6:1
148:14 154:1
160:3,14
162:13 166:8
168:8 170:18
170:22 171:23

176:8,10 177:9
179:5 188:17
188:23 193:16
193:16 207:2
233:6 234:10
234:15 237:24
238:1,3 244:6
244:6,7,7
**t&d** 215:12
**t&v** 212:22
213:2
**table** 31:18
113:22 114:5
151:5 152:14
205:9
**tactics** 137:11
141:24
**tailored** 100:6
**take** 7:14 8:3,9
9:23 15:14
18:7 78:18
87:18 97:20
115:10 128:25
134:24 142:22
145:16,20
146:6 151:12
156:25 172:17
177:9 189:6
191:1 195:9,25
209:4,10
211:13 228:8
240:19 243:24
250:2 254:4,5
254:11 265:20

281:10 299:5
299:15 303:23
314:10 330:25
**takeaway**
253:16
**taken** 59:12
244:3 249:11
261:21 333:9
**takes** 92:21
105:6 126:25
127:1,4 253:18
**talent** 232:6
**talented** 230:1
**talk** 56:23
100:17 101:6,6
104:18 105:4
106:1 110:12
110:13,15
115:5 120:4
121:22 122:13
124:13 126:21
127:6 133:1
138:25 143:10
147:1 148:12
148:22 150:8
150:10 154:20
155:14 160:1
160:22 161:25
173:20 185:13
188:6 199:14
205:21,21
209:11 211:7
223:17 224:7
230:22 233:5

Veritext Legal Solutions
800-336-4000

**[talk - term]**

| | | | |
|---|---|---|---|
| 237:22 240:20 | **tar** 122:16 | 142:24 165:16 | 163:18 167:16 |
| 247:5 248:11 | **target** 85:9 | 222:12 223:2 | 230:25,25 |
| 248:12 274:15 | 134:10 | 228:8,15 230:1 | 240:7 252:13 |
| 274:16 282:13 | **targeting** 82:17 | 232:20 238:8,8 | 256:24 257:12 |
| 285:9 287:24 | 83:13,14,14 | 266:18 269:22 | 269:24 275:11 |
| 290:9 314:7,21 | **tarnished** | 270:4 271:16 | 282:5 319:8 |
| 323:7 324:2 | 277:15 | 286:20 287:10 | 328:13 329:21 |
| **talked** 40:2 | **task** 112:6 | 313:14 318:24 | **telling** 48:22 |
| 91:6 94:13 | **tasked** 115:17 | **team's** 48:14 | 251:15 295:18 |
| 113:4 151:20 | **tax** 15:25 17:9 | 49:4 | 296:1 313:12 |
| 191:4 205:8 | 17:16,22 | **teams** 15:19,22 | 313:21 315:24 |
| 227:14 228:20 | 123:19 140:8 | 225:24 | 316:2 |
| 245:2 279:9 | 147:16 215:20 | **tease** 239:3 | **tells** 76:10 |
| 314:8 | 215:20 218:8 | **teaser** 122:16 | 94:13 |
| **talking** 10:6 | 218:20 233:5 | **tech** 123:19 | **tens** 301:12 |
| 19:20 29:6 | 235:21,21 | 139:22 | **tension** 25:5 |
| 41:18 43:15 | 236:18,21 | **technical** 99:25 | **term** 17:10 |
| 46:18 54:11 | 239:3 260:20 | 100:3 | 22:17 32:17 |
| 56:1 59:7 | 273:19 | **technicalities** | 33:10,14,20,24 |
| 86:25 95:16 | **taxes** 147:18 | 235:10 | 52:14 118:8 |
| 116:3,17 | 233:5 235:2 | **technology** | 132:16 139:25 |
| 137:12 159:11 | **td** 33:12 222:14 | 15:23 123:20 | 150:11 152:13 |
| 164:15 167:25 | 222:15 | 139:21 146:16 | 154:21 155:1 |
| 176:16 184:23 | **teachers** 134:7 | **teddy** 187:25 | 156:18,22 |
| 196:21 198:3,3 | **team** 11:7 | **teen** 191:15 | 158:8 160:11 |
| 201:25 202:2,6 | 15:19 20:3,4 | **teeth** 109:14 | 160:14,15 |
| 202:20 208:10 | 44:17 46:19 | **tell** 15:3 22:9 | 163:20,23 |
| 224:11,13 | 52:17 54:6 | 34:1 35:16 | 166:1,17,22 |
| 226:11 231:7 | 75:20 97:7 | 45:17 55:15,18 | 167:9,15,15 |
| 240:8 289:6 | 110:3 111:17 | 55:21,23 57:1 | 168:15,20 |
| 293:21,25 | 113:19 114:25 | 86:2 98:16 | 169:10,18 |
| 294:2,6 295:1 | 115:3 119:1 | 99:9 102:22 | 170:10 174:14 |
| 300:1,4 307:9 | 128:24 133:7 | 126:4 130:4 | 175:4,10 |
| 314:17 316:13 | 139:4 141:3 | 138:20 146:15 | 177:11,24 |

Veritext Legal Solutions
800-336-4000

**[term - thank]**

| | | | |
|---|---|---|---|
| 178:3,6,9 | 160:13 163:14 | 182:21 186:4,9 | 50:18,21 51:19 |
| 181:22 183:8 | 180:3,11 | 189:18 191:17 | 57:8 61:5,19 |
| 183:20 184:2,6 | 182:24 183:18 | 192:4 203:19 | 65:19 70:12,16 |
| 185:15 188:14 | 184:13,21 | 205:23 211:9 | 75:14 78:23,25 |
| 188:17 190:24 | 185:1,3 186:17 | 214:14 220:5 | 79:14 80:21 |
| 191:15 195:14 | 192:2 193:17 | 222:1 223:19 | 81:2 84:8,12 |
| 195:19 196:25 | 197:9 211:3 | 224:1,9 239:22 | 85:22 87:15,20 |
| 197:5,6,14 | 221:5 268:14 | 244:21 246:10 | 87:25 91:20 |
| 198:15 205:12 | 282:25 283:3,8 | 247:9,23 | 92:4 94:1,3,7 |
| 207:18 221:7 | 297:12 302:25 | 249:13 256:12 | 97:19 98:1 |
| 227:1 240:11 | 304:16 307:16 | 258:23 259:24 | 100:13,15 |
| 240:13,17 | 310:20 311:10 | 261:1,4 268:22 | 102:9 107:13 |
| 241:24 246:3 | 314:20 315:6 | 274:6 275:17 | 116:4 125:3,15 |
| 248:24 310:23 | 317:4 325:4,5 | 275:18 279:20 | 125:19 142:12 |
| **terminated** | **testify** 129:19 | 285:18,19 | 145:11 146:20 |
| 301:5 303:8 | 137:9 157:10 | 287:1 292:20 | 146:24 166:12 |
| **terminating** | 157:16 158:13 | 293:15 294:9 | 170:20 171:1,2 |
| 111:3 | 159:1,4 173:20 | 294:10,11 | 171:23 172:17 |
| **termination** | 175:13 185:7 | 300:2,2 | 173:4 174:11 |
| 88:9 | 263:14 293:17 | **testing** 242:14 | 175:20,21 |
| **terms** 33:13 | 324:12 326:1 | **tests** 235:17 | 176:9 177:8 |
| 38:7 83:13 | **testifying** 46:14 | **texas** 1:2,17 2:7 | 179:2 180:15 |
| 112:9 118:15 | 178:18 185:15 | 3:13,20 4:6,13 | 182:19 183:25 |
| 150:5 151:12 | 221:23 256:15 | 4:20 134:8,10 | 186:13,14,22 |
| 176:5 177:3 | 300:7 | 282:7 | 186:24 187:4 |
| 205:14 224:25 | **testimony** | **texting** 65:12 | 189:3,11 |
| 261:13 275:11 | 20:14 38:9 | **texts** 65:13,14 | 190:21 195:9 |
| 275:15 315:12 | 50:19 51:17 | 65:17 66:11 | 196:6,9,10,13 |
| **terrorism** 99:3 | 60:1 71:21 | **thank** 7:21 8:15 | 196:15,18 |
| **testified** 24:1 | 98:7 103:8 | 9:2,11,18 10:1 | 202:25 208:3 |
| 24:13 27:13,16 | 124:10,15 | 10:3 13:22 | 209:7,7,9 |
| 29:3,7 35:1 | 138:11 148:24 | 17:24 18:2 | 210:4 211:12 |
| 39:14 56:21 | 164:14 178:11 | 22:4 28:13 | 211:21 212:8 |
| 137:4 154:25 | 180:12,13 | 37:21,22 49:25 | 212:13,13 |

Page 90

**[thank - think]**

| | | | |
|---|---|---|---|
| 214:25 215:2,3 | 207:12 221:17 | 127:5,10,19 | 28:24,25 29:11 |
| 219:3,3,13 | 229:25 278:14 | 133:21 134:25 | 34:11,15 35:20 |
| 220:1,2,13,13 | **that'd** 176:9 | 135:3,4,12 | 38:19,22 39:4 |
| 221:14 228:23 | **that's** 185:21 | 137:6 139:7,8 | 39:5,18,20,25 |
| 229:16 230:16 | **them's** 285:2 | 139:10,13 | 40:2,17 46:10 |
| 230:20 231:22 | **theoretically** | 140:6 141:17 | 47:3 48:17 |
| 232:1 234:4,9 | 150:1 151:10 | 142:20 144:12 | 49:2 50:13 |
| 234:12,12 | **thereof** 283:24 | 153:25 159:25 | 52:13,22 53:5 |
| 240:19 244:13 | **thesis** 99:2 | 164:7,10 166:5 | 53:8 55:6 56:5 |
| 246:12,25 | **thing** 15:22 | 174:17 182:2 | 56:8 58:12,21 |
| 249:20,21 | 20:11 47:15 | 184:16 185:19 | 58:24 59:16 |
| 250:17 251:7 | 48:16 61:24 | 202:11 205:1 | 60:23 67:18,19 |
| 253:1 254:2,10 | 77:1 85:18 | 206:4,15 216:7 | 69:15 70:9,11 |
| 254:13,13,17 | 118:24 126:19 | 216:8,13 218:3 | 73:12 74:13,14 |
| 256:14,22 | 151:14 153:19 | 218:25 221:5 | 74:21,23 75:24 |
| 259:20 264:22 | 157:25 165:25 | 223:5 225:1,3 | 75:24 76:21,24 |
| 266:8,12 267:8 | 206:25 213:24 | 231:23,24 | 78:10 84:1,4 |
| 272:5,23 | 222:17 224:24 | 232:6 235:5 | 85:3 86:2,3,3,8 |
| 277:21 279:1,4 | 242:12 288:24 | 239:5,16 241:4 | 89:24 93:19 |
| 279:8 286:7,10 | 288:25 306:19 | 241:13,19 | 97:5,6 101:23 |
| 287:5,9,20 | 329:14 | 243:4 259:2 | 104:8,17 |
| 288:13,23,25 | **thing's** 49:18 | 261:19 263:15 | 107:14 109:21 |
| 289:1,2 300:16 | **things** 17:17 | 274:5 276:7 | 111:18 112:11 |
| 301:23 314:5 | 19:4,9 25:5 | 277:15 280:10 | 113:1 114:22 |
| 317:7 318:18 | 32:6 35:24 | 282:11 293:19 | 116:3 118:8,10 |
| 318:19,25 | 38:19 48:22 | 307:8,18 308:7 | 120:8 124:8,15 |
| 319:6,15 | 52:20,25 80:19 | 318:6 324:11 | 127:12 129:17 |
| 320:20 321:17 | 90:12 92:5 | 328:16 330:6 | 129:21 132:15 |
| 321:23,24 | 97:14 99:1,4,4 | 331:2 | 138:3,9 142:23 |
| 326:22 329:9 | 105:19 106:18 | **think** 9:20 | 143:18 144:4,5 |
| 329:23 330:15 | 107:1 108:19 | 11:16 12:10 | 144:11 151:5,5 |
| 332:16,18,19 | 110:18 113:7 | 18:25 20:16 | 151:17 152:8 |
| **thanks** 43:16 | 114:19 115:13 | 21:11 22:17 | 157:10 158:25 |
| 145:22 189:7 | 119:23 122:3 | 26:15 27:17,21 | 160:13 162:12 |

Page 91

**[think - time]**

162:12 165:1
166:22 167:1
167:20 169:20
170:17 171:8
173:16,24
174:11 176:11
177:1 185:10
186:6 189:19
190:12 191:4
199:22 201:23
202:23 205:23
209:2 211:8
212:5 215:11
219:18 222:13
222:14 223:8
227:6,21,21,25
228:20 229:7
231:5 233:6
234:20 239:5
239:13 241:9
242:6 243:2,9
245:9,13,14
246:14 247:6,7
248:9,18
252:24 257:13
258:5 259:2
260:21 263:9
263:19 269:3
269:11 273:5
278:10 279:18
280:5,16
281:11,25
282:1,24 283:8
283:9,10,13

285:16,17
286:8,11 288:6
288:7 289:7
291:8,10
292:25 296:5
297:12 298:18
299:24 303:25
304:8 307:19
307:24 311:10
311:22 315:1
315:23 316:1,9
316:20 317:4,5
318:10 322:12
322:20 324:3
324:12,16
326:15 327:5,6
327:19 328:17
329:4,16 332:6
**thinking**  20:5
22:19 89:18
98:20 113:6,23
216:15 224:19
245:15
**thinks**  220:10
256:20
**third**  48:22,22
65:6,22 69:10
105:16,16
107:15 111:12
121:15 122:9
123:17 148:5
151:11 205:10
216:16,18
261:14 270:2

277:3 279:15
283:12
**thomas**  1:8
**thompson**  2:5
**thompsoncob...**
2:8,9
**thorough**
126:11 181:15
**thought**  20:14
21:3 26:4,15
35:14,17 40:24
99:5 100:23
114:20 141:1
161:18 193:16
205:7,19
219:25 228:24
229:3 239:14
244:23 245:9
264:5 269:2
271:17,18
288:3 294:24
294:25 300:14
314:20
**thoughtful**
89:16 127:2
227:8 243:8,22
253:8
**thoughts**  10:23
14:11 18:11
238:11 239:6,6
**thread**  222:12
**threat**  198:14
**threatened**
195:15 197:1

200:17 202:14
203:5 311:4
**three**  15:17,24
20:24 42:4
44:4 59:6
66:14 70:18,25
92:13,19 100:5
119:8 122:22
123:9 126:25
128:5 149:23
168:3 175:23
176:24 252:7
319:11 327:17
328:12 332:1
**threshold**
29:15 278:1
**threw**  165:25
**thunder**  242:8
**thursday**  160:7
324:17
**tie**  211:20,22
211:24
**tier**  113:14
**tiering**  115:9
**time**  1:14 15:8
21:16 22:16
26:1 29:14
30:19,20 32:4
32:18 38:22
48:9 52:16,19
52:22 64:22
65:7 68:4,7
70:7,10 78:14
79:25 83:6

Page 92

**[time - top]**

| | | | |
|---|---|---|---|
| 88:14 89:7,20 | 216:18 218:10 | **titles** 294:12 | 130:6,15 |
| 90:21,23 96:23 | 219:6 220:7 | **tmre** 34:9,11 | 132:13 153:13 |
| 97:12,13 98:12 | 225:6 228:6 | **today** 20:17 | 157:2 197:22 |
| 100:21 101:11 | 232:5 235:4,7 | 29:21,24 85:8 | 200:12 213:2 |
| 101:12,20 | 242:22 243:3 | 104:11 112:18 | 215:13,18,19 |
| 105:5 106:17 | 249:1 250:9 | 119:23 131:10 | 215:19,19,21 |
| 108:7,17,17 | 255:25 260:18 | 132:25 133:2 | 215:22 293:23 |
| 109:25 110:10 | 261:21 269:5 | 133:24,25 | **tom's** 214:1 |
| 111:5,11,17,24 | 271:11 272:9 | 135:24 137:5 | **tomorrow** |
| 112:16 113:14 | 272:13 273:11 | 138:18 148:24 | 34:11 135:24 |
| 113:17 114:7 | 273:21 275:1,7 | 189:18 190:7 | 136:5 222:10 |
| 114:11 116:14 | 279:9 280:8 | 239:22 248:5,7 | 222:16 322:11 |
| 117:1,17 | 287:18 301:10 | 248:10 260:5 | 322:12 324:12 |
| 123:10 127:9 | 304:25 308:21 | 261:1 269:19 | 324:13,20 |
| 127:22 128:2,4 | 313:14 321:18 | 275:17 288:1 | 327:1,4,18 |
| 128:6 129:18 | 323:8 324:9 | 292:1 297:22 | 328:5,18,18 |
| 129:22,23 | 327:24 328:11 | 322:1 326:20 | 329:2,5,22 |
| 131:2,4,22 | 331:9,18,20 | **today's** 227:3 | 330:24 |
| 132:14,24 | **timeline** 66:24 | **together** 114:4 | **tone** 330:6 |
| 134:25 135:2,9 | 221:5 | 122:6 133:7 | **tonight** 222:11 |
| 136:25 138:17 | **times** 13:12 | 182:7,15,16 | **took** 98:24,24 |
| 143:12 145:4 | 27:13 55:5 | 237:8 242:25 | 101:23 157:22 |
| 147:4 149:17 | 114:19 121:8 | 261:5 293:16 | 211:22 229:4 |
| 155:12 156:13 | 137:5 168:3 | **told** 33:15 | 258:9 266:16 |
| 163:21 164:6 | 191:25 277:23 | 43:18 55:22 | 299:8 |
| 165:24 166:15 | 278:6 319:10 | 65:9 67:1 | **tools** 15:20 |
| 167:13 168:23 | 325:4 | 157:6 159:18 | 100:8 101:3 |
| 168:25 171:18 | **timestamp** | 166:18 175:25 | **top** 11:18 13:10 |
| 171:20 172:18 | 171:16 | 186:1,21 | 15:20 18:12 |
| 175:2 177:4 | **title** 129:24 | 256:11 315:22 | 20:24 21:3,12 |
| 187:21,22 | 130:5,22 131:1 | **tom** 45:10 54:8 | 34:2,5 46:11 |
| 189:6 190:1 | 147:25 | 55:5 59:23 | 46:15,24 48:5 |
| 193:20 203:4 | **titled** 13:6 | 113:13,18 | 50:15 51:10,14 |
| 206:1 213:16 | 228:19 | 116:3 128:19 | 65:2 70:20 |

Page 93

**[top - treyzon]**

| | | | |
|---|---|---|---|
| 82:24 84:2,16 86:3,6 101:15 101:16 104:11 110:23,25 122:25 136:11 141:19 171:16 190:4 203:22 205:7 213:3 216:12 218:11 219:11 | **tower** 98:23 | 147:23 154:24 163:24 164:16 164:17 165:13 166:4 168:3 176:1,5 177:6 178:1,1 179:5 180:9 183:8,12 187:22 195:7 198:16 203:7 203:24 204:19 206:5,16,19 208:11 209:1 218:2 224:13 274:13,14 | **transform** 134:3 |
| **topic** 188:23 262:3 265:3 283:4 313:13 | **track** 43:18 137:12 | | **transition** 56:6 129:10 |
| **topics** 207:1 236:15 290:9 | **tracker** 6:4 230:24 231:2 231:18 | | **transitioned** 129:13 |
| **topol** 7:19 11:3 27:3,7 44:11 44:15 94:24 95:20 160:6 180:19,24 187:8 240:3 | **tractor** 230:23 | | **translates** 153:18 |
| | **trade** 98:23 | | **transpired** 138:9 159:17 |
| | **traded** 119:6 130:11 | | **travel** 139:20 232:7 |
| | **tradition** 105:14 | | **traveling** 116:7 |
| | **traditional** 100:9 208:7 232:14 | **transactional** 18:19 23:24 106:25 119:21 | **treasury** 25:10 211:5 258:15 260:11 297:14 298:5 |
| **total** 68:2 82:8 82:12 156:2 248:6 | **trained** 115:21 | **transactions** 106:16,19 112:3 114:4 115:18 116:19 128:22,23 132:4 204:6 | **treating** 71:18 219:23,24 302:19 |
| **totally** 250:22 257:11 326:12 | **training** 99:19 99:21 102:17 103:1,5,15 106:4 112:16 115:15 | | **tremendous** 163:22 |
| **touch** 274:5 313:12 | **transaction** 11:21 18:24 23:7 24:5 27:8 27:9 28:21 108:21 109:9 109:22 110:5 112:4,5 116:18 120:15,24 121:1,3,4,15 127:11,13 129:13 132:12 132:21 134:23 135:21 139:3 | **transcends** 139:16 | **trends** 109:7 |
| **tough** 108:14 111:17 144:8 | | **transcriber** 333:1 | **trey** 269:21,24 270:4 |
| **towards** 52:15 52:21 324:18 | | **transcript** 40:21 136:4 333:3,5 | **treyzon** 2:14 3:3,4 8:25 145:16,19 146:6,8,14 211:13,14 251:10 257:8 258:3,9,17 272:1 322:6,9 322:10,14,17 |
| **towel** 221:12 | | **transfer** 246:4 | |
| | | **transfers** 297:8 297:10 | |

Veritext Legal Solutions
800-336-4000

**[treyzon - two]**

322:20 323:2,4
323:17,18,21
327:21,21
328:23 329:9
330:10,19,22
331:3,8,12,16
331:19 332:3,5
332:7,10,12,15
**treyzon's**
263:12
**triaging** 224:10
**trial** 8:18,22
60:18 94:1
171:6,7 281:8
282:3 283:20
**triangles** 11:24
**tried** 52:4
89:16 101:22
110:1 233:8
268:3
**true** 35:18 36:7
55:11 141:5,9
178:12,13
263:15 293:19
294:1 316:9,21
318:11 333:5
**truly** 114:13
**truncate**
326:14
**trust** 188:9
213:1,2 215:12
215:17,22
292:10 296:10
296:17

**trustee** 1:5 2:2
3:2 7:11 8:20
9:1 27:25 28:5
37:22 71:25
81:3 83:25
84:9 85:22
87:25 189:12
193:15 201:1
229:20,21,23
230:12 265:24
279:13,24
280:1,6,9
286:20 320:14
**trustee's** 7:15
10:10 13:16,23
14:20 21:25
32:23 37:11
43:21 46:4
50:2 61:9 64:2
67:12 74:9
79:17 80:10
84:10 85:17
87:9 88:16
91:24 92:14
93:17 96:16
179:18 189:13
230:1,2,12
247:6,7 269:18
279:25 291:24
296:13 299:6
308:8 309:7,10
312:14 319:21
320:16

**trustees** 80:22
281:2
**trustee's** 5:10
13:25 28:6
37:23 38:5
41:22 81:5
85:24 88:2
**truth** 35:16,18
46:12,20 47:14
48:6 201:18
279:15 280:3
283:11
**try** 15:10 16:8
36:12 46:15
55:19 76:2
77:5 110:6
116:22 121:17
126:6 127:13
127:20 134:16
135:10 141:21
174:22 214:7
227:7 232:11
232:20 234:8
241:20 246:25
267:5 305:15
**trying** 16:25
26:21 36:21
39:6,21 51:13
57:23 58:2
66:8 69:11
89:18 104:18
124:25 153:13
163:3,22
164:24 165:19

165:21,23
182:4 207:17
208:18,25
209:6 214:9,17
218:25 222:21
222:22 223:1
224:24 225:4,6
228:4,5,7
231:7 232:14
232:17,18
234:7 240:12
244:1 246:16
260:6 283:3
305:13 323:9
323:12,16
326:14
**tryout** 103:19
103:21
**tuesday** 1:13
**turn** 141:18
**turnaround**
135:13
**tweak** 166:24
**twice** 26:8
114:11
**two** 8:9 11:23
14:13,25 15:14
42:3,14 43:14
44:10 50:25
59:4,5 60:13
60:24 63:7
67:20 72:20
80:19 85:10
86:3 92:19,20

Page 95

**[two - understanding]**

93:4 94:11
105:7,10,11,13
105:25,25
106:1,3 107:14
108:18 111:18
116:18 119:24
123:24 142:21
149:6,7 166:16
174:13 177:10
181:20 185:11
191:6,7 206:4
206:8,9,15
213:4 218:3,6
232:18 236:15
236:18 245:4
248:12,13,19
249:6,24 252:3
252:4,5 256:15
257:17 259:2
266:16 281:1
282:11 295:15
312:21 313:3
315:5,21
319:11 328:13
**type**  58:3
123:21
**types**  16:13,13
17:12 104:3
106:19 242:9
**typical**  120:21
122:23
**typically**
101:15 105:7
105:21,25

120:12 122:14
123:11 126:13

**u**

**ubs**  112:12
**uh**  141:6
176:19 223:17
233:10 244:12
263:2
**ultimate**  218:6
**ultimately**  58:3
99:2 116:21
165:1 216:21
237:18 248:12
267:18
**uncertainty**
130:9
**unconventional**
140:23
**under**  8:6 9:24
12:13 16:11
26:18 46:16
47:16 67:23
82:1 103:24
152:13 162:1
169:17,18
170:10 172:8
177:24 178:6
184:5 206:18
208:6,8 216:10
216:24 217:5
252:4,8 274:22
282:1

**underneath**
15:20 20:25
215:16,25
216:1 217:13
**undersigned**
62:14
**understand**
16:25 20:13
33:11 36:24
39:13 48:6,14
49:8 70:1,7
76:12 89:5
110:17 116:24
124:24 144:14
145:2 158:16
161:22 165:20
172:3 173:23
179:22 186:10
187:20 203:24
214:3 219:8
223:1 232:11
232:22 240:3
243:5,5 256:18
263:16 267:16
268:9,20
269:22 270:3,4
270:9 274:22
275:17 290:12
291:25 295:8
296:9,22
301:12 305:6,7
308:15 316:11
320:11 322:4
325:24 326:12

**understanding**
21:21 32:22
45:18 46:2
48:13 49:4
73:6 88:14
90:20,25 154:2
155:4 156:24
159:1,4,5,16,22
160:19 163:7
165:5 166:25
169:17,20
170:8 171:11
172:4,20 174:2
176:14,21,25
178:19,24
181:13,15
183:2,3,11
184:22,24
185:16,17,23
188:16 191:18
193:9,19,22
198:14 203:4
206:20 208:5
219:6 229:25
231:13 234:23
240:4,9,10
248:7 249:5,15
250:4,5 252:22
253:5,7 259:1
261:6 262:20
262:21 263:11
275:23,25
293:22 298:8
303:7 305:19

Veritext Legal Solutions
800-336-4000

**[understanding - variety]**

| | | | |
|---|---|---|---|
| 306:25 314:24 320:7 321:11 322:10 | unions 134:12 | upstate 98:20 | 142:24,25 235:23 |
| **understands** 254:24 | unique 107:17 112:15,16 | urgent 121:1 | **value** 20:10 |
| **understood** 53:3,8 61:4 70:12 71:22 90:22 91:12 103:8 127:2 128:13 131:19 138:7,13 150:17 151:20 159:8 161:25 165:1 166:6 167:4 196:6 202:25 209:21 213:14 255:1,2 261:18,20 263:6 285:20 294:24 295:1 297:21 302:19 305:20 309:9 332:7 | **united** 1:1 112:11 113:3 113:17 117:17 118:11 134:1,2 134:7 225:24 | usa 116:25 | 107:3,9 108:12 236:21 |
| | **universally** 151:13 | **use** 19:2 78:3,6 90:1 199:7 205:2 233:17 234:2 250:5 255:6,7 260:16 262:14 283:19 284:6 312:18 316:17 327:23 327:24 | **vanderbilt** 7:18 11:7 24:11,13 24:17 28:17,18 29:3,7 72:22 72:25 74:17 75:3 84:21 86:8 92:16,20 92:24 93:1,6 94:11,23 95:19 154:17 158:2 175:8 185:18 187:9 203:20 222:8 223:24 224:11 238:7 244:9 293:15 294:5,11,12 |
| | **universe** 275:7 | | |
| | **university** 98:19,20 100:4 102:12 | | |
| | **unlimited** 49:24 | **used** 18:24 19:5 36:5 39:19 90:4 131:10 231:5 260:15 260:17 283:23 327:25 | |
| | **unpaid** 191:12 191:13 193:6 194:19,19,20 | | |
| | **unpredictable** 328:6 | **useful** 331:9 | **vanderbilt's** 73:9 76:6 249:12 |
| | **unsigned** 74:21 | **using** 79:10 119:25 146:17 261:12 | |
| | **unsuccessful** 110:2 | **usually** 326:7,9 331:1 | **vanek** 197:23 |
| **unidentified** 229:10,13,18 229:21 230:4 249:20 259:17 263:23 264:4 265:12 272:24 286:13,17 287:16 | **untoured** 209:1 | **utterly** 280:24 | **vanika** 286:22 |
| | **unusual** 26:24 | | **vannock** 198:4 199:16 |
| | **upcoming** 232:3 | v | |
| | **updated** 14:10 15:13 81:20 | **v** 1:7 | **vannock's** 198:9 |
| | | **vagueness** 185:22 | |
| | **ups** 317:8 | **valuable** 19:6 71:1 139:22 | **vantage** 169:16 |
| **union** 134:13 | **upside** 150:7 150:24 | **valuation** 16:1 33:13,14 | **variable** 127:9 |
| | | | **variety** 19:3 58:24 100:11 |

Veritext Legal Solutions
800-336-4000

**[variety - want]**

106:16 119:21 123:20 127:14 140:5,13 165:10 208:10 208:13 239:4 290:13,18 295:13 304:21 308:12

**various** 216:2,3 258:22 276:15 320:25

**vcp** 242:21

**vehicle** 234:24

**vendor** 5:18 57:23 88:9 242:1,4

**vendors** 55:15 55:18 139:6 250:2 251:19 252:6 301:14

**ventura** 2:15 3:5

**venture** 136:10

**veracity** 192:5

**verbal** 315:22

**verbally** 315:10

**verbatim** 19:18

**versed** 234:20

**version** 49:9 74:22,22 75:25 215:8 229:9

**versus** 8:20 13:2 16:20 17:4 24:25

73:13 141:19 218:10,14

**vertical** 216:25 218:12

**verticals** 108:16

**veruschka** 213:3 215:13 215:19,21

**vet** 197:22 323:4,23

**vet's** 200:12

**viability** 22:17 22:19 38:17 52:14 246:3 247:23 248:7 248:24

**viable** 268:1

**vice** 104:4 115:8,17 117:8 117:12 130:23

**video** 260:22 331:17

**view** 20:20 123:11 140:13 216:20 263:22 315:8

**viewed** 171:20

**views** 19:10

**vince** 197:19

**visa** 114:10

**visibility** 56:9 232:19 293:23

**volunteer** 273:24 274:1

**vote** 42:19 73:24 181:19 181:19

**voted** 132:12 300:25

**voting** 41:23 59:4 60:13 62:15 73:21 87:3 88:13 167:2,2 176:4 206:8,9 300:25

**vp** 111:19 114:3

**vugrincic** 266:16

**vugrincic's** 265:25

---

**w**

**wahlberg** 202:4

**wahlberg's** 46:18

**wait** 97:22 146:4 193:15 210:16,17 230:9 254:14 270:3 273:25 299:24

**waiting** 74:11 126:19

**waive** 137:16

**waived** 60:19 146:10 267:4 281:20

**waivers** 165:15 205:13

**waiving** 158:3

**walk** 124:18 161:12 210:21 213:4

**wall** 101:5 105:14

**walraven** 4:10 9:4

**want** 7:20 8:8,9 15:7,15 16:23 18:5 34:14 39:11 40:8,10 40:14,14 48:5 50:3 51:1 56:12,19 60:15 60:20 61:24 62:2 69:12 70:9 75:5 93:9 98:15 102:13 105:2 110:12 120:4,19 121:18,22 122:5,5 124:1 125:8 129:20 130:17,19 143:10 144:23 146:21 147:1 148:12,22,25 149:5 150:8

Veritext Legal Solutions
800-336-4000

**[want - we've]**

154:20 155:14
155:15,19
159:11 160:3
160:22 161:25
166:7 168:8
170:16 171:15
172:24 173:15
173:15 174:1
175:16 176:8
177:8,18
178:17,20
179:3 184:8
188:23 191:5,7
191:20 192:5
193:13,14,14
197:7,17
198:18,19
199:18 203:9
203:16 205:21
207:2 209:11
209:18 211:13
211:17 212:19
212:20 213:4
217:20 219:15
221:2,4,17
222:3,3 223:17
224:8 227:13
227:20 228:15
228:21,21
230:22 232:1
233:4 237:22
239:24 240:20
244:6 247:4
248:1 249:23

251:10 254:22
257:12,14,22
257:24 259:4
262:10 264:19
265:6,23 267:5
270:7 272:19
274:5 276:6
284:18 287:12
289:5 293:11
294:19 304:15
306:5 309:15
312:17 319:16
319:21 325:2,9
325:11 326:4
328:5,18 330:2
**wanted** 18:2
28:16 38:14,16
40:18 57:6
89:15 91:16
99:5 100:1,22
100:23 124:22
162:19 163:7
179:21 207:1
208:1,5,15,24
209:4 216:16
217:3 224:21
226:25 246:10
250:24 264:6
264:13 266:6
267:3 268:6
269:7 270:20
270:25 271:2,7
292:19 313:12
314:14 319:12

320:18
**wants** 8:4 75:9
76:20 144:2
249:17 257:18
263:20 277:16
**warburg**
143:22
**warn** 330:23
**warning** 251:1
**warranties**
268:18
**warrants**
127:18
**warranty**
179:21 268:18
**wasp** 329:14,14
**way** 11:2 12:12
17:20,22 33:8
39:18 40:18
44:13 50:7
73:8 77:5
99:24 109:21
111:4 120:8,21
124:8 127:12
128:12 139:18
139:23 141:8
141:15 143:14
144:13 148:17
150:4 152:11
152:24 169:13
171:10 186:3,6
197:24 206:17
209:1 210:5
211:20 212:6

215:10 226:13
233:19 234:8
236:15 253:15
257:15,16,20
260:7 262:24
268:2,6 275:5
276:8 286:17
295:5,16 296:7
318:3 328:6,15
**ways** 21:8
119:22 127:14
127:14 140:15
140:15 234:7
241:23 257:17
328:13
**we've** 7:14
19:10 22:14
23:10 24:2
28:21 41:17
47:19 69:13
96:15 98:6
121:7 135:16
135:18 136:8
136:12 155:16
158:19 180:11
182:13 183:18
187:6 188:10
191:4,24
200:21 203:18
205:22 214:17
223:18 238:13
244:21 247:22
261:21 269:15
275:17,18

Page 99

**[we've - williams]**

| | | | |
|---|---|---|---|
| 276:18 280:9 293:23 313:16 316:11,23 324:12 | **weight** 138:8 256:12 | 327:4,7,9 328:7 330:17 330:20 331:4 331:15 | 70:15,16,17 71:15,24 72:3 72:5,9 74:9,16 75:1,12,19 |
| **wearing** 83:10 83:16 85:13 86:23 96:7 211:23 | **welcome** 92:8 170:21 263:21 **wellbeing** 329:25 | **widely** 277:1 **wife** 296:8,9 **willful** 203:12 **williams** 2:3 | 76:4,15 77:6,7 77:15 78:1,4 78:12 79:2,14 79:15 80:21,25 81:4,7,10 |
| **weather** 242:18 **webster** 9:4 48:12 87:21 | **wells** 112:15 135:24 **went** 11:3,6 24:14 98:19 | 5:6 7:10,10 8:24 10:3,10 10:15 13:20 | 83:24 84:5,12 84:13 85:16 86:1 87:9,14 |
| **wednesday** 148:21 324:14 324:15 | 101:2,3 103:14 103:16 107:18 108:4 109:11 | 14:3,23 15:6 18:6 21:25 22:5 27:22 | 88:4,16,20,23 91:21,24 92:2 92:12 93:25 |
| **weeds** 174:16 **week** 54:11 68:21 81:20,23 82:1,7,11,22 83:18 84:25 103:9,11 145:1 191:10 221:22 232:18 248:21 249:13 305:25 324:18 | 109:17 112:19 120:12 135:7 147:23 166:23 179:19 201:6 216:21 258:19 265:5 267:18 268:7 277:2 293:3 329:19 | 28:1,8,12,14 32:23 33:4 35:12 36:19,21 36:23 37:11,18 37:25 38:3 41:2 43:21,25 44:3 46:3,7,23 47:10,23 48:3 | 94:4,8 96:22 124:6,22 136:22,24 137:21,22 143:23 145:21 146:18 147:3 148:15 150:11 |
| **weekend** 110:4 156:1 192:12 | **west** 161:10 **western** 1:2 **we're** 78:19 | 49:7,25 50:1 50:23 51:5,7 51:15,20,21 | 151:22 154:5 157:5,24 158:12,18 |
| **weekends** 224:23 | **wharton** 99:25 **what'd** 220:16 | 53:13,17,19 54:4 56:14,17 | 159:5,12 162:16 166:23 |
| **weekly** 232:4 232:18 | **whatsoever** 40:4 | 56:25 57:8,10 58:20 60:15 | 169:19,23 170:1,19,21 |
| **weeks** 123:9,9 177:11 266:17 | **whiteboarding** 246:15 **whitley** 4:17 9:9 221:11 | 61:2,5,9,13,16 61:20,23 62:4 62:7,9 64:1,6,9 | 173:2,4 174:19 176:16 178:15 178:17 179:2,8 |
| **weighing** 214:23 | **whitsitt** 324:6,7 324:9,19 327:2 | 65:15,20,24 69:17,23 70:4 | 179:16 184:11 185:9,10 |

Veritext Legal Solutions
800-336-4000

[williams - work]

186:14 188:20
189:4,7,10
192:16,19,23
198:20,23,25
200:1,3,20
201:10,22
202:10,15,22
210:14,18,25
211:12 212:4
212:18 213:18
214:16,25
219:14,16,20
220:1,3,9
221:6 222:1
227:22 228:20
229:20 230:9
233:7,10,13,18
233:20,23
237:25 239:23
247:8 250:13
250:22,24
251:1 252:17
254:19 255:5
255:11,14
256:4,9,20,23
256:24 257:9
257:12,21
258:4 259:6,18
259:21 262:1
263:20 265:15
265:19,22
266:2,6 267:2
269:19 272:3
277:6 278:9

279:5,7,17
280:5,16,19,21
280:23 281:14
281:17,21
282:7,14,21
284:9,20 285:6
285:12 286:14
286:16 287:3
287:20,23
288:3,7,25
289:2,4,13,17
289:20,22,23
290:2,3 293:5
294:22,23
295:21,25
300:1,4,6
301:17,24
303:4,6,25
305:5 307:3,16
308:4 309:6,9
309:13 312:13
312:19,20
314:3,6 317:8
317:13,14
318:13,17
319:23 320:8,9
320:12 321:20
321:21 322:13
322:15,19
**williams's**
157:21 199:21
**williamson**  7:5
7:13,22 8:11
8:23

**willing**  76:8
82:21,23 83:7
91:11 226:19
271:12
**wind**  67:14
248:4
**wipe**  153:2
**wire**  163:24
169:1 218:11
218:11
**wired**  170:14
**wisdom**  144:9
**wish**  255:8
**withdrawing**
234:1
**witness**  5:3
9:23 70:7
96:23 138:9
185:13 258:1
259:10 264:9
287:19 294:21
318:16 321:18
322:2,22 326:1
326:4,5,6,9,18
326:25 327:6
328:2,9 331:6
331:8
**witnesses**  78:11
154:6 158:15
182:23 324:4
327:14
**woman**  141:12
**wood**  72:20
73:13,14 84:22

86:7 320:24
321:5
**word**  35:20
40:1 166:17
284:14 316:17
**wording**  304:9
**words**  39:19
90:1,5 180:12
205:2 231:6,17
243:14 246:5
262:14
**work**  10:6 18:8
19:3,5,6 20:6
21:9,20 22:13
22:16,24 23:5
23:9 24:2,16
26:4,11 48:24
54:15 59:21
60:2 77:17
78:10 79:20
80:18,18 101:4
102:21 103:2
104:15 105:19
105:20 106:6
106:15,22
108:18 109:1,8
109:17 111:8
111:20,22
112:2 113:6,7
113:9,11,21,22
116:15 117:3
126:5,11,17
128:5 134:5
140:19 142:24

Page 101

**[work - year]**

147:10,13,19
147:25 161:7
164:18,21,21
165:24,24
182:4 200:24
210:6 225:23
228:9,11
245:11,22
273:25 274:2
311:13 322:21
322:22 325:23
**worked** 103:8
108:20 109:25
114:3,10 117:4
143:11,12
161:8
**working** 55:18
81:20 82:11
106:16,17
113:18,25
120:7,9 129:5
136:21 139:12
142:15 165:14
165:16,18
182:3,15,16
231:14 232:3
237:8 245:17
267:14
**works** 16:7
**world** 98:23
136:11 225:23
251:9
**worried** 207:23

**worst** 108:8
**worth** 77:13
128:5 151:6
227:5 236:5
**would've** 19:17
20:3,7,9,10,11
20:12 24:10,16
24:17,22 25:13
29:25 57:5
58:25 59:2
82:2 104:4
130:19 152:13
167:19 194:15
194:16 195:2
217:22 218:3
222:25 249:11
260:12 261:16
272:15 275:20
292:14 311:19
**wrench** 165:25
**write** 13:13
25:6 29:4,8
89:8 147:16
216:3 290:24
**writing** 176:18
284:2
**written** 33:16
34:10 62:10
180:5,10
187:17 198:10
209:19 282:15
283:18
**wrong** 86:3
135:4 140:16

166:10 201:24
205:2
**wrote** 34:19
43:20 269:20

| x |
|---|

**x** 1:3,11 5:8 6:1
**xfl** 197:19,21
197:25
**xfo** 38:13
**xos** 251:19
**xs** 12:5

| y |
|---|

**yeah** 7:21 15:9
15:14 16:22,23
28:12 35:4
36:8,17 51:3
56:22 73:12
75:23 78:13,17
80:6 84:3,6
85:6,20 87:3
100:19 101:10
102:7 103:25
104:4 106:13
112:19 116:6
121:2,12 126:2
133:3 138:19
140:21 142:17
143:25 145:2
145:18,22
152:1 155:20
161:13,19
167:1 170:8
172:3 176:22

182:15 188:22
189:6 191:3,3
205:18 207:17
209:8 210:24
212:23 213:15
215:18 220:17
220:20,23
221:19 223:10
224:19 226:12
226:17 227:25
232:11 233:12
234:11 237:5
237:11 245:2
247:8 248:18
249:19 250:20
256:19,25
259:12 261:6
264:4 265:16
272:3 278:4
280:18 281:5
283:1 285:13
287:23 290:7
298:25 308:5
314:16 318:21
319:19,19
320:2 322:20
327:8,10,12
330:4 331:7,23
331:24 332:3,4
332:7,12
**year** 29:16 96:9
99:12 103:3
104:1 105:7,16
105:17,25

Page 102

Veritext Legal Solutions
800-336-4000

**[year - zutter]**

106:1,3 107:14
110:25 111:12
119:24,24
130:17 135:15
135:16 194:23
195:1 310:5
313:17
**years** 104:7
105:10,11,13
105:25 108:18
110:12 111:8
111:10 113:20
114:3,23
115:24,25
116:1 120:6
128:15 129:12
135:11,15
143:12,15,20
167:12 194:5
220:21 235:9
236:2,3 290:5
304:8 308:18
308:21,24
312:5
**yep** 64:21
80:16,19 84:18
148:20 321:10
**yesterday** 8:3
10:6 20:14
26:3,7 35:14
36:2,13 39:6
39:14,20,23
40:10,22,22
42:6 47:22

54:9,11 57:21
66:1 69:13
137:5 148:16
148:24 154:25
157:22 160:14
166:23 170:17
176:17 179:20
180:4,5 224:9
225:9 227:23
242:2 330:13
**yesterday's**
198:8
**york** 98:20
103:4 107:25
119:12
**young** 115:14
328:20

**z**

**z** 14:9
**zero** 114:24
131:14 142:8
151:23 152:3
**zone** 7:19 13:1
13:4,4,14
14:17 16:7,9
16:10,12,17
18:14 19:24
20:2,4,9,16,21
20:24 21:1,4
21:14,19 23:10
23:16 234:17
234:22,23,24
235:11,13,14

235:24 236:5
236:17 237:19
237:20 239:11
308:14,16
**zones** 17:15
236:13
**zoom** 16:3
147:2 172:7
228:22 291:25
**zutter** 5:4 9:22
9:25 10:5,16
15:3,9,12,14
17:1,25 18:4,8
25:17 27:19
28:8,10,13
33:3 35:10,14
36:9,17 38:1,2
38:4 39:13
40:8,19,25
44:1,2 46:25
47:2,7,8,25
48:8,25 49:9
49:10 50:2,25
51:10,11,22
53:20 54:3
56:20 57:3
58:18 60:21
61:1,10,16,21
61:22 62:1,6,8
63:18 64:7,8
65:21,23 69:17
69:20 71:19
72:2,6 73:10
73:10 74:18

76:9,16 77:16
78:6,25 79:4
79:16 80:3
81:8,9 84:14
86:2 88:5,21
88:22 91:19
92:3,7,8,10
97:5,10,20
98:4 99:23
102:10,16
125:21 131:4
136:3,6,8
137:4,15,25
139:2 141:5,7
144:4 146:4,21
147:1,5,23
148:9 154:10
157:6,13,21,25
158:7 159:15
159:20 162:23
166:14 170:5
170:24 171:4
173:10 174:20
178:16,18,25
181:17 185:7
185:14,15,21
186:11,13
189:24 190:7
190:12 193:7
196:21 202:19
208:4 209:7,9
209:15,25
210:8,21,24
211:3 212:10

Veritext Legal Solutions
800-336-4000

**[zutter - zutter's]**

| | |
|---|---|
| 212:14 213:24 | 184:13 185:12 |
| 214:12 215:5 | 185:24 258:10 |
| 219:4,22 | 258:23 |
| 220:14 227:10 | **zutter's** 6:7 |
| 228:18 230:22 | |
| 231:23 234:15 | |
| 244:8 245:25 | |
| 246:3,8,12 | |
| 247:4 252:12 | |
| 253:3 254:11 | |
| 254:17 255:4 | |
| 257:8 258:15 | |
| 259:3 260:3 | |
| 261:22 264:11 | |
| 265:6 267:8 | |
| 273:3,12 275:8 | |
| 276:8 277:18 | |
| 278:5,14 | |
| 284:23 288:14 | |
| 289:5,16,22,24 | |
| 290:1 292:2,22 | |
| 292:25 293:17 | |
| 295:12 296:1 | |
| 300:2 301:25 | |
| 304:2,6,14,20 | |
| 304:24 305:2,4 | |
| 305:7 306:24 | |
| 308:2 309:16 | |
| 316:3 317:4,15 | |
| 320:23 321:22 | |
| 321:24 325:8 | |
| **zutter's** 48:7 | |
| 51:9 79:10 | |
| 124:7 158:1,4 | |

Page 104