**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 19-50900-cag |
| | § | |
| LEGENDARY FIELD | § | |
| EXHIBITIONS, LLC, et al., | § | |
| | § | Chapter 7 |
| Debtors. | § | |
| _____ | § | |
| | § | |
| RANDOLPH N. OSHEROW, | § | |
| Chapter 7 Trustee, and the Bankruptcy | § | |
| Estates of Legendary Field Exhibitions, LLC; | § | |
| AAF Players, LLC; AAF Properties, LLC; | § | |
| Ebersol Sports Media Group, Inc.; | § | |
| LFE 2, LLC; and We Are Realtime, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Adversary No. 22-05078-cag |
| | § | |
| THOMAS DUNDON; JOHN ZUTTER; | § | |
| and DUNDON CAPITAL PARTNERS, LLC, | § | |
| | § | |
| Defendants. | § | |

**CHAPTER 7 TRUSTEE'S AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND POST-TRIAL BRIEFING**

## TABLE OF CONTENTS

**Page**

I. PROPOSED FINDINGS OF FACT ..................................................................... 1

   A.   Parties ........................................................................................................ 1

   B.   Jurisdiction ................................................................................................ 2

   C.   Prior to Dundon's investment, the AAF was poised for success. ............................ 2

        1.   The AAF's pre-Dundon Board of Directors was controlled and assisted by experienced professionals. ................................................... 4

        2.   The AAF's pre-Dundon operations were guided by experienced professionals. ...................................................................................... 5

        3.   The AAF secured funding from a broad range of investors. ................. 6

              a)   Fowler's promised funding secured the AAF's launch, but that funding was inconsistent, at best. ....................................7

              b)   The AAF's additional sources of funding....8

        4.   The AAF secured media deals. ................................................. 9

        5.   The AAF pursued and secured relationships with the NFL. ................. 11

        6.   The AAF's product was well regarded................................................. 11

              a)   The AAF secured quality on-field talent. ..12

              b)   The AAF's early ratings were promising...12

        7.   The enterprise value of the AAF. ......................................................... 14

   D.   The AAF makes a deal with Dundon. ..................................................... 15

        1.   Ebersol seeks an investment to cover a short-term funding issue......... 15

        2.   Dundon proposes a much larger and comprehensive investment. ........ 17

        3.   The terms of the Dundon/AAF deal. ..................................................... 18

              a)   Dundon's comprehensive deal to take control of the AAF. ...............................................18

              b)   The initial funding provided by Dundon. ..21

              c)   The parties' exchange of information, representations, and documentation..........25

              d)   Overwhelming evidence corroborates the existence of the $250 million Oral Agreement.................................................29

   E.   Dundon and Zutter take control of the AAF......................................................... 41

        1.   Dundon and Zutter became ESMG's only voting board members

|   |   | on February 14, 2019. | 41 |
|---|---|---|---|
|   | 2. | The DCP team directed the AAF's operations after February 14, 2019 | 42 |
| F. |   | Dundon and Zutter breach Dundon's agreement with the AAF, breach their fiduciary duties, and engage in other wrongful conduct. | 46 |
|   | 1. | Dundon and Zutter had conflicting duties to DCP and the AAF, but acted in DCP's interest at all times, including as to funding decisions. | 46 |
|   | 2. | Dundon and Zutter knew that $70 million was insufficient, but failed to paper up or the $250 million deal or disclose that there would be no $250 million investment. | 50 |
|   | 3. | Dundon and Zutter forced the AAF to breach or threaten to breach its existing agreements. | 51 |
|   | 4. | Dundon soured the AAF's relationship with the NFL and NFLPA. | 53 |
|   | 5. | Dundon and Zutter refused to follow through on or allow other investment in the AAF, including when presented with options to preserve AAF assets. | 54 |
|   | 6. | Dundon and Zutter forced the AAF to benefit their other businesses. | 57 |
|   | 7. | Dundon and Zutter force the AAF into Chapter 7 bankruptcy proceedings | 58 |
| G. |   | Dundon and DCP Proofs of Claim | 62 |
| H. |   | Additional Factual Determinations | 64 |
| II. PROPOSED CONCLUSIONS OF LAW |   |   | 70 |
| A. |   | Jurisdiction | 70 |
| B. |   | Count I – Breach of Oral Contract (Against Defendant Dundon) | 70 |
|   | 1. | Conclusions of Law | 70 |
|   | 2. | Argument | 74 |
| C. |   | Count III – Breach of Covenant of Good Faith and Fair Dealing (Against Defendants Dundon) | 80 |
|   | 1. | Conclusions of Law | 80 |
|   | 2. | Argument | 81 |
| D. |   | Count IV – Promissory Estoppel (Against Defendant Dundon) | 84 |
|   | 1. | Conclusions of Law | 84 |
|   | 2. | Argument | 85 |

E.  Count V – Breach of Fiduciary Duty (Against Defendants Dundon and Zutter) ... 87

   1.  Conclusions of Law ................................................................................. 87

   2.  Argument ................................................................................................. 91

F.  Count XI – Common Law Fraud; Fraudulent Misrepresentation; Fraud by Non-Disclosure; Constructive Fraud (Against Defendant Dundon) .............................. 99

   1.  Conclusions of Law ................................................................................. 99

   2.  Argument ............................................................................................... 101

G.  Count XII – Fraud in the Inducement (Against Defendant Dundon) ................... 105

   1.  Conclusions of Law ............................................................................... 105

   2.  Argument ............................................................................................... 106

H.  Count XIII – Negligent Misrepresentation (Against Defendant Dundon) ........... 109

   1.  Conclusions of Law ............................................................................... 109

   2.  Argument ............................................................................................... 110

I.  Count XV – Unjust Enrichment (Against Defendants Dundon, Zutter, DCP) ..... 111

   1.  Conclusions of Law ............................................................................... 111

   2.  Argument ............................................................................................... 112

J.  Count XVI – Disallowance of Defendants' Claims (Against Defendants Dundon and DCP) ................................................................................................... 113

   1.  Conclusions of Law ............................................................................... 113

   2.  Argument ............................................................................................... 115

K.  Count XVII – Equitable Subordination (Against Defendants Dundon and DCP) 116

   1.  Conclusions of Law ............................................................................... 116

   2.  Argument ............................................................................................... 117

L.  Trustee's Damages ................................................................................. 118

   1.  Conclusions of Law ............................................................................... 118

         a)  Generally Applicable Standards            118

         b)  Expectancy or Benefit of the Bargain Damages            120

         c)  Actual Damages            120

         d)  Reliance Damages            121

         e)  Punitive Damages            122

         f)  Attorneys' Fees and Pre- and Post-Judgment Interest            123

         g)  Pre- and Post-Judgment Interest            123

|  |  |  | h) | One Satisfaction Rule | 124 |
|  | 2. | Damages Awarded |  |  | 125 |
|  |  |  | a) | Expectancy or Benefit of the Bargain Damages | 125 |
|  |  |  | b) | Actual Damages | 125 |
|  |  |  | c) | Reliance Damages | 129 |
|  |  |  | d) | Punitive Damages | 129 |
|  |  |  | e) | Attorney Fees | 130 |
|  |  |  | f) | Pre- and Post- Judgment Interest | 131 |
| M. | The Economic Loss Rule |  |  |  | 131 |
|  | 1. | Conclusions of Law |  |  | 131 |
|  | 2. | Argument |  |  | 133 |
| N. | Res judicata applies to Defendants' defenses. |  |  |  | 134 |
|  | 1. | Conclusions of Law |  |  | 134 |
|  | 2. | Argument |  |  | 135 |
| O. | Defendants' Affirmative Defense of Merger or Integration |  |  |  | 137 |
| P. | Defendants' Affirmative Defenses of Waiver, Estoppel, and Ratification |  |  |  | 141 |
| Q. | Defendants' Affirmative Defense of Fraud |  |  |  | 144 |
| R. | Defendants' Affirmative Defenses of Prior Material Breach and Impossibility .. 145 |  |  |  |  |
| S. | Defendants' Affirmative Defense of Lack of Authority |  |  |  | 149 |
| T. | Defendants' Affirmative Defense of Advice of Counsel |  |  |  | 150 |
| U. | Defendants' Assertion of Judicial Estoppel/Admission/Waiver |  |  |  | 152 |
| III. Conclusion |  |  |  |  | 154 |

# <u>TABLE OF AUTHORITIES</u>

**Section II.B (Count I - Breach of Oral Contract)**

*<u>Case Law</u>*

*Argonaut Ins. Co. v. Falcon V, L.L.C. (In re Falcon V, L.L.C.)*,
    44 F.4th 348 (5th Cir. 2022)

*Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc*.,
    518 S.W.3d 432 (Tex. 2017)

*Beverick v. Koch Power, Inc.*,
    186 S.W.3d 145 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)

*Bryant v. Clark,*
    347 S.W.2d 635 (Tex. Civ. App.—Austin 1961), aff'd, 358 S.W.2d 614 (Tex. 1962)

*Coe v. Chesapeake Exploration, LLC*,
    695 F.3d 311 (5th Cir. 2012)

*Copeland v. Alsobrook*,
    3 S.W.3d 598 (Tex. App.—San Antonio 1999, pet. denied)

*Cox Paving of Texas, Inc. v. H.O. Salinas & Sons Paving, Inc.*,
    657 S.W.3d 756 (Tex. App.—El Paso 2022, pet. denied)

*E-Learning LLC v. AT & T Corp.*,
    517 S.W.3d 849 (Tex. App.—San Antonio 2017, no pet.)

*Fischer v. CTMI, L.L.C.*,
    479 S.W.3d 231 (Tex. 2016)

*Gannon v. Baker*,
    830 S.W.2d 706 (Tex. App.—Houston [1st Dist.] 1992, writ denied)

*Garcia v. Garza*,
    No. 13-22-00431-CV, 2023 WL 8467664 (Tex. App.—Corpus Christi Dec. 7, 2023, no pet. h.)

*Houston Cmty. Coll. Sys. v. HV BTW, LP*,
    589 S.W.3d 204 (Tex. App.—Houston [14th Dist.] 2019, no pet.)

*Hubbard v. Shankle*,
    138 S.W.3d 474 (Tex. App.—Fort Worth 2004, pet. denied)

*Hudgins v. Sec. Bank (In re Hudgins)*,
    188 B.R. 938 (Bankr. E.D. Tex. 1995)

*Jonibach Mgmt. Trust v. Wartburg Enters., Inc.*,
    750 F.3d 486 (5th Cir. 2014)

*Krayem v. USRP (PAC), L.P.*,
    194 S.W.3d 91 (Tex. App.—Dallas 2006, pet denied)

*Lamajak, Inc v. Frazin*,
    230 S.W.3d 786 (Tex. App.—Dallas 2007, no pet.)

*McCalla v. Baker's Campground, Inc.*,
    416 S.W.3d 416 (Tex. 2013)

*One-Half Price Checks Cashed v. United Auto. Ins. Co.*,
    344 S.W.3d 378 (Tex. 2011)

*Prime Prods., Inc. v. S.S.I. Plastics, Inc.*,
    334 B.R. 853 (Bankr. W.D. Tex. 2005)

*In re Palms at Water's Edge, L.P.*,
    97 S.W.3d 631 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)

*Quantum Diversified Holdings, Inc. v. Wienheimer (In re Escarent Entities, L.P.)*,
    423 F. App'x 462 (5th Cir. 2011)

*Radford v. McNeny*,
    104 S.W.2d 472 (Tex. Com. App. 1937, no writ)

*Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*,
    25 F.3d 1281 (5th Cir. 1994)

*Slade v. Phelps*,
    446 S.W.2d 931 (Tex. Civ. App.—Tyler 1969, no writ)

*SOAP Engineering, LLC v. Infiniti Integration Servs. Corp.*,
    No. 07-24-00304-CV, 2025 WL 1646333 (Tex. App.—Amarillo June 10, 2025, no pet. hist.)

*State Farm Lloyds v. Fuentes*,
    597 S.W.3d 925 (Tex. App.—Houston [14th Dist.] 2020, no pet.)

*In re Sun Runner Marine, Inc.*,
    945 F.2d 1089 (9th Cir. 1991)

*T.O. Stanley Boot Co. v. Bank of El Paso*,
    847 S.W.2d 218 (Tex. 1992)

*Texas Gas Utils. Co. v. Barrett*,
    460 S.W.2d 409 (Tex. 1970)

*Thornton v. Dobbs*,
    355 S.W.3d 312 (Tex. App.—Dallas 2011, no pet.)

*Wiley v. Bertelsen*,
    770 S.W.2d 878 (Tex. App.—Texarkana 1989, no writ)

*Yazadani-Beioky v. Sharfian*,
　　550 S.W.3d 808 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)

*Young v. Ershick*,
　　617 F. Supp. 3d 563 (E.D. Tex. 2022)

*Statutes*

11 U.S.C. § 364

11 U.S.C. § 365(a)

11 U.S.C. §§ 365(g)(1)

11 U.S.C. §§ 365(d)(2)

11 U.S.C. § 541(a)

*Other Sources*

Black's Law Dictionary (12th ed.)

## Section II.C (Count III - Breach of Good Faith and Fair Dealing)

*Case Law*

*Acton Corp. v. Sabinske*,
    No. 05-91-01720-CV, 1995 WL 479671 (Tex. App.—Dallas Aug. 9, 1995, writ denied)

*Allright, Inc. v. Elledge*,
    515 S.W.2d 266 (Tex. 1974)

*Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*,
    725 S.W.2d 165 (Tex. 1987)

*In re Lyon Fin. Servs., Inc.*,
    257 S.W.3d 228 (Tex. 2008)

*Mims v. Beall*,
    810 S.W.2d 876 (Tex. App.—Texarkana 1991, no writ)

*McKenzie v. Cmty. Cmty. Nat'l Bank*,
    No. 04-14-00540-CV, 2015 WL 3616601 (Tex. App.—San Antonio June 10, 2015, no
    pet.)

*Prime Prods., Inc. v. S.S.I. Plastics, Inc.*,
    334 B.R. 853 (Bankr. W.D. Tex. 2005)

*Simms v. Jones*,
    2011 WL 5978594 (N.D. Tex. 2011)

*Tuttlebee v. Tuttlebee*,
    702 S.W.2d 253 (Tex. App.—Corpus Christi-Edinburg 1985, no writ)

*Villanova v. Fed. Deposit Ins. Corp.*,
    511 S.W.3d 88 (Tex. App.—El Paso 2014, no pet.)

*Wilgus v. Bond*,
    730 S.W.2d 670 (Tex. 1987)

## Section II.D (Count IV – Promissory Estoppel)

*Case Law*

*City of Beaumont v. Excavators & Constructors, Inc.*,
   870 S.W.2d 123 (Tex. App.—Beaumont 1993, writ denied)

*Collins v. Walker*,
   341 S.W.3d 570 (Tex. App.—Houston [14th Dist.] 2011, no pet.)

*English v. Fischer*,
   660 S.W.2d 521 (Tex. 1983)

*Eaton v. Mazanec Constr. Co.*,
   Nos. 10-21-00107-CV, 10-21-00111-CV, 2022 WL 7211332 (Tex. App.—Waco Oct. 12, 2022, no pet.)

*Frost Crushed Stone Co. v. Odell Geer Const. Co.*,
   110 S.W.3d 41 (Tex. App.—Waco 2002, no pet.)

*Lucas v. Ryan*,
   No. 02-18-00053-CV, 2019 WL 2635561 (Tex. App.—Fort Worth June 27, 2019, no pet.)

*Walker v. Walker*,
   631 S.W.3d 259 (Tex. App.—Houston [1st Dist.] 2020, no pet.)

**Section II.E (Count V – Breach of Fiduciary Duty)**

<u>Case Law</u>

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006)

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984)

*Auriga Cap. Corp. v. Gatz Props., LLC*,
    40 A.3d 839 (Del. Ch. 2012)

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000)

*Bridgeport Holdings Inc. Liquidating Trust v. Bayer (In re Bridgeport Holdings, Inc.)*,
    388 B.R. 548 (Bankr. D. Del. 2008)

*In re Carvana Co. Stockholders Litig.*,
    No. CV 2020-0415-KSJM, 2022 WL 2352457 (Del. Ch. June 30, 2022)

*Cede & Co. v. Technicolor, Inc.*,
    634 A.2d 345 (Del. 1993)

*Guth v. Loft, Inc.*,
    5 A.2d 503 (Del. 1939)

*Frederick Hsu Living Tr. v. ODN Holding Corp.*,
    No. CV 12108–VCL, 2017 WL 1437308 (Del. Ch. Apr. 14, 2017)

*Kelly v. Blum*,
    No. CIV.A. 4516-VCP, 2010 WL 629850 (Del. Ch. Feb. 24, 2010)

*Maffei v. Palkon*,
    No. 125,2024, 2025 WL 384054 (Del. Feb. 4, 2025)

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998)

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001)

*In re Match Group, Inc. Derivative Litig.*,
    315 A.3d 446 (Del. 2024)

*Metro Storage Int'l LLC v. Harron*,
    275 A.3d 810 (Del. Ch. 2022)

*In re Mindbody, Inc., S'holder Litig.*,
    332 A.3d 349 (Del. 2024)

*Orman v. Cullman*,
    794 A.2d 5 (Del. Ch. 2002)

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
    102 A.3d 155 (Del. Ch. 2014)

*PT China LLC v. PT Korea LLC*,
    No. 4456-VCN, 2010 WL 761145 (Del. Ch. Feb. 26, 2010)

*Schuss v. Penfield Partners, L.P.*,
    No. 3132-VCP, 2008 WL 2433842 (Del. Ch. June 13, 2008)

*In re Tesla Motors, Inc. S'holder Litig.*,
    No. 12711-VCS, 2020 WL 553902 (Del. Ch. Feb. 4, 2020)

*Tornetta v. Musk*,
    310 A.3d 430 (Del. Ch. 2024)

*In re Tower Air, Inc.*,
    416 F.3d 229 (3d Cir. 2005)

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013)

*United Food and Commercial Workers Union and Participating Food Indus. Employers Tri-State Pension Fund v. Zuckerberg*,
    262 A.3d 1034 (Del. 2021)

*Voigt v. Metcalf*,
    No. CV 2018-0828-JTL, 2020 WL 614999 (Del. Ch. Feb. 10, 2020)

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983)

*In re Xtreme Power Inc.*,
    563 B.R. 614 (Bankr. W.D. Tex. 2016)

<u>Statutes</u>

Delaware General Corporations Law § 102(b)(7)

## Section II.F (Count XI –Fraud)

*Case Law*

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*,
    297 S.W.3d 768 (Tex. 2009)

*Archer v. Griffith*,
    390 S.W.2d 735 (Tex. 1964)

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, L.L.C.*,
    572 S.W.3d 213 (Tex. 2019)

*CBE Grp., Inc. v. Lexington L. Firm*,
    993 F.3d 346 (5th Cir. 2021)

*Coldwell Banker Whiteside Assocs. v. Ryan Equity Partners, Ltd.*,
    181 S.W.3d 879 (Tex. App.—Dallas 2006, no pet.)

*Ernst & Young, L.L.P., v. Pac. Mut. Life Ins. Co.*,
    51 S.W.3d 573 (Tex. 2001)

*In re Estate of Kuykendall*,
    206 S.W.3d 766 (Tex. App.—Texarkana 2006, no pet.)

*Houle v. Casillas*,
    594 S.W.3d 524 (Tex. App.—El Paso 2019, no pet.)

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*,
    962 S.W.2d 507 (Tex. 1998)

*Lang v. Lee*,
    777 S.W.2d 158 (Tex. App.—Dallas 1989, no writ)

*Lundy v. Masson*,
    260 S.W.3d 482 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)

*In re Mercer*,
    246 F.3d 391 (5th Cir. 2001)

*Pitts v. Rivas*,
    709 S.W.3d 517 (Tex. 2025)

*Ralston Purina Co. v. McKendrick*,
    850 S.W.2d 629 (Tex. App.—San Antonio 1993, writ denied)

*In re Soza*,
    542 F.3d 1060 (5th Cir. 2008) (Wiener, J., concurring)

*United Tchr. Assocs. Ins. Co. v. Union Lab. Life Ins. Co.*,
    414 F.3d 558 (5th Cir. 2005

*Veale v. Rose*,
    657 S.W.2d 834 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.)

*Welder v. Green*,
    985 S.W.2d 170 (Tex. App.—Corpus Christi 1998, pet. denied)

*White v. Pei*,
    452 S.W.3d 527 (Tex. App.—Houston [14th Dist.] 2014, no pet.)

**Section II.G (Count XII – Fraud in the Inducement)**

<u>*Case Law*</u>

*Bohnsack v. Varco, L.P.*,
    668 F.3d 262 (5th Cir. 2012)

*Carroll v. Farooqi (In re Carroll)*,
    464 B.R. 293 (Bankr. N.D. Tex. 2011), *aff'd*, 486 B.R. 718 (N.D. Tex. 2013)

*Int'l Bus. Mach Corp. v. Lufkin Indus., LLC*,
    573 S.W.3d 224 (Tex. 2019)

*LeTourneau Techs. Drilling Sys., Inc. v. Nomac Drilling, L.L.C.*,
    676 F. Supp. 2d 534 (S.D. Tex. 2009)

*In re Primera Energy, LLC*,
    579 B.R. 75 (Bankr. W.D. Tex. 2017) (Gargotta, J.)

**Section II.H (Count XIII – Negligent Misrepresentation)**

<u>Case Law</u>

*Baker v. Great N. Energy, Inc.,*
    64 F. Supp. 3d 965 (N.D. Tex. 2014)

*Brown & Brown v. Omni Metals, Inc.*,
    317 S.W.3d 361 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)

*Fed. Land Bank Ass'n of Tyler v. Sloane*,
    825 S.W.2d 439 (Tex. 1991)

*Lindsey Constr., Inc. v. AutoNation Fin. Servs., LLC*,
    541 S.W.3d 355 (Tex. App.—Houston (14th Dist.) 2017, [])

*In re Primera Energy, LLC*,
    579 B.R. 75 (Bankr. W.D. Tex. 2017) (Gargotta, J.)

**Section II.I (Count XV – Unjust Enrichment)**

<u>Case Law</u>

*1 Oak Priv. Equity Venture Cap. Ltd. v. Twitter, Inc.*,
 C.A. No. N14C–10–186 EMD

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
 No. Civ.A. 762-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005)

*Nemec v. Shrader*,
 991 A.2d 1120 (Del. 2010)

*Wells Fargo Bank, N.A. v. Est. of Malkin*,
 278 A.3d 53 (Del. 2022)

**Section II.J (Count XVI – Disallowance of Defendants' Claims)**

*Case Law*

*In re Ali*,
   No. 13-50724-CAG, 2015 WL 4611343 (Bankr. W.D. Tex. July 23, 2015) (Gargotta, J.)

*In re GDC Technics, LLC*,
   643 B.R. 417 (Bankr. W.D. Tex. 2022) (Gargotta, J.)

*In re Mid-American Waste Sys., Inc.*,
   284 B.R. 53 (Bankr. D. Del. 2002)

*Statutes and Rules*

11 U.S.C. § 501

11 U.S.C. § 502(b)(1)

11 U.S.C. § 510(b)

FED. R. BANKR. P. 3001

FED. R. BANKR. P. 3007

FED. R. BANKR. P. 7001

**Section II.K (Count XVII – Equitable Subordination)**

<u>Case Law</u>

*Matter of Cajun Elec. Power Co-op., Inc.*,
    119 F.3d 349 (5th Cir. 1997)

*Fabricators, Inc. v. Technical Fabricators, Inc. (In the Matter of Fabricators, Inc.)*,
    926 F.2d 1458 (5th Cir. 1991)

*Pepper v. Litton*,
    308 U.S. 295 (1939)

<u>Statutes</u>

11 U.S.C. § 510(c)(1)

## Section II.L (Trustee's Damages)

### *Case Law*

*1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*,
    192 S.W.3d 20 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)

*Atrium Med. Ctr., LP v. Houston Red C LLC*,
    595 S.W.3d 188 (Tex. 2020)

*Baylor Univ. v. Sonnichsen*,
    221 S.W.3d 632 (Tex. 2007)

*Beard Research, Inc. v. Kates*,
    8 A.3d 573 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010)

*Craig v. GACP II, L.P.*,
    No. 3:19-CV-0058-G, 2022 WL 1778392 (N.D. Tex. June 1, 2022)

*Crisalli v. ARX Holding Corp.*,
    177 Fed. App'x 417 (5th Cir. 2006)

*D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*,
    973 S.W.2d 662 (Tex. 1998)

*Ellison v. Three Rivers Acquisition LLC*,
    No. 13-17-00046-CV, 2022 WL 17663839 (Tex. App.—Corpus Christi–Edinburg Dec. 15, 2022, pet. denied)

*In re Extended Stay, Inc.*,
    No. 09-13764-JLG, 2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020)

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*,
    960 S.W.2d 41 (Tex. 1998)

*Geis v. Colina Del Rio, LP*,
    362 S.W.3d 100 (Tex. App.—San Antonio 2011, pet. denied)

*Gentile v. Rossette*,
    No. CIV.A. 20213-VCN, 2010 WL 3582453 (Del. Ch. Sept. 10, 2010)

*Hindman v. Tex. Lime Co.*,
    157 Tex. 592, 305 S.W.2d 947 (1957)

*Incyte Corp. v. Flexus Biosciences, Inc.*,
    No. N15C-09-055MMJCCLD, 2016 WL 1735485 (Del. Super. Ct. Apr. 19, 2016)

*Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*,
    278 F.3d 494 (5th Cir. 2002)

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*,
    962 S.W.2d 507 (Tex. 1998)

*Lock v. Schreppler*,
    No. C.A. 79C-MY-113, 1980 WL 317337 (Del. Super. Ct. July 7, 1980)

*Metro Storage Int'l LLC v. Harr*,
    275 A.3d 810 (Del. Ch. 2022)

*Meyers v. Moody*,
    693 F.2d 1196 (5th Cir. 1982)

*In re Missionary Baptist Found. of Am.*,
    69 B.R. 536 (Bankr. N.D. Tex. 1987)

*Roth v. Mims*,
    298 B.R. 272 (N.D. Tex. 2003)

*Schneider Nat. Carriers, Inc. v. Bates*,
    147 S.W.3d 264 (Tex. 2004), *holding modified on other grounds by Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474 (Tex. 2014)

*Siam v. Mountain Vista Builders*,
    544 S.W.3d 504 (Tex. App.—El Paso 2018, no pet.)

*In re Smartalk Teleservices, Inc. Sec. Litig.*,
    487 F. Supp. 2d 940 (S.D. Ohio 2007)

*Soon Phat, L.P. v. Alvarado*,
    396 S.W.3d 78 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)

*In re S. Peru Copper Corp. S'holder Derivative Litig.*,
    52 A.3d 761 (Del. Ch. 2011), *aff'd sub nom. Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012)

*Spoljaric v. Percival Tours, Inc.*,
    708 S.W.2d 432 (Tex. 1986)

*State Farm Fire & Cas. Co. v. Gros*,
    818 S.W.2d 908 (Tex. App.—Austin 1991, no writ)

*Stewart Title Guar. Co. v. Sterling*,
    822 S.W.2d 1 (Tex. 1991), *holding modified on other grounds by Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006)

*Sun Oil Co. (Del.) v. Madeley*,
    626 S.W.2d 726 (Tex. 1981)

*Tex. Capital Sec., Inc. v. Sandefer*,
    58 S.W.3d 760 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)

*Thorpe by Castleman v. CERBCO, Inc.*,
  676 A.2d 436 (Del. 1996)

*In re TransCare Corp.*,
  No. 20-CV-06274 (LAK), 2021 WL 4459733 (S.D.N.Y. Sept. 29, 2021), *aff'd*, 81 F.4th 37 (2d Cir. 2023)

*Tumlinson v. Advanced Micro Devices, Inc.*,
  No. CIV.A. 08C-07-106FSS, 2010 WL 8250792 (Del. Super. Ct. July 23, 2010)

*US Dominion, Inc. v. Newsmax Media, Inc.*,
  No. N21C-08-063 EMD, 2025 WL 1092289 (Del. Super. Ct. Apr. 9, 2025)

*Vianet Group PLC v. Tap Acquisition, Inc.*,
  No. 3:14-CV-3601-B, 2016 WL 4368302 (N.D. Tex. Aug. 16, 2016)

*Wheeler v. White,*
  398 S.W.2d 93 (Tex. 1965)

*Wills v. USAA Gen. Indem. Co.*,
  No. 01-22-00304-CV, 2023 WL 8459498 (Tex. App.—Houston [1st Dist.] Dec. 7, 2023, no pet.)

## *Statutes*

28 U.S.C. § 151

28 U.S.C. § 157(a)

28 U.S.C. § 1334

28 U.S.C. § 1961

DEL. CODE ANN. TIT. 6, § 2301

TEX. CIV. PRAC. & REM. CODE § 38.001, *et. seq.*

TEX. CIV. PRAC. & REM. CODE ANN., § 41.008(b)

TEX. FIN. CODE ANN. § 304.003(c)

TEX. FIN. CODE ANN. § 304.103

## *Other Sources*

Restatement (Second) of Contracts § 344 (1981)

**Section II.M (Economic Loss Rule)**

<u>Case Law</u>

*Abbott Lab'ys v. Owens*,
No. 13C-09-186 JRJ CCLD, 2014 WL 8407613 (Del. Super. Ct. Sep. 15, 2014)

*Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*,
445 S.W.3d 716 (Tex. 2014)

*Commonwealth Capital Corp. v. Medshare Techs., Inc.*,
No. 3:15-CV-2144-C, 2015 WL 10818622 (N.D. Tex. Oct. 1, 2015)

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*,
960 S.W.2d 41 (Tex. 1998)

*Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*,
954 F.3d 804 (5th Cir. 2020)

*Gea Sys. N. Am. LLC v. Golden State Foods Corp.*,
No. N18C-11-242 EMD CCLD, 2020 WL 3047207 (Del. Super. Ct. June 8, 2020)

<u>Statutes</u>

11 U.S.C. § 510(c)(1)

**Section II.N (Res Judicata)**

*Case Law*

*Abiomed, Inc. v. Maquet Cardiovascular LLC*,
No. CV 16-10914-FDS, 2020 WL 4201187 (D. Mass. July 22, 2020)

*Am. Intern. Indus., Inc. v. Scott*,
355 S.W.3d 155 (Tex. App.—Houston [1st Dist.] 2011, no pet.)

*Amstadt v. U.S. Brass Corp.*,
919 S.W.2d 644 (Tex. 1996)

*Benson v. Wanda Petroleum Co.*,
468 S.W.2d 361 (Tex. 1971)

*Bradley v. Div. of Child Support Enf't ex rel. Patterson*,
582 A.2d 478 (Del. 1990)

*Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Protestant Church,*
No. CIV.A. 12055, 1995 WL 420003 (Del. Ch. July 13, 1995), *aff'd sub nom. Conference of African Union First Colored Methodist Protestant Church v. Mother African Union First Colored Methodist Protestant Church*, 683 A.2d 58 (Del. 1996) *and aff'd sub nom. Conference of African Union First Colored Methodist Protestant Church v. Mother African Union First Colored Methodist Protestant Church*, 687 A.2d 194 (Del. 1996)

*New Talk, Inc. v. Sw. Bell Tel. Co.,*
520 S.W.3d 637 (Tex. App.—Fort Worth 2017, no pet.)

*Samuel v. Fed. Home Loan Mortg. Corp.*,
434 S.W.3d 230 (Tex. App.—Houston [1st Dist.] 2014, no pet.)

*Talley v. Horn*,
303 A.3d 338 (Del. 2023)

**Sections II.O through II.U (Defendants' Affirmative Defenses)**

<u>Case Law</u>

*Alabama Football, Inc. v. Wright,*
    452 F. Supp. 182 (N.D. Tex. 1977), *aff'd* 607 F.2d 1004 (5th Cir. 1979)

*Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*,
    518 S.W.3d 432 (Tex. 2017)

*Blankenship v. Buenger,*
    653 Fed. App'x 330 (5th Cir. 2016)

*Brooks v. O'Connor,*
    120 Tex. 126, 39 S.W.2d 14 (1931)

*Buc-ee's, Ltd. v. Hribek,*
    No. 03-08-00120-CV, 2009 WL 5149922 (Tex. App.—Austin Dec. 31, 2009, no pet.)

*Carr v. Weiss,*
    984 S.W.2d 753 (Tex. App.—Amarillo 1999, pet. denied)

*In re Coastal Plains, Inc.,*
    179 F.3d 197 (5th Cir. 1999)

*In re Coinmint, LLC,*
    261 A.3d 867 (Del. Ch. 2021)

*Fed. Deposit Ins. Corp. v. Tex. Bank of Garland,*
    783 S.W.2d 604 (Tex. App.—Dallas 1989, no writ)

*Fish v. Tandy Corp.,*
    948 S.W.2d 886 (Tex. App.—Fort Worth 1997, pet. denied)

*Friel v. Jones,*
    42 Del. Ch. 148, 206 A.2d 232 (1964), *aff'd*, 42 Del. Ch. 371, 212 A.2d 609 (1965)

*GB-SP Holdings, LLC v. Walker*,
    No. 9413-VCF, 2024 WL 4799490 (Del. Ch. Nov. 15, 2024)

*Hernandez v. Gulf Group Lloyds,*
    875 S.W.2d 691 (Tex. 1994)

*Hines v. Liberty Life Ins. Co.,*
    No. EP-11-CV-545-KC, 2013 WL 310320 (W.D. Tex. Jan. 25, 2013)

*Holcombe v. United States,*
    No. SA-18-CV-555-XR, 2021 WL 398842 (W.D. Tex. Feb. 3, 2021)

*Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*,
    352 S.W.3d 462 (Tex. 2011)

*Huffines v. Swor Sand & Gravel Co., Inc.,*
     750 S.W.2d 38 (Tex. App.—Fort Worth 1988, no writ)

*Imperial Charters, LLC v. Redwood Fire and Casualty Insurance Co.,*
     No. 02-24-00237-CV, 2025 WL 1006279 (Tex. App.—Fort Worth Apr. 3, 2025, no pet.
     h.)

*Jerry L. Starkey, TBDL, L.P. v. Graves,*
     448 S.W.3d 88 (Tex. App.—Houston [14th Dist.] 2014, no pet.)

*Jethroe v. Omnova Sols., Inc.,*
     412 F.3d 598 (5th Cir. 2005)

*Kodiak Bldg. Partners, LLC v. Adams,*
     No. CV 2022-0311-MTZ, 2022 WL 2455987 (Del. Ch. July 6, 2022)

*LSREF2 Baron, L.L.C. v. Tauch,*
     751 F.3d 394 (5th Cir. 2014)

*GB-SP Holdings, LLC v. Walker*,
     No. 9413-VCF, 2024 WL 4799490 (Del. Ch. Nov. 15, 2024)

*In re Orchard Enterprises, Inc. Stockholder Litig.,*
     88 A.3d 1 (Del. Ch. 2014)

*Old Republic Ins. Co., Inc. v. Fuller,*
     937 S.W.2d 496 (Tex. App.—San Antonio 1996, writ denied)

*O'Shea v. IBM Corp.,*
     578 S.W.2d 844 (Tex. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.)

*In re Pattern Energy Group Inc. Stockholders Litig.,*
     2021 WL 1812674 (Del. Ch. May 6, 2021)

*In re Pyle,*
     No. 11-37390-HDH, 2015 WL 3956362 (Bankr. N.D. Tex. Feb. 24, 2015), report and
     recommendation adopted sub nom. *Pyle v. U.S. Bank Nat. Ass'n*, No. 3:15-CV-0624-B,
     2015 WL 3949376 (N.D. Tex. June 22, 2015)

*Rich v. Olah,*
     274 S.W.3d 878 (Tex. App.—Dallas 2008, no pet.)

*Satre v. Dommert,*
     184 S.W.3d 893 (Tex. App.—Beaumont 2006, no pet.)

*S.K.Y. Inv. v. H.E. Butt Grocery Co.,*
     440 S.W.2d 885 (Tex. App.—Corpus Christi 1969, no writ)

*Silverthorne Seismic, LLC v. Sterling Seismic Servs., Ltd.*,
     No. H-20-2543, 2021 WL 11728206 (S.D. Tex. 2021)

*Taylor v. Jones,*
No. CIV. A. 1498-K, 2002 WL 31926612 (Del. Ch. Dec. 17, 2002)

*TLC Hospitality, LLC v. Pillar Income Asset Mgmt.,*
570 S.W.3d 749 (Tex. App.—Tyler 2018, pet. denied)

*Tri–Star Petroleum Co. v. Tipperary Corp.,*
107 S.W.3d 607 (Tex. App.–El Paso 2003, pet. denied)

*West v. Quintanilla,*
573 S.W.3d 237 (Tex. 2019)

*White v. ARCO/Polymers, Inc.,*
720 F.2d 1391 (5th Cir. 1983)

*Womack v. Tex. Capital Bank, N.A.,*
No. SA-22-CV-00965, 2023 WL 4410517 (W.D. Tex. July 7, 2023)

<u>*Statutes and Rules*</u>

DEL. CODE ANN. TIT. 8, § 141(e)

FED. R. CIV. P. 8

<u>*Other Sources*</u>

Restatement (Third) Of Agency § 2.03 (2006)

TO THE HONORABLE CRAIG A. GARGOTTA, CHIEF U.S. BANKRUPTCY JUDGE:

Pursuant to L. Rule 7016-1(d), Plaintiff Randolph N. Osherow ("Trustee"), as the Chapter 7 Trustee of the Bankruptcy Estates of Legendary Field Exhibits, LLC, AAF Players, LLC; AAF Properties, LLC, Ebersol Sports Media Group, Inc. ("ESMG"), LFE 2, LLC and We are Realtime, LLC (collectively, "Debtors" and "Plaintiffs"), acting by and through counsel, respectfully submits these Proposed Findings of Fact and Conclusion of Law, amended following the presentation of evidence at trial. As requested by the Court, post-trial briefing is also included within this same document, in the sections noted as "Argument" following the Proposed Conclusions of Law for each claim.

Trustee requests that statements listed as Proposed Findings of Fact which are more properly Proposed Conclusions of Law be considered Proposed Conclusions of Law, and that statements listed as Proposed Conclusions of Law which are more properly Proposed Findings of Fact be considered Proposed Findings of Fact, regardless of the heading under which they are listed. Trustee further requests that statements which constitute mixed statements of law or fact be considered Proposed Findings of Fact *and* Proposed Conclusions of Law as appropriate, regardless of the heading under which they are listed.

## I. **PROPOSED FINDINGS OF FACT**[1]

The Court finds that the following facts have been established either by stipulation or admission of the parties, or by the preponderance of the evidence at trial.

**A.      Parties**

1.      The bankruptcy estate of the Debtors (the "Debtors' Estate") is a consolidated

---

[1] References to these Proposed Findings of Fact are sometimes abbreviated as "FOF" herein.

entity, defined in the underlying pleadings in the master bankruptcy matter.[2]

2.      The Trustee, RANDOLPH N. OSHEROW, is the individual who is the duly appointed Chapter 7 trustee of the Debtors' Estate. The Trustee, Randolph Osherow, was duly appointed as Chapter 7 Trustee for each of the Debtors and the Debtors' Estate and continues to serve in that capacity.

3.      Defendant THOMAS DUNDON ("Dundon") is an individual and a former board member of ESMG.

4.      Defendant JOHN ZUTTER ("Zutter") is an individual and a former board member of ESMG.

5.      Defendant Zutter has worked for Mr. Dundon, and for the Dundon family of related entities, since 2014. **Day 15, 8:25-12:2.**

6.      Defendant DUNDON CAPITAL PARTNERS, LLC ("DCP") is a Delaware limited liability company with its principal offices in Texas.

**B.      Jurisdiction**

7.      This case is an adversary matter brought by debtors in Case No. 19-50900-cag against persons and entities Trustee believes are liable to the Estate.

8.      No party has objected to this Court's personal jurisdiction.

9.      The parties have agreed that this Court has jurisdiction to enter a binding final judgment in this case (subject to all ordinary appeal rights).

**C.      Prior to Dundon's investment, the AAF was poised for success.**

10.     In early 2017, the Alliance of American Football (the "AAF") was established as a spring league intended to follow the Super Bowl and precede the NFL Draft.

---

[2] Case No. 19-50900-cag, ECF No. 150; 11 U.S.C. §§ 301, 541.

11.     Ebersol Sports Media Group, LLC ("ESMG") was the ultimate parent of subsidiary entities formed at various times, all of which together operated a springtime professional football league known as the Alliance of American Football. *See generally* **Day 3, 224:4-229:25**. ESMG and ESMG's subsidiaries LFE, AAF Players, AAF Properties, LFE 2, and Realtime are referred to collectively herein as "AAF" or the "League."

12.     Legendary Field Exhibitions, LLC, formed on April 13, 2018, owned and controlled all eight AAF teams (with no separate team owners), entered into operational agreements for goods, services, and facilities, and incurred substantial debt in its enterprise capacity with vendors and third parties. **Day 3, 229:12-14**.

13.     AAF Players, LLC formed in September 2018, owned and was the counterparty to all Standard Player Agreements with each AAF player. **Day 3, 226:14-15**.

14.     AAF Properties held the AAF's intellectual property and commercial licenses. **Day 3, 226:11-13**.

15.     LFE 2 was the employer of AAF's California-based staff and a counterparty to medical plans. **Day 3, 229:22-25**.

16.     Until February 14, 2019, Charles Ebersol ("Ebersol") served as ESMG's Chief Executive Officer and chairman of ESMG's board of directors, and generally oversaw the AAF's operations. **Day 3, 224:14-16**. Prior to February 14, 2019, Ebersol owned a majority of the common stock and approximately two million preferred shares of ESMG. Ebersol's family trust owned additional common stock and preferred shares of ESMG. *See* **TR. EX. 0807.0032**.

17.     ESMG, through its wholly owned entities, maintained ownership and operational control of the AAF's team-related entities, ensuring a single-entity model for all core organizational, logistical, and football business functions. **Day 3, 224:7-13**.

18.     ESMG's business plan recognized that the AAF would require outside financial support for the first five to six years to address projected negative cash flow. **Day 1, 133:13-24**; **TR. EX. 0015**.

19.     The AAF's plan was to complement, rather than compete with, the NFL, a plan that was informed by the failure of prior "Spring Leagues." NFL Commissioner Roger Goodell even recommended certain personnel to the AAF to assist it. **Day 1, 95:4-13**; **104:15-17**.

### 1. The AAF's pre-Dundon Board of Directors was controlled and assisted by experienced professionals.

20.     Ebersol, who served as Chairman of ESMG's Board of Directors prior to Dundon's takeover, had a 10-year relationship with the NFL that would benefit the AAF. **Day 1, 139:9-12**. Ebersol's relationship included entertainment project partnerships with the NFL, serving as a team relocation consultant for the NFL, and an existing long-term contract with the NFL through another company Ebersol founded. **Day 2, 14:14-16:13**

21.     Dick Ebersol, Ebersol's father and a prominent figure in the television industry, who co-created *Saturday Night Live* and other television shows like *Saturday Night's Main Event* and *Friday Night Videos*, served as a Member of ESMG's Board of Directors until February 14, 2019. **Day 1, 109:23-110:6; Day 2. 123:16-17**.

22.     Jeff Moorad was an initial investor in ESMG and served as a member of ESMG's Board of Directors until February 14, 2019. Moorad was an attorney and the head of the sports practice at Morgan Lewis, a prominent U.S. law firm. **Day 1, 158:12-19** (position at Morgan Lewis).Mr. Moorad was also an accomplished entrepreneur and an owner of the San Diego Padres, a professional baseball team. **Day 2, 138:22-139:5**. Aspects of the film *Jerry Maguire* were based on his career. **Day 2, 138:8-9**.

23.     Keith Rabois was an initial investor in ESMG and served a member of ESMG's

Board of Directors until February 14, 2019. **Day 4, 29:3-4**.

24.     Dawn Belt is an attorney with Fenwick & West in San Francisco, California who performed legal services for ESMG. **Day 4, 174:16-17**; **Day 12, 15:16-23**. Ms. Belt's corporate practice focuses primarily in the startup area where she works with companies from "formation, venture financing, exit transactions, and day-to-day corporate matters." **Day 12, 262:22-263:4**.

### 2.  The AAF's pre-Dundon operations were guided by experienced professionals.

25.     The AAF had a large number of high-profile NFL veterans and leaders among the sports and entertainment industry advising, working for, or leading the league.[3]

26.     Kevin Freedman advises entrepreneurs in the early stage of startups who advises those companies on how to raise money, determine strategy, and help execute their business through the challenges of getting off the ground. **Day 12, 332:9-333:6**. Mr. Freedman worked with ESMG as a consultant who assisted in interviewing and hiring people, fundraising, and

---

[3] The record supports that the following figures had important roles:

- NFL Hall of Famer Bill Polian served as Co-founder and Head of Football, overseeing AAF operations and player decisions Day 1, 130:25-131:3 [Hall of Fame] (**TR. EX. 0807.0007**);
- Troy Polamalu, a two-time Super Bowl champion, led the AAF's player health and wellness initiatives (**Day 1, 187:3-14; TR. EX. 0807.0007**);
- Hines Ward, a two-time Super Bowl champion, concentrated on player development and diversity hiring (**Day 1, 187:3-14; TR. EX. 0807.0007**);
- Mike Martz served as head coach for the AAF's San Diego team—he had served as offensive coordinator for the St. Louis Rams during their 1999 Super Bowl win and as head coach for the Rams during their 2001 Super Bowl appearance (**TR. EX. 0807.0009**);
- Dennis Erickson served as head coach for the AAF's Salt Lake City team—Erickson had won national championships with the University of Miami in 1989 and 1991 (**TR. EX. 0807.0009**);
- Mike Singletary served as head coach for the AAF's Memphis team, and was a Super Bowl-winning linebacker with the Chicago Bears in 1985 (**TR. EX. 0807.0009**);
- Steve Spurrier served as head coach for the AAF's Orlando team, Spurrier won a national championship at the University of Florida in 1996 (**TR. EX. 0807.0009**); and
- Daryl "Moose" Johnston served as a general manager for the AAF's San Antonio team, and was a three-time Super Bowl champion with the Dallas Cowboys.

determining a strategy for executing football games. **Day 12 333:7-335:3**.

27.　　Kevin Farrell has historically worked in operations in the bio-tech tool and life sciences industries. **Day 13, 20:9-10**. Mr. Farrell changed industries to work for ESMG as its pseudo-CFO, and he thereafter continued in that role at AAF after the DCP transaction. **Day 2, 229:12-15**; **Day 3, 225:25-224:5**. Mr. Farrell managed all of AAF's vendor relationships including to directly interface with vendors. **Day 2, 227:14-20**.

28.　　Alan Kantowitz acted as "Strategy Lead" for AAF. **TR. EX. 0102.0006**. In that role, Mr. Kantowitz prepared financial projections for AAF and prepared weekly estimates of cashflow needs for DCP. **Day 18, 28:15-29:7**.

29.　　Kellie Vugrincic was Head of People, *i.e.* Human Resources Director, for AAF. **Day 10, 231:9-22**. In that role, she handled payroll as well as reviewing accounts payable (including review of invoices, terms, payments, and creditors) and approving appropriate expenses accountable to Human Resources. *Id*.

30.　　Mark Teitelman is the executive producer of Thursday Night Football on Amazon and previously produced at Fox and NBC and ran NFL Networks production for a time. **Day 1, 171:7-16**. Teitelman acted as a producer for the AAF broadcasts. **Day 11, 76:3-21; TR. EX. 0807.0015**.

### 3. The AAF secured funding from a broad range of investors.

31.　　Gabe Giordano was an experienced business man that was brought in by Ebersol to work with Kantowitz on developing a franchise model that could be sold to potential investors in the AAF who would also build strong connections to the community. **Day 4, 98:7-99:19**. That model was referred to as FANchises or PALs ("Preferred Acquisition Licenses"). **Day 2, 130:11-23**.

32.　　The AAF had secured a $170 million equity and debt commitment through Reggie

Fowler, which was its primary funding source. **TR. EX. 0757**. But Ebersol and other AAF staff continued to reach out to various potential interested investors to amplify the AAF's funding, both of because of issues that began to occur with Fowler and because starting the AAF would be capital-intensive. **Day 12, 352:10-354:23; Day 54:11-16.**

> ### a) Fowler's promised funding secured the AAF's launch, but that funding was inconsistent, at best.

33.    ESMG's founding involved a Series Seed preferred stock purchase agreement through which ESMG raised $7 million in capital in late 2017. **TR. EX. 0709; Day 1, 165:22-166:7.**

34.    The following year, ESMG entered a Series One preferred stock offering totaling approximately $200 million (including converted notes), which, along with the Fowler equity and debt commitment, provided sufficient capital to fund the AAF's projected first season operating requirements. **Day 1, 176:12-177:4**, **182:9-12; Day 6, 12:2-8; TR. EX. 0016**.

35.    Fowler was introduced to Ebersol as a potential funder of the AAF by the NFL, where he co-owned the Minnesota Vikings franchise in the NFL. **Day 1, 175:18-176:5**; **Day 18, 316:21-317:7; 317:19-318:8**.

36.    Fowler presented himself as a successful businessman in the business of manufacturing drones for the military and in real estate, with more than $300 million in liquid assets. **Day 1, 177:14-18**; **180:9-23**.

37.    Fowler provided ESMG with bank statements evidencing that his balances and liquidity exceeded his funding commitments. **Day 1, 178:13-18, 179:16-19, 180:7-24, 181:4-12, 183:18-184:6**; **TR. EX. 0757.**

38.    By the end of the AAF's first week of play, Fowler funded at least $18,369,145.96 to the AAF, but he began to fall behind on the funding schedule he had agreed to. **Day 2, 85:9-**

**13; Day 5, 49:10-25, 50:9-12**.

39.     Fowler's sporadic funding placed financial pressure on the AAF as bills became due. **Day 10, 217:8-219:8**.

40.     Fowler claimed that funding delays were due to logistical, Know Your Customer, banking issues. **D-23**; **Day 1, 190:15-192:7**; **Day 2:16:3-19:14, 29:4-30:12.**

41.     The AAF did not know about Reginald Fowler's illicit money transfer operations before he was indicted in April 2019. **Day 2, 110:24-111:21.**

### b)     The AAF's additional sources of funding.

42.     By mid-2018, the AAF's founders raised sufficient capital through stock offerings and convertible debt financing, with early-stage financial backing from investors including Peter Chernin of The Chernin Group (**Day 18, 263:15-22**), Peter Thiel of the Founders Fund (**Day 1, 162:3-16**), MGM Resorts International (**Day 1, 188:16-23**, **189:21-190:2**), and Shaquille O'Neal. **TR. EX. 0807.0032; TR. EX. 0757.0057-59**.

43.     Following the AAF's successful inaugural weekend, substantial unsolicited interest flowed in from a range of prospective investors, including ICONIQ Capital (Divesh Makan) (**Day 12, 354:17-20**), and JPMorgan Private Bank (Kevin Adams) (**Day 12 475:4-18**), and American National Investments (Gina Champion-Cain) (**Day 11 402:14-20**). At the same time, ESMG critically needed money due to Fowler's sporadic funding caused by his legal issues.

44.     Additional expressions of interest came from George Pyne, Jeff Goldfarb (**Day 2, 68:10-16; 92:5-6**), Cliff Avril (**Day 2, 67:8-15**), and Colton Sudberry (**Day 4, 111:13-112:22**), who each initiated contact to explore or proceed with potential investment in the AAF.

45.     The AAF created a franchise licensing model as a funding mechanism. **Day 4, 98:16-99:4.** The AAF had conversations and draft term sheets with several different markets

including Salt Lake City, San Antonio, Arizona, and Florida before Dundon's involvement. **Day 4, 128:19-129:3**.

46.     The AAF engaged with approximately 150 potential franchise investors, with dozens agreeing to discuss investment opportunities further. **Day 4, 104:4-24, 107:25-108:21**.

47.     Potential franchise investors who showed interest included Dan Miller, David Dunn, Donnie Edwards, Doug Manchester, Tommy Azopardi, Greg LaMantia, Ian Lopatin, Alex Smith (NFL), Mike Fonseca, and Johnny Damon (MLB). **Day 4, 102:6-14, 102:15-103:1, 103:10-104:1, 107:25-108:21**.

48.     Dan Miller, through his entity, Remar Investments, invested $1 million into the AAF in September 2018. **Day 11, 179:23-182:4; TR. EX. 0136**. Mr. Miller then began negotiations with the AAF to enter a FANchise agreement with the AAF for the San Diego team. **TR. EX. 0727; Day 11, 431:8-441:19.** The FANchise agreement was executed. **TR. EX. 0388; Day 11, 207:3-19.** Mr. Miller even began recruiting other investors on behalf of the league including, Mike Stone, founder of asset management company, TPG. **Day 11, 412:4-414:25; TR. EX. 0142**.

49.     After the first week of games, the AAF received more calls from people expressing interest in franchise investments, including Colton Sudberry and Ian Lopatin**. Day 4, 111:13-112:22**.

### 4.  The AAF secured media deals.

50.     The AAF secured a media agreement with CBS Television and CBS Sports Network to televise select AAF games, including its premier and championship games, providing the AAF with broad national visibility. **Day 3, 11:16-12:2; TR. EX. 0719**.

51.     The AAF also entered a media agreement with Turner Sports, Inc. to televise AAF games. **Day 3, 19:21-20:4; TR. EX. 0771**.

52.     As part of the agreement, CBS aired commercial promotional spots for the league in the 2019 AFC Championship and the Super Bowl, together with other promotional units to spotlight upcoming AAF matchups or storylines. **Day 3, 11:16-12:2**; **TR. EX. 0719**; **Day 17, 270:11-17**. The promotional spots CBS aired for AAF during the Super Bowl represented significant value inventory that could not be sold for cash; the NFL never allowed another sport or football venture to be promoted during the Super Bowl prior to the AAF. **Day 17, 270:11-17; 270:18-20, 272:7-20**.

53.     As in all of its broadcast deals, the AAF retained digital rights to stream games on its own OTT (refers to the delivery of content directly to users via the internet) and mobile platforms, enabling secondary distribution alongside linear TV promotion. **Day 3, 14:18-15:19, 16:3-17:4, 21:7-22:9; TR. EX. 0719**. Ebersol's approach in negotiating deals was to keep digital rights, which Schanzer advised was critical given that 2019 was the beginning of cord cutting and new technology. **Day 17, 265:13-24**. These retained digital rights had significant present and future value because the greater role streaming plays in the media landscape, the greater ability to monetize content, and the more exclusivity over content, the greater the value. **Day 17, 267:8-11; 267:25-268:10**.

54.     On January 30, 2019, the AAF secured a broadcasting agreement with NFL Enterprises LLC (NFL Network) under which the NFL agreed to broadcast the AAF's games. **Day 3, 27:7-11**.

55.     NFL Network integrated AAF game telecasts into its programming schedule and utilized its existing in-game ticker and "NFL bug" (logo/score graphic) to promote other network content. **Day 3, 51:24-52:11**. It was significant for the NFL shield to be on screen with the AAF logo because it put the imprimatur of the NFL, which, as Schanzer testified, is the single most

important sports the brand in America and possibly the world. **Day 17, 282:3-9; 284:23-285:9**.

### 5. The AAF pursued and secured relationships with the NFL.

56. The AAF, NFL, and NFLPA were in confidential negotiations about a possible partnership between the AAF and the NFL. **Day 3, 98:3-10**.

57. By October 2018, the parties were so far along in their talks that they were already discussing changes to specific articles of the NFL collective bargaining agreement to accommodate this agreement. **Day 3, 98:24-99:22**.

58. On January 30, 2019, the AAF entered into a binding term sheet with NFL subsidiary 32 Equity LLC (**TR. EX. 1288**) pursuant to which 32 Equity (**Day 1, 140:16-141:4**) would receive a warrant to acquire up to 15% of ESMG (and, post-spinout, a proportional interest in TechCo) on a fully diluted basis at an exercise price equal to the lower of (i) $4.6023 per share (the ESMG Current Value) or (ii) the then-current fair market value as of the notice date, reflecting a pre-money valuation of $115,000,000. **Day 2, 269:17-270:9; TR. EX. 1288; Day 5, 112:22-113:21, 114:14-19.**

59. On October 23, 2018, the NFL granted the AAF access to its Game Statistics Information System (GSIS) to support the AAF's technological innovations. **Day 2, 130:24-131:5**. GSIS is the NFL's official system for capturing and distributing real-time game data. **Day 2, 131:10-19**.

60. No prior individual or entity had ever been granted access to the NFL's GSIS before that date. **Day 2, 131:6-19**.

### 6. The AAF's product was well regarded.

61. The AAF delivered a "highly authentic football product" with quality of play comparable to NFL practices and games. **Day 17, 255:13-15; Day 4, 108:22-109:18**. The football on the field was credible and met the standard of good football that was the "single most

important thing" for the AAF's success. **Day 1, 129:8-14; Day 4, 108:22-109:18; TR. EX. 1386**.

### a)      The AAF secured quality on-field talent.

62.      By late 2018, the AAF had staffed most key positions, hired coaching staff, held a combine, contracted with players, staffed local team business operations, secured ticketing partnerships, and prepared for stadium operations. **Day 1, 185:21-186:8**.

63.      The AAF executed contracts with players and coaches to support its business structure. **Day 2, 8:21-9:7; TR. EX. 1291**.

64.      The AAF recruited players considered to be at or just below NFL level. **Day 3, 20:3-25; Day 2, 20:3-25**.

65.      This recruitment effort resulted in player contracts with more than 500 athletes across eight teams, including agreements with well-known former NFL players and high-profile former college players. **Day 2, 8:21-13:13**.

66.      The AAF's player contracts prohibited players from joining other minor leagues while under contract with the AAF. **Day 2, 13:2-13**.

67.      The only contractual exception allowing a player to leave the AAF was the "NFL Out clause," which permitted departure for an NFL opportunity. **Day 2, 15:2-16:13; Day 17, 146:8-13, TR. EX. 1291**. This escape valve was designed to assist the AAF in functioning as a complement, rather than a competitor, to the NFL.

68.      Players who did not sign with an NFL team remained contractually bound to the AAF and could not join any other professional football league. The AAF maintained exclusive control over player contracts, restricting movement to competing minor leagues while allowing only NFL exits. **Day 2, 21:8-22**.

### b)      The AAF's early ratings were promising.

69.      The AAF's premiere game aired in primetime on CBS Network on February 9,

2019. **Day 11, 308:16-309:1; TR. EX. 0719**.

70.     The AAF's debut attracted more viewers than an NBA game airing simultaneously on ABC. **Day 11, 315:22-317:22; TR. EX. 0517**.

71.     Over 6 million people watched the AAF games in their first weekend. After Week 1 of AAF play, on February 10, 2019, the AAF's app was the number one trending sports app in both the Apple and Google Play app stores (and number 33 overall in the Apple App Store). **Day 2, 84:7-19, 106:8-16; TR. EX. 0020**.

72.     The AAF app averaged 650,000 people watching live games on the app. **Day 17, 218:22-219:1**.

73.     NFL Network executives were "genuinely surprised" the AAF was "getting much better ratings than they thought" because "spring football is hard to sell." **Day 11, 319:18-321:13.** NFL Network consistently delivered strong ratings throughout the season, including 0.32 ("very good one for an NFL network"), 0.33 ("good rating for 8:00 at night in March"), and maintained ratings of 0.2-0.24 even when competing against March Madness basketball. **Day 11, 314:4-11; 323:1-8; 328:1-4; TR. EX. 0518**.

74.     AAF games showed remarkable year-over-year growth for TV ratings in their given time slot, with Week 3 up +991% among P18-49 and +580% overall versus the previous year's time period. **TR. EX. 0516**.

75.     NFL Network's programming executives actively sought AAF playoff games based on the strong ratings performance, with one executive calling to "beg for the playoff games." **TR. EX. 0523**.

76.     The AAF's games continued to garner solid ratings that were referred to by Mark Teitelman, an experienced TV production executive, as "very good" (**TR. EX. 0510; Day 11,**

307-308:25; TR. EX. 0511; Day 11, 309:1-310:22) and "really good." (**TR. EX. 0515B; Day 11, 313:17-314:6**); *see also* **Day 11, 320:15-324:24; TR. EX. 0519; TR. EX. 0521; TR. EX. 0522; Day 11, 327:5-328:21; TR. EX. 524**.

77.     The ratings for the AAF were so good that Dundon was later quoted as saying, "Even if the league got half the TV ratings they are getting now, it would still be a pretty solid league." **TR. EX. 0380.0003**.

### 7. The enterprise value of the AAF.

78.     The enterprise value of the AAF around the time of February 13, 2019 was $144.1 million as demonstrated by expert testimony and similar, and contemporaneous pre-money valuations. **Day 14, 67:15-24**.

79.     Ms. Sonia Desai, a partner in the forensics and litigation services practice at the firm Weaver and Tidwell, performed expert analysis on behalf of Trustee in this matter to determine the enterprise value of the AAF. **TR. EX. 0600b; TR. EX. 0600c; Day 14, 12:21-26:10**.

80.     Desai calculated the enterprise value of the AAF by identifying an equity value, adding the company's debt, and subtracting the cash on hand. **Day 14, 26:18-24**.

81.     Desai testified that subject-company transactions the best available source of information for the fair market value of the AAF. **Day 14, 77:3-21; TR. EX. 0600e**.

82.     Desai weighted, or relied upon in her analysis, two subject-company transactions: (1) the ESMG Series 1 Preferred Stock Purchase Agreement which set the value of ESMG at $115 million (**TR. EX. 0757**); and (2) the ESMG Binding Term Sheet for the Techco and ESMG Warrants (**TR. EX. 1288**). *See also* **TR. EX. 600D.0004; Day 2, 269:17-270:9; Day 5, 112:22-113:21; Day 6, 12:2-8, TR. EX. 0016**.

83.     These two transactions were used because they represented the most consistent,

arm's-length, and proximate-in-time ESMG transactions from which the AAF's equity value could be determined. **Day 14, 84:16-88:8**.

84.     Desai also testified that startups, like the AAF, are "inherently difficult to find comparables for." **Day 14, 21:8-18**.

85.     Desai testified that she did not give any weight to any of the agreements in her schedule of prior transactions that were not executed. **Day 14, 81:9-82:24.** She also did not give any weight to the Term Sheet because what Dundon and the AAF agreed to was in dispute (**Day 14, 92:19-25**) and this Court has previously held that the Term Sheet never became enforceable (**Day 14, 128:11-19**).

**D.      The AAF makes a deal with Dundon.**

**1.      Ebersol seeks an investment to cover a short-term funding issue.**

86.     On or around February 10, 2019, Charlie Ebersol told prospective investor and friend Erik Anderson that the AAF had a defaulting investor and was looking for replacement capital quickly. He discussed a potential $100 million dollar credit facility with Anderson. **Day 6, 35:8-16**. Anderson was already familiar with the AAF based on prior interactions and discussions with Ebersol about a potential investment through his entity, WestRiver Group. **Day 11, 345:9-347:14**.

87.     Dundon acknowledged after-the-fact, that the AAF "had other commitments from investors." **Day 8, 246:10-25; TR. EX. 0349.**

88.     Anderson, who understood the type of business opportunities that Dundon liked, reached out to Tom Dundon to connect him with Ebersol regarding the AAF opportunity. **Day 7, 137:3-7, 137:13-18**; **Day 11, 357:15-23.**

89.     Dundon founded Defendant Dundon Capital Partners, LLC in 2015 and serves as its Chief Executive Officer, Chairman, and Managing Partner. *See* **Day 8, 23:13-16.** DCP

headquartered in Texas and John Zutter is also a partner of DCP. **Day 15, 10:1-2.**

90. Dundon is an entrepreneur and investor in sports-related ventures. He began his career by founding a subprime auto finance business that was later acquired by Santander Bank **Day 9, 161:20-165:17**. Following his exit from Santander, Dundon purchased the Carolina Hurricanes, a professional hockey team, though, admittedly, his goal was to purchase an NFL or NBA team. **Day 9, 172:16-18**. Dundon has also invested in, among others things, TopGolf (**Day 9, 46:22**) and the Professional Pickleball Association (**Day 9, 170-171:5**).

91. On February 13, 2019, Anderson texted Ebersol that Dundon might be interested in the opportunity to invest in the AAF and later introduced the two via group text. **Day 2, 101:6-17**; **TR. EX. 1433**; **TR. EX. 0329; Day 6, 35:17-36:6**.

92. Dundon and Ebersol spoke immediately thereafter by telephone about an investment in the AAF. **Day 6, 42:2-6**; **Day 7, 140:2-10**. The parties discussed the AAF, and Ebersol requested a $10 million dollar bridge loan to cover immediate expenses. **Day 2, 101:18-102:14, 109:22-110:13**. Dundon told Ebersol that he was willing to give ESMG the $10 million bridge loan without any information from ESMG and knowing that the Fowler funding issues had cause problems with the AAF's vendors. **Day 6, 42:21-43:17**.

93. Ebersol also arranged for Dundon to speak directly with leading industry figures—including Bob Bowman (MLBAM founder) **Day 6, 68:16-22**, Jeff Zucker (then CNN Chairman and CEO), David Zaslav (then CEO of Warner Bros. Discovery), and Jonathan Kraft (President of the Kraft Group and New England Patriots)—to provide firsthand perspectives on the AAF's value and potential. **Day 2, 116:2-12; Day 6, 71:19-72:2**.

94. On February 13, 2019, ESMG provided Dundon with a pro forma showing a $126 million first-year loss, a cap table, an investor deck, and projections of $270 million in cash

losses over five years before turning cash-positive. **Day 2, 112:20-22; Day 6, 63:6-64:1; D-75**; **Day 7, 149:2-9**.

95.     Dundon forwarded the same information to Zutter on the morning of February 13, 2019. **TR. EX. 0807**. Zutter testified at trial that he recalled receiving and reviewing the information and giving feedback to Dundon, but previously testified that he didn't remember. **Day 15, 40:15-44:20.**

96.     Zutter found it relevant to testify as to his background and experience dealing in "distressed assets" during his testimony in this case.  **Day 16, 108:4-108:14.**  Ms. Lee, also at DCP, also testified to having prior experience with distressed companies. **Day 18, 85:14-18.**

97.     Dundon also received a draft term sheet from Ebersol providing for a $10 million investment, which was consistent with their initial conversation. **TR. EX. 0808.**

98.     Zutter received the draft term sheet from Dundon and provided written comments on the proposal, calling the proposal "delusional," expressing his opinion the company was "burning cash," and noting he could "do a 1 dollar senior loan with foreclosure rights and wipe you out and restructure equity." **TR. EX. 0805**; **Day 15, 44:21-51:14**.

99.     On the morning of February 14, 2019, Dundon directed Zutter to work with Ebersol to complete the proposed deal. **TR. EX. 0825**.

100.    On February 14, 2019, Kevin Freedman sent Zutter a draft term sheet from the AAF detailing an initial funding amount of $5.1 million, along with a detailed list of certain payables for which that money would be immediately used. **TR. EX. 0829.**

### 2.  Dundon proposes a much larger and comprehensive investment.

101.    Following their initial call, Dundon suggested to Ebersol that the AAF needed a single funder instead of continuing rounds of fundraising. Dundon called this "series infinity"— a single, comprehensive capital solution. **Day 2, 147:19-148:3; Day 6, 48:12-23**.

102.    Dundon did not make the $10 million loan. He instead offered Ebersol a $250 million investment in exchange for complete operating control, board control, and majority ownership of the company. **Day 2, 155:13-16, 158:15-19; Day 7, 188:2-4**. Ebersol obtained the consent of the other ESMG board members and shareholders, and then accepted Dundon's offer. **Day 2, 163:22-164:2, 165:23-166:2, 167:6-168:19, 169:6-15; Day 15, 203:11-16**.

103.    On February 14, 2019, Dundon was aware that the AAF lacked a permanent funding solution, required additional capital to continue operations, and was actively negotiating with multiple potential investors as alternative sources of funding beyond his own investment. **Day 7, 182:8-17; Day 15, 50:22-51:6**.

104.    Unknown to Ebersol or ESMG, Dundon and Zutter (at DCP), had already discussed the possibility of attempting to acquire the AAF's assets if the AAF ended up in bankruptcy. **Day 15, 184:18-24**.

105.    Dundon was not under duress or time pressure to invest in the AAF and chose to invest on his own free will. **Day 7, 197:11-19**.

106.    Ebersol had other potential investors, including himself, that could have covered the AAF's immediate cash needs on February 14, 2019. **Day 2, 107:5-10, 110:2-13.** Ebersol testified that he had immediate access to the funds he needed (**Day 4, 87:15-88:17**), and was working to obtain a bridge loan from banks. **Day 2, 107:5-10**.

### 3.    The terms of the Dundon/AAF deal.

#### a)    Dundon's comprehensive deal to take control of the AAF.

107.    On February 14, 2019, Ebersol, on behalf of ESMG, and Dundon reached an oral agreement (the "Oral Agreement").

108.    During the board approval process, Ebersol specifically secured approval from Brian Singerman, Keith Rabois, Jeff Moorad, Reggie Fowler, Dick Ebersol, Kevin Colleran, and

David Patrick for the $250 million investment in exchange for 75% ownership and complete control. **Day 2, 163:15-169:15.**

109.     The terms of the Oral Agreement were:

a.   In exchange for a $250 Million investment, Dundon would receive majority ownership of ESMG and the AAF, complete control of the Board and all operational decision-making ability, with the precise mechanism of structuring the capital securities left to Dundon's sole discretion. These were the essential terms of the agreement between Dundon and Ebersol on behalf of ESMG. **Day 2 155:13-16, 158:15-19; Day 7, 188:2-4.**

b.   The terms regarding equity formalization were not essential to Ebersol and the AAF, provided that Dundon agreed he would not use his control of the AAF to entirely extinguish, terminate, or otherwise negate the equity interests of minority shareholders. **Day 2 169:11-171:7.**

110.     Importantly, the Oral Agreement included assurances that existing investors would not be "crushed down" to zero, and Dundon accepted these terms. **Day 2, 170:21-172:4.** Dundon testified that he made "an equity deal"; that he "bought" 75% of the AAF's equity. **Day 7, 269:17-19.**

111.     Dundon and Ebersol explicitly agreed on these terms and that the Oral Agreement was the deal they had struck, by phone on the morning of February 14, 2019. **Day 2, 171:8-17.**

112.     The Oral Agreement contained no performance thresholds for the AAF. No exhibit at trial reflects the existence of any such conditions. Dundon never communicated any such conditions to Ebersol or to anyone at the AAF and could not clearly describe any such conditions. **Day 7, 188:14-23.**

113.     Dundon was the offeror, and the Oral Agreement did not define (a) which of his entities (if any) would provide money to the AAF or (b) that the money would be provided as anything other than an equity investment (e.g., there was no agreement Dundon or any of his entities would provide a loan). This term was not reasonably essential to Dundon, who was left

with the ability to use whichever entity (or entities) he liked to provide the funds he committed, which was his standard business practice. *See* **Day 15, 120:5-11** (Zutter explaining that Dundon acquired equity in another entity but retained control over the investment vehicle). ESMG did not require that Dundon specify from which of the entities he owned or controlled (or from his personal finances) he would fund his commitment.

114. During their February 14, 2019 morning call, Dundon and Ebersol negotiated the valuation, with Dundon initially referencing a $90 million cap from the term sheet, Ebersol countering that they were at $115 million (where Fowler and others had invested), and Dundon responding he had them at $75 million before they agreed to split the difference at $82.5 million. **Day 2, 156:2-158:19; Day 6, 75:14-77:1.**

115. Dundon alone determined the amount and structure of the offer, as he believed $250 million to be the amount that would be necessary for the AAF to reach profitability. **Day 8, 174:25-175:1**. Dundon's offer was a rejection of Ebersol's initial offer that Dundon provide a far smaller short-term loan.

116. Ebersol made no warranties or promises to Dundon regarding AAF performance or expenses. *See infra* FOF ¶ 150.b. Dundon did not rely on the materials provided in making any decisions regarding the Oral Agreement. **Day 7, 149:12-19**. Dundon did not ask (nor did Zutter) for any specific financial documentation and conducted no due diligence, given his personal motives and immediate opportunity for seeking ownership of the AAF. **Day 7, 160:11-20**; **Day 8, 27:16-22; Day 16, 310:17-311:8.**

117. Dundon's offer was motivated by a personal desire to control the AAF, based on the prestige associated with owning a football league (**Day 10, 428:15-429:1**; **Day 11, 357:24-358:3**), his subjective appreciation for the quality of the product the AAF was selling (**TR. EX.**

**0860.0001-4**), the fact that he was very impressed by the AAF's initial television ratings (**TR. EX. 0380.0003**), and the ability to leverage the AAF's current financial situation to get the deal he wanted, specifically full control over operations as demonstrated by his offer to buy the whole League in response to Ebersol's request for a short term loan. *See supra* FOF ¶¶ 92, 97, & 102.

118.    In making his offer, Dundon intended to bind himself—and ESMG—to an agreement whereby he would become the principal owner and gain complete control of ESMG. Dundon's rejection of Ebersol's initial request for a loan in a much smaller amount, and his substitution of an offer of a $250 million equity investment, was calculated to force ESMG, represented by Ebersol, to agree to this takeover by Dundon.

119.    ESMG, through its agent, Ebersol, accepted Dundon's offer. Ebersol received oral consent from the other, then-existing ESMG board members and investors before the Oral Agreement was finalized. **Day 2, 163:22-164:2, 165:23-166:2, 167:6-168:19, 169:6-15; Day 15, 203:11-16**.

120.    Dundon knew that Ebersol was the CEO and leading board member of ESMG and the principal architect of the AAF. **Day 7, 163:9-15**. Dundon believed that Ebersol had the authority to bind ESMG to a transaction in which he received a majority equity position and board control. *See*, *e.g.*, **Day 7: 198:24-199:4**; **201:3-7**; **Day 8, 59:15-61:16.**

### b)    The initial funding provided by Dundon.

121.    Initially, Ebersol believed the parties would enter a written memorialization of the Oral Agreement after discussing the issue with both Zutter and Dundon. **Day 2, 187:24-188:7, 192:11-192:25.**

122.    Zutter, however, directed that the term sheet be between DCP and ESMG, rather than between Dundon and ESMG, and cover only $70 million of investment over several months, rather than $250 million and multiple years as Ebersol and Dundon had agreed. **Day 15 53:1-11.**

123. On February 14, 2019 at 2:58 CST, Zutter sent Ebersol a redline, prepared by Zutter, of the original term sheet that had been provided by the AAF. **TR. EX. 0830**; **Day 15, 59:2-14**.

124. The initial redline prepared by Zutter added the $70 million maximum commitment language over the next several months, made Zutter and Dundon the only members of ESMG's board of directors, gave DCP the right to control the day-to-day business decisions of ESMG, and provided that DCP would provide further documentation for the deal while closing immediately. **TR. EX. 0830**; **Day 15, 59:15-61:25.**

125. Also on February 14, 2019 at 3:13 PM CST, Zutter again sent another redline to Ebersol and others on the ESMG Board of Directors, copying James Skochdople of Bell Nunnally. **D-88**; **Day 15, 63:14-64:13**.

126. The second redline, sent at 3:13 PM CST, provided that Dundon and Zutter would be the only voting members of ESMG's board, and that Ebersol would have the right to designate two non-voting members of ESMG's Board of Directors. **D-88**; **Day 15, 64:13-65:7.**

127. Simultaneously to the negotiation of the Term Sheet, Zutter was already working to ensure that funds could be liquidated from one of Dundon's "high-earning money market accounts" to be transferred to the AAF in time to make the cut-off for the AAF's payroll. **TR. EX. 0273**; **Day 13, 238:5-24**.

128. Zutter testified that the $70 million figure in the Term Sheet did not come from any conversation he had with Ebersol. **Day 15, 65:20-66:1.**

129. The Term Sheet itself was not inconsistent with the Oral Agreement. It provided that, pursuant to its terms, DCP would provide up to $70 million during a certain period of time, but it did not purport to limit Dundon's commitment under the Oral Agreement, or prohibit

additional term sheets for the facilitation of additional funds, with DCP or with other Dundon entities. **TR. EX. 0021; Day 6, 116:9-11**.

130.    When Ebersol saw the Term Sheet contained a 70 percent ownership figure instead of the agreed 75 percent, he immediately called Zutter, who told him to address it with Dundon. **Day 2, 187:25-189:22.** Ebersol then called Dundon about the Term Sheet discrepancies, and Dundon stated he had not seen the document and that while this term sheet was part of the deal, it did not encompass the entirety of their agreement, reaffirming that Ebersol had "a deal" directly with him. **Day 2, 192:11-194:5.**

131.    Ebersol told Dundon that the agreement for which he had obtained approval from his Board was for $250 million for 75%, which did not match the Term Sheet. **Day 2, 188:8-191:24.**

132.    During their discussion about the Term Sheet discrepancies, Dundon told Ebersol that no other investments would be necessary as he was acting as "the bank" and urged Ebersol to sign the document so the initial funding could proceed. **Day 2, 193:9-195:7.**

133.    Ebersol testified that he never suggested or made a statement that $70 million would be enough to finish the season. **Day 6, 89:19-90:1**.

134.    The Term Sheet did reflect certain portions of the Oral Agreement. Under the Term Sheet, DCP was to receive 75% equity ownership of ESMG for Dundon, and the Board of ESMG was to be changed so that Dundon and Zutter were the only two voting members. **TR. EX. 0022.**

135.    Ebersol signed the Term Sheet for ESMG on February 14, 2019, but no one ever

signed the Term Sheet for DCP.[4] **Day 15, 84:14-85:5**; **TR. EX. 0821a; TR. EX. 0022**.

136. After Ebersol signed the Term Sheet, a Dundon entity, DDFS Limited Partnership, LP, a Delaware limited partnership ("DDFS") transferred $5.1 million to AAF's accounting ending in x308 at Silicon Valley Bank. **Day 14, 46:4-47:8**. DDFS was not expressly part of either the Oral Agreement or the Term Sheet.

137. Ebersol and other AAF executives and staff cooperated with and gave full authority over all aspects of the AAF and the control of the AAF and its day-to-day business decisions over to Dundon, Zutter, and their agents, beginning on February 14, 2019. *See infra* ¶¶ 228, 229. ESMG personnel and former board members recognized that Dundon and Zutter had immediately taken over as the AAF's only voting directors. **Day 15, 118:20-25**.

138. Also consistent with the Oral Agreement, the Term Sheet provided that the final form of the equity transfer would be determined later on Dundon's side of the transaction. **TR. EX. 0022.0004**.

139. In ESMG's view, after the Oral Agreement on February 14, 2019, Dundon was wholly in control of ESMG through his appointed board members, himself and Zutter, and all parties acted accordingly. *See infra* ¶¶ 228, 229, 240, 249.

140. After February 14, 2019, Dundon and Zutter wasted no time—they acted, and were treated by ESMG personnel and former board members, as though they were completely in charge of the AAF. After finalizing the deal on February 14, 2019, Dundon instructed Ebersol to book a flight to Dallas. **Day 2, 177:1-178:5; Day 8, 35:20-23**.

141. But Dundon did not, ultimately, provide $250 million to ESMG. Instead, Dundon

---

[4] The Court has determined that the Term Sheet is not a binding written contract and that it is bound by that decision as "law of the case." Case No. 22-05078, ECF No. 292-23.

unilaterally decided to try to limit his commitment to $70 million, and decided, along with Zutter, to put ESMG and the other AAF entities into bankruptcy. *See infra* § I.F.7.; ¶¶ **Error! Reference source not found.**, **Error! Reference source not found.**.

142.    Emails between Zutter and Dundon demonstrate that they believed putting the AAF into bankruptcy would benefit them financially and allow them to cancel contracts they didn't want. **TR. EX. 0980; TR. EX. 1116**. Further, Dundon's tax advisor was directed after February 14, 2019, to determine a strategy by which AAF would have all its assets acquired and be placed into a pass-through entity wholly owned by Dundon. *See infra* ¶ 268. Mr. Ballard also confirmed that this was Dundon's strategy with all of his investments. **Day 10, 348:10-349:24**.

143.    Dundon's failure to provide the full $250 million as agreed led to the AAF's ultimate failure.

144.    In any case, Dundon declined, either personally or through entities he controlled (including but not limited to DCP), to make any additional transfers to ESMG after DDFS had contributed $69.7 million (some of which went to or for the benefit of Dundon and/or DCP, rather than AAF), leaving approximately $180.3 million of his commitment unpaid. *See infra* § I.H. He also forced the AAF into a Chapter 7 bankruptcy liquidation before even concluding its first season, guaranteeing its total loss of value. *See infra* § I.F.7.

**c)      The parties' exchange of information, representations, and documentation.**

145.    AAF's first game occurred on February 9, 2019, four days before the February 14, 2019 transaction. As part of a natural invoice cycle, invoices from vendors regarding AAF operations took time to transmit to the company. **Day 19, 91:23-92:3; 95:3-5.**

146.    Of AAF's $20 million in accounts payable as of February 14, 2019, only $534,000 (2.5%) consisted of invoices dated from 2018, totaling 75 invoices. **Day 19, 103:2-3, 103:17-**

**18; 104:1-2, 104:16-19.** The remaining 97.5% of accounts payable arose from AAF's 2019 operations, including its inaugural season that began February 9, 2019. **Day 19, 103:2-3, 103:17-18; 104:1-2, 104:16-19.**

147. Zutter was not part of the conversations between Dundon and Ebersol on or about February 13-14, 2019, and thus he has no personal knowledge of any alleged representations or misrepresentations Ebersol or Dundon could have made. **Day 15, 16:12-16.**

148. AAF employees were transparent, honest, and forthcoming in what DCP asked them to do. **Day 13, 165:22-166:3; TR. EX. 1046; Day 18, 165:17-168:6.**

149. In an email with Zutter, Freedman, in identifying the make-up of the $5.1 million initial funding amount, described it as "payments needed to ensure this weekend happens without any material issues." **TR. EX. 021.** That same e-mail identifies the amount attributed to credit cards as "pay down." **Id.**

150. Prior to the February 14, 2019 deal –

    a. Dundon testified he was not discussing accounts payable and assumed it was "all tied up in that number" when told what it takes to run the league. **Day 9, 26:24-27:3.**

    b. Ebersol never made a representation to Dundon about the amount of accounts payable. **Day 8, 47:16-19.**

    c. Dundon does not recall Ebersol ever telling him there were no accounts payable. **Day 7, 219:13-17.**

    d. No standard due diligence was performed by Dundon regarding AAF's acquisition. **Day 8, 27:16-22.**

    e. Neither Zutter nor his team requested a balance sheet from AAF. **Day 15, 70:16-72:21.**

    f. Vanderbilt did not initially ask about AAF's accounts payable. **Day 13, 143:9-144:23.**

151. As of February 14, 2019, based on, among other things, the projections provided

the day before, Dundon knew or should have known that $70 million was not enough to "fund this league," "solve" its financial problems, or provide "the money to make this thing successful," nor could it "keep this thing [going for] years and years to come" or sustain it for "five years, something like that," as Dundon had characterized his investment. *See* Section I. D.d), *infra*.

152.    On February 14, 2019, based on, among other things, the projections provided on February 13, 2019 (**TR. EX. 0807**), Dundon also knew or should have known that $70 million was not sufficient "capital to do whatever we need" or to "run this league for a long time," as he had characterized the purpose of his investment. **Day 8, 263:13-20, TR. EX. 0380.0002; TR. EX. 0860.0001-4;** *see also* **Day 7, 246:5, 249:24-250:5, TR. EX. 0859.**

153.    On February 13, 2019, Ebersol offered Dundon access to the AAF data room. **Day 6, 10:6-9.**

154.    On February 15, 2019, the AAF provided Dundon and DCP's employees and consultants access to review certain of the AAF's finances via the AAF's data room, which stored the AAF's presentations, projections, model, contracts, and other information to be shared with investors as determined by the AAF's counsel. **Day 6, 8:7-19, 9:9-17**.

155.     Dundon and his representatives at DCP thereafter had open access to the AAF's books and records and AAF employees who maintained them. **Day 6, 10:6-14; Day 13, 150:13-151:15, TR. EX. 0838A; Day 15, 73:10-21**.

156.    DCP employee Vanderbilt accessed the AAF data room on February 17, 2019. **Day 13, 148:4-14, TR. EX. 0838A**.

157.    DCP employee Zutter also accessed the AAF data room on February 17, 2019. **TR. EX. 0838A; Day 15, 72:3-11.**

158.     Dundon's agents had unrestricted access to the data room and used it to review AAF financial and other documents. **Day 13, 150:13-151:15; TR. EX. 0838A**.

159.     DCP employee Elisa Lee testified inconsistently about the data room. In her deposition, despite being asked generally and specifically on this topic, she could not recall what kinds of documents were in the AAF data room to which she had been given access. **Day 18, 80:9-13.** At trial, she had somehow regained her memory about the kinds of documents in the data room, recalling player contracts, vendor contracts, and team-specific contracts. **Day 18, 78:6-16**.

160.     Lee also testified at trial that "a big part of the problem" for DCP was the lack of accounts payable information in the AAF data room. **Day 18, 83:21-84:1**. But when asked directly at her deposition, Ms. Lee testified she could not remember whether accounts payable information was in the AAF data room. **Day 18, 84:2-7**.

161.     DCP, through Dundon, Zutter, and its employees Zutter, Vanderbilt, and Lee, later asserted that DCP was misled about the amount of accounts payable that the AAF had before DCP took over. **Day 8, 92:17-22.**

162.     However, Dundon testified that he didn't ask any question about accounts payable and "assumed the risk of what the accounts payable would be" when he made the decision to invest the AAF. **Day 9, 26:21-27:6**; *see also* **Day 8, 113:10-11** ("I did this deal without diligence, I knew there was risk to that."); **Day 8, 92:20-24; Day 8, 93:13** ("I didn't do diligence on the accounts payable.").

163.     Zutter testified that he did not ask for an accounts payable report or debt documents upon Dundon's investment in the AAF. **Day 16, 310:25-311:8**.

164.     The AAF was a start-up and in its first weeks of play when Dundon and his team

took control and dictated both funding and operations. The AAF also was set up as a largely central operation because all the teams were owned by the AAF. Dundon's team's focus was taking projections (which were necessarily largely the only information available at this early time) and breaking them down "by team," even though that was not how AAF previously handle its operations or accounting. *See supra* §§ I.C.1.-2.

### d) Overwhelming evidence corroborates the existence of the $250 million Oral Agreement.

#### i. *Dundon's Public Statements*

165.    On February 19, 2019, CBS Sports quoted Dundon as saying: "there's a big difference between continuing to raise capital like every startup does, right… Series A, series B. Where, you know, I told Charlie you just raised series infinity, right? Like it's done now, so…." **Day 7, 252:20-253:2; TR. EX. 0859; TR. EX. 0860**.

166.    On February 19, 2019, during an interview, Dundon did not dispute the claim by a radio host at 99.9 The Fan that Dundon had committed $250 million to the AAF. **Day 7, 246:5, 249:24-250:5**; **TR. EX. 0859; TR. EX. 0860**.

167.    During the same interview, Dundon stated, among other things:

"So this -- my -- my investment will keep this thing years and years to come and it's -- it's not a viability issue. It's -- it's just, you know, how good can it be now. …

My money is in my bank; I'm sure of it. …

I just know when -- when they came to me, the football was good, the numbers were good, and, you know, the terms that I could -- the terms that I was wanting to invest in, they were willing to do. ….

I could care less how they got there, right? I just knew the football was good and the numbers were good and I liked it. …

Well, you know, I think they had other people they were talking to. …

I told Charlie you just raised series infinity, right? Like it's done now, so….

[O]ne thing on the $250 that—that's enough money to run this league for a long time"

**TR. EX. 0860.0001-4;** *see also* **Day 7, 246:5, 249:24-250:5**, **TR. EX. 0859**.

168.     On February 19, 2019, Dundon publicly acknowledged that before he agreed to invest, the AAF "had many people [they were] talking to" about securing additional funding. **TR. EX. 1002.0019; TR. EX. 1003.**

169.     On February 22, 2019, Dundon was quoted in USA Today as saying: "It's [The AAF is] going to cost money to get there, but it's a better investment than most in terms of venture capital." **Day 8, 262:18-263:4, TR. EX. 0380.0002**.

170.     On February 22, 2019, Dundon told USA TODAY Sports: "Five years, something like that," is response to being asked how long his investment would sustain the Alliance of American Football. **Day 8, 262:9-17, TR. EX. 0380.0001**.

171.     On February 22, 2019, Dundon stated that he had received numerous calls from people wanting to invest with him in the AAF but that the AAF did not "need any capital." **Day 8, 263:21-264:3; TR. EX. 0380.0004**.

172.     On February 22, 2019, Dundon told USA TODAY Sports, "We have the capital to do whatever we need to do to make this thing successful" in regard to the AAF. **Day 8, 263:13-20**, **TR. EX. 0380.0002**.

173.     On February 22, 2019, Dundon dismissed concerns about the AAF's financial issues, telling USA TODAY Sports, "There is no story here about the money it takes, and I can fund this league." **Day 8, 265:17-20, TR. EX. 0380.0004**.

174.     On February 22, 2019, Dundon addressed concerns about the AAF's financial stability, emphasizing that his investment had secured the AAF: "It's been a little bit strange that people have focused in on the problem that I already solved." **Day 8, 263:13-20, TR. EX.**

**0380.0002**.

175.    On February 22, 2019, Dundon stated, "Even if the league got half the TV ratings they are getting now, it would still be a pretty solid league." **TR. EX. 0380.0003**.

176.    On February 28, 2019, in a televised interview, Dundon stated to Rich Eisen: "once I put my name on this, we're going to make this work, right? This is what I'm committed to doing." **Day 8, 203:18-204:6, TR. EX. 1002.0013; TR. EX. 1003.**

177.    During the Eisen interview on February 28, 2019, Dundon stated that his timeline for making the investment decision was five days, described his financial commitment to the AAF as "not very smart." **TR. EX. 1002.0012.**

178.    Dundon further stated in the interview: "I took control of the League" (**TR. EX. 1002.0020**); "I'll put up the money, and I get to make the decisions" (**TR. EX. 1002.0012.**), and "Like we don't have to talk about the money anymore." **TR. EX. 1002.0012.**

179.    In each of Dundon's public interviews in February 2019, the investment amount was discussed to be $250 million specifically and also whatever capital was needed for the AAF for *years*, and even if things did not go according to plan. In no interview was the investment amount suggested to be $70 million or was the investment commitment suggested to be conditional generally or in particular to performance in an initial time frame.

180.    At trial, Dundon testified that he did not publicly state he agreed to invest $250 million in the AAF (**Day 7, 129:5-7**) until the Court interjected.

> **THE COURT:** Sir, in direct response to the prior question in which there was an objection interposed and overruled, it's not equivocal. It's unequivocal. It says this is your writing, right? $250 million into the Alliance of American Football. Notwithstanding what you said subsequent to that, I mean, it's an affirmative statement. You would acknowledge that.

> **THE WITNESS:** Yes, I was not answering his staggered investment question here.

**Day 8, 208:19-209:2.**

181.  Dundon also inconsistently testified that (1) he was speaking the truth when speaking to the media (**Day 7, 129:2-4**), and (2) that he "wasn't trying to tell the truth to the media[]" **Day 9, 257:19-258:1**).

182.  Dundon's testimony that he and Ebersol "had conversations around a number around $70 million" but that "there was an understanding of a number we (he and Ebersol) would use for marketing" – the $250 million number – is simply not credible. **Day 9, 88:4-11**; *see also* **Day 9, 86:2-87:7**.

183.  As the Court noted at trial, Dundon's trial testimony was the first time that anyone had heard "that Mr. Dundon was in league … with Mr. Ebersol to promote the $250 million" to the public. Prior to trial, Dundon never disclosed (in his deposition testimony, initial disclosures, answer, motion for summary judgment, or otherwise), that either he or Ebersol had deployed a media scheme to allege $250 million even though $250 million was not the deal. **Day 9, 275:2-15**.

184.  Ms. Hanson, an experienced public relations professional, was engaged as consultant by the AAF to "write press releases, distribute press releases, suggest or recommend

appropriate language to articulate in interview questions answers, strategiz[e] on media placements and cooodinat[e] media placements." **Day 7, 359:19-361:9**; **TR. EX. 0055**.

185. On February 20, 2019, in response to inquiries from Sports Business Journal's Dan Kaplan regarding Dundon's investment, Hanson drafted responses for Dundon's review and approval. **TR. EX. 0059.0002.** Dundon edited the talking points and emailed them to Megan Hanson—copying Charlie Ebersol—stating, "The money is in the bank. I'm committed" and "I have committed to investing $250 million into The Alliance of American Football," and directed that media be told he had committed $250 million, the funds were available, and he intended to make the AAF sustainable. **Day 7, 58:3-5, 59:2-10, TR. EX. 0052; Day 8, 205:5-25, 206:19-207:15**, **TR. EX. 0059**.

186. Hanson testified that Dundon "cared about" whether the AAF's media messaging included (1) that he was chairman of the board and majority owner; (2) that he was in control now; and (3) that he was investing $250 million into the AAF. **Day 6, 319:3-11**.

### ii. *Press Releases Approved by Dundon*

187. On February 17, 2019, Dundon and Hanson, Head of Communications for AAF, (**Day 6, 201:12-19, 204:7-11**) started work on a press release announcing Dundon's $250 million commitment. **Day 2, 247:16-18**, **TR. EX. 1317**; **Day 6, 215:20-24**.

188. Dundon personally insisted and directed Hanson to describe his investment commitment as "$250 million" in the official press release announcing the agreement. **Day 2, 261:24-262:11**, **TR. EX. 0012**, **Day 6, 223:16-224:19, 256:2-12**; **TR. EX. 0044**.

189. Between February 17-19, 2019, Dundon had 10 separate opportunities to review and edit the AAF investment press release. **TR. EX. 0034; TR. EX. 0276; TR. EX. 1418; TR. EX. 1417; TR. EX. 0043; TR. EX. 1420, TR. EX. 0046, TR. EX. 0049.**

190. Dundon's agents, including John Zutter, had 7 additional opportunities to review

the press release between February 17-18, 2019. **TR. EX. 0035; TR. EX. 0276; TR. EX. 0039; TR. EX. 0040; TR. EX. 0503.** Zutter expressly requested a draft of the press release from Ms. Hanson. **TR. EX. 0035**

191.    During these review opportunities, Dundon made multiple edits and comments to the press release including: adding partnership language references to CBS, Turner, and NFL; enhancing biographical details about Santander founding; adding quotes about player/referee development; requesting to be called "majority owner"; and modifying corporate partnership messaging. **TR. EX. 0034; TR. EX. 0276; TR. EX. 1418; TR. EX. 1417; TR. EX. 0043; TR. EX. 1420; TR. EX. 0046.**

192.    Across 17 total review opportunities, neither Dundon nor anyone else on his team ever questioned, changed, or removed the $250 million commitment figure from any draft of the press release. **TR. EX. 0034; TR. EX. 0276; TR. EX. 1418; TR. EX. 1417; TR. EX. 0043; TR. EX. 1420; TR. EX. 0046; TR. EX. 0049; TR. EX. 0041.**

193.    At Dundon's direction, AAF distributed the press release around 9 am on February 19, 2019. Dundon personally reviewed the final press release referencing his $250 million commitment on February 19, 2019. **Day 9, 94:16-95:1, 117:19-118:7, TR. EX. 1317; TR. EX. 1419; Day 6, 349:19-350:19**.

194.    Also on February 19, 2019, the Carolina Hurricanes issued their own press release announcing that Dundon had invested $250 million in the AAF. **Day 9, 283:17-284:12**, **TR. EX. 0506**. Dundon approved the form and content of the Hurricanes' press release. **Day 10, 186:8-187:13, 192:12-193:6, 194:8-9; TR. EX. 0502; TR. EX. 0503**.

195.    At the same time, the Hurricanes' communications department publicly tweeted that Dundon "committed $250 million" to the AAF without any retraction or correction from

Dundon. **Day 10, 200:1-201:13, TR. EX. 0508**.

196.    Media outlets, including the Hurricanes' national distribution list, received uniform statements that Dundon agreed to fund the AAF with $250 million. **Day 8, 193:9-18, TR. EX. 0008**.

197.    On February 19, 2019, Ebersol circulated the AAF press release to AAF employees by email noting that Dundon's "$250 million dollars and the support of his organizations add tools that will help take the Alliance to the next level for many years to come." **TR. EX. 1422; Day 7, 298:21-299:19.**

198.    On February 20, 2019, Hanson circulated an email to AAF leadership compiling media coverage of Dundon's investment in the AAF. **TR. EX. 0008; Day 7, 383:6-384:16; Day 8, 193:3-194:24**.

199.    No official statement or press release disclosed any conditions or conditional triggers for Dundon's $250 million commitment. **Day 9, 121:3-8, 260:3-8.** No contemporaneous statement by Dundon made reference to any $70 million limit. **Day 9, 260:3-8.**

### iii.    Dundon's Meetings with AAF Staff

200.    Players and others within the AAF organization, beyond the AAF executive team, were also aware of Dundon's investment at $250 million and heard his comments confirming the amount via multiple sources, including some from Dundon directly. **Day 8, 256:6-12; Day 11, 7:15-8:5, 12:8-18; Day 6, 223:13-224:19, 267:25-268:20; Day 7, 46:19-47:8; Day 12, 124:4-13; 203:18-23; Day 13, 68:20-22; Day 19, 200:23-201:8.**

201.    During a February 18, 2019 meeting in Dundon's Dallas office, Dundon told AAF's senior executives, including Tom Veit and Kellie Vurginic, that he had committed to a $250 million investment in the Alliance of American Football. **Day 11, 7:15-8:5, 12:8-18**.

202.    The same morning, Dundon told AAF members including Tom Veit, Erik

Schwartz, Kevin Farrell, Kevin Freedman, Alan Kantowitz, Hines Ward, and Daryl "Moose" Johnston that he had invested $250 million and referred to himself as "the bank." **Day 2, 245:15-247:15.**

203.    Dundon assured the team that financial concerns were no longer an issue, emphasizing there was sufficient money to sustain the organization for years. **Day 2, 245:15-247:15.**

204.    Prior to February 19, 2019, Dundon instructed Ebersol to inform the media that Dundon's commitment was for $250 million. *See* Section I.D.C.3.d.ii, *supra*.

205.    On February 20, 2019, the AAF sent an internal email to all employees featuring media coverage that stated Dundon had invested $250 million in the AAF. **TR. EX. 0008.**

206.    In a AAF-wide video conference call in mid-February 2019, Dundon was introduced as the new majority owner and was presented as having committed $250 million in capital. **Day 9, 271:8-21.**

### iv.    *Dundon's Private Statements*

207.    On February 18, 2019, Dundon leaked a story to the press by telling David Glenn who was reporter for the Athletic and someone that Dundon called "kind of a friend" that he had invested $250 million to save the AAF. **Day 8, 72:17-75:19; TR. EX. 0008.0003-4; Day 7, 46:19-47:4.**

208.    On the morning of February 19, 2019, Dundon also forwarded the draft press release that included a reference to Dundon's $250 million investment to Randall Stephenson, AT&T Inc.'s then-chairman and CEO, to get his thoughts and insights on the press release. **Day 7, 104:17-105:3, TR. EX. 0049; Day 8, 135:20-136:6, TR. EX. 0504** (duplicate of **TR. EX. 0049**).

209.    Stephenson told Dundon that a press release would likely lead others to believe

that (1) the AAF had received financial endorsement and support and (2) the financial endorser was credible and real. **Day 8, 136:9-23, TR. EX. 0504**. Following this input from Stephenson, Dundon did not change the financial representations in the press release. *See supra* § **I.D.3.d.ii**.

210.    In meetings with CBS and the NFL during February 2019, Dundon confirmed his $250 million commitment to the AAF. **Day 2, 271:8-12, 272:4-8**.

211.    Dundon wrote to DCP personnel on February 21, 2019, "They [CBS] have to be diluted from here by the 250," referring to any equity of CBS needing to be diluted by his $250 million commitment. **Day 8, 162:15-17, TR. EX. 0917**.

212.    On February 23-24, 2019, Dundon wrote to Michael Rapino, the CEO of LiveNation, stating that he "bought the AAF." **TR. EX. 0407**. In response to Mr. Rapino's comment that Dundon "had too much money," Dundon stated that Mr. Rapino needed "to help [him] make more!!" **TR. EX. 0407**; **Day 8, 39:25-42:2.**

### *v.    Dundon's Flip-Flop Compared to Ebersol's Consistency*

213.    Several witnesses testified that Ebersol was always honest and forthcoming. *See* **Day 1, 104:10-14** (Commission Goodell "would describe Charlie as honest"); **Day 7, 124:2-5** (M. Hanson had "never seen him mislead or deceive anyone"); **Day 12, 233:5-6** (K. Freedman knew "Ebersol to be an honest man"); **Day 11, 64:12-22** (K. Vugrincic). Even Vanderbilt refused to say that Ebersol ever misrepresented any information to him, and testified that he was not aware of anyone complaining to him about Ebersol misrepresenting any information. **Day 13, 166:-8-19**.

214.    Dundon, on the other hand, provided consistently inconsistent testimony before and at trial.

215.    Dundon testified (consistent with his deposition testimony) "I have committed $250 million into the Alliance" and "The money is in the bank. I am committed." **Day 8, 63:12-**

**16; 209:8-9.**

216.    Dundon also stated "I never committed more than $70 million." **Day 8, 257:10-11**; *see also* **Day 7, 126:6-7; Day 7 183:22-24**.

217.    When asked "Did you state publicly you agreed to invest $250 million?" Dundon answered "Yes" (**Day 7, 131:6-10**), but elsewhere testified "No" to whether he publicly stated he agreed to invest $250 million (**Day 7, 129:5-7**).

218.    Dundon testified "I was committed" to $250 million (**Day 7, 245:8-9**), but also answered "No" when asked if he committed $250 million to AAF (**Day 7, 126:6-7**).

219.    Dundon testified he was "willing to invest $250 million" (**Day 7, 182:18-24**), but also "No" to whether he agreed to invest $250 million (**Day 7, 126:8-9**).

220.    Dundon testified his commitment was "subject to certain conditions" (**Day 7, 132:22-24 and 255:14-22**), but also that "[t]here were no conditions" (**Day 7, 133:5-7**), and later that "[i]t would be impossible to know" what the conditions were (**Day 7, 188:17-20**).

221.    Dundon testified "I wasn't trying to tell the truth to the media, I was trying to tell a story" (**Day 9, 257:24-258:1**), while elsewhere claiming that when making public statements he was "speaking the truth" (**Day 7, 129:2-4**).

222.    Dundon testified that if he made a commitment to something and it wasn't working out, he could change his mind. **Day 8, 265:14-16.**

223.    Dundon testified that he and Zutter discussed that $250 million would be needed (**Day 8, 177:19-23**), Zutter testified that he and Dundon never discussed that $250 million would be needed (**Day 15, 96:25-97:8**). Instead, Zutter testified that the $250 million number was made up and had no basis in reality. **Day 16, 41:3-12; Day 15, 97:9-14.**

224.    Regarding who determined the $70 million figure he now claims was his actual

commitment, in his 2021 deposition (that was played at trial) he testified "I don't remember" (**Day 7, 141:19-20**), but at trial he testified "Charlie Ebersol" (**Day 7, 134:1-5**).

### vi. The Arithmetic

225. The initial pro forma that Dundon received from Ebersol on February 13, 2019 showed that the AAF would require $268 million before the company reached profitability.

| | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| League Revenue | $15,350,000 | $25,421,000 | $59,355,988 | $75,716,459 |
| Team Revenue | 44,800,000 | 74,690,000 | 151,488,288 | 204,041,470 |
| Digital Revenue | 4,160,760 | 32,796,547 | 56,200,033 | 81,501,047 |
| **Total Revenue** | **$64,310,760** | **$132,907,547** | **$267,044,309** | **$361,258,975** |
| | | | | |
| Digital Expenses | $13,217,050 | $15,973,761 | $18,128,379 | $18,490,947 |
| Football Expenses | 64,668,212 | 84,949,056 | 99,818,399 | 114,967,382 |
| Player Relations Expenses | 2,227,900 | 3,424,446 | 3,436,068 | 3,447,922 |
| Marketing/Branding Expenses | 21,984,486 | 21,861,356 | 22,240,810 | 22,685,626 |
| Production Expenses | 17,999,418 | 16,049,106 | 16,356,869 | 16,684,007 |
| League Expenses | 28,428,067 | 33,500,880 | 38,271,789 | 43,090,061 |
| Team Expenses | 25,395,399 | 38,026,520 | 45,631,824 | 53,237,128 |
| Medical Expenses | 8,462,900 | 13,462,096 | 15,414,093 | 17,367,186 |
| Corporate Expenses | 5,986,000 | 6,712,620 | 6,797,790 | 6,933,746 |
| Digital Payment Fees | 1,248,228 | 9,838,964 | 16,860,010 | 24,450,314 |
| AAF Player Digital Distributions | 728,133 | 5,739,396 | 9,835,006 | 14,262,683 |
| **Total Expenses** | **$190,345,793** | **$249,538,201** | **$292,791,038** | **$335,617,002** |
| | | | | |
| **Total Operating Income (Loss)** | **($126,035,033)** | **($116,630,654)** | **($25,746,729)** | **$25,641,973** |
| *% Margin* | *-196.0%* | *-87.8%* | *-9.6%* | *7.1%* |
| | | | | |
| **Cumulative Net Cash Flow** | **($126,035,033)** | **($242,665,687)** | **($268,412,416)** | **($242,770,443)** |

TR. EX. 0807.0034 (duplicate of **D-75**).

226. Ebersol testified that the $250 million investment figure was rooted in the valuation of the AAF. Specifically, Ebersol testified that he and Dundon and reached an agreement as to a pre-money valuation for ESMG of $82.5 million, which represented the difference between the discounted value of $90 million ESMG proposed and the approximately $75 million value that Dundon had arbitrarily assigned. **Day 6, 75:21-76:21.**



227.    Ebersol then testified that Dundon's agreement to invest $250 million would be adding $250 million into ESMG. **Day 6, 77:10-19**. Thus, the total value of the company based on the pre-money valuation of $82.5 million and Dundon's $250 million investment would be $332.5 million. **Day 6, 77:20-78:16.** Seventy-five percent of $332.5 million is just under $250 million, which explains the calculation of both Dundon's 75% ownership of ESMG's fully diluted stock and the $250 million investment that he and Ebersol agreed upon. **Day 6, 78:16-79:18**.



**E.      Dundon and Zutter take control of the AAF.**

**1.  Dundon and Zutter became ESMG's only voting board members on February 14, 2019.**

228.    Dundon testified he had a fiduciary duty to the AAF. **Day 7, 253:23-24.** He further testified that he had fiduciary duties to the AAF shareholders beginning on February 14, 2019. **Day 8, 23:2-12**. He was one of two voting board members of the ESMG Board of Directors. **Day 7, 276:6-8.**

229.    Zutter acted as the second of the two voting members of the ESMG Board of Directors and had a fiduciary duty to the AAF beginning on February 14, 2019. **Day 15, 118:20-119:7**.

230.    Ebersol and the other (prior) ESMG Board Members relinquished their voting positions and directorships, leaving only Dundon and Zutter as voting members. **Day 7, 276:3-5**.

231.    On February 16, 2019, Zutter, Dundon, and Vanderbilt had the AAF issue each of them AAF emails. **TR. 0840; Day 15, 110:14-112:17.**

232.    Zutter sent an email to a third-party on February 28, 2019, that said that "we bought a controlling stake in the [AAF] a few weeks back." **TR. EX. 0283; Day 15, 147:2-5**.

233.    Dundon and Zutter also had fiduciary duties to DCP. **Day 8, 23:13-16; Day 15, 10:18-25.** Dundon testified that he "wasn't aware of anything" he may have needed to do to address his overlapping fiduciary duties to both DCP and the AAF. **Day 8, 23:18-24:2**.

234.    Dundon admitted that the AAF's counsel, Ms. Belt, technically worked for him after he took control of the AAF on February 14, 2019. **Day 9, 268:8-20.**

235.    Ebersol testified that he did not believe he had the ability to issue ESMG stock, after February 14, 2019. **Day 4, 74:18-75:8.**

236.   DCP was never a board member of the AAF; Dundon and Zutter, individually, were the AAF board members. **Day 16, 88:5-15.**

237.   Even under Zutter's testimony, he and Dundon were officially the only voting board members by February 24, 2019. **Day 16, 183:16-25, D-135.**

### 2.   The DCP team directed the AAF's operations after February 14, 2019.

238.   After finalizing the deal, Ebersol and key AAF executives convened in Dallas to discuss the AAF's operations, outline its needs with Dundon, Zutter, Vanderbilt (Chief Financial Officer of DCP in February 2019, **Day 8:37:3-11, Day 13, 118:3-6**), Kulas (**Day 8, 35:2-14, 23-25**), and three DCP analysts, and receive direction from Dundon. **Day 12, 374:14-375:19; Day 18, 27:25-28:14, TR. EX. 0841**.

239.   Dundon directed DCP employees and Zutter to manage the AAF's daily operations. **Day 8, 89:12-14; Day 13, 121:20-122:3**.

240.   On February 14, 2019, Zutter emailed DCP representatives Elisa Lee, Jeff Vanderbilt, Ryan Rostenkowski, James Fugitt, and Jason Kulas regarding its "deal to take over control of the AAF." **TR. EX. 0256**. Zutter told the DCP team that the deal would be similar to DCP's structure for EDHC (Employer Direct Health Care). **TR. EX. 0256**.

241.   Shortly thereafter, Zutter forwarded DCP representatives the materials that Ebersol originally sent Dundon, including marketing materials, a pro forma, and capitalization table. **TR. EX. 0021; TR. EX. 0252.**

242.   Zutter was aware of the conflicting interests between DCP and the AAF and was conscious of the need for him and Dundon to keep careful track of which "hat" they were wearing at any time. **Day 16, 96:1-14, Tr. Ex. 298.**

243.   Dundon and Zutter required AAF staff to submit weekly funding requests and weekly cash flow reports for their approval to obtain operating funds pursuant to a tiered system

by DCP prioritized certain vendors over others. **Day 15, 145:25-146:8; Day 13, 41:3-42:1; TR. EX. 0104**; **TR. 0120; Day 15, 143:10-146:8; TR. EX. 0955; Day 15, 140:20-143:1; TR. EX. 1050; TR. EX. 1077; TR. EX. 1117; Day 15, 193:9-199:3.**

244.     The AAF was not allowed to make any significant payment or sign contracts without approval from Dundon, Zutter or Vanderbilt. **Day 3, 37:3-7, 17-19; Day 8, 87:10-24**, **TR. EX. 0274; Day 9, 25:19-22; Day 13, 180:5-17; Day 15, 191:4-10, 193:6-8, TR. EX. 0274; TR. EX. 0963; Day 13, 178:23-180:17; TR. EX. 0994; Day 13, 192:20-194:8; TR. EX. 1114; Day 13, 227:9:-230:5.**

245.     Eventually, by mid-March, Zutter's tactic of "holding [certain] payment[s] hostage" threatened the AAF's ability to broadcast and conduct games. **TR. EX. 1119; Day 13, 216:16-222:18**. In the case of SkyCam, which provided cameras necessary to broadcast games, threatened not to provide further services after a negotiated settlement payment was not made. **TR. EX. 1118.0001.** The same occurred with SIS Security, who provided stadium security for the AAF's games, after DCP refused to pay a settlement that SIS had agreed to with the AAF. **TR. EX. 1152**; **TR. EX. 1155**.

246.     Vanderbilt emailed Zutter on March 19, 2019 explain that AAF personnel felt like they were "in limbo" because they were being asked to reach settlements and then not being authorized to pay those settlements. **Day 13, 230:14-235:1; TR. EX. 0293.** Vanderbilt had previously reported to Zutter that the AAF was averaging a 12% discount through its vendor settlements. **TR. EX. 0422.**

247.     Both Dundon and Zutter, in separate conversations, told Ebersol that if he could not get MGM to agree to renegotiate their deal, they would withhold additional funding, cut off financial support, and shut down the AAF. **Day 3, 93:7-15; TR. EX. 0383; TR. EX. 0967.**

248.     Threats to cut funding or shut down the AAF were made repeatedly by both Dundon and Zutter whenever Ebersol was told to renegotiate contracts—such as with CBS or Turner. **Day 3, 95:7-96:16.**

249.     Kevin Farrell understood that Dundon's group "was in complete control of [the AAF's] expense decisions." **Day 13, 48:16-18.** Kelly Vugrincic, former Head of People for AAF, understood that she, Farrell, Freedman, and Ebersol all "took direction from the Dundon Group as to how we could operate our finances and they dictated which vendors were paid and when." **Day 11, 14:25-15:17**. Hanson testified that that she was aware that Dundon was control of the AAF. **Day 6, 220:18-22, 223:2-15.**

250.     On February 17, 2019, Zutter instructed Kantowitz to work with Lee and Ryan Rostenkowski on the AAF's financial model. **TR. EX. 102.**

251.     At a February 18, 2019 meeting, Dundon and Zutter instructed AAF senior staff to obtain discounts from vendors to which AAF had accounts payable. **Day 2, 231:25-232:7; Day 13, 233:7-10, 20-23, 331:17-23, TR. EX. 0962; TR. EX. 912; Day 15, 132:20-22; TR. EX. 1105** (Dundon "shocked by the lack of help from these vendors."). Dundon reserved the right to personally approve or deny any budget item he deemed nonessential. **Day 2, 233:24-234:3; Day 3, 32:13-25**. This practice continued even when Dundon and Zutter knew they would not fund payments even where discounts were negotiated. **Day 13, 333:20-335:18.**

252.     On February 19, 2019, Zutter emailed Farrell to ensure that he had oversight on what was paid by the AAF using an $8.5 million wire sent that day. **TR. EX. 0105.**

253.     On February 20, 2019, Zutter emailed Farrell and Freedman instructing them not to pay bill.com, employee reimbursements, and media buys, while asking that they try for a discount with certain hotels. **TR. EX. 0107; Day 15, 149:6-151:9.**

254.    On February 20, 2019, Zutter emailed Dundon about potentially moving the AAF's headquarters to Dallas. **TR. EX. 0278.**

255.    On February 15, 2019, discussions about outstanding accounts payable took place with Dundon, Zutter, Vanderbilt, Kulas, and Ms. Lee present**. Day 2, 230:25-232:15.**

256.    Dundon stated the bills would not be paid in full and must be negotiated down to approximately 10, 15, or 20 cents on the dollar. **Day 2, 230:25-232:15.**

257.    The AAF team used a whiteboard to list outstanding accounts payable identified by Dundon and Zutter, which needed to be negotiated down to 10 or 20 cents on the dollar. **Day 2, 232:16-234:10.**

258.    Once a vendor agreed to a reduced payment, the approval had to come from Dundon or Zutter, who often rejected initial agreements and instructed the team to negotiate an even lower payment before finalizing the deal. **Day 2, 232:16-234:10.**

259.    On February 20, 2019, Zutter issued a directive that all new AAF contracts must have DCP approval. **TR. EX. 0274**.

260.    On February 21, 2019, Kevin Farrell emailed Zutter and Vanderbilt seeking their approval for an "incremental payment" for the AAF's stadium rental from Georgia State University. **TR. EX. 0911**; **Day 15, 151:19-152:10.**

261.    On March 15, 2019, Dundon ordered Zutter to "[g]et controls in place" regarding the AAF's expenses and Ebersol responded saying "[t]here are controls in place. That are [DCP] approved." **TR. EX. 0423.** Zutter testified that one such control that DCP instituted was the use of reimbursement of personal credit card expenses, rather than the use of corporate credit cards. **Day 15, 173:25-176:23.** Employees were directed to use personal credit cards even after Dundon and Zutter knew DCP would not approve additional funding to AAF. **Day 13, 219:4-24.**

262.    On March 15, 2019, Jason Kulas and Zutter discussed by email the cancellation an insurance policy to self-fund the risk, mentioning that Dundon "was ok with cancelling the Birmingham game when we had potential weather issue (to save the expense)." **TR. EX. 1112.**

263.    As of March 18, 2019, Zutter's direction to DCP in its control of the AAF was to "pay nothing that doesn't keep the lights on." **TR. EX. 0084**; **Day 15, 164:15-18**; *see also* **TR. EX. 1048** (Zutter considering cancelling weather system)**.**

**F.    Dundon and Zutter breach Dundon's agreement with the AAF, breach their fiduciary duties, and engage in other wrongful conduct.**

**1.    Dundon and Zutter had conflicting duties to DCP and the AAF, but acted in DCP's interest at all times, including as to funding decisions.**

264.    Immediately following his deal with the AAF, Dundon hired PricewaterhouseCoopers ("PwC") to design a restructuring plan that would maximize tax benefits to Dundon. PwC had regularly assisted Dundon with tasks of this kind, and the instructions were invariably the same: find a way to turn the acquisition into assets that could be moved into pass-through entities ultimately wholly owned by Dundon. **Day 10, 269:21-24**.

265.    Zutter represented to PwC that he need a structure in place because he had to fund the deal with the AAF within two weeks. **TR. EX. 0174; Day 10, 412:20-413:24.** Zutter provided PwC with a hand-drawn potential structure through which he compared the pros of an asset deal for the AAF against the cons of a stock deal for the AAF investment. **Day 16, 10:10-15; TR. EX. 0286.**

266.    The approach that PwC was directed to follow is consistent with the approach Zutter suggested before the deal on February 14, 2019 to explore how Dundon could move the AAF's assets to separate companies that Dundon owned. **Day 8, 19:9-25; Day 10, 387:11-388:14**.

267.    PwC's representative, Walter Ballard, testified that "for years" Dundon's goal has

always been to have all of Dundon's acquisitions pulled out of their corporate form, put into some kind of disregarded entity, and ultimately be included as part of Dundon's 1040. **Day 10, 348:10-348:24**.

268.    As of February 2019, Dundon had approximately $200 million in an Opportunity Zone fund, which is a financial vehicle by which one can invest gains to avoid the taxes on those gains for up to 10 years. **Day 8, 16:14-23; Day 13, 241:19-23.** As Dundon's tax specialist at PwC, Ballard, provided testimony on how an opportunity Zone works to avoid capital gains tax. **Day 10, 52:15-53:23**.

269.    Dundon wanted to use his $200 million Opportunity Zone fund to fund his commitment to the AAF. **Day 8, 16:14-17:4**, **Day 10, 56:10-19, 89:6-8**. Vanderbilt testified that DCP "explored opportunity zone funds or opportunity investments [for the AAF] because that made a lot of sense from a tax perspective." **Day 13, 242:4-9**. Zutter later provided PwC with another drawing through he emphasized the benefits of an asset deal in conjunction with the potential Opportunity Zone. **TR. EX. 1052.0002; Day 16, 13:16-18:17.**

270.    Dundon received advice from PwC and possibly others, after his agreement with the AAF, that this was not likely to be possible. **Day 13, 243:11-244:5; Day 15, 226:24-227:12, 239:14-241:24; Day 16, 21:13-24, 239:1-14**. Vanderbilt confirmed that "pretty early on … a couple of weeks into the investment" DCP was aware that the Opportunity Zone could not be used for Dundon's AAF investment. **Day 13, 242:10-244:8**.

271.    Between February 14, 2019 and February 25, 2019, Dundon, Zutter, Vanderbilt, and Kulas began discussions with Eric Renner, Director at PwC, about the legal constraints of restructuring the AAF's assets/contracts and identifying liabilities that may be excluded from a future, revised structure. **Day 10, 122:11-123:11**.

272.    Zutter testified that he believed that the AAF was worth approximately $70 million, solely because of his commitment. **Day 15, 116:16-117:14.**

273.    On or around February 23, 2019, Dundon and Zutter caused ESMG to enter into a document entitled "Release Agreement," in which the AAF and its former majority shareholder (Fowler, through FO2 LLC) agreed to release each other from any claims relating to the Series 1 Term Sheet. **Day 4, 174:16-19**; **D-135**.

274.    The Release Agreement also required Fowler to support the [DCP] Term Sheet and related recapitalization and change in ownership and control of the AAF to Dundon. **Day 4, 177:20-178:14; TR. EX. 0967**.

275.    On February 25, 2019, Zutter circulated an email to PwC outlining three components of Dundon's contemplated restructuring: initial transaction, forward-looking structure, and a potential stock deal. **Day 10, 137:6-9, 140:7-141:7, TR. EX. 0173**.

276.    On February 26, 2019, in response to notice about a potential lawsuit from an alleged investor of the AAF, Zutter emailed Dundon asking whether they, DCP, "want to be involved at all or do we evaluate buying the assets and leaving this liability behind." **TR. EX. 0980.**

277.    Beginning on February 14, 2019, and continuing forward, Zutter and the rest of the DCP team controlled both the submission of funding requests from AAF and the approval of those requests by DCP, resulting in drastic cuts in spending for operations, breaching of agreements, and a vendor "settlement" program (with which Zutter then directed the AAF not comply).  *See* FOF ¶¶ 243-246, 248-253, 256-258, and 260-263, *supra*.

278.    On March 2, 2019, Zutter emailed with Ballard regarding the need for PwC to "include evaluation of foreign tax jurisdiction for offshore entities [and] opportunity zone

analysis and structuring" in its proposed scope of work for DCP in relation to the AAF transaction. **TR. EX. 1032.**

279. On March 15, 2019, Zutter and Dundon responded to Vanderbilt's summary of the AAF's request to pay its venders negotiated amounts immediately by discussing among themselves whether "legal recap" or a "prepackaged [bankruptcy]" would better serve DCP's interests in the league. **TR. EX. 1116**; **Day 15, 199:3-200:6**.

280. On March 18, 2019, Zutter, Vanderbilt, Zutter, and Kulas exchanged emails regarding DCP's approval of funding requests submitted by the AAF, where Zutter noted that he preferred to keep the AAF in a "fire drill" with respect to funding requests. **TR. EX. 1127.** The email exchanges also identified Zutter's "avoiding the prefund (not give the AAF cash to use)" and intention to "leave their cash balance real low." **TR. EX. 1127.**

281. On March 27, 2019, Dundon gave interview to USA Today in which he projected a dire future for the AAF, casting it as a toxic asset. **TR. EX. 0235**; **Day 9, 30:23-31:8**.

282. On April 1, 2019, Dundon and Zutter stated in an email to AAF executives stated, that "as an AAF board member, DCP has not made any further commitment after 70 and has made clear that there is no further capital from DCP, unless and until things change." **Day 16, 88:16-89:9, 90:6-14, TR. EX. 0311**.

283. On the same day, Vanderbilt, while consulting with a potential D&O insurer, appeared to admit in an email that the timing of documentation for the $250 million investment was "TBD," but – incredibly – testified that he was referring the $70 million deal. **TR. EX. 0266; Day 13, 133:16-136:15.**

284. On April 16, 2019, Zutter emailed Jason Cohen at Bracewell and Vanderbilt regarding the identification of DCP's investment on ESMG's bankruptcy filings. **TR. EX. 0298**.

Zutter was the sole representative of the AAF on the email chain, and was negotiating solely for the protection of DCP's interests in the ESMG bankruptcy. **Day 16, 92:13-96:21.**

285. As of February 14, 2019, and continuing until the bankruptcy filing, Dundon was a director of ESMG who owed ESMG formal fiduciary duties. *See supra* § ¶¶ 228, 229.

286. While Dundon later directed the former board of ESMG to confirm his (and Zutter's) board position, as described above, all parties were already behaving as though Dundon and Zutter were the only voting board members after February 14, 2019. *See supra* § 231.

287. Dundon (himself and through his agents, including Zutter) had actual control over ESMG and the AAF after February 14, 2019, regardless of his formal title. *See supra* § ¶¶ 240, 249.

288. From February 14, 2019 through the bankruptcy filing, Dundon failed to hold any formal Board of Directors meetings for ESMG. **Day 7, 277:14-24.**

289. When Dundon made decisions regarding ESMG, there was never a notice of a Board of Directors meeting or a waiver of consent for a Board of Directors meeting. **Day 7, 277:17-24.**

290. Despite having a fiduciary duty to AAF and knowing the company required an injection of capital, Dundon did not make a capital call to existing shareholders. **Day 8, 129:14-21; 130:12-17.**

> **2. Dundon and Zutter knew that $70 million was insufficient, but failed to paper up or the $250 million deal or disclose that there would be no $250 million investment.**

291. Immediately following his investment, Dundon forwarded the materials he received from Ebersol regarding the AAF to an acquaintance, Craig Kessler. **TR. EX. 0836.** Dundon knew Kessler from his time on the TopGolf Board of Directors, and viewed him as someone who was "financially sophisticated." **Day 8, 125:18-126:10.**

292.     Kessler responded to Dundon on February 15, 2019 stating, "Fascinating. I like it a lot. Only question – who funds the several hundred million dollars in projected losses over the next few years?" **TR. EX. 0836.** Dundon testified that he knew "it would take hundreds of millions of dollars to be put into the AAF before it got to profitability." **Day 8, 126:24-127:4**.

293.     At trial, Dundon testified that $250 million was "always the number we [DCP] thought it would take." **Day 8, 174:25-175:1**.

294.     Vanderbilt testified that, although he believed that some of the information he received was not correct, he believed that was the result of mistakes and that he was not intentionally misled. **Day 13, 166:7-17.** He further testified that he believed that the AAF would have had outstanding accounts payable at the time DCP took over control of the league. **Day 13, 166:18-21**.

295.     Ultimately, the $250 million investment deal was never reduced to paper by the DCP team once it took control of the AAF. **Day 15, 89:90:5**.

296.     Dundon and Zutter directed the former AAF Board members to conduct a meeting to ratify the term sheet and conduct other business at their specific direction. **Day 3, 93:21-96:7; TR. EX. 0967; Day 4, 172:18-174:12.**

297.     Dundon never retracted, corrected, or told anyone at the AAF that the statements he made that are detailed in Section I.D.3.d, *supra*, were untruthful or that he had changed his mind and would not be proceeding in accordance with those statements.

298.     Despite knowing the AAF would be unable to cover its outstanding accounts payable with only the $70 million investment, Dundon did not take steps to address this shortfall or inform affected parties. **Day 16, 55:21-57:16.**

### 3. Dundon and Zutter forced the AAF to breach or threaten to breach its existing agreements.

299.     Shortly after taking control of the AAF, Zutter performed a review of the AAF's NFL Network and CBS media deals, plotting how DCP could force renegotiations, specifically through an asset deal or prepackaged bankruptcy, to change the terms of those deals. **TR. EX. 0390**; **Day 15, 212:9-215:15; TR. EX. 0384.**

300.     On February 21, 2019, Zutter emailed Dundon regarding his desire that the AAF renegotiate deals with its own employees, referring to all AAF employees as "either a reduction now, a reduction in force later or long term. No middle ground." **TR. EX. 0420; Day 15, 203:19-205:22;** *see also* **TR. EX. 0408** (Dundon wanting to go through vendors and employees on February 22). This email was after the AAF had already proposed significant cuts to its operational budget. ***Id.***

301.     On March 3, 2019, Zutter further proposed reducing payroll by cutting employee salaries from $100k to $60k in exchange for potential stock options in the future, and also texted Ebersol regarding how to "take 40% or more out of headcount spend." **TR. EX. 1071; Day 15, 208:10-211:7; D-99 at DCP Parties 26259**.

302.     Despite knowing the AAF would be unable to cover its outstanding accounts payable with only the $70 million investment, Dundon did not take steps to address this shortfall or inform affected parties. **Day 16, 55:21-57:16.**

303.     Dundon allowed vendor negotiations and accounts payable to continue accumulating from March 18, 2019 through April 2, 2019, despite knowing AAF/DCP would not be able to pay these bills, as confirmed by Vanderbilt's admission that "some of the bills were not going to get paid." **Day 13, 346:14-15.**

304.     Dundon failed to notify vendors who were actively negotiating settlements that AAF/DCP had already determined they would not be able to fulfill payment obligations,

allowing these vendors to continue expending time and resources on negotiations in bad faith. **Day 13, 334:23-24; 346:14-15.**

305. As of March 3, 2019, Dundon and Zutter were aware that the AAF was no longer able to run TV or radio ads or produce video materials because of outstanding debts to those media companies. **Day 8, 246:6-250:10; TR. EX. 1049.**

306. From March 18, 2019 through April 2, 2019, Dundon permitted AAF to continue incurring new accounts payable obligations despite internal acknowledgment that the company could not pay existing or future vendor obligations. **Day 13, 334:23-24; 347:14-15.**

307. Dundon was on notice of the agreement that he caused the AAF to breach with Marietta Alba from Apartment and Relocation Center who paid March and April rent for all the AAF's San Antonio players based on her trust and belief in the AAF because Darly Johnston notified him by email. **TR. EX. 1259**.

308. Dundon directed staff to demand discounts from vendors in exchange for immediate payment. **Day 2, 231:25-232:7.** Dundon and Zutter often declined to pay the discounted settlements. **Day 2, 233:24-234:3; Day 10, 243:15-23; Day 15, 150:16-151:9, 160:21-162:4, 163:19-164:18; Day 18, 238:3-239:2**.

309. Dundon authorized the issuance of a default letter to Reggie Fowler (**D-100**) that terminated AAF's access to $127 million in available funding, without taking any additional steps to ascertain whether the money was actually available. **Day 8, 54:13-23; 56:12-57:6.**

### 4. Dundon soured the AAF's relationship with the NFL and NFLPA.

310. Dundon was aware that, prior to his investment in the AAF, the NFLPA and the AAF were negotiating a letter of intent and an agreement to have NFL players participate in the AAF but that it would take years to get the NFL to amend its collective bargaining agreement. **Day 8, 119:19-120:12**; **Day 3, 98:3-100:3**.

311.     As Ebersol explained to Zutter by text (**D-99 at DCP Parties 26246**) and set forth in his March 27, 2019 email, the primary reason the NFLPA refused to enter an agreement with the AAF in March or April 2019 was that Dundon was "rushing them into signing" a deal with AAF. **TR. EX. 0027.0001;** *see also* **Day 3, 100:4-103:15**.  Specifically, Ebersol said to Zutter that "Forced timeline is the issue. Forced to make a fast call they will always choose no just to be safe.", to which Zutter responded "I know." **D-99 at DCP Parties 26246.**

312.     Dundon undermined AAF's critical negotiations with the NFLPA by contradicting Bill Polian, a Hall of Fame inductee, during a conference call on April 1, 2019, arguing against the viability of an insurance solution that could have facilitated a deal with the NFLPA. **Day 3, 102:7-103:15.**

313.     During the NFL Combine, Dundon made statements directly contradicting AAF's negotiating position by telling agents that if he were an NFL practice squad player, he wouldn't play in the AAF due to the risk. **Day 3, 101:13-102:6.**

314.     Dundon threatened to shut down the league during NFLPA negotiations if they could not agree to proposed terms on an expedited timeline, damaging the relationship and negotiations. **Day 3, 151:21-153:5.** Dundon admitted that he was "[t]rying to put a little urgency" on the deal with the NFLPA. **TR. EX. 1063; Day 9, 224:17-225:13.**

315.     Dundon had a conversation with Mr. Smith from the NFLPA, and just but then five days later told the media that without the benefit of the NFLPA contract, the AAF would fold. **Day 9, 34:19-25; TR. EX. 1140.**

### 5.  Dundon and Zutter refused to follow through on or allow other investment in the AAF, including when presented with options to preserve AAF assets.

316.     Dundon instructed Ebersol to reject any inquiries of investments into AAF, stating he did not believe they needed money or could take money in good faith. **Day 8, 144:16-145:8.**

317. An investor who had previously provided $1 million to the AAF, Lee Bird was the CEO of the retail chain At Home, had his investment returned at Dundon's direction after Dundon took control of the AAF. **TR. EX. 0941**; **Day 2, 51:17-25**.

318. Mark Wahlberg and Marshal Mathers expressed in interest in investing the AAF on March 27, 2019. **Day 3, 128:22-129:7**

319. CBS and Turner both indicated that they were willing to renegotiate the AAF's TV contracts going forward, despite voicing concerns that Dundon was a problem to deal with. **TR. EX. 0384; D-268 at Ebersol 000060.**

320. Around March 28, 2019, Jeff Moorad, among others, was interested in purchasing Dundon's position. **Day 5, 129:22-132:5; Day 13:138:23-139:8.**

321. Dundon declined to pursue or allow alternative investments, instead insisting that continued funding depended solely on a favorable NFLPA deal, thereby limiting the AAF's options. **Day 4, 133:2-11; Day 8, 116:13-18; Day 9, 30:23-31:8, TR. EX. 0235**.

322. Despite Ebersol informing Dundon about multiple potential investors including the San Diego Padres ownership group, Dan Miller, Jeff Moorad, Ari Emanuel, Mark Shapiro, SilverLake, and Andreessen Horowitz, Dundon did not facilitate these investment opportunities. **Day 3, 116:23-117:23; TR. EX. 1434; Day 8, 241:2-242:20.**

323. Dundon instructed Ebersol not to attend meetings with potential investors that had been arranged in San Diego, including meetings with Jeff Moorad's group, Mark Wahlberg's team, representatives for Marshall Mathers, and Ari Emanuel and Mark Shapiro of William Morris Endeavor. **Day 3, 128:22-129:19.**

324. Dundon declined to move forward with a potential investment from the Saudi royal family, specifically His Excellency Bandar, despite Ebersol presenting the opportunity and

developing a term sheet. **Day 3, 136:17-141:11.**

325.    Dundon and Zutter did not seek additional funding or new investors from approximately March 25, 2019 to April 2, 2019, and did not inform Ebersol of any such efforts. **Day 3, 113:25-116:5.**

326.    On March 27, 2019, Ebersol circulated an internal email to Dundon and Zutter calling the player contracts the AAF's "most valuable asset," underscoring their importance in attracting NFL-caliber talent. **Day 3, 133:11-14, TR. EX. 0418; Day 8, 211:16-25**.

327.    On March 27, 2019, Ebersol also warned Dundon that if the AAF did not play the entire regular season, the AAF would be in breach of the players' contracts and could lose leverage in selling the contracts to a future spring league such as the XFL. **Day 16, 67:11-68:19, TR. EX. 0027**.

328.    On March 27, 2019, Ebersol and other AAF executives warned Dundon that failing to complete the season would result in a total loss of investment, bad publicity, loss of all national sponsorship revenue due to not fulfilling contract obligations, and likely would cause AAF football players to be released from their contracts and non-competes, devaluing the AAF. **Day 16, 64:1-65:14, 67:11-69:6, 70:18-71:7, TR. EX. 0027**.

329.    Around March 28, 2019, Jonathan Kraft of the New England Patriots coordinated calls with prospective buyers to enlighten them that, despite Dundon's efforts to undermine the AAF, the AAF was well-positioned for success. **Day 3, 127:13-18**.

330.    On April 1, 2019, David Cornwell (AAF General Counsel) issued a memorandum emphasizing that a short operational pause would preserve the AAF's Standard Player Agreements and prevent players from joining competitors that was sent to Dundon by Zutter, but his recommendations were ignored by Dundon and Zutter. **Day 5, 83:4-9**; **TR. EX. 0447**.

331.   On the same day, Daryl Johnston emailed Dundon, explicitly asking him when did his $250 million become $70 million. **Day 8, 253:20-21, 254:15-23, 255:7-12, TR. EX. 1355.**

### 6.   Dundon and Zutter forced the AAF to benefit their other businesses.

332.   Within a week of taking over the AAF, Zutter emailed Dundon and mentioned that medical expenses for the AAF would be shifted to Employer Direct Health Care (EDHC). **TR. EX. 0278**. EDHC was the company that actually employed Zutter and which was within the Dundon portfolio. **Day 15, 11:16-19.** Zutter and Dundon benefitted, ultimately, from the AAF's medical expenses being paid to EDHC. **Day 15, 10:23-11:15**.

333.   Zutter also instructed Ebersol to leverage his relationship with Fred Smith, the CEO of FedEx, to pitch EDHC's services to FedEx. **TR. EX. 0292**.

334.   By March 4, 2019, Dundon had supplied multiple entities with which he was affiliated with "no charge" advertising slots during AAF games, including AT&T, Invisalign, SAP, Sony Pictures, Carvana, and TopGolf. **TR. EX. 0433; TR. Ex. 0426; Day 9, 52:14-55:8; TR. EX. 0427; TR. EX. 0428; TR. EX. 0429; TR. EX. 0430; TR. EX. 0432**. Dundon owned stock in AT&T and was friends with the CEO of AT&T. **Day 9, 46:9-15.** Dundon owned stock in Carvana. **Day 9, 46:16-19.** Dundon was a substantial investor in TopGolf. **Day 9, 46:20-23.**

335.   Despite deploying steps to squeeze vendors in an alleged attempt to tighten AAF spending and improve revenue, Dundon did not attempt to sell ad space, even at a discounted rate, before giving it away. **Day 9, 46:24-47:5**.

336.   Although Dundon testified that his purpose in giving away free advertising was to associate the AAF with popular brands and to secure future ad sales, no evidence was presented Dundon made efforts to take advantage of his intention. **Day 15, 47:6-51:10.**

337.   Dundon and Zutter caused DCP to bill the AAF for DCP's "transaction costs,"

although Dundon and Zutter each testified that he had no idea what the $288,810.00 was billed for. **D-204; TR. EX. 0301**; **Day 8, 177:21-180:3; Day 16, 28:15-29:2.** Vanderbilt similarly provided no detail for the costs billed to the AAF. **Day 13, 259:6-261:3.** DCP referred to this amount as a "deemed" investment. **Day 13, 326:4-7**.

338. PwC's services in attempting to determine the best investment vehicle for DCP totalling $150,000 were for DCP as a client, not the AAF. **D-204 at 3**; **Day 15, 230:2-231:9**; **TR. EX. 0167**.

### 7. Dundon and Zutter force the AAF into Chapter 7 bankruptcy proceedings.

339. Before filing for Chapter 7 bankruptcy, Dundon did not take steps to market AAF's assets, claiming they did not have time. **Day 8, 131:6-10.**

340. Dundon did not get anyone to opine on the value of the assets before deciding to put them into Chapter 7 bankruptcy. **Day 8, 34:20-35:7.**

341. Dundon did not conduct any valuation of AAF's technology assets before deciding to dispose of them, despite using the AAF app and finding it "interesting." **Day 8, 131:23-132:6.**

342. Dundon did not reach out to the NFL regarding the value of technology they were licensing, and also does not recall talking to MGM who had lent $7 million against the technology's value. **Day 8, 219:3-9.**

343. Dundon never spoke to Brian Singerman, the lead investor for Founders Fund (an existing shareholder), when AAF needed additional funds. **Day 8, 141:2-6.**

344. Dundon never spoke to former AAF directors Keith Rabois, Dick Ebersol, or Jeff Moorad when he  AAF needed additional funds. **Day 8, 140:18-141:14.**

345. No shareholder notice was issued disclosing that DCP or Dundon would not provide funding beyond $70 million. **Day 16, 54:17-55:24.**

346. Dundon did not inform vendors, either those negotiating new contracts or resolving outstanding debts, that he or DCP would not invest more than $70 million. **Day 16, 54:17-55:24.**

347. Despite understanding by week seven or eight (end of March 2019) that the AAF had reached "the point of no return," Dundon did not take steps to maximize value or explore alternatives for stakeholders. **Day 13, 229:6-15.**

348. On March 26, 2019, Ebersol emailed Dawn Belt saying that "Dundon and Zutter informed me today they plan on only funding up to the 70M limit as described in the short form agreement." **TR. EX. 1171.** Ebersol testified this was approximately the time when he first learned that Dundon would not provide more than $70 million to the AAF. **Day 4, 215:1-216:7.**

349. On or about March 27, 2019, Ebersol and other AAF executives presented Dundon, Zutter, and DCP with four options from which to choose instead of rushing to kill the AAF. **Day 3, 130:22-134:9, TR. EX. 0027**; **Day 16, 64:1-65:14, TR. EX. 0027.**

350. Ebersol opposed bankruptcy and advocated for completing the season, but he held no control or authority. **Day 4, 217:15-19**; **Day 16, 73:17-74:8**, **TR. EX. 1225.**

351. On or about March 27, 2019, Dundon instructed Zutter to engage the services of the law firm Bracewell, LLP to assist with preparing a bankruptcy petition, and paid $400,000 for Bracewell's services, which amounts were counted against Dundon's contributions to the AAF. **D-204 at 3; TR. EX. 1185; TR. EX. 1194.**

352. On April 2, 2019, Dundon and Zutter forced the AAF to suspend operations immediately and terminate all vendor relationships, including consulting agreements and player agreements. **Day 7, 77:18-78:6; TR. EX. 0054; Day 8, 184:23-25; Day 16, 86:6-88:15; TR. EX. 1234.**

353.    On April 2, 2019, Zutter sent an email to Dundon, Kulas, Vanderbilt, and Trey Wood of Bracewell saying that he and Dundon need to send a message to the company informing it of the suspension of operations, noting that Ebersol may resign in protest. **TR. EX. 1232**.

354.    Initially, Dundon and Zutter contemplated Chapter 11 bankruptcy. **Day 10, 421:18-424:5; TR. EX. 0178; TR. EX. 1207.**

355.    On April 2, 2019, Zutter responded to an email from Alan Kantowitz that included a draft budget for a 12-week plan that would get AAF through a Chapter 11 bankruptcy. **TR. EX. 0126; TR. EX. 1236.** The email indicated that a total of $71 million would be required to complete the 12 week plan, but Zutter responded by saying that only $70 million was available. **TR. EX. 0126**; **Day 16 81:11-83:9.** Zutter testified that in responding to this email, he was acting in the AAF's best interest, despite simultaneously refusing to fund an additional $1.09 million from DCP to complete the 12-week plan. **Day 16 83:10-19.**

356.    After receiving the 12 week plan budget of approximately $71 million, Zutter send an e-mail to Dundon, Vanderbilt, Kulas, and a Bracewell attorney that "it is imperative to do the layoff immediately." **TR. EX. 1236**.

357.    When Dundon and DCP determined neither would provide the additional $1.09 million needed for a 12-week plan to complete the season, Dundon did not seek alternative sources for this relatively small amount. **Day 16, 82:20-83:23**.

358.    Dundon ultimately decided to put ESMG and its subsidiaries in a Chapter 7 liquidation proceeding and not a Chapter 11 reorganization. In other words, Dundon's decision was to liquidate the league rather than uphold his commitment to invest $250 million, or even a much smaller amount or to seek additional funding from another source. Both Dundon and Zutter executed the Written Consent of the Board of Directors of ESMG authorizing the Chapter 7

bankruptcy. **TR. EX. 1415; Day 9, 55:10-21.**

359.    Dundon unilaterally decided to file for bankruptcy without holding a board of directors meeting or notifying any other directors of an intent to hold such a meeting. Charles Ebersol was a director at the time. **Day 9, 18:2-20:3**.

360.    After receiving the 12 week plan budget of approximately $71 million, Zutter send an e-mail to Dundon, Vanderbilt, Kulas, and a Bracewell attorney that "it is imperative to do the layoff immediately."  **TR. EX. 1236**.

361.    No formal board meeting was held to authorize the AAF's bankruptcy filing, despite a "resolution of the Board of Directors" document being signed by Dundon and Zutter. **Day 9, 55:20-57:13.**

362.    When discussing the bankruptcy, Zutter stated "Since the board is obligated to agree with documents, should we do a 1 page document defining our security before filing," referring to DCP's security.  **TR. EX. 0298**; **Day 16, 94:9-96:21**.  A Bracewell attorney responded to say "It is also important to remember what hat you are wearing at each moment. And the BOD hat would not be agreeing to any new debt documents on the eve of filing." **TR. EX. 0298**.

363.    Trustee's expert testified that $63.3 million was the amount the League was worth as of the day that it was finally shuttered, April 2, 2019. **Day 14, 67:20-24**.

364.    The Debtors were put into bankruptcy at the direction of Defendants Dundon and Zutter through the filing of Chapter 7 petitions pursuant to 11 U.S.C. §§ 701, et seq. The Debtors' estates were substantively consolidated and are being jointly administered in this Court under Case No. 19-50900-cag.

365.    By failing to provide additional funds, preventing others from providing

additional funds, suspending the AAF, and putting it into bankruptcy, Dundon ensured that the value of the AAF would reduce to virtually nothing. These actions also robbed the AAF of the remaining amount due under the Oral Agreement.

**G.      Dundon and DCP Proofs of Claim**

366.    Between February 14 and April 16, 2019, DDFS Limited Partnership LP made sixteen wire transfers totaling $69,719,190 to the AAF. **Day 13, 317:6-15, 322:13-22, 323:21-25, 326:12-16, D-206.1, D-206.2**.

367.    All payments to ESMG originated from accounts and funds owned by DDFS Limited Partnership, LP, a distinct Delaware limited partnership. **Day 13, 246:3-15, 247:3-7**.

368.    DCP made no direct transfers or payments to the AAF. **Day 8, 22:1-7; Day 13, 246:3-15, 247:3-7**.

369.    Dundon made no direct transfers or payments to the AAF. **Day 13, 246:3-15, 247:3-7**.

370.    Dundon filed a Proof of Claim, No. 188 ("Dundon Claim") in the core bankruptcy proceeding (Case No. 19-50900). **TR. EX. 0449**.[5] Dundon filed an identical proof of claim in each of the consolidated cases.

371.    The Dundon Claim asserts an unliquidated claim for indemnification and "any other harm or damages suffered by him in connection with his relationship with the debtor." **TR. EX. 0449**.

372.    Dundon did not assert any counterclaims against any of the Debtors, whether based on a claim of indemnity, offset, or otherwise.

---

[5] The Court also can take judicial notice of the Dundon Claim pursuant to Federal Rule of Evidence 201.

373.    The Trustee generally objected to the Dundon Claim. ECF No. 56 at 63, ¶¶ 217-219. Therefore, Dundon was required to demonstrate at trial a proper basis for and the liquidated amount of any claim for it to be allowed. *See infra* ¶ 560. Dundon failed to do so. The Dundon Claim fails to elaborate any basis for its indemnity and general damages claim (by description or documentary evidence) and Dundon offered no evidence in support of the same at trial. **TR. EX. 0449**.

374.    The Dundon Claim also asserts a claim against Debtors' Estate in the amount of $70 million on identical or substantially the same grounds as the DCP Claim (defined below). **TR. EX. 0449**. For the same reasons as stated with regard to the DCP Claim, the Dundon Claim for $70 million or any other amount was not supported at trial.

375.    DCP filed a Proof of Claim, No. 187 ("DCP Claim") in the core bankruptcy proceeding (Case No. 19-50900). **TR. EX. 449**.[6]

376.    The DCP Claim alleges the AAF told DCP that it would only need and was requesting only up to $70 million for the first season and asked DCP to make a commitment for that amount. **TR. EX. 449**; **Day 7, 216:15-23**. The DCP Claim also asserts a claim for rescission of its $70 million investment, but fails to support that claim with anything other than conclusory statements in Exhibit "A" to the DCP Claim. **TR. EX. 449**.

377.    The DCP Claim alleges that unnamed AAF executives allegedly misrepresented and/or omitted material facts to Dundon and "misrepresented to the public, employees, and players the details of DCP's financial commitment to the League . . . ." DCP asserts a claim against Debtors' Estate in the amount of $70 million. **TR. EX. 449**; **Day 7, 228:20-23**.

378.    The Trustee generally objected to the DCP Claim. ECF No. 56 at 63, ¶¶ 217-219.

---

[6] Judicial notice was taken of TR. EX. 449.

Therefore, DCP was required to demonstrate at trial the basis for and amount of any claim to be allowed. *See infra* ¶ 560. DCP failed to do so. The DCP Claim fails to elaborate any basis for its indemnity and general damages claim (by description or documentary evidence) and Dundon offered no evidence in support of the same at trial. **TR. EX. 449**.

379.    Neither DCP nor Dundon provided any funding to the AAF (all funds having been transferred by or through DDFS), so neither has supported a claim for return of funds invested in any amount. *See supra* ¶¶ 366 - 369. Moreover, all funds that came into the AAF were ostensibly in furtherance of Dundon's investment into the AAF and thus related to the purchase or sale of a security.

380.    Dundon and DCP failed to offer any testimony or other evidence that supported any claims of misrepresentation during trial. **Day 7, 228:24-229:16**. *See* § I.3.D.c., *supra*.

## H.    Additional Factual Determinations

381.    Dundon entered into an Oral Agreement with Ebersol to invest $250 million in capital in exchange for full control of the board and the AAF, and 75% of the company's full diluted stock.

382.    Dundon breached the agreement by failing to provide the full amount of funding promised, falling $180,280,810 short of his funding commitment. **Day 14, 47:4-8**.

383.    Dundon, personally and individually, made a clear and unambiguous promise to ESMG (including through Ebersol) to provide financing of $250 million to the AAF in exchange for complete control of the AAF.

384.    The terms of Dundon's promise were sufficiently certain.

385.    ESMG acted in substantial reliance to its detriment on Dundon's promise by giving Dundon complete control of the AAF; and, this reliance was actual, justifiable, and foreseeable by Dundon given the position that ESMG was in during those negotiations.

386.    Dundon could have reasonably expected ESMG to act or to refrain from acting based on his promise, or Dundon should have foreseen that ESMG would act as it did in light of his promise.

387.    ESMG gave control of itself and the AAF as a whole to Dundon, who used that control to destroy its value.

388.    Certain of Dundon's fraudulent representations were undertaken specifically in the context of the negotiations surrounding the Oral Agreement, and were made with the intention of, and in fact did, induce ESMG to agree to the Oral Agreement.

389.    Dundon knew that he wanted to acquire the AAF and preferred to acquire it via liquidation and acquisition of its assets, which preference he did not disclose.

390.    Dundon subjectively had in his mind performance conditions for the AAF for access to the full $250 million he promised that he never disclosed to anyone.

391.    Dundon either was aware, or ought to have been aware, that he was not sufficiently liquid to fund a substantial fraction of the $250 million commitment immediately.

392.    Dundon's subjective knowledge of these facts at the time he negotiated the Oral Agreement with Ebersol renders his statements regarding his commitment either intentionally false, or at least reckless with respect to their truth or falsity.

393.    Dundon intended that the Debtors rely or act on the statements made in the course of negotiations related to the $250 million commitment to the AAF.

394.    Dundon made material misrepresentations to each of the Debtors – through their officers, their other directors, their shareholders, and their management – when he made the false statements that he was making and was going to follow through on his $250 million funding commitment to AAF, including to Ebersol, ESMG, AAF personnel, in press releases, to media

outlets, on podcasts, and in social media posts.

    a. Dundon told Ebersol that the deal had not changed when he initially presented Ebersol the $70 million Term Sheet;

    b. Dundon told Ebersol, and repeated many times, that he would keep the AAF operating for a long time;

    c. Dundon told Ebersol that he would ensure at least that Ebersol and his group of original investors always maintained at least a portion of their original equity stake; and,

    d. Dundon induced actions in reliance on his promises, directing that the AAF would not be discussing or accepting additional funding from other interested investors because he was providing all the necessary funding.

395. Dundon knew at the time that the representations were false, or he spoke recklessly with respect to their truth or falsity.

396. Dundon engaged in arbitrary and unreasonable conduct as to his performance, or lack thereof, of the Oral Agreement and his fiduciary duties, including acting disloyally, carelessly, unfairly, and in bad faith in the following ways:

    a. Failing to complete the terms of the Oral Agreement to provide the funding he promised;

    b. Intending not to provide the funding promised and failing to disclose that intention;

    c. Failing to reduce the terms of the Oral Agreement to writing;

    d. Investigating and assigning PwC to determine how to structure an acquisition of ESMG on terms entirely different from the negotiated Oral Agreement, which would (if fulfilled) ultimately force out Ebersol and the original investors and frustrate the entire purpose of the Oral Agreement;

    e. Forcing ESMG to pay for the very investigation described above;

    f. Forcing cuts of critical elements like marketing and technology;

    g. Engaging in self-dealing and/or benefiting his friends with ESMG assets, including by providing free advertising to entities related to him (like AT&T, Carvana and TopGolf) and to entities owned by friends;

    h. Destroying existing deals or negotiations with critical partners like the

NFL, CBS, and MGM due to his personal desire to maintain complete control over ESMG and ultimately obtain its assets free and clear of any other interests despite the terms of the Oral Agreement;

i.  Directing Ebersol and others not to pursue further discussions with other investors or funding opportunities;

j.  Intentionally failing to pursue additional investors himself despite his intention not to follow through on the funding commitment required by the Oral Agreement;

k.  Putting the AAF into bankruptcy without completing the first season, despite reasonable opportunities to do so;

l.  Breaching the valuable player contracts against advice;

m.  Using some of the funds that he did put into AAF to fund the bankruptcy, instead of for necessary operational functions as intended by the Oral Agreement to keep the AAF afloat for many seasons.

397.  The conduct listed in paragraph 396 also constituted breaches of the covenant of good faith and fair dealing as to the Oral Agreement.

398.  Dundon had competing duties of loyalty as a fiduciary of DCP and a fiduciary of ESMG and the AAF, and an actual conflict of interest, because Dundon and/or DCP were on opposite sides of various transactions related to funding the AAF, the operations of the AAF, and the use of funds and other resources of the AAF.

399.  Dundon was interested or lacked independence relative to the decisions he made when he was in control of the AAF.

400.  Dundon did not act in good faith relative to the decisions he made when he was in control of the AAF.

401.  Dundon's actions were not merely disloyal and careless, but willful, intentional, egregious, malicious, fraudulent, and/or grossly negligent and made with reckless indifference

402.  Zutter had competing duties of loyalty as a fiduciary of DCP and a fiduciary of ESMG and the AAF, and an actual conflict of interest, because DCP was on opposite sides of

various transactions related to funding of the AAF, the operations of the AAF, and the use of funds and other resources of the AAF.

403.    Zutter was interested or lacked independence relative to the decisions he made when he was in control of the AAF.

404.    Zutter did not act in good faith relative to the decisions he made when he was in control of the AAF.

405.    Zutter acted disloyally, carelessly, unfairly, and in bad faith with respect to the Debtors in all of the following ways:

    a.    Assisting, encouraging, participating in, and failing to disclose to ESMG all of Dundon's breaches of fiduciary duty as described above – Zutter was particularly involved in direct management of day-to-day operations of the AAF, and in matters like vendor settlements, breaches of contracts, and cuts to major programs as described above;

    b.    Failing to reduce the terms of the Oral Agreement to writing as was his role at ESMG;

    c.    Failing to disclose to Debtors that Dundon did not intend to provide the full $250 million he promised despite knowing this (and encouraging Dundon to spurn his commitments);

    d.    Engaging in self-dealing and attempting to benefit his own separate business interests, including but not limited to Employer Direct Healthcare (of which he is the CEO) to the detriment of ESMG and the AAF;

    e.    Investigating and assigning PWC to determine how to structure an acquisition of ESMG on terms utterly different from the negotiated Oral Agreement, and which would (if fulfilled) ultimately force out Ebersol and the original investors;

    f.    Forcing ESMG to pay for the very investigation described above;

    g.    Forcing cuts of or ceasing to pursue critical elements to the success of the AAF, like marketing and technology, out of a desire to limit the amount of DCP's contribution;

    h.    Failing to submit or approve appropriate funding requests necessary to the operation and success of the AAF;

    i.    Engaging in self-dealing by making preferential payments to DCP and its

professionals for purposes that benefitted DCP and not the AAF;

j.  Forcing ESMG to enter into a release agreement with Reggie Fowler;

k.  Destroying the AAF's reputation with critical vendors by breaching or forcing the negotiation of deep discounts on services already rendered and goods already procured, then in many cases failing even to finalize those settlements;

l.  Destroying existing deals or negotiations with critical partners like the NFL, CBS, and MGM;

m.  Directing Ebersol and others not to pursue further discussions with other investors or funding opportunities, and in some instances rejecting offered investments or funding;

n.  Intentionally failing to pursue additional investors himself;

o.  Breaching the valuable player contracts against advice and despite other options;

p.  Putting the AAF into bankruptcy without completing the first season, despite reasonable opportunities to do so, and using some of the funds that Dundon did put into AAF to fund the bankruptcy, instead of for necessary operational functions;

q.  Failing to disclose Dundon's and Zutter's true intentions regarding the above, including that his ultimate goal was to convert the AAF into an asset purchase for himself that would avoid liabilities, remove other shareholders, and allow rejection of existing contracts; and

r.  Failing to have a rational or prudent decision-making practice uncolored by self-interest with respect to all of the above.

406.  Dundon's and Zutter's actions were not merely disloyal and careless, but willful, intentional, egregious, malicious, fraudulent, and/or grossly negligent and made with reckless indifference to the consequences of those decisions on the Debtors.

407.  Dundon, Zutter, and DCP (in which both Dundon and Zutter were partners) obtained a benefit from the Debtors, including the 75% interest in ESMG and AAF, control over AAF's operations, financial benefits to their other business ventures such as the commercial airtime of AAF used without payment, funds of AAF routed to DCP and its professionals, by

fraud or the taking of an undue advantage.

408.   The judgment in Adversary Matter No. 22-5077 is now final. *See* Adv. No. 22-5077, ECF No. 180.

409.   The Court made a judgment, on the merits, that the Term Sheet cannot be enforced in Adv. No. 22-5077. *See* Adv. No. 22-5077, ECF 171, pp. 9-13. That question was fully litigated and contested by plaintiff DCP and defendant Charlie Ebersol.

410.   The Court further made a judgment, on the merits, that Dundon Capital Partners could not have justifiably relied on any information provided by Charlie Ebersol prior to his signing of the Term Sheet on February 14, 2019. *See* Adv. No. 22-5077, ECF 171, pp. 17-20.

411.

## II.  <u>PROPOSED CONCLUSIONS OF LAW</u>[7]

**A.   Jurisdiction**

412.   This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

413.   This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (H), and (K).

**B.   Count I – Breach of Oral Contract (Against Defendant Dundon)**

**1.   Conclusions of Law**

414.   Texas law governs the Breach of Oral Contract claim.

415.   To prevail on an oral breach of contract claim, a plaintiff must prove (1) the existence of a valid, enforceable contract between the parties; (2) plaintiff's performance or tender on that contract; (3) defendant's breach of the contract; and (4) damages sustained as a result of the breach. *E-Learning LLC v. AT & T Corp.*, 517 S.W.3d 849, 858 (Tex. App.—San

---

[7] Plaintiff recognize that, depending upon the Court's findings, Plaintiff may need to elect remedies, and will do so at the appropriate time.

Antonio 2017, no pet.); *Hubbard v. Shankle*, 138 S.W.3d 474, 481 (Tex. App.—Fort Worth 2004, pet. denied).

416. "A valid, enforceable contract exists when the following elements are shown: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds on the essential terms of the contract (mutual assent); (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding." *E-Learning LLC*, 517 S.W.3d at 858; *see also* ECF No. 54 at 7 (citing *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 150 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)); ECF No. 292 at 12 (quoting *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)).

417. "Although, in most cases, courts have held that the elements of proof [as listed above] are the same for oral contracts as for written contracts, we assume those holdings to exclude the fifth element that deals with execution and delivery." *Garcia v. Garza*, No. 13-22-00431-CV, 2023 WL 8467664, at *3 (Tex. App.—Corpus Christi Dec. 7, 2023, no pet. h.).

418. "Whether or not there was a valid contract must be based upon objective standards of what the party said and did. To determine whether there was a contract, and if so what the terms of the contract were, we look to the communications between the parties and to the acts and circumstances surrounding these communications." *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex. App.—Texarkana 1989, no writ) (citing *Slade v. Phelps*, 446 S.W.2d 931 (Tex. Civ. App.—Tyler 1969, no writ)); *see also* ECF No. 54 at 7 (citing *Wiley*); ECF No. 292 at 13 (quoting *Prime Products*, 97 S.W.3d at 636).

419. "The elements of an oral contract 'may be proved by either circumstantial or direct evidence.'" *Garcia*, 2023 WL 8467664, at *3.

420.     The relevant consideration is "what the parties said and did and not on their subjective state of mind." *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied).

421.     "Agreements to enter into future contracts are enforceable if they contain all material terms." *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013).

422.     "[T]he oral contract must only be 'sufficiently definite to confirm that both parties actually intended to be contractually bound,' and contain terms sufficiently definite to 'enable a court to understand the parties' obligations and to give an appropriate remedy' if breached." ECF No. 54 at 11 (quoting *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016)); *see also* ECF No. 292 at 14 (quoting *Fischer*).

423.     "Although the parties must agree to all material terms, they may choose to leave non-essential terms open for later negotiation without rendering the agreement unenforceable." *Coe v. Chesapeake Exploration, LLC*, 695 F.3d 311, 320 (5th Cir. 2012).

424.     "Each contract should be considered separately to determine its material terms." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

425.     "Texas courts routinely hold that the time of payment is not necessarily essential." ECF No. 292 at 16 (first citing *Bryant v. Clark*, 347 S.W.2d 635, 638 (Tex. Civ. App.—Austin 1961), aff'd, 358 S.W.2d 614 (Tex. 1962); and then citing *Young v. Ershick*, 617 F. Supp. 3d 563, 583 (E.D. Tex. 2022)). "The absence of an express time for performance does not necessarily mean that the parties did not enter into an enforceable agreement; generally, the law will imply a reasonable time." *Yazadani-Beioky v. Sharfian*, 550 S.W.3d 808, 827 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

426.     "Timely performance, however, is considered a material term if 'the contract

expressly makes time of the essence or if something in the nature and purpose of the contract and the surrounding circumstances make it apparent that [the] parties intended that time be of the essence.'" ECF No. 292 at 16 (quoting *Quantum Diversified Holdings, Inc. v. Wienheimer (In re Escarent Entities, L.P.)*, 423 F. App'x 462, 465 (5th Cir. 2011)); *Sharfian*, 550 S.W.3d at 827. "Thus, when a contract is silent as to time of payment, 'it is usually implied that payment is to be made within a reasonable time, or on demand.'" ECF No. 292 at 16 (quoting *Bryant*, 347 S.W.2d at 638).

427.    "An essential element of any valid contract is a meeting of the minds." *In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005). "A meeting of the minds can be inferred from the parties' conduct and their course of dealing." *Id.* The issue is judged by "objective standards of what the parties said and did not on their alleged states of mind." *Hudgins v. Sec. Bank (In re Hudgins),* 188 B.R. 938, 942 (Bankr. E.D. Tex. 1995).

428.    Texas law "favors finding agreements sufficiently definite for enforcement, particularly … where one of the parties has performed his part of the contract…. Or have taken other material action in reliance upon their existing expressions of agreement." *Fischer*, 479 S.W.3d at 237 & 242 (internal quotations omitted; cleaned up). "[P]artial performance may remove uncertainty and establish that a contract enforceable as a bargain has been formed, even when some terms are missing or left to be agreed upon." *Houston Cmty. Coll. Sys. V. HV BTW, LP¸* 589 S.W.3d 204, 213 (Tex. App.—Houston [14th Dist.] 2019, no pet.)).

429.    The promise of one party is valid consideration for the promise of another party. *Texas Gas Utils. Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970).

430.    A commitment is a promise, and it is binding. *One-Half Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 384 n.16 (Tex. 2011); Black's Law Dictionary (12th ed.)

("Commitment" defined as "an agreement to do something in the future, esp. to assume a financial obligation"; "an obligation that one has undertaken and must perform").

431. "'A party breaches a contract when he fails to perform an act that he has expressly or impliedly promised to perform.'" ECF No. 54 at 13 (quoting *Cox Paving of Texas, Inc. v. H.O. Salinas & Sons Paving, Inc.,* 657 S.W.3d 756, 769 (Tex. App.—El Paso 2022, pet. denied)).

432. The Court finds, on the basis of the findings of fact set forth above, that the Oral Agreement was made, and all of its essential terms sufficiently defined for enforcement.

433. Dundon breached the Oral Agreement by (1) failing to provide additional needed funds in April of 2019 to keep the AAF in operation, and (2) frustrating and/or repudiating the Oral Agreement by putting ESMG (and the other AAF entities) into Chapter 7 bankruptcy.

## 2. Argument

434. The parties have already briefed the legal issues related to breach of the Oral Agreement, and the Trustee's prior briefing can be found at ECF No. 196, pp. 6-18; ECF No. 30 at 2-13.

435. There is extensive evidence that Oral Agreement was formed when Dundon committed to invest $250 million in the AAF in exchange for majority ownership and control of the AAF. That evidence comes largely through Dundon's own words – to Ebersol, to other AAF team members, in press releases he directed and approved, in interviews, in internal emails to his own team, to his own friends, and to this Court (although he changed his story a few times through his testimony). *See* FOF ¶¶ 165-212. There is also supporting evidence in the other surrounding circumstances. Projections provided to Dundon showed the League needed more than $250 million to get to profitability (*see* FOF ¶ 225), a $250 million investment for 75% majority control is consistent with valuations of the AAF around the February 2019 time period (*see* FOF ¶¶ 225-227); and Dundon wanted other investors diluted by his $250 million

investment (*see* FOF ¶ 211).

436.    None of Dundon's or Ebersol's actions make sense with the maximum $70 million commitment that Defendants have attempted to push in this case. That amount was never going to be enough to sustain the AAF. *See* FOF ¶¶ 291-298. That amount was not enough to purchase a 75% ownership interest in control under any valuations of the AAF. *See* FOF ¶¶ 78-85. That amount is inconsistent with Dundon's statements that the AAF would not need additional capital beyond his own, and Dundon's actions in refusing additional capital offered and not seeking additional capital. *See* FOF ¶¶ 165-212. Dundon's story of where that number even came from changed between depositions and trial testimony. *See* FOF ¶¶ 213-224. Dundon and his own team still have inconsistent stories. Dundon acknowledges a $250 million commitment but with some unexpressed (and apparently still unexplainable) "conditions," and that the $250 million number was used from the beginning, including with Dundon's own team. *See* FOF ¶¶ 223-224. But Zutter disclaims the $250 million number entirely, even disagreeing with Dundon that he ever used the number in conversations with Zutter. *See* FOF ¶¶ 223-224.

437.    The Term Sheet – unsigned by anyone on the Dundon team and already found unenforceable – does not change anything.[8] Ebersol explained the origination of the Term Sheet as documentation to allow for the initial payment that needed to be made, and his confirmation from Dundon that it did not change the overarching oral agreement. *See* FOF ¶ 130. And Ebersol's behavior is consistent with his understanding that Dundon had agreed to provide all necessary capital for the AAF – he turned over control to Dundon, he relinquished his own voting seat on the Board, and he stopped seeking new investors. *See* FOF ¶¶ 230, 235, & 316-324. It

---

[8] Defendants' merger defense (unpled) and ratification defense are addressed in Sections II.O and II.P, *infra*.

was only when Dundon made clear he was *not* going to invest beyond $70 million (in late March 2019) that Ebersol began to take other actions, but when Dundon expressed his true intentions, it was too late. *See* FOF ¶¶ 348.

438.    A commitment is a promise, and it is binding. *One-Half Price Checks Cashed* 344 S.W.3d at 384 n.16; Black's Law Dictionary (12th ed.) ("Commitment" defined as "an agreement to do something in the future, esp. to assume a financial obligation"; "an obligation that one has undertaken and must perform"). In addition to the case examples cited in Trustee's prior briefing, Trustee brings this Court's attention to *SOAP Engineering, LLC v. Infiniti Integration Servs. Corp.*, No. 07-24-00304-CV, 2025 WL 1646333 (Tex. App.—Amarillo June 10, 2025, no pet. hist.). In *SOAP Engineering*, the Court found that states including "we shook hands" on the deal and the breaching party saying "[d]on't worry, son, I'm going to take care of you" were sufficient to form an oral contract for payment for services. *Id.* at *3. The court also noted evidence that the other party provided services, and that the communications and actions of both parties were relevant to the determination of the existence of the oral contract. *Id.* at *2-3. Dundon similarly assured Ebersol as part of the Oral Agreement that they had a "series infinity" deal, and that Ebersol no longer needed to worry about funding the AAF. *See* FOF ¶ 167. Cases – including those cited in Defendants' Pre-Trial Brief – also confirm that the relevant consideration is "what the parties said and did and not on their subjective state of mind." *See, e.g., Copeland*, 3 S.W.3d at 604. Additionally, *Thornton v. Dobbs*, 355 S.W.3d 312, 318 (Tex. App.—Dallas 2011, no pet.), cited in the Defendants' Pre-Trial Brief, found a sufficiently definite oral contract based upon conflicting testimony of the parties and the trial court's determination of the credibility of

the witnesses.[9]

439.     Because of the evidence, Dundon's primary argument is a legal, not factual, one – that the Oral Agreement was not formed because there were not definite terms or not a meeting of the minds on terms. But the evidence showed otherwise, which is consistent with the Court's prior determinations in denying Dundon's request for summary judgment on this claim:

a.  **There is sufficient evidence to determine the identity of the investor (ECF No. 292-14 to 292-15).** The evidence at trial was that Dundon conducted negotiations for the investment, stated publicly that he was the investor, and that *he* was the one who made the commitment to the AAF. *See* FOF ¶¶ 109, 110, & 165-212. The evidence at trial also was that Dundon retained control of the investment vehicle – *i.e.*, which Dundon-controlled entity he chose to use to make the investment. *See* FOF ¶ 109.a. It is not inconsistent with Dundon as the party to the Oral Agreement for the investments to ultimately be made through entities that he controls, at his direction, which is how Dundon typically conducts business, and the evidence showed was the intent of the parties to leave Dundon the control over that investment vehicle. *See* FOF ¶113,270.

b.  **There is sufficient evidence to determine the timing of payment and mechanisms for drawing the commitment (ECF No. 292-15 to 292-17).** The Court previously correctly determined that timing of performance is only a material term where there is something in the circumstances that indicates time is of the essence, or it will be an implied term that payment is to be made within a reasonable time, or on demand. *See, e.g., Sharfian*, 550 S.W.3d at 827; *Quantum Diversified Holdings, Inc. (In re Escarent Entities, L.P.)*, 423 F. App'x at 465. The evidence at trial was that timing was only of the essence for the initial payment of $5.1M, which was timely made, and the remaining amount of the commitment for the Oral Agreement was on an as-needed basis. *See* FOF ¶¶ 100,

---

[9] New cases cited in the Defendants' Pre-Trial Brief finding oral contracts insufficiently definite are inapposite to the facts here. In *Lamajak, Inc v. Frazin*, 230 S.W.3d 786, 794 (Tex. App.—Dallas 2007, no pet.), the court found the contract indefinite because it could not determine what "services" the other party was to provide, but there is no such issue here. *Gannon v. Baker*, 830 S.W.2d 706, 709-710 (Tex. App.—Houston [1st Dist.] 1992, writ denied), dealt with an alleged stock equalization agreement with multiple parties where the court could not determine the proper equalization method including because the plaintiff had two different interpretations of how it could be equalized. There is no such issue or differing interpretations by one party here. *Radford v. McNeny*, 104 S.W.2d 472, 474 (Tex. Com. App. 1937, no writ), dealt with a written lease agreement that did not contain terms specifically necessary for a lease, which is not an issue here. *Jonibach Mgmt. Trust v. Wartburg Enters., Inc.*, 750 F.3d 486, 490-92 (5th Cir. 2014), addressed only whether statute of frauds applies to certain oral contracts related to the sale of goods, also not at issue here.

106. The evidence at trial also was that the mechanism was for funding requests to be made by AAF as needed. *See* FOF ¶ 241.

    c. **There is sufficient evidence to determine the terms and conditions of the type of investment (ECF No. 292-17 to 292-18).** The evidence showed that Dundon bought control the AAF, and not any type of debt arrangement that would require additional terms. *See* FOF ¶¶ 110, 212, 214. The Term Sheet, while not enforceable, shows the nature of the pure equity investment, as well as the terms for that investment. *See* **TR. EX. 0022.**

440.    The other legal defenses asserted are inconsistent with Dundon's testimony, the

overwhelming evidence, and the law[10]:

    a. There is no fraud or misconduct by Ebersol or the AAF. Dundon and his team admitted there was no due diligence done, there was no misstatement of accounts payable, and there was no intent to mislead. *See* FOF ¶¶ 150, 154-163. Dundon even stated he assumed the risk by not doing due diligence. *See* FOF ¶ 162.

    b. Ebersol had authority to enter into the Oral Agreement, and the AAF performed the oral contract. Ebersol testified that he polled the board members for approval. The AAF actually gave control to Dundon. Any failure to finalize any documentation or transfer/issue stock was due to *Dundon's teams'* failure to follow through once they were in control. *See* FOF ¶¶ 295. Tendering control of the league tendered performance as to majority ownership. *Cf. Krayem v. USRP (PAC), L.P.*, 194 S.W.3d 91, 94 (Tex. App.—Dallas 2006, pet denied).

    c. There was no ratification of a $70 million deal. Ebersol testified he confirmed Dundon's intentions as to the larger $250 million investment before signing the Term Sheet. *See* FOF ¶¶ 130-132. The Board meeting incorporating the Term Sheet was *after* Dundon was in control, orchestrated and directed by Dundon, in which his own counsel was involved, and before he made known to Ebersol that he did not intend to follow through on the $250 million commitment. *See* FOF ¶ 296.

    d. It was not impossible for Dundon or the AAF to perform. The projections Dundon had before investing showed heavy losses through year 5 of the AAF, and Dundon didn't even allow the AAF to finish year 1. Dundon made the decision to file Chapter 7 bankruptcy, having refused to fund any additional portion over the $69.7 million that DDFS Partnership, LP provide (despite Dundon's $250 million commitment), including refusing to fund the estimated $1.09 million to allow for the possibility of Chapter 11 bankruptcy. *See* FOF ¶¶ 354-365.

    e. Whether the Oral Agreement was executory does not change the outcome of the Court's analysis of Count I. Assumption and rejection of contracts in bankruptcy

---

[10] These defenses also are addressed in Sections II.O through II.S, *infra*.

amounts to a business decision of the trustee and is not determinative of the substantive rights of the contract counterparties. *See, e.g.*, 11 U.S.C. § 365(a) ("[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."). The Trustee has not moved to assume or assume and assign the Oral Agreement, and thus neither Bankruptcy Code section 365(d)(2) nor 364 are implicated by the Trustee's suit. 11 U.S.C. §§ 365(d)(2), 364; *see also* ECF No. 196 at pp. 16-18 (discussing irrelevance of *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1093 (9th Cir. 1991). Rather, the Trustee brought suit against Dundon for his pre-bankruptcy breach of the Oral Agreement. ECF No. 56, Am. Compl. ¶¶ 140-46. Thus, the Court must determine the parties' rights that arose by virtue of their pre-bankruptcy relationship pursuant to applicable state law, separate and apart from a question of Oral Agreement's executory nature in the context of a bankruptcy proceeding.

f.   Even if the executory nature of the Oral Agreement were a relevant inquiry, because ESMG had performed all material obligations within its power by giving Dundon and Zutter control (*see supra* § I. E. and FOFs cited therein), leaving only Dundon's performance, the Oral Agreement was not an executory contract. *Argonaut Ins. Co. v. Falcon V, L.L.C. (In re Falcon V, L.L.C.)*, 44 F.4th 348, 353 (5th Cir. 2022). Moreover, to the extent the Oral Agreement could be considered executory, rejection pursuant to Bankruptcy Code section 365(g)(1) simply "constitutes a breach of such contract … immediately before the date of the filing of the [bankruptcy] petition." 11 U.S.C. § 365(g)(1). Even "a material breach does not discharge a claim for damages that has already arisen." *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 437 (Tex. 2017). Dundon's determination to breach the Oral Agreement and liquidate the league through Chapter 7 was a prior material breach to any breach by rejection, and thus rejection of the Oral Agreement does not qualify, as a matter of law, to relieve Dundon from his own, initial material breach. *State Farm Lloyds v. Fuentes*, 597 S.W.3d 925, 937 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

441.   If the Oral Agreement was formed, there is no dispute that (a) it was property of the Debtors' estate prior to the bankruptcy filings and (b) Dundon breached the Oral Agreement prior to the bankruptcy filings. AAF's claim for breach of the Oral Agreement arose pre-bankruptcy ,and therefore came into the Debtors' Estate as a claim for breach of contract pursuant to 11 U.S.C. § 541(a). *See Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1283-84 (5th Cir. 1994).

442.   Dundon failed to invest the $250 million amount to which he committed. *See* FOF ¶ 382. In fact, Dundon refused to provide even small (in comparison) sums requested to keep the

AAF from having to be liquidated, such as the $1.09 million needed for a 12-week plan to file Chapter 11 instead of Chapter 7 (*see* FOF ¶¶ 355-357), or the $4 million needed for one of Ebersol's "go forward" options that would allow the AAF to avoid an abrupt cancellation of the season and preserve valuable assets like the player contracts (*see* FOF ¶ 349). Thus, Dundon is liable for breach of the oral contract to invest $250 million in the AAF, of which he fell short by $180M.

**C.     Count III – Breach of Covenant of Good Faith and Fair Dealing (Against Defendants Dundon)**

**1.   Conclusions of Law**

443.    Texas law applies to the claims arising from the Oral Agreement. Whether Dundon had a fiduciary duty to ESMG is also relevant to this inquiry, and that is a question of Delaware law.

444.    An implied covenant of good faith and fair dealing can arise from a contract that creates either "(1) a fiduciary relationship arising from an element of trust necessary to accomplish the goals of the contract;" or "(2) a special relationship based on extra-contractual duties arising from an imbalance of bargaining power." *Prime Prods., Inc.*, 97 S.W.3d at 638; *see also* ECF No. 54 at 18 (citing same).

445.    [S]pecial relationships are recognized 'where there is unequal bargaining power between the parties and a risk exists that one of the parties may take advantage of the other based upon the imbalance of power.'" ECF No. 292 at 27-28 (quoting *McKenzie v. Cmty. Cmty. Nat'l Bank*, No. 04-14-00540-CV, 2015 WL 3616601, at *4 (Tex. App.—San Antonio June 10, 2015, no pet.)); *see, e.g.*, *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987); *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232-33 (Tex. 2008); *Villanova v. Fed. Deposit Ins. Corp.*, 511 S.W.3d 88, 105 (Tex. App.—El Paso 2014, no pet.).

446.    Making false statements to induce reliance, denying required disbursements, the failure to negotiate with third parties, and the mismanagement of an enterprise for the benefit of those to whom a duty of good faith and fair dealing is owed is evidence of a breach of that duty. *See Mims v. Beall*, 810 S.W.2d 876, 880 (Tex. App.—Texarkana 1991, no writ) (failing to negotiate with parties willing to pay for a lease in favor transferring that lease for no consideration breached duty of good faith and fair dealing); *see also Acton Corp. v. Sabinske*, No. 05-91-01720-CV, 1995 WL 479671, at *1 (Tex. App.—Dallas Aug. 9, 1995, writ denied) (denying disbursements based on defendant's "cost management and allocation of expenses" breached duty of good faith and fair dealing); *Tuttlebee v. Tuttlebee*, 702 S.W.2d 253 (Tex. App.—Corpus Christi-Edinburg 1985, no writ) (inducing reliance on false promises constituted a breach of the duty of good faith and fair dealing); *see also Wilgus v. Bond*, 730 S.W.2d 670, 671 (Tex. 1987).

447.    The Court finds that, upon assuming control of the AAF on February 14, 2019, through the Oral Agreement, Dundon had a fiduciary duty to ESMG and the other AAF entities, and his rights and duties under the Oral Agreement were required to be discharged fairly and in good faith.

448.    The Court also finds that there was unequal bargaining power between Dundon and ESMG in favor of Dundon, and a risk exists that Dundon may take advantage of ESMG based upon the imbalance of power.

449.    Dundon's conduct, as set out in the findings of fact, was not good faith and fair dealing as to ESMG and robbed ESMG of the value intended in the Oral Agreement.

### 2.  Argument

450.    The parties have already briefed the legal issues related to good faith and fair dealing as to the Oral Agreement, and the Trustee's prior briefing can be found at ECF No. 30,

pp. 17-20 and ECF No. 196, pp. 24-27.

451.    Dundon admitted that he had a fiduciary relationship with AAF beginning on February 14, 2019. *See* FOF ¶¶ 228, 229. Fiduciary relationships are the type of relationship that supports a duty of good faith and fair dealing. *See* ECF No. 54-18.

452.    The testimony of Dundon and Ebersol also establishes that there was unequal bargaining power between Dundon and the AAF, with Dundon being in the position of control. *See* FOF ¶¶ 101-103. The distressed nature of the AAF's position rendered it within the ordinary wheelhouse for Dundon's team. *See* FOF ¶ 96. This imbalance only increased after Dundon was given control of the AAF as of February 14, 2019 – a condition Dundon demanded – after which Dundon controlled the only two voting board members and also controlled AAF's financial situation. *See* FOF ¶¶ 117, 228-229. As this Court already recognized, a special relationship to support a duty of good faith and fair dealing exists "where there is unequal bargaining power between the parties and a risk exists that one of the parties may take advantage of the other based upon the imbalance of power." *See* ECF No. 292-27 to 292-28.[11]

453.    Once a duty of good faith and fair dealing is applied to the Oral Agreement, the evidence is clear that Dundon breached that duty and did not act in good faith or fairly. Dundon acknowledged his $250 million commitment, but stated there were some "conditions"; he never

---

[11] Defendants' Pre-Trial Brief cites *Simms v. Jones*, 2011 WL 5978594, at *4 (N.D. Tex. 2011), which holds that the nature of an NFL ticket transaction did not support a duty of good faith and fair dealing, but recognizes the general standard, and here, there exists not just unequal bargaining power but a particular situation presenting the risk that Dundon could take particular advantage of the imbalance of power with the AAF. That situation simply doesn't exist in a standard football game ticket transaction, which is not comparable to the evidence in this case.

Additionally, the following new cases cited in the Defendants' Pre-Trial Brief are not related to the duty of good faith and fair dealing. *See, e.g., Allright, Inc. v. Elledge*, 515 S.W.2d 266, 267-68 (Tex. 1974) (addressing contracts as void against public policy, but recognizing the situation is different when there is a "disparity of bargaining power"); *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228 (Tex. 2008) (orig. proceeding) (addressing forum selection clauses).

told those "conditions" to Ebersol or the AAF. *See* FOF ¶ 220. Dundon's unexpressed opinion of a "commitment" also was that he could change his mind, if he didn't think it was working out. *See* FOF ¶ 222. And ultimately, Dundon decided to do just that – change his mind and not comply with the $250 million investment agreement and instead placing the AAF into Chapter 7 bankruptcy. *See* FOF ¶ 358.

454. Dundon's failure to be honest about how he viewed his "commitment" (*i.e.*, as no commitment at all), combined with his actions upon taking control, placed the AAF in an even more precarious financial situation. After taking control, and despite assurances to Ebersol that the $250 million deal had not changed, Dundon failed to have the commitment papered up for the AAF. *See* FOF ¶ 295. Dundon's team, at his direction, controlled the purse strings to AAF, kept "the cash balance real low" and created leverage by not fully funding expense requests. *See* FOF ¶¶ 253, 263, 280. Dundon also stated repeatedly that he had all the capital the AAF needed and directed those at AAF not to pursue additional funding. *See* FOF ¶¶ 165-199, 179-185, 316-325. He supported that statement by refusing additional capital offered and not seeking additional capital himself. *See* FOF ¶¶ 290, 343-345. But, again, Dundon did not actually provide the capital needed by the AAF and owed under the Oral Agreement; instead, he placed the AAF into Chapter 7 bankruptcy.

455. In fact, throughout the short time he controlled the AAF, Dundon was seeking to restructure the deal he agreed to in the Oral Agreement, repeatedly discussing with his right-hand-man Zutter converting their AAF control to an asset deal, a prepackaged bankruptcy, or other vehicle that could remove liabilities of AAF and contracts or vendor arrangements that Dundon did not like, and also seeking to achieve tax benefits for Dundon. *See* FOF ¶¶ 142, 1-271, 279. Significant funds AAF needed for continued operations were used for this purpose

instead of funding AAF needs, including a refusal to fund smaller amounts needed to avoid Chapter 7 bankruptcy. *See* FOF ¶¶ 355-357.

456. Therefore, Dundon breached his duty of good faith and fair dealing as to the Oral Agreement.

**D.    Count IV – Promissory Estoppel (Against Defendant Dundon)**

**1.    Conclusions of Law**

457. Count IV is alternative to Counts I and III. Because the Court has already determined it there is an oral contract that was breached by Dundon, it makes the following findings regarding promissory estoppel alternatively.

458. Texas law governs the Promissory Estoppel claim.

459. Promissory estoppel is "an available cause of action to a promisee who relied to his detriment on an otherwise unenforceable promise." ECF No. 54 at 23 (citing *Frost Crushed Stone Co. v. Odell Geer Const. Co.*, 110 S.W.3d 41, 44 (Tex. App.—Waco 2002, no pet.)).

460. The elements of a promissory estoppel claim are that: (1) the defendant made a promise to the plaintiff, (2) there is foreseeability of reliance thereon by the promisor, (3) substantial reliance by the promisee to his detriment, and (4) enforcing the promise is necessary to avoid injustice. *See id.* at 23-24 (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)); *Collins v. Walker*, 341 S.W.3d 570, 574 (Tex. App.—Houston [14th Dist.] 2011, no pet.); ECF No. 54 at 23 (citing *City of Beaumont v. Excavators & Constructors, Inc.*, 870 S.W.2d 123, 136 (Tex. App.—Beaumont 1993, writ denied)).

461. "To support a finding of promissory estoppel, a successful promissory-estoppel claim must be based on an 'actual promise.'" *Eaton v. Mazanec Constr. Co.*, Nos. 10-21-00107-CV, 10-21-00111-CV, 2022 WL 7211332, at *19 (Tex. App.—Waco Oct. 12, 2022, no pet.). Promissory estoppel permits "'a party that has failed to prove a legally sufficient contract, but

has acted in reliance upon a promise to his detriment, … [to] be compensated for his foreseeable, definite, and substantial reliance.'" *Id.* (quoting *Lucas v. Ryan*, No. 02-18-00053-CV, 2019 WL 2635561, at *51 (Tex. App.—Fort Worth June 27, 2019, no pet.)).

462.     "The asserted 'promise' must be sufficiently specific and definite so that it would be reasonable and justified for the promise to rely on it as a commitment to future action." *Eaton*, 2022 WL 7211332, at *19.

463.     The findings of fact set out above establish that all of the required elements of promissory estoppel against Dundon are met by a preponderance of the evidence. The Court further finds that injustice could be avoided only by enforcing the promise.

### 2. Argument

464.     The parties have already briefed the legal issues related to promissory estoppel, as an alternative claims to the breach of oral contract, and the Trustee's prior briefing can be found at ECF No. 30, pp. 22-24 and ECF No. 196, pp. 18-24.

465.     Dundon made a promise to invest $250 million in the AAF, as supported by the evidence detailed in Section II.B.2, *supra*. This included Dundon's promise that he would cover the capital needs of the AAF, which was estimated to be $250 million over the course of five years and until the AAF became cash flow positive. *See* FOF ¶¶ 165-185. The promise by Dundon to provide a specific amount of capital (estimated to be the entirety of the capital AAF needed to become a sustainable enterprise) was a specific and definite promise, and one that Dundon repeated over and over again. *See* FOF ¶¶ 165-185. It is also sufficiently definite for the reasons discussed in Section II.B.2, *supra*. *See also* ECF No. 292-33 to 292-34 (evidence supporting definiteness of oral contract also supports definiteness for purposes of promissory estoppel). In addition to the case law cited in Trustee's previous briefing, a case cited in Defendants' Pre-Trial Brief is supportive of the definiteness of this promise by Dundon. In

*Walker v. Walker*, 631 S.W.3d 259, 264-265 (Tex. App.—Houston [1st Dist.] 2020, no pet.), the Court found evidence of a sufficiently-definite promise even where terms changed after the promise was initially made and the timing promise was "whenever [plaintiff] was ready."

466.    At that time, Dundon already knew that the capital needs of the AAF were approximately $250 million. *See* FOF ¶ 225, 293. Dundon also knew $70 million would never be enough capital to sustain the AAF. *See* FOF ¶¶ 291-293. Dundon knew or could reasonably foresee that AAF would rely on his promise of funding, and in fact it did so (as he knew) when it transferred control of the AAF to him on February 14, 2019, which placed the AAF's financial condition and activities within the control of Dundon. *See* FOF ¶¶ 228, 229, 240, 249. AAF also returned other investor funds at Dundon's direction and stopped seeking additional capital, also at Dundon's direction and based upon Dundon's assurances. *See* FOF ¶ 317.

467.    None of the evidence at trial should change the Court's prior determinations that there is support for justifiable reliance. *See* ECF No. 54-23 through 54-24 and 292-32. The unenforceable Term Sheet does not prevent justifiable reliance as a matter of law, and Ebersol testified as to why he relied at that time based on the representations of Dundon. *See* FOF ¶ 130. Further support for justifiable reliance is Dundon's repeated promises in public and private conversations, and supportive conduct discussed above and Section II.B.2, *supra*. Also supportive is what Ebersol and the AAF knew of Dundon and his other successful businesses and financial means. *See* FOF ¶¶ 88-90. Dundon's subjective intent that, in his opinion, he could change his mind on a commitment if he wanted to does not factor into this analysis. For example, the *Walker* case found the evidence supported reasonable reliance despite the defendant claiming he "could change his mind, according to him, the promise was illusory, and thus it was not reasonable for [plaintiff] to rely on it." 631 S.W.3d at 265.

468.     Therefore, in the alternative if there is no oral contract to be breached, Dundon is liable for promissory estoppel for his $250 million commitment to the AAF.

**E.     Count V – Breach of Fiduciary Duty (Against Defendants Dundon and Zutter)**

**1.  Conclusions of Law**

469.     ESMG was incorporated in Delaware, and thus Delaware law governs the Breach of Fiduciary Duty claims.

470.     "[U]nder Delaware law, 'an LLC's managers and controlling members in a manager-managed LLC owe the traditional fiduciary duties that directors and controlling shareholders in a corporation would.'" ECF No. 54 at 28 (quoting *Kelly v. Blum*, No. CIV.A. 4516-VCP, 2010 WL 629850, at *1 (Del. Ch. Feb. 24, 2010)); *see also Auriga Cap. Corp. v. Gatz Props.*, *LLC*, 40 A.3d 839, 851 (Del. Ch. 2012).

471.     Delaware General Corporations Law § 102(b)(7) "[p]ermit[s] [a corporation] to adopt a provision in the certificate of incorporation to free directors of personal liability in damages for due care violations, but not duty of loyalty violations, bad faith claims and certain other conduct." *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001).

472.     "Delaware law imposes fiduciary duties on those who effectively control a corporation." ECF No. 54 at 28 (quoting *Voigt v. Metcalf*, No. CV 2018-0828-JTL, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020) (quoting *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 183-84 (Del. Ch. 2014))). For purpose of establishing a fiduciary duty, control can be shown by any of: board control, shareholder voting control, or evidence the defendant had actual control over the operations of the business. *Tornetta v. Musk*, 310 A.3d 430, 497-99 (Del. Ch. 2024).

473.     In Delaware, the directors and officers of a corporation owe two overarching fiduciary duties: the duty of care and the duty of loyalty. *United Food and Commercial Workers*

*Union and Participating Food Indus. Employers Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1049 (Del. 2021). "The duty of loyalty requires an undivided and unselfish loyalty to the corporation and demands that there shall be no conflict between duty and self-interest." *Zuckerberg*, 262 A.3d at 1050 (internal quotations omitted). "The duty of loyalty [also] includes a requirement to act in good faith, which is a 'subsidiary element, i.e., a condition of the fundamental duty of loyalty." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 842 (Del. Ch. 2022) (quoting *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)). Acts taken in bad faith violate the duty of loyalty. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

474. The fiduciary duty of loyalty includes requirements to act in good faith, with an honest belief that the action is in the best interests of the company, and with full disclosure. *See, e.g., Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("The failure to act in good faith may result in [corporate fiduciary] liability because the requirement to act in good faith 'is a subsidiary element,' i.e., a condition, 'of the fundamental duty of loyalty.'") (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)); *Malone v. Brincat*, 722 A.2d 5, 11, 14 (Del. 1998) ("The director's fiduciary duty to both the corporation and its shareholders has been characterized by this Court as a triad: due care, good faith, and loyalty.") (holding if fiduciaries "are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty").

475. "[C]orporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading. *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 387 (Del. 2024).

476. Corporate fiduciaries "'are not permitted to use their position of trust and

confidence to further their private interests.'" ECF No. 54 at 29 (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)).

477. "When a director is a dual fiduciary (i.e., a director of two entities), they owe an 'uncompromising duty of loyalty' to both entities without dilution." ECF No. 54 at 29 (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)).

478. The duty of loyalty is breached when a director appears on both sides of a transaction or receives a personal benefit from a transaction not received by the shareholders generally. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993).

479. Delaware has three standards of review for alleged breaches of fiduciary duty. "[T]he standard of review depends initially on whether the board members (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness)." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013); *see, e.g.*, *Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. CV 12108–VCL, 2017 WL 1437308, at *25-27 (Del. Ch. Apr. 14, 2017), as corrected (Apr. 24, 2017).

480. The business judgment rule does not apply where "directors . . . appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). The enhanced scrutiny or entire fairness review applies where "the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business

purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000). There is "no 'safe harbor' for [] divided loyalties . . . where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." ECF No. 281 at 16 (quoting *In re Tesla Motors, Inc. S'holder Litig.*, No. 12711-VCS, 2020 WL 553902, at *18 (Del. Ch. Feb. 4, 2020)).

481. "To satisfy entire fairness review, the defendants bear the burden of demonstrating that the corporate act being challenged is entirely fair to the corporation and its stockholders." *In re Match Group, Inc. Derivative Litig.*, 315 A.3d 446, 459 (Del. 2024).

482. Damages are not an element of the claim for a breach of fiduciary duties, including because it would "relieve director defendants found to have breached their duty of care of establishing the entire fairness of a challenged transaction." *Cede*, 634 A.2d at 369.

483. The abstention doctrine does not apply "even if the director abstained from the formal vote to approve the transaction, if the director (i) was closely involved with the challenged [transaction] from the very beginning and the transaction was rendered unfair based, in large part, on the director's involvement; (ii) played a role in the negotiation, structuring, or approval of the proposal; or (iii) was deliberately absent from the directors' meeting at which the proposal is to be voted upon, specifically to shield themselves from any exposure to liability." *In re Carvana Co. Stockholders Litig.*, No. CV 2020-0415-KSJM, 2022 WL 2352457, at *17 (Del. Ch. June 30, 2022).

484. Under Delaware law, breach of contract and fiduciary duty claims can coexist when they "[s]hare a common nucleus of operative facts," as long as the breach of fiduciary duty claim relies on additional facts, is broader in scope, or involves different considerations in terms

of a potential remedy. *Schuss v. Penfield Partners, L.P.*, No. 3132-VCP, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008); *see also PT China LLC v. PT Korea LLC*, No. 4456-VCN, 2010 WL 761145, at *7 (Del. Ch. Feb. 26, 2010).

485.    Dundon and Zutter had control of ESMG and the AAF after February 14, 2019, and thus owned fiduciary duties to ESMG and to ESMG's subsidiaries LFE, AAF Players, AAF Properties, LFE 2, and Realtime (together with ESMG, referred to collectively as "AAF" or the "League") arising from their positions as fiduciaries to ESMG and its subsidiaries and their dominion and control over the entire enterprise of the Debtors.

486.    The Court finds it is appropriate to apply the entire fairness standard to the actions of Dundon and Zutter described in Section I.F, *supra*, in the findings of fact section and the conduct specifically identified in FOF ¶¶ 396 and 405.

487.    The Court finds, as a matter of law, that each act of Dundon described in Section I.F, *supra,* in the Findings of Fact and in FOF ¶ 396 separately and collectively violated Dundon's duties of loyalty, care, and fair dealing.

488.    The Court finds, as a matter of law, that each act of Zutter described in Section I.F, *supra*, in the Findings of Fact and in FOF ¶ 405 separately and collectively violated Zutter's duties of loyalty, care, and fair dealing.

489.    The Court finds that Dundon's and Zutter's breaches of fiduciary duty were also, largely, collective and shared between them, and they were operating together against the interests of the AAF, such that they are jointly and severally liable.

### 2.  Argument

490.    The parties have already briefed the legal issues related to breach of fiduciary duty, and the Trustee's prior briefing can be found at ECF No. 30, pp. 25-37, ECF No. 196, pp. 35-44, and ECF No. 197, pp. 7-14.

491.    Dundon admitted that he had fiduciary duties with AAF beginning on February 14, 2019 and until the bankruptcy. *See* FOF ¶ 228. Zutter also admitted that he had fiduciary duties to AAF beginning on February 14, 2019 and until the bankruptcy.[12] *See* FOF ¶ 229. The evidence showed that Dundon and Zutter also were in control of the AAF beginning on February 14, 2019 (*see* FOF ¶¶ 228, 229, 240, 249), held official positions as directors beginning at the latest on February 24, 2019 (*see* FOF ¶ 236), and directed board actions between February 14, 2019 and leading to their "official" appointment on February 24, 2019 (*see* FOF ¶ 296). Thus, all activities after February 14, 2019, are appropriately attributed to Dundon and Zutter as the control persons, decisionmakers, and ultimately voting directors. *See* ECF No. 196 at 49-50 (citing cases).

492.    Dundon and Zutter both also had a fiduciary relationship with and duties to DCP during the time they had fiduciary duties to AAF. *See* FOF ¶ 233. This created an actual and continuously existing conflict of interest for Dundon and Zutter because DCP was the vehicle through which Dundon was providing funding to AAF, and DCP's and AAF's interests were on opposite sides as to the providing and use of such funding. And for Dundon, he also had an actual conflict of personal interest due to his commitment to provide the $250 million investment, and because the DCP funds (or whichever of his entities he directed funding from) were essentially his personal funds and flowing through to his direct financials. *See* FOF ¶ 267. Thus, Dundon and Zutter stood to gain personally from their decisions even where AAF did not.

493.    Zutter admitted Defendants were on both sides of the transaction for DCP's consideration and provision of funding to AAF and that in making decisions related to AAF they

---

[12] Further, Zutter is not an independent actor; he was appointed to his duties to AAF by Dundon, and he is loyal and beholden to Dundon, whom he has worked for in various capacities since 2014. *See* FOF ¶ 5.

had to consider which "hat" they were wearing. *See* FOF ¶ 241. Scores of other evidence also support the existence of these "conflicting loyalties" for Dundon and Zutter, and the improper actions they influenced, including the following:

a. Dundon's directions and Zutter's actions in withholding funds from AAF (*see* FOF ¶¶ 243, 245, 253, 260, 261, 262, 280);

b. Dundon's directions and Zutter's actions in cutting key aspects of AAF operations (*see* FOF ¶¶ 244, 246, 262);

c. Dundon's and Zutter's insistence that the Fowler release be approved and executed to avoid interference with their control of AAF (*see* FOF ¶¶ 273-274);

d. Dundon's and Zutter's refusal to seek out, consider, or accept other funding that could impact Dundon's "control" or didn't acknowledge Dundon's $250 million commitment, leaving AAF with no options when Dundon decided not to honor his commitment on the timing that he did[13] (*see* FOF ¶¶ 316-325);

e. Dundon's and Zutter's efforts towards jettisoning AAF for an asset deal or pre-packaged bankruptcy (*see* FOF ¶¶ 1-271);

f. Zutter's prioritization of paying DCP fees and PwC fees that were for tax and restructuring advice to benefit DCP, even as the decision had been made to shut down the AAF (*see* FOF ¶¶ 337-338, 351);

g. Dundon's direction and Zutter's assistance to provide of free advertising from AAF to benefit Dundon's other companies and contacts (*see* FOF ¶¶ 334-335);

h. Dundon's and Zutter's decision to end operations in a manner that would not allow for potential continuation of the AAF and would not preserve the assets of AAF including the player contracts (*see* FOF ¶¶ ¶¶ 1-271, 326-330);

i. Zutter's refusal to consider even an amount of $1.09M to allow for a 12-week plan and avoid Chapter 7 bankruptcy (*see* FOF ¶¶ 355-357); and

j. Zutter's suggested that the directors prepare and execute last-minute documentation in favor of DCP before the bankruptcy, which resulted in bankruptcy counsel's admonition to Zutter to consider which "hat" he was wearing – AAF board or DCP – in the bankruptcy decision-making process (*see*

---

[13] The divided loyalty, and changing positions to benefit themselves and not AAF, is particularly clear and egregious on this example because Dundon and Zutter sought to preserve their control position and subject any other investor in AAF to a dilution for the $250 million amount, despite Dundon now claiming he wasn't required to invest this amount, and Zutter claiming that amount was "made up."

FOF ¶¶ 284, 362).

494.    The entire fairness standard, <u>not</u> the business judgment rule[14], applies to the

analysis of Dundon's and Zutter's above actions as fiduciaries. *See* ECF No. 196, pp. 40-41

(citing cases). Delaware recognizes a fiduciary duty of loyalty, that includes requirements to act

in good faith, with an honest belief that the action is in the best interests of the company, and

with full disclosure. *See, e.g., Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("The failure to act

in good faith may result in [corporate fiduciary] liability because the requirement to act in good

faith 'is a subsidiary element,' i.e., a condition, 'of the fundamental duty of loyalty.'") (quoting

*Guttman*, 823 A.2d at 506 n.34); *Malone*, 722 A.2d at 11, 14 ("The director's fiduciary duty to

both the corporation and its shareholders has been characterized by this Court as a triad: due

care, good faith, and loyalty.") (holding if fiduciaries "are deliberately misinforming

shareholders about the business of the corporation, either directly or by a public statement, there

is a violation of fiduciary duty");[15] *In re Mindbody, Inc.*, 332 A.3d at 387 (("[C]orporate

fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially

false statement, by omitting a material fact, or by making a partial disclosure that is materially

misleading.).

---

[14] The business judgment rule has been rebutted for both Dundon and Zutter by the evidence of divided loyalties, actions motivated by interests of Dundon and Zutter personally and for their other businesses, bad faith actions, actions taken without an honest belief that they were in the best interests of AAF, and without full disclosure, as set forth in the findings of fact cited in this Section.

[15] In *Malone*, the Delaware Supreme Court also overruled prior decisions of the Court of Chancery that a duty to disclose only applies when seeking shareholder action. The Delaware Supreme Court instead holds generally that "directors who knowingly disseminate false information" violate fiduciary duties. 722 A.2d at 10 ("Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, *with or without a request for shareholder action*, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty.") (emphasis added). Thus, the limitation argued in Defendants' Pre-Trial Brief that it was necessary for Dundon and Zutter to have been seeking shareholder action in the course of their mis-disclosures or non-disclosures is incorrect. *See* ECF No. 298-33.

495. As the Court already properly found, Delaware "is unflinching there being no safe harbor for divided loyalties … where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *See* ECF No. 292-42 (internal citations omitted); ECF No. 281-14 to 281-17.[16] The facts at trial, as set forth above, clearly establish the issue of divided loyalties for both Dundon and Zutter, and placing the burden on Dundon and Zutter to show the "entire fairness" of their actions to AAF to comply with their duty of loyalty, which they did not. Whether director actions were "fair dealing" is part of the entire fairness analysis. *See, e.g., Tornetta v. Musk*, 310 A.3d 430, 527 (Del. Ch. 2024).

496. The "transactions" at issue include all the decisions made by Dundon and Zutter, their actions <u>and</u> inactions, and overall course of conduct that led to the Chapter 7 bankruptcy and complete loss of value for AAF. In analyzing breaches of duty for fiduciary actions, Delaware courts have used not only the term "transaction" but also "decisions," "actions," "operations," and "strategies." *See Bridgeport Holdings Inc. Liquidating Trust v. Bayer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 565 (Bankr. D. Del. 2008) (examples of duties breached included "knowingly failing to make decisions" and "approaching the operation of the company with a level of indifference or egregiousness that amounted to bad faith"); *Frederick Hsu Living Tr. V. ODN Holding Corp.*, C.A. No. 12108-VCL, 2017 WL 1437308, at *15 (Del. Ch. 2017) (challenged actions included "abandoning the Company's growth strategy …in favor of selling off whole business lines and hoarding cash" to benefit a particular shareholder's

---

[16] The Court also previously recognized that Delaware does not permit contracting around duty of loyalty violations and bad faith claims. *See* ECF No. 292-40; ECF No. 281-17 to 281-18. Thus, any exculpatory clause is irrelevant because the Trustee has shown duty of loyalty violations and bad faith actions.

redemption rights); *In re Xtreme Power Inc.*, 563 B.R. 614, 624 (Bankr. W.D. Tex. 2016) (addressed a series of circumstances that led a company into a late-filed bankruptcy including failures to act); *Cede & Co.*, 634 A.2d at 361 (Del. 1993) (explains that fiduciary duties are required to be applied by directors who have direction over "the business and affairs of a corporation" and refers throughout to "challenged decisions" and "actions taken"); *In re Tower Air, Inc.*, 416 F.3d 229, 240 (3d Cir. 2005) (denying motion to dismiss allegations of bad faith business decisions that include making no decision, taking no action, or making decisions for personal family benefits).

497. Specifically, the evidence showed the following conduct of Dundon and Zutter was in breach of their fiduciary duties and fails the entire fairness standard[17]:

| Withholding funds requested by AAF | Dundon and Zutter | FOF ¶¶ 243, 245, 253, 260, 261, 262, 280 |
|---|---|---|
| Cutting key aspects of AAF operations against advice, including spending on marketing and advertising, player safety and accommodations, and technology development | Dundon and Zutter | FOF ¶¶ 244, 246, 262 |
| Insisting that the Fowler release be approved and executed | Dundon and Zutter | FOF ¶¶ 273-274 |
| Failing to seek out, consider, follow-through, or accept other funding opportunities, including from previously-negotiated agreements or existing shareholders | Dundon and Zutter | FOF ¶¶ 316-325 |
| Making false or misleading disclosures, or making material omissions, to other board members and shareholders, including true intentions regarding the $250 million commitment and holding of no board meetings | Dundon and Zutter | FOF ¶¶ 345, 348, 359 |

---

[17] The Court also previously and properly addressed that these identified breaches of fiduciary duty are not duplicative of the breach of contract claim, with the exception of Dundon's "failure to provide the funding as promised," which Trustee has removed. *See* ECF No. 292-43 to 292-46; ECF No. 281-19 to 281-21.

| | | |
|---|---|---|
| Working towards jettisoning AAF for an asset deal or pre-packaged bankruptcy | Dundon and Zutter | FOF ¶¶ 142, 1-271, 279 |
| Causing and/or threatening to cause breaches of existing agreements or failure to complete previously-negotiated contracts, including key media and operational deals | Dundon and Zutter | FOF ¶¶ 299-309 |
| Threatening and/or leveraging funding to dictate actions of AAF employees, non-voting directors, and shareholders | Dundon and Zutter | FOF ¶¶ 247-248 |
| Preferentially paying DCP fees and PwC fees that were for tax and restructuring advice to benefit DCP | Dundon and Zutter | FOF ¶¶ 337-338 |
| Providing free advertising from AAF to benefit Dundon's other companies and contacts | Dundon and Zutter | FOF ¶¶ 334-336 |
| Ending operations in a manner that would not allow for potential continuation of the AAF and would not preserve the assets of AAF including the player contracts | Dundon and Zutter | FOF ¶¶ 339-364 |
| Refusing to consider relatively small additional amounts of expenses to allow for preservation of good will and assets, time to obtain additional investments, or for a 12-week plan and avoid Chapter 7 bankruptcy | Dundon and Zutter | FOF ¶¶ 355-358 |

498.     New cases cited in the Defendants' Trial Brief arguing for the application of the business judgment rule, or attempting to limit the actions of Dundon and Zutter that are subject to the entire fairness review, do not support Defendants' arguments. In *Maffei v. Palkon*, the Supreme Court of Delaware dealt with a change of corporate domicile that had alleged impacts on liability of shareholders and directors, which is not analogous to the facts of this case. No. 125,2024, 2025 WL 384054, at *2 (Del. Feb. 4, 2025). But *Maffei* does confirm that entire fairness review is triggered by "[c]lassic examples of director self-interest in a business

transaction involv[ing] either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." *Id.* at *17. Those "classic examples" are implicated here and support use of the entire fairness review. In *Orman v. Cullman*, the Court of Chancery of Delaware was addressing a specific situation of the role and independence of a special committee that had approved a merger deal, but still noted that "[a] controlling or dominating shareholder standing on both sides of a transaction . . . bears the burden of proving its entire fairness" and did not dismiss claims alleging breach of the duty of loyalty where the facts made it "reasonable to question the independence and disinterest of the majority" of the board. 794 A.2d 5, 15, 20 (Del. Ch. 2002). The evidence above shows that Dundon and Zutter were affirmatively not independent or disinterested.

499.    The advice of bankruptcy professionals defense – which was not pled and is addressed further in Section II.T, *supra* – is also not supported by the evidence. No bankruptcy professional testified regarding any advice given to Dundon or Zutter that necessitated the actions they took to plunge the AAF into a Chapter 7 liquidation without preservation of assets. Dundon testified that it was his decision to place the AAF into bankruptcy, and both Dundon and Zutter signed the consent to do so. *See* FOF ¶ 358. The email correspondence at that time shows that Zutter was the decisionmaker and dictating the bankruptcy strategy to the professionals, and not the other way around. *See* FOF ¶¶ 353-354. And ultimately, Dundon's and Zutter's decisions to benefit DCP by refusing to provide "even a penny more" to allow for Chapter 11 bankruptcy, and to release the players, would have steered any advice towards the outcome Dundon and Zutter wanted – to just be done with the AAF.

500.    Therefore, Dundon and Zutter each breached their fiduciary duties to the AAF.

F.    **Count XI – Common Law Fraud; Fraudulent Misrepresentation; Fraud by Non-Disclosure; Constructive Fraud (Against Defendant Dundon)**

    1. **Conclusions of Law**

501.    Texas law governs the fraud claims, as the misrepresentations at issue were made within the territorial boundaries of the State of Texas.

502.    "The elements of a fraudulent misrepresentation claim are as follows: '(1) the defendant misrepresented a material fact; (2) the defendant knew the material misrepresentation was false or made it recklessly without any knowledge of its truth; (3) the defendant made the false material representation with the intent that it should be acted upon by the plaintiff; and (4) the plaintiff justifiably relied on the representation and thereby suffered injury.'" ECF No. 54 at 38-39 (quoting *United Tchr. Assocs. Ins. Co. v. Union Lab. Life Ins. Co.,* 414 F.3d 558, 566 (5th Cir. 2005) (citing *Ernst & Young, L.L.P., v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex. 2001))).

503.    A statement is fraudulent if "the speaker knew it was false when made or the speaker made it recklessly without knowledge of the truth." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998); *see also* ECF No. 54 at 39 (citing *In re Mercer,* 246 F.3d 391, 407 (5th Cir. 2001). "If a defendant represents that he will do something but has no intention to do so, his representation is fraudulent." ECF No. 54 at 39 (citing *Mercer*, 246 F.3d at 407-08).

504.    "A false promise of future performance is actionable as a misrepresentation 'if the promise was made with no intention of performing at the time it was made.'" ECF No. 54 at 40 (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex. 2009)); *see also Kenneco Energy, Inc.*, 962 S.W.2d at 526; *Mercer,* 246 F.3d at 407-08; *Aquaplex, Inc.,* 297 S.W.3d at 774.

505.     "'Fraud by non-disclosure, a subcategory of fraud, occurs when a party has a duty to disclose certain information and fails to disclose it.'" ECF No. 54 at 43 (quoting *CBE Grp., Inc. v. Lexington L. Firm*, 993 F.3d 346, 353 (5th Cir. 2021) (quoting *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, L.L.C.*, 572 S.W.3d 213, 219 (Tex. 2019))). The elements of fraud by non-disclosure are "(1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the nondisclosure, which resulted in injury." ECF No. 54 at 43 (quoting *CBE Grp., Inc.*, 993 F.3d at 353 (5th Cir. 2021) (quoting *Bombardier Aerospace Corp*, 572 S.W.3d at 219-20)).

506.     A duty to disclose exists when (1) there is a fiduciary relationship, (2) a defendant makes a partial disclosure that creates a false impression; or (3) a party knows, or should have known, its prior statement was false. ECF No. 54 at 43-45 (quoting *CBE Grp., Inc.*, 993 F.3d at 353 (5th Cir. 2021) (quoting *Bombardier Aerospace Corp*, 572 S.W.3d at 219-20), quoting *Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 635 (Tex. App.—San Antonio 1993, writ denied), and citing *Lang v. Lee,* 777 S.W.2d 158, 164 (Tex. App.—Dallas 1989, no writ)); *Coldwell Banker Whiteside Assocs. v. Ryan Equity Partners, Ltd.,* 181 S.W.3d 879, 888 (Tex. App.—Dallas 2006, no pet.).

507.     Information is material if a reasonable person would consider it important and would be induced to act on it in determining how to proceed in the matter. *See White v. Pei*, 452 S.W.3d 527, 538 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 478-79 (Tex. App.—Fort Worth 2004, no pet.)); *Lundy v. Masson*, 260 S.W.3d 482, 493 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (quoting

*Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 613 (Tex. App.—Waco 2000, pet. denied)).

508.     Constructive fraud is "defined as: 'the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests.'" ECF No. 54 at 45 (quoting *Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex. 1964)). "What differentiates constructive fraud from actual fraud is intent, or the lack thereof." ECF No. 54 at 45 (citing *In re Soza,* 542. F.3d 1060, 1072 (5th Cir. 2008) (Wiener, J., concurring)).

509.     Constructive fraud may occur where one violates a fiduciary duty…." *In re Estate of Kuykendall*, 206 S.W.3d 766, 770–71 (Tex. App.—Texarkana 2006, no pet.).

510.     The findings of fact regarding the representations identified in Sections I.D.3, and II.F.2, *supra* establish all of the elements of common law fraud by a preponderance of the evidence. The Court therefore finds that Dundon committed fraud against Debtors.

### 2.  Argument

511.     The parties have already briefed the legal issues related to fraud, and the Trustee's prior briefing can be found at ECF No. 30, pp. 40-48 and ECF No. 196, pp. 34-35.

512.     The evidence that Dundon made false statements to Ebersol includes the following: (1) Dundon was making a $250 million funding commitment to the AAF (*see* FOF ¶¶ 165-212); (2) Dundon was going to follow through on his $250 million funding commitment to AAF (*see* FOF ¶¶ 101-106, 121-132); (3) Dundon would keep the AAF operating for a long time and the AAF did not need additional outside funding (*see* FOF ¶¶ 165-212); and (4) the deal, as to the Oral Agreement, had not changed when Dundon initially presented Ebersol the $70 million Term Sheet (*see* FOF ¶¶ 130-132).

513.     When Ebersol initially talked to Dundon, he was only looking for a $10 million bridge loan, not to sell the AAF or relinquish control. *See* FOF ¶¶ 92, 106. Thus, Dundon's

representations to Ebersol were critical and material to the decision to enter the Oral Agreement and provide majority ownership and control to Dundon, as they fundamentally shaped the transaction. *See* FOF ¶¶ 130-132; *Lundy v. Masson*, 260 S.W.3d 482, 493 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (quoting *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 613 (Tex. App.—Waco 2000, pet. denied)) ("'Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question.'").

514.    Dundon has now stated that the $250 million funding commitment wasn't a true commitment at all – he could change his mind at any time and it had unstated conditions – but he never revealed that position, or any conditions, to Ebersol or anyone else with AAF. *See* FOF ¶¶ 165-212. These were failures to disclose where there was a duty to disclose – initially because there was a partial disclosure that created a false impression, and later because Dundon owed a fiduciary duty to the AAF[18] and knew, or should have known, his prior statement was false. Further, a representation to do something without an intention to do so is fraudulent, if Dundon never intended to provide the full $250 million, or at minimum knew there was a high probability that he would not, then these statements were all knowingly, or at least recklessly, false. *Kenneco Energy, Inc.*, 962 S.W.2d at 526; *Mercer,* 246 F.3d at 407-08; *Aquaplex, Inc.,* 297 S.W.3d at 774.

515.    Moreover, Dundon repeatedly endorsed and affirmed his $250 commitment

---

[18] Defendants misstate in their Pre-Trial Brief that "[a] special relationship necessary to create a confidential or fiduciary relationship must predate and be apart from the agreement sued upon," in an effort to avoid liability. ECF No. 298 at 43 (citing *Pitts v. Rivas*, 709 S.W.3d 517 (Tex. 2025)). *Pitts* only addresses the timing of when an informal fiduciary relationship can be formed. 709 S.W.3d at 528. Regardless, here, Dundon made his false statements and concealments not only around the time the fiduciary duty was formed, but also repeatedly after there was an existing fiduciary duty, as set forth above.

promise throughout his time in control of the AAF, both publicly and internally, each time creating a false impression, knowing his prior statement was false, and now doing so despite the fiduciary duties he owed to AAF. *See* FOF ¶¶ 165-212.

516.     Dundon made another material false statement to Ebersol when Dundon stated he would ensure Ebersol and his group of original investors retained at least a portion of their original equity stake. *See* FOF ¶ 110. In direct contrast to this statement, Walter Ballard, from Dundon's tax firm, PwC, testified that Dundon directed him to determine how to structure a transaction involving the AAF that would result in all of the assets being acquired and placed into a pass-through entity wholly owned by Dundon immediately after the Oral Agreement. *See* FOF ¶¶ 1-269. If Dundon's intention was always to liquidate the AAF, convert it to assets, and create new entities to hold those assets, then his assurances that he would ensure investors would maintain their equity were all knowingly, or at least recklessly, false. *Kenneco Energy, Inc.*, 962 S.W.2d at 526; *Mercer,* 246 F.3d at 407-08; *Aquaplex, Inc.,* 297 S.W.3d at 774.

517.     In *Lundy v. Masson*, the president of a corporation made assurances to a shareholder in discussions that took place as part of the president's job interview, stating there was "no problem" with the status of a patent that the corporation intended to use as its initial main product and the corporation could do whatever they wanted with it. 260 S.W.3d at 489. The president made these assurances despite his knowledge that an agreement was in place restricting use of the patent, as he had personally participated in negotiating that agreement. *Id.* at 493. Observing that fraudulent intent is not subject to direct proof and must invariably be proven from circumstantial evidence, the court in *Lundy* found that, at a minimum, the evidence supported an inference that the president acted recklessly in making these assurances and that he intended the shareholder to rely on them. *Id.* (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d

432, 435 (Tex. 1986)).

518.    Just as the president of the corporation in *Lundy* made knowingly false assurances critical to the shareholder's decision, Dundon made knowingly false assurances to Ebersol that were central to Ebersol's decision to enter the Oral Agreement and give Dundon majority ownership and control of the AAF. As the *Lundy* court recognized, fraudulent intent must often be proven from surrounding circumstances. *Id.* Dundon made repeatedly false statements knowingly and recklessly, including reassuring Ebersol that the deal as to the Oral Agreement had not changed when Dundon initially presented Ebersol the Term Sheet that included a reference to $70 million, which Dundon assured Ebersol was just a mechanism to allow him to provide the initial funding. *See* FOF ¶ 130-132.

519.    Regarding the failures to disclose, in *White v. Pei*, certain shareholders of a corporation transferred a corporation's assets to their new company, without informing the other shareholders. 452 S.W.3d at 537. The court concluded that, because these shareholders had previously disclosed certain false facts regarding the existing corporation's financial status and operating condition, creating the impression that the corporation was a going concern, they had a duty to disclose to the "whole truth" regarding the asset sale to the new company to the other shareholders. *Id.* at 538. Just as in *White*, Dundon's partial disclosure of his $250 million funding commitment – but without the caveats Dundon was holding only in his own mind – created the false impression to Debtors that the AAF had the funding necessary to get it through its inaugural season and for years to come, causing it to take actions such as agreeing to give Dundon control and discontinuing its search for other capital. *See* FOF ¶¶ 321, 332-333. As in *White*, Dundon's failure to disclose his intentions, and gaining control based upon that failure to disclose, resulted in there being no time or ability for the AAF take corrective action. *Id.* at 539; *see* FOF ¶¶ 112,

220, 348.

520.    Further, regardless of his intent, Dundon's conduct constitutes constructive fraud, as Dundon deceived the Debtors and they suffered as a result. *See Houle v. Casillas,* 594 S.W.3d 524 (Tex. App.—El Paso 2019, no pet.) (breach of fiduciary duty arising out of a failed business venture where defendant diverted funds for personal use and misrepresented financial state of the business); *Welder v. Green,* 985 S.W.2d 170, 173 (Tex. App.—Corpus Christi 1998, pet. denied) (finding failure to fully disclose critical financial information and that "[t]he misappropriation by one partner for his own use the property of the partnership is constructive fraud") *See also Veale v. Rose,* 657 S.W.2d 834, 837 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

521.    None of the evidence at trial should change the Court's prior determinations that there is support for justifiable reliance. *See* ECF No. 54-23 through 54-24 and 292-32. Further argument regarding justifiable reliance, which applies in the same manner to promissory estoppel, is set forth in Section II.D.2, *supra*.

522.    Therefore, Dundon is liable for fraud as to the AAF.

**G.     Count XII – Fraud in the Inducement (Against Defendant Dundon)**

      **1.  Conclusions of Law**

523.    Texas law governs Plaintiffs' Fraud in the Inducement claim as to the Oral Agreement.

524.    To establish a claim for fraud in the inducement "'the plaintiff must show that he would not have entered into a contract in the absence of the misrepresentation.'" ECF No. 54 at 47-48 (quoting *Bohnsack v. Varco, L.P.,* 668 F.3d 262, 277 (5th Cir. 2012) (internal quotations omitted); *see also Int'l Bus. Mach Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019).

525.    "[A] fraudulent-inducement claim requires proof that: (1) the defendant made a

material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury." *Int'l Bus. Mach. Corp.*, 573 S.W.3d at 228.

526.    "In a fraudulent-inducement claim, the 'misrepresentation' occurs when the defendant falsely promises to perform a future act while having no present intent to perform it." *Int'l Bus. Mach. Corp.*, 573 S.W.3d at 228.

527.    "'[P]arties challenging contracts as fraudulently induced may rely on evidence of oral promises or agreements to support their claims.'" ECF No. 54 at 48 (quoting *LeTourneau Techs. Drilling Sys., Inc. v. Nomac Drilling, L.L.C.,* 676 F. Supp. 2d 534, 542 (S.D. Tex. 2009)). Parties can rely on pre-agreement representations in fraudulent inducement claims, so long as Plaintiffs demonstrate justifiable reliance. *See* ECF No. 54 at 48 (citing *LeTourneau,* 676 F. Supp. 2d at 542).

528.    The Court finds that the factual findings set out in Section I.D, *supra* establish that ESMG was fraudulently induced to agree to the Oral Agreement by preponderance of the evidence. The Court adopts its findings establishing common law fraud above and further finds that Plaintiffs proved the existence of a binding agreement in the Oral Contract. This is all that is required for a fraud in the inducement claim. *See, e.g., In re Primera Energy, LLC,* 579 B.R. 75, 160-61 (Bankr. W.D. Tex. 2017) (Gargotta, J.).

## 2.  Argument

529.    The parties have already briefed the legal issues related to fraudulent inducement as to the Oral Agreement, and the Trustee's prior briefing can be found at ECF No. 30, pp. 50-53 and ECF No. 196, pp. 34-35.

530.    Dundon made false representations of material facts to Debtors, including those

set forth in Section I.D that took place prior to the entry of the Oral Agreement, to induce them to enter into and comply with the terms of the Oral Agreement. Those included statements as to the amount Dundon was committing ($250 million) pursuant to the Oral Agreement, that Dundon's capital would keep the AAF operating for a long time, and that the AAF did not need additional outside funding. *See* FOF ¶¶ 165-212. This also includes the statements, following circulated of the Term Sheet draft, that nothing in the Term Sheet altered the Oral Agreement or Dundon's overall commitment for $250 million. *See* FOF ¶ 130-132.

531.    The evidence supports that the AAF would not have entered into the Oral Agreement in the absence of the misrepresentation. Ebersol stated this explicitly. *See* FOF ¶ 130. And surrounding circumstances show that only an investment in the range of the $250 million would support the majority ownership stake and total control that Dundon was given. Projections provided to Dundon showed the League needed $250 million to get to profitability (*see* FOF ¶ 225), and a $250 million investment for 75% majority control is consistent with valuations of the AAF around the February 2019 time period (*see* FOF ¶¶ 226-227).

532.    The case of *Carroll v. Farooqi (In re Carroll)* is instructive. 464 B.R. 293 (Bankr. N.D. Tex. 2011), *aff'd*, 486 B.R. 718 (N.D. Tex. 2013). In *Carroll*, a prospect entered into an option agreement with a debtor to purchase a franchise interest in a restaurant after agreeing to a $150,000 purchase price. *Id.* at 302. Due to prospect's concerns regarding timing, the agreement was revised to include an opt-out provision that would allow the return of $25,000 if prospect didn't obtain the necessary financing. *Id.* at 302-3. Debtor repeatedly assured the prospect that the 30-day period in the option agreement did not apply to the opt-out provision (meaning that even after 30 days, if financing could not be obtained, the $25,000 would be returned), but also that he would disclose the necessary information for prospect to obtain

financing during the 30-day option period. *Id.* at 303. Despite the prospect's repeated requests, the debtor did not provide any additional information until the final day of the 30-day option period. *Id.* at 304. And when the prospect (as a result) failed to obtain financing, he requested a refund, but the debtor refused, arguing the opt-out provision was limited to a 30-day time period. *Id.* at 306-7. The *Carroll* court concluded that the debtor fraudulently induced prospect to enter the option agreement by stating that: (1) he would fully and promptly disclosure of information for prospect to obtain financing; and (2) the opt-out was not limited to the 30 days otherwise provided for in the option agreement. *Id.* at 317, 323. The court found that prospect would not have entered into the option agreement but for these material representations of the debtor, noting testimony of the debtor's repeated assurances to the prospect and the prospect's stated concerns regarding the opt-out provision. *Id.* at 317. The court state that "[i]t appear[ed] that [debtor] said what he needed to say to [prospect] to sign the Option Agreement irrespective of the truth of his statements" and debtor "lured [prospect] in with the promise" to get what debtor wanted. *Id.* at 318.

533.     Similarly, in this case, Dundon made repeated assurances to the Debtors, through Ebersol, regarding his intentions and financial commitment to the AAF, including specifically in response to questions regarding the $250 million amount of the total commitment. *See* FOF ¶¶ 130-132.

534.     The mechanics of this case are also similar to the facts and findings in *In re Primera Energy, LLC,* wherein this Court determined that Defendants' repeated statements as to how funds would be used caused Plaintiffs to agree on terms they otherwise would not have. 579 B.R. 75, 145-146 (Bankr. W.D. Tex. 2017). Defendants argued here, as there, that any oral representations were not material, mere projections and estimates of future events or "sales

puffing," and were not made in bad faith. *Id.* at 144. However, because the Court found that the Plaintiffs relied on these statements, and that these statements would likely affect the conduct of a reasonable person's decision in the transaction, what defendants characterized as "sales puffing" was instead a material misrepresentation. *Id.* at 145-146.

535.     None of the evidence at trial should change the Court's prior determinations that there is support for justifiable reliance. *See* ECF No. 54-23 through 54-24, 54-49 through 54-41, and 292-32. Further argument regarding justifiable reliance, which applies in the same manner to promissory estoppel, is set forth in Section II.D.2, *supra*.

536.     Therefore, Dundon is liable for fraudulent inducement of the Oral Agreement.

**H.     Count XIII – Negligent Misrepresentation (Against Defendant Dundon)**

**1.  Conclusions of Law**

537.     Count XIII is alternative to Counts XI and XII.

538.     Texas law governs the negligent misrepresentation claim.

539.     "The elements of negligent misrepresentation are: '(1) the representation is made by the defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or comm unicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.'" ECF No. 54 at 51 (quoting *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

540.     A claim for negligent misrepresentation can be based on a failure to disclose information when there is a duty to do so. *Brown & Brown v. Omni Metals, Inc.*, 317 S.W.3d 361, 384 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). "A duty to disclose may arise in four situations: (1) when there is a fiduciary relationship; (2) when one voluntarily discloses

information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression." *Id.*

541.    In the alternative, the findings of fact set out above establish all of the required elements of negligent misrepresentation against Dundon.

## 2.   Argument

542.    The parties have already briefed the legal issues related to negligent misrepresentation, and the Trustee's prior briefing can be found at ECF No. 30, pp. 55-56 and ECF No. 196, pp. 24-27.

543.    Alternatively, Dundon spoke with unreasonable disregard for the truth of the statements outlined in Sections I.D and I.F, *supra* rendering Dundon's representations at least negligent.

544.    These statements were made in the course of business or a transaction in which Dundon had a pecuniary interest because they were made initially as part of the agreement that gave Dundon majority ownership and control of the AAF, and then after to allow him to continue in that position. *See, e.g.*, FOF ¶¶ 199-205. They also were provided for the guidance of others, specifically for the AAF in determining whether to agree to give Dundon majority ownership and control, and then to cease looking for additional funding and allow Dundon to continue to have control. *See, e.g.*, FOF ¶¶ 315-328.

545.    The Court already correctly decided that it would not apply the Restatement (3d) approach to negligent misrepresentation in the context of business negotiations, and that the

Trustees alleged statements by Dundon could support a negligent misrepresentation claim.[19] *See* ECF No. 292-37 to 292-39. The evidence at trial, set forth herein and in Sections I.D and I.F, *supra*, supports the Trustee's allegations.

546.     As this Court noted in *In re Primera Energy, LLC,* the elements for negligent misrepresentation are identical for those of fraud with "the addition that plaintiff show that the defendant did not exercise reasonable care or competence in obtaining or communicating information that was false and supplied for the guidance of others, rather than meeting a heightened requirement of knowledge or recklessness regarding the falsity." 579 B.R. at 162; *see also Federal Land Bank Ass'n v. Sloane,* 825 S.W.2d 439, 442 (Tex. 1991). Here, Defendants did not exercise reasonable care or competence in communicating their continuing intended financial investment and commitment to Plaintiffs and the other statements outlined in Sections I.D and I.F, *supra.*

547.     Therefore, Dundon is liable for negligent misrepresentation to the AAF.

I.       **Count XV – Unjust Enrichment (Against Defendants Dundon, Zutter, DCP)**

           **1.  Conclusions of Law**

548.     Count IV is alternative to Count I.

549.     Delaware law applies to the unjust enrichment claim.

550.     Unjust enrichment is a quasi-contractual claim when pleaded in the alternative to

---

[19] The new cases cited in Defendants' Pre-Trial Brief are inapposite. *Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 979 (N.D. Tex. 2014) found both no duty to disclose – which Dundon did have a duty to disclose here – and found that the statements were promises of future conduct as to anticipate success and safe management of an investment – which is different from affirmative statements such the AAF being funded for several years and not needing any other capital. *Lindsey Constr., Inc. v. AutoNation Fin. Servs., LLC*, 541 S.W.3d 355, 366 (Tex. App.— Houston (14th Dist.) 2017), dealt with statements regarding intention to purchase prior to the purchase being made, whereas here, Dundon made numerous statements *after* the oral agreement was consummated such the AAF being funded for several years and not needing any other capital.

a breach of contract claim "[w]hen there is doubt surrounding the enforceability or the existence of the contract." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. Civ.A. 762-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005); *see also 1 Oak Priv. Equity Venture Cap. Ltd. v. Twitter, Inc.*, C.A. No. N14C–10–186 EMD CCLD, 2015 WL 7776758, at *14 (Del. Super. Ct. Nov. 20, 2015).

551.    "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Wells Fargo Bank, N.A. v. Est. of Malkin*, 278 A.3d 53, 69 (Del. 2022) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

552.    "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec*, 991 A.2d at 1130. The "impoverishment" element "[d]oes not require that the plaintiff seeking a restitutionary remedy suffer an actual financial loss, as distinguished from being deprived of the benefit unjustifiably conferred upon the defendant." *Id.* at 1130 n.37 (citing *Metcap Securities LLC*, 2009 WL 513756, at *5 n. 26).

## 2. Argument

553.    The parties have already briefed the legal issues related to unjust enrichment, and the Trustee's prior briefing can be found at ECF No. 30, pp. 56-57, ECF No. 196, pp. 44-45, and ECF No. 197, pp. 15-16.

554.    In the alternative to the award of damages sought on the various other causes of action, the Court can find that Dundon, Zutter, and DCP were unjustly enriched through (1) not having to pay the required remaining amount of the $250 million commitment; (2) the amounts that DCP received as payment from AAF for services that benefitted DCP (and through it,

Dundon and Zutter), in particular the DCP "transaction costs" and the payments to PwC and Bracewell (*see* FOF ¶¶ 337-338, 351); and (3) the advertising use to benefit DCP, Dundon, and Zutter's other entities and relationships (*see* FOF ¶¶ 334-336).

**J.      Count XVI – Disallowance of Defendants' Claims (Against Defendants Dundon and DCP)**

**1.  Conclusions of Law**

555.    "Sections 501 and 502 of the Bankruptcy Code govern the substantive basis for allowance of a claim, and Federal Rule of Bankruptcy Procedure Rule 3001 governs the procedure by which the Court determines whether a filed Proof of Claim is allowed." *In re Ali*, No. 13-50724-CAG, 2015 WL 4611343, at \*30 (Bankr. W.D. Tex. July 23, 2015) (Gargotta, J.).

556.    Objections made in adversary proceedings are expressly permitted by Federal Rule of Bankruptcy Procedure 3007(b). FED. R. BANKR. P. 3007(b) ("In objecting to a claim, a party in interest must not include a demand for a type of relief specified in Rule 7001 but may include the objection in an adversary proceeding.").

557.    The Court finds that DDFS Limited Partnership, and not either DCP or Dundon, actually paid the $69.7 million to the AAF that forms the basis of DCP's and Dundon's claims. *See* FOF ¶¶ 366-369.

558.    The Court further finds that, because Dundon and DCP failed to take the necessary actions to make the Term Sheet a binding contract, DCP was never a party to any agreement with the AAF. *See* Case No. 22-05077, ECF No. 171 at 13 ("Because DCP failed to sign the Term Sheet, the Court finds that there is no binding written contract to provide DCP with standing to pursue this case."). The Court is bound to follow its judgment in consolidated Case No. 22-05077.  DCP has no standing to assert a proof of claim, for rescission or otherwise in this bankruptcy.

559. A claim should be disallowed to the extent "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1).

560. "[T]he burden of persuasion under bankruptcy claims procedure always lies with the claimant, who must comply with Bankruptcy Rule 3001 by alleging sufficient facts in the proof of claim to support the proof of claim." *In re GDC Technics, LLC*, 643 B.R. 417, 426 (Bankr. W.D. Tex. 2022) (Gargotta, J.). A proof of claim constitutes *prima facie* evidence of the claim's validity and amount only if the claim complies with the Rules, including Rule 3001. FED. R. BANKR. P. 3001(f). Rule 3001(c)(1) requires that "[i]f a claim or an interest in the debtor's property securing the claim is based on a writing, the creditor must file a copy with the proof of claim." *Id.*, 3001(c)(1).

561. "Although there is an initial presumption of validity that attaches to all claims, claims asserted by insiders or fiduciaries demand closer scrutiny." *In re Mid-American Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002)).

562. "If the objecting party produces evidence to rebut the claim, the burden of persuasion shifts back to the claimant to establish the validity and amount of the claim by a preponderance of the evidence." *GDC Technics*, 643 B.R. at 426.

563. The Court finds that both the Dundon and DCP Claims must be disallowed. The evidence establishes that the claim Dundon and DCP allege for $70 million is owned, if by anyone, by DDFS, which has not asserted a claim. Dundon further failed to establish any basis for his claimed indemnity obligation (whether in the Dundon Claim or at trial) and further failed to allege or demonstrate any harm or damage amount due to "any other harm or damages suffered by him in connection with his relationship with the debtor."

564.     The Court further finds that the Dundon and DCP claims are disallowed pursuant to Bankruptcy Code section 502(d).

565.     The Court further finds, in the alternative, that to the extent Dundon or DCP have a claim for $70 million, such claim must be mandatorily subordinated because such claim relates to the rescission of the purchase or sale of a security (in ESMG), or for reimbursement or contribution on account of such a claim. 11 U.S.C. § 510(b).

## 2.  Argument

566.     The parties have already briefed the legal issues related to disallowance of Defendants' claims, and the Trustee's prior briefing can be found at ECF No. 196, pp. 48-49.

567.     The Dundon claim for indemnity and "any other harm or damages suffered by him in connection with his relationship with the debtor" should be disallowed on its face— Dundon failed to offer any evidence (in the Dundon Claim or at trial) that would allow the Court (a) to know on what basis Dundon seeks indemnification, (b) on what theory Dundon asserts "other harm or damages," and thus there is no basis on which the Court can rely to liquidate that portion of the Dundon claim.

568.     The Dundon and DCP Claims for $70 million are likewise unsupported and unsupportable. Neither Dundon nor DCP transferred or invested any money to or with the Debtors. Moreover, neither Dundon nor DCP (i) established (by their proofs of claim or at trial) any basis to support allowing a claim for a return of investment in any amount or (ii) filed or presented any counterclaims or asserted any theory of offset against the Debtors.

569.     To the extent (but only to the extent) the Court determines Dundon or DCP has supported its claim for $70 million, that claim is subject to and must be mandatorily subordinated pursuant to section 510(b), as any such claim necessarily relates to the purchase and sale of a security (that being ownership of ESMG). Equityholder claims are subordinated in this matter

in order to prevent the equityholder from getting "'the best of both worlds—the right to share in profits if [the debtor] succeeded and the right to repayment as a creditor ... if it failed.'" *See, e.g., In re Am. Hous. Found.*, 499 B.R. 517, 539–40 (Bankr. N.D. Tex. 2013) (quoting *Liquidating Trust Comm. of the Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio)*, No. 12–3065 TEC, 2012 WL 5467754, at \*6 (Bankr.N.D.Cal. Nov. 8, 2012) (quoting *In re VF Brands, Inc*., 275 B.R. 725, 728 (Bankr. D. Del. 2002)).

## K.    Count XVII – Equitable Subordination (Against Defendants Dundon and DCP)

### 1.   Conclusions of Law

570.    Count XVII is alternative to Count XVI. Because the Court has already determined it will disallow Dundon's and DCP's claims, it makes the following findings regarding equitable subordination alternatively.

571.    Section 510(c) of the Bankruptcy Code codified the "judicially-created doctrine of equitable subordination [which] developed as a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt." *Fabricators, Inc. v. Technical Fabricators, Inc. (In the Matter of Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir. 1991); 11 U.S.C. § 510(c).

572.    Equitable subordination is typically applied in cases involving: (1) insiders or fiduciaries who misuse their control to disadvantage other creditors, (2) claimants who exert control over a debtor for personal gain, and (3) misrepresentation or fraud that harms creditors. *Matter of Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 357 (5th Cir. 1997).

573.    The Fifth Circuit has enunciated a three-prong test for equitable subordination: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Fabricators, Inc.*, 926 F.2d at 1464–65.

574.    "A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Fabricators, Inc.*, 926 F.2d at 1465 (If the claimant is "a sole director, or one of a smaller number vested with certain powers, . . . his acts [are] subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness." *Pepper v. Litton*, 308 U.S. 295, 307 n.14 (1939).

575.    Here, Dundon, Zutter, and DCP were all insiders. *See* FOF ¶¶ 228-230. After February 14, 2019, Dundon and Zutter were in complete control of ESMG and were the only voting board members of ESMG. *See* FOF ¶¶ 228-230.

576.    There are three generally recognized categories of misconduct which may warrant subordination: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego. *Fabricators, Inc.*, 926 F.2d at 1467.

577.    This Court has found that Dundon, who owned and controlled DCP, and Zutter, Dundon's partner in DCP, committed fraud, willful and egregious violations of their fiduciary duties to ESMG, and knowingly denied funding to the league (whether by Dundon, entities Dundon controlled, or third parties) even as Dundon, Zutter, and DCP knew or should have known that the league required funding over and above $70 million. Consequently, the Court finds that in the event they are not disallowed, the DCP and Dundon Claims should be and hereby are equitably subordinated to every other claim and interest ultimately allowed against the Debtors' Estate.

### 2.  Argument

578.    To the extent the Court determines to allow the DCP or Dundon Claims in any amount, the Court should award the Debtors the equitable remedy of subordination pursuant to Bankruptcy Code section 510(c)(1). Dundon is both an insider of and a fiduciary to the Debtors.

His proven conduct and misconduct meets all the elements courts have considered in awarding such remedies. *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d at 357. Dundon had complete control of the Debtors as of February 14, 2019 (at his insistence), and thereafter he used and abused such control by, among other things, attempting to ready the league in a manner that was advantageous for his long-term gain while he and Zutter denied duly earned vendors payments and required employees to charge league expenses on personal credit cards. *See* FOF ¶ 261. To the extent Dundon now claims a refund is due for the monies DDFS transferred to the league, any such refund should be last in line.

### L.     Trustee's Damages

#### 1.     Conclusions of Law

##### a)     Generally Applicable Standards

579.     Under both Texas and Delaware law, because courts try to avoid leaving an injured party without a recovery, the finder of fact is not required to determine damages with precision or certainty. In Texas, and therefore as to Trustee's contract, good faith and fair dealing, promissory estoppel, fraudulent inducement, negligent misrepresentation, and fraud claims, the rule is:

> if an injured plaintiff has produced the best evidence available, and if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be denied a substantial recovery because the exact amount of the damage is incapable of ascertainment.

*Hindman v. Tex. Lime Co.*, 157 Tex. 592, 601, 305 S.W.2d 947, 953 (1957) (quoting *Shannon v. Shaffer Oil & Ref. Co.*, 51 F.2d 878, 881 (10th Cir. 1931)) (cleaned up); *see also Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 277 n. 59 (Tex. 2004), *holding modified on other grounds by Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474 (Tex. 2014).

580.     Under Delaware law, applicable to Trustee's fiduciary duty claims, the standard

is equally liberal:

> Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly. … Consequently, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate. …Plaintiffs must prove ... damages by a preponderance of the evidence. Delaware law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages.

*In re TransCare Corp.*, No. 20-CV-06274 (LAK), 2021 WL 4459733, at \*12 (S.D.N.Y. Sept. 29, 2021), *aff'd*, 81 F.4th 37 (2d Cir. 2023).

581.    Bankruptcy courts exercise this broad discretion within the confines of the Bankruptcy Code.  *See In re El Paso Refinery, L.P.*, 244 B.R. 613, 619 (Bankr. W.D. Tex. 2000).

582.    Under section 704(a)(1), the Trustee accumulates property of the bankruptcy estate and reduces it to money, through litigation if necessary.  11 U.S.C. § 704(a)(1).  Those claiming a right to payment file proofs of their claim or interest, which the Trustee is charged with reviewing. 11 U.S.C. § 704(a)(5).  Bankruptcy Code section 507 assigns payment priority to these claims and interest.  And Bankruptcy Code section 726 establishes how property of the estate will then be distributed and in what order. 11 U.S.C. § 726.  For distribution purposes the Bankruptcy Code provides even for the payment of valid tardy.  11 U.S.C. 726(a)(3).  After all distributions in order of priority, section 726 provides for payment of any excess to the debtor. Chapter 7 thus provides an ordered process to distribute the entire estate after the estate is determined. A bankruptcy court's discretion to fashion remedies, which is substantial in equity, is not affected by how distribution may later occur.[20]

---

[20] In considering remedies, the Court may consider that the total value of the combined claims reflected on the claims register is approximately the same as the amount Ms. Desai found to be the enterprise value of league at the time Defendant Dundon became involved.  The claims register shows approximately $145 million in claims, not including investor losses, after eliminating duplicates and denied claims, and disregarding claim no. 214 and the objected-to DCP and Dundon claims. Case No 19-50900-CAG, ECF 282.

583.    The types of damages available to Trustee differ by claim, but fall broadly into three categories: expectancy or "benefit of the bargain" damages, actual damages, and reliance damages.

### b)    Expectancy or Benefit of the Bargain Damages

584.    Benefit of the bargain or expectancy damages are measured by the amount a party expected to benefit as a result of the bargain. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). They "measure the difference between the value as represented and the value received." *Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 112 (Tex. App.—San Antonio 2011, pet. denied).

585.    Trustee may seek expectancy or benefit of the bargain damages if he prevails on his breach of oral contract claim (Count I), good faith and fair dealing claim (Count III), or fraudulent inducement claim (Count XII). *Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 193 (Tex. 2020) ("American law traditionally recognizes three types of recovery to compensate for a breach of contract: expectancy, reliance, and restitution damages."); *Wills v. USAA Gen. Indem. Co.*, No. 01-22-00304-CV, 2023 WL 8459498, at *4 (Tex. App.—Houston [1st Dist.] Dec. 7, 2023, no pet.) (listing benefit of the bargain damages and compensatory loss for the tort of bad faith as damages available for a breach of the duty of good faith); *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 50 (Tex. 1998) (authorizing benefit of the bargain damages for fraudulent inducement).

### c)    Actual Damages

586.    "Actual damages" are those damages caused by the alleged misconduct. "At common law, actual damages are either direct or consequential. Special damages, or consequential damages, are those damages which result naturally, but not necessarily, from the defendant's wrongful acts. Direct damages compensate for the loss that is the necessary and

usual result of the act." *Sonnichsen*, 221 S.W.3d at 636. This flexible category of damages compensates a plaintiff for "any loss it may suffer" as a result of the conduct complained of. *Meyers v. Moody*, 693 F.2d 1196, 1209 (5th Cir. 1982) (describing damages available for a breach of fiduciary duty under Texas common law).

587.     Trustee may seek actual damages for his breach of fiduciary duty claims (Count V), fraud claims (Count XI), and unjust enrichment claims (Count XV). *Sonnichsen*, 221 S.W.3d at 636 (fraud); *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) ("Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."). Trustee may also seek them in the alternative for Trustee's good faith and fair dealing claim (Count III) or fraudulent inducement claim (Count XII). *Wills*, 2023 WL 8459498, at *4 (compensatory loss for the tort of bad faith as type of available damages for breach of the duty of good faith); *Sonnichsen*, 221 S.W.3d at 636 (fraudulent inducement).

#### d)     Reliance Damages

588.     Reliance damages allow plaintiffs "to recover … damages measured by the detriment sustained," which is the amount necessary to "put the promisee in the position he would have been in had he not acted in reliance upon the promise." *Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965); *see also* Restatement (Second) of Contracts § 344 (1981).

589.     In the context of negligent misrepresentation, reliance damages are described as "pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998).

590.     Trustee may seek reliance damages for his promissory estoppel claim (Count IV) and negligent misrepresentation claim (Count XIII). *Wheeler*, 398 S.W.2d at 97 (promissory estoppel); *D.S.A., Inc.*, 973 S.W.2d at 664 (negligent misrepresentation). This is also an alternative measure of damages for Trustee's breach of oral contract claim (Count I). *Atrium*

*Med. Ctr.*, 595 S.W.3d at 193 ("American law traditionally recognizes three types of recovery to compensate for a breach of contract: expectancy, reliance, and restitution damages."). Because the implied covenant of good faith and fair dealing sounds in contract, Trustee may seek reliance damages as an alternative measure for Count III (breach of the duty of good faith and fair dealing). *State Farm Fire & Cas. Co. v. Gros*, 818 S.W.2d 908, 911 (Tex. App.—Austin 1991, no writ) (award including out-of-pocket expenses affirmed in case asserting good faith and fair dealing claim and statutory insurance claims). Reliance damages are also an alternative measure for damages for the Trustee's fraud and fraudulent inducement claims. *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 29 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (reliance damages a measure of damages for fraud evading the statute of frauds).

### e)      Punitive Damages

591.    Punitive damages are available for Trustee's breach of fiduciary duty (Count V), fraud (Count XI) and fraudulent inducement (Count XII) claims. *See In re Extended Stay, Inc.*, No. 09-13764-JLG, 2020 WL 10762310, at *121 (Bankr. S.D.N.Y. Aug. 8, 2020) (fiduciary duty, collecting cases); *see Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 774 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (citing *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 568 (Tex. 1963)) (fraud); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 436 (Tex. 1986) (fraudulent inducement).

592.    Texas law (but not Delaware law) limits punitive or exemplary damages to an amount equal to two times economic damages. *See* TEX. CIV. PRAC. & REM. CODE ANN., § 41.008(b). This limitation would apply to punitive damages for Trustee's fraud (Count XI) and fraudulent inducement (Count XII) claims, which are governed by Texas law.

593.    Delaware law has no punitive damages cap. *Tumlinson v. Advanced Micro*

*Devices, Inc.*, No. CIV.A. 08C-07-106FSS, 2010 WL 8250792, at *3 (Del. Super. Ct. July 23, 2010) (contrasting Texas and Delaware law on this point). Thus, there is no limitation on punitive damages for Trustee's breach of fiduciary duty claim (Count V), which is governed by Delaware law.

### f) Attorneys' Fees and Pre- and Post-Judgment Interest

594.    Under Texas law, "[t]he award of reasonable attorney's fees is mandatory under [Texas Civil Practice & Remedies Code] section 38.001 if the plaintiff prevails in his or her breach of contract claim and recovers damages." *Crisalli v. ARX Holding Corp.*, 177 Fed. App'x 417, 421 (5th Cir. 2006); TEX. CIV. PRAC. & REM. CODE § 38.001, *et. seq.*

595.    Under Delaware law, courts may award attorney fees "where a fiduciary has engaged in an egregious breach of the duty of loyalty, but the harm flowing from the breach was not readily capable of quantification." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 867 (Del. Ch. 2022).

### g) Pre- and Post-Judgment Interest

596.    Bankruptcy courts have discretion to award pre- and post-judgment interest pursuant to federal statutes or state law where necessary to render the injured party whole. 28 U.S.C. §§ 151, 157(a), 1334, 1961; TEX. FIN. CODE ANN. §§ 304.003(c), 304.103; *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002); *In re Missionary Baptist Found. of Am.*, 69 B.R. 536, 537-38 (Bankr. N.D. Tex. 1987).

597.    For Texas law claims, Trustee is entitled to prejudgment interest under the common law, accruing from the date that his suit was filed. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 530-31 (Tex. 1998) (setting common law rules for prejudgment interest, including that "prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed.").

598.    Common law prejudgment interest in Texas is equal to the published post-judgment rate, and is calculated as simple interest. *Johnson & Higgins*, 962 S.W.2d at 531-32.

599.    The relevant date to determine the interest rate is the date of final judgment. *Craig v. GACP II, L.P.*, No. 3:19-CV-0058-G, 2022 WL 1778392, at *8 (N.D. Tex. June 1, 2022) (applying current rate to determine prejudgment interest under Texas law); *Ellison v. Three Rivers Acquisition LLC*, No. 13-17-00046-CV, 2022 WL 17663839, at *14 (Tex. App.—Corpus Christi–Edinburg Dec. 15, 2022, pet. denied) (rate is as of final judgment); *Siam v. Mountain Vista Builders*, 544 S.W.3d 504, 514 (Tex. App.—El Paso 2018, no pet.) (same, and collecting cases).

600.    For the Delaware law claims for breach of fiduciary duty, Trustee is entitled to prejudgment interest starting from the date of injury. *Gentile v. Rossette*, No. CIV.A. 20213-VCN, 2010 WL 3582453, at *1 (Del. Ch. Sept. 10, 2010).

601.    The Delaware legal rate of interest is "5% over the Federal Reserve discount rate[.]" DEL. CODE ANN. TIT. 6, § 2301 (West); *see also Gentile*, 2010 WL 3582453 at *1-2.

602.    Trustee is entitled to post-judgment interest at the federal rate as of the date of judgment. *See* 28 U.S.C. § 1961.

### h)    One Satisfaction Rule

603.    Trustee's recovery is bound by the "one satisfaction" or "one recovery" rule—he may not recover more than once for the same injury. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991), *holding modified on other grounds by Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006) (stating the rule); *Incyte Corp. v. Flexus Biosciences, Inc.*, No. N15C-09-055MMJCCLD, 2016 WL 1735485, at *8 (Del. Super. Ct. Apr. 19, 2016) (one satisfaction rule prevents duplicate recovery). Trustee may therefore only seek one measure of damages for each claim on which he prevails, and must elect remedies when damages for different claims compensate for the same injury.

## 2. Damages Awarded

### a) Expectancy or Benefit of the Bargain Damages

604. Under the Oral Contract, Dundon was required to invest $250 million in the AAF in exchange for control and majority ownership. The evidence established Dundon directed DDFS to contribute only $69,719,190 to the AAF, and that no other transfers were made by Dundon or on his behalf. *See* FOF ¶¶ 366-369. The AAF performed, to the extent it was able, and any default in performance under the Oral Contract was caused by Defendants, who had complete control of the AAF from February 14, 2019 onward. *See* FOF ¶¶ 228-229, 240, 249.

605. The Court awards $180,280,810 in expectancy or benefit of the bargain damages against Defendant Dundon for Trustee's breach of oral contract (Count I), breach of the duty of good faith and fair dealing (Count III), and/or fraudulent inducement (Count XII claims) . *See* FOF ¶ 382. This is the "value as represented" ($250 million) minus the "value received" ($69,719,190). *Geis*, 362 S.W.3d at 112.

### b) Actual Damages

606. Trustee seeks to recover for the lost enterprise value of the AAF as actual damages for his fraud (Count XI) and breach of fiduciary duty claims (Count V).[21] The Court finds this is an appropriate measure of damages where Dundon's and Zutter's actions, individually and collectively, proximately caused the failure of the AAF. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 621 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010) (awarding enterprise value damages for breaches of fiduciary duty, as well as pre- and post-

---

[21] Defendants have previously disputed whether enterprise value as a measure of damages was adequately disclosed as to both of the dates Trustee offers evidence regarding (February 13, 2019 and April 2, 2019). **Day 14, 47:25-60:9.** This Court heard those arguments on Day 14 of trial, and ruled on the record that both dates, and the numbers relevant to those dates, had been adequately and timely disclosed. *Id.*

judgment interest); *Roth v. Mims*, 298 B.R. 272, 296 (N.D. Tex. 2003) (similar).

607.    Enterprise Value is the proper measure of damages because the Trustee seeks damages for the consequence of the complained-of conduct—the complete destruction of the Debtors' business. *See Vianet Group PLC v. Tap Acquisition, Inc.*, No. 3:14-CV-3601-B, 2016 WL 4368302, at *27 (N.D. Tex. Aug. 16, 2016) (applying Texas law, finding full enterprise value a proper measure of damages where argument was that consequence of conduct—in this case contract breach—was complete destruction of business); *US Dominion, Inc. v. Newsmax Media, Inc.*, No. N21C-08-063 EMD, 2025 WL 1092289, at *39 (Del. Super. Ct. Apr. 9, 2025) (Colorado law, holding that plaintiff could seek enterprise value damages as alternative to lost profit damages despite business continuing to exist); *In re Smartalk Teleservices, Inc. Sec. Litig.*, 487 F. Supp. 2d 940, 946 (S.D. Ohio 2007) (Ohio law, Trustee's measure of damages based on enterprise value before and after misconduct was not improper).

608.    Trustee's expert Sonia Desai testified that the AAF was worth $144.1 million as of February 13, 2019 (the day before Ebersol signed the Term Sheet in reliance on his belief that he and Dundon had a deal). **Day 14, 66:20-24**. This is the sole evidence of enterprise value, pre-reliance on Dundon's commitment and prior to Dundon's fraud and breaches of fiduciary duty dooming the League from the moment he took control of it. *See* FOF ¶¶ 80-85. The loss caused by this misconduct is thus best measured in terms of the value of the League before Dundon took over control. *See Vianet Group*, 2016 WL 4368302, at *27; *Beard Research, Inc.*, 8 A.3d at 621.

609.    The Court awards $144.1 million, jointly and severally against Defendants Dundon and Zutter, in actual damages for Trustee's fraud (Count XI) and/or breach of fiduciary duty (Count V) claims, and as an alternative award for Trustee's good faith and fair dealing (Count III) and fraudulent inducement (Count XII) claims. The Trustee must elect remedies based on this holding

under the one satisfaction rule.

610.    *[ALTERNATIVE DAMAGE AWARD]* Alternatively, and only to the extent the Court determines the date the AAF shut down, versus the date Dundon and Zutter took control, is the operative date for the calculation of damages, the Court awards $63.3 million in actual damages, jointly and severally against Defendants Dundon and Zutter, for Trustee's fraud (Count XI) and/or breach of fiduciary duty (Count V) claims, and as an alternative award for Trustee's good faith and fair dealing (Count III) and fraudulent inducement (Count XII) claims. Trustee's expert Sonia Desai testified that this was the amount the AAF was worth as of the day that it was finally shuttered, April 2, 2019. *See* FOF ¶ 363. If Defendants' conduct had not yet dealt a fatal blow to the league, the indefinite suspension of operations and breach of the player contracts on April 2, 2019, did. *See* FOF ¶¶ 327-328.

611.    Trustee also seeks recovery for certain specific amounts of damages attributable to individual fiduciary duty breaches by Defendants Dundon and Zutter or unjust enrichment of Defendants DCP, Dundon, and Zutter. Specifically, Trustee seeks recovery of amounts the AAF was made to pay, or which the AAF was charged by Dundon and Zutter, including on behalf of DCP, in connection with their breaches or which unjustly enriched them.

612.    The Court also awards as actual damages the value of the "deemed investment" of $280,810.00, *see* FOF ¶ 337, which was not shown by the evidence to have any factual basis, and which was a last-minute, preferential credit to DCP for Dundon to avoid putting any additional funds into the AAF and to benefit DCP, and therefore its partners Dundon and Zutter. *See* FOF ¶ 337. This was functionally a denial of that amount of investment capital to the AAF, and at a time when that would have been part of available funding that could have allowed it to at least enter into a 12-week plan for Chapter 11 bankruptcy instead of liquidation, was a breach of fiduciary

duty by Dundon and Zutter, and unjustly enriched Dundon, Zutter, and DCP. *See* FOF ¶¶ 355-362. In the event Trustee elects a damages remedy based on actual damages rather than expectancy damages, Trustee would be entitled to this amount in addition to any other recovery, jointly and severally against Defendants Dundon, Zutter, and DCP.

613.    The Court also awards as actual damages the amounts paid for the services of PwC and Bracewell that were results of the breaches of fiduciary duty and unjustly enriched Dundon, Zutter, and DCP, which include $400,000 paid to Bracewell (*see* FOF ¶ 351) and $150,000 paid to PwC (*see* FOF ¶ 338). These are additional items of direct damages to be recovered in addition to *either* an expectancy or enterprise value recovery.

614.    *[ALTERNATIVE DAMAGE AWARD]* Alternatively, and only to the extent the Court finds there was no oral contract, the Court awards as actual damages the amount of investment promised by Dundon, less the amount of investment he provided—a total of $180,280,810—as a separate measure of the injury to AAF as a result of Dundon's and Zutter's breaches of fiduciary duty. The Court has authority under Delaware law (which applies to Trustee's breach of fiduciary duty claims) to craft an appropriate and equitable remedy for breaches of fiduciary duty. *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 814 (Del. Ch. 2011), *aff'd sub nom. Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012) ("Unlike the more exact process followed in an appraisal action, damages resulting from a breach of fiduciary duty are liberally calculated … *I will craft from the panoply of equitable remedies within this court's discretion a damage award* that approximates the difference between the price that the Special Committee would have approved had the Merger been entirely fair (i.e., absent a breach of fiduciary duties) and the price that the Special Committee actually agreed to pay.")) (emphasis added).

### c)   Reliance Damages

615.     Trustee's reliance damages are calculated based on enterprise value, and therefore the authority, evidence, and reasoning of the prior section with respect to the determination of the value of the AAF applies and is adopted here as well.

616.     The AAF's actions in reliance on Dundon's promises and (at least) negligent misrepresentations regarding his funding intentions resulted in the AAF giving complete control of itself to Dundon and Zutter resulted in the complete loss of the AAF.

617.     The AAF's "out of pocket" detriment is equal to the value of the AAF as of the last day prior to any actions taken in reliance on Dundon, which is February 13, 2019. *See Wheeler*, 398 S.W.2d at 97 (authorizing reliance damages equal to the amount necessary to "put the promisee in the position he would have been in had he not acted in reliance upon the promise."); *see also Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 734 (Tex. 1981) (award for promissory estoppel is "amount necessary to compensate that party for a loss already suffered.").

618.     The Court awards as reliance damages $144.1 million against Defendant Dundon for Trustee's promissory estoppel (Count IV) and/or negligent misrepresentation (Count XIII) claims. The Court also awards this amount as an alternative measure of damages for Counts I, III, XII and XIII.

### d)   Punitive Damages

619.     Punitive damages are available under Trustee's breach of fiduciary duty (Count V), fraud (Count XI) and fraudulent inducement (Count XII) claims because Dundon and Zutter both behaved in a willful, egregious, malicious, fraudulent, intentional, and/or grossly negligent manner, as shown by the facts above. The Court finds that the evidence supporting its prior proposed Findings of Fact with respect to Dundon's and Zutter's fraud and breaches of fiduciary duty is clear and convincing.

620.    Two times economic damages is an appropriate measure of punitive damages for Dundon. "Evidence of a defendant's net worth is relevant in determining the amount of punitive damages because "the amount of punitive damages necessary to punish and deter wrongful conduct depends on the financial strength of the defendant. That which could be an enormous penalty to one may be but a mere annoyance to another." *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 109 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (Texas law); *see also Lock v. Schreppler*, No. C.A. 79C-MY-113, 1980 WL 317337, at *1 (Del. Super. Ct. July 7, 1980) (Delaware law, holding that wealth of the tort-feasor relevant to how much punitive damages are sufficient to punish). Defendant Dundon has substantial means: the parties have stipulated that his net worth is $2 billion. **Day 9, 66:21-67:9**. A substantial punitive award is necessary in order to have a significant deterrent effect on future conduct of this kind.

621.    The Court, in its discretion, could award a greater amount for breach of fiduciary duty under Delaware law against Dundon.

622.    The Court finds that $1,000,000 is an appropriate measure of punitive damages for Defendant Zutter.

### e)    Attorney Fees

623.    Under Texas law, Trustee is entitled to reasonable attorney's fees for prevailing on his breach of oral contract claim (Count I).

624.    Further, under Delaware law, the Court will alternatively award Trustee his reasonable attorney's fees for prosecuting this action in the event that any of the damages assessed by the Court for Defendants' breaches of fiduciary duty are determined, on appeal, to lack sufficient evidence to support them.

625.    The Court will, by subsequent order, set briefing and evidence presentation for the determination of Trustee's attorney's fees.

### f) Pre- and Post- Judgment Interest

626.    For the recovery on the Trustee's Texas law claims (Counts I, III, IV, XI, XII, and XII), to the Court awards prejudgment interest under the common law, accruing from the date that his suit was filed, November 14, 2022. *See* ECF No. 1. The current published post-judgment rate is 7.5%.[22] Prejudgment interest should be calculated as the amount accrued between November 14, 2022, and the date of the final judgment entered in this case.

627.    For the recovery on Trustee's Delaware law claims (Counts V and XV), the Court awards pre-judgment interest current Delaware legal rate of interest, calculated as simple interest, is equitable—this amount is "5% over the Federal Reserve discount rate[.]," which the Court finds is equitable. DEL. CODE ANN. TIT. 6, § 2301 (West); *see also Gentile*, 2010 WL 3582453 at *1-2. The Federal Reserve discount rate was 3% as of April 16, 2019,[23] generating a pre-judgment interest rate of 8%. The Court will apply the date the AAF filed for Chapter 7 bankruptcy, April 16, 2019, as the latest date on which accrual could have occurred for purposes of Delaware's standard for measuring the appropriate time for pre-judgment interest. Thus, the relevant period for calculation is April 16, 2019 through to the date of final judgment.

628.    Trustee is entitled to post-judgment interest at the federal rate as of the date of judgment. *See* 28 U.S.C. § 1961.

## M.    The Economic Loss Rule

### 1.  Conclusions of Law

---

[22] The Court can take judicial notice of this fact pursuant to Federal Rule of Evidence 201. *See* Texas Office of Consumer Credit Commissioner, occc.texas.gov, *at* occc.texas.gov/publications/interest-rate.

[23] The Court can take judicial notice of this fact pursuant to Federal Rule of Evidence 201. *See* Federal Reserve Board, www.federalreserve.gov., *at* https://www.federalreserve.gov/monetarypolicy/discountrate.htm, https://www.frbdiscountwindow.org/pages/discount-rates/historical-discount-rates.

629.    Defendants have raised the economic loss rule as a defense to certain of Trustee's claims.

630.    Under both Texas and Delaware law, the economic loss rule generally prevents recovery in tort for purely economic damage unaccompanied by injury to persons or property. ECF NO. 54 at 20 (quoting *Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 954 F.3d 804, 809 (5th Cir. 2020) (citations omitted)); *see Gea Sys. N. Am. LLC v. Golden State Foods Corp.*, No. N18C-11-242 EMD CCLD, 2020 WL 3047207, at * 7 (Del. Super. Ct. June 8, 2020).

631.    In Texas and Delaware, the economic loss rule does not bar tort claims arising out of a contractual setting where "the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014); *see also Abbott Lab'ys v. Owens*, No. 13C-09-186 JRJ CCLD, 2014 WL 8407613, at *7 (Del. Super. Ct. Sep. 15, 2014) ("[I]n order for contract and tort claims to co-exist in an action, the plaintiff must allege that the defendant breached a duty that is independent of the duties imposed by the contract.") (internal quotations omitted); *see also Commonwealth Capital Corp. v. Medshare Techs., Inc.*, No. 3:15-CV-2144-C, 2015 WL 10818622 (N.D. Tex. Oct. 1, 2015) ("[W]hile this rule prohibits recovery for a contract and tort claim under these facts, it does not prevent a plaintiff from pleading contract and tort claims as alternative theories of recovery.") (citing FED. R. CIV. P. 8(d)(2)–(3)) (emphasis in original).

632.    The economic loss rule does not apply at all in the case of fraudulent inducement claims. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) ("Accordingly, tort damages are recoverable for a fraudulent inducement claim

irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract.").

633.     The Court finds that the economic loss rule does not apply to limit the damages awarded.

### 2. Argument

634.     The parties have already briefed the legal issues related to the economic loss doctrine, and the Trustee's prior briefing can be found at ECF No. 196, pp. 46-48.

635.     If the Court finds the Oral Agreement enforceable and awards damages based on that claim, then the economic loss rule would operate to bar Trustee from recovering damages through non-contract claims arising out of the subject matter of that agreement to the extent they seek economic loss with respect to same. *Chapman Custom Homes, Inc.*, 445 S.W.3d at 718; *see also Abbott Lab'ys*, 2014 WL 8407613, at *7. The subject matter of the Oral Agreement was Dundon's provision of capital funding for the AAF. The exception to this is Trustee's fraudulent inducement claim (Count XII), to which the economic loss rule does not apply. *Formosa*, 960 S.W.2d at 47.

636.     The economic loss rule does not apply to damages sought against Zutter and DCP, against whom there are not contract claims.  The economic loss rule also would not apply even to Dundon, if this Court does not find there is an enforceable Oral Agreement and awards damages based on that claim.

637.     But even further, the economic loss rule does not bar the Trustee from recovering compensatory damages for other conduct of Dundon separate and apart from his failure to fund the AAF or related promises. This includes damages unrelated to promised funding commitments, like the destruction of the enterprise value of the AAF, forcing the AAF to pay

for its own bankruptcy and/or to pay for work conducted by PWC to benefit DCP and unrelated to the actual deal contemplated by the parties. The Court previously and properly found that the Trustee had alleged damages "not exclusively related to the contract and instead are correlated also to the breach of fiduciary duty and fraud claims," and the Trustee has now presented evidence of those separate damages. *See* ECF No. 292-50; *see also* Section II.L, *supra*.

**N.      Res judicata applies to Defendants' defenses.**

       **1.   Conclusions of Law**

638.    In Texas, res judicata applies to claims and defenses where there is "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996); *New Talk, Inc. v. Sw. Bell Tel. Co.*, 520 S.W.3d 637, 650 (Tex. App.—Fort Worth 2017, no pet.) (finding limitations defense barred by res judicata). This is true where the issue or matter precluded is a claim in one case but a defense in another. *Am. Intern. Indus., Inc. v. Scott*, 355 S.W.3d 155, 161 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (declaratory claim barred where theory of release on which it was based could have been raised as affirmative defense in earlier litigation).

639.    Delaware applies essentially the same law as Texas for res judicata. *Bradley v. Div. of Child Support Enf't ex rel. Patterson*, 582 A.2d 478, 480 (Del. 1990) (requiring a prior decision by a court with jurisdiction, the same parties or privies, "the issues necessarily decided in the prior action were the same as those" in the case at bar, "the issues in the prior action were decided adversely" to the party to be charged, and final judgment). In Delaware, as in Texas, res judicata bars raising an issue that could have been raised in the prior litigation, even if it would be a claim in one litigation and a defense in the other. *Mother African Union First Colored*

*Methodist Protestant Church v. Conference of African Union First Protestant Church*, No. CIV.A. 12055, 1995 WL 420003, at *6 (Del. Ch. July 13, 1995), *aff'd sub nom. Conference of African Union First Colored Methodist Protestant Church v. Mother African Union First Colored Methodist Protestant Church*, 683 A.2d 58 (Del. 1996) *and aff'd sub nom. Conference of African Union First Colored Methodist Protestant Church v. Mother African Union First Colored Methodist Protestant Church*, 687 A.2d 194 (Del. 1996) (claim barred where issue could have been raised as defense in prior matter).

640. The judgment in Adversary Matter No. 22-5077 is now final. *See* Adv. No. 22-5077, ECF No. 180.

641. The Court made a judgment, on the merits, that the Term Sheet cannot be enforced in Adv. No. 22-5077. *See* Adv. No. 22-5077, ECF 171, pp. 9-13. That question was fully litigated and contested by plaintiff DCP and defendant Charlie Ebersol.

642. The Court further made a judgment, on the merits, that Dundon Capital Partners could not have justifiably relied on any information provided by Charlie Ebersol prior to his signing of the Term Sheet on February 14, 2019. *See* Adv. No. 22-5077, ECF 171, pp. 17-20.

643. Defendant DCP is the same party as in Adversary 22-5077. Defendants Dundon and Zutter in this case are in privity with DCP, which was a party in Adversary 22-5077.

644. Res judicata applies to bar Defendants' affirmative defenses of waiver, estoppel, ratification, merger, and fraud.

## 2. Argument

645. Res judicata now bars several of Defendants' affirmative defenses.

646. The parties to Adversary No. 22-5077 are not identical to those of this matter, but they are "in privity" with them. In Texas there "is no generally prevailing definition of privity

which can be automatically applied to all cases involving the doctrine of res judicata and the determination of who are privies requires careful examination into the circumstances of each case as it arises." *Benson v. Wanda Petroleum Co.*, 468 S.W.2d 361, 363 (Tex. 1971). Ordinarily, "[a] party can be in privity in at least three ways: (1) it can control an action even if it is not a party to it; (2) its interests can be represented by a party to the action; or (3) it can be a successor-in-interest, deriving its claim through a party to the prior action." *Samuel v. Fed. Home Loan Mortg. Corp.*, 434 S.W.3d 230, 234-35 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

647. Delaware law is similar, turning principally on unity of interest. *Talley v. Horn*, 303 A.3d 338 (Del. 2023) (finding res judicata barred two parties who had not been parties to the prior action, when one had testified at the prior action and their interests were specifically addressed and disposed of in the case, where the rights of these parties were determined by the rights of the parties to the prior action).

648. Defendants in this case are in privity with DCP in Adversary 22-5077. DCP is a party to both actions. Defendant Dundon is the chairman, CEO, and managing partner of DCP. *See* FOF ¶ 89. Defendant Zutter is a partner and fiduciary of DCP. *See* FOF ¶ 89. Defendants in this action, and DCP in the 22-5077 matter, were represented by the same counsel, showing no variance of interest between DCP and the other Defendants in this action. DCP's interests generally, and its specific interest in enforcing the Term Sheet, are identical to Dundon's and Zutter's interests – both have strenuously argued for enforcement of the Term Sheet. DCP, Dundon and Zutter have identical interests in showing that Charlie Ebersol misled them—DCP brought a fraud claim against Ebersol, and Defendants in this case have asserted a fraud defense premised on Ebersol's representations to Dundon and DCP. Dundon, as CEO and Managing Partner of DCP, also had the power to control DCP during Adversary 22-5077.

649. The following affirmative defenses are now barred by res judicata:

   a. **Waiver, estoppel, and ratification.** Each of Defendants' affirmative defenses of waiver, estoppel, and ratification rely on the Term Sheet being an enforceable contract and seek to make the Term Sheet enforceable. All could have been raised as arguments for the enforceability of the Term Sheet in Adversary No. 22-5077 by plaintiff DCP. DCP had a strong interest in raising these arguments at the summary judgment stage in Adversary No. 22-5077, because without the Term Sheet, DCP had no support for its claims. But DCP did not raise these arguments, and the matter of the enforceability of the Term Sheet was decided. Thus, all of these defenses are now barred by res judicata.

   b. **Merger.** Defendants' affirmative defense of merger also relies on the enforceability of the Term Sheet. Because this Court has already ruled that the Term Sheet is not enforceable, this defense is also barred by res judicata.

   c. **Fraud.** Defendants' affirmative defense of fraud is a mirror image of plaintiff DCP's fraud claim against Charlie Ebersol in Adversary No. 22-5077, on which summary judgment has already been granted in Ebersol's favor. The uncontested evidence establishes that the only information on which Dundon, DCP, or Zutter could have relied prior to the binding of any agreement on February 14, 2019 was information provided by Ebersol. Because this Court has already ruled that DCP could not justifiably rely on that information under the circumstances, Defendants' affirmative defense of fraud is barred by res judicata.

650. Trustee need not have pleaded res judicata or collateral estoppel because judgment in Adversary 22-5077 was not final until after trial began in this matter. *See* Adv. No. 22-5077, ECF No. 180 (dated May 7, 2025). Moreover, Trustee does not have a pleading burden in responding to affirmative defenses. *Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. CV 16-10914-FDS, 2020 WL 4201187, at *2 (D. Mass. July 22, 2020) (defense to a defense need not be pleaded).

## O. Defendants' Affirmative Defense of Merger or Integration[24]

651. The Court finds that the defenses of merger and integration do not apply to any of Plaintiff's claims.

---

[24] The parties have already briefed the legal issues related to the merger defense, and the Trustee's prior briefing can be found at ECF No. 196, pp. 13-16.

652.     Delaware law applies to whether any language in the Term Sheet is properly characterized as a merger or integration clause. Texas law applies to whether the doctrine of merger applies to avoid the Oral Agreement. Texas law also applies to Count I, to which merger and integration are affirmative defenses.

653.     Merger (and the parole evidence rule) apply:

> … when parties have a valid, integrated written agreement, and precludes enforcement of prior or contemporaneous agreements." *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.,* 352 S.W.3d 462, 469 (Tex. 2011). Thus, to trigger the parol evidence rule, the parties must have "entered into a valid, written, integrated contract." *West v. Quintanilla,* 573 S.W.3d 237, 243 (Tex. 2019); *see Silverthorne Seismic, LLC v. Sterling Seismic Servs., Ltd.,* No. H-20-2543, 2021 WL 11728206, at *16 (S.D. Tex. 2021) (applying the parol evidence rule where the parties do not dispute the existence of a valid contract).

Case No. 22-05078, ECF No. 292-22.

654.     Under the "law of the case" doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. The doctrine applies to those issues decided by necessary implication as well as those decided explicitly." *In re Pyle*, No. 11-37390-HDH, 2015 WL 3956362, at *7 (Bankr. N.D. Tex. Feb. 24, 2015), *report and recommendation adopted sub nom. Pyle v. U.S. Bank Nat. Ass'n*, No. 3:15-CV-0624-B, 2015 WL 3949376 (N.D. Tex. June 22, 2015). As this Court has previously explained in this case, the doctrine applies to adversary proceedings as part of a bankruptcy case. See ECF No. 292-23, *see also Pyle*, 2015 WL 3956362, at *7 ("Adversary proceedings are part of a bankruptcy case.").

655.     For the reasons already given, this defense is barred by res judicata. *See* Section II.N, *supra*.

656.     Moreover, the Court has not only already determined that the Term Sheet is not a binding written contract, it has also determined that it is bound by that decision as "law of the

case." Case No. 22-05078, ECF No. 292-23.

657.     Even were the Court to again consider whether the Term Sheet is enforceable as a written contract, it should find as it previously did, for the same reasons. The Court incorporates its prior reasoning and authority cited in the adversary proceeding, where it found that under Delaware law, the Term Sheet required full execution by signature to be enforceable, and the evidence establishes that no person ever signed the Term Sheet on behalf of DCP. *See* Adv. No. 22-5077, ECF No. 171, pp. 9-13.

658.     Even if the Court found that the Term Sheet was a valid, binding contract, the Court would still find that the Oral Agreement does not merge into the Term Sheet.

659.     Under Delaware law, to be integrated and thus subject to the affirmative defense of merger, "a contract 'must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract.'" *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 51 (Del. Ch. 2015) (citing *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004). No such language exists in the Term Sheet—either in the provisions permitting the agreement to be signed in multiple counterparts, or in the provision preventing amendments other than in writing. No anti-reliance provisions, no merger language, no integration, and no "entire contract" language is present in the Term Sheet. The Court therefore finds, as a matter of law, that the Term Sheet does not contain a merger or integration clause, and therefore Dundon's merger defense would fail for this reason as well under Delaware law.

660.     Moreover, merger and integration also cannot apply as a matter of either Texas or Delaware law to the Oral Agreement because the Oral Agreement and the Term Sheet are between different parties—the Oral Agreement is between Dundon and ESMG, and the Term Sheet would

be between DCP and ESMG (were it bound and enforceable). Merger requires that both agreements be entered into by the same exact parties. "Before the merger doctrine applies to a contract, the later contract must be between the same exact parties." *Satre v. Dommert*, 184 S.W.3d 893 (Tex. App.—Beaumont 2006, no pet.); *see also Fish v. Tandy Corp.*, 948 S.W.2d 886, 898 (Tex. App.—Fort Worth 1997, pet. denied) ("Merger happens when the same parties to an earlier agreement later enter into a written integrated agreement covering the same subject matter.") (emphasis added); *Kodiak Bldg. Partners, LLC v. Adams*, No. CV 2022-0311-MTZ, 2022 WL 2455987, at *3 (Del. Ch. July 6, 2022) (merger and integration clause failed to merge prior agreements involving other parties).

661.    The Term Sheet also would not integrate the Oral Agreement (apart from the parties' identities) because the agreements are not inconsistent. "A subsequent agreement does not supersede a prior agreement if it is not inconsistent with the prior agreement, is made for separate consideration, or is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written agreement." *Carr v. Weiss*, 984 S.W.2d 753, 764 (Tex. App.—Amarillo 1999, pet. denied). "The question of whether a merger has occurred, or whether an agreement is merely additional to and not contradictory of a written contract, is determined from the intent of the parties." *Pitman v. Lightfoot*, 937 S.W.2d 496, 529 (Tex. App.—San Antonio 1996, writ denied). Though Texas law applies to this question, Delaware law is similar. *Taylor v. Jones*, No. CIV. A. 1498-K, 2002 WL 31926612, at *3 (Del. Ch. Dec. 17, 2002) (noting parole evidence rule does not apply to oral agreements or evidence not inconsistent with the written agreement at issue).

662.    The factual findings set forth above clearly establish that no party, as of February 14, 2019, actually thought that the total amount of the financial commitment Dundon had to the

AAF was only $70 million.

663. The Court further alternatively finds that Defendants did not plead the affirmative defenses of merger and integration, as required by Federal Rule of Civil Procedure 8(c)(1), and that Plaintiff would be prejudiced by Defendants' assertion of these defenses at trial. "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." FED. R. CIV. P. (8)(c)(1). "Failure to timely plead an affirmative defense may result in waiver and the exclusion of the defense from the case." *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014). Count I, to which this defense applies, is governed by Texas substantive law, under which the merger doctrine is an affirmative defense. *See Rich v. Olah*, 274 S.W.3d 878, 889 (Tex. App.—Dallas 2008, no pet.); *Jerry L. Starkey, TBDL, L.P. v. Graves*, 448 S.W.3d 88, 101 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Defendants did not plead this affirmative defense prior to the close of discovery, and the Court denied defendants leave to replead when they requested that opportunity after the close of discovery. It would be inequitable to permit Defendants to shield themselves with a defense Trustee has never had the opportunity to investigate.

664. For each of these independent reasons, the Court finds that Defendants' merger and integration defense fails.

**P.    Defendants' Affirmative Defenses of Waiver, Estoppel, and Ratification**

665. Defendants argue that Trustee has waived, or is estopped from bringing, certain of his claims as a result of AAF's actions constituting waiver, ratifying the Term sheet, or which would otherwise qualify for equitable or judicial estoppel. The Court will address judicial waiver and estoppel separately below in Section II.U, *infra*, but addresses the remaining matters here.

666. In the context asserted, estoppel, waiver, and ratification all require voluntary action on the part of the party to be charged. *Friel v. Jones*, 42 Del. Ch. 148, 154, 206 A.2d 232,

235 (1964), *aff'd*, 42 Del. Ch. 371, 212 A.2d 609 (1965) (equitable estoppel, Delaware law); *Brooks v. O'Connor*, 120 Tex. 126, 130, 39 S.W.2d 14, 17 (1931) (equitable estoppel, Texas law); *In re Coinmint, LLC*, 261 A.3d 867, 893 (Del. Ch. 2021) ("Waiver is the voluntary and intentional relinquishment of a known right either conferred by statute or secured by contract. It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights."); *Buc-ee's, Ltd. v. Hribek*, No. 03-08-00120-CV, 2009 WL 5149922, at *2 (Tex. App.—Austin Dec. 31, 2009, no pet.) (setting out elements of knowing and voluntary waiver under Texas law); *In re Pattern Energy Group Inc. Stockholders Litig.*, No. CV 2020-0357-MTZ, 2021 WL 1812674, at *64 (Del. Ch. May 6, 2021) (requiring stockholder vote to be voluntary, and not compelled in contract or otherwise, for ratification to result, under Delaware law); *Old Republic Ins. Co., Inc. v. Fuller*, 919 S.W.2d 726, 729 (Tex. App.—Texarkana 1996, writ denied) (voluntary, intentional act inconsistent with avoiding agreement required for ratification under Texas law).

667.     AAF and its former board did not ratify or engage in any of the alleged conduct constituting "waiver" or "estoppel" voluntarily—its actions were compelled by the very parties now asserting these defenses. Defendants compelled the relevant board meetings and actions. *See* FOF ¶¶ 296.

668.     AAF's actions also were not "knowing."  For the same reason that the Term Sheet is not inconsistent with the Oral Agreement, *see supra*, § [merger argument] , any action by AAF with respect to the Term Sheet—whether categorized as waiver, ratification, or estoppel—cannot constitute relinquishment of any known right under the Oral Agreement.  *In re Coinmint, LLC*, 261 A.3d at 893 (waiver is voluntary and knowing); *Buc-ee's*, 2009 WL 5149922, at *2 (same). Defendants bear the burden of proof on their affirmative defenses, and they have provided no

relevant evidence to establish that AAF or its board knew or should have known at the time of any board meeting or other action that it was forfeiting any rights under the Oral Agreement, any remedies for breach of fiduciary duty, or any right to contest the legal validity of the Term Sheet.

669. These defenses are barred by res judicata, for the reasons already given. *See* Section II.N, *supra*. They are also barred by law of the case, because having different answers to the same legal questions in different adversary proceedings is the very thing that "law of the case" is meant to prevent. *See* ECF No. 292-23. In *Pyle*, Judge Hale precluded the assertion of a ratification defense that should have been raised previously in a claim objection. *In re Pyle*, No. 11-37390-HDH, 2015 WL 3956362, at *7 (Bankr. N.D. Tex. Feb. 24, 2015), *report and recommendation adopted sub nom. Pyle v. U.S. Bank Nat. Ass'n*, No. 3:15-CV-0624-B, 2015 WL 3949376 (N.D. Tex. June 22, 2015). As in *Pyle*, so here—DCP should have raised waiver, estoppel, and ratification in the 22-05077 adversary. It failed to do so, and the Court ruled the Terms Sheet is not enforceable. *See* Adv. No. 22-5077, ECF No. 171, pp. 9-13. Defendants cannot now try to render the Term Sheet enforceable through these means in a separate adversary proceeding.

670. Even were they not barred by res judicata and law of the case, these defenses are all defeated by Dundon's control of the company after February 14, 2019. The facts establish that Dundon had complete control of the AAF, and therefore the ability to direct the AAF to ratify or perform in the form he preferred. Dundon and Zutter were also on both sides of each decision that benefited them, and which they now seek to use to defend themselves in this action, *see* FOF ¶¶ 1-290. It would be inequitable to use these common law and equitable principles to permit a party who bargains for control of an entity he has contracted with to escape his

agreements and the plain requirements of writings he has authorial control of by inducing the other party to waive its rights. *See*, *e.g.*, *In re Pattern Energy Group Inc. Stockholders Litig.*, 2021 WL 1812674, at *64 (Del. Ch. May 6, 2021) (requiring stockholder vote to be voluntary, and not compelled in contract or otherwise, for ratification to result, under Delaware law).

Q.      **Defendants' Affirmative Defense of Fraud**

671.    Defendants have asserted a defense of fraud in this matter.

672.    As this Court has previously explained:

Justifiable reliance implies a duty upon the party to whom the representation is made to exercise ordinary and reasonable due diligence to protect their own interests. The Fifth Circuit has explained that reliance is not shown if based on the plaintiff's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the alleged fraud, it is extremely unlikely that there is actual reliance on the plaintiff's part. Thus, while justifiable reliance is usually a question of fact, the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified. In determining whether justifiable reliance is negated as a matter of law, courts must consider the nature of the parties' relationship and the contract. A failure to exercise due diligence is not excused by mere confidence in the honesty and integrity of the other party. In the absence of reasonable diligence, the plaintiff is charged with knowledge of all facts that would have been discovered by a reasonably prudent person reasonably situated.

Adv. No. 22-05077, ECF No. 171 at 18 (internal citations and quotations omitted).

673.    This defense is barred by *res judicata* for the reasons already given. *See* Section II.N, *supra*.

674.    The Court previously determined, with respect to DCP's claim against Ebersol for fraud, that "…there was no justifiable reliance on any alleged misrepresentation made by Ebersol." Adv. No. 22-05077, ECF No. 171 at 20. The only facts on which Dundon and Zutter had to rely in making their pre-contract decisions in this case were provided by Ebersol; their fraud defense here is a mirror image of their fraud claim in Adv. No. 22-05077, on which this Court granted summary judgment in Ebersol's favor.

675.    Pursuant to the "law of the case" doctrine, this decision continues to govern the same issues across the main bankruptcy case and all adversary proceedings. *Pyle*, 2015 WL 3956362, at *7 (Bankr. N.D. Tex. Feb. 24, 2015); *see also* ECF No. 292-23. The Court rejects this defense for this reason as well.

676.    The Court further incorporates its reasoning with respect to justifiable reliance from Adv. No. 22-05077. Even if the Court were inclined to consider this issue again, the prior reasoning remains persuasive—the "red flags" that prevented justifiable reliance are precisely the same in this matter, because these cases are about exactly the same facts. *See* Adv. No. 22-5077, ECF No. 171, pp. 17-20.

## R.    Defendants' Affirmative Defenses of Prior Material Breach and Impossibility

677.    Defendants contend that Trustee cannot sue on the Oral Agreement because ESMG never transferred any stock or equity to DCP or to Dundon.

678.    "Where one party to the contract, by wrongful means, prevents the other party from performing, as by making it impossible for him or her to perform, such action constitutes a breach of the agreement, the effect of which not only excuses performance by the injured party, but also entitles him to seek to recover for any damage he may have sustained by reason of the breach." *TLC Hospitality, LLC v. Pillar Income Asset Mgmt.*, 570 S.W.3d 749, 765–66 (Tex. App.—Tyler 2018, pet. denied); *see also O'Shea v. IBM Corp.*, 578 S.W.2d 844, 846 (Tex. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) ("As a general rule, performance is excused when a party to a contract prevents the other party from performing."); *S.K.Y. Inv. v. H.E. Butt Grocery Co.*, 440 S.W.2d 885, 889 (Tex. App.—Corpus Christi 1969, no writ).

679.    After February 14, 2019, Dundon (and Zutter) had complete control of the AAF. FOF ¶¶ 228-229, 240, 249. It was Dundon's decision—and, under the Oral Agreement and the non-binding Term Sheet, Dundon's and DCP's obligation—to define the contours of the shares

and the final terms of the equity agreement. FOF ¶¶ 113-117. AAF could not, without Dundon's direction, take further actions to transfer stock or equity to Dundon or a related entity. Dundon also, having control, was the only one with the ability to cause the AAF to perform, and his inaction necessarily prevented AAF from performing. Dundon's prevention of AAF's performance defeats this argument. *TLC Hospitality, LLC*, 570 S.W.3d at 765–66; *see also O'Shea*, 578 S.W.2d at 846; *S.K.Y. Inv.*, 440 S.W.2d at 889.

680.    Further, even assuming that transferring ESMG stock to Dundon or a related entity was possible by someone other than Dundon while Dundon was in control, Defendants' argument fails because such a breach does not rise the level of material.

681.    "In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994); *see also Tri–Star Petroleum Co. v. Tipperary Corp.*, 107 S.W.3d 607, 622 (Tex. App.–El Paso 2003, pet. denied). "[W]hen a party commits a nonmaterial breach, the other party 'is not excused from future performance but may sue for the damages caused by the breach.'" *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (quoting *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App.–Houston [1st Dist.] 2014, pet. denied)).

682.    The failure to transfer ESMG stock to Dundon or a related entity did not deprive Dundon or DCP from any benefit that they could reasonably anticipated. Dundon bargained for and received complete control of the ESMG Board and all operational decision-making ability. Thus, because Dundon was not denied any benefit that he could have reasonably anticipated from full performance there is no material breach by Debtors. And, to the extent the failure to

transfer ESMG stock to Dundon or a related entity was a breach of the Oral Agreement, Defendants did not file any claim as to such breach and do not seek any damages for any breach.

683. Defendants rely on *Alabama Football, Inc. v. Wright*, 452 F. Supp. 182, 185 (N.D. Tex. 1977), *aff'd* 607 F.2d 1004 (5th Cir. 1979). for the proposition that Dundon's performance of the Oral Agreement was impossible and therefore Trustee can bring no claim for its breach. *Wright* is distinguishable.

684. First, in *Wright*, the Alabama football team in Wright, argued that "financial circumstances beyond its control and for which it had never assumed the risk" made its performance of the agreement in question impossible. *Id.* at 184. Here, the financial health of the AAF and its bankruptcy were entirely within the control of Dundon, who had stated "[t]here is no story here about the money it takes, and I can fund this league." *See* FOF ¶ 173. Dundon entirely accepted the risk of the leagues financial difficulties in committing $250 million. *See* FOF ¶¶ 116, 150, 162.

685. Second, the first element of impossibility as set forth by the *Wright* court is that "an unexpected contingency occurs[.]" *Wright*, 452 F. Supp. at 185. To that end, the Court in *Wright* found that "Alabama could not have reasonably foreseen such sudden demise of its team and the World Football League." *Id.* Dundon was well aware of the AAF's financial difficulties from February 14, 2019 until the time he elected to shut it down. *See*, *e.g.*, FOF ¶¶ 98, 103, 344-346. There is no set of facts on which Dundon can reasonably assert that the AAF's financial difficulties were an unexpected contingency, because they were made aware of them during negotiations for the Oral Agreement, including in a pro forma, and Dundon and Zutter contemplated a bankruptcy from the day they began negotiations with ESMG. *See* FOF ¶¶ 98, 103, 104, 225. Thus, Dundon's performance was not impossible.

686. Further, "[w]here the obligation to perform is absolute, impossibility of performance occurring after the contract is made is not an excuse for nonperformance if the impossibility might have reasonably been anticipated and guarded against in the contract." *Huffines v. Swor Sand & Gravel Co., Inc.*, 750 S.W.2d 38, 40 (Tex. App.—Fort Worth 1988, no writ) (citing *Metrocon Const. Co. v. Gregory Const. Co.*, 663 S.W.2d 460, 462 (Tex.App.—Dallas 1983, writ ref'd n.r.e.); *see also Imperial Charters, LLC v. Redwood Fire and Casualty Insurance Co.*, No. 02-24-00237-CV, 2025 WL 1006279, at *5 (Tex. App.—Fort Worth Apr. 3, 2025, no pet. h.).

687. Here, Defendants' affirmative defense of impossibility fails. Defendants cannot rely on "the league's early demise" as an unknown contingency because Dundon was well aware of the AAF's financial difficulties, Dundon had committed $250 million to keep the AAF viable for a long time, and Dundon is the one who made the decision to execute the AAF for an "early deminse." The fact that the AAF needed more than $70 million to complete its first season, and that Dundon's $250 million appeared more burdensome than he initially anticipated, does not allow him to assert impossibility.

688. In *Imperial Charters*, the a charter bus company, Imperial, asserted the affirmative defense of impossibility of performance in response to its insurer's suit for unpaid premiums. 2025 WL 1006279, *1-2. Imperial argued that COVID-19 and executive orders from the Texas Governor made its business impossible and excused its performance—payment of premiums—under the insurance contract. *Id.* The court held that Imperial's defense "failed as a matter of law" because "market shifts or financial inability do not usually effect [a] discharge" of contractual obligations, *Id.* *5 (quoting Restatement (Second) of Contracts Sec. 261), and because the notion that "a contract is more burdensome to perform that initially anticipated does

not excuse its performance." *Id.* \*5 (citing *EM Bldg. Contractors Servs., LLC v. Byrd Bldg. Servs., LLC*, No. 05-19-00153-CV, 2020 WL 4592791, at \*14 (Tex. App.—Dallas Aug. 11, 2020, no pet.) (mem. op.)).

**S.     Defendants' Affirmative Defense of Lack of Authority**

689.     Defendants have asserted a defense of "lack of authority" as to several of Trustee's claims.

690.     The Court finds that Ebersol obtained oral approval from the ESMG board members before the Oral Agreement was bound, and therefore had actual authority to bind ESMG. *See* FOF ¶¶ 102, 119.

691.     Additionally, Ebersol had apparent authority. Business leaders are clothed with the apparent authority one would reasonably expect a person with those same roles and titles to have. *Fed. Deposit Ins. Corp. v. Tex. Bank of Garland*, 783 S.W.2d 604, 607 (Tex. App.—Dallas 1989, no writ) (finding bank's appointment of agent as CEO clothed him in apparent authority to bind bank to credit agreement). Where an agent with apparent authority and a third party reach an agreement, both the third party and the principal are bound. Restatement (Third) Of Agency § 2.03 (2006) ("…when an agent acting with apparent authority enters into a contract with a third party that purports to bind the principal, the principal may enforce the contract against the third party.").

692.     Ebersol was the principal investor and CEO of ESMG and the architect of the AAF. Dundon and Zutter both believed Ebersol had the authority to bind ESMG to agreements of this kind. *See* FOF ¶ 120. Defendants' arguments that Ebersol himself could not provide the signals of this authority to create apparent authority fail. *Tex. Bank of Garland*, 783 S.W.2d at 607 (bank's appointment of agent as CEO clothed him in apparent authority to bind bank to credit agreement). ESMG's actions clothed Ebersol with his apparent authority, by granting him

the position of CEO and making it part of his ordinary job duties to negotiate investments and loans with third parties. *See* FOF ¶ 120.

## T.    Defendants' Affirmative Defense of Advice of Counsel

693.    Defendants refer in their trial brief, but have not pleaded, either in their answer or in the joint pretrial brief, an affirmative defense under Delaware General Corporate Law 141(e) regarding advice of counsel. ECF No. 298 at 35.

694.    The statute cited by Defendants creates an affirmative defense, protecting executives from decisions violating their duties of due care if they make decisions in good faith reliance on relevantly trained professionals selected with reasonable care. *See* DEL. CODE ANN. TIT. 8, § 141(e).

695.    Defendants are barred from raising this defense due to their failure to plead it.

The Count V Defendants' invocation of Section 141(e) fails for at least three independent reasons. First, a defense based on Section 141(e) is an affirmative defense. Affirmative defenses are required to be asserted in an answer or in an amended answer. As a general rule, the failure to raise an affirmative defense in an answer constitutes waiver. Here, the Count V Defendants did not assert a Section 141(e) defense in their answer and did not at any point seek to amend their answer. Thus, the defense is waived.

*GB-SP Holdings, LLC v. Walker*, No. 9413-VCF, 2024 WL 4799490, at *19 (Del. Ch. Nov. 15, 2024); *see also In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 48 (Del. Ch. 2014).

696.    Defendants cannot equitably raise this defense post-discovery. Among other things, assertion of an advice of counsel defense such as Section 141(e) waives attorney-client privilege. While Trustee was able to obtain information regarding communications through AAF channels with Bracewell, he had no access during discovery to relevant communications with Defendants' own attorneys at Bell Nunnally, who the facts show were involved in bankruptcy decisions, as it would have if this affirmative defense had been appropriately pleaded. FOF ¶

284.[25] *Grunstein v. Silva*, No. CIV.A. 3932-VCN, 2012 WL 5868896, at *1 (Del. Ch. Nov. 20, 2012) (disallowing introduction of evidence regarding counsel advice defense where attorney-client communications had been shielded by privilege during discovery).

697.    Moreover, the evidence introduced at trial fails to support any advice of counsel defense. Defendants presented no testimony from any bankruptcy professionals regarding any advice provided to Defendants that their actions in putting the AAF into Chapter 7 bankruptcy were necessary. In fact, the testimony and evidence establishes that it was Dundon and Zutter, not any hired professionals, who drove the bankruptcy. It was Dundon's decision, and he and Zutter both signed the consent. *See* FOF ¶ 358.

698.    The evidence further demonstrates that some form of bankruptcy reorganization for the AAF had been planned or considered by Defendants before any bankruptcy professional was engaged. *See* FOF ¶ 142. Defendants' tax preparers, PwC, were engaged not to plot out a finalized equity transaction, but to consider how to convert the AAF into assets for tax purposes. *See* FOF ¶¶ 1-278.

699.    Zutter—who was critical of the investment at the beginning, *see* FOF ¶ 98, and who was directly engaged in the money-throttling conduct that killed the league, *see* FOF ¶¶ 245-246, dictated the bankruptcy strategy to the professionals, and not the other way around. *See* FOF ¶¶ 353-354.

700.    Finally, Dundon's and Zutters decisions regarding funding (or not funding) the AAF, including their decision to refuse all other possible go-forward options (*see* FOF ¶ 349), their decision to refuse any and all other investments, (*see* FOF ¶¶ 316-325), their late descriptions of the AAF in such a way as to call into question its possibility of success (*see* FOF

---

[25] *See also* **Day 15, 173:14-174:10**.

¶ 281), and their determination not to make good even on their claimed $70 million commitment by attributing an improper "deemed investment" to the AAF and forcing the AAF to pay for PWC's unrelated work and the bankruptcy itself (*see* FOF ¶¶ 337-338), ultimately meant no professional could have advised this business, frozen out of every possible source of money, to do anything other than declare bankruptcy. The decisions that brought the AAF to that point were all Dundon's and Zutter's.

**U.    Defendants' Assertion of Judicial Estoppel/Admission/Waiver**

701.    Defendants contend that Trustee, because his First Amended Complaint still contains allegations that the Term Sheet was an enforceable contract, is estopped from denying the Term Sheet is enforceable. Defendants made various other references to statements in the First Amended Complaint as judicial estoppel or admissions.

702.    The First Amended Complaint is no longer Trustee's live pleading, as it was replaced by the Joint Pretrial Order when that was filed. *Womack v. Tex. Capital Bank, N.A.*, No. SA-22-CV-00965, 2023 WL 4410517, at *3 (W.D. Tex. July 7, 2023). This supersession is "for all pleadings" and the joint pretrial order "governs the issues and evidence to be presented at trial." Id. (quoting *Branch-Hines v. Hebert*, 939 F.2d 1311, 1319 (5th Cir. 1991). Trustee's First Amended Complaint is therefore not relevant for the purpose of judicial estoppel or judicial admissions.

703.    Defendants also have waived any argument for enforcing any judicial admissions as to any facts on which evidence presented at trial might bear. Defendants made no motions in limine, and to the extent any of the subject matter of their objections to testimony or evidence was based on the theory that certain matters were judicially admitted, the Court has already ruled on those objections and need not revisit them. To the extent they made no such objection when

the relevant testimony or evidence was offered, they have waived any right to rely on judicial admissions as conclusive. *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983).

704.   Judicial admissions also do not apply to questions of law. *See Blankenship v. Buenger*, 653 Fed. App'x 330, 335 (5th Cir. 2016). While whether a contract is effective is a question that involves certain facts, whether the actions of parties have created a contract is a question of law. *Hines v. Liberty Life Ins. Co.*, No. EP-11-CV-545-KC, 2013 WL 310320, at *12 (W.D. Tex. Jan. 25, 2013). They certainly don't apply to bar adjustment of argument after a question of has been decided *against* a party, such as when the Court dismissed Trustee's written contract claim (Count II) as moot in its summary judgment order after deciding the Term Sheet could not be enforced. Case No. 22-05078, ECF No. 292 at 23, 25, and 50.

705.   Moreover, Trustee's allegations with respect to the Term Sheet do not constitute judicial admissions in the first place:

> A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on a party making them. Pragmatically, a judicial admission has the effect of withdrawing a fact from contention. Thus, ***the purported admission must be made intentionally as a waiver***, releasing the opponent from proof of fact. The decision to treat a prior statement as a judicial admission is within the court's discretion.

*Holcombe v. United States*, No. SA-18-CV-555-XR, 2021 WL 398842, at *3 (W.D. Tex. Feb. 3, 2021) (cleaned up) (emphasis added).

706.   Especially given Trustee's attempt to amend, the identified statements in Trustee's pleadings were certainly not intended by Trustee to operate as a waiver. These statements do not constitute judicial admissions in the first place, much less admissions that Trustee is estopped to deny.

707.   To the extent Defendants intend that judicial estoppel apply to bar any change in legal position, that too fails.  "Judicial estoppel is 'a common law doctrine by which a party who

has assumed one position in his pleadings may be estopped from assuming an inconsistent position.'" *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) (quoting *Brandon v. Interfirst Corp.*, 858 F.2d 255, 268 (5th Cir. 1988)). "A court should apply judicial estoppel if (1) the position of the party against which estoppel is sought is plainly inconsistent with its prior legal position; (2) the party against which estoppel is sought convinced a court to accept the prior position; and (3) the party did not act inadvertently." *Jethroe v. Omnova Sols., Inc.*, 412 F.3d 598, 600 (5th Cir. 2005).

708. Two of the elements of judicial estoppel are not met. Here, Trustee acted inadvertently because the full facts surrounding the lack of execution of the Term Sheet were not known at the time of the pleading, and after those facts became known, the Trustee sought the opportunity to amend his pleading. The Court denied that amendment because it came after the parties' summary judgment motions were fully briefed, but there is no evidence that Trustee intentionally pleaded that the Term Sheet was valid to obtain some advantage, then changed his position mendaciously. He became aware of clear evidence that the Term Sheet was not valid well after his live pleading was filed.

709. Additionally, Trustee did not persuade this Court to accept his prior position that the Term Sheet was enforceable—to the contrary, this Court has ruled that the Term Sheet is *not* enforceable. Case No. 22-05078, ECF No. 292 at 23, 25. The Trustee therefore may not be judicially estopped from denying that the Term Sheet is enforceable.

## III. **CONCLUSION**

Trustee respectfully requests that this Court consider these Proposed Findings of Fact and Conclusions of Law, and the Post-Trial Briefing included herein at the Court's request, and enter Findings of Fact, Conclusions of Law, and judgment in favor of the Trustee, and grant such other and further relief to which Trustee may be justly entitled.

Dated: July 11, 2025                Respectfully submitted,

                                    */s/ Katharine Battaia Clark*
                                    **Nicole L. Williams** (SBN 24041784)
                                    **Katharine Battaia Clark** (SBN 24046712)
                                    **Thompson Coburn LLP**
                                    2100 Ross Avenue, Suite 3200
                                    Dallas, Texas 75201
                                    Phone: (972) 629-7100
                                    Fax: (972) 629-7171
                                    nwilliams@thompsoncoburn.com
                                    kclark@thompsoncoburn.com

                                    **and**

                                    **Boris Treyzon** (CA SBN 18893)
                                    Admitted *Pro Hac Vice*
                                    **Jonathon Farahi** (CA SBN 324316)
                                    Admitted *Pro Hac Vice*
                                    **Abir Cohen Treyzon Salo, LLP**
                                    16001 Ventura Boulevard, Suite 200
                                    Encino, California 91436
                                    Phone: (424) 288-4367
                                    Fax: (424-288-4368
                                    btreyzon@actslaw.com
                                    jfarahi@actslaw.com

                                    **and**

                                    **Brian S. Engel** (SBN 00789279)
                                    **Steve P. Turner** (SBN: (20314700)
                                    **Barrett Daffin Frappier Turner & Engel, LLP**
                                    580 La Ventana Blvd.
                                    Driftwood, Texas 78619
                                    Phone: (512) 687-2503
                                    Fax: (512) 477-0008
                                    brianen@bdfgroup.com
                                    stevet@bdfgroup.com

                                    **ATTORNEYS FOR PLAINTIFF**
                                    **RANDOLPH N. OSHEROW,**
                                    **CHAPTER 7 TRUSTEE, DEBTORS' ESTATE**

## CERTIFICATE OF SERVICE

I hereby certify that, on July 11, 2025, a true and correct copy of the foregoing document was served to the below listed parties via electronic means as listed on the Court's ECF noticing system or by electronic mail.

*VIA EMAIL*
K&L Gates, LLP
Brent D. Hockaday
1717 Main Street, Ste. 2800
Dallas, TX 75201
brent.hockaday@klgates.com

*VIA EMAIL*
Bell Nunnally & Martin LLP
Jeffrey S. Lowenstein
Beverly A. Whitley
Brent A. Turman
Sydnie A Shimkus
2323 Ross Ave., Ste 1900
Dallas, TX 75201
jlowenstein@bellnunally.com
bwhitley@bellnunnally.com
bturman@bellnunnaly.com
sshimkus@bellnunnally.com

*/s/ Katharine Battaia Clark*
Katharine Battaia Clark