IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | CASE NO. 19-50900-CAG |
| **EXHIBITIONS, LLC,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **RANDOLPH N. OSHEROW, Chapter 7** | § | |
| **Trustee, and the Bankruptcy Estates of** | § | |
| **Legendary Field Exhibits, LLC; AAF** | § | |
| **Players, LLC; AAF Properties, LLC;** | § | |
| **Ebersol Sports Media Group, Inc.; LFE** | § | |
| **2, LLC; and We Are Realtime, LLC,** | § | |
| | § | |
| Plaintiffs, | § | Adversary No. 22-05078-CAG-7 |
| | § | |
| v. | § | |
| | § | |
| **THOMAS DUNDON; JOHN ZUTTER;** | § | |
| **and DUNDON CAPITAL PARTNERS,** | § | |
| **LLC,** | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**PROPOSED FINDINGS OF FACT**

1.     This case arises from the demise of a professional spring football league known as the Alliance of American Football.

2.     Charles Ebersol co-founded the league in 2018 and served as the chief executive officer of Ebersol Sports Media Group, Inc. ("ESMG"). ESMG served as the parent company for the league. The debtors in this case include ESMG and Legendary Field Exhibits, LLC, AAF

Players, LLC, AAF Properties, LLC, LFE 2, LLC, and We are Realtime, LLC, all wholly owned subsidiaries of ESMG.

3.       In February of 2019, the league faced a funding crisis brought on by the failure of its main investor to meet funding commitments and a rumor started by the league's soon-to-be competitor (the XFL) that the league was not paying or could not pay players' salaries.  To stave off the league's collapse, Ebersol obtained an emergency injection of cash and a $70 million maximum funding commitment by signing a Term Sheet that committed ESMG to transfer 75% of its stock to Dundon Capital Partners LLC ("DCP") and hand over control of the league to DCP. Tom Dundon, DCP's owner, caused DDFS (another Dundon entity) to satisfy DCP's funding commitment, and Dundon and John Zutter, a non-equity partner in DCP, assumed control of the league. Legacy AAF management maintained control of day-to-day operations up to the time the debtors filed bankruptcy.  13TR 175-76.

4.       The $70 million DCP commitment proved not to be enough to stabilize the league financially.  Ultimately, the league filed for chapter 7 bankruptcy.  This case concerns the cause and necessity of the bankruptcy filing.  The Trustee blames Dundon for failing to invest $250 million in the league based on reports (from February of 2019) in the news that Dundon had committed to investing $250 million to the league.  The Trustee also blames Dundon and Zutter for making business decisions that the Trustee claims ultimately benefitted Dundon to the league's detriment.  DCP, Dundon, and Zutter claim that Ebersol misled Dundon and misrepresented the league's financial condition when DCP entered the Term Sheet; they claim the $250 million figure was marketing; and they claim the league failed because of Ebersol's mismanagement and because every spring football league has failed.

2

# BACKGROUND

5.     ESMG was formed under Delaware law.  D22.

6.     A board of directors ran ESMG. D1, D22.  Ebersol served as the chairman of the ESMG board.  D135 at 11.  The other board members included Reggie Fowler, Dick Ebersol, Jeff Moorad, and Keith Rabois.  D135; 2TR 123.  Dick Ebersol is Charlie Ebersol's father.  The elder Ebersol served as the president of NBC Sports and had experience with a prior professional spring football league (the original XFL).  Moorad, a lawyer, worked at Morgan Lewis, one of two firms the league had retained.  2TR 58; 1TR 158.  Ebersol testified that Moorad had substantial experience in the sports industry and led the sports practice at Morgan Lewis.  1TR 158.  Ebersol also testified that Moorad had been the inspiration in part for the movie character "Jerry Maguire."  2TR 138:22–139:5.

7.     Ebersol also served as ESMG's chief executive officer and the manager of all the subsidiary LLCs and generally oversaw the league's operations.  4TR 79.  Prior to his signing of the Term Sheet, Ebersol owned a majority of the common stock and approximately two million preferred shares of ESMG through his wholly owned entity Teddy Bright Pictures.  D75 (pdf page 60); D216; 1TR 112.  Ebersol's family trust owned additional common stock and preferred shares of ESMG.  D75 (pdf page 60); D216.

8.     Alan Kantowitz served as the league's chief of staff.  18TR 268-69.  He created and updated the pro forma projections used in the solicitation of investors.  5TR 14.

9.     Kevin Freedman served as the chief operating officer.  4TR 65; 12TR 339-40.  He worked with Kantowitz and was also responsible for operational oversight.  12TR 275, 340-41.

10.    Kevin Farrell served as an operations consultant.  13TR 441:6–17.  He managed accounts payable and spending.  13TR 364:3–4, 21–22.

11.     The league was a startup spring football league Ebersol contemplated as a business idea as early as 2016 after he produced the 30 for 30 film "This is the XFL."  Ebersol envisioned the league becoming a minor league, feeder option to the NFL, showcasing fringe professional players looking for another chance to play or former college and practice squad players looking for experience and exposure to gain a roster spot on an NFL team.  1TR 125-26.

12.     The league consisted of eight teams in eight markets (1TR 187):   Atlanta, Birmingham, Memphis, Orlando, Salt Lake City, San Antonio, San Diego, and Tempe (4TR 145). The teams would play a 10-game regular season, followed by a two-week playoff, with the championship game leading up to the NFL draft.

13.     Each of the league's players entered a standard player agreement, which consisted of a three-year deal.  The league contracted to pay the players $70,000 for the first season, $80,000 for the second season, and $100,000 for the third season.  T1291, 1TR 33.

14.     The player contracts prohibited players from playing for other professional spring football leagues, with an opt-out for playing in the NFL.  T1291.  The NFL opt-out did not require the NFL to pay or share revenue with the league.  T1291.

15.     The league began raising money in 2017.  T709.  Ebersol knew that professional spring football was a risky venture. In early interviews, he admitted that every professional spring football league prior to the AAF had failed. Other witnesses in this case echoed that sentiment.

16.     At trial, Ebersol named a number of wealthy potential investors in the league. Though several of them testified at trial, none of them had an interest in investing consequential money into to the league.  11TR 346:23-347:2. The only real substantial monetary commitments the league ever had were Fowler, who defaulted, and Dundon who sank $70 million into the league through DCP and lost it all.

17.     Ebersol also identified well-known entertainment and sports figures as having a serious interest in investing in the league, but none of the persons he named showed up at trial to substantiate that testimony.  The well-known names that did invest did not contribute substantial capital relative to the league's need for hundreds of millions of dollars.  T709; T757.  Time and again, Ebersol referred to unnamed, and waiting-in-the-wings investors, poised to "follow a legitimate lead," referring to an investor who commits after a respected investor has publicized a significant financial commitment.  T20.

18.     In hindsight, some of the league's early business decisions did not work to the league's advantage.

19.     **The TV contract.** The heart of any successful sports venture is a television deal, normally the most effective way to present a sports product and attract a large fan base across the country. Typical economics of a professional sports television deal rely on networks to bear the costs of production and pay a league or teams for the right to display and air games on their networks.  17TR 114:22–115:15.

20.     The league business model worked backwards.  Rather than securing networks as a revenue generator, the league secured a time buy, where the league paid networks for the privilege of having league games aired on television.   17TR 115:17–116:8, 116:18–118:15, 119:10–122:5; T719; T771.  Ebersol described the CBS and NFL deals as one-sided in CBS's and the NFL's favor.  D47.  The packages the league secured with CBS, Turner, and the NFL for games to air on CBS, CBS Sports, TNT, and the NFL Network became one of the largest expenses the league incurred.  The league paid the production costs, not the networks.  12TR 349; 17TR 115:17–116:8, 116:18–118:15, 119:10–122:5, 122:20-23; T719; T771.

21.     In an effective business model, a network would work with the league to sell advertising slots during game programing and sell much of the entire season prior to the first game or broadcast. 17TR 130:20-131:1.  The league and the teams would aim to complete all sponsorship and distribution deals well in advance of the actual season.  In this case, the league had the responsibility to secure advertising during its airtime.  17TR 115:17-116:8, 117. By the start of its inaugural season, the league had sold very little airtime.  17TR 141:21–142:9.

22.     **Financial management.** A successful sports league—like any other business—requires budgeting, cost controls, and coherent reporting systems that allow departments within the business to communicate and ensure accurate transmission of information.  Under Ebersol's, leadership the league lacked internal reporting and controls between the main league office and teams, within the league office itself, and between the league office and its representatives, who entered deals with third parties but failed to inform league management in real time.  13TR 291:13–293:16; 18TR 39-40. Often, league management discovered the expense after it received an invoice months later.  13TR 291:13–293:16. The league failed to implement a coherent system for reporting and tracking revenue and expenses at league or team levels. 13TR 291-293; 18TR 39-40.

23.     League management decisions on spending exacerbated the situation.  The league chartered flights at significant expense to take teams to games, where a minor league would normally take buses or commercial flights.  8TR 228:4-229:3.  The league issued company credit cards indiscriminately, and employees ran up uncontrolled charges.  13TR 291:13–293:16.

24.     **Timing.**  The abundance of other sporting events in the spring contributed to the lack of interest in the league.  17TR 149-150.  The NCAA basketball tournament, the NHL and NBA playoffs, the start of major league baseball, the Masters PGA tournament, and a myriad of

other traditional spring sporting events have saturated the spring viewing market.  17TR 149-150; 11TR 112:21–113:3.  The week before the league shut down, viewership ratings had dropped to one-fourth of week one's ratings.  11TR 338–339.

25.  **Bloated payroll.**  The league hired aggressively.  Between late 2017 and the start of league play, the league grew from a handful of employees to more than 900.  5TR 24-25.  The league paid its players more than double what the XFL paid players — a $21 million per season difference.  17TR 148.  The league's non-player salaries were double what they should be for a startup.  D31.  Jeff Moorad, one of the league's board members, observed that Ebersol ran the league like a 10-year business rather than a startup.  D31; D33.

26.  **Pro formas.**  From the outset, the league used a pro forma to show revenue and expense projections to potential investors.  D2; D26.  The projections included projected ticket sales, sponsorship deals, merchandise, the technology application, and what the league referred to as PAL or FANchise agreements.

27.  The pro formas contemplated deriving ticket revenue from the games and sponsorship and merchandise revenue at the league and team level. The technology-driven revenue centered on an app fans could use to interact with and watch the games and ultimately place wagers on the games.

28.  The league designed PAL agreements to bring in investors as quasi-owners of the teams.  For a negotiated price the league hoped it would start at $10 million, a PAL or FANchise owner could purchase a profit-sharing interest in a team.  The purchaser would own a market-wide right to that team's revenue and sales, but the teams would remain under league ownership at the league level.  1TR 147.

29.     Originally, the league's plan was to grow by two teams every other season.  5TR 18.  But, at the urging of a potential investor to juice the pro forma projections, the league changed its projections to show the league growing by two teams every season.  5TR 22-23; D12.  Shortly after that pro forma change, Ebersol shut down FANchise sales at the urging of Reggie Fowler, the league's original main investor. 5TR 18.

30.     The league contemplated that FANchise agreements would produce significant revenue, and, according to early proformas, supply the sole source of revenue in 2018, but the league never generated any revenue selling FANchises.  5TR 16-17.

31.     In around May 2018, the league projected that it would earn $176 million in revenue through the end of 2019.  19TR(PM) 172.  Ideally, the league should have been fully funded before the first kick off.  18TR 291-292.

32.     The evidence presented at trial showed that the pro formas consisted of speculative projections that had no real basis in fact.  5TR 14-23, 93-101.  The league frequently modified the projections, which showed widely varying revenue, expense, and capital needs.  14TR 230-47; 19TR(PM) 172-174; D2; D6; D31; D75; D188; T15.

33.     In spring 2018, Ebersol caught wind that the XFL, a former professional spring football league his father co-founded with WWE President Vince McMahon in 2001, planned to relaunch its league during the spring of 2020.

34.     To beat the XFL to market, Ebersol moved up the league's launch date by one year to debut the week after the Super Bowl in February 2019.  11TR 299.  As a result of that change, the league began incurring massive obligations and liabilities almost immediately and rushed to launch.

## THE FOWLER INVESTMENT

35.     Beginning in June 2018, ESMG met with Reggie Fowler about making a large investment into the league.  T757.

36.     Eventually, Fowler's entity FO2 LLC entered a Term Sheet for Series 1 Preferred Stock Financing with ESMG, which obligated FO2 to make a $50 million equity investment and provide a $120 million line of credit. T16.

37.     Almost immediately after the league signed the FO2 Term Sheet, FO2 defaulted on its initial funding obligations.  12TR 337-338.  The default began at the same time as the league began incurring significant costs attributable to the start of the season, including the pending training camp in January 2019.  13TR 361-365.  Throughout December 2018 to February 2019, Fowler repeatedly failed to meet the equity funding requests submitted by ESMG.  5TR 36-37, 39, 41-42, 44-47, 49-50; D23; D29; D31; D33; D100.   The parties later discovered the federal government seized many of the wire transfers Fowler sent to the league before the wires hit the league's bank accounts.  2TR 110-11.  The situation became so dire that, as early as the fourth quarter of 2018, ESMG realized it could not rely on Fowler and began a concerted effort to find investors to replace him.  D29; 12TR 353.  Ultimately, Fowler funded around $22 million of the $50 million equity funding and none of the $120 million line of credit.  D29 ($4.8 million); D36 ($13.4 million; D100 $5.35 million).  The Trustee sought and obtained a judgment against Fowler for $53,189,261.80 in damages based on a finding of total loss to ESMG.  D208.1.

38.     Even after Fowler failed to comply with his obligations, Ebersol told an NFL representative that Fowler had fully funded $170 million.  5TR 117-18; D20.  Ebersol told other investors the league was fully funded.  11TR 177:14–178:13, 183:21–184:2.  He even told his

father, Dick Ebersol, that the main investors had put nearly $200 million into the league. 5TR 124; D47. None of those statements were true.

39.     After Fowler failed to meet a significant funding request in late December 2018, Ebersol became desperate. The league had only $2 million in capital and was within a week of running out of funds. 5TR 41-42; D36. Ebersol told the board the league's options were to sell to the XFL or forfeit the 2019 season. D29. He met with Vince McMahon about selling the league to the XFL leader. 5TR 43. McMahon had no interest in acquiring any part of the league. 5TR 43.

40.     In mid-December 2018, Ebersol had no viable funding source that could meet the league's impending obligations. Ebersol considered shutting down the league altogether, as keeping it open would increase the amount of debt by tens of millions of dollars. D29.

41.     Eventually, in late December 2018, some funding from Fowler squeezed through the federal government's seizure efforts. 13TR 361:3-17. Ebersol described a check deposited by ATM as a $13.4 million Christmas miracle. 1TR 193-194; 2TR 7-8. The amount was not enough to finance the league through training camp the following month, much less the season. 5TR 38; 13TR 364:24-365:10; D36. The league used the funds to pay 2018 expenses. D36. Nonetheless, Ebersol plowed forward and allowed the league to remain open and incur tens of millions of dollars in additional liabilities without a reliable funding source in place. 5TR 38.

42.     Ebersol conceded that the dire financial situation completely ruined the league's marketing and sponsorship efforts Ebersol had to slash those expenditures, which cratered projected revenues. In Ebersol's own words, "Reggie's delinquency screwed us with respect to revenue by killing our marketing." 5TR 39; D33.

43.     Ebersol cut production and national marketing and sponsorship when the league needed to raise awareness, sell advertising, sell tickets, and sell sponsorships.  5TR 89-93; 19TR(PM) 143-145, 164-165, 167-172; D33; D40.  Ebersol also cut marketing personnel and funding necessary to drive local awareness.  5TR 93-101; 19TR(PM) 164-165, 167-172; D40; D41; 17TR 130:20-131:1 (advertising should be sold before playing the first game).  Ebersol testified the league terminated its advertising agency McGarry Bowen.  3TR 46.  In fact, McGarry Bowen terminated the league because it was about $3 million.  D224; 3TR 218-219.

44.     Ebersol failed to cause the league to invest in revenue generating digital products, which led to the league failing to earn revenue from digital products or related sponsorship sales.  5TR 102; D41; 19TR(PM) 170-172; D40.

45.     By the end of December 2018, Ebersol's team projected the league would need more than $24 million to get through most of January 2019 and would continue to incur millions in expenses to critical vendors without adequate funding.  D35; 19TR(PM) 149-52.

46.     In January of 2019, the league's training camp began.  As a result, the league's spending increased substantially.  12TR 352; 19TR(PM) 187.  At the close of training camp, the league was in poor financial condition, and bills were piling up.  Following a late December funding, Fowler's funds continued to not reach the league's accounts consistently and never in the amounts requested.  D100.  The financial situation at the league became so dire that, absent a new investor to replace Fowler, the league was on the verge of collapse.  D48.

47.     On January 7, 2019, based on an analysis done by Freedman and Kantowitz, the league finance committee downgraded the projected revenue from $176 million to $59 million for 2018 and 2019.  D40; D41.  The decreased revenue projections resulted from Ebersol's failure to secure adequate funding and his failure to properly market the league, secure sponsorships, and

promote local awareness before rushing the league into its first season of football.  19TR(PM) 164-165, 167-172; D40; D41.

48.     The league's expenses did not reduce proportionally to reduced projected revenues. The league retained its previously negotiated broadcast contracts and commitments to stadium leases and countless vendors and third parties, including 400+ players, referees and football staff needed to put on a game.  Ebersol made the decision to push forward with the league, knowing that the league had incurred significant liabilities that had not been paid and would continue to be pushed off and was going to incur additional liabilities without a committed source of capital. 19TR(PM) 185-187; D50.  Ebersol pushed forward in developing technology even though the league knew the technology would not yield substantial revenue for the foreseeable future.  Ebersol built the league with the expense structure of a 10-year mature business (including nearly 1,000 employees) and operational employees at double what a startup should pay.  D31; D33.  These decisions along with his decision to enter employment agreements with more than 400 players promising them more than double a market rate for a three-year term and allowing them to play for the NFL with no compensation from the NFL if players exercised their opt-out rights made the league's business model unsustainable.  17TR 148 (league paid players more than twice was XFL players were paid).

49.     Just a few weeks later, on January 22, 2019, Kantowitz sent an urgent memorandum to Ebersol, Freedman, and Farrell about the league having then $8 million in incurred but unpaid liabilities and approximately at least another $8 to $9 million in additional liabilities the league anticipated incurring to get through the first game of the season three weeks later, and an unknown amount owed to critical vendors like CBS.  D50; 18TR 221, 225, 226.  Kantowitz disclosed that

Ebersol had the league playing a game of chicken with critical vendors, like CBS, whose bills were long overdue. 19TR(PM) 179-186; D50.

50.     The league's first games debuted on February 9, 2019. At that point in time, the league was still seeking investors to replace Fowler, who continued to fail to meet his funding commitments. At the same time, Ebersol continued to misrepresent Fowler's investment and the status of on-going fund-raising efforts. D71 (Ebersol telling Jeff Goldfarb on February 11, 2019, "We are very happy" in response to questions about the status of Fowler's funding).

51.     By the second week of the season, the league lacked sufficient funds to cover payroll due on February 14, 2019, for the players' playing in the first week of the season. 4TR 14; 19TR 218:21-219:18. As Ebersol sat in the Arizona stadium to watch the final game of the first week, he knew that the league lacked funds to pay the players on the field. 4TR 59-61; D70.

52.     Ebersol suspected that the XFL purposely leaked a story on the issue (D255 at 2), and the players likely learned the lack of funding because of the leak and threatened to walk out.

53.     As of February 14, 2019, the best-case scenario was that $100 million or possibly more would have been required for the league to complete the first season. 19TR(PM) 63-64. The league had immediate cash needs of $36.7 million in addition to the $5.1 million needed for payroll. 19TR 46-47. $21.1 million at a minimum would have been required to cover the delinquent accounts payable as of February 14, 2019, in addition to the $5.1 million the league told Dundon it needed for player payroll and related expenses and additional unknown amounts tied to obligations never recorded in QuickBooks like stadium rentals, media, advertising, and legal services. 19TR 49, 54-55.

54.     Ebersol knew of the dire financial condition of the league in December 2018 through February 2019. 5TR 61-62; 13TR 364:21-367:21; D50. Ebersol knew that the league had

no reliable investor from December 2018 through early February 2019 to fund league operations or knew that its only investor was not or could not meet funding commitments. 13TR 364:21-367:21. Ebersol knew that the league had overdue obligations to critical vendors in January 2019. 13TR 364:21-367:21; D50.

55.     The situation left Ebersol scrambling to find emergency funding. 13TR 365:22-367:9. None of the existing or potential investors stepped up, and Ebersol himself, who claimed to have had the ability to cover the $5.1 million, did not step up and invest. 4TR 61-63. Due to Ebersol's actions, the condition of the league after the first week of play was such that the league had no reliable investor, had dismal outlook for revenue, had overdue obligations to critical vendors, and was incurring ongoing obligations to players, vendors, stadiums, and others despite lacking the funds to pay its existing debts. 19TR(PM) 187-188. Payroll had to be funded on a strict deadline (because of a new payroll system) or the players would likely quit and the league would die before the second week of games. Instead of using his family's money to cover the payroll, Ebersol opted to press forward and hope for a miracle.

**THE DCP INVESTMENT**

56.     On February 13, 2019, Erik Anderson introduced Ebersol to Tom Dundon, a Texas resident, as a potential investor in the league. T329. Anderson was a longtime business acquaintance of Dundon who Ebersol had unsuccessfully solicited for an investment in the league for a year. 6TR 177; 11TR 346:23–347:2, 347:19–348:1, 349:4–13, 351:12–352:2, 353:18–354:10; T329.

57.     Anderson initially told Dundon about the league during a breakfast meeting between the two earlier that same day (February 13, 2019). 11TR 349:14–19, 357:15–358:17. Anderson told Dundon the league had lost its lead investor, that the league was in trouble and

needed money immediately, and that Anderson had been approached about investing, but that the investment was too large for him.  11TR 346:23–347:2, 358:18–25, 369:15–370:3.

58.     Dundon had not previously met Ebersol and had no relationship with him or any of the Debtors.  9TR 156.

59.     Dundon and Ebersol first spoke via telephone on the morning of February 13, 2019. 7TR 139-140.  Dundon and Ebersol were the only persons on the call.  They discussed a potential investment opportunity with the league.  7TR 140.

60.     During the call, Dundon asked Ebersol how much money it would take for the league to make it through the first season.  Ebersol told Dundon that the number could be as low as $55 million or as high as $70 million.  At no point during that initial call or otherwise did Dundon and Ebersol discuss a $250 million agreement.  7TR 140:2-141:18; 9TR 88:16-89:11.

61.     That same morning, Ebersol sent Dundon an e-mail, touting the league's ratings from the first week of play, and attaching league financial projections, including an investor deck, a financial projections model, and a capitalization table.  D75.  Ebersol did not tell Dundon that a month prior the league had drastically downgraded its projected revenue because of cuts to marketing, advertising and technology, which adversely affected sponsorship, ticket sales, and general awareness of the league at a critical time — just before the start of the season.  5TR 95-102; D41.  The revenue projections Ebersol gave Dundon for 2019 were $5 million higher than the projections presented to the finance committee weeks earlier with no explanation for the difference.  D41; D75.  Projected expenses for 2019 differed by $21 million between the budget set by the finance committee and what Ebersol gave Dundon.  D41; D75.  Ebersol and his executive staff knew about substantial discrepancies between the projections he provided to Dundon and reality, but Ebersol did not disclose those discrepancies in the information he gave to Dundon.

62. The financial projections that Ebersol sent to Dundon differed materially in several respects from those Ebersol had sent to Fowler just months earlier. T15; D75. The projections sent to Fowler disclosed that projections could be toggled to make them more or less aggressive. T15. That disclosure was removed from the projections sent to Dundon. D75. The projections sent to Dundon contemplated the addition of two teams to the league every season for the first five seasons, whereas the earlier projections contemplated the addition of two teams every other season. The materials Ebersol sent Dundon contained material overstatements and unrealistic projections. Ebersol and his team knew about substantial, existing, immediately due and past due payables not referenced in the projections (in addition to the $5.1 million Ebersol did disclose). D50; 5TR 59-62. Defendants' expert Eric Bramer quantified the total accounts payable as of February 13 (excluding the $5.1 million need for payroll) at $21.1 million. 19TR 49. The projections sent to Fowler disclosed $46 million in expenses the league intended to pay from the revenue generated from the sale of FANchises in 2018. T15. The projections sent to Dundon did not disclose the decision to halt FANchise sales, actual expenses for 2018, or the status of payment for 2018 expenses. D75.

63. On February 13 and 14, Ebersol and Dundon had a series of phone calls, during which Ebersol stressed that the league needed money very quickly and that if Dundon did not make an investment, the league could not make payroll on February 14, 2019. Ebersol stated that the league's continued viability depended on it making payroll. 7TR 140.

64. Ebersol failed to disclose the league had millions of dollars in preexisting obligations in addition to player payroll. 8TR 51:6-12. The only pre-existing liability he disclosed was the $5.1 million needed for the league's payroll and related expenses. 16TR 191-193; T21; D237, Ex. A ¶ 6. Ebersol stated that the league needed between $55 and $70 million to make it

16

through the first season of play, which would conclude at the end of April, meaning that the league needed $55-70 million for the eleven weeks of the season that remained.  D50; 7TR 141.

65.     At trial, Ebersol denied that the $70 million figure originated with him.  The evidence showed otherwise.  Three days before Ebersol met Dundon, on February 10, 2019, Ebersol sent an e-mail to Michael Kives, a potential investment contact.  D70.  Ebersol told Kives that that the league needed $70 million to finish the season.  D70; 12TR 466-467; 19TR(PM) 201-203; TR20.  Contemporaneous league projections supported approximately the same estimate. D75 (pdf page 4); 4TR 56.

66.     Ebersol led Dundon to believe the league had paid expenses previously incurred by the league from inception through the first week of play—for items such as stadium fees, hotel accommodations for players—and that only the $5.1 million for player payroll, advertising expenses, and back-office expenses remained outstanding.  D75; T21; 13TR 285-86; 8TR 50:10-25; 51:6-12; 62:15-21.

67.     Ebersol testified he and Dundon initially discussed a $10 million bridge loan, but that there was no agreement who (Dundon or one of his entities) would be the lender.  2TR 120. After Ebersol sent a form of note to Dundon, Dundon called Ebersol back and said he (Dundon) was out, meaning there was no deal.  2TR 128.  Ebersol explained to Dundon more details about the AAF business model and suggested that Dundon call industry professionals who could verify the legitimacy of the AAF.  2TR 130, 132; 3TR 30:2–31:7; 6TR 71-72.  One of those industry professionals — David Zaslov — called Ebersol late that night and for the first time mentioned the figure $250 million as a potential investment (by Dundon).  2TR 140, 141, 142-144.  At almost midnight on February 13, Ebersol ended his day with no deal.  2TR 141, 142.

68.     The next morning, Ebersol had a call with Dundon in which Ebersol claims to have completed a deal for a Dundon investment.  In the complaint, the Trustee claimed the agreement involved an undisclosed Dundon entity investing $250 million over an unidentified period in exchange for a majority stake in and control of the league with the structure including **both** debt and equity.  ECF 56 at 18-19 ¶ 65 ("Dundon again assured Ebersol of his promise and commitment to fund a total of $250 million, keeping as an open item only the form such funding would take (debt, equity, or some combination)."); ECF 1 at 18 ¶ 65 (same); ECF 56 at 40 ¶ 142 ("Dundon offered and Ebersol accepted . . . that Dundon would invest $250 million in the AAF through ESMG, structured as both equity and debt, in exchange for a majority stake in and control of the AAF."); ECF 1 at 40 ¶ 142 (same).

69.     In his deposition, Ebersol testified that the terms were not even as clear as in the complaint:  Ebersol stated that, for $250 million, Dundon would receive a majority of ESMG and total control of the board.  4TR 19-25 (Ebersol impeachment clip from 9/19/24 deposition at 306:12–15.).  Ebersol admitted he and Dundon had not reached an agreement on whether the investment would be debt or equity.  4TR 19-25 (Ebersol impeachment clip from 9/19/24 deposition at 257:17–21).

70.     At trial, Ebersol claimed to recall certain terms in very specific detail and volunteered all new terms never before mentioned in the six years since he said he made the deal. The deal, according to Ebersol at trial, consisted of Dundon's agreement to invest $250 million in exchange for precisely a 75% equity interest in the league, no debt component, control of the board of directors, and complete control of the league (or ESMG).  2TR 169, 171.  Ebersol also testified contrary to his deposition that he and Dundon had agreed to a valuation of the league at $82.5 million.   6TR 184-87.   The Trustee presented multiple press reports and internal e-mails

referencing a $250 million commitment or investment or some combination of those terms. None of that evidence documented an exchange of $250 million for 75% of the league equity, control of the board, or an agreed valuation. No document discusses any other material terms of a $250 million transaction, including which Dundon-affiliated entity would be a party to the agreement, the timing or terms of the contribution of the funds or how they would be repaid. No document mentions an agreed valuation between Dundon and Ebersol. 6TR 184-87. The Term Sheet that Ebersol signed contains no reference to $250 million and contains no reference to an agreed value of ESMG.

71.     According to Ebersol, he called the existing board members and a few major existing shareholders and obtained their approval of the $250 million Dundon deal. 2TR 161, 163-168; 4TR 184-85. Ebersol also claims to have called Fenwick lawyer Jordan Roberts. 2TR 123-24. Notably, none of the board members, shareholders, or lawyers Ebersol claimed to have called testified at trial. The one investor who did testify — Dan Miller — contradicted Ebersol's testimony. Miller said Ebersol told him that he (Ebersol) had obtained financing for the season, but Miller did not recall Ebersol mentioning a $250 million deal. 11 TR 410:20-25, 430:8-11.

## THE TERM SHEET

72.     Ebersol and Dundon discussed various scenarios, investment amounts, and structures during multiple calls within the 24 hours between their initial introduction and when DCP transferred the initial $5.1 million to ESMG. 2TR 147-148. At the time that these discussions took place, ESMG, through Ebersol, was being advised by attorneys with Fenwick. D85.

73.     On February 14, 2019, Dundon connected Ebersol with John Zutter, who worked with DCP, an investment vehicle Dundon used to make investments. T21; D85; 15TR 51–53. DCP is a limited liability company organized under the laws of the state of Delaware with its

principal office in Texas. Dundon is DCP's manager, and DDFS Management, LLC is DCP's sole member. 16TR 215-219. Dundon is the sole member of DDFS Management, LLC, which is the sole general partner of DDFS Partnership LP. 16TR 296; D261. DCP and DDFS are pass-through entities for tax purposes. 10TR 400-401; 16TR 215-218.

74.     When Dundon connected Ebersol with Zutter, Dundon and Ebersol had not yet come to an agreement finalizing a potential investment. 7TR 284. Dundon tasked Zutter with structuring and negotiating, on behalf of DCP, the terms of a potential investment in the league. 7TR 178. Zutter testified that he never discussed a potential investment of $250 million with anyone prior to execution of the Term Sheet. 15TR: 92-93.

75.     DCP conducted limited due diligence on a potential investment in the league because ESMG needed the funding within a few hours to make the payroll deadline. 2TR 171-72; 15TR 17-18, 54; T21. Ebersol did not disclose to Dundon that the Ebersol family trust could have fulfilled the immediate $5.1 million for payroll and given DCP time for diligence. 6TR 63:1–9.

76.     DCP tried to determine the amount of capital the league needed to complete the first season. DCP also asked ESMG to provide all information on the investment (18TR 35-36) but prior to the Term Sheet ESMG provided no documentation other than the investor deck, financial projections model, and capitalization table that Ebersol emailed to Dundon on February 13, 2019. D75. Because time was of the essence, DCP did not have time to do the diligence that would normally accompany an investment. The evidence showed that if DCP had taken the time to conduct ordinary diligence, the league would have collapsed before it received the first dollar from DCP. 9TR 184-185.

77.     On February 14, 2019, the parties exchanged drafts of several proposed term sheets, the first of which was drafted by ESMG's counsel. 4TR 65; D85. Zutter handled the negotiations

for DCP and sent redlined changes back to Ebersol and the Fenwick lawyers.  4TR 65-66; 15TR 18-19; 23-24; 16TR 154-155.  Farrell was in the room with Ebersol during at least one of the calls about the Term Sheet.  Farrell's memory of those calls was that he did not recall any definitive statement of an agreement being discussed, other than that there would be a one-page deal for a quick investment, "that then *may* lead to an additional tranche of funding or financing."  13TR 372:11–373:22.  None of the draft term sheets referenced an investment or potential investment in the amount of $250 million.

78.  Fenwick lawyers Jordan Roberts and Dawn Belt represented ESMG in connection with the negotiations of the Term Sheet.  16TR 154-155.  Roberts did not testify.  Belt did not recall any discussions with DCP's representatives regarding an investment in the amount of $250 million by Dundon or any of his entities.  12TR 280-81.  Ebersol testified that he, Roberts, and Freedman had a call with Zutter about the Term Sheet.  2TR 180-181; 6TR 190.  During that call, Ebersol never mentioned that the deal was $250 million, not $70 million.  6TR 190.  Freedman did not recall any internal discussions regarding a $250 million investment by Dundon or his entities.  12TR 476.

79.  Except for Jordan Roberts, the others involved testified.  None of them recall a discussion of $250 million.  Besides Ebersol's trial testimony, the Trustee offered no evidence that anyone objected when the Term Sheet reflected the $70 million maximum cumulative commitment language.  16TR 275-276.

80.  Ultimately, negotiations culminated in the execution of a Binding Term Sheet for Series 2 Preferred Stock Financing (the "Term Sheet").  T7.  Ebersol executed the Term Sheet on behalf of ESMG.  4TR 66-67; T7.  Ebersol did not disclose that he had not obtained authority from the ESMG board or stockholders (in the form of a board vote at a meeting or a stockholder vote or

consent) to sign the Term Sheet on behalf of ESMG. T22; D136; 16TR 175-178, 180-182; D237, Ex. A ¶¶ 3, 9. Ebersol did not disclose he had not obtained authority from ESMG's other debt holders. D124; 9TR 202-203. Ebersol did not disclose that the change of control transaction would trigger defaults on millions of dollars of debt, that he lacked authority to consent to the issuance of a new series of preferred shares (4TR 45), or that agreements with other preferred shareholders including the Fowler agreement guaranteed the Series Seed shareholders and Fowler voting board seats (D22 at 11), which would make ESMG's performance of the Term Sheet impossible given that Ebersol promised DCP the only voting board seats. 4TR 176-78.

81.    When the parties finalized the Term Sheet, DCP believed, based on Ebersol and AAF legacy management's representations, the league had only $5.1 million in pre-existing liabilities. D50; 16TR 191-193.

82.    The Term Sheet contains the only agreement that any of the parties reached for an investment in the league. D90; D268; D269; 9TR 188-190.

83.    After he signed the Term Sheet, Ebersol retained sufficient shares to call for a vote to remove DCP or its representatives from league governance at any time. D22 at 11.

84.    The Term Sheet is between ESMG, as the "Company," and DCP, as "Investor," and outlines "a summary of terms for a proposed financing of the company."

85.    The Term Sheet required: "[t]he Investor [to] invest $5,100,000 (the "Initial Funding Amount") by 1:30pm PST on February 14, 2019.

86.    The Term Sheet contained a maximum cumulative funding commitment of $70 million:

> **Funding Commitment:** June 30, 2019, the Company will have the right to submit an equity funding request to the Investor, which shall state the amount of funding requested and include a supporting budget, subject to a maximum cumulative commitment of $70,000,000. Within 5 calendar days of receipt of each such

request, the Investor will invest into the Company the full funding amount listed on such request.

T7. The Term Sheet spelled out the ownership interest DCP would receive for its investment:

> **Investor Ownership:** Upon the execution of this Agreement and Funding of the Initial Funding Amount, the Company will issue the Investor a number of shares of Series 2 such that immediately after the Closing, the Investor will own 75% of the Company's fully diluted capital stock.

T7. The Term Sheet explained DCP's rights concerning corporate governance:

> **Board of Directors and Governance:** Upon the execution of this Agreement, the authorized size of the Board shall immediately be set at four members, two of which shall be voting members and two shall be non-voting members, consisting of members two voting members designated by the holders of a majority of the Series 2 (initially John Zutter and Tom Dundon) and two non-voting members designated by Charlie Ebersol. The Board shall have full authority over all aspects of the Company. The Investor shall have the right to make any and all day-to-day business decisions for or on behalf of the Company, including but not limited to determining capital required to be drawn under this Agreement, to bind the Company or to enter into any agreement on behalf of the Company. The Investor shall have the further right to define or limit any authorities of any employee, Director, advisor, representative, vendor, consultant or officer of the Company, up to and including terminating such individual or entity. To the maximum extent permissible under Delaware law, the parties agree that the Investor, in its role as such or as a director, officer or any other related role to the Company, shall have no fiduciaries obligations to the Company or its owners.

T7.

87.     At trial, Ebersol admitted that he understood the key terms of the Term Sheet when he signed it. 4TR 74. He understood that, by signing the Term Sheet (even though he lacked authority at the time), he obligated ESMG to issue Series 2 preferred stock to DCP representing 75% of ESMG's fully diluted stock. 4TR 74-76. He also understood that the Term Sheet set out a maximum cumulative commitment of $70 million and did not mention a $250 million commitment. 4TR 78-79.

88.     The Term Sheet required the Investor to "provide definitive documentation" that ESMG and its representatives would be "obligated to sign," but it made clear that the agreement was binding "upon [ESMG's] . . . receipt of the Initial Funding Amount." T7. The Term Sheet selected Delaware law as the governing law. T7.

89.     On February 14, 2019, DCP caused DDFS, an entity owned by Dundon, to fund the Initial Funding Amount of $5.1 million. 4TR 82-83; 12TR 374; 14TR 135. The funds were used by ESMG to pay payroll due that day.

90.     After ESMG received the $5.1 million, day-to-day management of the league remained with Ebersol and legacy league management. 19TR(PM) 207-209. Dundon and Zutter became the sole voting board members of ESMG on February 24, 2019; Ebersol continued to serve on the board of ESMG in a non-voting role, continued as the ESMG CEO, and remained the sole manager and CEO of ESMG's subsidiary LLCs. 4TR 79-80; 13TR 175:16–176:6. All of the other legacy league executives and staff remained in place. 13TR 175:16–176:6.

91.     Shortly after February 14, 2019, legacy league management met with DCP representatives in Dallas for a series of all-hands meetings. 12TR 374-375. During the meetings, which occurred over the course of several days, the parties discussed operational matters and the process for the league to make funding requests from DCP. 12TR 380-381; 16TR 223:17–227:12; D147. DCP also tried to obtain an understanding of the league's processes, systems, performance and business metrics. Under normal circumstances, DCP would have performed diligence before it made the investment, but it was unable to do so in this case because of the league's time constraints. D98; 16TR 221-223.

92.     The Term Sheet required funding requests to be submitted with a supporting budget. T7. DCP and league management agreed that, on a weekly basis, league management

would make a funding request to DCP, setting forth proposed vendors to be paid. 13TR 382-383, 462. DCP and ESMG would then agree on the budget and the amount of the funds needed from DCP, how much of a given request to fund, and how league management would use the funds to pay vendors.

93. Around the time of the Dallas meetings, league management provided DCP with access to its virtual data room for the first time. 15TR 72; 18TR 26; T841. Between viewing that room, which league personnel updated constantly with additional and new information, and the Dallas meetings, DCP began to discover material delinquent obligations incurred by ESMG prior to the execution of the Term Sheet ESMG that had not previously disclosed. DCP also began to discover that several of the representations Ebersol made before he signed the Term Sheet were false and that he had omitted material information. 15TR 83; D237, Ex. A.

94. In addition to the $5.1 million that ESMG needed for payroll, ESMG had tens of millions of dollars in outstanding accounts payable at the time it entered the Term Sheet. 19TR 49. The debts included the critical vendors with whom Ebersol had been playing "chicken." 19TR(PM) 179-186; 15TR 129-130; 16TR 191-195, 251, 253; D50; T278; D237, Ex. A ¶ 6.

95. The significant debt forced DCP to become creative and strategic in stretching the limited $70 million in capital to contend with the existing vendor liabilities and cover the cash shortfalls for the remainder of the first season. 13TR 288-89, 293-95.

96. During the entire time DCP worked with the league, the league failed to accurately report to DCP the true state of accounts payable. 13TR 290-91, 296, 301-04, 311-12, 315-16; 19TR(PM) 210-217; D150 (Kantowitz and Freedman discussing on March 1, 2019, how to hold back payables from the DCP funding request to make the weekly burn rate look less scary); D156. DCP implemented an accounts payable tracker to attempt to identify the monies owed by ESMG.

13TR 217-18, 293-96; T1119; 16 TR 230:22–231:20; D147. DCP also implemented a cash flow tracker to identify invoices that needed to be paid to get football on the field each week. 13TR 293-96, 299-300. Neither Ebersol nor legacy AAF management objected to the implementation of the accounts payable tracker or the cash flow tracker. 16 TR 224-233. DCP instructed league management to try to negotiate more favorable terms for certain obligations incurred prior to the Term Sheet and implemented a vendor settlement tracker to keep track of that process. 12TR 392; 13TR 293-96, 305-06; T962. In directing management to renegotiate obligations, DCP sought to increase the league's long-term prospects for success by preserving funds for the weeks to come. D98; 16TR 226-227. Zutter testified that, from his prior business experience, he knew professional service firms often accept discounts for pre-existing debts, and re-negotiation of pre-existing debts can benefit both the debtor, who saves cash, and the counterparty, who receives payment faster and is incentivized for the business to succeed by the prospect of a long-term business relationship. 16TR 225-227.

97. DCP prioritized spending to enable the league to put games on the field and make it through the first season. 13TR 288-89; 15TR 164-166; T84. DCP representatives Zutter and Jeff Vanderbilt created a triage system of payments that divided outstanding obligations into three tiers. 13TR 196-97, 217-218, 289, 295; 15TR 191-193. The first and most important tier consisted of expenses needed to put games on the field. 13TR 196-97, 217-218, 230, 295; 15TR 195; 196-197; T1117. The second tier consisted of expenses that allowed some runway for timing. 13TR 295. The third tier included those past-due obligations that no longer required any service. 13TR 295. DCP directed league management to renegotiate preexisting obligations to save funds. 16 TR 224:7-225:21. Though DCP had control of the board and had to approve the weekly contributions to the league, Ebersol and his staff maintained control of league operations, and,

ultimately, only they had access to the bank accounts and directed the payments to the vendors. 13TR 175–176; 178:2-5.

98.     As they dug into the details, DCP uncovered that ESMG had not accurately reported the state of its finances.  13TR 168-75; 15TR 86–87.  The league never gave DCP complete financial information.  13TR 168-69, 290-91.  The league never gave DCP a complete picture of finances at the team level.  13TR 170-72; 18TR 35-36, 38-39, 54-55.  DCP had to make multiple requests of ESMG to turn over complete information about stadium contracts and similar information.  13TR 172-73.  Previously undisclosed accounts payable kept popping up.  13TR 192-93; 16 TR 230:22-233:1; 19TR(PM) 212-214; D147.  Due to the league's gross financial mismanagement and its decentralized (and at times nonexistent) financial tracking system before DCP's investment, it took significant time for DCP to begin to uncover the extent of Ebersol's misrepresentations and omissions.  13TR 174-75, 378:19-25.

99.     DCP also eventually discovered that Ebersol made several other material misrepresentations and failed to disclose numerous material items prior to execution of the Term Sheet.  Ebersol represented that he had the authority to sign the Term Sheet on behalf of ESMG.  6TR 175-177; T-22; D237, Ex. A ¶ 3.  Ebersol was required to obtain approval from ESMG's board and a majority of the shareholders.  DCP discovered after the Term Sheet that Ebersol had not conducted a board meeting or a shareholder vote to approve the Term Sheet or any other transaction involving Dundon or his affiliates.  T22; 16TR 176-178; D237, Ex. A ¶ 9; D269.  DCP learned after the Term Sheet that a past associate of Ebersol's had threatened the league with litigation, claiming that he owned a 50% interest in the league.  16TR 195-198, 203; D237, Ex. A ¶ 8.  Ebersol failed to disclose, and DCP did not know about, the existence or nature of the threatened litigation before it executed the Term Sheet.  D114; 16TR 196-198; 203.  DCP also

learned of the existence of outstanding debts the league owed to David Pottruck, Dick Ebersol, and MGM, none of which Ebersol had disclosed before he executed the Term Sheet. D124; D237, Ex. A ¶ 10; 16TR 203-205. Ebersol did not tell DCP that the change of control transaction would accelerate the Pottruck and Ebersol notes and trigger a default under the MGM note. D124; D145.

100.    After the Dallas meetings, Ebersol and Dundon went to North Carolina for a Hurricanes game and then to New York to meet with the NFL and CBS. Ebersol testified that he and Dundon met with NFL Commissioner Roger Goodell at the NFL's New York offices. 2TR 267-68; 3TR 201 ("They shook hands, and yes, spoke briefly."). Goodell denied the meeting and said his only encounter with Dundon occurred by phone. 1TR 210:6-211:7.

101.    During the ensuing weeks, DCP led a robust effort to identify gaps between reporting and expenses. It tasked Elisa Lee, a DCP analyst, with creating a financial model that gave DCP and league leadership a view of the league's accounts payable and what the league anticipated in revenue. 18TR 24-25. Despite her best efforts, Lee could never wrap her arms around the true picture of the league. 18TR 35-36, 38-39, 63. The league lacked any coherent or consistent reporting structure between the league and the teams. 18TR 39-40.

102.    Legacy league leadership continued to discover new invoices and disclose additional accounts payable as the season progressed. 13TR 174; 19TR(PM) 211-216. What the league anticipated to be a need for roughly $5 million in outside capital (net of revenue) weekly to last the remaining nine weeks and two playoffs, quickly jumped to an eight-figure weekly burn rate. 13TR 308-317; 19TR(PM) 216-217; D172; T1343.

103.    Every week DCP learned of new expenses and liabilities necessary just to get games on the field, which was due in part to legacy league leadership withholding invoices to avoid scaring DCP. 13TR 301-02; 19TR(PM) 215-217; D125. DCP also learned that actual and

anticipated revenues were far below what the projections disclosed. 18TR 56-60, 71-72. As the season progressed, the situation compelled ESMG to tighten its belt to preserve the limited $70 million in capital. D172; T1343; 13TR 308-17.

### THE ESMG BOARD AND SHAREHOLDERS RATIFIED THE TERM SHEET

104. After ESMG signed the Term Sheet, Zutter (through DCP's lawyers) conducted a gap analysis that identified contractual and legal impediments to ESMG consummating the Term Sheet. D136; 16TR 180-182; D269. The transaction constituted a change of control that triggered a default on an MGM note, caused notes to an investor (David Pottruck) and the Ebersol family trust to become due, and caused a breach of the Fowler stock agreement. 4TR 193-97; 15TR 81:5–15, 83:2–22; 16TR 165-166, 180-182; D136. The transaction constituted a change of control that triggered a default on an MGM note, caused notes to an investor (David Pottruck) and the Ebersol family trust to become due, and caused a breach of the Fowler stock agreement. 4TR 193-97; 15TR 81-83; 16TR 165-166; D136.

105. Because the Term Sheet contemplated a change of control, it required board and shareholder approval. D22, Ex. A, Art. IV. When DCP discovered that Ebersol had lacked the authority to enter the Term Sheet on behalf of ESMG when he did because it constituted a material transaction, DCP sought to retroactively obtain ESMG's board approval (through ratification).

106. On February 24, 2019, a majority of the directors of ESMG at the time held a board meeting. 4TR 173-74; D135 at 11; D269. Ebersol, Jeff Moorad, Kevin Freedman, and Alan Kantowitz attended in person; Dick Ebersol and Dawn Belt attended by phone. 4TR 173-74; D135 at 11. The board meeting minutes accurately reflect what happened at the meeting. 4TR 173-74, 181. They show that Ebersol acted as the chairman and Belt acted as the secretary of the meeting

and kept the minutes.  D135 at 11.  Belt, a lawyer who specializes in start-up funding, worked at Fenwick with Jordan Roberts.  12TR 261-63.

107.     ESMG's board formally approved and ratified the Term Sheet.  D135 at 12; D269. The board determined that the Term Sheet was in the best interests of ESMG.  D135 at 12. ESMG's board also confirmed that it had already received $12 million from DCP in fulfilment of the Term Sheet.  D135 at 12.

108.     Besides Ebersol, none of the legacy ESMG board members testified at trial. Moorad's failure to testify is notable.  His firm (Morgan Lewis) represented ESMG through the critical events at issue in this case.  He served on the ESMG board and had a high level of experience in the fields implicated by the deals at issue because he had worked as a sports agent and a lawyer in sports and had been a prior owner of the San Diego Padres.  2TR 138-39.  He failed even to give a deposition to support Ebersol's claim that a $250 million agreement existed.

109.     Ebersol also testified that he called Fenwick lawyer Jordan Roberts about the $250 million deal with Dundon on February 14, 2019.  2TR 159.  Roberts did not testify in person or by deposition to corroborate Ebersol's testimony.  Roberts' Fenwick colleague Dawn Belt did testify. She admitted attending the board meeting, but she did not recall the mention of a $250 million agreement.  12TR 292, 300.

110.     No one ever presented ESMG's board of directors with, nor did it ever consider, any investment by Dundon or any entity owned or controlled by him in the amount of $250 million. 4TR 184-87; 12TR 479.

111.     None of the ESMG board members, shareholders, or attorneys sent a demand letter to Dundon stating or suggesting that Dundon breached a purported agreement to invest $250

million in the league, nor did any of the board members reach out to Dundon to ask why he did not fulfil a purported agreement to invest that amount. 9TR 89–90, 133–137.

112. Fenwick lawyer Jordan Roberts drafted a waiver to cure the MGM, Pottruck, and Ebersol family trust note defaults. 4TR 198-99; D145. In the waiver, Roberts described the transaction: "Dundon Capital Partners LLC, or one or more of its affiliates (including affiliates of Thomas G. Dundon) (collectively, "Dundon") . . . has committed to invest up to $70,000,000 in the Company, in exchange for Dundon receiving, among other things, 75% of the Company's fully-diluted capital stock . . . (the "Dundon Transaction") and Dundon has already made certain payments to the Company in connection with the Dundon Transaction." D145 at Dundon000591; 4TR 200-201. The waiver makes no reference to a $250 million transaction. Although the waiver was never signed (4TR 198-99), it shows Roberts' understanding of the transaction. Though Ebersol testified that he called Roberts among others on February 14 to describe the alleged $250 million agreement, Ebersol never objected in writing to Roberts that the waiver failed to mention a $250 million deal. 4TR 203; 6TR 188-90. Roberts' contemporaneous written description of the transaction and Ebersol's testimony about a $250 million deal cannot be reconciled.

113. ESMG could not enter a $250 million material transaction without board approval. 12TR 300-301. The board never gave its approval for a $250 million transaction.

114. It is inconceivable that Charlie Ebersol, Dick Ebersol, and Jeff Moorad, along with Dawn Belt would conduct a meeting on February 24, 2019, to approve a Term Sheet and that none of them would mention a materially different $250 million deal if Ebersol had told them one existed. Ebersol admitted no one brought up $250 million in the board meeting. 4TR 186-187.

115. The board also approved a release agreement with FO2, LLC and a voting agreement that gave Ebersol power of attorney to vote FO2's shares indefinitely. D135 at 4-10

31

(voting agreement), 11 (ratification of voting agreement and release agreement), 17-23 (release agreement).  The approval of the release agreement cured two major impediments to ESMG consummating the Term Sheet.  First, Ebersol and ESMG could not consummate the Term Sheet since majority ownership would shift to DCP and dilute FO2's shares.  4TR 176-78; D22, Ex. A, Art. IV.C.2.3.1(d).  Second, ESMG could not keep Fowler on the board (as required in the FO2 agreement) because the Term Sheet required DCP to have exclusive voting rights on the board.  D16 at 5; T7.

116.  Neither Dundon nor Zutter had been elected to the board at the time it approved the FO2 release.  D182 at 4.  Neither Dundon nor Zutter participated in the ESMG board's decision to approve the FO2 release.  D135 at 11.

117.  Neither Dundon nor Zutter received a material, non-ratable benefit from the FO2 release considering their respective financial circumstances, the fact that all stockholders were released equally, and the fact that no claims had been made by Fowler against Dundon or Zutter.  D135 at 17.

118.  The approval of the FO2 release was entirely fair to ESMG and its stockholders.

119.  Ebersol testified that he relied on Dundon's statements that the Term Sheet merely facilitated the initial wire transfer.  2TR 182-83, 189-95.  He also testified that he believed the Term Sheet did not displace the larger $250 million transaction and that Dundon assured him the larger agreement remained in place.  2TR 182-83, 189-95.  But, by no later than March 26, Dundon and Zutter made it clear that neither Dundon nor DCP would fund any amount above the $70 million maximum cumulative commitment in the Term Sheet.  9TR 142-143; D177, D182; D256; D269; T1171.  In those discussions, which included Dundon and Belt, Ebersol never claimed the existence of a $250 million agreement or even mentioned $250 million.  D256; D177; T1171.

120.    After the board ratification of the $70 million Term Sheet, and after Dundon and Zutter stated definitively that neither Dundon nor DCP would fund above the $70 million maximum cumulative commitment, on March 27, 2019, the stockholders of ESMG formally ratified the Term Sheet by duly executed written consent, expressly acknowledging that the Term Sheet was binding and enforceable by DCP.  4TR 210-12; D182 at 2.  In doing so, they acknowledged that the Term Sheet was approved by the board and that ESMG had received approximately $50 million from DCP under the terms of the Term Sheet.  4TR 209-12; D182 at 2. In the consent, the stockholders authorized the officers of ESMG to negotiate the definitive agreements reasonably necessary or advisable to implement the transactions contemplated by the Term Sheet and the take the actions necessary to carry into effect the resolutions concerning the Term Sheet.  4TR 210-12; D182 at 2-3.  The stockholders also ratified the actions of directors taken as to the investment.  4TR 210-12; D182 at 3.  Notably, at the time of the shareholder's ratification, Ebersol (with the FO2 proxy) unilaterally controlled more than 71% of the league shares and continued that control to the end because ESMG never issued equity to DCP.  3TR 239-40, 252; 4TR 208-10; D216; 16TR 187-188.  Ebersol never objected that the shareholder consent failed to reference a $250 million agreement even though he knew neither Dundon nor DCP would fund any amount above $70 million.  T1171.

121.    Dundon testified that, as of March 27, 2019, he and Ebersol had not had any discussions concerning an additional investment of $180 million.  9TR 148.

### THERE WAS NO ORAL AGREEMENT FOR $250 MILLION

122.    The foregoing events transpired with no objection from Ebersol, his lawyers, the ESMG board, or any other shareholder objecting that Dundon promised to invest $250 million in the league.  9TR 133-136.

123. The only individual who testified to the existence of a $250 million agreement was Ebersol. League middle management testified that, even if they had heard discussions of the $250 million figure, they had not seen such an agreement and did know its terms. 12TR 419. No other witness testified to an understanding that the parties reached an oral agreement on February 14, 2019. While there are references to $250 million in a few emails involving Dundon or other DCP personnel, none of those exhibits identify the agreement or any terms of that agreement. T917; T266. In a February 22 email relating to CBS, Dundon testified without rebuttal from the Trustee that the purpose of his reference to "250" was to make sure that there was an open discussion with CBS about how future investment with Dundon would likely involve additional dilution which could impact the negotiations with CBS over the term sheet it was negotiating with ESMG. 8TR 162-163. None of the communications are between DCP or Dundon and ESMG. None of the communications between the parties contemporaneous with the initial discussions, negotiation of the term sheet, minutes of the board meeting, or shareholder consent reference $250 million.

124. The only other evidence of the $250 million deal was statements Dundon made to the press after Ebersol had signed the Term Sheet. The press statements all occurred between February 17 and 24, 2019 (with later dated emails or articles that refer back to statements in that window), and while the amount of $250 million as a commitment or commitment to invest is mentioned, there are no statements to the media that corroborate any terms of an agreement or provide any other circumstantial support for a $250 million oral contract other than the amount. The vague references to "series infinity" support the idea that future investment would require an agreement and documentation similar to the league's history Series Seed and Series 1 financings.

125. At trial, Dundon explained that he and Ebersol agreed to make the statements to the press about a $250 million commitment to make a big impression on the market and calm down

the media furor caused by the suggestion that the league missed payroll.  9TR 273:6-12.  Ebersol was concerned at the time about the XFL potentially taking market share, and Dundon and Ebersol wanted the AAF's media messaging to project financial stability.  T34; 9TR 92-93. While they did mention the $250 million figure in media messaging, Dundon and Ebersol never had discussions about, let alone came to an agreement regarding Dundon or any entity controlled by him investing $250 million in the league.  Nor did they ever discuss or agree upon any specific terms or conditions for any hypothetical investment of $250 million in the league.  T16; D128; D131; D381; 9TR 108-110.

126.    At trial, the Trustee suggested that Dundon had previously not explained his motivation for the $250 media blitz.  9TR 273; 19TR(PM) 247–248; 9TR 274:23–275:1 (Dundon's counsel said Dundon gave a general statement about the issue in his deposition); 9TR 275:2–276:1 (Court mentioning not having seen the issue addressed in the summary judgment pleadings); 19TR(PM) 248:3-4 (Court describes the marketing statement as a revelation).  Dundon's summary judgment response cites his deposition testimony on the issue where he explained that the press release (referencing a $250 million commitment) was "marketing."  ECF 173 at 12 ¶ 11, ECF 173 at 198:16-19.  As counsel for Dundon pointed out at trial (9TR 274:23–275:1; 19TR(PM) 248:20-249:19), Dundon testified on the issue during his deposition without follow-up from the Trustee's lawyer.  ECF 173 at 198:16-25.  Dundon only answered the questions he was asked.  ECF 173 at 198:20–25.

127.    At trial, the Trustee's counsel claimed that there was follow-up.  19TR(PM) 250:3-10.  The deposition transcript attached to Dundon's motion for summary judgment and referenced in it shows that the Trustee's counsel did not follow up.  ECF 173 at 12 ¶ 11, 198:16–19.

128.    On February 23, 2019, when questions arose about the true nature of the investment, Dundon clarified with the media that he had not actually invested $250 million but that it was a sum that could theoretically get invested. D131; T381. Dundon went so far as to admit that he probably made a mistake in how the AAF did the press release and clarified that the decision on whether to invest in the future was conditioned on things such as ratings and demand. D131; T381.

129.    After February 24, 2019, there were no new statements from Dundon or Ebersol about a $250 million deal and almost no one mentioned the $250 million figure until the Trustee filed this adversary on November 14, 2022. D269; D217 at 16 ¶ 46(j). Between the petition date (April 17, 2019) and the day the Trustee filed the complaint in this case (November 14, 2022), the players filed a $700 million class action lawsuit against Dundon, Ebersol, and the Debtors. The Trustee settled the players' case by obtaining an assignment of the players claims against Ebersol. D217 at 16 ¶ 46(j). Ebersol avoided the players' claims and a potential claim for breach of fiduciary duty by the Trustee by settling with the Trustee. In the settlement, the Trustee released the claims against Ebersol in exchange for Ebersol's cooperation in this case. 3TR 175-79; D217 at 16 ¶ 46(j). After that settlement, for the first time since the media blitz in February of 2019, the Trustee claimed that Ebersol had made a $250 million agreement with Dundon. Dundon first learned of Ebersol's contention that Dundon had entered into a contract to invest $250 million in the league when the Trustee filed this lawsuit, which happened after Ebersol agreed with the Trustee to provide testimony in exchange for a release of the players' and Trustee's claims against him. D269; D217 at 16 ¶ 46(j); 9TR 148-149; 152-153.

130.    Both Ebersol and Ken Schanzer, a 24-year high-level veteran of NBC sports (17TR 238-239), and a one-time consultant with the AAF, testified that handshake deals (oral agreements)

of the magnitude of $250 million are common in the sports entertainment business. 17TR 245. Given the circumstances and the actors involved, that testimony lacked credibility. This was the biggest deal of Ebersol's life. 4TR 84-85. The league meticulously documented every other agreement it entered under Ebersol's leadership and ESMG's lawyers' advice. 4TR 83-86. The assertion that Ebersol and the ESMG lawyers would fail to document a $250 million agreement does not ring true. Lawyers and savvy businessmen insist on written contracts to avoid after-the-fact disputes about contractual rights. Jeff Vanderbilt testified that he had never seen Dundon invest without insisting on written documentation. 13TR 286-87. The notion that Dundon would obligate himself (without restrictions) to invest $250 million into the league with no written deal is not credible under the circumstances.

131. The Term Sheet is the only agreement between any of the parties concerning an investment by Dundon or DCP in ESMG or the league. 13TR 286-87. Any agreement for future investment would require the parties to agree to terms. 8TR 162-163.

132. Neither ESMG nor DCP instructed or requested that Zutter paper an agreement for a $250 million investment in or loan to ESMG. 16TR 274.

133. Dundon and Ebersol did not reach an oral agreement regarding an investment by Dundon or any entity that Dundon owned or controlled for a $250 million investment. All discussions between Ebersol and Dundon prior to the execution of the Term Sheet constituted negotiations.

134. During those negotiations, the parties never agreed upon: (a) the parties to the an alleged $250 million agreement (which Dundon-affiliated entity or entities would invest in the league); (b) the timeframe during which the alleged $250 million would be invested, (c) the mechanisms, requirements, and conditions for drawing on the funding commitment; (d) whether

the investment would take the form of equity or debt or both; (e) if equity, the price per share, quantity of shares, or any mechanism for valuing the shares, the features of the shares (*e.g.*, preferred payment rights, protective provisions, conversion rights, or whether the league would be issuing common shares, a new category of shares, or extending the offering of previous shares); and (f) if debt, the interest rate, maturity date, payment schedule, conditions to fund (*e.g.*, performance in line with the budget), or any other terms of debt repayment.

135.    The lack of material terms demonstrates that neither Dundon nor Ebersol intended the discussion of $250 million to bind anyone to a deal.

136.    Because there was a lack of agreement as to those material terms, Dundon and Ebersol did not form an enforceable oral contract.

137.    Whatever discussions occurred between Dundon and Ebersol did not address the essential terms of a proposed investment by Dundon or any entity owned or controlled by Dundon for a $250 million investment.  There was no meeting of the minds between Dundon and Ebersol concerning Dundon, or any entity owned or controlled by Dundon, investing any amounts in the league beyond the $70 million referenced in the Term Sheet.

138.    The league's governing documents (D22), the Fowler Term Sheet, and the DCP Term Sheet (both of which were structured by ESMG's counsel) demonstrate a deliberate intention by ESMG to structure financing deals to address the terms an investor in the league would be expected to agree on.  The Series Seed and Series 1 shareholders and all the details and features of their equity are identified in agreements. D22; D709; D757.  Both the Fowler and DCP term sheets similarly identify the parties to the investments, the time frame within which the investments would be made, and the specific procedures and prerequisites for ESMG requesting a disbursement of investment funds (or to borrow funds in the case of the Fowler line of credit).

139.     The DCP Term Sheet dictates that the investment would take the form of equity; the Fowler Term Sheet calls for equity and debt in the form of a line of credit. Both term sheets specify the features of the shares (the equity) by providing the details of a liquidation preference, preferential distributions, conversion rights, and anti-dilution.

140.     In the case of the debt component of the Fowler Term Sheet, the parties agreed on repayment terms and conditions to funding (*e.g.*, creation of a finance committee, preparation of budgets, performance consistent with the budget, review sharing, and other terms). The Trustee has judicially admitted in his complaint that the parties kept "as an open item" the "form the funding would take (debt, equity, or some combination)." ECF No. 56 at 18-19 ¶ 65.

141.     In the case of the equity component, Ebersol never claimed that he and Dundon had agreed to repayment terms in the form of preferred distributions and annual dividends. The Term Sheet entitled DCP to receive the first dollars of any distributions totaling the full amount of the investment plus a preferred return of 20% per year. T7. The Term Sheet also entitled DCP to a 20% annual PIK (payment-in-kind) dividend ahead of payment of any other dividends, redemptions or other distributions. T7. If a $250 million equity transaction existed under those terms with Dundon, ESMG would have owed Dundon a $50 million preferred return (20% of $250 million) and a $50 million dividend every year. The transaction would not result in DCP or Dundon or whoever merely receiving 75% of any distributions or dividends; the contracting party would receive every dollar of every distribution until $250 million plus whatever the $50 million dividends and distributions had grown to. The Trustee presented no evidence that the shareholders of ESMG would have agreed to a $250 million deal with those terms.

142.     No one testified that Dundon and Ebersol made an agreement on those terms with respect to a $250 million deal. Ebersol failed to testify that he and Dundon finalized any funding

commitment agreement—absent that contained in the Term Sheet—concerning (a) the parties to the agreement (which Dundon-affiliated entity or entities would invest in the league); (b) the timeframe during which the alleged $250 million would be invested, (c) the mechanisms, requirements, and conditions for drawing on the funding commitment; (d) whether the investment would take the form of equity or debt or both; (e) if equity, the price per share, quantity of shares, or any mechanism for valuing the shares, the features of the shares (*e.g.*, preferred payment rights, protective provisions, conversion rights, or whether the league would be issuing a new category of shares or extending the offering of a previous shares); and (f) if debt, the interest rate, maturity date, payment schedule, conditions to fund (*e.g.*, performance in line with the budget), or any other terms of debt repayment.

143.    Walter Ballard of PWC, a tax and accounting consultant for Dundon and DCP, testified about work his firm did for Dundon and his family office.  He testified that Zutter sent him (Ballard) the Term Sheet after it was done and that PWC addressed the tax ramifications after the fact.  10TR 269.  He had no discussions about the ramifications of a $250 million deal; the only deal PWC worked on was the Term Sheet (for a maximum cumulative commitment of $70 million).  10TR 308, 315-316, 402.

144.    Other than Dundon, or an entity owned or controlled by him, ESMG had no other material funding commitments at the time Ebersol signed the Term Sheet.  6TR 177 (Ebersol had been seeking investment from WestRiver Group (Anderson's investment firm) for more than a year without success).  Absent an investment by Dundon or an entity owned or controlled by him, the league likely would have failed on February 14, 2019, or shortly thereafter, when it missed payroll.

145.     Regardless of what Ebersol may have intended, neither the ESMG stockholders nor the ESMG board authorized Ebersol to make an agreement whereby Dundon or one of his entities would invest $250 million in the league.  4TR 83-86, 212-13.

146.     It was impossible for ESMG to deliver the alleged consideration of board control and a controlling equity interest to Dundon in exchange for the alleged oral argument agreement because such consideration had already been sold to DCP under the Term Sheet that the ESMG board and shareholders ratified.

147.     ESMG and DCP partially performed the Term Sheet.  DCP caused approximately $70 million in funds to be transferred to the league after Ebersol signed the Term Sheet was entered, and ESMG turned over control and two board seats to DCP.

148.     DDFS wired funds to ESMG on behalf of DCP, such that DCP, not DDFS, made the investment in the league.

149.     Between February 14, 2019, and April 16, 2019, ESMG submitted equity funding requests to DCP, and DCP provided funds in response to the requests.  13TR 175-178, 297-98, 304-20, 322-25, 327; T104; T962; D172; T1343; D206.1; D271 (illustrative); D206.2.

150.     After considering options, Ebersol, Dundon, and Zutter concluded that they could not save the league.  D177.

151.     The league agreed with the final accounting sent by DCP and did not make a request for any additional funds after its receipt of $69,719,190.  13TR 322-24; D206.1; D206.2.

152.     DCP complied with the Term Sheet by providing funds to fulfill equity funding requests made by the league.  12TR 504; 13TR 175-78, 297-98, 304-20, 322-25, 327; T104, T962, T1343; D172; D206.1; D206.2.

153. ESMG accepted approximately $70 million and acknowledged the funds as a fulfilment of DCP's commitment under the Term Sheet. D135 at 12; D182 at 2; 13TR 322-23; D204 at 2; D206.1; D206.2.

154. The league exhausted DCP's $70 million before the end of its first season. 13TR 175-178, 297:5–298:2, 304:20–307:1, 308-309, 310-320, 322-323, 324-25, 327:3-22; T104; T962; T1343; D172; D206.1; D206.2; D271 (illustrative).

155. Neither DDFS Partnership nor DCP intended to give ESMG a $70 million gift.

156. ESMG failed to transfer stock to DCP or Dundon as agreed in the Term Sheet. 5TR 142.

157. ESMG waived any requirement that both parties sign the Term Sheet through conduct after February 14, 2019, because the ESMG board and shareholders ratified the Term Sheet and acknowledged the receipt of funds as DCP's compliance with the Term Sheet, and the shareholders expressly provided the Term Sheet was binding and enforceable against ESMG. D135 at 12; D182 at 2; D269.

158. Dundon had no special relationship with the Debtors at the time the alleged oral agreement was entered.

159. ESMG and Ebersol were under no compulsion or pressure to accept a deal with DCP or Dundon. Ebersol confirmed that, had he felt pressure, he could have delayed the transaction and put in his own money. 4TR 87-88. Ebersol believed he had optionality for what investments to accept. 4TR 88-89.

160. In mid-February, after Ebersol signed the Term Sheet, ESMG sent a notice of default to Fowler. D100. ESMG never sent a notice of default to Dundon referring to a failure to invest $250 million or anything else. 5TR 48.

**DUNDON AND ZUTTER COMPLIED WITH THEIR FIDUCIARY DUTIES**

161.   Dundon and Zutter properly exercised business judgment in managing ESMG.

162.   The potential reduction of tax liability of approximately $14 million as a result of a nearly $70 million loss did not generate a material non-ratable benefit to Dundon because all investors received a reduced tax liability in proportion to their investments in the league.  Dundon testified that potential tax benefits were not the impetus behind his decision to invest in the league. 9TR 181-182.

163.   Neither Dundon nor Zutter received a material non-ratable benefit from decisions they made with respect to the operations of ESMG.  16TR 147-148.

164.   The Trustee did not show that Zutter received any benefit as a result of his service to the league.  Zutter did not benefit financially for his work for the league.  Zutter was a non-equity partner of DCP and never had an ownership interest in that entity or in DDFS.  16TR 129:217-131:24.  Neither Zutter nor any entity in which Zutter had an ownership interest ever obtained any interest in the league.  Zutter received no compensation, monetary or non-monetary, for his work for the league.  Zutter did not receive a tax write off or other tax benefit as a result of his work for the league.  Zutter received no financial benefit for his service as a board member. Zutter received no financial benefit from any advertising arrangement between DCP and third parties.  16TR 60, 147-148, 226-227, 273-274.

165.   To the extent Dundon and Zutter did receive a material non-ratable benefit in any transactions, the transactions, if any, were entirely fair to ESMG.  The efforts Dundon and Zutter undertook with the accounts payable management, as well as structuring, tax, and financial considerations (including opportunity zone analyses), and decisions regarding spending and advertising did or were designed to benefit the league.  16TR 14-17, 18-21, 234-236; T1052;

43

T1176.  DCP, Dundon, and Zutter worked in conjunction with existing league leadership throughout the process to attempt to save and hopefully grow the league for the benefit of ESMG and its shareholders.  16TR 237-239; T286; 13TR 288:15-289:4, 293-294, 306-307, 309:21-310:7; 13TR 401, 407:6-408:2.  The Debtors did not suffer damages as a result of any actions taken by Dundon or Zutter in which Dundon and Zutter (or either of them) received a material non-ratable benefit and which was not fair to the minority shareholders of ESMG.  16TR 60, 129-131, 147-148, 226-227, 273-274.

166.    The Trustee failed to identify any transaction Dundon or Zutter caused ESMG to enter where Dundon or Zutter (or DCP) was on both sides of the transaction.

167.    While the Trustee claims that Dundon engaged in self-dealing by providing free or discounted advertising to friends or affiliates, Dundon testified that his advertising strategy was to get big brands associated with the league by offering them advertising slots, which would, in turn, create buzz around the league and increase the league's perceived prestige due its association with major brands.  Dundon also planned to create a relationship with those brands he could leverage in the future.  9TR 51; D268; 214:14-216:6.  Dundon testified he has successfully employed a similar strategy with other businesses in the past.  9TR 171-172.  At the same time, Dundon had Top Golf show the AAF games at all locations. 9TR 54.  Doing this increased awareness of the AAF.

168.    The league failed to pre-sell its advertising slots, leaving it with advertising inventory during the season.  In Dundon's experience, advertising is typically sold upfront before the season starts.    9TR 49-50.  Bob Whitsitt testified: "Advertising, ticket sales, broadcast advertising, most of your revenue streams should be sold before you play your first game."  17TR 130:20-131:1  At the time Dundon set up the big brand advertisers, Ebersol expressed excitement

over the momentum an association with big-name brands would provide to the league. 9TR 216-217; D254. Dundon's decisions regarding advertising were fair to the league under the circumstances.

169. Dundon almost immediately honed in on one of the league's largest cost centers—its contract with CBS. Because it was a time buy and not a revenue channel, it was costing the league millions of dollars. Ebersol noted and bemoaned the one-sided nature of the agreement to his father. D47. Dundon's discussions with Sean McManus and others at CBS, unlike Ebersol's, led to a reconsideration of the bad deal that would have benefited the league. D268 at Ebersol 54-55; 9TR 209-210. Ebersol did not protest Dundon's efforts. D268 at Ebersol 54-55.

170. The Trustee did not identify any dollar figure for any of the alleged harms he claims Dundon and Zutter caused by allegedly breach their fiduciary duties. D273; 14TR 151, 156-165.

171. The Trustee only identified potential breaches that implicated the duty of care. Dundon and Zutter tried their best to maximize the DCP cash infusion. 13TR 293-294. They tried to save the league from collapse. Their decisions, if not perfect, are precisely the type of decisions the business judgment rule prevents courts from second guessing.

172. The Trustee claims Dundon and Zutter breached fiduciary duties to the league by considering, but ultimately deciding not to pursue, different investment structures for DCP's investment in the league. Dundon testified that at the time that DCP made its investment, it had not yet determined the best structure for the investment and employed professionals to look at potential structures. Zutter tasked PWC with considering a number of structures, including analyzing whether a tax vehicle, called an "opportunity zone" was suitable for the investment. T290; 8TR 16:12-18:5; 16TR 234-236. Zutter worked collaboratively with legacy league

personnel in these discussions. 16TR 237-238.  Ultimately, none of the structures discussed with PWC were pursued.  16TR 237.

173.    Zutter testified that DCP considered a variety of different investment structures, with a view to maximizing the value of the league over the long term to the benefit of all shareholders.  Ultimately, none of those structures were pursued.  15TR 217-218.

174.    The Trustee did not show that Dundon or Zutter committed a breach of the duty of loyalty.

175.    The Trustee did not show that any act of Dundon or Zutter caused any of the Debtors damages, much less the loss of the league.

## DEFENDANTS WERE NOT UNJUSTLY ENRICHED

176.    Dundon, DCP, or Zutter were not enriched at the expense of the league because they did not receive anything of value from the league beyond what DCP paid for, and the league gave them nothing beyond putting Dundon and Zutter in control.

177.    The Trustee did not provide a calculation of any dollar amount by which Defendants were unjustly enriched.  D273; 14TR 156-65.

178.    The potential reduction of tax liability of approximately $14 million as a result of a nearly $70 million loss did not unjustly enrich Dundon.  All investors were entitled to the same ratable reduction in taxes when the loss was recognized.  Even taking the reduction in tax liability into account, Dundon still suffered a net loss of $56 million, which far eclipses the loss of any other shareholder, lender, or trade creditor.

179.    The Trustee did not offer evidence of any out-of-pocket or reliance damages.

180.    No fraud or negligent misrepresentation by Defendants proximately caused damages to the Debtors.

181.    Dundon did not supply information to ESMG of the kind necessary to form the basis of a negligent misrepresentation claim.

## THE LEAGUE FAILED

182.    DCP entered the ESMG investment anticipating the league would spend approximately $5-7 million of DCP's capital each week.  T254.  Almost immediately, Vanderbilt realized the funding needs were drastically different.

183.    ESMG received the following wires in response to requests for funding to DCP:

| Date | Amount |
|---|---|
| 02/14/2019 | $5,100,000 |
| 02/19/2019 | 8,500,000 |
| 02/26/2019 | 6,250,000 |
| 02/28/2019 | 1,500,000 |
| 03/04/2019 | 5,000,000 |
| 03/07/2019 | 4,000,000 |
| 03/13/2019 | 6,800,000 |
| 03/13/2019 | 4,000,000 |
| 03/15/2019 | 2,300,000 |
| 03/19/2019 | 7,800,000 |
| 03/27/2019 | 7,200,000 |
| 03/29/2019 | 2,850,000 |
| 04/02/2019 | 6,950,000 |
| 04/10/2019 | 550,000 |
| 04/12/2019 | 445,000 |
| 04/16/2019 | 474,190 |
| **Total** | **$69,719,190** |

13TR 175-178, 297:5–298:2, 304:20–307:1, 308-309, 310-320, 322-323, 324-25, 327:3-22; T104; T962; T1343; D172; D206.1; D206.2; D271 (illustrative).

184.    ESMG spent the funds it identified as having been received in fulfilment of DCP's obligations in the Term Sheet.  12TR 445-446.  DCP provided oversight in the use of funds, but

the legacy league personnel under Ebersol had exclusive control of the bank accounts and made the final decision on what bills to pay. 13TR 175-176, 178; 19TR(PM) 207-209. DCP later discovered league personnel would not actually pay or short pay the bills it told DCP it was paying. D150.

185.    Despite the funding provided by DCP, the league could not pay its debts as they came due, and the league had significant payables. 13TR 315:4-317:10; T1343.

186.    By mid-March, despite efforts to cut cost and negotiate with vendors, Vanderbilt concluded that it looked unlikely that the $70 million would get to the end of the season. 13TR 310-320; T104; T962; T1343; D172; D206.1; D206.2; D271 (illustrative).

187.    Vanderbilt and Lee continued working to get their arms around the true expense and revenue picture of the league at the time. 18TR 35-36, 44, 46, 56-57, 70; D147. They could not determine the true weekly cost to run the league despite best efforts to collect that information. 18TR 35-36, 38-39, 63. Given that weekly cash requests were reaching above $10 million, the money would not last. 13TR 310-311, 315-317, D271 (illustrative). It did not come out until discovery in this case that Farrell and Kantowitz had actually been manipulating the amounts requested from DCP and withholding invoices to keep the funding requests artificially low so as not to scare DCP. D150.

188.    Dundon and Ebersol discussed that the $70 million was running out and that Ebersol and his team needed to come up with options about how to proceed forward. D255 at 3; D256.

189.    Dundon encouraged Ebersol to seek outside investment interest. 9TR 143-144. Prior to the end of March, Dundon expressed reservations about introducing outside capital because ESMG had no idea of the true financial condition of the league. D177; 9TR 240-242.

Dundon wanted to avoid potential fraud allegations based on him inadvertently misrepresenting something to interested investors in the way Dundon had discovered Ebersol had done. Specifically, DCP had not been able to conduct proper due diligence and was still uncovering new unpaid bills on a near daily basis and was still trying to get its arms around a realistic expense and revenue model of the league. Accordingly, Dundon could not confidently represent the financial condition of the league to a potential investor. 9TR 19-20, 201.

190. By the end of March Dundon believed he was likely going to lose the $70 million investment in any event, and he told Ebersol that DCP was willing to hand the league over to a new investor if Ebersol could identify someone comfortable with accepting the league as-is and willing to accept its obligations. 9TR 36, 40; 16TR 268-269. Ebersol did not identify an investor who was able and willing to do so. 16TR 272. Ebersol's misrepresentations to potential funding sources mixed with the constant emergency nature of the league's cash status scared off additional investment from existing and potential investors.

191. Dundon also asked Ebersol as CEO to find someone that would at least be willing to come in to fund the league to the end of the season and asked Ebersol to provide an analysis of "how long the 70 buys us." D256; 9TR 143-144. Based on the financial analysis DCP had been attempting to perform from the time of the investment and the assessment of the viability of the league, Dundon also made clear that DCP was not interested in additional investment in ESMG. T1171.

192. Factors that supported the conclusion that the league was not viable, included that none of the projections from the pro forma or any version of it had any basis in reality. 5TR 93-101; 18TR 49-50, 52-53, 70-72; D188. Ticket sales were dramatically lower than anticipated, the league received $0 in revenue from the technology application that received so much fanfare, and,

while one PAL agreement had been signed, the league received no money from it.  5TR 93-100; 18TR 59.   While initial TV ratings, app downloads, and in-person attendance seemed very promising, interest in the AAF quickly waned.  TV ratings quickly fell by half.  11TR 338:7-339:8. Stadium attendance was very low.  19TR 108-09.  The TV deals and player contracts saddled the AAF with enormous contractual expenses for years to come, which would only skyrocket if the league actually added two teams every year.

193.   Following Dundon's directive, on March 26, 2019, Kantowitz, Freedman, Farrell, and Ebersol each ran an analysis that revealed the league would need an additional $65 million from that point to get through the end of May and close out the first year of the league.  D176; 18TR 242-245.

194.   Ebersol then prepared four end-game strategies, each tethered to the $70 million figure agreed to in the Term Sheet and contemplated by all those who had actual knowledge and leadership roles within the league related to investment both before and after the entry of the Term Sheet.  D177.  Nowhere in any contemporaneous texts or communications did Ebersol reference a $250 million agreement.  Ebersol did not disclose in the analysis his team had done the day before that the actual expenses through the end of May 2019 would exceed $65 million.  D176.

195.   All four options Ebersol and his team put together contemplated imminent shutdown in the absence of new capital.  D177.  Ebersol and his team knew by their own analysis that the league required a minimum of $65 million in outside capital to get through May 2019.  At that point, DCP had invested $51.25 million.   This meant the league needed $46.25 million to get through May 2019, not the $20 million more that Ebersol told Dundon.

196.   Ebersol told Dundon in the email that any option other than immediate shut down would require the league to incur substantial additional vendor and salary obligations after the

50

league spent the $70 million without any capital source to pay them. D177. None of Ebersol's options included paying off existing obligations to vendors and lenders. Ebersol did not volunteer his family's money and did not find an investor ready to jump in to spend $46 million dollars to get to May 2019. In the risk factors identified in options two through four, Ebersol contemplated that the league would burn through all available cash and run up accounts payable. D177. In essence, Ebersol encouraged Dundon and Zutter to pick up where he left off and continue incurring vendor debt and putting players on the field without capital to pay them and hope that there was one more Dundon or Fowler that would show up hours before the players quit.

197.    Ebersol confirmed his plan to revert to incurring trade debt without capital in his discussions with Moorad regarding additional funding. D183. Ebersol provided Moorad with Kantowitz's misleading projections that assumed the NFL would fund more than $20 million a year of the League's salaries that the AAF would get paid for broadcasting starting in 2020. D188.

198.    The only viable option Ebersol and his team presented was immediate shut down, which, as Ebersol admitted, would preserve sufficient capital to initiate bankruptcy, pay all player and non-player salaries, and retain some capital to pay down debts. D177; 16TR 247-250.

199.    In retrospect, even another $180 million injection would not have made the league viable in the long term. 19TR 132-135. Once adjusted for reality, Kantowitz's contemporary projections, showed that the league would have needed another $500 million to get through 2028, and how much capital would be needed beyond that was unknown. 19TR 132-135. Whether the league had some intrinsic equity value or would be an appealing vanity investment for centi-millionaires in the future was irrelevant without someone willing to come in and pour hundreds of millions in additional capital to fund the short fall. At best, that outcome is completely speculative and no evidence supports it.

200.    One hope Dundon had to entice additional substantial investment in the league and increase its odds of survival was a deal with the NFL Players Association ("NFLPA").

201.    Dating back to the inception of the league, Ebersol and his inner circle determined that a positive relationship with the NFL would distinguish the antagonistic approach the XFL had toward the NFL. 3TR 98-99.  Ebersol thought the AAF would benefit if it became a minor league equivalent for the NFL.   To make his plan work, Ebersol tried to forge a partnership with the NFLPA. The AAF needed the NFLPA deal to form any partnership with the NFL as it pertained to its players playing in the league.  3TR 98-99.

202.    Even though an NFL-link was a crucial part of the business plan, Ebersol failed to initiate confidential negotiations with the NFLPA until December 2018, just two months prior to kick off of the AAF.  D24.  No one in the legacy AAF group had an explanation for the delay.  18TR 270-271, 275-276.  Because Ebersol delayed the negotiations but then raced to launch the league to beat the XFL to market, the AAF launched with no relationship with the NFLPA and no ability to field NFL practice squad players on its teams during its inaugural season.

203.    When Dundon entered the picture, he joined Ebersol in an aggressive pursuit of a relationship with NFLPA President DeMaurice Smith.  Dundon first met Smith on February 19, 2019, and spoke with him frequently over the ensuing months.  Dundon and Ebersol had multiple meetings with the NFLPA, trying to secure a deal akin to the two-way contracts the NBA has with certain G League players.  D270; 9TR 220-221.  Smith repeatedly communicated to Dundon that the NFLPA lacked interest in a relationship with the AAF because NFL players had concerns about being forced to play both the NFL and AAF seasons.   One of the major issues preventing a deal between the AAF and the NFLPA was the NFLPA's concerns over risks to player safety and the potential for player injury.  Dundon tried to develop a solution that would mitigate or resolve the

52

concerns expressed by the NFLPA but was ultimately unable to do so. T1104; 9TR 231-233. Dundon frequently communicated with Smith to figure out how to get the NFLPA to overcome its resistance to the relationship because Dundon saw a potential to attract substantial capital to enter the picture with some positive indication from the NFLPA that it would partner with the AAF.

204. By the end of March of 2019, Smith informed Dundon that he could not get the NFLPA to agree on a partnership, and there would be none at that time. D268; 9TR 231-233, 235-237. Any chance of a future NFLPA partnership, had the league survived, is speculative.

205. Once the immediate shutdown scenario outlined by Ebersol (Option 1) became the only responsible option and it was clear the NFLPA deal was unlikely, ESMG's board then sought the guidance of bankruptcy counsel. 6TR 180-183; D182.1. ESMG sought advice on whether seeking bankruptcy protection for the Debtors was advisable and whether a Chapter 11 bankruptcy was feasible. Counsel advised the board to proceed with a bankruptcy filing but advised that Chapter 7 was the only option, given the lack of capital to maintain a Chapter 11. D203.

206. Ebersol claims he was kept in the dark and became aware of the bankruptcy through third parties like the players, coaches or reporters. 6TR 102. He then doubled down on re-cross and suggested that he first became involved in the bankruptcy when he was asked to sign an engagement letter with Bracewell. 6TR 180-181. But Ebersol was at the center of the bankruptcy process from immediately after Zutter's first discussion with Bracewell. D182.1; 6TR 181-182. Ebersol was Zutter's first call after his initial consultation with bankruptcy counsel. D187; 6TR 182-183. Ebersol and his team were essential in selecting key personnel to retain to assist with the bankruptcy process, preparing a business plan and schedules and managing the remainder of the $70 million for payment of salaries and expenses post-filing. D187; D200.

207. The league failed because of forces entirely unrelated to Dundon's and Zutter's brief stint on ESMG's board, including:

- the fact that every spring football league that has ever been attempted has failed (17TR 198:2-10);

- inadequate funding in the crucial formative phases of the league leading up to the beginning of the 2019 season;

- excessive commitments agreed to and expenditures incurred without the capital to cover them prior to February 14, 2019 (19TR 214:4-13);

- 14 to 16 months of Ebersol's mismanagement of the league; and

- expenditures incurred at a rate more appropriate for an established league (*e.g.*, chartered flights for players, a 900-plus person staff, salaries for players and coaches at nearly double the market rate).

Given the history of spring football leagues, the league had a very slim chance of survival. 1TR 215:2–216:20. But any chance it had was destroyed by the bloated structure and mismanagement that occurred before Dundon and Zutter ever showed up. DCP's money and the efforts of the skilled DCP team could not help the league recover.

208. The league failed and shut down because it was insolvent and was not a viable business.

209. The league suspended operations on April 2, 2019, and subsequently filed bankruptcy on April 17, 2019.

210. The shut down and initiating bankruptcy was in the best interest of and entirely fair to the Debtors.

211. Notably, after the league collapsed, Ebersol sent a thank you e-mail to Dundon in which he recognized and expressed appreciation for Dundon's efforts to save the league. D202. Ebersol did not mention the alleged $250 million oral agreement or make any suggestion that Dundon and Zutter's actions had harmed the league or that they had engaged in self-dealing. D202.

212.    While still serving as the CEO of ESMG, manager of all the subsidiary LLC's and controlling shareholder, as soon as Ebersol saw the writing on the wall for the league, he began secret negotiations with MGM to get control of the league's intellectual property and technology assets. D191; 5TR 134-135. Ebersol claims he informed Dundon and Zutter of his negotiations (5TR 136-137), but no document in evidence confirmed that happened.    His original plan, knowing the league was preparing to enter a bankruptcy process, was to sell the league IP to MGM and to use the proceeds to pay part of the loans to his family and Pottruck. 5TR 136-137.  That deal did not happen. 5TR 136-137.

213.    Ebersol waited until after the league filed bankruptcy to get control of the league's intellectual property assets.  MGM bought all the IP assets in a sale in exchange for $125,000 and forgiveness of $2 million of debt.  5TR 137-138.  Then MGM invested the league assets into Ebersol's companies Infinite Athlete and Tempus Ex Machina.  5TR 137-138.  MGM and Ebersol's companies coordinated in obtaining patents on the league's technology.  5TR 138.

214.    After the league filed bankruptcy, Ebersol faced a $700 million claim from the players and exposure for his misconduct and self-dealing as an officer, director and controlling shareholder of ESMG and CEO and manager of the subsidiary LLC's.  Ebersol's business after the league depended on the ongoing use of league's technology.  Ebersol sought and reached a settlement with the players and the Trustee.  In the settlement, the Trustee released all claims against Ebersol in exchange for Ebersol's cooperation in this case.  3TR 175-179; D217 at 16 ¶ 46(j).  After that settlement, for the first time since the media blitz in February of 2019, the Trustee claimed that Ebersol had made a $250 million agreement with Dundon using words nearly identical to those stated for the first time in Ebersol's deposition in September 2024.  20TR 87-94. Escaping significant liability incentivized Ebersol to join the narrative that an actual contract for

$250 million existed and to change the tone of his view of how Dundon treated the league in comparison to Exhibit D202.

## THERE WAS NO EVIDENCE OF TORT DAMAGES

215.    The Trustee pleaded four categories of damages tied to tort claims: (i) destruction of the league's enterprise value; (ii) contracts/letters of intent breached or not pursued; (iii) assets and resources of the Debtors that Dundon and Zutter usurped; and (iv) lost opportunities and profits.  ECF 56 at 49-50.  In his disclosures, the Trustee stated "in total for all breaches" relating to his claims for breach of fiduciary duty, fraud, negligent misrepresentation against Dundon and Zutter and fraudulent inducement against DCP, Debtors damages are the full market value of the league at the time Dundon, Zutter and DCP forced it to suspend operations as set out in Desai's report.  D272 at 91-92.

216.    As the Trustee's sole source of disclosed damages, Desai did not provide any calculation of damages relating to: (ii) contracts/letters of intent breached or not pursued; (iii) assets and resources of Debtors that Dundon and Zutter usurped; or (iv) lost opportunities and profits.  D273.

217.    The only category of damages Desai addressed was enterprise value of the league on February 13, 2019 (the day before the DCP investment) and April 2 (the day of the shutdown). Desai did not opine that the values on those dates were damages or that Dundon, Zutter, or DCP caused the loss of the values on either of those dates.  14TR 151, 153.  Because she failed to consider causation, Desai's valuation numbers are not meaningful.  19TR 79-80.  Desai should have considered all of the issues the league faced to determine the impact of the alleged conduct relative to other factors but did not.  19TR 81-83. Desai's values are not useful because she did

not consider, if you took Defendants out of the picture, whether the league would have been better off.  19TR 83.

218.     Desai premised her valuation on the league's going concern value, which presumed a hypothetical world in the absence of the alleged breaches.  In the hypothetical world, Desai assumed the league would be the first successful spring football league and a successful digital and sports start-up business.  She also assumed the league would continue to operate for at least 10 years (14TR 248-249), that the NFL would fund at least $20 million per year of player and staff salaries (14TR 253-255), broadcasters would pay for broadcast and production starting in 2020 (14TR 256-257), that ticket sales would more than double in number and price immediately (19TR 112-13), that digital revenue would grow to $150 million annually even though there was no history of digital revenue (19TR 115-116), and that there would be more than 1700% growth in revenue and only a 45% growth in expenses (19TR 116-117).

219.     Desai admits that she did not allocate or consider causes other than Defendants. 14TR 154-55.  She did not allocate loss between the 14 to 16 months while Ebersol was in charge to the 46 days Defendants were involved.  14TR 152, 154-155.  She did not calculate the impact of Ebersol's decision to delay marketing, cut expenses, or cancel local and national marketing, failure to obtain local and national sponsorships, fill advertising space, and sell tickets before the league started.  14TR 165-169.  She did not consider the impact of Fowler's failure to fulfill his funding commitment, which was adjudged to have caused $53 million in loss to the league.  D273; D208.1; 14TR 162-163.  Desai failed to consider the fact that Ebersol had brought the league to the brink of shutdown at least three times prior to DCP's investment and the long-term impact that had on the league's financial condition and its relationship with critical vendors.  D29; D33; D36; D41; D50.

220.     Desai failed to consider any of the actual circumstances the league faced just prior to Dundon's investment or as the league neared shutdown.  On February 13, the league had $1.1 million in the bank, and Ebersol was seeking a $10 million bridge loan from Dundon and others and was considering contributing $5 million in trust money to hopefully get through week two. Desai did no valuation of the league under that scenario where the league would have burned through the bridge loan or trust money by week two.  14TR 175-176.

221.     With respect to the April 2 valuation, Desai failed to consider the actual futures the league had considered as set out in Ebersol's four options email, all of which contemplated a league shutdown in the absence of additional capital, but she admitted that the options from Ebersol are not going concern options.  14TR 249-52. And Desai admitted that Dundon had made it clear that no more than $70 million would be funded. Therefore, the hypothetical future depended on new investors putting hundreds of millions more into the league to achieve the future profits she calculated. Outside of DCP and Fowler, the league in its entire history had only raised about $15 million from outside investors.  T709, Ex. A; T757, Ex. A.

222.     Desai also admitted that she did no valuation of the Debtors or their assets post-filing.  14TR 250.

223.     Desai's valuations were fatally flawed.  Desai did a market approach valuation for February 13, 2019. She looked to other transactions within the company to determine what a willing buy and willing seller would have paid for the equity of ESMG on February 13, knowing the information that is known or knowable at the time.  She relied entirely on the valuation in the Fowler term sheet from November 2018 and the agreement with 32 Equity in January 2019 to support this value.  14TR 170-172.  The 32 Equity deal was not relevant because it was not a transaction.  19TR 89-91. The agreement does not state an agreed value; it was merely an option

for 32 Equity to purchase shares in the future at the lower of a set price (same price Fowler got) or a third-party fair market value at the time of the transaction.  19TR 89-91.  32 Equity never bought a single share at any price.  Fowler was the only one that every purchased shares at the $115 million valuation.  14TR 194-95.  The Fowler agreement is not a reliable source of value because the league was fundamentally different between November 2018 and February 2019.  19TR 92.  The league Fowler invested in predicted future profits of double what the predictions were in February of 2019.  19TR 92-94.  And there were a host of other issues the league faced during that period that would severely impact the value as of February 13, 2019.  19TR 94-96.  Desai did not consider the Term Sheet, which is the most relevant transaction because it was by far the closest in time and shows that ESMG was a willing seller on February 14, 2019, at a value of $23.3 million.  14TR 203, 209-213.

224.    Desai also added $37.8 million in debt to the February 13, 2019 value but admitted she did no investigation of that number and that the number included Fowler's equity investments which is not debt.  She made no effort to correct that number.  14TR 213-217.

225.    Desai's April 2, 2019, valuation is unreliable and speculative.  Desai used the income approach and relied entirely on a single pro forma prepared by Kantowitz on March 26, 2019.  14TR 219-20, 224; D188.  She did no independent analysis to determine the reliability of the pro forma.  14TR 216-217.  She had no knowledge of whether Dundon and Zutter approved the drastic changes in the pro forma, including the changes in how the league would grow.  14TR 225, 227. She did not compare the projection for 2019 to the league actual revenue and expenses. 14TR 228-230.  She did not consider the drastic swings in projections over time and the fact that the league had never met prior projections.  14TR 232-247.  She did not correct the pro forma to remove Kantowitz's unrealistic assumptions like the NFL contributing $20 million per year and

broadcasters paying for broadcast and production starting in 2020, unrealistic revenue growth, drastic expense cuts, and all the other flaws described above. 14TR 253-257; 18TR 34, 48-50; D275 at 101; T1067. When adjusted for reality, Bramer determined that the projections revealed that the league would continue to lose money for at least 10 years and would need more than $500 million dollars in addition to the $250 million to get through that period and would have a negative value. 19TR 132-135.

## PROPOSED CONCLUSIONS OF LAW

226. **Breach of contract.** The parties agree that the alleged oral agreement is governed by Texas law. ECF 300 at ¶ 510.

227. Under Texas law, a cause of action for breach of contract requires proof of (1) a valid contract; (2) the plaintiff's performance or tendered of performance; (3) a breach by the defendant by failing to perform or tender performance; and (4) damages sustained by the plaintiff due to the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

228. **Ebersol lacked authority to enter the oral agreement.** As the party suing to enforce an oral agreement, the Trustee bears the burden of proving the existence of a valid contract. *TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 465 (Tex. 2018). ESMG's corporate status necessitates that it act through agents. An agent for an entity cannot bind the entity to an agreement unless the entity authorizes the agent to do so. *See generally Seyvani v. Chipotle Mexican Grill of Colorado, LLC*, No. 1:22-CV-00721-RP, 2022 WL 17814233, at *5 (W.D. Tex. Oct. 5, 2022) (applying Texas law and noting the general rule that an act of an authorized agent does not bind the principal), *report and recommendation adopted*, No. 1:22-CV-721-RP, 2022 WL 17814230 (W.D. Tex. Oct. 25, 2022). A corporation may confer authority in advance or ratify an

unauthorized act after the fact. The authority of a corporate officer (like Ebersol) to bind a corporate entity does not extend to transactions that require board or shareholder approval. RESTATEMENT (THIRD) OF AGENCY § 3.03 cmt. e(3) at 186 (2006). Texas courts do not presume the extent of authority conferred on an agent. *Community Health Sys. Servs. Corp. v. Hansen*, 525 S.W.3d 571, 597 (Tex. 2017). The party relying on an agent's authority bears the burden of proving it. *Id*.

229.    Ebersol lacked authority from the ESMG board of directors and shareholders to enter an agreement whereby Dundon or one of his entities would invest $250 million in ESMG in exchange for a 75% interest in ESMG and control of the board. Because Ebersol lacked authority to enter a binding contract on behalf of ESMG, and because ESMG's board and shareholders did not vote to approve the alleged oral agreement in advance or ratify it after the fact, the Trustee cannot prove that a valid contract existed between ESMG and Dundon.

230.    On February 14, 2019, Ebersol had a call with Dundon in which Ebersol claims to have completed a deal for a Dundon investment. The deal, according to Ebersol, consisted of Dundon's agreement to invest $250 million in exchange for a 75% interest in the league, control of the board of directors, and complete control of the league (or ESMG) with a pre-money valuation of $82.5 million. 2TR 169:11-15, 171:8-15; 6TR 184-87. According to Ebersol, he called the existing board members and a few major existing shareholders and obtained their approval of the Dundon deal. 2TR 161:14-22, 163:15–164:25, 165:12–168:19. Even if Ebersol's testimony were true, the Trustee cannot recover on the alleged oral agreement because Ebersol lacked authority to enter it and ESMG never ratified it.

231.    **Ratification requirement.** To the extent that consideration of ESMG's actions concerns its internal corporate affairs, the "internal affairs doctrine" dictates that Delaware law

govern those issues. *Salzberg v. Sciabacucchi*, 227 A.2d 102, 128 (Del. 2020). Matters that fall within the traditional notion of "internal affairs" include the election or appointment of directors and officers, the issuance of corporate shares, preemptive rights, and directors' and stockholders' meetings. RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 302 cmt. a (1971).

232.    Article IV of the ESMG Restated Certificate of Incorporation requires a vote of all or a certain class of the stockholders to approve a transaction that involves an acquisition by a single person or entity of 50% of the outstanding stock, changes to the rights of preferred stockholders, creation of a new class of shares, an increase in the number of shares, or a change in the number of directors. D22, Art. IV.A.5, IV.C.2.3.1(d), IV.C.3.2.1, IV.C.3.2.2, IV.C.3.3(a), (b), (c), (h). DGCL § 211(b) requires a vote of the stockholders to elect new director. The shareholder consent (to the Term Sheet) confirms that requirement. D182 at 3.

233.    Under Delaware law, stockholder votes may only occur at meetings with a quorum present or by written consent of a sufficient number of stockholders. DGCL §§ 211, 216, 228. Though meetings may occur by remote means, "if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the corporation." DGCL § 211(a)(2). The ESMG bylaws (§§ 1.10.1-.2) are consistent. D1 at TR 5742-43 (requiring a signed, written consent for stockholder action in lieu of an annual or special meeting).

234.    The ESMG stockholders did not vote to authorize Ebersol to enter a $250 million transaction with Dundon, to agree to issue new securities to Dundon for a $250 million investment, to grant him preferred stock rights for a $250 million investment, to agree to conditions and timing for funding in that amount, to enter a debt transaction, or to change the number and members of the board of directors. Under Delaware law and ESMG's governing documents, ESMG could not

authorize Ebersol to accept a $250 million investment in exchange for the consideration Ebersol claims he obligated ESMG to convey without a vote of the stockholders, and that vote was never requested or obtained.

235. Dawn Belt was one of ESMG's lawyers. 12TR 15:20-23, 17:10-12, 17:19-24. She testified that ESMG could not enter a $250 million transaction with Dundon without the approval of the ESMG board. 12TR 46:16-20 (board would need to approve any material transaction), 46:21-23 ($70 million deal was a material transaction), 46:24–47:1 (a $250 million investment would be a material transaction), 47:5-10 (board would have to approve any transaction for a $250 million or $180 million investment), 47:11-16 (Ebersol could not agree to a $250 million or $180 million investment without board approval). Ebersol, John Zutter, and Kevin Freedman testified consistent with Belt that a $250 million investment would have required board and shareholder approval, and neither the board nor the shareholders ever approved a $250 million agreement. 4TR 45-47; 12TR 480:23–481:1, 483:11–484:10; 16TR 276:17–277:5.

236. Although Ebersol claims that he called the ESMG board members in individual calls, the ESMG board could not approve any corporate action by way of calls to individuals. The board of a Delaware corporation may only act in two ways. First, by a vote of the directors of the corporation (i) present at a meeting or (ii) in a telephonic meeting "by means of which all persons participating in the meeting can hear each other." DGCL § 141(b) ("The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors unless the certificate of incorporation or the bylaws shall require a vote of a greater number."); DGCL § 141(i) (telephonic meeting). Second, by unanimous written consent. DGCL § 141(f) (requiring a written consent in lieu of a meeting to be filed with the minutes of the board). The ESMG bylaws contain the same requirements for board action as DGCL § 141. D1 at 6-7

§§ 2.5, 2.8. A board cannot act without the collective sharing of business knowledge that comes from participation in a meeting and deliberation with others present at the meeting. *Lippman v. Kehoe Stenograph Co.*, 11 Del. Ch. 80, 88-89, 95 A. 895 (1915) (holding that board members cannot act without a quorum deliberating together). "[I]t has long been the policy of [Delaware] law to value the collaboration that comes when the entire board deliberates on corporate action and when all directors are fairly accorded material information." *OptimisCorp v. Waite*, 137 A.3d 970, \*3 (Del. 2016) (quoting *Lippman* and collecting authorities explaining Delaware law's commitment to requiring boards to vote after collective consultation). If Ebersol did call the ESMG board members individually, his calls did not satisfy DGCL § 141 or the ESMG bylaws.

237. John Zutter testified about Ebersol's lack of authority. 16TR 175-78, 180-82; D237, Ex. A ¶ 3. He testified that Ebersol did not disclose that he lacked board and shareholder authority to enter the Term Sheet (for $70 million). 15TR 81:5-15, 83:2-22. He testified that, after Ebersol signed the Term Sheet, he (Zutter) discovered governance issues and defaults of third-party agreements caused by Ebersol signing the Term Sheet without proper authority and without clearing default provisions for third-party agreements, including MGM, David Pottruck, and Reggie Fowler. 15TR 81:5-15, 83:2-22; 16TR 165:1-166:5. The same lack of authorization and defaults exist with respect to the alleged $250 million oral agreement.

238. **The existing board and shareholders had to authorize and consummate the alleged oral agreement.** At trial, Ebersol suggested that Dundon was responsible for consummating the alleged oral agreement by convening a meeting of the board of directors to approve it and then convening a meeting of the shareholders to authorize the transaction and the issuance of stock. 4TR 191-92. His suggestion makes no sense. Dundon and Zutter could not act as directors until the existing shareholders duly elected them. *See generally In re Walt Disney Co.*

*Der. Lit.,* 906 A.2d 27, 48-49 (Del. 2006) (rejecting a de facto fiduciary argument and explaining that a corporate officer cannot assume officer duties until he is duly elected). Ebersol convened a meeting of the ESMG board (without inviting Dundon or Zutter) to ratify the Term Sheet. D135 at DCP 241, 250-251. ESMG's counsel determined the presence of a quorum (which did not include Dundon or Zutter). D135 at 11. There is no evidence that anyone present at the meeting suggested that Dundon or Zutter should have attended. DCP had no right to exercise the rights of a shareholder until ESMG issued stock to it, and ESMG could not issue stock to DCP until the existing shareholders authorized the issuance of stock. 4TR 45; D22, Art. IV.A.5, IV.C.2.3.1(d), IV.C.2.3.3.(a), (b), (c), (h).

239. On February 14, 2019, Ebersol did not control a majority of the ESMG shares. Some combination of votes in addition to Ebersol would be necessary to vote to approve the alleged oral agreement. On March 27, 2019, the existing shareholders signed a consent ratifying the Term Sheet. 4TR 210-12; D182 at 2. At that time, Ebersol controlled 71% of the shareholders' vote. 4TR 208-10; D216. With Fowler's proxy, Ebersol—and no one else—had the power to consummate a deal if one existed. There is no basis upon which to impose an obligation on Dundon or DCP to authorize ESMG to enter an agreement with Dundon or DCP or some other Dundon entity when the existing board and shareholders (represented by able counsel) properly ratified a different agreement and caused ESMG to act on it. D135 at 12; D182 at 2. Dundon did not, at any time, have a proxy to vote shares of ESMG.

240. The Court finds that Ebersol lacked authority to enter an agreement with Dundon for an investment of $250 million in equity (or debt) in the league and that a valid agreement could not be formed without that authority.

241.    **Apparent authority.** The Trustee cannot rely on apparent authority to cure Ebersol's lack of actual authority. "Apparent authority in Texas is based on estoppel." *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984). "Apparent authority depends on the act of the principal." *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 471 (Tex. 2004); *see also Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007) ("[O]nly the conduct of the principal is relevant."). Apparent authority estops the *principal* from *denying* the authority of the agent, it does not estop a third party from denying that the principal authorized the agent. *See Ames*, 672 S.W.2d at 450 (holding that principal's actions did not create apparent authority). Delaware law on apparent authority is the same as Texas law. *See Caribbean Sun Airlines Inc. v. Halevi Enterprises LLC*, No. 199, 2024, ___ A.3d ___, 2025 WL 250787, at *6-7 (Del. Jan. 21, 2025) (discussing basic principles of apparent authority). "A principal may not choose to act through agents whom it has clothed with the trappings of authority and then determine at a later time whether the consequences of [the] acts [of the agents] offer an advantage." RESTATEMENT THIRD OF AGENCY §2.03 cmt. c at 115. This rule prevents a principal from deciding after the fact if its agent has entered an advantageous deal.

242.    Even if a putative principal could invoke apparent authority against a third party, the agreement to transfer 75% of the stock of ESMG and complete control of ESMG was an extraordinary transaction. 12TR 47:5-16. The authority of a corporate officer (like Ebersol) to bind a corporate entity does not extend to transactions that require board or shareholder approval. RESTATEMENT (THIRD) OF AGENCY § 3.03 cmt. e(3) at 186. Consistent with that rule, apparent authority does not apply when the putative agent purports to enter an extraordinary transaction for his principal. RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. d at 121. A transaction "fundamental to [an entity's] future operations or existence requires the assent of the principal's governing board,

members, or shareholders." *Id.*; *see also Chase v. Consolidated Foods Corp.*, 744 F.2d 566, 569 (7th Cir. 1984) (holding that title of president did not invest agent with apparent authority to enter extraordinary contract to sell a major corporate division).

243.  Because Ebersol lacked authority to bind ESMG to an oral agreement with Dundon, the alleged oral agreement never became binding on or enforceable by ESMG or Dundon.  *See Tex. Midland R.R. v. Monroe*, 110 Tex. 97, 101, 216 S.W. 388 (1919) (holding that agent's unauthorized act did not bind putative principal); *see also Seyvani v. Chipotle Mexican Grill of Colorado, LLC*, No. 1:22-CV-00721-RP, 2022 WL 17814233, at *5 (W.D. Tex. Oct. 5, 2022) (applying Texas law and citing *Tex. Midland*), *report and recommendation adopted,* No. 1:22-CV-721-RP, 2022 WL 17814230 (W.D. Tex. Oct. 25, 2022).

244.  Since apparent authority does not apply here, only ratification could make an unauthorized agreement a valid and enforceable agreement against ESMG.  *See Longoria v. Atl. Gulf Enterprises, Inc.*, 572 S.W.2d 71, 77 (Tex. App. — Corpus Christi 1978, writ ref'd n.r.e.). The ESMG board and shareholders did not ratify the alleged oral agreement.  The board ratified the Term Sheet on February 24, 2019.  D135 at 12.  The shareholders ratified the Term Sheet on March 27, 2019.  D182 at 2.

245.  The day before the shareholders signed the consent ratifying the Term Sheet, Dundon and Zutter informed Ebersol that Dundon would not fund any amount over the $70 million maximum cumulative investment called for in the Term Sheet, and Ebersol passed that information on to Dawn Belt and Kevin Freedman.  T1171.  "A ratification of a transaction is not effective unless it precedes . . . any manifestation of intention to withdraw from the transaction made by the third party."  RESTATEMENT (THIRD) OF AGENCY § 4.05(1); *see also* RESTATEMENT (SECOND) OF AGENCY § 88 (1958) (same).  The ESMG shareholders ratified the Term Sheet, not the alleged

$250 million oral agreement.  D182 at 2.  Dundon and Zutter told Ebersol there would be no funding above $70 million on March 26, 2019, manifesting Dundon's intent to withdraw from an agreement, if one existed, to fund the league over $70 million.  T1171.  Because the withdrawal happened before an attempt to ratify the alleged $250 million agreement, any attempt to ratify after that was ineffective.  RESTATEMENT (THIRD) OF AGENCY § 4.05(1); RESTATEMENT (SECOND) OF AGENCY § 88.

246.    **The Trustee cannot ratify a contract he rejected.**  Besides the above, the Trustee cannot ratify an agreement he rejected.  An agreement is breached by the Trustee when it is rejected.  11 U.S.C. § 365(g).  A rejection occurs if the trustee fails to assume an executory contract.  11 U.S.C. § 365(d)(1).  Courts use the Countryman test articulated in *Matter of Falcon V, L.L.C.*, 44 F.4th 348, 353 (5th Cir. 2022), to determine whether a contract is executory.  Under the Countryman test, a contract is executory if both parties have yet to perform contractual obligations such that the failure of either party to perform them would constitute a material breach excusing performance of the other.  *Id.*  If it existed, the oral agreement was executory because Dundon or his entities owed ESMG substantial performance — payment or a loan of $180 million — and ESMG owed substantial performance — repayment of any loan, furnishing Dundon or his entities 75% of the stock of the company, and the preferential return set out in the Term Sheet.  The Trustee failed to assume the alleged oral agreement.  19TR 234:5-10, 236:7-8, 21-24.  The Trustee cannot ratify an agreement he failed to assume because the failure to assume is a rejection.  11 U.S.C. § 365(d)(1).  11 U.S.C. § 365(c)(2) prohibits the Trustee from assuming a contract to make a future loan to a debtor.

247.    The Trustee cannot enforce an agreement that Ebersol lacked authority to enter where the other party withdrew from the alleged agreement prior to any attempt to ratify it and

where the Trustee rejected the agreement prior to any act of ratification.   Therefore, Dundon is entitled to a take-nothing judgment on the oral agreement claim.

248.    **The alleged oral agreement is too indefinite to be enforced.**  "To prove the first element [of a breach of contract claim] (the existence of a valid contract), the plaintiff must establish that (1) an offer was made; (2) the other party accepted in strict compliance with the terms of the offer; (3) the parties had a meeting of the minds on the essential terms of the contract (mutual assent); (4) each party consented to those terms; and (5) the parties executed and delivered the contract with the intent that it be mutual and binding." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 (Tex. 2018).

249.    Formation of a contract requires proof of an offer and acceptance and a meeting of the minds on all essential elements.  *See Ibe v. Jones*, 836 F.3d 516, 524 (5th Cir. 2016).  The term "meeting of the minds" refers to the parties' mutual understanding and assent to the expression of their agreement.  *Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 454–55 (Tex. App. — Dallas 2012, pet. denied).  The parties must agree on the same thing, in the same sense, at the same time.  *See id*.  For an offer to be capable of forming a contract upon acceptance, the offer must be reasonably definite in its terms and must sufficiently cover the essentials of the proposed transaction such that an expression of assent will create a complete and definite agreement on all essential details.  *Id*.

250.    Under Texas law, "the terms of an oral contract must be clear, certain, and definite." *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *see also Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455 (Tex. App.—Fort Worth 2009, pet. denied) ("[A] party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain."); *Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 802 (Tex. App.—Eastland

2005, no pet.) ("The terms of an oral contract must be definite, certain, and clear as to all essential terms; or the contract will fail for indefiniteness."). Although Texas courts favor validating contracts, a court may not create a contract where none exists. *Lamajak Ins. v. Frazin*, 230 S.W.3d 786, 793 (Tex. App.—Dallas 2007, no pet.).

251.    The elements of written and oral contracts are the same and all must be present for a contract to bind the parties. *Thorton v. Dobbs*, 355 S.W.3d 312, 316 (Tex. App.—Dallas 2011, no pet.). To determine the existence of an oral contract, a court should look to the communications between the parties and to the facts and circumstances surrounding the communications. *Id.* "The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind." *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied). "It is not enough that one party thinks that there was a contract; they must show that their intentions to contract were expressed in a manner that the court is capable of understanding." *Id*. at 605. A court cannot enforce a contract unless its terms are sufficiently definite that a court can understand what the promisor undertook. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

252.    All contracts have material terms. *See Barrow-Shaver Resources Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 481 (Tex. 2019). In order for a contract to be enforceable, it must "address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). Material and essential terms are those that parties would reasonably regard as "vitally important ingredient[s]" of their bargain. *Id.*

253.    Cases addressing comparable transactions can illuminate what terms parties generally consider material.  In *T.O. Stanley Boot Co.,* a case about an alleged oral agreement to make a loan, the court cites five loan cases to support the conclusion that the material terms of a loan are the amount to be loaned, maturity date, interest rate, and repayment terms.  847 S.W.2d at 221 (refusing to enforce purported oral agreement to make loan that failed for indefiniteness where borrower offered insufficient evidence of interest rate or repayment terms); *see also Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663 (Tex. App. — Houston [1st Dist.] 1996, no writ) (refusing to enforce purported oral agreement to provide financing which lacked total amount, interest rate, or repayment terms); *Pine v. Gibraltar Sav. Ass'n*, 519 S.W.2d 238 (Tex. App.— Houston [1st Dist.]1974, writ ref'd n.r.e.) (refusing to enforce purported oral agreements to make loans, one of which left open amount, repayment terms, and specifications for collateral, and the other of which included no total amount and no terms).

254.    Texas courts have identified the material terms of an equity investment as the price per share, or, at the very least, a mechanism for determining how to determine the value shares of a company.  *See In Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 458 (Tex. App.—Fort Worth 2009, pet. denied) (refusing to enforce alleged oral agreement for a specified percentage of the fair market value of certain companies on finding that the alleged oral agreement failed for indefiniteness because parties never agreed how they would determine fair market value); *see also Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 802 (Tex. App. — Eastland 2005, no pet.) (refusing to enforce alleged oral agreement to compensate the plaintiff for his equity interest because the alleged agreement lacked terms, including the price, whether the method of payment would consist of cash or in an equity interest, and, if in an equity interest, the method of computation of value, and the precise entity from which the equity interest would come).

255.    With the exception of traditional friends and family loans, ESMG did not structure investments as simple loan transactions or the sale of common stock. ESMG structured investor transactions to minimize ESMG's short-term cash obligations to investors and to recognize the investor's high risk, venture capital type investment in a start-up. 1TR 165-66. All investments in ESMG were documented. ESMG documented every financing agreement in its history in a term sheet and then subsequent definitive documents, including investments that ranged from $20,000 to $170 million. T709; T757.

256.    The Fowler Term Sheet and the DCP Term Sheet (both of which were structured by ESMG's counsel and approved by ESMG's board and its shareholders) demonstrate a deliberate intention by ESMG to structure financing deals to address the terms the league would expect an investor in the league to agree on. T7; D16. Both term sheets identify the parties to the investments, the time frame within which the investments would be made, and the specific procedures and prerequisites for ESMG requesting a disbursement of investment funds (or to borrow funds in the case of the Fowler line of credit). T7; D16. The DCP Term Sheet dictates that the investment would take the form of equity; the Fowler Term Sheet calls for equity and debt in the form of a line of credit. T7; D16. Both term sheets specify the features of the shares (the equity) by providing the details of a liquidation preference, preferential distributions, conversion rights, and anti-dilution. T7; D16. In the case of the debt component of the Fowler Term Sheet, the parties agreed on repayment terms and conditions to funding (*e.g.*, creation of a finance committee, preparation of budgets, performance consistent with the budget, review sharing, and other terms). D16.

257.    The Trustee judicially admitted in his complaint that the parties kept "as an open item" the "form the funding would take (debt, equity, or some combination)." ECF 56 at 18-19

¶ 65.   The Trustee also judicially admitted that the Term Sheet "constitutes a valid and binding contract between DCP and ESMG."  ECF 56 at 42 ¶ 148.

258.    A judicial admission is a statement "(1) made in a judicial proceeding; (2) contrary to a fact essential to the theory of recover; (3) deliberate, clear, and unequivocal; (4) such that giving it conclusive effect meets with public policy; and (5) about a fact on which a judgment for the opposing party can be based. *Jonibach Mgmt. Trust v. Wartburg Enters., Inc.*, 750 F.3d 486, 491 n.2.  In *Jonibach*, the court refused to allow a party who admitted an oral contract in his pleading to later assert that the statute of frauds barred the oral agreement.  *Id.*  This case is similar.  For two years, the Trustee pursued a claim for breach of the Term Sheet based on an unequivocal pleading that the Term Sheet constituted a valid and binding contract.  ECF 56 at 42 ¶ 148.  He cannot at this late date withdraw his admissions because the converse of his admissions are suddenly more advantageous to his litigation strategy.  The admissions establish that DCP and ESMG entered the Term Sheet to the exclusion of the alleged oral agreement.

259.    The parties never finalized any Dundon funding commitment agreement—absent that contained in the Term Sheet—concerning (a) the parties to the agreement (which Dundon-affiliated entity or entities would invest in the league); (b) the timeframe during which the alleged $250 million would be invested; (c) the mechanisms, requirements, and conditions for drawing on the funding commitment; (d) whether the investment would take the form of equity or debt or both; (e) if equity, the price per share, quantity of shares, or any mechanism for valuing the shares, the features of the shares (*e.g.*, preferential distributions, protective provisions, conversion rights, or whether the league would be issuing a new category of shares or extending the offering of a previous shares); and (f) if debt, the interest rate, maturity date, payment schedule, conditions to

fund (*e.g.*, performance in line with the budget), or any other terms of debt repayment. These terms are material. ECF 292 at 14-20.

260.    Consistent with Ebersol's deposition, the complaint described the terms of the alleged oral agreement as consisting of merely a $250 million investment in exchange for a majority of ESMG and control of the board with the form of debt or equity left open. ECF 56 at 18.    At trial, Ebersol added specific details of the alleged agreement he had not previously disclosed, including that the agreement was for exactly 75%, only equity, and that he and Dundon had agreed on a valuation that conveniently made $250 million 75% of the total. 2TR 169:11-15, 171:8-15; 6TR 184-87. These details came out for the first time after Defendants identified the material terms missing from the oral agreement in a motion for summary judgment. ECF 173 at 16-23. Ebersol's new testimony on these issues lacks credibility given the timing and the lack of corroboration.

261.    Even if the Court accepted Ebersol's trial testimony as true, the alleged oral agreement consists of only a total amount, a percentage of equity, the right of Dundon to have control of the board, and a pre-money valuation. The oral agreement does not address (a) the parties to the agreement (which Dundon-affiliated entity or entities would invest in the league); (b) the timeframe during which the alleged $250 million would be invested, (c) the mechanisms, requirements, and conditions for drawing on the funding commitment; (d) whether the investment would take the form of equity or debt or both; (e) if equity, the price per share, quantity of shares, or any mechanism for valuing the shares, the features of the shares (*e.g.*, preferential distributions, protective provisions, conversion rights, or whether the league would be issuing a new category of shares or extending the offering of a previous shares); and (f) if debt, the interest rate, maturity date, payment schedule, conditions to fund (*e.g.*, performance in line with the budget), or any other

74

terms of debt repayment.  The lack of agreement as to those material terms negates the formation of an enforceable oral contract.

262.    Whatever discussions Dundon and Ebersol had did not address the essential terms of a proposed investment by Dundon or any entity owned or controlled by Dundon for $250 million.  There was no meeting of the minds between Dundon and Ebersol concerning Dundon, or any entity owned or controlled by Dundon, investing any amounts in the league beyond the $70 million referenced in the Term Sheet.

263.    Because there was no meeting of the minds as to essential terms of the alleged oral agreement — outside of the agreement reflected in the Term Sheet—the alleged oral agreement is unenforceable.

264.    The Court concludes that the essential and material terms of any agreement between Ebersol and Dundon by which Dundon or any entity owned or controlled by him would provide financing beyond the $70 million referenced in the Term Sheet include: (a) the identity of the investor who would supply the $180 million balance after DCP's $70 million commitment; (b) the consideration to be received by the unidentified investor in exchange for the $180 million post-Term Sheet funding; (c) the timeline within which the investor would provide the funds; (d) the structure of the balance of the alleged agreement to invest, including whether the $180-million post-Term Sheet funding would take the form of debt, equity, or some combination of the two; (e) with respect to any equity component, the price per share, quantity of shares, or a mechanism for valuing the shares, and the features of the shares (*e.g.*, preferential distributions, conversion rights, etc.); and (f) with respect to any debt component, the interest rate, maturity date, payment schedule, or any other terms of debt repayment.  Each of the above terms are essential to an enforceable

agreement. Because there was no meeting of the minds as to any of these terms—outside of the agreement reflected in the Term Sheet—the alleged oral agreement is too indefinite to be enforced.

265. **Impossibility of performance.** In ruling on prior motions, the Court observed that a "reasonable person could conclude that Dundon would not invest more than $70 million between the Term Sheet's effective date [February 14, 2019] and June 30, 2019, and still invest a total of $250 million at some other point(s) in time." ECF 54 at 42; ECF 295 at 32. Even if the Court concluded that Dundon agreed to invest $250 million, but that any amount above $70 million would be payable at a point in time after the June 30, 2019 — the end of the period for the maximum cumulative commitment of $70 million stated in the Term Sheet, then Dundon's failure to pay the balance would not prove a breach, and the failure to pay the balance would be excused by impossibility (the bankruptcy of the league).

266. Impossibility of performance occurs when an unexpected contingency occurs, the risk of which was not allocated either by agreement or custom, and the occurrence of the contingency has made performance impossible. *Alabama Football, Inc. v. Wright*, 452 F. Supp. 182, 185 (N.D. Tex. 1977). Even if Dundon and Ebersol entered an oral agreement, the agreement did not address the contingency of the shutting down of the league before the end of season one. The *Wright* case was similar. Rayfield Wright had signed a multiyear deal to play for the Alabama Football team in the World Football League. The team failed and the league filed bankruptcy. Wright sued the team for the salary he would have earned playing for the league for five years. The court denied Wright's claim because the risk of bankruptcy was not expressly allocated to either party, and the team's dissolution and league's bankruptcy made it impossible for Wright to play for the team. The circumstances excused both parties' performance. *Id*.

267.    This rule is sometimes called supervening frustration.    It applies where circumstances frustrate the purpose of the contract without the fault of the party excused. RESTATEMENT (SECOND) OF CONTRACTS § 265 (1981).  Even if the parties could have foreseen the contingency that creates the frustration, that fact does not compel the conclusion that its non-occurrence was not a basic assumption of the contract.  *Id.* cmt. a.  The failure of the World Football League and the failure of the AAF are similar in that respect.

268.    In his case, the oral agreement (if made) was intended to provide for future seasons, none of which came to fruition.  Both the Fowler and DCP term sheets required an operations budget with each funding request.  There is no evidence that Dundon and Ebersol agreed that Dundon would continue to fund a shutdown league.  No one has testified that the parties, in discussing the alleged oral agreement, allocated the risk of the league's early demise to one of them or the other.  12TR 504:14-21 (DCP fulfilled all of the funding requests from ESMG). Therefore, even if an oral agreement existed, impossibility of performance excuses Dundon's non-performance.

269.    **The alleged oral contract is an unenforceable agreement to agree.**  The alleged oral contract also fails because, at best, the parties formed nothing more than an agreement to agree.  "[W]hen an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Fischer v. CTMI, L.L.C.,* 479 S.W.3d 231, 237 (Tex. 2016) (internal quotation marks omitted).  As an agreement to agree, the Court cannot enforce the alleged oral agreement.  *See id*.

270.    In *RDA Prof'l Beauty Supply Inc. v. Clay*, No. 12-23-00050-CV, 2023 WL 8658711, at *7 (Tex. App.—Tyler Dec. 14, 2023, no pet.), the court held that an oral separation agreement, pursuant to which one party agreed to sell shares of stock in a company to another, but

which left the price term open pending two evaluations, constituted an unenforceable agreement to agree. The court noted that the absence of evidence of any agreement as to material terms, such as the date on which to calculate the stock price, precluded the court from fashioning an appropriate remedy for the alleged breach. Because the court could not determine the sale price upon which the parties would have eventually agreed, or any other terms of the sale, the court could not approximate the amount the seller would have received and could not fashion an appropriate remedy for any breach. *Id*. at *7.

271.     The Trustee judicially admitted that the parties kept "as an open item" the "form the funding would take (debt, equity, or some combination)." ECF 56 at 18-19 ¶ 65. Dundon testified that any funding beyond $70 million depended on yet-to-be-determined conditions. T1423; 9TR 105:5–106:18. The lack of essential terms makes impossible the task of fashioning an appropriate remedy with respect to the breach alleged by the Trustee. The Court cannot ignore the uncertainty without imposing new terms on the parties that were never agreed to. *See Radford v. McNeny*, 129 Tex. 568, 572, 104 S.W.2d 472, 474 (Comm'n App. 1937) (noting that a court cannot make a contract for the parties and their failure to agree on material terms renders an attempted contract a nullity). The absence of an agreement on essential terms renders the alleged agreement unenforceable. *See Fischer*, 479 S.W.3d at 237.

272.     The Court finds, that, to the extent any agreement was formed between Dundon and Ebersol prior to the execution of the Term Sheet, it constituted an unenforceable agreement to agree.

273.     **Partial performance does not apply.**  Partial performance does not cure the uncertainties in the alleged oral agreement. Partial performance may remove indefiniteness, but only where the performance rendered gives meaning to the indefinite terms. RESTATEMENT

(SECOND) OF CONTRACTS § 34(2) cmt. c; *see also Fischer v. CTMI, LLC*, 479 S.W.3d 231, 240 (Tex. 2016) (quoting *Restatement*).

274.    Partial performance does not apply unless the performance rendered is unequivocally referable to the alleged oral agreement. *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426–27 (Tex. 2015) (discussing partial performance as a defense to the statute of frauds). ESMG expressly performed the act claimed as performance (here, transfer of control) to comply with the Term Sheet. D135 at 12; D182 at 2. DCP did not get control of the board until the shareholders elected Dundon and Zutter to sit on the board. D182 at 3. When the shareholders consummated the election, they expressly referred to transfer of control of the board as a condition of the Term Sheet. D182 at 2. ESMG repeatedly acknowledged DCP's performance with reference to the Term Sheet. D135 at 12 (acknowledging receipt of $12 million from DCP as fulfillment of the Term Sheet); D182 at 2 (acknowledging receipt of $50 million from DCP in fulfillment of the Term Sheet); D204 (acknowledging receipt of funds from DCP in fulfillment of the $70 million commitment).

275.    "If the evidence establishes that the party who performed the act that is alleged to be partial performance could have done so for some reason other than to fulfill obligations under the oral contract," the doctrine of partial performance does not apply. *Westergren*, 453 S.W.3d at 426-27. Because the evidence pointed to an express explanation for the performance (performance of an obligation in the Term Sheet), whatever partial performance the Trustee alleges ESMG supplied does not remove uncertainty in this case.

276.    In *Houston Cmty. Coll. Sys. v. HV BTW, LP*, 589 S.W.3d 204, 213 (Tex. App.—Houston [14th Dist.] 2019, no pet.), the party denying the contract observed and acquiesced in the performance, establishing that an agreement to the terms (when and what) had been made. The

court held that partial performance could elucidate terms that one party claimed were too indefinite to be enforced in the original agreement, and the court found that the work actually done (and known to be done by the other party) was the work the parties agreed HV BTW would do. *Id.* In that case, there was no other explanation for why HV BTW would have constructed drainage, curbs, and landscaping on the other party's property. *See id.*

277.    In this case, the Trustee claims that ESMG performed by turning over control to Dundon and Zutter. That performance does not remove the uncertainty as to the terms the parties never agreed to, but which are nonetheless material (the features of the shares, the number of shares, the timing, the parties, etc.). Another explanation for the performance exists—the Term Sheet that the board and shareholders expressly referenced when they ratified it. Thus, partial performance does not render the oral agreement enforceable because the performance alleged does not remove the uncertainty that renders the alleged oral agreement unenforceable and another explanation for the performance exists.

278.    **Prior material breach.** "[W]hen one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004). It is undisputed that ESMG never issued or transferred any stock to Dundon, which is a prior material breach of the alleged oral agreement by which the Trustee claims ESMG promised to transfer an unquantified number of shares of some form of stock to Dundon in exchange for a multiyear investment of $250 million in equity or debt. Even if the Court accepts that Dundon made an oral agreement to buy a majority of the ESMG stock for a $250 million equity investment and a loan, ESMG never transferred any stock to Dundon, DCP, or any Dundon affiliate. The board never ratified an agreement to do so, and the shareholders never ratified any agreement to do so or agreed

to amend the corporate documents to allow for the issuance of additional stock.  The failure to obtain ratification and transfer the stock was a prior material breach.  A prior material breach excuses the performance of the other party.  *Id.*

279.    The Court finds that, even if Dundon and Ebersol reached an agreement regarding a $250 million investment in equity (and possibly debt), ESMG's prior material breach excuses Dundon's performance of the agreement.

280.    **The Trustee cannot enforce a rejected agreement.**  Though the details of the alleged oral agreement are scant, the Trustee has judicially admitted that the investment from Dundon would be in the form of a combination of a loan and an equity investment.  ECF 56 at 18-19 ¶ 65.  The Trustee failed to assume the alleged oral agreement.  19TR 234:5-10, 238:7-8, 21-24.  Under Section 365(d)(1), the contract (assuming it existed) was rejected.  Though the loan part of the deal has not been quantified, 11 U.S.C. § 365(c)(2) prohibits the Trustee from assuming a contract to make a future loan to the debtor (ESMG).  The Trustee cannot enforce a contract § 365(c)(2) prohibits him from assuming.  *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1093 (9th Cir. 1991) (holding that Section 365(c)(2) prohibits the debtor from accepting post-petition financing without complying with Section 364).

281.    The equity part of the alleged oral agreement required an issuance of stock and payment of a preferential return.  Texas law requires a plaintiff to prove its own performance as part of a claim for breach.  *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019); *Krayem v. USRP (PAC), L.P.*, 194 S.W.3d 91, 94 (Tex. App.—Dallas 2006, pet. denied).  ESMG never issued any stock to Dundon or paid him a preferential return—meaning that material obligations on the part of ESMG remained unperformed when ESMG filed bankruptcy. The material unperformed obligations made the alleged oral agreement (assuming it ever existed)

an executory contract.  The Trustee had 60 days after the order of relief to reject or assume the oral

agreement but did neither.  19TR 234:5-10, 238:7-8, 21-24.  His failure to assume a contract when

the debtor (ESMG) owed material unperformed obligations (the transfer of stock and payment of

a preferential return)  makes the oral agreement (assuming it existed) rejected by operation of law.

11 U.S.C. § 365(d)(1).

282.    The Countryman test discussed in *Matter of Falcon V, L.L.C.*, 44 F.4th 348, 353

(5th Cir. 2022), compels the conclusion that the alleged oral agreement was an executory contract

because both parties had yet to perform contractual obligations such that the failure of either party

to perform them would constitute a material breach excusing the performance of the other.  Dundon

(or one of his entities) would have to loan or pay $180 million to ESMG.  The loan would require

repayment (and its assumption is expressly prohibited in Section 365(c)(2)), and the equity piece

would require an issuance and transfer of stock and payment of a preferential return.  Those

obligations were material and remained unperformed.  *See generally TKO Props., LLC v. Young*

(*In re Young*), 214 B.R. 905, 910 (D. Idaho 1997) (explaining that sale agreement was executory

where property buyer had tendered but not actually paid purchase price and seller had failed to

transfer title).  Thus, under 11 U.S.C. § 365, even if the agreement was made, the Trustee rejected

it.  Rejection is a breach.  11 U.S.C. § 365(g).  Because the Trustee cannot prove ESMG's

performance of even the meager terms the Trustee admits, and the Trustee rejected it, the Trustee

cannot recover for breach of the alleged oral agreement.

283.    The Trustee argues that Dundon's prior material breach negates a finding that the

oral agreement was executory.  This argument assumes the parties agreed to the timing of the

investment and that the timing required payment prior to the bankruptcy filing.  The evidence does

not support that theory.  The evidence indicates that the league contemplated the $250 million

investment would support the league after season one, not that it would be infused mid-way through the first season. T7 (calling for a $70 million maximum cumulative funding commitment through June 30, 2019). The Court finds that the Trustee has not proved a prior material breach.

284. **The Trustee failed to prove ESMG's performance of the alleged oral agreement.** A cause of action for breach of contract requires proof of the plaintiff's performance. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019); *Krayem v. USRP (PAC), L.P.*, 194 S.W.3d 91, 94 (Tex. App.—Dallas 2006, pet. denied). The equity part of the alleged oral agreement required an issuance of stock and payment of a preferential return. ESMG never issued any stock to Dundon or paid him a preferential return. ESMG never transferred title to any stock to Dundon (or DCP or another Dundon affiliate). 4TR 76; 5TR 142. The Trustee's failure to prove ESMG's performance precludes his claim for breach of the oral agreement. *See Krayem*, 194 S.W.3d at 94-95 (holding that the plaintiff's failure to show his own performance precluded recovery on his breach of contract claim).

285. **The Trustee failed to prove breach of the alleged oral agreement.** A cause of action for breach of contract requires proof of the defendant's breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). Ebersol did not explain the timing of the payment of the alleged $250 million investment. The Term Sheet and the Fowler agreement required ESMG to request funding. T7; D16. DCP fulfilled all of the funding requests from ESMG. 12TR 504:14-21. The league contemplated that at least some part of the $250 million would be paid in future seasons. T7 (calling for a $70 million maximum cumulative funding commitment through June 30, 2019). The league failed to make a request to Dundon or a Dundon affiliate to contribute funds above the funds that DCP contributed in response to specific requests. 13TR 322-23; D206.1; D206.2. Because the league never made a request for the balance of the

alleged oral agreement (approximately $180 million), the Trustee has failed to prove that Dundon breached the alleged oral agreement. Without proof of breach, the Trustee cannot recover for breach of contract.

286. **The law of the case doctrine does not prevent the Court from considering defenses that establish the Term Sheet is a binding agreement.** The Court's ruling in the Ebersol adversary does not preclude the Court from revisiting the enforceability of the Term Sheet. The law of the case doctrine does not prevent a court from reconsidering prior rulings at any time. *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010). The law of the case doctrine guides the Court's exercise of its discretion, but it does not limit the Court's power to revisit an earlier decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in the law. *Stoffels ex rel. SBC Tel. Concession Plan v. SBC Communications, Inc.*, 677 F.3d 720, 727–28 (5th Cir. 2012); *Zarnow*, 614 F.3d at 171 (noting that the rule yields to adequate reason); *United States v. Horton*, 622 F.2d 144 (5th Cir. 1980) (*per curiam*) ("Law of the case does not deprive a trial court from reexamining and altering a prior ruling to avoid the perpetration of an error.").

287. **DCP's acceptance by conduct rendered signature requirement immaterial and unnecessary.** In the Court's opinion in the Ebersol adversary, the Court concluded that DCP's failure to sign the Term Sheet prevented the Term Sheet from ever becoming an enforceable agreement between DCP and ESMG. No. 22-05077, ECF 171 at 13. The Court noted that Dundon had not alleged a potential defense to the failure to sign the Term Sheet or provided an alternative avenue for the Court to find it was a binding agreement. No. 22-05077, ECF 171 at 13. This case, by contrast, includes defenses and facts that compel a different outcome. Foremost, in his amended complaint, the Trustee judicially admitted the Term Sheet "constitutes a valid and binding contract

between DCP and ESMG." ECF 56 at 41 ¶ 148. The Trustee judicially admitted that DCP met $69.7 million of the maximum cumulative commitment of $70 million. ECF 56 at 42 ¶ 150. The Trustee's pleadings bind him, but they did not bind Ebersol.

288.    In addition, Defendants have pleaded excuse, waiver, estoppel, and ratification, and argued merger. ECF 65 at 22-23 ¶¶ 3, 8, 20, 22.

289.    The Term Sheet expressly selects Delaware law as the governing law. T7. The Delaware Supreme Court recently issued an opinion that compels reconsideration of the Court's prior ruling in the Ebersol matter. In *Thompson St. Capital Ptrs. IV, LP v. Sonova Hearing Instrs.*, No. 166, 2024, 2025 WL 1213667, ___ A.3d ___ (Del. April 28, 2025), the Delaware Supreme Court held that a court may excuse the failure of an express contractual condition if the failure of the condition causes a forfeiture and the condition was not material. *Id.*, *17 (citing RESTATEMENT (SECOND) OF CONTRACTS § 229). The lack of materiality of the signature — especially as it compared to the $5.1 million cash infusion ESMG needed to make payroll — justifies the excuse of the condition of the signature under *Thompson St. Capital*.

290.    The Term Sheet supports the finding that parties did not view the signature requirement as material. Considering the circumstances — ESMG's immediate need to make payroll — the signature was inconsequential to ESMG if DCP sent the $5.1 million initial cash infusion. The Term Sheet does not limit the manner of acceptance, and it does not expressly state the consequences of non-compliance with the signature requirement. It merely says that it will be binding when signed; it does not say that it will *only* be binding *if* it is signed. T7.

291.    "Insistence on a particular form of acceptance is unusual." RESTATEMENT (SECOND) OF CONTRACTS § 30 cmt. b. "Language referring to a particular mode of acceptance is

often intended and understood as suggestion rather than limitation; the suggested mode is then authorized, but other modes are not precluded." *Id.*

292.    *RCG Int'l Invests., LDC v. Ari Network Servs., Inc.*, No. 03-0003, 2004 WL 189784, *5 (D. Del. Jan. 22, 2004) (applying Wisconsin law), explains the key event that drives a finding of acceptance by conduct—when the party seeking to avoid the contract has retained a benefit of the contract (normally a payment).  In such a case—where a party retains a payment (like ESMG's retention of the payment of the funding amount and acknowledgement that the funding fulfilled DCP's commitment in the Term Sheet)—the party's retention of the benefit estops the party from denying the acceptance of the contract. *Id.*

293.    Delaware cases have invoked estoppel to prevent a party from retaining the benefit of a contract and denying its obligation.  In *Universal Studios Inc. v. Viacom, Inc.*, 705 A.2d 579, 597 (Del. Ch. 1997), the court held that a party could not avoid a contractual obligation on anti-trust grounds and at the same time retain the immensely lucrative benefits of the contract. Likewise, in this case, DCP's accepted the Term Sheet by sending the $5.1 million initial funding amount, and ESMG is estopped from denying the contract because it accepted the funds as fulfillment of the Term Sheet and spent them.  In his complaint, the Trustee judicially admitted the Term Sheet was a valid and binding contract.  ECF 56 at 67 ¶ 148.  ESMG even sent documentation to DCP to confirm ratification of the Term Sheet.  D135 at 1.  The minutes it sent show that the board had ratified Term Sheet and acknowledged DCP's partial performance of the Term Sheet with the ratification, and the ESMG shareholders acknowledged that the Term Sheet was a binding agreement enforceable against ESMG and that DCP had sent funds to ESMG in compliance with the Term Sheet.  D135 at 12; D182 at 2.

294.    *Thompson St. Capital* compels the Court to avoid construing the signature as a condition precedent or to excuse the failure of the condition because it was not material.  2024 WL 1213667, *10, 13.   Despite the Court's prior ruling, the Court should construe the signature requirement as not creating a condition to formation because the Term Sheet does not say it is not binding *until* it is signed or *only* if it is signed.   A writing that says it "shall" be effective upon execution does not create a condition precedent to formation.  *Brady v. Huber*, No. 2019-0204-SEM, 2023 WL 3736371, *6-7 (Del. Ch. May 31, 2023).   The cases cited in the Court's opinion in the Ebersol adversary that discuss the positive agreement issue involved settlement agreements, not agreements that parties complied with prior to the signing party claiming (years later) that the agreement was not consummated.  No. 22-05077, ECF 171 at 10-11.   In the settlement context, when no performance has occurred, it is not unusual for parties to have a post-deal change of heart, and the requirement of a writing serves to adjust expectations for all parties pending signatures.  Those considerations do not apply when the writing itself contemplates immediate payment of $5.1 million as acceptance, the $5.1 million was sent and accepted by the receiving party, and the receiving party retained and spend the funds.

295.    ESMG received the initial funding amount and identified those funds as performance of the Term Sheet by DCP, and ESMG turned over control to DCP and had its board and stockholders ratify the Term Sheet by name and acknowledge DCP's compliance with it.  D135 at 12; D182 at 2.  Enforcement of the signature requirement to deny DCP of the benefit of the Term Sheet would cause a disproportionate forfeiture.  DCP sent almost $70 million in funding to the league.  By the Trustee's logic, that $70 million was a gift from DDFS that entitles DCP to nothing and precludes defenses to the alleged $250 million oral agreement based on the parol evidence rule and merger.   The evidence does not support that conclusion.   Under the

circumstances, even if the parties intended not to be bound without signatures, the Court can excuse failure of DCP to sign because the signature was not material. *See Thompson St.*, 2025 WL 1213667, *17.

296.    **ESMG waived the requirement (if any) that DCP sign the Term Sheet.** Even if the execution was a condition to formation and the Court does not excuse the condition under *Thompson St. Capital*, under Delaware law, contractual requirements and conditions may be waived. *See AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005). "Waiver is the voluntary and intentional relinquishment of a known right." *Realty Growth Inv'rs v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982). Waiver "implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing [certain] contractual rights." *AeroGlobal*, 871 A.2d at 444.

297.    To prove waiver, a party must establish (1) a requirement or condition claimed to be the subject of the waiver, (2) that the waiving party knew of the requirement or condition, and (3) that the waiving party intended to waive the requirement or condition. *Id.*

298.    In *AeroGlobal*, Cirrus and AeroGlobal entered a letter of intent with an exclusive negotiations provision. The LOI required AeroGlobal to make a $15 million bridge loan to Cirrus within a specified time. AeroGlobal made the loan in time, but it advanced $12 million to Cirrus, not $15 million. Cirrus accepted the $12 million and spent it, but then began negotiating a stock acquisition with a third party in violation of the exclusive negotiation provision in the AeroGlobal LOI. The trial court granted summary judgment against AeroGlobal on its claim that Cirrus waived the timing requirement for the full $15 million loan by accepting the $12 million loan and not demanding payment of the remaining $3 million. *Id.* at 445. The Delaware Supreme Court reversed. It held that Cirrus's retention of the $12 million loan without demanding the additional

$3 million be paid within the time specified evidenced Cirrus's intent to waive the timing requirement. *Id.* at 445-446.

299.     Likewise, in this case, ESMG acknowledged the receipt of funds identifiable to the Term Sheet as having been received from DCP in compliance with the Term Sheet, and ESMG spent the funds. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by [the other] acting with actual authority." RESTATEMENT (THIRD) OF AGENCY § 4.01(1). In documents prepared by ESMG's lawyers (who also prepared the Term Sheet the Court has construed as imposing a signature requirement), ESMG's board and stockholders ratified the Term Sheet, the shareholders acknowledged it as binding and enforceable, and both the board and the shareholders identified funds received as DCP's compliance with the Term Sheet. D135 at 11-12; D182 at 2. The shareholder's ratification acknowledged the Term Sheet as binding and enforceable against ESMG and authorized ESMG officers to proceed with documenting the issuance and transfer of preferred shares and the change in the board. D182 at 2. At no time did ESMG suggest that the Term Sheet was unenforceable because DCP failed to sign it. Under the circumstances, the signature requirement (if any) was waived.

300.     The manifestation by the ESMG board and shareholders of a willingness to accept the Term Sheet is a species of ratification sometimes called affirmance. RESTATEMENT (SECOND) OF CONTRACTS § 380 cmt. a. "A party who has the power of avoidance may lose it by action that manifest a willingness to go on with the contract." *Id.* (addressing the loss of the power of avoidance on account of incapacity, duress, undue influence or abuse of a fiduciary relation and mistake or misrepresentation by affirmance). When ratification by affirmance occurs, "the affirming party is bound as from the outset and the other party continues to be bound." *Id.* An example of ratification by affirmance occurs when a party exercises dominion over what he has

received as a result of the agreement in a manner inconsistent with avoidance of the contract. *Id.* cmt. b. In this case, the ESMG board and shareholders expressly ratified the Term Sheet and acknowledged receipt of funds identifiable to the Term Sheet as having been received from DCP. D135 at 12; D182 at 2. Ebersol, who controlled 71% of the shareholder vote, signed the shareholder consent less than 24 hours after Dundon and Zutter told him there would be no more funding beyond the $70 million. T1711; D182 at 2. Even if the Term Sheet had been non-binding before, when the board and shareholders ratified it, the Term Sheet became retroactively binding on both parties.

301. Based on the above, the Court finds that the Term Sheet was a binding and enforceable agreement between DCP and ESMG such that the parol evidence rule applies and merger bars any inconsistent oral agreement.

302. **The parol evidence rule bars enforcement of the alleged oral agreement.** Under Delaware law, which governs the Term Sheet, the parol evidence rule is a rule of substantive law and not a rule of evidence; it excludes evidence of an antecedent or contemporaneous oral understanding to vary or contradict the terms of a written contract. *Brandywine Shoppe, Inc. v. State Farm Fire & Cas. Co.*, 307 A.2d 806, 808–09 (Del. Super. Ct. 1973). Parol evidence may not be considered to vary the express terms of a written contract, even if the contract is not fully integrated. *See In re Universal Mktg., Inc.*, 541 B.R. 259, 282 (Bankr. E.D. Pa. 2015) (applying Delaware law). "Whether a binding agreement is completely integrated or partially integrated, it supersedes inconsistent terms of prior agreements." RESTATEMENT (SECOND) OF CONTRACTS § 213. Though a partially integrated agreement can be supplemented by parol evidence, its express terms cannot be contradicted. *McGrew v. Vanguard Corp.*, No. C.A. 5743, 1979 WL 4635, at *3 (Del. Ch. Sept. 25, 1979).

303.     The parol evidence rule bars enforcement of the alleged oral agreement because the alleged oral agreement contradicts the Term Sheet.  The Term Sheet unequivocally limits the DCP maximum cumulative commitment to $70 million.  T7.  The parol evidence rule bars a claim against Dundon personally (an individual distinct from DCP) because the Term Sheet obligated ESMG to transfer a 75% stock interest to DCP and give DCP control of the board.  T7.  An oral agreement to transfer all or a majority of the stock of ESMG and control of its board to Dundon for $250 million directly contradicts the agreement to transfer the 75% stock interest and control to DCP for a maximum cumulative commitment of $70 million.

304.     On this issue, Texas and Delaware law are in accord.  In Texas, the parol evidence rule denies efficacy to prior or contemporaneous expressions relating to the same subject matter as that encompassed in a written contract.  *West v. Quintanilla*, 573 S.W.3d 237, 243 (Tex. 2019).  The rule bars extrinsic evidence offered "to show that a written instrument was executed for a consideration different from that expressed in the instrument."  *Id.* at 247.  It bars evidence offered by the Trustee to show that the consideration in the Term Sheet of 75% of the stock of ESMG and control of the board was anything other than a maximum cumulative investment of $70 million from DCP.  *See id.*  "The very purpose of putting [an] agreement in writing is to definitely settle its terms and to exclude all oral understandings to the contrary."  *Supercold Southwest Co. v. Elkins*, 140 Tex. 48, 166 S.W.2d 97, 98 (1942).

305.     To ignore the Term Sheet after DCP paid almost $70 million to ESMG and the ESMG board and shareholders ratified it would undermine the parol evidence rule and the law of contracts generally, especially when the purpose of ignoring the Term Sheet is to pin extraordinary liability on individuals who acted in reliance on the parties' written expression of the limits of their

rights and liabilities. The Court finds that the parol evidence rule bars the inconsistent alleged oral agreement.

306. **Merger bars the inconsistent alleged oral agreement.** Under Texas law, "all prior oral and written agreements are presumed to merge into a subsequent written contract," even in the absence of an express merger clause. *Yasuda Fire & Marine Ins. Co. of Am. v. Criaco*, 225 S.W.3d 894, 899 (Tex. App.—Houston [14th Dist.] 2007, no pet.). For merger to occur, "the same parties to an earlier agreement must later enter into a written integrated agreement covering the same subject matter." *Fastracked Executive, LLC v. Prevost Car (US), Inc.*, No. 01-20-00735-CV, 2022 WL 2068817, at *3 (Tex. App.—Houston [1st Dist.] June 9, 2022, no pet.). "An integrated contract is a writing or writings constituting a final expression of one or more terms of an agreement." *Spangler v. Liss*, No. 14-22-00144-CV, 2024 WL 1207300, at *3 (Tex. App.—Houston [14th Dist.] Mar. 21, 2024, no pet.). "In evaluating a contract, a court may conclude that the contract is integrated in some of its terms but is not fully integrated as to others." *Dorta v. Rave*, No. 09-12-00376-CV, 2014 WL 69564, at *4 (Tex. App.—Beaumont Jan. 9, 2014, no pet.). "Whether a binding agreement is completely integrated or partially integrated, it supersedes inconsistent terms of prior agreements." RESTATEMENT (SECOND) OF CONTRACTS § 213; *see also Prince v. Weleba*, No. 02-23-00085-CV, 2023 WL 6476009, at *7 (Tex. App.—Fort Worth Oct. 5, 2023, no pet.) (noting that parol evidence may be offered as to non-integrated portions of partially integrated contract).

307. Based on the above, the Court concludes that the oral agreement is not enforceable. The ESMG board ratified it, as did the shareholders. D135 at 12; D182 at 2. Their actions waived any requirement that DCP sign the Term Sheet and constitute acquiescence. ESMG sent the evidence of ratification to Zutter as proof of the action by the board. D135 at 1. Neither the parol

evidence rule nor the merger doctrine require a fully integrated writing to preclude all oral agreements that contradict the Term Sheet's express terms.  Under the circumstances, the oral agreement (if made) is not enforceable.

308.  **Good faith and fair dealing.**  The parties agree that Texas law governs the Trustee's claim for breach of the duty of good faith and fair dealing.  ECF 300 at 89 ¶ 510.  Texas law does not recognize a claim for the breach of the duty of good faith and fair dealing in the absence of a special relationship.  *UMLIC VP LLC v. T&M Sales & Environ. Servs., Inc.*, 176 S.W.3d 595, 612 (Tex. App. — Corpus Christi 2005, pet. denied) (refusing to recognize duty of good faith and fair dealing between mortgagor and mortgagee or creditor and guarantor).  A special relationship must predate and be apart from the agreement sued upon.  *Pitts v. Rivas*, 709 S.W.3d 517, 528 (Tex. 2025) (refusing to find a special relationship where engagement letter excluded special duties).  In the absence of a preexisting special relationship, "[t]here is no general duty of good faith and fair dealing in ordinary, arms-length commercial transactions." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 52 (Tex. 1998) (refusing to impose a duty of good faith and fair dealing in owner-contractor relationship).  "Unequal bargaining power alone is not enough to establish a special duty." *Simms v. Jones*, No. 3:11-CV-0248-M, 2011 WL 5978594, at *4 (N.D. Tex. Nov. 30, 2011) (finding no duty of good faith and fair dealing owed by NFL to a purchaser of tickets).  Where parties are sophisticated and represented by able counsel in an arm's length transaction, there is no duty of good faith and fair dealing. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 490–91 (Tex. 2019) (explaining that Texas law does not impose a duty of good faith and fair dealing between sophisticated parties who negotiated at arm's length).

309.     Since *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983), Texas courts have refused to subject sophisticated parties in an arms-length transaction to the "onerous threat of treble damages" based on the duty of good faith and fair dealing.  A relative disparity in the financial circumstances of the parties does not create a special relationship.  To impose such a duty based on nothing but a difference in net worth would subject persons of means to punitive damages in any dealings with insolvent corporations or persons without means.

310.     *In re Lyon Fin. Services, Inc.*, 257 S.W.3d 228, 233 (Tex. 2008), held that a lessee had no lack of choice in entering a pre-printed agreement that contained a forum selection clause.  *Lyon* cited *Allright, Inc. v. Elledge*, 515 S.W.2d 266, 268 (Tex. 1974), which held that a garage did not have unequal bargain power compared to a parker sufficient to avoid a limitation on liability unilaterally imposed by the garage.  The evidence in this case established that ESMG did not lack a choice in entering the alleged oral agreement sufficient to support a finding of a special relationship.  Ebersol had another option; he had personal funds sufficient to pay the immediate payables and could have transferred those funds to ESMG.  2 TR 133:5-8; 4 TR 60:17-20, 61:5-8, 16-19, 62:5-7, 63:1-4, 87:25–88:5, 88:9-20.  The situations in *Lyon* and *Allright* are comparable to this case in the sense that the league had a choice; Ebersol could have used his own funds to satisfy the league's immediate need to pay the players for the first week of games then continued to explore other funding options.  Nothing forced the league to accept an investment from Dundon or DCP.  Ebersol testified that he was under no pressure to accept Dundon's investment offer.  4TR 87:25–88:12.  The evidence establishes an ordinary arm's length transaction in which both parties had a choice to take the deal or leave it.  *Formoso Plastics* dictates that no special relationship existed between Dundon and ESMG sufficient to impose a duty of good faith and fair dealing.  960 S.W.2d at 52.

311.     The cases cited by the Trustee do not support his argument that Texas law imposes a duty of good faith and fair dealing in an ordinary, arm's length transaction. *Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 638 (Tex. App.—Houston [1st Dist.] 2002, pet. denied), applied the rule that no duty of good faith and fair dealing exists in an ordinary arm's length transaction. *Mims v. Beall*, 810 S.W.2d 876, 878 (Tex. App.—Texarkana 1991, no writ), applied the rule from *Schlittler v. Smith,* 128 Tex. 628, 630, 101 S.W.2d 543, 545 (1937), that an executive rights holder (in charge of a mineral estate) owes royalty owners (the non-executives) a fiduciary duty. *See generally In re Bass*, 113 S.W.3d 735, 745 (Tex. 2003) (explaining unique duties owed by executives in a mineral context). The unpublished 1995 case of *Acton Corp. v. Sabinske*, No. 05-91-01720-CV, 1995 WL 479671, at *6 (Tex. App.—Dallas Aug. 9, 1995, writ denied), cites no authority in its discussion of good faith and fair dealing, and no case has ever cited it for the proposition that a duty exists in an arm's length transaction. *Tuttlebee v. Tuttlebee*, 702 S.W.2d 253, 256 (Tex. App.—Corpus Christi–Edinburg 1985, no writ), held that the brother-in-law caretaker of an elderly woman owed her a fiduciary duty. And *Wilgus v. Bond*, 730 S.W.2d 670, 671 (1987), turned on a failure to preserve error, not the propriety of the good faith and fair dealing claim.

312.     The evidence established no special relationship between Dundon and ESMG that predated the transaction at issue. Dundon and Ebersol met the day before Ebersol claims to have made the alleged oral agreement with Dundon. Under the circumstances, the Trustee has failed to establish a special relationship sufficient to impose a duty of good faith and fair dealing. Therefore, the Trustee cannot recover on his claim for breach of the duty of good faith and fair dealing.

313.     **Breach of fiduciary duty.** Delaware law governs the Trustees breach of fiduciary duty claims because ESMG is a Delaware corporation. ECF 300 at 47 ¶ 133; ECF 300 at 88 ¶ 509.

95

314.     **The business judgment rule bars the Trustee's breach of fiduciary duty claims.**

Delaware law recognizes two fiduciary duties imposed on directors, officers, and persons who exercise control over corporations:  the duty of care and the duty of loyalty.  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  Good faith is not a separate fiduciary duty; rather, bad faith may create basis for liability for breach of fiduciary duty in certain circumstances such as a claim based on oversight liability (not applicable here) called a *Caremark* claim after *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).  *Stone*, 911 A.2d at 369-70 (noting that a failure to act in good faith is more culpable than a breach of the duty of care); *see also In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64-66 (Del. 2006) (defining three categories of bad faith that would impose result in liability and describing bad faith as qualitatively more culpable than gross negligence).  The Trustee styles his fiduciary duty claims against Dundon and Zutter as claims for breach of the duties of care, loyalty, and *fair dealing*.  ECF 56 at 56 at 45-47 ¶¶ 167, 171-73.  Fair dealing is not an independent basis for a breach of fiduciary duty claim.  *See Stone*, 911 A.2d at 370.

315.     **Dundon and Zutter did not owe a fiduciary duty to ESMG's creditors.**  Under Delaware law, directors of an insolvent corporation do not owe a duty to the corporation's creditors.  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007).  "[I]ndividual *creditors* of an *insolvent* corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors."  *Id.* (emphasis in original); *see also Torch Liquidating Tr. ex rel. Bridge Associates L.L.C. v. Stockstill*, 561 F.3d 377, 392 (5th Cir. 2009) (affirming dismissal of liquidating trustee's claims under *Gheewalla* because complaint asserted claims for injuries to creditors who lacked the right to assert direct claims against the debtor's fiduciaries).  *Gheewalla* clarifies that a corporation's insolvency does not shift its directors' duties

from the corporation to the creditors; rather, the insolvency shifts the ability to assert derivative claims on behalf of the corporation to the creditors because the insolvency makes the creditors (and not the shareholders) the group most likely to benefit from recovery for a claim on behalf of the corporation.  930 A.2d at 102.

316.     The Court finds that *Gheewalla* bars the Trustee from pursing a claim that Dundon or Zutter or DCP breached a fiduciary duty to the league's creditors, including the players.

317.     **The business judgment rule is the default standard of review.**  Delaware courts apply three standards of review to corporate transactions:  the business judgment rule, enhanced scrutiny, and entire fairness.  *Maffei v. Palkon*, ___ A.3d ___, No. 125,2024, 2025 WL 384054, *16 (Del. February 4, 2025).  Most board decisions fall under the least strict of the standards — the business judgment rule.  The business judgment rule creates a presumption that, in making a business decision, a corporation's board "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the corporation."  *Id.* (quoting *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986)).  The party challenging the decision (the plaintiff) bears the burden to rebut the presumption.  *Id.*

318.     To rebut the presumption, **the plaintiff must show a breach of the fiduciary duty of care or of loyalty.**  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993); *see also Emeral Ptrs. v. Berlin*, 787 A.2d 85, 91 (Del. 2001).  The duty of loyalty requires a director to act in the best interest of the corporation and its shareholders and not in his own self-interest.  *Cede*, 634 A.2d at 361-62.  The standard for a breach of the duty of care is gross negligence.  *Malpiede v. Townson*, 780 A.2d 1075, 1097 n.77 (Del. 2001).  "[T]he duty of care requires that fiduciaries inform themselves of material information before making a business decision and act prudently in carrying out their duties."  *United Food & Commercial Workers Union & Participating Food*

97

*Indus. Employers Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1049-50 (Del. 2021). A breach of the duty of good faith as a prong of the duty of loyalty requires a showing of bad faith. *Stone*, 911 A.2d at 369 ("[A] failure to act in good faith is not conduct that results, *ipso facto*, in the direct imposition of fiduciary duty liability."). Bad faith is an intent to do harm, intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 63-67 (Del. 2006). If a plaintiff fails to prove a breach of fiduciary duty, the business judgment rule protects the director's decision and prevents a court from second-guessing that decision. *Cede*, 634 A.2d at 361.

319.    In addition to duty of care and loyalty claims, the Trustee alleges a breach of the **duty to disclose**. The duty to disclose "represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992). The Trustee cannot establish this claim because he does not complain about a failure to disclose in the context of a request for shareholder action.

320.    The mere fact that a company has **a controlling stockholder does not rebut the business judgment rule** or trigger the entire fairness standard of review. *Maffei*, 2025 WL 384054, *18. In any event, controlling stockholder liability does not apply in this case because ESMG did not issue stock to Dundon or DCP.

321.    Courts do not pivot to an entire fairness review simply because a transaction ends with the director in a better position than he occupied before the transaction. *Id.*, *19. **The benefit must be more than merely material; it must be sufficiently material to taint the director's interest.** *See id.*, *20. In the context of a claim of self-interest, the party challenging the business

judgment rule presumption must show that the director had a subjectively material interest in the transaction. *Id.*, \*17. The interest must be significant enough to make it improbable that the director could perform his fiduciary duties to the shareholders of the corporation. *Id.*, \*17. "The key issue is not simply whether a particular director receives a benefit from a challenged transaction not shared with the other shareholders, or solely whether another person or entity has the ability to take some benefit away from a particular director, but whether the possibility of gaining some benefit or the fear of losing a benefit is likely to be of such importance to that director that is reasonable for the Court to question whether valid business judgment or selfish considerations animated the director's vote on the challenged transaction." *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del Ch. 10023), *cited with approval in Maffei*, 2025 WL 384054, \*17 n.161.

322. In addition to being material, **the benefit to the director must be non-ratable**. *Maffei*, 2025 WL 384054, \*18. "Non-ratable" means the benefit the director will receive rises to sufficiently material importance, "in the context of the director's economic circumstances, as to have made it improbable that the director could perform [his] fiduciary duties . . . without being influenced by [an] overriding personal interest." *Id*. A non-ratable benefit is uniquely valuable to the director. *Id.*, \*19. Examples of transactions with a director that generate material non-ratable benefits include compensation arrangements, consulting agreements, and services agreements. *Id.* This case does not involve any of those typical examples or any comparable transaction.

323. The concept of **temporality** governs the situation where a board member votes to adopt a mechanism to limit existing or threaten liability. *Id.,* \*20. Where there is no existing claim against a director, a vote that limits potential, speculative or hypothetical exposure unrelated to any particular transaction does not evidence a receipt of a material non-ratable benefit. *Id.*, \*26. There was no existing threat of litigation by Fowler or FO2 when the FO2 release was entered.

Therefore, it did not confer a material, non-ratable benefit sufficient to demonstrate a breach of fiduciary duty that would flip the standard of review from the business judgment rule to entire fairness. *See id.*, *28. In addition, the release applied to all officers, directors, and shareholders of ESMG, making it by definition a ratable benefit, not a non-ratable one. Dundon and Zutter did not, as board members, vote to approve the FO2 release. The Court finds that the FO2 release is not a basis for the Trustee to claim a breach of fiduciary duty.

324.     In contrast to the material non-ratable benefits inherent in a compensation agreement, the Trustee asks the Court to apply the entire fairness standard to vaguely described events that do not rise to the level of a transaction that would confer a material non-ratable benefit on Dundon or Zutter. In the absence of a material non-ratable benefit flowing to either Dundon or Zutter, the business judgment rule protects them from liability for the actions described. *See Maffei*, 2025 WL 384054, *28.

325.     The Trustee complained that Dundon (aided by Zutter) breached his fiduciary duty because he caused the shutdown of the league. At Dundon's direction, Ebersol prepared end-game strategies, all of which contemplated imminent shutdown of the league without an injection of significant new capital. D177. After that, ESMG hired Bracewell to advise on a potential bankruptcy. 6TR 180-83; D182.1. Bracewell advised on the merits of a bankruptcy filing and determined that reorganization of the league was not feasible given the current state of the league's financial affairs—meaning a Chapter 7 made sense over a Chapter 11. D203. Dundon and Zutter relied on ESMG's counsel in making the decision to proceed with the bankruptcy filing. 9TR at 44. Even where a party does not plead the complete bar of DGCL Section 141(e), a court may consider the reliance on professionals as evidence of compliance with a fiduciary's duty to make informed decisions. *See Brehm v. Eisner*, 746 A.2d 261-62 (Del 2000). The filing stopped the

league from plunging itself further in irreversible debt.  The filing for bankruptcy protection under the circumstances was not a breach of a fiduciary duty to ESMG.  *See generally  Nelson v. Emerson*, No. CIV.A. 2937-VCS, 2008 WL 1961150, at \*2 (Del. Ch. May 6, 2008) (holding that filing bankruptcy was not a breach of fiduciary duty, even though strategy was not entirely successful).

326.    The Trustee has failed to prove an intent to do harm, intent to violate applicable positive law, or that Dundon or Zutter intentionally failed to act in the face of a known duty to act, demonstrating a conscious disregard of their duties.  For that reason, the Court finds no breach of the duty of good faith.  *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 at 63-67.

327.    The Trustee claimed that Dundon breached his fiduciary duty to the league by giving away unsold TV ad time to brands that Dundon had a relationship with.  Dundon explained that he gave high profile advertisers free ad time to entice them to buy ad time during later games. 9TR 51:11-23, 214:14–216:6; D268.  Contemporaneous correspondence from Ebersol showed that he viewed the high-profile sponsors as a positive for the league, and he asked for a press release to tout their involvement.  D254.  The Trustee has failed to show that Dundon or Zutter obtained a material non-ratable benefit as a result of the diversion of unsold TV advertising.  Considering Dundon's and Zutter's economic circumstances, it is improbable that either of them could not perform fiduciary duties concerning the allocation of TV advertising without being influenced by an overriding personal interest.  *See Maffei*, 2025 WL 384054, \*18.

328.    The Trustee claims that Zutter failed to paper the $250 million oral agreement with Dundon, but he failed to show that Zutter was directed to do so, especially given that the board and the shareholders failed to authorize that agreement and instead directed ESMG's officers to document the transactions set out in the Term Sheet.  D135 at 12; D182 at 2-3.

329.    The Trustee has failed to show that the balance of his claimed breaches rise to the level of a breach of fiduciary duty.  The other claimed breaches relate to ordinary management decisions the Trustee contests only in hindsight.  The business judgment rule exists to prevent courts from using hindsight to second-guess ordinary decisions only because the efforts of a director fail to achieve the goal of setting an entity on a prosperous course.  Based on the evidence presented, the Court finds that the Trustee failed to establish a breach of fiduciary duty to rebut the business judgment rule.  Therefore, the Trustee cannot recover for breach of fiduciary duty.

330.    Notwithstanding the above, even if the Court had found a breach, the entire fairness standard of review would not afford the Trustee relief.  When a court concludes that the evidence establishes an actual breach of fiduciary duty with respect to any particular director decision or transaction, then the entire fairness standard of review applies.  *Maffei,* 2025 WL 384054, *16. Entire fairness has two basic aspects:  fair dealing and fair price.  *Id.  Maffei* cited the Chancery Court's reference to the fair price prong as the substantive dimension of fairness and the fair dealing prong as the procedural dimension of fairness.  *Id.*, *11 n. 99, 100.  Fair dealing embraces the timing of a transaction, how it was initiated, structured, negotiated, disclosed to directors, and how the approvals of the directors and the stockholders were obtained.  *Id.*, *16 (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983)).  Fair price relates to the economic and financial considerations of a transaction.  *Id.*  Where, as here, the transaction does not rise to the level of requiring board or stockholder approval (as would be the case with a merger, for example), the classic fair dealing and fair price concepts do not lend themselves to seamless application. Where the actions being examined relate to ordinary management decisions, the Court should look to the entirety of the circumstances to determine whether the action was fair to the corporation. That said, besides Zutter's failure to paper the alleged oral agreement, the shutdown of the league,

the FO2 release, and the diversion of TV advertising already discussed, the Trustee has only vaguely described the decisions and actions he claims constitute a breach. The lack of discrete transactions leaves the Court unable to conduct an ordinary analysis of the entire fairness. Though one action may inform the analysis of another, the fairness in terms of price and dealing is difficult when no price or value attaches to the action taken and there was no dealing with shareholders to assess.

331.     Under the circumstances, the Court finds that the transactions were fair to the league. The league was in dire straits when Dundon and Zutter assumed control. Ebersol had shut down marketing efforts, destroyed relationships with critical vendors, and killed the league's revenue. Ticket sales were poor. The league had preexisting and mounting debts due to a bloated payroll and lack of internal controls and poor decisions by prior management to cut marketing and sponsorships. Decisions had to be made. Prior management had failed to face reality. Playing chicken with critical vendors and maintaining the bloated structure would not sustain the league. Dundon and Zutter tried to maximize a difficult situation. In hindsight, it is easy to ignore the urgency of the situation they faced. But the fact is that implementing resuscitative strategies in a crisis does not always work. Under the circumstances, the Court finds that the decisions Dundon and Zutter made fair to the league. That they failed to rescue an already sinking ship does make them unfair.

332.     Even if the Court had found that the Trustee established a breach of fiduciary duty, because Dundon and Zutter satisfied the Court that the actions at issue were fair to the league, there is no liability for breach of fiduciary duty. *Emerald Ptrs.*, 787 A.2d at 98.

333.     Delaware courts have held that if a plaintiff establishes a breach of fiduciary duty and the defendant cannot establish entire fairness, then the Court must decide whether the league

suffered an injury as a result of the particular transaction identified.  *Id.*  If, given those circumstances, the Trustee established damages that flowed from the breach proven, the Court must decide whether the damages caused by the breach proven are damages caused by a breach of the duty of care or a breach of the duty of loyalty.  *See id.*  This step-by-step process is necessary because the exculpatory clause in the ESMG certificate of formation (discussed below) bars a monetary judgment against a director for a breach of the duty of care.  *See id.*  Because the Trustee failed to prove damages that flowed from a breach of the duty of loyalty, the Trustee cannot recover for a breach of fiduciary duty.

334.    **The Trustee cannot recover undisclosed damages.**  The damages the Trustee disclosed for breach of fiduciary duty, fraud, negligent misrepresentation, and unjust enrichment did not include damages for the value of the league from the time that DCP assumed control (an amount the Trustee quantified in the pretrial order to be $144.1 million), $68 million in reduced tax liability, or the amount of all claims of creditors.  D272.

335.    Rule 26(a)(1)(A)(iii) required the Trustee to disclose "a computation of each category of damages."  FED. R. BANKR. P. 7026 (making Rule 26 applicable in adversary proceedings).  For purposes of discovery, an evasive or incomplete disclosure is treated as a failure to disclose.  FED. R. CIV. 37(a)(4); FED. R. BANKR. P. 7037 (making Rule 37 applicable in adversary proceedings).  Under Rule 37,

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

FED. R. CIV. P. 37(c)(1).  The drafters intended this provision (added in 1993) to give a strong incentive to parties to disclose material they intend to use at trial.  8B WRIGHT, CHARLES A., FED. PRAC. & PROC. § 2289.1 at 597 (2010).

336.    The determination whether to exclude evidence for a violation of Rule 37(c) is addressed to the Court's discretion.  *King v. King*, 117 F.4th 301, 306 (5th Cir. 2024).  The factors listed in *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 279–80 (5th Cir. 2009), guide the Court's decision: (1) the importance of the evidence; (2) any prejudice to the opposing party that would result if the evidence were admitted; (3) the availability of a continuance to cure such prejudice; and (4) the party's explanation for its failure to comply with Rule 26 in the first instance.  *King*, 117 F.4th at 306–07.  The party seeking to use undisclosed evidence must show that the balance of the factors weighs in favor of allowing the evidence.  *Id.* at 307–08.

337.    The operative disclosure is the Trustee's supplemental disclosure (served December 13, 2024).  D272.  In that disclosure, the Trustee identified three categories of damages with reference to the report of his expert, Sonia Desai.  D272 at 89.  Those categories are:

(a)    For the oral agreement claim,

    a.    the remaining approximately $180.3 million in promised funds under the oral agreement;

    b.    the full market value at the time of breach; and

(b)    For the  fiduciary duty claim, compensatory damages in the total amount of the full market value of the AAF at the time the AAF was induced to suspend operations; and

(c).    For the fraud and misrepresentation claims, the total full market value of the AAF at the time the AAF was induced to suspend operations.

D272 at 89.  The league suspended operations on April 2, 2019.  14TR 27-28.

338.    The Trustee further detailed his damages on the following pages of the disclosure. Under the headings "breach of the oral contract," "good faith and fair dealing," and "promissory estoppel," the Trustee disclosed $180.3 million (for the unfunded balance of the total alleged oral agreement), and the full market value of the AAF at the time the contract was breached.  D272 at

90-91 ¶¶ 1, 3(a), 4.  The Trustee did not disclose the date of the breach or quantify the value of the league on the date of an alleged breach.

339.     For the first time, in the joint pretrial order, the Trustee included three categories of previously undisclosed damages for breach of fiduciary duty, fraud, negligent misrepresentation, and unjust enrichment; the new categories were damages in the amount of $144.1 million for the value of the league the day before Defendants became involved, $68 million in reduced tax liability, and an amount equal to all outstanding creditor claims.  ECF 300 at 18 ¶ 45, 19 ¶ 46, 30 ¶ 86, 31 ¶¶ 86-87, 41 ¶ 118.  The Trustee did not disclose those categories of damages in his pretrial disclosures.  D272 at 89-92.  In his supplemented initial disclosures for the tort claims, the Trustee referred to "compensatory damages for the diminished enterprise value of the [l]eague, attributable to Defendants' actions, specifically the cessation of advertising and technology activities and the rejection of significant opportunities" and, alternatively, rescissory damages.  D272 at 92 ¶ 5.  Neither description includes an amount, a calculation, an event, or a precise date that would point to a computation of damages.  In the next sentence, the Trustee explains that, "In total, for all breaches (related to the claims identified above), he seeks to recover "damages in the amount of the full market value of the AAF at the time [defendants] forced [the league] to suspend operations, as set out in Ms. Desai's report."  The parties all agree that the league ceased operations on April 2, 2019.  14TR 27-28.  In her report, Desai opined that the league had a non-marketable value of $63.3 million on April 2, 2019.  14TR 105, 145.  The "in total" phrase capped the Trustee's disclosure of tort damages by quantifying the "total" damages sought as $63.3 million.  The $144.1 million alleged value of the league on February 13, 2019 (before the DCP investment), the $68 million reduced tax liability, and the creditors' claims were not part of the Trustee's disclosures.

340.    Initial disclosures should contain "a computation of each category of damages claimed." FED. R. CIV. P. 26(a)(1)(A)(iii).  Besides the alleged $180.3 million balance owed on the alleged oral agreement, the Trustee did not include any precise damage figure in his disclosures.  Instead, he referred to his expert's report and the damages she quantified related a specific event.  Desai tied her opinion to specific dates, not events.  14TR 27-28.  Though Desai's report includes opinions of value on other dates, the Trustee only identified one date—the date that the league suspended operations (April 2, 2019)—as the date of the value sought as damages.  And, though Desai stated in her report that the debtors suffered $144.1 million in damages as a result of Defendants' action (and the Court referenced that statement in its opinion denying Defendants' motion for summary judgment, ECF 292 at 49), Desai was not designated to give an opinion on causation, she did not have an opinion on causation, she did not opine that the value she specified for February 13, 2019, was a damages calculation, and she did not testify that Defendants were responsible for any damages to the league.  14TR 151, 153.

341.    The party seeking to recover damages has the burden to adequately disclose them and supplement its disclosures when necessary. *Hagen v. BeneTek, Inc.*, 714 F. Supp. 3d 1075, 1089–91 (E.D. Wis. 2024) (refusing to allow plaintiff to pursue damages plaintiff failed to substantiate with calculation of amount sought and documentation).  Defendants were entitled to rely on the words "in total" as indicating the total amount sought exclusive of any other amount tied to a different valuation date.  Defendants should not have to guess whether the Trustee might intend to craft a theory that would encompass some other value discussed in his expert's report. *See generally id.* at 1090 (refusing to shift burden to the opposing party to inquire when the party seeking damages failed to adequately disclose them); *Oliver v. City of Orlando*, No. 606CV-1671-ORL-31DAB, 2007 WL 3232227, at *3 (M.D. Fla. Oct. 31, 2007) ("It is not Defendant's task to

calculate Plaintiff's damages for her, nor must Defendant be left to guess as to the elements of Plaintiff's claimed damages.").

342.    The listing of rescissory damages as an alternate category does not help because the value of the league as of February 13, 2019, is not the equivalent of rescissory damages. Rescissory damages are damages that would return the party to the position it was in before the transaction at issue occurred. Rescission requires mutual restoration. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 37 cmt. d (2011). When a party seeks rescission, each party must return what it received from the other with the goal of returning both parties to the position they occupied prior to entering the contract. *Id.* § 49(2)-(5); *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012) (explaining that rescission requires a mutual restoration and accounting, in which each party restores property received from the other).

343.    Rescissory damages are common in stock cases. If the seller of a stock (that has appreciated in value) seeks recision, but the buyer has sold the stock and cannot return it to the seller, then the seller may recover the value of the stock less the price paid by the buyer. *See generally Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501 (Del. 1981) (discussing mechanics of rescissory damages in a stock sale case), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983). The Trustee has made no effort to quantify what rescission damages would look like in this case. Given that the Trustee now claims ESMG's stock has decreased to a value of zero, rescission would require the Trustee to refund to DCP what DCP paid for the stock. *Cruz*, 364 S.W.3d at 825 (noting that rescission is not a "one-way street"; it requires mutual restoration). Rescission would not enable the Trustee to recover the value of the league on the day before the alleged oral agreement; he could only recover the value of the stock less the

price paid for it, which has not been quantified or disclosed but appears to be zero or a negative number.

344.    Based on the above, the *CQ* factors weigh in favor of exclusion of these undisclosed theories of damages.  First, though the evidence might be important to recovery of the damages the Trustee did not disclose, the Trustee has other damages theories for each claim, meaning, unlike *King*, the exclusion of the evidence will not necessitate a dismissal of any of the Trustee's claims. *See* 117 F.4th at 307 n.2.  And, as *King* notes, the importance of the evidence alone is not enough to justify a court refusing to exclude improperly disclosed evidence.  *Id.* at 307.  Second, the Trustee's failure to comply with his Rule 26 obligations prejudiced Defendants because they had no opportunity to conduct discovery about and plan for a rebuttal for the undisclosed theories.  Third, at the point this came up in trial, a continuance, often the preferred remedy for a failure to disclose, *id.*, was not a realistic option because the trial has already started.  Fourth, the Trustee did not explain his failure to disclose the value of the alleged damages.  Vague references that direct the reader generally to other sources do not satisfy the requirements of Rule 26(a)(1)(A)(iii).

345.    In addition to the above, the Trustee did not offer evidence at trial that showed that Dundon reduced his tax liability by $68 million as claimed by the Trustee.  At most, the evidence showed that Dundon declared a loss of approximately that amount.  No one testified that the loss resulted in a dollar-for-dollar reduction in tax liability as opposed to a reduction of some amount of taxable income or capital gains.

346.    **The Trustee cannot recover for creditor claims.**  The Trustee cannot recover damages for "all creditor's claims" identified in the joint pretrial order as being sought for breach of fiduciary duty.  ECF 300 at 19.  When the Trustee previously disclosed an intent to seek recovery for the players' claims of $82.4 million, the Court struck the Trustee's supplemental disclosure of

those damages.  ECF 224.  Though the Court directed the Trustee to amend his disclosures to omit that category of damages, ECF 224, the Trustee did not.  14TR 49:16-23.

347.    Regardless, the Trustee cannot pursue damages for creditor claims because none of the Defendants owed a duty to the league's creditors.  Under Delaware law, directors of an insolvent corporation do not owe a fiduciary duty to the corporation's creditors; the directors owe their duties to the corporation they serve even if the corporation is insolvent.  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007).  "[I]ndividual *creditors* of an *insolvent* corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors."  *Id.* (emphasis in original); *see also Torch Liquidating Tr. ex rel. Bridge Associates L.L.C. v. Stockstill*, 561 F.3d 377, 392 (5th Cir. 2009) (affirming dismissal of liquidating trustee's claims under *Gheewalla* because complaint asserted claims for injuries to creditors who lacked the right to assert direct claims against the debtor's fiduciaries).  *Gheewalla* clarifies that a corporation's insolvency does not shift its directors' duties from the corporation to the creditors; rather, the insolvency shifts the ability to assert a derivative claims on behalf of the corporation to the creditors because the insolvency makes the creditors (and not the shareholders) the group most likely to benefit from recovery for a claim on behalf of the corporation.  930 A.2d at 102.

348.    Only the players assigned their claims to the Trustee, and the Court struck the disclosure of damages to satisfy their claims.  ECF 224.  The Trustee does not have an assignment from the other creditors and lacks standing to make a claim on their behalf.  Even if there was an assignment, in *Torch Liquidating*, the Fifth Circuit followed *Gheewalla* in upholding the dismissal of claims for harm to creditors asserted by a liquidating trustee as an assignee of creditors because the creditors had no direct claims.  516 F.3d at 392.  There is no difference between that case and

this one—both concern an alleged harm to creditors.  Thus, even if the Trustee had disclosed the creditor claims as a category of damages (which he did not), he cannot recover those damages because the creditors had no right to assert those claims directly against any of the Defendants. *See Gheewalla*, 930 A.2d at 103.

349.    Based on the above, the Trustee cannot pursue damages for the value of the league from the time DCP assumed control (alleged to be $144.1 million), the alleged $68 million in reduced tax liability, or the claims of creditors.

350.    **The Trustee has not identified damages proximately caused by a breach of fiduciary duty.**  To recover damages for breach of fiduciary duty, the plaintiff must prove quantifiable damages "logically and reasonably related to the harm or injury for which compensation is being awarded." *In re PLX Tech. Inc. Stockholders Litig.,* No. CV 9880-VCL, 2018 WL 5018535, at *50, 56 (Del. Ch. Oct. 16, 2018) (finding a breach of fiduciary duty but that the plaintiffs "were unable to prove that the breaches resulted in damages" where the damages measure was unreliable and flawed), *aff'd*, 211 A.3d 137 (Del. 2019).

351.    Based on the evidence, the Court finds that the Trustee did not disclose or prove any category of damages attributable to a particular decision or transaction, and the Trustee did not prove that damages equaling the total value of the league at the time it ceased operations were proximately caused by the actions or transactions he identified as constituting a breach of fiduciary duty.

352.    As an initial matter, the Trustee's expert Desai gave no testimony tying the damages calculated for a specific date to any action of Dundon or Zutter.  Desai failed to consider other factors in her analysis that showed the league failing was far more likely than its success even if Dundon and Zutter had never been involved, including the historical failure of all such leagues,

the lack of funding to cover the hundreds of millions of dollars of outside capital that the league would need, the ruinous financial condition of the league during the 16 or more months Ebersol was in charge, and Fowler's failure to fund, among other issues. By failing to allocate cause of the loss of the value of the league between these other factors and Dundon and Zutter, and by failing to calculate damages relating to any particular act, decision, or omission, the Court has no basis to determine any amount of damages assignable to Dundon or Zutter relating to a breach of fiduciary duty or any other tort claim.

353. **The Trustee's evidence of lost value of the league is unreliable.** Outside of contract damages, the sole damage model disclosed by the Trustee was the entire loss of the value of the league at the time it shutdown. D272 at 89. The Trustee's expert relied on one of the many and ever-changing financial projections prepared by legacy league management in calculating value of the league on April 2, 2019. 14TR 219-20, 224; D188. "In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Jacked Up, L.L.C. v. Sara Lee Corp.,* 807 Fed. Appx. 344, 348–49 (5th Cir. 2020) (affirming district court's conclusion that expert did not evaluate the projections on which he relied where his report did not analyze reliability of the pro forma or its preparation and instead assumed it was correct). An expert cannot blindly rely on financial projections prepared by others. *Id.* The expert must show a basis for concluding that projections prepared by others are reliable "other than the fact that it was the opinion of someone [the source of the projection] believed to be an expert." *Id.*

354. "Projecting results for a new business is inherently speculative. Because of that fact, courts generally reject efforts to prove lost-profits damages for a new business that has no

history of making profits." *Hyde Park Venture Partners Fund III, L.P. v. FairXchange, LLC*, No. 2022-0344-JTL, 2024 WL 3579932, at *22 (Del. Ch. July 30, 2024). Courts adopt a similar practice in appraisal proceedings by declining to credit projections for a new business without any operating track record. *Id.*

355. Courts are more likely to find a valuation unreliable where it is based on aggressive or historically inaccurate projections or fails to account for other market forces. *In re PLX Tech. Inc. Stockholders Litig.,* No. CV 9880-VCL, 2018 WL 5018535, at *50, 56 (Del. Ch. Oct. 16, 2018), aff'd, 211 A.3d 137 (Del. 2019). In *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1, 27 (Del. 2017), the Delaware Supreme Court warned that courts should be especially wary of crediting management projections when management has historically missed its forecasts. In making that pronouncement in *Dell*, the Delaware Supreme Court cited with approval the Chancery Court opinion from *In re Nine Sys. Corporation Shareholders Litig.*, No. CIV.A. 3940-VCN, 2014 WL 4383127, at *42 (Del. Ch. Sept. 4, 2014), *aff'd sub nom. Fuchs v. Wren Holdings, LLC,* 129 A.3d 882 (Del. 2015). In *Nine Sys.*, a case about a start-up media streaming service, the court refused to accept a damages calculation based on management projections because a comparison of past projections by the same management to results showed that management projections had failed significantly to comport with reality. *Id.*; *see also id.,* *42 n.363 (noting challenge of making reliable projections for a start-up in a nascent industry).

356. The Trustee's expert selected a single pro forma out of the many and wildly fluctuating pro formas generated by the league, all of which were admittedly speculative. 14TR 219-20, 224; D188. The selected pro forma included a multitude of unverified assumptions (including that the NFL would contribute $20 million per year and networks would start paying the league starting 2020) and aggressive and speculative predictions of future profitability (1,700%

revenue growth and only 45% expense growth).  14TR 253-257; 18TR 34, 48-50; 19TR 116-117. Given that league management prepared the pro forma and the league never met any management projection in its short life, the Trustee's expert should not have credited the unverifiable and unreliable projections in the pro forma.  Her opinions are unreliable because of the underlying evidence she credited.

357.    Defendants' expert Erica Bramer found unexplained calculation errors that render Desai's opinions unusable.  Desai admitted to one error that amounted to a nearly $15 million miscalculation of taxes.  19TR 103-04.  That error and others render Desai's opinions unreliable.

358.    During trial, Defendants objected that the Trustee failed to disclose a valuation for February 13 valuation as a calculation of damages.  Even if the Trustee had timely disclosed that value as a damage, the Court would not consider it because it is unreliable and irrelevant.  There was no evidence of causation linking a value before DCP's investment to any acts of Dundon or Zutter.  Desai relied on a valuation established in Fowler's term sheet that was agreed to prior to the ruinous series of events following Fowler's defaults and the waterfall of events that led to the league ending up on the precipice of shut down at least three times leading up to February 13. Desai also added $37.8 million in debt to her calculation of value for February 13 but admitted at trial she had not investigated how that number was comprised prior to rendering her opinions, had not investigated when she learned those numbers included Fowler's equity investments and potentially other errors, and did not attempt to correct the error and recalculate after Bramer pointed it out.  19TR 100-01.  The Court will not consider Desai's valuation for February 13, 2019.

359.    **The Trustee cannot recover lost opportunity damages.** For the Court to award lost opportunity damages for a breach of fiduciary duty, the estimate of what a business would have been worth needs to be reasonable, and the business must have collapsed because of the

breach.  In *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 860 (Del. Ch. 2022), the court found a breach of fiduciary duty but refused to award the plaintiff damages.  The court held that the plaintiff failed to carry its burden to prove causation or damages.  The business collapsed because of ineffective local management and a reluctant lender.  *Id.* at 862.  The court found the damages speculative because the model relied on unproven projections for a startup business and depended on everything going as planned.  *Id.* at 860.  For a startup company where the collapse was caused by forces apart from the breach of fiduciary duty, the court found a remedy of the magnitude sought ($5.3 to $8.8 million) would be speculative, disproportion, and inequitable.  *Id.* at 862.

360.    The case is similar to *Metro Storage*.  The Trustee seeks to recover what he believes the league would have been worth at the time it ceased operations based on projections that made aggressive and speculative assumptions about future revenue streams, changes to contractual relationships, and that the league would double in size and survive more than 10 years.  D188; 14TR 248-49, 253-57; 19TR 115-117.  From the beginning, things did not go according to plan for the league.  Fowler proved unreliable, Ebersol cut marketing and sponsorships, debts piled up without revenue to cover them, the NFLPA refused to enter a deal, and the league failed to develop revenue generating technology.  The league was in dire straits when Dundon first got involved, and his team uncovered a complete lack of cost controls and internal structure, considerable undisclosed debt, and mismanagement by Ebersol that doomed league before it even started.  Every prior professional spring football league has failed.  The league needed outside investment of more than $750 million to get through 10 years.  Those facts show that the league's demise happened for reasons besides Dundon's and Zutter's management.  The same facts also show that an award equal to the value of the league would be speculative, disproportionate, and inequitable.  *See Metro Storage*, 275 A.3d at 862.

361.    The history of past failed professional football leagues demonstrates that things failing to go as planned is the rule, not the exception.  *See, e.g., U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1342 (2d Cir. 1988) ("[T]here was ample evidence that the USFL failed because it did not make the painstaking investment and patient efforts that bring credibility, stability and public recognition to a sports league."); *In re Alpha Entm't LLC*, No. AP 3:23-CV-118 (VAB), 2023 WL 4157346, at *1 (D. Conn. June 23, 2023) (discussing the demise of the XFL); *Green v. United Football League LLC Hambrecht*, No. A145772, 2016 WL 4382629, at *1 (Cal. Ct. App. Aug. 17, 2016) ("The UFL shut down its operations the following year as it failed to attract sufficient public interest and generate sufficient revenues to remain viable."); *Alabama Football, Inc. v. Wright*, 452 F. Supp. 182, 183 (N.D. Tex. 1977) (discussing the demise of the World Football League), *aff'd sub nom. Alabama Football, Inc. v. Pugh,* 607 F.2d 1004 (5th Cir. 1979), *and aff'd*, 607 F.2d 1004 (5th Cir. 1979).  If Dundon had never tried to come to the league's rescue, it would have failed anyway.  The league was hamstrung from the start by bloated payroll, bad decisions by management, and a string of events failing to go as planned.  Even if Dundon's or Zutter's decisions fell short of expectations in directing the affairs of the league, there is no evidence that their decisions caused the loss of the league or its value.

362.    The Court finds that the lost opportunity damages sought by the Trustee do not have a reliable basis and fail to consider causes of the league's demise other than Dundon and Zutter.  For that reason, the Court finds the damages too speculative and unreliable to support an award.

363.    **Damages for breach of contract and breach of fiduciary duty claims would give the Trustee a double recovery.**  "[U]nder Delaware law, breach of fiduciary duty is a legally consistent *alternative theory* of recovery to breach of contract." *Clinton v. Aspinwall*, 344 Conn. 696, 711, 281 A.3d 1174, 1184 (2022) (emphasis added).  The Court cannot award damages for

breach of fiduciary duty on top of damages for a breach of contract. Rather, the Court must carefully fashion any award of damages for any breach of fiduciary duty to avoid double recovery. *See, e.g., Auriga Capital Corp. v. Gatz Properties,* 40 A.3d 839, 880 n.171 (Del. Ch. 2012) (fashioning an award to avoid double recovery for breach of contract and breach of fiduciary duty claims), *aff'd*, 59 A.3d 1206 (Del. 2012). Because the Trustee has not disclosed any calculation of damages that the Debtors would have suffered if Dundon had funded the alleged oral agreement, he cannot recover for both a breach of contract and a breach of fiduciary duty.

364. **The exculpatory clause precludes monetary damages for duty of care claims.** Even if the Court found damages caused by a breach of fiduciary duty, if the damages flow from a breach of the duty of care, then the Trustee cannot recover because the ESMG restated certificate of formation (D22 at 25-26, Art. VIII.A) exculpates directors from liability for a breach of the duty of care. *See Emerald Partners v. Berlin*, 787 A.2d 85, 98 (Del. 2001). Delaware allows exculpatory clauses because waiver of the duty of care encourages directors to "undertake risky, but potentially value-maximizing, business strategies, so long as they do so in good faith" *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 777 (Del. Ch. 2004). "[W]hen, despite the directors' good intentions, the business plan of the firm did not generate financial success, and the firm has become insolvent, the possibility of hindsight bias about the directors' prior ability to foresee that their business plans would not pan out is at its zenith and when the exculpatory charter provision is most useful." *Id.* Because the Trustee's claims exist, if at all, as duty of care claims and the damages he claims arise from his allegations of a breach of the duty of care, the exculpatory clause precludes recovery. D22 at 25-26, Art. VIII.A.

365. **Promissory estoppel.** The parties agree that Texas law governs the Trustee's promissory estoppel claim. ECF 300 at 88 ¶ 510.

366.     **The Trustee cannot establish his promissory estoppel claim.**  "The elements of an affirmative claim for promissory estoppel are (1) a promise, (2) foreseeability by the promisor of reliance on the promise, and (3) substantial reliance by the promisee to his detriment." *Walker v. Walker*, 631 S.W.3d 259, 264 (Tex. App.—Houston [14th Dist.] 2020, no pet.).   To be enforceable under a theory of promissory estoppel, the terms of a promise must be sufficiently certain.  *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 570 (Tex. App.—Dallas 1989, no writ).   The alleged promise must be sufficiently specific and definite such that it would be reasonable and justified for the promisee to rely upon it as a commitment to future action.  *Walker*, 631 S.W.3d at 265.   "The promise also must be more than mere speculation concerning future events, a statement of hope, or an expression of opinion, expectation, or assumption." *Id.*

367.     Even if the Court had found a promise by Dundon to inject $250 million in some combination of debt and equity into the league, that promise could not support a promissory estoppel claim because it was not specific and definite enough to justify reliance.  The promise, if made, did not address the material terms ESMG and its lawyers had included in comparable investments.  Ebersol knew of the term sheets signed with other investments.  Because the promise, if there was one, did not specify conditions of the investment — preferential features of shares or prerequisites to funding (a request or certain performance metrics), the promise was not specific enough to generate justifiable reliance.   Therefore, the Trustee cannot recover for promissory estoppel.

368.     **The Trustee cannot recover promissory estoppel damages.**   Benefit of the bargain damages are not available for a promissory estoppel claim.  *Heritage Constructors, Inc. v. Chrietzberg Elec., Inc.,* No. 06-14-00048-CV, 2015 WL 3378377, at *7 (Tex. App.—Texarkana March 4, 2015, no pet.) (citing *Bechtel Corp. v. CITGO Prods. Pipeline Co.,* 271 S.W.3d 898, 927

(Tex. App.—Austin 2008, no pet.)). Where a promise has failed to bind the promisor to a legally sufficient contract, but the promisee has acted in reliance upon a promisee to his detriment, the promisee is to be allowed to recover no more than reliance damages measured by the detriment sustained. *Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965). Reliance damages include "expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty." *Bechtel Corp. v. CITGO Products Pipeline Co.*, 271 S.W.3d 898, 927 (Tex. App.—Austin 2008, no pet.) (internal quotation marks omitted); *see also Quigley v. Bennett*, 227 S.W.3d 51, 56 (Tex. 2007) (Brister, J., concurring) (reliance damages compensate for the plaintiff's out-of-pocket expenditures). Even if Dundon refused to consider additional funding sources, the trustee never quantified the sources, and the sources were not out of pocket damages because the Debtors did not spend that money in reliance on an alleged oral agreement. The Trustee has identified no damages that consist of amounts the Debtors spent out of pocket in preparation for performance of the alleged oral agreement. Therefore, the Trustee cannot recover promissory estoppel damages.

369. **Fraud.** The parties agree that Texas law governs the Trustee's fraud claims. ECF 300 at 88 ¶ 510.

370. Fraud requires proof that "(1) the defendant made a false, material representation; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff justifiably relied on the representation, which caused the plaintiff injury." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019) (internal quotes omitted).

371.    **Fraud by nondisclosure.**  A failure to disclose information does not constitute fraud unless there is a duty to disclose the information.  *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001).  Some cases have discussed a duty to disclose in an arm's length transaction when a party makes a partial disclosure that, although true, conveys a false impression.  The Texas Supreme Court has not adopted those authorities.  *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 562 (Tex. 2019); *Bradford*, 48 S.W.3d at 755.  "[T]here is no duty to disclose without evidence of a confidential or fiduciary relationship."  *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019).

372.    The Trustee claims that Dundon failed to disclose his true intent in making the alleged oral agreement.  When that agreement was allegedly made, the parties were negotiating at arm's length.  A special relationship necessary to create a confidential or fiduciary relationship must predate and be apart from the agreement sued upon.  *Pitts v. Rivas*, 709 S.W.3d 517, 528 (Tex. 2025) (refusing to find a special relationship where engagement letter excluded special duties).  Because there was no pre-existing duty to disclose, the Trustee cannot recover for fraudulent nondisclosure based on statements made during the negotiation of the alleged oral agreement.

373.    The Trustee also claims Dundon failed to disclose that he was using league assets for his own benefit and not acting fairly or in the best interest of the league, though the Trustee did not quantify a damages model for this claim.  These allegations are breach of fiduciary duty claims, not fraud claims.  A party cannot recast a breach of fiduciary duty claim as fraud to evade an exculpatory clause in a corporation's certificate of formation.  *See In re Verestar, Inc.*, 343 B.R. 444, 477 (Bankr. S.D.N.Y. 2006) (dismissing fraud claims as recast fiduciary duty claim barred by exculpatory clause).

374. **Negligent misrepresentation.** The parties agree that Texas law governs the Trustee's negligent misrepresentation claim. ECF 300 at 88 ¶ 510. "To prevail on a cause of action for negligent misrepresentation, a plaintiff must show: (1) a representation made by a defendant in the course of its business or in a transaction in which it has a pecuniary interest; (2) the representation conveyed false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–54 (Tex. 2018) (internal quotations omitted). The requirement of false information means a misstatement of a then existing fact, not a promise of future conduct. *Lindsey Constr., Inc. v. AutoNation Fin. Services, LLC*, 541 S.W.3d 355, 366 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Though some courts have indicated that negligent misrepresentation may flow from a failure to state a fact, *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 384 (Tex. App.—Houston [1st Dist.] 2010, pet. denied), the Texas Supreme Court has continuously included the requirement of an affirmative representation in the elements of negligent misrepresentation and that the information supplied be provided for the guidance of others in their business. *JP Morgan Chase Bank*, 546 S.W.3d at 653-54. When parties are negotiating a contract for an investment, there is no duty to disclose that forms the basis for a negligent misrepresentation claim. *See Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 979 (N.D. Tex. 2014) (dismissing negligent misrepresentation claim based on non-disclosure in the context of the solidification of an investment). A failure to disclose the intent not to invest $250 million would fall in the category of a promise of future conduct, which cannot serve as the basis for a negligent misrepresentation claim. *Lindsey Constr.,* 541 S.W.3d at 366 (holding that party's alleged failure to disclose

conditions attending agreement party was alleged to have promised to enter constituted mere promises of future conduct which cannot form the basis of a negligent misrepresentation claim).

375.    **The Trustee failed to prove actual and justifiable reliance.**    As the party asserting claims for fraud, negligent misrepresentation, and promissory estoppel, the Trustee bears the burden of proving reliance by ESMG.  *See Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 (Tex. 2002); *see also Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 n.15 (Tex. 2010) (explaining that lack of justifiable reliance for a fraud claim also bars a negligent misrepresentation claim).  The reliance element has two requirements.  The plaintiff must show (a) that it actually relied on the defendant's representation, and (b) that the reliance was justifiable.  *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018).

376.    **There is no evidence of actual reliance**.  The Trustee claims that ESMG relied on Dundon's alleged promise to invest $250 million into the league.  ECF 300 at 24-40.  Within hours of Ebersol claiming to have made a $250 million agreement with Dundon, Ebersol signed the Term Sheet and forwarded it to Zutter for the purpose of triggering DCP's payment of $5.1 million to ESMG.  T7.  After that, ESMG accepted funds sent in compliance with DCP's obligations in the Term Sheet, and ESMG spent those funds.  Over a month later, on March 26, 2019, Dundon and Zutter informed Ebersol that DCP would not fund any amounts above the $70 million called for in the Term Sheet.  T1171.  After Ebersol received that notice, he (as the person controlling 71% of the shareholder vote), signed a shareholder consent by which the shareholders ratified the Term Sheet, not an agreement for an investment of $250 million.  D182 at 2.  At the same time, the shareholders acknowledged receipt of $50 million from DCP with reference to the Term Sheet.  D182 at 2.  The board (of which Ebersol was also a member) had previously ratified the Term

Sheet but not a $250 million agreement. D135 at 12. When these votes occurred, no one objected that Dundon had agreed to infuse an additional $180 million. D135 at 12; 4TR 184-87; 12TR 479:17-19. When Ebersol and Dundon and Zutter discussed bankruptcy and other go-forward options, Ebersol never mentioned a $250 million agreement. D177.

377.    Ebersol testified he told every board member, the lawyers involved, and several shareholders, that he had an agreement with Dundon for $250 million on February 14. Despite that, not a single board member (including Moorad, a lawyer) or shareholder objected to ratification of a $70 million transaction or questioned where the documentation was for a $250 million deal. None of those board members came forward to say there was any reliance on Dundon's press statements about $250 million.

378.    Ebersol's failure to mention a different $250 million agreement and the board's and shareholders' ratification of the Term Sheet collectively negate actual reliance on the part of ESMG. In *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983), the Texas Supreme Court held that Fischer did not prove actual reliance because he would have done everything he did (clean up a burned house) whether the alleged promise had been made or not. The Trustee suggests that Ebersol would have continued to try to raise capital if ESMG had known Dundon would stop at $70 million. ECF 300 at 24-40. There was no evidence that any post-Dundon fundraising would have succeeded in raising the substantial capital the league needed to keep going. Ebersol's prior efforts had failed to generate a substantial investment sufficient to keep the league afloat. The Trustee did not prove that, with the DCP committed to invest the $70 million in the Term Sheet, the league would not have stopped fundraising without a larger commitment. The evidence suggested that the league would have done precisely what it did even if it only had the $70 million commitment from DCP. Like Fischer, the Trustee failed to introduce evidence that ESMG, relying

123

on a larger $250 million agreement, did something it would have not done had it known it only had a $70 million agreement and suffered a detriment. *See* 660 S.W.2d at 524. There is no evidence that suggests that ESMG *actually* relied on a representation by Dundon and took action or failed to act based on that reliance.

379.    **Lack of justifiable reliance.** Two types of evidence negate justifiable reliance under Texas law. First, the Texas Supreme Court has consistently held that a writing that contradicts an alleged oral agreement forecloses the oral agreement as a matter of law. *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 559 (Tex. 2019) (noting that, even if there are no red flags, a party to a written agreement must protect itself and cannot, as a matter of law, justifiably rely on an oral promise that contradicts a writing); *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 658-60 (Tex. 2018) (holding that direct contradiction between an alleged oral agreement and a written contract, even if not stated in the same terms, negates justifiable reliance as a matter of law).

380.    When strangers negotiate, neither party has a right to rely on an oral promise that contradicts a written agreement. "Written agreements, relative to oral agreements, serve a purpose under the law to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 498 (Tex. 2019) (internal quotation omitted).

381.    Second, a party entering an arm's-length transaction must exercise ordinary care for the protection of his own rights. *Id.* at 497-98. If a party fails to exercise reasonable diligence and ordinary care when red flags exists, that failure will negate justifiable reliance. *Id.* Business-savvy parties who enter a complicated, multi-million-dollar transaction should be expected to

recognize red flags that the less experienced may overlook.  *Orca Assets*, 546 S.W.3d at 656.

Diligence is not excused by trust in the other party.  *Id.* at 654.

382.   "A party who enters into a written contract while relying on a contrary oral agreement does so at its peril."  *DRC Parts & Accessories, LLC v. VM Motori, SPA,* 112 S.W.3d 854, 858-59 (Tex App. — Houston [14th Dist.] 2003, pet. denied).  A writing that contradicts an oral representation is a red flag.  *Orca Assets*, 546 S.W.3d at 658.

383.   The fact that the parties are at arm's length when negotiating a non-form agreement is a red flag.  *See Barrow-Shaver Resources*, 590 S.W.3d at 501.  Both parties to the transaction having sophisticated representatives is another red flag.  *Id.*

384.   The Term Sheet says the $70 million investment is the maximum (meaning there is nothing more) and the cumulative (meaning all the investments together will not exceed $70 million).  T7.  The Trustee never addressed how "a maximum cumulative investment of $70,000,000" could be read in any way other than that the most all the investments together will add up to is $70 million.

385.   The writing Ebersol signed within 24 hours of meeting Dundon spells out what DCP promised to do.  T7.  If Ebersol thought the deal was something other than what the Term Sheet said, he had the duty of reasonable diligence and ordinary care; it was his obligation to protect the league by insisting on a change to the Term Sheet.  Ironically, the Trustee claims that Zutter breached a fiduciary duty by failing to document the alleged $250 million oral agreement but ignores that Ebersol never suggested to anyone that something needed to be done to document the rest of the deal.  In the single board meeting that addressed the investment, no board member mentioned a $250 million agreement even though Ebersol claimed to have called all of them in advance of signing the Term Sheet.  The Court cannot justify ESMG's failure to take any steps to

memorialize the alleged $250 million agreement. By seeking and obtaining board and shareholder approval of the Term Sheet without mention of any larger agreement, Ebersol negated justifiable reliance.

386.     The Court has already found that the parties were sophisticated entities. No. 22-05077, ECF 171 at 18. The evidence shows that Ebersol and the board of directors were sophisticated parties. Ebersol had experience as a producer, as a director, and in media. 1TR 112-22. He testified about his extensive exposure to the media and sports industries through his father and mother while growing up and throughout college. 1TR 109-12. He was familiar and had experience with securing funding for major projects, including film and television. 1TR 112-22. He was familiar with various forms of financing —hard money lenders, sharks (high-interest rate lenders), convertible notes, and other financing vehicles. 1TR 166-67; 2TR 41. He was familiar with contracts and had experience negotiating contracts. 3TR 84. He had in-depth knowledge of sports and professional leagues, especially football and NFL issues. 2TR 11-12, 14-15; 3TR 99-100. Ebersol even claimed to have advised on past amendments to the NFL collective bargaining agreement. 3TR 100:2-3. He had preexisting relationships with major private equity groups. 2TR 67-68. He demonstrated a sophisticated understanding of financing vehicles with the Trustee's Ex. 808, including discount rates, caps, conversion triggers, and similar mechanisms. 2TR 119-21.

387.     Both sides of the transaction were represented by able counsel. The league had two highly capable law firms — Morgan Lewis & Bockius LLP and Fenwick & West, LLP. 3TR 83-84; 16TR 154:20–155:13. The board included a lawyer (Jeff Moorad), who Ebersol described as uniquely qualified because he had started his own business, been a sports agent, been a team owner, and provided the inspiration at least in part for the character "Jerry Maguire." 2 TR 138:22–139:5.

388.     The negotiations between Dundon and ESMG were at arm's length.  The parties

met for the first time one day before Ebersol claims to have made a $250 million deal and when

he signed the $70 million Term Sheet.  These are red flags the Court has already recognized negate

justifiable reliance.  No. 22-05077, ECF 171 at 20.  In addition, Ebersol signed a written agreement

that expressly contradicted what he now claims was the oral agreement.  T7.  Under the

circumstances, a party cannot justifiably rely on vague, general statements of unverifiable future

intent (especially when the statements contradict a written agreement).  *See Barrow-Shaver Res.*

*Co.*, 590 S.W.3d at 501.

389.     In a transaction of the size the Trustee claims the parties contemplated (the alleged

$250 million infusion), this transaction came together quickly, especially considering that the

parties had no prior relationship.  When they agreed to the Term Sheet, neither side had a right to

justifiably rely on the other party's inconsistent prior representations.  Under the circumstances,

ESMG could not have justifiably relied on any representation by Dundon.

390.     **The Trustee has not identified out-of-pocket damages recoverable for a**

**negligent misrepresentation claim.**  The Trustee has not explained how the damages he

identifies — loss of the league, alleged usurped assets, lost opportunities, and contract

damages — are recoverable for negligent misrepresentation.  *DSA, Inc. v. Hillsboro Indep. Sch.*

*Dist.*, 973 S.W.2d 662, 663-664 (Tex. 1998), held that benefit of the bargain damages are not

recoverable in a negligent misrepresentation case.  Damages for negligent misrepresentation are

limited to out-of-pocket damages.  *House of Raeford Farms, Inc. v. SOMMA Food Group, LLC*,

No. 05-22-01231-CV, 2024 WL 396609, at *10 (Tex. App.—Dallas Feb. 2, 2024, pet. denied).

None of the Trustee's alleged damages are out-of-pocket damages.  Therefore, he cannot recover

damages for his negligent misrepresentation claim.

391. **Unjust enrichment.** A claim for unjust enrichment requires: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law. *Nemec v. Shrader,* 991 A.2d 1120, 1130 (Del. 2010). There is no unjust enrichment claim if the party has a breach of contract or other cause of action to redress its claim. *Id.* (dismissing unjust enrichment claim based on conduct covered by contract). Neither Dundon nor Zutter benefited from their relationship with the league. Dundon lost $70 million through the DCP investment; Zutter worked for the league but had no equity in it and never got paid. Zutter gained nothing from his involvement. 16TR 60:1-4, 142: 5-8, 147:12-148:11, 227:10-12, 273: 11-23, 276: 6-10; 278: 20-22. The Trustee did not quantify any impoverishment the league suffered that enriched any of the Defendants. D272 at 92. Desai, the Trustee's only witness to give damages testimony, did not quantify any enrichment to Dundon or Zutter or DCP. 14TR 156:23–157:1. Though the Trustee claims to seek disgorgement, the Trustee did not disclose an amount or basis for disgorgement damages. D272 at 92. Under the circumstances, the Trustee cannot recover for unjust enrichment.

392. **Rescissory damages.** Although the Trustee asked for rescissory damages by name, he did not disclose any rescissory damages amount or have an expert quantify what they might be. Rescissory damages are "the monetary equivalent of rescission" and may be awarded where "the equitable remedy of rescission is impractical." *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014). Rescission and restitution require mutual restoration. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 37 cmt. d (2011). When a party seeks rescission, each party must return what it received from the other with the goal of returning both parties to the position they occupied prior to entering the contract. *Id.* § 49(2)-(5); *see generally Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012) (explaining

that rescission requires a mutual restoration and accounting, in which each party restores property received from the other). If the Court awarded rescission in this case, the Debtors would have to return the $70 million consideration they received. *Cruz*, 364 S.W.3d at 825 (noting that rescission is not a "one-way street"; it requires mutual restoration). Given the circumstances, the remedy of rescission makes no sense in this case.

393. **Attorney's fees.** Attorney's fees are not appropriate under **Delaware law** even if the Court finds a breach of fiduciary duty. Delaware follows the American Rule, which generally obliges each party to pay only its own attorneys' fees, whatever the outcome of the litigation. *Johnston v. Arbitrium* (*Cayman Islands*) *Handels AG*, 720 A.2d 542, 545 (Del. 1998). "Delaware recognizes only a limited number of exceptions to the American Rule. For example, fees may be shifted if: (i) recovery of fees is provided by statute or court rule; (ii) there is a contractual provision regarding entitlement to attorneys' fees; (iii) a party has acted in bad faith in connection with the conduct of the litigation process; (iv) a party fails to abide by a court order or is held in contempt; and (v) the action results in the creation, protection or distribution of a common fund or confers a corporate benefit." *In re Delaware Pub. Sch. Litig.*, 312 A.3d 703, 716 (Del. 2024). There are no facts in this case that satisfy the Delaware exceptions to the American Rule.

394. Though the alleged oral agreement (if proven) is governed by **Texas law**, the Trustee cannot recover attorney's fees under Section 38.001, *et seq.* of the Texas Civil Practice and Remedies Code. The statute requires the plaintiff to make presentment of his claims to the defendant more than 30 days before the trial of the case. TEX. CIV. PRAC. REM. CODE § 38.002. Filing a lawsuit is not presentment. *Huff v. Fid. Union Life Ins. Co.*, 312 S.W.2d 493, 500 (Tex. 1958) (discussing predecessor statute); *see also Genender v. USA Store Fixtures, LLC*, 451 S.W.3d 916, 924 (Tex. App. — Houston [14th Dist.] 2014, no pet.) (collecting cases and noting that *Huff*

addresses predecessor statute).  The Trustee failed to make presentment of his claim to Dundon more than 30 days before the commencement of the trial.  9TR 89-90, 134-37.  A lack of presentment precludes recovery under Section 38.001.  TEX. CIV. PRAC. & REM. CODE § 38.002.

395.  **Punitive damages.**  The Trustee cites one case for the proposition that the Court may award punitive damages for the breach of a fiduciary duty under **Delaware law** — *In re Extended Stay, Inc.*, No. 09-13764-JLG, 2020 WL 10762310, *121 (Bankr. S.D.N.Y. Aug. 8, 2020), an unreported New York district court case decided on a motion to dismiss.  *Extended Stay* cites several cases that either did not award punitive damages under Delaware law for a breach of fiduciary duty or were decided at the pleading stage and merely refused to dismiss a pleading alleging a claim for punitive damages.  *Id.* (collecting cases).  The gist of the cases is that Delaware Chancery Courts cannot award punitive damages (because they are courts of equity), but other non-Delaware courts have said that Delaware law allows punitive damages for breach of fiduciary duty only if there is an intent to do harm.  *Id.*  The Court declines to award punitive damages in this case considering the lack of precedent for such an award from any Delaware court and where the facts involve no egregious conduct demonstrating an intent to do harm.

396.  Under **Texas law**, punitive damages require proof of fraud or malice.  TEX. CIV. PRAC. & REM. CODE § 41.003(a).  Fraud means fraud other than constructive fraud.  *Id.* § 41.001(6).  Malice means a specific intent by the defendant to cause substantial injury.  *Id.* § 41.001(7).  The claimant must prove the basis for exemplary damages by clear and convincing evidence.  *Id.* § 41.003(b).  "The burden of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence, bad faith, or a deceptive trade practice."  *Id.*  In this case, the facts are not of the extraordinary quality that would justify punitive damages under Texas law.  This is an ordinary business case that came about only because the Debtors filed bankruptcy.  Like

130

many cases, persons known to have means end up being sued when debtors lack sufficient assets to pay creditors. The evidence revealed nothing that rises to the level of fraud, malice, or gross negligence that would warrant a judgment for punitive damages.

397.    **Disallowance of claims.**  In his complaint, the Trustee alleged that the Dundon and DCP claims should be disallowed to the extent the claims are "voidable under section 544 or 547 of the Bankruptcy Code." ECF No. 56 ¶ 219.  The Court dismissed the Trustee's claims under 11 U.S.C. §§ 544 and 547 against DCP and Dundon in November 2023.  ECF No. 54 at 34-36.  The Trustee did not attempt to reassert those claims in the first amended complaint.  ECF No. 56 at 53 (indicating the causes of action were removed pursuant to the Court's order).  Because the Trustee has no claim that any transfers are voidable under 11 U.S.C. §§ 544 or 547 against Dundon or DCP, he cannot claim DCP or Dundon's claims should be disallowed under 11 U.S.C. § 502(d).

398.    In the pretrial order, the Trustee for the first time asserted disallowance under 11 U.S.C. § 502(a).  ECF 300 at 42-43.  DCP and Dundon objected to the Trustee's attempt to assert a new basis for disallowance for the first time in the pretrial order.  *Id.* at 43.  The Court agrees that a party may not assert a new basis for disallowance for the first time in a pretrial order.

399.    Defendants' claims are deemed allowed to the extent the claims are not objected to, 11 U.S.C. § 502(a), and the proofs of claim are prima facie evidence of the claims' validity and amounts, FED. R. BANKR. P. 3001(f).  The Trustee bears the initial burden to present evidence to overcome the claims' validity.  *In re 1701 Commerce, LLC*, 511 B.R. 812, 822 (N.D. Tex. Bankr. 2014).  To put a claim at issue, the Trustee must identify the specific bases for its claim objections. W.D. Tex. Local R. 3007-1(b) ("All Objections to claims shall specifically set forth all bases for the objection. General denials regarding the accuracy of the claim without specific contentions regarding the disputed items may result the Court denying the Objection.").  The Trustee did not

allege or argue any other basis for disallowance besides Section 502(d).  The Trustee's request for disallowance is denied.

400.  **Subordination.**  In the Pretrial Order, the Trustee asserted a new basis for subordination, referring for the first time to subsection (b) of 11 U.S.C. § 510.  ECF 300 at 44.  The Trustee previously relied on (and only pleaded for subordination under) 11 U.S.C. § 510(c).  The Trustee's new claim relies on Section 510(b), which the Trustee failed to plead.  DCP and Dundon objected to the Trustee's attempt to assert a new basis for subordination for the first time in the pretrial order.  ECF 300 at 44-45.  The Court agrees that a party may not assert a new basis for subordination for the first time in a pretrial order.

401.  The Trustee's claims for equitable subordination are derivative of the Trustee's other claims and should be denied for the same reasons.  Equitable subordination is an extraordinary remedy that should only be granted sparingly.  *Matter of U.S. Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994).  The Fifth Circuit "established a three-prong test to identify those situations in which equitable subordination is permitted: (1) the claimant must have engaged in some type of inequitable conduct; (2) the conduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) the invocation of equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code."  *Id.*  Though this three-pronged test appears broad, the Fifth Circuit has largely confined equitable subordination to "three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors."  *Id.*

402.  The Trustee has not established any basis for the extraordinary relief of equitable subordination.  The Trustee has not established alleged misconduct by Defendants resulted in an

injury to the creditors of the Debtors or conferred an unfair advantage to Defendants. DCP sunk $70 million into the league at a time when no other investor stepped up to make a substantial commitment to the league. DCP's investment enabled the players to be paid for every game played. The fact that the league shut down and ultimately filed bankruptcy cannot be blamed on Dundon or DCP. If DCP had not made its investment, the league would have collapsed earlier and the creditors (including players) who did get paid out of the $70 million would not have received those payments.

403. The Court finds that the facts of this case do not justify equitable subordination.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By:     /s/ *Beverly A. Whitley*
        Jeffrey S. Lowenstein
        Texas Bar No. 24007574
        jlowenstein@bellnunnally.com
        Beverly A. Whitley
        Texas Bar No. 21374500
        bwhitley@bellnunnally.com
        Gwen I. Walraven
        Texas Bar No. 24047065
        gwalraven@bellnunnally.com
        Laura K. Lavernia
        Texas Bar No. 24126586
        llavernia@bellnunnally.com
        2323 Ross Ave., Ste. 1900
        Dallas, Texas 75201
        (214) 740-1400
        (214) 740-1499 Fax

**K&L GATES LLP**

        Brent D. Hockaday
        Texas Bar No. 24071295
        Brent.hockaday@klgates.com
        1717 Main Street, Suite 2800
        Dallas, Texas 75201
        (214) 939-5677
        (214) 939-5849 Fax

        **ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned certifies a true and correct copy of the foregoing pleading was served by delivering the same to the person listed below in the manner and on the date indicated.

**VIA ECF**

Nicole L. Williams
Email: nwilliams@thompsoncoburn.com
Katherine Battaia Clark
Email: dkclark@thompsoncoburn.com
THOMPSON COBURN LLP
2100 Ross Avenue, Suite 3200
Dallas, TX 75201
***Counsel for Plaintiffs Randolph N. Osherow, Chapter 7 Trustee, Debtors' Estate***

**VIA ECF**

Boris Treyzon
Email: btreyzon@actslaw.com
Jonathon Farahi
Email:  jfarahi@actslaw.com
ABIR COHEN TREYZON SALO, LLP
16001 Ventura Boulevard, Suite 200
Encino, CA 91436
***Counsel for Plaintiffs Randolph N. Osherow, Chapter 7 Trustee, Debtors' Estate***

**VIA ECF**

Brian S. Engel
Email:  brianen@bdfgroup.com
Steve P. Turner
Email: stevet@bdfgroup.com
BARRETT  DAFIN  FRAPPIER  TURNER  & ENGEL, LLP
580 La Ventana Blvd.
Driftwood, TX 78619
***Counsel for Plaintiffs Randolph N. Osherow, Chapter 7 Trustee, Debtors' Estate***

Dated July 11, 2025.

*/s/ Beverly A. Whitley*
Beverly A. Whitley

10802803  04251-00029