

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: November 25, 2025.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-50900-CAG |
| | § | |
| LEGENDARY FIELD EXHIBITIONS, LLC, et al., | § | |
| | § | |
| Debtors. | § | CHAPTER 7 |

| | | |
|---|---|---|
| RANDOLPH N. OSHEROW, | § | |
| Chapter 7 Trustee for the Bankruptcy Estates Of Legendary Field Exhibits, LLC, et al., | § | |
| | § | |
| Plaintiff, | § | |
| | § | ADV. NO. 22-05078-CAG |
| v. | § | |
| | § | |
| THOMAS DUNDON, JOHN ZUTTER, and DUNDON CAPITAL PARTNERS, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S FIRST AMENDED COMPLAINT (ECF NO. 56)

Introduction ............................................................................................................. 4

Jurisdiction ............................................................................................................. 4

Background ............................................................................................................. 4

Chapter 7 Case Procedural History ........................................................................ 7

    Colton Schmidt and Reggie Northrup v. AAF Players et al. ............................... 7

    Dundon Capital Partners v. Charles Ebersol, Adversary No. 22-05077-cag ........... 10

Procedural History, Adversary No. 22-05078-cag ............................................... 12

Parties' Contentions ............................................................................................. 13

Summary of Witness Testimony and Credibility Determinations ........................ 15

Findings of Fact ................................................................................................... 45

Background ........................................................................................................... 46

    Parties ............................................................................................................... 46

    ESMG and Its Operations ................................................................................. 47

    The Fowler investment ..................................................................................... 54

    AAF's Television Contracts and Ratings ......................................................... 58

    Negotiations Involving the DCP Investments ................................................... 60

    The Term Sheet ................................................................................................. 67

    The ESMG Board and Shareholders Ratified the Term Sheet .......................... 76

    No Oral Agreement for $250 Million ............................................................... 80

    Dundon Breached His Fiduciary Duty .............................................................. 89

    Breach of Fiduciary Duty ................................................................................. 96

    Unjust Enrichment ........................................................................................... 96

    The League Failed ............................................................................................ 97

    ESMG (Dundon and Zutter) and its Related Entities
    Elect to File Chapter 7 Bankruptcy ................................................................ 103

    Dundon Proof of Claim .................................................................................. 107

    Damages ......................................................................................................... 109

Discussion ........................................................................................................... 113

    I.     The Court Declines to Reconsider Defendants' Arguments
          Regarding the Term Sheet. ................................................................... 113

    II.    Valid and Enforceable Oral Contract ................................................... 115

       A.   DCP and DDFSP were the investors in the oral contract. ............... 118

       B.   Consideration is proper and sufficiently definite. ........................... 119

       C.   The oral contract was for equity investment. ................................... 123

       D.   Judicial admissions do not render the contract vague. ..................... 125

III.    Dundon's Contract Formation Defenses...............................................................127

    A.    *ESMG ratified the parties' oral contract.*......................................................127

    B.    *Any alleged misrepresentations made by Ebersol do not prevent enforcement of the parties' contract.*...................................130

    C.    *The parties' contract was not impossible to perform.*.......................................131

IV.    Breach of Contract ...................................................................................................133

V.    Covenant of Good Faith and Fair Dealing...........................................................135

VI.    Breach of Fiduciary Duty.......................................................................................138

    A.    *Dundon and Zutter owed fiduciary duties to ESMG and its subsidiaries.*...........138

    B.    *The Court reviews Dundon's self-dealing under the entire fairness standard...*142

        1.    Spending Cuts ..............................................................................................145

        2.    Contracts ......................................................................................................146

        3.    Bankruptcy Filing .......................................................................................148

        4.    Outside Investments.....................................................................................152

        5.    Advertising...................................................................................................156

    C.    *Dundon failed to prove that the advertising transactions were entirely fair.*......157

    D.    *Trustee failed to prove monetary damages.*....................................................163

    E.    *Conclusion* ...................................................................................................170

VII.    Promissory Estoppel ...............................................................................................171

VIII.    Common Law Fraud; Fraudulent Misrepresentation; Constructive Fraud; Fraudulent Non-disclosure ...................................................175

IX.    Fraudulent Inducement ...........................................................................................177

X.    Negligent Representation.........................................................................................178

XI.    Unjust Enrichment ..................................................................................................179

    A.    *Texas law applies to the unjust enrichment claim.*.........................................180

    B.    *Defendants were not unjustly enriched under Texas law.*.................................181

    C.    *Even if Delaware law applied, Defendants were not unjustly enriched.*.............185

XII.    Disallowance of Claims ..........................................................................................187

XIII.    Equitable Subordination..........................................................................................192

Conclusion ......................................................................................................................198

## INTRODUCTION

Came on to be considered for trial the First Amended Complaint (ECF No. 56) of Plaintiff Randolph N. Osherow ("Trustee" or the "chapter 7 trustee"), and the consolidated bankruptcy estates of Legendary Field Exhibitions, LLC ("LFE"); AAF Players, LLC ("AAF Players"); AAF Properties, LLC ("AAF Properties"); Ebersol Sports Media Group, Inc. ("ESMG"); LFE 2, LLC ("LFE 2"); and We Are Realtime, LLC ("Realtime") (collectively "Debtors" or "Plaintiff") and Defendants Thomas Dundon, John Zutter, and Dundon Capital Partners, LLC's First Amended Answer ("First Amended Answer") (ECF No. 65).[1] Trial on the merits was heard on April 14, 15, 16, 17, 21, 22, 23, 24, 29, and 30; May 1, 28, 29, and 30; and June 2, 3, 4, 5, and 6, 2025. Closing arguments were heard on June 30, 2025. For the reasons stated herein, the Court **GRANTS IN PART** and **DENIES IN PART** the claims asserted in Plaintiff's First Amended Complaint (ECF No. 56).

## JURISDICTION

This Court has subject matter jurisdiction over the First Amended Complaint pursuant to 28 U.S.C. § 1334(b). Trustee's claims are core proceedings under 28 U.S.C. § 157(b)(2)(A), (B), (C), (H), and (K). Venue is proper under 28 U.S.C. §§ 1408 and 1409. Plaintiff and Defendants consent to a final order or judgment in this Adversary Proceeding.[2] This matter is referred to this Court pursuant to the District Court's Order of Reference.

## BACKGROUND

This case arises from the creation and dissolution of the Alliance of American Football ("AAF" or the "League"), an alternative professional football league. According to Plaintiff's

---

[1] "ECF" denotes electronic filing docket number in Adversary No. 22-05078-cag unless otherwise indicated. Unless otherwise indicated, Defendants refer to Thomas Dundon, John Zutter, and Dundon Capital Partners, LLC.
[2] ECF No. 300, ¶ 9.

First Amended Complaint, the idea for AAF was first conceived in 2017 by Charles "Charlie" Ebersol and others as a developmental football league for highly touted collegiate players and former NFL players to gain exposure and garner interest from NFL teams.

AAF sought to improve upon previously unsuccessful alternative professional football leagues in innovative and creative ways. For example, AAF aspired to be a true developmental partner to the NFL, like other professional league relationships, such as the National Basketball Association's ("NBA") "G League" and Major League Baseball's ("MLB") Minor League. Negotiations between AAF and the NFL regarding a potential partnership began as early as October 2018. Additionally, AAF was designed to introduce cutting-edge technology that would allow for instantaneous metric data from the games to be collected and viewed by fans via AAF's app. AAF envisioned that this data—in addition to being used by the teams for scouting and player evaluation—would be used to create enhanced wagering opportunities for fans. These new ideas made AAF attractive to potential investors.

Initially, AAF had financial backing from Reginald Fowler, a former part-owner of the Minnesota Vikings of the NFL. During the pendency of AAF's first season, Fowler's investment commitment fell through because of accusations of financial crimes against him. In the market for new investors, Ebersol, on behalf of AAF, engaged Erik Anderson about a potential investment.[3] The First Amended Complaint alleges that Anderson, instead of investing in AAF himself, told Thomas Dundon about the investment opportunity.[4] Dundon called Ebersol to discuss the details of a potential Dundon investment in AAF.

The First Amended Complaint alleges that Ebersol and Dundon agreed that Dundon would

---

[3] According to the Complaint, Erik Anderson owned a large stake in Top Golf with Defendant Dundon. ECF No. 1, ¶¶ 50–51.
[4] Dundon has had several successful business ventures, such as Santander, Top Golf, and Carvana, but he is now known for his ownership of an NHL hockey team, the Carolina Hurricanes.

provide $250 million to fund AAF for the rest of the first season and beyond. There is no written document evidencing that both parties fully executed the Term Sheet for Series 2 Preferred Stock Financing (the "Term Sheet"); only Ebersol's signature appears on any of the versions of the document that formed the basis of the Dundon commitment and investment. Trustee alleges that Dundon made several public statements confirming his intention to invest $250 million in AAF for the first year and beyond.

On or around February 13 or 14, 2019, Dundon or his agents sent Ebersol the Term Sheet, which provided that Dundon would immediately send AAF an investment of $5.1 million and up to $70 million upon request. Ebersol inquired about the discrepancy between the Term Sheet and the $250 million investment they had allegedly agreed upon. The First Amended Complaint states that Ebersol received assurances from Dundon that the deal had not materially changed and that he still intended to invest $250 million. Once the Term Sheet was thought to be executed, Dundon and his business partner, John Zutter, became controlling members of AAF.

Throughout the following weeks, Dundon—as sole manager of DDFS Partnership, LP ("DDFSP")—wired a total of $69,719,190 to AAF. The First Amended Complaint states that this amount was not sufficient to keep AAF operating, and that the success of the League was dependent on the full $250 million commitment from Dundon. Dundon was allegedly unhappy with AAF's operations and began implementing cost-saving measures. After reportedly laying off employees and declining to fund marketing efforts, Dundon allegedly directed Zutter to engage bankruptcy counsel for AAF.

AAF and its associated debtor corporate entities filed for chapter 7 bankruptcy protection on April 17, 2019. All the entities' bankruptcy cases were consolidated. Randolph Osherow was appointed as Trustee to administer the consolidated debtors' estates. This adversary was initiated

on November 14, 2022, with the filing of the Original Complaint.[5]

### CHAPTER 7 CASE PROCEDURAL HISTORY

After the bankruptcy cases were filed on April 17, 2019, a Motion for Substantive Consolidation was filed on May 9, 2019.[6] During the initial stages of the consolidated cases, Trustee had the difficult task of locating, storing, and selling personal property. AAF and its investors owned eight teams; as such, any equipment, uniforms, big screen TVs, and cameras were league-owned and had to be collected and organized for liquidation.[7] AAF controlled accounting and management functions; as such, AAF conducted team operations and was responsible for all facets of a team's operations. To date, Trustee has liquidated all personal property, and the only source of recovery for creditors is this lawsuit.

### *Colton Schmidt and Reggie Northrup v. AAF Players et al.*

One week prior to AAF filing bankruptcy, Colton Schmidt and Reggie Northrup, individually and as putative class representatives of all AAF players, filed suit on April 10, 2019, in the Superior Court of California, County of San Francisco, alleging multiple claims for relief against some of the defendants in this case: Charles Ebersol and Thomas Dundon for failure to perform on the player contracts ("Standard Player Agreement" or "SPA"). Briefly, AAF was unique in that all players were compensated the same amount regardless of position and were paid under a standard player contract that provided for a graduated increase in base salary over the three-year period. The contracts contained other financial incentives a player could earn that are not relevant here. Schmidt and Northrup alleged that AAF, Ebersol, and Dundon breached the

---

[5] ECF No. 1.

[6] Case No. 19-50900-cag, ECF No. 34. An Order substantively consolidating the bankruptcy cases was entered on July 8, 2019. ECF No. 150.

[7] Case No. 19-50900-cag, ECF No. 36; ECF No. 80; ECF No. 45; ECF No. 82. Trustee's Report of Sale stated that the football equipment sold for $455,000.00. ECF No. 156.

player contracts by failing to pay them. Northrup and Schmidt also alleged other claims related to AAF's failure to pay them.[8] After the consolidated bankruptcy cases were filed, this lawsuit was removed to the United States District Court for the Northern District of California, which subsequently transferred the case to the United States District Court for the Western District of Texas. The District Court for the Western District of Texas then referred this case to this Court.[9]

After this lawsuit was referred to this Court, there was protracted litigation over the merits of the Original Complaint, which involved multiple motions to dismiss with several amendments to the complaint. In addition, the Court had to rule on the merits of class certification and whether Schmidt and Northrup could serve as class representatives. Also, the chapter 7 trustee objected to the players' proof of claims, asserting that the players were priority wage claimants for part of their unpaid salaries under the player contracts. The Court subsequently consolidated the chapter 7 trustee's objection to players' proofs of claim and this adversary proceeding for further disposition.

Thereafter, the chapter 7 trustee, Schmidt and Northrup as putative class representatives for all of the AAF players, and Ebersol requested that the Court approve a settlement agreement that provided in relevant part: (1) that the AAF players were a certified class; (2) appointment of Schmidt's and Northrup's counsel as class counsel; (3) that Schmidt and Northrup were lead class plaintiffs; (4) that players who opted into the class would receive an allowed priority wage claim for $13,650.00 under 11 U.S.C. § 507(a)(4); (5) that the class of players would receive a general unsecured claim for $180,000.00 representing second and third year compensation under the SPA; (6) lead plaintiffs would receive an additional unsecured claim for $135,000 for acting on behalf

---

[8] The original complaint filed in California Superior Court included claims for breach of contracts; breach of implied covenant of good faith and fair dealing; promissory estoppel; failure to pay wages; violation of business and professions code; fraud; false promise; and inducing breach of contract.
[9] Adv. No. 19-05053-cag, ECF No. 1.

of the settlement class for their time and expense; (7) that plaintiffs would retain all claims against Dundon; (8) that class counsel would receive a 33% payment out the settlement proceeds from distributions to class members; and notably (9) the class plaintiffs assigned all rights and interests (with some conditions and reservations of rights) to the chapter 7 estate against the Debtors and Ebersol and the right of recovery for certain damages against Dundon.[10] The effect of this settlement was to waive any estate claims against Ebersol, such that the Trustee would be the assignee of all AAF player claims against Dundon.

The defendants filed a response in opposition, arguing that players were not entitled to wage priority status. The defendants also claimed Ebersol gained a waiver of claims against him in exchange for his testimony in support of the plaintiffs, putting the integrity of the bankruptcy system at risk because Ebersol would be rewarded for his testimony against Dundon and his entities.[11]

The initial motion sought approval of class certification, designation of Schmidt and Northrup as class representatives, and appointment of class counsel.[12] The Court granted the parties' initial request to approve class certification and provide notice of the proposed settlement to the class of AAF players.[13] After the class of players had the opportunity to opt into the settlement, the Court issued its order approving the settlement agreement; certifying the class; appointing class counsel and class representatives; and approving compensation of class counsel.[14]

After the class certification and settlement agreement were approved, plaintiffs, the chapter 7 trustee, and Ebersol requested the Court grant a partial judgment as to the claims resolved

---

[10] Adv. No. 19-05053-cag, ECF No. 175.
[11] *Id.* at ECF No. 187.
[12] *Id.* at ECF No. 194.
[13] *Id.*
[14] *Id.* at ECF No. 215.

9

by the final settlement order. The parties argued that there was no longer a dispute between the settling parties, and, therefore, the Court should grant the entry of a partial judgment.[15] Given that there were no remaining disputes or claims between the settling parties, the Court granted a partial final judgment under Federal Rules of Civil Procedure 54(b) ("FRCP").[16] As a result of the settlement and partial final judgment, the only remaining claims were those asserted against Dundon individually for damages related to Dundon's failure to pay any amounts in excess of or separate from the amounts not paid under the SPA. Because the plaintiffs assigned their claims against Dundon and his related entities to Trustee, plaintiffs elected to enter a stipulation of dismissal with the defendants with prejudice under FRCP 41 to resolve the adversary proceeding.[17]

### *Dundon Capital Partners v. Charles Ebersol, Adversary No. 22-05077-cag*

After the AAF player litigation was concluded, Dundon and his entities, Trustee, and Ebersol initiated litigation against one another. In this adversary, Dundon Capital Partners ("DCP") asserted that Ebersol made material misrepresentations to DCP to induce DCP to invest in AAF and omitted material facts regarding AAF's finances. DCP pled claims for fraudulent inducement; violations of the Texas Securities Act; and violations of the Texas Business and Commerce Code for false promises and representations. When the instant adversary (22-05078-cag) was filed, the parties recognized that many of the operative facts for both adversaries were the same. As such, the parties worked collaboratively to conduct discovery for both adversary proceedings. Both adversary proceedings were tracked through the same litigation process using the same scheduling order in both cases.[18] The parties then agreed to consolidate Adversary

---

[15] *Id.* at ECF No. 219.
[16] *Id.* at ECF No. 222.
[17] *Id.* at ECF No. 236.
[18] *See* Adv. No. 22-05077-cag, ECF No. 50; *id.* ECF No. 57.

Nos. 22-05077 and 22-05078 for a joint trial.[19]

Defendant Ebersol moved for summary judgment arguing that (1) DCP lacked standing to pursue claims against Ebersol because DCP did not loan the money to ESMG and did not suffer an injury in fact; (2) that DCP did not suffer any damages because of Ebersol's alleged misconduct because DDFSP loaned the money to ESMG; (3) that there are no statutory and securities fraud claims because no stock was sold or conveyed to DCP; and (4) that there was no competent summary judgment evidence to support DCP's fraud claims.[20] After both parties finished briefing the issues raised in the summary judgment motion, and the Court ruled on objections to summary judgment evidence, the Court granted Ebersol's Motion for Summary Judgment.[21] Based on the competent summary judgment evidence, or lack thereof, the Court found that under Delaware law, DCP's failure to sign the term sheet resulted in no binding written contract, such that DCP had no standing to pursue this case.[22] Second, there was insufficient evidence to raise an issue of material fact on the issue of injury in fact for consideration of DCP's standing at trial. Rather, the uncontradicted evidence shows DDFSP paid ESMG and DDFSP took the loss, not DCP. Therefore, the Court found DCP lacked an injury in fact under Article III of the Constitution.[23] Third, because the Court found an absence of a written contract and that Dundon failed to undertake any diligence on any of the alleged misrepresentations Ebersol made, there could not be any justifiable reliance to support any fraud claims.[24] Finally, the Court held that the securities fraud claims failed as a matter of law because no stock was conveyed.[25] The Court's granting of

---

[19] *Id*. at ECF No. 85; ECF No. 88.
[20] *Id*. at ECF No. 101.
[21] *Id*. at (ECF No. 171.
[22] *Id*. at ECF No. 71, 7–13).
[23] *Id*. at ECF No. 71, 15–16.
[24] *Id*. at ECF No. 71, 17–20.
[25] *Id*. at ECF No. 71, 20–23.

Ebersol's summary judgment resulted in a take-nothing judgment in favor of Ebersol.[26]

## PROCEDURAL HISTORY, ADVERSARY NO. 22-05078-CAG

Trustee filed his Original Complaint in this case on November 14, 2022, alleging 17 claims for relief, including claims that the AAF players assigned to Trustee.[27] Defendants filed their Motion to Dismiss, seeking dismissal of all claims.[28] After extensive briefing, the Court granted in part, and denied in part, Defendants' Motion to Dismiss.[29] Plaintiffs then filed their First Amended Complaint on November 27, 2023.[30] Defendants timely filed their First Amended Answer and affirmative defenses on December 22, 2023.[31] There were multiple discovery disputes and requests for protective orders to preclude publishing alleged sensitive or confidential information during the discovery period.

In late 2024, at the close of discovery and dispositive motions, Defendants timely filed their summary judgment motions.[32] Additionally, the parties objected to each other's summary judgment evidence. After disposing of all the objections, the Court held a hearing on Defendants' summary judgment motions on February 4, 2025. The Court denied Defendants' Motions for Summary Judgment.[33] Shortly thereafter, Trustee attempted to amend his Complaint based on the discovery that neither Dundon nor any other representative of DCP signed the Term Sheet, thereby indicating that there was no written contract.[34] Defendants sought leave of court to amend their

---

[26] *Id.* at ECF 180. DCP timely exercised its right of appeal. ECF No. 183.
[27] ECF No. 1.
[28] ECF No. 18.
[29] ECF No. 54. The Court denied the Motion to Dismiss as to some claims, allowed repleading on other claims, and dismissed one count with prejudice. As to the claims that were subject to further amendment, the Court granted Plaintiffs 14 days to replead, or those claims would be dismissed with prejudice.
[30] ECF No. 56.
[31] ECF No. 63.
[32] Dundon and DCP filed their motion jointly. ECF No. 173. Zutter filed his individually. ECF No. 175.
[33] ECF Nos. 281, 292.
[34] ECF Nos. 247, 249, 255.

answer to include the affirmative defense of merger.[35] Both motions were denied as untimely and prejudicial.[36] After roughly two and a half years from the filing of the original complaint, dozens of pretrial motions, several summary judgment motions considered and denied, this Adversary Proceeding advanced to trial on April 14, 2025, taking 21 days to try and argue over a period of 78 calendar days.

**PARTIES' CONTENTIONS**

The parties filed their Joint Pre-Trial Order on April 9, 2025.[37] The Court notes that, despite the parties' disagreement on many facts and the law, the lawyers in this case adhered to the highest level of civility, professionalism, and candor toward the Court. The Court describes the contentions below as follows.

Trustee, through his primary witness, Charlie Ebersol, argues that when Ebersol decided to start AAF, he solicited the advice and support of persons with NFL and football experience. Ebersol used his connections through his father, Dick Ebersol (of NBC Sports and Olympic fame), to attract interest in a spring league that Ebersol believed would be unique, as described herein. Ebersol believed that with the support of Reggie Fowler as his primary investor, AAF could sustain itself through the first year of operation. Based upon what Ebersol thought he could do in marketing AAF to attract more investment, Ebersol hoped that with television and cable exposure, AAF could establish itself as a spring football alternative. AAF's technology was creative and new, and Ebersol believed that he could cultivate a partnership with the NFL.

Once the Fowler funding became problematic, Ebersol lacked the resources or investment

---

[35] ECF No. 246.

[36] ECF Nos. 269, 267.

[37] ECF No. 300. The Joint Pre-Trial Order is 123 pages, excluding the attached exhibits. The Pre-Trial Order lists 13 stipulated facts and 11 stipulations as to what law (Delaware, Texas, or federal law) applies.

base for AAF to launch its first games. Tom Dundon was the only alternative that could support AAF through its first season. Dundon's investment and control of ESMG removed Ebersol's and the previous ESMG board members' decision-making power and control over AAF. Dundon and his designated representative, John Zutter, determined early on that AAF needed to rid itself of unfavorable media contracts, vendor deals, and personnel. As a result, Ebersol stated that Dundon would not consider other investors or sponsors, with the attendant effect that Dundon would be the only source of funding for AAF. Further, Ebersol maintained that Dundon had always represented to him that Dundon would fund AAF beyond its first year of operations. When Dundon told Ebersol that he would not provide any funding beyond roughly $70 million, Dundon knew, based on the available financial information, that AAF would lose money in its first year and would fail. Ebersol says that Dundon orchestrated AAF's demise for the sole purpose of divesting AAF of its most important assets: its technology and player contracts.

Ebersol says that Dundon gave him assurances about the $250 million investment, and this representation provided Ebersol with false hope about the success of AAF. Ebersol relied upon Dundon's statements to the media and other persons connected with AAF that Dundon was committed to the long-term success of AAF. Trustee argues that Dundon did no due diligence into AAF's financial condition. As such, any evidence about AAF's misrepresentations regarding AAF's financial condition is unavailing because Dundon made no effort pre-investment to ascertain AAF's financial stability. Ebersol maintains that through Dundon's and Zutter's control, they breached their fiduciary duty to the ESMG board, AAF's investors, and the players. Had Dundon acted with AAF's best interests in mind, Dundon could have facilitated AAF's survival.

Dundon, Zutter, and DCP see it differently. Dundon is steadfast in his statements that he never told Ebersol, AAF, or his employees that his commitment or investment exceeded

$70 million. Dundon maintains that his media statements were nothing more than "puffery" and intended to market AAF. Further, Dundon and Zutter maintain that contractually, DCP was only committed to the $70 million investment. Dundon notes that AAF was financially insolvent when he and Zutter took over and that Dundon wanted all media and vendor contracts renegotiated to reduce costs and achieve viability. Moreover, AAF's business model was not sustainable. Further, when DCP employees reviewed accounts payable and vendor agreements, they realized that a $70 million investment was woefully inadequate to fund AAF. Dundon says that he, Zutter, and DCP reached the difficult decision that AAF could not survive under its present structure and that bankruptcy and/or an asset sale were the only options to salvage AAF. Dundon insists he wanted AAF to succeed, but by the time he and DCP became involved, there was not enough cash or time for them to keep AAF alive.

### SUMMARY OF WITNESS TESTIMONY AND CREDIBILITY DETERMINATIONS

The Court heard from 23 witnesses and admitted hundreds of exhibits. The Court will briefly summarize each witness's testimony for context, subject to making findings of fact, and provide its evaluation of each witness's credibility. The operative events in this litigation occurred more than five years ago—many of the witnesses have not thought about the events of late 2018 and January–April 2019. Understandably, some witnesses do not recall much from their involvement in AAF or DCP at that time. Nonetheless, given that the parties dispute much of what happened, credibility and recollection are paramount in this Court's findings of fact.

**Roger Goodell**

Roger Goodell, Commissioner of the NFL, testified by video for roughly 25 minutes. Goodell vaguely recalled discussing the possibility of an NFL developmental league concept with Ebersol. Goodell was aware of the possible technological aspects of AAF but could not offer an

opinion on AAF's viability. Goodell stated that spring leagues are inherently problematic and unsuccessful. Goodell's testimony was credible but of little probative value other than his acknowledgment that spring football leagues are unsuccessful.

**Charles Ebersol**

The Court finds Mr. Ebersol charismatic, engaging, creative, driven, and smart. Ebersol was well-liked by AAF employees, and AAF staff appeared to respect him. Nonetheless, Ebersol's testimony over multiple days was inconsistent at times and questionable regarding operative facts. His direct examination was, at times, confused and disorganized, which did not enhance his credibility. Ebersol professed concern for the AAF players, yet Ebersol allowed AAF to play the first game of the season with insufficient funds to pay the players. Ebersol was unwilling to put his personal resources into AAF to pay players or sustain AAF operations. While Ebersol appeared sincere in his testimony on behalf of Trustee and the players, the reality is that he was testifying in exchange for his release from any liability to Trustee or the players, with the added incentive of possibly recovering something in this litigation if Trustee is successful.

Ebersol testified credibly about his business plan for AAF, and he was thoughtful in selecting his support personnel and AAF team coaches. The Court recognizes that Ebersol had no control over Fowler's demise as an investor, which served as the catalyst for Dundon's involvement. While Ebersol discussed investing in AAF with several investors, little capital was actually raised. Ebersol testified that his initial conversations with Dundon centered on obtaining a bridge loan to meet immediate financial needs (such as paying the players for their first game), and that Dundon raised the idea of a much higher financial investment. Ebersol's recollection of the terms regarding the investment is not any more probative than what Dundon testified; Ebersol could not recall how the investment would be made, the terms, the structure (equity or debt or a

combination), or what Dundon's role would be after the investment. Notably, at no time during Ebersol's examination did Ebersol say he thought Dundon's alleged investment of $250 million was "puffery" or for media purposes only. Ebersol consistently maintained that Dundon told Ebersol that he would invest $250 million in AAF. Ebersol also testified credibly that Dundon did not conduct any pre-investment due diligence and did not want access to any data room containing AAF financial information.

Ebersol's testimony was less than clear as to whether he solicited ESMG board approval of Dundon's investment or complied with the ESMG governing documents regarding board approval prior to Dundon's investment and dissolution of ESMG stock. Ebersol was unclear if stockholders knew that their stock was being diluted until after DCP acquired 75% of ESMG. Ebersol acknowledged that, prior to Dundon's investment, AAF had over 1,000 employees, including players, and that if Fowler had made his full investment of $250 million, AAF would have operated at a loss—even with revenue. Ebersol agreed that internally, AAF staff had advised him that projections showed AAF was underfunded and unable to pay vendors and media outlets. Ebersol also testified that he had little involvement in the decision to file for bankruptcy or in determining which chapter ESMG and related entities should file under.

In sum, while the Court found Ebersol's testimony credible at times, Ebersol was not any more credible than Dundon about Dundon's investment or the terms of his investment. Ebersol was evasive about AAF's financials and reluctant to testify about AAF's failure to pay players or vendors. While the Court recognizes that Dundon conducted no due diligence, such that there was no justifiable reliance under a claim of fraud, neither Ebersol nor AAF accurately portrayed the state of financial distress AAF was in at the time Dundon made his investment.

**Gabriel Giordano**

Gabriel Giordano is a former BYU football player who has coached high school football. Giordano previously knew Ebersol from another sports venture and was intrigued by AAF model. He lives in San Diego and, given that San Diego no longer had an NFL team, believed there was potential for an AAF team there. Giordano asked Ebersol about being involved in AAF, and Ebersol suggested that he lead the local effort to attract investors through the "FANchise" model, which allowed an investor to invest locally in an AAF team. Giordano took the initiative to contact local investors to invest in the San Diego AAF team. Giordano stated that once Dundon invested in AAF, Giordano was terminated because Dundon did not believe that outside investment was necessary. Giordano was not privy to the DCP/AAF negotiations regarding Dundon's investment and did not have any personal knowledge about Dundon's investment. While Giordano was credible, his testimony was of limited value, other than to underscore Ebersol's plan to attract local investor interest through FANchises, which was unsuccessful and raised little money.

**Megan Hanson**

Megan Hanson was responsible for public relations and media communications for ESMG/AAF. She worked for Ebersol in one of his other companies before joining ESMG. She now works for Ebersol in one of his current ventures. Hanson testified that she thinks Ebersol is honest. Hanson was credible. She had a firm recollection of her involvement in ESMG and testified convincingly about the events regarding the media publication of Dundon's investment. While Hanson did not recall everything about her time at ESMG, when she did recall something, the Court had the definite belief that her testimony was accurate and true.

Hanson initially became involved with AAF when training camp began, and AAF wanted to publicize training camp in San Antonio and the League's start-up. She talked daily with Ebersol.

18

Hanson was intimately involved in the Carolina Hurricanes' press release regarding Dundon's investment in AAF. Hanson explained that, based on her experience in public relations, it is not wise to be overly specific in media blasts, as they could be misinterpreted. She explained that Dundon wanted to see the drafts of the press release and that Dundon was most anxious to publicize his investment in AAF. Several persons were involved in writing the press release, and several drafts were circulated. Hanson cautioned them about using too much hyperbole or too many details. Hanson further suggested not including any specifics regarding financial information. Dundon told Hanson that he wanted the AAF press release to state that he was making an investment of $250 million in AAF. Hanson acknowledged that she did not comment on the use of the word "commitment" versus "investment" in the press release. Hanson also testified that she was not part of the changes being made to the press release. Hanson acted as the conduit to Ebersol and Dundon regarding any AAF media communications.

Hanson stated that Dundon leaked the press release to a local sports reporter, which was not her advice on how to publish the press release. When AAF decided to cease operations, Hanson discussed with Zutter how best to publicize that AAF was ceasing operations. Zutter told Hanson that he did not want any attribution to who decided to cease operations.

**Thomas Dundon**

Dundon is a self-made billionaire. Dundon has a world-class business acumen and is adept at making marginal companies profitable. Dundon is well regarded in the business community, but several witnesses opined that Dundon is not particularly warm or personable. Nonetheless, every witness who commented on Dundon's personality praised him for his personal accomplishments.

Before trial, Dundon consistently maintained that he was only making an initial investment in AAF for $70 million and that any commitment to invest up to $250 million was contingent on

several unspecified conditions. Dundon said that his initial impression of Ebersol was that he was energetic and charismatic. His recollection regarding his acquisition of AAF is unclear. Dundon acknowledged that he expanded Ebersol's initial request for Ebersol to fund player payroll and make a bridge loan that went from $10 million to an investment of $70 million. Dundon, notwithstanding all his business and financial acumen, could not recall the initial terms of the AAF deal and any specifics about how his investment would fund AAF; the structure of the investment (equity, debt, or a combination); what percentage of AAF Dundon or DCP would receive as part of any investment in AAF; or how Dundon would obtain control of AAF.

Dundon used the words "commitment" and "investment" interchangeably, attaching different significance to each word depending on what part of the AAF deal he was explaining. Dundon stated during his trial testimony that he did tell Ebersol about the potential for a $250 million commitment, but for the first time in Court (after three depositions), Dundon said his use of the words "$250 million commitment" was merely puffery and marketing. Neither Dundon nor Ebersol disputes that Dundon said $250 million during Dundon's acquisition of AAF, but both disagree as to the context and terms of what $250 million meant. Other than various press releases stating $250 million commitment or investment, nowhere is there proof of $250 million investment being part of the Term Sheet.

Trustee tried to elicit testimony from Dundon that the purpose of the AAF acquisition was to take advantage of the tax benefits associated with investing in economic opportunity zones. The Court could not discern from Dundon's testimony or admitted exhibits that achieving tax attributes was the motivating reason to acquire AAF. Rather, the testimony from Dundon and others was that because Dundon was unable to buy an NFL team, owning the Hurricanes was the next best thing alternative to owning a sports franchise. Also, because Dundon was unable to buy an NFL

team, he was attracted to buying a football league.

Dundon testified about matters that related to his fiduciary duty to AAF. Dundon stated that he neither attempted nor allowed outside investment in AAF once he acquired it. Dundon agreed that he and Zutter initiated cost-saving measures on vendor and media contracts and required AAF employees to compromise outstanding balances. More troubling, evidence was clear that while AAF employees were negotiating reductions in unpaid bills, Dundon and Zutter had no intention of paying any reductions on delinquent bills and did not authorize payment of most of the compromised bills. Also, Trustee intimated that Dundon's assurances of a $250 million commitment were to persuade the AAF players to continue to play, notwithstanding that $70 million could not sustain AAF operations for the entire season. Prior to filing bankruptcy, Dundon knew by late March 2019 that AAF was not sustainable based on revenue projections and available cash. As such, Dundon and Zutter explored filing options for bankruptcy without ESMG involvement or Ebersol's consent. Dundon asked Ebersol to come up with options to save AAF, but ultimately concluded bankruptcy was his only option. Dundon could not explain or recall his decision-making process about filing bankruptcy or why Dundon and Zutter chose to file under chapter 7 of the Bankruptcy Code, other than he took the advice of counsel on filing bankruptcy. Most importantly, Dundon's testimony was no more credible than Ebersol's on what "the deal" was such that the Court cannot weigh either Dundon's or Ebersol's testimony more favorably— they cancel each other out.

**Walter Ballard**

Walter Ballard was the corporate representative under Rule 30(b)(6) for PricewaterhouseCoopers ("PwC"). He was designated as a witness to testify as to tax attributes for the Dundon entities. Ballard testified in the course of his work for Dundon that he had worked

closely with John Zutter and Jeffrey Vanderbilt of DCP. Ballard was asked to review the term sheet, which he referred to as "Project Football." Ballard was also asked to consider the tax attributes connected to acquiring AAF. In particular, Ballard was asked whether acquiring AAF and treating it as an "economic opportunity zone" would allow Dundon to reduce his overall tax liability.

Ballard had little recollection regarding the Term Sheet or the terms of the parties' contract. Ballard was also unsure if he had any direct discussions with Dundon or his team about the benefits of acquiring AAF and using it to acquire economic opportunity zone tax credits. Ballard was pressed about any net operating losses ("NOL") from AAF and how that might reduce Dundon's tax liability. Ballard explained that assuming there were NOLs from AAF, the tax benefits for Dundon using those NOLs would be limited at best. Ballard has no recollection that Dundon and Zutter considered the tax benefits of acquiring AAF. Also, Ballard said that while he was briefly involved in assisting Dundon and Zutter with a potential bankruptcy filing, he did not recall that they filed for bankruptcy to obtain a tax benefit.

The Court found that Ballard was credible and forthright. Ballard was unable to corroborate Trustee's theory that acquiring AAF was to enable Dundon to take advantage of an economic opportunity zone tax benefits or that the filing of bankruptcy had anything to do with tax considerations.

**Michael Sundheim**

Michael Sundheim was the media relations manager for the Carolina Hurricanes and served as director of hockey operations. Sundheim was responsible for promoting the team through media. Sundheim explained that the Hurricanes have internal protocols to ensure the accuracy of press releases but stated that the team did not correct errors or omissions present in press releases

procured from other parties.

Sundheim explained that he would get press releases from Megan Hanson on behalf of AAF. Sundheim did recall that Dundon was involved in the Hurricanes' press release regarding Dundon's acquisition of AAF. Also, Sundheim recalls that Dundon used the phrase "$250 million commitment" in the press release. Sundheim recalled that it was rare for Dundon to be intimately involved with any press release. Sundheim did not recall whether the AAF acquisition was for $70 million or $250 million, although Sundheim did recall making changes to the press release. Sundheim explained that if Dundon wanted to issue a press release on his own, he did not need to clear it through him. Sundheim was credible but had no recollection of what Dundon said other than what was contained in the Hurricanes' press release. Sundheim could not recall if Dundon intended to invest or commit $250 million into AAF.

**Kellie Vugrincic**

Kellie Vugrincic worked at AAF and was primarily responsible for payroll and human resources. She previously worked in the human resources department of the NBA's Golden State Warriors. She stated that she knew AAF was a start-up company and was familiar with the Fowler investment. Vugrincic testified that players not being paid the first week of the season was not the first time that AAF was in danger of not making payroll. She was also responsible for employee healthcare and "on boarding" of players—assistance with direct deposit for their checks, training camp details such as hotel stays and transportation. She was familiar with accounts payable as it pertained to human resources.

Vugrincic attended some of the meetings in Dallas in February 2019. She recalled meeting with Dundon, Zutter, and other members of DCP. They asked Vugrincic about her role at AAF and inquired about human resources. Vugrincic was appreciative that Dundon had knowledge of

managing a major sports team and how that experience assisted Dundon in understanding the structure of AAF. Vugrincic was aware of, but did not participate in, reducing claims or making decisions about which vendor to pay. Vugrincic did observe DCP personnel negotiating bills and instructing AAF personnel on which bills to pay. Vugrincic did terminate AAF personnel at DCP's direction.

Vugrincic mostly testified about the lack of certainty regarding whether the initial player payroll would be made and who would be the source of the funds. She also expressed frustration with the "false narrative" that player payroll would be paid during the first week of the season but was uncertain as to the source of the false narrative. Vugrincic was aware that without DCP's investment in AAF, AAF would have failed the first week of the season. Vurgrincic did not have any personal knowledge about the type of investment Dundon was making or any of the material terms of the investment. The Court finds Vugrincic credible and that the probative value of her testimony was that without Dundon's investment, AAF would have failed.

**Mark Teitelman**

Teitelman is a producer and director for live sports. He has an impressive work history in the sports industry, having worked for the NFL, Amazon's Thursday Night Football, and the NFL Combine and Draft. Teitelman is knowledgeable about live sports, particularly football, and how to interpret television ratings. He was attracted to the idea of a spring football league and the opportunity to run the TV production for AAF.

Teitelman explained that the AAF games were produced in Arizona and that the League produced two games per week. Teitelman said that remote production was new and innovative. Teitelman explained that the initial ratings for the AAF games were excellent across all demographic groups and that AAF either outperformed or was competitive against other broadcast

sports, such as the NBA and National Hockey League ("NHL"). Teitelman noted that both CBS and the NFL Network were pleased and surprised by how well AAF's ratings were. Teitelman noted that the AAF games on TNT also did well for a Saturday nighttime slot on a cable network.

Also, given that CBS and TNT were not interested in producing the AAF games, AAF elected to self-produce games, which gave AAF more control over its content. Teitelman acknowledged that AAF was having difficulty competing against the NCAA basketball tournament. In sum, Teitelman provided a good portrayal of how the AAF competed against other sports during the initial part of its season. The difficulty in evaluating Teitelman's testimony is how well AAF would have competed against golf, basketball, and hockey had it successfully concluded its season.

**Eric Anderson**

Eric Anderson owns and manages investment groups. He is the owner of West River Group. Anderson looks for long-term investments and reviewed the DCP/AAF term sheet. Anderson stated that he had a business relationship with Dundon and that he told Dundon about investing in AAF. Anderson could not recall any specifics about AAF and the term sheet. Anderson referred the possibility of investing in AAF to Dundon because he knew that Dundon was interested in investing in sports groups. Anderson explained that he generally does not invest in startups because of the significant need for capital and the risks of investing. In sum, the only probative testimony that Anderson provided was that he referred Dundon to Ebersol for investing in AAF.

**Craig Kessler**

Craig Kessler met Dundon in early 2016 when Dundon was on the board of Top Golf and Kessler worked there. Kessler described Dundon as a private person. Kessler said that Dundon is

smart, full of good ideas, and a good operator. Kessler noted that Dundon has an excellent track record in business. Kessler had no understanding of the Dundon investment in AAF or any of the terms of the investment. Kessler vaguely recalled discussing AAF with Zutter . Kessler could offer no probative testimony about Dundon's involvement in AAF.

**Daniel Miller**

Daniel Miller is a friend of Gabriel Giordano. Giordano sent Miller some information about AAF, including a PowerPoint about AAF and some financial information. Miller described AAF as an interesting concept, and he did meet with AAF representatives. Miller did consider purchasing a FANchise and investing $1 million. Miller did not enter into a formal agreement with AAF, and he believed at the time of making his investment that Fowler was still investing money in AAF. Miller was supportive of getting a team in San Diego. After Miller became aware of Dundon's investment in AAF, he elected not to pursue further investment in AAF. Miller has no recollection of what the Dundon investment was in AAF or the terms.

**Dawn Belt**

Ebersol described Belt as the attorney for ESMG. Belt works at the firm of Fenwick & West. She has an MBA and a law degree and describes herself as a corporate attorney. Belt attended some of the meetings in February 2019 between AAF and Dundon. She created some of the corporate documents for Debtors. Belt also took the minutes of the ESMG board meetings regarding the Dundon acquisition and worked on the Fowler investment. Belt explained that the Fowler investment was a mixture of equity and debt, and that if AAF were liquidated, then Fowler would have his stock liquidated first.

Belt had a limited recollection regarding the Dundon investment. She could not recall if it was for $70 million or $250 million. Belt understood that Dundon's Series 2 Stock would be a new

investment. Belt did not know if she had prepared the Term Sheet for the Dundon investment. She was familiar with the February 19, 2019 holder voting agreement that was a condition of Dundon's investment, such that Ebersol had Fowler's proxy to vote his shares.

Belt served as the ESMG secretary for the board meetings in late February 2019 and took minutes of the ESMG board's discussion. Belt has no recollection of Dundon investing $250 million in AAF, any draft of the Term Sheet indicating a $250 million investment, or a fully executed term sheet. Belt explained that, based on the ESMG governing documents, Ebersol could not, on his own, accept a $250 million investment without ESMG board approval. Belt understood that ESMG accepted roughly $12 million from DCP before board approval of the Dundon $70 million investment. Belt understood that Dundon got 75% of ESMG in exchange for $70 million investment. The ESMG board approved and ratified all prior actions involving Dundon investing $70 million.

Belt observed that there is no discussion in the ESMG minutes about an additional investment of $180 million or a total investment of $250 million. Belt did not recall if it was an event of default under the MGM financing documents for Dundon to have taken over majority ownership in ESMG. Also, Belt was unsure whether David Pottruck waived his rights under his loan documents to declare a default due to the Dundon investment and change of ownership. In summary, although Belt is a sophisticated attorney who was alleged to be ESMG's attorney and secretary, her memory and understanding of the Dundon transaction are poor at best. As such, Belt could not offer any credible testimony beyond what was contained in the minutes regarding Dundon and Ebersol's February 2019 agreement.

**Kevin Freedman**

Kevin Freedman testified that he met Ebersol in late 2017 and that his expertise is in

working with entrepreneurs and startups. Freedman acts as a consultant, providing guidance on strategies to help startup companies achieve success. Freedman explained that as a consultant, he was hired to secure funding for AAF. Freedman testified that he worked on negotiating the terms of the Fowler investment and drafting related documents. According to Freedman, Fowler's investment had two components: equity and a letter of credit. Freedman agreed that Fowler did not meet his funding commitments. Additionally, other than Fowler, Freedman had difficulty in soliciting investor interest because he knew little about AAF revenue and most investors wanted to know when AAF would become profitable before investing in AAF.

Freedman explained that he went from a consultant to AAF to being the Chief Operating Officer ("COO") for the non-football operations of AAF. Freedman focused his time on obtaining a binding agreement with the NFL and attempted to negotiate a term sheet with the NFL that would include a spinout for a technology company and AAF appearing on the NFL network.

Freedman stated that as training camp began, AAF spending requirements increased. Freedman was aware of the need for additional funding and attempted to secure additional investment in December 2018–January 2019. Freedman explained that he was unsuccessful and does not recall who he spoke to about the investment. Thereafter, Freedman knew that by the time AAF started playing games on February 9, 2019, cash flow was low and that AAF needed another source of funding other than Fowler.

Freedman said he was involved in negotiating the Term Sheet with DCP and had discussed the Term Sheet and its changes with Zutter and Belt. Freedman recognized that the $70 million was a red-line change, but he could not recall its origin. Freedman opined that the words "75% control" dictate ownership of AAF. Freedman saw both the Fowler and Dundon terms sheets, and he did not see anything in writing about an additional $180 million.

28

Freedman also worked with Dundon post-investment. Freedman recalled media interviews with Dundon and his use of the phrases "$250 million investment" and "my money is in the bank." Freedman observed Dundon instructing AAF employees to negotiate with vendors to reduce outstanding invoices. Freedman was involved in Dundon's discussions with the NFL Players Association ("NFLPA"), and it was Freedman's impression that if AAF achieved unspecified milestones, the NFL might consider a partnership with AAF.

**Kevin Farrell**

Farrell had an undefined role at AAF that he described as a "jack of all trades" role that included tracking expenses. Farrell testified that he initially served as a consultant to AAF and later became an employee with an unspecified role or title. Farrell was less engaged with the AAF's football operations. Farrell testified about the logistical challenges involved in managing eight football teams and their operations across eight cities. Farrell was aware that by the end of training camp, AAF had used up all of Fowler's funding and that AAF was on the brink of insolvency. Farrell knew that vendor claims needed to be paid, and that Ebersol was seeking new investors. Farrell estimated that the opening week vendor payables were roughly $10 million to $11 million. Farrell's testimony was consistent with that of other witnesses who stated that without the Dundon investment, AAF would have failed.

Farrell was privy to the Ebersol-Dundon discussions in February 2019 and said he knew a one-page deal was in the works to secure cash for AAF and football on the field. Farrell knew through Allen Kantowitz that there were accounts payable that needed to be paid immediately. Farrell was aware that there was an AAF accounts payable tracker, but was less clear about how accurate it was. Farrell attempted to keep DCP apprised of cash needs on a weekly or daily basis. Farrell understood that he needed either Vanderbilt's or Zutter's approval to pay bills. Farrell also

understood that any day-to-day AAF operational decisions required DCP approval. Farrell also testified that any settlement of an invoice required DCP approval.

**Jeffrey Vanderbilt**

Vanderbilt was the Chief Financial Officer ("CFO") for DCP and operated other Dundon businesses. Notably, Vanderbilt served as CFO of the Carolina Hurricanes, including running the arena where the Hurricanes played and ensuring compliance with the NHL's revenue-sharing agreement. Vanderbilt worked directly with Dundon and described him as direct and matter-of-fact, with an acute ability to turn failing businesses around. Vanderbilt had no role at either ESMG or AAF and was neither an employee nor a contractor for AAF. Vanderbilt reported directly to Dundon and worked closely with Zutter.

Vanderbilt stated that he did not know about AAF until after Dundon began discussions with Ebersol to acquire AAF. Vanderbilt acknowledged that he heard about Dundon's public statements about investing $250 million in AAF but did not question the veracity of Dundon's statements or their purpose. Vanderbilt said that he thought the limit of Dundon's investment in AAF was $70 million and that Vanderbilt's experience was that Dundon did not do a deal that was not well documented. Vanderbilt stated that his first task regarding AAF acquisition was to obtain Directors and Officers Insurance for Dundon and Zutter as board members of ESMG. Vanderbilt accessed the AAF data room. Vanderbilt did not recall seeing any financial projections. Although Vanderbilt was presented with several emails as either the originating or receiving party, he could not recall any specifics about AAF's cash needs, the status of any accounts receivable, or balances on any AAF employee credit cards. Vanderbilt said that AAF and its employees were cooperative, transparent about AAF's operations, and forthcoming with financial information during the Dundon acquisition of AAF.

Vanderbilt stated that shortly after the DCP meetings with AAF around February 14, 2019, he saw some financial projections and thought that if he could reduce expenses by roughly 30%, AAF might have survived its first year of operations. Vanderbilt agreed that DCP originally decided not to pay vendors, but later concluded that it might pay some vendors to maintain AAF's going-concern value. Vanderbilt stated that he met with Kevin Farrel of AAF almost weekly to identify all accounts payable due that week, and which accounts payable or vendor bills AAF could pay. Vanderbilt did not think the AAF acquisition was to take advantage of economic opportunity zones to reduce Dundon's tax liability.

Vanderbilt testified that DCP had to review AAF at two levels: team expenditures and league operations. Vanderbilt noted that team operations were conducted individually and that none of the teams had established good record-keeping practices. For example, Vanderbilt found that the teams lacked both a policy on travel and expenses and controls to monitor stadium contracts or vendor claims. Vanderbilt observed that the accounts payable tracker was inaccurate, negatively affecting financial forecasts and cash allocation to accounts payable. Vanderbilt conducted a financial analysis to determine whether AAF could operate on the remaining funds from the $70 million investment and concluded that AAF would need about $7 million per week. As AAF operated from week four of the season forward, Vanderbilt realized that AAF was losing more money than expected and could not sustain operations based on Dundon's remaining investment without more capital being infused into AAF. Vanderbilt explained that by week eight of the season, AAF would have to cease operations due to insufficient revenue and capital.

**Sonia Desai**

Sonia Desai was Plaintiff's expert on valuation. Desai works in Toronto with a public audit firm. Desai has certification as a professional accountant (Canada) and is a forensic accountant.

Desai has done business appraisals for over 18 years in several types of businesses but has not valued a sports team. Desai stated that, because AAF was in its infancy with little revenue, she examined other valuation variables, such as market transactions, debt versus equity, and asset and liability data.

Desai recognized that it was difficult to value AAF because it did not have a track record of performance. She concluded that the best way to value AAF was to treat it as a technology and sports league. Desai explained that she was hired to determine AAF's enterprise value ("EV") by valuing AAF based on its debt structure, equity, and cash reserves. Desai examined AAF's value the day before Dundon took over (February 13, 2029) and the day the AAF ceased operations (April 2, 2029). Desai gave no consideration to the effect of COVID on future AAF operations. Desai did not conduct any fraud analysis or breach-of-fiduciary-duty analysis. Desai considered the viability or failure of football spring leagues.

Desai explained that there were three primary ways she could value AAF based on its assets, income, or observable market transactions. She decided to value AAF based on market transaction and income because the asset approach would not consider the intangible value of AAF. In conducting her analysis, Desai did not question the reliability of any document. Desai determined that EV of AAF was $144.1 million on February 13, 2019, using the market transaction approach because AAF had limited historical income data. In reaching her valuation, Desai relied upon the Fowler and NFLPA transactions as the best indicators of value. She did not consider the Dundon investment in her analysis because it was disputed. She also considered AAF's projections in her analysis because she viewed them as reliable.

Desai acknowledged that, in preparing her report, she did not use the $82.5 million valuation that Ebersol and Dundon discussed in the term sheet negotiations around February 14,

2019, as an indication of value. Further, Desai made no adjustment for either AAF or DCP, causing AAF to fail. Desai also did not include causation in her computation of damages. Additionally, Desai declined to calculate the loss of marketing on AAF, the lack of sponsorships, or the absence of digital revenue. In addition, Desai failed to recognize that the $1 million Bird investment was returned, rendering her reliance on the $115 million valuation moot. Further, the deal with CBS to broadcast games was never executed, and no warrants were exercised with the NFL/32 equity deal. Also, Fowler made his investment on November 21, 2018, and Desai used a valuation date of February 13, 2019, 84 days after Fowler's investment.

In sum, while the Court believes that Desai is competent, her methodology is unreliable and fails to account for all the variables affecting AAF's value. Desai made unrealistic assumptions and failed to consider several factors that would have reduced her valuation of AAF. More importantly, the data points she used to reach her value—the Fowler investment, the CBS deal, and the NFL/32 equity investment—were unreliable. Finally, Erica Bramer, Defendants' expert, demonstrated that Desai's analysis was plagued by improper assumptions and a reliance on AAF data that was clearly wrong. As such, the Court cannot find that Desai's determination that AAF lost $144.1 million in value because of Dundon/DCP's involvement.

## John Zutter

Three primary witnesses testified regarding the Dundon investment/commitment in AAF: Ebersol, Dundon, and Zutter. Like Dundon, Zutter possesses superior business acumen, despite having no formal education in finance. Zutter rose through the ranks of Wall Street based upon his tenacity and propensity to understand complex financial transactions and evaluate a business's potential. Before working for Dundon, Zutter worked for JPMorgan, where he met Dundon. Zutter then worked with some of Dundon's other companies before taking an executive role at DCP.

Zutter exhibits a nearly photographic memory of Dundon's businesses and their relationships. Zutter is closely aligned with Dundon and is one of Dundon's most trusted advisors. There was no doubt that, although Dundon was in charge when he took over AAF, Dundon deferred to Zutter's judgment and advice.

Zutter acknowledged that he worked on the AAF Term Sheet and worked closely with members of both AAF and DCP in drafting the Term Sheet. Zutter and Dundon were involved in making changes to the initial draft of the Term Sheet. Zutter indicated that he learned about the proposed DCP/AAF deal from Dundon. While Zutter did not recall his conversations with others involved in the AAF investment with clarity, his name appears on numerous emails, demonstrating that he had direct involvement in drafting the Term Sheet and operating AAF. Zutter recalls that Dundon's initial investment was to be a bridge loan to stabilize AAF through the first week of games played. Dundon made the decision to expand his investment in AAF to $70 million. Zutter was non-committal about Dundon's alleged statements to invest $250 million in AAF, but he agreed that Dundon made public statements about $250 million, but did not state a $250 million investment to him privately.

Zutter explained that his primary objectives regarding AAF were to minimize Dundon's exposure and risk regarding his investment and to ensure that he and Dundon would have the requisite control over ESMG and the operation of AAF. Remarkably, Zutter does not recall the Term Sheet being signed by anyone on behalf of DCP, nor did he retain any copies of a fully executed Term Sheet. Zutter's testimony regarding whether Dundon intended and agreed to invest $250 million in AAF was vague at best. Zutter testified that he knew that Dundon was "telling a story" about investing $250 million in AAF, yet Zutter never disclosed to anyone his sense that Dundon was not committed to making a $250 million investment. Zutter was unclear on whether

Dundon told Ebersol that Dundon was willing to invest $250 million in AAF for the first year of AAF and beyond. Critically, Zutter did not memorialize in writing whether the Dundon investment could be more than $70 million, and Zutter concentrated his efforts on making changes to the Term Sheet, which only evidenced a $70 million investment in AAF.

After the Term Sheet was thought to be fully executed, Zutter focused his attention on understanding AAF's debt structure, outstanding accounts payable, and redrafting vendor, media, and stadium agreements. Zutter also examined AAF's personnel, evaluating whether their roles were necessary and their compensation appropriate. Zutter then required that either he or Dundon approve all expenditures, thereby taking all financial decisions from AAF. Zutter also directed that AAF personnel seek reductions or compromises of outstanding invoices. Like Dundon, Zutter admitted that he and Dundon had AAF negotiate settlements on delinquent invoices without any intention of paying the compromised amount.

In addition to Zutter's efforts to streamline AAF operations, Zutter was careful to ensure that any asserted security interests in AAF assets were subordinated to DCP's investment. He also insisted that Fowler execute a release of his ESMG board position, such that he and Dundon were the majority holders in AAF. Zutter also ensured that other ESMG stockholders had their stock diluted such that he and Dundon acquired a 75% voting interest and control of AAF.

Zutter knew by mid-March 2019 that AAF would run out of the $70 million in funding and that AAF would have to cease operations without further capital infusions. Zutter enlisted the assistance of PwC to evaluate whether bankruptcy could preserve Dundon's investment in the AAF. Zutter also explored the hiring of bankruptcy counsel and discussed with Bracewell LLP whether AAF could pursue bankruptcy relief under chapter 11 of the Bankruptcy Code. Further, Zutter initiated discussions with Dundon about filing for bankruptcy and their options. Zutter first

35

considered a pre-packaged bankruptcy and the potential of an asset sale, where DCP would get AAF's assets, and the remaining liabilities would be unpaid through bankruptcy. During this time, Zutter continued to evaluate AAF personnel and the possibility of firing non-essential employees. Zutter explained that he wanted to "extend the runway" on Dundon's investment such that it would lead to an asset sale.

After his initial discussions with PwC and Bracewell, Zutter concluded that AAF was not viable and that PwC should cease all restructuring work for AAF by late March 2019. PwC's and Bracewell's fees were paid from the remaining funds from Dundon's investment. Zutter primarily discussed bankruptcy with Dundon and considered Ebersol's input as to what options AAF might have in completing its first season. Nonetheless, Zutter testified that he and Dundon were the ones who elected to file a chapter 7 bankruptcy.

Zutter was asked about his fiduciary duty to both DCP and AAF. He acknowledged that he had a duty to both but could not articulate which duty was paramount over the course of DCP's involvement in AAF. Zutter tried to cut costs and make AAF more efficient. As controlling members of ESMG's board, Zutter and Dundon did little, if anything, to consider what other shareholders wanted regarding the operation of AAF. Rather, Zutter and Dundon made decisions without input from the ESMG board and showed little interest in attending ESMG board meetings. Zutter, like Dundon, took corrective measures to enhance AAF by cutting costs and compromising accounts payable. Ebersol made misrepresentations regarding the AAF's financial condition, particularly as to the number of accounts payable and the amount of revenue AAF was generating. Zutter spent considerable time investigating AAF's finances and enlisted both DCP and AAF personnel to understand how AAF operated. But neither Dundon nor Zutter conducted any due diligence regarding AAF's finances. Zutter maintains that no one at AAF approached him about

36

outside investors.

Zutter was credible in explaining his role in Dundon's investment in AAF and in managing AAF. He was clear in his understanding of the undisclosed financial considerations that impaired AAF operations. Zutter was less conversant on the details regarding Dundon's investment and could not credibly explain whether Dundon intended to invest $70 million versus $250 million, notwithstanding his close business relationship with Dundon. Also, his testimony regarding Dundon's businesses and their relationship was contradictory; he provided less information in his pleadings filed with the Court but could recall in exacting detail how Dundon structured his businesses on his direct examination. Like Ebersol and Dundon, Zutter could not explain what the exact terms of the Dundon investment were or the precise amount. The Court cannot find that Zutter's testimony on the alleged contractual terms of the term sheet was any more probative than Dundon's or Ebersol's.

**Joseph Petrucelli**

Plaintiff listed Joseph Petrucelli as a CPA who qualifies as a certified financial analyst. He teaches forensic accounting at a college level and has provided litigation support. Petrucelli was asked to provide an analysis of whether Dundon and DCP had sufficient liquidity to fund AAF for an additional $180 million. Petrucelli was qualified to render an opinion, but did not do so at the time he was deposed. At trial, Plaintiff's counsel attempted to elicit testimony that Defendants did not have the requisite liquidity to fund AAF for the full amount of $250 million. Defendants asserted that, given Petrucelli's prior testimony that he had no opinion about Defendants' liquidity, Petrucelli could not offer an opinion at trial. The Court sustained Defendants' objection, and the Court ruled that it would not consider Pertucelli's testimony on liquidity.

**Robert Whitsitt**

Mr. Whitsitt has considerable experience in sports, notably in the NBA, serving in general manager or leadership roles with the Indiana Pacers, Seattle SuperSonics, Portland Trail Blazers, and Kansas City Kings. His responsibilities for those teams included developing team operating budgets, securing naming rights to basketball stadiums, managing stadiums, and broadcasting deals with major networks. He also worked for Diamond Sports Group, which provided regional sports casts before filing bankruptcy. Whitsitt was asked to opine on AAF's broadcast operations. Whitsitt noted that ticket and sponsorship projected sales were substantially lower than actual sales and that broadcasting AAF games on major television networks was having a significant cash drain on AAF operations. Whitsitt observed that broadcasting AAF games would support its brand, which would in turn make the league more profitable. That said, Whitsitt questioned the AAF's business model of absorbing $275,000 to $300,000 in production costs for broadcasting games and paying the networks to broadcast the games.

Whitsitt noted that AAF had a four-year arrangement with CBS, which granted CBS exclusive control over broadcasting AAF games, including AAF covering production costs and sharing revenue with CBS. Further, AAF could not negotiate broadcasts of its games with other networks. In addition, Whitsitt stated that AAF's broadcast agreement with the TBS network required AAF to be responsible for a "quality broadcast" and pay for all the associated costs in TBS televising AAF games.

Whitsitt contended that a fundamental flaw in AAF's spring league was that, by spring, consumers were experiencing "football fatigue" and would be less interested in watching football. Moreover, football fans would be more interested in NFL-related events such as the draft. Whitsitt also noted that AAF's hurried start to its games did not provide the AAF teams or its potential

fanbase with enough lead time to prepare for the start of the league.

Whitsitt stated that Dundon's approach to offering free advertising to marquee advertisers such as AT&T and Carvana was a sound business practice. Whitsitt explained that by offering free advertising to notable businesses such as AT&T and Carvana, AAF had the attendant effect of legitimizing itself and attracting other advertisers. He also explained that, due to the rushed start of AAF, it did not have sufficient lead time (typically 12 months) to attract and negotiate contracts with advertisers. Whitsitt stated that AAF failed to sell all of its television advertising slots by the time Dundon took over, thereby making it more difficult to sell ads to advertisers with revenue projections that fell short of actual revenues.

Whitsitt argued that AAF overpaid its players more than other spring leagues, such as the XFL. He also noted that a spring football league has too many competing sports leagues, such as the NBA playoffs, NHL playoffs, NCAA March Madness, NASCAR, the Master's gold tournament, and the beginning of MLB, to sustain revenues.

On cross-examination, Whitsitt acknowledged he had no real experience with a startup league, the NFL, or any experience with technology or sports apps. Whitsitt was not conversant on AAF's connections with Dick Ebersol or how AAF negotiated its vendor deals. Whitsitt recognized that the AAF assembled coaches and GMS with considerable NFL and/or collegiate football experience, as well as an understanding of the impact their reputations would have on fan support of AAF. Whitsitt also lacks an understanding of how AAF's streaming rights would have impacted future revenues. In sum, while Whitsitt knew much about the operations of professional basketball teams, he does not have real experience with professional football or start up leagues.

**Kenneth Schanzer**

Kenneth Schanzer has an impressive television background with experience working as an

executive vice president for NBC baseball and as president of NBC Sports. He is well acquainted with Dick and Charlie Ebersol. As the former president of NBC Sports, Schanzer has considerable experience in negotiating broadcast deals, strategic partnerships among different sports leagues, and hands-on experience with the NFL and Notre Dame football. Schanzer explained that he partnered with Vince McMahon of the XFL to start a spring league and argued that the downfall of the XFL was that it was never properly promoted to the public. He explained that Charlie Ebersol learned from his experience with the XFL and recognized that AAF would have to structure a league that was "authentic." Schanzer explained that having coaches with NFL playing and coaching experience and involving Bill Polian (former General Manager of the Buffalo Bills) made AAF more attractive to football fans.

Schanzer discounted Whitsitt's testimony about the sufficiency of AAF's number of advertisers, noting that in his experience, no sports league gets favorable broadcasting rights until the league is established. Schanzer recognized that AAF's retention of its streaming rights would have been a valuable asset in today's streaming environment. Also, Schanzer recognized that CBS allowed AAF to promote its brand during the 2019 AFC Championship game, which was more valuable than any loss in advertising revenue. Also, Schanzer opined that "football is king" in American sports media and that there is no saturation point to televising football games. Nonetheless, Schanzer admitted that AAF's broadcasting agreement with CBS and TBS was not the industry norm and that it would be difficult for any league to survive its first year of operation with advertising revenue. In sum, while Schanzer was credible like Whitsitt, neither had direct experience with spring football leagues and the unique challenges that spring football leagues have in succeeding. Moreover, while both offered their perspective on the necessity of having advertising revenue for AAF, the Court finds that AAF's obligation to pay to broadcast its games

was detrimental to AAF operations and its success.

**Elisa Lee**

Elisa Lee has her degree in Finance from Southern Methodist University. She currently lives in California, but initially stayed in Texas after college to work at Santander Consumer at the end of May 2015. In her role at Santander, she managed a single portfolio of asset sales. Lee reported directly to John Zutter, from whom she received her assignments and was required to update him on her progress while working on a project. Tom Dundon then asked Lee to work for him at DCP.

Lee first learned about DCP's investment in AAF through receiving an email with the Term Sheet of the deal, which was not signed, but she believed it operated as an enforceable contract. Lee was tasked with compiling a data room of AAF files, so she created an outline of financial modeling processes, including the League's revenues and expenses. Lee claims that her work for this job was not typical of other DCP deals, and AAF needed capital immediately to operate. Lee compiled details of how AAF was structured, both at the team and league levels. Lee received an email from Alan Kantowitz on February 16, 2019, requesting that she create a data room and meet with him in Dallas, along with other DCP and AAF personnel. The purpose of the meetings was to gain an understanding of all the different AAF departments and company leaders to understand AAF business as quickly as possible. Kantowitz requested that she compile a weekly estimate on a cash flow basis so that DCP could get an idea of AAF's cash flow needs and a model of AAF's financial protections.

Lee examined all available AAF invoices to understand AAF's expense categories and used income data, such as contract or ticket sales, to develop a model of AAF operations. Lee had to make assumptions at both the team and league levels to produce a profit-and-loss analysis for

AAF. Lee testified that significant information was missing from the data room, preventing her analysis from being complete. Lee stated that she had requested all expenses related to completing her model, including invoices and contractual obligations, but that AAF was unable to provide the missing information. For example, Lee was unable to find contracts related to football operations for the Atlanta Legends, Birmingham Iron, and San Diego Fleet.

Lee stated that the AAF acquisition was a distressed situation, and there was possibly missing information in the data room, such as accounts payable information and vendor contracts. Nonetheless, Lee did not recall any "red flags" in her examination of AAF's finances. Lee explained that she worked closely with Kantowitz, who was responsive and forthcoming about any request for AAF documentation. In sum, Lee was credible, and Lee's testimony demonstrated that AAF lacked an accurate accounting system and controls to provide Lee with the requisite information to develop revenue and expense models for AAF and each team.

**Alan Kantowitz**

Alan Kantowitz was AAF's direct interface with DCP and appeared to have been responsible for providing DCP personnel, such as Lee, Zutter, and Vanderbilt, with all financial information and projections. Kantowitz appears on many emails, both as a sender and recipient of AAF's financial information. The Court expected Kantowitz to be the principal AAF witness in explaining AAF operations. The Court was disappointed with Kantowitz's testimony and his limited recall of many emails and the subject matter in those emails. While the Court believes that Kantowitz is competent, he had no recollection regarding AAF's financial projections, how they were compiled, or the assumptions for those projections. Kantowitz was unable to explain AAF revenues or expenses. Kantowitz did acknowledge that AAF's financial projections were flawed and that AAF was seriously undercapitalized. Remarkably, he was unconcerned about Fowler's

failure to make scheduled capital investment payments and did not consider that a red flag for the league's operations. Kantowitz admitted that AAF was underfunded at the beginning of the season, and its expenses were excessive. In sum, Kantowitz's lack of recollection and his inability to testify about emails he drafted and received undermine any credibility the Court can give to his testimony. The Court recognizes that the operative events in this case happened six years ago but would have expected Kantowitz to be able to recall and testify about AAF's financial structure, its capital needs, and its expenses.

**Erica Bramer**

Erica Bramer was Defendants' principal witness on damages. Plaintiff contested Bramer's methodology in a ***Daubert*** motion and argued during trial that Bramer was not properly disclosed about her testimony. The Court denied both motions. Bramer has impressive credentials: she graduated from the Wharton School of Business, is a certified valuation analyst, and is an insolvency and restructuring advisor. She previously worked at PwC and the Alix Group. Barmer has worked on many bankruptcy disputes and has testified in bankruptcy court. She provided expert testimony in the bankruptcy case of the MLB Texas Rangers. The Court finds her expertise persuasive and her testimony more credible than Plaintiff's expert, Sonia Desai.

Bramer testified as to the difficulties she had in accessing Debtors' QuickBooks. Bramer testified about how inaccurate Debtors' accounts payable were, noting that during the time that DCP was negotiating with AAF about the Dundon investment, roughly 700 invoices were not disclosed, and about 1,000 accounts payable were entered after the Term Sheet was negotiated. She opined that AAF had looming notes payable to investors David Pottruck, Ebersol-St. James and MGM, which Desai failed to include in her valuation. Bramer disagrees with Desai's conclusions about AAF's immediate cash needs and concluded that AAF would have needed

significant capital infusions because of the number of accounts payable outstanding, and that revenues were lower than projected. Further, Bramer noted that Desai's expert report failed to opine on causation or the value of damages. Bramer also disagreed with Desai's failure to evaluate damages for both a $70 million and $250 million investment by DCP.

Bramer disagrees with Desai's use of the unexecuted NFL/32 equity agreement as a valuation basis. No warrants were exercised. Bramer argues that because the NFL/32 transaction did not occur, it is speculative to base any valuation on the NFL/32 equity agreement. The same basis for the CBS broadcast deal that never materialized. Bramer also disagreed with Desai's use of EV as a basis for valuing AAF because Desai should have included debt in her valuation model. Further, had Desai included recoverable debt in her valuation model, she would have needed to reduce her valuation to account for debt in a distressed company. Bramer does agree with Desai that she should have used a 28% tax rate in her calculations.

Bramer stated that Desai made several assumptions regarding revenue that were unsupported by either data or rational projections. For example, Desai accepted at face value the average ticket price of $50.00 when tickets were sold at a discount. Also, Desai used attendance figures that were much higher than those reported by the teams. Bramer argues that Desai double-counted sponsorships and presumes strong attendance growth without any rational basis. Bramer testified that Desai impermissibly relied on digital revenue as a component of growth, where there was no indication when AAF would receive revenue from digital platforms. Desai also accepted the premise that AAF would grow by two teams each year without evaluating the attendant cost of adding teams. Also, Bramer believed Desai incorrectly relied on AAF's belief that the NFL would pay part of players' salaries going forward, despite having no agreement to do so. Bramer says that Desai incorrectly concluded that the NFL would pay roughly $21 million in player

salaries without any agreement to do so. Bramer is critical of Desai's reliance on March 29, 2019, AAF projections in her valuation analysis as unreliable and unsupported. Bramer argues that even if Dundon had invested $250 million in AAF, AAF would not have been viable in 2021, and that it would have required $500 million in capital investment to operate AAF successfully for years.

On cross-examination, Plaintiff's counsel was able to demonstrate that the number of missing accounts payable not listed in the QuickBooks is a small percentage of the known accounts payable, so Bramer's concerns about missing accounts payable appear inflated. Bramer could not explain why she did not consider the $115 million valuation of AAF used on February 14, 2019, when Bird offered to invest $1 million in AAF at that valuation. Bramer acknowledged that this valuation had a basis in fact but pointed out that Bird returned his investment. In sum, Bramer demonstrated that Desai's report lacked an acceptable methodology and relied upon invalid assumptions or unverified data.

### FINDINGS OF FACT

The Court finds that statements listed as Findings of Fact, which are more properly Conclusions of Law, be considered Conclusions of Law, and that statements listed as Conclusions of Law, which are more properly Findings of Fact, be considered Findings of Fact, regardless of the heading under which they are listed. Further, the Court finds that statements which constitute mixed statements of law or fact be considered Findings of Fact *and* Conclusions of Law as appropriate, regardless of the heading under which they are listed.

The Court finds that the following facts have been established either by stipulation or admission of the parties, or by the preponderance of the evidence at trial. ***Grogan v. Garner***, 498 U.S. 279, 286 (1991) (finding that the preponderance of the evidence standard is applicable in most civil proceedings).

## BACKGROUND

### Parties

1.      The bankruptcy estate of Debtors (the "Debtors' Estate") is a consolidated entity, defined as the master bankruptcy matter.[38]

2.      The trustee, Randolph N. Osherow ("Trustee"), is the individual who is the duly appointed chapter 7 trustee for each of the Debtors and the Debtors' Estate and continues to serve in that capacity.

3.      Defendant Thomas Dundon ("Dundon") is an individual and a former board member of ESMG.

4.      Defendant John Zutter ("Zutter") is an individual and a former board member of ESMG.

5.      Defendant Zutter has worked for Dundon and the Dundon family or related entities since 2015.[39]

6.      Defendant Dundon Capital Partners, LLC ("DCP") is a Delaware limited liability company with its principal offices in Texas.

7.      AAF intended to follow the Super Bowl and precede the NFL Draft.

8.      Ebersol Sports Media Group, LLC ("ESMG") was the parent of subsidiary entities (LFE, AAF Players, AAF Properties, LFE 2, and Realtime) formed at various times, all of which together operated a springtime professional football league known as the Alliance of American Football.[40] ESMG and ESMG's subsidiaries are referred to collectively herein as "AAF" or the "League."

---

[38] Case No. 19-50900-cag, ECF No. 150; 11 U.S.C. §§ 301, 541.
[39] Trial Tr. 128:19–130:25, ECF No. 396.
[40] Trial Tr. 224:4–229:25, ECF No. 323.

9. Legendary Field Exhibitions, LLC, formed on April 13, 2018, owned and controlled all eight AAF teams (with no separate team owners), entered into operational agreements for goods, services, and facilities, and incurred substantial debt in its enterprise capacity with vendors and third parties.[41]

10. AAF Players, LLC, formed in September 2018, owned and was the counterparty to all Standard Player Agreements with each AAF player.[42]

11. AAF Properties held AAF's intellectual property and commercial licenses.[43]

12. LFE 2 was the employer of AAF's California-based staff and a counterparty to medical plans.[44]

### ESMG AND ITS OPERATIONS

13. Until February 14, 2019, Charles Ebersol ("Ebersol") served as ESMG's chief executive officer ("CEO") and chairman of ESMG's board of directors and generally oversaw AAF's operations. Prior to February 14, 2019, Ebersol owned a majority of the common stock and approximately two million preferred shares of ESMG. Ebersol's family trust owned additional common stock and preferred shares of ESMG.[45]

14. ESMG, through its wholly owned entities, maintained ownership and operational control of AAF's team-related entities, ensuring a single-entity model for all core organizational, logistical, and football business functions.[46]

15. ESMG's business plan recognized that AAF would require outside financial support for the first five to six years to address projected negative cash flow.[47]

---

[41] *Id.* at 229:12–14.
[42] *Id.* at 226:14–15.
[43] *Id.* at 226:11–13.
[44] *Id.* at 229:22–25.
[45] *Id.* at 224:14–16; Trustee's Ex. 0807 at 0032 [hereinafter "T-_"].
[46] Trial Tr. 224:7–13, ECF No. 323.
[47] Trial Tr. 133:22–24, ECF No. 319; T-0015.

16.     AAF planned to complement, rather than compete with, the NFL. The failure of prior spring leagues informed the plan. NFL Commissioner Roger Goodell even recommended certain personnel to AAF to assist it.[48]

17.     AAF had many high-profile NFL veterans and leaders among the sports and entertainment industry advising, working for, or leading the League.

18.     ESMG was formed under Delaware law.[49]

19.     A board of directors ran ESMG. Ebersol served as the chairman of the ESMG board. The other board members included Reggie Fowler, Dick Ebersol, Jeff Moorad, and Keith Rabois. Dick Ebersol is Charlie Ebersol's father. The elder Ebersol served as the president of NBC Sports and had experience with a prior professional spring football league (the original XFL). Moorad, a lawyer, worked at Morgan Lewis, one of two firms the League had retained. Ebersol testified that Moorad had substantial experience in the sports industry and led the sports practice at Morgan Lewis.[50]

20.     Ebersol was the manager of all the subsidiary LLCs and generally oversaw the League's operations.[51]

21.     Alan Kantowitz served as the League's chief of staff. He created and updated the pro forma projections used in soliciting investors.[52]

22.     Kevin Freedman served as the chief operating officer. He worked with Kantowitz and was also responsible for operational oversight.[53]

23.     Kevin Farrell served as an operations consultant. He managed accounts payable

---

[48] *Id.* at 95:4–13, 104:15–17.
[49] Def.'s Ex. 22 [hereinafter "D-_"].
[50] *Id.*; D-1; D-135; Trial Tr. 123:14–19, 58:10–15, 137:25–139:5, ECF No. 321.
[51] Trial Tr. 79, ECF No. 327.
[52] Trial Tr. 268–69, ECF No. 398; Trial Tr. 124, ECF No. 331.
[53] Trial Tr. 65:6–9, ECF No. 327; Trial Tr. 82:25–26, ECF No. 412.

and spending.[54]

24.     The League was a startup spring football league Ebersol contemplated as a business idea as early as 2016, after he produced the 30 for 30 film "This is the XFL." Ebersol envisioned the League becoming a minor league, feeder option to the NFL. The League would showcase both fringe professional players seeking another chance to play and former college and practice squad players looking for experience and exposure to gain a roster spot on an NFL team.[55]

25.     The League consisted of eight teams in eight markets: Atlanta, Birmingham, Memphis, Orlando, Salt Lake City, San Antonio, San Diego, and Tempe. The teams would play a 10-game regular season, followed by a two-week playoff, with the championship game leading up to the NFL Draft.[56]

26.     Each of the League's players entered a standard player agreement, which consisted of a three-year deal. The League contracted to pay the players $70,000 for the first season, $80,000 for the second season, and $100,000 for the third season.[57]

27.     The player contracts prohibited players from playing for other professional spring football leagues, with an opt-out for playing in the NFL. The NFL opt-out did not require the NFL to pay or share revenue with the League.[58]

28.     The League began raising money in 2017. Ebersol knew that professional spring football was a risky venture. In early interviews, he admitted that every professional spring football league prior to AAF had failed. Other witnesses in this case echoed that sentiment.[59]

---

[54] Trial Tr. 86:14–25, ECF No. 413; *id.* at 88:6–17.
[55] Trial Tr. 125–26, ECF No. 319.
[56] *Id.* at 187; Trial Tr. 145, ECF No. 327.
[57] T-1291; Trial Tr. 33, ECF No. 319.
[58] T-1291.
[59] T-0709.

29.     At trial, Ebersol named several wealthy potential investors in the League. Although several of them testified at trial, none of them had a significant interest in investing substantial money into the League. The only substantial monetary commitments the League ever made were those of Fowler, who defaulted, and Dundon, who provided $70 million to the League through DDFSP and ultimately lost it all.[60]

30.     Ebersol also identified well-known entertainment and sports figures as having a serious interest in investing in the League, but none of the persons he named showed up at trial to substantiate that testimony. The well-known names that did invest did not contribute substantial capital relative to the League's need for hundreds of millions of dollars. Time and again, Ebersol referred to unnamed, and waiting-in-the-wings investors, poised to "follow a legitimate lead," referring to an investor who commits after a respected investor has publicized a significant financial commitment.[61]

31.     Some of the League's early business decisions did not work to the League's advantage.

32.     Generally, any successful sports venture is a television deal, normally the most effective way to present a sports product and attract a large fan base across the country. Typical economics of a professional sports television deal rely on networks to bear the production costs and pay a league or teams for the right to air games on their networks.[62]

33.     AAF's business model worked backwards. Rather than securing networks as a revenue generator, the League secured a time buy, paying networks for the privilege of airing games on television. Ebersol described the CBS and NFL deals as one-sided in CBS's and the

---

[60] *See generally* ECF No. 354 (testifying about potential and defaulting investors).

[61] *See* T-0709 (identifying "Series Seed Preferred Stock" purchasers); T-0757 (identifying Series 1 Preferred Stock purchasers); T-0020.

[62] Trial Tr. 114:22–115:15, ECF No. 397.

NFL's favor. The packages the League secured with CBS, Turner, and the NFL for games to air on CBS, CBS Sports, TNT, and the NFL Network became one of the League's largest expenses. The League paid the production costs, not the networks.[63]

34.     In an effective business model, a network would work with the League to sell advertising slots during game programming and sell much of the entire season prior to the first game or broadcast. The league and the teams would aim to complete all sponsorship and distribution deals well in advance of the actual season. In this case, the League had the responsibility to secure advertising during its airtime. By the start of its inaugural season, the League had sold little airtime.[64]

35.     AAF advertising prices depended on the part of the game in which it was displayed, the platform on which it was shown, and its duration.

36.     A successful sports league—like any other business—requires budgeting, cost controls, and coherent reporting systems that allow departments within the business to communicate and ensure accurate transmission of information. Under Ebersol's leadership, the League lacked sufficient internal reporting and controls between the main league office and teams, within the league office itself, and between the league office and its representatives, who entered deals with third parties but failed to inform league management in real time. Often, league management discovered the expense after it received an invoice months later. The League failed to implement a coherent system for reporting and tracking revenue and expenses at league or team levels.[65]

37.     The abundance of other sporting events in the spring contributed to the lack of

---

[63] Trial Tr. 212:7–14, ECF No. 412; D-47; Trial Tr. 115:17–122:23, ECF No. 397; T-0719; T-0771.
[64] Trial Tr. 115:17–116:8, 117, 130:20–131:1, 141:21–142:9, ECF No. 397.
[65] Trial Tr. 107–08, ECF No. 413; Trial Tr. 39–40, ECF No. 398.

interest in the League. The NCAA basketball tournament, the NHL and NBA playoffs, the start of MLB, the Masters PGA tournament, and a myriad of other traditional spring sporting events saturated the spring viewing market. The week before the League shut down, viewership ratings had dropped to one-fourth of week one's ratings.[66]

38.     The League hired aggressively. Between late 2017 and the start of league play, the league grew from a handful of employees to more than 900. The League paid its players more than double what the XFL paid players—a $21 million per season difference. The League's non-player salaries were double what they should be for a startup. Jeff Moorad, one of the League's board members, observed that Ebersol ran the League like a 10-year business rather than a startup.[67]

39.     From the outset, the League used a pro forma to show revenue and expense projections to potential investors. The projections included projected ticket sales, sponsorship deals, merchandise, the technology application, and what the league referred to as PAL or FANchise agreements.[68]

40.     The pro formas contemplated deriving ticket revenue from the games and sponsorship and merchandise revenue at the league and team level. The technology-driven revenue centered on an app that fans could use to interact with and watch the games and ultimately place wagers on the games.

41.     The League designed PAL agreements to bring in investors as quasi-owners of the teams. For a negotiated price, the League hoped it would start at $10 million; a PAL or FANchise owner could purchase a profit-sharing interest in a team. The purchaser would own a

---

[66] Trial Tr. 149–50, ECF No. 397; Trial Tr. 112:3–113:8, ECF No. 354.
[67] Trial Tr. 24–25, ECF No. 331; Trial Tr. 148, ECF No. 397; D-31; D-33.
[68] D-2; D-26.

market-wide right to that team's revenue and sales, but the teams would remain under league ownership at the league level.[69]

42.     Originally, the League planned to grow by two teams every other season. But, at the urging of a potential investor to inflate the pro forma projections, the league changed its projections to show the league growing by two teams every season.[70]

43.     The League contemplated that FANchise agreements would produce significant revenue, and, according to early proformas, supply a significant source of revenue in 2018, but the League never generated any revenue from selling FANchises.[71]

44.     Around May 2018, the League projected that it would earn $176 million in revenue through the end of 2019.[72]

45.     The evidence presented at trial showed that the pro formas consisted of speculative projections that had no real basis in fact. The League frequently modified the projections, which showed widely varying revenue, expense, and capital needs.[73]

46.     In spring 2018, Ebersol caught wind that the XFL, a former professional spring football league his father co-founded with former WWE President Vince McMahon in 2001, planned to relaunch its league during the spring of 2020.

47.     To beat the XFL to market, Ebersol moved up the League's launch date by one year to debut the week after the Super Bowl in February 2019. As a result of that change, the League began incurring massive obligations and liabilities almost immediately and rushed to launch.[74]

---

[69] Trial Tr. 147, ECF No. 319.
[70] Trial Tr. 18, 22–23, ECF No. 331; D-12.
[71] Trial Tr. 16–17, ECF No. 331.
[72] Trial Tr. 172, ECF No. 434
[73] Trial Tr. 14–23, 93–101. ECF No. 331; Trial Tr. 230–47, ECF No. 380; Trial Tr. 172–74, ECF No. 434; D-2; D-6; D-31; D-75; D-188; T-0015.
[74] Trial Tr. 299, ECF No. 354.

## THE FOWLER INVESTMENT

48.     Beginning in June 2018, ESMG met with Reggie Fowler about making a large investment in the League.[75]

49.     Fowler presented himself as a successful businessman in the business of manufacturing drones for the military and in real estate, with more than $300 million in liquid assets.[76]

50.     Fowler provided ESMG with bank statements evidencing that his balances and liquidity exceeded his funding commitments.[77]

51.     Eventually, Fowler's entity FO2 LLC entered a Term Sheet for Series 1 Preferred Stock Financing with ESMG, which obligated FO2 to make a $50 million equity investment and provide a $120 million line of credit.[78]

52.     Almost immediately after the League signed the FO2 Term Sheet, FO2 defaulted on its initial funding obligations. The default began at the same time as the League began incurring significant costs attributable to the start of the season, including the pending training camp in January 2019. Throughout December 2018 to February 2019, Fowler repeatedly failed to meet the equity funding requests submitted by ESMG. The parties later discovered that the federal government had seized many of the wire transfers Fowler sent to the League before they reached the League's bank accounts. The situation became so dire that, as early as the fourth quarter of 2018, ESMG realized it could not rely on Fowler and began a concerted effort to find investors to replace him. Ultimately, Fowler funded around $22 million of the $50 million equity funding, and none of the $120 million line of credit. The Trustee sought and obtained a judgment

---

[75] T-0757.
[76] Trial Tr. 177:14–18; 180:9–23, ECF No. 319.
[77] *Id.* at 178:13–18, 179:16–19, 180:7–24, 181:4–12, 183:18–184:6; T-0757.
[78] T-0016.

against Fowler for $53,189,261.80 in damages based on a finding of total loss to ESMG.[79]

53.     Even after Fowler failed to comply with his obligations, Ebersol told an NFL representative that Fowler had fully funded $170 million. Ebersol told other investors the League was fully funded. Charlie even told his father, Dick Ebersol, that the main investors had put nearly $200 million into the League.[80] None of those statements was true.

54.     After Fowler failed to meet a significant funding request in late December 2018, Ebersol became concerned about the League launching. The League had only $2 million in capital and was within a week of running out of funds. Ebersol told the board the League's options were to sell to the XFL or forfeit the 2019 season. He met with McMahon about selling the League to the XFL leader. McMahon had no interest in acquiring any part of the League.[81]

55.     Prior to the Dundon investment, while Fowler was making sporadic investments, AAF could not rely on other investors for providing capital. While there may have been testimony as to the possible investors in addition to Fowler and Dundon, there is no credible evidence that these alleged investors made any significant investments in AAF such that the Dundon investment was not critical to AAF's survival. In mid-December 2018, Ebersol had no viable funding source that could meet the League's impending obligations. Ebersol considered shutting down the League altogether, as keeping it open would increase the amount of debt by tens of millions of dollars.[82]

56.     Eventually, in late December 2018, some funding from Fowler avoided the federal government's seizure efforts. Ebersol described a check deposited by ATM as a

---

[79] Trial Tr. 80–81, 96, ECF No. 412; Trial Tr. 8–12, ECF No. 413; Trial Tr. 36–37, 39, 41–42, 44–47, 49–50, ECF No. 331; D-23; D-29; D-31; D-33; D-100; Trial Tr. 110–11, ECF No. 321; D-36; D-208.1.
[80] Trial Tr. 117–18, 124, ECF No. 331; D-20; Trial Tr. 177:14–178:13, 183:21–184:2, ECF No. 354; D-47.
[81] Trial Tr. 41–43, ECF No. 331; D-36; D-29.
[82] D-29.

$13.4 million Christmas miracle. The amount was insufficient to finance the League through training camp the following month, much less the entire season. The League used the funds to pay 2018 expenses. Nonetheless, Ebersol moved forward and allowed the League to remain open and incur tens of millions of dollars in additional liabilities without a reliable funding source in place.[83]

57.     Ebersol conceded that the dire financial situation completely ruined the League's marketing and sponsorship efforts. Ebersol had to slash those expenditures, which cratered projected revenues. In Ebersol's own words, "Reggie's delinquency screwed us with respect to revenue by killing our marketing."[84]

58.     Ebersol cut production, national marketing, and sponsorship when the League needed to raise awareness, sell advertising, sell tickets, and sell sponsorships. Ebersol also cut marketing personnel and funding necessary to drive local awareness. Ebersol testified that the League terminated its advertising agency, McGarry Bowen. In fact, McGarry Bowen terminated the League because it was about $3 million.[85]

59.     Ebersol failed to cause the League to invest in revenue-generating digital products, which led to the League failing to earn revenue from digital products or related sponsorship sales.[86]

60.     By the end of December 2018, AAF projected the League would need more than $24 million to get through most of January 2019 and would continue to incur millions in expenses to critical vendors without adequate funding.[87]

---

[83] Trial Tr. 8:3-17, 11:24–12:10, ECF No. 413; Trial Tr. 193–94, ECF No. 319; Trial Tr. 7–8, ECF No. 321; Trial Tr. 38, ECF No. 331; D-36.
[84] Trial Tr. 39, ECF No. 331; D-33.
[85] Trial Tr. 89–101, ECF No. 331; Trial Tr. 143–45, 164–65, 167–72, ECF No. 434; D-33; D-40; D-41; Trial Tr. 130:20–131:1, ECF No. 397; Trial Tr. 46, 218–19 ECF No. 323; D-224.
[86] Trial Tr. 102, ECF No. 331; D-41; Trial Tr. 170–172, ECF No. 434; D-40.
[87] D-35; Trial Tr. 149–52, ECF No. 434.

61.     In January 2019, the League's training camp began. As a result, the League's spending increased substantially. At the close of training camp, the League was in poor financial condition, and bills were piling up. Following a late December funding, Fowler's funds continued not to reach the League's accounts consistently and never in the amounts requested. The League's financial condition became so dire that, absent a new investor to replace Fowler, it was on the verge of collapse.[88]

62.     On January 7, 2019, based on an analysis done by Freedman and Kantowitz, the league finance committee downgraded the projected revenue from $176 million to $59 million for 2018 and 2019. The decreased revenue projections resulted from Ebersol's failure to secure adequate funding and his failure to market the League, secure sponsorships, and promote local awareness before rushing the League into its first season of football.[89]

63.     The League's expenses did not reduce proportionally to reduced projected revenues. The League retained its previously negotiated broadcast contracts and commitments to stadium leases and countless vendors and third parties, including over 400 players, referees, and football staff, needed to put on a game. Ebersol made the decision to move forward with the League, aware that it had incurred significant liabilities that had not been paid and would continue to be deferred and would also incur additional liabilities without a committed source of capital.  Ebersol pushed forward in developing technology even though the League knew the technology would not yield substantial revenue immediately. Ebersol built the League with the expense structure of a 10-year mature business (including nearly 1,000 employees) and operational employees at double what a startup should pay. These decisions, along with Ebersol's decision to enter employment agreements with more than 400 players promising them

---

[88] Trial Tr. 95, ECF No. 412; Trial Tr. 187, ECF No. 434; D-100; D-48.
[89] D-40; D-41; Trial Tr. 164–65, 167–72, ECF No. 434.

more than double a market rate for a three-year term and allowing them to play for the NFL with no compensation from the NFL if players exercised their opt-out rights, made the League's business model unsustainable.[90]

64.     Just a few weeks later, on January 22, 2019, Kantowitz sent an urgent memorandum to Ebersol, Freedman, and Farrell about the League having then $8 million in incurred but unpaid liabilities and approximately at least another $8 to $9 million in additional liabilities the league anticipated incurring to get through the first game of the season three weeks later, and an unknown amount owed to critical vendors like CBS. Kantowitz disclosed that Ebersol had the League playing a game of chicken with critical vendors, like CBS, whose bills were overdue.[91] Notwithstanding the League's financial distress, AAF did enjoy favorable television ratings.

### AAF'S TELEVISION CONTRACTS AND RATINGS

65.     On October 23, 2018, the NFL granted AAF access to its Game Statistics Information System (GSIS) to support AAF's technological innovations. GSIS is the NFL's official system for capturing and distributing real-time game data.[92]

66.     AAF secured a media agreement with CBS Television and CBS Sports Network to televise select AAF games, including its premier and championship games, providing AAF with broad national visibility.[93]

67.     As part of the agreement, CBS aired commercial promotional spots for the League in the 2019 AFC Championship and the Super Bowl, together with other promotional units to

---

[90] Trial Tr. 185–87, ECF No. 434; D-50; D-31; D-33; Trial Tr. 148, ECF No. 397.
[91] D-50; Trial Tr. 221, 225, 226, ECF No. 398; Trial Tr. 179–86, ECF No. 434.
[92] Trial Tr. 130:24–131:19, ECF No. 321.
[93] Trial Tr. 11:16–12:2, ECF No. 323; T-0719.

spotlight upcoming AAF matchups or storylines.[94] The promotional spots CBS aired for AAF during the Super Bowl represented significant value inventory that could not be sold for cash; the NFL never allowed another sport or football venture to be promoted during the Super Bowl prior to AAF.[95]

68.    On January 30, 2019, AAF secured a broadcasting agreement with NFL Enterprises LLC (NFL Network) under which the NFL agreed to broadcast AAF's games. AAF also entered a media agreement with Turner Sports, Inc. to televise AAF games.[96]

69.    NFL Network integrated AAF game telecasts into its programming schedule and utilized its existing in-game ticker and "NFL bug" (logo/score graphic) to promote other network content. It was significant for the NFL shield to appear on screen alongside the AAF logo because it carried the imprimatur of the NFL, which, as Schanzer testified, is the single most important sports brand in America and possibly the world.[97]

70.    AAF's premiere game aired in primetime on CBS Network on February 9, 2019.[98]

71.    Over six million people watched AAF games in their first weekend. After Week 1 of AAF play, on February 10, 2019, AAF's app was the number one trending sports app in both the Apple and Google Play app stores (and number 33 overall in the Apple App Store).[99]

72.    NFL Network executives were "genuinely surprised" AAF was "getting much better ratings than they thought" because "spring football is hard to sell." NFL Network consistently delivered strong ratings throughout the season, including 0.32 ("very good one" for an NFL network), 0.33 ("good rating for 8:00 at night in March"), and maintained ratings of 0.2-

---

[94] Trial Tr. 11:16–12:2, ECF No. 323; T-0719; Trial Tr. 270:11–17, ECF No. 397.
[95] Trial Tr. 270:11–20, 272:7–20, ECF No. 397.
[96] Trial Tr. 19:21–20:4, 27:7–11, ECF No. 323; T-0771.
[97] Trial Tr. 51:24–52:11, ECF No. 323; Trial Tr. 282:3–9, 284:23–285:9, ECF No. 397.
[98] Trial Tr. 308:16–309:1, ECF No. 354; T-0719.
[99] Trial Tr. 84:7–19, 106:8–16, ECF No. 321; T-0020.

0.24 even when competing against March Madness basketball.[100]

73.     As in all its broadcast deals, AAF retained digital rights to stream games on its own OTT (refers to the delivery of content directly to users via the internet) and mobile platforms, enabling secondary distribution alongside linear TV promotion. Ebersol's approach to negotiating deals was to retain digital rights, which Schanzer advised was critical, given that 2019 marked the beginning of cord-cutting and new technology. These retained digital rights had significant future value because, as streaming's role in the media landscape grows, the greater the ability to monetize content and the more exclusivity over content, the greater the value.[101]

74.     The League failed to pre-sell its advertising slots, leaving it with advertising inventory during the season. In Dundon's experience, advertising is typically sold upfront before the season starts. Bob Whitsitt testified: "Advertising, ticket sales, broadcast advertising, most of your revenue streams should be sold before you play your first game."[102]

### NEGOTIATIONS INVOLVING THE DCP INVESTMENTS

75.     As noted herein, the League's first games debuted on February 9, 2019. At that point, the League was still seeking investors to replace Fowler, who continued to fail to meet his funding commitments. At the same time, Ebersol continued to misrepresent Fowler's investment and the status of ongoing fundraising efforts.[103]

76.     Ebersol knew of the dire financial condition of the League from December 2018

---

[100] Trial Tr. 81–101, ECF No. 354; T-0518.
[101] Trial Tr. 14:18–15:19, 16:3–17:4, 21:7–22:9, ECF No. 323; T-0719; Trial Tr. 265:13–24, 267:8-11; 267:25–268:10, ECF No. 397.
[102] Trial Tr. 49–50, ECF No. 349; Trial Tr. 130:20–131:1, ECF No. 397.
[103] On February 11, 2019, Ebersol told Jeff Goldfarb that he was "very happy" about the status of Fowler's funding. The Court acknowledges that Ebersol provided considerable testimony about alleged sources of capital funding and interested investors, but as noted herein, none of these sources or investors provided any source of capital that would have precluded the need for Dundon to make his investment. *See* D-71.

to February 2019. Ebersol knew that the League had no reliable investor from December 2018 through early February 2019 to fund League operations or knew that its only investor was not or could not meet funding commitments. Ebersol knew that the League had overdue obligations to critical vendors in January 2019.[104]

77.    The situation left Ebersol scrambling to find funding. None of the existing or potential investors stepped up, and Ebersol himself, who claimed he could cover the $5.1 million, did not step up and invest. Due to Ebersol's actions, the condition of the League after the first week of play was such that the League had no reliable investor, had a dismal outlook for revenue, had overdue obligations to critical vendors, and was incurring ongoing obligations to players, vendors, stadiums, and others despite lacking the funds to pay its existing debts.  Payroll had to be funded on a strict deadline (due to a new payroll system), or the players would likely quit, and the League would likely fail before the second week of games. Instead of using his family's money to cover the payroll, Ebersol opted to press forward and hope for a new investor.[105]

78.    On February 13, 2019, Erik Anderson introduced Ebersol to Tom Dundon, a Texas resident, as a potential investor in the League. Anderson was a longtime business acquaintance of Dundon, whom Ebersol had unsuccessfully solicited for an investment in the League for a year.[106]

79.    Anderson told Dundon that the League had lost its lead investor, was in trouble, and needed money immediately, and that Anderson had been approached to invest, but that the investment was too large for him.[107]

---

[104] Trial Tr. 61–62, ECF No. 331; Trial Tr. 11:21–13:21, ECF No. 413; D-50.
[105] Trial Tr. 187–88, ECF No. 434; Trial Tr. 61–63, ECF No. 327; Trial Tr. 12–14, ECF No. 413.
[106] T-0329; Trial Tr. 177, ECF No. 332; Trial Tr. 25, 127, ECF No. 354.
[107] Trial Tr. 123–25, 134–37, 215, ECF No. 354.

80. Dundon founded DCP in 2015 and serves as its CEO, Chairman, and Managing Partner. DCP is headquartered in Texas, and Zutter is also a DCP partner.[108]

81. Dundon is an entrepreneur and investor in sports-related ventures. He began his career by founding a subprime auto finance business that was later acquired by Santander Bank. Following his exit from Santander, Dundon purchased the Carolina Hurricanes, a professional hockey team, though, admittedly, his goal was to purchase an NFL or NBA team. Dundon has also invested in, among other things, TopGolf and the Professional Pickleball Association.[109]

82. Dundon had not previously met Ebersol and had no relationship with him or Debtors.[110]

83. Dundon and Ebersol first spoke via telephone on the morning of February 13, 2019. Dundon and Ebersol were the only people on the call. They discussed a potential investment opportunity with the League.[111]

84. Ebersol testified that he arranged for Dundon to speak directly with leading industry figures—including Bob Bowman (MLBAM founder), Jeff Zucker (then CNN Chairman and CEO), David Zaslav (then CEO of Warner Bros. Discovery), and Jonathan Kraft (President of the Kraft Group and New England Patriots)—to provide firsthand perspectives on AAF's value and potential.[112]

85. During the call, Dundon asked Ebersol how much money it would take for the League to make it through the first season. Ebersol told Dundon that the number could be as low as $55 million or as high as $70 million. The evidence does not reflect that, during the initial

---

[108] Trial Tr. 23:13–16, ECF No. 343. Trial Tr. 10:1–2, ECF No. 383.
[109] Trial Tr. 161:20–165:17, 170–71:5, 172:16–18, ECF No. 349.
[110] *Id.* at 156.
[111] Trial Tr. 139–40, ECF No. 335.
[112] Trial Tr. 68:16–22, ECF No. 332.

call or otherwise, Dundon and Ebersol discussed a $250 million agreement.[113]

86.     That same morning, Ebersol sent Dundon an email, touting the League's ratings from the first week of play, He attached league financial projections, including an investor deck, a financial projections model, and a capitalization table. Ebersol did not inform Dundon that a month prior, the League had drastically downgraded its projected revenue due to cuts in marketing, advertising, and technology, which had adversely affected sponsorship, ticket sales, and general awareness of the league at a critical time—just before the start of the season. The revenue projections Ebersol provided to Dundon for 2019 were $5 million higher than the projections presented to the finance committee weeks earlier, with no explanation for the discrepancy. Projected expenses for 2019 differed by $21 million between the budget set by the finance committee and what Ebersol gave Dundon. Ebersol and his executive staff knew about substantial discrepancies between the projections he provided to Dundon and reality. Still, Ebersol did not disclose those discrepancies in the information he gave to Dundon.[114]

87.     The financial projections that Ebersol sent to Dundon differed materially in several respects from those Ebersol had sent to Fowler just months earlier. The projections sent to Dundon contemplated the addition of two teams to the league every season for the first five seasons, whereas the earlier projections contemplated the addition of two teams every other season. Ebersol and his team knew about the immediately due and past-due payables not referenced in the projections (in addition to the $5.1 million Ebersol did disclose). Defendants' expert Erica Bramer quantified the total accounts payable as of February 13 (excluding the $5.1 million need for payroll) at $21.1 million. The projections sent to Fowler disclosed $46 million in expenses the league intended to pay from the revenue generated from the sale of

---

[113] Trial Tr.140:2–141:18, ECF No. 335; Trial Tr. 88:16–89:11, ECF No. 349.
[114] D-75; Trial Tr. 95–102, ECF No. 331; D-41.

FANchises in 2018. Although evidence suggested there was interest from investors in buying FANchises, none of those potential investors purchased a FANchise. The projections sent to Dundon did not disclose the decision to halt FANchise sales, actual expenses for 2018, or the status of payment for 2018 expenses.[115]

88.     On February 13 and 14, Ebersol and Dundon had a series of phone calls, during which Ebersol stressed that the League needed money and that if Dundon did not make an investment, the League could not make payroll on February 14, 2019. Ebersol stated that the League's continued viability depended on its making payroll.[116]

89.     Dundon forwarded the same information to Zutter on the morning of February 13, 2019.[117] Zutter testified at trial that he recalled receiving and reviewing the information and giving feedback to Dundon, but previously testified that he did not remember.[118]

90.     Zutter received the draft Term Sheet from Dundon and provided written comments on the proposal, calling the proposal "delusional," expressing his opinion that the company was "burning cash," and noting he could "do a 1-dollar senior loan with foreclosure rights and wipe you out and restructure equity."[119]

91.     Following their initial call, Dundon suggested to Ebersol that AAF needed a single funder instead of continuing rounds of fundraising. Dundon called this "series infinity"—a single, comprehensive capital solution.[120]

92.     Ebersol failed to disclose that the League had millions of dollars in preexisting obligations in addition to player payroll. The only pre-existing liability he disclosed was the

---

[115] T-0015; D-75; D-50; Trial Tr. 59–62, ECF No. 331; Trial Tr. 49, ECF No. 434.
[116] Trial Tr. 140, ECF No. 335.
[117] T-0807.
[118] Trial Tr. 40:15–44:20, ECF No. 383.
[119] *Id.* at 44:21–51:14; T-0805.
[120] Trial Tr. 147:19–148:3, ECF No. 321; Trial Tr. 48:12–23, ECF No. 332.

$5.1 million needed for the League's payroll and related expenses. Ebersol stated that the League needed between $55 and $70 million to make it through the first season of play, which would conclude at the end of April, meaning that the League needed $55–$70 million for the remaining eleven weeks of the season.[121]

93.    Three days before Ebersol met Dundon, on February 10, 2019, Ebersol sent an email to Michael Kives, a potential investment contact. Ebersol told Kives that the League needed $70 million to finish the season. Contemporaneous league projections supported a similar estimate.[122]

94.    Ebersol led Dundon to believe the League had paid expenses previously incurred by the League from inception through the first week of play—for items such as stadium fees, hotel accommodations for players—and that only the $5.1 million for player payroll, advertising expenses, and back-office expenses remained outstanding.[123]

95.    Ebersol testified he and Dundon initially discussed a $10 million bridge loan, but that there was no agreement on who (Dundon or one of his entities) would be the lender. After Ebersol sent a form note to Dundon, Dundon called Ebersol back and said he (Dundon) was out, meaning there was no deal. Ebersol provided Dundon with more details about the AAF business model and suggested that Dundon call industry professionals to verify AAF's legitimacy. One of those industry professionals—David Zaslov—called Ebersol late that night and, for the first time, mentioned the figure $250 million as a potential investment. At almost midnight on

---

[121] Trial Tr. 51:6–12, ECF No. 343. Trial Tr. 191–93, ECF No. 396; T-0021; D-237, Ex. A ¶ 6; D-50; Trial Tr. 141, ECF No. 335.

[122] Trial Tr. 209–10, ECF No. 412; Trial Tr. 201–03, ECF No. 343; *see* T-0020 ("[I] need $10M to get through the next 2 weeks and an additional $60M to get through the end of the season. I have investors who will follow a legitimate lead.").

[123] D-75; T-0021; Trial Tr. 50:10–25, 51:6-12; 62:15–21, ECF No. 343.

February 13, Ebersol ended his day with no deal.[124]

96.     The next morning, Ebersol had a call with Dundon in which Ebersol claims to have completed a deal for a Dundon investment. In the Complaint, Trustee claimed the agreement involved an undisclosed Dundon entity investing $250 million over an unidentified period in exchange for a majority stake in and control of the league, with the structure including both debt and equity.[125]

97.     In his deposition, Ebersol testified that the terms were not even as clear as in the complaint: Ebersol stated that, for $250 million, Dundon would receive a majority of ESMG and total control of the board. Ebersol admitted he and Dundon had not reached an agreement on whether the investment would be debt or equity.[126]

98.     At trial, Ebersol claimed to recall certain terms in specific detail and volunteered new terms never mentioned in the six years since he said he made the deal. According to Ebersol's testimony, the deal consisted of Dundon's agreement to invest $250 million in exchange for a 75% equity interest in the League, no debt component, control of the board of directors, and complete control of the League. Ebersol also testified contrary to his deposition that he and Dundon had agreed to a valuation of the League at $82.5 million. Trustee presented multiple press reports and internal emails referencing a $250 million commitment, investment, or some combination of those terms. None of that evidence documented an exchange of $250 million for 75% of the league equity, control of the board, or an agreed valuation. No

---

[124] Trial Tr. 120, 128, 130, 132, 140, 141, 142–44, ECF No. 32; Trial Tr. 30:2–31:7, ECF No. 323; Trial Tr. 71–72, ECF No. 332.

[125] ECF No. 56 at 18–19 ¶ 65 ("Dundon again assured Ebersol of his promise and commitment to fund a total of $250 million, keeping as an open item only the form such funding would take (debt, equity, or some combination)."); ECF No. 1 at 18 ¶ 65; ECF No. 56 at 40 ¶ 142 ("Dundon offered and Ebersol accepted . . . that Dundon would invest $250 million in the AAF through ESMG, structured as both equity and debt, in exchange for a majority stake in and control of the AAF."); ECF No. 1 at ¶142, ECF No. 1 (same).

[126] Trial Tr. 19–25, ECF No. 327.

document discusses any other material terms of a $250 million transaction, including which Dundon-affiliated entity would be a party to the agreement, the timing or terms of the contribution of the funds, or how they would be repaid. No document mentions an agreed valuation between Dundon and Ebersol. The Term Sheet contains no reference to $250 million and contains no reference to an agreed-upon value of ESMG.[127]

99.     According to Ebersol, he called the existing board members and a few major existing shareholders and obtained their approval of the $250 million Dundon deal. Ebersol also claims to have called Fenwick lawyer Jordan Roberts. Notably, none of the board members, shareholders, or lawyers Ebersol claimed to have called testified at trial. The one investor who did testify—Dan Miller—contradicted Ebersol's testimony. Miller said Ebersol told him that he (Ebersol) had obtained financing for the season, but Miller did not recall Ebersol mentioning a $250 million deal.[128]

## THE TERM SHEET

100.     Ebersol and Dundon discussed various scenarios, investment amounts, and structures during multiple calls within the 24 hours between their initial introduction and when DCP transferred the initial $5.1 million to ESMG. At the time that these discussions took place, ESMG, through Ebersol, was being advised by attorneys with Fenwick.[129]

101.     On February 14, 2019, Dundon connected Ebersol with John Zutter, who worked with DCP, an investment vehicle Dundon used to make investments. Dundon is DCP's manager, and DDFS Management, LLC is DCP's sole member. Dundon is the sole member of DDFS Management, LLC, which is the sole general partner of DDFS Partnership LP. DCP and DDFSP

---

[127] Trial Tr. 169:13–15, 171:11–15, ECF No. 321; Trial Tr. 184–87, ECF No. 332.
[128] Trial Tr. 123–24, 161, 163–68, 180, ECF No. 321; Trial Tr. 184–85, ECF No. 327; Trial Tr. 189–90, 205, ECF No. 354.
[129] Trial Tr. 123:12–13, ECF No. 321; D-85 (cc'ing attorneys).

are pass-through entities for tax purposes.[130]

102. During their February 14, 2019, morning call, Dundon and Ebersol discussed how to value a potential deal, with Dundon initially referencing a $90 million cap from the term sheet, Ebersol countering that they were at $115 million (where Fowler and others had invested), and Dundon responding he had them at $75 million before they agreed to split the difference at $82.5 million.[131]

103. On February 14, 2019, Dundon was aware that AAF lacked a permanent funding solution, required additional capital to continue operations, and was actively negotiating with multiple potential investors as alternative sources of funding beyond his own investment.[132]

104. When Dundon connected Ebersol with Zutter, Dundon and Ebersol had not yet come to an agreement finalizing a potential investment. Dundon tasked Zutter with structuring and negotiating, on behalf of DCP, the terms of a potential investment in the League. Zutter testified that he never discussed a potential investment of $250 million with anyone prior to execution of the Term Sheet.[133]

105. Initially, DCP conducted little due diligence on a potential investment in the League because ESMG needed the funding within a few hours to make the payroll deadline. Ebersol did not disclose to Dundon that the Ebersol family trust could have fulfilled the immediate $5.1 million for payroll and given DCP time for diligence.[134]

106. Dundon accepted, for due diligence purposes, ESMG's documentation, the investor deck, the financial projections model, and the capitalization table that Ebersol emailed

---

[130] T-0021; D-85; Trial Tr. 51–53, ECF No. 383. Trial Tr. 215–19, 296, ECF No. 396; D-261; Trial Tr. 141:4–7, ECF No. 351.
[131] Trial Tr. 156:2–58:19, ECF No. 321; Day 6, 75:14-77:1.
[132] Trial Tr. 182:8–17, ECF No. 335; Trial Tr. 50:22–51:6, ECF No. 383.
[133] Trial Tr. 178, 284, ECF No. 335; Trial Tr. 17–18, 54, 92–93, ECF No. 383; Trial Tr. 171–72, ECF No. 321; T-0021.
[134] Trial Tr. 61–63, ECF No. 327.

to him on February 13, 2019.[135] Dundon elected not to conduct any other due diligence during the term sheet negotiations.

107.    On February 14, 2019, the parties exchanged drafts of several proposed term sheets, the first of which was drafted by ESMG's counsel. Zutter handled the negotiations for DCP and sent redlined changes back to Ebersol and the Fenwick lawyers. Zutter, however, directed that the Term Sheet be between DCP and ESMG, rather than between Dundon and ESMG, and cover only $70 million of investment over several months, rather than $250 million and multiple years as Ebersol and Dundon had agreed.[136]

108.    Farrell was in the room with Ebersol during at least one of the calls about the Term Sheet. Farrell's memory of those calls was that he did not recall any definitive statement of an agreement being discussed, other than that there would be a one-page deal for a quick investment, "that then may lead to an additional tranche of funding or financing."[137] None of the draft term sheets referenced an investment or potential investment in the amount of $250 million.

109.    Fenwick lawyers Jordan Roberts and Dawn Belt represented ESMG in connection with the negotiations of the Term Sheet. Roberts did not testify. Belt did not recall any discussions with DCP's representatives regarding an investment in the amount of $250 million by Dundon or any of his entities. Ebersol testified that he, Roberts, and Freedman had a call with Zutter about the Term Sheet. During that call, Ebersol never mentioned that the deal was $250 million, not $70 million. Freedman did not recall any internal discussions regarding a $250 million investment by Dundon or his entities.[138]

---

[135] D-75.
[136] Trial Tr. 65, ECF No. 327; D-85; Trial Tr. 53:1–11, ECF No. 383.
[137] Trial Tr. 19:11–20:22, ECF No. 413.
[138] Trial Tr. 154–55, ECF No. 396; Trial Tr. 23–24, 219, ECF No. 412; Trial Tr. 180–81, ECF No. 321; Trial Tr. 190, ECF No. 332; Trial Tr. 190, ECF No. 332.

110.    When Ebersol saw that the Term Sheet contained a 70% ownership figure instead of the agreed 75%, he immediately called Zutter, who told him to address it with Dundon. Ebersol then called Dundon about the Term Sheet discrepancies, and Dundon stated he had not seen the document and that while the Term Sheet was part of the deal, it did not encompass the entirety of their agreement, reaffirming that Ebersol had "a deal" directly with him.[139]

111.    Except for Jordan Roberts, all other individuals involved in the negotiations testified. Only Ebersol recalls a discussion of $250 million being the Dundon investment. Besides Ebersol's trial testimony, Trustee offered no evidence that anyone objected when the Term Sheet reflected the $70 million maximum cumulative commitment language.[140]

112.    Ultimately, negotiations culminated in the execution of a Term Sheet for Series 2 Preferred Stock Financing. Ebersol executed the Term Sheet on behalf of ESMG. Ebersol did not disclose that he had not obtained authority from the ESMG board or stockholders (in the form of a board vote at a meeting, a stockholder vote, or consent) to sign the Term Sheet on behalf of ESMG. Ebersol did not disclose he had not obtained authority from ESMG's other debt holders. Ebersol did not disclose that the change of control transaction would trigger defaults on millions of dollars of debt, that he lacked authority to consent to the issuance of a new series of preferred shares, or that agreements with other preferred shareholders including the Fowler agreement guaranteed the Series Seed shareholders and Fowler voting board seats, which would make ESMG's performance of the Term Sheet impossible given that Ebersol promised DCP the only voting board seats.[141] Notwithstanding these omissions or representations, Dundon did not conduct any due diligence prior to his acquisition of AAF, nor did he ask any questions about

---

[139] Trial Tr. 187:25–189:22, 192:11–194:5, ECF No. 321.
[140] Trial Tr. 275–76, ECF No. 396.
[141] T-0007; Trial Tr. 45, 66–67, 176–78, ECF No. 327; T-0022; D-136; Trial Tr. 175–78, 180–82, ECF No. 396; D-237, Ex. A ¶¶ 3, 9; D-124; Trial Tr. 202–03, ECF No. 349; T-0007 at 007.0002.

the financial condition of the league or request any financial documents from AAF personnel.

113.    When the parties finalized the Term Sheet, DCP believed, based on Ebersol and AAF legacy management's representations, that the League had only $5.1 million in pre-existing liabilities.[142]

114.    The Term Sheet contains the only agreement that any of the parties reached for an investment in the League.[143]

115.    The Term Sheet is between ESMG, as the "Company," and DCP, as "Investor," and it outlines "a summary of terms for a proposed financing of the company."

116.    The Term Sheet required: "[t]he Investor [to] invest $5,100,000 (the "Initial Funding Amount") by 1:30 pm PST on February 14, 2019.

117.    The Term Sheet contained a maximum cumulative funding commitment of $70 million:

> **Funding Commitment:** June 30, 2019, the Company will have the right to submit an equity funding request to the Investor, which shall state the amount of funding requested and include a supporting budget, subject to a maximum cumulative commitment of $70,000,000. Within 5 calendar days of receipt of each such request, the Investor will invest into the Company the full funding amount listed on such request.

The Term Sheet spelled out the ownership interest DCP would receive for its investment:

> **Investor Ownership:** Upon the execution of this Agreement and Funding of the Initial Funding Amount, the Company will issue the Investor a number of shares of Series 2 such that immediately after the Closing, the Investor will own 75% of the Company's fully diluted capital stock.

The Term Sheet explained DCP's rights concerning corporate governance:

> **Board of Directors and Governance:** Upon the execution of this Agreement, the authorized size of the Board shall immediately be set at four members, two of which shall be voting members and two shall be non-voting members, consisting of members two voting members designated by the holders of a majority of the Series

---

[142] D-50; Trial Tr. 191–93, ECF No. 396.
[143] D-90; D-268; D-269; Trial Tr. 188–90, ECF No. 349.

2 (initially John Zutter and Tom Dundon) and two non-voting members designated by Charlie Ebersol. The Board shall have full authority over all aspects of the Company. The Investor shall have the right to make any and all day-to-day business decisions for or on behalf of the Company, including but not limited to determining capital required to be drawn under this Agreement, to bind the Company or to enter into any agreement on behalf of the Company. The Investor shall have the further right to define or limit any authorities of any employee, Director, advisor, representative, vendor, consultant or officer of the Company, up to and including terminating such individual or entity. To the maximum extent permissible under Delaware law, the parties agree that the Investor, in its role as such or as a director, officer or any other related role to the Company, shall have no fiduciaries obligations to the Company or its owners.[144]

118.    At trial, Ebersol admitted that he understood the key terms of the Term Sheet when he signed it. He understood that, by signing the Term Sheet (even though he lacked authority at the time), he obligated ESMG to issue Series 2 preferred stock to DCP, representing 75% of ESMG's fully diluted stock. He also understood that the Term Sheet set out a maximum cumulative commitment of $70 million and did not mention a $250 million commitment.[145]

119.    The Term Sheet required the Investor to "provide definitive documentation" that ESMG and its representatives would be "obligated to sign," but it made clear that the agreement was binding "upon [ESMG's] . . . receipt of the Initial Funding Amount." The Term Sheet selected Delaware law as the governing law.[146]

120.    On February 14, 2019, DCP caused DDFSP, an entity owned by Dundon, to fund the Initial Funding Amount of $5.1 million. ESMG used the funds to pay payroll due that day.[147]

121.    After ESMG received the $5.1 million, day-to-day management of the League remained with Ebersol and league management. Dundon and Zutter became the sole voting board members of ESMG on February 24, 2019; Ebersol continued to serve on the board of ESMG in

---

[144] T-0007.
[145] Trial Tr. 74–79, ECF No. 327.
[146] T-0007.
[147] Trial Tr. 82–83, ECF No. 327; Trial Tr. 374, ECF No. 412; Trial Tr. 135, ECF No. 380.

a non-voting role, continued as CEO, and remained the manager and CEO of ESMG's subsidiary LLCs. All the other league executives and staff remained in place.[148]

122.    Shortly after February 14, 2019, league management met with DCP representatives in Dallas for a series of all-hands meetings. During the meetings, which took place over several days, the parties discussed operational matters and the process for the League to submit funding requests to DCP. DCP also sought to understand the League's processes, systems, performance, and business metrics. After February 14, 2019, Dundon and Zutter wasted no time—they acted, and were treated by ESMG personnel and former board members, as though they were completely in charge of AAF. After finalizing the deal on February 14, 2019, Dundon instructed Ebersol to book a flight to Dallas.[149]

123.    The Term Sheet required funding requests to be submitted with a supporting budget. DCP and league management agreed that, on a weekly basis, League management would submit a funding request to DCP, outlining the proposed vendors to be paid. DCP and ESMG would then agree on the budget, the amount of funds needed from DCP, the amount of a given request to fund, and how league management would use the funds to pay vendors.[150]

124.    Around the time of the Dallas meetings, League management provided DCP with access to its virtual data room for the first time. Between viewing that room, which League personnel updated with additional and new information, and the Dallas meetings, DCP began to discover material delinquent obligations incurred by ESMG prior to the execution of the Term Sheet that had not previously been disclosed. DCP also began to discover that several of the

---

[148] Trial Tr. 207–09, ECF No. 434; Trial Tr. 79–80, ECF No. 327.
[149] Trial Tr. 117–18, 123, ECF No. 412; Trial Tr. 223:17–227:12, ECF No. 396; D-147; Trial Tr. 177:1–178:5, ECF No. 321; Trial Tr. 35:20–23, ECF No. 343.
[150] T-0007; Trial Tr. 29–30, 109, ECF No. 413.

representations Ebersol made before he signed the Term Sheet omitted material information.[151]

125.  In addition to the $5.1 million that ESMG needed for payroll, ESMG had millions of dollars in outstanding accounts payable at the time it entered the Term Sheet. The debts included the critical vendors with whom Ebersol had been playing "chicken."[152]

126.  During the entire time DCP worked with the League, the League failed to accurately report to DCP the true state of accounts payable. DCP implemented an accounts payable tracker to attempt to identify the monies owed by ESMG. DCP also implemented a cash flow tracker to identify invoices that needed to be paid to get football on the field each week. Neither Ebersol nor AAF management objected to the implementation of the accounts payable tracker or the cash flow tracker.[153]

127.  DCP instructed League management to attempt to negotiate more favorable terms for certain obligations incurred prior to the Term Sheet and implemented a vendor settlement tracker to monitor this process. DCP alleges that, in directing management to renegotiate obligations, DCP sought to increase the League's long-term prospects for success by preserving funds for the weeks ahead. Zutter testified that, from his prior business experience, he knew professional service firms often accept discounts for pre-existing debts, and re-negotiation of pre-existing debts can benefit both the debtor, who saves cash, and the counterparty, who receives payment faster and is incentivized for the business to succeed by the prospect of a long-term business relationship.[154]

---

[151] Trial Tr. 72, 83 ECF No. 383; Trial Tr. 26, ECF No. 398; T-0841; D-237, Ex. A.
[152] Trial Tr. 49, 179–86, ECF No. 434; Trial Tr. 129–30, ECF No. 383; Trial Tr. 191–95, 251, 253, ECF No. 396; D-50; T-0278; D-237, Ex. A ¶ 6.
[153] *See* ECF No. 413 (testifying about the implementation of financial trackers); Trial Tr. 210–17, ECF No. 434; D-150 (discussing how to hold back payables from the DCP funding request to make the weekly burn rate look less scary); D-156; T-1119; Trial Tr. 224–33, ECF No. 396; D-147.
[154] Trial Tr. 135:8–18, ECF No. 412; Trial Tr. 76–77, ECF No. 413; T-0962; D-98; Trial Tr. 226–27, ECF No. 396; Trial Tr. 164–66, ECF No. 383; T-0084.

128.    DCP prioritized spending to enable the League to put games on the field and make it through the first season. DCP representatives Zutter and Jeff Vanderbilt created a triage system for payments, dividing outstanding obligations into three tiers. The first and most important tier consisted of expenses needed to put games on the field. The second tier consisted of expenses that provided some flexibility in timing. The third tier included those past-due obligations that no longer required any service. DCP directed league management to renegotiate preexisting obligations to save funds. DCP controlled the board and had to approve the League's weekly contributions.[155]

129.    DCP uncovered that ESMG had not accurately reported the state of its finances. The League never gave DCP complete financial information or a complete picture of finances at the team level. DCP had to make multiple requests to ESMG for complete details on stadium contracts and related matters. Previously undisclosed accounts payable were uncovered. Due to AAF's financial mismanagement and its decentralized financial tracking system before DCP's investment, DCP took significant time to uncover the extent of Ebersol's misrepresentations and omissions.[156]

130.    DCP also eventually discovered that Ebersol made several material misrepresentations and failed to disclose material items prior to execution of the Term Sheet. Ebersol represented that he had the authority to sign the Term Sheet on behalf of ESMG. Ebersol was required to obtain approval from ESMG's board and a majority of the shareholders. DCP discovered after the Term Sheet that Ebersol had not conducted a board meeting or a shareholder vote to approve the Term Sheet or any other transaction involving Dundon or his affiliates. DCP

---

[155] Trial Tr. 73–82, ECF No. 413; Trial Tr. 129–57, ECF No. 383.
[156] Trial Tr. 35–55, ECF No. 398; *see* Trial Tr. 23, ECF No. 413; Trial Tr. 76, ECF No. 383; D-147 (implementing a project tracker).

learned after the Term Sheet negotiations that a past associate of Ebersol's had threatened the League with litigation, claiming to own a 50% interest in the League. Ebersol failed to disclose, and DCP was unaware of, the existence or nature of the threatened litigation before it executed the Term Sheet. DCP also learned of the existence of outstanding debts the League owed to David Pottruck, Dick Ebersol, and MGM, none of which Ebersol had disclosed before he executed the Term Sheet. Ebersol did not tell DCP that the change-of-control transaction would accelerate the Pottruck and Ebersol notes and trigger a default under the MGM note.[157]

131.     During the ensuing weeks, DCP attempted to identify gaps between reporting and expenses. DCP tasked Elisa Lee, a DCP analyst, with creating a financial model that provided DCP and league leadership with a view of the League's accounts payable and anticipated revenue. Lee could not determine the League's true financial condition. The League lacked a coherent, consistent reporting structure between the League and the teams.[158]

132.     Every week, DCP learned of new expenses and liabilities necessary just to get games on the field, which was due in part to legacy League leadership withholding invoices to avoid scaring DCP. DCP also learned that actual and anticipated revenues were far below what the projections disclosed. As the season progressed, the situation compelled ESMG to tighten its belt to preserve the limited $70 million in capital.[159]

### THE ESMG BOARD AND SHAREHOLDERS RATIFIED THE TERM SHEET

133.     After ESMG signed the Term Sheet, Zutter conducted a gap analysis that identified contractual and legal impediments to ESMG consummating the Term Sheet. The transaction constituted a change of control that triggered a default under an MGM note, made

---

[157] Trial Tr. 177:4–17, 198–99, 204, 275–76, ECF No. 396; T-0022; D-114; D-237, Ex. A ¶ 10; D-124; D-145.
[158] Trial Tr. 24–25, 35–39, 63–64, ECF No. 398.
[159] Trial Tr. 215–17, ECF No. 434; D-125; Trial Tr. 56–60, 71–72, ECF No. 398; D-172; T-1343; Trial Tr. 78–86, ECF No. 413.

notes to David Pottruck and the Ebersol family trust due, and caused a breach of the Fowler stock agreement.[160]

134.    Because the Term Sheet contemplated a change of control, it required board and shareholder approval. When DCP discovered that Ebersol had lacked the authority to enter the Term Sheet on behalf of ESMG because it constituted a material transaction, DCP sought to obtain ESMG's board approval through retroactive ratification.[161]

135.    On February 24, 2019, a majority of the ESMG directors at the time held a board meeting. Ebersol, Jeff Moorad, Kevin Freedman, and Alan Kantowitz attended in person. Dick Ebersol and Dawn Belt attended by phone. The board meeting minutes accurately reflect what happened at the meeting. They show that Ebersol served as the chairman and Belt as the secretary of the meeting, and that Belt kept the minutes.[162]

136.    ESMG's board formally approved and ratified the Term Sheet. The board determined that the Term Sheet was in ESMG's best interests. ESMG's board also confirmed that it had already received $12 million from DCP in fulfillment of the Term Sheet.[163]

137.    Ebersol testified that he called Fenwick lawyer Jordan Roberts about the $250 million deal with Dundon on February 14, 2019. Roberts did not testify in person or by deposition to corroborate Ebersol's testimony. Roberts' Fenwick colleague Dawn Belt did testify. She admitted attending the board meeting but did not recall any mention of a $250 million agreement.[164]

138.    No one presented ESMG's board of directors with, nor did it consider, any

---

[160] D-136 ("Change of Control–Gap Analysis"); Trial Tr. 180–82, ECF No. 396; D-269; Trial Tr. 193–97, ECF No. 327; Trial Tr. 81:5–15, 83:2–22, ECF No. 383; Trial Tr. 165–66, 180–82, ECF No. 396.
[161] D-22, Ex. A, Art. IV.
[162] Trial Tr. 173–74, 181, ECF No. 327; D-135 at 11; D-269.
[163] D-269; D-135 at 12.
[164] Trial Tr. 159, ECF No. 321; Trial Tr. 35, 43, ECF No. 412.

investment by Dundon or any entity owned or controlled by him in the amount of $250 million.[165]

139.     None of the ESMG board members, shareholders, or attorneys sent a demand letter to Dundon stating or suggesting that Dundon breached a purported agreement to invest $250 million in the League, nor did any of the board members reach out to Dundon to ask why he did not fulfill a purported agreement to invest that amount.[166]

140.     Fenwick lawyer Jordan Roberts drafted a waiver to cure the MGM, Pottruck, and Ebersol family trust note defaults. In the waiver, Roberts described the transaction:

> Dundon Capital Partners LLC, or one or more of its affiliates (including affiliates of Thomas G. Dundon) (collectively, "Dundon") . . . has committed to invest up to $70,000,000 in the Company, in exchange for Dundon receiving, among other things, 75% of the Company's fully-diluted capital stock . . . (the "Dundon Transaction") and Dundon has already made certain payments to the Company in connection with the Dundon Transaction.

The waiver does not refer to a $250 million transaction. Although the waiver was never signed, it shows Roberts's understanding of the transaction. Though Ebersol testified that he called Roberts, among others, on February 14 to describe the alleged $250 million agreement, Ebersol never objected in writing to Roberts that the waiver failed to mention a $250 million deal.[167]

141.     ESMG could not enter a $250 million material transaction without board approval. The board never approved a $250 million transaction.[168]

142.     Charlie Ebersol, Dick Ebersol, Jeff Moorad, and Dawn Belt conducted a meeting on February 24, 2019, to approve the Term Sheet. None of them brought up $250 million deal at the board meeting.[169]

---

[165] Trial Tr. 184–87, ECF No. 327; Trial Tr. 222, ECF No. 412.
[166] Trial Tr. 89–90, 133–37, ECF No. 349.
[167] D-145 at 000591; Trial Tr. 188–203, ECF No. 332.
[168] Trial Tr. 43–44, ECF No. 412.
[169] Trial Tr. 186–87, ECF No. 327.

143.     The board also approved a release agreement with FO2, LLC, and a voting agreement that gave Ebersol power of attorney to vote FO2's shares indefinitely. The approval of the release agreement cured two major impediments to ESMG's consummation of the Term Sheet. First, Ebersol and ESMG could not consummate the Term Sheet because the majority ownership would shift to DCP, diluting FO2's shares. Second, ESMG could not keep Fowler on the board (as required in the FO2 agreement) because the Term Sheet required DCP to have exclusive voting rights on the board.[170]

144.     Neither Dundon nor Zutter had been elected to the board at the time the board approved the FO2 release. Neither Dundon nor Zutter participated in the ESMG board's decision to approve the FO2 release.[171]

145.     There is no evidence that Dundon or Zutter received a material, non-ratable benefit from the FO2 release, considering their respective financial circumstances, the fact that all stockholders were released equally, and the fact that Fowler had made no claims against Dundon or Zutter.[172]

146.     Ebersol testified that he relied on Dundon's statements that the Term Sheet merely facilitated the initial wire transfer. Ebersol also testified that he believed the Term Sheet did not displace the larger $250 million transaction and that Dundon assured him the larger agreement remained in place. But by March 26, 2019, Dundon and Zutter made it clear that neither Dundon nor DCP would fund any amount above the $70 million maximum cumulative commitment in the Term Sheet. In those discussions, which included Dundon and Belt, Ebersol never claimed the existence of a $250 million agreement or even mentioned $250 million.[173]

---

[170] D-135 at 4–11, 17–23; D-16 at 5; T-0007; Trial Tr. 176–78, ECF No. 327; D-22, Ex. A, Art. IV.C.2.3.1(d).
[171] D-182 at 4; D-135 at 11.
[172] D-135 at 17.
[173] Trial Tr. 142–43, ECF No. 349; D-182; D-269; Trial Tr. 182–83, 189–95, ECF No. 321; D-256; D-177; T-1171.

147.    After the board ratified the $70 million Term Sheet, the stockholders of ESMG formally ratified the Term Sheet by duly executed written consent, expressly acknowledging that the Term Sheet was binding and enforceable by DCP on March 27, 2019. In doing so, they acknowledged that the board had approved the Term Sheet and that ESMG had received approximately $50 million from DCP under its terms. In the consent, the stockholders authorized the officers of ESMG to negotiate the definitive agreements reasonably necessary or advisable to implement the transactions contemplated by the Term Sheet and to take the actions necessary to carry into effect the resolutions concerning the Term Sheet. The stockholders also ratified the directors' actions regarding the investment. Notably, at the time of the shareholder's ratification, Ebersol, with the FO2 proxy, unilaterally controlled more than 71% of the League shares and maintained that control to the end, as ESMG never issued equity to DCP. Ebersol never objected that the shareholder consent failed to reference a $250 million agreement, even though he knew neither Dundon nor DCP would fund any amount above $70 million.[174]

148.    Dundon testified that, as of March 27, 2019, he and Ebersol had not had any discussions concerning an additional investment of $180 million.[175]

### NO ORAL AGREEMENT FOR $250 MILLION

149.    The foregoing events transpired with no objection from Ebersol, his lawyers, the ESMG board, or any other shareholder objecting that Dundon promised to invest $250 million in the League.[176]

150.    Ebersol testified to the existence of a $250 million agreement. League middle-management testified that, even if they had heard discussions of the $250 million figure, they

---

[174] Trial Tr. 208–12, ECF No. 327; D-182 at 2; Trial Tr. 239–40, 252 ECF No. 323; D-216; Trial Tr. 187–88, ECF No. 396; T-1171.
[175] Trial Tr. 143, ECF No. 349.
[176] *Id.*

had not seen such an agreement and were unaware of its terms. No other witness definitively testified to an understanding that the parties reached an oral agreement on February 14, 2019. While there are references to $250 million in emails involving Dundon or other DCP personnel, none of those exhibits identify the agreement or any terms of that agreement. In a February 22 email relating to CBS, Dundon testified that the purpose of his reference to "250" was to make sure that there was an open discussion with CBS about how future investment with Dundon would likely involve additional dilution, which could impact the negotiations with CBS over the term sheet it was negotiating with ESMG. None of the communications is between DCP or Dundon and ESMG. None of the communications between the parties is contemporaneous with the initial discussions, the negotiation of the term sheet, the minutes of the board meeting, or the shareholder consent reference to $250 million.[177]

151.   The only other evidence of the $250 million deal was statements Dundon made to the press after Ebersol had signed the Term Sheet. The press statements all occurred between February 17 and 24, 2019 (with later-dated emails or articles that refer to statements in that window). While the amount of $250 million as a commitment or commitment to invest is stated, there are no statements to the media that corroborate any terms of an agreement or provide any other circumstantial support for a $250 million oral contract other than the amount.

152.   At trial, Dundon testified that he made statements to the press about a $250 million commitment to make a big impression on the market and calm down the media furor caused by the suggestion that the league missed payroll. Ebersol was concerned at the time about the XFL potentially taking market share, and Dundon and Ebersol wanted AAF's media messaging to project financial stability. While Dundon mentioned the $250 million figure in

---

[177] Trial Tr. 43, ECF No. 412. T-0917; T-0266; Trial Tr. 162–63, ECF No. 343.

media messaging, it is unclear whether he and Ebersol discussed, let alone reached an agreement, on Dundon or any entity under his control investing $250 million in the League. Nor did Ebersol and Dundon ever discuss or agree upon any specific terms or conditions for any hypothetical investment of $250 million in the League.[178]

153.    At trial, Trustee argued that Dundon had previously not explained his motivation for the $250 media blitz. The Court agrees with Trustee that the trial was the first instance about the alleged "$250 million media blitz."[179] The Court finds that the Dundon "media blitz" occurred as follows.

154.    On February 18, 2019, Dundon leaked a story to the press by telling David Glenn that he had invested $250 million to save AAF. Glenn was a reporter for the Athletic and someone that Dundon called "kind of a friend."[180]

155.    Dundon personally insisted and directed Hanson to describe his investment commitment as "$250 million" in the official press release announcing the agreement.[181]

156.    On February 19, 2019, CBS Sports quoted Dundon as saying: "There's a big difference between continuing to raise capital as every startup does, right . . . Series A, series B. Where, you know, I told Charlie you just raised series infinity, right? Like it's done now, so . . . ."[182]

157.    During the same interview, Dundon stated, among other things:

"So this—my—my investment will keep this thing years and years to come and it's—it's not a viability issue. It's—it's just, you know, how good can it be now.

. . .

---

[178] Trial Tr. 92–93, 108–10, 273:6–12, ECF No. 349; T-0034; T-0016; D-128; D-131; D-381.
[179] Trial Tr. 274:23–276:1, ECF No. 349; Trial Tr. 247–248:3–4, ECF No. 434.
[180] Trial Tr. 72:17–75:19, ECF No. 343; T-008 at 0003–04; Trial Tr. 46:19–47:4, ECF No. 335.
[181] Trial Tr. 261:24–262:11, ECF No. 321; T-1317; Trial Tr. 223:16–224:19, 256:2–12, ECF No. 332.
[182] Trial Tr. 252:20–253:2, ECF No. 335; T-0859; T-0860.

My money is in my bank; I'm sure of it.

. . .

I just know when—when they came to me, the football was good, the numbers were good, and, you know, the terms that I could—the terms that I was wanting to invest in, they were willing to do.

. . .

I could care less how they got there, right? I just knew the football was good and the numbers were good and I liked it.

. . .

Well, you know, I think they had other people they were talking to.

. . .

I told Charlie you just raised series infinity, right? Like it's done now, so

. . .

[O]ne thing on the $250 that—that's enough money to run this league for a long time"[183]

158.    At Dundon's direction, AAF distributed the press release around 9 a.m. on February 19, 2019. Dundon personally reviewed the final press release referencing his $250 million commitment on February 19, 2019.[184]

159.    On February 20, 2019, in response to inquiries from Sports Business Journal's Dan Kaplan regarding Dundon's investment, Hanson drafted responses for Dundon's review and approval. Dundon edited the talking points and emailed them to Megan Hanson—copying Charlie Ebersol—making statements such as, "The money is in the bank. I'm committed" and "I have committed to investing $250 million into The Alliance of American Football." Dundon directed that the media be told he had committed $250 million, the funds were available, and he

---

[183] T-0859; T-0860.
[184] Trial Tr. 94:16–95:1, 117:19–118:7, ECF No. 349; T-1317; T-1419.

intended to make AAF sustainable.[185]

160. During these review opportunities, Dundon made edits and comments to the press release, including adding partnership language references to CBS, Turner, and NFL; enhancing biographical details about Santander founding; adding quotes about player/referee development; requesting to be called "majority owner"; and modifying corporate partnership messaging.[186]

161. Also on February 19, 2019, the Carolina Hurricanes issued their own press release announcing that Dundon had invested $250 million in AAF. Dundon approved the form and content of the Hurricanes' press release.[187]

162. On February 22, 2019, Dundon dismissed concerns about AAF's financial issues, telling USA TODAY Sports, "There is no story here about the money it takes, and I can fund this league."[188]

163. On February 28, 2019, in a televised interview, Dundon told Rich Eisen: "So, once I put my name on this, we're going to make this work, right? This is what I'm committed to doing."[189]

164. Dundon further stated in the interview: "I took control of the League"; "I'll put up the money, and I get to make the decisions"; and "Like we don't have to talk about the money anymore."[190]

165. Dundon also inconsistently testified that (1) he was speaking the truth when speaking to the media, and (2) that he "wasn't trying to tell the truth to the media."[191]

166. Dundon's trial testimony was the first time that anyone had heard "that

---

[185] T-0059; Trial Tr. 58:3–5, 59:2–10, ECF No. 335; T-0052; Trial Tr. 205:5–25, 206:19–207:15, ECF No. 343.
[186] T-0034; T-0276; T-1418; T-1417; T-0043; T-0046.
[187] Trial Tr. 283:17–284:12, ECF No. 349; T-0506; Trial Tr. 186:8–187:13, 192:12–193:6, 194:8–9, T-0502, T-0503.
[188] Trial Tr. 265:17–20, ECF No. 343; T-0380 at 0004.
[189] Trial Tr. 203:18–204:6, ECF No. 343; T-1002 at 0013; T-1003.
[190] T-1002 at 0012–20.
[191] Trial Tr. 129:2–4, ECF No. 335; Trial Tr. 257:19–258:1, ECF No. 349.

Mr. Dundon was in league . . . with Mr. Ebersol to promote the $250 million" to the public. Before trial, Dundon never disclosed (in his deposition testimony, initial disclosures, answer, motion for summary judgment, or otherwise) that either he or Ebersol had deployed a media scheme to allege $250 million, even though $250 million was not the deal.[192]

167.    After February 24, 2019, there were no new statements from Dundon or Ebersol about a $250 million deal. Between the petition date, April 17, 2019, and the day Trustee filed the complaint in this case, November 14, 2022, the players filed a $700 million class action lawsuit against Dundon, Ebersol, and the Debtors. Trustee settled the players' case by obtaining an assignment of the players' claims against Ebersol. Ebersol avoided the players' claims and a potential claim for breach of fiduciary duty by the Trustee by settling with the Trustee. In the settlement, Trustee released the claims against Ebersol in exchange for Ebersol's cooperation in this case. After that settlement, Trustee claimed that Ebersol had made a $250 million agreement with Dundon. Dundon first learned of Ebersol's contention that Dundon had entered into a contract to invest $250 million in the League when Trustee filed this lawsuit, which happened after Ebersol agreed with Trustee to provide testimony in exchange for a release of the players' and Trustee's claims against him.[193]

168.    Dundon's explanation that his statements to the press and, allegedly, to AAF employees about investing or committing $250 million in AAF are "puffery" is incredulous and lacks credibility. Dundon's public statements that he was either "committed" or "willing to make an investment" of $250 million in ESMG are contradicted by the more probative evidence of what the Term Sheet stated. No one involved in the negotiations, other than Ebersol, stated that Dundon was committing or investing more than $70 million in AAF.

---

[192] Trial Tr. 275:2–15, ECF No. 349.
[193] D-269; D-217 at 16; Trial Tr. 175-179, ECF No. 323; Trial Tr. 148–149, 152–153, ECF No. 349.

169. Both Ebersol and Ken Schanzer, a 24-year high-level veteran of NBC Sports and a one-time consultant with AAF, testified that handshake deals, oral agreements of the magnitude of $250 million, are common in the sports entertainment business. Given the circumstances and the actors involved, that testimony lacked credibility. This was the biggest deal of Ebersol's life.[194]

170. The Term Sheet is the only proposed written agreement between the parties regarding an investment by Dundon or DCP in ESMG or the League. Any agreement for future investment would require the parties to agree to terms.

171. Neither ESMG nor DCP instructed or requested that Zutter paper an agreement for a $250 million investment in or loan to ESMG.[195]

172. Dundon and Ebersol did not reach an oral agreement regarding a $250 million investment by Dundon or any entity that Dundon owned or controlled. All discussions between Ebersol and Dundon prior to the execution of the Term Sheet constituted negotiations.

173. During those negotiations, the parties never agreed upon: (a) the parties to an alleged $250 million agreement; (b) the timeframe during which the alleged $250 million would be invested; (c) the mechanisms, requirements, and conditions for drawing on the funding commitment; (d) whether the investment would take the form of equity or debt or both; (e) if equity, the price per share, quantity of shares, or any mechanism for valuing the shares, the features of the shares (*e.g.*, preferred payment rights, protective provisions, conversion rights, or whether the league would be issuing common shares, a new category of shares, or extending the offering of previous shares); and (f) if debt, the interest rate, maturity date, payment schedule, conditions to fund (*e.g.*, performance in line with the budget), or any other terms of debt

---

[194] Trial Tr. 238–239, 245, ECF No. 397; Trial Tr. 84-85, ECF No. 327.
[195] Trial Tr. 274, ECF No. 396.

repayment.

174.    The League's governing documents, the Fowler Term Sheet, and the DCP Term Sheet (both of which were structured by ESMG's counsel) demonstrate an intention by ESMG to structure financing deals to address the terms an investor in the League would be expected to agree. The Series Seed and Series 1 shareholders, along with all the details and features of their equity, are identified in the agreements. Both the Fowler and DCP term sheets similarly identify the parties to the investments, the timeframe for making the investments, and the specific procedures and prerequisites for ESMG to request a disbursement of investment funds (or to borrow funds in the case of the Fowler line of credit).[196]

175.    The DCP Term Sheet states that the investment would take the form of equity; the Fowler Term Sheet, on the other hand, calls for a combination of equity and debt, specifically a line of credit. Both term sheets specify the features of the shares (the equity) by providing details on liquidation preferences, preferential distributions, conversion rights, and anti-dilution provisions.

176.    Regarding the debt component of the Fowler Term Sheet, the parties agreed on repayment terms and conditions for funding (e.g., the creation of a finance committee, preparation of budgets, performance consistent with the budget, review sharing, and other terms). The Trustee has admitted in his complaint that the parties kept "as an open item" the "form the funding would take (debt, equity, or some combination)."[197]

177.    In the case of the equity component, Ebersol never claimed that he and Dundon had agreed to repayment terms in the form of preferred distributions and annual dividends. The Term Sheet entitled DCP to receive the first dollars of any distributions totaling the full amount

---

[196] D-22; T-0709; T-0757.
[197] ECF No. 56 at 18–19.

of the investment, plus a preferred return of 20% per year. The Term Sheet also entitled DCP to a 20% annual PIK (payment-in-kind) dividend ahead of payment of any other dividends, redemptions, or other distributions. Trustee presented no evidence that the ESMG shareholders would have agreed to a $250 million deal with those terms.[198]

178.    No one testified that Dundon and Ebersol reached an agreement regarding a $250 million deal.

179.    Walter Ballard of PwC, a tax and accounting consultant for Dundon and DCP, testified about work his firm did for Dundon and his family office. Ballard testified that Zutter sent him the Term Sheet after it was done and that PwC was asked to address the tax ramifications after the fact. He had no discussions about the ramifications of a $250 million deal; the only deal PwC worked on was the Term Sheet (for a maximum cumulative commitment of $70 million).[199]

180.    Other than Dundon, or an entity owned or controlled by him, ESMG had no other material funding commitments at the time Ebersol signed the Term Sheet. Ebersol had been seeking investment from WestRiver Group (Anderson's investment firm) for more than a year without success. Absent an investment by Dundon or an entity owned or controlled by him, the League likely would have failed on February 14, 2019, or shortly thereafter, when it missed payroll.[200]

181.    Regardless of what Ebersol may have intended, neither the ESMG stockholders nor the ESMG board authorized Ebersol to make an agreement whereby Dundon or one of his entities would invest $250 million in the league.[201]

---

[198] T-0007
[199] Trial Tr. 67–69, ECF No. 351.
[200] Trial Tr. 177, ECF No. 332.
[201] Trial Tr. 83–86, 212–13, ECF No. 327.

182.     ESMG and DCP partially performed the Term Sheet. DDFSP sent approximately $70 million in funds to the League after Ebersol signed the Term Sheet, and ESMG turned over control and two board seats to Dundon and Zutter.

183.     Between February 14 and April 16, 2019, ESMG submitted equity funding requests to DCP, and DDFSP provided funds in response to the requests.[202]

184.     The League agreed with the final accounting sent by DCP and did not receive any additional funds after receiving $69,719,190.[203]

185.     DCP complied with the Term Sheet by providing funds to fulfill requests made by the League.[204]

186.     The League exhausted DCP's $70 million before the end of its first season.[205]

187.     ESMG failed to transfer stock to DCP or Dundon as agreed in the Term Sheet.[206]

188.     Dundon had no special relationship with the Debtors at the time the alleged oral agreement was entered.

189.     In mid-February, after Ebersol signed the Term Sheet, ESMG sent a notice of default to Fowler. ESMG never sent a notice of default to Dundon, referring to a failure to invest $250 million or anything else.[207]

### DUNDON BREACHED HIS FIDUCIARY DUTY

190.     Dundon testified he had a fiduciary duty to AAF. He further testified that he had fiduciary duties to the AAF shareholders beginning on February 14, 2019. He was one of two voting board members of the ESMG board of directors.[208]

---

[202] Trial Tr. 108–09, ECF No. 413; T-0962; D-172; T-1343; D-206.1; D-206.2.
[203] D-206.1; D-206.2.
[204] Trial Tr. 247, ECF No. 412; T-0962, T-1343, D-172, D-206.1, D-206.2.
[205] T-0104; T-0962; T-1343; D-172; D-206.2; D-271.
[206] Trial Tr. 142, ECF No. 331.
[207] Trial Tr. 48, ECF No. 331; D-100.
[208] Trial Tr. 253:23–24, 276:6–8, ECF No. 335; Trial Tr. 23:2–12, ECF No. 343.

191. Zutter acted as the second of the two voting members of the ESMG board of directors and had a fiduciary duty to AAF beginning on February 14, 2019.[209]

192. Dundon and Zutter also had fiduciary duties to DCP. Dundon testified that he was not aware of anything he may have needed to do to address his overlapping fiduciary duties to both DCP and the AAF.[210]

193. Dundon admitted that AAF's counsel, Ms. Belt, technically worked for him after he took control of AAF on February 14, 2019.[211]

194. DCP was never an AAF board member; Dundon and Zutter were, individually.[212]

195. After finalizing the deal, Ebersol and key AAF executives convened in Dallas to discuss AAF's operations; outline its needs with Dundon, Zutter, Vanderbilt (chief financial officer of DCP in February 2019), Kulas; and three DCP analysts, and receive direction from Dundon.[213]

196. On February 14, 2019, Zutter emailed DCP representatives Elisa Lee, Jeff Vanderbilt, Ryan Rostenkowski, James Fugitt, and Jason Kulas regarding its "deal to take over control of the AAF." Zutter told the DCP team that the deal would be structured like DCP's EDHC (Employer Direct Health Care) model.[214]

197. Beginning on February 14, 2019, and continuing forward, Zutter and the rest of the DCP team controlled both the submission of funding requests from AAF and the approval of those requests by DCP, resulting in drastic cuts in spending for operations, breaches of agreements, and a vendor "settlement" program (with which Zutter then directed AAF not to

---

[209] Trial Tr. 118:20–119:7, ECF No. 383.
[210] Trial Tr. 23–24, ECF No. 343; Trial Tr. 10:18–25, ECF No. 383.
[211] Trial Tr. 267–268; ECF No. 349.
[212] Trial Tr. 88:5–15, ECF No. 396.
[213] Trial Tr. 37:3–11, ECF No. 343; Trial Tr. 118:14–119:19, ECF No. 412; Trial Tr. 22, ECF No. 413; Trial Tr. 27:25–28:14, ECF No. 398; T-0841.
[214] T-0256.

comply).[215]

198.    As of February 14, 2019, and continuing until the bankruptcy filing, Dundon was a director of ESMG who owed ESMG formal fiduciary duties.[216]

199.    While Dundon later directed the former board of ESMG to confirm his (and Zutter's) board position, as described above, all parties were already behaving as though Dundon and Zutter were the only voting board members after February 14, 2019.

200.    Dundon (himself and through his agents, including Zutter) had actual control over ESMG and AAF after February 14, 2019, regardless of his formal title.

201.    From February 14, 2019, through the bankruptcy filing, Dundon failed to hold any formal board of directors meetings for ESMG.[217]

202.    At a February 18, 2019 meeting, Dundon and Zutter instructed AAF senior staff to obtain discounts from vendors to which AAF had accounts payable. Dundon reserved the right to personally approve or deny any budget item he deemed nonessential. This practice continued even when Dundon and Zutter knew they would not fund payments, even where discounts were negotiated.[218]

203.    On February 20, 2019, Zutter issued a directive that all new AAF contracts must have DCP approval.[219]

204.    On March 15, 2019, Dundon ordered Zutter to "[g]et controls in place" regarding AAF's expenses. Ebersol responded, "There are controls in place. That are [DCP] approved." Zutter testified that one such control DCP instituted was reimbursing personal credit card

---

[215] *See infra* ¶ 202 [hereinafter "FOF ¶ __"].
[216] *See* FOF ¶¶ 190, 192.
[217] Trial Tr. 277:14–24, ECF No. 335.
[218] Trial Tr. 231:25–232:7, 233:24–234:3, ECF No. 321; Trial Tr. 32:13–25, ECF No. 323; Trial Tr. 132:20–22, ECF No. 383; T-0912, T-1105.
[219] T-0274.

expenses rather than using corporate credit cards. Employees were directed to use personal credit cards even after Dundon and Zutter knew DCP would not approve additional funding to AAF.[220]

205.    As of March 18, 2019, Zutter's direction to DCP in its control of AAF was to "pay nothing that doesn't keep the lights on."[221]

206.    From March 18 through April 2, 2019, Dundon permitted AAF to continue incurring new accounts payable obligations despite internal acknowledgment that the company could not pay existing or future vendor obligations.[222]

207.    Zutter was aware of the conflicting interests between DCP and AAF and was conscious of the need for him and Dundon to keep careful track of which "hat" they were wearing at any time.[223]

208.    Dundon and Zutter required AAF staff to submit weekly funding requests and cash flow reports for their approval to obtain operating funds, following a tiered system. DCP prioritized certain vendors over others.[224]

209.    AAF was not allowed to make any significant payment or sign contracts without approval from Dundon, Zutter, or Vanderbilt.[225]

210.    Eventually, by mid-March, Zutter's tactic of "holding [certain] payment[s] hostage" threatened AAF's ability to broadcast and conduct games. In the case of SkyCam, which provided cameras necessary to broadcast games, it threatened not to provide further services after a negotiated settlement payment was not made. The same occurred with SIS Security, who provided stadium security for AAF's games, after DCP refused to pay a settlement

---

[220] T-0423; Trial Tr. 173:25–176:23, ECF No. 383.
[221] T-0084; Trial Tr. 164:15–18, ECF No. 383; T-1048.
[222] Trial Tr. 73–74, ECF No. 413.
[223] Trial Tr. 96:1–14, ECF No. 396; T-0298.
[224] Trial Tr. 140:20–143:1, 143:10–146:8, 193:9–199:3, ECF No. 383. T-0104; T-0120; T-0955; T-1077.
[225] Trial Tr. 37:3–7, 17–19, ECF No. 323; T-0274; Trial Tr. 25:19–22, ECF No. 349; T-0963; T-1114.

that SIS had agreed to with AAF.[226]

211.     Both Dundon and Zutter, in separate conversations, warned Ebersol that if he could not get MGM to agree to renegotiate their deal, they would withhold additional funding, cut off financial support, and shut down AAF.[227]

212.     Kevin Farrell understood that Dundon's group "was in complete control of [the AAF's] expense decisions." Kelly Vugrincic, former Head of People for AAF, understood that she, Farrell, Freedman, and Ebersol all "took direction from the Dundon Group as to how we could operate our finances, and they dictated which vendors were paid and when." Hanson testified that she was aware that Dundon was in control of AAF.[228]

213.     Dundon stated the bills would not be paid in full and must be negotiated down to approximately 10, 15, or 20 cents on the dollar.[229]

214.     Once a vendor agreed to a reduced payment, the approval had to come from Dundon or Zutter, who often rejected initial agreements and instructed the team to negotiate an even lower payment before finalizing the deal.[230]

215.     On March 15, 2019, Zutter and Dundon responded to Vanderbilt's summary of AAF's request to pay its vendors negotiated amounts immediately by discussing among themselves whether a "legal recap" or a "prepackaged [bankruptcy]" would better serve DCP's interests in the League.[231]

216.     On March 18, 2019, Zutter, Vanderbilt, Zutter, and Kulas exchanged emails regarding DCP's approval of funding requests submitted by AAF, where Zutter noted that he

---

[226] T-1119; T-1118 at 0001; T-1152; T-1155.
[227] Trial Tr. 93:7–15, ECF No. 323; T-0383; T-0967.
[228] Trial Tr. 37, ECF No. 413; Trial Tr. 14:25–15:17, ECF No. 354; Trial Tr. 220:18–22, 223:2–15, ECF No. 332.
[229] Trial Tr. 230:25–232:15, ECF No. 321.
[230] Trial Tr. 232:16–234:10, ECF No. 321; Trial Tr. 74–75, ECF No. 413.
[231] T-1116; Trial Tr. 199:3–200:6, ECF No. 383.

preferred to keep the AAF in a "fire drill" with respect to funding requests. The email exchanges also identified Zutter was "avoiding the prefund (not giving AAF cash to use)" and intended to "leave their cash balance real low."[232]

217.    On March 27, 2019, Ebersol circulated an internal email to Dundon and Zutter calling the player contracts AAF's "most valuable asset," underscoring their importance in attracting NFL-caliber talent.[233]

218.    On March 27, 2019, Ebersol also warned Dundon that if AAF did not play the entire regular season, AAF would be in breach of the players' contracts and could lose leverage in selling the contracts to a future spring league such as the XFL.[234]

219.    On March 27, 2019, Ebersol and other AAF executives warned Dundon that failing to complete the season would result in a total loss of investment, bad publicity, loss of all national sponsorship revenue due to not fulfilling contract obligations, and likely would cause AAF football players to be released from their contracts and non-competes, devaluing the AAF.[235]

220.    Dundon did not believe AAF needed money at the time he took control, nor could it later take money in good faith.[236]

221.    Dundon did not make a capital call to existing shareholders.[237]

222.    Dundon testified that potential tax benefits were not the impetus behind his decision to invest in the league. Trustee argued that the purpose of Dundon acquiring AAF was at least two-fold: (1) to take advantage of tax benefits with Dundon utilizing any benefits from

---

[232] T-1127.
[233] Trial Tr. 133:11–14, ECF No. 323; T-0418; Trial Tr. 211:16–25, ECF No. 343.
[234] Trial Tr. 67:11–68:19, ECF No. 396; T-0027.
[235] Trial Tr. 64:1–65:14, 67:11–69:6, 70:18–71:7, ECF No. 396; T-0027.
[236] Trial Tr. 144:16–145:8, ECF No. 343.
[237] Trial Tr. 129:14–21, 130:12–17, ECF No. 343.

"economic opportunity zones", and (2) to facilitate a bankruptcy filing in which Dundon would strip AAF of its two most valuable assets: the SPAs and the AAF technology.[238]

223.    The Court examined the evidence regarding Dundon's alleged impetus for acquiring AAF and found insufficient evidence to support Trustee's contention that Dundon was looking to obtain tax benefits through economic opportunity zones. Trustee questioned Walter Ballard of PwC on the alleged tax attributes from Dundon acquiring AAF, and Ballard's testimony did not demonstrate that Dundon or Zutter premised the acquisition of AAF for tax benefits. PwC was asked to explore the tax attributes of using opportunity zone funds and opportunity investments, but Ballard's testimony showed Dundon's acquisition of AAF was not for this purpose.

224.    While there is evidence that Dundon and Zutter were interested in putting AAF in a chapter 11 bankruptcy, that was not Dundon and Zutter's original intent.

225.    Trustee did not show that Zutter received any benefit because of his service to the League. Zutter did not benefit financially from his work for the League. Zutter was a non-equity partner of DCP and never had an ownership interest in DCP or in DDFSP. Neither Zutter nor any entity in which Zutter had an ownership interest ever obtained any interest in the League. Zutter received no compensation, monetary or non-monetary, for his work for the League. Zutter did not receive a tax write-off or other tax benefit because of his work for the League. Zutter received no financial benefit for his service as a board member. Zutter received no financial benefit from any advertising arrangement between DCP and third parties.[239]

226.    Dundon engaged in self-dealing by providing free or discounted advertising to friends or affiliates, notwithstanding that Dundon testified that his advertising strategy was to

---

[238] Trial Tr. 181–82, ECF No. 349.
[239] Trial Tr. 60, 129:4–131:24, 147–148, 226–227, 273–274, ECF No. 396.

get big brands associated with the League by offering them advertising slots, which would, in turn, create buzz around the League and increase the League's perceived prestige due to its association with major brands. Free advertising may have exacerbated AAF's financial condition. By March 4, 2019, Dundon had supplied multiple entities with which he was affiliated with "no charge" advertising slots during AAF games, including AT&T, Invisalign, SAP, Sony Pictures, Carvana, and TopGolf. Dundon owned AT&T stock and was friends with AT&T's CEO. Dundon owned Carvana stock. Dundon was a substantial investor in TopGolf.[240]

227.    Trustee did not identify any specific dollar figure for any of the alleged harms he claims Dundon and Zutter caused by allegedly breaching their fiduciary duties.[241]

### BREACH OF FIDUCIARY DUTY

228.    Dundon and Zutter were acting in good faith and within their informed business judgment when they cut spending, negotiated with critical partners, declined to aggressively pursue outside investors, filed for bankruptcy, and ultimately breached player contracts.

229.    Dundon breached his fiduciary duty of loyalty by engaging in self-dealing and/or benefiting his friends with ESMG assets, including by providing free advertising to entities related to him (like AT&T, Carvana, and TopGolf) and to entities owned by friends.

230.    Dundon had competing duties of loyalty as a fiduciary of DCP, ESMG, and AAF. Dundon had an actual conflict of interest because Dundon or DCP was on opposite sides of various transactions related to funding AAF, AAF's operations, and the use of AAF's funds and other resources.

### UNJUST ENRICHMENT

231.    Advertisement slots are preferably sold for cash but are sometimes sold or given

---

[240] T-0433; T-0426; Trial Tr. 52:14–55:8; T-0427; T-0428; T-0429; T-0430; T-0432; Trial Tr. 46, ECF No. 349.
[241] D-273; Trial Tr. 151, 156–165, ECF No. 380.

away for a variety of benefits.[242]

232.    Advertising is perishable. If you do not sell advertising before a broadcast, you have lost a revenue opportunity. The vast majority of advertising inventory is sold over the 12 months leading up to the first game. Once the season starts, it is difficult and rare to sell advertising for cash. This is primarily because companies plan ahead and put advertising budgets together in advance.[243]

233.    AAF had sold little of its advertising inventory by the start of its inaugural season, which was before Dundon joined ESMG. Over half of what AAF had sold was a barter arrangement.[244]

234.    Some of the no-charge advertisers later considered a potential barter arrangement with AAF.[245]

235.    Trustee does not provide adequate evidence as to what the advertisements would have sold for, if they could have been sold at all.

236.    Trustee did not provide a calculation of any dollar amount by which Defendants were unjustly enriched.

237.    Trustee did not offer evidence of any out-of-pocket or reliance damages.

### THE LEAGUE FAILED

238.    DCP entered the ESMG investment, anticipating the League would spend approximately $5–7 million of DCP's capital each week. DCP soon realized the League's funding needs were drastically more than expected.[246]

---

[242] Trial Tr. 131:9–132:20, 136, ECF No. 397.
[243] *Id.* at 136, 138–139.
[244] *Id.* at 141:21–142:9.
[245] *Id.* at 141:4–20.
[246] T-0254; Trial Day 13, Audio 3:40:30–3:43:12, May 29, 2025.

239.    ESMG received the following wires in response to requests for funding to DCP:[247]

| Date | Amount |
|---|---|
| 02/14/2019 | $5,100,000 |
| 02/19/2019 | 8,500,000 |
| 02/26/2019 | 6,250,000 |
| 02/28/2019 | 1,500,000 |
| 03/04/2019 | 5,000,000 |
| 03/07/2019 | 4,000,000 |
| 03/13/2019 | 6,800,000 |
| 03/13/2019 | 4,000,000 |
| 03/15/2019 | 2,300,000 |
| 03/19/2019 | 7,800,000 |
| 03/27/2019 | 7,200,000 |
| 03/29/2019 | 2,850,000 |
| 04/02/2019 | 6,950,000 |
| 04/10/2019 | 550,000 |
| 04/12/2019 | 445,000 |
| 04/16/2019 | 474,190 |
| **Total** | **$69,719,190** |

240.    ESMG spent the funds it identified as having been received in fulfilment of DCP's obligations in the Term Sheet.[248]

241.    Despite the funding provided by DCP, the League was unable to pay its debts as they became due, leaving significant outstanding payables.[249]

242.    By mid-March, despite efforts to cut costs and negotiate with vendors, it looked unlikely that the $70 million would AAF get to the end of the season.[250]

243.    Vanderbilt and Lee attempted to determine the revenue picture of AAF during

---

[247] T-0104; T-0962; T-1343; D-172; D-206.1; D-271; Trial Day 13, Audio 7:09:08–7:10:00, May 29, 2025.
[248] Trial Tr. 195, ECF No. 412.
[249] Trial Tr. 10–11, ECF No. 413; T-1343.
[250] T-0104; T-0962; T-1343; D-172; D-206.1; D-206.2; D-271.

February–March 2018. They could not determine the true weekly cost to run the League despite their best efforts to collect that information. Given that weekly cash requests were reaching above $10 million, the money would not last. Testimony in this case indicated that Farrell and Kantowitz had been manipulating the amounts requested from DCP and withholding invoices to keep the funding requests artificially low so as not to scare DCP.[251]

244.    Dundon and Ebersol discussed that the $70 million was running out and that Ebersol and his team needed to come up with options about how to proceed forward.[252]

245.    Dundon said he encouraged Ebersol to seek outside investment interest. Prior to the end of March, Dundon expressed reservations about introducing outside capital because ESMG had no clear understanding of the League's true financial condition. Dundon wanted to avoid potential fraud allegations arising from his inadvertent misrepresentation to interested investors, similar to how Dundon had discovered that Ebersol had done so.[253]

246.    By the end of March, Dundon believed he was likely going to lose the $70 million investment in any event, and he told Ebersol that DCP was willing to hand the League over to a new investor if Ebersol could identify someone comfortable with accepting the League as-is and willing to accept its obligations. Ebersol did not identify an investor who was able and willing to do so.[254]

247.    Dundon asked Ebersol to find someone who would at least be willing to come in and fund the League through the end of the season. Dundon also asked Ebersol to provide an analysis of "how long the 70 buys us." Based on the financial analysis that DCP had been attempting to perform since the time of the investment and the assessment of the League's

---

[251] Trial Tr. 35–36, 38–39, 44, 46, 56–57, 63, 70, ECF No. 398; D-147; D-271.
[252] D-255 at 3; D-256.
[253] Trial Tr. 143–44, 240–242, ECF No. 349; D-177.
[254] Trial Tr. 36, 40, ECF No. 349; Trial Tr. 268–69, 272, ECF No. 396.

viability, Dundon made it clear that DCP was not interested in additional investment in ESMG.[255]

248.    Factors supporting the conclusion that the League was not viable included the fact that none of the projections from the pro forma or any version of it had any basis. Ticket sales were dramatically lower than anticipated. The League received $0 in revenue from the technology application that had generated much fanfare. Although one PAL agreement had been signed, the League received no money from it. While initial TV ratings, app downloads, and in-person attendance seemed promising, interest in AAF quickly waned. TV ratings quickly fell significantly. Stadium attendance was low. The TV deals and player contracts saddled AAF with contractual expenses for years to come, which would only skyrocket if the League added two teams every year.[256]

249.    Following Dundon's directive, on March 26, 2019, Kantowitz, Freedman, Farrell, and Ebersol each ran an analysis that revealed the League would need an additional $65 million from that point to get through the end of May and close out the first year of the League.[257]

250.    Ebersol prepared four end-game strategies. Each strategy was tethered to the $70 million figure agreed to in the Term Sheet and was contemplated by all those who had actual knowledge and leadership roles within the League related to investment, both before and after the entry of the Term Sheet. Nowhere in any contemporaneous texts or communications did Ebersol reference a $250 million agreement. Ebersol did not disclose in the analysis that his team had done the day before that the actual expenses through the end of May 2019 would exceed

---

[255] D-0256; Trial Tr. 143–144, ECF No. 349; T-1117.
[256] Trial Tr. 93–101, ECF No. 331; Trial Tr. 49–50, 52–53, 70–72, ECF No. 398; D-188; Trial Tr. 93–100, ECF No. 331; Trial Tr. 59, ECF No. 398. Trial Tr. 111–12, ECF No. 354; Trial Tr. 108–109, ECF No. 434.
[257] D-176; Trial Tr. 242–45, ECF No. 398.

$65 million.[258]

251.    All four options Ebersol and his team contemplated were an imminent shutdown in the absence of new capital. Ebersol and his team knew, based on their own analysis, that the League required a minimum of $65 million in outside capital to get through May 2019. At that point, DCP had invested $51.25 million. This meant the League needed $46.25 million to get through May 2019, not the $20 million more that Ebersol told Dundon.[259]

252.    Ebersol told Dundon in an email that any option other than immediate shutdown would require the League to incur substantial additional vendor and salary obligations after the league spent the $70 million without any capital source to pay them. None of Ebersol's options included paying off existing obligations to vendors and lenders. Ebersol did not volunteer his family's money, and he did not find an investor willing to jump in and spend $46 million to get to May 2019. In the risk factors identified in options two through four, Ebersol contemplated that the League would burn through all available cash and run up accounts payable. In essence, Ebersol encouraged Dundon and Zutter to continue incurring vendor debt and putting players on the field without capital to pay them and hoped that there was one more Dundon or Fowler that would show up hours before the players quit.[260]

253.    The only viable option Ebersol and his team presented was immediate shutdown, which, as Ebersol admitted, would preserve sufficient capital to initiate bankruptcy, pay all player and non-player salaries, and retain some capital to pay down debts.[261]

254.    One hope Dundon had to entice additional substantial investment in the League and increase its odds of survival was a deal with the NFLPA.

---

[258] D-176; D-177.
[259] D-177.
[260] D-177.
[261] *Id.*; Trial Tr. 247–250, ECF No. 396.

255.    Dating back to the League's inception, Ebersol and his inner circle determined that a positive relationship with the NFL would distinguish the XFL from its antagonistic approach toward the NFL. Ebersol thought AAF would benefit if it became a minor league equivalent for the NFL. To make his plan work, Ebersol tried to forge a partnership with the NFLPA. AAF needed the NFLPA deal to form any partnership with the NFL as it pertained to its players playing in the League.[262]

256.    Even though an NFL link was a crucial part of the business plan, Ebersol failed to initiate confidential negotiations with the NFLPA until December 2018, just two months before AAF's kickoff. No one in AAF leadership had an explanation for the delay. Because Ebersol delayed the negotiations but then raced to launch the League to beat the XFL to market, the League launched with no relationship with the NFLPA and no ability to field NFL practice squad players on its teams during its inaugural season.[263]

257.    When Dundon entered the picture, he joined Ebersol in an aggressive pursuit of a relationship with NFLPA President DeMaurice Smith. Dundon first met Smith on February 19, 2019, and spoke with him frequently over the ensuing months. Dundon and Ebersol had multiple meetings with the NFLPA, trying to secure a deal akin to the two-way contracts the NBA has with certain G League players. Smith repeatedly communicated to Dundon that the NFLPA lacked interest in a relationship with AAF because NFL players had concerns about being forced to play both the NFL and AAF seasons. One of the major issues preventing a deal between AAF and the NFLPA was the NFLPA's concerns about player safety and the potential for player injury. Dundon attempted to develop a solution to address the concerns expressed by the NFLPA

---

[262] Trial Tr. 98–99, ECF No. 323.
[263] D-24; Trial Tr. 270–71, 275–76, ECF No. 398.

but was ultimately unsuccessful.[264]

258.    By the end of March 2019, Smith informed Dundon that he could not get the NFLPA to agree on a partnership, and there would be no partnership at that time.[265]

### ESMG (DUNDON AND ZUTTER) AND ITS RELATED ENTITIES ELECT TO FILE CHAPTER 7 BANKRUPTCY

259.    Once the immediate shutdown scenario outlined by Ebersol (Option 1) became the only responsible option and it was clear the NFLPA deal was unlikely, ESMG's board sought guidance from bankruptcy counsel. ESMG sought advice on whether seeking bankruptcy protection for the Debtors was advisable and whether a chapter 11 bankruptcy was feasible. Counsel advised the board to proceed with a bankruptcy filing but advised that chapter 7 was the only option, given the lack of capital to maintain a chapter 11.[266]

260.    Ebersol was involved in the bankruptcy process after Zutter's first discussion with Bracewell. Ebersol was Zutter's first call after his initial consultation with bankruptcy counsel. Ebersol and his team were essential in selecting key personnel to retain to assist with the bankruptcy process, preparing a business plan and schedules, and managing the remainder of the $70 million for payment of salaries and expenses post-filing. Given the history of spring football leagues, the League had a slim chance of survival. DCP funds and the DCP team's efforts could not help the League recover.[267]

261.    Before filing for chapter 7 bankruptcy, Dundon did not have time to market AAF's assets.[268]

262.    Dundon did not get anyone to opine on the value of the assets before deciding to

---

[264] D-270; Trial Tr. 220–21, 231–33, ECF No. 349; T-1104.
[265] D-268; Trial Tr. 231–33, ECF No. 349.
[266] Trial Tr. 180–83, ECF No. 332; D-182.1; D-203.
[267] D-182.1; Trial Tr. 181–82, ECF No. 332; D-187; Trial Tr. 182–83, ECF No. 332; D-200; Trial Tr. 150, ECF No. 319.
[268] Trial Tr. 131:6–10, ECF No. 343.

put them into chapter 7 bankruptcy.[269]

263.    Dundon did not conduct any valuation of AAF's technology assets before deciding to dispose of them.[270]

264.    Dundon did not reach out to the NFL regarding the value of technology they were licensing and does not recall talking to MGM who had lent $7 million against the technology's value.[271]

265.    Dundon never spoke to Brian Singerman, the lead investor for Founders Fund (an existing shareholder), when AAF needed additional funds.[272]

266.    Dundon never spoke to former ESMG directors Keith Rabois, Dick Ebersol, or Jeff Moorad about the need for additional funds.[273]

267.    Ebersol opposed bankruptcy and advocated for completing the season, but he held no control or authority.[274]

268.    The Court finds that the League failed and shut down because it was insolvent and was not a viable business.

269.    The League suspended operations on April 2, 2019, and subsequently filed bankruptcy on April 17, 2019.

270.    Notably, after the League collapsed, Ebersol sent a draft thank-you email to Dundon in which he recognized and expressed appreciation for Dundon's efforts to save the League. Ebersol did not mention the alleged $250 million oral agreement or make any suggestion that Dundon and Zutter's actions had harmed the League or that they had engaged in self-

---

[269] Id. at 34:20–35:7.
[270] Id. at 131:23–132:6.
[271] Id. at 219:3–9.
[272] Id. at 141:2–6.
[273] Id.at 140:18–141:14.
[274] Trial Tr. 129–30, ECF No. 323; Trial Tr. 73:17–74:8, ECF No. 396; T-1225.

dealing.[275]

271.     Ebersol waited until after the League filed bankruptcy to get control of the League's intellectual property assets. MGM bought all the IP assets in a sale in exchange for $125,000 and forgiveness of $2 million of debt. Then MGM invested the League assets into Ebersol's companies Infinite Athlete and Tempus Ex Machina. MGM and Ebersol's companies coordinated in obtaining patents on the League's technology.[276]

272.     On or about March 27, 2019, Dundon instructed Zutter to engage the law firm Bracewell, LLP to assist in preparing a bankruptcy petition and paid $400,000 to Bracewell, which amount was counted against Dundon's contributions to AAF.[277]

273.     On April 2, 2019, Dundon and Zutter forced AAF to suspend operations immediately and terminate all vendor relationships, including consulting agreements and player agreements.[278]

274.     On April 2, 2019, Zutter sent an email to Dundon, Kulas, Vanderbilt, and Trey Wood of Bracewell saying that he and Dundon need to send a message to the company informing it of the suspension of operations.[279]

275.     Initially, Dundon and Zutter contemplated chapter 11 bankruptcy.[280]

276.     On April 2, 2019, Zutter responded to an email from Alan Kantowitz that included a draft budget for a 12-week plan that would get AAF through a chapter 11 bankruptcy. The email indicated that a total of $71 million would be required to complete the 12-week plan, but Zutter responded by saying that only $70 million was available.[281]

---

[275] D-202.
[276] Trial Tr. 137–38, ECF No. 331.
[277] D-204 at 3; T-1185; T-1194.
[278] Trial Tr. 77:18–78:6, ECF No. 335; T-0054; Trial Tr. 86:6–88:15, ECF No. 396. T-1234.
[279] T-1232.
[280] T-0178; T-1207.
[281] T-0126; T-1236; Trial Tr. 81:11–83:9, ECF No. 396.

277.    After receiving the 12-week plan budget of approximately $71 million, Zutter sent an email to Dundon, Vanderbilt, Kulas, and a Bracewell attorney stating that "it is imperative to do the layoff immediately."[282]

278.    When Dundon and DCP determined neither would provide the additional $1.09 million needed for a 12-week plan to complete the season, Dundon did not seek alternative sources for this relatively small amount.[283]

279.    Dundon ultimately decided to put ESMG and its subsidiaries in a chapter 7 liquidation proceeding and not a chapter 11 reorganization. Dundon decided to liquidate the League rather than invest more money or seek additional funding from another source. Both Dundon and Zutter executed the Written Consent of the Board of Directors of ESMG authorizing the chapter 7 bankruptcy.[284]

280.    Dundon decided to file for bankruptcy without holding a board of directors meeting or notifying any other directors of an intent to hold such a meeting. Ebersol was a non-voting director at the time.[285]

281.    A "resolution of the Board of Directors" document being signed by Dundon and Zutter.[286]

282.    Trustee's expert testified that the League was worth $63.3 million on the day it was finally shuttered, April 2, 2019.[287]

283.    Debtors were put into bankruptcy at the direction of Defendants Dundon and Zutter through the filing of chapter 7 petitions. Debtors' estates were substantively consolidated

---

[282] T-1236.
[283] Trial Tr. 82:20–83:23, ECF No. 396.
[284] T-1415; Trial Tr. 55:10–21, ECF No. 349.
[285] Trial Tr. 18:2–20:3, ECF No. 349.
[286] *Id.* at 55:20–57:13.
[287] Trial Tr. 67:20–24, ECF No. 380.

and are being jointly administered in this Court under Case No. 19-50900-cag.

### DUNDON PROOF OF CLAIM

284.    Between February 14 and April 16, 2019, DDFS Limited Partnership LP made sixteen wire transfers totaling $69,719,190 to AAF.[288]

285.    All payments to ESMG originated from accounts and funds owned by DDFSP, a distinct Delaware limited partnership.[289]

286.    DCP made no direct transfers or payments to AAF.[290]

287.    Dundon made no direct transfers or payments to AAF.[291]

288.    Dundon filed a Proof of Claim, No. 188 ("Dundon Claim") in the core bankruptcy proceeding (Case No. 19-50900). Dundon filed an identical proof of claim in each of the consolidated cases.[292]

289.    The Dundon Claim asserts an unliquidated claim for indemnification and "any other harm or damages suffered by him in connection with his relationship with the debtor."[293]

290.    Dundon did not assert any counterclaims against any of Debtors, whether based on a claim of indemnity, offset, or otherwise.

291.    The Trustee generally objected to the Dundon Claim. Therefore, Dundon was required to demonstrate at trial a proper basis for and the liquidated amount of any claim for it to be allowed. Dundon failed to do so. The Dundon Claim fails to elaborate any basis for its indemnity and general damages claim (by description or documentary evidence) and Dundon offered no evidence in support of the same at trial.[294]

---

[288] T-0104; T-0962; T-1343; D-172; D-206.1; D-271; Trial Day 13, Audio 7:09:08–7:10:00, May 29, 2025.
[289] Trial Tr. 24, ECF No. 343
[290] Id.
[291] Trial Day 13, Audio 7:40:10–7:40:45, May 29, 2025.
[292] The Court can take judicial notice of the Dundon Claim pursuant to Federal Rule of Evidence 201.
[293] Case No. 19-50900, Claim No. 188 at 3.
[294] ECF No. 56 at 63; Case No. 19-50900, Claim No. 188.

292.    The Dundon Claim also asserts a claim against Debtors' Estate in the amount of $70 million on identical or substantially the same grounds as the DCP Claim (defined below). For the same reasons as stated regarding the DCP Claim, the Dundon Claim for $70 million or any other amount was not supported at trial.[295]

293.    DCP filed a Proof of Claim, No. 187 ("DCP Claim") in the core bankruptcy proceeding (Case No. 19-50900).[296]

294.    The DCP Claim alleges that AAF told DCP it would need only up to $70 million for the first season and requested a commitment for that amount. The DCP Claim also asserts a claim for rescission of its $70 million investment but fails to support that claim with anything other than conclusory statements in Exhibit "A" to the DCP Claim.[297]

295.    The DCP Claim alleges that unnamed AAF executives allegedly misrepresented or omitted material facts to Dundon and "misrepresented to the public, employees, and players the details of DCP's financial commitment to the League." DCP asserts a claim against Debtors' Estate for $70 million.[298]

296.    Neither DCP nor Dundon provided any funding to AAF (all funds having been transferred by or through DDFSP), so neither has supported a claim for return of funds invested in any amount. Moreover, all funds that came into AAF were ostensibly in furtherance of Dundon's investment in AAF and thus related to the purchase or sale of a security. Dundon and DCP failed to offer any testimony or other evidence that supported any claims of misrepresentation during the trial.[299]

---

[295] Case No. 19-50900, Claim No. 188.
[296] *Id.* at Claim No. 187.
[297] Case No. 19-50900, Claim No. 187, Ex. A.; Trial Tr. 216:15–23, ECF No. 335.
[298] Case No. 19-50900, Claim No. 187 at 6; Trial Tr. 228:20–23, ECF No. 335.
[299] FOF ¶¶ 284–287; Trial Tr. 228:24–229:16, ECF No. 335.

**DAMAGES**

297.    Trustee pleaded four categories of damages tied to tort claims: (i) destruction of the League's enterprise value; (ii) contracts/letters of intent breached or not pursued; (iii) assets and resources of the Debtors that Dundon and Zutter usurped; and (iv) lost opportunities and profits. In his disclosures, Trustee stated "in total for all breaches" relating to his claims for breach of fiduciary duty, fraud, negligent misrepresentation against Dundon and Zutter, and fraudulent inducement against DCP, Debtors' damages are the full market value of the League at the time Dundon, Zutter, and DCP forced it to suspend operations, as set out in Desai's report.[300]

298.    As Trustee's sole source of disclosed damages, Desai did not provide any calculation of damages relating to: (ii) contracts/letters of intent breached or not pursued; (iii) assets and resources of Debtors that Dundon and Zutter usurped; or (iv) lost opportunities and profits.[301]

299.    Desai weighted, or relied upon in her analysis, two subject-company transactions: (1) the ESMG Series 1 Preferred Stock Purchase Agreement, which set the value of ESMG at $115 million; and (2) the ESMG Binding Term Sheet for the Techco and ESMG Warrants.[302]

300.    The only category of damages Desai addressed was the enterprise value of the League on February 13, 2019 (the day before the DCP investment) and April 2 (the day of the shutdown).  Desai did not opine that the values on those dates were damages or that Dundon, Zutter, or DCP caused the loss of the values on either of those dates. Because she failed to consider causation, Desai's valuation numbers are suspect. Desai should have considered all the

---

[300] ECF No. 56 at 49–50; D-272 at 91–92.
[301] D-273.
[302] T-0757; T-1288; *see also* T-600D at 0004; Trial Tr. 269:17–270:9, ECF No. 321; Trial Tr. 112:22–113:21, ECF No. 331; Trial Tr. 12:2–8, ECF No. 332; T-0016.

issues the League faced to determine the impact of the alleged conduct relative to other factors but did not. Desai's values are not useful because she did not consider whether, if Defendants were removed from the picture, the League would have been better off.[303]

301. Desai premised her valuation on the League's going concern value, which presumed a hypothetical world in the absence of the alleged breaches. In the hypothetical world, Desai assumed the League would be the first successful spring football league and a thriving digital and sports start-up business. She also assumed the League would continue to operate for at least 10 years, that the NFL would fund at least $20 million per year of player and staff salaries, broadcasters would pay for broadcast and production starting in 2020, that ticket sales would more than double in number and price immediately, that digital revenue would grow to $150 million annually even though there was no history of digital revenue, and that there would be more than 1700% growth in revenue and only a 45% growth in expenses.[304]

302. Desai admits that she did not allocate or consider causes other than Defendants. She did not allocate the loss between the 14 to 16 months when Ebersol was in charge and the 46 days during which Defendants were involved. She did not calculate the impact of Ebersol's decision to delay marketing, cut expenses, or cancel local and national marketing; failure to obtain local and national sponsorships; failure to fill advertising space; and failure to sell tickets before the league started. She did not consider the impact of Fowler's failure to fulfill his funding commitment, which was adjudged to have caused $53 million in loss to the league. Desai failed to consider that Ebersol had brought the League to the brink of shutdown at least three times prior to DCP's investment, and the long-term impact this had on the League's financial condition

---

[303] Trial Tr. 151, 153, ECF No. 380; Trial Tr. 79–83, ECF No. 434.
[304] Trial Tr. 248–49, 253–57, ECF No. 380; Trial Tr. 112–17, ECF No. 434.

and its relationship with critical vendors.[305]

303. Desai failed to consider any of the actual circumstances the League faced just prior to Dundon's investment or as the League neared shutdown. On February 13, the League had $1.1 million in the bank, and Ebersol was seeking a $10 million bridge loan from Dundon and others, while considering contributing $5 million in trust money to hopefully get through week two. Desai did no valuation of the League under that scenario, where the League would have burned through the bridge loan or trust money by week two.[306]

304. With respect to the April 2 valuation, Desai failed to consider the actual futures the League had considered as set out in Ebersol's four options email, all of which contemplated a League shutdown in the absence of additional capital, but she admitted that the options from Ebersol are not going-concern options. Desai admitted that Dundon had made it clear that no more than $70 million would be funded. Therefore, the hypothetical future depended on new investors putting hundreds of millions more into the League to achieve the future profits she calculated. Outside of DCP and Fowler, the League had raised only about $15 million from outside investors in its entire history.[307]

305. Desai also admitted that she did no valuation of the Debtors or their assets post-filing.[308]

306. Desai's valuations were flawed. Desai did a market approach valuation for February 13, 2019. She looked at other transactions within the company to determine what a willing buyer and willing seller would have paid for the equity of ESMG on February 13. She relied entirely on the valuation in the Fowler term sheet from November 2018 and the agreement

---

[305] Trial Tr. 152, 154–55, 162–63, 165–69, ECF No. 380; D-273; D-208.1; D-29; D-33; D-36; D-41; D-50.
[306] Trial Tr. 175–76, ECF No. 380.
[307] T-0709, Ex. A; T-0757. Ex. A.
[308] Trial Tr. 250, ECF No. 380.

with 32 Equity in January 2019 to support her valuation. The 32 Equity deal was not relevant because it was not a transaction. The agreement does not state an agreed value; it was merely an option for 32 Equity to purchase shares in the future at the lower of a set price (same price Fowler got) or a third-party fair market value at the time of the transaction. 32 Equity never bought a single share at any price. Fowler was the only one who ever purchased shares at the $115 million valuation. The Fowler agreement is not a reliable source of value because the League underwent fundamental changes between November 2018 and February 2019. The League Fowler invested in predicted future profits to be double what the predictions were in February 2019. Desai did not consider the Term Sheet, which is the most relevant transaction because it was by far the closest in time and shows that ESMG was a willing seller on February 14, 2019, at a value of $23.3 million.[309]

307.    Desai also added $37.8 million in debt to the February 13, 2019, value, but admitted she did no investigation of that figure and that it included Fowler's equity investments, which are not debt.  She made no effort to correct that number.[310]

308.    Desai's April 2, 2019, valuation is unreliable. Desai used the income approach and relied entirely on a single pro forma prepared by Kantowitz on March 26, 2019. She did no independent analysis to determine the reliability of the pro forma. She had no knowledge of whether Dundon and Zutter approved the drastic changes in the pro forma, including the changes in how the League would grow. She did not compare the projection for 2019 to the League's actual revenue and expenses. She did not consider the drastic swings in projections over time and the fact that the league had never met prior projections. She did not correct the pro forma to

---

[309] Trial Tr. 170–72, 194–95, 203, 209–13, ECF No. 380; Trial Tr. 89–94, ECF No. 433. The Court received evidence from Ebersol about the alleged 32 Equity deal, but it did not result in a fully executed deal that would have supported the League with revenue at the time the League needed cash.
[310] Trial Tr. 213–17, ECF No. 380.

remove Kantowitz's unrealistic assumptions, like the NFL contributing $20 million per year and broadcasters paying for broadcast and production starting in 2020, unrealistic revenue growth, drastic expense cuts, and all the other flaws described above. When adjusted for reality, Bramer determined that the projections revealed that the League would continue to lose money for at least ten years and would need more than $500 million in addition to the $250 million to get through that period and would have a negative value.[311]

DISCUSSION

### I.     The Court Declines to Reconsider Defendants' Arguments Regarding the Term Sheet.

At the outset, the Court will address Defendants' arguments regarding Count II of Trustee's Complaint, which the Court previously dismissed as moot because of the Court's ruling in No. 22-05077 ("Ebersol Adversary"). Defendants attempt to resurrect the same argument the Court dismissed at the summary judgment stage, arguing that the Term Sheet was a binding written contract. In support of their argument, Defendants point to the Court's ruling in the Ebersol Adversary, where the Court noted that Dundon failed to allege a defense or alternative argument that would allow the Court to find a binding written contract. According to Defendants, the Court is not precluded from revisiting its decision by the law of the case doctrine. As such, Defendants claim that because they allege defenses in this adversary, the Court can find the Term Sheet is a binding contract in direct contradiction to its previous order.

The law of the case doctrine "is a judicial doctrine that promotes finality and efficiency in the judicial process by encouraging courts to follow their own decisions within any given case." *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 529 (Bankr. N.D. Tex. 2010); *Montco Oilfield Contrs.,*

---

[311] Trial Tr. 216–17, 219, 219–20, 224–25, 227–230, 232–47, 253–57, ECF No. 380. D-188; Trial Tr. 48–50, ECF No. 398; D-275; Trial Tr. 132–35, ECF No. 433.

*LLC v. Black Elk Energy Offshore Operations, LLC (In re Montco Offshore, Inc.)*, 595 B.R. 524, 546 (Bankr. S.D. Tex. 2018) (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817 (1988)) ("The doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided.'"). The doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson*, 486 U.S. at 816. "In the bankruptcy context, the law of the case doctrine should be applied to disputes arising in the main bankruptcy case as well as all of its related adversary proceedings." *In re Pilgrim's Pride Corp.*, 442 B.R. at 530. One thing that frustrates the purpose of the Bankruptcy Code and the certainty of bankruptcy proceedings is differing court rulings based on identical or substantially similar facts and identical legal theories. *Id.*

The law of the case doctrine serves as a guide for how a court should exercise its discretion. *Id.* Thus, a court is free to revisit its own decisions, though it should "loathe to do so in the absence of extraordinary circumstances." *Christianson*, 486 U.S. at 817. The Fifth Circuit has directed that courts generally refuse to revisit decisions unless "(i) the evidence on a subsequent trial was substantially different; (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice." *Royal Ins. Co. v. Quinn-L Cap. Corp.*, 3 F.3d 877, 880 (5th Cir. 1993) (citing *North Miss. Commc'ns v. Jones*, 951 F.2d 652, 656 (5th Cir. 1993), *cert. denied*, 506 U.S. 863 (1994)).

The Court is unpersuaded by Defendants' attempt to take a second bite at the apple. Defendants knew that both adversaries were scheduled for a joint trial because the cases revolved around the same transaction. The signature issue was present in both cases at the summary judgment stage.[312] In fact, Defendants admitted that the result in the Ebersol Adversary did not

---

[312] *See* Adv. Case No. 22-05077, ECF No. 101 at 18.

change their preparation for trial in this case.[313] As such, Defendants could have easily included the alternative contract theories, such as waiver, estoppel, and ratification, in their response to Ebersol's Motion for Summary Judgment.[314] Defendants failed to include any of those arguments and argued the wrong state law at the summary judgment hearing in support of their position, despite the Term Sheet explicitly providing that Delaware law would govern the validity of the document.[315] Notably, this controlling law has not produced a contrary decision applicable to the issues in this case. *See Astellas Pharma Inc. v. MSN Pharm. Inc.*, No. 23-689, 2025 WL 254577, at *8 (D. Del. Jan. 21, 2025) (applying the general rules to determine the existence of a positive agreement to require a signature). Ultimately, Defendants point to law regarding defenses and alternative contract theories that could have been raised in the Ebersol Adversary but were not.

If Defendants disagreed with the Court's decision in the Ebersol Adversary, their best course of action was a motion to reconsider or a direct appeal.[316] Thus, the Court will not use this adversary to reconsider its decision in the Ebersol Adversary. There is no question that a contract exists in this case, but the Term Sheet is not the ultimate governing document. Nevertheless, the Court's previous ruling does not preclude the Court from considering the Term Sheet as evidence of the alleged oral contract here.

## II.     Valid and Enforceable Oral Contract

Turning to the remaining breach of contract claim, Trustee alleges that the parties entered into an oral contract whereby Dundon would invest $250 million in exchange for 75% ownership of ESMG and majority control of the company. Trustee argues that Dundon breached this contract

---

[313] Trial Tr. 71:4–13, ECF No. 327.

[314] Delaware courts hold that "[i]ssues not raised are deemed waived." *Intertek Testing Servs. NA v. Eastman*, No. 2022-0853, 2023 WL 2544236, at *10 (Del. Ch. 2023).

[315] The Court also found law in its Order Denying in Part and Granting in Part Defendants' Motion to Dismiss that the applicable law for determining the validity and applicability of the Term Sheet is Delaware law. ECF No. 54 at 15.

[316] The Court notes that DCP has filed an appeal in the Ebersol Adversary.

by (1) failing to provide additional needed funds in April of 2019 to keep AAF in operation, and (2) frustrating and/or repudiating the Oral Agreement by putting ESMG (and other AAF entities) into chapter 7 bankruptcy.

Under Texas law, to succeed on a claim for breach of contract, a plaintiff must prove "1) a valid contract exists, 2) its performance by the claimant, 3) its breach by the defendant, and 4) damages as a result of the breach." ***Soap Eng'g, LLC v. Infiniti Integration Servs. Corp.***, No. 07-24-00304-CV, 2025 WL 1646333, at *5 (Tex. App.—Amarillo June 10, 2025, no pet.) (mem. op.). To prove that a valid contract exists, a plaintiff must show (a) an offer, (b) an acceptance, (c) a meeting of the minds, (d) each party's consent to the terms, and (e) execution and delivery of a contract[317] "with the intent that it be mutual and binding." ***Prime Prods., Inc. v. S.S.I. Plastics, Inc.***, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (citing ***Angelou v. Afr. Overseas Union***, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.)). "In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding those communications." ***Id.*** at 636 (citing ***Copeland v. Alsobrook***, 3 S.W.3d 598, 605 (Tex. App.—San Antonio 1999, pet. denied)). "The terms must be expressed with sufficient certainty so that there will be no doubt as to what the parties intended." ***Copeland***, 3 S.W.3d at 605. "The elements of an oral contract 'may be proved by either circumstantial or direct evidence.'" ***Garcia***, 2023 WL 8467664 at *3; *see also* ***Hui Ye v. Xiang Zhang***, No. 22-20026, 2023 WL 3888160, at *4 (5th Cir. 2023) (per curiam) ("Courts may rely on the parties' testimony to determine the existence of an agreement.").

---

[317] "Although, in most cases, courts have held that the elements of proof [as listed above] are the same for oral contracts as for written contracts, we assume those holdings to exclude the fifth element that deals with execution and delivery." ***Garcia v. Garza***, No. 13-22-00431-CV, 2023 WL 8467664, at *3 (Tex. App.—Corpus Christi Dec. 7, 2023, no pet.) (mem. op.).

Dundon argues that the alleged oral contract lacked specificity as to the following terms: (1) the identity of the investor; (2) the consideration to be given in exchange for $250 million; (3) the structure of the investment; and (4) the timing of the investment.[318] In support of this argument, Dundon points to ESMG's previous investment agreement with Fowler and the Term Sheet to suggest the above terms were material to the parties. According to Dundon, because the alleged oral contract was devoid of the above material terms, the parties lacked a meeting of the minds.

"Whether an agreement fails for indefiniteness is a question of law." *Coe v. Chesapeake Expl., LLC*, 695 F.3d 311, 320 (5th Cir. 2012). An oral contract must be "sufficiently definite to confirm that both parties actually intended to be contractually bound," and contain "terms that are 'material and essential' to the parties' agreement." *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 237 (Tex. 2016) (first quoting *Fort Worth Indep. Sch. Dist. V. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); and then quoting *Radford v. McNeny*, 104 S.W.2d 472, 475 (1937)). "'Essential' or 'material' terms to a contract are those 'that parties would reasonably regard as vitally important elements of their bargain.'" *Thoroughbred Ventures, LLC v. Disman*, No. 4:18-CV-00318, 2019 WL 1331738, at *7 (E.D. Tex. Mar. 25, 2019) (quoting *Heartland Holdings, Inc. v. U.S. Tr. Co. of Tex. N.A.*, 316 S.W.3d 1, 9 (Tex. App.—Houston [14th Dist.] 2010, no pet.)). "Although the parties must agree to all material terms, they may choose to leave non-essential terms open for later negotiation without rendering the agreement unenforceable." *Coe*, 695 F.3d at 320. "The material terms of a contract are determined on a case-by-case basis." *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (per curiam). As such, "Each contract should

---

[318] ECF No. 300 at 8.

be considered separately to determine its material terms." ***T.O. Stanley Boot Co. v. Bank of El Paso***, 847 S.W.2d 218, 221 (Tex. 1992).

Because Dundon claims each of the above terms is material, if the alleged oral contract lacks evidence for any one term, the contract will fail as a matter of law. Accordingly, the Court will review each term in turn below to (1) determine if it is material and (2) if the parties sufficiently reached a meeting of the minds on the terms.

### A. DCP and DDFSP were the investors in the oral contract.

Dundon first claims that the alleged oral contract lacks the identity of the parties to the contract. Specifically, Dundon argues the record is silent regarding whether Dundon would invest individually or whether some other Dundon-related entity would perform under the oral contract. Trustee maintains that Dundon, individually, and Ebersol, as a representative of ESMG, created the oral contract. As a result, Trustee claims that Dundon is the investor in his individual capacity.

At the outset, the identity of the investor is undoubtedly a material term because it enables the "[C]ourt to understand the parties' obligations" under the alleged oral contract. ***Khubchandani v. State Farm Lloyds***, No. 4:22-cv-00488, 2024 WL 4634068, at *7 (N.D. Tex. Mar. 7, 2024). Thus, when parties enter a contract to invest, it is reasonable to find that the parties regard the identity of the investor as "vitally" important to their bargain. ***Thoroughbred Ventures, LLC***, 2019 WL 1331738, at *7. Because the term is material, the Court must determine whether the oral contract was sufficiently definite enough for the Court to ascertain who the investor is under the alleged oral contract.

Here, Ebersol's testimony was the only testimony that reflected Trustee's position that Dundon entered the contract in his individual capacity. While self-serving, both Dundon and Zutter denied such facts. Trustee points, however, to several news articles and media interviews where

118

Dundon said he was "committed" to investing in AAF and that his investment would sustain the League for years to come.[319] Based on these public statements, Trustee posits that Dundon was the primary investor under the oral contract. While these public statements certainly support the idea that Dundon made the deal on behalf of himself, the Term Sheet provides evidence that Dundon was negotiating on behalf of DCP. This is further supported by ESMG recognizing DCP as an investor and DCP's exerted control over ESMG's operations post-investment.[320] Additionally, all payments accepted by ESMG came from DDFSP, another Dundon-related entity, revealing that negotiations between Dundon and Ebersol were conducted in their representative capacities for their respective entities.[321] While Dundon repeatedly and publicly stated that he was "saving the league," the circumstantial evidence shows that Dundon was making such statements as a spokesperson of DCP and his other related entities.

Accordingly, the identity of the investor is a material term, and the conduct of the parties reveals that the parties reached a meeting of the minds that DCP and DDFSP were the investors under the alleged oral contract. As such, this term is sufficiently definite enough for the Court to consider Trustee's oral contract claim.

### B. Consideration is proper and sufficiently definite.

Dundon next argues that the alleged oral contract lacks consideration and, therefore, cannot constitute a contract. Essentially, Dundon argues that the alleged oral contract and Term Sheet both purportedly grant identical consideration (majority ownership and control of ESMG), which is prohibited under Texas law. Thus, Dundon reasons that the parties failed to reach a meeting of the minds concerning new consideration under the alleged oral contract. Conversely, Trustee

---

[319] T-0142; T-0381.
[320] *See* T-1317 at 2 (recognizing DCP as part of the investment and explaining Dundon's roll in the company as a chairman and managing partner).
[321] FOF ¶ 284.

maintains that the Term Sheet is legally ineffective and, therefore, the two agreements do not improperly convey the same consideration.

Consideration, a requirement for all enforceable contracts, is "a present exchange bargained for in return for a promise" and "consists of either a benefit to the promisor or a detriment to the promisee." ***Roark v. Stallworth Oil & Gas, Inc.***, 813 S.W.2d 492, 496 (Tex. 1991). Any modification to an existing contract or creation of a new contract must be supported by new consideration. *See **McCallum Highlands, Ltd. v. Wash. Cap. Dus, Inc.***, 66 F.3d 89, 93 (5th Cir. 1995) (noting that consideration from an original contract cannot constitute consideration for a subsequent modification). This concept, known as the "pre-existing duty rule," applies to all modifications, supplements, and new contracts. ***Id.*** In such cases, "merely offering the pre-existing duty [a party] already contracted to perform cannot serve as consideration for the change." ***Id.*** Modern jurisprudence urges courts to disfavor solely relying upon the pre-existing duty rule, particularly "if even minimal consideration supports the contract." ***Johnson v. Seacor Marine Corp.***, 404 F.3d 871, 875 (5th Cir. 2005). As long as the parties involved "gain some legally enforceable right . . . *which they previously did not have*, consideration is present." ***Id.*** (emphasis added) (citing ***Morrison Flying Serv. v. Deming Nat'l Bank***, 404 F.2d 856, 861 (10th Cir. 1968)).

The Court views Dundon's argument as two-fold: (1) the Term Sheet and the alleged oral contract purportedly grant the same consideration, and (2) the parties agreed to a maximum investment of $70 million. Both of Dundon's arguments hinge on the reputed validity of the Term Sheet; however, as the Court espoused above, the Term Sheet is not a binding document and only serves as evidence of the alleged oral contract. Because the Term Sheet is not a legally effective contract, it cannot grant consideration that is granted by the alleged oral contract.[322] Thus,

---

[322] *See* T-0821A (revealing no representative of DCP signed the Term Sheet).

Dundon's first argument is unavailing. As such, the bargained-for exchange under the oral contract was a monetary investment paid by DCP or DDFSP in exchange for Dundon receiving majority control and ownership of ESMG.

Turning to Dundon's second argument, it is clear to the Court that the investment amount is at the center of this contract dispute—Trustee maintains that it is $250 million while Dundon vigorously argues that the investment was only $70 million. Trustee uses the Court's previous ruling to bolster his position that the investment amount is $250 million. In addition, Trustee relies on the pre- and post-money valuations of ESMG to suggest that $250 million is the only logical capital figure to support the number of shares proposed to be transferred.[323]

Ebersol, Dundon, and Zutter provided the only fact witness testimony regarding contract formation, and they directly conflicted with one another.[324] Dundon's allegation that he and Ebersol only discussed the $250 million for marketing purposes is not credible.[325] The Court believes the parties likely discussed $250 million as the total investment figure, but finds that Ebersol and Dundon agreed only on $70 million.[326] The conduct of the parties militates against

---

[323] The Court found the following definitions of pre-money valuation instructive:

> The pre-money valuation is the most important term in an equity venture financing because it functions as the price of the deal and, in conjunction with the amount raised, determines the percentage of the company that will be owned by the investors. The term gets its name because it refers to the value the parties assign to the company before the investors put in their money.

Spencer Williams, *Venture Capital Contract Design: An Empirical Analysis of The Connection Between Bargaining Power and Venture Financing Contract Terms*, 23 FORDHAM J. CORP. & FIN. L. 105, 125 (2017).

[324] *See* Trial Tr. 419:7–24, ECF No. 412 (revealing no AAF employees knew the terms of the alleged oral contract for $250 million). Ebersol testified that when Zutter returned a drafted version of the Term Sheet, Ebersol was shocked that the unexecuted document stated a maximum investment of $70 million. Trial Tr. 192:16–23, ECF No. 321. Thereafter, Ebersol claimed he called Dundon to question him about the amount, and, according to Ebersol, Dundon reassured Ebersol that they only listed $70 million as a means to execute their supposed larger $250 million agreement. *See id.* (explaining "the purpose of [the Term Sheet] was to figure out a mechanism to start moving funding"). On the other hand, Dundon testified that he was only willing to invest $250 million under certain conditions, but he could not clarify such conditions. Trial Tr. 255:7–22, ECF No. 335 (claiming Dundon's commitment was to invest if "it was appropriate").

[325] *See* Trial Tr. 244:25, ECF No. 335 ("They were really good marketing statements . . . .").

[326] *See* Trial Tr. 177:19–23, ECF No. 343 (revealing Dundon's position that he and Zutter previously discussed that the league would eventually need $250 million). *But see* Trial Tr. 96–97, ECF No. 383 (showing Zutter disagreed with Dundon).

finding that the parties reached a meeting of the minds for the entirety of the $250 million. In particular, the pertinent individuals to the contract always operated under the belief that $70 million was the maximum investment.[327] It appears to the Court that Ebersol was the only person who asked why the Term Sheet only listed $70 million.[328] No one else questioned Dundon about the larger number when ESMG's board and shareholders both recognized $70 million as the price under the contract, especially after Dundon repeatedly announced to the public that he was investing $250 million.[329] In fact, ESMG's lawyers drafted amendments and waivers to outstanding promissory notes and, although these documents were not executed, they only referenced a default relating to a $70 million contract.[330]

Furthermore, Ebersol's actions buttress the existence of an oral contract at $70 million. Roughly three days before Dundon's involvement with the League, Ebersol elicited investment from other individuals, stating he needed "$10 [million] to get through the next two weeks and an additional $60 [million] to get through the end of the season."[331] At that time, the representation was supported by League projections that showed ESMG needed around $70 million for the first season.[332] Thereafter, Ebersol provided "go forward" options to Dundon and the DCP team in response to the League's advanced cash burn rate.[333] None of the options referenced $250 million or demanded that Dundon pay; rather, the options proposed by Ebersol revolved around $70 million.[334]

---

[327] *See* T-0311 ("As an AAF board member, DCP has not made any further commitment after 70.").

[328] Trial Tr. 10–20, ECF No. 332 (alleging Ebersol never saw a reference to a max commitment of $70 million until he received the first draft of the Term Sheet).

[329] D-135; T-1171.

[330] D-145.

[331] D-70.

[332] D-75. The League's projections were ever fluctuating and often indicated drastically different numbers for the expected cost of the first season. *Compare* D-2 at 71 (showing a total loss of over $400 million by the end of 2025), *with* D-26 at 20 (showing a total loss of close to $500 million by the end of 2025).

[333] D-177; T-0027.

[334] *Id.*

Accordingly, the Court finds that the parties contemplated a *potential* total investment of $250 million but only committed to the $70 million. Therefore, the consideration is proper and sufficiently definite for the Court to enforce the oral contract.

### C.  The oral contract was for equity investment.

Dundon next argues that the oral contract fails for indefiniteness because the parties failed to clarify whether the investment was in the form of equity, debt, or a combination of the two. If the contract is one for debt or a combination of debt and equity, Dundon claims additional terms must be present before the parties' agreement can be enforceable. Trustee counters that the alleged oral contract was for the purchase of ESMG, and, thus, no debt component was contemplated by the parties. Accordingly, Trustee maintains that additional terms relating to a repayment are unnecessary, making the parties' agreement enforceable as is.

For a lending contract, Texas courts generally require evidence of the interest rate, repayment terms, and collateral. *See **T.O. Stanley Boot Co.**, 847 S.W.2d at 221 (finding the only material term present was the loan amount); **Pine v. Gibraltar Sav. Asso.**, 519 S.W.2d 238, 243–44 (Tex. Civ. App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.) (holding a contract indefinite because it lacked the loan amount, interest rate, and repayment schedule); **Farah v. Mafrige & Kormanik, P.C.**, 927 S.W.2d 663, 678 (Tex. App.—Houston [1st Dist.] 1996, no writ) ("In a contract to loan money, the material terms are generally the amount to be loaned, the maturity date of the loan, the interest rate, and repayment terms."). "In the context of a stock sale, the material terms are generally the identity of the issuer, the amount of stock to be sold, and the price to be paid." **Givaudan SA v. Conagen Inc.**, 128 F.4th 485, 500 (2d Cir. 2025); *see also **Farone v. Bag'n Baggage, Ltd.**, 165 S.W.3d 795, 802 (Tex. App.—Eastland 2005) (holding the material terms for an oral contract in the context of a stock option include the method of payment and a mechanism

123

for determining share value and which entity will grant equity shares if the payment method is an equity interest).

Here, there is ample evidence revealing that Dundon purchased ESMG as a representative of his related entities. Shortly after the parties reached an agreement on the terms of their contract, Zutter emailed the DCP staff stating, "Today we signed a deal to take over control of the AAF."[335] Similarly, Dundon testified at trial that the deal he reached with Ebersol was an equity deal whereby he "bought 75% of equity of AAF."[336] While the parties often referred to the League interchangeably as AAF and ESMG, no one disputes that ESMG was the entity issuing stock shares. Further, both parties argued about the pre-money valuation of ESMG and the impact it has on the oral contract claim.[337] Ebersol was the only party who testified to a specific number, asserting that Ebersol and Dundon agreed to a pre-money value of $82.5 million. Trustee alleges that, based on Ebersol's pre-money valuation, $70 million cannot support the price per share for 75% of the company. ESMG can, however, certainly sell stock for less than the stock's value, which appears to be what the parties did here. The price for 75% of the company was $70 million.

Because the record provides evidence that reveals the oral contract was an equity investment with no loan component, and because the terms are clear on the issuer of stock, the price per share, and amount of shares sold, the structure of the parties' agreement is sufficiently definite for the Court to enforce. Accordingly, all the material terms complained of by Dundon are sufficiently definite, rendering the oral contract valid.

---

[335] T-0256.
[336] Trial Tr. 269:17–21, ECF No. 335.
[337] See Trial Tr. 76, ECF No. 332 (indicating the parties assigned different values to ESMG).

### D. Judicial admissions do not render the contract vague.

Defendants argue Trustee judicially admitted that ESMG and Dundon left open various terms for the alleged oral $250 million contract, including the funding structure.[338] Defendants point to select portions of Trustee's First Amended Complaint to support Defendants' contention that the parties failed to reach a meeting of the minds sufficient to form an oral contract.[339] Accordingly, Defendants argue Trustee's breach of oral contract claim fails.

"A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the other party making them." *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001). Judicial admissions are not evidence, but they have the "effect of withdrawing a fact from contention." *Id.* "For the doctrine of judicial admission to apply, the purported admission 'must be made intentionally as a waiver, releasing the opponent from proof of fact.'" *Angel v. Tauch (In re Chiron Equities, LLC)*, 552 B.R. 674, 692 (Bankr. S.D. Tex. 2016) (quoting *Martinez*, 244 F.3d at 476). Thus, for a judicial admission to conclusively establish a fact, the statement must be "(1) made in a judicial proceeding; (2) contrary to a fact essential to the theory of recovery; (3) deliberate, clear, and unequivocal; (4) such that giving it conclusive effect meets with public policy; and (5) about a fact on which a judgment for the opposing party can be based." *Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001), *cert. denied*, 534 U.S. 997.

Nevertheless, the Court has discretion to treat prior statements in briefs as binding judicial admissions of fact. *Angel v. Tauch (In re Chiron Equities, LLC)*, 552 B.R. 674, 692 (Bankr. S.D. Tex. 2016); *see also* *City Nat'l Bank v. United States*, 907 F.2d 536, 544 (5th Cir. 1990) ("We can

---

[338] ECF No. 289 at 14, 16, 19. At the close of trial, Defendants requested the Court take judicial notice of paragraphs 65, 148, and 150 in Trustee's First Amended Complaint. The Court granted the Motion but made clear that it was not making a factual finding.

[339] *Id.*

appropriately treat statements in briefs as binding judicial admissions of fact. Whether we do so, however, is within our discretion."). Additionally, the Court may allow parties to withdraw statements that constitute judicial admissions. ***Wyatt v. Hunt Plywood Co.***, 297 F.3d 405, 412 n.18 (5th Cir. 2002).

Defendants point to three statements in Trustee's First Amended Complaint: (1) "Dundon again assured Ebersol of his promise and commitment to fund a total of $250 million, keeping as an open item only the form such funding would take";[340] (2) "The Term Sheet included an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound sufficient to find a meeting of the minds";[341] and (3) "Under the Term sheet, DCP was required to, upon the submission of funding requests, provide $70 million to ESMG."[342] Based on these purported judicial admissions, Defendants suggest Trustee's breach of oral contract claim fails by way of Trustee's own pleading. Trustee counters that the factual contentions in the First Amended Complaint are based on a lack of information available to Trustee when the amendment was filed. Further, Trustee's counsel asserts that they attempted to amend the Complaint for a second time shortly before trial to conform the Complaint to facts subsequently discovered. The Court, however, declined to permit leave for Trustee to amend the Complaint for a second time because of the looming trial date. According to Trustee, these actions show the paragraphs in question were not deliberate, clear, and unequivocal judicial admissions of fact.

The Court agrees with Trustee—the three statements do not amount to judicial admissions sufficient to entitle Defendants to judgment on Trustee's oral contract claim. The statements were made during a judicial proceeding through pleadings in this adversary proceeding and are facts

---

[340] ECF No. 56 at 18–19, ¶ 65.
[341] *Id.* at 41 ¶ 148.
[342] *Id.* at 42 ¶ 150.

that would be conclusive of Trustee's oral contract claim if deemed admitted. Nevertheless, the Court finds that Trustee's attempts to correct the pleadings reveal that the statements were not unequivocal and deliberate. Trustees often operate from a deficit of information. A few months before trial, Trustee learned the Term Sheet was never executed by both parties. Thereafter, the Trustee sought to correct the error, but due to the timing of the proposed amendment, the Court declined to grant leave. Additionally, the Court later ruled in the Ebersol Adversary that the Term Sheet does not constitute a binding written contract. Based on when Trustee confirmed that the Term Sheet lacked a signature and when the Court ruled in the Ebersol Adversary, the Court finds it inappropriate to deem Trustee's statements in the First Amended Complaint as judicial admissions.

### III.    Dundon's Contract Formation Defenses

#### A. *ESMG ratified the parties' oral contract.*

In Dundon's first oral contract defense, Dundon claims Ebersol lacked the authority to enter an oral contract on behalf of ESMG without board and shareholder approval. Additionally, Dundon contends that Ebersol failed to similarly seek ratification from ESMG's shareholders and board after creating an investment contract with Dundon. Conversely, Trustee asserts Ebersol polled board members for approval before reaching an agreement with Dundon. Further, Trustee reasons that when ESMG gave control to Dundon, the League tendered majority ownership to Dundon. As such, Trustee maintains that any failure to finalize documentation or transfer/issue stock is attributable to Dundon's team alone.

Authority and ratification concern ESMG's internal corporate affairs, which implicates the "internal affairs doctrine."[343] This doctrine requires that Delaware law govern issues that fall

---

[343] The Supreme Court has described the internal affairs doctrine as follows:

within the traditional notion of "internal affairs" for formal entities, including: the election or appointment of directors and officers; the issuance of corporate shares; preemptive rights; and directors' and stockholders' meetings. Restatement (Second) of Conflicts of Laws § 302 cmt. a (A.L.I. 1971); *see also **Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.**,* No. 6179, 2011 WL 3371493, at *13 (Del. Ch. Aug. 5, 2011) (explaining the law of the state of corporation also determines the showing a plaintiff must make to satisfy standing in a derivative action). Stockholder approval may only occur by a meeting with a quorum present or by written consent of a sufficient number of stockholders.[344] Del. Code Ann. tit. 8, § 216 (2009) (requiring a quorum of shareholders to vote on a specified action); *id.* § 211 (requiring a quorum of shareholders to elect a new director). Similarly, a board of directors' approval may occur through a telephonic meeting so long as the meeting is conducted "by means of which all persons participating in the meeting can hear each other." *id.* § 141(i). A board cannot act without the collective sharing of business knowledge that comes from participation in a meeting and deliberation with others present at the meeting. ***Lippman v. Kehoe Stenograph Co.***, 95 A. 895, 899 (Del. Ch. 1915).

Dundon's defense and Trustee's response center on the investment figure of $250 million. As noted above, the Court believes $250 million was discussed, but the parties ultimately reached a meeting of the minds on $70 million. There is evidence that ESMG's board and shareholders approved an investment amount of $70 million.[345] Nevertheless, Trustee asserts that Dundon

---

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—*matters peculiar to the relations among or between the corporation and its current officers, directors, and shareholders*—because otherwise a corporation could be faced with conflicting demands.

***Edgar v. Mite Corp.***, 457 U.S. 624, 645 (1982) (emphasis added).

[344] A meeting may also occur through a remote meeting; however, "if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the corporation." Del. Code Ann. tit. 8, § 211(a)(2).

[345] D-135 at 241, 250–51; D-182.

orchestrated and directed approval of the parties' $70 million because the board and shareholder meetings occurred after Dundon and Zutter assumed actual control of the League. Trustee's argument insinuates that the approval of $70 million was somehow wrongful or tainted. Ebersol, however, convened a meeting of the ESMG board to the exclusion of Dundon and Zutter to ratify $70 million.[346]

Similarly, Ebersol owned or controlled 71% of the shareholders' vote and had the sole power to consummate a deal if one existed.[347] Prior to the parties' oral contract, Teddy Bright Pictures, Ebersol's entity, owned much of ESMG's common stock and approximately two million preferred shares of ESMG.[348] Additionally, Ebersol executed a holder voting agreement with Fowler, under which Fowler named Ebersol as proxyholder for Fowler's company voting stock, which amounted to roughly 30% of ESMG's fully diluted stock.[349] With these rights in hand, Ebersol ratified a contract for $70 million.[350] If anyone orchestrated the approvals, it was Ebersol. Accordingly, even if Ebersol lacked authority to enter an investment deal with Dundon and his related entities, there is ample evidence to support that ESMG's board and shareholders approved a $70 million investment, which supports the Court's finding of an oral contract for that amount.

Because the Court finds that the board of directors and stockholders ratified Ebersol's actions with respect to the oral contract for $70 million, Dundon's alternative argument that Ebersol lacked apparent authority to contract for ESMG is moot. Accordingly, neither defense— lack of actual authority nor lack of apparent authority—is persuasive in disposing of Trustee's oral contract claim.

---

[346] D-135 at 241, 250–51 (revealing minutes of the "Special Meeting of the Board of Directors," which neither Dundon nor Zutter attended).

[347] D-182 at 5–8.

[348] D-75 at 60.

[349] D-135 at 243–49.

[350] D-182. Ebersol's father also signed the resolution on behalf of their family trust, which owned approximately five percent of ESMG's fully diluted company stock.

### B. Any alleged misrepresentations made by Ebersol do not prevent enforcement of the parties' contract.

Dundon asserts the Court cannot enforce the oral contract because Ebersol made false representations and failed to disclose material information regarding the League's debts and cash requirements to DCP and Dundon. Furthermore, Dundon alleges Ebersol lied about his authority to enter an oral contract. In response, Trustee points to the Court's ruling in the Ebersol Adversary, asserting that the Court previously ruled that Defendants did not justifiably rely on Ebersol's alleged fraudulent misrepresentations or nondisclosures.

Dundon's defense appears to the Court as a wrongful inducement defense. Accordingly, the Court will treat it as such. "Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations." **Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.**, 444 F. App'x 1, 10 (5th Cir. 2011) (quoting **Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.**, 960 S.W.2d 41, 46 (Tex. 1998)). "A contract defendant pleading the defense of wrongful inducement is asserting that it agreed to one or more contractual provisions only because the plaintiff misled the defendant into believing untrue statements." **United States v. Texarkana Trawlers**, 846 F.2d 297, 304 (5th Cir. 1988). Under common law, a party cannot give their informed consent when they are wrongfully induced to accept objectionable contractual terms through misrepresentations or nondisclosures. **Id.** Consequently, a defendant may choose to avoid the objectionable portions of such contract or rescind the entire contract where the plaintiff has "wrongfully induced the defendant to consent to the contract itself." **Id.** Recission, however, will only be granted where a defendant seeks the remedy shortly after discovering the misrepresentation. **Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.**, 752 F.2d 178, 182 (5th Cir. 1985) ("[T]he right to rescind a contract may be lost by failure to assert the right . . . .").

Here, the Court finds Dundon's defense of wrongful inducement unavailing for several reasons. First, and most persuasively, Dundon admitted at trial that he simply relied on Ebersol's word without inquiring into the status of the League's accounts payable.[351] It was evident to the Court that Dundon wanted to be a part of ESMG's effort to create a new spring football league and that Dundon understood the risk he undertook when he made his investment without performing due diligence.[352] As a result, the Court found in the Ebersol Adversary that Dundon, as a representative of DCP, could not justifiably rely on any alleged misrepresentations made by Ebersol.[353] Second, Dundon failed to put on evidence to show that Ebersol intentionally misled Dundon in making the parties' contract. The company's mode of operations for tracking accounts payable were certainly inefficient but appeared to the Court to be nothing more than disorganization.[354] Finally, Dundon, through his related entities, continued to fund payment requests by ESMG after discovering that ESMG's accounting methods were unreliable.[355] In fact, Dundon almost funded the entire $70 million required by the parties' oral contract without seeking rescission, which is required before Dundon can assert the defense of wrongful inducement.[356] Accordingly, Dundon's wrongful inducement defense is unpersuasive.

### C. The parties' contract was not impossible to perform.

Next, Dundon raises the defense of impossibility, arguing that even if Dundon and Ebersol entered into an oral agreement, the agreement did not address the contingency of the League shutting down before the first season ended. According to Dundon, supervening factors frustrated the parties' contract because there is no evidence that the parties agreed to fund a shutdown of the

---

[351] *See* Trial Tr. 99:15–33, ECF No. 343 ("I was taking someone's word.").
[352] *Id.* at 113:10–13.
[353] Adv. No. 22-05077, ECF No. 171 at 18–20.
[354] Trial Tr. ECF No. 412, 413.
[355] Trial Tr. 135:5–11, ECF No. 413.
[356] *Id.* at 135:19–21.

League. Trustee asserts that the oral contract was not impossible because the projections provided to Dundon disclosed heavy losses for the first five years of the team. In addition, Trustee alleges that Dundon had the ability to pay the remainder of the $70 million, which could have allowed the League to reorganize under chapter 11 of the bankruptcy code.

Dundon relies on ***Alabama Football, Inc. v. Wright*** to support his argument that Dundon's decision, through DCP, to place AAF into bankruptcy excused any further performance of Dundon under the oral contract. ***Ala. Football, Inc. v. Wright***, 452 F. Supp. 182 (N.D. Tex. 1977). There, a player sued a defunct football team for breach of contract, alleging that the team failed to provide a forum for the player to perform services pursuant to their contract. ***Id.*** at 185. According to the player, the team was not excused from allowing the player to play, despite having filed for bankruptcy and ceased operations. ***Id.*** The Court explained that "[i]mpossibility occurs where (1) an unexpected contingency occurs, (2) the risk of which was not allocated either by agreement or custom, and (3) the occurrence of the contingency has made performance impossible." ***Id.*** After reviewing the parties' contract, the court determined that the parties did not allocate the risk of the team shutting down or filing for bankruptcy. ***Id.*** Because of this lack of allocation, the court found the unexpected dissolution of the team made performance under the parties' contract impossible and declined to award summary judgment to the player on his claim. ***Id.***

The breach complained of in ***Alabama Football*** is materially different than the breach complained of in this case. There, the player complained about the team's failure to give the player an opportunity to perform. Here, the League complains that the investor has failed to fulfill its investment. The contract here was made for the purpose of allowing ESMG to operate. It was created at a time when funding was undoubtedly needed, a fact known by Dundon when the contract was created. Dundon cannot claim that filing for bankruptcy and shutting down the

League was so unexpected that his further performance is excused, given that he, through his entities, made the decision to place ESMG in bankruptcy.

Accordingly, the Court finds Dundon's defense of impossibility is inapplicable to defeat Trustee's breach of oral contract claim. Whether Trustee can recover the remainder of the $70 million will be addressed below.

### IV. Breach of Contract

Because there is a valid and enforceable contract, the Court must review whether ESMG performed its obligations thereunder and whether Dundon, through his entities, breached the contract. In Texas, a "breach of contract is defined as 'a failure, without legal excuse, to perform a promise that forms the whole or part of a contract.'" *Raybourne & Dean Consulting, Ltd. v. Metrica, Inc.*, No. SA-14-CA-918, 2016 WL 7497587, at *18 (W.D. Tex. Feb. 19, 2016) (quoting *Gilmore v. SCI Tex. Funeral Servs., Inc.*, 234 S.W.3d 251, 259 (Tex. App.—Waco 2007, pet. denied)). "Any breach, even a nonmaterial breach, may give rise to a claim for damages." *Lavender v. Bortz (In re Bortz)*, Ch. 7 Case No. 22-33772, Adv. No. 23-3052, 2025 WL 1428161, at *17 (Bankr. S.D. Tex. May 16, 2025) (citing *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam)). "[W]hether a party has breached a contract is a question of law for the court." *Willis v. Donnelly*, 118 S.W.3d 10, 25 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

Trustee argues that ESMG fully performed its obligations under the contract and that Dundon breached by failing to continue funding the remainder of the investment funds or, at a minimum, supply additional money to allow ESMG to reorganize. Conversely, Dundon asserts that ESMG failed to provide sufficient evidence to show that ESMG fulfilled its obligation to tender majority stock ownership to DCP and pay a preferential return. As a result, Dundon

contends that ESMG breached the parties' oral contract first, and any action or inaction on the part of DCP is inconsequential.[357]

The parties' arguments concern the timing of their obligations under the oral contract. Beginning with ESMG's required performance to issue company stock, the Court will review when and how ESMG was required to issue stock according to Delaware law because the issuance of stock concerns internal affairs. *See Beard v. Elster*, 160 A.2d 731, 735 (Del. 1960). Under general Delaware corporate law, the issuance of stock "shall be paid in the manner that the board of directors shall determine." Del. Code Ann. tit. 8, § 152(a); *see also id.* § 153(b) ("Shares of stock without par value may be issued for such consideration as is determined from time to time in accordance with § 152 of this title, or by stockholders if the certificate of incorporation so provides.").[358] This procedure is necessary because "an issuance of stock without receipt by the company of valid consideration is void." *Fonds de Regulation et de Controle Cafe Cacao v. Lion Cap. Mgmt., LLC*, No. 1509-N, 2007 WL 315863, at *12 (Del. Ch. 2007).

Here, the Term Sheet provides evidence regarding when ESMG was obligated to issue stock to DCP. It provides that upon DCP's initial funding of $5.1 million, ESMG was required to issue several shares of Series 2 stock such that DCP would own 75% of ESMG.[359] There is no dispute that DDFSP sent the initial $5.1 million to ESMG by the end of the day on February 14, 2019. Ebersol testified that he believed Dundon was the majority owner by the morning of

---

[357] Dundon raised a similar argument, alleging that because ESMG breached the parties' contract first, there is no breach of contract claim for the estate, rendering the contract executory in nature. According to Dundon, because Trustee failed to assume this executory contract, Trustee rejected it and cannot attempt to enforce it through this lawsuit. The Court need not address this argument because whether the contract is a claim of the estate depends on whether ESMG fully performed its obligations and whether Dundon breached the contract—two of the core elements for a breach of contract claim.

[358] Similarly, in Texas, "Shares may not be issued until the consideration, determined in accordance with [the Code], has been paid or delivered as required in connection with the authorization of the shares." Tex. Bus. Org. Code § 21.157.

[359] T-0007 at 1.

February 19, 2019, revealing the parties indeed intended for ESMG to be obligated to issue stock shortly after DCP provided the initial funding amount.[360] There is also no dispute that ESMG failed to issue any stock to DCP or any other Dundon entity. Trustee alleges that it was Dundon and Zutter's duty to issue the stock and, as a result, Dundon cannot complain of ESMG's failure to comply with the parties' contract. This argument is not persuasive. While Dundon took actual control of ESMG on February 14, 2019, the original board and shareholders did not ratify the agreement until ten days later. ESMG could have issued 75% of fully diluted stock to DCP before or at the same time the board signed its resolution concerning Dundon and Zutter's majority control of the company. As a result, ESMG did not fully perform its obligations under the parties' contract.

Because ESMG did not fulfill its portion of the contract, ESMG was in breach when the bankruptcy petition was filed. Accordingly, Trustee, who is in the shoes of ESMG, cannot satisfy the third element—contract performance by claimant—to maintain its breach of contract claim. *See Soap Eng'g, LLC*, 2025 WL 1646333, at *5 (listing the elements for a breach of contract).

## V.   Covenant of Good Faith and Fair Dealing

Trustee alleges Dundon breached the covenant of good faith and fair dealing. An implied covenant of good faith and fair dealing did not exist in the oral contract. The Texas Supreme Court has "not recognized that an implied covenant of good faith and fair dealing exists in every contract but, instead, has recognized that such duty 'may arise as a result of a special relationship between the parties governed or created by a contract.'" *Texas Champps Americana, Inc. v. Comerica Bank*, 643 S.W.3d 738, 747–48 (Tex. App.—Dallas 2022, no pet.) (quoting *Arnold v. Nat'l Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)). "Special relationships arise where there is an element of trust necessary to accomplish the goals of the undertaking or when the courts have

---

[360] ECF No. 332.

declared the existence of a special relationship because of imbalance of bargaining power." *Cent. Sav. & Loan Ass'n v. Stemmons Nw. Bank*, 848 S.W.2d 232, 239–40 (Tex. App.—Dallas 1992, no writ); *see also Laredo Med. Grp. v. Lightner*, 153 S.W.3d 70, 72–73 (Tex. App.—San Antonio 2004) ("A 'special relationship' has been recognized where there is unequal bargaining power between the parties and a risk exists that one of the parties may take advantage of the other based upon the imbalance of power. . . ."). But "[t]here is no general duty of good faith and fair dealing in ordinary, arms-length commercial transactions." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 52 (Tex. 1998).

Here, there was no special relationship that arose from an element of trust necessary to accomplish the goal of the contract. The bargained-for exchange under the oral contract was a monetary investment paid by DCP or DDFSP[361] in exchange for Dundon receiving majority control and ownership of ESMG.[362] The goal of the contract was to ensure Dundon received control and ESMG received the investment. While the fulfillment of the goal of any contract may require at least some element of trust between the parties, there is no special element of trust required here that would create a special relationship. *See Cent. Sav. & Loan Ass'n*, 848 S.W.2d at 240 ("Because one business entity trusts another and relies on their contractual promise to perform the contract does not cause a special relationship.").

There was also no unequal bargaining power between DCP and ESMG that would risk one party taking advantage of the other. Rather, Dundon and Ebersol's dealings reflected an ordinary, arms-length commercial transaction. Dundon and Ebersol discussed various scenarios, investment

---

[361] The Joint Proposed Pre-Trial Order states, "Plaintiffs are not proceeding to trial on Count III [Breach of Covenant of Good Faith and Fair Dealing] as to Defendant DCP." (ECF No. 300 ¶ 28). Because the Court found the parties to the oral contract were DCP and DDFSP, not Dundon, the Court examines whether DCP or DDFSP violated the covenant of good faith and fair dealing.

[362] *See supra* Section II.B.

amounts, and structures during multiple calls within the 24 hours between their initial introduction and when DCP transferred the initial $5.1 million to ESMG.[363] During their February 14, 2019 morning call, Dundon and Ebersol discussed how to value a potential deal, with Dundon initially claiming ESMG was worth $90 million.[364] Ebersol stated that they were worth more than $90 million, referencing the $115 million valuation at which other investors had invested.[365] Dundon stated he valued them at $75 million, so the two sides split the difference and agreed at a $82.5 million valuation.[366] At the time, Dundon was aware ESMG needed funding but was also aware ESMG was actively negotiating with multiple potential investors as alternative sources of funding to Dundon.[367]

The parties later exchanged drafts of several proposed term sheets and continued to negotiate, ultimately agreeing on the Term Sheet.[368] Fenwick lawyers Jordan Roberts and Dawn Belt represented ESMG in connection with the negotiations of the Term Sheet.[369] The dealing between Dundon and Ebersol does not represent the imbalance of bargaining power courts reference when finding a special relationship. *See, e.g.*, *Arnold*, 725 S.W.2d 165, 167 ("In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims."); *see also In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008) (describing "disparity in bargaining power" as a situation where one party has no choice but to accept an agreement). Therefore, there was no

---

[363] FOF ¶ 100.
[364] FOF ¶ 102.
[365] FOF ¶ 102.
[366] *Id.*
[367] FOF ¶ 103.
[368] FOF ¶ 107–12.
[369] FOF ¶ 109.

special relationship based on an imbalance of bargaining power. Accordingly, there was no covenant of good faith and fair dealing.

### VI. Breach of Fiduciary Duty

Trustee alleges that Dundon and Zutter breached their duties of care, loyalty, and good faith to ESMG.[370] The Court concludes that Dundon breached his fiduciary duty of loyalty to ESMG. The following analysis details the applicable legal framework and the Court's reasoning.

*A. Dundon and Zutter owed fiduciary duties to ESMG and its subsidiaries.*

"The elements of a breach of fiduciary duty claim are (1) that a fiduciary duty exists and (2) that the fiduciary breached that duty." ***Off. Comm. of Unsecured Creditors. v. Bay Harbour Master Ltd., (In re BH S& B Holdings LLC)***, 420 B.R. 112, 143 (Bankr. S.D.N.Y. 2009) (applying Delaware law).

Dundon and Zutter owed fiduciary duties to ESMG. Directors owe fiduciary duties to the corporation and its shareholders. ***Balasiano v. Borell (In re Furniture Factory Ultimate Holding, L.P.)***, No. 20-12816, 2023 WL 5662747, at *11 (Bankr. D. Del. Aug. 31, 2023). Dundon and Zutter were directors of ESMG. Thus, they owed fiduciary duties to ESMG.

Dundon and Zutter also owed fiduciary duties to We Are Realtime, LLC, AAF Properties, LLC, Legendary Field Exhibitions, LLC, LFE 2, LLC, and AAF Players, LLC. "Delaware law imposes fiduciary duties on a person who controls an entity." ***Ban v. Manheim***, 339 A.3d 41, 61 (Del. Ch. May 19, 2025). A "controller" does not have to hold the majority stock. ***Kahn v. Lynch Commc'n Sys., Inc.***, 638 A.2d 1110, 1113 (Del. 1994); ***In re Cysive, Inc. v. S'holders Litig.***, 836 A.2d 531, 551–53 (Del. Ch. 2003). The default rule, however, has always been that controller status usually requires *some* stock ownership. *Lynch*, 638 A.2d at 1113; *see also **In re Tesla***

---

[370] The Court refers to ESMG and its subsidiaries collectively as "AAF."

*Motors, Inc. S'holders Litig.*, No. 12711, 2018 WL 1560293, at \*19 (Del. Ch. Mar. 28, 2018) (suggesting Elon Musk, as minority shareholder, may be a controller because of his "managerial power" and outside influence of Tesla's board, public persona, and economic ties).

But in ***Pattern Energy***, the Chancery addressed the issue of whether "nonstockholders" could yield significant control over the company, thereby implicating their status as controllers. ***In re Pattern Energy Grp. Inc. S'holders Litig.***, No. 2020-0357, 2021 WL 1812674, at \*36 (Del. Ch. May 6, 2021). The court distinguished two cases where the Chancery dismissed fiduciary duty claims against alleged controllers because they held no stock in the company. *Id.* at 38. First, ***Klein v. H.I.G. Capital, L.C.C.*** considered a control group theory where the alleged controllers did not own stock at the time the challenged transaction occurred. *Id.* The Chancery, in that case, noted that it declined to impose fiduciary status on the defendants who neither owned stock nor were "a party to any agreement or arrangement that controlled the votes of any shares" of the company's stock, nor "took any action to exercise control." *Id.* Notably, ***Klein*** emphasized that the alleged control must have existed at the time the alleged breach occurred—it is not enough that the nonstockholder had the potential to exercise control *later*. *Id.* Second, ***Skye Mineral Investors, LLC v. DXS Capital (U.S.) Ltd.*** declined to extend controller status to nonstockholders who owned no shares, appointed no board members, and held no contractual blocking rights. *Id.* Thus, ***Klein*** and ***Skye Mineral Investors*** "both looked beyond the bounds of stock ownership to other sources of soft power" to imply that fiduciary duties may extend to a nonstockholder. *Id.* Noting that "Delaware law looks to substance rather than form when considering who wields control sufficient to impose fiduciary duties," the Chancery in ***Pattern Energy*** held that controller status and fiduciary duties may be imposed upon a nonstockholder that holds and exercises power to displace the will of the board with respect to decisions and transactions. *Id.* at 40. In other words, a director

139

who owns no stock is not a controlling stockholder but could be described as having *de facto* control or domination over corporate governance. *See Tornetta v. Musk*, 310 A.3d 430, 497–500, 503–06 (Del. Ch. 2024) (imposing fiduciary duties on Musk because his "influence over managerial decisions, decision makers, and the process" constituted control over the company even though he was a minority shareholder).

Under Delaware law, parent corporations do not owe fiduciary duties to their subsidiaries. *In re Essar Steel Minn. LLC*, 602 B.R. 600, 607 (Bankr. D. Del. 2019). A director of the parent, however, *can* be its subsidiary's controller in the unconventional sense by dominating the board or corporate decisions without owning stock. *In re Pattern Energy*, 2021 WL 1812674, at *36. "To show that the requisite degree of control exists generally, a plaintiff may establish that a defendant or group of defendants exercised sufficient influence" over corporate decisions. *Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC*, No. 11802, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018).

> Examples include, but are not limited to: (i) relationships with particular directors that compromise their disinterestedness or independence, (ii) relationships with key managers or advisors who play a critical role in presenting options, providing information, and making recommendations, (iii) the exercise of contractual rights to channel the corporation into a particular outcome by blocking or restricting other paths, and (iv) the existence of commercial relationships that provide the defendant with leverage over the corporation, such as status as a key customer or supplier.

*Id.* at *26 (footnotes omitted) (quoting *NVent, LLC v. Hortonworks, Inc.*, No. 05-148, 2017 WL 449585, at *9 (Del. Super. Ct. Feb. 1, 2017)). Lastly, "Delaware law expressly rejects the notion that directors of a corporation owe no fiduciary duties to a limited partnership or LLC controlled by that corporation." *Off. Comm. of Unsecured Creditors v. Tech. Olympic, S.A. (In re TOUSA, Inc.)*, 437 B.R. 447, 460 (Bankr. S.D. Fla. 2010) (applying Delaware law and collecting cases); *see also Tow v. Amega Bank N.A.*, 505 B.R. 455, 467 (S.D. Tex. 2014) (explaining *TOUSA* applies to situations when the parent fiduciary injures the subsidiary to benefit another corporate

140

entity that the fiduciary owns or controls).

Because this case has its own unique set of facts and circumstances that dictate the analysis, the Court examines the sources of influence and control holistically. In doing so, the Court finds that Trustee produced sufficient evidence to establish a valid fiduciary relationship between Dundon, Zutter, ESMG, and its subsidiaries. Dundon and Zutter do not dispute that they owed fiduciary duties to AAF. Dundon and Zutter were controllers of AAF immediately upon their election to ESMG's board of directors.[371] At trial, Zutter agreed that he owed a fiduciary duty to both DCP and AAF from February 14, 2019, until bankruptcy.[372] Dundon similarly understood his obligations to AAF once he was elected to ESMG's board.[373] On February 14, 2019, Zutter sent an email stating that he and Dundon "signed a deal to take over control of the AAF" through "fund[ing] a small equity amount today" to "have control over the vehicle similar to our structure for EDHD" (referring to Employer Direct Healthcare).[374] Zutter also admitted that DCP controlled whether capital would be injected into AAF after February 14, 2019.[375]

Dundon instructed Zutter to get AAF's expenses under DCP's control.[376] Several witnesses testified to their understanding of Dundon and Zutter's controlling relationship with AAF. Kevin Farrell—who authorized bankruptcy for ESMG subsidiaries and served as AAF's operating consultant—testified that Dundon and Zutter were "in complete control of [AAF's] expense decisions.[377] Kelly Vugrincic, former Head of People for AAF, also testified that she understood that "the Dundon Group" directed Farrell and other AAF agents about how to operate their

---

[371] *See* FOF ¶ 14 (finding ESMG controlled AAF).
[372] Trial Tr. 10:15–21, 119:4–7 ECF No. 383.
[373] Trial Tr. 253:23–24, ECF No. 335.
[374] Trial Tr. 120:5–11, ECF No. 383; T-0256.
[375] Trial Tr. 144:8–11, ECF No. 383.
[376] FOF ¶ 203.
[377] Trial Tr. 37:14–16, ECF No. 413.

finances.[378] Additionally, Jeffrey Vanderbilt held no position at either ESMG or AAF, but he worked closely with Zutter, who both reported directly to Dundon.[379] Yet, he testified that AAF was not allowed to make any payments or sign contracts without his approval (along with Dundon and Zutter's).

Dundon and Zutter exercised effective control over ESMG and its subsidiaries as a result of a combination of factors: (i) Dundon's use of his contractual rights to "make any and all day-to-day business decisions for or on behalf of the Company, including but not limited to determining capital required to be drawn" and "define or limit any authorities of any employee, Director, advisor, representative, vendor, consultant or officer of the Company";[380] (ii) Dundon's influence over Zutter; and (iii) Dundon and Zutter, together, representing the only voting members of the Board.[381] Although Dundon and Zutter were not traditional controlling shareholders because they never owned stock, they had *de facto* control, dominated business decisions, and held managerial superiority. They exercised control pervasively over ESMG—and ultimately AAF's—business and affairs. Both under Trustee's controller theory and under ***TOUSA***, Dundon and Zutter owed fiduciary duties to AAF.

### B. The Court reviews Dundon's self-dealing under the entire fairness standard.

Delaware law distinguishes between the standard of conduct and the standard of review. ***Chen v. Howard-Anderson***, 87 A.3d 648, 666 (Del. Ch. 2014). The standard of conduct "describes what directors are expected to do" and is bifurcated into the duties of loyalty and care. ***Id.*** The duty of care requires fiduciaries "to inform themselves fully and in a deliberate manner." ***Burtch***

---

[378] Trial Tr. 242:7–18, ECF No. 351.
[379] FOF ¶ 127.
[380] T-0007. Although the Court finds the Term Sheet unenforceable, it considers the Term Sheet as evidence of the oral contract. *See supra* Part I.
[381] FOF ¶ 191.

*v. Opus, LLC (In re Opus E., LLC)*, 528 B.R. 30, 66 (Bankr. D. Del. 2015) (quoting *Off. Comm. Of Unsecured Creditors v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009)). The duty of loyalty "mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co., v. Technicolor, Inc. (Cede II)*, 634 A.2d 345, 363 (Del. 1993). Traditionally, the triad of fiduciary duties consisted of the duty of care, the duty of loyalty, and the duty to act in good faith. *Hurwitz v. Mahoney (In re Space Case)*, No. 23-50748, 2024 WL 1628440, at *5 (Bankr. D. Del. Apr. 15, 2024). Although Trustee invokes the duty of good faith as separate from the duty of loyalty, under Delaware law, the duty of good faith is now subsumed within the duty of loyalty. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).[382] Fiduciaries "breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Id.* Good faith "requires 'true faithfulness and devotion to the interests of the corporation and its shareholders.'" *Id.* at 67 (quoting *In re Walt Disney Co. Derivative Litig. (Disney II)*, 906 A.2d 27, 67 (Del. 2006)).

The standard of review is how the Court evaluates "whether directors have met the standard of conduct." *Chen*, 87 A.3d at 666. "To determine whether a fiduciary has breached [their] duties, the court must identify the applicable standard of review." *In re Dura Medic Holdings, Inc. v. Consolidated Litig.*, 331 A.3d 796, 821 (Del. Ch. 2025). The standard of review is divided into

---

[382] The Delaware Supreme Court has previously examined the spectrum of "bad faith" conduct sufficient to create liability. *See In re Walt Disney Co. Derivative Litig. (Disney II)*, 906 A.2d 27, 66 (Del. 2006) ("Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision."). On one end, "subjective bad faith" is "fiduciary conduct motivated by an actual intent to do harm," which constitutes "classic, quintessential bad faith." *Id.* at 64. On the other end of the spectrum, conduct involved is a "lack of due care," which is "fiduciary action taken solely by reason of gross negligence and without any malevolent intent." *Id.* The third category, which "falls in between the first two categories," is an "intentional dereliction of duty, a conscious disregard for one's responsibilities." *Id.*

three tiers: the business judgment rule, enhanced scrutiny, and entire fairness. *Id.*

The business judgment rule is the default standard of review. *Id.* at 820. The rule presumes "that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Firefighters' Pension Sys. of Kansas City v. Found. Bldg. Materials, Inc.*, 318 A.3d 1105, 1136 (Del. Ch. 2024); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del Ch. 1996) ("[I]n the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible for the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith."). If these elements are unrebutted, then the Court's only role is to see "whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *Id.* (quoting *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010)). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *Id.* at 1139 (quoting *Trados II*, 73 A.3d at 43). The business judgment rule "prevents courts from injecting themselves into a management role for which they were neither trained nor competent" and encourages entrepreneurial "risk-taking activities" by shielding personal liability arising out of good-faith and due care, "however unfortunate the consequence[s]." *Continuing Creditors' Comm. Of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 449, 458 (D. Del. 2004). If the plaintiff successfully rebuts one of the elements of the rule, entire fairness applies. *Dollar Thrifty*, 14 A.3d at 598.

"Absent a conflict of interest, the business judgment rule applies to the managerial decisions." *In re Dura Medic*, 331 A.3d at 821. A conflict of financial interest does not have to be direct. *See, e.g.*, *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) ("[D]irectoral interest also exists where a corporate decision will have a materially detrimental impact on a director, but not

on the corporation and the stockholders."). When a director is not engaged in *direct* self-dealing, the benefit received from the interested transaction must be material; it must be of a "sufficiently material importance, *in the context of the director's economic circumstances*, as to have made it improbable that the director could perform her fiduciary duties to the [corporation's] shareholders without being influenced by her overriding personal interest." ***In re Gen. Motors Class H S'holders Litig.***, 734 A.2d 611, 617 (Del. Ch. 1999) (emphasis added). The analysis is a "subjective 'actual person' standard to determine whether a *particular* director's interest is material and debilitating." ***Orman***, 794 A.2d at 24 (quoting ***Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary III)***, 663 A.2d 1156, 1167 (Del. 1995)).[383] To determine materiality, the Court must find that there is a reasonable likelihood that the interest would "affect the decision-making process of a reasonable person on a board composed of such persons." ***Cede II***, 634 A.2d at 363.

Trustee alleged that Dundon breached his fiduciary duties by cutting critical elements of the business, engaging in self-dealing, sabotaging existing deals or negotiations, directing Ebersol to disengage from other investors for additional funding, failing to personally pursue additional investors, filing for bankruptcy, using AAF funds to file for bankruptcy, and breaching contracts. At trial, Trustee had to rebut the business judgment rule by demonstrating that a conflict of interest existed sufficient to implicate an entire fairness review.

### 1. Spending Cuts

First, Trustee failed to prove that decisions to cut spending arose out of conflicts of interest.

---

[383] Additionally, on March 25, 2025, the Delaware legislature passed the amendments to Delaware Code Section 144, which codified doctrinal corporate law concepts developed by Delaware courts. Del. Code. Ann. tit. 8, § 144 (2025); *see generally **Kahn v. M&F Worldwide Corp. (MFW)***, 88 A.3d 635 (Del. 2014) (collecting doctrinal cases that developed Delaware corporate fiduciary duty law). Under the newly added Section 144(e), "Material interest" is defined as an "actual or potential benefit, including avoidance of a detriment" that "would reasonably be expected to impair the objectivity of [a] director's judgment when participating in the negotiation, authorization, or approval of the act or transaction at issue." Del. Code. Ann. tit. 8, § 144(e)(7).

Dundon gained complete control over the business and its operational decisions.[384] Dundon denied having the intention to sabotage ESMG, whether in the short term or otherwise.[385] The evidence at trial showed that Dundon took thoughtful and innovative approaches to AAF's situation, including implementing strict oversight of all funding requests and weekly cash flow reports, in accordance with the tiered system of prioritized vendors.[386] Additionally, Zutter and Vanderbilt created an emergency payment system, dividing outstanding obligations into hierarchical categories.[387] Zutter placed expenses needed to put football games on the field in the highest and most important tier for payment.[388] The second tier was allocated for payments that were more flexible in terms of timing, and the last tier included past-due obligations.[389] Together, Dundon and Zutter directed League management to vigorously renegotiate existing debts in an effort to save funds.[390] The Court determines that Dundon and Zutter's decisions to drastically cut spending to salvage the league and prioritize operating expenses were within their business judgment. For the reasons discussed above, the Court finds that these acts were made within the scope of their business judgment and constitute rational business decisions.

## 2. Contracts

Next, Trustee argues that Dundon breached his fiduciary duties by breaching contracts with players, key vendors, media companies, and others. Dundon aggressively pursued an NFLPA contract and sought to resolve disagreements throughout the negotiation process.[391] Additionally, Dundon maintained, and the evidence shows, that he issued directives to negotiate vendor claims

---

[384] FOF ¶ 96.
[385] FOF ¶¶ 223–24.
[386] FOF ¶ 128.
[387] *Id.*
[388] *Id.*
[389] *Id.*
[390] *Id.*
[391] FOF ¶ 358.

to stop the bleeding.[392] Defendants' expert Robert Whitsitt opined on why AAF failed in 2019 and whether or not he believed Dundon used good business judgment.[393] First, Whitsitt stated that the League failed because the business model was "flawed" from the start, because the business plan results in one party losing "over a quarter of a billion dollars of cash in three years, with no real horizon to make that back."[394] Whitsitt also explained that his view of the revenue projections for ticket and sponsorship sales led to a higher number than the model anticipated (another "flaw").[395] Another issue Whitsitt cited was the fact that the business was paying millions of dollars to broadcast its games, which he considered a "huge guaranteed financial risk to a business that really was not in a position to drive any revenue," resulting in a "giant cash flow drain."[396]

The League, under Ebersol's direction, had already incurred millions in liabilities without a committed source of capital before DCP became involved.[397] Ebersol's decisions rendered the League's business model unsustainable before Dundon and Zutter even entered the picture, and Kantowitz described Ebersol's approach as "playing a game of chicken" with critical vendors.[398] Dundon and Zutter, either due to misrepresentations by Ebersol or their own lack of due diligence, or both, were operating under the assumption that DCP's investment would help stabilize the condition of AAF, particularly regarding the vendor contracts.[399] Once DCP gained access to the data room, it began to discover the significant delinquent obligations incurred by ESMG prior to DCP's involvement.[400]

Even after Defendants began working with the League, AAF failed to accurately report the

---

[392] FOF ¶¶ 127–28.
[393] Trial Tr. 151, ECF No. 397.
[394] *Id.*
[395] *Id.*
[396] *Id.*
[397] FOF ¶¶ 56–64.
[398] FOF ¶¶ 64, 125.
[399] FOF ¶¶ 129–32.
[400] FOF ¶ 124.

actual condition of its accounts payable.[401] DCP implemented cash flow and accounts payable trackers in an effort to mitigate the financial distress of AAF.[402] Zutter testified that he utilized his prior business experience and knowledge in attempting to renegotiate contracts, as he believed it could benefit both parties, save money, and foster a long-term business relationship with the creditor.[403] Further, DCP learned that Ebersol had concealed prior threats of litigation, in which a prior associate claimed he owned 50% of the league.[404] As for the player contracts, AAF would be in breach if it did not play its entire regular season. Based on the evidence at trial, it appears that breach of the player contracts was inevitable. Again, the League was operating at a net negative and would likely not have completed its first season even if Dundon and Zutter had not become involved. In other words, Trustee did not offer any compelling evidence to demonstrate that Dundon and Zutter intentionally, or in bad faith, breached player contracts. Dundon also explained that he was concerned about putting the players on the field if he knew they could not get paid.[405] The League's poor condition and operational deficiencies, which predated Dundon and Zutter's involvement, led to contractual defaults that were beyond the control of any individual. Thus, the Court finds that Trustee also failed to rebut the business judgment rule regarding contractual breaches. For the reasons discussed above, the Court finds that these acts were made within the scope of their business judgment and constitute rational business decisions.

### 3. Bankruptcy Filing

Regarding the bankruptcy filing, Trustee's theory hinged on the idea that Dundon diverted ESMG resources to preserve capital for his ultimate intention to file bankruptcy and strip the

---

[401] FOF ¶ 126.
[402] *Id.*
[403] FOF ¶ 128.
[404] FOF ¶ 130.
[405] Trial Tr. 188:10–12, ECF No. 343; FOF ¶ 128.

company of its assets.

The duty of loyalty requires directors to "maximize the value of the corporation over the long-term for the benefit of the providers of equity capital, as warranted for an entity with perpetual life in which the residual claimants have locked in their investment." *Trados II*, 73 A.3d at 37. This standard of conduct requires that, when directors evaluate strategic alternatives that would "end or fundamentally alter the stockholders' ongoing investment in the corporation," the return value must exceed what the corporation would otherwise generate over the long term. *Id.* Notably, stockholders may hold contractual rights with respect to a class or series of stock, which can alter their desired outcomes in order to maximize the value of those rights. *Id.* at 38. Any class of stock with special "voting powers, designations, preferences, rights and qualifications, limitations, or restrictions" superior to the common stock is preferred stock. Del. Code. Ann. tit. 8, § 151(a); *Starring v. Am. Hair & Felt Co.*, 191 A. 887, 385 (Del. Ch. 1937) ("The term 'preferred stock' is of fairly definite import. There is no difficulty in understanding its general concept. [I]t is of course a stock which in relation to other classes enjoys certain defined rights and privileges."). Thus, "the degree to which directors own different classes or series of stock may affect the standard of review." *Trados II*, 73 A.3d at 40. *Compare In re Tele-Commc'ns, Inc. S'holder Litig.*, No. 16470, 2005 WL 3642727, at *7 (Del. Ch. Dec. 21, 2005) (applying entire fairness to a transaction involving a high-voting preferred class of stockholders almost entirely comprised of the board), *with In re Staples, Inc. S'holder Litig.*, 792 A.2d 934, 950–51 (Del. Ch. 2001) (applying the business judgment rule because the directors' interest was not material to the decision)."[I]t is *possible* that a director could breach her duty by improperly favoring the interests of the preferred stockholders over those of the common stockholders." *Trados II*, 73 A.3d at 42 (quoting *In re Trados Inc. S'holder Litig. (Trados I)*, No. 1512, 2009 WL 2225958, at *7 (Del.

149

Ch. 2009)).

In this case, Dundon and Zutter decided to file under chapter 7 to liquidate the company, which would have triggered the Series 2 Preferred Stock contractual liquidation preference. Trustee contends that Dundon and Zutter should not have filed for bankruptcy but instead should have sought further outside investments. At trial, Trustee failed to prove that Dundon and Zutter were materially conflicted in the decision to file for bankruptcy. As the Court has noted, ESMG was obligated to issue Series 2 Preferred Stock once DCP provided the initial funding. Despite DCP providing the initial $5.1 million financing to ESMG on February 14, 2019, ESMG never issued the stock. The Series 2 Preferred Stock carried preference upon liquidation, entitling its owner to receive, in preference to the holders of Preferred and Common Stock, an aggregate liquidation amount equal to the funded capital plus a preferred return of 20% per year. Additionally, the holder would accrue dividends at a rate of 20% per annum and was entitled to convert to Common Stock after the preferred stock's liquidation preference was paid. *See id.* at 48–49 (listing the same features of preferred stock as "economic incentives" the holder has that "diverge from those of the common"). Pertinent to the Court's analysis, the Series 2 Stock was never formally transferred. Dundon and Zutter did not have a material financial interest in liquidation. As equity holders, they understood their interests would be subordinated to those of all creditors. Given the company's limited assets and inability to satisfy even its creditors' claims in bankruptcy, Dundon and Zutter (DCP) stood to recover nothing in liquidation. If anything, their financial incentive aligned with efforts to preserve and grow the League's value, thereby facilitating a potential return on their investment.

At the summary judgment stage, the Court found Trustee's theory that Dundon exercised

his control in bad faith to obtain a prepackaged bankruptcy compelling.[406] The evidence at trial, however, did not support that theory. Dundon stated in an interview on February 28, 2019, before Trustee filed his original complaint alleging breaches of fiduciary duty, that his goal upon acquiring the league was to "continu[e] to build the league and grow it."[407] Consistent with Dundon's stated intention, the evidence at trial established that Dundon acted consistently with trying to keep the League afloat as long as possible. ESMG was insolvent before Dundon took control, and Ebersol admitted bankruptcy was inevitable.[408] The evidence also showed that Dundon explored strategic alternatives. He instructed Ebersol, Kantowitz, Freedman, and Farrell to each conduct a financial analysis of the League's viability.[409] Their assessments revealed that AAF would need $65 million to finish its first year.[410] The only viable option Ebersol's team presented was an immediate shutdown.[411] Ebersol admitted that the shutdown was the only way to preserve enough capital to initiate bankruptcy, pay salaries, and pay some debts.[412] ESMG's operating and reporting conditions were in poor shape when Dundon took over.[413] Inconsistent financial records in the data room made ESMG's financial health indiscernible.[414] Additionally, Dundon and Zutter, through Vanderbilt and Kantowitz, sought legal advice and accounting audits as part of their exploration of bankruptcy.[415] They explored the viability of a chapter 11 plan and administrative expenses with bankruptcy counsel.[416] Counsel advised them that chapter 7 was the

---

[406] ECF No. 292.
[407] T-1002.
[408] FOF ¶ 269 (finding ESMG filed for bankruptcy because it was insolvent and no longer a viable business).
[409] FOF ¶¶ 247–51.
[410] FOF ¶¶ 249, 51.
[411] FOF ¶ 253.
[412] *Id.*
[413] FOF ¶ 36.
[414] Trial Tr. 35:5–2, ECF No. 398.
[415] T-0531; Trial Tr. 220–22, ECF No. 434.
[416] T-0531.

only option because the company did not have the capital to maintain a chapter 11 plan.[417] While Dundon did not obtain a valuation of the assets before deciding to put them into bankruptcy, he and the board acted on counsel's advice that the League was not a viable business. Ebersol even thanked Dundon and expressed his appreciation for the efforts Dundon made to save the League.[418]

Filing chapter 7 bankruptcy is generally protected by a business judgment standard, and Dundon's decision to file for bankruptcy was supported by evidence that the business was truly insolvent, making the minority equity effectively worthless. The Court refrains from evaluating a debtor's pre-bankruptcy decisions with the benefit of hindsight.[419] The Court is not convinced by Trustee's theory that Dundon and Zutter engaged with ESMG for the purpose of stripping its assets and liquidating the company. Thus, the business judgment rule protects Defendants' decision to file for bankruptcy under chapter 7.

### 4.   Outside Investments

In another theory, Trustee argues that Dundon breached his duties by refusing to consider and seek additional investments or outside funding. Dundon instructed Ebersol to reject inquiries about investments in AAF, stating he did not believe they could accept money in good faith.[420] At trial, Trustee delved into his theory that Dundon had sabotaged PAL agreement opportunities.[421] But Dundon repeatedly explained that he felt uncomfortable with taking more investments because "bills were piling up" and he "didn't know where the end was."[422] He further explained that even if he were to sell the preferred acquisition licenses at Trustee's suggested value of $10 million, he

---

[417] FOF ¶ 259.
[418] FOF ¶ 270.
[419] Trustee did not plead a "deepening insolvency" claim. Even if the Court were to construe the pleadings as such, Trustee must have demonstrated fraud on behalf of the director to prevail on such a claim. ***Bruno v. Beacon Sales Acquisition, Inc.***, 553 B.R. 280, 284 (Bankr. W.D. Penn. 2016) (consulting Delaware law).
[420] FOF ¶ 220.
[421] Trial Tr. 147:6–23, ECF No. 343.
[422] *Id.* at 148:13–16.

was not sure it would have saved the League. Dundon agreed that Ebersol offered him paths to reach the end of the season for less than $10 million, but he did not trust Ebersol's assessment because Dundon's team had conducted financial analyses that contradicted it. Dundon also instructed Zutter to ensure that future investment offers contain protections and antidilution provisions.[423]

While threatening to veto competing transactions can be evidence of bad faith, the Court is not convinced that Dundon and Zutter demonstrated such behavior. *Kahn v. Dairy Mart Convenience Stores, Inc.*, No. 12489, 1996 WL 159628, at *8 (Del. Ch. Mar. 29, 1996). Both Dundon and Zutter were interested in renegotiating the MGM deal because they viewed it as unfavorable to the League.[424] They both told Ebersol that if he could not renegotiate the MGM deal, they would not contribute additional funds and warned him that the League was facing bankruptcy.[425] They wanted Ebersol to renegotiate the MGM deal aggressively. Ebersol, however, lacked meaningful leverage in those negotiations, as he was the reason the deals had soured. His sale of ESMG had triggered change-of-control defaults and constituted breaches under the existing agreements.

Trustee failed to prove that either Dundon or Zutter acted with an actual intent to do harm. *See Disney II*, 906 A.2d at 64 n.102 (quoting *McGowan v. Ferro*, 859 A.2d 1012, 1036 (Del. Ch. 2004) ("Bad faith is 'not simply bad judgment or negligence,' but rather 'implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'"). The record makes clear that Dundon

---

[423] *Id.* at 174:15–24.
[424] *See* Trial Tr. 240:10–18, ECF No. 396 ("So my understanding was that the MGM agreement was in direct contradiction to our term sheet and so we were trying to rectify that by getting them to accept the term sheet through some modification of their agreement. . . . [I]n the absence of resolving that, we might not be able to fund further dollars because our term sheet itself may be deemed to be, you know, ineffective.").
[425] FOF ¶ 211.

and Zutter focused on promoting ESMG's welfare and preserving the value of DCP's investment, reflecting a balance between their investment interests and fiduciary duties.

The relationships between MGM, CBS, TNT, and the NFL Network were critical to the League's survival. Dundon and Zutter were concerned with preventing the dilution of their equity and negotiating with these entities in good faith.[426] Zutter understood that AAF had an immediate short-term need for funds.[427] By February 17, AAF personnel, including Alan Kantowitz, created a list of topics for the "Dundon team" to address, including media deals, vendor tracking, business opportunities, and player expenses.[428] Zutter expressed his disapproval of the various deals AAF had made and his wish to utilize DCP's legal counsel to restructure AAF, rather than AAF's counsel, so that AAF could be restructured in accordance with DCP's goals.[429] The Court finds that Trustee fails to establish a violation of bad faith beyond gross negligence. "[G]rossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith." *Id.* at 65. Dundon and Zutter are therefore afforded the business judgment presumption.

The company was in distress. There was meaningful financial risk, and Dundon and Zutter both knew that the league was at risk of surviving its first season. Outside investor options existed,[430] and Dundon was aware that it would take more than his $70 million to survive.[431] Dundon and his team began considering outside investment forty days after taking control of the League.[432]

On March 25, Dundon realized that his $70 million was almost gone. At the same time, he was unwilling to provide representations and warranties because he did not yet have a complete

---

[426] FOF ¶¶ 149, 174.
[427] FOF ¶¶ 88, 89.
[428] T-0102.
[429] Trial Tr. 144:8–11, ECF No. 383.
[430] Trial Tr. 270:1–14, ECF No. 396.
[431] Trial Tr. 126:13–22, ECF No. 335.
[432] Trial Tr. 32:18–25, ECF No. 343.

understanding of the league's internal operations.[433] Because due diligence was still ongoing, he believed it would not comport with good faith and fair dealing to make such assurances to any outside investors prematurely. Zutter expounded upon Dundon's hesitancy to represent and warrant the company's liabilities and obligations to outside investors, but said that by the end, they were willing to sell the company "as is."[434] At trial, there was some discussion about an outside investment of $10 million.[435] Zutter explained that it was conditioned on DCP (or another investor) fully funding League operations, which it was unwilling to do. Dundon and Zutter did not believe it was a credible offer because it was conditioned on an unrealistic precedent of DCP investing "a billion" more into the League.[436]

On March 26, Dundon texted Ebersol to "find someone to help keep this going to end of year so we have time."[437] In response, Ebersol said he would make calls to all "top potential investors," and asked Dundon if he had targets he would like to consider, to which Dundon responded, "I don't."[438] The next day, on March 27, Ebersol sent an email to Dundon, Zutter, and Jason Kulas (all DCP representatives).[439] The email contained Ebersol's "4 go forward options for the league."[440] The four options Ebersol presented to Dundon and Zutter were (1) winding down the league; (2) accelerating the championship game and closing down the League afterwards; (3) completing the regular season and winding down "*if no new investor surfaces before then*"; and (4) finishing the regular and postseason, "*as originally contemplated*."[441] Under each option, Ebersol outlined the risks and benefits associated with each option. While Dundon ultimately

---

[433] *Id.* at 34:5–14.
[434] Trial Tr. 269:3–14, ECF No. 396.
[435] *Id.* at 270:1–14.
[436] *Id.*
[437] D-268 at 75.
[438] *Id.*
[439] D-177.
[440] *Id.*
[441] *Id.* (emphasis added).

questioned Ebersol's ability to clearly understand what the "burn rate" was, communications between the two demonstrated Dundon's willingness to accept outside investments to keep the League going, at least until the end of its first season.

The Court is not persuaded that Trustee's evidence sufficiently demonstrates bad faith, either by Dundon purportedly sabotaging potential outside investments or wholly disregarding efforts to secure them. Dundon delegated this responsibility for pursuing such opportunities to Ebersol, who was unsuccessful.

### 5.  Advertising

Trustee argues that Dundon used AAF resources to further his own personal interests, particularly by providing free advertising to his other ventures and connections. Trustee also claims that Zutter participated in these conflicted transactions.

First, "each director has a right to be considered individually when the directors face claims for damages in a suit challenging board action." *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1182 (Del. 2015). Dundon and Zutter had an exceptional business and personal relationship that blurred the boundaries of their independent judgment.[442] Interestingly, Zutter did not receive financial benefits from AAF, nor did he have an ownership interest in DCP or DDFSP.[443] But even without *direct* financial conflict between Dundon, Zutter, and affiliated entities, including DCP, their institutional, relational, and social loyalties created indirect conflict with their loyalties to AAF. *See Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."). They approached the challenged decisions as aligned

---

[442] FOF ¶ 5.
[443] FOF ¶ 225.

partners. The record, however, did not reflect Zutter's participation or interest in advertisement deals and negotiations with Dundon-affiliated entities.

Dundon, on the other hand, had a financial interest in the decision to order AAF to provide free and discounted advertising to friends and brands with whom he was involved, including AT&T, Invisalign, SAP, Sony Pictures, Carvana, and TopGolf.[444] Dundon's duty of loyalty required him to use ESMG's resources for its own benefit and refrain from using ESMG's resources for his own benefit or the benefit of affiliated third parties. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 848 (Del. Ch. 2022) (quoting Restatement (Third) of Agency § 8.05(1) (A.L.I. 2024)) ("An agent has a duty 'not to use property of the principal for the agent's own purposes or those of a third party.'"). The advertising spaces that AAF gave away to Dundon-affiliated companies were a resource that Dundon was obligated to use for AAF's benefit.

"The entire fairness standard applies to a transaction between an entity and its controller [and] . . . when the board making the decisions lacks a majority of disinterested and independent decision makers." *In re Dura Medic*, 331 A.3d at 826. The Board did not implement any procedural protections for these advertising transactions in which Dundon was unequivocally on both sides. Thus, the Court will evaluate Dundon's self-dealing advertisement transactions under an entire fairness review.

### C. Dundon failed to prove that the advertising transactions were entirely fair.

The Court must next determine whether Dundon met his burden of entire fairness regarding his self-interested decisions. If the Court determines that Dundon did not meet that burden, the Court must then decide which remedy is available.

Entire fairness review is Delaware's most onerous standard of review that applies when the

---

[444] FOF ¶ 226.

fiduciary stands to benefit from both sides of a transaction or is not disinterested. *In re Tesla Motors, Inc. S'holder Litig.*, No. 12711, 2020 WL 553902, at *18 (Del. Ch. Feb. 4, 2020); *see Trados II*, 73 A.3d at 44 ("[Entire fairness] applies when the board labors under actual conflicts of interest"). Once entire fairness applies, the defendants bear the burden of proving to the Court that the transaction was the result of fair dealing and a fair price. *Trados II*, 73 A.3d at 44.[445] The "transaction itself must be objectively fair, independent of the board's beliefs" and "[n]ot even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006). Defendants prove entire fairness only if they can "demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Valeant Pharms.*, 921 A.2d at 746 (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)).

Entire fairness encompasses both fair dealing and fair price. *Weinberger*, 457 A.2d at 711. The Court, however, "does not focus on the components individually, but determines entire fairness based on all aspects of the entire transaction." *Valeant Pharms.*, 921 A.2d at 746; *see William Penn P'ship v. Saliba*, 13 A.3d 749, 757 (Del. 2011); *In re Dura Medic*, 331 A.3d at 821 ("Entire fairness is a unitary standard that combines a substantive dimension (fair price) and a procedural dimension (fair dealing)."). "The two dimensions of the entire fairness test interact: 'A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price.'" *In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 520 (Del. Ch. 2024) (quoting *Reis*

---

[445] But see *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 788 (Del. Ch. 2011), where the court explained how the burden of persuasion shifts back to the plaintiff under the *Lynch* doctrine. Where controlling shareholders demonstrate that the transaction was approved by an independent board majority or special committee, or by requiring an informed vote of the majority of minority shareholders, the plaintiff then bears the burden of persuasion. There is no *Lynch* burden-shifting available in this case because Defendants neither engaged with an independent board majority nor required an informed vote of the majority of the minority shareholders.

*v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011)), *modified*, 2024 WL 3555781 (Del. Ch. 2024). Lastly, while the entire fairness standard is the most demanding, the transaction must be fair, not *perfect*. *In re Dura Medic*, 331 A.3d at 821.

"The procedural dimension of the entire fairness inquiry examines the process that generated the result." *Id.* at 827. This dimension, known as fair dealing, "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction." *Id.* (quoting *Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422, 430 (Del. 1997)). It addresses questions of timing, how the transaction was "initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. A "cornerstone of fair dealing is a process implemented by the board that reflects arm's length bargaining and provides protections for the interests of all shareholders." *In re Transcare Corp.*, 2020 WL 8021060, at *19. A fair dealing analysis is not technical; it "will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case." *Technicolor Plenary III*, 663 A.2d at 1140. "Traditional indicia" of a fair process include "negotiations by a majority of disinterested and independent directors or appointment of a special committee, actual negotiation over price, obtaining stockholder approval, receiving guidance from qualified advisors, and testing the market." *In re Dura Medic*, 331 A.3d at 828.

The substantive dimension, also known as "fair price," considers whether the fiduciaries considered market evidence, contemporaneously with expert and financial analysis, in their decision. *Id.* at 829; *see In re Sears*, 309 A.3d at 507 ("To evaluate the fair price dimension of the unitary entire fairness test, the court examines the economic and financial merits of the transaction, taking into account all relevant factors."). Typically, when a defendant fails to satisfy the fair dealing element of the entire fairness test, the defendant is unlikely to demonstrate that the price

was entirely fair. *See Saliba*, 13 A.3d at 758 ("The [defendant]s' self-interest in the transaction and their domination of the sales process tainted the entire transaction."); *In re Dole Food Co. v. S'holder Litig.*, Nos. 8703, 9079, 2015 WL 5052214, at *34 (Del. Ch. Aug. 27, 2015) (quoting *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011)) ("[P]rocess can infect price."). Fair dealing reflects the procedural fairness of the decision-making *process*, while fair price represents the substantive fairness of the *outcome*—i.e., the economic consequences of the decision.

It appears that Dundon and Zutter had a significant interest in the long-term success of AAF, and the Court agrees that they were likely misled about ESMG's condition, particularly regarding anticipated revenues and the millions of dollars in preexisting obligations.[446] DCP encountered gaps between reported and actual expenses, leading to confusion about the company's financial condition.[447]

Bearing in mind that Dundon was acting under significant pressure to preserve both the League and Dundon's personal investment, he nonetheless offered free advertising to their affiliated entities. He was fully aware that the advertising spaces constituted valuable sources of revenue for the distressed company. Ebersol, having worked in the television business for more than twenty years, explained the League's business structure surrounding its ad space. AAF owned all advertising time during its games, and it sold sponsorships before the season started.[448] Before the change of control, AAF sold ad space to various companies, such as At Home and Navy Federal Credit Union, which received advertisements during the games and sponsorships on the field.[449] When Dundon took control mid-season, he started running advertisements for Dundon-affiliated

---

[446] FOF ¶¶ 92, 131, 132.
[447] FOF ¶ 131.
[448] Trial Tr. 62:15–22, ECF No. 323.
[449] *Id.*

companies, which created turmoil between AAF and potential sponsors with whom AAF was actively negotiating ad placement. Dundon started giving away ad space to their competitors, which spoiled the negotiation process.[450]

There is conflicting evidence about whether the price of the advertising deals between AAF and Dundon-affiliated entities could be considered "fair." Dundon attempted to meet his burden to prove entire fairness by arguing that giving away the ad space was a reasonable and strategic business decision. Although the Court believes that could be true, speculation overwhelms its fair price analysis.

ESMG was in a dire situation. Defendants depicted AAF as a failing entity without cash. One of the themes at trial was that ESMG could not fund the AAF business plan, would have run out of money within eleven weeks, and that bankruptcy was inevitable. The company was out of money. Yet, Dundon and Zutter's expert suggested that the free advertising was a prudent business decision to increase the League's appeal and legitimacy. He argued that Dundon's decision to give away valuable ad space was because companies would not be willing to sell advertising for a game a couple of days away. He stated that because some of those companies indicated they might consider paying a discounted rate for advertising in the future, it was a solid business decision: "They had some success, they got some traction, and d[id] the best they could do."[451]

AAF advertising prices depended on the part of the game in which it was displayed, the platform on which it was shown, and its duration.[452] Ebersol explained that AAF was selling advertisement slots for between $500 and $20,000 per unit, depending on when they appeared in the game.[453] Each game ran 48 units, which were ultimately given away as a purported "strategic

---

[450] *Id.* at 63:8–13.
[451] Trial Tr. 141:19–20, ECF No. 397.
[452] See *id.* for expert testimony regarding ad space and pricing.
[453] Trial Tr. 76:21–23, ECF No. 323.

play." Trustee offered no other evidence regarding the value or price of the advertisement slots given away.[454] Dundon, however, did not meet his burden under the entire fairness review because he failed to convincingly establish that $0.00 was a fair price for major corporations to pay for advertisement space on AAF's broadcasting space.

Under Delaware law, even if the ultimate outcome did not change the stockholders' residual value, an unfair process infects the entire fairness analysis and precludes a finding of fairness. *See In re Loral Space & Commc'ns Inc.*, Nos. 2808, 3022, 2008 WL 4293781, at *22 (Del. Ch. Sept. 19, 2008) (finding the process unfair because it did not replicate arms-length bargaining). Although the common stockholders likely receive little to no value in liquidation, given their subordination to all other claims in bankruptcy, and the challenged transactions did not materially alter that economic reality, the process by which the transaction was conducted was fundamentally unfair.

"When the process used involves no market check and the resulting transaction is . . . impossible to compare with confidence to other arms-length transactions, the court is left with no reasoned basis to conclude that the outcome was fair." *Id.* at *22. Under the circumstances of this case, the Court finds that Dundon's self-interested and conflicted transactions and decisions were not entirely fair to ESMG. Dundon breached his fiduciary duty of loyalty by using ESMG property for the benefit of third parties. The unfair dealing did not replicate arms-length bargaining between Dundon and his affiliated entities. The Court cannot find a fair price because Dundon unilaterally gave away advertisement space to competitors of other entities with which AAF had active deals,

---

[454] Trustee offered credible testimony from Mr. Schanzer regarding the advertising deals. Mr. Schanzer, however, agreed that it was reasonable to give away ad space as part of bartering arrangements. Although this point lends support to Dundon's theory that the price was fair, the Court does not find the brief testimony, which touched on only general business judgment and speculation of price, to be probative of the determination at hand. Trial Tr. 308–18, ECF No. 397.

thereby cutting off potential revenue streams. After a unitary analysis, taking into account both factors, the Court finds that using AAF property for the benefit of Dundon-affiliated third parties was a breach of Dundon's fiduciary duty of loyalty. The Court will now evaluate which remedy is available.

### D.  Trustee failed to prove monetary damages.

Defendants argue that Trustee failed to prove damages because they are purely economic, barred by the economic loss rule, and the claims for breach of contract overlap with the breach of fiduciary duty claims.

First, the breach of fiduciary duty claim is independent of the breach of contract claim. A contractual claim would preclude a fiduciary claim "if the duty sought to be enforced arises from the parties' contractual relationship." *Solow v. Aspect Res., LLC*, No. 20397, 2004 WL 2694916, at \*4 (Del. Ch. Oct. 19, 2004). Here, rights arise out of Dundon and Zutter's fiduciary duties independent from the contractual framework the parties created. The establishment of the fiduciary relationship between Dundon, Zutter, ESMG, and its subsidiaries comes by way of their directorship and control, where the breach thereof was not the source of Trustee's breach of contract claim involving funding ESMG.

Second, the economic loss rule is a judicially created doctrine that "prevents plaintiffs from recovering in tort for losses suffered that are solely economic in nature." *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 526 (D. Del. 2012). Initially applied in products liability actions, courts have now expanded the doctrine's application to all disputes arising from a commercial transaction where the alleged damages caused harm only to the bargained-for item. *McKenna v. Terminex Int'l Co.*, No. 04C-02-022, 2006 WL 1229674, at \*2 (Del. Super. Ct. Mar. 13, 2006). To determine whether the economic loss doctrine will apply to the present case,

the Court must first analyze the contract and tort claims asserted. *Id.* at *2. Here, the Court has found that the contract and tort claims coexist because Dundon breached a duty independent of the contract's obligations. The economic loss rule does not apply to the equitable tort of breach of fiduciary duty. *Id.* at *3; *Leo Invests. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1191 (Del. Ch. 2025). Additionally, different remedies may be available for each claim. *In re Mobilactive Media, LLC*, No. 5725, 2013 WL 297950, at *20 n.219 (Del. Ch. Jan. 25, 2013). Delaware courts do not apply the economic loss doctrine to fiduciary duty claims, and the Court declines to do so now.

Next, plaintiffs need not always prove damages resulting from a breach of fiduciary duty. *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 334 (Del. 1993), *overruled on other grounds by Tooley*, 845 A.2d 1031; *see In re Fuqua Indus., Inc.*, No. 11974, 2005 WL 1138744, at *6 (Del. Ch. May 6, 2005) ("[D]efendants' contention that the corporation did not suffer damages from [the breach of fiduciary duty] is unavailing as plaintiffs needs not demonstrate damages."). Although a breach of fiduciary duty requires plaintiffs to prove only two formal elements, a successful plaintiff cannot obtain a meaningful remedy without showing either (1) harm to the plaintiff or (2) a benefit wrongly received by the fiduciary. *Leo Invests.*, 342 A.3d at 1191. Courts have broad discretion to impose equitable remedies for breach of fiduciary duty. *See Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999) (quoting *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (1996) (Del. 1996)) ("Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly. . . . The strict imposition of penalties under Delaware law [is] designed to discourage disloyalty."). Because Delaware fiduciary law is designed to discourage fiduciaries from profiting from disloyal conduct that causes harm to the beneficiary, the plaintiff must demonstrate something akin to damages to be entitled

164

to a *monetary* remedy. ***Henkel of Am., Inc. v. Bell***, 825 F. App'x 243, 255 (6th Cir. 2020) (applying Delaware law). Mathematical uncertainty relating to the calculation of damages is permissible "so long as the Court has a basis to make a reasonable estimate of damages." ***Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.***, No. 12036, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992). "Speculation is an insufficient basis, however." ***Id.***

Trustee's only claim for a monetary remedy is the $144.1 million sought in recovery for "the substantial depreciation and ultimate destruction" of AAF's enterprise value; contracts not pursued; assets and resources Defendants "usurped and used for their own personal benefit"; and lost opportunities and profits.[455] The Court will address the monetary remedy first.

In ***Nobilis Health Corp.***, the Delaware bankruptcy court found that an expert's analysis was insufficient to demonstrate a causal link between the breach of fiduciary duty and the company's loss in market value because it relied on "conclusory allegations regarding financial misstatements." ***Guiliano v. Fleming (In re Nobilis Health Corp.)***, 661 B.R. 891, 919–20 (Bankr. D. Del. 2024). Here, witnesses testified to ESMG's financial condition before the change of control. Whitsitt testified that consumers experience "football fatigue" by spring and are inclined toward NFL-related events such as the NFL Draft.[456] Whitsitt also noted that AAF rushed its start, which hindered the teams and their potential fan base from adequate preparation.[457] Additionally, he testified that AAF was overpaying players, and the spring football league had too many competitors.[458]

Most pertinent to the Court's analysis is Trustee's expert, Sonia Desai. In her valuation of

---

[455] ECF No. 300 at 18–19.
[456] Trial Tr. 123–24, ECF No. 397.
[457] *Id.* at 130:6–19.
[458] *Id.* at 150:4–8.

AAF, Desai did not conduct any analysis of fraud or breach of fiduciary duty.[459] Her determination that AAF was worth $144.1 million on February 13, 2019, was based on the market transaction approach, relying on other investor transactions to indicate value.[460] She did not include either DCP's $70 million investment or the $82.5 million Term Sheet negotiations in her valuation analysis.[461] She also relied on returned investments and deals that never went through.[462] Ultimately, the Court was unconvinced that Desai used reliable and accurate measurements for any monetary damages relative to Dundon's breach of fiduciary duty. The record does not provide the Court with a basis to make a reasonable estimate of damages, either in terms of harm caused or benefit received.[463] Thus, Trustee failed to show by a preponderance of the evidence that "a sufficient causal linkage exists between the breach of duty and the remedy sought to make the remedy an apt means of addressing the breach." *Metro Storage*, 275 A.2d at 859. The award would be based on mere speculation.[464] Additionally, Trustee alleged a general damages figure for all asserted breaches of fiduciary duty, and the Court does not find that this amount sufficiently correlates to the singular breach established at trial.[465] The evidence presented did not allow the Court to isolate or attribute that aggregate figure to the specific breach found. Thus, the Court declines to adopt Trustee's generalized damages calculation.

---

[459] Trial Tr. 30:8–17, ECF No. 380.

[460] *Id.* at 67:21–24.

[461] *Id.* at 149.

[462] *Id.* at 194:8–22.

[463] Even if Trustee is entitled to receive the value of ESMG absent a breach of fiduciary duty, that value is "inherently unknowable" because there is no way to determine what financing arrangements ESMG might have acquired in the absence of Dundon and Zutter's disloyal conduct. *Bomarko*, 794 A.2d at 1184.

[464] Lost profits and lost business opportunities are likewise considered speculative damages and are generally unrecoverable absent a reasonably certain evidentiary basis. *See Metro Storage*, 275 A.3d at 860 (declining to award damages based on speculative lost profits from a new business because they were too uncertain and remote because there was no history of prior profits).

[465] Although remedies such as disgorgement of profits, rescission, and restitution are available for a duty of loyalty breach, such remedies are grounded on unjust enrichment. DEBORAH A. DEMOTT, SHAREHOLDER DERIVATIVE ACTIONS: LAW AND PRACTICE § 7:6 (2025); *see* FOF ¶ 236 (finding Trustee did not provide evidence of unjust enrichment amounts); FOF ¶ 235 (finding advertisement value indefinite and speculative). See Part XI for the Court's unjust enrichment analysis.

Alternatively, or in addition to the monetary damages, Trustee seeks the "amount of all outstanding creditor claims against the Debtors' estates."[466] Dundon contends that directors are not directly liable for creditors' claims, and therefore, Trustee lacks standing to pursue such claims against him.

Creditors of insolvent corporations hold derivative claims against the corporation and its directors, under the "trust fund doctrine." *Id.*; *see In re Altaba, Inc.*, 264 A.3d 1138, 1154 n.2 (Del. Ch. 2021) (discussing the doctrine and collecting cases). "Insolvency is measured on the date the action is filed, and will be adjudged by the balance sheet test, or by the cash flow test." *Id.* (citations omitted). The Delaware Supreme Court explained:

> When a corporation is insolvent, . . . its creditors take the place of the shareholders as the residual beneficiaries of any increase in value. Consequently, the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties. The corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the [company]'s value. Therefore, equitable considerations give creditors standing to pursue derivative claims against the directors of an insolvent corporation. Individual creditors of an insolvent corporation have the same incentive to pursue valid derivative claims on its behalf that shareholders have when the corporation is solvent.

*Gheewalla*, 930 A.2d at 98; *see Quadrant Structured Prods. Co. v. Vertin (Quadrant II)*, 115 A.3d 535, 546–47 (Del. Ch. 2015) ("[Directors] continue to owe fiduciary duties to the corporation for the benefit of all of its residual claimants, a category which now includes creditors."). At the time AAF filed for chapter 7 bankruptcy, it was balance sheet insolvent and was not paying its bills in the ordinary course of business.[467] Courts recognize chapter 7 trustees' authority to assert derivative claims for breach of fiduciary duty against members of the debtor corporation's board of directors. *E.g.*, *Crawford v. Zambrano (In re Zambrano Corp.)*, 478 B.R.

---

[466] ECF No. 300, at 19.
[467] ECF No. 300; D-150; Trial Tr. 17:16–18, ECF No. 331.

670, 684–85 (Bankr. W.D. Penn. 2012) (finding the trustee could seek damages for breaches of fiduciary duties owed to creditors once the corporation became insolvent). Trustee has standing to assert derivative claims for breach of fiduciary duties as the representative of Debtors' estate with the capacity to sue and be sued. 11 U.S.C. § 323. Thus, Trustee has standing to pursue creditor claims against Dundon.

Although Trustee has standing to pursue breach of fiduciary duty claims on behalf of the creditors, Trustee's reliance on the amount of creditor claims served only as a measure of alleged damages, not as a basis for standing itself. Dundon, therefore, mischaracterizes the issue by conflating Trustee's derivative standing with the method presented to quantify harm. Dundon's argument conflates these distinct concepts by treating Trustee's damages theory as if it were a jurisdictional standing defect. Dundon's contention that Trustee sought to recover on behalf of creditors misstates the nature of the claim. Trustee did not pursue individual creditor rights but used the aggregate value of their claims as a measure of the estate's loss. Thus, while insolvency conferred standing, Trustee still bore the burden to prove that Dundon's conduct caused that loss— a showing that the record does not support.

Trustee also requests punitive damages relating to Dundon's breach of fiduciary duty. In support of this request, Trustee cites *In re Extended Stay, Inc.*, No. 09-13764, 2020 WL 10762310, at *121 (Bankr. S.D.N.Y. Aug. 8, 2020).[468] Trustee's reliance on that case is misplaced, as that decision did not resolve the considerable uncertainty surrounding the availability of punitive damages under Delaware law. *See, e.g.*, *Overwell Harvest Ltd. V. Widerhorn*, 662 F. Supp. 3d 801, 803–04 (N.D. Ill. 2022) (collecting cases); *Buschwald v. Renco Grp.*, 539 B.R. 31, 52–54 (S.D.N.Y. 2015) (applying *Erie* and concluding that punitive damages are unavailable under

---

[468] ECF No. 300 at 108.

Delaware law). Even if the Court were to find *Extended Stay* persuasive, the award for punitive damages under its framework would only be possible upon proof that Dundon acted maliciously, outrageously, or egregiously, and with evil motive. *In re Extended Stay*, 2020 WL 10762310, at *121 (collecting cases). The Court does not find such behavior present here. Additionally, the Delaware Court of Chancery, sitting in equity, has historically refrained from awarding punitive damages involving breaches of fiduciary duty. *Beals v. Washington Int'l, Inc.*, 386 A.2d 1156, 1159 (Del. Ch. 1978). This principle was reaffirmed in *Metro Storage Int'l LLC v. Harron*, where the court held that it lacks statutory authority to assess punitive damages for a claim in equity. *Metro Storage*, 275 A.3d at 886. Recently, the Delaware bankruptcy court declined to award the trustee punitive damages for breach of fiduciary duty, finding that they "are not available under Delaware law." *RPA Asset Mgmt. Servs., LLC v. Siffin (In re MTE Holdings LLC)*, No. 21-51255, 2024 WL 3272224, at *10 (Bankr. D. Del. July 1, 2024). Thus, the Court does not find punitive damages available, even under Trustee's reliance on *Extended Stay*.

Finally, Trustee requests that the Court award attorney fees.[469] Under the American Rule, attorneys' fees for breach of fiduciary duty are not warranted unless the fiduciary "engaged in an 'egregious breach of the duty of loyalty,' but the harm flowing from the breach was 'not readily capable of quantification.'" *Metro Storage*, 275 A.3d at 867 (quoting *Cantor Fitzgerald, L.P. v. Cantor*, No. 16297, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001)). Trustee cites *Metro Storage* and this exact quote in its request for attorneys' fees. Doing so, Trustee implicitly agrees that the harm is not readily capable of quantification, while at the same time arguing the breach was egregious. The fiduciary's conduct in *Metro Storage* was malicious and persisted for years. *Id.* at 867–68. The Chancery noted that the fiduciary in that case was secretive and attempted to

---

[469] ECF No. 300.

take confidential documents upon his departure. *Id.* at 868. The Court agrees with Trustee that the harm in this case is not quantifiable at this point, but it does not agree that Dundon engaged in egregious conduct comparable to that in ***Metro Storage***. Therefore, the Court does not believe awarding Trustee attorneys' fees and costs is the appropriate remedy in this case.

"If a court finds that the defendant has breached his fiduciary duties, but the court is unable to fashion an appropriate remedy, it may still award nominal damages." ***Bell***, 825 F. App'x at 254 (collecting cases); *see, e.g.*, ***Leo Invests.***, 342 A.3d at 1193 ("A court may award nominal damages when a breach does not warrant a meaningful remedy."); ***Macrophage Therapeutics, Inc. v. Goldberg***, No. 2019-0137, 2021 WL 2582967, at *19 (Del. Ch. June 23, 2021) (collecting cases). Trustee has failed to prove actual damages, punitive damages are not available in this case, and attorneys' fees are unwarranted. Nevertheless, the Court finds that Trustee proved a breach of duty, and the breach warrants an award of nominal damages. Dundon derived no benefit beyond the exercise of his (and DCP's) proofs of claim in bankruptcy, which merely represents a valid exercise of his preexisting creditor rights.

### E.  Conclusion

The Court finds that Dundon's self-interested decisions and self-dealing implicated the duty of loyalty and therefore required an entire fairness review. Because Dundon engaged in conflicted decision-making and self-dealing transactions, his conduct fails to satisfy the strict requirements of the entire fairness standard. The Court, however, finds that Trustee was unable to prove any causally related harm. Given that Trustee failed to establish a causal link between its claimed damages and the proven breaches of fiduciary duty, the Court awards Trustee nominal damages in the amount of $1.00.

## VII.   Promissory Estoppel

As an alternative argument to Trustee's breach of oral contract claim, Trustee asserts a claim for promissory estoppel. Trustee argues that Dundon made a promise to inject $250 million into ESMG through tranches, which started at $70 million.[470] Trustee alleges that ESMG relied to its detriment on Dundon's promise by foregoing additional investment inquiries after Dundon's involvement. As a result, Trustee claims injustice can only be avoided by enforcing Dundon's promise. On the other hand, Dundon asserts that Trustee's promissory estoppel claim fails for three reasons: (1) the alleged promise was too indefinite; (2) Trustee improperly seeks the benefit of the bargain damages; and (3) the Trustee failed to identify or quantify alternative funding that was lost as a result of Dundon's acts.

To prevail on a promissory estoppel claim, a plaintiff must prove (1) the existence of a promise; (2) that the promisor could foresee would be relied on by the promisee; and (3) the promisee substantially relied on the promise to his detriment. *G.D. Holdings, Inc. v. H.D.H. Land & Timber, L.P.*, 407 S.W.3d 856, 861 (Tex. App.—Tyler 2013, no pet.) (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)). Additionally, "a plaintiff must show that injustice can be avoided only by enforcing the promise." *Vinewood Cap., L.L.C. v. Dar al-Maal al-Islami Tr.*, No. 4:06-CV-316-Y, 2007 WL 2791876, at *31 (N.D. Tex. Sept. 26, 2007).

Promissory estoppel does not create liability for a noncontracting party where liability does not otherwise exist. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 134 (Tex. 2005) (finding a promise to invest, without more, is not sufficient to maintain a claim for promissory estoppel). Rather, the doctrine "prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them." *Id.* (quoting *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex.

---

[470] ECF No. 300 at 12.

1965)). Thus, "a party that has failed to prove a legally sufficient contract, but has acted in reliance upon a promise to his detriment, may be compensated for his foreseeable, definite, and substantial reliance." ***Lucas v. Ryan***, No. 02-18-00053-CV, 2019 WL 2635561, at *51 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.); ***Frost Crushed Stone Co. v. Odell Geer Const. Co.***, 110 S.W.3d 41, 44 (Tex. App.—Waco 2002, no pet.) (explaining promissory estoppel is "an available cause of action to a promisee who relied to his detriment on an otherwise unenforceable promise"). Nevertheless, "a promissory estoppel claim may apply despite a contract between the parties, if a promise was made outside the contract." ***Raybourne & Dean Consulting, Ltd. v. Metrica, Inc.***, No. SA-14-CA-918, 2016 WL 7497587, at *45 (W.D. Tex. Feb. 19, 2016). Thus, while the Court found an enforceable oral contract for $70 million, that does not prevent the Court from considering Trustee's promissory estoppel claim for promises not covered by the parties' oral agreement—i.e., capital investment beyond $70 million.

For the first element of promissory estoppel, Texas courts require the claim be "based on an actual promise." ***Eaton v. Mazanec Constr. Co.***, Nos. 10-21-00107-CV, 10-21-00111-CV, 2022 WL 7211332, at *19 (Tex. App.—Waco Oct. 12, 2022, no pet.) (mem. op.). "A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment[471] has been made." Restatement (Second) of Contracts § 2 (A.L.I. 1981). "The asserted promise must be sufficiently specific and definite so that it would be reasonable and justified for the promisee to rely on it as a commitment to future action." ***Eaton***, 2022 WL 7211332, at *19. Additionally, the promise "must be more than mere

---

[471] Dundon repeatedly differentiated between a commitment and an obligation or promise, intimating that a commitment was not as formal or binding as a promise. *See* T-0860 at 1 ("I think there is a difference between commitments and funding."). The Court found these semantics woefully unavailing. Black's Law Dictionary defines commitment as "agreement to do something in the future, esp. to assume a financial obligation" and a "promise to do something or to behave in a particular way." *Commitment*, BLACK'S LAW DICTIONARY (12th ed. 2024). Thus, the two words are considered synonyms for one another.

172

speculation concerning future events, a statement of hope, or an expression of opinion, expectation, or assumption." *Jack in the Box Inc. v. San Tex Rests., Inc.*, No. SA-20-CV-00328, 2021 WL 148058, at *30 (W.D. Tex. 2021).

Here, Trustee alleges that Dundon made a promise to invest $250 million in ESMG which included Dundon's promise to cover the capital needs of ESMG over the course of five years and until the league became cash flow positive. The evidence unequivocally shows that Dundon made public statements through press releases and media interviews, asserting that he was "committed" to investing $250 million, which he avowed would buy the League five years.[472] There is evidence that these declarations were potentially shared with other investors.[473] Additionally, Dundon made these assertions to employees of ESMG, including Ms. Hanson while she drafted ESMG's press release announcing Dundon's investment.[474] Further, Ebersol testified that Dundon gave reassurances that he was investing $250 million. Dundon reflected this sentiment at trial, testifying that he "had the money" and "was committed."[475]

Nevertheless, Dundon alleges his promise was too vague and indefinite to sustain a claim for promissory estoppel. To support his position, Dundon explained at trial that he did not wish to delve into the conditions of his $250 million investment in the press, which is why he claims some news articles are devoid of reference to conditions, reservations, or details.[476] In one interview, Dundon publicly stated, "So long as we get the rating and the demand then obviously [we will]

---

[472] T-0380 at 1; *see also* T-0860 at 1 ("[M]y investment will keep this thing years and years to come.").
[473] *Id.* at 4 (revealing Dundon reported to interviewers that he told interested investors that the league didn't "need any capital").
[474] ECF No. 407 at 55–58. Dundon also spoke to Kelly Vugrincic and other executives in charge of the accounts payable for ESMG. (ECF No. 354 at 7–8). Vugrincic testified that she did not recall exactly what Dundon told the team, but that Dundon never discussed the details about his investment. *Id.* Additionally, Vugrincic explained that she understood that it was common practice for press release to announce an investment commitment even if the investor did not necessarily invest the entire amount up front. *Id.*
[475] ECF No. 343 at 210.
[476] *Id.* at 209.

keep putting in capital . . . ."[477] From Dundon's perspective, he would only invest $250 million once various conditions were met, and the parties clearly did not reach an agreement on those conditions. Notably, there is no evidence that Dundon made his promise to invest $250 million directly to any decision makers of ESMG—stockholders or board directors—besides Ebersol, who the Court finds not credible.

The Court agrees with Dundon—the promise is too indefinite to show justifiable reliance and does not support promissory estoppel.[478] There is no record that ESMG's stockholders or directors ever heard directly from Dundon that he was investing $250 million over a five-year period. ESMG's corporate lawyer did not recall a total investment figure of $250 million despite attending ESMG's board meeting and drafting ESMG's board and stockholder resolutions.[479] Both resolutions were signed after Dundon began publicly blasting word of a $250 million investment in connection with his takeover of ESMG, revealing that the board members and shareholders of ESMG who voted to approve a contract for $70 million either did not hear Dundon's indirect promise or did not rely on it. Even after it became clear to ESMG that $70 million would not cover the league's rapid cash burn, ESMG's shareholders did not demand Dundon inject the $250 million to sustain operations. While the Court believes that Ebersol and Dundon discussed the possibility of a total investment of $250 million, it does not appear that such discussions reached other decision makers of ESMG and merely represented an intent to negotiate about additional funding tranches in the future.

---

[477] T-0381 at 2.

[478] Dundon also made allegations, for the first time during trial, that his public statements to invest $250 million were part of a marketing scheme concocted by Ebersol. The Court finds Dundon's allegation not credible. Prior to trial, Dundon did not assert that he circulated talk of a $250 million investment at Ebersol's direction as part of a marketing scheme and there was no evidence to support his assertion.

[479] FOF ¶ 109.

Moreover, the record reflects that Ebersol, Dundon, and Zutter (who participated in the latter half of the investment negotiations) are sophisticated businessmen with significant experience negotiating business deals, often for millions of dollars. These parties were also represented by competent legal counsel through their respective entities. ESMG could not have justifiably relied on a promise of a $250 million investment made in an arm's-length transaction that occurred in roughly two days through telephone conversations when the commitment was not reduced to writing or, at the very least, a resolution of ESMG's board after Dundon began publicizing his investment. "Similarly, an anticipated investment would be presumed by any reasonable person to be contingent on future events." ***Est. of Crescent Mach. v. Roberson (In re Crescent Mach.)***, No. 03-04024, 2003 Bankr. LEXIS 546, at *26 (Bankr. N.D. Tex. 2003). "A party to an arm's-length transaction must exercise reasonable diligence in protecting his own interest, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." ***Comiskey v. FH Partners, LLC***, 373 S.W.3d 620, 635 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Trustee provides few arguments regarding ESMG's reliance or the reasonableness thereof. Instead, Trustee relies on the inference that because promises were made publicly and Dundon, as the board director, declined funds from additional investors, ESMG must have relied on Dundon's promise to invest $250 million. This scenario, however, implicates Dundon's duties as a board member and is better characterized as a breach of his fiduciary duty, not a claim for promissory estoppel.

### VIII.   Common Law Fraud; Fraudulent Misrepresentation; Constructive Fraud; Fraudulent Non-disclosure

As another alternative argument to breach of contract, Trustee brought claims for common law fraud, fraudulent non-disclosure, and constructive fraud. Trustee asserts that Dundon made false statements to Ebersol regarding Dundon's funding commitment and the longevity of AAF as

a result of such funding. Additionally, Trustee claims Dundon had a duty to disclose the conditions connected to a $250 million investment, and his failure to do so created a false impression in ESMG that Dundon was investing more than he intended to. On the other hand, Dundon asserts that Trustee cannot prove that ESMG's reliance was actual or justified.

This district categorizes fraud claims into two similar but distinct classes:

> Under Texas law, there are two types of common-law fraud: (1) simple fraud, also known as fraudulent misrepresentation, and (2) fraudulent inducement,[480] which is when someone allegedly induces another to enter into a contract by using false representations. These are separate causes of action, but they share the same elements, which are: (1) defendant made a material misrepresentation that (2) was false, (3) and was either known to be false when made or was asserted without knowledge of its truth, (4) the defendant intended the representation to be acted upon, (5) it was relied upon, and (6) it caused injury.

*Holland v. CryptoZoo Inc.*, No. 1:23-CV-00110-ADA, 2025 WL 2493064, at *7 (W.D. Tex. Aug. 25, 2025) (quoting *Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 660 (W.D. Tex. 2019)). The elements for fraud by nondisclosure are similar to those above but require that the defendant "deliberately failed to disclose material facts" even though the defendant "had a duty to disclose such facts to the plaintiff." *CBE Grp., Inc. v. Lexington L. Firm*, 993 F.3d 346, 353 (5th Cir. 2021). Lastly, constructive fraud is "the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Jacked Up, LLC v. Sara Lee Corp.*, 854 F.3d 797, 810 (5th Cir. 2017) (quoting *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied)) ("It does not require an intent to defraud."). For all four causes of action, a plaintiff is required to show justifiable reliance. *McLane Champions, LLC v. Hous. Baseball Partners LLC*, 671 S.W.3d 907, 926 (Tex. 2023) (Blacklock, J., dissenting) (assessing justifiable reliance for fraud, fraud by nondisclosure, and negligent

---

[480] Trustee brought a claim for fraudulent inducement in a separate count. As such, the Court will address fraudulent inducement below.

misrepresentation because the majority declined to do so in light of its holding); *see also **Vulcan Cap. Corp. v. Miller Energy Res., Inc.**, No. 3:14-CV-3283-B, 2015 WL 293839, at *24 (N.D. Tex. Jan. 22, 2015) (requiring justifiable reliance to sustain a constructive fraud claim).

As the Court noted above, ESMG could not have justifiably relied on Dundon's oral representations or public comments referring to an investment of $250 million. In the context of a $250 million dollar arm's-length transaction among sophisticated parties for the purchase of a professional sports league, reliance on any representation or omission by the opposing party is not justifiable. *See **McLane Champions, LLC**, 671 S.W.3d at 926 (Blacklock, J., dissenting) (applying well-settled principles of justifiable reliance). Accordingly, Trustee cannot recover on his common law fraud, fraudulent misrepresentation, constructive fraud, or fraudulent non-disclosure claims.

## IX.    Fraudulent Inducement

Trustee's next alternative contract theory is fraudulent inducement. Rather than pointing to Dundon's public statements, Trustee relies on Dundon's alleged reassurances made to Ebersol when the parties drafted the Term Sheet. Like the above claims, Dundon argues that ESMG lacked justifiable reliance on any representation Dundon made.

"Fraudulent inducement is a 'species of common-law fraud' that 'arises only in the context of a contract.'" ***IBM v. Lufkin Indus., LLC***, 573 S.W.3d 224, 228 (Tex. 2019). Thus, the elements for fraudulent inducement are:

> (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury.

*Id.* The misrepresentation for fraudulent inducement occurs when the defendant makes a promise to perform in the future without the intent to do so. *Id.* When the plaintiff relies on the defendant's

promise, the plaintiff is induced to agree to a contract the plaintiff otherwise would not agree to in the absence of the false promise. *Id.* Such reliance must also be justified to succeed on a fraudulent inducement claim. *Harrison v. Meritz Fire & Marine Ins. Co.*, No. 14-18-00336-CV, 2020 WL 2070660, at *7 (Tex. App.—Houston [14th Dist.] Apr. 30, 2020, pet. denied) (mem. op.) (requiring a plaintiff show justifiable reliance).

Because the Court reached a determination on justifiable reliance under the circumstances of this case, the Court need not determine whether the other elements of fraudulent inducement are present. Again, any reliance ESMG had on Dundon's representation that he would invest $250 million was not justified. Accordingly, Trustee cannot recover on his fraudulent inducement claim.

## X. Negligent Representation

Trustee's final alternative contract argument is that Dundon negligently misrepresented that he intended to unconditionally invest a total of $250 million into AAF. Dundon again asserts the same defense that he asserted against Trustee's fraud claims—that ESMG lacked justifiable reliance.[481]

To prevail on a cause of action for negligent misrepresentation, a plaintiff must prove, among other things, that reliance was justified. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–54 (Tex. 2018). For the same reasons the Court finds ESMG lacked justifiable reliance to succeed on its fraud claims, the Court also finds that ESMG lacked justifiable reliance sufficient for Trustee to recover on his negligent misrepresentation claim.

---

[481] Dundon also raised defenses about whether the Supreme Court of Texas recognizes a claim for negligent misrepresentation. (ECF No. 300 at 40). Because the Court finds this claim fails for other reasons, the Court declines to reach the merits of Dundon's other defenses.

## XI.     Unjust Enrichment

Trustee claims Defendants were unjustly enriched. There is a question of whether Texas or Delaware law applies to the unjust enrichment claim. The Court implied that Texas law applied to the unjust enrichment claim in Order Granting In Part, Denying In Part Defendants' Motion to Dismiss.[482] But in Order Denying Defendant Zutter's Motion for Summary Judgment, the Court stated Delaware law applied to the claim, wrongly citing the fiduciary duty discussion in the Court's prior order on the motion to dismiss.[483] The pleadings reflect a confusion on the applicable law as well. In the Joint Proposed Pre-Trial Order, both parties agreed "[t]he law that applies to unjust enrichment claims is determined by the object of the unjust enrichment."[484] But in the same document, Trustee claimed Delaware law applies to the unjust enrichment claim without identifying the object of the unjust enrichment.[485] In Trustee's Amended Proposed Findings of Fact and Conclusions of Law, Trustee again claims Delaware law applies with no explanation, but he also points to his legal arguments on unjust enrichment in earlier pleadings where he used Texas law.[486] In Defendants' Amended Proposed Findings of Fact and Conclusions of Law, Defendants now also apply Delaware law but provide no explanation as to why.[487] The Court will therefore first discuss whether Texas or Delaware law applies and then will examine whether Defendants were unjustly enriched under the applicable law.

---

[482] ECF No. 54 at 56.
[483] ECF No. 281 at 12.
[484] ECF No. 300 ¶ 512.
[485] *Id.* ¶ 569.
[486] ECF No. 427 ¶¶ 549, 553 ("The parties have already briefed the legal issues related to unjust enrichment, and the Trustee's prior briefing can be found at ECF No. 30 . . . .").
[487] ECF No. 428 ¶ 391

*A. Texas law applies to the unjust enrichment claim.*

In determining the applicable law, the Court must first determine which choice of law rules govern. A federal court sitting in diversity jurisdiction must apply the choice of law rules of the forum state in which it sits. ***Klaxon Co. v. Stentor Elec. Mfg. Co.***, 313 U.S. 487 (1941). This Court, however, has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334(b). Therefore, the Court has federal question jurisdiction, not diversity jurisdiction. Neither the Supreme Court nor the Fifth Circuit has addressed the question of what choice of law rules bankruptcy courts should apply in such cases. ***Woods-Tucker Leasing Corp. of Georgia v. Hutcheson-Ingram Dev. Co.***, 642 F.2d 744, 748 (5th Cir. 1981); ***Reed v. Carecentric Nat'l, LLC (In re Soporex, Inc.)***, 446 B.R. 750, 761 (Bankr. N.D. Tex. 2011). Bankruptcy courts, however, apply forum state choice-of-law rules when resolving state law issues that do not implicate federal policy. *See* ***ASARCO LLC v. Americas Min. Corp.***, 382 B.R. 49, 60-61 (S.D. Tex. 2007) (compiling cases). Here, the issue is whether Defendants were unjustly enriched. Unjust enrichment is a state law cause of action and does not implicate federal policy. ***Wilmington Savings Fund Soc'y v. iHeartCommunications, Inc. (In re iHeartMedia, Inc.)***, 597 B.R. 339, 350, 359 (Bankr. S.D. Tex. 2019). Therefore, the Court will apply Texas choice of law rules.

Based on Texas choice of law rules, Texas law applies to Trustee's unjust enrichment claim. In resolving choice of law issues, Texas courts apply the "most significant relationship" test outlined in sections 6 and 145 of the Restatement (Second) Conflict of Laws. ***Grant Thornton LLP v. Suntrust Bank***, 133 S.W.3d 342, 358 (Tex. App.—Dallas 2004, pet. denied). But "the Restatement contains sections for specific situations, and when these are applicable, the courts are to apply them to resolve the conflict." *Id.* Section 221 provides five factors to be considered when determining choice of law issues for restitution:

> (a) the place where a relationship between the parties was centered . . . , (b) the place where the benefit or enrichment was received, (c) the place where the act conferring the benefit or enrichment was done, (d) the domicil residence, nationality, place of incorporation and place of business of the parties, and (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

Restatement (Second) of Conflict of Laws § 221 (A.L.I. 1971). Each factor shall be "evaluated according to their relative importance with respect to the particular issue." *Id.*

The factors favor Texas. The relationship between the parties was centered in Texas. DCP has its principal place of business in Texas.[488] Following the agreement between DCP and ESMG, DCP representatives and AAF management held a series of key all-hands meetings in Texas for several days.[489] The alleged benefit or enrichment would be received primarily in Texas, as DCP is headquartered in Texas, and Dundon is a Texas resident.[490] While both DCP and ESMG are incorporated in Delaware, Delaware otherwise has little relation to the unjust enrichment claim. Therefore, the Court will apply Texas law, not Delaware law.

### B. Defendants were not unjustly enriched under Texas law.

Defendants were not unjustly enriched. "The doctrine of unjust enrichment belongs to the measure of damages known as quasi-contract or restitution." ***First Union Nat. Bank v. Richmont Cap. Partners I, L.P.***, 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.). Unjust enrichment is an equitable doctrine. ***Houle v. Casillas***, 594 S.W.3d 524, 555 (Tex. App.—El Paso 2019, no pet.). It "applies to disputes where there is no actual contract and 'characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay.'" ***Picard v. Chase Home Fin., LLC***, No. 3:11-CV-439, 2011 WL 5333060, at *4 (N.D. Tex. Nov. 3, 2011) (quoting ***Walker v.***

---

[488] FOF ¶ 6.
[489] FOF ¶ 121.
[490] FOF ¶¶ 78, 80.

*Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.)). In other words, one is unjustly enriched "when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Middaugh v. InterBank*, 528 F. Supp. 3d 509, 551 (N.D. Tex. 2021) (citing *Villareal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied)). "When a valid, express contract covers the subject matter of the parties' dispute, there can generally be no recovery under this theory, as allowing such recovery would be inconsistent with the parties' express agreement." *Houle*, 594 S.W.3d at 554. "However, when a person has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon that person to restore the benefits to the plaintiff." *Id.* at 555.

The doctrine of unjust enrichment does not apply to this case. Trustee claims Defendants were unjustly enriched by:

> (1) not having to pay the required remaining amount of the $250 million commitment; (2) the amounts that DCP received as payment from AAF for services that benefitted DCP (and through it, Dundon and Zutter), in particular the DCP "transaction costs" and the payments to PwC and Bracewell . . . ; and (3) the advertising use to benefit DCP, Dundon, and Zutter's other entities and relationships . . . .[491]

First, a valid contract covers the subject matter of how much DCP was obligated to pay ESMG. The Court found DCP was obligated to pay $70 million based on the oral contract, not $250 million.[492] Therefore, Trustee's first claim fails. Second, Trustee fails to provide evidence regarding what the $280,810 in "transaction costs" was for or whether it was a proper or improper payment. The Court cannot find that a payment was an unjust enrichment with such a lack of information. Regarding the payments to PwC and Bracewell, Trustee appears to claim DCP's

---

[491] ECF No. 427 ¶ 554.
[492] *See supra* Section II.B.

$70 million investment was wrongfully applied in paying PwC and Bracewell for services rendered for the benefit of DCP. Based on Trustee's theory, Defendants were unjustly enriched because part of the $69,719,190 DCP invested in ESMG was wrongfully used and therefore does not count towards the investment amount. If Trustee is correct, DCP invested less than $69,719,190 of the promised $70 million in the contract. The contract covers this subject matter. Trustee is essentially making a breach of contract claim. Therefore, Trustee's claim fails.

Third, Trustee claims Defendants and their associates were unjustly enriched with free or discounted advertising. Zutter was not enriched from the advertising arrangement between Dundon and third parties.[493] DCP, Dundon, and his third-party associates were enriched from free or discounted advertising.[494] But it would not be unjust for DCP, Dundon, and the third parties to retain the advertising benefit.

According to Mr. Robert Whitsitt, there are generally four steps or categories when selling advertising spots for sports broadcasting.[495] First, and most preferably, advertisement slots are sold for cash.[496] Second, advertisements slots are sold at discounted rates.[497] Third, advertising slots are bartered for goods the advertised company can provide.[498] Fourth, generally as a last resort, advertisement slots are given away for free to garner interest in future paid advertising and to give the broadcasting a "quality look."[499] Importantly, advertising is perishable. If you do not do any of these four things before a broadcast, you have lost a revenue opportunity.[500] The vast majority of advertising inventory is sold over the 12 months leading up to the first game.[501] Once the season

---

[493] FOF ¶ 225.
[494] FOF ¶ 226.
[495] Trial Tr. 131:9–132:20, ECF No. 397.
[496] *Id.* at 136.
[497] *Id.*
[498] *Id.*
[499] *Id.*
[500] *Id.*
[501] *Id.* at 138.

starts, it is difficult and rare to sell advertising for cash.[502] This is primarily because companies plan ahead and put advertising budgets together in advance.[503]

AAF had sold little of its advertising inventory by the start of its inaugural season, which was before Dundon joined ESMG.[504] Over half of what AAF had sold was a barter arrangement.[505] Dundon states that of what AAF had sold, they had few "big brands."[506] Dundon argues his advertising strategy was to associate big brands with AAF by offering them advertising slots, which would, in turn, create buzz around AAF and increase its prestige due to its association with major brands.[507] Dundon claims that not only would this strategy give AAF brand recognition, but it would also open doors to future advertising deals. He states:

> I can tell you that to get someone involved with your brand committed to put their stuff on your brand, companies like Morgan Stanley, is a benefit because it makes other people take you more seriously, and it gets the people who make the decision to spend money to think about you when they have all the other choices and all the other networks and all the other media, and they get to think about that stuff, and now they're thinking about you. That lead that I provided to our people was in— I'm going to say is impossible. I don't know many other people in the world who could have got those eight or ten great brand companies to participate for a week or two with their brand with our brand and open up the possibility for a future investment.[508]

In Mr. Whitsitt's opinion, Dundon's actions benefitted AAF. He reasons,

> When you're trying to sell advertising for a game that's coming up in a few days, it's very, very difficult to get people to pay cash. . . . And at that time of the year, . . . if you can even get an advertiser to put a spot in, you've done a pretty good job.[509]

Further, in a subsequent sales meeting, some of the no-charge advertisers were considering a potential barter arrangement.[510] On the other hand, Trustee provides no dollar estimate as to the

---

[502] Id.
[503] Id. at 138:21–139:5.
[504] Id. at 141:21–142:9.
[505] Id. at 142:4–9.
[506] Trial Tr. 47:12–20, ECF No. 349.
[507] FOF ¶ 226.
[508] Trial Tr. 50, ECF No. 349.
[509] Trial Tr. 141:4–10, ECF No. 397.
[510] Id. at 141:10–20.

value of the advertisement slots.[511] Trustee does not provide adequate evidence as to what the advertisements would have sold for, if they could have been sold at all.

With the current evidence, the Court cannot find that DCP, Dundon, or his associates were unjustly enriched from the free or discounted advertising. AAF had failed to sell the vast majority of its advertising inventory before the season began. It is difficult to sell advertising slots after the start of a season. Under the circumstances, Trustee failed to prove that Dundon's acts unjustly enriched Dundon or DCP. Therefore, unjust enrichment does not apply here.[512]

### C.  Even if Delaware law applied, Defendants were not unjustly enriched.

Even if Delaware law applied, Defendants were not unjustly enriched. In Delaware, "[u]njust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (en banc) (citations omitted). Unjust enrichment requires: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, and (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id.* "A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009). Put another way, when "the contract is the measure of plaintiff's rights, there can be no recovery under an unjust enrichment theory independent of it." *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979).

---

[511] FOF ¶ 236.

[512] The unjust enrichment discussion here has no bearing on the Court's duty of loyalty analysis. A breach of a fiduciary duty does not necessarily result in unjust enrichment. *See* discussion *supra* Part VI.

First, Trustee claims Defendants were unjustly enriched by "not having to pay the required remaining amount of the $250 million commitment."[513] This claim fails because the oral contract governed how much DCP or DDFSP had to pay ESMG, and the Court found they did not have to pay ESMG $250 million.[514] Second, Trustee claims Defendants were unjustly enriched by "the amounts that DCP received as payment from AAF for services that benefitted DCP (and through it, Dundon and Zutter), in particular the DCP "transaction costs" and the payments to PwC and Bracewell"[515] Regarding the transaction costs, the Court lacks information to determine whether the $280,810 in transaction costs were proper or improper. Regarding the payments to PwC and Bracewell, Trustee is essentially making a breach of contract claim. Based on Trustee's theory, Defendants were unjustly enriched because a portion of the $69,719,190 DCP invested in ESMG was wrongfully used in paying PwC and Bracewell and therefore does not count towards the investment amount. If Trustee is correct, DCP invested less than $69,719,190 of the promised $70 million in the contract. The contract covers this subject matter. Therefore, Trustee's second claim fails.

Third, Trustee claims Defendants were unjustly enriched by "the advertising use to benefit DCP, Dundon, and Zutter's other entities and relationships."[516] Zutter was not enriched by the free or discounted advertising.[517] DCP, Dundon, and his affiliates were enriched by the advertising.[518] But, under the circumstances, Dundon's actions may have benefitted AAF. The reasoning is the same as above. The vast majority of advertising inventory is sold over the 12 months leading up

---

[513] ECF No. 427 ¶ 554.
[514] *See supra* Section II.B.
[515] *Id.*
[516] ECF No. 427 ¶ 554.
[517] FOF ¶ 225.
[518] FOF ¶ 226.

to the first game.[519] Once the season starts, it is difficult and rare to sell advertising for cash.[520] AAF had sold little of its advertising inventory by the start of its inaugural season, which was before Dundon joined AAF.[521] Dundon states that of what AAF had sold, they had few "big brands."[522] Dundon argues that his advertising strategy was to associate big brands with AAF by offering them advertising slots, which would, in turn, create buzz around AAF and increase its prestige due to its association with major brands.[523] As discussed, in Mr. Whitsitt's opinion, Dundon's actions benefited AAF. He reasons,

> When you're trying to sell advertising for a game that's coming up in a few days, it's very, very difficult to get people to pay cash. . . . And at that time of the year, . . . if you can even get an advertiser to put a spot in, you've done a pretty good job.[524]

Further, in a subsequent sales meeting, some of the no-charge advertisers were considering a potential barter arrangement.[525] On the other hand, Trustee does not provide adequate evidence as to what the advertisements would have sold for, if they could have been sold at all. Therefore, the Court finds Defendants were not unjustly enriched.

## XII. Disallowance of Claims

Dundon and DCP each filed proof of claims in Legendary Field Exhibitions, LLC, Bankruptcy Case No. 19-50900-cag. DDFSP did not file a proof of claim.

DCP filed Claim #187-1 in an unspecified amount as an unsecured nonpriority claim. Exhibit "A" to the Claim #187-1 states that Dundon asserts a claim "arising from its indemnity obligations and from any other harm or damages suffered by Dundon in connection with his

---

[519] FOF ¶ 232.

[520] *Id.*

[521] Trial Tr. 141:21–142:9, ECF No. 349.

[522] *Id.* at 47:12–20.

[523] FOF ¶ 226.

[524] Trial Tr. 141:4–10, ECF No. 397.

[525] *Id.* at 141:10–20.

relationship to the debtor herein."[526] In Exhibit "A" to the proof of claim, the $70 million paid to ESMG is described as either commitment, rescue capital, cash infusion, and in paragraph 12 of Exhibit "A", a "$70,000,000 investment." Nowhere in the proof of claim does the claimant assert a loan.

Dundon filed proof of claim #188-1 in an unspecified amount as an unsecured nonpriority claim. Exhibit "A" to Claim #187-1 states that Dundon asserts a claim "arising from its indemnity obligations and from any other harm or damages suffered by Dundon in connection with his relationship to the debtor herein." In Exhibit "A" to the proof of claim, the $70 million paid to ESMG is described as either commitment, rescue capital, cash infusion, and in paragraph 12 of Exhibit "A," a "$70,000,000 investment." Nowhere in the proof of claim does the claimant assert a loan. Dundon, through DDFSP, invested nearly $70 million in ESMG, and all the money was spent on ESMG and its related entities' operations, but for money that was used to pay PwC to examine if a chapter 11 case was a viable option, and money that Dundon and/or Zutter caused to be paid to Bracewell as bankruptcy counsel.

"Sections 501 and 502 of the Bankruptcy Code govern the substantive basis for allowance of a claim, and Federal Rule of Bankruptcy Procedure Rule 3001 governs the procedure by which the Court determines whether a filed Proof of Claim is allowed." *In re Ali*, No. 13-50724, 2015 WL 4611343, at *30 (Bankr. W.D. Tex. July 23, 2015) (Gargotta, J.).

Objections made in adversary proceedings are expressly permitted by Federal Rule of Bankruptcy Procedure 3007(b). Fed. R. Bankr. P. 3007(b) ("In objecting to a claim, a party in interest must not include a demand for a type of relief specified in Rule 7001 but may include the objection in an adversary proceeding.").

---

[526] Case No. 19-50900, Claim #187-1, Ex. A.

The allegations for Trustee's disallowance of claims are contained in paragraph 139 of the First Amended Complaint:

> On or about June 24, 2019, DCP filed a Proof of Claim, No. 187 ("DCP Claim") in the core bankruptcy proceeding (Case No. 19-50900). The DCP Claim alleges that unnamed AAF executives allegedly misrepresented and/or omitted material facts to Dundon and "misrepresented to the public, employees, and players the details of DCP's financial commitment to the League...." DCP asserts a claim against Debtors' Estate in the amount of $70 million. On the same day Dundon filed a Proof of Claim, No. 188 ("Dundon Claim") in the core bankruptcy proceeding (Case No. 19-50900). The Dundon Claim also asserts a claim against Debtors' Estate in the amount of $70 million on identical or substantially the same grounds as the DCP Claim.[527]

In his Original Complaint, Trustee alleged that the Dundon and DCP claims should be disallowed to the extent the claims are "voidable under section 544 or 547 of the Bankruptcy Code."[528] The Court dismissed Trustee's claims under 11 U.S.C. §§ 544 and 547 against DCP and Dundon in November 2023.[529] Trustee did not attempt to reassert those claims in the First Amended Complaint.[530] Because Trustee has no claim that any transfers are voidable under 11 U.S.C. §§ 544 or 547 against Dundon or DCP, he cannot claim DCP or Dundon's claims should be disallowed under 11 U.S.C. § 502(d).[531] Trustee's request under § 502(d) for disallowance is denied.

Further, to the extent that Trustee alleges that DCP and Dundon's proof of claims are incorrectly based on Ebersol's alleged omissions or misrepresentations, the objection is denied. As detailed herein, the Court made specific findings of fact that Ebersol made misrepresentations

---

[527] ECF No. 56 ¶ 139.

[528] *Id.* at ¶ 219.

[529] ECF No. 54 at 34–36.

[530] ECF No. 56 at 53 (indicating the causes of action were removed pursuant to the Court's order).

[531] Section 502(d) states:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

and omissions regarding the financial condition of AAF, its unpaid vendor bills, and the status of its accounts payable. As such, Dundon and DCP had a basis in fact to assert that the $70 million paid to ESMG was premised on or in part because of Ebersol's erroneous statements.

Defendants' claims are deemed allowed to the extent the claims are not objected to, and the proofs of claim are prima facie evidence of the claims' validity and amounts. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). Trustee bears the initial burden to present evidence to overcome the claims' validity. *In re 1701 Commerce, LLC*, 511 B.R. 812, 822 (N.D. Tex. Bankr. 2014). To put a claim at issue, Trustee must identify the specific bases for its claim objections. Local R. 3007-1(b) ("All Objections to claims shall specifically set forth all bases for the objection. General denials regarding the accuracy of the claim without specific contentions regarding the disputed items may result in the Court denying the Objection.").

In the Pre-Trial Order, Trustee for the first time asserted disallowance under 11 U.S.C. § 502(a).[532] DCP and Dundon objected to Trustee's attempt to assert a new basis for disallowance for the first time in the Pre-Trial Order.[533]

The Joint Pre-Trial Order states:

> The Trustee objects to the DCP Claim and Dundon Claim and therefore DCP and Dundon must demonstrate at trial the basis for and amount of any claim to be allowed. For instance, the Dundon Claim asserts a claim for indemnity but fails to elaborate on the basis for such claim (by description or documentary evidence). Dundon asserts no counterclaims against Plaintiffs and alleges neither indemnity nor offset as an affirmative defense. Similarly, the DCP Claim asserts a claim for rescission, but fails to support that claim with anything other than conclusory statements in Exhibit "A" to the DCP Claim.[534]

Defendants argue that a pretrial order cannot add new claims. That is incorrect. The

---

[532] ECF 300 at 42–43.
[533] *Id.* at 43.
[534] ECF No. 300 ¶ 122.

Supreme Court has held that the final pretrial order supersedes all prior pleadings. *See **Rockwell Int'l Corp. v. United States***, 549 U.S. 457, 474 (2007) (holding that a final pretrial order supersedes all prior pleadings and controls the course of action) (citations omitted); ***Syrie v. Knoll Int'l***, 748 F.2d 304, 308 (5th Cir. 1984) (finding that incorporation of a new claim in a pretrial order amends the previous pleadings). Therefore, Trustee's additional allegations as to his claim objection to Dundon and DCP are proper.

"[T]he burden of persuasion under bankruptcy claims procedure always lies with the claimant, who must comply with Bankruptcy Rule 3001 by alleging sufficient facts in the proof of claim to support the proof of claim." ***In re GDC Technics, LLC***, 643 B.R. 417, 426 (Bankr. W.D. Tex. 2022) (Gargotta, J.). A proof of claim constitutes *prima facie* evidence of the claim's validity and amount only if the claim complies with the Rules, including Rule 3001. Fed. R. Bankr. P. 3001(f). Rule 3001(c)(1) requires that "[i]f a claim or an interest in the debtor's property securing the claim is based on a writing, the creditor must file a copy with the proof of claim." *Id.*, 3001(c)(1). "Although there is an initial presumption of validity that attaches to all claims, claims asserted by insiders or fiduciaries demand closer scrutiny." ***In re Mid-American Waste Sys., Inc.***, 284 B.R. 53, 69 (Bankr. D. Del. 2002)). "If the objecting party produces evidence to rebut the claim, the burden of persuasion shifts back to the claimant to establish the validity and amount of the claim by a preponderance of the evidence." ***GDC Technics***, 643 B.R. at 426.

The Court agrees with Trustee that the evidence adduced at trial does not support Dundon's assertion that he is entitled to indemnification or recission. There are no counterclaims regarding indemnification or recission. Dundon further failed to establish any basis for his claimed indemnity obligation (whether in the Dundon Claim or at trial) and further failed to allege or demonstrate any harm or damage amount due to "any other harm or damages suffered by him in connection with

his relationship with the debtor." The Court notes that Dundon and DDFSP lost their investment of roughly $70 million; that is not in dispute. Further, as noted in this Memorandum Opinion, Dundon nor any of his entities ever received stock from ESMG. Therefore, the Court fails to understand how a stock transaction can be rescinded if it never happened. As such, Dundon's bald assertions of indemnification and recission, without more, fail under § 502(a).

In addition, DCP does not have a claim in this case because, as the Court found in Adversary No. 22-05077, DDFSP, and not DCP, provided the investment of monies to ESMG.[535] Therefore, DCP's proof of claim is disallowed because it provided no funds to ESMG. A claim should be disallowed to the extent "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). The Court finds that both the Dundon and DCP Claims must be disallowed. The evidence establishes that the claim Dundon and DCP allege for $70 million is owned, if by anyone, by DDFSP, which has not asserted a claim. Nonetheless, the Court finds that Dundon has an investment of roughly $70 million in ESMG through DDFSP.

### XIII. Equitable Subordination

In the Pre-Trial Order, Trustee asserted a new basis for subordination, referring for the first time to subsection (b) of 11 U.S.C. § 510.[536] Trustee previously relied on (and only pleaded for subordination under) 11 U.S.C. § 510(c). Trustee's new claim relies on § 510(b) and (c). As explained herein, the Joint Pre-trial Order supersedes the First Amended Complaint.

Paragraph 126 of the Joint Pre-Trial Order states:

In the event either Dundon or DCP are determined to have an allowed "claim" in some amount based on a "debt," those claims must be subordinated under Section 510(b) and (c). Both the Dundon and DCP Claims appear to relate to the purchase

---

[535] *See* Adv. No. 22-05077, ECF No. 171 at 16 (the uncontradicted evidence shows DDFSP paid ESMG and DDFSP took the loss, not DCP).
[536] ECF No. 300 at 44.

and sale of a security, must be evaluated accordingly, and, to the extent found to be so related, must be subordinated to all claims or interests that are senior to or equal the claim or interests. Moreover, DCP and Dundon both engaged in inequitable and fraudulent conduct towards the Debtors (as described in paragraphs 148-373 herein and Plaintiffs' First Amended Complaint) that resulted in harm to the Debtors. Under principles of equitable subordination, such claims should be subordinated for purposes of distribution so that all other creditors or interest holders receive distributions prior to Dundon or DCP.[537]

Trustee argues that if the Court further finds, in the alternative, that to the extent Dundon or DCP has a claim for $70 million, such claim must be mandatorily subordinated because such claim relates to the rescission of the purchase or sale of a security in ESMG, or for reimbursement or contribution on account of such a claim. 11 U.S.C. § 510(b).

Trustee argues that Defendants' claims are subject to and must be mandatorily subordinated pursuant to § 510(b), as any such claim necessarily relates to the purchase and sale of a security (that being ownership of ESMG). Equity holder claims are subordinated in this matter to prevent the equity holder from getting "the best of both worlds—the right to share in profits if [the debtor] succeeded and the right to repayment as a creditor . . . if it failed." *In re Am. Hous. Found.*, 499 B.R. 517, 539–40 (Bankr. N.D. Tex. 2013) (alteration in original) (quoting *Liquidating Trust Comm. of the Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio)*, No. 12–3065, 2012 WL 5467754, at *6 (Bankr. N.D. Cal. Nov. 8, 2012)).

Although Trustee has asserted a new claim under § 510(b), Trustee has not sufficiently alleged a basis for subordination under that subsection. Under subsection (b), the claim must arise from "rescission of a purchase or sale of a security of the debtor or affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim." 11 U.S.C. § 510(b).[538] The

---

[537] ECF No. 300.
[538] In *Seaquest Diving*, the court stated:

Court previously observed "both parties agree that no stock of ESMG was transferred to DCP,"[539] and Trustee does not allege a transfer of stock to support its new claim. As such, it is difficult to discern how § 510(b) is implicated if there was no purchase or sale of stock.[540] The Court recognizes that Dundon or DDFSP invested roughly $70 million for control of Debtor (two controlling seats on the ESMG board), but ESMG did not convey or transfer any stock to Dundon or DDFSP. Without more, Trustee has not demonstrated how § 510(b) applies to Defendants' claims. Moreover, Trustee's vague allegations that paragraphs 148-373 of the Joint Pre-Trial Order and Plaintiffs' First Amended Complaint demonstrate a basis for equitable subordination under § 510(b) are insufficient for the Court to order the extraordinary remedy of equitable subordination. *See In re Rhodium Encore LLC*, No. 24-90448, 2025 WL 2501132 at *18 (Bankr. S.D. Tex. Aug. 30, 2025) (noting § 510(b) inapplicable where there is no recission of stock); *In re Think3, Inc.*, 529 B.R. 147, 206 (Bankr. W.D. Tex. 2015) (finding the complaint failed to allege with specificity the basis for damages arising out of the recission or sale of stock).

Trustee also argues that Defendants' claims should be subordinated under 11 U.S.C. § 510(c)(1). Section 501(c) states in relevant part that, notwithstanding § 510(a) and (b), a court may, under the principle of equitable subordination, subordinate for purposes of distribution part or all an allowed claim.

---

For purposes of § 510(b), "rescission" is not defined in the bankruptcy code. Black's Law Dictionary defines the term as "[a] party's unilateral unmaking of a contract for a legally sufficient reason, such as the other party's material breach, or a judgment rescinding the contract; voidance." It defines "legal rescission" as "[r]escission that is effected by the agreement of the parties." The plain language of § 510(b) does not distinguish between equitable rescission by a court as a remedy for securities fraud and legal rescission by the parties as a remedy for irreconcilable differences. *In re Seaquest Diving, LP*, 579 F.3d 411, 419 (5th Cir. 2009) (citations omitted) (quoting BLACK'S LAW DICTIONARY 1332 (8th ed. 2004)).

[539] Adv. No. 22-05077, ECF No. 171 at 21.

[540] *But see In re Linn Energy*, 936 F.3d 334, 343 (5th Cir. 2019) (stating that the form of the equity interest is irrelevant if the claimant's interest enabled it to participate in the success of the enterprise and distribution of profits) (citation omitted).

Equitable subordination is a remedial, not penal, measure that should only be granted sparingly. *Matter of U.S. Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994). The Fifth Circuit "established a three-prong test to identify those situations in which equitable subordination is permitted: (1) the claimant must have engaged in some type of inequitable conduct; (2) the conduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) the invocation of equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code." *Id*. Though this three-pronged test appears broad, the Fifth Circuit has largely confined equitable subordination to "three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." *Id*.

The Court found that Dundon engaged in inequitable conduct by granting free advertising to Dundon-owned, controlled, or preferred entities. That said, Trustee has not established that misconduct by Defendants resulted in an injury to the creditors of Debtors or conferred an unfair advantage to Defendants. DDFSP paid $70 million into the League at a time when no other investor was willing to make a substantial commitment to the League. DDFSP's investment enabled the players to be paid for every game played. If DDFSP had not made its investment, the League would have collapsed earlier, and the creditors (including players) who did get paid out of the $70 million would not have received those payments.

Additionally, the Fifth Circuit has determined that there are three generally recognized categories of misconduct by an insider which may warrant subordination: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego. *In the Matter of Fabricators, Inc.*, 926 F.2d 1458, 1467 (5th Cir.

195

1991).

"A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Fabricators, Inc.*, 926 F.2d at 1465. If the claimant is "a sole director, or one of a smaller number vested with certain powers, . . . his acts [are] subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness." *Pepper v. Litton*, 308 U.S. 295, 307 n.14 (1939). Here, Dundon, Zutter, and DCP were all insiders.[541] After February 14, 2019, Dundon and Zutter were in complete control of ESMG and were the only voting board members of ESMG.[542]

Trustee argues the Court should award the Debtors the equitable remedy of subordination pursuant to 11 U.S.C. § 510(c)(1). Dundon is both an insider of and a fiduciary to Debtors. Trustee alleges that Dundon's proven conduct and misconduct meet all the elements courts have considered in awarding such remedies.[543] Trustee alleges Dundon had complete control of the Debtors as of February 14, 2019, (at his insistence), and thereafter he used and abused such control by, among other things, attempting to ready the League in a manner that was advantageous for his long-term gain while he and Zutter denied duly earned vendors payments and required employees to charge league expenses on personal credit cards.[544] Trustee argues that, to the extent Dundon now claims a refund is due for the monies DDFSP transferred to the League, any such refund should be last in line.

The Court did not find that Dundon, who owned and controlled DCP, and Zutter, Dundon's partner in DCP, committed fraud or willful and egregious violations of their fiduciary duties to

---

[541] 11 U.S.C. § 101(31)(B)(iii) states that the term "insider" includes "if the debtor is a corporation" a person in control of the debtor.
[542] FOF ¶ 182.
[543] *See In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 357 (5th Cir. 1997) (outlining the three preconditions to equitable subordination).
[544] FOF ¶ 204.

ESMG. Rather, the Court found that Dundon and Zutter split their loyalties between ESMG and DCP. More importantly, the Court specifically found that although Dundon breached his fiduciary duties by awarding free advertising, such misconduct did not rise to the level of being malicious, egregious, or motivated by an evil motive.

Also, Dundon and Zutter allegedly took actions that were detrimental to AAF's survival, but those actions were permitted under the Term Sheet, as ratified by the ESMG board.[545] The Term Sheet stated that Dundon and Zutter, as controlling members of the ESMG board, were vested with the authority to make all financial decisions for ESMG.[546] Cutting expenses is within Dundon's and Zutter's discretion. While the Court acknowledges that negotiating vendor claims to a reduced amount and then failing to pay them is wrong, the evidence did not show that doing so affected or accelerated AAF's demise. Further, Trustee argues Defendants knowingly denied funding to the League (whether by Dundon, entities Dundon controlled, or third parties) even as Dundon, Zutter, and DCP knew or should have known that the League required funding over and above $70 million.

The Court agrees with Trustee that capital investment *may* have prolonged AAF, but the evidence was clear that after Dundon's investment of $70 million, it would have taken millions of dollars of investment to prolong AAF. Even if Ebersol had been permitted to find further investment, it would not have prevented AAF from collapsing. The Term Sheet provided that Dundon and DCP were to have a preferred stock interest in ESMG (as agreed to by the board). Dundon and Zutter had the authority not to dilute their equity in ESMG. Further, the Court examined all allegations of breach of fiduciary duty and self-dealing and concluded, in all instances but one, that the alleged misconduct was supported by the business judgment standard or was not

---

[545] T-0007.

[546] *Id.*

actionable. Finally, there is no evidence of instrumentality or alter ego between Dundon, Zutter, and Debtors. Accordingly, the Court finds no basis to subordinate Dundon's investment under 11 U.S.C. § 510 (b) or (c).

CONCLUSION

The Court has presided over the jointly administered bankruptcy cases for roughly six years and the instant adversary case for roughly three years. During that time, the Court has made countless findings of fact and conclusions of law, culminating in this Memorandum Opinion. All parties were well represented by competent counsel. Arguments were fully presented, and evidence was fully developed. The credibility of all witnesses has been weighed, and all admitted documents have been evaluated. This matter ultimately was decided on what the Trustee could prove. In doing so, the evidence adduced only supported one claim for relief as discussed in this Memorandum Opinion. Further, there was insufficient evidence to support an award of damages or attorney's fees in this case. The result may be viewed as harsh, but it is appropriate. Trustee was afforded a full trial, and the merits of the Trustee's claim fail but for Count V as noted in this Memorandum Opinion. It is therefore

**ORDERED**, **ADJUDGED**, and **DECREED** that Plaintiff be awarded a take nothing judgment on all counts but for Count V–Breach of Fiduciary Duty against Dundon. As discussed herein, Trustee failed to meet his burden on damages and attorney's fees, and therefore Trustee is awarded nominal damages of $1.00. It is further

**ORDERED** that Defendants prepare a form of judgment consistent with this Court's Memorandum Opinion and file the judgment no later than December 4, 2025. It is further

**ORDERED** that Defendants may request their attorney's fees and costs as permitted under Fed. R. Bankr. P. 7054 and Local Rule 7054-1. It is further

198

**ORDERED**, **ADJUDGED**, and **DECREED** that all other relief is **DENIED**.

# # #