**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 19-50900-cag |
| | § | |
| LEGENDARY FIELD | § | |
| EXHIBITIONS, LLC, et al., | § | |
| | § | Chapter 7 |
| Debtors. | § | |
| ——————————————— | § | |
| | § | |
| RANDOLPH N. OSHEROW, | § | |
| Chapter 7 Trustee, and the Bankruptcy | § | |
| Estates of Legendary Field Exhibitions, LLC; | § | |
| AAF Players, LLC; AAF Properties, LLC; | § | |
| Ebersol Sports Media Group, Inc.; | § | |
| LFE 2, LLC; and We Are Realtime, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Adversary No. 22-05078-cag |
| | § | |
| THOMAS DUNDON; JOHN ZUTTER; | § | |
| and DUNDON CAPITAL PARTNERS, LLC, | § | |
| | § | |
| Defendants. | § | |

**CHAPTER 7 TRUSTEE'S MOTION TO AMEND FINDINGS OF FACT AND
MEMORANDUM OPINION PURSUANT TO FED. R. BANKR. P. 7052 AND 9023**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. AUTHORITY AND POWER TO ENTER ORDER ........................................................ 2

II. PROCEDURAL POSTURE ..................................................................................... 3

III. LEGAL STANDARDS ........................................................................................... 3

IV. ARGUMENT AND AUTHORITIES ........................................................................ 4

    A.   The Court should amend or alter certain findings to reconcile them across the Memorandum Opinion. ....................................................................................... 4

           1.   The Court's findings regarding the Term Sheet (FOF 107, FOF 110, FOF 114, and FOF 172) should be clarified to resolve internal conflicts within the Memorandum Opinion. ........... 4

           2.   The Court should harmonize the Memorandum Opinion's findings regarding the probative value of Dundon's public statements that he invested $250 million into the AAF. .................... 6

           3.   The Court should amend and alter the Memorandum Opinion's promissory-estoppel reliance and contract performance discussions to harmonize them with other parts of the Memorandum Opinion and the record itself. .......................... 7

    B.   The Court should amend or alter certain findings to accurately reflect record evidence. ............................................................................................................. 10

           1.   FOF 150 and FOF 151 should be amended because their categorical record-descriptions are contradicted by admitted exhibits, and the Court's own control findings. .............................. 10

           2.   The "only person/no one else questioned" sentence at page 122 should be corrected because the record contains direct questions from others about the $250/$70 mismatch. ..................... 14

           3.   Finding of Fact 111 should be amended because the record contains multiple non-Ebersol sources reflecting that Dundon communicated a $250 million "commitment" and used "250" as an operative investment reference point. ...................................... 14

           4.   Finding of Fact 167 should be amended because the record includes post-February 24 statements about a $250 million deal and commitment ....................................................................... 16

    C.   The Court should amend or alter certain findings that are not supported by

**record evidence.** ................................................................................................. **17**

**D.**    **The Court should amend or alter certain findings to reflect undisputed facts.18**

    **1.**    **The Court should add findings on contemporaneous valuation evidence and clarify that insolvency is not the same as "zero value."** ................................................................................ **18**

**V. Conclusion** ......................................................................................................... **19**

TO THE HONORABLE CRAIG A. GARGOTTA, CHIEF U.S. BANKRUPTCY JUDGE:

Plaintiff Randolph N. Osherow ("Trustee"), as the Chapter 7 Trustee of the Bankruptcy Estates of Legendary Field Exhibits, LLC, AAF Players, LLC; AAF Properties, LLC, Ebersol Sports Media Group, Inc. ("ESMG"), LFE 2, LLC and We are Realtime, LLC (collectively, "Debtors" and "Plaintiffs"), acting by and through counsel, respectfully moves under Federal Rules of Bankruptcy Procedure 7052 and 9023 (incorporating Federal Rules of Civil Procedure 52(b) and 59(e)) for targeted amendments and clarifications to discrete findings and record-descriptions in the Court's Memorandum Opinion and Order Regarding Plaintiff's First Amended Complaint, entered November 25, 2025 (the "Memorandum Opinion"). ECF No. 437.[1] The relief sought is deliberately narrow. The Trustee identifies discrete internal inconsistencies within the Court's findings and discrete categorical record-description statements that are contradicted by record materials cited or described in the Opinion. The Trustee does not offer new evidence. The Trustee does not seek a rehearing on the merits. The Trustee seeks accurate, internally consistent findings that match the record and that do not rest dispositive inferences on objectively incorrect factual premises.

## I. AUTHORITY AND POWER TO ENTER ORDER

The Court has already determined its authority, core status, venue, and consent posture in the Opinion. The Court found subject matter jurisdiction under 28 U.S.C. § 1334(b), core

---

[1] The Trustee respectfully submits this Motion for the limited purpose authorized by Fed. R. Bankr. P. 7052 and 9023, and to provide the Court a full opportunity to address the discrete matters identified herein. The Trustee expressly preserves, without limitation and to the fullest extent permitted by applicable law, all rights, arguments, objections, and issues that may be asserted in any further proceeding, including any appeal, from the Memorandum Opinion, the Judgment, and any related orders. Nothing in this Motion, and no statement, omission, or framing herein, should be construed as a waiver, forfeiture, concession, stipulation, or abandonment of any position, including with respect to any finding of fact, conclusion of law, evidentiary characterization, legal standard, procedural ruling, or remedy determination addressed or not addressed by the Court.

status under 28 U.S.C. § 157(b)(2)(A), (B), (C), (H), and (K), venue under 28 U.S.C. §§ 1408 and 1409, and consent to entry of a final order and judgment. (Mem. Op., ECF No. 437, at 4.) That same authority permits the Court to amend findings and make additional findings under Fed. R. Bankr. P. 7052 (incorporating Fed. R. Civ. P. 52(b)), and to alter or amend the judgment under Fed. R. Bankr. P. 9023 (incorporating Fed. R. Civ. P. 59(e)).

Rule 52(b), as incorporated, expressly contemplates that when findings are amended or additional findings are made, the Court "may amend the judgment accordingly." Fed. R. Civ. P. 52(b); Fed. R. Bankr. P. 7052. Rule 59(e), as incorporated, provides the vehicle to alter or amend the judgment where the corrected premises require that result. Fed. R. Civ. P. 59(e); Fed. R. Bankr. P. 9023.

## II.  **PROCEDURAL POSTURE**

The Memorandum Opinion was entered on November 25, 2025. ECF No. 437. The Memorandum Opinion directed Defendants to prepare and file a form of judgment no later than December 4, 2025. ECF No. 437, at 198. The Court entered its Judgment on December 5, 2025. ECF No. 439. This motion is filed within fourteen (14) days after entry of the judgment contemplated by the Memorandum Opinion, as required by Fed. R. Bankr. P. 7052 and 9023.

## III.  **LEGAL STANDARDS**

This motion is confined to the purpose the rules allow. Rule 52(b) and Rule 59(e) are not vehicles for a rehearing, a new trial, or a new theory. They are targeted mechanisms to correct manifest errors of law or fact and to bring findings and judgment into alignment with the actual trial record and the Court's own internal determinations. *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207 (5th Cir. 1986); *Templet v. HydroChem Inc.*, 367 F.3d 473 (5th Cir. 2004); *Simon v. United States*, 891 F.2d 1154 (5th Cir. 1990); *Alexander v. Wells Fargo Bank, N.A.*, 867 F.3d 593 (5th Cir. 2017); *Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1989).

## IV. <u>ARGUMENT AND AUTHORITIES</u>

A.     **The Court should amend or alter certain findings to reconcile them across the Memorandum Opinion.**

     1.     **The Court's findings regarding the Term Sheet (FOF 107, FOF 110, FOF 114, and FOF 172) should be clarified to resolve internal conflicts within the Memorandum Opinion.**

The Memorandum Opinion contains findings that, as written, create a reconciliation problem internal to the Court's own factual account about the Term Sheet, independent of any party's characterization.

The Court found that "Zutter… directed that the Term Sheet… cover only $70 million… rather than $250 million and multiple years as Ebersol and Dundon had agreed." **FOF 107.** The Court also found that "[t]he Term Sheet contains the only agreement that any of the parties reached for an investment in the League." **FOF 114.** These findings cannot simultaneously be true as written because **FOF 107** contains an agreement predicate ("had agreed") regarding $250 and multiple years that cannot be squared with **FOF 114** ("only agreement"). The same internal-consistency issue appears because the Opinion states in the Discussion that "There is no question that a contract exists in this case, but the Term Sheet is not the ultimate governing document." **ECF No. 437, at 115.** That statement is difficult to reconcile with a literal reading of **FOF 114** ("only agreement"). This reconciliation problem is compounded by the Term Sheet's own text. It identifies the "Investor" as Dundon Capital Partners LLC and states that it becomes binding only upon execution by the parties to that document; it does not identify or bind DDFSP as a signatory or party. **D-90.**

The inconsistency between **FOF 107** and **FOF 114** is reinforced by the Memorandum Opinion's law-of-the-case discussion regarding the Term Sheet. The Court refused Defendants' attempt to relitigate whether the Term Sheet was a binding written contract, stressed finality, and

declined to allow a "second bite" through this adversary proceeding. ECF No. 437 at 113–15. In the same discussion, the Court drew a distinction that matters here: "There is no question that a contract exists in this case, but the Term Sheet is not the ultimate governing document," while also recognizing the Term Sheet may be considered as evidence of the oral contract the Court found. ECF No. 437 at 115. Read in that context, **FOF 114** must be amended so as to not suggest the Term Sheet was the "only agreement" because that phrase would erase the Court's own contract-versus-Term-Sheet distinction. *Compare* **FOF 114** *with* ECF No. 437 at 115.

The same reasoning requires amendment of **FOF 110** and **FOF 172**. In **FOF 110**, the Court finds that Dundon told Ebersol he had not seen the Term Sheet and reaffirmed that Ebersol had "a deal" directly with him and that the Term Sheet "did not encompass the entirety of their agreement." **FOF 110**. In **FOF 172**, the Court finds that "All discussion between Ebersol and Dundon prior the execution of the Term Sheet constituted negotiations." **FOF 172**. The Trustee requests that the Court harmonize its own findings by (1) adding a sentence acknowledging what **FOF 110** already finds: Dundon contemporaneously represented that the Term Sheet did not capture the entirety of the framework being discussed between him and Ebersol; (2) removing the last sentence of **FOF 172.**.

The inconsistency between **FOF 107**, **FOF 110**, & **FOF 172** and **FOF 114** is material because it affects how later parts of the Memorandum Opinion describe what was agreed, what was negotiated, and what was represented. The record also includes evidence that, following the parties' initial call, Dundon emphasized to Ebersol that the AAF needed a single funder instead of continuing fundraising rounds, a concept Dundon called "series infinity," meaning one comprehensive capital solution. (Trial Tr. Day 2, 147:19–148:3; Trial Tr. Day 6, 48:12–23.) Dundon reiterated the same concept publicly on February 19, 2019, describing "series infinity"

as "done now." (Trial Tr. Day 7, 252:20–253:2; Tr. Ex. 0859; Tr. Ex. 0860.)

The Trustee asks the Court to:

1) amend **FOF 114** so as to not suggest the Term Sheet was the "only agreement";

2) remove the final sentence of **FOF 172**; and

3) amend **FOF 110** by adding a sentence acknowledging what **FOF 110** already finds: Dundon contemporaneously represented that the Term Sheet did not capture the entirety of the framework being discussed between him and Ebersol.

### 2. The Court should harmonize the Memorandum Opinion's findings regarding the probative value of Dundon's public statements that he invested $250 million into the AAF.

The Memorandum Opinion finds Dundon's attempt to explain away the $250 million commitment narrative as a "marketing scheme" was not credible and lacked evidentiary support. ECF No. 437 at 174 (marketing-scheme discussion). The Memorandum Opinion also finds Dundon's "puffery" explanation was "incredulous and lacks credibility." ECF No. 437 at 85 (**FOF 168**). Those findings are material because they remove the primary benign explanations for repeated, consistent $250 commitment statements. And the Memorandum Opinion separately rejects Dundon's effort to dilute the force of those statements: Dundon "repeatedly differentiated between a commitment and an obligation or promise," but the Court found "these semantics woefully unavailing" and treated "commitment" and "promise" as synonyms. ECF No. 437 at 172 n.471 (citing T-0860 at 1; Commitment, BLACK'S LAW DICTIONARY (12th ed. 2024)). Put differently, once the Court has rejected both the "marketing scheme" story and the "puffery/semantics" defense, the remaining record framing should not treat the $250 million narrative as something less than an intentional representation of future funding.

The Memorandum Opinion also contains findings and framing that treat the public statements as lacking corroborative "terms" beyond the $250 million number itself. **FOF 151** states press statements did not corroborate terms of an agreement beyond the amount. ECF

437 at 81 (**FOF 151**). Yet the Court also found statements that include governance and funding representations, including the Rich Eisen statements reflecting control and funding commitment language. ECF No. 437 at 84 (**FOF 163–164**, as referenced); Tr. Ex. 1002.0012.

The Trustee requests that the Court amend findings, so the Opinion accurately reflects what the Court itself found in other findings: some statements included terms or at least representations about control and funding expectations, not merely the number "250." A narrow amendment to **FOF 151** acknowledging that at least some public statements contained governance and funding representations would make the findings internally consistent with **FOF 163–164** and the Rich Eisen transcript. *See* Tr. Ex. 1002.0012.

The Trustee also requests a clarifying finding that, having rejected "marketing scheme" and "puffery" explanations as not credible, the Court's factual findings should describe Dundon's repeated $250 million commitment narrative as intentional representations he chose to make and direct, even if the Court concludes the legal elements of promissory estoppel fail on other grounds. ECF No. 437 at 174; *id.* at 85 (**FOF 168**); Trial Tr. Day 7, 58:3–5; 59:2–10; Tr. Ex. 0052; Trial Tr. Day 8, 205:5–25; 206:19–207:15; Tr. Ex. 0059; Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917; Tr. Ex. 1002.0012. That clarification is especially appropriate in light of footnote 471: the Court has already found that "commitment" carries the ordinary meaning of an "agreement" and a "promise," so the Opinion should not simultaneously (i) reject Dundon's benign explanations and semantic distinctions, yet (ii) describe the $250 million narrative in a way that treats it as inherently less meaningful than a promise to fund. ECF No. 437 at 172 n.471; *id.* at 174; *id.* at 85. **FOF 168.**

### 3. The Court should amend and alter the Memorandum Opinion's promissory-estoppel reliance and contract performance discussions to harmonize them with other parts of the Memorandum Opinion and the record itself.

The Opinion's promissory estoppel analysis rests in part on the premise that Dundon did

not make a $250 million promise "directly to any decision makers of ESMG—stockholders or board directors—besides Ebersol," and it frames the transaction as an "arm's-length" deal formed in "roughly two days through telephone conversations." ECF No. 437, at 174–75. But elsewhere the Opinion assigns decision authority in ways that point in the opposite direction. It states, "If anyone orchestrated the approvals, it was Ebersol," and it further reasons that "ESMG could have issued 75% of fully diluted stock to DCP before or at the same time the board signed its resolution …." *Id.* at 129, 135. At the same time, the Court found that after February 14, Dundon and Zutter "acted, and were treated … as though they were completely in charge of AAF," that Dundon had "actual control … regardless of his formal title," and that AAF could not make significant payments without approval from Dundon, Zutter, or Vanderbilt. **FOF 122**; **FOF 200**; **FOF 209**; *see also* **FOF 117**; **FOF 123**.

Each of these portions of the Memorandum Opinion constitute inconsistent answers to a single factual question: ***who had the operative approval power after February 14?*** Because the Opinion says Ebersol "orchestrated the approvals" (ECF No. 437 at 129), and **FOF 110** finds Dundon's deal-scope assurances were made directly to Ebersol, the promissory-estoppel discussion cannot rely on "besides Ebersol" as a premise that dilutes materiality without reconciling that premise with the Opinion's own findings that (i) Ebersol 'orchestrated the approvals' and (ii) Dundon told Ebersol he had 'a deal' with him beyond the Term Sheet.

First, if "decision makers" as stated in the promissory estoppel discussion includes the person who "orchestrated the approvals," then the statement that no promise was made "directly to any decision makers "besides Ebersol" is misleading because Ebersol is the very actor the Opinion elsewhere describes as able to drive approvals. ECF No. 437 at 129, 174. Conversely, if the operative reality is the one the Court also found—i.e., Dundon and Zutter were treated as

completely in charge, controlled day-to-day business decisions, and held the payment veto—then the "arm's-length/two-day" framing (and the suggestion that ESMG "could have issued" control stock pre-ratification) requires reconciliation with the Court's own control findings. ECF No. 437 at 175, 135; **FOF 117**; **FOF 122**; **FOF 123**; **FOF 200**; **FOF 209**. That reconciliation is also required because the Court's own findings describe a distressed, time-compressed rescue financing—not a conventional, deliberative arm's-length negotiation: on February 13–14 the League faced an immediate payroll cliff and likely collapse absent same-day funding.

The record also contains direct testimony that Ebersol did not believe he had the ability to issue ESMG stock after February 14, 2019, which makes the page-135 "could have issued" sentence particularly in need of a limiting clarification to avoid a speculative premise inconsistent with the record. Trial Tr. Day 4, 74:18–75:8; Trial Tr. Day 4, 46:4–5; 46:23–24; 75:1–4. Consistent with Dundon's testimony, the Term Sheet contemplates Investor-driven approvals, the contemplated equity/control package was treated as driven by DCP's approvals and documentation, not as a unilateral issuance option Ebersol could simply execute." Trial Tr. Day 9, 204:17–205:13; D-90.

In addition, **FOF 193** is a contemporaneous control marker that bears directly on the Opinion. The Court found Dundon admitted that AAF's counsel, Ms. Belt, technically worked for him after he took control on February 14, 2019, and the record also contains Ebersol's testimony that he did not believe he could issue ESMG stock after February 14. **FOF 193**; Trial Tr. 267–268, ECF No. 349; Trial Tr. Day 4, 74:18–75:8. Taken together, those facts support a limiting clarification that a pre-ratification equity issuance was not a practical option available to Ebersol in the post-February 14 control posture the Court found elsewhere. **FOF 193** also sharpens what the Opinion means by "decision makers" once control shifted and supports

reconciling the promissory-estoppel "arm's-length/two-day" framing with the Court's findings that Dundon and Zutter acted as though "completely in charge," Dundon had "actual control," and AAF could not make significant payments without Dundon/Zutter/Vanderbilt approval. **FOF 122**; **FOF 200**; **FOF 209**; ECF No. 437, at 175.

The Trustee therefore requests narrow Rule 52(b) amendments and Rule 59(e) supplementations that brings these portions of the Memorandum Opinion into alignment.

**B.      The Court should amend or alter certain findings to accurately reflect record evidence.**

> **1.      FOF 150 and FOF 151 should be amended because their categorical record-descriptions are contradicted by admitted exhibits, and the Court's own control findings.**

**FOF 150** and **FOF 151** function as a single, interlocking premise underpinning the absence of an oral agreement for $250 million. **FOF 150** acknowledges "references to $250 million in emails involving Dundon or other DCP personnel," but then uses absolute language:

> None of the communications is between DCP or Dundon and ESMG. None of the communications between the parties is contemporaneous with the initial discussions, the negotiation of the term sheet, the minutes of the board meeting, or the shareholder consent reference to $250 million.

ECF No. 437 at 80–81 (**FOF 150**). **FOF 151** builds on that characterization by stating: "The only other evidence of the $250 million deal was statements Dundon made to the press after Ebersol had signed the Term Sheet," limiting those statements to the February 17–24, 2019 window. ECF No. 437 at 81 (**FOF 151**). Read together, these findings describe the record as if the "$250" figure appears only in post-Term-Sheet press statements and not in contemporaneous communications involving ESMG/AAF personnel and DCP personnel. That is not accurate.

The "none/between-the-parties" phrasing in **FOF 150** is factually overbroad and it is conceptually inconsistent with the Court's own findings about who controlled ESMG and AAF during this period. The Court found that after February 14, 2019, Dundon and Zutter "acted, and

were treated … as though they were completely in charge of AAF," and that Dundon had "actual control over ESMG and AAF after February 14, 2019, regardless of his formal title." ECF No. 437 at 73 (**FOF 122**); *id.* (**FOF 200**). The Court also found AAF could not make significant payments without approval from Dundon, Zutter, or Vanderbilt. ECF No. 437 at 92 (**FOF 209**). Under those findings, Dundon and Zutter were not outsiders communicating on February 21. They *were* ESMG—controlling decision-makers the Court found were "completely in charge" and exercising "actual control." **FOF 122**; **FOF 200**. In that posture, a February 21 email chain involving Dundon and Zutter is, by the Court's own logic, a contemporaneous communication occurring inside the controlled enterprise by ESMG and DCP—exactly the opposite of what the categorical "none" phrasing suggests. **FOF 150**; **FOF 122**; **FOF 200**; Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917.

       **FOF 151** likewise requires amendment because it depends on the same categorical narrowing. **FOF 151** states: "The only other evidence of the $250 million deal was statements Dundon made to the press after Ebersol had signed the Term Sheet." ECF No. 437 at 81 (**FOF 151**). That sentence ignores undisputed evidence:

1) Trustee's Exhibit 266 reflects a written underwriting inquiry asking "when the formal agreement regarding the $250M commitment is going to be executed," with a response explaining that "initial term sheet allows … up to $70m" and that timing of a "formal agreement" remained to be determined. Tr. Ex. 266.0001–.0002.

2) Dundon edited talking points and emailed them to Megan Hanson—copying Charlie Ebersol—stating, "The money is in the bank. I'm committed" and "I have committed to investing $250 million into The Alliance of American Football." Trial Tr. Day 7, 58:3–5; 59:2–10; Tr. Ex. 0052; Trial Tr. Day 8, 205:5–25; 206:19–207:15; Tr. Ex. 0059.; Trial Tr. Day 8, 210:9.

3) Across 17 review opportunities, neither Dundon nor anyone on his team questioned, changed, or removed the $250 million commitment figure from drafts of the official press release. Tr. Exs. 0034, 0276, 1418, 1417, 0043, 1420, 0046, 0049, 0041.

4) Internal communications to employees distributed the $250 narrative, and non-media communications to personnel described Dundon's $250 commitment. Tr. Ex. 0008; Trial Tr. Day 11, 7:15–8:5; 12:8–18; Trial Tr. Day 9, 271:8–21.

These record items exist clarify that **FOF 151**'s "only other evidence … was statements … to the press" is not reflective of the trial record. **FOF 151.**

**FOF 151** is also incomplete because it frames the press statements as containing "no statements to the media that corroborate any terms of an agreement" beyond the amount. ECF No. 437 at 81 (**FOF 151**). The record includes contemporaneous public quotations that go beyond the number and speak to duration and sufficiency—i.e., how long the investment would last and whether additional capital would be needed. On February 22, 2019, USA TODAY Sports quoted Dundon stating: "Five years, something like that," in response to how long the investment would sustain the league (Trial Tr. Day 8, 262:9–17; Tr. Ex. 0380.0001); that the league did not "need any capital" (Trial Tr. Day 8, 263:21–264:3; Tr. Ex. 0380.0004); "We have the capital to do whatever we need to do" (Trial Tr. Day 8, 263:13–20; Tr. Ex. 0380.0002); and "I can fund this league." Trial Tr. Day 8, 265:17–20; Tr. Ex. 0380.0004. Those are not complete contract terms. But they are duration-and-sufficiency representations that bear on whether the record supports the Memorandum Opinion's determinations that the media statements corroborate "no" terms beyond the amount. **FOF 151.**

The "series infinity" funding narrative reflected in the record also supports corroboration beyond the amount. Following the parties' initial call, Dundon suggested to Ebersol that AAF needed a single funder rather than continuing fundraising rounds, calling it "series infinity," meaning one comprehensive capital solution. Trial Tr. Day 2, 147:19–148:3; Trial Tr. Day 6, 48:12–23. Both Dundon and Ebersol publicly recounted the same "Series Infinity" funding conversation in the same terms roughly ten days after the deal. The Court found that on February

19, 2019, CBS Sports quoted Dundon telling Ebersol that instead of raising Series A/Series B, "you just raised series infinity … like it's done now." **FOF 156; Tr. Ex. 0859; Tr. Ex. 0860.** NBC Sports/ProFootballTalk likewise quoted Ebersol recounting Dundon's offer—"You can raise Series A, Series B, Series C, or you can raise Series Infinity right now"—and reported, "With a fresh $250 million, there should be no urgency now." **Tr. Ex. 008.0002.** Those contemporaneous accounts corroborate that the "$250million/Series Infinity" narrative was being endorsed in real time, undermining any premise that Dundon first learned of Ebersol's $250-million attribution only when this lawsuit was filed. **FOF 167.**

Accordingly, the Court should amend **FOF 150** to remove the categorical "none" phrasing and to state with precision that no contemporaneous writing memorialized a complete and enforceable $250 million contract term set, while acknowledging that contemporaneous communications during the control period did reference more than just "250" as an operative economic metric and included ESMG/AAF personnel and DCP personnel, including Trial Exhibit 0917. **FOF 150; FOF 122; FOF 200**; Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917. Further, the Court should amend **FOF 151** to remove the "only other evidence … was press statements" phrasing and to clarify that, in addition to press statements, the record includes non-press and internal communications reflecting the $250 commitment narrative, including Trustee's Exhibits 0052, 0059, 0008, 0917, and 266, while maintaining the Court's separate finding that those items do not corroborate a complete set of enforceable $250 million contract terms beyond the amount. **FOF 151**; Trial Tr. Day 7, 58:3–5; 59:2–10; Tr. Ex. 0052; Trial Tr. Day 8, 205:5–25; 206:19–207:15; Tr. Ex. 0059; Tr. Ex. 0008; Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917; Tr. Ex. 266.0001–.0002.

**2. The "only person/no one else questioned" sentence at page 122 should be corrected because the record contains direct questions from others about the $250/$70 mismatch.**

The Opinion states: "It appears to the Court that Ebersol was the only person who asked why the Term Sheet only listed $70 million. No one else questioned Dundon about the larger number …." ECF No. 437 at 122. This factual assertion supports an inference that other relevant actors did not question the discrepancy, which in turn supports downstream conclusions about what was understood and treated as operative in the Court's contract analysis.

That absolute phrasing is contradicted by contemporaneous written questions from others about the $250 million/$70 million mismatch, including (i) an underwriting inquiry asking when the "formal agreement regarding the $250M commitment" would be executed, with a response noting the term sheet allowed contributions "up to $70m" and that any "formal agreement" was TBD (Tr. Ex. 266.0001–.0002), and (ii) PwC's February 25, 2019 email to John Zutter (copying Jeff Vanderbilt and others) stating PwC was "struggling … to connect the dots on the $250M number in the press" and asking whether it was "in addition to the $70M commitment signed a few weeks ago" Tr. Ex. 173.0001 (PwC000945). Those are "questions" about the larger number in writing.

The Trustee respectfully requests that the Court amend the page-122 statement to remove the absolute phrasing and to include the underwriting inquiry as additional facts, so that the inference drawn from the record does not rest on a premise the record contradicts. Trial Tr. Day 8, 253:20–21; 254:15–23; 255:7–12; Tr. Ex. 1355; Tr. Ex. 266.0001–.0002.

**3. Finding of Fact 111 should be amended because the record contains multiple non-Ebersol sources reflecting that Dundon communicated a $250 million "commitment" and used "250" as an operative investment reference point**

**FOF 111** states: "Only Ebersol recalls a discussion of $250 million being the Dundon investment." Even if the Court intended a narrower point—such as that only Ebersol testified

that $250 million was a binding, negotiated contract term—the finding as written is broader. It speaks categorically to whether anyone other than Ebersol "recalls a discussion" of $250 million being Dundon's investment. The trial record contains multiple non-Ebersol sources reflecting that $250 million was communicated as Dundon's commitment and treated as the investment number in internal and operational channels.

1) Dundon also admitted at trial that he made a $250 million commitment to AAF—answering "Yes" and "I was committed" when asked whether he committed $250 million. He further admitted that he told Ebersol he was willing to invest $250 million. Trial Tr. Day 7, 245:8–9; Trial Tr. Day 8, 63:12–15; Trial Tr. Day 7, 182:18–24.

2) On February 21, 2019, Dundon wrote internally, "They [CBS] have to be diluted from here by the 250 or it is not fair," using "250" as the dilution baseline for third-party equity economics. Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917.

3) Dundon told AAF senior executives, including Kellie Vurginic, that he had committed to a $250 million investment. Trial Tr. Day 11, 7:15–8:5; 12:8–18.

4) In an AAF-wide video conference call, Dundon was introduced as the new majority owner and was presented as having committed $250 million in capital. Trial Tr. Day 9, 271:8–21.

5) Dundon edited talking points communicating that "The money is in the bank. I'm committed" and that he had "committed to investing $250 million," and those talking points circulated through management channels. Trial Tr. Day 7, 58:3–5; 59:2–10; Tr. Ex. 0052; Trial Tr. Day 8, 205:5–25; 206:19–207:15; Tr. Ex. 0059.; Trial Tr. Day 8, 210:9.

6) An internal email to all employees distributed media coverage stating that Dundon had invested $250 million. Tr. Ex. 0008.

7) At trial, Dundon further testified that $250 million was "always the number we [DCP] thought it would take." Trial Tr. Day 8, 174:25–175:1.

8) Trustee's Exhibit 266 reflects a written underwriting inquiry asking "when the formal agreement regarding the $250M commitment is going to be executed," with a response explaining that "initial term sheet allows … up to $70m" and that timing of a "formal agreement" remained to be determined. Tr. Ex. 266.0001–.0002.

These record facts are material because they directly contradict **FOF 111**'s assertion that "250" existed only in Ebersol's recollection, or only as a press number, and they bear on the

internal consistency of the Opinion's treatment of the "$250" narrative across **FOF 111** and other Findings and Opinion passages bearing on $250 addressing what was (and was not) reflected outside Ebersol's testimony. (Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917; Trial Tr. Day 8, 174:25–175:1.)

The Trustee asks the Court to correct the overbroad phrasing of **FOF 111** so it accurately states the limited point the Court may have intended while acknowledging the existence of multiple non-Ebersol sources in the record reflecting the $250 commitment narrative and Dundon's contemporaneous internal use of "250" as an operative investment metric. **FOF 111**; Trial Tr. Day 7, 58:3–5; 59:2–10; Tr. Ex. 0052; Trial Tr. Day 8, 205:5–25; 206:19–207:15; Trial Tr. Day 8, 210:9; Tr. Ex. 0059; Trial Tr. Day 11, 7:15–8:5; 12:8–18; Trial Tr. Day 9, 271:8–21; Tr. Ex. 0008; Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917; Trial Tr. Day 8, 174:25–175:1.

Accordingly, the Trustee respectfully requests that the Court amend **FOF 111** to remove the absolute "Only Ebersol" framing and to clarify, in findings-ready language, that Ebersol was the only witness who testified that $250 million was a binding, negotiated contract term, while the record independently reflects that Dundon communicated a $250 million commitment narrative through multiple non-Ebersol channels and used "250" internally as an operative economic reference point. **FOF 111**; Trial Tr. Day 11, 7:15–8:5; 12:8–18; Trial Tr. Day 9, 271:8–21; Trial Tr. Day 7, 58:3–5; 59:2–10; Tr. Ex. 0052; Trial Tr. Day 8, 205:5–25; 206:19–207:15; Trial Tr. Day 8, 210:9; Tr. Ex. 0059; Tr. Ex. 0008; Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917; Trial Tr. Day 8, 174:25–175:1.

### 4. Finding of Fact 167 should be amended because the record includes post-February 24 statements about a $250 million deal and commitment

**FOF 167** states: "After February 24, 2019, there were no new statements from Dundon or Ebersol about a $250 million deal." ECF No. 437, at 85 (**FOF 167**). As written, that

categorical statement conflicts with admitted record evidence reflecting post-February 24 statements framing both the "$250 million" commitment narrative and the control-for-funding tradeoff.

In the February 28, live Rich Eisen interview, Dundon stated that "within 24 hours, we had a deal done," and described the deal as him taking control "in the sense of" putting up the money in exchange for decision-making authority. Tr. Ex. 1002.0012. In the same interview, Eisen asked about committing "a quarter of a billion dollars," asked "You were committed?," and Dundon answered, "Done." Tr. Ex. 1002.0012. Dundon then reinforced the commitment framing by stating, "once I put my name on this, we're going to make this work … This is what I'm committed to doing," and later stated, "we don't have to talk about the money anymore." Tr. Ex. 1002.0013; Tr. Ex. 1002.0020. Dundon also described control as the negotiated tradeoff with Charlie Ebersol—stating that giving up control was something Dundon "had to have" and Ebersol "had to give," and that Ebersol "had choices." Tr. Ex. 1002.0020.

A clarifying amendment is warranted because a categorical temporal finding ("no new statements after February 24") is the type of proposition that can be checked against—and should match—the admitted record excerpts. Here, the record contains multiple post-February 24 statements expressly referencing the "quarter of a billion" commitment narrative and describing the deal structure in commitment/control terms. Tr. Ex. 1002.0012; Tr. Ex. 1002.0013; Tr. Ex. 1002.0020.

**C.  The Court should amend or alter certain findings that are not supported by record evidence.**

The Opinion includes findings describing Dundon as "consistently" maintaining that any commitment to invest up to $250 million was contingent on conditions. ECF No. 437 at 19–20 (as quoted in the Trustee's excerpt). The trial record includes a direct contradiction: Dundon

testified "[t]here were no conditions." Trial Tr. Day 7, 133:5–7. When pressed to identify the supposed conditions, Dundon admitted it would be "impossible to know," and he further testified that he did not know what the "factors" were and did not tell Ebersol "all of those factors," leaving him unable to say what Ebersol would or would not know about any such conditions. (Trial Tr. Day 7, 188:14–23; 188:17–20.) The record further shows he gave inconsistent sworn answers about whether he committed or agreed to invest $250 million, including testimony that he was committed (Trial Tr. Day 7, 245:8–9) and testimony denying he committed $250 million (Trial Tr. Day 7, 126:6–7) as well as denying he had a commitment (Trial Tr. Day 7, 183:22–24). The record also reflects inconsistency about whether he was telling the truth to the media versus telling a story. Trial Tr. Day 9, 257:24–258:1; Trial Tr. Day 7, 129:2–4.

The Trustee requests that any finding stating Dundon "consistently maintained" conditions existed be amended to reflect this record-based inconsistency. Trial Tr. Day 7, 132:22–24; 255:14–22; 133:5–7; 188:17–20.

**D. The Court should amend or alter certain findings to reflect undisputed facts.**

**1. The Court should add findings on contemporaneous valuation evidence and clarify that insolvency is not the same as "zero value."**

The Memorandum Opinion already recognizes contemporaneous valuation evidence with "a basis in fact," including the $115 million valuation used when Lee Bird offered to invest $1 million at that valuation. ECF No. 437 at 45. Separately, the Memorandum Opinion finds Dundon (or his vehicle) invested roughly **$70 million** to obtain control. ECF No. 437 at 194.

Relatedly, the Trustee asks the Court to acknowledge—expressly and in a confined way—the record evidence showing that "250" was used as an operational input in ownership/dilution calculations (including in connection with CBS), without treating that usage as proof of an enforceable $250 million contract. Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917. As

a matter of basic valuation logic, cap-table and dilution modeling is only meaningful if the equity being allocated is treated as having some value (or at least potential value) at the time of the analysis—because a $0 enterprise yields $0 to any percentage holder, making dilution mathematically irrelevant. Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917.

The Trustee respectfully requests the Court add/clarify findings so that the Opinion's damages discussion is anchored to the record evidence of contemporaneous valuation indicia (third-party and transactional) and does not conflate subsequent insolvency with zero value at the time control transferred. ECF No. 437 at 45, 194; Trial Tr. Day 2, 269:17–270:9; Tr. Ex. 1288; Trial Tr. Day 5, 112:22–113:21; 114:14–19; Trial Tr. Day 8, 162:15–17; Tr. Ex. 0917.

## V. <u>CONCLUSION</u>

Accordingly, the Trustee respectfully requests that the Court enter an order granting this Motion under Fed. R. Bankr. P. 7052 and 9023 (incorporating Fed. R. Civ. P. 52(b) and 59(e)) and (i) amending and/or making additional findings of fact to correct the discrete categorical record-description errors and to reconcile the discrete internal inconsistencies identified in this Motion in the Court's Memorandum Opinion and Order (ECF No. 437)—including, where necessary, clarifying the Opinion's treatment of the Term Sheet/oral agreement findings, the "only/none/no one" premises, and the control/authority/reliance framing so the findings accurately reflect the record and are internally coherent—and (ii) amending the judgment accordingly to the extent these corrected and clarified findings require modification of any legal conclusions or relief, and granting such other and further relief as the Court deems just and proper.

Dated: December 19, 2025     Respectfully submitted,

          */s/ Katharine Battaia Clark*
          **Nicole L. Williams** (SBN 24041784)
          **Katharine Battaia Clark** (SBN 24046712)
          **Thompson Coburn LLP**
          2100 Ross Avenue, Suite 3200
          Dallas, Texas 75201
          Phone: (972) 629-7100
          Fax: (972) 629-7171
          nwilliams@thompsoncoburn.com
          kclark@thompsoncoburn.com

          **and**

          **Boris Treyzon** (CA SBN 18893)
          Admitted *Pro Hac Vice*
          **Jonathon Farahi** (CA SBN 324316)
          Admitted *Pro Hac Vice*
          **Abir Cohen Treyzon Salo, LLP**
          16001 Ventura Boulevard, Suite 200
          Encino, California 91436
          Phone: (424) 288-4367
          Fax: (424-288-4368
          btreyzon@actslaw.com
          jfarahi@actslaw.com

          **and**

          **Brian S. Engel** (SBN 00789279)
          **Steve P. Turner** (SBN: (20314700)
          **Barrett Daffin Frappier Turner & Engel, LLP**
          580 La Ventana Blvd.
          Driftwood, Texas 78619
          Phone: (512) 687-2503
          Fax: (512) 477-0008
          brianen@bdfgroup.com
          stevet@bdfgroup.com

          **ATTORNEYS FOR PLAINTIFF**
          **RANDOLPH N. OSHEROW,**
          **CHAPTER 7 TRUSTEE, DEBTORS' ESTATE**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 19, 2025, a true and correct copy of the foregoing document was served to the below listed parties via electronic means as listed on the Court's ECF noticing system or by electronic mail.

*VIA EMAIL*
K&L Gates, LLP
Brent D. Hockaday
1717 Main Street, Ste. 2800
Dallas, TX 75201
brent.hockaday@klgates.com

*VIA EMAIL*
Bell Nunnally & Martin LLP
Jeffrey S. Lowenstein
Beverly A. Whitley
Brent A. Turman
Sydnie A Shimkus
2323 Ross Ave., Ste 1900
Dallas, TX 75201
jlowenstein@bellnunally.com
bwhitley@bellnunnally.com
bturman@bellnunnaly.com
sshimkus@bellnunnally.com

*/s/ Katharine Battaia Clark*
Katharine Battaia Clark